# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

| | |
|---|---|
| ALLIANCE OF HEALTH CARE SHARING MINISTRIES, <br><br> Plaintiff – Appellant, <br><br> v. <br><br> MICHAEL CONWAY, in his official capacity as Commissioner of the Colorado Division of Insurance <br><br> Defendant – Appellee. | Case No. 25-1035 |

On Appeal from the United States District Court, District of Colorado
The Honorable Gordon P. Gallagher
District Judge

District Court Case No. 24-cv-01386-GPG-STV

## RESPONSE IN OPPOSITION TO MOTION FOR INJUNCTION PENDING APPEAL

PHILIP J. WEISER
Attorney General
REED W. MORGAN*
Senior Assistant Attorney General
DANNY RHEINER*
Assistant Solicitor General
PHILLIP KHALIFE*
Assistant Attorney General

Colorado Department of Law
1300 Broadway, 10th Floor
Denver, Colorado 80203
Telephone: 720-508-6349
E-Mail: reed.morgan@coag.gov;
danny.rheiner@coag.gov;
phillip.khalife@coag.gov
*Counsel of Record
*Attorneys for Michael Conway*

## INTRODUCTION

In 2021, health care sharing plans ("Sharing Plans") had more than 40,000 members in Colorado—approximately 27% of Colorado's individual market for health insurance. Nevertheless, prior to 2022, Sharing Plans effectively operated with no regulatory oversight in Colorado. In that vacuum, some Sharing Plans misrepresented their products to consumers, routinely denied or delayed payment on claims, and diverted member contributions to enrich their affiliates and controlling personnel.

In 2022, Colorado enacted House Bill 22-1269 (together, with its implementing regulations, the "Law"). The Law protects consumers. It requires all Sharing Plans operating in Colorado—secular and religious—to make limited disclosures to the state, providing the state and consumers insight into these Sharing Plans' operations, and allowing the Commissioner for the Colorado Division of Insurance to ensure that they are not improperly operating or misrepresenting themselves as insurance plans. The Alliance of Health Care Sharing Ministries' member organizations submitted disclosures under the Law on three occasions over two years before filing this suit.

The Alliance's request for an injunction pending appeal—an extraordinary remedy—should be denied. The district court reviewed "around one thousand pages of evidence" in connection with the parties' briefing on the Alliance's request for a preliminary injunction. Ex.4 at 5, n.3.[1] Based on that record, the district court correctly

---

[1] Citations to exhibits are in Appellant's Appendix, unless otherwise noted.

concluded that "[t]he Alliance has not made a showing—strong or otherwise—that it is likely to succeed on the merits of any of its claims." Ex.3 at 19; *see also* Ex.4 at 7. The Law does not infringe on any First Amendment rights; it is a consumer protection law that requires modest commercial disclosures from all Sharing Plans, secular and religious. And the Alliance's claims of irreparable harm are belied by the fact that its members have, on multiple occasions, already made disclosures under the Law. Finally, the balance of equities and public interest weigh in the Commissioner's favor because the Law is a critical consumer protection measure.

## BACKGROUND

### A. Sharing Plans pose unique risks to Colorado consumers.

Sharing Plans saw substantial growth after the passage of the Affordable Care Act ("ACA") in 2010, driven by the fact that membership in a Sharing Plan often comes at a lower monthly cost than traditional health insurance. Dkt.46-1[2], Ex.1 (Declaration of Kate Harris) ("Harris Decl.") at ¶7. Any upfront savings comes with significant backend risks, however. *Id*. ¶8. Sharing Plans do not guarantee reimbursement of health expenses, as they rely on voluntary contributions from other members. *Id.* Sharing Plans are not subject to the ACA requirement that insurance plans spend at least 80% of premiums paying out claims. *Id.* They also commonly exclude coverage for many items that ACA-compliant insurance plans are required to cover, including pre-existing conditions, pregnancy, substance use disorder treatment, family planning services, mental health treatment, and

---

[2] Enclosed as Exhibit AA in the appendix filed with this response.

cancer treatments. *Id.* Unlike ACA-compliant insurance plans, Sharing Plans may deny repayment based on ethical, moral, or religious principles. *Id.; compare* § 10-16-113, C.R.S. (2025) (claim denial procedures for insurance plans).

Beginning in 2018, the Division of Insurance (the "Division") began receiving consumer complaints about Sharing Plans. Harris Decl. ¶¶9-13. The Division's consumer protection concerns were augmented by warnings issued and enforcement actions taken by other state regulators. *Id.*, ¶¶17-23, 29-30, 33-42. These concerns included Sharing Plans (1) offering incentives to insurance producers and agents, who would aggressively market the plans to consumers; (2) distributing misleading marketing materials, which made consumers believe that Sharing Plans offered standard insurance benefits at less cost, without indicating that Sharing Plans lacked many of the required protections of traditional insurance; and (3) refusing or delaying payment on claims in contravention of consumers' expectations. *Id.*, ¶10; *see also id.,* ¶9, 11-13.

In August 2019, the Division issued cease and desist orders to two Sharing Plan entities, Aliera Healthcare ("Aliera") and Trinity Healthshare ("Trinity"), because Trinity was operating as an unlicensed insurance company and Aliera was marketing and administering Trinity's products in Colorado. *Id.*, ¶14. Many states took similar actions against Aliera and Trinity. *Id.*, ¶¶17-23. Despite promising to pay claims, Aliera and Trinity only paid out a small portion of fees collected from members—8% to 35%, depending on the plan. *Id.*, ¶19. Instead of paying claims, Aliera and Trinity siphoned members' contributions and made improper payments to their corporate officers. *Id.*, ¶21. Aliera and Trinity later reported that they could pay only between 0-10% of nearly a billion dollars'

worth of their members' claims. *Id.*, ¶¶24-25. This misconduct affected not only Colorado consumers enrolled in Trinity plans, but also Colorado consumers enrolled in Sharing Plans offered by OneShare Health (an Alliance member) that were administered by Aliera. *Id.*, ¶¶26-28.

State and federal governments took enforcement actions against other Sharing Plans for deceptive representations and unauthorized operations as insurers, including fraudulent schemes that "cheated hundreds of members" of their contributions. Harris Decl. ¶34. An Alliance member that operates in Colorado, Liberty Healthshare, engaged in similar conduct, diverting millions of dollars in funds contributed by its members to its corporate affiliates and senior officers. *Id.*, ¶¶35-36.

In December 2020, the Division issued an advisory to Colorado consumers about the limitations of Sharing Plans. *Id.*, ¶31. Many states issued similar warnings. *Id.*, ¶30.

States have taken a variety of regulatory approaches to protect consumers from risks posed by Sharing Plans. *See* Mot. at 4. Colorado is not the first state to require reporting from Sharing Plans. *Id.,* ¶¶56-58 (discussing Massachusetts' reporting requirements that went into effect in January 2020).

**B. Colorado enacted the Law to protect consumers from the risks posed by Sharing Plans.**

Traditional insurance companies are subject to significant oversight and reporting requirements in Colorado. Harris Decl. ¶¶62-76. In contrast, before 2022, Sharing Plans in Colorado were not subject to any oversight or reporting requirements. *Id.*, ¶¶44-45. In

2022, Colorado enacted HB22-1269, which imposes modest reporting requirements on Sharing Plans. *Id.*, ¶¶44-49. Similar bills failed in 2020 and 2021. *Id.,* ¶46.

This legislation was motivated by the pressing consumer protection concerns articulated above, rather than by religious animus. *Id.*, ¶¶44-61. HB22-1269's sponsor noted that Sharing Plans have "minimal oversight," so the Law "requires [Sharing Plans] to submit some basic, routine information to the Division of Insurance about how they operate[.]" *Id.*, ¶51.[3] The disclosures were intended to "promote a necessary level of transparency" and "discourage misconduct," including by making "sure the programs can provide coverage to their members, and help the programs keep their advertising honest and clear." *Id.*, ¶51. But the Law does not otherwise "impact the way these arrangements operate," because "[t]hese programs may work for some people, particularly those for whom health sharing aligns with their deeply held religious beliefs." *Id.* Religious entities, including religious Sharing Plans, supported the bill. *Id.*, ¶¶53-55.

Even the Alliance and one of its members recognized that oversight of Sharing Plans was necessary. They testified in support of an alternate bill, HB22-1198, that would have required reporting to the Attorney General, rather than the Division.[4] *Id.*, ¶¶47-48.

---

[3] *See* Health-care Sharing Plan Reporting Requirements: Hearing on HB22-1269 Before the H. Comm. on Health & Insurance (April 1, 2022) (statement of Rep. Susan Lontine), https://tinyurl.com/mcyx46up (12:23:45-12:26:44).

[4] The Alliance testified HB22-1198 provided "robust authority" to regulate "bad actors" among Sharing Plans, and supported that authority in the hands of the Attorney General, rather than the Division of Insurance. See Health-care Sharing Plan Reporting Requirements: Hearing on HB22-1269 Before the H. Comm. on Health & Insurance (April 1, 2022) (Statement of Katy Talento) https://tinyurl.com/mcyx46up (4:41:15-4:42:20).

In addition to the reporting requirements, the alternate bill would have regulated Sharing Plans' communications with members, required Sharing Plans to report financial and transactional information to members, submit to financial audits, and publicly post information on their website regarding their plan, membership requirements, program materials, and the annual financial audit. *Id*. The alternate oversight bill, however, failed. *Id.*, ¶49.

### C. The Law's disclosures address the risks posed by Sharing Plans.

The Law is designed to shed light on Sharing Plans' operations and does so by requiring reporting on specific, tailored categories:

- **Membership Numbers.** The Law requires a Sharing Plan to report on the number of its members in Colorado and nationally. §§ 10-16-107.4(1)(a)(I)-(III), (XII)-(XIV), C.R.S. (2025); 3 Colo. Code Regs. § 702-4:4-10-01(5)(A)(1)(a) (2025). This allows the Commissioner to understand the number of people who do not have health insurance coverage in the state, as well as which Sharing Plans are operating in Colorado and the extent of their operations. This information also sheds light on how much a Sharing Plan's business may depend on Colorado consumers.

- **Financial Health and Corporate Disclosures**. The Law requires various financial disclosures, including total contributions received by a Sharing Plan from Colorado consumers and the total value of claims submitted, approved, denied, paid, and approved but not paid. § 10-16-107.4(1)(a)(V)-(XI), C.R.S.; 3 C.C.R. § 702-4:4-10-01(5)(A)(1)(a). It also requires basic corporate information, including a contact person, affiliated companies, and an organizational chart. § 10-16-107.4(1)(a)(XVIII)-(XX), C.R.S.; 3 C.C.R. § 702-4:4-10-01(5)(A)(1)(d). Given the demonstrated concerns relating to various Sharing Plans' financial solvency and direction of member payments to fund corporate salaries rather than pay out claims, these disclosures allow Colorado to monitor Sharing Plans' financial health, understand their corporate structure, and evaluate whether a Sharing Plan is following through on its commitments to its members.

- **Marketing.** The Law also seeks information to confirm that a Sharing Plan is marketing in a way that is not misleading. § 10-16-107.4(1)(a)(XVII), C.R.S.; 3 C.C.R. § 702-4:4-10-01(5)(A)(1)(c). These disclosures of advertising materials directly address the validated consumer protection concerns relating to consumers'

confusion about whether a Sharing Plan is insurance and what rights the consumers may have to receive coverage.

- **Commercial Third-Party Affiliates.** The Law seeks to identify third parties that a Sharing Plan contracts with to form provider networks, as well as insurance brokers that a Sharing Plan engages with to market its products. §§ 10-16-107.4(1)(a)(IV), (XV), and (XVI), C.R.S.; 3 C.C.R. § 702-4:4-10-01(5)(A)(1)(a). These commercial relationships—provider networks and contracted insurance brokers—are indicative of traditional insurance arrangements subject to broader regulatory authority by the Division. These disclosures also help the Division put consumers on notice, through the annual report, that licensed insurance producers may attempt to market non-ACA compliant Sharing Plans to Colorado consumers. These disclosures therefore help Colorado both monitor the operations of the Sharing Plans to ensure they are not engaged in the business of insurance, while simultaneously ensuring consumers are not confused and are on notice about the limits of these arrangements compared to traditional insurance.

Harris Decl. ¶59.

The Legislature drafted the Law to shed light on Sharing Plans' operations and finances with respect to the unique risks they pose to members. The Law does not ban Sharing Plans. And it does not interfere with their non-commercial activities, such as how they engage in religious messaging or achieve religious objectives.

Because the Law is designed to provide information about Sharing Plans, it is appropriately tailored to achieve that informational interest and does not regulate in ways that do not advance that interest. For example, it does not broadly subject Sharing Plans to all Colorado insurance laws. In fact, the Law pales in comparison to regulation of traditional health insurers. Insurers are subject to extensive, ongoing examinations of their finances, claims handling, plan designs, and other business activities. Harris Decl. ¶¶61-76. This substantial regulation acknowledges the acute risks inherent in the

insurance industry, including the harms suffered by insureds when an insurance company fails to pay claims.

### D. The Commissioner properly implemented the Law.

Sharing Plans, including the Alliance's members, have made disclosures under the Law on three occasions since its passage, including in December 2022, March 2023, and May 2024.[5] Dkt.46-1, Ex.2 (Declaration of Leilani Russell) ("Russell Decl.") at ¶34. Once Sharing Plans report information to the Division, the Law requires the Commissioner to publish an annual report summarizing the information. § 10-16-107.4(3), C.R.S. Despite some incomplete data submissions from Sharing Plans, these reports have provided key data regarding their operations in Colorado, including that around 60,000 Coloradans are current members of Sharing Plans; that Coloradans contributed between $78 and $97 million annually in 2021 and 2022 to Sharing Plans; and Sharing Plans' extensive use of insurance producers to recruit and enroll new members. *Id.*, ¶46.

### E. Procedural history of this litigation.

HB22-1269 was enacted in June 2022. Nearly two years later, in May 2024, the Alliance filed this lawsuit and its Motion for Preliminary Injunction, seeking to disrupt

---

[5] On June 5, 2024, the Commissioner offered to withhold any enforcement activity against the Alliance during the pendency of the motion for preliminary injunction so that the Commissioner could obtain an extension on its response to the motion in order to conduct expedited discovery relating to the motion. The Commissioner made that offer to avoid any claim that the Alliance would be prejudiced by the extension due to the May 2025 reporting deadline. Dkt.22 at 4-5.

the status quo. The Commissioner's opposition to the Alliance's requested preliminary injunction was supported by more than 70 exhibits, totaling nearly 800 pages. *See* Dkt.46-1. These records conclusively demonstrate that HB22-1269 was enacted to protect Colorado consumers from unique risks posed by Sharing Plans, and not due to any religious animus. In January 2025, the district court issued a comprehensive 66-page order denying Plaintiffs' Motion for Preliminary Injunction. Ex.3.

The Commissioner has produced more than 20,000 pages of documents in response to discovery in this litigation. Declaration of Reed W. Morgan at ¶2.[6] The Alliance relies on just two of those documents in an effort to support its requested injunction. Ex.1. As the district court aptly concluded, the Alliance misconstrues these documents—they are fully consistent with the well-established record considered by the district court in denying the preliminary injunction—and neither support the Alliance's requested injunction pending appeal. Ex.4 at 5-7.

## ARGUMENT

### I. Legal standard for an injunction pending appeal.

In ruling on a motion for injunction pending appeal, the Court "makes the same inquiry as it would when reviewing a district court's grant or denial of a preliminary injunction." *Homans v. City of Albuquerque*, 264 F.3d 1240, 1243 (10th Cir. 2001). The Court considers (1) the likelihood of success on appeal; (2) the threat of irreparable harm

---

[6] Enclosed as Exhibit BB in the appendix filed with this response.

if the injunction is not granted; (3) the absence of harm to opposing parties if the injunction is granted; and (4) any risk of harm to the public interest. 10th Cir. R. 8.1.

Disregarding this authority, the Alliance argues that it is entitled to relief if it can show a "serious question" going to the merits—a "lower" standard than showing a likelihood of success. Mot. at 13. The district court correctly rejected this argument. Ex.4 at 3. This "relaxed standard" is not the law of the Tenth Circuit; rather the court "must consider, based on the preliminary record, whether the district court abused its discretion and whether the movant has demonstrated a clear and unequivocal right to relief." *Homans*, 264 F.3d at 1243; *see also High Plains Harvest Church v. Polis*, 835 F.App'x 372, 373 (10th Cir. 2020).

Injunctions that change the status quo are disfavored and require the movant to satisfy an even heavier burden of proof. *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019). In seeking such an injunction, the movant must "make[] a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1071 (10th Cir. 2009).

## II. The Alliance is not likely to prevail on the merits of its appeal.

### A. The Law does not violate the Free Exercise Clause.

"[T]he right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability . . . .'" *Emp. Div. v. Smith*, 494 U.S. 872, 879 (1990) (citation omitted).

### 1. The Law is generally applicable.

"A law is not generally applicable if it 'invite[s] the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Fulton v. Philadelphia*, 593 U.S. 522, 533 (2021). In *Fulton*, the Court held that the City's nondiscrimination requirement in its foster care contract was not generally applicable because the contract expressly permitted "exception[s] granted by the Commissioner or the Commissioner's designee, in his/her sole discretion." 593 U.S. at 535 (quoting the contract). The Court explained that creating this mechanism for granting exceptions "'invite[s]' the government to decide which reasons for not complying with the policy are worthy of solicitude." *Id*. at 537. Similarly, a state unemployment compensation statute that generally disqualified applicants from receiving benefits if they refused suitable work, but permitted exceptions for applicants deemed to have "good cause," "created a mechanism for individualized exemptions" because it required courts to consider "the particular circumstances" for an applicant's refusal of suitable work. *Smith*, 494 U.S. at 884 (distinguishing *Sherbert v. Verner*, 374 U.S. 398 (1963)).

The Law applies to Sharing Plans, defined as "[a] person not authorized . . . to offer insurance in this state that offers . . . a plan or arrangement to facilitate payment or reimbursement of health-care costs or services." § 10-16-107.4(1), C.R.S. The Alliance argues that the Law is not generally applicable because the statute empowers, and the Division has exercised, exemptive authority for *other* consumer payment arrangements. Mot. at 15-16. But the district court correctly rejected this argument, noting that the Law

11

does not grant an "individualized exemption" for any person or group or invite the Commissioner to "consider whether individuals persons' beliefs are worthy . . . of solicitude." Ex.3 at 29. Instead, it "simply delegates rulemaking authority to a public official—that is, it permits a public official to create categorical exclusions for types of arrangements that do not implicate [law]'s underlying policy objectives and concerns." *Id.*

Sharing Plans have a unique collection of features that distinguish them from other arrangements cited by the Alliance, including monthly payments, a comprehensive benefits-like package to members, and a formal arrangement involving third parties who help facilitate payment of health care costs or services on an individual's behalf. Harris Decl. ¶79. Therefore, the Commissioner did not exercise discretion to exempt consumer payment arrangements from the Law's requirements. Instead, he simply followed the Legislature's mandate to promulgate rules clarifying that such arrangements do not meet the definition of Sharing Plan. § 10-16-107.4(5)(b), C.R.S.

The district court correctly found that the email chain highlighted by the Alliance (Mot. at 22) is fully consistent with this analysis. It does not "discuss[] how . . . to exempt a particular favored entity," rather it "reflect[s] a . . . general intent not to subject charitable organizations to the [] Law, because they do not pose the same consumer risks" as Sharing Plans. Ex.4 at 5-6.[7]

---

[7] The Alliance claims the document confirms that Colorado "discussed using its exemptive authority to selectively protect secular 'good guys' (*see* **Ex. 1.B.)** while ensuring the ministries receive harsh treatment." Mot. at 17. In fact, it was a lobbyist who

Next, the Alliance argues the Law is not generally applicable because "Colorado fails to subject and indeed explicitly exempts at least eight numerous [sic] comparable secular activities from the burdens imposed on health care sharing ministries." Mot. at 17. In *Tandon,* the Supreme Court held that California's COVID restrictions were not generally applicable because the restrictions "treat[ed] some comparable secular activities more favorably than at-home religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam). However, the Alliance has failed to show that these entities pose a similar risk to consumers as Sharing Plans. *See id.* ("[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue," specifically, "the risks various activities pose.").

The district court correctly held that Sharing Plans are unique from each of the allegedly comparable secular arrangements identified by the Alliance (Mot. at 17-18) because Sharing Plans are the only one of these arrangements in which third parties solicit monthly payments (akin to premiums) while holding themselves out as offering comprehensive benefits packages (akin to insurance plans) and promising to facilitate payments for member's healthcare costs (akin to insurance claims). Ex.3 at 29-31; *see also* Harris Decl. ¶79. The complaints the Division received before Colorado enacted the Law illustrate that consumers were confused by sharing plans' insurance-like features, on several occasions mistaking these plans for traditional, comprehensive insurance plans.

referred to "charitable entities" as "good guys." And the fact that a lobbyist referred to such entities as "good guys" does not undermine the district court's analysis.

*See supra* Background, A. The district court therefore correctly held that the Law is generally applicable because "[t]here is no evidence that any of the excepted arrangements pose similar consumer confusion risks." Ex.3 at 30.

The Alliance argues that "courts have treated far more disparate activities as comparable than the Alliance proposes here." Mot. at 18. However, this argument does not address the risks posed by those entities. Therefore, the Alliances fails to show that the district court applied *Tandon* improperly. Similarly, the Alliance cites CrowdHealth as an example of a crowdfunding relationship that is "exactly the same relative to insurance as" Sharing Plans, minus the religious belief. Mot. at 18. But despite its misleading name, CrowdHealth is *not* crowdfunding, but rather a Sharing Plan, and the Division has repeatedly notified CrowdHealth—including before this litigation commenced—that it is subject to the Law. Second Declaration of Leilani Russell, Exs. A-C.[8]

### 2.    The Law is neutral.

"[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). Evidence of a law's impermissible religious hostility may be found in its text or legislative history, or in the background circumstances that gave rise to the law. *See id.* at 533-34. As discussed above, the Reporting Law's text, legislative history, and background circumstances make clear that it sought to protect consumers, not to suppress religious practice. *See supra* Background, A-C.

---

[8] Enclosed as Exhibit CC in the appendix filed with this response.

The Law also does not establish an impermissible "religious gerrymander." *Id.* at 535. The Law regulates Sharing Plans regardless of their religious or secular nature. For example, one plan subject to the Law, Knew Health, "accept[s] everyone, regardless of . . . religious affiliations." Dkt.46-1, Ex. 2 (Russell Decl.), ¶¶ 25-28. Similarly, CrowdHealth—which is subject to the law, as detailed above—has no religious affiliation. CROWD HEALTH, *Member Guide*, https://www.joincrowdhealth.com/resources/member-guide. Any "adverse impact" of the Law therefore reflects not "impermissible targeting," but instead the government's "legitimate concern" in addressing "a social harm." *See Lukumi,* 508 U.S. at 535; *Chiles v. Salazar,* 116 F.4d 1178, 1223 (10th Cir. 2024) (even if law disproportionately affected practitioners with religious practices, it was neutral where its focus was "not on restricting religious practice, but on preventing the harmful impact" of regulated conduct).

The Alliance argues that the Law is not neutral because "the Commissioner himself conspired with the John Oliver show—a well-known anti-religious entertainer—to denigrate the ministries." Mot. at 19. However, as the district court noted, the "obvious innocent explanation" for this was that Oliver, with his large popular following, could use his platform to advise consumers of health sharing plans' documented risks, not so that they could express their disapproval of the religious beliefs and religious practices of sharing ministries." Ex.4 at 6. Thus, the Division's communications with the John Oliver show do not demonstrate a lack of neutrality.

The Alliance makes a number of other arguments as to why the Law is not neutral (Mot. at 19-20) but it fails to develop those arguments. *See A Brighter Day, Inc. v. Barnes*, 860 F. App'x 569, 575 (10th Cir. 2021) (noting that "a 'perfunctory' paragraph of argument" is underdeveloped). This is not enough to overcome the district court's well-reasoned conclusion that "[t]he Alliance has not shown that the Reporting Law targets religious exercise as its object or imposes reporting requirements on sharing plans *because* of the religious nature of some of the entities that market them." Ex.3 at 28 (emphasis in original).

In sum, the law is neutral because "Colorado's legislature and regulators imposed the Reporting Law to address legitimate consumer protection concerns—not to target religious exercise." *Id.* at 26.

Because the law is neutral and generally applicable, it is subject to rational basis review, which it easily satisfies. *See Lukumi*, 508 U.S. at 531. The Law was designed to achieve a legitimate government interest: shedding light on Sharing Plans' operations given the unique risks they pose to members. *See supra* Background, A-B. The Law is rationally related to that interest. *See supra* Background, C.

**B.      The Law does not violate the Establishment Clause.**

In *Lemon v. Kurtzman,* the Supreme Court adopted several tests for determining when the government violates the Establishment Clause. 403 U.S. 602 (1971). The Alliance invokes one particular *Lemon* test—that the government may not cause "excessive government entanglement with religion." 403 U.S. 602, 613 (1971). In *Kennedy v. Bremerton Sch. Dist.,* 597 U.S. 507, 534 (2022), the court "abandoned"

*Lemon* and at least some of its Establishment Clause tests. Dkt.46 at 20-21. In place of those tests, the Court directed that the Establishment Clause "must be interpreted by 'reference to historical practices and understandings.'" *Kennedy,* 597 U.S. at 535.

Ignoring the question of whether *Kennedy* supplanted *Lemon*'s "excessive entanglement" test with a "historical practices" test, the Alliance argues only that the Law is unconstitutional under the "excessive entanglement" analysis. Mot. at 20-23.[9] The district court correctly rejected this argument. Ex.3 at 32-40.

"Interaction between church and state is inevitable [], and [courts] have always tolerated some level of involvement between the two." *Agostini v. Felton,* 521 U.S. 203, 233 (1997). While government regulations that require "pervasive monitoring by public authorities" can create excessive entanglement, *id.*, "generally applicable administrative and recordkeeping regulations may be imposed on religious organization without running afoul of the Establishment Clause," *Jimmy Swaggart Ministries v. Bd. of Equalization,* 493 U.S. 378, 395 (1990) (citations omitted).

The Court has repeatedly found challenged administrative and recordkeeping regulations to be permissible under the Establishment Clause, including:

- A sales tax, which applied to sales of religious materials and was assumed to impose "substantial administrative burdens" on religious entities. *Id.* at 394-95.

- Government monitoring of public funds used in parochial schools, including monthly surprise site visits and close contact between administrative personnel for the public and parochial school systems. *Agostini*, 521 U.S. at 233-35.

---

[9] The law is constitutional under the "historical practices" test for the reasons previously articulated by the Commissioner. *See* Dkt.46 at 23.

- Recordkeeping requirements of the Fair Labor Standards Act, despite being "burdensome in terms of paperwork." *Tony & Susan Alamo Found. v. Sec'y of Labor,* 471 U.S. 290, 305-06 (1985).

- Government review of adolescent counseling programs established by religious institutions that are grant recipients, involving review of materials and periodic site visits. *Bowen v. Kendrick*, 487 U.S. 589, 615-17 (1988).

The Law is a generally applicable administrative and recordkeeping regulation. The fact that the Law imposes some "paperwork" burdens—even if those amounted to "substantial administrative burdens," of which there is no evidence[10]—does not render a generally applicable statute an "excessive entanglement" under *Jimmy Swaggart* and *Tony & Susan Alamo Found.* While the Alliance claims the Law involves "long-term, continuing monitoring," any monitoring required by the Law is less continuous and less intrusive than the monthly unannounced onsite visits approved by *Agostini* and on par with the government review of materials approved by *Bowen*.

Neither *Medina v. Catholic Health Initiatives*, 877 F.3d 1213 (10th Cir. 2017), nor *Church of Scientology v. City of Clearwater*, 2 F.3d 1514 (11th Cir. 1993), holds otherwise. *See* Mot. at 21-22. Recognizing that "long-term, continuing monitoring" could constitute excessive entanglement, *Medina* simply held that an exemption from ERISA for church benefit plans avoided such entanglement. 877 F.3d 1233-34. And the Eleventh Circuit in *Church of Scientology* relied on *Aguilar v. Felton,* 473 U.S. 402 (1985), for its

---

[10] The Alliance's motion argues the "uncontroverted record" is that its members "each spend about 200 hours in attempting to comply with Colorado's regime." Mot. at 23. But aside from its declaration, the Alliance failed to provide any documentation substantiating its concerns about employee burdens. And the Alliance undermines its claimed employee burdens by admitting that much of information is "largely already share[d] publicly . . . ." Mot. at 10.

analysis of the "close" and "detailed" monitoring to support its finding of excessive entanglement. 2 F.3d at 1536. But the Supreme Court in *Agostini* later overruled *Aguilar,* finding that what it had earlier deemed "close" and "detailed" monitoring was in fact permissible under the Establishment Clause. 521 U.S. at 235.

The district court correctly concluded that the Law, which requires only an annual submission of "high-level and basic business information," does not entail detailed monitoring or close administrative contact between Colorado and the Sharing Plans. Ex. 3 at 40. The Alliance cannot prevail on its Establishment Clause claim.

## III.    The Alliance will not suffer irreparable harm if the injunction is denied.

Sharing Plans, including the Alliance's member organizations, made disclosures under the Law on three occasions: December 2022, March 2023, and May 2024. Russell Decl. ¶34. Despite filing this action nearly two years after enactment of the Law, the Alliance is unable to demonstrate burdens to the Sharing Plans from any of the prior reporting periods. *See infra* at n.11. The Alliance cannot satisfy its heavy burden to disrupt the Law's status quo with an injunction. *Beltronics USA, Inc.,* 562 F.3d at 1071.

## IV.    The balance of equities and public interest weigh against an injunction.[11]

Colorado's Legislature demonstrated what it believes to be the public interest by passing HB22-1269. *See Fish v. Kobach*, 840 F.3d 710, 755 (10th Cir. 2016) ("our democratically elected representatives are in a better position than this Court to determine the public interest"). The Law safeguards the public against harm, and the Alliance has

---

[11] Here, the third and fourth factors for injunctive relief merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

failed to substantiate any purported harms its members would suffer from its continued operation. Therefore, this factor also weighs against an injunction pending appeal. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.")

## V. Expedited consideration is not warranted here.

Alternatively, the Alliance argues that "this Court should expedite consideration of this appeal." Mot. at 24. The Commissioner opposes this request. Each of the Alliance's member organizations have made disclosures under the Law on three occasions starting in 2022. The upcoming March 1, 2025 reporting deadline does not justify a departure from normal deadlines and procedures.

## CONCLUSION

This Court should deny the motion.

Dated: February 18, 2025        PHILIP J. WEISER
                                Attorney General

                                s/ *Reed W. Morgan*
                                Reed W. Morgan, Senior Assistant Attorney General*
                                Danny Rheiner, Assistant Solicitor General*
                                Phillip Khalife, Assistant Attorney General*
                                Office of the Attorney General
                                1300 Broadway, 8th Floor
                                Denver, CO  80203
                                Telephone:  720-508-6000
                                Email: Reed.Morgan@coag.gov
                                Danny.Rheiner@coag.gov
                                Phillip.Khalife@coag.gov
                                *Attorneys for Defendant – Appellee*
                                *Counsel of Record

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

1. This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this motion contains 5,198 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface (thirteen-point Times New Roman) using Microsoft Word.

Date: February 18, 2025.

*s/      Reed W. Morgan*
