**IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

| | |
|---|---|
| ALLIANCE OF HEALTH CARE SHARING MINISTRIES, <br><br> Plaintiff – Appellant, <br><br> v. <br><br> MICHAEL CONWAY, in his official capacity as Commissioner of the Colorado Division of Insurance <br><br> Defendant – Appellee. | Case No. 25-1035 |

On Appeal from the United States District Court, District of Colorado
The Honorable Gordon P. Gallagher
District Judge

District Court Case No. 24-cv-01386-GPG-STV

**APPENDIX TO RESPONSE IN OPPOSITION TO MOTION FOR INJUNCTION
PENDING APPEAL**

| No. | DESCRIPTION | DATE |
|---|---|---|
| AA | *Alliance of Health Care Sharing Ministries v. Conway*, No. 1:24-cv-01386-GPG-STV (D. Colo.), Dkt. 46-1, Appendix of Exhibits | 9/3/2024 |
| BB | Declaration of Reed Morgan | 2/18/2025 |
| CC | Declaration of Leilani Russell | 2/18/2025 |

# Exhibit AA

# <u>Respondent's Appendix</u>

## Response to Plaintiff's Motion for Preliminary Injunction

## September 3, 2024

**EXHIBIT**

**AA**

**ALLIANCE OF HEALTH CARE SHARING MINISTRIES**

**vs**

**MICHAEL CONWAY, COMMISSIONER OF INSURANCE**

Index of Exhibits to Response to Motion for Preliminary Injunction

| Ex. No. | Name |
| --- | --- |
| 1 | Declaration of Kate Harris (2024.08.30) |
| 1.1 | Children's Hospital complaint (2019.08.13) |
| 1.2 | Complaint (267210-2019) |
| 1.3 | Complaint (271626-2020) |
| 1.4 | Complaint (266367-2019) |
| 1.5 | Complaint (276680-2021) |
| 1.6 | Complaint (277885-2021) |
| 1.7 | Complaint (278502-2022) |
| 1.8 | Complaint (279673-2022) |
| 1.9 | Complaint (281368-2022) |
| 1.10 | Complaint (264831-2018) |
| 1.11 | Complaint (265047-2018) |
| 1.12 | Complaint (268433-2019) |
| 1.13 | Aliera Healthcare - Appeal Response February 2019 |
| 1.14 | Complaint (268833-2019) |
| 1.15 | Complaint (269679-2019) |
| 1.16 | Complaint (271355-2020) |
| 1.17 | Complaint (273778-2020) |
| 1.18 | Complaint (275178-2021) |

Index of Exhibits                                                                    1

| 1.19 | Complaint (275763-2021) |
|------|--------------------------|
| 1.20 | Complaint (276239-2021) |
| 1.21 | Complaint (277886-2021) |
| 1.22 | Trinity Healthshare - Colorado Cease and Desist Order |
| 1.23 | Aliera Healthcare - Colorado Cease and Desist Order |
| 1.24 | Trinity Healthshare - Colorado Final Agency Order |
| 1.25 | Aliera Healthcare - Colorado Final Agency Order |
| 1.26 | California Attorney General Consumer Alert (April 2021) |
| 1.27 | Aliera Healthcare - Maryland Order of Disciplinary Action (March 2020) |
| 1.28 | Aliera Healthcare - Texas Rule 11 Agreement (July 2019) |
| 1.29 | Trinity Healthshare - Iowa Cease and Desist Order (March 2021) |
| 1.30 | Aliera Healthcare - Washington Cease and Desist Order (May 2019) |
| 1.31 | Trinity Healthshare - Washington Cease and Desist Order (May 2019) |
| 1.32 | Aliera Healthcare - New Hampshire Cease and Desist Order (December 2019) |
| 1.33 | Trinity Healthshare - New Mexico Cease and Desist Order (March 2020) |
| 1.34 | Aliera and Trinity - Connecticut Cease and Desist Order (December 2019) |
| 1.35 | Aliera Companies - Michigan Cease and Desist Order (August 2021) |
| 1.36 | Aliera and Trinity - New Jersey Cease and Desist Order (December 2020) |
| 1.37 | Aliera and Trinity - New York Charges and Notice of Hearing (October 2020) |
| 1.38 | Aliera Companies - Oregon Cease and Desist Order (October 2019) |
| 1.39 | Aliera Healthcare - U.S. Dept of Labor Action (August 2023) |
| 1.40 | Sharity Ministries - Disclosure Statement and Chapter 11 Plan (November 2021) |

Index of Exhibits                                                       2

| 1.41 | Aliera Companies - Disclosure Statement and Plan (August 2023) |
| 1.42 | Aliera-OneShare Settlement Agreement (May 2023) |
| 1.43 | Alabama Dept of Insurance - Consumer Warning (July 2019) |
| 1.44 | Louisiana Dept of Insurance - Consumer Alert (December 2019) |
| 1.45 | Maryland Attorney General Letter (February 2021) |
| 1.46 | Massachusetts Division of Insurance - Consumer Alert (June 2019) |
| 1.47 | Nebraska Dept of Insurance - Consumer Alert (November 2018) |
| 1.48 | Rhode Island Health Insurance Commissioner - Consumer Alert (August 2019) |
| 1.49 | Vermont Dept of Financial Regulation - Consumer Warning (October 2019) |
| 1.50 | West Virginia Insurance Commissioner - Consumer Alert (July 2019) |
| 1.51 | Colorado Division of Insurance - Consumer Advisory (December 2020) |
| 1.52 | Alaska Governor - Producer Warning (September 2019) |
| 1.53 | Texas Dept of Insurance - Producer Warning (July 2019) |
| 1.54 | Jericho Share - California Cease and Desist Order (March 2024) |
| 1.55 | Medical Cost Sharing - U.S. Dept of Justice - Press Release (November 2023) |
| 1.56 | Jericho Share - North Dakota Assurance of Voluntary Compliance (August 2023) |
| 1.57 | Alliance for Shared Health - Washington Cease and Desist Order (April 2020) |
| 1.58 | OneShare Health - Washington Cease and Desist Order (March 2020) |
| 1.59 | Unite Health Share - Washington Cease and Desist Order (June 2024) |
| 1.60 | Liberty HealthShare - Class Action Complaint (October 2021) |
| 1.61 | Liberty Settlement Agreement with Ohio Attorney General (December 2022) |

Index of Exhibits                                                  3

| 1.62 | Liberty Vendor Settlement Agreement with Ohio Attorney General (December 2022) |
|------|-------------------------------------------------------------------------------|
| 1.63 | New Mexico Regulator Final Order (February 2023) |
| 1.64 | Massachusetts Health - Connector – Report (September 2021) |
| 2 | Declaration of Leilani Russell (2024.08.30) |
| 2.1 | Reporting Template |
| 2.2 | Health Care Sharing Plan or Arrangement Reporting Attestation |
| 2.3 | Knew Health Member Guidelines (Existing) |
| 2.4 | Knew Health Member Guidelines (Effective October 2024) |
| 2.5 | HSA Secure in Colorado - HSA HealthShare Plan - ColoHealth |
| 2.6 | HSA for America Announces HSA Secure - A New Way to Save on Healthcare Costs |
| 2.7 | Big Stuff Health Share - Foundations for Membership |
| 2.8 | Health Care Sharing Plans and Arrangements in Colorado, 2021 Report |
| 2.9 | Health Care Sharing Plans and Arrangements in Colorado, 2022 Report |
| 3 | FRCP 30(b)(6) Deposition of Samaritan Ministries International (designee, Ron Waldo) - Transcript pp. 159 - 160 |
| 4 | FRCP 30(b)(6) Deposition of Samaritan Ministries International (designee, Ron Waldo) - Transcript p. 162 |
| 5 | FRCP 30(b)(6) Deposition of Samaritan Ministries International (designee, Ron Waldo) - Transcript pp. 117 - 122 |
| 6 | FRCP 30(b)(6) Deposition of Samaritan Ministries International (designee, Ron Waldo) - Transcript pp. 109-110 |
| 7 | FRCP 30(b)(6) Deposition of Samaritan Ministries International (designee, Ron Waldo) - Transcript p. 152 |

Index of Exhibits                                                                4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-01386-GPG-STV

ALLIANCE OF HEALTH CARE SHARING MINISTRIES,

   Plaintiff,

v.

MICHAEL CONWAY, in his official capacity as
Commissioner of the Colorado Division of
Insurance,

   Defendant.

---

## ECLARATION OF   ATE HARRIS

---

I, Kate Harris, in accordance with 28 U.S.C. § 1746 state as follows:

  1.  I am the Chief Deputy Commissioner of the Colorado Division of Insurance ("Division").

  2.  I have been employed by the Division since April 2019.

  3.  The Division is charged with supervising the business of insurance in Colorado. § 10-1-103(1), C.R.S. The Commissioner of Insurance is the head of the Division. § 10-1-104(1), C.R.S. In accordance with section 10-1-104(2), C.R.S., the Commissioner has delegated the duties and responsibilities of investigating, enforcing, and taking action to enforce compliance with the insurance laws of Colorado to the Division and its staff. I use the term "Division" throughout this declaration to refer generally to actions and activities pursued under the Commissioner's authority, by the Division.

  4.  The Division regulates a variety of insurance-related products within the state with the mission of protecting Colorado consumers. The Division has regulatory responsibilities over health insurance companies, property and casualty insurers, insurance brokers selling insurance products, bail bonds agents and agencies, public adjusters and preneed funeral contracts. The Division is responsible for licensing and vetting both companies and individuals who engage in the business of insurance, as

**EXHIBIT 1**

well as conducting investigations and enforcement actions arising from consumer complaints and violations of Colorado Insurance law.

5.      I supervise personnel responsible for managing and overseeing health care sharing plans and arrangements' ("Sharing Plans") reporting obligations under section 10-16-107.4, C.R.S., and its implementing regulations, including Emergency Regulation 22-E-20, and Regulation 4-10-01, 3 CCR 702-4 (collectively, the "Reporting Law"). In addition to these supervisory responsibilities, I also have significant managerial responsibilities, oversight and responsibility over the four core areas of focus for the Division: property and casualty, health, finance, and enforcement. I serve as the principal delegate for the Commissioner and provide direction to all Division programs, as distinguished from other senior leadership team roles who have responsibility in specific functional areas.

6.      This declaration references numerous documents. True and correct copies of these documents are attached as Exhibits 1.1 to 1.64 to this declaration, which is filed in support of the Commissioner's Response in Opposition to the Motion for Preliminary Injunction.

## S a    a s  ose a    e s  o o s  me s.

7.      Sharing Plans saw substantial growth after the passage of the Affordable Care Act ("ACA") in 2010. This growth was driven by multiple factors including that membership in a Sharing Plan often comes at a lower monthly cost than traditional health insurance, and brokers (who are permitted in Colorado to market and sell both ACA-compliant insurance plans and Sharing Plans to consumers) were offered significantly higher commissions by Sharing Plans to promote their products than they were by ACA-compliant insurance plans.

8.      Any upfront savings with Sharing Plans come with significant backend risks, however. For example, while Sharing Plans' materials often contain representations suggesting that members' health care costs will be shared, in actuality, Sharing Plans do not guarantee reimbursement of health expenses as they rely on voluntary contributions from other members. Sharing Plans are also not subject to the ACA requirement for insurance plans that at least 80% of premiums are paid out via claims. And Sharing Plans commonly exclude coverage for many items that are required to be covered by ACA-compliant health insurance plans, including pre-existing conditions, pregnancy and family planning services, mental health and substance use disorder treatment, cancer treatments, while imposing waiting periods before costs will be covered. They also often have vague and broad exclusions based on ethical, moral or religious principles.

9.      Beginning around 2018, the Division became aware of consumer protection concerns associated with Sharing Plans. These concerns were raised by

consumer complaints to the Division, warnings issued and enforcement actions taken by other state regulators and insurance commissioners, discussions at the National Association of Insurance Commissioners, and misleading marketing materials that Sharing Plans were ACA compliant.

10.     These concerns included that Sharing Plans offered significant financial incentives to insurance brokers, who in turn would aggressively market the Plans to consumers. And Sharing Plans' marketing materials and communications were misleading, inducing consumers to believe that Sharing Plans offered comprehensive insurance benefits at less cost, without realizing that Sharing Plans lacked many of the required provisions, protections, and guarantees offered by traditional health insurance. Perhaps most significantly, Sharing Plans commonly refused or delayed payment on claims that consumers believed and understood would be reimbursed.

11.     Specifically, prior to passage of the Reporting Law in 2022, multiple medical professionals in Colorado submitted complaints regarding Sharing Plans:

   a. Children's Hospital reported that it was having "a growing number of issues regarding unpaid claims" from Sharing Plans, specifically referencing each of the Alliance of Health Care Sharing Ministries' ("Alliance") Colorado membership organizations—Liberty HealthShare ("Liberty"), Christian Care Ministry/Medi-Share, Samaritan Ministries, Altrua Healthshare, OneShare Health—among other Sharing Plans. August 2019 (Ex. 1.1).

   b. Primary Care Partners encouraged the State to issue "a notification to individuals in the State of Colorado that providers are having issues with non-payment or late payment from [Sharing Plans] . . . Eventually, the charges/billing [associated with late payments] will come back to the consumer. It is in the best interest of the Colorado consumer that they be made aware of this problem – and that they do not have the protection of the DOI." Primary Care Partners further complained that it was not receiving communication from Sharing Plans with respect to claims issues and problems. Complaint 267210-2019, Apr. 2019 (Ex. 1.2)

   c. A healthcare provider complained that Alliance's Colorado membership organization, Liberty, has a consistent pattern of refusing to pay providers for services in a timely manner, specifically preventive-well child exams dating from February 2019. Complaint 271626-2020, May 2020 (Ex. 1.3.)

12.     Prior to passage of the Reporting Law in 2022, numerous Colorado consumers submitted complaints to the Division reporting that Sharing Plans were making misleading claims, often through insurance brokers and agents who confused consumers about the nature of memberships in and benefits provided by Sharing Plans,

including:

   a. A consumer joined a Sharing Plan based on an understanding that she
      would be eligible for reimbursement for surgery for a pre-existing condition
      if conducted after a two-month waiting period. The consumer waited two
      months before scheduling surgery, but the Sharing Plan denied coverage,
      resulting in the consumer bearing sole responsibility for thousands in
      medical expenses. The consumer also paid the Sharing Plan $449/month
      for four months and received no benefit. Complaint 266367-2019, Feb.
      2019 (Ex. 1.4).

   b. A consumer joined a Sharing Plan product believing it to be insurance,
      including based on representations from a broker. The consumer then
      struggled to cancel the auto-debit for the Sharing Plan. The consumer
      called for regulatory action to protect future consumers from similar
      misrepresentations. Complaint 276680-2021, Aug. 2021 (Ex. 1.5).

   c. A consumer joined Sharing Plan believing it to be a 70/30 individual health
      plan (insurer responsible for 70% of costs, insured for remaining 30%)
      with maximum out of pocket costs of $6,500, when in fact she was
      agreeing to become a member of Sharing Plan that was not a 70/30 policy
      and did not have a maximum out of pocket of $6,500. The consumer then
      encountered resistance and hostility when she tried to cancel the policy.
      The consumer expressed hope that her complaint will help other
      consumers avoid the same issue. Complaint 277885-2021, Nov. 2021 (Ex.
      1.6).

   d. A consumer's elderly mother enrolled in a Sharing Plan offered by Alliance
      member, Altrua Healthshare, without understanding that it was not regular
      insurance and did not cover mental healthcare and other coverages. The
      consumer's elderly mother had paid a "substantial amount" of money for
      the Sharing Plan after believing she signed up for a "real, standard
      insurance plan." Complaint 278502-2022, Jan. 2022 (Ex. 1.7).

   e. A consumer enrolled in a Sharing Plan and was confused that it was not
      an insurance policy offered on Colorado Health Exchange, and based on
      misrepresentation by a broker as to when enrollment would be effective.
      The consumer was unable to receive a refund when the Sharing Plan
      canceled the policy. Complaint 279673-2022, Apr. 2022 (Ex. 1.8).

   f. A consumer sought to obtain health insurance, Googled "affordable care
      act," and called the number on the first website that was pulled up,
      believing it to be the Colorado marketplace. A broker signed the consumer
      up with a Sharing Plan and the consumer began paying a monthly

premium. After realizing it was a Sharing Plan, and not true insurance, the consumer called a third party promoting the Sharing Plan, who represented that it was "indeed health insurance with full coverage." After a visit with an orthopedic surgeon, and receiving a $1,815 bill, the consumer realized he did not have insurance coverage and statements made by the third party were "essentially a lie." Complaint 281368-2022, Aug. 2022 (Ex. 1.9).

13.    Prior to passage of the Reporting Law in 2022, numerous Colorado consumers submitted complaints to the Division reporting that Sharing Plans were not paying claims/sharing requests, including:

a.   A Sharing Plan denied a consumer's request for reimbursement for an ER visit claiming that the illness was "not life-threatening," despite hospital's admission of the consumer for two nights, leaving the consumer to pay full claim herself. Complaint 264831-2018, Sept. 2018 (Ex. 1.10).

b.   An Alliance member, Liberty, pre-approved a consumer's procedure but then refused to cover cost after treatment was provided. When the consumer complained, Liberty HealthShare again indicated it would cover the procedure but continued to fail to reimburse it. Complaint 265047-2018, Oct. 2018 (Ex. 1.11).

c.   A Sharing Plan member was a survivor of a domestic violence incident that resulted in broken neck and medical bills over $40,000. The Sharing Plan denied reimbursement, finding that "m[e]dical condition is self-inflicted in contradiction to elements of a healthy and spiritual lifestyle" because the consumer had allegedly used tobacco, alcohol, prescription drugs, illegal drugs, and/or not exercised regularly and eaten healthy foods. Complaint 268433-2019, Aug. 2019 (Exs. 1.12 and Exs. 1.13)

d.   A Sharing Plan refused to pay a consumer's claim even though the Sharing Plan had instructed the consumer to go to hospital for testing and subsequently confirmed it would pay claim. The consumer was forced to make monthly payments for medical expenses to save their credit. Complaint 268833-2019, Sept. 2019 (Ex. 1.14).

e.   A consumer enrolled in Sharing Plan's "Silver Plan," after being advised it was a 70/30 plan (Sharing Plan would cover 70%, consumer 30%) and based on her understanding it was insurance. In fact, however, the Sharing Plan did not cover her expenses, citing a pre-existing condition, and instead solicited contributions over $5,000 with demands for another $4,000 to maintain membership in the Plan. Complaint 269679-2019, Nov. 2019 (Ex. 1.15).

f.  A Sharing Plan refused to reimburse a consumer for a valid claim and failed to respond to the consumer's inquiries and requests for reimbursement. Complaint 271355-2020, Apr. 2020 (Ex. 1.16).

g.  A consumer enrolled in Unity HealthShare (predecessor to Alliance member, OneShare Health) and was hospitalized for several days due to cardiac arrest. Unity represented that it had paid claims when, in fact, it never did so. The consumer was left personally responsible for large out of pocket expenses. Complaint 273778-2020, Dec. 2020 (Ex. 1.17).

h.  Alliance member, Oneshare Health, refused to pay a claim for a surgical procedure which Oneshare falsely claimed, contrary to a physician's letter, was a pre-existing condition. As a result, the consumer was in collections. Complaint 275178-2020, Apr. 2021 (Ex. 1.18).

i.  Alliance member, Liberty, was non-responsive to a consumer and her hospital and then failed to reimburse the consumer for medical bills exceeding $10,000 for more than a year after they were incurred. Complaint 275763-2021, Jun. 2021 (Ex. 1.19).

j.  Alliance member, Liberty, failed to timely reimburse a member for medical expenses. Complaint 276239-2020, Jul. 2021 (Ex. 1.20).

k.  Alliance member, Liberty, changed membership rules to avoid reimbursing a consumer's medical expenses incurred during the term of the consumer's membership. Complaint 277886-2021, Nov. 2021 (Ex. 1.21).

14.    In August 2019, the Commissioner issued Cease and Desist orders to two Sharing Plan entities, Aliera Healthcare, Inc. and Trinity Healthshare, Inc., on the grounds that Trinity was operating as an unlicensed insurance company and Aliera was marketing, administering, and managing Trinity's products in Colorado. Aliera and Trinity were corporate affiliates—Aliera created its affiliate, Trinity, with whom it partnered to market, sell and manage Trinity's products. I signed the Cease and Desist orders for both entities on behalf of the Commissioner. The Cease and Desist Orders are attached as Exhibits 1.22 (Trinity C&D) and 1.23 (Aliera C&D).

15.    In particular, the Cease and Desist Order against Trinity found that, through its agents and affiliates, it was selling "insurance products within the state of Colorado" without the required certificate of authority to do so. Exhibit 1.22, ¶¶ 16-18. Trinity utilized "licensed resident insurance producers [brokers] to sell its products in Colorado" and was the subject of enforcement actions in other states, including Texas and Washington, that similarly found it to be operating as an unlicensed insurance company in those states. *Id.*, ¶ 17, 19.

16.     As a result of the Cease and Desist Orders issued to Aliera and Trinity, each entity entered into a Stipulation for Entry of Final Agency Order with the Division. Those Stipulations are attached as Exhibits 1.24 (Trinity) and 1.25 (Aliera). Trinity agreed in its stipulation to cease doing business with Colorado residents as of January 31, 2020, among other provisions. *See* Ex. 11.24. Aliera agreed in its stipulation to not provide services or contract with other Sharing Plans unless and until such Sharing Plans were expressly permitted in Colorado by statute or administrative or judicial determination. *See* Ex. 1.25. The Stipulations were approved in Final Agency Orders issued by the Commissioner. *See* Exs. 1.24 and 1.25.

17.     During the course of the Division's investigations into Aliera Healthcare and Trinity Healthshare, the Division learned that both companies were the subject of ongoing regulatory actions and investigations and consumer warnings by other states for misleading consumers into purchasing their products, operating as unlicensed insurance companies, and improperly siphoning members' contributions and thereby depleting the companies of funding necessary to pay valid claims, including in California, Maryland, Texas, Iowa, Washington, New Hampshire, New Mexico, Connecticut, Michigan, New Jersey, New York and Oregon. *See* Exs. 1.26-1.38, attached.

18.     By way of example, these enforcement actions alleged that Aliera and Trinity misrepresented their products to be insurance plans. For example, Aliera offered a product called "AlieraCare" that came in "Bronze," "Silver," or "Gold" plans, the same metallic designations used by ACA-compliant federally facilitated marketplace plans. Ex. 1.29, ¶ 7; 1.34, ¶ 6. Trinity used insurance terms, such as "deductible," "premium," and "comprehensive coverage," when describing products to consumers. Ex. 1.29, ¶ 8; *see* Ex. 1.34, ¶ 7. Aliera touted its product as a "healthcare plan that saves money" and claimed that it "mirrors traditional insurance, but truly provide[s] comprehensive healthcare for an individual." Ex. 1.30, ¶¶ 9-10; *see* Ex. 1.34, ¶ 8.

19.     These enforcement actions further alleged that Aliera and Trinity were not properly paying claims or requests for reimbursement by their members. For example, Aliera and Trinity paid out only a small portion of the fees collected from members for reimbursement—between 8% and 35%, depending on the particular plan. Ex. 1.29, ¶¶ 17-21; Ex. 1.37, ¶ 28.

20.     Multiple of these enforcement actions further noted that while Aliera and Trinity claimed to be health care sharing ministries within the meaning of 26 USC §5000A, neither met the requirements, including because (1) they were not in operation and continuously sharing members' health care costs since at least December 1, 1999, as required by 26 USC § 5000A(d)(2)(B); Ex. 1.34, ¶¶ 1-2; Ex. 1.31, ¶¶ 5-7; Ex. 1.32, ¶ 24, and (2) they did not limit the marketing of their products to individuals holding any particular religious beliefs, but rather open their programs to members of all faiths and

simply require that members agree to general belief statements. Ex. 1.34, ¶ 5; Ex. 1.30, ¶¶ 8-11; Ex. 1.32, ¶ 25.

21.     Finally, and perhaps most concerningly, some of these enforcement actions detailed how Aliera used its corporate affiliates, including Trinity, to siphon funds from its members and make improper payments to its corporate officers, thereby reducing funds available to pay members' valid claims. Ex. 1.37, ¶¶ 24-28.

22.     A lawsuit filed by the U.S. Department of Labor alleged that Aliera and its CEO Shelley Steele used member contributions of over $100 million to make payments to Aliera, Steele, and their affiliated businesses. See Ex. 1.39.

23.     The U.S. Department of Labor eventually obtained a judgment barring Aliera and its CEO Shelley Steele from serving as fiduciaries or service providers to any plan covered by the Employee Retirement Income Security Act ("ERISA"), following the Department of Labor's allegations they improperly paid themselves and affiliated businesses more than $100 million. *Id.*

24.     Eventually, Trinity began operating as Sharity Ministries, Inc., and on July 8, 2021, Sharity commenced Chapter 11 bankruptcy proceedings. On December 3, 2021, an involuntary petition for relief under Chapter 11 of the Bankruptcy Code was filed against Aliera. Both bankruptcy proceedings proceeded before the United States Bankruptcy Court for the District of Delaware.

25.     In July 2021, I was invited to participate in a multi-state regulator call to discuss those bankruptcy proceedings. I understand that the total value of members' claims against Sharity is over $300,000,000, and that only 0-10% of these claims will ever be reimbursed by Sharity. *See* Ex. 1.40, at 8 ("Class 4 – Member Claims and General Unsecured Claims"). Similarly, I understand that the total value of members' claims against Aliera is over $600,000,000, and that only 1-5% of these claims will ever be reimbursed by Aliera. *See* Ex. 1.41, at 50 ("Class 4 – Unsecured Medical Claims").

26.     Between 2016 and 2018, Aliera entered into an arrangement with OneShare Healthshare, LLC (a member of the Alliance that has operated in Colorado since at least 2021). Aliera agreed to administer some of OneShare's Sharing Plan programs, including receiving consumer funds and determining sharing decisions based on eligibility criteria. *See* Ex. 1.42, at 1.

27.     As a result of Aliera's eventual disintegration and bankruptcy, consumers who enrolled in OneShare sharing plans that were administered by Aliera were harmed, including by the non-payment of medical expenses. The harmed consumers brought a class action suit against OneShare and Aliera, among others, in the U.S. District Court for Colorado. That class action was assigned case number 20-cv02130-RBJ.

28.     In a subsequent settlement agreement, OneShare agreed to pay $3 million to impacted consumers who had enrolled in OneShare sharing plans that were administered by Aliera. Ex. 1.42, at 8, § 3.1.

29.     At the same time that Colorado was receiving consumer complaints regarding Sharing Plans and was taking enforcement action against Aliera and Trinity, other states were issuing warnings about Sharing Plans and commencing enforcement actions against these plans. I am also aware there was significant litigation pertaining to these plans at this time.

30.     Numerous states issued general warnings about Sharing Plans, warning that such plans do not have to cover pre-existing conditions, do not guarantee payment of any claims, are typically unsupervised by state insurance regulators, and may misrepresent such plans to be comparable or even superior to insurance. Exs. 1.43 (Alabama), 1.44 (Louisiana), 1.45 (Maryland), 1.46 (Massachusetts), 1.47 (Nebraska), 1.48 (Rhode Island), 1.49 (Vermont), 1.50 (West Virginia); 1.26 (California).

31.     On December 11, 2020, the Division issued a consumer advisory cautioning that Sharing Plans may use insurance terms ("premiums") and have similarities to ACA-compliant insurance (using terms like "bronze," "silver," and "gold" tiered plans), but they "often do not have the same comprehensive benefits as ACA plans, and do not meet the ACA consumer protection standards." Ex. 1.51. Specifically, the advisory noted that Sharing Plans typically have restrictions for pre-existing conditions, may include religious or moral restrictions on coverages, often do not cover mental health or substance use coverages, and can leave members responsible for doctor and hospital bills. *Id.*

32.     These warnings were borne of documented consumer protection hazards associated with some of these Sharing Plans, as detailed above, and were not borne of any animus toward the religious nature of some of these Sharing Plans.

33.     Several states also issued publications cautioning brokers from working with companies engaged in the unauthorized transaction of insurance, including Sharing Plans. These warnings noted that such unauthorized insurance products often offer significantly higher commissions than ACA-compliant insurance products and may have various features that are similar to insurance, but are not insurance. Exs. 1.52 (Alaska), 1.53 (Texas)

34.     And there were various additional enforcement actions brought against other Sharing Plans and litigation associated with Sharing Plans. Ex. 1.54 (California Cease & Desist Order against Sharing Plan, Jerricho Share); 1.55 (press release announcing founder of Sharing Plan pleaded guilty to $8 million fraudulent scheme that "cheated hundreds of members" in Sharing Plan while paying only 3.1% of health care claims); 1.56 (North Dakota order, signed by Jericho Share, finding violations of North

Dakota insurance code due to deceptive representations and requiring Jericho Share to issue refunds for premiums paid by consumers and to advise consumers that its product is not health insurance); 1.57 (Washington Cease and Desist Order to Alliance for Shared Health for unauthorized operations as insurance company); 1.58 (Washington Cease and Desist Order to Alliance member, OneShare Health, for unauthorized operations as insurance company); 1.59 (Washington Cease and Desist to Unite Health Share Ministries for unauthorized operations as insurance company and imposing $300,000 fine).

35.     Prior to the passage of the Reporting Law, Colorado was also aware of allegations of fraudulent, coercive or dishonest business practices by Alliance members, including Liberty.

36.     For example, following an investigation commenced in January 2018, the Ohio Attorney General filed a class action complaint against Liberty alleging that Liberty and its controlling senior officers had violated Ohio law relating to charitable trusts by using millions of dollars in funds that were contributed by Liberty's members for participating in sharing of health care costs and diverting those funds to the controlling senior officers and Liberty's affiliates instead of paying valid claims. *See generally* Ex. 1.60, ¶¶ 91-96. The complaint further alleged that Liberty did not qualify as a health care sharing ministry under the Affordable Care Act (¶¶ 70-72) and that its dispute resolution procedures were a sham (¶¶ 97-104).

37.     A two-part settlement reached in 2021 between Liberty, its principals and parent entity, and the Ohio Attorney General imposed a host of serious financial and operational penalties against Liberty, its founders and controlling senior officers and Liberty's vendors controlled by the same senior officers. The Ohio Attorney General Settlement Agreements are attached as Exhibits 1.61 and 1.62.

38.     Liberty, its principals and founders and related vendors agreed, in their settlement with the Ohio Attorney General, to pay over $6 million in civil penalties, costs and fees, and payments for the ultimate benefit of former members of Liberty. *See* Ex. 1.62, ¶ 3; Ex. 1.61, ¶ 11.

39.     Payments under the Settlement Agreements continue to be made by Liberty and/or its affiliates to the Ohio Attorney general, with a $540,000.00 payment required to have been made no later than July 15, 2024, and future payments required through November 2026. *See* Ex. 1.62, ¶ 3(B).

40.     In addition to the payment of millions of dollars destined for harmed Ohio consumers, Liberty's founders and several senior operating officers were forced to resign from the company, including Liberty's Chief Executive Officer, the replacement for whom must have been approved by the Ohio Attorney General. Ex. 1.61, ¶¶ 6-8. Liberty further agreed it would allow certain vendor relationships to expire moving

forward. *Id.*, ¶ 9.

41.     The Settlement Agreement between the Ohio Attorney General and Liberty further contains a number of ongoing monitoring provisions which far exceed the scope and burden of Colorado's reporting statute. The monitoring provisions agreed by Liberty include:

  a. Appointing two new board members to govern Liberty, each of whom must be previously approved by the Ohio Attorney General. *Id.*, ¶ 3(B).

  b. Termination of the relationship between Liberty and its auditing firm, and the selection of a new auditing firm approved by the Ohio Attorney General. *Id.*, ¶ 5.

  c. Mandatory inclusion of substantial financial and operational information in Liberty's IRS tax filings from 2020 forward, including the cost, identity and services performed by Liberty's vendors. *Id.*, ¶ 5(C)(ii); ¶ 5(d).

42.     In 2021, following consumer complaints submitted to the New Mexico Superintendent of Insurance, New Mexico also commenced an investigation into and enforcement action against Liberty. At the conclusion of that enforcement action, the New Mexico Superintendent of Insurance found that Liberty committed 502 violations of the New Mexico Insurance Code, fined Liberty $2,510,000 for those violations, and ordered Liberty to cease and desist from operations in New Mexico until Liberty complies with New Mexico insurance laws. Ex. 1.63, at 7.

### C o o a o E a s Le s a o Re a     S a     a s

43.     I understand that the Alliance challenges the constitutionality of HB22-1269 in this matter. HB22-1269 is titled "Concerning requirements imposed on persons not authorized to transact insurance business in this state who are offering coverage of health-care costs for Colorado residents, and, in connection therewith, making an appropriation."

44.     HB22-1269 was introduced in the Colorado legislature in February 2022 and signed into law on June 8, 2022.

45.     The Division supported passage of HB22-1269 because, as detailed above, significant consumer protection concerns were raised in Colorado and elsewhere regarding Sharing Plans, but the Division lacked basic information regarding their operations within the State of Colorado. The disclosure requirements in the legislation would help shed light on Sharing Plans' Colorado operations and provide insight into potential risks for Colorado consumers via misleading marketing materials or significant financial vulnerabilities of companies not paying enrollees' medical bills, in

line with complaints received by the Division. These disclosures also enable the Division to monitor the Sharing Plans' commercial activities to ensure they are not transacting the business of insurance.

46.     Prior to the passage of HB22-1269, previous iterations of the legislationwere introduced in the Colorado legislature in 2020 (HB20-1008) and 2021 (HB 21-1135). Contrary to the Alliance's claims, these bills did not "target" health care sharing ministries, but rather, like HB22-1269, sought to require disclosures from any "health care cost-sharing arrangement," which included any "medical cost-sharing community" that "collects funds from its members on a regular basis, at levels established by the arrangement, for purposes of sharing, covering, or defraying the medical costs of its members." HB20-1008 ("Bill Summary"); HB 21-1135 ("Bill Summary"). These bills failed to become law.

47.     The Alliance testified in support of another bill, HB22-1198, which would have: a) regulated Sharing Plan's communications with their members by requiring notices that they are not insurance, do not guarantee payment of medical bills, and may contain more exclusions than ACA-compliant insurance plans; b) required signed written affirmation from each applicant that they received and understood the notice, among other affirmations; c) required Sharing Plans to report specified financial and transactional information to members monthly and annually; d) required Sharing Plans to submit to annual, independent audits of their financial information; e) post on their website information about their plan, program materials, the annual financial audit, and information about Colorado membership in the program; and f) indicate on membership cards and communications to providers that the program is not health insurance, among other requirements. *See* First Am. Compl., ¶ 30 (citing Hannah Metzger, Colorado Bill Aims to Create Reporting Requirements for Health Care Sharing Ministries, Colorado Politics (Mar. 11, 2022), https://perma.cc/A4K4-4Q8F (reporting the Alliance's support for HB22-1198)). HB22-1198 also specified that Sharing Plans were generally exempt from state insurance laws provided they met certain requirements.

48.     The Division testified in favor of HB22-1269 and in opposition to HB22-1198. The Division supported HB22-1269 primarily because the bill required reporting to the Division, as opposed to HB 22-1198, which would have required reporting to the Attorney General's office HB22-1198. As compared to the Attorney General, the Division was more appropriately situated to provide oversight over Sharing Plans because of its institutional knowledge regarding insurance regulation. This institutional knowledge and expertise allows the Division to review data and submissions from Sharing Plans and identify practices which constitute the unauthorized business of insurance or were likely to lead consumers into believing that a Sharing Plan was offering traditional health insurance.

49.     Ultimately, HB22-1269 was enacted into law while HB22-1198 was not.

50.     HB22-1269, much like its prior iterations that did not become law, HB20-1008 and HB21-1135, does not target religious plans but instead applies to all Sharing Plans, regardless of whether they are religiously-affiliated or secular.

51.     The intent of HB22-1269 was to protect consumers. Its sponsor, Representative Lontine, described the bill as follows:

> Health care sharing arrangements . . . are programs where individual members with shared values pay monthly into a pool designed to help cover other members' medical expenses. These programs have minimal oversight and there is no guarantee they will actually pay for anyone's medical expenses. House Bill 22-1269 requires health care sharing arrangements to submit some basic, routine information to the Division of Insurance about how they operate and DOI will share this information publicly. This is a comprehensive data reporting bill designed to discourage misconduct and promote a necessary level of transparency to protect consumers. It will not impact the way these arrangements operate beyond requiring HCSAs to submit an annual data report. Currently very little information is known about these arrangements. That's why we're running a data reporting bill: to best understand how HCSAs are affecting consumers. We simply want to shed light on how many of these programs there are in Colorado, how these programs do business, how many Coloradans are paying into them, and how much of their health care costs get paid. The Division of Insurance will share this information publicly. This will help the DOI and the public learn about the impact these programs have on the cost of health insurance and health care in our state, make sure the programs can provide coverage to their members, and help the programs keep their advertising honest and clear. These programs may work for some people, particularly those for whom health sharing aligns with their deeply held religious beliefs. More concerning, however, are people who are signing up because they see these arrangements as a cheaper alternative to health insurance, without recognizing the financial risk they are taking on. As the cost of health care and coverage continue to rise out of the reach of many consumers these arrangements may look increasingly attractive but people need to know why they are priced lower and how they may impact them long-term. Both current members and individuals considering these option alike should be aware of what members are paying for, how contributions are being used, and what protections they may or may not have when using these programs. And that is why I'm bringing the bill.

*See* https://tinyurl.com/mcyx46up (12:23:45-12:26:44).

52.     Debra Judy, Deputy Commissioner of the Division of Insurance, confirmed

the Division's support for the bill. She testified that in 2021, more than 40,000 Coloradans were members of Sharing Plans—representing approximately 27% of the individual market for health insurance. The Reporting Law would collect data allowing the Division to more fully understand the market in Colorado and assist consumers as they navigate coverage questions. *See* https://tinyurl.com/mcyx46up (2:44:48-2:47:24).

53.     And multiple religiously-affiliated entities testified in support of HB 22-1269, including Christian Healthcare Ministries and Lutheran Advocacy Ministry.

54.     Keith Hopkinson from Christian Healthcare Ministries testified that the bill will help inform consumers, that the financial disclosures required under the legislation are a "subset" of what Sharing Plans must disclose nationally already, and that disclosures regarding membership are also publicly posted on Sharing Plans' websites. Mr. Hopkinson further testified that Christian Healthcare Ministries has long-supported transparency and consumer protection and is pushing for reporting requirements on Sharing Plans in states nationwide. *See* https://tinyurl.com/mcyx46up (2:47:37-2:50:55).

55.     Peter Severseen, from Lutheran Advocacy Ministry, testified that the legislation struck an appropriate balance between protecting religious beliefs and commitments while heightening safeguards for consumers involved in Sharing Plans. *See* https://tinyurl.com/mcyx46up (2:12:40-2:15:30).

56.      Colorado is not the only state to pass reporting requirements related to Sharing Plans. Beginning in 2020, Massachusetts began requiring Sharing Plans to annually report data to the state, including:

     a. Total number of members in the state
     b. Public facing marketing materials
     c. Entity financial statements
     d. Member guidelines or participation standards

*See* Ex. 1.64 at 13 (discussing disclosure requirements for Sharing Plans in Massachusetts).

57.     There is accordingly significant overlap between the data that is required to be reported in Massachusetts, and the reporting requirements for sharing plans in Colorado.

58.     Massachusetts, like Colorado, publishes a report summarizing its findings from disclosures required by state law. *Id.*.

59.     The disclosures required under the Reporting Law help the Division achieve its regulatory interest in protecting consumers in the following ways:

a.  The Reporting Law requires Sharing Plans to report on the scope of their membership in Colorado and nationally. §§ 10-16-107.4(1)(a)(I)-(III), (XII)-(XIV), C.R.S.; 3 Colo. Code Regs. § 702-4:4-10-01(5)(A)(1)(a). This allows the Commissioner to understand the scope of people who do not have health insurance coverage in the state, as well as which Sharing Plans are operating in Colorado and the extent of their operations. This information also sheds light on how much a Sharing Plan's business may depend on Colorado consumers.

b.  The Reporting Law requires various financial disclosures, including total contributions received by the Sharing Plan from Colorado consumers and the total value of claims submitted, approved, denied, paid, and approved but not paid. § 10-16-107.4(1)(a)(V)-(XI), C.R.S.; 3 C.C.R. § 702-4:4-10-01(5)(A)(1)(a). It also requires basic corporate information, including a contact person, affiliated companies, and an organizational chart. § 10-16-107.4(1)(a)(XVIII)-(XX), C.R.S.; 3 C.C.R. § 702-4:4-10-01(5)(A)(1)(d). Given the demonstrated concerns relating to numerous Sharing Plans' financial solvency and direction of member payments used to fund corporate salaries instead of paying out claims, these disclosures allow Colorado to monitor the financial health of the Sharing Plans, understand their corporate structure, and evaluate whether the Sharing Plans are following through on their commitments to their members.

c.  The Law also seeks information to confirm that Sharing Plans are marketing their plans to consumers in a way that is not misleading to suggest that consumers have insurance. § 10-16-107.4(1)(a)(XVII), C.R.S.; 3 C.C.R. § 702-4:4-10-01(5)(A)(1)(c). These disclosures of advertising materials directly address the validated consumer protection concerns relating to consumers' confusion about whether the Sharing Plans are insurance and what rights the consumers may have to receive coverage. Specifically, Sharing Plans have historically utilized marketing materials which include Affordable Care Act terms including "Open Enrollment", and "Gold", "Silver" and "Bronze" Metal Tiers, which are direct technical terms from the Affordable Care Act.

d.  The Reporting Law seeks to identify third parties that Sharing Plans contract with to form provider networks as well as insurance brokers that Sharing Plans engage to market or administer their products. § 10-16-107.4(1)(a)(IV), (XV), and (XVI), C.R.S.; 3 C.C.R. § 702-4:4-10-01(5)(A)(1)(a). These commercial relationships are indicative of traditional insurance arrangements. The disclosure of these relationships helps the Division put consumers on notice, through the annual report, that licensed insurance brokers may attempt to market non-ACA compliant Sharing

Plans to Colorado consumers. And again, these disclosures help Colorado monitor the operations of the Sharing Plans to ensure these Sharing Plans are not engaged in the business of insurance, while simultaneously ensuring consumers are not confused and are on notice about the limits of these arrangements compared to traditional insurance. Also, many Colorado consumer complaints involving Sharing Plans originate with a third-party insurance broker guiding the Colorado consumer toward a Sharing Plan. Commissions to such brokers when selling Sharing Plans are often substantially higher than commissions for traditional health insurance products, potentially incentivizing these brokers to shift consumers toward Sharing Plans and away from traditional health insurance.

60.     The Division publishes an annual report summarizing the information reported by Sharing Plans to help advise Colorado consumers.

61.     The Reporting Law pales in comparison to the regulation of traditional health insurers. Making information available to Colorado consumers regarding Sharing Plans' administrative costs and proportion of paid vs. denied claims also helps Colorado consumers make informed decisions regarding health coverage between traditional health insurance and Sharing Plans.

62.     Consumers are able to access and review in-depth information regarding traditional health insurance rate filings including administrative expenses, profit ratio, expected claims and other details through the public rate filing process for health insurance plans.

63.     The information gathered and published under the Reporting Law constitutes only a fraction of the information available to Colorado consumers regarding traditional health insurance plans.

64.     The scale of information and burden on Sharing Plans imposed by the Reporting Law are significantly lighter than those imposed on traditional health insurance carriers and plan filings.

65.     Traditional health insurance rate filings include voluminous financial and operational information specific to each plan an insurer intends to offer in Colorado, and a multi-month review and approval process during which the health insurer must promptly respond to any relevant inquiry from the Division of Insurance. Insurers also must undergo financial reviews, which require them to submit financial and/or corporate data.

66.     All health benefit plans that a traditional health insurer intends to offer in Colorado are statutorily required to be reviewed by the Commissioner to ensure the

proposed rates are not excessive, inadequate or unfairly discriminatory. *See* 10-16-107, C.R.S. Sharing Plans are under no such requirement to submit their plans and rates for review, or demonstrate their rates are not excessive, inadequate, or unfairly discriminatory.

67.     The risks to Colorado consumers, health care providers, medical centers and taxpayers from a failed or bad actor health insurer is considered so serious that health insurance companies are subject to a thoroughly developed set of statutes and regulations that provide the Division of Insurance nearly unrestricted access to real time financial and operational data for all health insurers operating in Colorado, or applying to operate in Colorado.

68.     Before a health insurer can offer a single plan in Colorado, a health insurer must submit to an in-depth analysis of its finances, corporate structure, governing officers and investors. *See* C.R.S. 10-3-101 to 10-3-113.

69.     The financial requirements to base a health insurer in Colorado or a reciprocal jurisdiction are similarly stringent, and require the submission of voluminous and detailed financial data, credit ratings, officer background checks and fingerprints, and the provision of additional data to the Division of Insurance upon request. *See* C.R.S. 10-3-101 to 10-3-113.

70.     In addition to stringent investigation of an insurer's officers and directors, Colorado's insurance laws require substantial minimum capital or guaranty fund and an accumulated surplus in the form of cash or marketable securities of at least $1.5 million. C.R.S. 10-3-201.

71.     ACA-compliant health insurance plan details and designs are also subject to strict regulation at both the State and Federal level, requiring specific coverages and carefully designed loss ratios intended to protect consumers, medical providers and carriers themselves, and ensure financial stability in the health insurance market. C.R.S. 10-16-107.

72.     In conjunction with reviewing health insurance plans and premiums, the commissioner has broad authority to "require submission of any relevant information the commissioner deems necessary in determining whether to approve or disapprove a filing." C.R.S. 10-16-107(4).

73.     Health insurers in Colorado are also subject to the possibility of extensive market conduct exams which may investigate all portions of a health insurers business over a period of months or years and may result in the imposition of significant financial and operational penalties for failing to adhere to applicable Colorado insurance laws. *See* C.R.S. 10-1-304 to 10-1-312.

74.     Another key difference between the regulation of Sharing Plans and traditional health insurance carriers is that every health insurer is statutorily required to be members of the Colorado Life and Health Insurance Protection Association (CLHIPA), as a condition of their participation in the Colorado health insurance market. *See* C.R.S. 10-20-101 to 10-20-120.

75.     If a traditional health insurer becomes insolvent, the CLHIPA has the power to level assessments on all other insurers who are members of the CLHIPA to ensure that claims are paid, and that consumers and providers do not suffer harm from unpaid medical claims as a result of the insolvency of their health insurance carrier.

76.     Sharing Plans are not required to participate in the CLHIPA, and therefore there is no protection for consumers or medical providers to ensure legitimate medical claims are paid by levying assessments to CLHIPA members if a Sharing Plan becomes insolvent.

77.     The lack of consumer protections in the event of a Sharing Plan's insolvency has been amply demonstrated through the bankruptcy proceedings of Aliera/Trinity/Sharity, which left impacted members owed over $900 million in unpaid consumer claims.

78.     The scale of the possible consumer and provider harm which may result from an insolvent Sharing Plan is significant, and far greater than an insolvent health insurer covered by the CLHIPA, and is an additional reason the State has a legitimate interest in understanding which Sharing Plans operate in Colorado, and the number of members they have enrolled in the state.

79.     Sharing Plans pose a unique risk to consumers, and are different from other entities and arrangements, including but not limited to, for the following reasons:

a.  Unlike Sharing Plans, direct primary care arrangements, which are specifically excepted by statute, do not hold themselves out as offering comparable coverage to insurance plans. Direct primary care arrangements are agreements made directly between consumers and providers for consumers to be access certain services with those providers; there is no third-party acting as an intermediary for payments as with Sharing Plans.

b.  Unlike Sharing Plans, crowdfunding entities, which are exempted by Regulation 4-10-01, Section 4(G)), do not hold themselves out as offering comparable coverage to insurance plans, nor do they involve regular payments like a Sharing Plan.

c. Unlike Sharing Plans, consumer payment plans, which are exempted by Regulation 4-10-01, Section 4(G)), do not hold themselves out as offering comparable coverage to insurance plans. The plans are also made directly between consumers and providers, without a third-party acting as an intermediary for payments as with Sharing Plans.

d. Unlike Sharing Plans, medical discount plans do not hold themselves out as offering comparable coverage to insurance plans. Rather medical discount plans involve consumers paying to access discounted rates with certain providers, or in the case of drug discount cards, to access discounts at certain pharmacies. Neither of these arrangements involve a third-party that facilitates payments for health care services like with Sharing Plans.

e. Unlike Sharing Plans, student health clinics at universities do not hold themselves out as offering comparable coverage to insurance plans. These arrangements also typically involve a student paying a direct fee for unlimited access to certain providers.

   i. To the extent the Alliance's mention of student health clinics, Mot. for PI, pp 18-19, is referring to student health insurance plans, those plans are regulated with the same scrutiny as any other health insurance plan and are subject to stringent examination under C.R.S. 10-16-107. Student health insurance plans are therefore far more regulated by the Division than Sharing Plans.

f. Unlike Sharing Plans, charities that pay medical bills do not hold themselves out as offering comparable coverage to insurance plans, nor involve monthly payments.

g. Unlike Sharing Plans, fraternal organizations do not hold themselves out as offering comparable coverage to insurance plans.

   i. In any case, fraternal organizations are subject to regulation and rules governing their corporate organizations (10-14-301), reporting requirements to the state (10-14-602), cash to capital requirements (10-14-604), financial examinations (10-14-605) and liquidation (10-14-607). They are also subject to regulation 3-1-8 Concerning Actuarial Opinions and Memorandums for Life Companies and Fraternal benefit Societies. The Division therefore has far more regulatory power over Fraternal Organizations than Sharing Plans.

h. Fully-insured out-of-state employer health plans with Colorado enrollees provide insurance and advertise accordingly. However, these plans are

regulated by the insurance commissioners in the states where they are headquartered, mitigating the risk to Colorado consumers.

I declare under penalty of perjury under the law of Colorado that the foregoing is true and correct.

Executed on August 30, 2024.

8/30/24

Kate Harris



**STATE OF COLORADO**

Harris - DORA, Kate <kate.harris@state.co.us>

---

## Fwd: Health sharing ministry challenges

---

**Riester - DORA, Jefferey** <jefferey.riester@state.co.us>          Tue, Aug 13, 2019 at 11:37 AM
To: Kate Harris - DORA <kate.harris@state.co.us>
Cc: "Mortier - DORA, Matt" <matt.mortier@state.co.us>

Kate,

Hopefully Matt hasn't forwarded this yet, if he has apologies for the dual emails. Ellen Stern reached out about health ministry companies and was hoping to get a meeting to discuss the recent cease and desists and a few other issues. Full ask is below. Happy to help set up a conversation with you or whoever from staff would be most appropriate. Let me know and thanks!

---------- Forwarded message ---------
From: **Stern, Ellen** <Ellen.Stern@childrenscolorado.org>
Date: Tue, Aug 13, 2019 at 11:19 AM
Subject: Health sharing ministry challenges
To: jefferey.riester@state.co.us <jefferey.riester@state.co.us>
Cc: Ruth Aponte <raponte@aponte-busam.com>, Dave DeNovellis <ddenovellis@aponte-busam.com>


Hi Jefferey – We were interested to learn about the recent cease and desist orders from the Division of Insurance regarding two health ministry companies (for reference, press release below). We have a growing number of issues regarding unpaid claims from other similar health sharing ministries (our list is below). Further, this can be complicated when a child has Medicaid as a secondary payer source. I am interested to see if we can connect with someone on your team at DOI to discuss a few issues – related to the cease and desist, whether there can be considerations about expanding the cease and desist orders to other ministries, how to navigate primary/secondary payment issues, and how to communicate concerns when the ministries are not paying claims for our patients. One outstanding claim has reached into the high hundreds of thousands of dollars.


We appreciate any connections you can make to discuss this issue in more detail. Thank you very much in advance –

Ellen Stern


Liberty HealthShare

Christian Care Ministry/Medi-Share

Samaritan Ministries

Altrua Healthshare

Solidarity Healthshare

OneShare Health

Trinity Healthshare with Aliera Companies as the TPA


**Ellen Stern | Senior Policy Coordinator, Government Affairs | Children's Hospital Colorado**
13123 East 16th Avenue, Box 080 | Aurora, CO 80045 | Phone: 720-777-8768 | Cell: 970-764-5143

https://mail.google.com/mail/u/0/?ik=a1e3328fc3&view=pt&search=all&permmsgid=msg-f:1641774219351032518&simpl=msg-f:1641774219351032518          1/3



EXHIBIT
**1.1**          Ex. 1.1, p. 1 of 3

Connect with Children's Hospital Colorado | childrenscolorado.org | Facebook | Twitter | Pinterest





**NEWS RELEASE**

**For Immediate Release**: Aug. 12, 2019

**MEDIA CONTACT**

Vincent Plymell
P:  303-894-2261
Vincent.Plymell@state.co.us
dora.colorado.gov/insurance

# Consumer Advisory:  Cease and Desist Orders for Trinity Healthshare and Aliera Healthcare

### Concerned about harm to consumers, Division of Insurance issues orders.

DENVER - Today, the Colorado Division of Insurance (DOI), part of the Department of Regulatory Agencies (DORA), issued cease and desist orders for Trinity Healthshare and Aliera Healthcare. Trinity represents itself as a healthcare sharing ministry. Aliera is the administrator, marketer, and program manager  for Trinity.

Consumer protection is the DOI's mission, and this action results from concerns about these companies and their interactions with Colorado consumers. Over the past few months, the DOI has received a number of complaints from consumers regarding these companies. The DOI is concerned that they may be using misleading marketing practices, blurring the lines between health insurance that complies with the requirements of the Affordable Care Act (ACA) and non-compliant insurance (like what is offered by health care sharing ministries, such as these companies). Because of this, the companies may be putting consumers at risk and violating Colorado insurance law.

The orders require the companies to immediately cease and desist conducting insurance business in Colorado. However, the DOI has included provisions in the orders to protect Colorado consumers who are members of the health care

sharing programs offered by these entities, requiring that the companies honor and maintain any existing contracts, plans or policies with Colorado businesses and consumers until the Commissioner of Insurance releases them from this obligation.

Washington State and Texas have also issued cease and desist orders against Trinity and Aliera.

If you have had problems with either of these companies, please contact the DOI to let us know and to find out what recourse you may have. If you're unsure of what kind of coverage you currently have, whether it is traditional health insurance, a health care sharing ministry, or something else, contact the DOI to find out what questions to ask. Contact the DOI at 303-894-7490 / 1-800-930-3745 (outside of the Denver metro area) / or email DORA_insurance@state.co.us.

###

CONFIDENTIALITY NOTICE:  This e-mail, including any attachments, is for the sole use of the intended recipient and may contain confidential and privileged information.  If you are not an intended recipient, or the person responsible for delivering this message to an intended recipient, you are hereby notified that reading, copying, using or distributing this message is prohibited. If you are not an intended recipient, please contact the sender by reply email and destroy all copies of the original message from your computer system.

--
**Jeffery Riester**
**Director of Legislative Affairs**
Executive Director's Office



P 303.894.7873  |  C 330.265.8877
1560 Broadway, Suite 1550, Denver, CO 80202
jefferey.riester@state.co.us  |  www.dora.colorado.gov

*06-17-2024*                                   **Problem Report Information Inquiry**                                *Page 1 of 2*

| | | |
|---|---|---|
| **Problem Report ID:** 267210 | **Problem Report Type:** Inquiry | **Responsible Section:** Life, Accident, and Health |
| **Status:** Closed | **Opened Date:** 04-23-2019 | **Closed Date:** 04-29-2019 | **Closure Reason:** |

## PROBLEM REPORT DETAILS

| TYPE OF PROBLEM | OTHER PROBLEM TYPE DESCRIPTION |
|---|---|
| | |

### DESCRIPTION

HCSA
DAA  Recommends that DOI issue consumer notice about health sharing programs.

### CONSUMER DETAIL OF COMPLAINT

I understand that Liberty Health Share is NOT insurance. We have a growing population of individuals looking for a less expensive alternative to insurance and are turning to these health sharing programs.

As Executive Director of Primary Care Partners, I would encourage a notification to individuals in the State of Colorado that providers are having issues with non-payment or late payment from these organizations.

While I understand that the public may not be too concerned about late payment to providers given the high cost of health care. Eventually, the charges/billing will come back to the consumer.

It is in the best interest of the Colorado consumer that they be made aware of this problem - and that they do not have the protection of the DOI.

Our organization is having a difficult time with ANY communication with Liberty Health Share with respect to claims issues/problems.

Respectfully submitted,

Michael J. Pramenko M.D.
Executive Director
Primary Care Partners, Inc.

970-254-2600 office
970640-8178  cell

### CONSUMER DESIRED RESOLUTION

Press release or other notification to the public.

| CONSUMER IS COMPLAINING AGAINST | CONSUMER IS REPRESENTED BY AN ATTORNEY? | HOW DID THE CONSUMER KNOW ABOUT US? |
|---|---|---|
| My Insurance Company | No | Internet/Division Website |

| HAS THE CONSUMER PREVIOUSLY REPORTED THIS PROBLEM TO OUR OFFICE OR ANY OTHER AGENCY? | PURCHASED INSURANCE ON THE HEALTH CARE EXCHANGE? |
|---|---|
| No | |

## RESPONDENT INFORMATION

| NAME | ADDRESS | EIN/NPN |
|---|---|---|
| LIberty HealthShare | Gospel Light Mennonite Church 4845 Fulton Dr. NW CantonOH 44718 | |

| EMPLOYMENT TYPE | NAIC ID | REPRESENTATIVE | COMPLAINT CONFIRMED |
|---|---|---|---|
| State Specific | | | |

| SOURCE | COMPLAINT TYPE | INCIDENT DATE | RECEIVED DATE | PRIORITY | LOCATION | LOCATION DATE |
|---|---|---|---|---|---|---|
| Consumer | Portal | | | | | |

| FINDING TYPE | INCIDENT GROUP | SUBJECT | SUBJECT ADDITIONAL DETAILS | STATE ID | SYSTEM SOURCE |
|---|---|---|---|---|---|
| | | | | | |

| INSURER | AGENT/AGENCY | TYPE OF INSURANCE | SELF-FUNDED HEALTH PLAN | COVERAGE TYPE | COVERAGE LEVEL | COVERAGE SUBLEVELS |
|---|---|---|---|---|---|---|
| Liberty Health Share | | Other | No | Accident and Health | Individual | |

| NAME OF INSURED | POLICY NUMBER | POLICY PERIOD BEGIN DATE | POLICY PERIOD END DATE | POLICY ISSUED STATE | INSURANCE CARD ID | CLAIM NUMBER |
|---|---|---|---|---|---|---|
| Pramenko, Michael | | | | | | |

| TYPE OF POLICY | LOCATION OF LOSS | IS THE INSURED MEDICARE | MEDICARE SUPP. PLAN | OTHER PARTY'S POLICY OR CLAIM NUMBER |
|---|---|---|---|---|
| Life or Health | | No | | |

**EXHIBIT 1.2**

Ex. 1.2, p. 1 of 2

# Problem Report Information Inquiry

| | | | |
|---|---|---|---|
| **Problem Report ID:** 267210 | **Problem Report Type:** Inquiry | | **Responsible Section:** Life, Accident, and Health |
| **Status:** Closed | **Opened Date:** 04-23-2019 | **Closed Date:** 04-29-2019 | **Closure Reason:** |

## COMPLAINANT INFORMATION

| NAME | ADDRESS | NPN | ORGANIZATION | ROLE | REPRESENTATIVE | AGE GROUP | MEDICAL INFO. AUTHORIZATION |
|---|---|---|---|---|---|---|---|
| Pramenko, Michael | 3150 North 12th Street Grand Junction, CO 81501 | | Primary Care Partners, Inc | Portal | | | No |

## STAFF MEMBERS

| STAFF MEMBER | | BEGIN DATE | END DATE | RESPONSIBLE |
|---|---|---|---|---|
| Axman Dayle | | 04-23-2019 | 04-29-2019 | Yes |

## REASONS

| CATEGORY | REASON TYPES | RESPONDENT |
|---|---|---|
| CH | Delay | Liberty HealthShare |

## ACTIVITIES

| ACTIVITY DATE | ACTIVITY | | | | DUE DATE | RECEIVED DATE | INVOLVED PARTY NAME |
|---|---|---|---|---|---|---|---|
| | STAFF MEMBER | TIME | BATCH QTY | COMMENT | | | |
| 04-29-2019 | Case Closing Report | | | | | | |
| | Dayle Axman | 0.05 | | No jurisdiction over claim issues with Liberty Healthshare.  Only request was for Division to issue a consumer notice. | | | |
| 04-29-2019 | Email | | | | | | Pramenko, Michael |
| | Dayle Axman | 0.1 | | Advised Dr. Pramenko that the Division is planning on issuing a consumer notice about healthcare sharing programs in the next 30 days or so and that this case file is being closed. | | | |

## INVOLVED PARTIES

| INVOLVED PARTY | INVOLVED PARTY TYPE | ORGANIZATION | COMMENT |
|---|---|---|---|
| Liberty Health Share | Portal - Company | | |
| Pramenko, Michael | Portal - Insured | Primary Care Partners | |

## COMMENTS

| DATE | COMMENT | VISIBLE ON PORTAL |
|---|---|---|
| 04-29-2019 | Dr. Pramenko, | Yes |
| | Thank you for providing information regarding the issues you've been experiencing with Liberty Health Share.  The Division is planning on issuing a consumer notice regarding healthcare sharing programs in the next 30 days or so. As the Division is unable to assist you, this case file is being closed.  Please contact me directly if you have any questions or send additional comments to:  dora_insurance@state.co.us  Thank you. Dayle Axman (303-894-7881) | |

07-24-2024        **Problem Report Information Inquiry**        *Page 1 of 2*

| | | | |
|---|---|---|---|
| **Problem Report ID:** 271626 | **Problem Report Type:** Inquiry | | **Responsible Section:** Life, Accident, and Health |
| **Status:** Closed | **Opened Date:** 05-29-2020 | **Closed Date:** 07-24-2020 | **Closure Reason:** |

### PROBLEM REPORT DETAILS

| TYPE OF PROBLEM | OTHER PROBLEM TYPE DESCRIPTION |
|---|---|
| | |

**DESCRIPTION**

Work Telephone:  970-565-7822 - KTT

**CONSUMER DETAIL OF COMPLAINT**

Liberty Healthshare has a consistent pattern of refusing to pay providers for covered services in a timely manner. They do not return my phone calls. Their email response is also very slow, if at all. When they do respond it is a generic response and hasn't resolved the matter.
My current unpaid claims are for preventative-well child exams- dating 2/2019.

**CONSUMER DESIRED RESOLUTION**

Liberty Healthshare consistently paying claims within 30 days of receipt.

| CONSUMER IS COMPLAINING AGAINST | CONSUMER IS REPRESENTED BY AN ATTORNEY? | HOW DID THE CONSUMER KNOW ABOUT US? |
|---|---|---|
| My Insurance Company | No | Internet/Division Website |
| **HAS THE CONSUMER PREVIOUSLY REPORTED THIS PROBLEM TO OUR OFFICE OR ANY OTHER AGENCY?** | | **PURCHASED INSURANCE ON THE HEALTH CARE EXCHANGE?** |
| No | | |

### RESPONDENT INFORMATION

| SOURCE | COMPLAINT TYPE | INCIDENT DATE | RECEIVED DATE | PRIORITY | LOCATION | LOCATION DATE |
|---|---|---|---|---|---|---|
| Consumer | Portal | | 05-29-2020 | | Life, Accident and Health | 05-29-2020 |

| FINDING TYPE | INCIDENT GROUP | SUBJECT | SUBJECT ADDITIONAL DETAILS | STATE ID | SYSTEM SOURCE |
|---|---|---|---|---|---|
| | | | | | |

| INSURER | AGENT/AGENCY | TYPE OF INSURANCE | SELF-FUNDED HEALTH PLAN | COVERAGE TYPE | COVERAGE LEVEL | COVERAGE SUBLEVELS |
|---|---|---|---|---|---|---|
| Liberty Healthshare | | Faith Sharing Plan | No | Accident and Health | State Specific | |

| NAME OF INSURED | POLICY NUMBER | POLICY PERIOD BEGIN DATE | POLICY PERIOD END DATE | POLICY ISSUED STATE | INSURANCE CARD ID | CLAIM NUMBER |
|---|---|---|---|---|---|---|
| Vreeken, MaryAnn | | | | | | |

| TYPE OF POLICY | LOCATION OF LOSS | IS THE INSURED MEDICARE | MEDICARE SUPP. PLAN | OTHER PARTY'S POLICY OR CLAIM NUMBER |
|---|---|---|---|---|
| Life or Health | | No | | |

### COMPLAINANT INFORMATION

| NAME | ADDRESS | NPN | ORGANIZATION | ROLE | REPRESENTATIVE | AGE GROUP | MEDICAL INFO. AUTHORIZATION |
|---|---|---|---|---|---|---|---|
| Vreeken, MaryAnn | 25266 Road P<br>Dolores, CO 81323 | | | Portal | | | No |

### STAFF MEMBERS

| STAFF MEMBER | | BEGIN DATE | END DATE | RESPONSIBLE |
|---|---|---|---|---|
| Taylor, ACS, AIAA Karen | | 06-01-2020 | 07-24-2020 | Yes |

### ACTIVITIES

| ACTIVITY DATE | ACTIVITY | | LETTER DESCRIPTION | | DUE DATE | RECEIVED DATE | INVOLVED PARTY NAME |
|---|---|---|---|---|---|---|---|
| | STAFF MEMBER | TIME | BATCH QTY | COMMENT | | | |
| 07-24-2020 | Case Closing Report | | | | | | Complainant |
| | Karen  Taylor, ACS, AIAA | 0.1 | | Ms. Vreeken's complaint was regarding claims that were not paid by Liberty Healthshares.  In reviewing this file did not do any action until today.  I sent the following comment to Ms. Vreeken:  The Colorado Division of Insurance does not have any regulatory authority to action on your behalf regarding your claim issues regarding Liberty Healthshare.  I honestly do not know if there is any government entity that does regulate health sharing ministry plans like Liberty Healthshare. | | | |
| 05-29-2020 | Review Materials | | | | | | |
| | Karen  Taylor, ACS, AIAA | 0.1 | | | | | |

**EXHIBIT 1.3**

Ex. 1.3, p. 1 of 2

## Problem Report Information Inquiry

**Problem Report ID:** 271626     **Problem Report Type:** Inquiry     **Responsible Section:** Life, Accident, and Health

**Status:** Closed     **Opened Date:** 05-29-2020     **Closed Date:** 07-24-2020     **Closure Reason:**

### INVOLVED PARTIES

| INVOLVED PARTY | INVOLVED PARTY TYPE | ORGANIZATION | COMMENT |
|---|---|---|---|
| Liberty Healthshare | Portal - Company | | |
| Vreeken, Maryann | Portal - Insured | | |

### COMMENTS

| DATE | COMMENT | VISIBLE ON PORTAL |
|---|---|---|
| 07-24-2020 | Dear Ms.  Vreeken, | Yes |

I do apologize for not contacting you sooner.  I am the Analyst that is assigned to your complaint.  I guess I thought I called you .  Ms. Vreeken, the Colorado Division of Insurance does not have any regulatory authority to action on your behalf regarding your claim issues regarding Liberty Healthshare.  I honestly do not know if there is any government entity that does regulate health sharing ministry plans like Liberty Healthshare.  With this  information, I am going to close your complaint file.  Please feel free to contact me via-portal, call me at 303-894-7561 or email me at karen.taylor@state.co.us if you have any questions or concerns.

Sincerely,
Karen T. Taylor, ACS, AIAA
Insurance Analyst
Consumer Services Life and Health Section

# Problem Report Information Inquiry

| | | | |
|---|---|---|---|
| **Problem Report ID:** 266367 | **Problem Report Type:** Complaint | | **Responsible Section:** Life, Accident, and Health |
| **Status:** Closed | **Opened Date:** 02-12-2019 | **Closed Date:** 01-13-2020 | **Closure Reason:** |

## PROBLEM REPORT DETAILS

| TYPE OF PROBLEM | OTHER PROBLEM TYPE DESCRIPTION |
|---|---|
| | |

### DESCRIPTION

Ms. ▇▇▇▇ health coverage is a health cost sharing ministry.  The Division of Insurance does not have any regulatory authority over a health cost sharing ministry.  KTT

### CONSUMER DETAIL OF COMPLAINT

Ms. Julianne Towle, Insurance Agent,CA License #0L07718, TX License #2125157, National Producer #18078328, with SureCo Health & Life is who sold me the policy. I explained that I needed a knee replacement. The last time I saw a doctor for my knee was over 15 years ago. Ms. Towle explained that since I hadn't seen a doctor within the last 2 years that my knee surgery would be covered after the 2 month waiting period. In my recorded conversation with Ms. Towle, I asked 3 times to confirm the surgery would be covered. THe only parameters were the 2 month waiting period and not having seen a doctor for my knee in the last 2 years. I met both parameters.

I proceeded to see Dr. Kim at Steadman Hawkins Clinic and schedule the surgery. My pre-authorization for surgery (scheduled after the 2 month waiting period)was denied.

Aliera Health denied the claim due to pre-existing conditions. These conditions were not set forth in the paperwork emailed to me at the time of insurance purchase. The paperwork sent to me by SureCo did not detail any of these additional pre-existing conditions.

As as result, I purchased the insurance based on the assurance of Sureco and the policy information provided by Sureco that my pre-existing conditions would be covered by Aliera Health if I waited 2 months for the surgery. When I called Ms. Towle, she assured me that the insurance would be covering my surgery and she and her manager would look into it. They both assured me that the surgery should be covered.

The information between SureCo and Aleira did not match. Ms. Towle agreed that the policy sold to me was misleading due to SureCo's lack of communication with Aleira.

I paid for the policy for 4 months at a rate of $449.90 per month. I requested a refund for the insurance from SureCo. She stated that SureCo could not refund the money since it was collected by Aliera and that she would look into what SureCo could do for me. I have not heard from SureCo since November 15, 2018.

### CONSUMER DESIRED RESOLUTION

I feel that SureCo is the responsible party since Ms. Towle assured me that the surgery would be covered. As a result of  her assurances, I have paid almost $2000 in medical bills and insurance for a surgery that has been disallowed. I also have to meet these medical expenses again under my 2019 new insurance deductible with my new insurance company.I feel the least SureCo can do is to refund my insurance policy premiums that I paid based on their assurances that my surgery would be covered.

| CONSUMER IS COMPLAINING AGAINST | CONSUMER IS REPRESENTED BY AN ATTORNEY? | HOW DID THE CONSUMER KNOW ABOUT US? |
|---|---|---|
| Agency | No | Friend/Relative/Co-worker |

| HAS THE CONSUMER PREVIOUSLY REPORTED THIS PROBLEM TO OUR OFFICE OR ANY OTHER AGENCY? | PURCHASED INSURANCE ON THE HEALTH CARE EXCHANGE? |
|---|---|
| No | |

## RESPONDENT INFORMATION

| NAME | ADDRESS | EIN/NPN |
|---|---|---|
| ALIERA HEALTHCARE INC | 990 HAMMOND DRIVE, SUITE 700 SUITE B-200 ATLANTAGA 30328 | 81-1019555 |

| EMPLOYMENT TYPE | NAIC ID | REPRESENTATIVE | COMPLAINT CONFIRMED |
|---|---|---|---|
| Producer | | | Yes |

| SOURCE | COMPLAINT TYPE | INCIDENT DATE | RECEIVED DATE | PRIORITY | LOCATION | LOCATION DATE |
|---|---|---|---|---|---|---|
| Consumer | Portal | 11-15-2018 | 02-12-2019 | | Life, Accident and Health | 02-13-2019 |

| FINDING TYPE | INCIDENT GROUP | SUBJECT | STATE ID | SYSTEM SOURCE |
|---|---|---|---|---|
| | | | | |

| INSURER | AGENT/AGENCY | TYPE OF INSURANCE | SELF-FUNDED HEALTH PLAN | COVERAGE TYPE | COVERAGE LEVEL | COVERAGE SUBLEVELS |
|---|---|---|---|---|---|---|
| | SureCo Health & Life | Individual Health | No | Accident and Health | Individual | |

| NAME OF INSURED | POLICY NUMBER | POLICY PERIOD BEGIN DATE | POLICY PERIOD END DATE | POLICY ISSUED STATE | INSURANCE CARD ID | CLAIM NUMBER |
|---|---|---|---|---|---|---|
| ▇▇▇▇ | AlieraCarePrem | | | Colorado | ▇▇▇▇ | |

| TYPE OF POLICY | LOCATION OF LOSS | IS THE INSURED MEDICARE | MEDICARE SUPP. PLAN | OTHER PARTY'S POLICY OR CLAIM NUMBER |
|---|---|---|---|---|
| Life or Health | | No | | |

**EXHIBIT**

**1.4**

Ex. 1.4, p. 1 of 3

**Problem Report Information Inquiry**

| Problem Report ID: 266367 | Problem Report Type: Complaint | | Responsible Section: Life, Accident, and Health |
|---|---|---|---|
| Status: Closed | Opened Date: 02-12-2019 | Closed Date: 01-13-2020 | Closure Reason: |

## COMPLAINANT INFORMATION

| NAME | ADDRESS | NPN | ORGANIZATION | ROLE | REPRESENTATIVE | AGE GROUP | MEDICAL INFO. AUTHORIZATION |
|---|---|---|---|---|---|---|---|
| ███ | ███ | | | Portal | | | No |

## STAFF MEMBERS

| STAFF MEMBER | BEGIN DATE | END DATE | RESPONSIBLE |
|---|---|---|---|
| Taylor, ACS, AIAA Karen | 02-12-2019 | 02-13-2019 | Yes |

## REASONS

| CATEGORY | REASON TYPES | RESPONDENT |
|---|---|---|
| CH | Denial of Claim | ALIERA HEALTHCARE INC |
| MS | Misrepresentation | ALIERA HEALTHCARE INC |

## ACTIVITIES

| ACTIVITY DATE STAFF MEMBER | ACTIVITY | TIME | LETTER DESCRIPTION BATCH QTY   COMMENT | DUE DATE | RECEIVED DATE | INVOLVED PARTY NAME |
|---|---|---|---|---|---|---|
| 03-06-2020 Jason  Lapham | Phone | 1 | Age ██ at the time of purchase. Purchased through Sureco Agency in July 2018 for effective coverage August 2019 She owns a small retail business and customers recommended Aliera after she told them that she needed a knee replacement. She did not have other coverage and has not had insurance coverage for the last few years. She repeatedly told the Sureco sales rep that she needed a knee replacement and the sales rep told her that it would cover her knee replacement. After Aliera told her it would not be covered because it was a preexisting condition, the Sureco sales rep told her that this was not their understanding with the way the plan worked and they would contact Aliera.  After not being able to resolve this, ████ says that the sales rep agreed that Aliera should refund her money. $500-$600/ month and she paid 8/2018 through 11/2018. ████ purchased BCBS for 2019 and had her knee replaced in February 2019. I asked if she had any email communication from the Sureco rep regarding the pre-exisiting condition question or that she should receive a refund. ████ will check her email and get back to me. | | | Complainant |
| 08-13-2019 Jason  Lapham | Email | 0.08 | ████ followed-up with marketing documentation | | | Complainant |
| 08-06-2019 Jason  Lapham | Email | 0.08 | sent follow-up email to ████ asking if she would be willing to discuss | | | Complainant |
| 07-31-2019 Jason  Lapham | Phone | 0.08 | left ████ a voicemail | | | Complainant |
| 02-13-2019 Karen  Taylor, ACS, AIAA | Email | 0.2 | I sent am E-Mail to ████ letting her know that I am the Analyst that is assigned to her complaint.  I told Ms. ██ that I contacted AlieraCare  and was told her health plan is a health cost sharing ministry.  I told Ms. ██ that the Colorado Division of Insurance (Division) does not have any regulatory authority over a health cost sharing ministry.  The Division has jurisdiction over a complaint regarding an insurance company. There is no state agency that regulates a health cost sharing ministries.  I suggested  that she  can file a written appeal or contact Alleracare by phone to file the appeal.  I told Ms. ████ that since there was no insurance company involved that I am going to close her complaint as an inquiry. | | | Complainant |
| 02-13-2019 Karen  Taylor, ACS, AIAA | Phone | 0.1 | I spoke with Megan Long at AlieraCare asking if there is an insurance company involved.  Ms. Long said that AlieraCare is a health sharing ministry, and that there is no insurance company involved.  Ms. Long recommends that the complainant either submit a written appeal or call AlierCare to file the appeal. | | | Long, Meghan/AlieraCare |

## INVOLVED PARTIES

| INVOLVED PARTY | INVOLVED PARTY TYPE | ORGANIZATION | COMMENT |
|---|---|---|---|
| ███ | Portal - Insured | | |

**Problem Report Information Inquiry**

**Problem Report ID:** 266367      **Problem Report Type:** Complaint      **Responsible Section:** Life, Accident, and Health

**Status:** Closed      **Opened Date:** 02-12-2019      **Closed Date:** 01-13-2020      **Closure Reason:**

| INVOLVED PARTY | INVOLVED PARTY TYPE | ORGANIZATION | COMMENT |
|---|---|---|---|
| SureCo Health & Life | Portal - Agent/Agency | | |

**DISPOSITIONS**

| DATE | TYPE | REQUESTED AMOUNT | DISPOSITION AMOUNT | PAID AMOUNT |
|---|---|---|---|---|
| 01-13-2020 | Referred for Discplnry Actn | $ 0.00 | $ 0.00 | $ 0.00 |

06-17-2024

**Problem Report Information Inquiry**

| **Problem Report ID:** 276680 | **Problem Report Type:** Inquiry | **Responsible Section:** Life, Accident, and Health |
|---|---|---|
| **Status:** Closed | **Opened Date:** 08-16-2021 | **Closed Date:** 09-07-2021 | **Closure Reason:** |

## PROBLEM REPORT DETAILS

| TYPE OF PROBLEM | OTHER PROBLEM TYPE DESCRIPTION |
|---|---|
| | |

| DESCRIPTION |
|---|
| RLG- 720-273-4823 No Jurisdiction.  Health Share Plan |

**CONSUMER DETAIL OF COMPLAINT**

I purchased "insurance" from an agent at this number.  Not sure of the actual buisness name as different people have given me different names of the company, I was told National insurance agency ,and ABC innovations at different times. I cannot find either on the internet. The agent described it as a PPO policy.  During the month of August I tried to use the insurance several times and offices requested a group number which I did not have.  After three separate calls to the company I learned it was not health insurance but a health sharing ministry.  This was not disclosed verbally by the agent.  I called to cancel the policy and was routed to many numbers.  Finally, I spoke with a Cristine P and she canceled the policy.She told me I would receive email confirmation in 24-48 hours.  I told her that I wanted to file a complaint to get my $2600 back, as the company misrepresented the product.  She told me that many times people buy things they are not satisfied with and argued with me that is was health insurance, and kept wanting to tell me the benefits. I told her I knew the benefits and they were not what I wanted she continued to talk over me.  I asked for a supervisor, she said she was the supervisor. I asked for her direct line and she gave me the companies general 800 number. I asked for the companies address and she said the she needed to put me on hold and then she disconnected me and never called back.  I never received email confirmation and have found out that she DID NOT cancel the policy as she told me.  I called the bank and the credit company and tried to put a stop payment on any future charges and was told because they are listed as "insurance" it will not let them put a stop payment.  I called the parent company and now being passed around again.  My next payment is going to be taken on August 20 and it seems that I have no options to cancel.  I am afraid I will now be charged AGAIN.

**CONSUMER DESIRED RESOLUTION**

I would like my money back and some disciplinary action to the agency that sold the insurance as they are clearly misrepresenting a product.  I was told that it was insurance, that is was a "large PPO network" and that all my doctors were on the plan and I would be covered.  My 17 year old daughter was there for the last phone call as the agent continually argued with me about, benefits, and the fact that it was insurance and then hung up on me and deleted my request to cancel. I found all this out 33 days after purchasing the membership and have NEVER USED it.  I would like to know this will not happen to anyone else.  I am an educated, and honest person, I am a mental health therapist and I work with insurance. I cannot believe that an agency is able to operate without any regulations on what they can say to sell health care on the exchange. My husband and I own are own business and have to purchase health care through the exchange.  I had breast cancer 5 years ago and would have NEVER opted for something that was not traditional insurance.  PLEASE HELP!

| CONSUMER IS COMPLAINING AGAINST | CONSUMER IS REPRESENTED BY AN ATTORNEY? | HOW DID THE CONSUMER KNOW ABOUT US? |
|---|---|---|
| Agency | No | Insurance agent/company |

| HAS THE CONSUMER PREVIOUSLY REPORTED THIS PROBLEM TO OUR OFFICE OR ANY OTHER AGENCY? | PURCHASED INSURANCE ON THE HEALTH CARE EXCHANGE? |
|---|---|
| No | |

## RESPONDENT INFORMATION

| SOURCE | COMPLAINT TYPE | INCIDENT DATE | RECEIVED DATE | PRIORITY | LOCATION | LOCATION DATE |
|---|---|---|---|---|---|---|
| Consumer | Portal | | | | | |
| FINDING TYPE | INCIDENT GROUP | SUBJECT | | SUBJECT ADDITIONAL DETAILS | STATE ID | SYSTEM SOURCE |
| | | | | | | |

| INSURER | AGENT/AGENCY | TYPE OF INSURANCE | SELF-FUNDED HEALTH PLAN | COVERAGE TYPE | COVERAGE LEVEL | COVERAGE SUBLEVELS |
|---|---|---|---|---|---|---|
| | 855-662-1480 no consistent name, National Insurance agency | Individual Health | No | | | |
| NAME OF INSURED | POLICY NUMBER | POLICY PERIOD BEGIN DATE | POLICY PERIOD END DATE | POLICY ISSUED STATE | INSURANCE CARD ID | CLAIM NUMBER |
| ▮ | none | | | Colorado | | |
| TYPE OF POLICY | LOCATION OF LOSS | IS THE INSURED MEDICARE | MEDICARE SUPP. PLAN | OTHER PARTY'S POLICY OR CLAIM NUMBER | | |
| Life or Health | | No | | | | |

## COMPLAINANT INFORMATION

| NAME | ADDRESS | NPN | ORGANIZATION | ROLE | REPRESENTATIVE | AGE GROUP | MEDICAL INFO. AUTHORIZATION |
|---|---|---|---|---|---|---|---|
| ▮ | ▮ | | | Portal | | | No |

## STAFF MEMBERS

| STAFF MEMBER | BEGIN DATE | END DATE | RESPONSIBLE |
|---|---|---|---|
| Gonzales Ramona | 08-16-2021 | 09-07-2021 | Yes |

**EXHIBIT 1.5**

Ex. 1.5, p. 1 of 2

# Problem Report Information Inquiry

| | | |
|---|---|---|
| **Problem Report ID:** 276680 | **Problem Report Type:** Inquiry | **Responsible Section:** Life, Accident, and Health |
| **Status:** Closed | **Opened Date:** 08-16-2021 | **Closed Date:** 09-07-2021 | **Closure Reason:** |

## ACTIVITIES

| ACTIVITY DATE | ACTIVITY | | LETTER DESCRIPTION | | DUE DATE | RECEIVED DATE | INVOLVED PARTY NAME |
|---|---|---|---|---|---|---|---|
| | STAFF MEMBER | TIME | BATCH QTY | COMMENT | | | |
| 09-07-2021 | Phone | | | | | | ▮ |
| | Ramona Gonzales | 0.16 | | Called and left two messages because I don't belive the first VM went through. Advised that I have tried to collect the name of the broker who sold the plan. I called the number located in the complaint but was transferred to different departments and finally told that I would have to have the consumer contact the company for that information. Advised that I would be closing the complaint but would reopen it upon receiving the name of the broker who sold the plan. | | | |
| 08-31-2021 | Phone | | | | | | ▮ |
| | Ramona Gonzales | 0.05 | | called the consumer but I got the mailbox and the vm is full | | | |
| 08-27-2021 | Meeting | | | | | | ▮ |
| | Ramona Gonzales | 0.5 | | Too discuss next steps. Send out inquiry letter to the broker. | | | |
| 08-24-2021 | Review Materials | | | | | | ▮ |
| | Ramona Gonzales | 0.5 | | | | | |

## INVOLVED PARTIES

| INVOLVED PARTY | INVOLVED PARTY TYPE | ORGANIZATION | COMMENT |
|---|---|---|---|
| 855-662-1480 no consistent name, National Insurance agency | Portal - Agent/Agency | | |
| ▮ | Portal - Insured | | |

## RELATED DOCUMENTS

| SOFTWARE PRODUCT | DOCUMENT NAME | | DOCUMENT | PATH NAME |
|---|---|---|---|---|
| DOC LOC ID | | SCAN DOC | CONFIDENTIAL | |
| Database File System | insurance 2.jpg | | insurance card | /sirgov/sgov_p2/15558/rltddoc/08242021134850155insurance 2.jpg |
| | | | No | |

## COMMENTS

| DATE | COMMENT | VISIBLE ON PORTAL |
|---|---|---|
| 08-27-2021 | ▮ | Yes |
| | I will be sending out a letter to the broker on Monday. Can you please provide me with the name of the broker who sold you the plan. Any information would be helpful. | |
| | Thank you, | |
| | Ramona | |
| 08-18-2021 | ▮ | Yes |
| | Can you upload a copy of your insurance card. I need to know who the insurance carrier is to determine if we have jurisdiction over these plans. | |
| | Please and thank you, | |
| | Ramona | |

06-17-2024

# Problem Report Information Inquiry

**Problem Report ID:** 277885
**Status:** Closed

**Problem Report Type:** Inquiry
**Opened Date:** 11-29-2021

**Closed Date:** 12-10-2021

**Responsible Section:** Life, Accident, and Health
**Closure Reason:**

## PROBLEM REPORT DETAILS

| TYPE OF PROBLEM | OTHER PROBLEM TYPE DESCRIPTION |
|---|---|
| | |

### DESCRIPTION

**CONSUMER DETAIL OF COMPLAINT**

I was told I was buying a 70/30 individual health plan, with a total of out of pocket for $6500. I was told that in order to hold (I didn't need a new policy nor do I qualify for a lower rate, until January of 2022) this price and policy, they would need a credit card and would charge at a later date. Once the credit card was provided, they sent me a portal to access my detailed policy information. Right away I saw issues with what had been agreed upon and what had been provided via this portal. This is Not a 70/30 policy, nor do I have coverage that is a max of $6500 out of pocket. Once I saw this, within 24 hours, I tried calling them back with the number provided. I reached someone the next day, still within 24 hours, and I told then I was canceling because I was sold something that was clearly not what was being delivered. The woman handling my call was combative and not wanting or willing to cancel my policy. She just kept saying why did you give your credit card if you didn't want the policy, this of course was infuriating considering that I had been lied to on the phone about what I was buying. When I challenged her on this fact, she hung up on me. I followed up with an email that stated that I was canceling and why. They have charged my credit card and will not respond to my cancellation. I was never told that I was buying something through Jericho Share, which is very difficult to find information on. I was told I was buying from the open market called, Multi Plan. They even went as far as to tell me that one of the plans being discussed was through, Atena. Blackhawk Claim Services, is who is on my credit card statement. I researched them, and found plenty of complaints that had bait and switch overtones. Jericho Share would appear to be a 'health care share ministry', which doesn't provide actual insurance, according to the internet. This is an erroneous group, taking advantage of people. Embarrassed,I was fooled and I hope that this filing helps others.

**CONSUMER DESIRED RESOLUTION**

I would like my credit card reimbursed and a letter showing that the policy was canceled.
I have placed a dispute on this with my credit card company as well. I expect this to be reversed by them but would like to have acknowledgement by the above said companies. I also canceled the original credit card that I gave them, so to alleviate any further charges. But again, I would still like a letter of acknowledged, cancellation from Jericho Share and Blackhawk Claim Services, as it should have been done per my request.

| CONSUMER IS COMPLAINING AGAINST | CONSUMER IS REPRESENTED BY AN ATTORNEY? | HOW DID THE CONSUMER KNOW ABOUT US? |
|---|---|---|
| My Insurance Company | No | Internet/Division Website |

| HAS THE CONSUMER PREVIOUSLY REPORTED THIS PROBLEM TO OUR OFFICE OR ANY OTHER AGENCY? | PURCHASED INSURANCE ON THE HEALTH CARE EXCHANGE? |
|---|---|
| No | |

## RESPONDENT INFORMATION

| NAME | ADDRESS | EIN/NPN |
|---|---|---|
| unknown | c/o Bobbi Baca Denver CO 80202 | |

| EMPLOYMENT TYPE | NAIC ID | REPRESENTATIVE | COMPLAINT CONFIRMED |
|---|---|---|---|
| State Specific | | | No |

| SOURCE | COMPLAINT TYPE | INCIDENT DATE | RECEIVED DATE | PRIORITY | LOCATION | LOCATION DATE |
|---|---|---|---|---|---|---|
| Consumer | Portal | | | Low Priority | Life, Accident and Health | 11-29-2021 |

| FINDING TYPE | INCIDENT GROUP | SUBJECT | SUBJECT ADDITIONAL DETAILS | STATE ID | SYSTEM SOURCE |
|---|---|---|---|---|---|
| Question of Fact | | | | | |

| INSURER | AGENT/AGENCY | TYPE OF INSURANCE | SELF-FUNDED HEALTH PLAN | COVERAGE TYPE | COVERAGE LEVEL | COVERAGE SUBLEVELS |
|---|---|---|---|---|---|---|
| Jericho Share and Blackhawk Claim Services | | Individual Health | No | Accident and Health | Individual | |

| NAME OF INSURED | POLICY NUMBER | POLICY PERIOD BEGIN DATE | POLICY PERIOD END DATE | POLICY ISSUED STATE | INSURANCE CARD ID | CLAIM NUMBER |
|---|---|---|---|---|---|---|
| ▮▮▮▮ | | | | Colorado | | |

| TYPE OF POLICY | LOCATION OF LOSS | IS THE INSURED MEDICARE | MEDICARE SUPP. PLAN | OTHER PARTY'S POLICY OR CLAIM NUMBER |
|---|---|---|---|---|
| Life or Health | | No | | |

## COMPLAINANT INFORMATION

| NAME | ADDRESS | NPN | ORGANIZATION | ROLE | REPRESENTATIVE | AGE GROUP | MEDICAL INFO. AUTHORIZATION |
|---|---|---|---|---|---|---|---|
| ▮▮▮▮ | ▮▮▮▮ | | | Portal | | | No |

**EXHIBIT 1.6**

Ex. 1.6, p. 1 of 2

**Problem Report Information Inquiry**

| | | | |
|---|---|---|---|
| **Problem Report ID:** 277885 | **Problem Report Type:** Inquiry | | **Responsible Section:** Life, Accident, and Health |
| **Status:** Closed | **Opened Date:** 11-29-2021 | **Closed Date:** 12-10-2021 | **Closure Reason:** |

### STAFF MEMBERS

| STAFF MEMBER | BEGIN DATE | END DATE | RESPONSIBLE |
|---|---|---|---|
| Tucker Tony | 11-29-2021 | 12-10-2021 | Yes |

### REASONS

| CATEGORY | REASON TYPES | RESPONDENT |
|---|---|---|
| PS | Abusive Service | unknown |

### ACTIVITIES

| ACTIVITY DATE | ACTIVITY | | LETTER DESCRIPTION | | DUE DATE | RECEIVED DATE | INVOLVED PARTY NAME |
|---|---|---|---|---|---|---|---|
| | STAFF MEMBER | TIME | BATCH QTY | COMMENT | | | |
| 12-12-2021 | Letter | | CLOSELTR | | | | Complainant |
| | Tony  Tucker | 0.5 | | Explained to consumer the DOI does not have any jurisdiction over | | | |

### INVOLVED PARTIES

| INVOLVED PARTY | INVOLVED PARTY TYPE | ORGANIZATION | COMMENT |
|---|---|---|---|
| ▓▓▓▓▓▓ | Portal - Insured | | |
| Jericho Share and Blackhawk Claim Services | Portal - Company | | |

### DISPOSITIONS

| DATE | TYPE | REQUESTED AMOUNT | DISPOSITION AMOUNT | PAID AMOUNT |
|---|---|---|---|---|
| 12-10-2021 | No Jurisdiction | $ 0.00 | $ 0.00 | $ 0.00 |

# Problem Report Information Inquiry

| | | |
|---|---|---|
| **Problem Report ID:** 278502 | **Problem Report Type:** Inquiry | **Responsible Section:** Life, Accident, and Health |
| **Status:** Closed | **Opened Date:** 01-17-2022 | **Closed Date:** 02-18-2022 | **Closure Reason:** |

## PROBLEM REPORT DETAILS

| TYPE OF PROBLEM | OTHER PROBLEM TYPE DESCRIPTION |
|---|---|
| | |

### DESCRIPTION
AAE - Healthshare ministry - No DOI jurisdiction.

### CONSUMER DETAIL OF COMPLAINT
Hello,

My elderly mother recently tried to sign me up for a regular insurance plan by the Jan 15 deadline.

Rather than being able to find a standard insurance plan, she was scammed by Anthony Setter (not sure of the spelling on that) of Altrua.  Altrua is NOT a regular insurance plan but a health sharing ministry.

It turned out she had NOT been informed that this was not a regular insurance plan (like the kind offered by Blue Cross Blue Shield or a regular provider)- in fact she had no idea!  She had not been informed that it did not cover mental healthcare or other kinds of care that standard, actual insurance plans are required to provide.

She unfortunately is out a substantial amount of money now, after believing she had signed up for a real, standard insurance plan.

This is totally disgusting and unacceptable.

I know that sellers of these alternatives to insurance are required to provide information about their plan and to make it clear what is for sale- in this case, the details were completely misrepresented to her.

Please address this issue swiftly- this company and many of its agents have scores of complaints against them in various states.

IT makes me sick to see elderly people being scammed and taken advantage of.

### CONSUMER DESIRED RESOLUTION
The agent and the company need to be penalized and investigated.

There are scores of complaints against this company online.

If the agent is found to be doing this repeatedly, he needs to lose his license.

| CONSUMER IS COMPLAINING AGAINST | | CONSUMER IS REPRESENTED BY AN ATTORNEY? | HOW DID THE CONSUMER KNOW ABOUT US? |
|---|---|---|---|
| My Insurance Company | Agency | No | |
| HAS THE CONSUMER PREVIOUSLY REPORTED THIS PROBLEM TO OUR OFFICE OR ANY OTHER AGENCY? | | PURCHASED INSURANCE ON THE HEALTH CARE EXCHANGE? | |
| No | | | |

## RESPONDENT INFORMATION

| SOURCE | COMPLAINT TYPE | INCIDENT DATE | RECEIVED DATE | PRIORITY | LOCATION | LOCATION DATE |
|---|---|---|---|---|---|---|
| Consumer | Portal | | | | | |
| FINDING TYPE | INCIDENT GROUP | SUBJECT | | SUBJECT ADDITIONAL DETAILS | STATE ID | SYSTEM SOURCE |
| | | | | | | |

| INSURER | AGENT/AGENCY | TYPE OF INSURANCE | SELF-FUNDED HEALTH PLAN | COVERAGE TYPE | COVERAGE LEVEL | COVERAGE SUBLEVELS |
|---|---|---|---|---|---|---|
| Altrua Health Share | Anthony Setter | Other - health share- not insurance | No | | | |
| NAME OF INSURED | POLICY NUMBER | POLICY PERIOD BEGIN DATE | POLICY PERIOD END DATE | POLICY ISSUED STATE | INSURANCE CARD ID | CLAIM NUMBER |
| ▇ | | | | Colorado | | |
| TYPE OF POLICY | LOCATION OF LOSS | IS THE INSURED MEDICARE | MEDICARE SUPP. PLAN | OTHER PARTY'S POLICY OR CLAIM NUMBER | | |
| Life or Health | | No | | | | |

## COMPLAINANT INFORMATION

| NAME | ADDRESS | NPN | ORGANIZATION | ROLE | REPRESENTATIVE | AGE GROUP | MEDICAL INFO. AUTHORIZATION |
|---|---|---|---|---|---|---|---|
| ▇ | ▇ | | ▇ | Portal | | | No |

EXHIBIT
**1.7**

Ex. 1.7, p. 1 of 2

*06-17-2024*　　　　　　　　　　**Problem Report Information Inquiry**　　　　　　　　　　*Page 2 of 2*

| **Problem Report ID:** 278502 | **Problem Report Type:** Inquiry | | **Responsible Section:** Life, Accident, and Health |
| **Status:** Closed | **Opened Date:** 01-17-2022 | **Closed Date:** 02-18-2022 | **Closure Reason:** |

### STAFF MEMBERS

| STAFF MEMBER | BEGIN DATE | END DATE | RESPONSIBLE |
| --- | --- | --- | --- |
| Ebrahim Ambereen | 01-18-2022 | 02-18-2022 | Yes |

### ACTIVITIES

| ACTIVITY DATE | ACTIVITY | | LETTER DESCRIPTION | | DUE DATE | RECEIVED DATE | INVOLVED PARTY NAME |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | STAFF MEMBER | TIME | BATCH QTY | COMMENT | | | |
| 02-18-2022 | Case Closing Report | | | | | | Complainant |
| | Ambereen Ebrahim | 0.1 | | No response from complainant. No DOI jurisdiction over plan as not ACA complaint. | | | |
| 01-21-2022 | Email | | | | | | Complainant |
| | Ambereen Ebrahim | 0.1 | | | | | |

### INVOLVED PARTIES

| INVOLVED PARTY | INVOLVED PARTY TYPE | ORGANIZATION | COMMENT |
| --- | --- | --- | --- |
| Altrua Health Share | Portal - Company | | |
| Anthony Setter | Portal - Agent/Agency | | |
| ▮▮▮▮▮ | Portal - Insured | | |

### COMMENTS

| DATE | COMMENT | VISIBLE ON PORTAL |
| --- | --- | --- |
| 01-21-2022 | Good afternoon. | Yes |

Thank you for contacting the Division of Insurance. It appears that Altrua Healthshare is not ACA compliant and not licensed to do business in the State of Colorado and as such, the Division of Insurance does not have jurisdiction over it.

If you can provide the actual (correct spelling) name of the broker who sold your mother the product, that would be helpful. I did not find the name you mentioned in our producer/broker database.

In addition, do you have a Member ID card provided by the company or the broker? Was there any marketing material or documentation shared by the broker or the company. We will try to pursue this, but unless the plan is actually an insurance plan, or ACA complaint or licensed to do business in the state of Colorado, there is not much that the Division of Insurance can do in this situation as our jurisdiction is over insurance companies.

The best thing to do at this point is to cancel the insurance and to ask for the money back. It is always a good idea to get the name and license number of the person contacting you, call the Division of Insurance to verify if the broker is in good standing and licensed to do business in the State of Colorado, before proceeding. Similarly, reviewing the policy information to see what exactly is covered before signing up and paying for the product is important.

Please let me know if you have any questions. You can always reach me via the portal, by email at Ambereen.Ebrahim@state.co.us or by telephone at 303-894-7697.

You can also contact the State Attorney General's office at 720-508-6000 for Consumer Fraud Protection.

Sincerely,
Amber

**Problem Report Information Inquiry**

| | | | |
|---|---|---|---|
| **Problem Report ID:** 279673 | **Problem Report Type:** Inquiry | | **Responsible Section:** Life, Accident, and Health |
| **Status:** Closed | **Opened Date:** 04-05-2022 | **Closed Date:** 04-11-2022 | **Closure Reason:** |

### PROBLEM REPORT DETAILS

| TYPE OF PROBLEM | OTHER PROBLEM TYPE DESCRIPTION |
|---|---|
| | |

**DESCRIPTION**

AAE - Complaint against a healthcare sharing ministry for premium refunds.

**CONSUMER DETAIL OF COMPLAINT**

I purchased a policy through the Colorado Health Exchange during the open enrollment period on 11/3/21 through a Joseph White 866-813-8280 ext. 0027.I later discovered that I could continue my COBRA coverage through 4/31/22 and preferred to remain with COBRA through April and pick up a stop gap policy for May and June until I become eligible for Medicare in July. Called my initial contact # and talked to James # ID 66106 to see if I could make the policy effective May 1st, 2022, instead of January or get a refund. I was told that he could push the date out until March if I disenrolled, got a refund than reenrolled in the plan which we did on Jan 5th. I needed to call back first part of March to go through the same process again. It has now come to light that Jerricho Shares (PHCS) processed my payment on Feb 15th and began my coverage while I was still covered through COBRA. I called again as instructed multiple times in the beginning of March to go through the same process of disenroll/reenroll. I left James several messages for him to call me back and he did not return 3 calls. I talked to another representative and was told that I did not have to go through that process and to call back at the end of March. I called on March 25th and spoke to Ed at ext. 66109 and was told that my policy was set to activate on May 1st. Jerricho Shares called me yesterday and told me that my policy was no longer active due to non-payment. I went through the circumstances with them, spoke to a supervisor who said that there was nothing she could do and advised to call the licensed agency customer service who sold me the policy. I called back and spoke to several representatives (not Joseph or James) who told me there was nothing they could do and routed me back to Jerico shares and I spoke to the same people who refused to activate my policy in May with my prepaid premium and would not offer a refund.

**CONSUMER DESIRED RESOLUTION**

I would like to get a refund of the $786.85 premium that was processed to pay for a Feb-March policy instead of the agreed upon activation date of May 1st.I had already paid my COBRA coverage for that time period and had no need for 2 policy's.

| CONSUMER IS COMPLAINING AGAINST | | CONSUMER IS REPRESENTED BY AN ATTORNEY? | HOW DID THE CONSUMER KNOW ABOUT US? |
|---|---|---|---|
| My Insurance Company | | No | |

| HAS THE CONSUMER PREVIOUSLY REPORTED THIS PROBLEM TO OUR OFFICE OR ANY OTHER AGENCY? | PURCHASED INSURANCE ON THE HEALTH CARE EXCHANGE? |
|---|---|
| No | |

### RESPONDENT INFORMATION

| SOURCE | COMPLAINT TYPE | INCIDENT DATE | RECEIVED DATE | PRIORITY | LOCATION | LOCATION DATE |
|---|---|---|---|---|---|---|
| Consumer | Portal | | | | | |

| FINDING TYPE | INCIDENT GROUP | SUBJECT | SUBJECT ADDITIONAL DETAILS | STATE ID | SYSTEM SOURCE |
|---|---|---|---|---|---|
| | | | | | |

| INSURER | AGENT/AGENCY | TYPE OF INSURANCE | SELF-FUNDED HEALTH PLAN | COVERAGE TYPE | COVERAGE LEVEL | COVERAGE SUBLEVELS |
|---|---|---|---|---|---|---|
| Jericho Share | | Individual Health | No | | | |

| NAME OF INSURED | POLICY NUMBER | POLICY PERIOD BEGIN DATE | POLICY PERIOD END DATE | POLICY ISSUED STATE | INSURANCE CARD ID | CLAIM NUMBER |
|---|---|---|---|---|---|---|
| ███████ | | | | Colorado | ███████ | |

| TYPE OF POLICY | LOCATION OF LOSS | IS THE INSURED MEDICARE | MEDICARE SUPP. PLAN | OTHER PARTY'S POLICY OR CLAIM NUMBER |
|---|---|---|---|---|
| Life or Health | | No | | |

### COMPLAINANT INFORMATION

| NAME | ADDRESS | NPN | ORGANIZATION | ROLE | REPRESENTATIVE | AGE GROUP | MEDICAL INFO. AUTHORIZATION |
|---|---|---|---|---|---|---|---|
| ███████ | ███████ | | | Portal | | | No |

### STAFF MEMBERS

| STAFF MEMBER | BEGIN DATE | END DATE | RESPONSIBLE |
|---|---|---|---|
| Ebrahim Ambereen | 04-06-2022 | 04-11-2022 | Yes |



EXHIBIT

**1.8**

Ex. 1.8, p. 1 of 2

*06-17-2024*                                    **Problem Report Information Inquiry**                                    *Page 2 of 2*

| | | | |
|---|---|---|---|
| **Problem Report ID:** 279673 | **Problem Report Type:** Inquiry | | **Responsible Section:** Life, Accident, and Health |
| **Status:** Closed | **Opened Date:** 04-05-2022 | **Closed Date:** 04-11-2022 | **Closure Reason:** |

### ACTIVITIES

| ACTIVITY DATE | ACTIVITY | | LETTER DESCRIPTION | | DUE DATE | RECEIVED DATE | INVOLVED PARTY NAME |
|---|---|---|---|---|---|---|---|
| | STAFF MEMBER | TIME | BATCH QTY | COMMENT | | | |
| 04-11-2022 | Case Closing Report | | | | | | ▇▇▇▇ |
| | Ambereen Ebrahim | 0.1 | | Emailed and send portal message about HCSM, no DOI jurisdiction and asked template questions.  No response. | | | |
| 04-08-2022 | Email | | | | | | ▇▇▇▇ |
| | Ambereen Ebrahim | 0.1 | | Sent an email directly to email address provided. | | | |
| 04-07-2022 | Email | | | | | | ▇▇▇▇ |
| | Ambereen Ebrahim | 0.33 | | Portal message regarding HCSM. | | | |
| 04-07-2022 | Review Materials | | | | | | ▇▇▇▇ |
| | Ambereen Ebrahim | 0.2 | | | | | |

### INVOLVED PARTIES

| INVOLVED PARTY | INVOLVED PARTY TYPE | ORGANIZATION | COMMENT |
|---|---|---|---|
| ▇▇▇▇ | Portal - Insured | | |
| Jericho Share | Portal - Company | | |

### COMMENTS

| DATE | COMMENT | VISIBLE ON PORTAL |
|---|---|---|
| 04-07-2022 | Good morning, ▇▇▇▇ | Yes |

Thank you for contacting the Colorado Division of Insurance.  The Colorado Division of Insurance (DOI) regulates the insurance industry in Colorado We regulate and monitor the insurance companies in Colorado, as well as insurance agents, making sure everyone is following the law.

In reviewing your complaint, it appears that you selected Jericho Share, which is a Health Care Sharing Ministry and not a licensed insurance company.  As such, the Division of Insurance does not have jurisdiction over this company.

The official Colorado insurance market place is Connect for Health Colorado and it provides ACA approved insurance plans from insurance companies licensed to do business in the State of Colorado (examples are Kaiser,  Anthem BCBS, Cigna, etc).

The Division is collecting information on Health Care Sharing Ministries and have some questions listed below.
1.How did you purchase your HCSM membership?
a.Through a broker or insurance producer?  Do you have their insurance license information?
b.What information was disclosed during the sale?
i.Were you aware the plan was not insurance?
ii.Were you aware the plan is not ACA compliant?
iii.Were you aware of the coverages/exclusions?
c.What documentation was given to you at the time of sale?
d.When you initially contacted the seller where you looking for insurance or an HCSM membership?

You can always reach me via the portal, by email at Ambereen.Ebrahim@state.co.us or by telephone at 303-894-7697.

Sincerely,
Amber.

06-17-2024                          **Problem Report Information Inquiry**                          *Page 1 of 2*

**Problem Report ID:** 281368                **Problem Report Type:** Inquiry              **Responsible Section:** Life, Accident, and Health
**Status:** Closed          **Opened Date:** 08-02-2022          **Closed Date:** 08-05-2022          **Closure Reason:**

### PROBLEM REPORT DETAILS

| TYPE OF PROBLEM | OTHER PROBLEM TYPE DESCRIPTION |
|---|---|
| | |

| DESCRIPTION |
|---|
| RLG-No Jurisdiction.  Jericho. |

**CONSUMER DETAIL OF COMPLAINT**

I had insurance through my spouses employment til 8/31/2021. She went on a cobra plan due to retiring.  I started the process in August to find my own health insurance.  I googled affordable care act and called the first website, not knowing I wasn't calling the Colorado marketplace. I spoke with an agent and signed up with Jericho Shares and started paying a monthly premium.  I realized after an urgent care visit in March of 2022 that it was a healthcare sharing ministry and not a true insurance policy.  I then went back to google and went to Colorado Health Insurance.org.  I spoke to Mack Ryan x201 and he informed me that this company HMA{First Health Network) was indeed health insurance with full coverage: pharmacy, doctor appointments, hospital etc.  the only thing they didn't cover was pregnancies and mental illness.  I signed up for this plan starting May 1, 2022 with a premium deducted from my checking account monthly.  I had my first doctor visit on May 5, 2022 with an orthopedic surgeon because of hip pain. On July 21, 2022 I received the EOB paperwork. The entire visit was $1815.00 and the check amount to the doctor was $160.80.  This is when I realized that there was a problem.  After contacting HMA I was informed that my coverage is extremely limited and all that was said to me by Mack Ryan was essentially a lie.  I have contacted the company many times this past week trying to get in touch with Mack Ryan and also a manager, supervisor etc.  I was told twice that the calls would be expedited and have not heard anything back to date.

**CONSUMER DESIRED RESOLUTION**

I would appreciate having this resolved and allowing me to consider these issues from these so called health insurance companies as a life changing event so that I can reestablish a health care plan that will fulfill my healthcare needs until I turn 65 in February of 2025.

| CONSUMER IS COMPLAINING AGAINST | CONSUMER IS REPRESENTED BY AN ATTORNEY? | HOW DID THE CONSUMER KNOW ABOUT US? |
|---|---|---|
| My Insurance Company    Agency | No | Internet/Division Website |

| HAS THE CONSUMER PREVIOUSLY REPORTED THIS PROBLEM TO OUR OFFICE OR ANY OTHER AGENCY? | PURCHASED INSURANCE ON THE HEALTH CARE EXCHANGE? |
|---|---|
| No | |

### RESPONDENT INFORMATION

| SOURCE | COMPLAINT TYPE | INCIDENT DATE | RECEIVED DATE | PRIORITY | LOCATION | LOCATION DATE |
|---|---|---|---|---|---|---|
| Consumer | Portal | | | | Life, Accident and Health | 08-05-2022 |
| FINDING TYPE | INCIDENT GROUP | SUBJECT | | SUBJECT ADDITIONAL DETAILS | STATE ID | SYSTEM SOURCE |
| | | | | | | |

| INSURER | AGENT/AGENCY | TYPE OF INSURANCE | SELF-FUNDED HEALTH PLAN | COVERAGE TYPE | COVERAGE LEVEL | COVERAGE SUBLEVELS |
|---|---|---|---|---|---|---|
| HMA{First Health Network} | Mack Ryan | Individual Health | No | | | |
| NAME OF INSURED | POLICY NUMBER | POLICY PERIOD BEGIN DATE | POLICY PERIOD END DATE | POLICY ISSUED STATE | INSURANCE CARD ID | CLAIM NUMBER |
| | | | | Colorado | | |
| TYPE OF POLICY | LOCATION OF LOSS | IS THE INSURED MEDICARE | MEDICARE SUPP. PLAN | OTHER PARTY'S POLICY OR CLAIM NUMBER | | |
| Life or Health | | No | | | | |

### COMPLAINANT INFORMATION

| NAME | ADDRESS | NPN | ORGANIZATION | ROLE | REPRESENTATIVE | AGE GROUP | MEDICAL INFO. AUTHORIZATION |
|---|---|---|---|---|---|---|---|
| ██████ | ████████████ | | | Portal | | | No |

### STAFF MEMBERS

| STAFF MEMBER | BEGIN DATE | END DATE | RESPONSIBLE |
|---|---|---|---|
| Gonzales Ramona | 08-02-2022 | 08-05-2022 | Yes |

### ACTIVITIES

| ACTIVITY DATE | ACTIVITY | LETTER DESCRIPTION | | DUE DATE | RECEIVED DATE | INVOLVED PARTY NAME |
|---|---|---|---|---|---|---|
| | STAFF MEMBER | TIME | BATCH QTY | COMMENT | | |
| 08-11-2022 | Note | | | | | Sent Matt the Complaint ->C4 |
| | Ramona  Gonzales | 0.16 | | To assist with enrolling in an ACA compliant plan. | | |

**EXHIBIT 1.9**

*Ex. 1.9, p. 1 of 2*

*06-17-2024* **Problem Report Information Inquiry** *Page 2 of 2*

| | | | | |
|---|---|---|---|---|
| **Problem Report ID:** 281368 | | **Problem Report Type:** Inquiry | | **Responsible Section:** Life, Accident, and Health |
| **Status:** Closed | **Opened Date:** 08-02-2022 | | **Closed Date:** 08-05-2022 | **Closure Reason:** |

| ACTIVITY DATE | ACTIVITY | | LETTER DESCRIPTION | | DUE DATE | RECEIVED DATE | INVOLVED PARTY NAME |
|---|---|---|---|---|---|---|---|
| | STAFF MEMBER | TIME | BATCH QTY | COMMENT | | | |
| 08-10-2022 | Phone | | | | | | Broker-Emma |
| Ramona Gonzales | | 0.16 | | 7195301420/emma@dunninsurancegroup.com | | | |
| | | | | Matt advised me to provide Jessalyn Hamptons name to assist with enrolling ▮▮▮▮▮▮ in an ACA-compliant plan. | | | |
| 08-05-2022 | Phone | | | | | | Complainant |
| Ramona Gonzales | | 0.25 | | Called to make sure she is getting assistance with C4 to enroll in ACA plan as when was a victim of fraud with Jehrico and HMA. Advised that I would be closing the complaint. | | | |
| 08-05-2022 | Case Closing Report | | | | | | Complainant |
| Ramona Gonzales | | 0.16 | | No Jurisdiction.  Called to make sure she is getting assistance through C4. | | | |
| 08-05-2022 | Review Materials | | | | | | Complainant |
| Ramona Gonzales | | 0.5 | | | | | |

### INVOLVED PARTIES

| INVOLVED PARTY | INVOLVED PARTY TYPE | ORGANIZATION | COMMENT |
|---|---|---|---|
| HMA{First Health Network} | Portal - Company | | |
| Mack Ryan | Portal - Agent/Agency | | |
| ▮▮▮▮▮▮ | Portal - Insured | | |

### RELATED DOCUMENTS

| SOFTWARE PRODUCT | DOCUMENT NAME | | DOCUMENT | | PATH NAME |
|---|---|---|---|---|---|
| | DOC LOC ID | SCAN DOC | CONFIDENTIAL | | |
| Database File System | From the Division | | Correspondence with Emma-Broker | | /siroov/sgov_p2/15558/rltddoc/08102022140346790State.co.us Executive Branch Mail - C4 Contact for ▮▮▮▮.pdf |
| | | | No | | |

06-17-2024                     **Problem Report Information Inquiry**                    *Page 1 of 2*

| | | |
|---|---|---|
| **Problem Report ID:** 264831 | **Problem Report Type:** Complaint | **Responsible Section:** Life, Accident, and Health |
| **Status:** Closed | **Opened Date:** 09-30-2018 | **Closed Date:** 01-13-2020 | **Closure Reason:** |

### PROBLEM REPORT DETAILS

| TYPE OF PROBLEM | OTHER PROBLEM TYPE DESCRIPTION |
|---|---|

**DESCRIPTION**

██████ No CO DOI- spoke with consumer in detail- has a health sharing ministry plan- explained no jurisdiction and CO state laws do not apply.  Contact carrier to ask if any appeals/grievance rights under the plan and request copy.  Also may want to contact broker who sold plan to her- does he/she have info on administrator of plan- call them to see if they can assist with complaint & possible appeal for med necessity if offered under plan.  Did explain this is not ACA compliant and not insurance. Consumer clear on next steps and understands I am closing file.

**CONSUMER DETAIL OF COMPLAINT**

Company is denying an ER visit that turned into a hospital admission. I have paid most of my deductible of $5,000 already, and intend to pay the approx. $1,000 remaining, but Aliera says they won't cover the costs because the condition "was not life threatening".  The symptoms caused the hospital to give me a CT and MRI to look for stroke, aneurysm or blood clot in brain. the attending even sent me for a second CT due to my "left eye drooping". The doctors were not certain what was going on, but it was serious enough to admit me. This was not my "choice". The end diagnosis code was related to a "status migraine", but it took the hospital 2 nights to determine and treat. These claims should be paid!

**CONSUMER DESIRED RESOLUTION**

Payment of claims over my $5,000 deductible just as my policy and its emergency services "prudent person" standard promises to do.

| CONSUMER IS COMPLAINING AGAINST | CONSUMER IS REPRESENTED BY AN ATTORNEY? | HOW DID THE CONSUMER KNOW ABOUT US? |
|---|---|---|
| My Insurance Company | No | Internet/Division Website |

| HAS THE CONSUMER PREVIOUSLY REPORTED THIS PROBLEM TO OUR OFFICE OR ANY OTHER AGENCY? | PURCHASED INSURANCE ON THE HEALTH CARE EXCHANGE? |
|---|---|
| No | |

### RESPONDENT INFORMATION

| NAME | ADDRESS | EIN/NPN |
|---|---|---|
| ALIERA HEALTHCARE INC | 990 HAMMOND DRIVE, SUITE 700<br>SUITE B-200<br>ATLANTAGA 30328 | 81-1019555 |

| EMPLOYMENT TYPE | NAIC ID | REPRESENTATIVE | COMPLAINT CONFIRMED |
|---|---|---|---|
| Producer | | | Yes |

| SOURCE | COMPLAINT TYPE | INCIDENT DATE | RECEIVED DATE | PRIORITY | LOCATION | LOCATION DATE |
|---|---|---|---|---|---|---|
| Consumer | Portal | 03-24-2018 | | | | |

| FINDING TYPE | INCIDENT GROUP | SUBJECT | SUBJECT ADDITIONAL DETAILS | STATE ID | SYSTEM SOURCE |
|---|---|---|---|---|---|

| INSURER | AGENT/AGENCY | TYPE OF INSURANCE | SELF-FUNDED HEALTH PLAN | COVERAGE TYPE | COVERAGE LEVEL | COVERAGE SUBLEVELS |
|---|---|---|---|---|---|---|
| Aliera Healthcare | | Individual Health | No | Accident and Health | Individual | |

| NAME OF INSURED | POLICY NUMBER | POLICY PERIOD BEGIN DATE | POLICY PERIOD END DATE | POLICY ISSUED STATE | INSURANCE CARD ID | CLAIM NUMBER |
|---|---|---|---|---|---|---|
| ██████ | | | | Colorado | | Multiple |

| TYPE OF POLICY | LOCATION OF LOSS | IS THE INSURED MEDICARE | MEDICARE SUPP. PLAN | OTHER PARTY'S POLICY OR CLAIM NUMBER |
|---|---|---|---|---|
| Life or Health | St. Anthony Hospital<br>Lakewood CO | No | | |

### COMPLAINANT INFORMATION

| NAME | ADDRESS | NPN | ORGANIZATION | ROLE | REPRESENTATIVE | AGE GROUP | MEDICAL INFO. AUTHORIZATION |
|---|---|---|---|---|---|---|---|
| ██████ | ██████ | | | Portal | | | No |

### STAFF MEMBERS

| STAFF MEMBER | BEGIN DATE | END DATE | RESPONSIBLE |
|---|---|---|---|
| Bouhall Diane | 10-01-2018 | 10-01-2018 | Yes |

**EXHIBIT 1.10**

Ex. 1.10, p. 1 of 2

# Problem Report Information Inquiry

| | | |
|---|---|---|
| **Problem Report ID:** 264831 | **Problem Report Type:** Complaint | **Responsible Section:** Life, Accident, and Health |
| **Status:** Closed | **Opened Date:** 09-30-2018 | **Closed Date:** 01-13-2020 | **Closure Reason:** |

## REASONS

| CATEGORY | REASON TYPES | RESPONDENT |
|---|---|---|
| CH | Denial of Claim Emergency Services | ALIERA HEALTHCARE INC |

## ACTIVITIES

| ACTIVITY DATE STAFF MEMBER | ACTIVITY | TIME | LETTER DESCRIPTION BATCH QTY | COMMENT | DUE DATE | RECEIVED DATE | INVOLVED PARTY NAME |
|---|---|---|---|---|---|---|---|
| 11-21-2019 Jason Lapham | Phone | 1 | | Call with ▇▇▇. Went to ER with symptoms of what could have been a stroke. It was a status migraine. This migraine ultimately lasted 10 days. ▇▇▇ has a history of migraines, but never experience this before which caused her to seek emergency services. Initially denied in early 2019 as not life threatening. After she appealed, she received a denial for pre-ex. She is upset about company changing the rationale for denying. She is still covered by Aliera despite originally having Unity. She was ported over to Trinity. She purchased this in 2017 to get away from Kaiser. She purchased during OE for 2018. The broker also has Aliera coverage. She also indicated that she uses tobacco on the application, so she questions why she was even covered. She remains covered but will change to an insurance plan for 2020. She understood that this was not insurance but an alternative. | | | Complainant |
| 11-19-2019 Jason Lapham | Email | 0.08 | | ▇▇▇ responded indicating that she would like to discuss | | | Complainant |
| 10-24-2019 Jason Lapham | Email | 0.08 | | email to ▇▇▇ | | | Complainant |
| 10-01-2018 Diane Bouhall | Phone | 0.2 | | No CO DOI- spoke with consumer in detail- has a health sharing ministry plan- explained no jurisdiction and CO state laws do not apply. Contact carrier to ask if any appeals/grievance rights under the plan and request copy. Also may want to contact broker who sold plan to her- does he/she have info on administrator of plan- call them to see if they can assist with complaint & possible appeal for med necessity if offered under plan. Did explain this is not ACA compliant and not insurance. Consumer clear on next steps and understands I am closing file. | | | |

## INVOLVED PARTIES

| INVOLVED PARTY | INVOLVED PARTY TYPE | ORGANIZATION | COMMENT |
|---|---|---|---|
| Aliera Healthcare | Portal - Company | | |
| ▇▇▇ | Portal - Insured | | |

## DISPOSITIONS

| DATE | TYPE | REQUESTED AMOUNT | DISPOSITION AMOUNT | PAID AMOUNT |
|---|---|---|---|---|
| 01-13-2020 | Referred for Discplnry Actn | $ 0.00 | $ 0.00 | $ 0.00 |

## RELATED DOCUMENTS

| SOFTWARE PRODUCT DOC LOC ID | DOCUMENT NAME SCAN DOC | DOCUMENT CONFIDENTIAL | PATH NAME |
|---|---|---|---|
| Database File System | Aliera appeal letter.docx | Appeal letter sent to my insurer No | /sirgov/sgov_p2/15558/rltddoc/09302018183111520Aliera appeal letter.docx |

06-17-2024

## Problem Report Information Inquiry

**Problem Report ID:** 265047     **Problem Report Type:** Inquiry     **Responsible Section:** Life, Accident, and Health

**Status:** Closed     **Opened Date:** 10-17-2018     **Closed Date:** 10-19-2018     **Closure Reason:**

### PROBLEM REPORT DETAILS

| TYPE OF PROBLEM | OTHER PROBLEM TYPE DESCRIPTION |
| --- | --- |
| | |

**DESCRIPTION**

I have notified ▓▓▓▓ ▓▓▓▓ health plan is a faith based health sharing plan through Liberty HealthShare.  The Division of Insurance does not have any regulatory authority over Liberty HealthShare.

**CONSUMER DETAIL OF COMPLAINT**

On 2/27/2017, i received medical treatment from Community Hospital.  This procedure was approved in advance by Liberty Healthshare.  Afterwards, they refused to cover the cost. I initiated a series of complaints and they finally agreed to pay it. This was a lie.  They did not pay it and, at length, I was sued by a collection agency.  Liberty falsely claimed they would take care of it but failed to do so. Finally a judgment was entered against me. After repeated calls and complaints they said they would pay part of it, but refused to pay the court costs and attorney fees that resulted from their dishonest behavior.  I paid the balance directly and was promised that Liberty would pay the rest. This was another lie and they still have not paid it.  This is just the worst example of a pattern of lies and deception that I have experienced with this company.  They repeated took months to make payments and routinely did not pay the bill in full.  On numerous occasions I had to complain repeatedly to get payments on the most routine treatment.

**CONSUMER DESIRED RESOLUTION**

Liberty Healthshare should immediately pay the balance due on the judgment and should reimburse me for the expenses  for court cost and attorney fees I incurred as a result of their dishonesty.  Their pattern of behavior on this and other matters  was so egregious that I was unable to obtain even routine medical treatment that was supposedly included in the policy, such as basic well patient service. As such they should be required to reimburse me for all the premiums I paid them.

| CONSUMER IS COMPLAINING AGAINST | CONSUMER IS REPRESENTED BY AN ATTORNEY? | HOW DID THE CONSUMER KNOW ABOUT US? |
| --- | --- | --- |
| My Insurance Company | No | None of the Above |

| HAS THE CONSUMER PREVIOUSLY REPORTED THIS PROBLEM TO OUR OFFICE OR ANY OTHER AGENCY? | PURCHASED INSURANCE ON THE HEALTH CARE EXCHANGE? |
| --- | --- |
| No | |

### RESPONDENT INFORMATION

| SOURCE | COMPLAINT TYPE | INCIDENT DATE | RECEIVED DATE | PRIORITY | LOCATION | LOCATION DATE |
| --- | --- | --- | --- | --- | --- | --- |
| Consumer | Portal | 02-27-2017 | 10-17-2018 | | Life, Accident and Health | 10-19-2018 |

| FINDING TYPE | INCIDENT GROUP | SUBJECT | SUBJECT ADDITIONAL DETAILS | STATE ID | SYSTEM SOURCE |
| --- | --- | --- | --- | --- | --- |
| | | | | | |

| INSURER | AGENT/AGENCY | TYPE OF INSURANCE | SELF-FUNDED HEALTH PLAN | COVERAGE TYPE | COVERAGE LEVEL | COVERAGE SUBLEVELS |
| --- | --- | --- | --- | --- | --- | --- |
| Liberty HealthShare | | Individual Health | No | Accident and Health | State Specific | |

| NAME OF INSURED | POLICY NUMBER | POLICY PERIOD BEGIN DATE | POLICY PERIOD END DATE | POLICY ISSUED STATE | INSURANCE CARD ID | CLAIM NUMBER |
| --- | --- | --- | --- | --- | --- | --- |
| ▓▓▓▓ | | | | Colorado | | |

| TYPE OF POLICY | LOCATION OF LOSS | IS THE INSURED MEDICARE | MEDICARE SUPP. PLAN | OTHER PARTY'S POLICY OR CLAIM NUMBER |
| --- | --- | --- | --- | --- |
| Life or Health | | No | | |

### COMPLAINANT INFORMATION

| NAME | ADDRESS | NPN | ORGANIZATION | ROLE | REPRESENTATIVE | AGE GROUP | MEDICAL INFO. AUTHORIZATION |
| --- | --- | --- | --- | --- | --- | --- | --- |
| ▓▓▓▓ | ▓▓▓▓ | | | Portal | | | No |

### STAFF MEMBERS

| STAFF MEMBER | BEGIN DATE | END DATE | RESPONSIBLE |
| --- | --- | --- | --- |
| Taylor, ACS, AIAA Karen | 10-19-2018 | 10-19-2018 | Yes |

### ACTIVITIES

| ACTIVITY DATE | ACTIVITY | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | STAFF MEMBER | TIME | BATCH QTY | COMMENT | DUE DATE | RECEIVED DATE | INVOLVED PARTY NAME |
| 10-19-2018 | Review Materials | | | | | | Complainant |
| | Karen  Taylor, ACS, AIAA | 0.1 | | | | | |

**EXHIBIT**

**1.11**

Ex. 1.11, p. 1 of 2

*06-17-2024*                                   **Problem Report Information Inquiry**                                   *Page 2 of 2*

| | | | | | |
|---|---|---|---|---|---|
| **Problem Report ID:** 265047 | | **Problem Report Type:** Inquiry | | **Responsible Section:** Life, Accident, and Health | |
| **Status:** Closed | **Opened Date:** 10-17-2018 | | **Closed Date:** 10-19-2018 | | **Closure Reason:** |

| ACTIVITY DATE | ACTIVITY | | LETTER DESCRIPTION | | DUE DATE | RECEIVED DATE | INVOLVED PARTY NAME |
|---|---|---|---|---|---|---|---|
| | STAFF MEMBER | TIME | BATCH QTY | COMMENT | | | |
| 10-19-2018 | Phone | | | | | | Complainant |
| | Karen  Taylor, ACS, AIAA | 0.1 | | I spoke with ███████ letting her know that the Colorado Division of Insurance does not have any regulatory authority over faith based health plan.  I told ██████ that as far as know there is no state agency that regulates them. ████████ said that now that she is on Medicare they do not have the coverage.  There is the claim for $861.00 that she is waiting for payment.  She has been told that they will pay the claim.  I told ███████ that I am going to be closing her complaint file. ██████████ thanked me for calling her and letting her know. | | | |

| **INVOLVED PARTIES** | | | | |
|---|---|---|---|---|
| INVOLVED PARTY | INVOLVED PARTY TYPE | ORGANIZATION | | COMMENT |
| █████████ | Portal - Insured | | | |
| Liberty HealthShare | Portal - Company | | | |

| **RELATED DOCUMENTS** | | | | |
|---|---|---|---|---|
| SOFTWARE PRODUCT | DOCUMENT NAME | DOCUMENT | | PATH NAME |
| DOC LOC ID | SCAN DOC | | CONFIDENTIAL | |
| Database File System | Lib. Health demand emails.pdf | assorted demands and emails to Liberty Healthshar | | /sirgov/sgov_p2/15558/rltddoc/10172018181918289Lib. Health demand  emails.pdf |
| | | | No | |

08-22-2024     **Problem Report Information Inquiry**     *Page 1 of 3*

| Problem Report ID: 268433 | Problem Report Type: Complaint | Responsible Section: Life, Accident, and Health |
|---|---|---|
| Status: Closed | Opened Date: 08-13-2019    Closed Date: 01-13-2020 | Closure Reason: |

## PROBLEM REPORT DETAILS

| TYPE OF PROBLEM | OTHER PROBLEM TYPE DESCRIPTION |
|---|---|

### DESCRIPTION

### CONSUMER DETAIL OF COMPLAINT

I purchased AlieraCarePremium last year.  I had been pay a premium monthly.  On 8/4/18 I was involved in a domestic that caused me to have to go to the hospital.  The man who attacked me had been prosecuted and convicted in the case.  When I went to the hospital I had a broken neck and a terminal brain injury.

I received a bill stating that I owed 43,750.86 out of a total bill of 54,688.58 from the hospital.  I thought I had Aliera so they would pay the bill.  This hospital was in their network, the attack was considered a life threatening injury and I had a deductible of only $5000 dollars.

When I called Aliera to see why they had not paid this bill they told me to go through their appeal process and gave me an email address and physical address to send the medical records to.  I sent the records to this email.  Come to find out, this email address is not even valid.

From there I mailed the medical records to the address and received a response for a completely different hospital visit a month earlier.  These medical records did not correspond to this visit.

Next I called an explained that this response was for a hospital visit that had nothing to do with the medical records I sent in.  They said 30 days and I should get a response.  On about the 30th day I get a response denying my appeal because "medical condition is self-inflicted in contradiction to elements of a healthy and spiritual lifestyle as enumerated in the Aliera Master Guidelines as follows:  2.Follow spiritual teachings on the use or abuse of alcohol."  So they were saying because I drank the night I was attacked the injury was self-inflicted.

From there I wrote a complaint with the Better Business Bureau.  Essentially I was asking how this injury was self-inflicted at all, like I caused myself to be attacked because I chose to drink.  That did not make sense to me at all.  They denied it again and sent me an additional letter with the same reason.

### CONSUMER DESIRED RESOLUTION

I think they need to pay the bill minus the deductible.  To be honest even more I feel like they further victimized me by causing extreme stress.  This bill has been stressing me out for months and I had no idea what to do.  They made me jump through several hoops because they did not want to pay the bill, which is the reason insurance companies are regulated in the first place.  I even tried to contact lawyers to sue and because of their "wording" that they are not a contract or actually health insurance lawyers are wary.  I am very happy the state of Colorado is doing something about this because I feel as though I have been deceived and further victimized by this company!

| CONSUMER IS COMPLAINING AGAINST | CONSUMER IS REPRESENTED BY AN ATTORNEY? | HOW DID THE CONSUMER KNOW ABOUT US? |
|---|---|---|
| My Insurance Company | No | Internet/Division Website |

| HAS THE CONSUMER PREVIOUSLY REPORTED THIS PROBLEM TO OUR OFFICE OR ANY OTHER AGENCY? | PURCHASED INSURANCE ON THE HEALTH CARE EXCHANGE? |
|---|---|
| No | |

## RESPONDENT INFORMATION

| NAME | ADDRESS | EIN/NPN |
|---|---|---|
| ALIERA HEALTHCARE INC | 990 HAMMOND DRIVE, SUITE 700<br>SUITE B-200<br>ATLANTAGA 30328 | 81-1019555 |

| EMPLOYMENT TYPE | NAIC ID | REPRESENTATIVE | COMPLAINT CONFIRMED |
|---|---|---|---|
| Producer | | | Yes |

| SOURCE | COMPLAINT TYPE | INCIDENT DATE | RECEIVED DATE | PRIORITY | LOCATION | LOCATION DATE |
|---|---|---|---|---|---|---|
| Consumer | Portal | 08-04-2018 | | | | |

| FINDING TYPE | INCIDENT GROUP | SUBJECT | SUBJECT ADDITIONAL DETAILS | STATE ID | SYSTEM SOURCE |
|---|---|---|---|---|---|
| | | | | | |

| INSURER | AGENT/AGENCY | TYPE OF INSURANCE | SELF-FUNDED HEALTH PLAN | COVERAGE TYPE | COVERAGE LEVEL | COVERAGE SUBLEVELS |
|---|---|---|---|---|---|---|
| Aliera Healthcare | | Individual Health | No | Accident and Health | Individual | |

| NAME OF INSURED | POLICY NUMBER | POLICY PERIOD BEGIN DATE | POLICY PERIOD END DATE | POLICY ISSUED STATE | INSURANCE CARD ID | CLAIM NUMBER |
|---|---|---|---|---|---|---|
| ▮▮▮▮ | AlieraCarePrem | | | Colorado | ▮▮▮▮ | ▮▮▮▮ |

| TYPE OF POLICY | LOCATION OF LOSS | IS THE INSURED MEDICARE | MEDICARE SUPP. PLAN | OTHER PARTY'S POLICY OR CLAIM NUMBER |
|---|---|---|---|---|
| Life or Health | St Anthony Hospital<br>Lakewood, CO | No | | |

**EXHIBIT 1.12**

Ex. 1.12, p. 1 of 3

**Problem Report Information Inquiry**

| | | | |
|---|---|---|---|
| **Problem Report ID:** 268433 | | **Problem Report Type:** Complaint | **Responsible Section:** Life, Accident, and Health |
| **Status:** Closed | **Opened Date:** 08-13-2019 | **Closed Date:** 01-13-2020 | **Closure Reason:** |

### COMPLAINANT INFORMATION

| NAME | ADDRESS | NPN | ORGANIZATION | ROLE | REPRESENTATIVE | AGE GROUP | MEDICAL INFO. AUTHORIZATION |
|---|---|---|---|---|---|---|---|
| ▮▮▮ | ▮▮▮ | | | Portal | | | No |

### STAFF MEMBERS

| STAFF MEMBER | BEGIN DATE | END DATE | RESPONSIBLE |
|---|---|---|---|
| Lapham Jason | 08-14-2019 | 01-13-2020 | Yes |

### REASONS

| CATEGORY | REASON TYPES | RESPONDENT |
|---|---|---|
| CH | Denial of Claim | ALIERA HEALTHCARE INC |
| MS | Misrepresentation | ALIERA HEALTHCARE INC |

### ACTIVITIES

| ACTIVITY DATE STAFF MEMBER | ACTIVITY TIME | LETTER DESCRIPTION BATCH QTY COMMENT | DUE DATE | RECEIVED DATE | INVOLVED PARTY NAME |
|---|---|---|---|---|---|
| 10-31-2019<br>Jason Lapham | Phone<br>1 | She moved from IA to CO 10/2017.<br>She was covered under her fathers businesss health plan when she moved but then realized it would not work in Colorado.  By the time she realized this, it was past open enrollment, so she found Agent Christina Frost who recommended Aliera.<br>Purchased 6/18/2018.<br>She was aware that it was different, but didnt know if I didnt follow statement of beliefs they would pay. But maybe I didnt do my due diligence.<br>I asked her how it was described and explained to her.  She said that it was explained as qualified for the tax credit or something, but that it was not typical insurance.  But that you have deductibles and everything looked like insurance.<br>yes, maybe it wasnt insurance, but everything they said said I had coverage.<br>If I had known how this company operated, I wouldnt have purchased it.<br>Maybe I didnt do my due diligence, but I feel its misleading.<br>She had an initial ER visit month before the ER visit in the complaint. $6K bill but was negotiated down to $3K, maybe by Aliera but she was unsure.<br>Next month she is at a casino and had a few drinks and the guy she was with punched her.<br>The ER claim was denied and she appealed it.  But Aliera processed the appeal for the first ER visit.<br>She then appealed again and this time Aliera denied as self-inflicted due to alcohol use.<br>I advised her that the DOI most likely not be able to assist her I getting the claims paid.<br>She acknowledged that the plan language states that it is not a contract and that they may not pay claims.<br>She said that it is misleading because the plan documents suggests that they will cover what the plan says they will cover and if they can pick and choose what claims they are going to pay, why would anyone purchase this.  "Makes it appear something it's not."<br>"maybe they are not insurance, but they are criminals. Hiding behind the guise of faith."<br>"they are causing suffering. What kind of faith based organization causes suffering." | | | |
| 10-24-2019<br>Jason Lapham | Email<br>0.08 | second email email to ▮▮▮ | | | Complainant |
| 10-24-2019<br>Jason Lapham | Email<br>0.25 | email to ▮▮▮ | | | Complainant |
| 08-12-2019<br>Jason Lapham | Email<br>0.25 | email to ▮▮▮ requesting she submit a complaint | | | Complainant |
| 08-12-2019<br>Jason Lapham | Email<br>0.25 | ▮▮▮ followed-up her earlier complaint in March 2019 after seeing news story about the DOI consumer alert. | | | Complainant |

### INVOLVED PARTIES

| INVOLVED PARTY | INVOLVED PARTY TYPE | ORGANIZATION | COMMENT |
|---|---|---|---|
| Aliera Healthcare | Portal - Company | | |

# Problem Report Information Inquiry

| | | |
|---|---|---|
| **Problem Report ID:** 268433 | **Problem Report Type:** Complaint | **Responsible Section:** Life, Accident, and Health |
| **Status:** Closed | **Opened Date:** 08-13-2019 | **Closed Date:** 01-13-2020 | **Closure Reason:** |

| INVOLVED PARTY | INVOLVED PARTY TYPE | ORGANIZATION | COMMENT |
|---|---|---|---|
| ▉▉▉▉▉▉ | Portal - Insured | | |

## DISPOSITIONS

| DATE | TYPE | REQUESTED AMOUNT | DISPOSITION AMOUNT | PAID AMOUNT |
|---|---|---|---|---|
| 01-13-2020 | Referred for Discplnry Actn | $ 0.00 | $ 0.00 | $ 0.00 |

## RELATED DOCUMENTS

| SOFTWARE PRODUCT | DOCUMENT NAME | DOCUMENT | PATH NAME | |
|---|---|---|---|---|
| DOC LOC ID | | SCAN DOC | CONFIDENTIAL | |
| Database File System | MedicalBill.pdf | Medical Bill | | /sirgov/sgov_p2/15558/rltddoc/08132019190408713MedicalBill.pdf |
| | | | No | |
| Database File System | HealthInsurance Cards.pdf | Health Insurance Cards | | /sirgov/sgov_p2/15558/rltddoc/08132019190439560HealthInsurance Cards.pdf |
| | | | No | |
| Database File System | Download Complaint Form.pdf | BBB complaint | | /sirgov/sgov_p2/15558/rltddoc/08132019190644287Download Complaint Form.pdf |
| | | | No | |
| Database File System | Appeal Response2.pdf | appeal response 2 | | /sirgov/sgov_p2/15558/rltddoc/08132019190755191Appeal Response2.pdf |
| | | | No | |
| Database File System | Appeal Response 1.pdf | appeal response 1 | | /sirgov/sgov_p2/15558/rltddoc/08132019190738730Appeal Response 1.pdf |
| | | | No | |
| Database File System | Appeal Letter.docx | Appeal letter | | /sirgov/sgov_p2/15558/rltddoc/08132019190808170Appeal Letter.docx |
| | | | No | |



02/11/2019

Aliera Healthcare
5901 Peachtree Dunwoody Rd.
Building B. Suite 200
Atlanta, GA 30328

Re: ▮▮▮▮▮▮▮
DOB: ▮▮▮▮▮▮
Member ID: ▮▮▮▮▮▮



To Whom This May Concern,

Aliera Healthcare, LLC is in receipt of your appeal regarding our determination of eligibility for your sharing request in the amount of $54,688.58 for the date of service 08/04/2018.

Following a review of the medical services provided, Aliera has determined that your appeal is denied for the following reason:

☐ Not a life-threatening emergency.

☐ The services are not eligible for sharing under the Aliera Master Guidelines.

☐ The claim was processed correctly with the billing code that was provided.

☐ The services were provided by an out of network provider or facility and are not eligible for sharing under the Aliera Master Guidelines.

☒ Medical condition is self-inflicted in contradiction to elements of a healthy and spiritual lifestyle as enumerated in the Aliera Master Guidelines as follows:

    1. Refrain from tobacco use in any form.

    2. Follow spiritual teachings on the use or abuse of alcohol.

    3. Avoid abuse of prescription drugs, which means consuming prescription medications in a manner not intended by the prescriber that would likely result in bodily harm or dependency.

    4. Abstain from the use of illegal drugs including, without limitation, any hallucinogenic substance, barbiturates, amphetamines, cocaine, heroin or other opiates, marijuana, illegal intravenous drugs, or narcotics.

    5. Exercise regularly and eat healthy foods that do not harm the body.


EXHIBIT
1.13

Ex. 1.13, p. 1 of 3



If you are in possession of documentation that refutes our findings, we will gladly take that information into account.  Please mail copies of supporting documentation to:

Aliera Healthcare, LLC
5901 Peachtree Dunwoody Rd. Suite C 160
Atlanta, GA  30328

If you have immediate questions regarding this appeal decision, please phone us at (404) 618 0602.

You are also welcome to email your documentation to our Administrator, Aliera Healthcare, Inc at Claimsaccess@alierahealthcare.com, or you can fax them to (404) 420 5750. Please clearly indicate that you are submitting documents for consideration of your appeal request.

If you have no additional documentation to submit, and the medical expense is creating a true financial hardship, please contact us at (800) 847-9794 to request a hardship request form.  If Aliera determines that you have a true financial hardship, your request will be considered for sharing.

Additional information about the Aliera health care sharing ministry plans can be found at www.Alierahealthcare.com

Sincerely,

Aliera Healthcare – *Claims Dept.*

Aliera Healthcare Inc.
5901 Peachtree Dunwoody Rd., Suite B-200, Atlanta, GA 30328

844-834-3456 Toll Free | 404-618-0602 Direct
www.alierahealthcare.com

CONFIDENTIAL

Ex. 1.13, p. 2 of 3

Resp. Appx. p. 50





Aliera Healthcare Inc.
5901 Peachtree Dunwoody Rd., Suite B-200. Atlanta. GA 30328

844-834-3456 Toll Free | 404-618-0602 Direct
www.alierahealthcare.com

CONFIDENTIAL

*06-17-2024*                    **Problem Report Information Inquiry**                    *Page 1 of 2*

| Problem Report ID: 268833 | Problem Report Type: Complaint | | Responsible Section: Life, Accident, and Health |
|---|---|---|---|
| Status: Closed | Opened Date: 09-16-2019 | Closed Date: 01-13-2020 | Closure Reason: |

## PROBLEM REPORT DETAILS

| TYPE OF PROBLEM | OTHER PROBLEM TYPE DESCRIPTION |
|---|---|
| | |

**DESCRIPTION**

**CONSUMER DETAIL OF COMPLAINT**

Aliera Healthcare denied coverage to uchealth Hospital in Loveland, CO. My Doctors office sent me to ER (06/01/2018) because they ran a D-dimer test that indicated a blood clot either in lungs or in my heart. I called Aleira on the way to the hospital to let them know of the situation. The Aleira Rep stated "hangup and Go." uchealth ran more tests for 6 hours. They could not find the blood clot and I requested to leave and they released me. According to my Aliera health share card, the only thing that I had to pay was $500.00 and the rest was covered. They did not pay for months, I called claims Rep at Aliera and asked when they were going to pay. The claims Rep stated that these things take several months to process and not worry it will be paid. So, eight months later they still not pay and stated that my claim was denied because it was not life threatening. The Rep said you can Appeal, I did appeal on 4/30/2019 they approved my claim and said they legally had until 7/24/2019 to pay. I call them every week to check if the claim has been paid to uchealth or not. They always have another excuse why it's not been paid. This organization is fraudulent. I am making monthly payments to uchealth to save my credit.

**CONSUMER DESIRED RESOLUTION**

Aliera needs to pay $9510.48 soon as possible uchealth. They already agreed to pay but haven't. I have their letter of approved appeal, dated 4/30/2019. Now it has  been 1 year and 5 months fighting for resolve. I really don't think they are going to pay.

| CONSUMER IS COMPLAINING AGAINST | CONSUMER IS REPRESENTED BY AN ATTORNEY? | HOW DID THE CONSUMER KNOW ABOUT US? |
|---|---|---|
| My Insurance Company | No | Internet/Division Website |

| HAS THE CONSUMER PREVIOUSLY REPORTED THIS PROBLEM TO OUR OFFICE OR ANY OTHER AGENCY? | PURCHASED INSURANCE ON THE HEALTH CARE EXCHANGE? |
|---|---|
| No | |

## RESPONDENT INFORMATION

| NAME | ADDRESS | EIN/NPN |
|---|---|---|
| ALIERA HEALTHCARE INC | 990 HAMMOND DRIVE, SUITE 700 SUITE B-200 ATLANTAGA 30328 | 81-1019555 |

| EMPLOYMENT TYPE | NAIC ID | REPRESENTATIVE | COMPLAINT CONFIRMED |
|---|---|---|---|
| Producer | | | Yes |

| SOURCE | COMPLAINT TYPE | INCIDENT DATE | RECEIVED DATE | PRIORITY | LOCATION | LOCATION DATE |
|---|---|---|---|---|---|---|
| Consumer | Portal | | | | | |

| FINDING TYPE | INCIDENT GROUP | SUBJECT | SUBJECT ADDITIONAL DETAILS | STATE ID | SYSTEM SOURCE |
|---|---|---|---|---|---|
| | | | | | |

| INSURER | AGENT/AGENCY | TYPE OF INSURANCE | SELF-FUNDED HEALTH PLAN | COVERAGE TYPE | COVERAGE LEVEL | COVERAGE SUBLEVELS |
|---|---|---|---|---|---|---|
| Aliera Healthcare | | Individual Health | No | Accident and Health | Individual | |

| NAME OF INSURED | POLICY NUMBER | POLICY PERIOD BEGIN DATE | POLICY PERIOD END DATE | POLICY ISSUED STATE | INSURANCE CARD ID | CLAIM NUMBER |
|---|---|---|---|---|---|---|
| | | | | Colorado | | |

| TYPE OF POLICY | LOCATION OF LOSS | IS THE INSURED MEDICARE | MEDICARE SUPP. PLAN | OTHER PARTY'S POLICY OR CLAIM NUMBER |
|---|---|---|---|---|
| Life or Health | | No | | |

## COMPLAINANT INFORMATION

| NAME | ADDRESS | NPN | ORGANIZATION | ROLE | REPRESENTATIVE | AGE GROUP | MEDICAL INFO. AUTHORIZATION |
|---|---|---|---|---|---|---|---|
| | | | | Portal | | | No |

## STAFF MEMBERS

| STAFF MEMBER | BEGIN DATE | END DATE | RESPONSIBLE |
|---|---|---|---|
| Lapham Jason | 09-17-2019 | 01-13-2020 | Yes |

**EXHIBIT 1.14**

Ex. 1.14, p. 1 of 2

# Problem Report Information Inquiry

**Problem Report ID:** 268833     **Problem Report Type:** Complaint     **Responsible Section:** Life, Accident, and Health

**Status:** Closed     **Opened Date:** 09-16-2019     **Closed Date:** 01-13-2020     **Closure Reason:**

## REASONS

| CATEGORY | REASON TYPES | RESPONDENT |
|---|---|---|
| CH | Delay<br>Denial of Claim<br>Emergency Services | ALIERA HEALTHCARE INC |

## ACTIVITIES

| ACTIVITY DATE | ACTIVITY<br>STAFF MEMBER | TIME | LETTER DESCRIPTION<br>BATCH QTY | COMMENT | DUE DATE | RECEIVED DATE | INVOLVED PARTY NAME |
|---|---|---|---|---|---|---|---|
| 10-28-2019 | Phone | | | | | | Complainant |
| | Jason  Lapham | 1 | | His primary complaint is that after approving his appeal of a denied ER claim on 4/30/2019, Aliera has yet to pay.<br>He said that Aliera last told him in late August 2019 that it would take 60-90 business days to process, so he will wait until late November, early December. However, based on his experience, he is not optimistic which is why he contacted the DOI.<br>He purchased the Aliera coverage when he retired and lost his group coverage for himself and his wife.  He shopped for ACA coverage but could not afford it and was advised by a friend about Medishare which led him to Aliera.<br>He turns 65 in May 2020.<br>He and his wife now have Anthem as a result of the SEP.<br>Does not seem that he was unware that he was purchasing a HCSM rather than licensed insurance when he stated: Nice thing about sharing plans is that it would be good if it worked and My first bout with non-insurance folks.<br>He also said that He never had a problem with United Healthcare or Blue Cross Blue Shield.<br>I asked him if he was told why it was so much less expensive than ACA coverage.  He explained that he was told that it worked by the money he pays goes into an account and that a committee decides when to pay claims. I thought it might be too good to be true.<br>He said that sounded like insurance to him.<br>The ID card looks like insurance card.<br>He will follow-up with me after the 90 days about whether Aliera pays.<br>I advised him that we most likely could not resolve this as we cannot compel Aliera to pay the claim. He understood. | | | |
| 10-24-2019 | Email | | | | | | Complainant |
| | Jason  Lapham | 0.08 | | acknowledgement email to ▮▮▮▮▮ | | | |

## INVOLVED PARTIES

| INVOLVED PARTY | INVOLVED PARTY TYPE | ORGANIZATION | COMMENT |
|---|---|---|---|
| Aliera Healthcare ▮▮▮ | Portal - Company | | |
| | Portal - Insured | | |

## DISPOSITIONS

| DATE | TYPE | REQUESTED AMOUNT | DISPOSITION AMOUNT | PAID AMOUNT |
|---|---|---|---|---|
| 01-13-2020 | Referred for Discplnry Actn | $ 0.00 | $ 0.00 | $ 0.00 |

## RELATED DOCUMENTS

| SOFTWARE PRODUCT | DOCUMENT NAME | DOCUMENT | PATH NAME | |
|---|---|---|---|---|
| | DOC LOC ID | SCAN DOC | CONFIDENTIAL | |
| Database File System | Appeal to Aliera Letter.docx | Appeal Letter Aliera | | /sirgov/sgov_p2/15558/rltddoc/09162019145921163Appeal to Aliera Letter.docx |
| | | | No | |
| Database File System | Aliera approval letter.pdf | Aliera Approval Letter | | /sirgov/sgov_p2/15558/rltddoc/09162019145052612Aliera approval letter.pdf |
| | | | No | |

*06-17-2024*   **Problem Report Information Inquiry**   *Page 1 of 2*

| | | |
|---|---|---|
| **Problem Report ID:** 269679 | **Problem Report Type:** Complaint | **Responsible Section:** Life, Accident, and Health |
| **Status:** Closed | **Opened Date:** 11-24-2019 | **Closed Date:** 01-13-2020 | **Closure Reason:** |

## PROBLEM REPORT DETAILS

| TYPE OF PROBLEM | OTHER PROBLEM TYPE DESCRIPTION |
|---|---|
| | |

**DESCRIPTION**

purchased the plan when she was 9 weeks pregnant and Aliera will not cover pregnancy-related claims

**CONSUMER DETAIL OF COMPLAINT**

This complaint is against Aliera Healthcare/Trinity Health Share. I was about 9 weeks pregnant when this plan was suggested to me and seemed like one of my only options, being that I was not insured when I got pregnant and nothing else was open for me during this open enrollment time. I had to wait a few weeks to receive the cards in the mail and went into this plan thinking that I was getting the help I truly needed. The medical insurance that would allow me to be seen for what I was told would be 35 dollars at my primary care appointments, 75 if I needed urgent care and 300 dollars for emergency visits. This was known as their Silver Plan. Sadly, this has not been the case. Being that I was pregnant before I became "insured," and even though this turns out to not be insurance, but more so a health share I have come to realize I am more responsible for this plan than the company is responsible in helping me. Since getting the plan, I have been charged over 300 dollars to begin. I have also received a few different Explanation of Benefits forms that have showed large balances that I now owe to the company, that the clinic or hospitals would not be able to cover. For example, one of the largest EOB's I have a balance of $1,029.01 just for services in the month of September. Previously charged for therapy for over $50 each time and had to stop going because it was not affordable. This plan obviously is not covering even simple blood work because from St. Josephs hospitals billing department I have been billed for $671.67. When getting this plan, I was told I would have to pay $1000 as my MSRA, but that since it was a pre-existing condition it would be doubled. I was told Aleria would be reliable for 70% and I would be responsible for 30%. Each month, the plan is $750 in addition to other charges to keep the plan. From my bills, we have already contributed over $500 dollars to this company, and have been told $4000 is needed in order for further assistance.

**CONSUMER DESIRED RESOLUTION**

We did some research and it shows that this company is known as a scam and I would like to know if I have any recourse. Thank you for your time.

| CONSUMER IS COMPLAINING AGAINST | CONSUMER IS REPRESENTED BY AN ATTORNEY? | HOW DID THE CONSUMER KNOW ABOUT US? |
|---|---|---|
| My Insurance Company | No | None of the Above |

| HAS THE CONSUMER PREVIOUSLY REPORTED THIS PROBLEM TO OUR OFFICE OR ANY OTHER AGENCY? | PURCHASED INSURANCE ON THE HEALTH CARE EXCHANGE? |
|---|---|
| No | |

## RESPONDENT INFORMATION

| NAME | ADDRESS | EIN/NPN |
|---|---|---|
| ALIERA HEALTHCARE INC | 990 HAMMOND DRIVE, SUITE 700 SUITE B-200 ATLANTAGA 30328 | 81-1019555 |

| EMPLOYMENT TYPE | NAIC ID | REPRESENTATIVE | COMPLAINT CONFIRMED |
|---|---|---|---|
| Producer | | | Yes |

| SOURCE | COMPLAINT TYPE | INCIDENT DATE | RECEIVED DATE | PRIORITY | LOCATION | LOCATION DATE |
|---|---|---|---|---|---|---|
| Consumer | Portal | 11-24-2019 | | | | |

| FINDING TYPE | INCIDENT GROUP | SUBJECT | SUBJECT ADDITIONAL DETAILS | STATE ID | SYSTEM SOURCE |
|---|---|---|---|---|---|
| | | | | | |

| INSURER | AGENT/AGENCY | TYPE OF INSURANCE | SELF-FUNDED HEALTH PLAN | COVERAGE TYPE | COVERAGE LEVEL | COVERAGE SUBLEVELS |
|---|---|---|---|---|---|---|
| Aliera Healthcare | | Group Health | No | Accident and Health | Individual | |

| NAME OF INSURED | POLICY NUMBER | POLICY PERIOD BEGIN DATE | POLICY PERIOD END DATE | POLICY ISSUED STATE | INSURANCE CARD ID | CLAIM NUMBER |
|---|---|---|---|---|---|---|
| | Unknown | | | Colorado | | n/a |

| TYPE OF POLICY | LOCATION OF LOSS | IS THE INSURED MEDICARE | MEDICARE SUPP. PLAN | OTHER PARTY'S POLICY OR CLAIM NUMBER |
|---|---|---|---|---|
| Life or Health | n/a | No | | |

## COMPLAINANT INFORMATION

| NAME | ADDRESS | NPN | ORGANIZATION | ROLE | REPRESENTATIVE | AGE GROUP | MEDICAL INFO. AUTHORIZATION |
|---|---|---|---|---|---|---|---|
| | | | | Portal | | | No |

**EXHIBIT**

**1.15**

Ex. 1.15, p. 1 of 2

# Problem Report Information Inquiry

**Problem Report ID:** 269679      **Problem Report Type:** Complaint      **Responsible Section:** Life, Accident, and Health

**Status:** Closed      **Opened Date:** 11-24-2019      **Closed Date:** 01-13-2020      **Closure Reason:**

## STAFF MEMBERS

| STAFF MEMBER | BEGIN DATE | END DATE | RESPONSIBLE |
|---|---|---|---|
| Lapham Jason | 11-25-2019 | 01-13-2020 | Yes |

## REASONS

| CATEGORY | REASON TYPES | RESPONDENT |
|---|---|---|
| CH | Denial of Claim<br>Pre-existing Conditions | ALIERA HEALTHCARE INC |

## ACTIVITIES

| ACTIVITY DATE | ACTIVITY | | LETTER DESCRIPTION | | DUE DATE | RECEIVED DATE | INVOLVED PARTY NAME |
|---|---|---|---|---|---|---|---|
| | STAFF MEMBER | TIME | BATCH QTY | COMMENT | | | |
| 12-09-2019 | Phone | | | | | | Complainant |
| | Jason  Lapham | 0.08 | | left voicemail for ███ | | | |

## INVOLVED PARTIES

| INVOLVED PARTY | INVOLVED PARTY TYPE | ORGANIZATION | COMMENT |
|---|---|---|---|
| Aliera Healthcare | Portal - Company | | |
| | Portal - Insured | | |

## DISPOSITIONS

| DATE | TYPE | REQUESTED AMOUNT | DISPOSITION AMOUNT | PAID AMOUNT |
|---|---|---|---|---|
| 01-13-2020 | Referred for Discplnry Actn | $ 0.00 | $ 0.00 | $ 0.00 |

# Problem Report Information Inquiry

| Problem Report ID: 271355 | Problem Report Type: Inquiry | | Responsible Section: Life, Accident, and Health |
|---|---|---|---|
| Status: Closed | Opened Date: 04-30-2020 | Closed Date: 05-05-2020 | Closure Reason: |

## PROBLEM REPORT DETAILS

| TYPE OF PROBLEM | OTHER PROBLEM TYPE DESCRIPTION |
|---|---|

### DESCRIPTION
DB: no CO DOI- against Aliera - sent final email w explanation to consumer- attached.

### CONSUMER DETAIL OF COMPLAINT

In 2018, I purchased a health policy from a Colorado broker with a 5000$ MAX out of pocket/deductible covering myself and my daughter. In February of 2019, my daughter (covered) had a covered event, a knee injury. Surgery on 4/13/19 ensued.

Between April and June of 2019, I, ▮▮▮▮▮▮▮▮▮▮, the policy holder, paid out of pocket approximately 7500$ dollars, exceeding my max out of pocket by at least 2500$.

The surgery was performed at Boulder Community Hospital, the surgeons group was Boulder Bone and Joint. Most of the out of pocket expenses were paid to them.

On 5/21/19, my daughter was sent to the Boulder Community Hospital emergency room by a BBJ doctor, who told her her life was in danger. She went to the ER. She was billed over 6500$ for that visit.

Aliera Health denied coverage for that visit, even though I am well well passed my deductible and out of pocket for this claim. Aliera Health has said it was not an emergency, and thus not covered. This is nonsense.

Aliera has been no help in this matter. Aliera in late 2020 has left the Colorado Healthcare market. There is NO ONE TO CONTACT AT ALIERA ANYMORE. Evidently, they don't exist and do not care about their former clients.

My daughter ▮▮▮▮▮▮▮▮▮▮, now has collections chasing her around and negative information on her credit reports due to Aliera Health's negligence and inability to care about clients.

Clients that ALWAYS PAID THEIR PREMIUMS on time and expected the insurance company to pay bills that they contracted to.

I am at my wits end in trying to get the broker, or aliera to care about this.

I can document all. The last person I spoke to at Aleira in the third qtr of 2019 was barbara.patrick@alieracompanies.com. She said she would look into it and never got back. The last phone I had for her was 404.618.0602 Ext1740.

We have written BCH, copied Aliera and the collections agent. BCH has defer for a short time

### CONSUMER DESIRED RESOLUTION

I consider it fair that Aliera Health own up to its responsibilty to pay out a claim that is clearly covered. I paid a 575 dollar premium every month on time.

But when it came time for them to make good on a contract that we had, they seem to have used obfuscation and leaving the Colorado maket to run and hide.

I find it reprehensible for an insurance carrier to pin a huge bill on a ▮▮▮▮▮ kid thats just getting started, because the know the ins and outs.

Its reprehensible, and if I thought legal action would help, I would use that avenue.

Kind Regards,

▮▮▮▮▮▮▮

| CONSUMER IS COMPLAINING AGAINST | CONSUMER IS REPRESENTED BY AN ATTORNEY? | HOW DID THE CONSUMER KNOW ABOUT US? |
|---|---|---|
| My Insurance Company | No | |

| HAS THE CONSUMER PREVIOUSLY REPORTED THIS PROBLEM TO OUR OFFICE OR ANY OTHER AGENCY? | PURCHASED INSURANCE ON THE HEALTH CARE EXCHANGE? |
|---|---|
| No | |

**EXHIBIT 1.16**

Ex. 1.16, p. 1 of 3

06-17-2024

**Problem Report Information Inquiry**

| Problem Report ID: 271355 | Problem Report Type: Inquiry | | Responsible Section: Life, Accident, and Health |
|---|---|---|---|
| Status: Closed | Opened Date: 04-30-2020 | Closed Date: 05-05-2020 | Closure Reason: |

## RESPONDENT INFORMATION

| SOURCE | COMPLAINT TYPE | INCIDENT DATE | RECEIVED DATE | PRIORITY | LOCATION | LOCATION DATE |
|---|---|---|---|---|---|---|
| Consumer | Portal | | | | | |

| FINDING TYPE | INCIDENT GROUP | SUBJECT | | SUBJECT ADDITIONAL DETAILS | STATE ID | SYSTEM SOURCE |
|---|---|---|---|---|---|---|
| | | | | | | |

| INSURER | AGENT/AGENCY | TYPE OF INSURANCE | SELF-FUNDED HEALTH PLAN | COVERAGE TYPE | COVERAGE LEVEL | COVERAGE SUBLEVELS |
|---|---|---|---|---|---|---|
| AlieraHealthcare | | Individual Health | No | Accident and Health | Individual | |

| NAME OF INSURED | POLICY NUMBER | POLICY PERIOD BEGIN DATE | POLICY PERIOD END DATE | POLICY ISSUED STATE | INSURANCE CARD ID | CLAIM NUMBER |
|---|---|---|---|---|---|---|
| ▇▇▇ | | | | | | |

| TYPE OF POLICY | LOCATION OF LOSS | IS THE INSURED MEDICARE | MEDICARE SUPP. PLAN | OTHER PARTY'S POLICY OR CLAIM NUMBER | | |
|---|---|---|---|---|---|---|
| Life or Health | | No | | | | |

## COMPLAINANT INFORMATION

| NAME | ADDRESS | NPN | ORGANIZATION | ROLE | REPRESENTATIVE | AGE GROUP | MEDICAL INFO. AUTHORIZATION |
|---|---|---|---|---|---|---|---|
| ▇▇▇ | ▇▇▇▇▇ | | | Portal | | | No |

## STAFF MEMBERS

| STAFF MEMBER | | | BEGIN DATE | END DATE | RESPONSIBLE |
|---|---|---|---|---|---|
| Bouhall Diane | | | 04-30-2020 | 05-05-2020 | Yes |

## ACTIVITIES

| ACTIVITY DATE | ACTIVITY | | | | DUE DATE | RECEIVED DATE | INVOLVED PARTY NAME |
|---|---|---|---|---|---|---|---|
| | STAFF MEMBER | TIME | LETTER DESCRIPTION BATCH QTY | COMMENT | | | |
| 05-11-2020 | Phone | | | | | | Complainant |
| | Jason  Lapham | 0.25 | | At Dayle Axman's request, I contacted ▇▇▇ to explain that Aliera was not a licensed insurance carrier. He was surprised by this but understood. He indicated Aliera has been nonresponsive to him about a remaining $7K hospital bill for his daughter's knee and that he may attempt to negotiate with the hospital. I advised that this appeared to be reasonable approach since it was unclear if Aliera would ever respond to him. | | | |
| 05-05-2020 | Email | | | | | | |
| | Diane  Bouhall | 0.25 | | sent final email to consumer- in comments/received rebuttal email from consumer- referred to DA- uploaded-5.8 | | | |

## INVOLVED PARTIES

| INVOLVED PARTY | | INVOLVED PARTY TYPE | ORGANIZATION | | COMMENT |
|---|---|---|---|---|---|
| AlieraHealthcare | | Portal - Company | | | |
| ▇▇▇ | | Portal - Insured | | | |

## RELATED DOCUMENTS

| SOFTWARE PRODUCT | DOCUMENT NAME | DOCUMENT | | PATH NAME | |
|---|---|---|---|---|---|
| DOC LOC ID | | SCAN DOC | CONFIDENTIAL | | |
| Database File System | eml corresp consum & to DA | eml corresp consum & to DA | | /sirgov/sgov_p2/15558/rltddoc/05082020121947943eml corresp consum & to DA.pdf | |
| | | | Yes | | |

**Problem Report Information Inquiry**

| | | | |
|---|---|---|---|
| **Problem Report ID:** 271355 | **Problem Report Type:** Inquiry | | **Responsible Section:** Life, Accident, and Health |
| **Status:** Closed | **Opened Date:** 04-30-2020 | **Closed Date:** 05-05-2020 | **Closure Reason:** |

**COMMENTS**

| DATE | COMMENT | VISIBLE ON PORTAL |
|---|---|---|
| 05-05-2020 | Good afternoon: | Yes |

The Division of Insurance (Division) received your complaint against Aleira Health.

As a result of a final agency order signed by the Commissioner on January 13, 2020 Aliera/Trinity is no longer allowed to accept contributions from Colorado residents and will not process any sharing requests for services provided after January 31, 2020.  This mandate was put in place by the commissioner because Aliera was conducting business unfairly, as if it were a licensed insurance company.  Therefore, the policy you purchased through Aleira Health was not considered insurance and does not fall under the Division's regulatory authority.

Unfortunately, as the company was not an insurance company, we are unable to assist with unpaid claims unlike with licensed insurance carriers. We encourage consumers to  pursue whatever appeal or grievance process is available through Aliera/Trinity.

I am truly sorry we are unable to assist further in this matter.  However, the Division is tasked with enforcing policy provisions and Colorado insurance laws for insurance companies licensed within the state of Colorado.

Best Regards,
Diane Bouhall

Sr. Insurance Analyst

06-17-2024                          **Problem Report Information Inquiry**                          *Page 1 of 6*

| | | | |
|---|---|---|---|
| **Problem Report ID:** 273778 | **Problem Report Type:** Complaint | | **Responsible Section:** Life, Accident, and Health |
| **Status:** Closed | **Opened Date:** 12-23-2020 | **Closed Date:** 01-20-2022 | **Closure Reason:** |

### PROBLEM REPORT DETAILS

**TYPE OF PROBLEM**          **OTHER PROBLEM TYPE DESCRIPTION**

**DESCRIPTION**

RLG-Aliera. No jurisdiction . Inquiry letter sent on 04.28.2021.

**CONSUMER DETAIL OF COMPLAINT**

█████ was a dependent of his wife, █████, and both were members, beginning 12/28/2017, of Aliera Healthcare and Unity HealthShare--health sharing ministry programs. █████ was hospitalized at UCHealth Medical Center of the Rockies from June 13, 2019 to June 17, 2019 for a cardiac arrest. He then had to treated for a medical emergency on July 3, 2019 at the Cheyenne Regional Medical Center in Wyoming. After █████ satisfied his $10,000 sharing amount, the claims for the remaining $109,944.38 due to UC Health Medical Center of the Rockies and the remaining bills for $17,426.83 from the Cheyenne Medical Center were submitted to Aliera and Trinity for sharing.

After very significant delays and his own appeal letters to them, █████ was informed by Aliera, in writing, that both sets of medical bills had been paid. However, those medical bills were NOT paid. On █████ behalf I submitted a demand letter to Aliera and Trinity dated September 24 which included exhibits of all the background information, references to the Commissioner's and Deputy Commissioner's C&D and Final Orders against both of these entities (which mandated that they honor contracts they'd issued to Colorado members), and a demand for payment.

I received no responses. So, I sent a follow-up demand letter dated 10/28/20 to The Aliera Companies which was sent via FedEx and email. I know Aliera received the follow-up letter, but I still haven't heard a thing from it or from Trinity.

I copied the Commissioner and Deputy Commissioner on both of these letters, but I was recently informed by Messrs. Frigo and Evans from the Colorado AG's Office that in order to obtain assistance from the DOI it was necessary to file a consumer complaint.

Therefore, I'm submitting this complaint on behalf of █████ and I ask for your assistance for him by forcing Aliera and/or Trinity to make payment of the full amounts of the medical bills. In further support, I also ask that the DOI consider those previous letters.

**CONSUMER DESIRED RESOLUTION**

A fair resolution for █████ would be, as set forth in the detail of the consumer complaint, at an absolute minimum, prompt payment of the full amounts of the medical provider bills by Aliera and/or Trinity.

Because █████ has had to enter into payment plans with both UCHealth and Cheyenne Medical Center to avoid having those bills sent to collections, and because he has been making monthly payments to these providers, it would be best to have checks issued, with guaranteed good funds. So, under the circumstances, I think it would be best to have the payments made in the full amounts by cashier's checks by Aliera (or Trinity) naming █████ as the payee in order to allow him to make payment to the medical providers of the amounts which remain unpaid and to thereby also allow him to be reimbursed for his out-of-pocket costs he's incurred.

I also think it would be appropriate to force Aliera and/or Trinity to make payment of interest at the statutory amount on the unpaid amounts of the medical bills since December of 2019 when █████ and his wife █████ were told they'd been paid--again which did NOT occur.

Ideally, a fair resolution would also be payment of penalties and my attorney fees as set forth in my demand letter of September 24, 2020.

Again, and in summary, at an absolute minimum, █████ is and has been entitled to have Aliera pay at least the full amounts of the medical bills it said had been paid which were not paid.

Additionally, I encourage the DOI to have Aliera complete the audit set forth in paragraph 2 e. of the STIPULATION FOR ENTRY OF FINAL AGENCY ORDER in the Matter of TRINITY HEALTHSHARE, INC. and, as is in the DOI's judgment appropriate, to determine whether other prior Members have been victimized by Aliera's violations of the DOI's/Commissioner's Final Agency Order in order to provide them relief if and as needed.

| **CONSUMER IS COMPLAINING AGAINST** | **CONSUMER IS REPRESENTED BY AN ATTORNEY?** | **HOW DID THE CONSUMER KNOW ABOUT US?** |
|---|---|---|
| My Insurance Company   Other | Yes | |
| **HAS THE CONSUMER PREVIOUSLY REPORTED THIS PROBLEM TO OUR OFFICE OR ANY OTHER AGENCY?** | | **PURCHASED INSURANCE ON THE HEALTH CARE EXCHANGE?** |
| Yes | | |



EXHIBIT
**1.17**

Ex. 1.17, p. 1 of 6

**Problem Report Information Inquiry**

| | | | |
|---|---|---|---|
| **Problem Report ID:** 273778 | **Problem Report Type:** Complaint | | **Responsible Section:** Life, Accident, and Health |
| **Status:** Closed | **Opened Date:** 12-23-2020 | **Closed Date:** 01-20-2022 | **Closure Reason:** |

### RESPONDENT INFORMATION

| NAME | ADDRESS | EIN/NPN |
|---|---|---|
| ALIERA HEALTHCARE INC | 990 HAMMOND DRIVE, SUITE 700<br>SUITE B-200<br>ATLANTAGA 30328 | 81-1019555 |

| EMPLOYMENT TYPE | NAIC ID | REPRESENTATIVE | COMPLAINT CONFIRMED |
|---|---|---|---|
| Producer | | | Yes |

| SOURCE | COMPLAINT TYPE | INCIDENT DATE | RECEIVED DATE | PRIORITY | LOCATION | LOCATION DATE |
|---|---|---|---|---|---|---|
| Consumer | Portal | 06-13-2019 | | | Life, Accident and Health | |

| FINDING TYPE | INCIDENT GROUP | SUBJECT | SUBJECT ADDITIONAL DETAILS | STATE ID | SYSTEM SOURCE |
|---|---|---|---|---|---|
| | | | | | |

| INSURER | AGENT/AGENCY | TYPE OF INSURANCE | SELF-FUNDED HEALTH PLAN | COVERAGE TYPE | COVERAGE LEVEL | COVERAGE SUBLEVELS |
|---|---|---|---|---|---|---|
| The Aliera Companies | | Individual Health - Health Sharing Ministry | No | Accident and Health | Individual | |

| NAME OF INSURED | POLICY NUMBER | POLICY PERIOD BEGIN DATE | POLICY PERIOD END DATE | POLICY ISSUED STATE | INSURANCE CARD ID | CLAIM NUMBER |
|---|---|---|---|---|---|---|
| | NA | | | Colorado | █████████ | ████████ |

| TYPE OF POLICY | LOCATION OF LOSS | IS THE INSURED MEDICARE | MEDICARE SUPP. PLAN | OTHER PARTY'S POLICY OR CLAIM NUMBER |
|---|---|---|---|---|
| Life or Health | Ft. Collins | No | | |

### COMPLAINANT INFORMATION

| NAME | ADDRESS | NPN | ORGANIZATION | ROLE | REPRESENTATIVE | AGE GROUP | MEDICAL INFO. AUTHORIZATION |
|---|---|---|---|---|---|---|---|
| Kezer, John | ███████████ | | | Portal | | | No |

### STAFF MEMBERS

| STAFF MEMBER | BEGIN DATE | END DATE | RESPONSIBLE |
|---|---|---|---|
| Gonzales Ramona | 12-23-2020 | 01-20-2022 | Yes |

### REASONS

| CATEGORY | REASON TYPES | RESPONDENT |
|---|---|---|
| CH | Denial of Claim | ALIERA HEALTHCARE INC |

### ACTIVITIES

| ACTIVITY DATE | ACTIVITY | | | DUE DATE | RECEIVED DATE | INVOLVED PARTY NAME |
|---|---|---|---|---|---|---|
| | STAFF MEMBER | TIME | LETTER DESCRIPTION   COMMENT | | | |
| 01-20-2022 | Case Closing Report | | | | | Kezer, John |
| | Ramona  Gonzales | 0.16 | Per the AGs office. | | | |
| | | | The bankruptcy is ongoing and will likely last months/years longer. We have referred Mr. Kezers clients to the appropriate parties in the bankruptcy and hopefully that is their avenue to restitution. | | | |

# Problem Report Information Inquiry

**Problem Report ID:** 273778     **Problem Report Type:** Complaint     **Responsible Section:** Life, Accident, and Health

**Status:** Closed     **Opened Date:** 12-23-2020     **Closed Date:** 01-20-2022     **Closure Reason:**

| ACTIVITY DATE | ACTIVITY | | LETTER DESCRIPTION | | DUE DATE | RECEIVED DATE | INVOLVED PARTY NAME |
|---|---|---|---|---|---|---|---|
| | STAFF MEMBER | TIME | BATCH QTY | COMMENT | | | |
| 01-20-2022 | Email | | | | | | Evn Spencer |

*06-17-2024*                                    **Problem Report Information Inquiry**                                    *Page 4 of 6*

| Problem Report ID: 273778 | | Problem Report Type: Complaint | | | Responsible Section: Life, Accident, and Health |
|---|---|---|---|---|---|
| Status: Closed | Opened Date: 12-23-2020 | | Closed Date: 01-20-2022 | | Closure Reason: |

| ACTIVITY DATE | ACTIVITY | | LETTER DESCRIPTION | | DUE DATE | RECEIVED DATE | INVOLVED PARTY NAME |
|---|---|---|---|---|---|---|---|
| STAFF MEMBER | | TIME | BATCH QTY | COMMENT | | | |
| Ramona Gonzales | | 0.25 | | Advised that it is ok to close this complaint. | | | |

RE: 273778-Keezer
Inbox

Evan Spencer
9:01 AM (1 hour ago)
to me

Ramona:

████████████████████████████████

Best,

Evan Spencer

Assistant Attorney General

Colorado Department of Law

Business & Licensing Section, Insurance Unit

Direct: 720.508.6378

Email: evan.spencer@coag.gov

From: Gonzales - DORA, Ramona <ramona.gonzales@state.co.us>
Sent: Wednesday, January 19, 2022 4:49 PM
To: Evan Spencer <Evan.Spencer@coag.gov>
Subject: 273778-Keezer

Hi Evan,

████████████████████████████

████████████████████████████

Ramona Gonzales

Senior Insurance Analyst

Consumer Services

# Problem Report Information Inquiry

| | | | | | |
|---|---|---|---|---|---|
| **Problem Report ID:** 273778 | | **Problem Report Type:** Complaint | | | **Responsible Section:** Life, Accident, and Health |
| **Status:** Closed | | **Opened Date:** 12-23-2020 | | **Closed Date:** 01-20-2022 | **Closure Reason:** |

| ACTIVITY DATE | ACTIVITY | | LETTER DESCRIPTION | | DUE DATE | RECEIVED DATE | INVOLVED PARTY NAME |
|---|---|---|---|---|---|---|---|
| | STAFF MEMBER | TIME | BATCH QTY | COMMENT | | | |
| 08-12-2021 | Letter | | FLWUPLTR | | | | ▆▆▆▆ |
| Ramona Gonzales | | 1 | | | | | |
| 07-08-2021 | Letter | | FLWUPLTR | | | | |
| Ramona Gonzales | | 1 | | | | | |
| 04-28-2021 | Letter | | INITINQ | | 05-18-2021 | 06-30-2023 | |
| Ramona Gonzales | | 0.25 | | Sent revised letter due to bounced back emails. | | | |
| 04-07-2021 | Letter | | INITINQ | | 04-27-2021 | 06-30-2023 | ▆▆▆ |
| Ramona Gonzales | | 1 | | Bounced back from all emails on file. | | | |
| 04-05-2021 | Meeting | | | | | | Matt and EVAN |
| Ramona Gonzales | | 0.5 | | Discuss next steps. Will send out an inquiry letter since Aliera has agreed to pay for both claims. | | | |
| 01-14-2021 | Email | | | | | | Kezer, John |
| Ramona Gonzales | | 0.16 | | See comments. | | | |
| 12-23-2020 | Review Materials | | | | | | Kezer, John |
| Ramona Gonzales | | 0.25 | | | | | |

## INVOLVED PARTIES

| INVOLVED PARTY | INVOLVED PARTY TYPE | ORGANIZATION | COMMENT |
|---|---|---|---|
| Kezer, John | Portal - Attorney | | |
| ▆▆▆▆ | Portal - Insured | | |
| The Aliera Companies | Portal - Company | | |
| Trinity Healthshare | Portal - Other | | |

## DISPOSITIONS

| DATE | TYPE | REQUESTED AMOUNT | DISPOSITION AMOUNT | PAID AMOUNT |
|---|---|---|---|---|
| 01-20-2022 | Company Position Substantiated | $ 0.00 | $ 0.00 | $ 0.00 |

## RELATED DOCUMENTS

| SOFTWARE PRODUCT | DOCUMENT NAME | DOCUMENT | PATH NAME |
|---|---|---|---|
| DOC LOC ID | SCAN DOC | CONFIDENTIAL | |
| Database File System | From the Divison/Atty | Letter from Mr. Kezer | /sirgov/sgov_p2/15558/rltddoc/06212021180614438State.co.us Executive Branch Mail - Re_ FW_ A document was posted for your Division of Insurance Complaint ID 273778.pdf |
| | | No | |
| Database File System | From the Division | Email-Inquiry Confirmation | /sirgov/sgov_p2/15558/rltddoc/04282021165847201State.co.us Executive Branch Mail - 273778▆▆▆.pdf |
| | | No | |
| Database File System | From the Division | Email-Kezer | /sirgov/sgov_p2/15558/rltddoc/04282021170910288State.co.us Executive Branch Mail - 273778▆▆▆.pdf |
| | | No | |
| Database File System | From the Division | Letter | /sirgov/sgov_p2/15558/rltddoc/04282021165756107273778-Inquiry ▆▆▆▆ 4.28.2021.pdf |
| | | No | |
| Database File System | From the Division | Follow-up Letter | /sirgov/sgov_p2/15558/rltddoc/07082021175749498▆▆▆▆ - FollowUp7.8.21.pdf |
| | | No | |
| Database File System | From the Division | Follow Up 08.18.2021 | /sirgov/sgov_p2/15558/rltddoc/08182021153147278State.co.us Executive Branch Mail - 273778▆▆▆.pdf |
| | | No | |
| Database File System | From the Division | Email from Mr. Keezer 08.23.2021 | /sirgov/sgov_p2/15558/rltddoc/08232021150214118State.co.us Executive Branch Mail - FW_ Follow-up for ▆▆▆▆ (DOI File No. 273778_RLG).pdf |
| | | No | |

## Problem Report Information Inquiry

**Problem Report ID:** 273778     **Problem Report Type:** Complaint     **Responsible Section:** Life, Accident, and Health

**Status:** Closed     **Opened Date:** 12-23-2020     **Closed Date:** 01-20-2022     **Closure Reason:**

| SOFTWARE PRODUCT | DOCUMENT NAME | DOCUMENT | PATH NAME |
|---|---|---|---|
| DOC LOC ID | SCAN DOC | CONFIDENTIAL | |
| Database File System | From the Division | Email-FollowUp Confirmation | /sirgov/sgov_p2/15558/rltddoc/07082021175844090State.co.us Executive Branch Mail - 273778-Follow-up 07.08.2021.pdf |
| | | No | |
| Database File System | From the Division | Follow up Letter 08-18-2021 | /sirgov/sgov_p2/15558/rltddoc/08182021153233191273778▮▮▮▮.Follow-up.08.18.2021.docx |
| | | No | |
| Database File System | From the Carrier | Company Response | /sirgov/sgov_p2/15558/rltddoc/05252021095531291▮▮▮▮▮▮05212021(v.1x).pdf |
| | | No | |
| Database File System | From the Attorney | Documentation | /sirgov/sgov_p2/15558/rltddoc/04212021184504948273778-Kezer Docs..pdf |
| | | No | |

| COMMENTS | | |
|---|---|---|
| DATE | COMMENT | VISIBLE ON PORTAL |
| 01-20-2022 | Mr. Kezer, | Yes |
| | The Division of Insurance (Division) has completed its investigation of your complaint against Aliera Healthcare Inc. (Aliera) regarding your claim issues. | |
| | I want to thank you for bringing this matter to the Division's attention.  Based on a thorough review of the documentation and information provided by you and the company, the Division has determined we are unable to assist further. | |
| | I have spoken with Evan at the Attorney Generals Office regarding this complaint.  I was advised that the bankruptcy is ongoing and ▮▮▮▮▮ has been referred to the appropriate parties in the bankruptcy court.  Hopefully, this will be the avenue to resolution. | |
| | With this information, the Division is closing your file at this time.  However, if you have new information you would like the Division to review, please forward it to my attention for consideration. | |
| | Your complaint will remain on file with the Division.  If you have any questions or concerns please feel free to contact me at 303-894-7580 or by email at ramona.gonzales@state.co.us. | |
| | All the best, | |
| | Ramona | |
| 01-14-2021 | Mr. Kezer, | Yes |
| | We see this from time to time.  Please email them to me and I will upload them.  My email address is ramona.gonzales@state.co.us. | |
| | Thank you, | |
| | Ramona | |
| 01-14-2021 | From Portal: Ramona, I've now tried 3 times to attach/upload the background documents. However, they won't attach to the portal. Can you advise me as to how I can attach documents?<br>Thanks,<br>John | Yes |
| 01-14-2021 | Mr. Kezer, | Yes |
| | Thank you for reaching out to the Division of Insurance with your complaint against Trinity Healthshare.  To best assist you, please upload, to the portal, ▮▮▮▮ ▮▮▮▮Explanation of Benefits,  written correspondence, and pertinent documentation. | |
| | Thank you, | |
| | Ramona | |

**Problem Report Information Inquiry**

| Problem Report ID: 275178 | Problem Report Type: Inquiry | Responsible Section: Life, Accident, and Health |
|---|---|---|
| Status: Closed | Opened Date: 04-13-2021 | Closed Date: 04-16-2021 | Closure Reason: |

## PROBLEM REPORT DETAILS

| TYPE OF PROBLEM | OTHER PROBLEM TYPE DESCRIPTION |
|---|---|
| | |

| DESCRIPTION |
|---|
| ▮▮▮▮▮ OneShare Health.  Health share.  No jurisdiction. |

| CONSUMER DETAIL OF COMPLAINT |
|---|
| I had a total hysterectomy for a very large fibroid. Oneshare is still refusing to pay the anetheresia bill to US Anesthesia Partners of CO Acct # ▮▮▮▮▮ for $3,996.00 and the balance to Rose Medical Center Acct # ▮▮▮▮▮ for a remaining balance of$4,038.15. They aren't paying the anestheia bill saying it was a preexisting condition. I have sent them a later from mt physician Adele Sykes SCL Health, phone number 303-318-5163 saying it absolutely was not prexisting. They are saying The balance to Rose was my deductable which had already been paid. I sent them statements from Midtown OBGYN showing that I paid them more than the deductable directly. I have appealed this twice and am now in collection. |

| CONSUMER DESIRED RESOLUTION |
|---|
| Pay the outstanding bills and reimburse me the amount I paid over the deductable.<br>Also please clear my credit report. |

| CONSUMER IS COMPLAINING AGAINST | CONSUMER IS REPRESENTED BY AN ATTORNEY? | HOW DID THE CONSUMER KNOW ABOUT US? |
|---|---|---|
| My Insurance Company | No | None of the Above |

| HAS THE CONSUMER PREVIOUSLY REPORTED THIS PROBLEM TO OUR OFFICE OR ANY OTHER AGENCY? | PURCHASED INSURANCE ON THE HEALTH CARE EXCHANGE? |
|---|---|
| No | |

## RESPONDENT INFORMATION

| SOURCE | COMPLAINT TYPE | INCIDENT DATE | RECEIVED DATE | PRIORITY | LOCATION | LOCATION DATE |
|---|---|---|---|---|---|---|
| Consumer | Portal | 11-18-2019 | | | Life, Accident and Health | 04-16-2021 |

| FINDING TYPE | INCIDENT GROUP | SUBJECT | SUBJECT ADDITIONAL DETAILS | STATE ID | SYSTEM SOURCE |
|---|---|---|---|---|---|
| | | | | | |

| INSURER | AGENT/AGENCY | TYPE OF INSURANCE | SELF-FUNDED HEALTH PLAN | COVERAGE TYPE | COVERAGE LEVEL | COVERAGE SUBLEVELS |
|---|---|---|---|---|---|---|
| Oneshare Health/Loomis | | Other - healthcare sharing ministry | No | | | |

| NAME OF INSURED | POLICY NUMBER | POLICY PERIOD BEGIN DATE | POLICY PERIOD END DATE | POLICY ISSUED STATE | INSURANCE CARD ID | CLAIM NUMBER |
|---|---|---|---|---|---|---|
| ▮▮▮▮▮ | | | | Colorado | | ▮▮▮▮▮ |

| TYPE OF POLICY | LOCATION OF LOSS | IS THE INSURED MEDICARE | MEDICARE SUPP. PLAN | OTHER PARTY'S POLICY OR CLAIM NUMBER |
|---|---|---|---|---|
| Life or Health | Denver | No | | |

## COMPLAINANT INFORMATION

| NAME | ADDRESS | NPN | ORGANIZATION | ROLE | REPRESENTATIVE | AGE GROUP | MEDICAL INFO. AUTHORIZATION |
|---|---|---|---|---|---|---|---|
| ▮▮▮▮▮ | ▮▮▮▮▮ | | | Portal | | | No |

## STAFF MEMBERS

| STAFF MEMBER | BEGIN DATE | END DATE | RESPONSIBLE |
|---|---|---|---|
| Gonzales Ramona | 04-14-2021 | 04-16-2021 | Yes |



EXHIBIT
**1.18**

Ex. 1.18, p. 1 of 3

# Problem Report Information Inquiry

| | | |
|---|---|---|
| **Problem Report ID:** 275178 | **Problem Report Type:** Inquiry | **Responsible Section:** Life, Accident, and Health |
| **Status:** Closed | **Opened Date:** 04-13-2021 | **Closed Date:** 04-16-2021 | **Closure Reason:** |

## ACTIVITIES

| ACTIVITY DATE | ACTIVITY | | | | | INVOLVED PARTY NAME |
|---|---|---|---|---|---|---|
| | STAFF MEMBER | TIME | LETTER DESCRIPTION | COMMENT | DUE DATE | RECEIVED DATE |
| | | | BATCH QTY | | | |
| 04-21-2021 | Email | | | | | ▮▮▮▮▮▮ |
| | Ramona Gonzales | 0.16 | | Complaint 275178 | | |
| | | | | Gonzales - DORA, Ramona <ramona.gonzales@state.co.us> 11:41 AM (0 minutes ago) to ▮▮▮▮▮ | | |
| | | | | Good morning ▮▮▮▮▮, | | |
| | | | | Yes ma'am. At this point, you would need to hire an attorney.  See the email below that I sent through the portal. | | |
| | | | | The Division of Insurance has received your complaint against OneShare Health.  Although our office assists consumers with insurance issues, we do not have jurisdiction over all plans.  Unfortunately, we don't have jurisdiction over Health Share plans, nor does Colorado insurance law apply. Please refer to the appeal process as provided by OneShare Health. | | |
| | | | | With this information, the Division is closing your file at this time.  Your complaint will remain on file with the Division.  If you have any questions or concerns please feel free to contact me via the portal, by phone at 303-894-7580, or by email at ramona.gonzales@state.co.us. | | |
| | | | | All the best, | | |
| 04-16-2021 | Email | | | | | Complainant |
| | Ramona Gonzales | 0.16 | | See comments. | | |
| 04-16-2021 | Case Closing Report | | | | | |
| | Ramona Gonzales | 0.16 | | No Jurisdiction.  OneShare Health. | | |
| 04-16-2021 | Review Materials | | | | | ▮▮▮▮▮▮ |
| | Ramona Gonzales | 0.25 | | | | |

## INVOLVED PARTIES

| INVOLVED PARTY | INVOLVED PARTY TYPE | ORGANIZATION | COMMENT |
|---|---|---|---|
| ▮▮▮▮▮▮ | Portal - Insured | | |
| Oneshare Health/Loomis | Portal - Company | | |

## RELATED DOCUMENTS

| SOFTWARE PRODUCT | DOCUMENT NAME | DOCUMENT | PATH NAME |
|---|---|---|---|
| DOC LOC ID | SCAN DOC | CONFIDENTIAL | |
| Database File System | From the Consumer | Faxed documents | /sirgov/sgov_p2/15558/rltddoc/04272021150308945Scanned from a Xerox Multifunction Printer (25).pdf |
| | | No | |

## COMMENTS

| DATE | COMMENT | VISIBLE ON PORTAL |
|---|---|---|
| 04-18-2021 | From Portal: I have been through their  appeal process twice. This is a year and a half old and I have been turned over to collection. Is my only recourse to hire an attorney? They have all the information. This is a valid claim. Thanks ▮▮▮▮▮ | Yes |

**Problem Report Information Inquiry** *Page 3 of 3*

| | | |
|---|---|---|
| **Problem Report ID:** 275178 | **Problem Report Type:** Inquiry | **Responsible Section:** Life, Accident, and Health |
| **Status:** Closed | **Opened Date:** 04-13-2021 | **Closed Date:** 04-16-2021      **Closure Reason:** |

| DATE | COMMENT | VISIBLE ON PORTAL |
|---|---|---|
| 04-16-2021 | ▮▮▮▮▮ | Yes |

The Division of Insurance has received your complaint against OneShare Health.  Although our office assists consumers with insurance issues, we do not have jurisdiction over all plans.  Unfortunately, we don't have jurisdiction over Health Share plans, nor does Colorado insurance law apply. Please refer to the appeal process as provided by OneShare Health.

With this information, the Division is closing your file at this time.  Your complaint will remain on file with the Division.  If you have any questions or concerns please feel free to contact me via the portal, by phone at 303-894-7580, or by email at ramona.gonzales@state.co.us.

All the best,

Ramona

06-17-2024

**Problem Report Information Inquiry**

*Page 1 of 2*

**Problem Report ID:** 275763 | **Problem Report Type:** Inquiry | **Responsible Section:** Life, Accident, and Health
**Status:** Closed | **Opened Date:** 06-01-2021 | **Closed Date:** 06-03-2021 | **Closure Reason:**

### PROBLEM REPORT DETAILS

| TYPE OF PROBLEM | OTHER PROBLEM TYPE DESCRIPTION |
|---|---|
| | |

**DESCRIPTION**

- KTT ███████ filed a complaint with the Division of Insurance (Division) regarding her health coverage through Liberty HealthShare regarding the bills they have not paid for claims for the birth of her son in August 2020. The Division does not have jurisdiction over Liberty HealthShare or Health Sharing Ministries. - KTT

**CONSUMER DETAIL OF COMPLAINT**

I gave birth to my son in August of 2020. I have been in contact with Liberty since February of 2020 discussing my pregnancy and their coverage. My first bill was sent out September of 2020 and they have yet to pay a dime. My hospital threatened to send me to collections and our bill was totaling over $12,000. Our deductible $2,250. I reached out to liberty again as they make me submit many of the bills and wont correspond with my hospital unless I make them, and asked them when they would be sending payment. They promised April 26,2021. I got a call the beginning of May saying that they actually werent able to do coverage then and I would have to wait until at least June or later... nearly a full year after my son has been born. I have now put all my bills on a payment plan until further action can be taken seeing as how we dont have $12,000, but it is costing over $500 a month to keep said payment plan, which is financially taxing.

**CONSUMER DESIRED RESOLUTION**

Liberty paying in full our amount due, minus our deductible of $2250 by July or August

| CONSUMER IS COMPLAINING AGAINST | CONSUMER IS REPRESENTED BY AN ATTORNEY? | HOW DID THE CONSUMER KNOW ABOUT US? |
|---|---|---|
| My Insurance Company | No | Friend/Relative/Co-worker |

| HAS THE CONSUMER PREVIOUSLY REPORTED THIS PROBLEM TO OUR OFFICE OR ANY OTHER AGENCY? | PURCHASED INSURANCE ON THE HEALTH CARE EXCHANGE? |
|---|---|
| No | |

### RESPONDENT INFORMATION

| SOURCE | COMPLAINT TYPE | INCIDENT DATE | RECEIVED DATE | PRIORITY | LOCATION | LOCATION DATE |
|---|---|---|---|---|---|---|
| Consumer | Portal | | 06-01-2021 | | Life, Accident and Health | 06-03-2021 |

| FINDING TYPE | INCIDENT GROUP | SUBJECT | SUBJECT ADDITIONAL DETAILS | STATE ID | SYSTEM SOURCE |
|---|---|---|---|---|---|
| | | | | | |

| INSURER | AGENT/AGENCY | TYPE OF INSURANCE | SELF-FUNDED HEALTH PLAN | COVERAGE TYPE | COVERAGE LEVEL | COVERAGE SUBLEVELS |
|---|---|---|---|---|---|---|
| Liberty Health Share | | Individual Health - Health Sharing Ministries | No | Accident and Health | State Specific | |

| NAME OF INSURED | POLICY NUMBER | POLICY PERIOD BEGIN DATE | POLICY PERIOD END DATE | POLICY ISSUED STATE | INSURANCE CARD ID | CLAIM NUMBER |
|---|---|---|---|---|---|---|
| ███████ | | | | Colorado | | |

| TYPE OF POLICY | LOCATION OF LOSS | IS THE INSURED MEDICARE | MEDICARE SUPP. PLAN | OTHER PARTY'S POLICY OR CLAIM NUMBER |
|---|---|---|---|---|
| Life or Health | | No | | |

### COMPLAINANT INFORMATION

| NAME | ADDRESS | NPN | ORGANIZATION | ROLE | REPRESENTATIVE | AGE GROUP | MEDICAL INFO. AUTHORIZATION |
|---|---|---|---|---|---|---|---|
| ███████ | ███████ | | | Insured | | | No |

### STAFF MEMBERS

| STAFF MEMBER | BEGIN DATE | END DATE | RESPONSIBLE |
|---|---|---|---|
| Taylor, ACS, AIAA Karen | 06-02-2021 | 06-03-2021 | Yes |



**EXHIBIT**
**1.19**

*Ex. 1.19, p. 1 of 2*

## Problem Report Information Inquiry

**Problem Report ID:** 275763      **Problem Report Type:** Inquiry      **Responsible Section:** Life, Accident, and Health

**Status:** Closed      **Opened Date:** 06-01-2021      **Closed Date:** 06-03-2021      **Closure Reason:**

### ACTIVITIES

| ACTIVITY DATE | ACTIVITY | | LETTER DESCRIPTION | | DUE DATE | RECEIVED DATE | INVOLVED PARTY NAME |
|---|---|---|---|---|---|---|---|
| | STAFF MEMBER | TIME | BATCH QTY | COMMENT | | | |
| 06-03-2021 | Case Closing Report | | | | | | |
| | Karen  Taylor, ACS, AIAA | 0.1 | | ▉▉▉ submitted a complaint to the Division of Insurance (Division) regarding claims being denied by LibertyHealth Share.  Unfortunately, the Division is unable to assist in this matter.  The Division is responsible for ensuring that insurance companies that are licensed within the state of Colorado, follow Colorado insurance law.  Liberty HealthShare is not a licensed insurance company and Colorado Insurance laws do not apply to the policy. The Division does not have jurisdiction over these plans. ▉▉▉ will need to follow any appeal process offered to her under her plan with Liberty HealthShare. | | | |
| 06-03-2021 | Review Materials | | | | | | Kristina Schleer/DOI |
| | Karen  Taylor, ACS, AIAA | 0.1 | | I asked the Life and Health Team if anyone had a closing letter for LibertyHeathShare complaints.  Kristina Schleer, Senior Insurance Analyst emailed me a copy of a closing letter she used. | | | |
| 06-03-2021 | Meeting | | | | | | Matt Motier |
| | Karen  Taylor, ACS, AIAA | 0.1 | | As part of a scheduled file review meeting with Matt Motier, Director of Consumer Services Life and Health Section I asked what is the best course of action on this complaint.  Matt provided me with template letter from Jason Lapham, Director of Life and Health Rates and Forms Section, and I am to ask anyone on the Life & Health team if they had a closing letter. | | | |
| 06-03-2021 | Letter | | CLOSELTR | | | | |
| | Karen  Taylor, ACS, AIAA | 0.2 | | ▉▉▉ | | | |

### INVOLVED PARTIES

| INVOLVED PARTY | INVOLVED PARTY TYPE | ORGANIZATION | COMMENT |
|---|---|---|---|
| Liberty Health Share | Portal - Company | | Liberty Health Share is a health sharing ministry. |
| ▉▉▉ | Portal - Insured | | |

# Problem Report Information Inquiry

**Problem Report ID:** 276239    **Problem Report Type:** Complaint    **Responsible Section:** Life, Accident, and Health

**Status:** Closed    **Opened Date:** 07-06-2021    **Closed Date:** 05-18-2022    **Closure Reason:**

## PROBLEM REPORT DETAILS

| TYPE OF PROBLEM | OTHER PROBLEM TYPE DESCRIPTION |
|---|---|
| | |

**DESCRIPTION**

HCSA
Insured is experiencing Claim-handling delays.  Liberty Health share

**CONSUMER DETAIL OF COMPLAINT**

Insured is experiencing Claim-handling delays.  Liberty Health share

**CONSUMER DESIRED RESOLUTION**

Pay unpaid claims.

| CONSUMER IS COMPLAINING AGAINST | CONSUMER IS REPRESENTED BY AN ATTORNEY? | HOW DID THE CONSUMER KNOW ABOUT US? |
|---|---|---|
| My Insurance Company | No | |

| HAS THE CONSUMER PREVIOUSLY REPORTED THIS PROBLEM TO OUR OFFICE OR ANY OTHER AGENCY? | PURCHASED INSURANCE ON THE HEALTH CARE EXCHANGE? |
|---|---|
| No | |

## RESPONDENT INFORMATION

| NAME | ADDRESS | EIN/NPN |
|---|---|---|
| LIberty HealthShare | Gospel Light Mennonite Church 4845 Fulton Dr. NW CantonOH 44718 | |

| EMPLOYMENT TYPE | NAIC ID | REPRESENTATIVE | COMPLAINT CONFIRMED |
|---|---|---|---|
| State Specific | | | No |

| SOURCE | COMPLAINT TYPE | INCIDENT DATE | RECEIVED DATE | PRIORITY | LOCATION | LOCATION DATE |
|---|---|---|---|---|---|---|
| Consumer | General | | 07-06-2021 | Low Priority | Life, Accident and Health | 07-06-2021 |

| FINDING TYPE | INCIDENT GROUP | SUBJECT | SUBJECT ADDITIONAL DETAILS | STATE ID | SYSTEM SOURCE |
|---|---|---|---|---|---|
| Other | | | | | Sircon for States |

| INSURER | AGENT/AGENCY | TYPE OF INSURANCE | SELF-FUNDED HEALTH PLAN | COVERAGE TYPE | COVERAGE LEVEL | COVERAGE SUBLEVELS |
|---|---|---|---|---|---|---|
| Liberty Healthshare | | Accident  and Health | No | Accident and Health | Individual | |

| NAME OF INSURED | POLICY NUMBER | POLICY PERIOD BEGIN DATE | POLICY PERIOD END DATE | POLICY ISSUED STATE | INSURANCE CARD ID | CLAIM NUMBER |
|---|---|---|---|---|---|---|
| ▮▮▮▮ | | | | | | |

| TYPE OF POLICY | LOCATION OF LOSS | IS THE INSURED MEDICARE | MEDICARE SUPP. PLAN | OTHER PARTY'S POLICY OR CLAIM NUMBER |
|---|---|---|---|---|
| | | No | | |

## COMPLAINANT INFORMATION

| NAME | ADDRESS | NPN | ORGANIZATION | ROLE | REPRESENTATIVE | AGE GROUP | MEDICAL INFO. AUTHORIZATION |
|---|---|---|---|---|---|---|---|
| ▮▮▮▮ | ▮▮▮▮▮▮ | | | Insured | | | No |

## STAFF MEMBERS

| STAFF MEMBER | BEGIN DATE | END DATE | RESPONSIBLE |
|---|---|---|---|
| Tucker Tony | 07-06-2021 | 05-18-2022 | Yes |

## REASONS

| CATEGORY | REASON TYPES | RESPONDENT |
|---|---|---|
| CH | Delay | LIberty HealthShare |

**EXHIBIT 1.20**

Ex. 1.20, p. 1 of 2

**Problem Report Information Inquiry**

**Problem Report ID:** 276239     **Problem Report Type:** Complaint     **Responsible Section:** Life, Accident, and Health

**Status:** Closed     **Opened Date:** 07-06-2021     **Closed Date:** 05-18-2022     **Closure Reason:**

## ACTIVITIES

| ACTIVITY DATE | ACTIVITY | | | | DUE DATE | RECEIVED DATE | INVOLVED PARTY NAME |
|---|---|---|---|---|---|---|---|
| | STAFF MEMBER | TIME | LETTER DESCRIPTION | COMMENT | | | |
| | | | BATCH QTY | | | | |
| 05-18-2022 | Letter | | CLOSELTR | | | | Complainant |
| | Tony  Tucker | 0.5 | | The Colorado Division of Insurance has no jurisdiction over Liberty Health Share. | | | |

## DISPOSITIONS

| DATE | TYPE | REQUESTED AMOUNT | DISPOSITION AMOUNT | PAID AMOUNT |
|---|---|---|---|---|
| 05-18-2022 | No Jurisdiction | $ 0.00 | $ 0.00 | $ 0.00 |

## RELATED DOCUMENTS

| SOFTWARE PRODUCT | DOCUMENT NAME | DOCUMENT | PATH NAME |
|---|---|---|---|
| DOC LOC ID | SCAN DOC | CONFIDENTIAL | |
| Database File System | | Closing letter | /sirgov/sgov_p2/15558/rltddoc/0520202210293658█████4.pdf |
| | | No | |
| Database File System | | Insured's proof | /sirgov/sgov_p2/15558/rltddoc/0709202123340295█████.pdf |
| | | No | |

*06-17-2024*                    **Problem Report Information Inquiry**                    *Page 1 of 3*

| | | | |
|---|---|---|---|
| **Problem Report ID:** 277886 | **Problem Report Type:** Inquiry | | **Responsible Section:** Life, Accident, and Health |
| **Status:** Closed | **Opened Date:** 11-29-2021 | **Closed Date:** 12-20-2021 | **Closure Reason:** |

## PROBLEM REPORT DETAILS

| TYPE OF PROBLEM | OTHER PROBLEM TYPE DESCRIPTION |
|---|---|
| | |

**DESCRIPTION**

DB: no CO DOI/ healthsharing ministry- discuss w MM response to consumer

**CONSUMER DETAIL OF COMPLAINT**

This health sharing ministry is changing its rules to state that once a person cancels their insurance they will not be reimbursed for any medical expenses during the last two months of their insurance. That is they want me to pay for two months membership for which I will get zero membership benefits. The new rules take place Dec. 1.   ith this plan my year starts March 1. By this time of the year I have paid my annual unshared amount to them and I feel that I should get the remainder of my year, through the end of Feb., at the terms upon which the year began vs. them changing these rule midway.

**CONSUMER DESIRED RESOLUTION**

I want them to waive these caveats and let me finish my year with them up through end of Feb. 2022 and apply any changes to my account commencing Mar. 1.

| CONSUMER IS COMPLAINING AGAINST | CONSUMER IS REPRESENTED BY AN ATTORNEY? | HOW DID THE CONSUMER KNOW ABOUT US? |
|---|---|---|
| My Insurance Company | No | None of the Above |

| HAS THE CONSUMER PREVIOUSLY REPORTED THIS PROBLEM TO OUR OFFICE OR ANY OTHER AGENCY? | PURCHASED INSURANCE ON THE HEALTH CARE EXCHANGE? |
|---|---|
| No | |

## RESPONDENT INFORMATION

| SOURCE | COMPLAINT TYPE | INCIDENT DATE | RECEIVED DATE | PRIORITY | LOCATION | LOCATION DATE |
|---|---|---|---|---|---|---|
| Consumer | Portal | | | | | |

| FINDING TYPE | INCIDENT GROUP | SUBJECT | SUBJECT ADDITIONAL DETAILS | STATE ID | SYSTEM SOURCE |
|---|---|---|---|---|---|
| | | | | | |

| INSURER | AGENT/AGENCY | TYPE OF INSURANCE | SELF-FUNDED HEALTH PLAN | COVERAGE TYPE | COVERAGE LEVEL | COVERAGE SUBLEVELS |
|---|---|---|---|---|---|---|
| Liberty Health Share | | Individual Health | No | Accident and Health | Individual | |

| NAME OF INSURED | POLICY NUMBER | POLICY PERIOD BEGIN DATE | POLICY PERIOD END DATE | POLICY ISSUED STATE | INSURANCE CARD ID | CLAIM NUMBER |
|---|---|---|---|---|---|---|
| ▉ | | | | Colorado | | |

| TYPE OF POLICY | LOCATION OF LOSS | IS THE INSURED MEDICARE | MEDICARE SUPP. PLAN | OTHER PARTY'S POLICY OR CLAIM NUMBER |
|---|---|---|---|---|
| Life or Health | | No | | |

## COMPLAINANT INFORMATION

| NAME | ADDRESS | NPN | ORGANIZATION | ROLE | REPRESENTATIVE | AGE GROUP | MEDICAL INFO. AUTHORIZATION |
|---|---|---|---|---|---|---|---|
| ▉ | ▉ | | | Portal | | | No |

## STAFF MEMBERS

| STAFF MEMBER | BEGIN DATE | END DATE | RESPONSIBLE |
|---|---|---|---|
| Bouhall Diane | 11-29-2021 | 12-20-2021 | Yes |

## ACTIVITIES

| ACTIVITY DATE | ACTIVITY | | | | DUE DATE | RECEIVED DATE | INVOLVED PARTY NAME |
|---|---|---|---|---|---|---|---|
| | STAFF MEMBER | TIME | BATCH QTY | COMMENT | | | |
| 12-20-2021 | Case Closing Report | | | | | | Complainant |
| | Diane  Bouhall | 0.2 | | sent final email to consumer- copied into comments below | | | |
| 12-16-2021 | Meeting | | | | | | |
| | Diane  Bouhall | 0.25 | | discussed response to consumer w MM and KW | | | |
| 12-07-2021 | Email | | | | | | ▉ |
| | Diane  Bouhall | 0.2 | | received response from consumer to my rfi email | | | |

**EXHIBIT**

**1.21**

Ex. 1.21, p. 1 of 3

**Problem Report Information Inquiry**

| | | |
|---|---|---|
| **Problem Report ID:** 277886 | **Problem Report Type:** Inquiry | **Responsible Section:** Life, Accident, and Health |
| **Status:** Closed | **Opened Date:** 11-29-2021 | **Closed Date:** 12-20-2021   **Closure Reason:** |

### INVOLVED PARTIES

| INVOLVED PARTY | INVOLVED PARTY TYPE | ORGANIZATION | COMMENT |
|---|---|---|---|
| Liberty Health Share | Portal - Company | | |
| | Portal - Insured | | |

### RELATED DOCUMENTS

| SOFTWARE PRODUCT | DOCUMENT NAME | DOCUMENT | PATH NAME |
|---|---|---|---|
| **DOC LOC ID** | **SCAN DOC** | **CONFIDENTIAL** | |
| Database File System | Response from consumer 12.7.21 | email | /sirgov/sgov_p2/15558/rltddoc/12142021112435523Response from consumer 12.7.21.pdf |
| | | No | |
| Database File System | Lib health change of rules.PDF | The Lib Health announcement of change in terms | /sirgov/sgov_p2/15558/rltddoc/11292021101928445Lib health change of rules.PDF |
| | | No | |

### COMMENTS

| DATE | COMMENT | VISIBLE ON PORTAL |
|---|---|---|
| 12-20-2021 | CO DOI: File # 277886 | Yes |

Bouhall - DORA, Diane <diane.bouhall@state.co.us>
2:28 PM (1 hour ago)
to ▇▇▇▇▇▇▇

Good afternoon:

The Division of Insurance appreciates you sharing the details of your concerns regarding the company, Liberty Healthshare.  As this company is a health sharing ministry and not a licensed insurer, our office holds limited authority which does not extend to a company's internal policies or business practices.

You may wish to reach out to the company and request a copy of any appeal rights you may have under the policy provisions and file an appeal related to the claims referenced in your complaint.  It is important to understand that because this company is not a licensed insurer and is a health sharing ministry, they are not required to pay claims.

Should you wish to purchase insurance, the open enrollment period in the state of Colorado extends through January 12, 2022 for a February 1, 2022 start date.  The state health insurance Exchange is

Connect for Health Colorado:

855-752-6749
https://connectforhealthco.com/

Kind Regards,

Diane Bouhall
Sr. Insurance Analyst

**Problem Report Information Inquiry** *Page 3 of 3*

| **Problem Report ID:** 277886 | **Problem Report Type:** Inquiry | | **Responsible Section:** Life, Accident, and Health |
| --- | --- | --- | --- |
| **Status:** Closed | **Opened Date:** 11-29-2021 | **Closed Date:** 12-20-2021 | **Closure Reason:** |

| DATE | COMMENT | VISIBLE ON PORTAL |
| --- | --- | --- |
| 12-06-2021 | O DOI: File # 277886- Request for Information please | Yes |

Bouhall - DORA, Diane <diane.bouhall@state.co.us>
2:24 PM (0 minutes ago)
to ▮▮▮▮▮▮▮▮

Good afternoon:

The Division of Insurance (Division) received your complaint against a health sharing ministry. Health sharing ministries are not licensed insurance companies so the Division has limited ability when it comes to health sharing ministries, however, in order to see if we can help we need further information.

Please clarify for the Division:

1) Please explain the background and what is happening on your end further, your intentions for the plan through this entity- Is your intention to cancel your plan with this entity before your next membership term begins in March 2022?

Thank you,

Diane Bouhall
Sr. Insurance Analyst

**BEFORE THE DIVISION OF INSURANCE, STATE OF COLORADO**

Case File No. 268068
DOI Order No. O-20-005

---

*EX PARTE* **EMERGENCY ORDER TO CEASE AND DESIST THE UNAUTHORIZED AND UNLAWFUL TRANSACTION OF THE BUSINESS OF INSURANCE IN THE STATE OF COLORADO**

---

In the Matter of TRINITY HEALTHSHARE, INC.

Respondent.

---

      This matter comes before Michael Conway, Commissioner of Insurance for the state of Colorado ("Commissioner"), pursuant to the provisions of the Regulation of Unauthorized Insurance Act, §§ 10-3-901 through 10-3-910, C.R.S., whereby the Commissioner is authorized to issue an *ex parte* emergency cease and desist order to prevent the unauthorized transaction of insurance business in Colorado.

## PARTIES AND JURISDICTION

      1.    Pursuant to § 10-1-108(7), C.R.S., the Commissioner has the duty and responsibility to supervise the business of insurance in the state of Colorado to assure it is conducted in accordance with Colorado law and in such a manner as to protect policyholders and the general public.

      2.    The Colorado Division of Insurance ("Division") is an agency charged with the execution of laws relating to insurance and has supervising authority over the business of insurance in this state pursuant to § 10-1-103(1), C.R.S. Pursuant to § 10-1-104(2), C.R.S., the Commissioner has delegated the duties and responsibilities of investigating, enforcing, and taking actions to enforce compliance with the insurance laws of Colorado to the Division and its staff.

      3.    Respondent, Trinity Healthshare, Inc. ("Respondent") is a foreign corporation organized under the law of Delaware.

      4.    Respondent first incorporated in the state of Delaware on June 27, 2018.

**EXHIBIT**

**1.22**

Ex. 1.22, p. 1 of 5

5.      Respondent represents itself as a healthcare sharing ministry ("HCSM") as defined by 26 USC §5000A.[1]

6.      Respondent does not hold a certificate of authority in the state of Colorado.

7.      Section 10-1-102(12), C.R.S., defines 'insurance' as, a contract whereby one, for consideration, undertakes to indemnify another or to pay a specified or ascertainable amount or benefit upon determinable risk contingencies.

8.      Pursuant to § 10-1-108(5), C.R.S., the Commissioner has the duty to make such investigations and examinations as are authorized by Title 10 of the Colorado Revised Statutes and to investigate such information as is presented to the Commissioner by authority that the Commissioner believes to be reliable pertaining to violations of Colorado insurance laws.

9.      Section 10-1-102(6)(a), C.R.S., defines insurance company[2] to include all corporations, associations, partnerships, or individuals engaged as insurers in the business of insurance.

10.     Pursuant to § 10-2-102(13), C.R.S., an insurer is every person engaged as principal, indemnitor, surety, or contractor in the business of making contracts of insurance.

11.     Pursuant to § 10-3-105(1), C.R.S., no foreign or domestic insurance company shall transact any insurance business in this state, unless it first procures from the commissioner a certificate of authority stating that the requirements of the laws of this state have been complied with and authorizing it to do business.

12.     Pursuant to § 10-3-903, C.R.S., the making of, or proposing to make, as an insurer, an insurance contract, by an unauthorized insurer, constitutes transacting insurance business in this state.

13.     Pursuant to § 10-3-904.5, C.R.S., when the Commissioner believes that an unauthorized person is engaging in the transaction of insurance business in violation of §§ 10-3-105 or 10-3-903, C.R.S., or any rule promulgated by the Commissioner, and when it appears to the Commissioner that such conduct is fraudulent, creates an immediate danger to the public safety, or is causing or can be reasonably expected to cause significant, imminent, and irreparable public injury, the Commissioner may issue an *ex parte* emergency cease and desist order to such unauthorized person to immediately cease and desist from such unlawful conduct.

---

[1] Respondent does not qualify as an HCSM under federal law as it has not been in operation and continuously sharing member health care costs since at least December 31, 1999. See 26 U.S.C. § 5000A(d)(2)(B).
[2] The section defines "company", "corporation", "insurance company", or "insurance corporation."

2

14.     The Commissioner has jurisdiction over Respondent and the subject matter of this *Ex Parte* Emergency Cease and Desist Order ("Order") pursuant to §§ 10-3-901 through 10-3-910, C.R.S.

## FINDINGS OF FACT

15.     Respondent, by and through its agents and affiliates, offers insurance products in the state of Colorado.

16.     Respondent offers its HCSM products as alternatives to traditional health insurance.

17.     Respondent, by and through its agents and affiliates, is selling insurance products within the state of Colorado. Respondent utilizes licensed resident insurance producers to sell its products in Colorado.

18.     Respondent does not hold a certificate of authority in the state of Colorado.

19.     Moreover, an investigation by the Division has revealed that Respondent is the subject of administrative enforcement actions in Texas and Washington.

20.     The Division has also received consumer complaints regarding Respondent's business transactions and products.

## CONCLUSIONS OF LAW

21.     The Commissioner fully incorporates by reference the paragraphs set forth above as though fully set forth herein.

22.     The Commissioner has jurisdiction over Respondent and the subject matter of this Order.

23.     The products offered by Respondent within the state of Colorado constitute insurance products as defined by § 10-1-102(12), C.R.S.

24.     By offering these products, Respondent is transacting insurance business within the state of Colorado as defined by § 10-3-903, C.R.S.

25.     Respondent is an insurance company as defined by § 10-1-102(6)(a), C.R.S.

3

26.     Respondent does not hold a certificate of authority in the state of Colorado as required by § 10-3-105, C.R.S.

27.     Based on the conduct described herein and above, the Commissioner believes that Respondent is engaging in the business of insurance in violation of the provisions of §§ 10-3-105 or 10-3-903, C.R.S.

28.     It further appears to the Commissioner that Respondent's conduct, as described above and herein, is fraudulent, creates an immediate danger to public safety, and/or is causing or can be reasonably expected to cause significant, imminent, and irreparable public injury.

## ORDER

29.     Based upon the above Findings of Facts and Conclusions of Law, the Commissioner of Insurance ORDERS that Respondent **CEASE AND DESIST** from transacting the business of insurance in the State of Colorado, as defined in § 10-3-903, C.R.S., and as specifically described herein. Except that, pursuant to § 10-3-906, C.R.S., the Commissioner of Insurance ORDERS that Respondent honor and maintain any and all existing contracts, plans, policies or memberships with Colorado entities and consumers until the Commissioner of Insurance releases such obligation.

30.     Based upon the above Findings of Facts and Conclusions of Law, the Commissioner of Insurance ORDERS that any and all of Respondent's agents, affiliates, employees, contractors, successors in interest, and or authorized representatives **CEASE AND DESIST** from the solicitation, negotiation, sale, or effectuation of any and all of Respondent's products in the state of Colorado.

## OTHER MATTERS

31.     Pursuant to § 10-3-904.6(1), C.R.S., Respondent may contest this Order and request a hearing **within 60 days** of the date of this Order in accordance with § 24-4-105(12), C.R.S. Such request for hearing must be received by the Division on or before the expiration of 60 days from the date of this Order.

32.     Pursuant to § 10-3-904.6(5), C.R.S., upon determination of a violation of this Order, the Commissioner may impose a civil penalty of $25,000.00 for each act in violation and/or direct restitution.

33.     This Order contains a total of six (6) pages, including the Certificate of Service.

4

34.     The Commissioner reserves the right to amend this Order to add any individual, entity or company that is directly or indirectly affiliated or associated with the named entity in this Order or has any type of business or contractual relationship with the named entity in this Order that relate to the unauthorized transaction of insurance business based upon evidence acquired through the Division's continuing investigation.

35.     This Order is effective immediately upon execution by the Commissioner or his designee.

36.     A facsimile or other copy of this Order shall be treated as an original.

Dated this _12_ day of _August_, 2019.

_____
KATE HARRIS
CHIEF DEPUTY COMMISSIONER
LIFE & HEALTH POLICY

5

BEFORE THE DIVISION OF INSURANCE, STATE OF COLORADO

Case File No. 268068
DOI Order No. O-20-006

---

***EX PARTE*** **EMERGENCY ORDER TO CEASE AND DESIST THE UNAUTHORIZED AND UNLAWFUL TRANSACTION OF THE BUSINESS OF INSURANCE IN THE STATE OF COLORADO**

---

In the Matter of ALIERA HEALTHCARE, INC.

Respondent.

---

This matter comes before Michael Conway, Commissioner of Insurance for the state of Colorado ("Commissioner"), pursuant to the provisions of the Regulation of Unauthorized Insurance Act, §§ 10-3-901 through 10-3-910, C.R.S., whereby the Commissioner is authorized to issue an *ex parte* emergency cease and desist order to prevent the unauthorized transaction of insurance business in Colorado.

## PARTIES AND JURISDICTION

1.      Pursuant to § 10-1-108(7), C.R.S., the Commissioner has the duty and responsibility to supervise the business of insurance in the state of Colorado to assure it is conducted in accordance with Colorado law and in such a manner as to protect policyholders and the general public.

2.      The Colorado Division of Insurance ("Division") is an agency charged with the execution of laws relating to insurance and has supervising authority over the business of insurance in this state pursuant to § 10-1-103(1), C.R.S.  Pursuant to § 10-1-104(2), C.R.S., the Commissioner has delegated the duties and responsibilities of investigating, enforcing, and taking actions to enforce compliance with the insurance laws of Colorado to the Division and its staff.

3.      Respondent, Aliera Healthcare, Inc. ("Respondent") is a foreign, for-profit corporation organized under the laws of Delaware and doing business in Colorado.[1]

---

[1] Upon information and belief, Aliera Healthcare, Inc. has initiated a name change to The Aliera Companies, Inc. This name change has occurred on the entity's website and in its foreign corporation filings in at least Texas and Georgia. Both Aliera Healthcare, Inc. and The Alieria Companies, Inc. are Delaware corporations.

**EXHIBIT**

**1.23**

Ex. 1.23, p. 1 of 5

4.      Respondent first incorporated in the state of Delaware on September 29, 2011.

5.      Respondent is licensed as a non-resident insurance producer with life, and accident and health lines of authority, license number 544844.

6.      Trinity Healthshare, Inc. ("Trinity") is a foreign corporation organized under the laws of Delaware.

7.      Trinity first incorporated in the state of Delaware on June 27, 2018.

8.      Trinity represents itself as a healthcare sharing ministry ("HCSM") as defined by 26 USC §5000A.[2]

9.      Trinity does not hold a certificate of authority in the state of Colorado.

10.     Section 10-1-102(12), C.R.S., defines 'insurance' as, a contract whereby one, for consideration, undertakes to indemnify another or to pay a specified or ascertainable amount or benefit upon determinable risk contingencies.

11.     Pursuant to § 10-1-108(5), C.R.S., the Commissioner has the duty to make such investigations and examinations as are authorized by Title 10 of the Colorado Revised Statutes and to investigate such information as is presented to the Commissioner by authority that the Commissioner believes to be reliable pertaining to violations of Colorado insurance laws.

12.     Section 10-1-102(6)(a), C.R.S., defines insurance company[3] to include all corporations, associations, partnerships, or individuals engaged as insurers in the business of insurance.

13.     Pursuant to § 10-2-102(13), C.R.S., an insurer is every person engaged as principal, indemnitor, surety, or contractor in the business of making contracts of insurance.

14.     Pursuant to § 10-3-105(1), C.R.S., no foreign or domestic insurance company shall transact any insurance business in this state, unless it first procures from the commissioner a certificate of authority stating that the requirements of the laws of this state have been complied with and authorizing it to do business.

---

[2] Trinity does not qualify as an HCSM under federal law as it has not been in operation and continuously sharing member health care costs since at least December 31, 1999. See 26 U.S.C. § 5000A(d)(2)(B).

[3] The section defines "company", "corporation", "insurance company", or "insurance corporation."

2

15.     Pursuant to § 10-3-903, C.R.S., the making of, or proposing to make, as an insurer, an insurance contract, by an unauthorized insurer, constitutes transacting insurance business in this state.

16.     Pursuant to § 10-3-904.5, C.R.S., when the Commissioner believes that an unauthorized person is engaging in the transaction of insurance business in violation of §§ 10-3-105 or 10-3-903, C.R.S., or any rule promulgated by the Commissioner, and when it appears to the Commissioner that such conduct is fraudulent, creates an immediate danger to the public safety, or is causing or can be reasonably expected to cause significant, imminent, and irreparable public injury, the Commissioner may issue an *ex parte* emergency cease and desist order to such unauthorized person to immediately cease and desist from such unlawful conduct.

17.     The Commissioner has jurisdiction over Respondent and the subject matter of this *Ex Parte* Emergency Cease and Desist Order ("Order") pursuant to §§ 10-3-901 through 10-3-910, C.R.S.

## FINDINGS OF FACT

18.     On or around August 13, 2018, Respondent and Trinity entered into a Marketing and Administration Agreement ("Agreement").

19.     Under the Agreement, Respondent is the administrator, marketer, and program manager for Trinity.

20.     As program manager for Trinity, Respondent is responsible for the development of plan designs, pricing, and marketing materials, and vendor management, and recruitment and maintenance of a national sales force to market plans.

21.     Under the Agreement, Respondent has the exclusive right to design, market and sell the Trinity HCSM.

22.     Respondent markets Trinity's HCSM products as alternatives to traditional health insurance.

23.     Respondent markets Trinity's HCSM products to Colorado consumers and utilizes licensed resident insurance producers to sell Trinity's HCSM products within the state of Colorado.

24.     Moreover, an investigation by the Division has revealed that Respondent is the subject of administrative actions in Texas, Washington, and New Hampshire.

3

25.    The Division has also received consumer complaints regarding Respondent's business transactions and products.

## CONCLUSIONS OF LAW

26.    The Commissioner fully incorporates by reference the paragraphs set forth above as though fully set forth herein.

27.    The Commissioner has jurisdiction over Respondent and the subject matter of this Order.

28.    Trinity is an insurance company as defined by § 10-1-102(6)(a), C.R.S.

29.    Trinity does not hold a certificate of authority in the state of Colorado as required by § 10-3-105, C.R.S.

30.    The Trinity HCSM products offered by Respondent within the state of Colorado constitute insurance products as defined by § 10-1-102(12), C.R.S.

31.    Based on the conduct described herein and above, the Commissioner believes that Respondent's conduct developing, pricing, and marketing Trinity's HCSM products violates of the provisions of §§ 10-3-105 or 10-3-903, C.R.S.

32.    Based on the conduct described herein and above, the Commissioner believes that Respondent's conduct developing, pricing, and marketing Trinity's HCSM products violates of the provisions of § 10-2-801(1)(i), C.R.S.

33.    It further appears to the Commissioner that Respondent's conduct, as described above and herein, is fraudulent, creates an immediate danger to public safety, and/or is causing or can be reasonably expected to cause significant, imminent, and irreparable public injury.

## ORDER

34.    Based upon the above Findings of Facts and Conclusions of Law, the Commissioner of Insurance ORDERS that any and all of Respondent and all of its agents, affiliates, employees, contractors, successors in interest, and or authorized representatives **CEASE AND DESIST** from the solicitation, negotiation, sale, or effectuation of any and all Trinity HCSM products in the state of Colorado.

## OTHER MATTERS

35.    Pursuant to § 10-3-904.6(1), C.R.S., Respondent may contest this Order and request a hearing **within 60 days** of the date of this Order in accordance with

4

§ 24-4-105(12), C.R.S. Such request for hearing must be received by the Division on or before the expiration of 60 days from the date of this Order.

36.     Pursuant to § 10-3-904.6(5), C.R.S., upon determination of a violation of this Order, the Commissioner may impose a civil penalty of $25,000.00 for each act in violation and/or direct restitution.

37.     This Order contains a total of six (6) pages, including the Certificate of Service.

38.     The Commissioner reserves the right to amend this Order to add any individual, entity or company that is directly or indirectly affiliated or associated with the named entity in this Order or has any type of business or contractual relationship with the named entity in this Order that relate to the unauthorized transaction of insurance business based upon evidence acquired through the Division's continuing investigation.

39.     This Order is effective immediately upon execution by the Commissioner or his designee.

40.     A facsimile or other copy of this Order shall be treated as an original.

Dated this 12 day of August, 2019.

KATE HARRIS
CHIEF DEPUTY COMMISSIONER
LIFE & HEALTH POLICY

5

# BEFORE THE DIVISION OF INSURANCE, STATE OF COLORADO

Case File No. 268068
DOI Order No. 0-20-005

## FINAL AGENCY ORDER

In the Matter of TRINITY HEALTHSHARE, INC.

Respondent.

This matter comes before Michael Conway, Commissioner of Insurance for the State of Colorado ("Commissioner"), pursuant to §§ 10-3-901 through 10-3-910, C.R.S., whereby the Commissioner is authorized to issue a Final Agency Order. After reviewing the Stipulation and grounds therein, and being fully advised in the premises, the Commissioner makes the following Findings and enters the Orders as hereinafter set forth:

### FINDINGS

1. On August 12, 2019, the Commissioner, pursuant to §§ 10-3-901 through 10-3-910, C.R.S., issued an *Ex Parte* Emergency Cease and Desist Order against Trinity ("Order").

2. Trinity denies any wrongdoing or engaging in any activities that violate any Colorado insurance laws. By entering into the Stipulation, Trinity knowingly and voluntarily waived the right to: a hearing in this matter, the right to be represented at such hearing by counsel chosen and retained by Trinity; the right to present a defense, oral and documentary evidence and cross-examine witnesses at such hearing; the right to seek judicial review of the Stipulation and this Final Agency Order.

### ORDER

Based upon the foregoing and the terms of the Stipulation between the Division and Trinity, it is hereby ORDERED as follows:

1. Trinity will no longer accept voluntary contributions from Colorado residents after January 31, 2020, and will not process sharing requests from Colorado members for any service rendered after January 31, 2020. Trinity may, however, continue to process sharing requests from Colorado members for services rendered to them prior to January 31, 2020.

2. The cease and desist order by the Commissioner in Paragraph twenty-nine (29) of the Order remains in effect. Notwithstanding the above, upon entry of the Commissioner's Final Agency Order approving this Stipulation Trinity shall be released of its obligation to maintain any and all existing contracts plans, policies or memberships with Colorado consumers effective January 31, 2020.

**EXHIBIT**

**1.24**

Ex. 1.24, p. 1 of 7

3. Trinity will withdraw its request for hearing relating to the Order.

4. Subject to Division approval, Trinity will provide a notice to all current Trinity Colorado members explaining the following:

   a. Trinity will no longer do business with Colorado residents as of January 31, 2020;
   b. ACA-compliant insurance is available through Connect for Health Colorado during the open enrollment period; and
   c. The Division has opened a special enrollment period extending the open enrollment deadline 60 days, which will extend the open enrollment deadline for Trinity members from January 16, 2020 to March 16, 2020.

5. Trinity shall exercise its best efforts to have Aliera itself or through its third-party administrator perform an audit of all sharing request denials (partial and whole) for adherence with the applicable member sharing agreement ("Audit"). The Audit shall relate to all Trinity's Colorado members from Trinity's inception until present. Trinity shall direct Aliera to prepare a spreadsheet for the Division including the following information for all audited denials:

   i. Member Name;
   ii. Date of Service;
   iii. Provider name;
   iv. Provider Network Status;
   v. Total Charge;
   vi. Allowed Amount (per network repricing);
   vii. Denied Amount;
   viii. Amount Applied to MSRA;
   ix. Total Payment made by Aliera;
   x. Total Member Responsibility;
   xi. Original Basis for Denial; and
   xii. Comments/Notes explaining the results of the audit and whether Aliera upheld its original denial or reversed following the audit.

6. Trinity will follow up with the Division's Lead Analyst regarding his inquiry relating to a specific Colorado Consumer.

7. The Stipulation is incorporated by reference, and all of its conditions, terms, and agreements are specifically made part of this Order as though fully set forth herein.

DONE AND ORDERED this 13th day of January, 2020.

Michael E. Conway
Insurance Commissioner

2

## CERTIFICATE OF SERVICE

This is to certify that I have duly served the within **FINAL AGENCY ORDER** upon all parties herein by depositing copies of same in the United States mail, first class postage prepaid, at Denver, Colorado, this 13th day of January 2020 addressed as follows:

LEWIS ROCA ROTHGERBER CHRISTIE LLP

Kris J. Kostolansky, Esq. (Bar No. 13764)
Hilary D. Wells, Esq. (Bar No. 33952)
1200 17th Street, Suite 3000
Denver, Colorado 80202
kkosto@lrrc.com
hwells@lrrc.com

*Counsel for Trinity Healthshare, Inc.*

*(Via Electronic Mail)*

Karl D. Kaesemeyer (Bar No. 38993)
First Assistant Attorney General
Peter Frigo (Bar No. 38621)
Senior Assistant Attorney General
Evan Spencer (Bar No. 47651)
Assistant Attorney General
Business and Licensing Section
1300 Broadway, 8th Floor
Denver, Colorado 80203
Karl.Kaesemeyer@coag.gov
Peter.Frigo@coag.gov
Evan.Spencer@coag.gov

*Counsel for the Division of Insurance*

/s/
For the Division of Insurance

3

## BEFORE THE DIVISION OF INSURANCE, STATE OF COLORADO

Case File No. 268068
<u>DOI Order No.</u> 0-20-005

## STIPULATION FOR ENTRY OF FINAL AGENCY ORDER

In the Matter of TRINITY HEALTHSHARE, INC.

Respondent.

       The Colorado Division of Insurance ("Division") and Trinity Healthshare Inc. ("Trinity") hereby enter into this Stipulation for Entry of Final Agency Order ("Stipulation") to resolve the matters at issue in Division file number 268068 and do hereby stipulate and agree as follows:

1. On August 12, 2019, Michael Conway, Commissioner of Insurance for the State of Colorado ("Commissioner"), pursuant to §§ 10-3-901 through 10-3-910, C.R.S., issued an *Ex Parte* Emergency Cease and Desist Order against Trinity, Order Number 0-20-005 ("Order").

2. Trinity denies the allegations in the August 12, 2019 Order against Trinity and any wrongdoing or violation of Colorado insurance laws. However, in order to avoid the uncertainty of litigation and resolve the matters at issue, the Division and Trinity agree to the following:

   a. Trinity will no longer accept voluntary contributions from Colorado residents after January 31, 2020, and will not process sharing requests from Colorado members for any service rendered after January 31, 2020. Trinity may, however, continue to process sharing requests from Colorado members for services rendered to them prior to January 31, 2020.

   b. Trinity agrees that the cease and desist order by the Commissioner in Paragraph twenty-nine (29) of the Order remains in effect. Notwithstanding the above, upon entry of the Commissioner's Final Agency Order approving this Stipulation, Trinity shall be released of its obligation to maintain any and all existing contracts plans, policies or memberships with Colorado consumers effective January 31, 2020.

   c. Trinity agrees to withdraw its request for hearing relating to the Order.

   d. Subject to Division approval, Trinity will provide a notice to all current Trinity Colorado members explaining the following:
      i. Trinity will no longer do business with Colorado residents as of January 31, 2020;
      ii. ACA-compliant insurance is available through Connect for Health Colorado during the open enrollment period; and

   iii. The Division has opened a special enrollment period extending the open enrollment deadline 60 days, which will extend the open enrollment deadline for Trinity members from January 16, 2020 to March 16, 2020.

  e. Trinity shall exercise its best efforts to have Aliera itself or through its third-party administrator perform an audit of all sharing request denials (partial and whole) for adherence with the applicable member sharing agreement ("Audit"). The Audit shall relate to all Trinity's Colorado members from Trinity's inception until present. Trinity shall direct Aliera to prepare a spreadsheet for the Division including the following information for all audited denials:

   i. Member Name;
   ii. Date of Service;
   iii. Provider name;
   iv. Provider Network Status;
   v. Total Charge;
   vi. Allowed Amount (per network repricing);
   vii. Denied Amount;
   viii. Amount Applied to MSRA;
   ix. Total Payment made by Aliera;
   x. Total Member Responsibility;
   xi. Original Basis for Denial; and
   xii. Comments/Notes explaining the results of the audit and whether Aliera upheld its original denial or reversed following the audit.

  f. Trinity will follow-up with the Division's Lead Analyst regarding his inquiry relating to a specific Colorado Consumer.

3. By entering into this Stipulation, Trinity knowingly and voluntarily waives its rights pursuant to §§ 10-3-904.6(1)-(4); and 24-4-104, 105, and 106, C.R.S., including, but not limited to the right to a hearing in this matter; the right to be represented at such hearing by counsel chosen and retained by it; the right to present a defense; to present oral and documentary evidence; to cross-examine witnesses at such hearing; and the right to seek judicial review of this Stipulation and the Final Agency Order approving this Stipulation.

4. By execution of this Stipulation and the Final Agency Order approving the Stipulation, the Division and Trinity intend to and do resolve Trinity's request for a hearing relating to the Order.

5. The Stipulation is subject to approval by the Commissioner or his designee, and shall become binding upon the parties hereto upon such approval.

6. Should the Commissioner not approve this Stipulation, each party shall retain all of its rights, claims and defenses.

7. In the event the Division takes action relating to alleged violations of this Stipulation or Final Agency Order approving this Stipulation, the Commissioner shall retain all authority provided to him under 10-3-904.6(5), C.R.S., including, but not limited to, the right to determine whether the Stipulation or Final Agency Order have been violated; the right to conduct a hearing to make such determination; and the right to impose civil penalties and restitution in accordance with 10-3-904.6(5)(a), (b), and (c), C.R.S.

8. Upon the Commissioner's entry of the Final Agency Order approving this Stipulation, this Stipulation and the Final Agency Order shall be a public record in the custody of the Division under the Colorado Public Records Act, as required by §§ 24-72-200.1, et seq., C.R.S.

9. This Stipulation and the Final Agency Order approving this Stipulation shall be reported to the National Association of Insurance Commissioners pursuant to § 10-2-803(2), C.R.S.

10. This Stipulation and Final Agency Order embody the entire agreement between the Division and Trinity, and there are no agreements, understandings, representations or warranties which are not expressly set forth herein.

11. A facsimile or other copy of this Stipulation and Final Agency Order approving this Stipulation shall be treated as an original.

12. There are four (4) pages to this Stipulation, including all signature pages.

**FOR THE COLORADO DIVISION OF INSURANCE**

Kate Harris
Chief Deputy Commissioner
Life & Health Policy

1/2/20
Date

**FOR TRINITY HEALTHSHARE INC.**

William H. Thead, III
Chairman and CEO of Trinity Healthshare, Inc.

12-23-19
Date

3

**APPROVED AS TO FORM**

PHILIP J. WEISER
Attorney General

_signature_  #4+65 1

Karl D. Kaesemeyer (Bar No. 38993)
First Assistant Attorney General
Peter Frigo (Bar No. 38621)
Senior Assistant Attorney General
Evan Spencer (Bar No. 47651)
Assistant Attorney General
Business and Licensing Section
1300 Broadway, 8th Floor
Denver, Colorado 80203
Karl.Kaesemeyer@coag.gov
Peter.Frigo@coag.gov
Evan.Spencer@coag.gov

_Counsel for the Division of Insurance_

LEWIS ROCA ROTHGERBER
CHRISTIE LLP

_/s/ Hilary D. Wells_

Kris J. Kostolansky, Esq. (Bar No. 13764)
Hilary D. Wells, Esq. (Bar No. 33952)
1200 17th Street, Suite 3000
Denver, Colorado 80202
kkosto@lrrc.com
hwells@lrrc.com

BAKER AND HOSTETLER LLP

_/s/ Laurin Quiat_

Baker & Hostetler LLP
1801 California Street, S 400
Denver, Colorado 80202
lquiat@bakerlaw.com

_Counsel for Trinity Healthshare. Inc._

4

| | |
|---|---|
| **STATE OF COLORADO**<br>**DEPARTMENT OF REGULATORY AGENCIES**<br>**DIVISION OF INSURANCE**<br>1560 Broadway, Suite 850, Denver, CO 80202<br><br>**Before the Division of Insurance,**<br><br>**IN THE MATTER OF ALIERA HEALTHCARE,**<br>**INC. (n/k/a THE ALIERA COMPANIES, INC.)** | ▲ **AGENCY USE ONLY**▲<br>**Final Agency Order**<br>**Number:**<br><br>_____<br>Division File No.: 268068<br><br>DOI Order No. O-20-035 |
| **FINAL AGENCY ORDER** | |

THIS MATTER comes before Michael E. Conway, Commissioner of Insurance for the State of Colorado ("Commissioner"), upon the Stipulation for Entry of Final Agency Order ("Stipulation") between the Colorado Division of Insurance ("Division") and Aliera Healthcare, Inc. ("Respondent"). After reviewing the Stipulation, the Commissioner makes the following findings and enters the following order:

### FINDINGS

1.      The Commissioner has jurisdiction over Respondent and the subject matter herein pursuant to the provisions of the Colorado Producer Licensing Model Act, §§ 10-2-101 through 10-2-1101, C.R.S. (the "PLMA").

2.      By entering into the Stipulation, Respondent has waived its right to a hearing in this matter pursuant to §§ 10-2-801, 10-3-904.6, and 24-4-104, 105, and 106, C.R.S.; the right to be represented at such hearing by counsel chosen and retained by it; the right to present a defense, to present oral and documentary evidence, to cross-examine witnesses at such hearing, and the right to seek judicial review of this Final Agency Order.

3.      The Commissioner accepts the terms of the Stipulation.

4.      Respondent admits the facts recited in Section II of the Stipulation.

### ORDER

Based upon the foregoing and the terms of the Stipulation between the Division and Respondent, it is hereby ORDERED as follows:

**EXHIBIT**
**1.25**

Ex. 1.25, p. 1 of 10

1. Aliera and its subsidiaries, affiliates, and assigns will not provide any services or contract with any unauthorized insurers or unauthorized insurance products, including but not limited to, Health Care Sharing Ministries ("HCSM") or programs representing themselves as HCSMs, unless and until HCSMs are permitted to be marketed in Colorado either by statute, or through an administrative or judicial determination that HCSMs are not an insurance product subject to regulation by the Commissioner.

2. Notwithstanding the above, Aliera shall continue to administer and act as program manager for any and all Colorado consumers currently enrolled in Trinity Healthshare, Inc. ("Trinity") programs until the Commissioner releases such obligation.

3. Aliera agrees to comply with all Colorado insurance laws and regulations.

4. The Division agrees to withdraw the Cease and Desist Order upon the execution of the Final Agency Order approving this Stipulation.

5. In the event the Division takes action relating to alleged violations of this Stipulation or Final Agency Order approving this Stipulation, the Commissioner shall retain all authority provided to him under 10-3-904.6(5), C.R.S., including, but not limited to, the right to determine whether the Stipulation or Final Agency order have been violated; the right to conduct a hearing to make such determination; and the right to impose civil penalties and restitution in accordance with 10-3-904.6(5)(a), (b), and (c), C.R.S.

6. In the event the Division commences an action against Respondent for an alleged violation of this Final Agency Order, the Final Agency Order, Stipulation, and the factual basis of this proceeding shall be admissible in any such action.

7. The Stipulation is incorporated by reference, and all of its conditions, terms, and agreements are specifically made a part of this Order as though fully set forth herein.

DONE AND ORDERED this 13th day of January, 2020.

MICHAEL E. CONWAY
COMMISSIONER OF INSURANCE

2

## CERTIFICATE OF SERVICE

This is to certify that I have duly served the within **FINAL AGENCY ORDER** upon all parties herein by depositing copies of same in the United States mail, first class postage prepaid, at Denver, Colorado, this 13ᵗʰ day of January, 2020, addressed as follows:

Alissa H. Gardenswartz, #36126
Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202
*Attorney for Aliera Healthcare, Inc.*

*(Via e-mail)*

Evan Spencer
Assistant Attorney General
Peter W. Frigo
Senior Assistant Attorney General
Colorado Department of Law
Evan.spencer@coag.gov
Peter.frigo@coag.gov
*Attorneys for the Division of Insurance*

_____
For the Division of Insurance

3

**STATE OF COLORADO**
**DEPARTMENT OF REGULATORY AGENCIES**
**DIVISION OF INSURANCE**
1560 Broadway, Suite 850, Denver, CO 80202

**Before the Division of Insurance,**


**IN THE MATTER OF ALIERA HEALTHCARE,**
**INC. (n/k/a THE ALIERA COMPANIES, INC.)**

▲ **AGENCY USE ONLY** ▲

**Final Agency Order**
**Number:**

_____

Division File No.: 268068

DOI Order No. 0-20-006

## STIPULATION FOR ENTRY OF FINAL AGENCY ORDER

The Colorado Division of Insurance ("Division"), and Aliera Healthcare, Inc., hereby enter into this Stipulation for Entry of Final Agency Order ("Stipulation") to resolve the matters at issue in *Ex Parte* Emergency Cease and Desist Order number 0-20-006 ("Cease and Desist Order"), and hereby stipulate and agree as follows:

### I.   JURISDICTION AND PARTIES

1.      Pursuant to § 10-1-108(7), C.R.S., the Commissioner of Insurance ("Commissioner") has the duty and responsibility to supervise the business of insurance in the state of Colorado to assure it is conducted in accordance with Colorado law and in such a manner as to protect policyholders and the general public.

2.      Pursuant to § 10-1-108(5), C.R.S., the Commissioner has the duty to make such investigations and examinations as are authorized by Title 10 of the Colorado Revised Statutes and to investigate such information as is presented to the Commissioner by authority that the Commissioner believes to be reliable pertaining to violations of Colorado insurance laws.

3.      Section 10-1-102(12), C.R.S., defines "insurance" as, a contract whereby one, for consideration, undertakes to indemnify another or to pay a specified or ascertainable amount or benefit upon determinable risk contingencies.

4.      Section 10-1-102(6)(a), C.R.S., defines insurance company[1] to include all corporations, associations, partnerships, or individuals engaged as insurers in the business of insurance.

5.      Pursuant to § 10-2-102(13), C.R.S., an insurer is every person engaged as principal, indemnitor, surety, or contractor in the business of making contracts of insurance.

6.      Pursuant to § 10-3-105(1), C.R.S., no foreign or domestic insurance company shall transact any insurance business in this state, unless it first procures from the commissioner a certificate of authority stating that the requirements of the laws of this state have been complied with and authorizing it to do business.

7.      Pursuant to § 10-3-903, C.R.S., the making of, or proposing to make, as an insurer, an insurance contract, by an unauthorized insurer, constitutes transacting insurance business in this state.

8.      Pursuant to § 10-3-904.5, C.R.S., when the Commissioner believes that an unauthorized person is engaging in the transaction of insurance business in violation of §§ 10-3-105 or 10-3-903, C.R.S., or any rule promulgated by the Commissioner, and when it appears to the Commissioner that such conduct is fraudulent, creates an immediate danger to the public safety, or is causing or can be reasonably expected to cause significant, imminent, and irreparable public injury, the Commissioner may issue an *ex parte* emergency cease and desist order to such unauthorized person to immediately cease and desist from such unlawful conduct.

9.      The Colorado Division of Insurance ("Division") is an agency charged with the execution of laws relating to insurance and has supervising authority over the business of insurance in this state pursuant to § 10-1-103(1), C.R.S.  Pursuant to § 10-1-104(2), C.R.S., the Commissioner has delegated the duties and responsibilities of investigating, enforcing, and taking actions to enforce compliance with the insurance laws of Colorado to the Division and its staff.

10.     Aliera Healthcare, Inc. (n/k/a The Aliera Companies, Inc.) ("Aliera") is a foreign, for-profit corporation, organized under the laws of Delaware and doing business in Colorado.[2]

11.     Aliera first incorporated in the State of Delaware on September 29, 2011.

---

[1] The section defines "company", "corporation", "insurance company", or "insurance corporation."

[2] Aliera Healthcare, Inc. has secured a name change to The Aliera Companies, Inc in both Delaware and Colorado Secretary of State records. The statement of change of entity name was filed with the Colorado Secretary of State on September 20, 2019. Aliera has not updated its licensing record with the Division to incorporate this name change.

12.     Aliera is licensed as a non-resident insurance producer with life, and accident and health lines of authority, license number 544844.

13.     The Commissioner has jurisdiction over Aliera and the subject matter of the Cease and Desist Order pursuant to §§ 10-3-901 through 10-3-910, C.R.S.

## II.     PROCEDURAL HISTORY AND FACTUAL FINDINGS

14.     The Cease and Desist Order relates to Aliera's relationship with Trinity Healthshare, Inc. ("Trinity"), a foreign corporation organized under the laws of Delaware.

15.     Trinity represents itself as a healthcare sharing ministry ("HCSM") as defined by 26 USC §5000A.

16.     Trinity does not hold a certificate of authority in the State of Colorado.

17.     On or around August 13, 2018, Aliera and Trinity entered into a Marketing and Administration Agreement ("Agreement").

18.     Under the Agreement, Aliera is the administrator, marketer, and program manager for Trinity.

19.     As program manager for Trinity, Aliera is responsible for the development of plan designs, pricing, and marketing materials, and vendor management, and recruitment and maintenance of a national sales force to market plans.

20.     Under the Agreement, Aliera has the exclusive right to design, market, and sell the Trinity HCSM.

21.     Aliera markets Trinity's HCSM products as alternatives to traditional health insurance.

22.     Aliera markets Trinity's HCSM products to Colorado consumers and utilizes licensed resident insurance producers to sell Trinity's HCSM products within the State of Colorado.

23.     On August 12, 2019, the Commissioner issued the Cease and Desist Order against Aliera based on his finding that Trinity was operating as an unlicensed insurance company. The Cease and Desist Order ordered Aliera and all of its agents, affiliates, employees, contractors, successors in interest, and or authorized representatives cease and desist from the solicitation, negotiation, sale, or effectuation of any and all Trinity HCSM products in the State of Colorado.

## III.   RESOLUTION

24.   In order to avoid the time, cost, and uncertainty of litigation, and for the consideration recited below, the sufficiency of which is acknowledged by the parties, Aliera and the Division agree to settle this matter pursuant to the following terms:

  a. Aliera admits the facts recited in Section II above;

  b. Aliera agrees not to challenge the Cease and Desist Order;

  c. Aliera and its subsidiaries, affiliates, and assigns agree not to provide any services or contract with any unauthorized insurers or unauthorized insurance products, including but not limited to, HCSMs or programs representing themselves as HCSMs, unless and until HCSMs are permitted to be marketed in Colorado either by statute, or through an administrative or judicial determination that HCSMs are not an insurance product subject to regulation by the Commissioner. Notwithstanding the above, Aliera shall continue to administer and act at program manager for any and all Colorado consumers currently enrolled Trinity programs until the Commissioner of Insurance releases such obligation.; and

  d. Aliera agrees to comply with all Colorado insurance laws and regulations;

  e. The Division agrees to withdraw the Cease and Desist Order upon the execution of the Final Agency Order approving this Stipulation.

25.   By entering into this Stipulation, Aliera knowingly and voluntarily waives its rights pursuant to §§ 10-3-904.6(1)-(4); and 24-4-104, 105, and 106, C.R.S., including, but not limited to the right to a hearing in this matter; the right to be represented at such hearing by counsel chosen and retained by it; the right to present a defense; to present oral and documentary evidence; to cross-examine witnesses at such hearing; and the right to seek judicial review of this Stipulation and the Final Agency Order approving this Stipulation.

26.   The Division and Aliera agree that this Stipulation is a full and final settlement of the matters at issue in *Ex Parte* Emergency Cease and Desist Order number 0-20-006.

27.     Neither this Stipulation nor the Final Agency Order approving this Stipulation shall be deemed in any manner to prevent the Division from commencing any other agency action relating to any other conduct of Aliera not settled herein, and without regard to whether such conduct occurred prior to the date of this Stipulation or the Final Agency Order approving this Stipulation.

28.     Aliera understands and acknowledges that the Division may take such lawful steps as may be required or appropriate to investigate and determine whether Aliera is in compliance with this Stipulation and the Final Agency Order approving this Stipulation, and may take any action it deems appropriate to enforce compliance with the terms of the Stipulation and Final Agency Order.

29.     In the event the Division takes action relating to alleged violations of this Stipulation or Final Agency Order approving this Stipulation, the Commissioner shall retain all authority provided to him under 10-3-904.6(5), C.R.S., including, but not limited to, the right to determine whether the Stipulation or Final Agency order have been violated; the right to conduct a hearing to make such determination; and the right to impose civil penalties and restitution in accordance with 10-3-904.6(5)(a), (b), and (c), C.R.S.

30.     In the event the Division takes action relating to alleged violations of this Stipulation or Final Agency Order approving this Stipulation, the Stipulation and Final Agency Order shall be admissible in full in that proceeding for any purpose.

31.     This Stipulation is entered into by Aliera freely and voluntarily, after having had the opportunity to consult with counsel of its choice, and with full understanding and acceptance of the legal consequences of this Stipulation and the Final Agency Order approving this Stipulation.  Aliera affirms that it has read this Stipulation and fully understand its nature, meaning, content, and consequences.

32.     Aliera understands that this Stipulation and the Final Agency Order approving this Stipulation shall be reported to the National Association of Insurance Commissioners pursuant to § 10-2-803(2), C.R.S.

33.     Aliera agrees that upon execution of this Stipulation, no subsequent action or assertion shall be maintained or pursued in any manner asserting the invalidity of this Stipulation or the Final Agency Order approving this Stipulation and its provisions.

34.     Invalidation of any provision of this Stipulation or the Final Agency Order approving this Stipulation by a court of competent jurisdiction will in no way affect any other provisions, which shall remain in full force and effect.

35.    Upon the Commissioner's entry of the Final Agency Order approving this Stipulation, this Stipulation and the Final Agency Order shall be a public record in the custody of the Division under the Colorado Public Records Act, as required by §§ 24-72-200.1, *et seq.*, C.R.S.

36.    This Stipulation is subject to approval by the Commissioner or his designee, and shall become binding upon the parties hereto upon such approval.

37.    Should the Commissioner not approve this Stipulation, each party shall retain all of its rights, claims and defenses.

38.    This Stipulation embodies the entire agreement between the Division and Aliera, and there are no agreements, understandings, representations or warranties, which are not expressly set forth herein.

39.    A facsimile or other copy of this Stipulation and Final Agency Order approving this Stipulation shall be treated as an original.

40.    There are seven (7) pages to this Stipulation, including all signature pages.

_____        12/05/19
CHASE MOSES                             _____
ON BEHALF OF ALIERA HEALTHCARE, INC     DATE

Subscribed and sworn to before me in the County of Fulton, State of Georgia, this 5th day of December 2019, by Chase Moses on behalf of Aliera Healthcare, Inc.

_____
NOTARY PUBLIC

My Commission expires: February 8th, 2021

Fulton County, State ...
I certify this to be a complete, ...
copy of the original document. Certi...
5th day of December ...
Deborah Diana McCaggs    Notary P...
DEBORAH DIANA MCCAGG
My commission expires February 8, 2, 21

**FOR THE COLORADO DIVISION OF INSURANCE**

Kate Harris
Chief Deputy Commissioner
Life & Health Policy

12|10|19
Date

**APPROVED AS TO FORM**

BROWNSTEIN HYATT FARBER
SCHRECK, LLP

PHILIP J. WEISER
Attorney General

Peter W. Frigo, #38621
Senior Assistant Attorney General
Evan Spencer, #47651
Assistant Attorney General
Business and Licensing
1300 Broadway, 8th Floor
Denver, CO 80203
*Attorneys for the Division of Insurance*

Alissa H. Gardenswartz, #36126
Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202
*Attorney for Aliera Healthcare, Inc*


**Subscribe to Our Newsletter**     Enter your emai     Subscribe


## ROB BONTA
*Attorney General*

# Attorney General Bonta Issues Consumer Alert Warning Californians About Misleading Claims Made by Healthcare Sharing Ministry Plans

Press Release   /   *Attorney General Bonta Issues Consumer Alert Warning Califor…*

Friday, April 30, 2021

Contact: (916) 210-6000, agpressoffice@doj.ca.gov

**SACRAMENTO –** California Attorney General Rob Bonta today issued a consumer alert warning Californians about sham health insurance plans offered by some healthcare sharing ministries (HSMs). These HSMs use misinformation to mislead consumers into enrolling under the guise of offering an affordable alternative to health insurance from the Covered California marketplace. However, unlike Covered California plans, healthcare sharing ministries are not obligated to cover preexisting conditions or guarantee coverage for medical costs or services. As a result, consumers have filed complaints with the Attorney General's Office alleging that their healthcare sharing ministry plans have refused to cover treatments and pay their medical bills.

**EXHIBIT**
**1.26**

"Our office has received multiple complaints from devastated Californians who have been left in financial jeopardy with mounting medical bills after their healthcare sharing ministry plan failed to provide the reliable coverage they expected," **said Attorney General Bonta**. "Before signing up for one of these plans, please do your research and consider applying instead for affordable, reliable coverage through Covered California."

Prior to the passage of the Affordable Care Act (ACA), HSMs allowed people to pool their money with others who shared their religious beliefs in order to assist each other during times of medical crisis. After the ACA was passed, the Covered California health insurance marketplace was established, giving uninsured Californians access to quality, affordable, and ACA-compliant health insurance. Many companies also began to capitalize on the exemption of HSMs from many of the coverage mandates in the ACA by marketing them as a less-expensive alternative to ACA-compliant health insurance. However, unlike plans through the Covered California marketplace, HSMs do not guarantee payment for covered services and fail to cover essential health benefits, like birth control, prescriptions, preexisting conditions, and mental health care.

Many HSMs may be operating in California illegally because they do not meet the requirements of the healthcare ministry exception. Last year, the California Department of Insurance issued a cease and desist order to Aliera Healthcare, Inc. and Trinity Healthshare, Inc. (currently doing business as Sharity Ministries) for misleading California consumers into purchasing their products.

There are several important factors to consider before choosing a healthcare sharing ministry plan as opposed to a traditional health insurance plan:

- **Healthcare sharing ministries use language that closely mimics traditional health insurance** Healthcare sharing ministry plans can be difficult to distinguish from traditional health insurance. Sometimes they even adopt tiered gold, silver,

and bronze "plans" in their marketing materials. Many consumers often do not realize they have enrolled into a healthcare sharing ministry instead of traditional health insurance until the medical bill comes due. Carefully check the plan documents to ensure that you will actually receive coverage for your medical expenses.

- **Healthcare sharing ministries are not required to cover or pay for your care**: Federal law does not mandate that healthcare sharing ministries provide the ten essential health benefits required of ACA-compliant health plans, including coverage for preventive care, services for mental health and substance use disorders, and reproductive care. For example, unlike traditional health insurance, healthcare sharing ministries do not guarantee payment for birth control or abortions.

- **Healthcare sharing ministries can choose not to cover your care based on preexisting conditions** In contrast, Covered California plans cover all of your health conditions regardless of whether they existed at the time you signed up for insurance.

- **Beware of using healthcare sharing ministries as a means of saving money** Premiums to enroll with healthcare sharing ministries are generally cheaper than traditional health insurance, but those savings can come at a price. They are lower because they are not required to pay for your medical costs even though you have made all your monthly payments. Be wary of any personal finance blogs or healthcare navigation tools that steer you towards healthcare sharing ministries as a cost-saving measure.

A health insurance plan through Covered California not only provides the protections of the ACA, but monthly premiums are now lower than ever thanks to new and expanded financial help through the American Rescue Plan. Many Californians will be able to find a high-quality plan for $1 a month, or richer benefits for less than $100 per month.

https://oag.ca.gov/news/press-releases/attorney-general-bonta-issues-consumer-alert-warning-californians-about          3/4

Resp. Appx, p. 104          Ex. 1.26, p. 3 of 4

Consumers can enroll now and do not need to wait for open enrollment in the fall. Visit www.coveredca.com to see how much you may be able to save on your premiums and find the plan that works best for you and your family.

If you believe you have been the victim or target of suspicious marketing by a healthcare sharing ministry, please immediately file a complaint at www.oag.ca.gov/report

# # #

Office of the Attorney General      Accessibility      Privacy Policy      Conditions of Use      Disclaimer

© 2024 DOJ



LARRY HOGAN
Governor

BOYD K. RUTHERFORD
Lt. Governor

AL REDMER, JR.
Commissioner

JAY COON
Deputy Commissioner

# INSURANCE ADMINISTRATION

200 St. Paul Place, Suite 2700, Baltimore, Maryland 21202
Direct Dial: 410-468-2009   Fax: 410-468-2020
Email: melanie.gross@maryland.gov
1-800-492-6116   TTY: 1-800-735-2258
www.insurance.maryland.gov

February 27, 2020

CERTIFIED MAIL
RETURN RECEIPT REQUESTED
REGULAR MAIL

Aliera Healthcare, Inc.
990 Hammond Drive, Suite 700
Atlanta, GA 30328

Alexander J. Gonzales, P.C.
Duane Morris, LLP, Las Cimas IV
900 S. Capital of Texas Highway, Suite 300
Austin, TX 78746-5435

Re:     *Maryland Insurance Administration v.* Aliera Healthcare, Inc.
        Case No.: MIA-2020-02-025

Dear Parties:

The Maryland Insurance Commissioner has entered an Order taking disciplinary action against your company. A copy of the Order is attached and is self-explanatory. This Order is subject to your right to request a hearing as set forth on the last page of the Order.

Please include the above case number on all future correspondence to the administration. **Payment of administrative penalties must also reference the above case number or include a copy of this letter when making payment.**

If you have any questions regarding this Order, you may contact the Associate Commissioner of Compliance & Enforcement at 410-468-2113.

Sincerely,

Melanie Gross
Executive Assistant to the Deputy Commissioner

Enclosure
cc:     Al Redmer, Jr., Commissioner
        Jay Coon, Deputy Commissioner
        Erica J. Bailey, Associate Commissioner
        Philip Pierson, Assistant Attorney General
        Craig Ey, Director of Communications
        Denise Owens, Management Associate

**EXHIBIT
1.27**

Ex. 1.27, p. 1 of 10

BEFORE THE MARYLAND INSURANCE COMMISSIONER

| | |
|---|---|
| **MARYLAND INSURANCE**<br>**ADMINISTRATION**<br> 200 ST. PAUL PLACE, SUITE 2700<br> **BALTIMORE, MARYLAND  21202** | \*<br><br>\*<br><br>\* |
| **V.** | \*   CASE NO.: MIA-2020- 02 - 025 |
| **ALIERA HEALTHCARE, INC.**<br> License No. 3000134860<br> 990 Hammond Drive, Ste. 700<br> Atlanta, GA  30328 | \*<br><br>\*   **INVESTIGATION NO. MCLH-25-2019-I**<br>\* |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

## ORDER

This Order is entered by the Maryland Insurance Administration ("the Administration") against Aliera Healthcare, Inc. ("Aliera" or "Respondent").  The purpose of the Order is to enforce Md. Code Ann., Insurance  §§ 4-101, 4-203, 4-205 and 10-126.  As the basis for this action, the Maryland Insurance Administration ("Administration") states:

### I. Facts

1. Respondent is a corporation with a principal place of business in Georgia.  Respondent's mailing address is alternately listed as:

> (a) 5901 Peachtree Dunwoody Road, Building B, Suite 200, Atlanta, GA 30328;

> (b) P.O. Box 28220, Atlanta, GA 30358; and

> (c) 990 Hammond Drive, Ste. 700, Atlanta, GA 30328.

2. Throughout the period of the investigation described below, Respondent has been licensed by the Commissioner to operate in Maryland as a business entity insurance producer.

3. On November 29, 2016, the Commissioner began an investigation into the activities of the Respondent.  This investigation continued into 2017.

4.     On October 2, 2017, the Commissioner issued an Order ("the Initial Order") detailing the findings of the investigation and holding the Respondent in violation of §§ 4-101, 4-203 and 4-205 of the Insurance Article.

5.     The Respondent requested a hearing to contest the Initial Order.

6.     On April 30, 2018, the parties executed a Consent Order ("the Consent Order"), which found that the "health sharing ministry" operated and sold by Respondent was not a "voluntary noncontractual religious publication arrangement" and was not exempt from the application of the Insurance Article.

7.     The Consent Order further stated that "Respondent is directed to provide a written affirmation of its compliance with the terms of this Consent Order no later than February 1, 2019."

8.     The Consent Order further stated that "[e]ffective January 1, 2019, Respondent is to permanently cease the sale, solicitation or operation in Maryland of the Unity Healthshare Ministry plan and any other plan that is not excluded from the application of the Insurance Article by § 1-202, and thereby constitutes health insurance under the terms of § 1-101 (p), and that is operated without a valid certificate of authority."

9.     Respondent failed to provide the written affirmation required by the Consent Order by February 1, 2019.

10.     On June 7, 2019, counsel for the Administration contacted counsel for Respondent to inquire as to Respondent's failure to submit this required written affirmation.

11.     On June 13, 2019, Respondent admitted that it had failed to file the written affirmation as it had agreed to do in the Consent Order.

12.     Also on June 13, 2019, Respondent belatedly filed the required written affirmation.

13.　　This belatedly-filed written affirmation stated that "Aliera has not sold, solicited or been in operation in the State of Maryland under the Unity Healthshare Ministry plan or any other plan that is not excluded from the application of the Insurance Article by § 1-202 since January 1, 2019."

14.　　On or about March 28, 2019, in conjunction with follow-up investigations into Aliera's conduct, an Administration investigator entered her name, email address, and ZIP code into the online portal of Aliera's website.

15.　　Shortly after entering this information, this investigator was contacted, via email, by a sales representative from Aliera. The email and its attachments solicited the purchase of a membership in a program designated as "Aliera's PrimaCare program in conjuction [sic] with Trinity HealthShare, Inc."

16.　　The sales documents attached to the email touted the benefits offered by the PrimaCare program, included a schedule of premium rates charged, provided a list of medical services covered, and urged the recipient to sign up for a membership in the Program.

17.　　The sales documents further described Trinity HealthShare, Inc. as "a religious organization" and a "health care sharing ministry." The documents further stated that "Our role is to enable self-pay patients to help fellow Americans through voluntary financial gifts."

18.　　The documents further contained a reference to "Maryland Article 48, Section 1-202(4)."

19.　　The sales documents contained the logos of Aliera healthcare and Trinity Healthshare. The email to the Administration's investigator was sent from the email address "ssummers@alierahealthcare.com" and contained the Aliera Healthcare logo.

## II. Violations

20.　　The Administration considers the following provisions of the Insurance Article relevant to this matter:

3

**Section 1-101(s)** provides, in relevant part, as follows:

(j) "Certificate of authority" means a certificate issued by the Commissioner to engage in the insurance business.
…
(s) Except as expressly provided otherwise in this article, "insurance" means a contract to indemnify or to pay or provide a specified or determinable amount or benefit on the occurrence of a determinable contingency.
…
(p)(1) "Health insurance" means insurance of human beings against:
    (i) bodily injury, disablement, or death by accident or accidental means, or the expenses of bodily injury, disablement, or death by accident or accidental means;
    (ii) disablement or expenses resulting from sickness or childbirth; and
    (iii) expenses incurred in prevention of sickness or dental care.
…
(t)(1) "Insurance business" includes the transaction of:
    (i) all matters pertaining to an insurance contract, either before or after it takes effect; and
    (ii) all matters arising from an insurance contract or a claim under it.
…
(u)(1) "Insurance producer" means a person that, for compensation, sells, solicits, or negotiates insurance contracts, including contracts for nonprofit health service plans, dental plan organizations, and health maintenance organizations, or the renewal or continuance of these insurance contracts for:
    (i) persons issuing the insurance contracts; or
    (ii) insureds or prospective insureds other than the insurance producer.
…
(ll) "Solicit" means to attempt to sell insurance or to ask or urge a person to apply for a particular kind of insurance from a particular insurer.

**Section 1-201** provides, in relevant part, as follows:

A person that engages in or transacts insurance business in the State, or performs an act relative to a subject of insurance resident, located, or to be performed in the State, shall comply with each applicable provision of this article.

**Section 1-202(a)(4)** provides, in relevant part, as follows:

(a) This article does not apply to:
…
(4) a voluntary noncontractual religious publication arrangement that:
    …
    (ii) publishes a newsletter whose subscribers are limited to members of the same denomination or religion;
    (iii) acts as an organizational clearinghouse for information between subscribers who have medical costs and subscribers who choose to assist with those costs;

(iv) matches subscribers with a willingness to pay and subscribers with present medical costs;

(v) coordinates payments directly from one subscriber to another;

(vi) suggests amounts to give that are voluntary among the subscribers, with no assumption of risk or promise to pay either among the subscribers or between the subscribers and the organization;

(vii) does not use a compensated insurance producer, representative, or other person to solicit or enroll subscribers;

...

(x) does not use funds paid by subscribers for medical costs to cover administrative costs[.]

**Section 4-101(a)** provides, in relevant part, as follows:

(a)(1) Except as otherwise provided in this article, a person may not act as an insurer and an insurer may not engage in the insurance business in the State unless the person has a certificate of authority issued by the Commissioner.

**Section 4-203(b)** provides, in relevant part, as follows:

(b) With respect to a subject of insurance resident, located, or to be performed in the State, a person may not in the State directly or indirectly act as an insurance producer for, or otherwise represent or help on behalf of another, an unauthorized insurer to:

    (1) solicit, negotiate, or effect insurance or an annuity contract;

    (2) inspect risks;

    (3) fix rates;

    (4) investigate or adjust losses;

    (5) collect premiums; or

    (6) transact insurance business in any other manner.

**Section 4-205(b) and** (c) provide, in relevant part, as follows:

(b) An insurer or other person may not, directly or indirectly, do any of the acts of an insurance business set forth in subsection (c) of this section, except as provided by and in accordance with the specific authorization of statute.

(c) Any of the following acts in the State, effected by mail or otherwise, is considered to be doing an insurance business in the State:

    (1) making or proposing to make, as an insurer, an insurance contract;

    ...

    (6) except as provided in subsection (d) of this section, with respect to a subject of insurance resident, located, or to be performed in the State, directly or indirectly acting as an insurance producer for, or otherwise representing or helping on behalf of another, an insurer or other person to:

        (i) solicit, negotiate, procure, or effect insurance or the renewal of insurance;

        (ii) disseminate information about coverage or rates;

        (iii) forward an application;

5

...

  (ix) in any other manner represent or help an insurer or other person to transact insurance business;

(7) doing any kind of insurance business specifically recognized as doing an insurance business under statutes relating to insurance;

(8) doing or proposing to do any insurance business that is substantially equivalent to any act listed in this subsection in a manner designed to evade the statutes relating to insurance.

**Section 4-212** provides as follows:

An unauthorized insurer or person that violates this subtitle is subject to a civil penalty of not less than $100 but not exceeding $50,000 for each violation.

**Section 10-126(a)** provides, in relevant part as follows:

(a) The Commissioner may deny a license to an applicant under §§ 2-210 through 2-214 of this article, or suspend, revoke, or refuse to renew or reinstate a license after notice and opportunity for hearing under §§ 2-210 through 2-214 of this article if the applicant or holder of the license:

  (1) has willfully violated this article or another law of the State that relates to insurance;

  ...

  (13) has otherwise shown a lack of trustworthiness or competence to act as an insurance producer.

21. By failing to comply with the Consent Order to which it agreed in 2018, which required the submission of a written affirmation of compliance no later than February 1, 2019, Respondent violated § 10-126(a)(13).

22. By soliciting the sale of memberships in the PrimaCare program in the state of Maryland, despite that program's lack of eligibility for § 1-202(a)(4) or any other exemption from the Insurance Article, Respondent violated §§ 4-203, 4-205(b), and 10-126(a)(1) and (13).

23. By submitting a written affirmation in June, 2019, which stated "Aliera has not sold, solicited or been in operation in the State of Maryland under the Unity Healthshare Ministry plan or any other plan that is not excluded from the application of the Insurance Article by § 1-202 since

6

January 1, 2019," despite having solicited the sale of PrimaCare memberships in the state of Maryland in 2019, Respondent violated § 10-126(a)(13).

### III. Sanctions

24.   By the facts and violations stated above, Respondent's license to act as an insurance producer in the State of Maryland is subject to suspension or revocation, and/or the imposition of an administrative penalty, and/or a requirement to pay restitution.

25.   In view of the gravity of the violations and considering that insurance producers are in a position of trust and responsibility, revocation and an administrative penalty are the appropriate disciplinary actions in this case.  The Respondent's failure to comply with the terms of the 2018 Consent Order and its continued solicitation of memberships in an unauthorized insurance plan demonstrates that it does not meet the standard of trustworthiness and competence required of an insurance producer.

26.   Administrative penalties shall be made payable to the Maryland Insurance Administration and shall identify the case by number or name.  Unpaid penalties will be referred to the Central Collection Unit for collections.  Payment of the administrative penalty shall be sent to the attention of:  Erica J. Bailey, Associate Commissioner, Compliance and Enforcement, Maryland Insurance Administration, 200 St. Paul Place, Suite 2700, Baltimore, MD 21202.

27.   This Order does not preclude any potential or pending action by the Insurance Fraud Division of the Administration or prosecution by any other person, entity or governmental authority, regarding any conduct by Respondent including the conduct that is the subject of this Order.

28.   This is a reportable administrative proceeding.  As such, it is a public record.  The Administration construes this as an adverse administrative action.  As a result, the Respondent may

7

be required to disclose this Order on any license application, and may be required to report this action to any state in which Respondent currently holds an insurance license.

**WHEREFORE**, for the reasons set forth above, and subject to Respondent's right to request a hearing, it is this 27th day of _February_, 2020, ORDERED that:

A.     The insurance producer license of Respondent Aliera HealthCare, Inc. is REVOKED.

B.     Respondent shall pay an administrative penalty of $11,000 (Eleven Thousand Dollars).

C.     If any Maryland residents were sold a membership in any Healthshare program sold or operated by Respondent after January 1, 2019, Respondent shall provide to the Administration, within 30 days of the date of this Order, a list of all such Maryland residents. The list shall include the names of the Maryland residents and the date enrolled.

D.     If any Maryland residents were sold a membership any Healthshare plan or program sold or operated by Respondent after January 1, 2019, Respondent shall provide written notice to all such Maryland-resident members indicating that Healthshare plan will no longer be operational. This notice shall include the return of all monies received from such Maryland-resident members that paid a contribution to any of the Healthshare plans on or after January 1, 2019.

<div style="margin-left:40%">

ALFRED W. REDMER, JR.
INSURANCE COMMISSIONER


By:    Erica J. Bailey
       Associate Commissioner
       Compliance & Enforcement

Date:    2/27/2020

</div>

8

## RIGHT TO REQUEST A HEARING

Pursuant to § 2-210 of the Insurance Article and Code of Maryland Regulations ("COMAR") 31.02.01.03, an aggrieved person may request a hearing on this Order. This request must be in writing and received by the Commissioner within thirty (30) days of the date of the letter accompanying this Order. However, pursuant to § 2-212 of the Article, the Order shall be stayed pending a hearing only if a demand for hearing is received by the Commissioner within ten (10) days after the Order is served. The request shall include the following information:

> (1) the action or non-action of the Commissioner causing the person requesting the hearing to be aggrieved;
> (2) the facts related to the incident or incidents about which the person requests the Commissioner to act or not act; and
> (3) the ultimate relief requested.

The failure to request a hearing timely or to appear at a scheduled hearing will result in a waiver of your rights to contest this Order and the Order shall be final on its effective date. Please note that if a hearing is requested on this initial Order, the Commissioner may affirm, modify, or nullify an action taken or impose any penalty or remedy authorized by the Insurance Article against Respondent in a Final Order after hearing.

The written request for hearing must be addressed to the Maryland Insurance Administration, 200 St. Paul Place, Suite 2700, Baltimore, Maryland 21202, Attn: Melanie Gross, Executive Assistant to the Deputy Commissioner.

9

7/18/2019 5:08 PM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-19-003388**
**Irene Silva**

CAUSE NO. D-1-GN-19-003388

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALIERA HEALTHCARE, INC., | § | |
| | § | |
| *Defendant.* | § | 53RD JUDICIAL DISTRICT |

## RULE 11 AGREEMENT

Pursuant to Rule 11 of the Texas Rules of Civil Procedure, the parties in this case agree to be bound by the following terms during the pendency of this litigation to the same extent as if these terms were entered by the Court. The parties agree and acknowledge that this Rule 11 Agreement will be filed and made a part of the record in this case.

1. Aliera Healthcare, Inc., named as the defendant in this case, and now doing business as the Aliera Companies, on behalf of itself and its successors, affiliates, agents, and assigns, agrees that it will not accept or write any new business in the State of Texas until such time as this case is resolved.

2. Aliera Healthcare, Inc., now doing business as the Aliera Companies, on behalf of itself and its successors, affiliates, agents, and assigns, further agrees that it will refrain from transferring, expending, or disbursing any funds outside the ordinary course of business without approval from the Court until such time that this case is resolved.

3. The parties agree that all currently scheduled or noticed depositions are suspended until further agreement by the parties. No other depositions will be noticed or scheduled until the expiration of the Temporary Restraining Order in this case.

4. The parties agree to negotiate in good faith to address the issues raised in this matter. A settlement conference is tentatively scheduled for July 26, 2019.

**EXHIBIT**
**1.28**

Ex. 1.28, p. 1 of 2

5.    Aliera Healthcare, Inc. agrees that, prior to July 26, 2019, it will send an accounting of money collected from Texas residents and paid on behalf of Texas residents to counsel for the State of Texas.

SIGNED AND AGREED:

Alexander J. Gonzales
State Bar No. 08118563
Duane Morris LLP
Counsel for Aliera Healthcare, Inc.

H. Melissa Mather
State Bar No. 24010216    with permission
Assistant Attorney General
Office of the Texas Attorney General
Counsel for the State of Texas

B

FILED

COMMISSION OF INSURANCE
INSURANCE DIVISION OF IOWA

,

**ORDER AND CONSENT
TO ORDER**

**NOW THEREFORE,**

## I. PARTIES AND JURISDICTION

B

B

## II. BACKGROUND

**EXHIBIT**

**1.29**

Ex. 1.29, p. 1 of 21

B

B

## III. FINDINGS OF FACT

B

B

B

B

B

B

B

B

_____

B

B

---

B

B

B

B

B

B

B

B

B

B

B

B

B

*Baptist entities and*

*individuals*

B

B

B

B

_____

## IV. CONCLUSIONS OF LAW

### COUNT ONE
**Unauthorized Sale of Insurance Products**

## COUNT TWO
**Premium Tax on Unauthorized Insurers**

## COUNT THREE
**Unfair Methods of Competition and Unfair or Deceptive Acts or Practices**

B

B

B

B

## V. ORDER

**WHEREFORE,  IT  IS  ORDERED**

B

B

B

B



_/s/ Johanna Nagel_____

B

_____

**Attorneys for the Iowa Insurance Division**

**Copies by email to:**
B

**Attorneys for Trinity Healthshare, Inc.**

B

## NOTICE OF PENALTIES FOR WILLFUL VIOLATION OF THIS ORDER

**YOU ARE NOTIFIED**

B

**YOU ARE NOTIFIED**

B

## NOTICE OF FINAL ORDER IMPACT

## CONSENT TO ORDER AND AGREEMENT

I, _William H. Thomas III_, as authorized agent for Respondent Trinity Healthshare Inc. (currently known as Sharity Ministries, Inc.) in this matter, have read, understood, and do knowingly consent to this Consent Order in its entirety.  By executing this Consent, Trinity understands that it is waiving its right to a hearing, to confront and cross-examine witnesses, to produce evidence, and to judicial review.

Trinity further understands this Consent Order is considered a final administrative action that will be reported by the Division to the National Association of Insurance Commissioners and to other regulatory agencies.  Trinity also understands this Consent Order is a public record under Iowa Code chapter 22 and information may be shared with other regulatory authorities or governmental agencies, pursuant to Iowa Code § 505.8(8)(d).  Trinity also understands this Consent Order will be posted to the Division's website and a notation will be made to the publicly available website record that administrative action has been taken against it.

Dated: _3-11-2021_

_[signature]_

Sharity Ministries, Inc. f/k/a
Trinity Healthshare Inc., Respondent
By: _William H. Thomas III_

Title: _CEO_

Address of Signatory
_5901 Peachtree Dunwoody Rd.; Ste. C-160_
_Atlanta GA 30328_

Subscribed and sworn before me by _Fred Lavender Jr_ on this _11th_ day of _March_, 2021.

_[signature]_

Notary Public for the State of _Georgia_

```
+---------------------------------+
|         FRED LAVENDER JR        |
|      Notary Public, Georgia     |
|          Clayton County         |
|      My Commission Expires      |
|          July 20, 2024          |
+---------------------------------+
```

21

**STATE OF WASHINGTON**
**OFFICE OF THE INSURANCE COMMISSIONER**

| | |
|---|---|
| *In the Matter of* | |
| **ALIERA HEALTHCARE INC.,** | Order No.    19-0251 |
| Unauthorized Entity. | |
| Respondent. | ORDER TO CEASE AND DESIST |

Pursuant to RCW 48.02.080 RCW 48.15.023, RCW 48.17.063, RCW 48.30.010, RCW 48.44.016, and RCW 48.155.130(1) the Insurance Commissioner of the state of Washington ("Insurance Commissioner") orders the above-named Respondent, and its officers, directors, trustees, employees, agents, and affiliates to immediately cease and desist from:

A.  Engaging in or transacting the unauthorized business of insurance or acting as an unregistered health care service contractor or as an unlicensed discount plan organization in the state of Washington;

B.  Seeking, pursuing and obtaining any insurance or discount plan business in the state of Washington;

C.  Soliciting Washington residents to purchase any insurance or discount plan to be issued by an unauthorized insurer or unlicensed discount plan organization;

D.  Soliciting Washington residents to induce them to purchase any insurance contract or discount plan.

**BASIS:**

1.     Aliera Healthcare Inc. ("Aliera") is a nonresident corporation domiciled in Delaware and incorporated on December 18, 2015. Aliera does not hold a certificate of authority and is not licensed to sell, solicit, or negotiate insurance in the state of Washington. Aliera is also

---

ORDER TO CEASE AND DESIST
ORDER NO. 19-0251

LA - 1589861 - 1

1

State of Washington
Office of Insurance Commissioner
PO Box 40255
Olympia, WA 98504-0255

**EXHIBIT**
**1.30**

not registered as a health care service contractor or licensed as a discount plan organization in the state of Washington.

2.     Trinity HealthShare, Inc. ("Trinity") is a nonresident corporation domiciled in Delaware. Trinity represents itself as a health care sharing ministry ("HCSM") as defined by 26 USC §5000A and incorporated by reference under RCW 48.43.009. Trinity does not hold a certificate of authority in Washington. Trinity HealthShare, Inc. is the subject of a separate but related Cease and Desist Order. See Order No. 19-0152.

3.     To qualify as a health care sharing ministry under the Internal Revenue Service (IRS) and Washington law, a HCSM must be a 501(c)(3) organization whose members share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs. A HCSM must also have been in operation and continuously sharing member health care costs since at least December 31, 1999.

4.     Aliera is the administrator, marketer, and program manager for Trinity and is solely responsible for the development of HCSM plan designs, pricing, marketing materials, vendor management, and recruitment and maintenance of a national sales force on behalf of Trinity.

5.     By the terms of their Management and Administration Agreement ("the Agreement"), Aliera has the right, at its sole discretion, to develop and market "the schedule of medical services eligible for sharing under the HCSM" with other purportedly "non-insurance" health care products developed and managed by Aliera. Such products include telemedicine, discount prescription drugs, and concierge services to locate in-network providers. In order to purchase any of Aliera's HCSM-inclusive plans, individuals must acknowledge Trinity's statement of faith and lifestyle requirements, as deemed necessary by Trinity and agreed upon by Aliera.

6.     Following receipt of a complaint, the Insurance Commissioner investigated to determine whether Aliera is accurately representing its products to Washington consumers as a HCSM in compliance with state and federal law. The complaint alleged that Aliera is soliciting and recruiting agents to sell misleading products to Washington consumers by using marketing materials that may lead the average consumer to believe they are purchasing healthcare insurance rather than a HCSM membership.

7.     The investigation determined that Aliera 1) failed to represent Trinity's actual statement of faith, as defined by Trinity's own bylaws, 2) provided misleading training to

ORDER TO CEASE AND DESIST                    2              State of Washington
ORDER NO. 19-0251                                           Office of Insurance Commissioner
                                                            PO Box 40255
LA - 1589861 - 1                                            Olympia, WA  98504-0255

prospective agents about the nature of its HCSM products, 3) provided misleading advertisements to the public and prospective HCSM customers about the nature of its HCSM products, 4) held itself out as health care service contractor without being registered, and 5) is doing business as an unlicensed discount plan organization.

8.     Trinity has communicated to state and federal regulatory authorities that it holds to a Protestant expression of the Christian faith. Trinity's own bylaws obligate its members to affirm this expression of faith. However, as marketed by Aliera, Trinity offers an alternative solution to health insurance and offers membership to individuals of "all faiths." In training materials to prospective agents, Aliera describes Trinity's statement of faith as simply a belief in a higher power, whether a Christian, Buddhist, or Jewish God. This statement of faith, as presented to the public, is materially different from and inconsistent with the statement of faith that Trinity has represented to regulatory authorities. Aliera also has the contractual right to "agree upon" Trinity's required statement of beliefs.

9.     Aliera's web-based advertisement to recruit prospective agents to sell its HCSM products touts the opportunity to sell "the next generation Healthcare products" and suggests Aliera can offer employers "a healthcare plan that saves money." The advertisement does not include any reference to a required affirmation of a common set of ethical or religious beliefs. Likewise, Aliera's prospective agent training portal provides required training videos that explain Aliera's HCSM plan offerings with no reference to consumers' required affirmation of a common set of ethical or religious beliefs.

10.     A video seminar for prospective agents refers to Aliera's "individual alternative market" as the company's "bread and butter." The narrator/trainer states that Aliera's comprehensive HCSM plans not only "mirrors traditional insurance, but truly provide comprehensive healthcare for an individual." The narrator/trainer also describes one of Aliera's HCSM plans (InterimCare) as "our short-term medical plan." Aliera's repeated use of insurance terminology in its agent training and marketing materials has the capacity to deceive both prospective agents and prospective consumers into believing they are purchasing a non-traditional *insurance* plan.

11.     In another video seminar for prospective Aliera agents, a trainer represents Trinity's statement of faith in the following manner:

ORDER TO CEASE AND DESIST           3          State of Washington
ORDER NO. 19-0251                                 Office of Insurance Commissioner
                                                  PO Box 40255
LA - 1589861 - 1                                  Olympia, WA  98504-0255

Resp. Appx. p. 141                                                    Ex. 1.30, p. 3 of 7

*Just to give you a general overall synopsis of what it's saying ... It basically is saying that you believe in a higher power. It doesn't necessarily have to be a Christian God, or a Buddhist God, or a Jewish God. It doesn't ... it doesn't matter as long as we all believe that there is a higher power and we're all living our life that the best way that we possibly can. We're maintaining a healthy lifestyle. We're trying to avoid those types of foods, behaviors, habits - things that, you know, cause us illness that are in our control. As long as we're doing those types of things, we're all like-minded individuals. So if you feel that way, and you are a like-minded individual, that's all we're trying to find out. And, if you are, you're gonna say, "Yes," you believe in the five same statement of beliefs that we all do.*

12.     Aliera solicits and sells plans to Washington consumers that are built on an extensive network of preferred providers and include other healthcare "essentials" that may mislead consumers into thinking they are purchasing healthcare insurance. Aliera's HCSM plans include telemedicine, prescription drug discounts, and access to in-network labs and diagnostics.

13.     RCW 48.30.040 states no person shall knowingly make, publish, or disseminate any false, deceptive or misleading representation or advertising in the conduct of the business of insurance, or relative to the business of insurance or relative to any person engaged therein.

14.     RCW 48.15.020(2)(a) provides that a person may not, in this state, represent an unauthorized insurer except as provided in this chapter.

15.     RCW 48.17.060(1) provides that a person shall not sell, solicit, or negotiate insurance in this state for any line or lines of insurance unless the person is licensed for that line of authority in accordance with this chapter.

16.     RCW 48.02.080(3) states if the Insurance Commissioner has cause to believe that any person is violating or is about to violate any provision of this code or any regulation or order of the Insurance Commissioner, he or she may: (a) issue a cease and desist order.

17.     WAC 284-50-050(1) states the format and content of an advertisement to which these rules apply shall be sufficiently complete and clear to avoid deception or the capacity or tendency to mislead or deceive. Whether an advertisement has a capacity or tendency to mislead or deceive shall be determined by the insurance commissioner from the overall impression that the advertisement may be reasonably expected to create upon a person of average education or intelligence, within the segment of the public to which it is directed.

ORDER TO CEASE AND DESIST
ORDER NO. 19-0251

LA - 1589861 - 1

4

State of Washington
Office of Insurance Commissioner
PO Box 40255
Olympia, WA  98504-0255

Ex. 1.30, p. 4 of 7

Resp. Appx, p. 142

18.     WAC 284-50-050(2) states advertisements shall be truthful and not misleading in fact or in implication. Words or phrases, the meaning of which is clear only by implication or by familiarity with insurance terminology, shall not be used.

19.     WAC 284-50-060(1) states no advertisement shall omit information or use words, phrases, statements, references, or illustrations if the omission of such information or use of such words, phrases, statements, references, or illustrations has the capacity, tendency, or effect of misleading or deceiving purchasers or prospective purchasers as to the nature or extent of any policy benefit payable, loss covered, or premium payable. The fact that the policy offered is made available to a prospective insured for inspection prior to consummation of the sale or an offer is made to refund the premium if the purchaser is not satisfied, does not remedy misleading statements.

20.     RCW 48.44.015(1) provides that a person may not in this state, by mail or otherwise, act as or hold himself or herself out to be a health care service contractor, as defined in RCW 48.44.010 without first being registered with the commissioner.

21.     RCW 48.155.020(1) provides that, before conducting discount plan business to which this chapter applies, a person must obtain a license from the commissioner to operate as a discount plan organization.

22.     The Respondent's actions described herein violate Insurance Code provisions that include RCW 48.15.020 (representation of an unauthorized insurer prohibited), RCW 48.17.060 (license required), RCW 48.30.040 (false information and advertising), RCW 48.44.015(1) (registration by health care service contractors required), and RCW 48.155.020(1) (discount plan organization license required).

**IT IS FURTHER ORDERED** that nothing herein shall prevent the Respondent from fulfilling the terms of contracts formed prior to the effective date of this Order pursuant to RCW 48.15.020(2)(b).

Any violation of the terms of this Order by the Respondent and its officers, directors, trustees, employees, agents, and affiliates or the Respondent's failure to fulfill or perform its contracts subject to this Order will render the violator(s) subject to the full penalties authorized by RCW 48.02.080, 48.15.023, and other applicable sections of the Insurance Code of the state of Washington.

ORDER TO CEASE AND DESIST                5        State of Washington
ORDER NO. 19-0251                                 Office of Insurance Commissioner
                                                  PO Box 40255
LA - 1589861 - 1                                  Olympia, WA 98504-0255

Resp. Appx. p. 143                                          Ex. 1.30, p. 5 of 7

The Respondent has the right to demand a hearing in accordance with RCW 48.04.010, WAC 284-02-070, and WAC 10-08-110.

This Order shall remain in effect subject to the further order of the Insurance Commissioner.

**THIS ORDER IS EFFECTIVE IMMEDIATELY AND IS ENTERED** at Tumwater, Washington, this ___13ᵗʰ___ day of ___MAY___, 2019.

MIKE KREIDLER
Insurance Commissioner

By and through his designee

KIMBERLY TOCCO
Insurance Enforcement Specialist
Legal Affairs Division

ORDER TO CEASE AND DESIST          6          State of Washington
ORDER NO. 19-0251                              Office of Insurance Commissioner
                                               PO Box 40255
LA - 1589861 - 1                               Olympia, WA  98504-0255

## CERTIFICATE OF MAILING

The undersigned certifies under the penalty of perjury under the laws of the state of Washington that I am now and at all times herein mentioned, a citizen of the United States, a resident of the state of Washington, over the age of eighteen years, not a party to or interested in the above-entitled action, and competent to be a witness herein.

On the date given below I caused to be served the foregoing Order to Cease and Desist on the following individual(s) in the manner listed below:

*By depositing in the U.S. mail via state Consolidated Mail Service with proper postage affixed to:*

Aliera Healthcare Inc.
The Corporation Trust Company
Corporation Trust Center
1209 Orange St
Wilmington, DE 19801

*By email and by depositing in the U.S. mail via state Consolidated Mail Service with proper postage affixed to:*

Dwight Francis
Sheppard, Mullin, Richter & Hampton LLP
2200 Ross Ave, Ste. 2400
Dallas, TX 75201
dfrancis@sheppardmullin.com

Aliera Healthcare Inc.
5901 Peachtree Dunwoody Rd Ste B-200
Atlanta, GA 30328
tmoses@aliera.com

Reba Leonard
Vice President, Compliance and Regulatory Affairs
15301 Dallas Parkway, Suite 920
Addison, TX 75001
rleonard@alierahealthcare.com

Dated this ___13th___ day of ___May___, 2019, in Tumwater, Washington.

*Christine Tribe*
CHRISTINE TRIBE
Paralegal
Legal Affairs Division

ORDER TO CEASE AND DESIST          7
ORDER NO. 19-0251

LA - 1589861 - 1

State of Washington
Office of Insurance Commissioner
PO Box 40255
Olympia, WA  98504-0255

## STATE OF WASHINGTON
## OFFICE OF THE INSURANCE COMMISSIONER

*In the Matter of*

**TRINITY HEALTHSHARE, INC.**

Unauthorized Entity.

Respondent.

Order No.      19-0252

ORDER TO CEASE AND DESIST

Pursuant to RCW 48.02.080, RCW 48.15.020, and RCW 48.15.023, the Insurance Commissioner of the state of Washington ("Insurance Commissioner") orders the above-named Respondent, and its officers, directors, trustees, employees, agents, and affiliates to immediately cease and desist from:

A. Engaging in or transacting the unauthorized business of insurance in the state of Washington;

B. Seeking, pursuing and obtaining any insurance business in the state of Washington;

C. Soliciting Washington residents to sell any insurance issued or to be issued by an unauthorized insurer;

D. Soliciting Washington residents to purchase any insurance contract.

**BASIS:**

1.      Trinity HealthShare, Inc. ("Trinity") is a nonresident corporation domiciled in Delaware. Trinity represents itself as a health care sharing ministry ("HCSM") as defined by 26 USC §5000A and incorporated by reference under RCW 48.43.009. Trinity does not hold a certificate of authority in the state of Washington.

2.      To qualify as a health care sharing ministry under the Internal Revenue Service (IRS) and Washington law, a HCSM must be a 501(c)(3) organization whose members share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs. A HCSM must also have been in operation and continuously sharing member health care costs since at least December 31, 1999.

ORDER TO CEASE AND DESIST
ORDER NO. 19-0252

LA - 1601489 - 1

1

State of Washington
Office of Insurance Commissioner
PO Box 40255
Olympia, WA 98504-0255

**EXHIBIT**
**1.31**

3.      Washington adopts the IRS definition of HCSM under RCW 48.43.009. HCSMs that comply with the required federal provisions are not considered Washington health carriers or insurers and are exempt from regulation under Washington's insurance code.

4.      Following receipt of a complaint, the Insurance Commissioner investigated to determine whether Trinity is accurately representing itself to Washington consumers as a HCSM in compliance with state and federal law. The complaint alleged that Trinity's corporate partner, Aliera Healthcare, Inc. ("Aliera"), is soliciting and recruiting agents to sell misleading products to Washington consumers because the co-branded marketing materials use language that may lead the average consumer to believe they are purchasing healthcare insurance rather than a HCSM membership.

5.      The investigation determined that Trinity does not meet the legal definition of a HCSM and is therefore acting as an unauthorized insurer in the state of Washington.

6.      Trinity first incorporated in the state of Delaware on June 27, 2018. Approximately six weeks later, Trinity entered into a Management and Administration Agreement ("the Agreement") with Aliera. The Agreement was effective August 13, 2018, and stated Trinity's intent to partner with Aliera to include Trinity's HCSM program as a component of Aliera's new and existing healthcare products. Trinity also grants its corporate affiliate Aliera the exclusive right to develop, market, and sell its HCSM plans to individuals who agree to Trinity's statement of faith and lifestyle requirements.

7.      Trinity has been in existence less than one (1) year. Further, at the time of the Agreement with Aliera, Trinity had zero members in its HCSM and there was no predecessor organization in which Trinity's members were sharing medical costs. Trinity, with zero members, further provided that any future enrolled members would become "customers" of Aliera, who would maintain ownership over the "membership roster." Trinity has not "been in operation and continuously sharing member health care costs since at least December 31, 1999" as required to qualify for exemption from state insurance regulation.

8.      Trinity espouses contradictory versions of the required "common set of ethical or religious beliefs" that vary based on the intended audience. If Trinity's members do not share common beliefs – regardless of the content of such beliefs – and share medical burdens in accordance with those common beliefs, Trinity cannot represent itself as a HCSM.

ORDER TO CEASE AND DESIST          2          State of Washington
ORDER NO. 19-0252                                   Office of Insurance Commissioner
                                                                    PO Box 40255
LA - 1601489 - 1                                        Olympia, WA  98504-0255

9.      Trinity has communicated to state and federal regulatory authorities that it holds to a Protestant expression of the Christian faith. Trinity's own bylaws obligate its members to affirm this expression of faith. However, according to its website, Trinity offers an alternative solution to health insurance and offers membership to individuals of "all faiths." In training materials to prospective agents, Trinity's statement of faith becomes simply a belief in a higher power, whether a Christian, Buddhist, or Jewish God. This statement of faith, as presented to the public, is materially different from and inconsistent with the statement of faith that Trinity has claimed to regulatory authorities, demonstrating that Trinity and its ministers do not share "a common set of ethical or religious beliefs" as required to qualify for exemption from state insurance regulation.

10.     Finally, Trinity also grants Aliera the contractual right to "agree upon" the required statement of beliefs. Conditioning its common set of ethical or religious beliefs on the consent of its for-profit corporate partner is contradictory to Trinity's own statements about its religious traditions.

11.     RCW 48.05.030(1) states no person shall act as an insurer and no insurer shall transact insurance in this state other than as authorized by a certificate of authority issued to it by the Insurance Commissioner and then in force; except, as to such transactions as are expressly otherwise provided for in this code.

12.     RCW 48.30.040 states no person shall knowingly make, publish, or disseminate any false, deceptive or misleading representation or advertising in the conduct of the business of insurance, or relative to the business of insurance or relative to any person engaged therein.

13.     RCW 48.02.080(3) states if the Insurance Commissioner has cause to believe that any person is violating or is about to violate any provision of this code or any regulation or order of the Insurance Commissioner, he or she may: (a) issue a cease and desist order.

14.     RCW 48.15.023(5)(a) states if the Insurance Commissioner has cause to believe that any person has violated the provisions of RCW 48.15.020(1), the Insurance Commissioner may: (i) issue and enforce a cease and desist order in accordance with the provisions of RCW 48.02.080.

15.     RCW 48.44.015(1) provides that a person may not in this state, by mail or otherwise, act as or hold himself or herself out to be a health care service contractor, as defined in RCW 48.44.010 without first being registered with the Insurance Commissioner.

ORDER TO CEASE AND DESIST                3           State of Washington
ORDER NO. 19-0252                                    Office of Insurance Commissioner
                                                     PO Box 40255
LA - 1601489 - 1                                     Olympia, WA  98504-0255

Resp. Appx. p. 148                                                          Ex. 1.31, p. 3 of 5

16.     The Respondent's actions described herein violate Insurance Code provisions that include RCW 48.05.030 (certificate of authority required), RCW 48.14.020 (failure to timely pay premium tax), RCW 48.15.020 (solicitation by unauthorized insurer prohibited), and RCW 48.30.040 (unfair practices and frauds).

**IT IS FURTHER ORDERED** that nothing herein shall prevent the Respondent from fulfilling the terms of contracts formed prior to the effective date of this Order pursuant to RCW 48.15.020(2)(b).

Any violation of the terms of this Order by the Respondent and its officers, directors, trustees, employees, agents, and affiliates or the Respondent's failure to fulfill or perform its contracts subject to this Order will render the violator(s) subject to the full penalties authorized by RCW 48.02.080, 48.15.023, and other applicable sections of the Insurance Code of the state of Washington.

The Respondent has the right to demand a hearing in accordance with RCW 48.04.010, WAC 284-02-070, and WAC 10-08-110.

This Order shall remain in effect subject to the further order of the Insurance Commissioner.

**THIS ORDER IS EFFECTIVE IMMEDIATELY AND IS ENTERED** at Tumwater, Washington, this ____13TH____ day of ____MAY____, 2019.

MIKE KREIDLER
Insurance Commissioner

By and through his designee

KIMBERLY TOCCO
Insurance Enforcement Specialist
Legal Affairs Division

ORDER TO CEASE AND DESIST          4          State of Washington
ORDER NO. 19-0252                              Office of Insurance Commissioner
                                               PO Box 40255
LA - 1601489 - 1                               Olympia, WA 98504-0255

## CERTIFICATE OF MAILING

The undersigned certifies under the penalty of perjury under the laws of the state of Washington that I am now and at all times herein mentioned, a citizen of the United States, a resident of the state of Washington, over the age of eighteen years, not a party to or interested in the above-entitled action, and competent to be a witness herein.

On the date given below I caused to be served the foregoing Order to Cease and Desist on the following individual(s) in the manner listed below:

*By depositing in the U.S. mail via state Consolidated Mail Service with proper postage affixed to:*

Trinity Healthshare
5901 Peachtree Dunwoody Rd., Ste 160
Atlanta, GA 30328

*By email and by depositing in the U.S. mail via state Consolidated Mail Service with proper postage affixed to:*

J. Joseph Guilkey
BakerHostetler
200 Civic Center Drive, Ste. 1200
Colombus, OH 43215
jguilkey@bakerlaw.com

Dated this _13th_ day of _May_ , 2019, in Tumwater, Washington.

*Christine Tribe*
CHRISTINE TRIBE
Paralegal
Legal Affairs Division

ORDER TO CEASE AND DESIST              5
ORDER NO. 19-0252

LA - 1601489 - 1

State of Washington
Office of Insurance Commissioner
PO Box 40255
Olympia, WA 98504-0255

# STATE OF NEW HAMPSHIRE
# INSURANCE DEPARTMENT

### In re: Aliera Healthcare, Inc. (dba The Aliera Companies, Inc.) & Trinity Healthshare Inc.

## Docket No.: INS No. 19-027-EP

## CEASE AND DESIST ORDER

The Commissioner of the New Hampshire Insurance Department ("NHID"), pursuant to his authority under RSA 400-A:3, orders the Respondents Aliera Healthcare, Inc. and Trinity Healthshare Inc. to immediately Cease and Desist from engaging in the unlicensed business of insurance; administering health insurance plans without being certified as a third party administrator; falsely holding out products as exempt from insurance regulation in New Hampshire; and misleading New Hampshire consumers by offering, marketing and administering health coverage that does not meet state and federal requirements.

In support this Order to Cease & Desist, the NHID states as follows:

**Factual Allegations**

1. Respondent Aliera Healthcare, Inc. ("Aliera") is a foreign, for-profit corporation organized under the laws of Delaware with a business address of 5901-B Atlanta, Peachtree Dunwoody Rd. #200, Atlanta, GA 30328.

2. Aliera is a non-resident business entity insurance producer (NPN # 18501490) that is licensed to sell Life, Accident and Health insurance products. Aliera holds no appointments in New Hampshire.

3. Aliera is not licensed as an insurance company and, other than its insurance producer license, holds no licenses, certificates, or other approvals to engage in the business of insurance in New Hampshire.

4. Aliera does not hold a certificate of authority to act as a Third Party Administrator ("TPA") in New Hampshire.

5. Aliera markets and administers health plans in New Hampshire on behalf of Respondent Trinity Healthshare ("Trinity"). Prior to August 10, 2018 Aliera marketed and administered health plans on behalf of Unity Health Share ("Unity.") This relationship ended when Unity terminated its agreement with Aliera on August 10, 2018.

1

**EXHIBIT**

**1.32**

Ex. 1.32, p. 1 of 6

6.  Trinity was created in Delaware on June 27, 2018 by Aliera and its principals.

7.  Trinity holds no licenses, certificates, or other approvals to engage in the business of insurance in New Hampshire.

8.  Trinity claims to be Health Care Sharing Ministry ("HCSM") that is exempt from insurance regulation in New Hampshire under RSA 126-V.  Like a health insurance company, Trinity collects fixed monthly payments from its members, payments that vary according to the level of coverage and conducts medical underwriting to screen for pre-existing conditions. There is also a schedule of covered and excluded services, a schedule of copayments and deductibles, a claim adjudication process, use of provider networks and annual or lifetime limits.

9.  August 13, 2018 Aliera and Trinity entered into a Marketing and Administration Agreement.  Under this agreement Aliera is the program manager for Trinity's health care sharing ministry plans, responsible for the development of plan designs, pricing, marketing, vendor management, recruitment and maintenance of the a national sales force and accounting and management of sales commissions on behalf of the ministry.

10. Aliera has the exclusive right to design market and sell HCSM plans to its existing members and prospective members.

11. Per the agreement, Aliera also maintains ownership of the "Membership Roster" of all Trinity enrollees.

12. Aliera markets Trinity HCSM products as alternatives to traditional health insurance to New Hampshire consumers and utilizes licensed resident insurance producers to sell Trinity's products within the state.

13. Aliera has made false and misleading claims to New Hampshire consumers concerning the Aliera and Trinity products it markets and administers.

14. Aliera and Trinity are currently the subject of administrative actions in Texas, Washington and Colorado.

**Applicable New Hampshire Laws**

15. Per NH RSA 405:1, no foreign insurance company shall engage in the insurance business in New Hampshire unless it has first obtained a license to do so.

16. The following acts, when done on behalf of an unlicensed insurer, are deemed to constitute the transaction or doing of insurance business in this state:

2

a. The making of or proposing to make an insurance contract;
b. The taking or receiving of any application for insurance;
c. The receiving or collection of any premium, commission, membership fees, assessments, dues or other consideration for any insurance;
d. The issuance or delivery of contracts or certificates of insurance to residents of this state;
e. Directly or indirectly acting as an agent for or otherwise representing or aiding another person or insurer in the solicitation, negotiation, procurement, or effectuation of insurance or renewals thereof, or in the dissemination of information as to coverage or rates, or forwarding of applications, or delivery of policies or contracts, or inspection of risks, a fixing of rates or investigation or adjustment of claims or losses or in the transaction of matters subsequent to effectuation of the contract and arising out of it, or in any other manner representing or assisting a person or insurer in the transaction of insurance with respect to subjects of insurance resident, located or to be performed in this state; or
f. Doing any kind of insurance business specifically recognized as constituting the doing of an insurance business within the meaning of the insurance statutes. RSA 406-B:2.

17. New Hampshire law exempts health care sharing organizations from insurance regulation if they meet the requirements of RSA 126-V:1.

18. To qualify for the exemption from insurance regulation under RSA 126-V:1, II, a health care sharing organization must meet all of the following criteria:

a. Be a nonprofit organization that is tax-exempt pursuant to section 501(c)(3) of the Internal Revenue Code;
b. Have been in existence continuously and have facilitated the sharing of medical expenses of participants without interruption since December 31, 1999, including predecessor organizations;
c. Be faith-based and limit its participants to individuals who share a common set of ethical or religious beliefs; and
d. Share medical expenses among its participants in accordance with those beliefs.

19. Qualifying organizations are subject to other requirements, including providing a notice to consumers warning that the organizations do not offer insurance and are not regulated by the NHID. RSA 126-V:1, III(g). Providing the notice to consumers is not sufficient to qualify an organization for the exemption if the requirements of RSA 126-V:1, II are not also met.

20. Under Title XXXVII, as well as applicable federal requirements, health insurance coverage in New Hampshire is subject to numerous requirements including prior form and rate approval, coverage requirements for specified services, and limitations on medical underwriting and preexisting condition exclusions.

3

21. Under New Hampshire's Managed Care Law, RSA Chapter 420-J, network-based health insurance is subject to numerous requirements designed to protect members, including grievances and appeals procedures, network adequacy requirements, and the obligation to protect members from balance billing by providers.

22. Under New Hampshire law, "administrator" or "third party administrator" or "TPA" is defined as "a person who directly or indirectly underwrites, collects charges or premiums from, or adjusts or settles claims on residents of this state, in connection with life, annuity, or health coverage or workers' compensation insurance . . ." RSA 402-H:1, I. "Underwrites or Underwriting" is further defined, though not limited to, accepting employer or individual applications in accordance with the written rules of the insurer or self-funded plan for the overall planning and coordinating of a benefits program. RSA 402-H:1, XIII.

23. New Hampshire law provides that "[n]o person shall act as, or offer to act as, or hold himself or herself out to be an administrator in this state without a valid certificate of authority as an administrator issued by the commissioner." RSA 402-H:11.

## Legal Allegations/Violations

24. Trinity cannot meet the exemption requirements of RSA 126-V:1, II, specifically in that it has not been in existence continuously and have facilitated the sharing of medical expenses of participants without interruption since December 31, 1999. Trinity had no members as of August 13, 2018 when it signed the Management and Administrative Agreement with Aliera.

25. Trinity also fails to establish that it is faith based and limits its membership to individuals who share a common set of ethical or religious beliefs. Trinity's bylaws indicate that the organization adheres to a Christian expression of faith; however, its applications and policy documents only ask participants to believe in nonsectarian religious views. This statement of faith is inconsistent with the religious views purportedly held by Trinity.

26. Further, Aliera also offers Trinity HCSM plans, not only to individuals, but also to employer groups. This is inconsistent with RSA 126-V:1 II, which limits participation in HCSM to individuals.

27. As Trinity does not meet the required elements to designate it as a HCSM under RSA 126-V, it is operating as an unlicensed insurance company in violation of RSA 406-B:3 and RSA 405:1.

28. Based on the conduct described herein, Aliera, through its arrangement with Trinity, is engaging in the "insurance business," as defined by RSA 406-B:2, by acting as an

4

unlicensed insurance company in New Hampshire without the proper license or authorization in violation of RSA 406-B:3 and RSA 405:1.

29. Alternatively, Aliera, by directly or indirectly underwriting, collecting charges or premiums from, and adjusting and settling claims on behalf New Hampshire residents in connection with Trinity, is operating as a unlicensed Third Party Administrator for a health insurance company within the meaning of RSA 402-H.

30. Aliera does not qualify for any exemption from the requirement to be certified as a TPA in New Hampshire under RSA 402-H.  Aliera marketing and administration activities with respect to Trinity health plans go beyond the sale of these plans as a producer, and Aliera is not authorized to transact insurance in New Hampshire, nor is Aliera a subsidiary or affiliated corporation of a licensed insurer.

31. Aliera is operating as an unlicensed TPA in violation of RSA 402-H.

32. Based upon the information and allegations recited above, the New Hampshire Commissioner of Insurance hereby ORDERS that Trinity and Aliera immediately CEASE AND DESIST from writing any new coverage or renewing any coverage for New Hampshire insurance consumers.

33. Pursuant to RSA 400-A:17, the Respondents may request a hearing regarding this Order by filing a written application for hearing with the Commissioner within 30 (thirty) days of the date the Respondents either knew or should have known of the issuance of this Order.

SO ORDERED

<div style="text-align:right">

NEW HAMPSHIRE
INSURANCE DEPARTMENT

</div>

Date: 10/30/19

John Elias, Commissioner

5

CERTIFICATION OF SERVICE

I certify that the a copy of the foregoing Cease and Desist Order has been served upon the above-captioned Respondents by United States first class mail, postage prepaid. Said Order was mailed to the Aliera Healthcare Inc. 5901 Peachtree Dunwoody Rd. Ste B-200, Atlanta GA, 30328 and Trinity Healthshare Inc. 5901 Peachtree Dunwoody Rd. Ste C-160, Atlanta, GA 30328

Date: _10/30/2019_                    _M. Bu_____
                                       Mary C. Bleier, Esq.

6

## Case Summary

Case #        20-00020-COMP-CL

Case Name
**IN THE MATTER OF TRINITY HEALTHSHARE INC.**

Case Type        COMPLIANCE        Case Sub-Type        LIFE AND HEALTH

Document Type        SOI Order (Cease & Desist)        Folder        Orders

Submission Date/Time        03/24/2020 14:00        Filing Date        3/24/2020

Case Status        Pending

Company Name        NM Office of Superintendent of Insurance

Address        1120 Paseo de Peralta, Santa Fe, NM 87501

Email

Phone                Fax

Author Type        Internal        Author Name        RUSSELL TOAL

Case Notes

## Document summary

Document #        100001672        Document Timestamp        03/26/2020 11:22

Document Title        **ORDER TO CEASE AND DESIST AND IMPOSING PENALTY**

Document Type        SOI Order (Cease & Desist)        Folder        Orders

Author Type        Internal        Author Name        RUSSELL TOAL

Is Confidential ?        No        Is Approved ?        Yes

Document Notes

**EXHIBIT**
**1.33**

**BEFORE THE NEW MEXICO OFFICE OF SUPERINTENDENT OF INSURANCE**

IN THE MATTER OF                        )
TRINITY HEALTHSHARE INC.,               )            Docket No. 20-00020-COMP-CL
                                        )
                                        )
RESPONDENT.                             )

**ORDER TO CEASE AND DESIST AND IMPOSING PENALTY**

The New Mexico Superintendent of Insurance ("Superintendent"), on his own motion, and based on the evidence appended to the Declaration of Paige Duhamel filed herewith, finds, concludes and orders as follows:

**FINDINGS:**

1.    Respondent ("Trinity") is an Internal Revenue Code Section 501(c)(3) not-for-profit organization that provides health care sharing options to its members.

2.    Trinity's members agree to voluntarily contribute to the payment of other members' medical needs.  By so contributing to a common fund, each member is entitled to submit requests for reimbursement of medical expenses that are reimbursement under the terms of a membership plan.  Reimbursement is provided if the expense is reimbursable pursuant to the terms of the member's plan, and there are funds available for reimbursement in the common pool.

3.    Trinity contracts with Aliera Healthcare, Inc., ("Aliera"), who markets and administers the health care products that Trinity offers to its members.  Aliera collects member contributions, accepts member requests for reimbursement, determines entitlement to reimbursement pursuant to the member's plan, and issues reimbursements pursuant to the member's plan agreement.

4.    Trinity members have access to a network of healthcare providers, laboratory services, primary care, hospitalizations, specialty care, preventative care, telemedicine and prescription benefits.

5.    To access these services and benefits, Trinity members must make a pre-determined "monthly contribution".  A Trinity member has access to different levels of services and benefits depending on his or her pre-determined contribution amount and cumulative monthly contributions.

*Cease and Desist Order*
Docket No. 20-00020-COMP-CL
Page 1

6.    Eligible healthcare services received by Trinity members are subject to a Member Shared Responsibility Amount ("MSRA"), which is a form of cost-sharing.  A member must satisfy the MSRA before being reimbursed for a service.

7.    Trinity does not guarantee that a member will be reimbursed for the cost of an eligible service.  However, Trinity represents that if a member's eligible bills exceed the available shares to meet medical expenses, payments will be made on a pro-rata basis.

8.    Trinity offers several membership plans, each of which is subject to different terms and conditions with respect to available benefits, monthly contributions and MSRA. Trinity promotes one of its plans -- Complete Health Care -- as "An Alternative to Major Medical".

9.    Trinity promotes the "Complete Health Care" plan as "a complete health care solution with 60% in-network cost sharing.  From the doctor's office to the operating table, get the medical services when you need them."

10.   Trinity's member guides and promotional materials assert that the plans are not insurance.

11.   In January 2020, Trinity reported to OSI that as of November 2019 it had 2443 New Mexico members under 1620 plans.  Trinity has not provided an updated membership count since that report.

12.   NMSA (1978), § 59A-1-5 defines "Insurance" as "a contract whereby one undertakes to pay or indemnify another as to loss from certain specified contingencies or perils, or to pay or grant a specified amount or determinable benefit in connection with ascertainable risk contingencies * * *."  The New Mexico Supreme Court has determined that a product qualifies as "insurance" under this statute if "the principal object of the contract is indemnity * * *." When that is the principal object of the contract, the transaction involves "insurance" and "is therefore within the scope of state regulation." *Guest v. Allstate Ins. Co.,* 2010-NMSC-047, ¶ 67, 149 N.M. 74.  A transaction can involve "insurance" under this test even if "it lacks an insurance contract's formal characteristic of adhesion and its components of paid premiums, a formal policy, and issued claims." *Id.,* at ¶ 68.

13.   NMSA (1978), § 59A-16-21.2(C)(2) defines a "health insurance carrier" as "an entity subject to the insurance laws and regulations of this state, including a health insurance company, a health maintenance organization, a hospital and health services corporation, a provider service network, a nonprofit health care plan or any other entity that contracts or offers to contract, or enters into agreements to provide, deliver, arrange for, pay for or reimburse any costs of health

care services, or that provides, offers or administers health benefits plans or managed health care plans in this state."

**14.**     NMSA (1978), § 59A-16-21.2(C)(1) defines a "health benefits plan" as "a policy or agreement entered into, offered or issued by a health insurance carrier to provide, deliver, arrange for, pay for or reimburse any of the costs of health care services."

**15.**     NMSA (1978), § 59A-15-16 provides:

> Notwithstanding any other provision of law and except as provided in the Health Care Benefits Jurisdiction Act, any person who provides coverage in this state for health benefits, including coverage for medical, surgical, hospital, osteopathic, acupuncture and oriental medicine, chiropractic, physical therapy, speech pathology, audiology, professional mental health, dental or optometric expenses, whether such coverage is by direct payment, reimbursement or otherwise, shall be presumed to be subject to the provisions of the Insurance Code and the jurisdiction of the superintendent unless the person provides evidence satisfactory to the superintendent that he is subject exclusively to the jurisdiction of another agency of this state or the federal government.

**16.**     Trinity has not provided the Superintendent with any evidence that it is subject to the exclusive jurisdiction of another agency of this state or of the federal government.

**17.**     NMSA (1978), § 59A-5-10(A) provides that "[n]o person shall act as an insurer, and no insurer shall transact insurance in this state by direct solicitation or solicitation through the mails or otherwise, unless so authorized by a subsisting certificate of authority issued by the superintendent, except as to such transactions as are expressly otherwise provided for in the Insurance Code.

**18.**     Trinity does not hold a certificate of authority to transact insurance in the state of New Mexico, and has made no application for a certificate of authority.

**19.**     NMSA (1978), § 59A-15-10 provides that "[a]ny unauthorized insurer which transacts in this state any insurance business in violation of the Insurance Code shall be subject to a fine of not to exceed twenty thousand dollars ($20,000) for each such violation."

**CONCLUSIONS:**

**20.**     The principal object and purpose of a Trinity membership plan is to indemnify the member against qualifying health care expenses and, thus, each such plan constitutes "insurance" under New Mexico law as defined in the Insurance Code and in case law.

*Cease and Desist Order*
Docket No. 20-00020-COMP-CL
Page 3

**21.** By selling health care sharing membership plans in New Mexico, Trinity transacted the business of insurance in this state.

**22.** By entering into agreements to provide, deliver, arrange for, pay for or reimburse the costs of certain health care services, funding permitting, Trinity qualifies as a "health insurance carrier" as that term is defined in NMSA (1978), § 59A-16-21.2(C)(2).

**23.** Because they include an agreement to reimburse costs of health care services, funding permitting, the Trinity memberships constitute "health benefit plans" as that term is defined in NMSA (1978), § 59A-16-21.2(C)(1).

**24.** Trinity is a health insurance carrier, who sold 1620 health benefit plans in New Mexico without a valid certificate of authority to transact insurance.

**25.** Because Trinity has not provided any evidence that it is subject exclusively to the jurisdiction of another agency of this state or the federal government, the Superintendent has jurisdiction over Trinity pursuant to NMSA (1978), § 59A-15-16.

**26.** Pursuant to NMSA (1978), § 59A-15-10, the Superintendent may fine Trinity up to $20,000 for each unauthorized insurance transaction in this state.

**27.** Pursuant to NMSA (1978), § 59A-16-27(A), the Superintendent may order Trinity to cease and desist from transacting insurance business in New Mexico.

Based on these Findings and Conclusions, the Superintendent hereby **ORDERS**:

**A.** Effective immediately, Trinity shall cease and desist from offering to sell, or selling, health care sharing plans in New Mexico, unless and until Trinity obtains a certificate of authority to operate as a health insurer in this state, and its plans are approved by the Superintendent for sale in this state.

**B.** Trinity shall pay a fine of $32,400,000 (1,620 X $20,000) for the unauthorized insurance transactions it effected in this state. In lieu of this fine, Trinity may cancel all 1,620 of the membership plans it sold in New Mexico, refund all contributions received by the members of those plans, and inform each plan member of all possible options for obtaining major medical coverage.

**C.**     Pursuant to NMSA (1978), § 59-16-27, Respondent may request a hearing regarding this Order by filing a written request within twenty days of the issuance of this Order by mail, or electronic mail to:

> OSI Records and Docketing
> 1120 Paseo de Peralta, Room 331
> P. O. Box 1689
> Santa Fe, NM 87504-1689
> OSI-docketfiling@state.nm.us          **ATTN:  Docket No. 20-00020-COMP-CL**

**D.**     If a written request for hearing is not made within twenty days, this Order shall be deemed final and the docket closed.

**DONE AND ORDERED** this 26th day of March, 2020.

                                               RUSSELL TOAL
                                               SUPERINTENDENT OF INSURANCE

*Cease and Desist Order*
Docket No. 20-00020-COMP-CL
Page 5

## CERTIFICATE OF SERVICE

**I HEREBY** certify that a true and correct copy of the foregoing *Cease and Desist Order* was sent via electronic mail or mailed by first class U. S. Certified Mail to the following individuals, as indicated below, this 26th day of March, 2020.

Bryan Brock, General Counsel
Office of Superintendent of Insurance
P.O. Box 1689, Santa Fe, NM 87504-1689
bryan.brock@state.nm.us

Rebecca Branch, Staff Counsel
Office of Superintendent of Insurance
P.O. Box 1689, Santa Fe, NM 87504-1689
rebecca.branch@state.nm.us

Joe Guarino, President
Trinity Healthshare, Inc.,
5901 Peachtree Dunwoody Road, Suite C-160
Atlanta, GA 30328

**MELISSA Y. GUTIERREZ, Law Clerk**
**Office of General Counsel**
**Office of Superintendent of Insurance**

*Cease and Desist Order*
Docket No. 20-00020-COMP-CL
Page 6



# STATE OF CONNECTICUT
## *INSURANCE DEPARTMENT*

———————————————

———————————

**EXHIBIT**
**1.34**

Ex. 1.34, p. 1 of 10

B

*et seq.*

———————————————

*et seq.*

Ex. 1.34, p. 9 of 10

**STATE OF MICHIGAN**
**DEPARTMENT OF INSURANCE AND FINANCIAL SERVICES**

**Before the Director of the Department of Insurance and Financial Services**

In the matter of:

**Aliera Companies (formerly known as Aliera Healthcare)**          **Enforcement Case No. 21-16507**
Unlicensed

**Sharity Ministries, Inc. (formerly known as Trinity Healthshare, Inc.)**
Unlicensed

**Ensurian Agency,**
Unlicensed,

                    Respondents.
_____/

**Issued and entered**
**on August 11, 2021**
**by Anita G. Fox**
**Director**

**ORDER TO CEASE AND DESIST WITH STATEMENT OF FINDINGS**
**AND NOTICE OF OPPORTUNITY FOR HEARING**

Pursuant to Section 251 of the Michigan Insurance Code (Code), MCL 500.251, and after reviewing evidence of the conduct described in the attached Statement of Findings, and

**WHEREAS,** the Director of the Department of Insurance and Financial Services finds that immediate action is necessary and appropriate in the public interest for the protection of the public health, safety, and welfare, and consistent with the purposes fairly intended by public policy and provisions of the Code,

**IT IS THEREFORE ORDERED THAT:**

1.    Respondents shall immediately **CEASE AND DESIST** from all activities in violation of the Code as described in the Statement of Findings.

2.    A copy of this Order shall be immediately served upon Respondents and shall be effective upon the date of service.

3.    Respondents will have 30 calendar days after the service of this Order to contest it by requesting a hearing. Within 10 calendar days after receiving the request, the hearing process shall commence. This Order shall remain in effect until further order of the Director. Any request for a hearing should be addressed to the Department of Insurance and

**EXHIBIT**
**1.35**

Ex. 1.35, p. 1 of 9

Order to Cease and Desist
Enforcement Case No. 21-16507
Page 2 of 2

    Financial Services, Attention: Randie Swinson, Hearings Coordinator, P.O. Box 30220, Lansing, MI 48909-7720 or faxed to 517-284-8843.

4.    Any such hearing held shall address the following issues:

    a.    The facts set forth in the Statement of Findings.

    b.    The continuation of the Order to Cease and Desist.

    c.    Restitution to be paid by the Respondent.

5.    If a hearing is requested, an administrative law judge from the Michigan Office of Administrative Hearings and Rules shall preside over any such hearing.

6.    The Director retains jurisdiction of the matters contained herein and the authority to issue such further Orders as shall be deemed just, necessary, and appropriate.

7.    Pursuant to Section 251(6) of the Code, MCL 500.251(6), a person who violates or otherwise fails to comply with an Order to Cease and Desist is subject to one or more of the following:

    a.    Payment of a civil fine of not more than $1,000 for each violation not to exceed an aggregate civil fine of $30,000. However, if the person knew or reasonably should have known the conduct was in violation of the cease and desist order, the person shall be subject to a civil fine of not more than $25,000 for each violation not to exceed an aggregate civil fine of $250,000.

    b.    Suspension or revocation of the person's license or certificate of authority.

    c.    Complete restitution, in the form, amount, and within the period determined by the Director, to all persons in Michigan damaged by the violation or failure to comply.

Anita G. Fox
Director

STATE OF MICHIGAN
DEPARTMENT OF INSURANCE AND FINANCIAL SERVICES

**Before the Director of the Department of Insurance and Financial Services**

In the matter of:

**Aliera Companies (formerly known as Aliera Healthcare)**      Enforcement Case No. 21-16507
Unlicensed

**Sharity Ministries, Inc. (formerly known as Trinity Healthshare, Inc.)**
Unlicensed

**Ensurian Agency,**
Unlicensed,

                    Respondents.
_____/


**STATEMENT OF FINDINGS**

1.    Pursuant to Section 251(1) of the Code, MCL 500.251(1), the Director is empowered to issue a cease and desist order upon finding any of the following:

> (a) A person is conducting transactions of insurance for which a certificate of authority is required by this act without having obtained a certificate of authority.

> (b) A person is acting as an insurance agent, solicitor, adjuster, or counselor without a license as required by this act.

> (c) A person is engaged in an act or practice in the business of insurance for which authority from or notification to the commissioner is required by this act and the person has not received authority or given notification.

> (d) A person authorized to engage in the business of insurance under this act is engaged in conduct that presents an immediate danger to public health, safety, or welfare. MCL 500.251(1).

2.    Under Section 1201a(1) of the Code, it is a violation for a person to sell, solicit, or negotiate insurance in this state for any line of insurance without first obtaining a license or qualification for that line. MCL 500.1201a(1).

> a.    "Negotiate" means the act of conferring directly with or offering advice directly to a purchaser or prospective purchaser of a particular contract of insurance concerning any of the substantive benefits, terms, or conditions of the contract, provided that the person engaged

        in that act either sells insurance or obtains insurance from insurers for purchasers. MCL 500.1201(m).

    b.    "Sell" means to exchange a contract of insurance by any means, for money or its equivalent, on behalf of an insurance company. MCL 500.1201(n).

    c.    "Solicit" means attempting to sell insurance or asking or urging a person to apply for a particular kind of insurance from a particular company. MCL 500.1201(o).

3.    The definitions of an eligible entity and health care sharing ministry are set forth in MCL 550.1853 as follows:

    (a) "Eligible entity" means a faith-based, nonprofit entity that maintains tax-exempt status under section 501(c) of the internal revenue code, 26 USC 501.

    (b) "Health care sharing ministry" or "ministry" means a program established by an eligible entity for the sharing of finances and health care in compliance with this act.

4.    Pursuant to MCL 550.1865, "[a]n eligible entity may establish and operate a health care sharing ministry under this act. An eligible entity that establishes and operates a health care sharing ministry in compliance with this act is not engaged in the business of insurance in this state and the entity and ministry are not subject to the insurance laws of this state."

5.    Pursuant to MCL 550.1867, in order to be considered a health care sharing ministry under Michigan law, the ministry must meet all of the following requirements:

    (a) Limit participation in the ministry to individuals who are of a similar faith.

    (b) Provide that the ministry act as a facilitator by matching its participants who have financial or medical needs with participants who have the ability to assist in meeting those needs according to criteria established for the ministry by the eligible entity.

    (c) Provide for the financial or medical needs of a participant through voluntary contributions by its participants.

    (d) Provide amounts that participants may contribute with no assumption of risk or promise to pay among its participants.

    (e) Provide financial assistance to participants who have financial or medical needs with no assumption of risk or promise to pay by the ministry to its participants.

    (f) Provide a monthly written statement to its participants that lists the total dollar amount of qualified financial or medical needs that were submitted to the ministry, as well as the amount actually published or assigned to participants for their contribution.

(g) Provide, in substantially similar form and language, the following written disclaimer on or accompanying all applications and guideline materials distributed by or on behalf of the ministry:

"Notice: The [insert name of eligible entity] that operates this health care sharing ministry is not an insurance company and the financial assistance provided through the ministry is not insurance and is not provided through an insurance company. Whether any participant in the ministry chooses to assist another participant who has financial or medical needs is totally voluntary. A participant will not be compelled by law to contribute toward the financial or medical needs of another participant. This document is not a contract of insurance or a promise to pay for the financial or medical needs of a participant by the ministry. A participant who receives assistance from the ministry for his or her financial or medical needs remains personally responsible for the payment of all of his or her medical bills and other obligations incurred in meeting his or her financial or medical needs.".

6.  Respondent Aliera Companies (Aliera) was originally incorporated in Delaware in 2015 and is a for-profit business without religious affiliation. Aliera has created several subsidiary companies, through which it markets and sells memberships in what it purports to be health care sharing plans operated by a health care sharing ministry. These heath care sharing plans are marketed and sold throughout most of the U.S., including Michigan.

7.  Respondent Sharity Ministries (Sharity) purports to be a health care sharing ministry (HCSM) created by an eligible entity as defined by MCL 550.1853. Sharity was formed on June 27, 2018, and, on or about August 13, 2018, it entered into a management agreement with Aliera whereby it agreed that Aliera would receive approximately 84% of Sharity members' sharing contributions. The management agreement was signed by Sharity's then Chairman, Mr. William Thead, who was also employed by Aliera at or about the time that the agreement was executed. Although Sharity is purportedly a separate entity from Aliera, it was formed for the primary purpose of allowing Aliera to essentially operate as an unlicensed insurer and avoid both state and federal regulation by claiming that Sharity, which it maintained significant control over, was an HCSM and therefore exempt from state and federal insurance laws.

8.  Respondent Ensurian Agency is a subsidiary of Respondent Aliera that was created to market and facilitate the sale of health care sharing plans offered by Respondent Sharity.

9.  Aliera, Sharity, and Ensurian are collectively referred to herein as Respondents.

10. DIFS staff received information about possible unlicensed activity by Respondents. A review of DIFS' records revealed that none of the Respondents are licensed under the Code. As a result, DIFS initiated an investigation into Respondents' activities and discovered the following facts:

    a.  Respondents are currently marketing and selling memberships to Michigan residents to Respondent Sharity—a purported HCSM. These memberships provide a mechanism for members to seek reimbursement of certain medical expenses by submitting what Respondents refer to as "share requests" to Respondents who in turn refer requests that meet plan guidelines on a monthly basis to members for reimbursement. All members must

Statement of Findings
Enforcement Case No. 21-16507
Page 4 of 7

pay a mandatory monthly sharing contribution to maintain membership and their payment of this fee constitutes an opt-in for the monthly sharing request.

b. Respondents offer three membership plans: Sharity Basic, Sharity Secure, and Sharity Spectrum. These plans are equivalent to the various tiers of health care coverage that are commonly provided as options by health care insurers that require escalating premiums the more coverage that is selected. In order to participate in any of Respondent's membership plans, consumers are required to pay an initial membership fee and monthly fees thereafter. Although Respondents refer to these mandatory monthly payments as sharing contributions, they are for all practical purposes premiums. As with coverage provided by health care insurers, Respondents' member guides outline escalating sharing contributions based on whether, basic, catastrophic, or comprehensive coverage is sought by the member.

c. Respondents have created an electronic "ShareBox Portal" by which they send out monthly messages to members outlining the share requests that are being made that month and asking whether the member wishes to opt in or out of sharing. There is no indication that the members make any individualized determinations on monthly share requests and Respondents' member guides render it clear that participation in the healthcare sharing ministry constitutes an "opt-in" for sharing. Thus, the practical effect of the notification of share requests is not to give the members any real choice on whether to assist fellow members but instead simply a choice on whether to remain a member of the ministry. Similar to an insurance policy in which there is no coverage without payment of the required monthly premium, there is no ability to make a share request or participate in the sharing ministry without the payment of a monthly sharing contribution.

d. As part of the enrollment process, applicants are asked to provide a detailed medical history so that Respondents are able to identify preexisting conditions, many of which are excluded from share requests, other than on a hardship basis which requires additional assessments on members. Respondent's member guides state that "[t]o be fair and equitable and not overburden the membership community, restrictions and limitations are applied to conditions occurring prior to membership, known as pre-existing conditions." Exclusion of preexisting conditions from coverage was a common feature of many health insurance plans prior to the passage of the Affordable Care Act (ACA).

e. For all of the membership plans, the percentage of health care costs that are eligible for share requests is dependent upon whether the costs were incurred at what is commonly referred to in the insurance industry as "in-network providers," but which Respondent refers to as "recognized provider groups." For example, under the Sharity Secure Plan, hospital costs incurred at a recognized provider group are eligible for a 100% reimbursement share request while hospital costs incurred at a non-recognized provider group are eligible for a 60% reimbursement share request.

f. Similar to healthcare coverage offered by insurance providers, for all of Respondents' membership plans, the membership costs vary based upon the ages of the applicants. For example, under the Sharity Spectrum plan, the cost of a membership plan for members aged 18-29 is $315.00/month while the same plan for members aged 60 and over is $715.00/month.

Statement of Findings
Enforcement Case No. 21-16507
Page 5 of 7

    g.    Although Respondents state that the cost-sharing among members is based on voluntary contributions, they also informed DIFS that members "remain active participants in the HCSM programs and may submit their medical expenses for sharing as long as they adhere to the Statement of Beliefs and submit monthly voluntary gifts to share in other members' medical expenses." Under this plan, if a member does not "voluntarily" pay the monthly membership fee, their membership is rendered inactive, and they cannot participate in the ministry.

    h.    Similar to health insurance, all of Respondents' plans require a deductible to be met before any payments or share requests can be made. Respondents refer to this deductible as a Member Share Responsibility Amount (MSRA). For example, under the Sharity Spectrum plan, members must meet a $3000 MSRA for each medical expense before any portion of the medical expense can be submitted as a sharing request.

    i.    Similar to most health insurance plans prior to the passage of the ACA, Respondents' plans include a lifetime cap on the amount of reimbursement that can be received through sharing requests. For example, under the Sharity Spectrum Plan, there is a $600,000 lifetime maximum reimbursement limit.

    j.    Respondents actively solicit and sell the membership plans described above in the State of Michigan.

11.    Based on the facts set forth above, Respondents are engaged in the unlicensed practice of insurance. At its heart, the business of insurance involves the transfer of risk whereby one party undertakes to indemnify another against loss in the event that a specified contingency occurs. The individual or entity purchasing insurance makes a payment to the insurer that essentially transfers the risk that a costly contingency will occur to the insurer by transferring the responsibility to pay for the costs associated with the contingency to the insurer. The indemnity agreement between parties almost always contains several hallmark characteristics—the payment of premiums, coverage limits, and deductibles. The amount of premium is usually determined in part by a business risk profile of the applicant as determined by the insurer.

12.    Here, Respondents are accepting a transfer of risks from its members. They are receiving monthly premiums in the form of mandatory monthly sharing contributions. They have agreed to submit sharing requests to its members should certain contingencies occur. All members of the ministry are required to make monthly sharing contributions in order to remain active. Thus, a promise to submit a share request to ministry members is essentially a promise that the ministry will pay according to the terms of the membership plan.

13.    Moreover, increasing the rates based upon the members' age and the exclusion of preexisting conditions is indicative that Respondents are creating a business risk profile of its members and adjusting premiums/sharing contributions accordingly. Other indications that Respondents have merely re-labeled its actions as non-insurance in order to avoid the state and federal laws and regulations that are associated with the business of insurance are its tiered membership plans that provide more or less coverage dependent upon the amount of premium/sharing contributions that the member is willing to pay. Differing prices based on whether in network providers are used and

Statement of Findings
Enforcement Case No. 21-16507
Page 6 of 7

the imposition of deductibles/member share responsibility amounts described above are also characteristics of health insurance.

14.    Respondents have done little more than relabel their actions by using different terminology than is typically used in the insurance industry, but it is the actions themselves, not the labels applied to those actions, that determine whether Respondents are engaged in the business of insurance. Based on the factors described above, Respondents' actions are properly labeled as insurance and they have failed to obtain the proper licensure and/or certificates of authority to engage in such business in the state of Michigan.

15.    Respondents' attempts to avoid application of state and federal laws and regulations by labeling themselves as an HCSM are likewise without merit. Pursuant to MCL, 550.1867, in order to qualify as an HCSM, the ministry must "act as a facilitator by matching its participants who have financial or medical needs with participants who have the ability to assist in meeting those needs according to criteria established for the ministry by the eligible entity." Here, the ministry's utilization of membership plans does not operate to match participants with needs to those who have the ability to assist in meeting those needs. As indicated above, the monthly sharing contributions are mandatory in order to participate in the ministry and the ability of a member to assist is not a factor. Indeed, if a member does not have "the ability to assist," and thus does not pay their monthly contribution, they will no longer be a member of the ministry and will lose the ability to submit share requests.

16.    Respondents also fail to meet the requirements of MCL 550.1867(d) which states that ministries must "[p]rovide amounts that participants may contribute with no assumption of risk or promise to pay among its participants." Here too, the mandatory nature of membership sharing contributions renders Respondents' compliance impossible. Because failure to pay a monthly sharing contribution results in the removal of the member from the ministry, the practical effect is that all members have agreed to pay the share requests. There is no discretion—indeed, the member guides state that participation in the ministry constitutes an opt-in to sharing. Thus, if you are a member, you are promising to pay the share requests.

17.    Additionally, Respondents fail to meet the requirements of MCL 550.1867(e) which provides that ministries must "[p]rovide financial assistance to participants who have financial or medical needs with no assumption of risk or promise to pay by the ministry to its participants." Once again, the mandatory nature of the sharing contributions renders it impossible for the Respondents to comply. Those participants who have financial or medical needs that render them incapable of providing a monthly sharing contribution are no longer members and can receive no assistance from the ministry. Likewise, because all participants in the ministry are considered to have opted into monthly sharing, all members have essentially promised to pay share requests in accordance with the ministry guidelines.

18.    Based on their failure to comply with the requirements of MCL 550.1867 set forth above, Respondents are not operating as a healthcare sharing ministry, but instead are merely claiming the HCSM exemption from state regulation in order to engage in the business of insurance without complying with the statutory and regulatory requirements that an insurer must meet to receive a certificate of authority and/or license to operate in the state of Michigan.

Statement of Findings
Enforcement Case No. 21-16507
Page 7 of 7

19.   By engaging in a concerted action to enroll Michigan residents in the membership plans described above, Respondents have acted as an insurer without the required certificate of authority, in violation of Section 402 of the Code, MCL 500.402.

20.   By engaging in a concerted action to solicit and sell the membership plans described above, Respondents have acted as unlicensed insurance producers in violation of Section 1201a(1) of the Code, MCL 500.1201a(1).

21.   By violating Chapter 12 of the Code in the manner described above, Respondents are subject to sanctions under Section 1244 of the Code, MCL 500.1244, which may include civil fines of up to $50,000.00 and restitution. By violating Section 402 of the Code in the manner described above, Respondent is subject to sanctions under Section 150 of the Code, MCL 500.150, which may include civil fines of up to $50,000.00.

B

B                                                **ORDER TO CEASE AND DESIST**

B



B

B

B          B

B

B

B

## **ORDER TO CEASE AND DESIST**

B

B

B

B

B

B

B

B                    B                    B    B

B

B

B

B

B

B



**<u>STATEMENT OF CHARGES AND NOTICE OF HEARING</u>**

B

EXHIBIT

**1.37**

Ex. 1.37, p. 1 of 24

**OVERVIEW**

**LEGAL FRAMEWORK & JURISDICTION**



B

Ex. 1.37, p. 5 of 24


**FACTUAL ALLEGATIONS**

**I.**      **Background**

---

B

*Aliera*

————————————————————

B

B

B                                                    B

II.     <u>**Respondents' Product Offerings Constitute Insurance**</u>

*i.e.*

III.     **<u>Respondents Utilize Misrepresentations and Deceptive Tactics to Evade Regulation</u>**

B

B

---
3


**IV.** **Consumers Have Been Harmed By Respondents' Deceptive Tactics**

B

•

-                                              B

                                                     B

                                                                       B

- 

- 

- 

-

- 

- 

- 

- B

-

Ex. 1.37, p. 19 of 24

Ex. 1.37, p. 21 of 24



B

**This statement contains important information concerning your rights and the Department's hearing procedures and should be read carefully.**

B   *Katherine A. Lemire / LM*

B   *Christopher B. Mulvihill*
B

*Of Counsel*

B

**CONSENT ORDER AS AGAINST
THE ALIERA COMPANIES, INC.
FKA ALIERA HEALTHCARE, INC.**

B

B

B



**EXHIBIT
1.38**

B



B



B

B



B

B

B

B

*[The remainder of this page intentionally left blank.]*





B

B

B

B



Ex. 1.38, p. 7 of 16

Resp. Appx, p. 218

B

B

B



B

B

B

B

B



B



B





B



B



*/s/ Dorothy Bean*
B

B

B

B

B

B

B

B

B

*[The remainder of this page intentionally left blank.]*

**U.S. DEPARTMENT OF LABOR**

News Release

## DEPARTMENT OF LABOR OBTAINS CONSENT JUDGMENT BARRING ALIERA HEALTHCARE, CEO SHELLEY STEELE FROM SERVING AS ERISA FIDUCIARIES, SERVICE PROVIDERS

*Aliera, Steele alleged to have paid more than $100M to themselves, affiliated businesses*

**WASHINGTON** – The U.S. Department of Labor has obtained a judgment barring a plan administrator and its CEO Shelley Steele from serving as fiduciaries or service providers to any plan covered by the Employee Retirement Income Security Act, amid allegations they improperly paid themselves and affiliated businesses more than $100 million.

The action in the U.S. District Court for the Northern District of Georgia follows an investigation by the Philadelphia, Atlanta and Boston regional offices of the department's Employee Benefits Security Administration. The investigation found The Aliera Companies, doing business as Aliera Healthcare Inc., and Steele commingled hundreds of millions of dollars in funds received from individuals and ERISA-covered health plans.

Based in Atlanta, Aliera created, marketed, sold and administered health coverage for approximately 1,025 employers across 39 states for ERISA-covered employer-sponsored plans. The company and its CEO serve as fiduciaries to more than 1,000 U.S. employer-sponsored health plans.

"Shelley Steele and The Aliera Companies flagrantly violated their duties as fiduciaries by failing to act solely in the interest of plan participants and their beneficiaries," said Acting Regional EBSA Director Norman Jackson in Philadelphia. "This judgment should serve as a warning to other fiduciaries who choose to place the interests of themselves over the plan participants."

Aliera partnered with healthcare sharing ministries and sold healthcare products to individuals and ERISA-covered employer-sponsored group health plans that included a claimed health care-sharing ministry component. The company received at least $543,941,705 in healthcare payments from individuals and employer-sponsored group plans and commingled these payments. Although the vast majority of the payments Aliera obtained were made by individuals, the company also received more than $17 million from more than 1,000 ERISA-covered employer-sponsored group plans.

A lawsuit filed by the department's Office of the Solicitor alleged that Aliera and Steele made payments of more than $100 million from those commingled funds to Aliera, Steele and their affiliated businesses, and only used approximately $189,226,916 of the money it received to pay healthcare claims for individuals and ERISA-covered plans. The Aliera Companies Inc. filed for bankruptcy in federal court in Delaware. On August 4, 2023, the department filed a proof of claim in the ongoing bankruptcy proceedings in the amount of $3,874,950 for the amounts owed by Aliera to more than 1,000 ERISA-covered plans.

**Agency:** Employee Benefits Security Administration
**Date:** August 7, 2023
**Release Number:** 23-1634-PHI

**Media Contact:** Grant Vaught
**Phone Number:** 202-693-4672
**Email:** vaught.grant.e@dol.gov
Share This

   

### More News Releases

| Previous | Next Up |
|---|---|
| Statement by US Secretary of Labor Su on July jobs report | Department of Labor returns to normal workplace safety enforcement operations throughout Guam following Typhoon Mawar |

**EXHIBIT 1.39**

Ex. 1.39, p. 1 of 2      1/2

**Agencies**      **Forms**      **Guidance Search**      **FAQ**      **About DOL**      **News**      **Contact Us**

### FEDERAL GOVERNMENT⊞

White House

Benefits.gov

Coronavirus Resources

Disaster Recovery Assistance

DisasterAssistance.gov

USA.gov

Notification of EEO Violations

No Fear Act Data

U.S. Office of Special Counsel

### LABOR DEPARTMENT⊞

About DOL

Guidance Search

Español

Office of Inspector General

Subscribe to the DOL Newsletter

Read the DOL Newsletter

Emergency Accountability Status Link

A to Z Index

### ABOUT THE SITE⊞

Freedom of Information Act

Disclaimers

Plug-Ins Used on DOL.gov

Accessibility Statement

**U.S. DEPARTMENT OF LABOR**

200 Constitution Ave NW
Washington, DC 20210
1-866-4-USA-DOL
1-866-487-2365
www.dol.gov

Connect With DOL

     

Site Map    |    Important Website Notices    |    Privacy & Security Statement

Submit Feedback

# **EXHIBIT 1**

EXHIBIT
**1.40**

Ex. 1.40, p. 1 of 87

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

**COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN**
**OF LIQUIDATION OF SHARITY MINISTRIES INC.**

**BAKER & HOSTETLER LLP**
*pro hac vice*
B                                    *pro hac vice*


*pro hac vice*




**LANDIS RATH & COBB LLP**

B




*Counsel for the Debtor and Debtor in Possession*

## TABLE OF CONTENTS

B

B
B
B
B
B

B

B
B

B

B

B

B

B

B

B

B

*De Minimis*

B

B          B

B

B

B

B

B

## <u>EXHIBITS</u>

**Exhibit A:  MEMBER SUMMARY**

**Exhibit B:  LIQUIDATION ANALYSIS**

**Exhibit C:  EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

## DISCLAIMER

B                                                        B
                                                   B

_____

**Combined Plan and Disclosure Statement**          **Plan**

Resp. Appx, p. 238

# I.  EXECUTIVE SUMMARY[3]

## A.    Introduction

            **If a Member disagrees with the amount or wishes to file a claim for any other amounts, the Member should file a proof of claim before the General Bar Date of January 4, 2022.**

B

B

B

**B.**     **Plan Overview**

B

     **Members are advised to consult the enclosed Member Summary, which is attached to this Plan as Exhibit A, for easy-to-read information about their claims in this process.**

**C.**     **Questions and Answers About This Combined Plan and Disclosure Statement.**

     **1.**     **What is chapter 11?**

B

         B

B

     **2.**     **Am I entitled to vote on the Plan?**

B

| Class | Claim or Interest | Treatment | Entitled to Vote? |
|-------|-------------------|-----------|-------------------|
|       |                   |           |                   |
|       |                   |           |                   |
|       |                   |           |                   |
|       |                   |           |                   |
|       |                   |           |                   |
|       |                   |           |                   |

3.      **When is the deadline to vote on the Plan?**

4.      **How do I vote for or against the Plan?**

             **actually received**                       B
**on or before the Voting Deadline, *i.e.* November 22, 2021 at 5:00 p.m. (prevailing Eastern Time)**

_____

**5.**    **Do the Debtor and Member Committee recommend voting in favor of the Plan?**

**6.**    **Why is the Bankruptcy Court holding a Confirmation Hearing?**

B                          B

**7.**    **When is the Confirmation Hearing set to occur?**

B

_____

**8.**    **What is the purpose of the Confirmation Hearing?**

B

**9.**    **Is the Debtor's business still operating?**

B

**10.**    **What will I receive from the Debtor if the Plan is consummated?**

B

B    B

B

| Class | Type | Estimated Amount of Claims | Recovery Estimate | Treatment |
|---|---|---|---|---|
|  |  |  |  | B |
|  |  |  |  |  |
|  |  |  |  | *See below.* |

| | | | | |
|---|---|---|---|---|
| | | | | B |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | *pro rata* |
| | | | | |
| | | | | |

**11.    Is there a preferable alternative to my treatment under the Plan?**

**12.    Are any regulatory approval required to consummate the Plan?**

**13.    What happens to my recovery if the Plan is not confirmed or does not go effective?**

B

*see*
**Exhibit B**

**14.    What is meant by "Confirmation," "Effective Date," and "Consummation?"**

B

B

*See*

**15.    Is there potential litigation related to the Plan?**

B

B                                        B

B

**16.    How will the preservation of the Causes of Action impact my recovery under the Plan?**

        **No Entity may rely on the absence of a specific reference in the Plan or the Plan Supplement to any Cause of Action against it as any indication that the Liquidating Trust will not pursue any and all available Causes of Action against it. Except as specifically released under the Plan or pursuant to a Final Order, the Debtor and the Liquidating Trust expressly reserve all rights to prosecute any and all Causes of Action against any Entity.**

    **17.**       **Who do I contact if I have additional questions with respect to the Plan?**

B

B

## II.  DEFINITIONS AND CONSTRUCTION OF TERMS

**A.**      **Definitions**

      **Administrative Expense Claim**

B

B

B

**Administrative Expense Claim Bar Date**

**Aliera  Companies"**

B

**Aliera Contracts**

**Allowed**

B                                    B

B                    _____

**Allowed Priority Tax Claims**

**Allowed Secured Claim**

**Allowed Unsecured Claim**

**Assets**

B

**Available  Trust  Cash**

B

**Avoidance Actions**

B                                                          B

B

**Ballot**

**Bankruptcy Code**

**Bankruptcy Court**                        B

**Bankruptcy Rules**                        B

**Beneficiary**

**Beneficial Interests**

**Business Day**

**Cash**

"**Causes of Action**

B

**Chapter 11 Case**                                        B

B

**Claim**

B

**Claims Agent**          B                                    B

                                B

_____

**Claims Objection Deadline**

                                                        B

**Claims Resolution Procedures**

          B

**Class**

B

**Collateral**

                                                        B

**Clerk**                        B

**Combined Plan and Disclosure Statement**        **Plan**            *Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Sharity Ministries Inc.*

**Creditor**                                                B

**Debtor**        **Debtor-in-Possession**

**Disputed**

**Disputed Claims Reserve**

**Distribution**
   B

**Distribution Record Date**

**Docket**

**Effective Date**

**Entity**                                        B

**Estate**
                        B

**Exculpated  Parties**

   B

   B

B                                    B              B


            B


**Exculpation  Timeframe**

**Executory  Contract**
                        B

**File**, **Filed**    **Filing**                                                    B

**Final Order**                              B
                                                    B


**General Bar Date**


**General Unsecured Claim**

                                                    B


"**Governmental Fines and Penalty Claim**"

**Governmental Unit**                                                          B

**Governmental Unit Bar Date**

**Holder**

**Impaired**
                                                    B

**Insurance Policies**

**Interim Compensation Order**            B


**IRC**

**IRS**

**Lien**

B

**Liquidating Trust Committee**

**Liquidating Trust**

**Liquidating Trust Advisors**

**Liquidating Trust Agreement**

**Liquidating Trust Assets**

**Liquidating Trust Operating Expenses**

**Liquidating Trustee**

**Local Rules**                          B

B

**Medical Claim(s)**

**Member**

**Member Claim Allocation**

**Member Claim for Post-July 8, 2021 Monthly Payments**

**Member Committee**

**Member Refund Claim**

**Miscellaneous Secured Claims**

B

B

**Notice of Effective Date**                                      B

**Order**                                      B

**Other Member Claim**

**Person**                                      B

**Petition Date**

**Plan Confirmation Date**                                      B

**Plan Confirmation Hearing**                                      B

**Plan Confirmation Order**                                      B

B

**Plan  Documents**

**Plan Proponent**

**Plan Supplement**

B

B

_____

**Post-Petition Payments Reserve**

**Priority Non-Tax Claim**

**Priority Tax Claim**

B

**Privilege**

**Professional**

B                                                    B

**Professional Fee Claim**                    B

**Professional  Fee  Claim  Reserve**

**Pro  Rata  Share**

**Rejection Damages Claim**                                    B

B

B

**Rejection Notice**


**"Residual Interests"**


**Schedules**
                                       B                    B


**Section 510(c) Claim**


**Sharity**


**Statutory Fees**


**Unclaimed Distribution**


**Unclaimed Distribution Deadline**


**U.S. Trustee**

**Unpaid Medical Claim**


**Voting Deadline**

**Voting Procedures**                                        B

*Order (I) Approving the Disclosure Statement on an Interim Basis; (II) Scheduling a Combined Hearing on Final Approval of the Disclosure Statement and Plan Confirmation and Deadlines Related Thereto; (III) Approving the Solicitation, Notice and Tabulation Procedures and the Forms Related Thereto; and (IV) Granting Related Relief*


**B.**      **Interpretation; Application of Definitions and Rules of Construction**

B

B

B

B

B

### III.  <u>BACKGROUND</u>

B

A.    <u>Nature and History of the Debtor's Business.</u>

‗‗‗‗‗

B.    <u>Legal Structure and Ownership</u>

B

B

B

**C.**     <u>**Events Leading to the Filing of the Bankruptcy Case.**</u>

B

**D.**     **Debtor's Assets**

**E.**     **Debtor's Liabilities**

B

B

**F.** **Current and Historical Financial Condition.**

**G.** **Significant Events During the Bankruptcy Case.**

    **1.** **First Days Orders.**

B

B

- o *Final Order (I) Authorizing the Debtor to (A) Pay Pre-Petition Employee Wages, Salaries, Benefits, and Reimbursable Expenses, and Other Associated Obligations, and (B) Continue the Post-Petition Maintenance of Employee Benefit Programs, Policies, and Procedures; and (II) Granting Related Relief.*

- o *Final Order (I) Authorizing the Debtor to (A) Continue to Operate its Cash Management System, (B) Maintain its Bank Accounts and Pay Bank and Processor Charges, and (C) Maintain Existing Business Forms; (II) Granting a Limited Waiver of the Requirements of Section 345(b) of the Bankruptcy Code, to the Extent Applicable; and (III) Granting Certain Other Related Relief.*

- o *Interim Order Authorizing the Debtor to Continue Paying Share Requests of its Members in Furtherance of its Charitable Mission.*

- o *Order (i) Approving Scope of Notice with Respect to Debtor's Members, (ii) Approving Opt-In Procedure for Additional Notice, and (iii) Granting Related Relief*

    **2.** **Employment of Professionals and Advisors.**

B

B

B

B

3.      **Assumption or Rejection of Certain Contracts.**

B

*Order (i) Authorizing the Debtor to Reject Certain Executory Contracts Nunc Pro Tunc to the Petition Date or Later Specified Rejection Date, and (ii) Granting Certain Related Relief*

*Second Omnibus Motion for Entry and Order (I) Authorizing the Debtor to Reject, as of a Specified Rejection Date, (A) Certain Executory Contracts, and (B) that Certain Unexpired Lease; and (II) Granting Related Relief*
B

*Third Omnibus Motion for Entry and Order (I) Authorizing the Debtor to Reject Certain Executory Contracts; and (II) Granting Related Relief*

B

4.      **Stay of Pending Litigation.**

B

B

5.      **Claims Process and Bar Date.**

**Schedules and Statements.**
B
B

2.      **Bar Dates.**                B
B

6.      **The Debtor's Decision to Cease Operations and Wind Down its Affairs**

B

B

B                              B

                                       B

B

7.      **The U.S. Trustee's Motion to Remove the Debtor, or Alternatively to Authorize the Subchapter V Trustee to Investigate the Debtor's Financial Affairs.**

*United States Trustee's Motion to Remove the Debtor in Possession Pursuant to 11 U.S.C. § 1185, or Alternatively, Motion to Authorize the Subchapter V Trustee to Investigate the Debtor's Financial Affairs Pursuant to 11 U.S.C. § 1183*

*AlieraCare Plaintiffs' Joinder In United States Trustee's Motion To Remove The Debtor In Possession Or Alternatively To Authorize The Subchapter V Trustee To Investigate The Debtor's Affairs          Joinder To The United States Trustee's Motion To Remove The Debtor In Possession Pursuant To 11 U.S.C. § 1185, Or Alternatively, Motion To Authorize The Subchapter V Trustee To Investigate The Debtor's Financial Affairs Pursuant To 11 U.S.C. § 1183*

*Debtor's Response In Opposition To The United States Trustee's Motion To Remove The Debtor In Possession Pursuant To 11 U.S.C. § 1185, Or Alternatively, Motion To Authorize The Subchapter V Trustee To Investigate The Debtor's Financial Affairs Pursuant To 11 U.S.C. § 1183*
*United States Trustee's Reply In Support Of Motion To Remove The Debtor In Possession Pursuant To 11 U.S.C. § 1185, Or Alternatively, Motion To Authorize The Subchapter V Trustee To Investigate The Debtor's Financial Affairs Pursuant To 11 U.S.C. § 1183*

B

B

B

B

8.    **Development of the Plan.**

B

B

## IV.  <u>CONFIRMATION AND VOTING</u>

A.    <u>Plan Confirmation Hearing</u>

B                    B                                    B

B
**December 2, 2021 at 1:00 p.m. (prevailing Eastern Time)**

B

B

B

B
**November 22, 2021 at 4:00 p.m. (prevailing**

**Eastern Time)**

_____

B

B                    B

B

B

**UNLESS AN OBJECTION TO APPROVAL AND CONFIRMATION OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT IS TIMELY SERVED UPON THE PARTIES LISTED ABOVE AND FILED WITH THE BANKRUPTCY COURT, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT IN DETERMINING WHETHER TO APPROVE AND CONFIRM THIS COMBINED PLAN AND DISCLOSURE STATEMENT.**

**B.**    <u>**Requirements for Plan Confirmation**</u>

B

B

B

B

**C.**    <u>**Best Interests of the Creditors Test**</u>

B

B

B

B

B

**attached hereto as Exhibit B**

B

B

**D.**     **Plan Feasibility**

B

B

**E.**     **Classification of Claims and Interests**

B

B

        EXCEPT AS SET FORTH IN THE PLAN OR UNDER FEDERAL RULE OF
BANKRUPTCY PROCEDURE 3019(A), UNLESS SUCH MODIFICATION OF
CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A
HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE
PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL

BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.

B

B

**F.      Impaired Claims or Interests**

B

B

ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 3, 4, AND 5 INCLUDING CURRENT AND FORMER SHARITY MEMBERS.

**G.      Eligibility to Vote on this Plan**

B

B

**H.      Voting Procedure and Deadlines**

B                                                         B
B            B
B                      B                    B
B                      B                    B
B

.

B                    **RECEIVE**                    **November 22, 2021 at**
**5:00 p.m. (prevailing Eastern Time)**                    B
                                B                        B

B

B

B

B

                                B                        B

B

B

B

B

B                        B

B

                                                        B

        B

B                        B

    B

                            B

**I.**    <u>**Acceptance of this Plan**</u>

*i.e.*

**YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY RETURN THE BALLOT OR SUBMIT A BALLOT VIA THE BMC ELECTRONIC BALLOTING SERVICE. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR AND, IF SUBMITTING A PHYSICAL BALLOT, INCLUDE AN ORIGINAL SIGNATURE ON THE BALLOT.**

**J.**    <u>**Elimination of Vacant Classes**</u>

B

B

**V.**  <u>**TREATMENT OF UNCLASSIFIED CLAIMS**</u>

**A.**    <u>**Administrative Expense Claims**</u>

B

B

B          B

B

**B.**     **Professional Fee Claims**

B

**C.**     **Priority Tax Claims**

B

## VI.  CLASSIFICATION OF CLAIMS AND INTERESTS; ESTIMATED RECOVERIES

| Class | Type | Status Under Plan | Voting Status | Recovery Estimate |
|-------|------|-------------------|---------------|-------------------|
|       |      |                   |               |                   |
|       |      |                   |               |                   |
|       |      |                   |               |                   |

| **Class** | **Type** | **Status Under Plan** | **Voting Status** | **Recovery Estimate** |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

## VII.  TREATMENT OF CLAIMS AND INTERESTS

A.  **Classification and Treatment of Claims and Interests**

1.  **Class 1—Miscellaneous Secured Claims**

*Classification*

B

*Treatment:*

B

*Voting*

2.  **Class 2 —Priority Non-Tax Claims**

*Classification*

B

*Treatment*

*Voting*

3.      **Class 3—Member Claims for Post July 8, 2021 Payments.**

*Classification*

*Treatment*

*Voting*

4.      **Class 4—Member Claims and General Unsecured Claims.**

*Classification*

*Allowance*

B

*Treatment*

B

*Payment Priority:*

*Voting*

5.    **Class 5—Governmental Fines and Penalty Claims.**

*Classification*

*Treatment*

*Voting*

      **6.**      **Class 6—Section 510(c) Claims.**

*Classification*

*Treatment*

*Voting*

## VIII.  <u>THE LIQUIDATION OF THE DEBTOR</u>

**A.**      <u>Liquidation</u>

                   B             *provided, however,*
      B

B
B

## IX.  <u>PROVISIONS REGARDING THE LIQUIDATING TRUST</u>

**A.**      <u>Appointment of the Liquidating Trustee</u>

      B

B

B

**B.**      **<u>Creation of the Liquidating Trust</u>**

___                                                                _____

B

**C.**    **Beneficiaries of Liquidating Trust**

B

B

B

B

B

**D.**    **Vesting and Transfer of Assets to the Liquidating Trust**

B

B

B        B

B

B

E.      **Certain Powers and Duties of the Liquidating Trust, Liquidating Trustee, and Liquidating Trust Committee**

    1.      **General Powers of the Liquidating Trustee**

        B

                                          B

B

    **2.**       **Books and Records**

    **3.**       **Investments of Cash**

B                                     _____ _____

    **4.**       **Costs and Expenses of Administration of the Liquidating Trust**

    **5.**       **Reporting**

                           B

**F.**     <u>**Post-Effective Date Notice**</u>

                                          B

                                          B

                          B

_____ _____

B                              B

**G.**     **Federal Income Tax Treatment of the Liquidating Trust for the Liquidating Trust Assets; Preparation and Filing of Tax Returns for Debtor**

      B

B

B

B

**H.**     <u>Term of Liquidating Trust</u>

_____  _____

B

B

**I.**     <u>Limitation of Liability of the Liquidating Trustee and Liquidating Trust Committee</u>

_____  _____

**X.**   <u>MEANS FOR IMPLEMENTATION</u>

**A.**     <u>Preservation of Right to Conduct Investigations</u>

B

B

**B.**     **Prosecution and Resolution of Causes of Action and Avoidance Actions**

B

B          B

B

**C.**     **Effectuating Documents and Further Transactions**

B

**D.**     **Funding of Liabilities and Distributions**

B

**E.**     **Release of Liens**

B

**F.**     **Exemption from Securities Laws**

B

**G.**     **Exemption from Certain Taxes and Fees**

B

**H.**     **Debtor's Privileges as to Certain Causes of Action**

**I.**      <u>**Insurance Policies**</u>

**J.**      <u>**Filing of Monthly and Quarterly Reports and Payment of Statutory Fees**</u>

B

B

**K.**      <u>**Completion of Services of Professionals**</u>

B

B

**L.**      <u>**Operations of the Debtor Between the Confirmation Date and the Effective Date**</u>

B

B                         B                                         B

## XI.  PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE PLAN

**A.**    **Distribution Record Date**

**B.**    **Method of Payment**

**C.**    **Claims Objection Deadline**

B

B

B

**D.**    **No Distribution Pending Allowance**

E.      **Reserve of Cash Distributions**

F.      **Distribution After Allowance**

G.      **Delivery of Distributions**

H.      **Fractional Dollars; *De Minimis* Distributions**

**I.**     **Excess Funds**

*cy pres*

B

**J.**     **Unclaimed Distributions**

B

B

B

B

**K.**     **Set-Off**

**L.**     **Postpetition Interest**

B

**M.**     **Allocation of Distributions Between Principal and Interest**

**N.**      **Prepayment**

## XII.  EXECUTORY CONTRACTS

**A.**      **Rejection of Executory Contracts and Unexpired Leases**

B

**Exhibit C**                                   B

                                                          B

**B.**      **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

B

                                                  B

                                        B

                        B

## XIII.  CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

B

## XIV.  EXCULPATION, INJUNCTION, AND RELATED PROVISIONS

### A.    Exculpation

Except for liability of an Exculpated Party that arises primarily and directly from any act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct, the Exculpated Parties shall neither have nor incur any liability to any Entity for any and all claims, causes of action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing during the Exculpation Timeframe arising, in law, at equity, whether for tort, contract, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances taking place or arising during the Exculpation Timeframe and related in any way to the Chapter 11 Case.

This exculpation provision only includes those claims and causes of action that the Debtor would have been legally entitled to assert against the Exculpated Parties or that any Holder of a Claim or other Entity would have been legally entitled to assert against the Exculpated Parties for or on behalf of the Debtor or the bankruptcy estate and further including those claims and causes of action that are related to the Chapter 11 Case, Liquidating Trust Agreement, or this Plan, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating,

implementing, administering, confirming, or consummating the Plan, the Liquidating Trust Agreement, or any other contract, instrument, release or other agreement or document created or entered into in connection with this Plan or any other post-petition act taken or omitted to be taken in connection with the Chapter 11 Case, but only during the Exculpation Timeframe.

B.    <u>Injunction</u>

Pursuant to 1141(d)(3), confirmation of this Plan does not discharge this Debtor from any debt that arose before the date of the confirmation.

Except as otherwise specifically provided in the Combined Plan and Disclosure Statement, all Persons who have held, hold, or may hold Claims against or Interests in the Debtor and any successors, assigns or representatives of such Person shall be precluded and permanently enjoined on and after the Effective Date from (a) commencing or continuing in any manner any Claim, action or other proceeding of any kind against any of the assets to be distributed under the Plan, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree, or order with respect to any of the assets to be distributed under the Plan, and (c) creating, perfecting or enforcing any encumbrance of any kind with respect to any of the assets to be distributed under the Plan. All Persons or Entities who directly or indirectly have held, hold, may hold, or seek to assert Claims that been exculpated in this Plan (the "<u>Exculpated Claims</u>") shall be enjoined from (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to the Exculpated Claims; (ii) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order on account of or in connection with or with respect to the Exculpated Claims; (iii) creating, perfecting, or enforcing any encumbrance of any kind on account of or in connection with or with respect to the Exculpated Claims (iv) asserting any right of subrogation on account of or in connection with or with respect to the Exculpated Claims, except to the extent that a permissible right of subrogation is asserted with respect to a timely filed proof of claim; (v) or commencing or continuing in any manner any action or other proceeding on account of or in connection with or with respect to the Exculpated Claims.

Notwithstanding any provision in this Combined Plan and Disclosure Statement or the Plan Confirmation Order to the contrary, nothing contained in this Combined Plan and Disclosure Statement, or the Confirmation Order shall:

(i) extinguish, impact, or release any right of setoff, recoupment, or subrogation of any kind: (a) held by any creditor or vendor which is asserted in a timely filed proof of claim or objection to this Combined Plan and Disclosure Statement, or pursuant to section 503(b)(1)(d) of the Bankruptcy Code or (b) that is or may be asserted as an affirmative defense or other defense to a cause of action or claim asserted by a Debtor or the Liquidating Trust against such creditor or vendor; or

(ii) affect the applicability of 26 U.S.C. § 7421(a).

Notwithstanding anything contained in the section, the injunction referenced herein shall not apply to the prosecution of any Claim against the Aliera Companies or their predecessors, successors, and assigns, current and former shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, managers, consultants, limited partners, trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, in each case in their capacity as such, and their assets and properties, as the case may be.

**C.**   **Termination of All Employee and Workers' Compensation Benefits**

**D.**   **Exclusions and Limitations on Liability**

## XV.  **RETENTION OF JURISDICTION**

B

B

B

B

B

B

B

B

## XVI.  <u>MISCELLANEOUS PROVISIONS</u>

**A.**      <u>Modification of Plan</u>

B                           B
                      B                    B

                      B
                                    B
                            B                        B

**B.**      <u>Revocation of Plan</u>

**C.**      <u>Successors and Assigns</u>

**D.**      **Governing Law**

                            B                    B

**E.**      **Reservation of Rights**

B

**F.**      **Effectuating Documents; Further Transactions**

**G.**      **Further Assurances**

**H.**      **Dissolution of the Debtor and Closing of the Chapter 11 Case**

**I. Dissolution of the Members Committee**

B

**J. Service of Documents**

| | B<br><br>B<br><br>B |
|---|---|
| | |

**K.**     **Filing of Additional Documents**

B

## XVII.  RISKS AND OTHER CONSIDERATIONS

**A.**     **Bankruptcy Considerations**

B

B

B

B

B

B

B

**B.**     **No Duty to Update Disclosures**

B

C.      <u>**Alternatives to Confirmation and Consummation of the Plan**</u>

     1.      **Alternate Plan**

         B
       B

     2.      **Chapter 7 Liquidation or Dismissal**

                B

B

          B

                  B
              B

                    B
                  **Exhibit B**

D.      <u>**Certain Federal Tax Consequences**</u>

<u>**THE FOLLOWING DISCUSSION SUMMARIZES CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN TO THE DEBTOR AND TO CERTAIN HOLDERS OF ALLOWED CLAIMS. THIS SUMMARY DOES NOT ADDRESS THE FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS WHO ARE UNIMPAIRED, DEEMED TO HAVE REJECTED THE PLAN IN ACCORDANCE WITH THE PROVISIONS OF SECTION 1126(G) OF THE BANKRUPTCY CODE, OR HOLDERS WHOSE CLAIMS ARE ENTITLED TO PAYMENT IN FULL IN CASH.**</u>

*e.g*

**ACCORDINGLY, THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR FOR ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN.**

     3.     **Consequences To The Debtor**

_____

**<u>CODI</u>**

B                                                **<u>Bankruptcy</u>**
**<u>Exceptio</u>n**
      **<u>Insolvency Exception</u>**

**NOLs**

_____

4.      Consequences to Holders of Allowed General Unsecured Claims

B

_____

**5.**        **Distributions in Respect of Accrued Interest or OID**

**6.** **Tax Treatment of the Liquidating Trust and Holders of Liquidating Trust Interests**

_____

*i.e*

B

_____

B

B

**7.     Withholding on Distributions and Information Reporting**

B

B

## XVIII.  <u>**RECOMMENDATION AND CONCLUSION**</u>

B

B    */s/ Neil Luria*

# EXHIBIT A

## MEMBER SUMMARY

B

B

**Please read this summary of the Plan and the process for approving it.**

**STEPS TO CONFIRMATION OF THE PLAN:**

- B

- 

- B

- B

-

- **You have until January 4, 2022 to submit additional claims for compensation or to dispute your claim information.  You can find instructions on how to submit an additional claim or other information at _____**

- 

- 　　　　　　　　　　　　　　B

　　　　　　　　　　　　　　　　　　　B
　　　　　　　　　　　　　　　　B

**YOUR VOTE COUNTS**

　　　　　　　　　　　　　　　　　　　**Ballots must be RECEIVED by November 22, 2021, at 5:00 p.m. prevailing Eastern Time,**

**HOW TO VOTE:**

　　　　　　　　　　B

　　　　B

　　　　　　　　　　_____
　　　　_____

**LIQUIDATING TRUST:**

**TIMING:**

**CLAIMS**

　　　　　　　　_____

**PLEASE VOTE.**

## <u>FREQUENTLY ASKED QUESTIONS FOR MEMBERS</u>

**1.**    <u>Do I need to file a claim to receive compensation under the Plan?</u>

<div style="text-align:center">_____</div>

**January 4, 2022**
<div style="text-align:center">_____</div>

**2.**    <u>Under the Plan, how will my claims be paid?</u>

**3.**    <u>Does the Bankruptcy Court need to approve Sharity's Plan?</u>

B

**4.**    <u>Do members get to vote on whether the Bankruptcy Court should approve or not approve the Plan?</u>

**5.**    <u>Do I vote twice if I have two claims, one in Class 3 and one in Class 4?</u>

**6.**    <u>How do I vote?</u>

**7.      How many Classes must vote in favor of the Plan for the Plan to be Confirmed?**

**8.      If no Class accepts the Plan, can the Bankruptcy Court still approve the Plan?**

**9.      If the Plan is Approved, Who will run the Liquidating Trust?**

B

B

**10.     What claims will be paid from the Liquidating Trust?**

B

**11.     What is my Unpaid Medical Claims Amount?**

B

_____ **by no later than January 4, 2022.**

**12.     How will the Liquidating Trust be funded**


**13.     What does the Liquidating Trustee do?**


**14.     What if I have more questions?**

B

B


                                                    B


**15.     How Do I Obtain Health Insurance?**

# <u>EXHIBIT B</u>

**Sharity Ministries**
**Liquidation Analysis**
($ in Thousands)

*For Discussion Purposes Only*
*Subject to Ongoing Review and Material Revision*

| Liquidation Analysis - Chapter 7 Liquidation Compared to Chapter 11 Plan of Liquidation | | | | | | | | | | |

Amounts in $000s

| | | | Chapter 7 Liquidation | | | | Chapter 11 Plan of Liquidation | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Table I: Assets Available For Distribution** | Notes | Estimated Balance | Realization Percentage Low | High | Liquidation Value Low | High | Realization Percentage Low | High | Liquidation Value Low | High |
| Estimated Cash and Cash Equivalents - Operating Account | a | $ 841 | 100% | 100% | $ 841 | $ 841 | 100% | 100% | $ 841 | $ 841 |
| Estimated Cash and Cash Equivalents - Monies Received on Post-Petition Member Contributions | b | $ 1,174 | 100% | 100% | $ 1,174 | $ 1,174 | 100% | 100% | 1,174 | 1,174 |
| Estimated Cash and Cash Equivalents - Monies Residing in Sharebox Funding Account | c | $ 779 | 100% | 100% | 779 | 779 | 100% | 100% | 779 | 779 |
| Cash Deposits | d | $ 331 | 0% | 0% | - | - | 10% | 100% | 33 | 331 |
| Due from Aliera | e | 23,654 | 10% | 100% | 2,365 | 23,654 | 10% | 100% | 2,365 | 23,654 |
| Licenses; Intangibles; Other Assets | f | - | NA | NA | - | - | NA | NA | - | - |
| **Total Assets and Net Proceeds Available For Distribution** | | $ 26,779 | 19% | 99% | $ 5,159 | $ 26,448 | 19% | 100% | $ 5,192 | $ 26,779 |
| | | | | | | | | | | |
| **Table II: Estimated Wind Down Expenses** | | | | | | | | | | |
| Wind Down Expenses | g | | | | $ 450 | $ 450 | | | $ - | $ - |
| Chapter 7 Trustee Professional Fees | h | | | | 800 | 300 | | | | |
| Chapter 11 Liquidating Trust Professional Fees | h | | | | | | | | 800 | 300 |
| Chapter 7 Trustee Fees (3% of Proceeds) | i | | | | 155 | 793 | | | - | - |
| **Total Wind Down Expenses** | | | | | $ 1,405 | $ 1,543 | | | $ 800 | $ 300 |
| **Net Proceeds Available After Wind Down Expenses** | | | | | $ 3,754 | $ 24,904 | | | $ 4,392 | $ 26,479 |

| | Notes | Preliminary Balance | Recovery Percentage Low | High | Recovery Value Low | High | Recovery Percentage Low | High | Recovery Value Low | High |
|---|---|---|---|---|---|---|---|---|---|---|
| **Table III: Estimated Creditor Recoveries** | | | | | | | | | | |
| Class 1: Miscellaneous Secured Claims (Unimpaired) | | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| Class 2: Priority Non-Tax Claims (Unimpaired) | | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| Class 3: Member Claims for Post-July 8, 2021 Monthly Payments (Impaired) | | 1,174 | 100.00% | 100.00% | $ 1,174 | $ 1,174 | 100.00% | 100.00% | $ 1,174 | $ 1,174 |
| Class 4: Members Claims and General Unsecured Claims (Impaired) | j | TBD | TBD | TBD | 2,581 | 23,731 | TBD | TBD | 3,219 | 25,305 |
| Class 5: Governmental Fines and Penalty Claims (Impaired) | j | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Class 6: Section 510(c) Claims (Fully Extinguished and Discharged) | | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD |

*Notes:*
a  Estimated operating cash balance tested at the effective date subject to continued updating and refinement; assumes professional fee retainers of Baker Hostetler and SOLIC Capital Advisors are applied. Does not include segregated funds currently held in separate accounts at Regions Banks. Includes wind-down expenses for professional fees.
b  Cash reserve balance for refunds to members who made monthly contributions subsequent to the filing date.
c  Static cash reserve balance for bank account that was used for funding share requests.
d  Estimated cash deposits held by attorneys outside of Baker Hostetler and includes other prepaid amounts, primarily a MedWatch advanced payment amount of $316k.
e  Represents monies due from Aliera Companies and its affiliates to the estate; subject to ongoing analysis to determine amounts Due from Aliera.  Estimate is hypothetical for illustrative purposes only  using the reported unaudited balance sheet from the general ledger provided by the Aliera Companies as of 12/31/2020. Includes estimated TSYS credit card processor withholdings. These amounts do not include the value of any claims from causes of action or claims against Aliera outside of current amounts owing by Aliera.
f  No value assigned in the financial statements to the estate's intangible assets (domain names, mailing lists, trademark, etc.). Estimated at de minimus value for purpose of analysis.
g  Incremental wind-down costs for liquidation approximated at an incremental 12 weeks applying application of CRO services at 75% of current run-rate (shown at $37.5k per week). Base wind-down expenses for CRO services are already reflected as a deduct in the cash balance per footnote (a) above.
h  Estimate.
i  Chapter 7 Trustee Commission is calculated in accordance with 11 U.S.C. section 326(a).
j  Claims amounts uncertain in light of the General Bar Date extended to January 4, 2022. Recoveries are before any contingency fees due to counsel representing the Chapter 7 Trustee or the Liquidating Trustee.

# <u>EXHIBIT C</u>

## EXECUTORY CONTRACTS AND UNEXPIRED LEASE

| CONTRACT/LEASE COUNTERPARTY | COUNTERPARTY ADDRESS | CONTRACT/LEASE DESCRIPTION | STATUS |
|---|---|---|---|
| | | | |
| | | B | |
| B B | B B | | |
| | B | | |

| CONTRACT/LEASE COUNTERPARTY | COUNTERPARTY ADDRESS | CONTRACT/LEASE DESCRIPTION | STATUS |
|---|---|---|---|
| | | | |
| *dba* | B | | |
| | | | |
| | | | |
| | B | | |
| | | | |
| | | | |

| CONTRACT/LEASE COUNTERPARTY | COUNTERPARTY ADDRESS | CONTRACT/LEASE DESCRIPTION | STATUS |
|---|---|---|---|
| | | | |
| B | B | | |
| | | | |
| B | B | | |
| | | | |
| | | | |
| B | B | | |
| | B | | |

| CONTRACT/LEASE COUNTERPARTY | COUNTERPARTY ADDRESS | CONTRACT/LEASE DESCRIPTION | STATUS |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| B | B |  |  |
| B | B B  B |  |  |

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

---

**MODIFIED COMBINED FIRST AMENDED DISCLOSURE STATEMENT
AND PLAN OF LIQUIDATION FILED JOINTLY BY THE DEBTORS AND
THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

---

**SCROGGINS & WILLIAMSON, P.C.**

**J. Robert Williamson**
**Georgia Bar No. 765214**
**Ashley Reynolds Ray**
**Georgia Bar No. 601559**
**4401 Northside Parkway**
**Suite 450**
**Atlanta, GA 30327**
**(404) 893-3880**

       **and –**

**MONZACK MERSKY AND BROWDER,
P.A.**

**Rachel B. Mersky**
**Del. Bar No. 2049**
**1201 Orange Street, Suite 400**
**Wilmington, DE 19801**
**T: (302) 656-8162**
**F: (302) 656-2769**
**E: rmersky@monlaw.com**

**Counsel for the Debtors**

**Dated:  August 14, 2023**

**GREENBERG TRAURIG, LLP**

**Dennis A. Meloro**
**Del. Bar No. 4435**
**222 Delaware Avenue, Suite 1600**
**Wilmington, DE 19801**
**T: (302) 661-7000**
**E: melorod@gtlaw.com**

       **and -**

**John D. Elrod**
**Georgia Bar No. 246604**
**3333 Piedmont Road, NE, Suite 2500**
**Atlanta, GA 30305**
**T: (678) 553-2259**
**F: (678) 553-2269**
**E: elrodj@gtlaw.com**

**Counsel for the Official Committee of
Unsecured Creditors**



EXHIBIT
**1.41**

Ex. 1.41, p. 1 of 57

B

B

B

B

B

B

B

B

B

B

# NOTICE

# INTRODUCTION

*Aliera*

*Debtors*
*Committee,*                          *Plan Proponents*
                                              *Plan*
                                                      *Combined Plan and*
*Disclosure Statement*                                B

*Bankruptcy Code*

B

B
B

B

B

## SECTION 1.  DEFINITIONS AND INTERPRETATION

### 1.1   Definitions

B                                                                        **<u>Exhibit 1</u>**

### 1.1.1   Rules of Construction

B

## SECTION 2.  BACKGROUND AND DISCLOSURES

B                                                                        B

### 2.1   The Debtors' Business and Corporate Structure

*DPCMH*

*HCSM*

*AHS*

*Unity*

***Unity Agreement***

***Trinity*** ***Sharity***

***Aliera Companies***

**The  Aliera  Companies,  Inc.**

    ***Advevo"***              ***Ensurian***
***Tactic Edge***        B          ***USA Benefits***

B     **Advevo**

**USA  Benefits  &  Administrators  –**

**Tactic Edge**
B                  B

**Ensurian**

## 2.2    Events Precipitating the Debtors' Chapter 11 Filing

*Jackson et al., v. The Aliera Companies, Inc.; Aliera Healthcare Inc.; Trinity Healthshare Inc.,* **Jackson Suit**    *Albina et al. v. The Aliera Companies, Inc.; Trinity Healthshare Inc.; OneShare Health LLC,* **Albina Suit**    B

B

*Sharity Case*

B

B

*ABC*          B

B

*ARAA*

*Sharity Committee*

*inter alia*

### 2.3    The Chapter 11 Cases

*Involuntary Petition*

B                                              B

*Delaware Court*                          *Jackson*

*Albina*

B

*Georgia Court*

*Venue Motions*    *Motion to Transfer Venue Pursuant to 28 U.S.C. § 1412 and Fed. R. Bankr. P. 1014*                          *Petitioning Creditors' Motion to Transfer Venue of the Later-Filed Voluntary Bankruptcy Cases of the Aliera Companies Inc. and Its Four Affiliates*                          *Motion to Dismiss Involuntary Petition*          *Motion to Dismiss*

B

_____


### 2.4    Significant Events During Chapter 11


- ***Retention of Chief Liquidation Officer***



- ***Retention of Debtor Professionals***

B



- ***Retention of Committee Professionals***

B


- ***Bar Date Motion***             *Motion of Debtors For Entry of Order Pursuant to Bankruptcy Code Sections 105(a), 501, 502, 503, and 1111(a), Bankruptcy Rules 2002 and 3003(C)(3), and Local Rules 1009-2 and 2002-1(e) (I) Establishing Bar Dates For*

*Filing Claims Against the Debtors and (II) Approving Form And Manner Of Notice Thereof*

- ***Adversary Proceeding Against Burdette Atlanta and Shelley Steele***
  *Motion Of Official Committee Of Unsecured Creditors For An Order Authorizing The Committee To Pursue Certain Claims On Behalf Of The Debtors' Estates Against Insiders* **Standing Motion**

B

*inter alia*

- ***Settlement with ROC III Fairlead Embassy Row Owner, LLC.***

*inter alia*

- ***Ongoing Litigation and Investigations by the Committee and Certain Governmental Entities.***

### 2.5    Certain Federal Income Tax Consequences

**2.6     Alternate Plan**

—————

B

**2.7     Best Interests Test and Liquidation Analysis**

B

B

B

B

**Exhibit 2**

**SECTION 3.  TREATMENT OF ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, U.S. TRUSTEE FEES, AND PROFESSIONAL FEES**

**3.1    Administrative Claims**

B

**Section 3**

**3.2    Administrative Claims Bar Date**

B

*Administrative Claims Bar Date*                                                                 B

B

B

B

### 3.3     Priority Tax Claims

B

<u>**Section 3**</u>

B

B

B

### 3.4     U.S. Trustee Fees

B

B

## SECTION 4.  SUMMARY OF TREATMENT OF CLAIMS AND ESTIMATED RECOVERIES

| Class | Estimated Allowed Claims | Treatment | Estimated Recovery to Holders of Allowed Claims[2] |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

B

| Class | Estimated Allowed Claims | Treatment | Estimated Recovery to Holders of Allowed Claims[2] |
|---|---|---|---|
| | | *pro rata* | |
| | | *pro rata* | |
| | | | |
| | | | |
| | | | |

## SECTION 5.  CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

### 5.1    Classification and Specification of Treatment of Claims

<u>Section 3</u>

<u>Section 5</u>            B                                                   <u>Section 5</u>

B

B

B

### 5.2    Classes of Claims

#### 5.2.1    Class 1 – Other Secured Claims

**5.2.2   Class 2 – Unsecured Priority Claims**

**5.2.3    Class 3 – Unsecured Trade Claims.**

*pro rata*

<u>Sections 3, 5.2.1 and 5.2.2</u>

**5.2.4   Class 4 – Unsecured Medical Claims**

*pro rata*

<u>Sections 3, 5.2.1 and 5.2.2</u>

**5.2.5   Class 5 – Subordinated Governmental Claims**

<u>Sections 3, 5.2.1, 5.2.2, 5.2.3 and 5.3.4</u>                    *Senior Claims*

*pro rata*

**5.2.6   Class 6 – Insider Claims**

### 5.2.7    Class 7 – Equity Interests

## SECTION 6.   ACCEPTANCE OR REJECTION OF THE PLAN

### 6.1      Impaired Classes Vote

B

B

### 6.2      Presumed Acceptance of this Plan

B

### 6.3      Presumed Rejection of this Plan

B

### 6.4      Voting Classes

### 6.5      Nonconsensual Confirmation

B

B

## SECTION 7.   CONFIRMATION AND VOTING PROCEDURES

### 7.1      Confirmation Hearing

B

B
B

**7.2     Procedure for Objections**

B                                        B
B
**actually  received**              **4:00 p.m. (Eastern Time) on August 4, 2023**
                                        B
B

B               B

B

**7.3     Requirements for Confirmation**

B
B

B

B

**7.4     Classification of Claims and Equity Interests**

B

B

**7.5**      **Impaired Claims or Equity Interests**

B

B

**7.6**      **Eligibility to Vote on the Plan**

B

B

**7.7**      **Solicitation Notice**

*Objection Deadline and Hearing Notice*

**7.8**      **Procedure and Voting Deadline**

B

B

**If by First Class mail**

B

B

B

**If by overnight courier or hand delivery:**

B

B

B

**By electronic, online submission:**

_____

B

B                                    B

B

B                                    ___

B                      **RECEIVE**                          **August 4,   2023, at**
**4:00 p.m. (Eastern)**        *Voting Deadline*                                B

B

B

B

### 7.9 Acceptance of the Plan

*i.e.*

**You are urged to complete, date, sign, and promptly return the ballot.  Please be sure to complete the ballot properly, and legibly identify the exact amount of your claim and the name of the Creditor.**

## SECTION 8.  MEANS FOR IMPLEMENTATION OF PLAN

### 8.1 Funding for this Plan

### 8.2 Formation of the Trust

*provided*

### 8.3 Appointment of Liquidating Trustee; Deemed Resignation of Directors and Officers

B

B

B

B

**8.4     Vesting of Assets**

B

B

**8.5     Corporate Action**

**8.6     Continuing Existence**

### 8.7     Substantive Consolidation of Debtors for Plan Purposes

B

**Section 8.7**

### 8.8     Distributions to Classes 3 and 4 Pursuant to Unsecured Creditor Settlement

_____

**Sharity Adversary Proceeding**

_____

B

B

*pro rata*

———————————————

***Available Cash***

*pro rata*

*pro rata*

*pro rata*

**8.9**    **Causes of Action**

*res judicata*

No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any specific Cause of Action as any indication that the Debtors, the Committee, or the Liquidating Trustee will not pursue any and all available Causes of Action.  All Causes of Action against current and former Insiders are reserved.  The Debtors, the Committee, and the Liquidating Trustee expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan,

*res judicata*

B

***Joint Claims***

8.10    **Privileges as to Certain Causes of Action**

B

**8.11    Agreements, Instruments, and Documents**

B

**8.12    Closing of the Debtors' Chapter 11 Cases**

B                              B

                                   B                              B

            B

                                              *cy pres*
                        B                              B

B
            B

**8.13    Corporate Dissolution**

                        *provided  however*

**8.14    Effective Date Events**

B

**SECTION 9.  PROVISIONS REGARDING LIQUIDATING TRUSTEE**

**9.1       General Powers and Duties of the Liquidating Trustee**

B

B

**9.2     Compensation of Liquidating Trustee and its Professionals**

**9.3     No Agency Relationship**

**9.4     Reporting**

    **9.5**    **Resignation, Death or Removal of Liquidating Trustee**

B


**SECTION 10.**        **EXECUTORY CONTRACTS**

    **10.1**    **Rejection of Contracts and Unexpired Leases**


    **10.2**    **Insurance Contracts**


B                        B


    **10.3**    **Compensation and Benefit Programs**


    **10.4**    **Reservation of Rights as to Executory Contracts**

## SECTION 11.        DISTRIBUTION PROVISIONS

**11.1    No Distributions on Account of Claims That Have Not Become Allowed Claims**

**11.2    Reserves for Claims That Have Not Been Allowed**

**subparagraph (a)**              **Section 10.1**

**Section 11.2**

**11.3    Distribution of Plan Consideration**

B

B

**11.4    Unclaimed Cash**

**11.5     Unnegotiated Distribution Checks**

**11.6     Fractional Dollars**

**11.7     Distribution Dates**

B
B

**11.8     Bankruptcy Code Sections 509 and 510**

B

**11.9     Distributions to be Applied First to Administrative and Priority Claims**

**11.10   Estimation of Claims**

B

B

B

B

B

B

B

**11.11   Chapter 5 Provisions**

<u>**Section 11.11**</u>

**11.12   Third-Party Agreements**

**11.13   Objections to Claims**

B

*provided, however*

**11.14   Settlement of Causes of Action and Disputed Claims**

B

B

**11.15   Setoffs**

B

*provided*

*provided*
*further*

*provided*
*further*

**11.16   Distribution Cap**

**11.17   De Minimis Distributions**

**11.18   Withholding Taxes**

### 11.19   Distribution Record Date

B

B

### SECTION 12.          CONDITIONS PRECEDENT

#### 12.1    Conditions to Confirmation

B

#### 12.2    Conditions to Effective Date

B

#### 12.3    Nonfulfillment of Conditions

#### 12.4    Waiver of Conditions to Confirmation and Effective Date

B

### SECTION 13.   EFFECTS OF PLAN CONFIRMATION

#### 13.1   Interest on Claims, Fees, Costs, Charges

B

#### 13.2   Exculpation

Except as specifically provided in this Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from, any Exculpated Claim, obligation, cause of action, or liability for any Exculpated Claim, except for gross negligence, willful misconduct, or fraud, but in all respects such Persons shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan..

#### 13.3   Injunction

Except as otherwise provided in this Plan or Confirmation Order, as of the Effective Date all Persons that hold a Claim are permanently enjoined from taking any of the following actions:  (1) commencing or continuing in any manner any action or other proceeding against an Exculpated Party with respect to an Exculpated  Claim, or as against any of the Assets to be distributed under this Plan or any other Trust Assets; (2) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against an Exculpated Party with respect to an Exculpated Claim, or as against any of the any of the Assets to be distributed under this Plan or any other Trust Assets; or (3) creating, perfecting or enforcing any lien or encumbrance against an Exculpated Party with respect to an Exculpated Claim, or as against any of the Assets to be distributed under this Plan or any other Trust Assets. Nothing in this injunction shall preclude the Holder of a Claim from enforcing its rights to the treatment provided in this Plan, from pursing any available insurance or third parties not expressly described above, or from seeking discovery in actions against third parties. Nothing in the Plan or this Confirmation Order shall preclude any Governmental Entity from using its own judicial or regulatory processes to initiate, pursue, or resolve any police or regulatory matters involving the Debtor and to settle such matters or enter judgment thereon, but with the understanding that collection of any amounts found to be owing from the Debtor shall be made in accordance with the payment terms of the Plan to holders of Class 5 Claims.

#### 13.4   Post-Effective Date Effect of Evidences of Claims

**13.5    Surrender of Instruments and Release of Liens**

**13.6    Term of Stays**

Except as otherwise provided in this Plan the stay provided for in the Debtors' Chapter 11 Cases pursuant to Bankruptcy Code Section 362, shall remain in full force and effect until the Chapter 11 Cases are closed.

**13.7    No Discharge**

B

**13.8    Retention of Jurisdiction**

B

B

**13.9     Failure of the Court to Exercise Jurisdiction**

**SECTION 14.          MISCELLANEOUS PROVISIONS**

**14.1    Exemption from Transfer Taxes**

B

### 14.2    Modification of Plan

*provided, however*
      B                                 B
     B

                         *provided*                     B
            B
                  B

### 14.3    Revocation of this Plan

### 14.4    Preservation and Application of Insurance

                                     B

### 14.5    Successors and Assigns, Binding Effect

**14.6    Computation of Time**

B

**14.7    Notices**

<u>**Section 14.8**</u>

**14.8    Severability**

**14.9    Designated Notice**

**14.10   Validity and Enforceability**

**14.11   Plan Supplement**

**14.12   Controlling Documents**

**14.13   Reservation of Rights**

B

**14.14   Substantial Consummation**

B

**14.15   Governing Law**

B

B

*Signature page follows*

B

B   */s/ Katie S. Goodman*
_____

B   */s/ Craig Wilson*
_____

## Exhibit 1
## Definitions

*Administrative Claim*
B                                                                                          B


                                                                    *provided, however*




B


*Aliera*


*Allowed*


        B
B


                                                                                          B
                                                                               B
                                                    B


*Allowed*,


                            B
        B

*Assets*

B

*Avoidance Action Recoveries*

*Avoidance Actions*

*Ballots*

*Bankruptcy Code*

*Bankruptcy Court* **or** *Court*

B

*Bankruptcy Rules*

B

*Budget*

*Business Day*

B

*Cash*

*Cause of Action*

*Chapter 11 Cases*

*Claim*

B

*Class*                                                                                          <u>**Section 3**</u>

*Confirmation  Date*

*Confirmation Hearing*

B

*Confirmation Order*
        B

*Cramdown*                                                                                B

*Creditor*

*Debtors*
                                                        B

*Designated  Notice*
        B

*Disallowed  Claim*

                                B

                                                                B

*Disclosure Statement*
                                                B                        B

*Distribution*
                                                        B

*Distribution Record Date*
                                                B

*District Court*

*Effective Date*

*Estates*
B

*Exculpated Claim*

*provided  however*

*Exculpated Party*

*Existing  Debtor-Held  Funds*

*File* or *Filed*                                                                    B
                                                                B

*Final Order*                                             B

*provided, however*

B

B

**General Litigation Claims**

*provided*

**General Litigation Recoveries**

**Governmental Unit**                                                      B

B

B

B

**Impaired**
B

**Insider**                                                      B

**Insider Claim**

*Intercompany Claim*

*Interest*
  B

*Person*

*Petition Date*

*Plan*
                    B                    B

*Plan Documents*

*Plan Supplement*

*Priority Tax Claim*
B

*Privilege*

*Professionals*
B

*Schedules*
                              B                    B

*Secured  Claim*

B

B
B

**Section 1.55**

*Secured Tax Claim*

B

*Sharity*

*Sharity  Case*

B

*Sharity Plan*

B

*Sharity Trust*

*Sharity Trust Claim*

**Section 8.8**

*Sharity Trustee*

*Subordinated  Claim*

B

*Subordinated  Governmental  Claim*

*Trust*

*Trust  Agreement*

*Trust Assets*

*Trust Beneficial Interest*

*Trustee* **or** *Liquidating Trustee*

*Trust Committee*

*Trust Counsel*

*Trust Expense Fund*

*UMC Cash*

*Unimpaired*

*Unity*

*Unity Class Certification Motion*

B

B

*Unity Class POC*

*Unity Class Representatives*                    B

B                                                        B

*Unity Class Settlement Administrator*

*Unity Members*

*Unity Member Class Claim*

**Section 8.8(b)**

*Unsecured Claim*

B

B

*Unsecured Creditor Settlement*

**Section 8.8**
*inter alia*

*Unsecured Medical Claim*

*Unsecured Priority Claim*

B

B

*UTC Cash*

*Unsecured Trade Claim*

*U.S. Trustee Fees*

**EXHIBIT 2**
**LIQUIDATION ANALYSIS**

B

B

**Section 8.8**

B

**Projected Distribution under the Plan**

| Claims/Interests | Estimated Allowed Claims | Projected Recovery |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**Projected Distribution in Chapter 7**

| Claims/Interests | Estimated Allowed Claims | Projected Recovery |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

## AGREEMENT TO SETTLE CLAIMS

*Duncan v. The Aliera Companies, Inc., et. al,*
*No. 2:20-cv-00876-TLN-KJN U.S. District Court, Eastern District of California*

*Albina v. The Aliera Companies, Inc., et. al,*
*No. 5:20-cv-00496-DCR, U.S. District Court, Eastern District of Kentucky*

*Smith v. The Aliera Companies, Inc., et. al,*
*1:20-cv02130-RBJ, U.S. District Court, District of Colorado*

B
B            B

## RECITALS



Ex. 1.42, p. 1 of 24

*See Aliera Healthcare v. Unity Healthshare, LLC, et al*

*inter alia*

B

B

B

**AGREEMENT**

*1.*     *Definitions.*

*Duncan v. OneShare Health, LLC, et. al*

*Albina et al., v. OneShare Health, LLC, et. al*

*Smith et al., v. OneShare Health, LLC, et. al*     B

*Agreement Execution Date*

*Aliera Bankruptcy*     *In re The Aliera Companies Inc*
B

*Case Contribution Award"*

*Claims Processor*

*Class Counsel*

*Court*     *Duncan v. OneShare Health, LLC, et. al*

*Defendants*

*Distribution Plan*

*Effective Date*

*Final*

*Named Plaintiffs*                                                    B

                                                                              B

          B

*Parties*

*"Releasees"*

*Settlement*

 *Settlement Amount*        *Settlement Fund*

*Settlement Class Members*        *Settlement Class*

 *Settlement Class Period*

*"Settlement Class Released Claims*

*Settlement Trust Account*

                              B

*Taxes*

2.        *Conditions to Effectiveness of the Settlement.*

        *General*

        *Court Approval*

        *Albina*     *Smith*

             *Duncan*

        *Certification of Settlement Class*

        *Motion for Preliminary Approval and Notices*

*Issuance of Settlement Class Notice*   B

*Fairness Hearing*

*Motions for Final Approval*

*No Termination*

**3.     Payments.**

*Initial $3 Million Payment (split into two payments of $1.5 million)*

*Assignment of $3.75 Million Aliera Obligation*

B

B

*Time Payments*

*Amount*

*Timing  of  Time  Payments*

4.      ***Default.***

5.      ***Cooperation.***

*6.*     *Releases.*

       *Releases of the Releasees.*

       *Defendants' Releases of Named Plaintiffs, the Settlement Class, and Class Counsel.*

*7.*     *Representations and Warranties.*

       *The Named Plaintiffs.*

       *The Parties.*

8.      *No Admission of Liability.*

9.      ***Distribution Plan, Claim Processing, and Report***

        *Plan Submitted to Court for Approval.*

                B               *per se*

        *Claims  Processor  Payment.*

    3   *Timing.*

10.     ***Effective Date of Settlement.***

        *Effective Date*

        *Disputes Concerning the Effective Date of Settlement*

**11.      *Termination of Agreement to Settle Claims Due to Lack of Approval.***

   *Court Rejection*

   *Court of Appeals Reversal*

   *Supreme Court Reversal*

   *Pending Appeal*

**12.      *Consequences of Termination.***

   *Reversion of Actions*

   *Releases and Terms Void*

   *Return of Funds*

**13.      *Attorney Fees, Litigation Expenses, and Case Contribution Awards.***

   *Attorney Fees and Litigation Costs*

*Case Contribution Award*

**14.** **Joint Communication About Settlement and Non-Disparagement.**
*Appendix A*

**15.** **Miscellaneous**

*Dispute Resolution*

*Governing Law*

*Tolling*

.   *Amendment*   B

*Waiver*

*Construction*

*Principles of Interpretation*

    *Headings*

    *Singular and Plural*

    *References to a Person*

*Survival*

*Entire Agreement*

*Counterparts*

*Binding Effect*

*Further   Assurances.*

*Tax  Advice  Not  Provided*

B

B

interest, affiliates, benefit plans, predecessors, and transferees, and their past and present shareholders, officers, directors, agents, and employees.

15.12 *Further Assurances.* Each of the Parties agree, without further consideration, and as part of finalizing the Settlement hereunder, that they will in good faith promptly execute and deliver such other documents and take such other actions as may be necessary to consummate the subject matter and purpose of this Agreement.

15.13 *Tax Advice Not Provided.* No opinion or advice concerning the Tax consequences of the Settlement Agreement has been given or will be given by counsel involved in the Action to the Settlement Class, nor is any representation or warranty in this regard made by virtue of this Agreement. The Tax obligations of the Settlement Class and the determination thereof are the sole responsibility of each Settlement Class Member, and it is understood that the Tax consequences may vary depending on the particular circumstances of each Settlement Class Member.

DATED this 27th day of April, 2023.

for OneShare Health, LLC
Name: Buddy Combs
Title: Chief Legal Officer & General Counsel

Counsel for Plaintiffs in Duncan, Smith, and Albina Putative Class Actions
Name: Richard E. Spoonemore
SIRIANNI YOUTZ SPOONEMORE HAMBURGER PLLC

15

**Plaintiffs:**

_____
Bruce Duncan

_____
Corlyn Duncan

_____
Ellen Larson

_____
Rebecca White, f/k/a/ Rebecca Smith

_____
Jared Beard

_____
Jamie Beard

_____
Hanna Albina

_____
Austin Willard

16

Resp. Appx, p. 390

**Plaintiffs:**

_____

Bruce Duncan

_____

Corlyn Duncan

_____

Ellen Larson

_____

Rebecca White, f/k/a/ Rebecca Smith

_____

Jared Beard

_____

Jamie Beard

_____

Hanna Albina

_____

Austin Willard

16

Plaintiffs:

_____
Bruce Duncan

_____
Corlyn Duncan

_____
Ellen Larson

_____
Rebecca White, f/k/a/ Rebecca Smith

_____
Jared Beard

_____
Jamie Beard

_____
Hanna Albina

_____
Austin Willard

16

**Plaintiffs:**

_____

Bruce Duncan

_____

Corlyn Duncan

_____

Ellen Larson

_____

Rebecca White, f/k/a/ Rebecca Smith

_____

Jared Beard

_____

Jamie Beard

_____

Hanna Albina

_____

Austin Willard

16

**Plaintiffs:**

_____

Bruce Duncan

_____

Corlyn Duncan

_____

Ellen Larson

_____

Rebecca White, f/k/a/ Rebecca Smith

_____

Jared Beard

_____

Jamie Beard

_____

Hanna Albina

_____

Austin Willard

16

# EXHIBIT 1

## AGREEMENT TO SETTLE CLAIMS – DISTRIBUTION PLAN

*Duncan v. OneShare Health, LLC, et. al,*
*No. 2:20-cv-00876-TLN-KJN U.S. District Court, Eastern District of California*

*Albina v. OneShare Health, LLC, et. al,*
*No. 5:20-cv-00496-DCR, U.S. District Court, Eastern District of Kentucky*

*Smith v. OneShare Health, LLC, et. al,*
*1:20-cv02130-RBJ, U.S. District Court, District of Colorado*

*pro rata*

7/3/24, 10:37 AM                                    ALDOI - Current News Item

## ALABAMA DEPARTMENT OF INSURANCE

ABOUT US    CONTACT US    

**Search ALDOI.gov**

[                                    ]   [        ]

# NOT ALL HEATH PLANS ARE THE SAME; KNOW WHAT YOU'RE SIGNING UP FOR

Contact: Jennifer Bowen
(334) 269-3550

7/29/2019

As the cost of healthcare continues to climb, many people are looking for new coverage options. While consumer protection laws govern many types of health coverage, like plans purchased through an employer or through the Health Insurance Marketplace, other types of plans aren't required to protect consumers in the same way. Consumers who use healthcare sharing ministries (HCSMs), discount plans or risk-sharing plans can best protect themselves by understanding the coverage they participate in.

**Healthcare Sharing Ministries**

When talking to neighbors or searching online, you may hear about healthcare sharing ministries. HCSMs are organizations in which the members share the costs of health care. Usually these members have common ethical or religious beliefs. However, before you sign up for an HCSM, there are some things you should know:

- HCSMs do not have to comply with the consumer protections of the federal Affordable Care Act (ACA), like covering treatments for pre-existing conditions or capping your out-of-pocket costs.

- HCSMs are not insurance, and they can't guarantee payment of claims. That means that while they may share funds with members who have health needs, they are not legally required to do so.

- State insurance regulators don't supervise HCSMs.

- HCSMs usually don't have provider networks, so members may be charged full price by doctors and hospitals, rather than the lower negotiated rates charged to consumers who have insurance coverage.

- HCSMs may provide value to some, but they pose a risk to others because they often provide limited benefits.

**How HCSMs Work**

A member will typically contribute a monthly payment to cover the qualifying medical expenses of other members. The HCSM will match paying members who need the healthcare funds or pool all the monthly shares and administer payments to members directly. Some people look to HCSMs because of their typically lower up-front costs compared to ACA plans.

According to one online source, enrollment in HCSMs has increased to nearly one million members as of 2019.

So far, there are 30 states where state law explicitly exempts HCSMs from insurance regulation. The remaining 20 states and Washington, DC don't contain an explicit exemption for HCSMs under state law.

**Discount Plans**

**MORE RESOURCE**

Online Services

Laws, Bulletins, & Regulations

FAQs

Surplus Line Brokers

Employment Opportunities

Health Care Reform

Fraud Unit

State Fire Marshal Office

Strengthen Alabama Homes

**EXHIBIT 1.43**

Ex. 1.43, p. 1 of 2

Resp. Appx, p. 398

You might receive advertisements from plans offering discounts on healthcare for a monthly fee. These are not health insurance plans, and participants do not have the same protections as under licensed health insurance plans. Insurance commissioners strongly recommend that you thoroughly investigate any plan promising deep discounts for a "low" monthly fee and weigh the benefits against the cost carefully.

**Non-Licensed Risk-Sharing Plans**

You may receive offers to join a group or association that will take your monthly payments, put them in a savings account (or trust) with other participants' money, and then help pay some of your healthcare costs, as needed. Such arrangements are not insurance and the participants do not have the protections available to purchasers of licensed insurance plans. State insurance regulators strongly recommend that you thoroughly investigate such plans before joining.

HCSMs, discount plans, and risk-sharing plans are not insurance plans. Before signing, be sure to understand how the program works and what benefits you or your family can count on.



**CONSUMERS**

File a Complaint, Search for Life Insurance Policy, View Long-Term Care Info, etc.

MORE



**PRODUCERS/AGENTS**

Apply, Renew, or Print a License, View CE Transcript, Check Status, Exam Sites, etc.

MORE



**COMPANIES**

Company Search, Filing Requirements, Rate Bu Captives, Clarity Act, etc.

MORE

---

© 2024 Alabama Department of Insurance. | DesignTEMPLATED | Home | E-mail the Webmaster | Public Records | Disclaimer

 

Select Language    ▾

Powered by Google Translate

Case No. 1:24-cv-01386-GPG-STV   Document 46-1   filed 09/03/24   USDC Colorado   pg 404 of 793

7/3/24, 10:53 AM                    12.17.19 Donelon Reminds Consumers that Faith-Based Health Sharing Ministries Are Not Insurance Products



**FOR IMMEDIATE RELEASE**

**December 17, 2019**

# Donelon Reminds Consumers that Faith-Based Health Sharing Ministries Are Not Insurance Products

The Louisiana Department of Insurance (LDI) is clarifying that faith-based health sharing ministries are not recognized insurance products and therefore are not subject to the same regulations as traditional health insurance or oversight by the LDI.

Health care sharing ministries collect monthly payments from members under the agreement that the money will be used when a member has medical bills. However, these programs do not have to follow the same rules as insurers and there is no requirement that they pay claims.

"While some families may feel that the lower-cost membership and the alignment with members religious values works for their lifestyle, I would like to caution that these products are not regulated like insurance and may leave Louisiana families on the hook for expensive medical care and emergencies," said Commissioner Donelon. "Like any financial decision, your personal circumstances will dictate the best choice."

Commissioner Donelon encourages consumers who have problems with traditional coverage to contact the LDI for assistance. Unfortunately, since health care sharing ministries are not an insurance product there is nothing the LDI can do for consumers who feel as if they have not received appropriate benefits.

Under Louisiana law and the Affordable Care Act (Obamacare), health sharing ministries are not required to register or be regulated. There are no exact figures, but some industry groups say close to 1 million Americans get health care coverage through a health care sharing ministry and presently there are health care sharing ministries advertising in Louisiana.

**EXHIBIT**
**1.44**

***About the Louisiana Department of Insurance:*** *The Louisiana Department of Insurance works to improve competition in the state's insurance market while assisting individuals and businesses with the information and resources they need to be informed consumers of insurance. As a regulator, the LDI enforces the laws that provide a fair and stable marketplace and makes certain that insurers comply with the laws in place to protect policyholders. You can contact the LDI by calling 1-800-259-5300 or visiting* *www.ldi.la.gov.*

**BRIAN E. FROSH**
*Attorney General*

**ELIZABETH F. HARRIS**
*Chief  Deputy Attorney General*

**CAROLYN QUATTROCKI**
*Deputy Attorney General*

**WILLIAM D. GRUHN**
*Chief*

**STATE OF MARYLAND**
**OFFICE OF THE ATTORNEY GENERAL**
**CONSUMER PROTECTION DIVISION**

B

B

B

B

B

EXHIBIT
**1.45**

Ex. 1.45, p. 1 of 4

**In the 2018 consent order, the company agreed to "permanently cease the sale, solicitation or operation in Maryland of the Unity Healthshare Ministry plan and any other plan" that did not meet the qualification for a religious exemption.**

**In a June 2019 written affirmation, Aliera Healthcare told the MIA that it had not sold products that would violate Maryland law or the consent order. But in March, an MIA investigator was contacted by an Aliera Healthcare representative, who attempted to sell her a membership in another health ministry product.**

- 
- 
- 

-

An official website of the Commonwealth of Massachusetts   Here's how you know

**Menu**

 **Mass.gov**

| Search Mass.gov | SEARCH |

(/) › Executive Office of Economic Development (/orgs/executive-office-of-economic-development) › Office of Consumer Affairs and Business Regulation (/orgs/of

NEWS

# Division of Insurance Warns Against Unlicensed Health Insurance Plans

6/12/2019                          Division of Insurance

Office of Consumer Affairs and Business Regulation

**BOSTON** — The Baker-Polito Administration's Division of Insurance (Division) is advising consumers that Aliera, a company that markets itself as a health care sharing ministry, may be operating illegally in Massachusetts.

Previously, Aliera acted as a plan administrator to Unity Healthshare, which is a qualified health care sharing ministry. Health care sharing ministry plans allow groups of people with a religious affiliation to share in the costs of members' health care. These plans are exempt from the Division's oversight.

A recent **Georgia court order** (http://ci.criticalimpact.com/user/31553/files/Aliera_Healthcare_v__Anabaptist_Healtshare_Court_Order_April_2019.pdf) found that Aliera, a for-profit company, misrepresented itself to its members and state regulators as a health care sharing ministry and consumers who purchased an Aliera product may have coverage from an unlicensed insurance company.

Unity Healthshare, now known as OneShare Health, was authorized by the court to reach out to Unity members about their options, and consumers who have purchased a Unity/Aliera product should be aware that they may be receiving this communication.

"Massachusetts residents should be clear about what their health insurance does and does not cover," said **Insurance Commissioner Gary Anderson**. "Unlicensed health insurance plans may leave consumers with



EXHIBIT
**1.46**

Ex. 1.46, p. 1 of 4

significant bills for medical services that are not covered."

Health insurance plans purchased from an unlicensed insurance company do not comply with the Affordable Care Act, do not meet Minimum Creditable Coverage requirements and typically do not pay for medical treatment and services. Consumers should also use caution when considering alternatives to traditional health insurance plans, such as discounted health insurance plans or health care sharing ministries, as these plans, while legal, do not offer the same consumer protections as a traditional insurance plan and may not guarantee payments for or discounts on medical services and expenses.

*Before purchasing a health insurance plan, consumers are advised to*:

- Always confirm the company or agent offering the coverage is licensed in Massachusetts.

- Review plan documents carefully and ask questions of your insurance agent to ensure the coverage is right for you or your family. There are many different types of health plans offered in Massachusetts, such as Preferred Provider Plans (PPP), Health Maintenance Organizations (HMO), and Indemnity plans. Before making a choice, be sure to check if a plan has a provider network and whether your current physicians and area hospitals are in it.

- Calculate your healthcare costs from recent years and try to estimate what your costs might be for the coming year. Don't forget to include the cost of doctor visits, daily medication, and any planned procedures. Then make a list of the premiums, out-of-pocket expenses and benefits under each plan. Co-payments, coinsurance, deductibles, and additional charges for wellness care or certain services, such as alternative medicine and cosmetic surgery, are examples of out-of-pocket expenses that you may pay.

- Understand any restrictions or exclusions on pre-existing conditions. In Massachusetts, all health insurance plans must have minimum essential benefits requirements, including preventive care and mental health care.

- Report unlicensed companies to the Division of Insurance.

The Division of Insurance is an agency within the Office of Consumer and Business Regulation. Consumers with questions or concerns about a health insurance plan or company are urged to visit the Division's website at **www.mass.gov/doi** (/orgs/division-of-insurance) or to contact the Division's Consumer Services Section at (617) 521-7794 or (877) 563-4467 (Toll Free).

The Office of Consumer Affairs and Business Regulation (OCABR) oversees five regulatory agencies: Division of Banks, Division of Insurance, Division of Professional Licensure, Division of Standards, and the Department of Telecommunications and Cable. OCABR also oversees the state's Lemon Laws and Lemon Law Arbitration, Data Breach reporting, Home Improvement Contractor Programs, and the state's Do Not Call Registry. Learn more about OCABR at **mass.gov/consumer** (/orgs/office-of-consumer-affairs-and-business-regulation).



## Division of Insurance

The primary mission of the Division of Insurance is to monitor the solvency of its licensees in order to promote a healthy, responsive and willing marketplace for consumers who purchase insurance products. Protection of consumer interests is of prime importance to the Division and is safeguarded by providing accurate and unbiased information so consumers may make informed decisions and by intervening on behalf of consumers who believe they have been victimized by unfair business practices.

---



## Office of Consumer Affairs and Business Regulation

The Office of Consumer Affairs and Business Regulation protects and empowers consumers through advocacy and education, and ensures a fair playing field for the Massachusetts businesses its agencies regulate.

Division of Insurance Warns Against Unlicensed Health Insurance Plans | Mass.gov

  (/)

**All Topics** (/topics/massachusetts-topics)

**Site Policies** (/massgov-site-policies)

**Public Records Requests** (/topics/public-records-requests)

© 2024 Commonwealth of Massachusetts.

Mass.gov® is a registered service mark of the Commonwealth of Massachusetts. **Mass.gov Privacy Policy** (/privacypolicy)



# Health Care Sharing Ministries
## Information You Should Know

The Nebraska Department of Insurance reminds the public that Health Care Sharing Ministries are **not** considered health insurance pursuant to Nebraska law.   Under Nebraska law, specifically <u>Neb. Rev. Stat.</u> § 44-311, the ministry is required to provide a disclaimer to the consumer that states the following:

**IMPORTANT NOTICE. This organization is not an insurance company, and its product should never be considered insurance. If you join this organization instead of purchasing health insurance, you will be considered uninsured. By the terms of this agreement, whether anyone chooses to assist you with your medical bills as a participant of this organization will be totally voluntary, and neither the organization nor any participant can be compelled by law to contribute toward your medical bills. Regardless of whether you receive payment for medical expenses or whether this organization continues to operate, you are always personally responsible for the payment of your own medical bills. This organization is not regulated by the Nebraska Department of Insurance. You should review this organization's guidelines carefully to be sure you understand any limitations that may affect your personal medical and financial needs.**

The Department has become aware of several health care providers being presented a card from consumers purporting to provide a discount for services they provide that comes from a healthcare sharing ministry.  Often, the provider does not have a contract with the healthcare sharing ministry and the consumer is subject to payment of the bill at a rate provided to them by the medical provider.  In some instances, the cost of the services provided have been significant.

As a reminder, when a consumer utilizes a health care sharing ministry, they should be aware that:

- It is not insurance.
- If this is the only product you have for coverage of your medical expenses, you are considered uninsured.
- You may be subject to pre-existing condition restrictions and to the religious tenets of the ministry which may potentially disqualify you for claim repayment.
- The Insurance Department cannot assist you with any complaints about the ministry.
- Your medical provider is not obligated to accept any discount from the ministry if there is no contract between the ministry and the provider.

The disclosure required under the law has important consequences.  By the terms of the contract itself, any payment from the organization and its members is completely voluntary.

**More Information**
Any questions may be directed to Martin Swanson, Administrator for Health Policy at 402-471-4648 or **martin.swanson@nebraska.gov** or Laura Arp, Administrator for the Life and Health Division at 402-471-4635 or **laura.arp@nebraska.gov**.  Additional insurance-related information can also be found on the Department's website at **www.doi.nebraska.gov**.

**EXHIBIT 1.47**

OUT18331—11/18

Ex. 1.47, p. 1 of 1



State of Rhode Island
**Department of Business Regulation**

**FOR IMMEDIATE RELEASE**
Media Contact: Cory King
(401) 462-9658
cory.king@ohic.ri.gov

### OHIC and DBR Warn of the Risks of Health Care Sharing Ministries

**CRANSTON, R.I. (August 13, 2019) –**
                    B                                    B




                    B

Protecting Consumers • Ensuring Solvency • Engaging Providers • Improving the System

www.ohic.ri.gov
1511 Pontiac Avenue • Building #69, First Floor • Cranston, RI 02920
401.462.9517 • 401.462.9645 fax • TTY: 711

EXHIBIT
**1.48**
Ex. 1.48, p. 1 of 2

Resp. Appx. p. 411

B

_____  B

 

## Department of Financial Regulation and Attorney General Donovan Caution Public about Healthcare Sharing Arrangements

**Press Release**
**For Immediate Release:** October 24, 2019
**Contact:**     Stephanie Brackin, Information Management Officer 802-828-4872, stephanie.brackin@vermont.gov

*Montpelier, VT* – Several weeks ago the Department of Financial Regulation (DFR) issued a cease and desist order against four entities and one individual alleged to be deceptively marketing and soliciting unlicensed health insurance to Vermonters under the guise of a "healthcare sharing arrangement." With open enrollment starting on November 1 and running through December 15, Vermont State officials want to encourage the public to be wary of unlicensed health insurance products that promise considerably lower costs.

"I want to thank Commissioner Pieciak and his team at the Department for their quick response, which has no doubt protected Vermonters from these predatory and illegal practices," said Governor Phil Scott. "While the cost of health care is a huge concern, there is no value to the consumer in these illegal arrangements and could only make the challenge of health care coverage worse if the entity or individual is not required to cover any potential costs," Governor Scott said.
Vermont Attorney General T.J. Donovan applauded the department's action. "We work every day to protect Vermonters from unfair or deceptive practices," he said. "We're proud to partner with the Department of Financial Regulation to make sure all Vermonters are treated fairly, especially when it comes to ensuring access to quality, affordable healthcare."

The Governor, the Commissioner and the Attorney General want to take this opportunity to caution the public about widespread deceptive practices and unlicensed activity in this area. DFR, on behalf of the Governor, and the Attorney General's Office will continue to monitor these practices and alert Vermonters to unfair or deceptive practices in the healthcare insurance marketplace.

Healthcare sharing arrangements are typically marketed to closely resemble comprehensive health insurance plans, like those found on Vermont Health Connect and through licensed insurers, replete with provider networks and "gold," "silver," and "bronze" plan tiers. They frequently describe themselves as an alternative to health insurance but use different terms for insurance concepts (for example, "share" instead of "premium," "need" instead of "claim") and often structure their

**EXHIBIT 1.49**

Ex. 1.49, p. 1 of 2

advertising to lead consumers to believe that consumer "needs" (i.e. healthcare claims) will be paid and that their products are a viable alternative for "traditional health insurance" that will reduce consumers' financial risk.

These arrangements, however, *do not guarantee payment of claims*—meaning that while they *may* share funds with members who have health needs, they are not legally obligated to do so. Their advertising materials may obscure the fact that there is no guarantee that consumers will actually be paid for any healthcare costs.

"Vermonters should be wary of so-called 'plans' that seem too good to be true with low costs, but no guarantees," said Attorney General T.J. Donovan. "All Vermonters should get great care at an affordable price when they can – but there is nothing 'affordable' about finding out that the plan you bought just stuck you with the bill."

"These products claim to save Vermonters money and reduce their risks related to healthcare expenses, but they actually present serious risks," said Commissioner Pieciak. "The department and the Attorney General will continue to take a very serious look at these products, their marketing, and the entities that sell them. I encourage Vermonters to reach out to us, the Department of Vermont Health Access, or the Vermont Attorney General if approached by anyone selling similar products."

Under Vermont law, licensed insurance agents and brokers are prohibited from soliciting or enrolling Vermonters into healthcare sharing arrangements. If you are aware of any healthcare sharing arrangements using deceptive advertising materials or engaging in the business of insurance in Vermont, or have purchased any products from such an entity or from an insurance agent, please report it immediately to the Department of Financial Regulation Consumer Services Section at 802-828-3302 or dfr.insuranceinfo@vermont.gov, or contact the Consumer Assistance Program at 800-649-2424 or ago.cap@vermont.gov.

If you are buying health insurance, the Commissioner and the Attorney General recommend that you do so through Vermont Health Connect or a licensed health insurer such as Blue Cross Blue Shield of Vermont, MVP Health Care, or Cigna. You may be eligible for federal and state subsidies that will cover a portion of your premium expenses.

If you are struggling to find or afford health care coverage, you can use the Department of Vermont Health Access's plan comparison tool.

Connect with the Vermont Department of Financial Regulation on Twitter, Facebook, and our website and the Attorney General's Office on Twitter, Facebook, Instagram, and its website.

###



*West Virginia Offices of the Insurance Commissioner*

## Consumer Alert

### Not All Health Plans are the Same, Know What You're Signing up For

As the cost of health care continues to climb, many people are looking for new coverage options. While consumer protection laws govern many types of health coverage, like plans purchased through an employer or through the Health Insurance Marketplace, other types of plans aren't required to protect consumers in the same way. Consumers who use health care sharing ministries (HCSMs), discount plans, or risk-sharing plans can best protect themselves by understanding the coverage they participate in.

**Health Care Sharing Ministries**

When talking to neighbors or searching online, you may hear about HCSMs. HCSMs are organizations in which the members share the costs of health care. Usually these members have common ethical or religious beliefs. However, before you sign up for an HCSM, there are some things you should know:

- 
- 
- 
- 
- 

**EXHIBIT**
**1.50**

How HCSMs Work

A member will typically contribute a monthly payment to cover the qualifying medical expenses of other members. The HCSM will match paying members who need the health care funds or pool all the monthly shares and administer payments to members directly. Some people look to HCSMs because of their typically lower up-front costs compared to ACA plans.

According to one online source, enrollment in HCSMs has increased to nearly one million members as of 2019.

So far, there are 30 states where state law explicitly exempts HCSMs from insurance regulation. The remaining 20 states and Washington, DC don't contain an explicit exemption for HCSMs under state law.

**Discount Plans**

You might receive advertisements from plans offering discounts on health care for a monthly fee. These are not health insurance plans, and participants do not have the same protections as under licensed health insurance plans. Insurance commissioners strongly recommend that you thoroughly investigate any plan promising deep discounts for a "low" monthly fee and weigh the benefits against the cost carefully.

**Non-Licensed Risk-Sharing Plans**

You may receive offers to join a group or association that will take your monthly payments, put them in a savings account (or trust) with other participants' money, and then help pay some of your health care costs, as needed. Such arrangements are not insurance and the participants do not have the protections available to purchasers of licensed insurance plans. State insurance regulators strongly recommend that you thoroughly investigate such plans before joining.

HCSMs, discount plans, and risk-sharing plans are not insurance plans! Before signing, be sure to understand how the program works and what benefits you or your family can count on.

**More Information**

For more information about any type of insurance, or are concerns about a call you have received, please call the West Virginia Offices of the Insurance Commissioner Consumer Services Division at 1-888-879-9842, or visit our webpage at www.wvinsurance.gov .

Select Language



# Consumer Advisory: Division of Insurance Cautions Coloradans on the Limitations of Health Care Sharing Programs

Friday, December 11, 2020

## These programs can leave you stuck with huge medical bills.

As open enrollment for individual plans (meaning not from an employer) continues, the Colorado Division of Insurance (DOI), part of the Department of Regulatory Agencies (DORA), is again alerting consumers about the risks of Health Care Sharing Programs or Ministries.

On the surface, such programs may look like complete, Affordable Care Act (ACA) insurance. Low monthly payments, which the programs may refer to as "premiums," may entice people to join, thinking they're getting full health insurance coverage at a bargain. Such programs may even mimic the look and feel of ACA-compliant health insurance, using terms like "bronze, silver and gold tiers." But these sharing programs or ministries often do not offer the same comprehensive benefits as ACA plans, and do not meet the ACA consumer protection standards.

Problems occur when members get medical care and then these programs don't pay, leaving the member with the doctor and hospital bills. The member is surprised as they thought they had full insurance coverage, but come to find out all that these programs don't cover.

If you are enrolled in one of these programs and are now having problems - like not getting your claims paid - please contact the DOI's Consumer Services Team to see if we can provide assistance: 303-894-7490 / 800-930-3745 / DORA_insurance@state.co.us (mailto:DORA_insurance@state.co.us) / doi.colorado.gov.

The DOI urges Colorado consumers to be aware of the following before signing up for a health care sharing program or ministry.

- These programs typically have restrictions or exclusions on pre-existing conditions, leaving the member responsible for the health care costs for those conditions.
- Members may also be subject to religious or moral restrictions from the sharing ministry, which may leave members responsible for the full costs of health care that results from an activity the ministry does not agree with.

EXHIBIT
**1.51**

Ex. 1.51, p. 1 of 2

- Often such programs do not provide mental health coverage or substance use disorder treatment.
- All of which means that health care sharing programs or ministries DO NOT comply with the Affordable Care Act (ACA) coverage requirements, even if their materials imply they do. If you come across any advertising or statements by a sharing program or ministry stating that it is ACA-compliant (or similar language), **please report this to the DOI's Consumer Services team at** 303-894-7490 (tel:13038947490) / 800-930-3745 (tel:18009303745) (outside of the Denver metro area) / DORA_insurance@state.co.us (mailto:DORA_insurance@state.co.us).

"I'm worried that many people will only find out about what these programs don't cover when it's too late - when they're already at the hospital or when they get a large bill in the mail," said Colorado Insurance Commissioner Michael Conway. "Up front, these programs look like they can save you money, but the costs to a consumer on the back end will not only be surprising, but also a serious financial blow. People need to understand the limitations of these products, especially in the midst of pandemic."

**Open enrollment for full, ACA-compliant individual plans continues here in Colorado until Jan. 15, 2021, although to have coverage in place by Jan. 1, you need to be enrolled by Dec. 15.** While health care sharing programs or ministries may look attractive, they very often are a case of "too good to be true," as they can ultimately leave you with health care bills that will negate any savings you expect. The DOI encourages Coloradans to shop for individual plans through Connect for Health Colorado      . There, people can find help through insurance brokers, assisters or Connect's online resources in selecting a plan that can best meet their needs.

If someone is trying to sell you a health care sharing program or ministry by telling you that "it is just as good as an ACA plan" or "it complies with the ACA," contact the DOI Consumer Services Team to let us know about these misleading marketing practices. Please also contact us if you are currently enrolled in one of these programs and are struggling to have your claims paid. If you're unsure of what kind of coverage you currently have, whether it is a traditional health insurance, a health care sharing ministry, or something else, you can contact us to find out what questions to ask.

Contact the DOI's dedicated Consumer Services Team:

- 303-894-7490 (tel:13038947490)
- 800-930-3745 (tel:18009303745) (outside of the Denver metro area)
- DORA_insurance@state.co.us (mailto:DORA_insurance@state.co.us)
- Or visit our website - doi.colorado.gov (/home) - and look for our "For Consumers" information.

###

**About the Division of Insurance:**

The Colorado Division of Insurance (DOI) (/home), part of the Department of Regulatory Agencies (DORA), regulates the insurance industry and assists consumers and other stakeholders with insurance issues. Visit doi.colorado.gov (/home) for more information or call 303-894-7499 (tel:13038947499) / toll free 800-930-3745 (tel:18009303745).

**About DORA:**

DORA is dedicated to preserving the integrity of the marketplace and is committed to promoting a fair and competitive business environment in Colorado. Consumer protection is our mission. Visit dora.colorado.gov (https://dora.colorado.gov/) for more information or call 303-894-7855 (tel:13038947855) / toll free 800-886-7675 (tel:18008867675).

Related Tags:
- health care sharing ministries (/category/health-care-sharing-ministries) • health care sharing programs (/category/health-care-sharing-programs) • ACA (/category/aca) • Affordable Care Act (/category/affordable-care-act) • Connect for Health Colorado (/category/connect-for-health-colorado) • open enrollment (/category/open-enrollment) • consumer advisory (/category/consumer-advisory) • health insurance (/category/health-insurance)

# Recent

## Landmark Reinsurance Program to Save Coloradans $477 Million on Premiums in 2025 (/news-releases-consumer-advisories/landmark-reinsurance-program-to-save-coloradans-477-million-on)

July 17, 2024 - Bipartisan Reinsurance program effort continues to save consumers millions in 2025. Colorado Option plans will again have lower premiums than non-option plans.



**Department of Commerce, Community, and Economic Development**

P.O. Box 110805
Juneau, AK 99811-0805
Main: 907.465.2515
Fax: 907.465.3422

**BULLETIN 19-13**

**TO:   ALL INSURANCE LICENSEES AND THIRD-PARTY ADMINISTRATORS**

**RE:   LIABILITY FOR ASSISTING IN THE TRANSACTION OF UNAUTHORIZED INSURANCE**



**EXHIBIT 1.52**

Ex. 1.52, p. 1 of 3

- 
- 

- 
- 
    - 

    - 
    - 
    - 
    - 
    - 
    - 
    - 

    - 

- 

- 
- 
- B
- 

- 

-

Ex. 1.52, p. 3 of 3



# Commissioner's Bulletin # B-0007-19

August 12, 2019

**To:   Insurance agents and third-party administrators**

**Re:   Strict liability for assisting in the practice of unauthorized insurance**

The Texas Department of Insurance reminds all insurance agents and third-party administrators (TPAs) that their licenses may be at risk and that they may be held responsible for assisting a company engaging in the unauthorized business of insurance under Insurance Code Chapter 101.

New types of health insurance or insurance like products are being marketed to Texas consumers by unlicensed and unauthorized companies. While some health plans, including self-funded health plans under ERISA and legitimate health care sharing ministries, are exempt from state regulation and do not need a license or authorization from TDI, others are not. Specifically, companies may claim to be a health care sharing ministry or other innovative business without complying with the requirements of the claimed exemption. TDI advises agents and TPAs to carefully evaluate all new products and companies. You may check the National Association of Insurance Commissioners website to verify a company's license. If you have questions about a company or product, call TDI at 512-676-6500.

A person who in any manner assists directly or indirectly in the procurement of the unauthorized insurance contract could be held strictly liable to the insured for the full amount of a claim or loss under the terms of the contract if the unauthorized insurer fails to pay the claim or loss.

Further, if a company is engaged in unauthorized insurance, TDI may bring an action against an agent or TPA who assists the company whether the agent or TPA knew the product was unauthorized or not. A person violating Chapter 101 may be subject to civil penalties of up to $10,000 for each act of violation and for each day of violation. TDI may also revoke or suspend the agent or TPA's license for engaging in the unauthorized business of insurance.

Acts for which TDI may bring an action against an agent or TPA under Chapter 101 include:

- Taking or receiving an application for the unauthorized insurance product;
- Receiving or collecting any consideration for the product, including premiums, commissions, membership fees, assessments, or dues;
- Issuing or delivering a contract for the product;
- Directly or indirectly acting as an agent for or otherwise representing or assisting in:
    - Soliciting, negotiating, procuring, or effectuating the product or renewal of the product;
    - Disseminating information relating to the product's coverage or rates;
    - Forwarding an application for the product;
    - Delivering the product policy or contract;



- Inspecting a risk;

- Setting a rate;

- Investigating or adjusting a claim or loss;

- Transacting a matter after the effectuation of the product that arises out of the product; or

- Representing or assisting the company in any other matter relating to the product; or

- Contracting to provide indemnification or expense reimbursement for medical expenses by direct payment, reimbursement, or otherwise.

Agents and TPAs should exercise due diligence before offering products from companies who are not licensed by TDI or who are claiming to be exempt from licensing requirements. The products may have one or more of the following features:

- Commissions significantly higher than similar licensed products;

- Declarations that the product is not insurance;

- Risk-bearing, risk-shifting, or risk-pooling;

- Offers of unlimited, free, or low-cost medical services included with a flat monthly fee, such as telemedicine or preventative care;

- Offers a network of providers similar to preferred provider organizations or health maintenance organizations; or

- Products that function, look, and sound like traditional health insurance.

If you believe a company may be engaged in the unauthorized business of insurance, please notify TDI at 800-252-3439 or EnforcementInfo@tdi.texas.gov.

For more information, contact: ChiefClerk@tdi.texas.gov

Last updated: 1/20/2021

TYLER P. McKINNEY (SBN 263717)
EUGENE KALINSKY (SBN 256751)
CALIFORNIA DEPARTMENT OF INSURANCE
 300 Capitol Mall, Suite 1700
 Sacramento, CA 95814
 (916) 492-3497
 kalinskye@insurance.ca.gov
*Attorneys for the California Department of Insurance*

BEFORE THE INSURANCE COMMISSIONER

OF THE STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of | File No. SC202200130 |
| | **ORDER TO CEASE AND DESIST and NOTICE OF RIGHT TO HEARING** |
| HOUSE OF PRAYER AND LIFE, INCORPORATED dba JERICHO SHARE, | (Insurance Code § 12921.8) |
| Respondent. | |

The California Department of Insurance alleges that:

## JURISDICTION

1.     California Insurance Code § 12921.8(a) authorizes the Insurance Commissioner to issue a Cease and Desist Order to a person who has acted in a capacity for which a license, registration, or Certificate of Authority from the Insurance Commissioner was required but not possessed.[1]

---

[1] See Exhibit 1.

#1437509.1

1

EXHIBIT

**1.54**

Ex. 1.54, p. 1 of 8

2.      Insurance Code § 22 provides that insurance is a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from a contingent or unknown event.

3.      Insurance Code § 700 provides as follows:

a) A person shall not transact any class of insurance business in this state without first being admitted for that class. Except for the State Compensation Insurance Fund as authorized by Sections 11770 and 11778 to 11780.5, inclusive, admission is secured by procuring a certificate of authority from the commissioner. The certificate shall not be granted until the applicant conforms to the requirements of this code and of the laws of this state prerequisite to its issue.

b) The unlawful transaction of insurance business in this state in willful violation of the requirement for a certificate of authority is a public offense punishable by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code, or in a county jail not exceeding one year, or by fine not exceeding one hundred thousand dollars ($100,000), or by both that fine and imprisonment, and shall be enjoined by a court of competent jurisdiction on petition of the commissioner.

4.      Insurance Code § 740(a) provides:

Notwithstanding any other provision of law, and except as provided herein, any person or other entity that provides coverage in this state for medical, surgical, chiropractic, physical therapy, speech pathology, audiology, professional mental health, dental, hospital, or optometric expenses, whether the coverage is by direct payment, reimbursement, or otherwise, shall be presumed to be subject to the jurisdiction of the department unless the person or other entity shows that while providing the services it is subject to the jurisdiction of another agency of this or another state or the federal government.

1
                              **PARTIES AND FINDINGS**

2
      5.      Respondent House of Prayer and Life, Incorporated began operating in

3
1968 in Texas. It currently functions as a nonprofit entity. In approximately October 2021,

4
House of Prayer and Life began using the Jericho Share alias to act as a health care

5
sharing ministry ("HCSM").[2]

6

7
      6.      Federal law defines an HCSM as follows:

8
     • A nonprofit that is exempt from taxation;

9

10
     • Members share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs and without regard to the State in which a member resides or is employed;

11

12
     • Members retain membership even after they develop a medical condition;

13
     • Which (or a predecessor of which) has been in existence at all times since December 31, 1999, and medical expenses of its members have been shared continuously and without interruption since at least December 31, 1999; and

14

15

16
     • Which conducts an annual audit which is performed by an independent certified public accounting firm in accordance with generally accepted accounting principles and which is made available to the public upon request.[3]

17

18

19
California Government Code § 100705(c)(2) incorporates the federal definition of an

20
HCSM. Notably, these definitions only apply in the context that membership in an HCSM

21
provides an exemption from applicable health insurance mandates.

22

23

24

25

26

---

27
[2] House of Prayer and Life's website makes reference to its pastor reopening the entity in October 2021, indicating that it may have been dormant for some time before then.

28
[3] 26 U.S.C. § 5000A(d)(2)(B)(ii)

7.     Jericho Share markets its products as alternatives to traditional health insurance to California consumers. Those products have many of the attributes of traditional health insurance products subject to Department jurisdiction, regulation, and authority.

8.     Jericho Share collects fixed monthly payments from its members, payments which vary according to the level of coverage, and conducts underwriting to screen for pre-existing conditions. Additionally, Jericho Share has a schedule of covered and excluded services such as those referenced in Insurance Code § 740, a schedule of copayments and deductibles, a claims adjudication process, and annual and lifetime limits.

9.     In exchange for the fixed monthly payments, Jericho Share undertakes to indemnify its members for loss, damage, or liability arising from costs incurred in connection with health events, as encompassed in the definition of insurance in Insurance Code § 22.

10.     The Department interviewed several California residents who became Jericho Share members in 2021 and 2022. They experienced problems with coverage for medical issues and canceling their membership.

11.     Jericho Share is not currently licensed or authorized by the Insurance Commissioner to act in any capacity regarding the transaction of insurance in California, and during relevant periods herein, did not hold any license, Certificate of Authority, or permit, issued by the Insurance Commissioner, to act in any capacity regarding the transaction of insurance in California.

12.     Jericho Share does not qualify as an HCSM under state or federal law as it has not been in existence at all times since December 31, 1999, and medical expenses of its members have not been shared continuously and without interruption since at least December 31, 1999. Members of Jericho Share may be subject to penalties under the state health insurance mandate.

**ORDER TO CEASE AND DESIST**

13.     Respondent is hereby ORDERED to immediately CEASE AND DESIST the solicitation, marketing, sale, and issuance of any contracts, policies, certificates of insurance, or health care sharing membership plans in California.

14.     RESPONDENT IS FURTHER ORDERED TO immediately cease and desist from the following:

a.     Transacting insurance or health care sharing membership plans in the State of California in any capacity, including but not limited to insurer, insurance agent, broker, solicitor, or HCSM.

b.     Advertising or acting as an insurer, insurance agent, broker, solicitor, or HCSM in the State of California.

c.     Advertising or acting as an insurer, insurance agent, broker, solicitor, or HCSM exempt from regulation in the State of California.

d.     Advertising, or participating in advertising, by newspaper, telephone book or listing, mail, handout, business card, or by any other written or printed presentation, or by telephone, radio, television, internet, public outcry or proclamation, or in any other manner or means whatsoever, whether personally or through others, that implies that they are licensed or are engaged in the business of soliciting, negotiating, executing, delivering, or

1    furnishing insurance or health care sharing in the State of California in any

2    manner.

3      e.      Receiving any money, commission, fee, rebate, payment, remuneration, or

4              any other valuable consideration whatsoever, in connection with any

5              insurance or health care sharing transactions.

6

7                          **NOTICE OF RIGHT TO HEARING**

8      15.      Insurance Code § 12921.8(c), a copy of which is attached to this Order,

9    provides in part, as follows:

10

11          "A person to whom a cease and desist order…has been issued,
            may, within <u>seven days</u> after service of the order…request a
12          hearing by filing a request for the hearing with the commissioner."

13

14          If you desire a hearing in this matter, your written request for a hearing must be

     received within seven days after you are served with this Order. The seven-day period
15
     begins on the day after you are served with this Order, and if the seventh day falls on a
16
     weekend or holiday, the deadline is extended to the next business day. Your written
17
     request for a hearing must be directed to Eugene Kalinsky, attorney for the California
18
     Department of Insurance, at the physical or email address at the top of the first page of
19
     this Order.
20

21
          IN WITNESS THEREOF, I have set my hand and affixed my official seal on
22
     March 18, 2024.
23

24                                          RICARDO LARA
                                            Insurance Commissioner
25                                                            Digitally signed by
                                                              Tyler McKinney
26                                        Date: 2024.03.18
                                                              08:55:25 -07'00'
27                                          By _____
                                                 TYLER P. McKINNEY
28                                               Assistant Chief Counsel

#1437509.1                        6

EXHIBIT 1

California Insurance Code 12921.8

(a) The commissioner may do the following:

    (1) Issue a cease and desist order to a person who has acted in a capacity for which a license, registration, or certificate of authority from the commissioner was required but not possessed.

    (2) Issue a cease and desist order to a person who has aided or abetted a person described in paragraph (1).

    (3) Impose a monetary penalty, pursuant to an order to show cause, on a person described in paragraph (1) or (2). The monetary penalty shall be the greater of the following:

        (A) Five times the amount of money received by the person for acting in the capacity for which the license, registration, or certificate of authority was required but not possessed.

        (B) Five thousand dollars ($5,000) for each day the person acted in the capacity for which the license, registration, or certificate of authority was required but not possessed. In the absence of contrary evidence, it shall be presumed that a person continuously acted in a capacity for which a license, registration, or certificate of authority was required on each day from the date of the earliest such act until the date those acts were discontinued, as proven by the person at a hearing.

(b) Notwithstanding paragraph (3) of subdivision (a), the commissioner shall not impose a monetary penalty under this section on a person who has held a license or registration within the prior five years pursuant to Chapter 5 (commencing with Section 1621), Chapter 6 (commencing with Section 1760), Chapter 7 (commencing with Section 1800), or Chapter 8 (commencing with Section 1831) of Part 2 of Division 1.

(c) A person to whom a cease and desist order or order to show cause has been issued, may, within seven days after service of the order, if a hearing has not already been scheduled by the commissioner, request a hearing by filing a request for the hearing with the commissioner. The hearing shall be conducted in accordance with the Administrative Procedure Act (Chapter 3.5 (commencing with Section 11340), Chapter 4 (commencing with Section 11370), Chapter 4.5 (commencing with Section 11400), and Chapter 5 (commencing with Section 11500) of Part 1 of Division 3 of Title 2 of the Government Code), and the commissioner shall have all the powers granted therein.

(d) A person who has a hearing pursuant to subdivision (c) shall be entitled to have the proceedings and the order of the commissioner reviewed by means of any remedy provided by the Administrative Procedure Act (Chapter 3.5 (commencing with Section 11340), Chapter 4 (commencing with Section 11370), Chapter 4.5 (commencing with Section 11400), and Chapter 5 (commencing with Section 11500) of Part 1 of Division 3 of Title 2 of the Government Code).



**PRESS RELEASE**

# Founder of Medical Charity in St. Joseph Pleads Guilty to $8 Million Fraud Scheme

Tuesday, November 14, 2023

**For Immediate Release**

U.S. Attorney's Office, Western District of Missouri

### 'Christian Health Care Sharing Ministry' Defrauded Hundreds of Members

KANSAS CITY, Mo. – The founder of a so-called Christian health care sharing ministry in St. Joseph, Mo., pleaded guilty in federal court today to leading an $8 million wire fraud conspiracy that cheated hundreds of members, and to making false statements on a personal tax return.

Craig Anthony Reynolds, 61, of St. Joseph, waived his right to a grand jury and pleaded guilty before U.S. District Judge Greg Kays to a federal information that charges him with one count of conspiracy to commit wire fraud and one count of making false statements on a tax return.

Reynolds incorporated and ran Medical Cost Sharing, a tax-exempt organization, as its president and chief executive officer from 2014 through December 2022.

By pleading guilty today, Reynolds admitted that he and his co-conspirators used false and fraudulent promises to market Medical Cost Sharing as a "Health Care Sharing Ministry" to defraud hundreds of "ministry members." Reynolds and his co-conspirators collected more than $8 million in member "contributions," yet paid only 3.1 percent in health care claims so that they could personally profit and take most of the members' contributions for themselves.

**EXHIBIT 1.55**   Ex. 1.55, p. 1 of 5

The co-conspirators included an executive vice president and chairman of Medical Cost Sharing, who ran the organization with Reynolds. This co-conspirator, identified in court documents as "CC1," has not been charged.

Reynolds marketed Medical Cost Sharing as a "Christian Health Care Sharing Ministry" through insurance brokers, radio stations, social media, and its website. Medical Cost Sharing sales materials promoted its 501(c)(3) tax-exempt designation, advertising that it was different from for profit health insurance. The Medical Cost Sharing website claimed, "while we are not an insurance company, many think of us as a Christian Health Insurance, or Christian Medical Insurance because, like conventional insurance plans, we help you pay your healthcare costs. We help you protect your family. But unlike these corporate, profit based plans, we are a healthcare sharing ministry … your healthcare costs are shared with other Christians enrolled in our medical sharing plans."

Medical Cost Sharing promised its member that if they paid monthly "contributions," Medical Cost Sharing would pay claims after the members' "personal responsibility" (deductible) was met.

In reality, Reynolds admitted today, Medical Cost Sharing rarely paid members' health care claims. Sometimes Medical Cost Sharing would pay a part of a claim if the member filed a complaint with their state attorney general and/or hired an attorney to represent them against Medical Cost Sharing.

Non-profit organizations file IRS Forms 990, which are accessible to the public. Medical Cost Sharing filed false Forms 990 for tax years 2016 through 2019 that understated Reynolds's and CC1's compensation. Medical Cost Sharing filed no tax returns for tax years 2020–2022.

According to today's plea agreement, Medical Cost Sharing collected more than $8,035,544 in member contributions from 2015 through 2022. During that time, Medical Cost Sharing paid no more than $245,982 in claims, which constitutes only 3.1 percent of the member contributions collected. The $245,982 includes payments to members who filed complaints with their state attorney general and/or hired legal counsel to represent them against Medical Cost Sharing.

Medical Cost Sharing paid no claims at all from Feb. 22, 2021, through December 2022, although it collected a total of nearly $1.2 million in dues in 2021 and 2022.

Reynolds admitted that he and CC1 pocketed at least $5,168,268 from the member contributions from December 2015 through December 2022. Reynolds and CC1 took at least 64 percent of total member contributions for their personal profit.

On Dec. 13, 2022, federal agents served search warrants on the Medical Cost Sharing business location and Reynolds's residence and seized property generated from Medical Cost Sharing proceeds. Medical Cost Sharing continued to try to collect membership dues after the search

Case No. 1:24-cv-01386-GPG-STV   Document 46-1   filed 09/03/24   USDC Colorado   pg 438 of 793

7/26/24, 1:59 PM          Western District of Missouri | Founder of Medical Charity in St. Joseph Pleads Guilty to $8 Million Fraud Scheme | United States De…

and seizure warrants. On Dec. 27, 2022, the court entered a temporary restraining order that prohibited Medical Cost Sharing, Reynolds, and CC1 from continuing to perpetrate a fraudulent scheme and from processing Medical Cost Sharing member payments, among other actions.

In addition to the wire fraud conspiracy, Reynolds also pleaded guilty to making false statements on a personal tax return. Reynolds admitted that he filed a return that claimed he had no taxable income in 2019. Reynolds actually received at least $354,292 in taxable income in 2019.

Under the terms of today's plea agreement, Reynolds must forfeit his gain from Medical Cost Sharing as well as any property obtained from his criminal activity, including two residences in St. Joseph, the contents of his bank account, and a 2022 Harley Davidson motorcycle. He must also pay $167,799 in restitution to the government.

Under federal statutes, Reynolds is subject to a sentence of up to 23 years in federal prison without parole. The maximum statutory sentence is prescribed by Congress and is provided here for informational purposes, as the sentencing of the defendant will be determined by the court based on the advisory sentencing guidelines and other statutory factors. A sentencing hearing will be scheduled after the completion of a presentence investigation by the United States Probation Office.

This case is being prosecuted by Assistant U.S. Attorneys Kathleen D. Mahoney, Patrick Daly, and John Constance. It was investigated by the FBI and IRS-Criminal Investigation.

### FBI Website for Victims of Medical Cost Sharing Fraud

Those who believe they are victims of this fraud and wish to receive restitution for any losses suffered as a result may provide their information through the MCS Victim Information Page that has been established by the FBI.

https://www.fbi.gov/how-we-can-help-you/victim-services/seeking-victim-information/mcs-victim-information-page

*Updated November 14, 2023*

**Topics**

| **FINANCIAL FRAUD** | **TAX** |

https://www.justice.gov/usao-wdmo/pr/founder-medical-charity-st-joseph-pleads-guilty-8-million-fraud-scheme          3/5

Resp. Appx, p. 434          Ex. 1.55, p. 3 of 5

**Component**

[USAO - Missouri, Western](#)

# Related Content

---

PRESS RELEASE

### Former Bank Employee Pleads Guilty to $2.4 Million Embezzlement Scheme

A Higbee, Mo., woman pleaded guilty in federal court today to stealing nearly $2.4 million from customers' accounts at Exchange Bank of Missouri in Fayette, Mo., during a 15-year-long fraud...

July 25, 2024

---

PRESS RELEASE

### Joplin Man, Woman Plead Guilty to Bank Fraud Conspiracy

A Joplin, Mo., man and woman have pleaded guilty to stealing mail from Joplin residents as part of a conspiracy to commit bank and wire fraud.

July 24, 2024

---

PRESS RELEASE

### Co-founder of Medical Charity in St. Joseph Sentenced to 17 Years in Prison for $8 Million Fraud Scheme

Case No. 1:24-cv-01386-GPG-STV    Document 46-1    filed 09/03/24    USDC Colorado    pg 440 of 793

7/26/24, 1:59 PM                 Western District of Missouri | Founder of Medical Charity in St. Joseph Pleads Guilty to $8 Million Fraud Scheme | United States De…

The co-founder of a so-called Christian health care sharing ministry in St. Joseph, Mo., was sentenced in federal court today for his role in an $8 million wire fraud conspiracy...

June 26, 2024

✉ **Western District of Missouri**

**U.S. Attorney's Office**

**Room 5510**

**400 East 9th Street**

**Kansas City, MO 64106**

**Email USAO-WDMO**

📞  **Telephone: (816) 426-3122**

**Fax Line: (816) 426-4210**

STATE OF NORTH DAKOTA

COUNTY OF BURLEIGH

STATE OF NORTH DAKOTA EX REL.
DREW H. WRIGLEY,
ATTORNEY GENERAL,

                    Petitioner,

    -vs-

HOUSE OF PRAYER AND LIFE,
INCORPORATED D/B/A
JERICHO SHARE,
JERICHO HEALTH SHARE, and
JHS COMMUNITY.

                    Respondent.

IN DISTRICT COURT

SOUTH CENTRAL JUDICIAL DISTRICT

Civil No. 08-2023-CV-00560

ASSURANCE OF
VOLUNTARY COMPLIANCE

CPAT 220044.004

To:    House of Prayer and Life, Incorporated, 1900 Matlock Rd. Suite #502, Mansfield, Texas 76063.

[¶1]    WHEREAS Drew H. Wrigley Attorney General of the State of North Dakota (Attorney General), acts in the public interest pursuant to North Dakota Century Code (N.D.C.C.) ch. 51-15, commonly referred to as the Consumer Fraud Law, and ch. 51-18, commonly referred to as the Home Solicitation Sales Statute.

[¶2]    WHEREAS House of Prayer and Life, Incorporated ("Respondent") is a Texas Business Corporation with its principal address at 1900 Matlock Rd. Suite #502, Mansfield, Texas 76063. Respondent is not registered in the State of North Dakota. Respondent does business under the names Jericho Share, Jericho Health Share, and JHS Community.

[¶3]    WHEREAS Respondent is a nonprofit 501(c)(3) health care sharing ministry that offers memberships that enables people who share a common set of religious and ethical beliefs to share in medical needs of one another, which memberships are not Insurance, but a community sharing in each other's medical needs with no promise to pay.

**EXHIBIT
1.56**

Ex. 1.56, p. 1 of 8

[¶4]   WHEREAS Respondent is engaged in the business of soliciting and selling merchandise, as those terms are defined in N.D.C.C. § 51-15-01, in the State of North Dakota, namely health share membership programs;

[¶5]   WHEREAS N.D.C.C. § 51-15-02 prohibits the act, use, or employment of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise;

[¶6]   WHEREAS N.D.C.C. § 51-15-02 makes it unlawful for a person from provide assistance or support to any person engaged in any act or practice in violation of N.D.C.C. § 51-15-02 when the person providing assistance or support knows or consciously avoids knowing that the other person is engaged in an act or practice in violation of N.D.C.C. § 51-15-02.

[¶7]   WHEREAS N.D.C.C. ch. 51-18 regulates home solicitation sales and requires, among other things, that sellers provide North Dakota consumers with both verbal and written notice of cancellation rights;

[¶8]   WHEREAS N.D.C.C. § 51-18-04 requires an agreement in a personal solicitation sales to be in writing, dated and signed, and contain certain required disclosures and acknowledgements regarding the consumer's right to cancel.

[¶9]   WHEREAS the Attorney General has received information indicating Respondent is or has engaged in violations of N.D.C.C. chapter 51-15 and 51-18 while selling health share membership programs to North Dakota consumers.

[¶10]  WHEREAS the Attorney General has determined that in the public interest an investigation should be conducted into the activity of Respondent to ascertain whether violations of N.D.C.C. chs. 51-15 or 51-18 occurred;

2

[¶11]   WHEREAS as a result of this investigation the Attorney General alleges Respondent has violated N.D.C.C. chs. 51-15 or 51-18; and

[¶12]   WHEREAS the parties desire to settle this matter without further investigation or litigation, and without any admission of liability; NOW, THEREFORE, it is hereby agreed as follows:

[¶13]   This Assurance of Voluntary Compliance shall constitute the statutory assurance of discontinuance as provided in N.D.C.C. § 51-15-06.1. Respondent acknowledges *in personam* jurisdiction in North Dakota. Nothing in this Assurance of Voluntary Compliance is intended to waive any rights or private remedies available to consumers. *See also* N.D.C.C. § 51-15-09.

[¶14]   Respondent, its directors, officers, principals, employees, agents, and servants, and all other persons in active concert or participation with it, voluntarily agrees to be, and hereby is, permanently enjoined from engaging in any violations of N.D.C.C. ch. 51-15, including any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation in connection with the sale or advertisement of any merchandise, or facilitating or assisting any such violations.

[¶15]   Respondent, its directors, officers, principals, employees, agents, and servants, and all other persons in active concert or participation with it agree to company with all requirements of N.D.C.C. chapter 51-18 while selling merchandise to a North Dakota consumer in a personal solicitation sale.

[¶16]   Respondent, its directors, officers, principals, employees, agents, and servants, and all other persons in active concert or participation with it, agrees to provide a verbal and written disclosure, at the time of a sale, that the product offered is not, and does not work like, health insurance, and obtain an acknowledgement from the customer that a verbal disclosure has been made and received by the customer.

3

[¶17]  Respondent agrees to establish a mechanism that ensures reasonable oversight over third-party producers marketing and selling its health share membership programs, to make sure that proper disclosures are made to customers regarding the products sold, and that creates accountability for third-party producers and rewards compliance with applicable laws.

[¶18]  Within 30 days of executing this agreement, Respondent agrees to provide full refunds to North Dakota customers Angela Schneider, Jeanette Smith-Murphy, and Paul Kerzman, of all amounts paid to Respondent, except Respondent may deduct from any refund the amount the customer has received, if any, for medical needs from the membership.  The refunds shall in form of a check issued to the customer and mailed to the Attorney General.

[¶19]  Respondent agrees to provide refunds to any customer who cancelled within 60 days of purchasing a health share membership program if the customer has not received any sharing for medical needs from the membership. Such refunds shall be made within 30 days of executing this agreement, and proof of the refunds shall be provided to the Attorney General.

[¶20]  Upon execution of this agreement, Respondent shall make a payment to the Attorney General in the sum of $15,000 in lieu of civil penalties, investigation costs and attorney fees. Payment shall be the form of a certified check or money order payable to Office of Attorney General – North Dakota, and delivered to:

> Elin S. Alm
> Assistant Attorney General
> Consumer Protection and Antitrust Division
> Office of Attorney General
> 1720 Burlington Drive, Suite C
> Bismarck, ND 58504-7736

[¶21]  Respondent agrees it will comply with this Assurance of Voluntary Compliance and further acknowledge and agree any violations of this Assurance of Voluntary Compliance, as determined by a State of North Dakota District Court, shall be punishable as contempt of court

4

pursuant to N.D.C.C. ch. 27-10 and Respondent further may be subject to all other civil penalties and sanctions provided by law, including attorney fees and costs.

[¶22]   If Respondent is adjudged in contempt of court for violations of this Assurance of Voluntary Compliance, adjudged in violation of this Assurance of Voluntary Compliance or adjudged in violation of N.D.C.C. ch. 51-15, said Respondent shall also be responsible for payment to the Attorney General for reasonable investigation costs, expenses, and attorney fees.

[¶23]   In the event of a breach of this Assurance of Voluntary Compliance, the Attorney General may make application to a State of North Dakota District Court to have the entire amount still owing under the Assurance of Voluntary Compliance entered as a formal judgment so it may be filed on the judgment roll and docketed pursuant to North Dakota law. *See* N.D.C.C. §§ 28-20-11, 28-20-12 and 28-20-13.

[¶24]   Respondent represents the signers below are competent and fully authorized to act on behalf of Respondent. Respondent acknowledges it has been provided the opportunity to review this Assurance of Voluntary Compliance with an attorney, understands the implications and obligations imposed by it and has freely and willingly entered into this Assurance of Voluntary Compliance. Respondent further acknowledges and agrees this Assurance of Voluntary Compliance may be approved by and filed with the State of North Dakota District Court without any further notice or hearing. Respondent agrees to and acknowledges the sufficiency of service by facsimile, and/or first-class mail at its last known address, with respect to any and all actions taken with regard to this Assurance of Voluntary Compliance. Signatures transmitted electronically or via facsimile by Respondent shall be deemed the equivalent of original signatures; this document may be executed in counterparts, with each counterpart deemed an original.

5

Dated this 24 day of February, 2023.

<div style="margin-left:40%">

HOUSE OF PRAYER AND LIFE,
INCORPORATED
(including all "doing business as" names, formal
corporate names, fictitious names of any kind or
any variations of the same)

By: _____

VICTOR MENSAVAGE
(print name)

Its: _____CEO_____
    (title)

</div>

STATE OF __Texas__    )
                      ) ss
COUNTY OF __Tarrant__ )

Subscribed and sworn to before me this
24 day of February, 2023.

_____
Notary Public

AMANDA HARRELL
Notary Public, State of Texas
My Commission Expires
December 04, 2026
NOTARY ID 13182033-2

6

STATE OF NORTH DAKOTA

COUNTY OF BURLEIGH

STATE OF NORTH DAKOTA EX REL.
DREW H. WRIGLEY,
ATTORNEY GENERAL,

                  Petitioner,

    -vs-

HOUSE OF PRAYER AND LIFE,
INCORPORATED D/B/A
JERICHO SHARE,
JERICHO HEALTH SHARE, and
JHS COMMUNITY.

                  Respondent.

IN DISTRICT COURT

SOUTH CENTRAL JUDICIAL DISTRICT

Civil No. 08-2023-CV-00560


ORDER OF APPROVAL


CPAT 220044.004

[¶1]    Pursuant to the authority of this Court provided in N.D.C.C. § 51-15-06.1, IT IS HEREBY ORDERED that the Assurance of Voluntary Compliance filed in this matter is approved as an assurance of voluntary compliance as specified in N.D.C.C. § 51-15-06.1.

[¶2]    The Clerk of Court shall receive and file the Assurance of Voluntary Compliance.

Signed: 3/15/2023 8:19:29 AM

_____
Judge of the District Court

This Assurance of Voluntary Compliance is hereby received and accepted this __28th__ day of __February__ , 2023.

STATE OF NORTH DAKOTA
Drew H. Wrigley
Attorney General

BY: _____

Elin S. Alm, ND ID 05924
Assistant Attorney General
Office of Attorney General
Consumer Protection & Antitrust Division
1720 Burlington Drive, Suite C
Bismarck, ND 58504-7736
Telephone (701) 328-5570
Facsimile (701) 328-5568
ealm@nd.gov

Attorneys for the Petitioner

7

**STATE OF WASHINGTON**
**OFFICE OF THE INSURANCE COMMISSIONER**

| | |
|---|---|
| *In the Matter of* | Order No.    20-0335 |
| **ALLIANCE FOR SHARED HEALTH,** | ORDER TO CEASE AND DESIST |
| Unauthorized Entity/Respondent. | |

Pursuant to RCW 48.02.080, RCW 48.15.023 and RCW 48.44.016, the Insurance Commissioner of the state of Washington ("Insurance Commissioner") orders the above-named Respondent, and its officers, directors, trustees, employees, agents, and affiliates to immediately cease and desist from:

A.  Acting as an insurer in the state of Washington;

B.  Acting as a health care service contractor in the state of Washington;

C.  Engaging in or transacting the unauthorized business of insurance in the state of Washington;

D.  Seeking, pursuing, and obtaining any insurance business in the state of Washington;

E.  Soliciting Washington residents to purchase any insurance to be issued by an unauthorized insurer; and

F.  Soliciting Washington residents to induce them to purchase any insurance contract.

**BASIS:**

1.     Alliance for Shared Health Inc. ("ASH") is a non-profit 501(c)(3) corporation headquartered in Missouri. In September 2019, ASH filed an Application for a Certificate of Authority of a Foreign Non-Profit Corporation with the Missouri Secretary of State.

2.     ASH does not hold a certificate of authority to transact insurance in Washington. ASH is also not registered with the Washington Secretary of State or the Washington State Department of Revenue.

ORDER TO CEASE AND DESIST
ORDER NO. 20-0335
LA - 1602799 - 1

1

State of Washington
Office of Insurance Commissioner
PO Box 40255
Olympia, WA  98504-0255

**EXHIBIT 1.57**

Ex. 1.57, p. 1 of 9

Resp. Appx. p. 445

3.     ASH was originally incorporated in the U.S. Virgin Islands in June 2017. ASH provided the Insurance Commissioner's Regulatory Investigations Unit ("Investigations") with ASH's Internal Revenue Service ("IRS") non-profit organization filings. ASH submitted an application for non-profit status to the IRS in November 2018. The filings list the following ASH executive officers: Corey Durbin ("Durbin"), *President*; John Lewis ("Lewis"), *Treasurer*; and Leslie Hunsel ("Hunsel"), *Secretary*.

4.     Christian Discount Alliance, LLC, dba Shared Health Alliance ("SHA"), is a business entity insurance producer licensed in Missouri since 2016. The Designated Licensed Responsible Producers for SHA's Missouri insurance producer license are also Durbin, *President, Owner*; Lewis, *Chief Operating Officer, Owner*; and Hunsel, *Secretary*. None of these individuals hold an insurance producer license in Washington. Durbin was previously licensed as a producer in Washington (WAOIC No. 255411). In October 2015, SHA registered with the Missouri Secretary of State as a limited liability company.

5.     SHA is not licensed as an insurance producer in Washington or any other state. SHA is not registered with the Washington Secretary of State. SHA registered with the Washington Department of Revenue in February 2018 with the business designation of "insurance agencies and brokerages."

6.     ASH refers to SHA as its "vendor consultant." ASH and SHA entered a vendor consulting agreement, effective January 1, 2019. ASH explained to Investigations that SHA "offers non-insurance solutions to help strengthen the ASH sharing programs" including "Rx Advocacy for high cost maintenance medications... 24/7/365 Telemedicine... Virtual Primary Care... National Lab Program... Discount Rx Card... Provider Discounts... Member Support Services..."

7.     The Office of the Insurance Commissioner opened an investigation to determine if 1) ASH meets the statutory definition of a Health Care Sharing Ministry ("HCSM") under Washington law and Federal law and 2) if ASH is not a bona fide HCSM, whether ASH is acting as an unauthorized insurer in Washington.

8.     ASH represents itself as a HCSM. HCSMs are exempt from the Affordable Care Act ("ACA") individual mandate.

ORDER TO CEASE AND DESIST                    2          State of Washington
ORDER NO. 20-0335                                        Office of Insurance Commissioner
                                                         PO Box 40255
LA - 1602799 - 1                                         Olympia, WA  98504-0255

*ASH does not meet the legal definition of a HCSM.*

9.      To qualify as a health care sharing ministry under the IRS and Washington law, a HCSM must be a 501(c)(3) organization whose members share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs. A HCSM must also have been in operation and continuously sharing member health care costs since at least December 31, 1999.

10.     ASH has not been in operation and continuously sharing health care costs since 1999.

11.     ASH acknowledges that it does not meet the statutory requirements for an HCSM because it was not incorporated until June 2017.

12.     ASH stated to Investigations: "[ASH] was not originally formed, nor does it warrant that it meets the original ACA grandfathering clause to qualify its members for the exemption to the individual mandate under federal law." ASH provided the following explanation:

> While ASH was originally formed in 2017, Hurricane Irma delayed the initial roll-out. As mentioned above, ASH as a health share solution was designed to help meet needs that the other health share programs were not/are not meeting - and do so without pre-existing condition limitations. However, participation in ASH was not available until 2019. There was no intention to introduce ASH until such time as the Federal Mandate was not being enforced - which began in January 2019. ASH did not want any participant to think that ASH alone met the ACA individual mandate. When the mandate was removed (or at least it was announced that the mandate would not be enforced at the Federal level beginning in 2019), ASH felt comfortable offering participation per the approval of the IRS as a bona fide 501(c)(3).

13.     During the course of the investigation of ASH, Investigations conducted a review of ASH's website.

14.     As of May 29, 2019, ASH's "About Us" webpage stated the following:

> Alliance for Shared Health was formed to provide "health sharing" access to Americans of any faith persuasion. When Americans come together to meet challenges, there is little we can't accomplish together… Alliance for Shared Health is a non-profit health sharing community that seeks to provide a way for its members to access specific medical needs outside of expensive, traditional health insurance. All members must agree with and attest to the statement of standards developed by the Board of ASH…

15.     Additionally, ASH listed the following statement of standards:

> I believe that traditional health care does not work for me anymore, and want to be a part of a moral, ethical and health-conscious community of people that shares in medical needs under the ASH Guidelines

ORDER TO CEASE AND DESIST
ORDER NO. 20-0335

LA - 1602799 - 1

3

State of Washington
Office of Insurance Commissioner
PO Box 40255
Olympia, WA 98504-0255

Ex. 1.57, p. 3 of 9

Resp. Appx. p. 447

I affirm that I understand ASH is not an insurance company but rather a non-profit benevolence organization. ASH members have committed to paying a monthly contribution in order to help share in medical expenses under the guidelines.

I do understand that ASH is not a guarantee of payment, but that ASH intends to share in the medical needs per the ASH guidelines and the sharing level selected by me.

I desire to live a healthy lifestyle and make good health decisions to be positive member of the ASH community.

I agree to refrain from the usage of any form of illegal substances and that if I do engage in use of these, any medical needs caused by or related to such shall not be eligible for sharing.

I agree to submit to mediation followed by arbitration, if needed, should a dispute arise with ASH or its affiliates. As such, I understand that ASH is not an insurance company and will not file any complaints with my state insurance department if I have a dispute on a medical need.

I agree that whether or not I sign and submit this form, submitting my application for membership in ASH is equivalent to attesting to this statement of beliefs.

(Emphasis added.) Since the Insurance Commissioner's investigation, ASH has made changes to its website and statement of standards.

*ASH is acting as an unauthorized insurer in the state of Washington.*

16.     Because ASH is not qualified as a HCSM, it is acting as an unauthorized insurer. ASH has denied acting as an unauthorized insurer. ASH asserts it has never intended to operate as an insurer and stated it includes "all appropriate disclaimers and notifications on its materials including its website, enrollment portal, sharing guidelines, and member identification cards." ASH further asserts it is operating similarly to other health sharing entities, which are not considered insurers under state or federal law.

17.     In ASH's response to Investigation, it states:

[ASH] helps its members access preventive care (the same preventive care codes that the Affordable Care Act ("ACA") mandate included), as well as virtual primary care - including the diagnosis and treatment of over 1,500 conditions - all at one member responsibility amount per episode of care – again with no pre-existing condition limitations and shareable at 100%.

18.     ASH's member guidelines discuss benefit levels as "plans" and require a set monthly contribution to maintain membership. One of ASH's member guidelines discusses four "Sharing Level" plans: Allied Basic, Allied Visit, Allied Core, and Allied Max. ASH's guidelines

ORDER TO CEASE AND DESIST
ORDER NO. 20-0335
LA - 1602799 - 1

4

State of Washington
Office of Insurance Commissioner
PO Box 40255
Olympia, WA  98504-0255

Ex. 1.57, p. 4 of 9

Resp. Appx. p. 448

state: "Make your choice wisely, because different programs offer different levels of health cost sharing support."

19.    In describing the four plans, discussed above, ASH explains:

ASH shares 100 percent of bills for any medical incident exceeding the MRA (Member Responsibility Amount) as long as all other Guidelines are met and funds are available for sharing up to the agreed upon Referenced Based-Pricing Allowances for that service as agreed upon by the ASH Community. Any medical expense less than the MRA per incident is the member's responsibility.

20.    One of ASH's guidelines includes a table which shows what medical care and services are covered by each of the four plans, such as "Preventive Care", "Doctor Access", "Virtual Primary Care", "PCP Visits", "Outpatient Lab", "Daily Hospital Allowance", and "Prescription Drugs…Tier 1… Tier 2…Tier 3… Specialty Drugs".

21.    Another one of ASH's guidelines discusses three other plans: "SHA Premier", "SHA Preventative", and "SHA Scripts". The guidelines include a table which shows what medical care and services are covered by each of the three plans, such as "Preventive Care", "Doctor Access", "Telemedicine", "Virtual Primary Care", "PCP Visits", "Specialist", "Urgent Care", "Diagnostic X-Ray and Lab", "Cat-Scan/MRI", "Outpatient Testing", and "Prescription Drugs…Tier 1…Tier 2…Tier 3…Specialty Drugs". The guidelines of these plans also include tables regarding coverage for "Preventive Care Services" and "Preventive Immunizations".

22.    Other plans provided by ASH include similar member guidelines and tables as to the ones discussed.

23.    ASH also sells plans to Washington members that provide members with access to a network of providers, called "First Health." ASH provides members with "access to providers in the First Health network – A national PPO network, with more than 5,000 hospitals, over 90,000 ancillary facilities and over 1 million health care professional service locations." According to ASH, "access is wide-ranging – more than 96 percent of people in the United States are within 20 miles of a network provider." ASH's member guidelines discuss First Health, as well as include information about First Health's provider locator assistance toll-free number and First Health's provider locator website.

24.    ASH provided a spreadsheet to Investigations showing ASH sold a variety of plans to Washington consumers. ASH sold twelve (12) different plans to a total of 1,411 Washington consumers and collected $237,188.27.

ORDER TO CEASE AND DESIST
ORDER NO. 20-0335
LA - 1602799 - 1

5

State of Washington
Office of Insurance Commissioner
PO Box 40255
Olympia, WA  98504-0255

Ex. 1.57, p. 5 of 9

Resp. Appx. p. 449

25.    RCW 48.01.040 states that "insurance" is a contract whereby one undertakes to indemnify another or pay a specified amount upon determinable contingencies.

26.    RCW 48.01.050 states in relevant part that "insurer" as used in this code includes every person engaged in the business of making contracts of insurance.

27.    RCW 48.01.060 defines insurance transaction as including any solicitation, negotiations preliminary to execution, execution of an insurance contract, transaction of matter subsequent to execution of the contract and arising out of it, and insuring.

28.    RCW 48.43.009 provides that health care sharing ministries are not health carriers as defined in RCW 48.43.005 or insurers as defined in RCW 48.01.050. For purposes of this section, "health care sharing ministry" has the same meaning as in 26 U.S.C. Sec. 5000A.

29.    26 U.S.C. Sec. 5000A states the term "health care sharing ministry" means an organization—

(I) which is described in section 501(c)(3) and is exempt from taxation under section 501(a),

(II) members of which share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs and without regard to the State in which a member resides or is employed,

(III) members of which retain membership even after they develop a medical condition,

(IV) which (or a predecessor of which) has been in existence at all times since December 31, 1999, and medical expenses of its members have been shared continuously and without interruption since at least December 31, 1999, and

(V) which conducts an annual audit which is performed by an independent certified public accounting firm in accordance with generally accepted accounting principles and which is made available to the public upon request.

30.    RCW 48.05.030(1) states no person shall act as an insurer and no insurer shall transact insurance in this state other than as authorized by a certificate of authority issued to it by the Insurance Commissioner and then in force; except as to such transactions as are expressly otherwise provided for in this code.

31.    RCW 48.44.015(1) provides that a person may not in this state, by mail or otherwise, act as or hold himself or herself out to be a health care service contractor, as defined in RCW 48.44.010 without first being registered with the Insurance Commissioner.

32.    RCW 48.44.180 states for the purposes of this chapter, the Insurance Commissioner shall have the same powers and duties of enforcement as are provided in RCW 48.02.080.

ORDER TO CEASE AND DESIST
ORDER NO. 20-0335
LA - 1602799 - 1

6

State of Washington
Office of Insurance Commissioner
PO Box 40255
Olympia, WA  98504-0255

Ex. 1.57, p. 6 of 9

Resp. Appx. p. 450

33.    RCW 48.15.020(1) states that an insurer that is not authorized by the Insurance Commissioner may not solicit or transact insurance business in this state.

34.    RCW 48.15.023(5)(a)(i) states that if the Insurance Commissioner has cause to believe that any person has violated the provisions of RCW 48.15.020(1), the Insurance Commissioner may issue and enforce a cease and desist order in accordance with the provisions of RCW 48.02.080.

35.    RCW 48.44.016(5)(a)(i) states if the Insurance Commissioner has cause to believe that any person has violated the provisions of RCW 48.44.015(1), the Insurance Commissioner may issue and enforce a cease and desist order in accordance with the provisions of RCW 48.02.080.

36.    RCW 48.02.080(3)(a) states if the Insurance Commissioner has cause to believe that any person is violating or is about to violate any provision of this code or any regulation or order of the Insurance Commissioner, he or she may issue a cease and desist order.

37.    The Respondent's actions described herein violate Insurance Code provisions that include RCW 48.05.030(1) [Certificate of Authority required], RCW 48.15.020(1) [solicitation by insurer not authorized prohibited] and RCW 48.44.015(1) [registration by health care service contractor required].

**IT IS FURTHER ORDERED** that nothing herein shall prevent the Respondent from fulfilling the terms of contracts formed prior to the effective date of this Order pursuant to RCW 48.15.020(2)(b).

Any violation of the terms of this Order by the Respondent and its officers, directors, trustees, employees, agents, and affiliates or the Respondent's failure to fulfill or perform its contracts subject to this Order will render the violator(s) subject to the full penalties authorized by RCW 48.02.080, RCW 48.15.023, RCW 48.44.016 and other applicable sections of the Insurance Code of the state of Washington.

The Respondent has the right to demand a hearing in accordance with RCW 48.04.010, WAC 284-02-070, and WAC 10-08-110.

ORDER TO CEASE AND DESIST
ORDER NO. 20-0335
LA - 1602799 - 1

7

State of Washington
Office of Insurance Commissioner
PO Box 40255
Olympia, WA 98504-0255

Ex. 1.57, p. 7 of 9

Resp. Appx. p. 451

This Order shall remain in effect subject to the further order of the Insurance Commissioner.

**THIS ORDER IS EFFECTIVE IMMEDIATELY AND IS ENTERED** at Tumwater, Washington, this _22_ day of _April_____, 2020.

_Mike Kreidler_

MIKE KREIDLER
Insurance Commissioner

By and through his designee

_Toni Hood for_

SOFIA PASAROW
Insurance Enforcement Specialist
Legal Affairs Division

ORDER TO CEASE AND DESIST          8          State of Washington
ORDER NO. 20-0335                             Office of Insurance Commissioner
                                              PO Box 40255
LA - 1602799 - 1                              Olympia, WA 98504-0255

## CERTIFICATE OF MAILING

The undersigned certifies under the penalty of perjury under the laws of the state of Washington that I am now and at all times herein mentioned, a citizen of the United States, a resident of the state of Washington, over the age of eighteen years, not a party to or interested in the above-entitled action, and competent to be a witness herein.

On the date given below I caused to be served the foregoing Order to Cease and Desist on the following individual(s) in the manner listed below:

*By email and by depositing in the U.S. mail via state Consolidated Mail Service with proper postage affixed to*:

Alliance for Shared Health, Inc.
7600 Bolongo Bay
St. Thomas, VI 00802

John Lewis
*Registered agent for Alliance for Shared Health, Inc.*
3155 Sutton Blvd, Ste 201
Saint Louis, MO 63143

*Courtesy copy to:*
Kyle Gilster
Attorney at Law
750 17th St NW, Ste 900
Washington, DC 20006
kyle.gilster@huschblackwell.com

Dated this 23rd day of April , 2020, in Tumwater, Washington.

KIMBERLY SHOBLOM
Paralegal
Legal Affairs Division

ORDER TO CEASE AND DESIST
ORDER NO. 20-0335

LA - 1602799 - 1

9

State of Washington
Office of Insurance Commissioner
PO Box 40255
Olympia, WA 98504-0255

**STATE OF WASHINGTON**
**OFFICE OF THE INSURANCE COMMISSIONER**

*In the Matter of*

**ONESHARE HEALTH, LLC,**

Unauthorized Entity/
Respondent.

Order No.    20-0250

ORDER TO CEASE AND DESIST

Pursuant to RCW 48.02.080 and RCW 48.15.023, the Insurance Commissioner of the state of Washington ("Insurance Commissioner") orders the above-named Respondent, and its officers, directors, trustees, employees, agents, and affiliates to immediately cease and desist from:

A.  Acting as an insurer in the state of Washington;

B.  Engaging in or transacting the unauthorized business of insurance in the state of Washington;

C.  Seeking, pursuing, and obtaining any insurance business in the state of Washington;

D.  Soliciting Washington residents to purchase any insurance to be issued by an unauthorized insurer; and

E.  Soliciting Washington residents to induce them to purchase any insurance contract.

**BASIS:**

1.      The parent of OneShare Health, LLC, Anabaptist Healthshare, Inc., incorporated on May 26, 2015 in Virginia; on August 31, 2018, it amended its name to Kingdom Healthshare International; and on March 12, 2019, it amended its name to OneShare International (hereinafter referred to as "the Organization"). On April 9, 2019, the Organization registered Anabaptist

ORDER TO CEASE AND DESIST
ORDER NO. 20-0250

LA - 1602460 - 1

1

State of Washington
Office of Insurance Commissioner
PO Box 40255
Olympia, WA 98504-0255

**EXHIBIT**
**1.58**

Healthshare as a d.b.a. The Organization represents itself as a health care sharing ministry ("HCSM"), exempt from insurance regulation. It does not have members in Washington State.

2.       On November 10, 2016, the Organization formed a wholly owned subsidiary, Unity Healthshare, LLC; on August 27, 2018, it amended its name to Kingdom Healthshare Ministries, LLC; and on March 11, 2019, it amended its name to OneShare Health, LLC ("OneShare"). OneShare is incorporated in Virginia and headquartered in Texas. OneShare represents itself as a HCSM, exempt from insurance regulation. It has members in Washington State and it does not hold a Certificate of Authority in this state.

3.       There is pending litigation in Fulton County Superior Court (Georgia) between OneShare and Aliera Healthcare, Inc. ("Aliera"), regarding Aliera's marketing of OneShare's insurance products. Aliera is also the subject of an enforcement action by the Insurance Commissioner.

4.       Following a referral from its producer licensing division, the Insurance Commissioner opened an inquiry to determine 1) if OneShare is a legitimate HCSM in compliance with state and federal law, and 2) if it is not a bona fide HCSM, whether it is acting as an unauthorized insurer in Washington State.

*OneShare does not meet the legal definition of a health care sharing ministry.*

5.       To qualify as a health care sharing ministry under Internal Revenue Service (IRS) and Washington law, a HCSM must be a 501(c)(3) organization whose members share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs. In addition, the organization (or its predecessor) must also have been in operation and continuously sharing member health care costs since at least December 31, 1999.

6.       OneShare has not been in operation and continuously sharing amongst members since 1999. To meet this requirement, OneShare relies entirely on a letter, dated July 14, 2015, from the Department of Health & Human Services ("DHHS"), approving the Organization as a HCSM. However, there are several problems with OneShare's reliance on this letter: (1) the Organization serves a different religious community than OneShare serves, (2) the letter from DHHS contains a disclaimer that it is not binding on state authorities, (3) the Organization has not been in operation since 1999, and (4) the Organization is not OneShare's "predecessor."

ORDER TO CEASE AND DESIST                 2                State of Washington
ORDER NO. 20-0250                                                Office of Insurance Commissioner
                                                                         PO Box 40255
LA - 1602460 - 1                                                  Olympia, WA 98504-0255

                                                                         Ex. 1.58, p. 2 of 6
Resp. Appx, p. 455

7.    OneShare explained that the Organization and OneShare serve different communities. The Organization's membership focuses on members of the traditional Anabaptist church or those who work for Anabaptist ministries or employers. The Organization does not have and has never had any Washington members. On the other hand, OneShare members are not required to be practicing Anabaptists or among those who work for Anabaptist ministries. Instead, each member must attest to OneShare's Statement of Beliefs which is founded on Biblical principles. OneShare explained that creating OneShare allowed a larger community to take advantage of healthcare sharing services in accordance with their faith. This distinction in beliefs between the two sets of members runs contrary to the continuous sharing requirement for HCSMs.

8.    OneShare denies that it is a separate legal entity from the Organization and points out that, for tax purposes, it is not treated as a separate legal entity. In support, it provided an IRS Announcement which states that an LLC, if wholly-owned by an organization exempt under section 501(c)(3) of the Internal Revenue Code, may be disregarded as a separate entity for federal tax purposes. However, members were signed up with OneShare as their insurer, not the Organization. Further, and most importantly, the Insurance Commissioner is not bound by the IRS's tax treatment of OneShare.

9.    Additionally, in order to qualify as an HCSM, an entity must conduct an annual audit performed by an independent certified public accounting firm. OneShare failed to meet this requirement. OneShare provided the Insurance Commissioner with an audit of the Organization for year ending December 31, 2016. The audit report is dated September 20, 2019. On this basis alone, OneShare fails to qualify as an HCSM.

*OneShare is acting as an unauthorized insurer in the state of Washington.*

10.    Because OneShare is not qualified as a HCSM, it is acting as an unauthorized insurer. OneShare asserts throughout its website and written materials that it is not insurance, does not guarantee payment of medical expenses, and does not enter into contracts with members. However, based on those same materials, the members pay a monthly fee and, in return, OneShare pays providers for covered services upon the members getting sick or injured. This qualifies as insurance.

11.    At the time OneShare terminated its contract with Aliera on August 10, 2018, OneShare had approximately 2,900 Washington members. Since then, 1,470 Washington residents

ORDER TO CEASE AND DESIST        3        State of Washington
ORDER NO. 20-0250                      Office of Insurance Commissioner
                                     PO Box 40255
LA - 1602460 - 1                        Olympia, WA 98504-0255

Ex. 1.58, p. 3 of 6

Resp. Appx, p. 456

have been OneShare members, with a current total of 1,091 Washington members. Members from Washington have paid OneShare a total of $1,239,328.15 to date.

12.    Based on their website, OneShare continues to offer Washington consumers insurance.

13.    RCW 48.01.040 states that "insurance" is a contract whereby one undertakes to indemnify another or pay a specified amount upon determinable contingencies.

14.    RCW 48.01.050 states in relevant part that "insurer" as used in this code includes every person engaged in the business of making contracts of insurance.

15.    RCW 48.43.009 provides that health care sharing ministries are not health carriers as defined in RCW 48.43.005 or insurers as defined in RCW 48.01.050. For purposes of this section, "health care sharing ministry" has the same meaning as in 26 U.S.C. Sec. 5000A.

16.    26 U.S.C. Sec. 5000A states the term "health care sharing ministry" means an organization—

(I) which is described in section 501(c)(3) and is exempt from taxation under section 501(a),
(II) members of which share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs and without regard to the State in which a member resides or is employed,
(III) members of which retain membership even after they develop a medical condition,
(IV) which (or a predecessor of which) has been in existence at all times since December 31, 1999, and medical expenses of its members have been shared continuously and without interruption since at least December 31, 1999, and
(V) which conducts an annual audit which is performed by an independent certified public accounting firm in accordance with generally accepted accounting principles and which is made available to the public upon request.

17.    RCW 48.05.030(1) states no person shall act as an insurer and no insurer shall transact insurance in this state other than as authorized by a certificate of authority issued to it by the Insurance Commissioner and then in force; except, as to such transactions as are expressly otherwise provided for in this code.

18.    RCW 48.15.020(1) states that an insurer that is not authorized by the Insurance Commissioner may not solicit or transact insurance business in this state.

19.    RCW 48.15.023(5)(a)(i) states that if the Insurance Commissioner has cause to believe that any person has violated the provisions of RCW 48.15.020(1), the Insurance

ORDER TO CEASE AND DESIST
ORDER NO. 20-0250

LA - 1602460 - 1

4

State of Washington
Office of Insurance Commissioner
PO Box 40255
Olympia, WA  98504-0255

Ex. 1.58, p. 4 of 6

Resp. Appx, p. 457

Commissioner may issue and enforce a cease and desist order in accordance with the provisions of RCW 48.02.080.

20.    RCW 48.02.080(3)(a) states if the Insurance Commissioner has cause to believe that any person is violating or is about to violate any provision of this code or any regulation or order of the Insurance Commissioner, he or she may issue a cease and desist order.

21.    The Respondent's actions described herein violate Insurance Code provisions that include RCW 48.05.030(1) [Certificate of Authority required] and RCW 48.15.020(1) [solicitation by insurer not authorized prohibited].

**IT IS FURTHER ORDERED** that nothing herein shall prevent the Respondent from fulfilling the terms of contracts formed prior to the effective date of this Order pursuant to RCW 48.15.020(2)(b).

Any violation of the terms of this Order by the Respondent and its officers, directors, trustees, employees, agents, and affiliates or the Respondent's failure to fulfill or perform its contracts subject to this Order will render the violator(s) subject to the full penalties authorized by RCW 48.02.080, RCW 48.15.023, and other applicable sections of the Insurance Code of the state of Washington.

The Respondent has the right to demand a hearing in accordance with RCW 48.04.010, WAC 284-02-070, and WAC 10-08-110.

This Order shall remain in effect subject to the further order of the Insurance Commissioner.

**THIS ORDER IS EFFECTIVE IMMEDIATELY AND IS ENTERED** at Tumwater, Washington, this _31_ day of _March_____, 2020.

MIKE KREIDLER
Insurance Commissioner

By and through his designee

ELLEN RANGE
Insurance Enforcement Specialist
Legal Affairs Division

ORDER TO CEASE AND DESIST          5          State of Washington
ORDER NO. 20-0250                             Office of Insurance Commissioner
                                             PO Box 40255
LA - 1602460 - I                             Olympia, WA 98504-0255

## CERTIFICATE OF MAILING

The undersigned certifies under the penalty of perjury under the laws of the state of Washington that I am now and at all times herein mentioned, a citizen of the United States, a resident of the state of Washington, over the age of eighteen years, not a party to or interested in the above-entitled action, and competent to be a witness herein.

On the date given below I caused to be served the foregoing Order to Cease and Desist on the following individual(s) in the manner listed below:

*By email and by depositing in the U.S. mail via state Consolidated Mail Service with proper postage affixed to:*

Tyler Hochstetler
2452 S. Seminole Trail
Madison, VA  22727
*Registered Agent for OneShare Health, LLC*

*Courtesy copy to:*
Kyle G.A. Wallace
Attorney at Law
Alston & Bird
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA  30309-3424
Kyle.wallace@alston.com
*Attorney for OneShare Health, LLC*

Dated this  31st  day of  March  , 2020, in Tumwater, Washington.

DAWN KRECH
Paralegal
Legal Affairs Division

ORDER TO CEASE AND DESIST                6         State of Washington
ORDER NO. 20-0250                                  Office of Insurance Commissioner
                                                   PO Box 40255
LA - 1602460 - 1                                   Olympia, WA  98504-0255

DocuSign Envelope ID: 095645D7-ED05-43AC-A6BE-4319C1745614

**STATE OF WASHINGTON**
**OFFICE OF THE INSURANCE COMMISSIONER**

*In the Matter of*

**UNITE HEALTH SHARE MINISTRIES,
INC.,**

**BASIS:**

B

**EXHIBIT**
**1.59**

DocuSign Envelope ID: 095645D7-ED05-43AC-A6BE-4319C1745614

B

DocuSign Envelope ID: 095645D7-ED05-43AC-A6BE-4319C1745614

B

B

B

DocuSign Envelope ID: 095645D7-ED05-43AC-A6BE-4319C1745614

B

DocuSign Envelope ID: 095645D7-ED05-43AC-A6BE-4319C1745614

B

DocuSign Envelope ID: 095645D7-ED05-43AC-A6BE-4319C1745614

B

**ORDER TO CEASE AND DESIST**

B

B

DocuSign Envelope ID: 095645D7-ED05-43AC-A6BE-4319C1745614

**IT IS FURTHER ORDERED**

**ORDER IMPOSING A FINE**

B

B

B

DocuSign Envelope ID: 095645D7-ED05-43AC-A6BE-4319C1745614

## NOTICE OF OPPORTUNITY FOR HEARING

If the Insurance Commissioner does not receive a hearing demand from Respondent within 90 days from the date Respondent received this Order, Respondent's right to a hearing is conclusively deemed to have been waived.

THIS ORDER IS EFFECTIVE IMMEDIATELY AND IS ENTERED

B

DocuSigned by:

*Puna Patel*

3AB80F37FC1445C...

B

DocuSign Envelope ID: 095645D7-ED05-43AC-A6BE-4319C1745614

## CERTIFICATE OF SERVICE

B

_____

B _____

_____

B

____   ____

DocuSigned by:

*Katrina Shepard*

B

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

B

**COMPLAINT WITH CLASS ACTION ALLEGATIONS AND REQUEST FOR RESTITUTION, TEMPORARY, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF, REMOVAL OF TRUSTEES, AND COSTS**

***Jury Demand Endorsed Hereon***

B

B
B

B
B

B
B

EXHIBIT
**1.60**

Ex. 1.60, p. 1 of 70

B          B        B
     B

          B
     B

               B

B

          B

B          B

          B
     B

          B

     B

     B

*ALSO SERVE STATUTORY AGENT*


B


*ALSO SERVE STATUTORY AGENT*

B


*ALSO SERVE STATUTORY AGENT*

B          B


B

*ALSO SERVE STATUTORY AGENT*

B

**NATURE OF THE CASE**

B



*These plans promise to deliver all the benefits of traditional health insurance at a fraction of the cost*

---

*Health Care Sharing Ministries: Last Week Tonight with John Oliver*    B
B

*Health Care Sharing Ministries*          *Last Week Tonight*

B        B

B

B

B

*Id*

B       B         B          BBB

BBB

*LeCann et al v. The Aliera Companies, Inc.*

**JURISDICTION**

## <u>**THE PARTIES**</u>

*Plaintiffs*

B

*Corporate Defendants*

B            B

B

B                                    B

***Individual Defendants***

B

B          B      B

B              B              B                    B

B                    B              *de facto*

---

*See*

B

B

B       B       B               B       B

B

B

B

B       B       B               B       B

B

B       B

B

B               B               B       B

B

B

B               B       B       B       B

B

B          B          B     B          B

B

B

B

B

B

B

B

B

B                                              B

B

## FACTUAL ALLEGATIONS

***Background of Health Care Sharing Ministries***

B

B

B

B

B

B

B

B

B

B

B

*Liberty HealthShare's History and Internal Governance*

B                    B

B                                        B

B              B     B

B

B

B

B                    B

B

B                              B

B

B          B

B

_____

*See*              B                    B

B

[8]                                        **Exhibit A**

B

B

B                    B

B

B

,

*See*

Resp. Appx, p. 486

B

B

B

B

B

B

B

B

B

B

B

B

B

B

B

B

B

B

*See   Leading   Healthcare   Sharing   Programs*

*Liberty's Creation, Marketing, Sales, and Administration of a Sham HCSM*

B

**Exhibit A**

**Statement of Shared Beliefs**

B

B

*Id*

B

B

_____

B

B

*See.*

B

B

*Liberty's Sham Dispute Resolution Procedures*

**Appeals will be accepted from Sharing Members only; appeals will not be accepted from providers. Sharing Members cannot appeal the guidelines, balance bills nor matters relating to enrollment.**

*First  Level  Appeal*

B   *Second  Level  Appeal*

*Third Level & Final Appeal*

*Mediation and Arbitration*

*against one another*
*Any such arbitration shall be*
*held in Fredericksburg, Virginia subject to the laws of the Commonwealth of*
*Virginia*

*The aggrieved Sharing Member agrees to be*
*legally bound by the Arbitrator's decision*

*See*

*against one another.*

B

*bona fide*

B

*Liberty's Related Entities and Affiliated Enterprises*

B

B

B

B

B

B

B                                           B

B

B

*Defendants' Self-Dealing Activities were Concealed from Members and Liberty*

B

B

*never any bid process to ensure that Liberty paid market prices for*

*business  services  expenses*                                                                                    B

B

B

B

B              B

B

**DEFENDANTS' VIOLATIONS OF LAW**

_____

*California v. Texas*

B

B

B

B    B

B

B

B

## PIERCING THE CORPORATE VEIL

### <u>CLASS ACTION ALLEGATIONS</u>

*Definition of Class:*

<u>*Current Liberty HealthShare Members*</u>

<u>*Former Liberty HealthShare Members*</u>

*Size of the Class and Numerosity*

*Class Representative and Adequacy*

*Typicality*

*Common Questions of Fact and Law*

*Questions of Law and Fact Common to the Class Predominate Over Individual*

*Issues:*

*Superiority of Class Action:*

*Venue:*


*Class Counsel:*

## <u>CAUSES OF ACTION</u>

## <u>COUNT I</u>

**(Breach of Contract and Covenant of Good Faith and Fair Dealing
as to Defendant Liberty)**

B

**<u>COUNT II</u>**

**(Money Had and Received as to All Defendants)**

*e.g.*

**COUNT III**

**(Unjust Enrichment as to Defendant Liberty)**

*e.g.*

## <u>COUNT IV</u>

**(Violations of 18 U.S.C. § 1962(c) Against Defendants Liberty, CSS, MCS, and SavNet)**

B

B

B

B

**<u>COUNT V</u>**

**(Conversion)**

## COUNT VI

**(Breach of Fiduciary Duty as to Liberty)**

B

B

B

## **<u>COUNT VII</u>**

**(Intentional, or Alternatively, Negligent Misrepresentation as to Liberty)**

B

B

## COUNT VIII

### (Accounting as to Defendant Liberty)

## PRAYER FOR RELIEF

WHEREFORE

## DEMAND FOR JURY TRIAL

**LAW OFFICE OF GEORGE W. COCHRAN**

*/s/ George W. Cochran*
_____

**JOHNSON FISTEL, LLP**

B

***Counsel to Plaintiffs***

<u>**SETTLEMENT AGREEMENT**</u>

This Settlement Agreement ("<u>Agreement</u>") is entered into effective March 15, 2021 (the "<u>Effective Date</u>") between the State of Ohio, *ex rel*., Dave Yost, Ohio Attorney General (the "<u>Attorney General</u>"), and National Coalition of Health Care Sharing Ministries, Inc. ("<u>National Coalition</u>"), Gospel Light Mennonite Church Medical Aid Plan, Inc. which does business as "Liberty HealthShare" ("<u>Gospel Light</u>"), Druzilla Abel personally ("<u>Abel</u>"), Dale Bellis personally ("<u>Bellis</u>"), and Larry Foster personally ("<u>Foster</u>") (National Coalition, Gospel Light, Abel, Bellis, and Foster, collectively, constituting the "<u>Liberty Parties</u>").

**In consideration** of the mutual promises and obligations contained in this Agreement, the Attorney General and National Coalition, Gospel Light, Abel, Bellis and Foster enter into this Agreement and agree as follows:

1.  <u>Parties and Predicate</u>.

    A. Either individually or jointly, National Coalition and/or Gospel Light have been operating a healthcare sharing ministry beginning no later than 2014 under the name "Liberty HealthShare."

    B. The Attorney General has authority for enforcing charitable trusts and overseeing charitable solicitations in the State of Ohio pursuant to the Ohio Charitable Organizations Act, R.C. 1716.01 *et seq*., the Ohio Charitable Trust Act, R.C. 109.23 *et seq*., and Ohio common law.

    C. National Coalition is an Ohio nonprofit corporation whose principal place of operations is 4845 Fulton Drive NW, Canton, Ohio 44718.

    D. Gospel Light is a Virginia Non-Stock corporation whose principal place of operations is 4845 Fulton Drive NW, Canton, Ohio 44718.

**EXHIBIT**
**1.61**

EXHIBIT A-1

E.  National Coalition and Gospel Light each have 501(c)(3) status under the Internal Revenue Code.

F.  National Coalition and Gospel Light are "charitable organizations" as that term is defined in R.C. 1716.01(A) and "charitable trusts" as that term is defined in R.C. 109.23.

G.  National Coalition and Gospel Light have engaged in "solicitation" as that term is defined in R.C. 1716.01(K)(1).

H.  Pursuant to his statutory and common law authority, the Attorney General directed that the Charitable Law Section of the Ohio Attorney General's Office investigate under R.C. 109.24 whether the property held by Gospel Light and/or National Coalition for charitable, religious or educational purposes has been and is being properly administered in accordance with fiduciary principles as established by the courts and statutes of this state and whether Gospel Light and/or National Coalition have properly complied with the requirements of R.C. Chapter 1716 regarding the conduct of charitable solicitations (the "Charitable Investigation").

I.  The current board members of the National Coalition are Dale Bellis, Druzilla Abel, Durlin Beachy, and Everett Yoder.

J.  The current board members of Gospel Light are Durlin Beachy, Don Brewer, Scot Burris, Ryan Mast, and Everett Yoder.

K.  Gospel Light has been recognized by Centers for Medicare & Medicaid Services ("CMS") as a healthcare sharing ministry under Section 5000A(d)(2)(B)(ii) of the Affordable Care Act.

L.  Gospel Light registered the trade name "Liberty Healthshare" with the Ohio Secretary of State on or about June 15, 2015, with a date of first use of November 15, 2014.

M.  In December 2018, National Coalition transferred substantially all of its assets to Gospel Light for the purpose of benefiting the health care sharing ministry and the membership of Gospel Light.  National Coalition and Gospel Light represent that they were unaware of the Charitable Investigation until after the asset transfer.  Gospel Light's Board of Directors has approved returning a portion of the previously transferred assets in an amount sufficient for National Coalition to pay the civil penalty agreed to by National Coalition as part of this settlement with the Attorney General.

N.  Beginning no later than January 1, 2021, National Coalition has had no employees or ongoing operations and Liberty HealthShare is being operated exclusively by Gospel Light.

O.  Abel is the current Chief Executive Officer of Gospel Light, previously served for multiple years and simultaneously as a board member, board secretary, Chief Operating Officer of both National Coalition and Gospel Light, and was listed as a vice president of both National Coalition and Gospel Light in certain filings with the Internal Revenue Service and the Charitable Law Section of the Ohio Attorney General's Office.  She resides in Stark County, Ohio.

P.  Bellis is described as the founder of Liberty HealthShare and previously served for multiple years and simultaneously as a board member, President and Executive Director of both National Coalition and Gospel Light.  He resides in Stark County, Ohio.

Q. Foster was previously a board member and Chief Executive Officer of both National Coalition and Gospel Light.  He resides in Marion County, Indiana.

R. On the basis of the Charitable Investigation, the Attorney General believes that one or more of the Liberty Parties have, through their acts and/or omissions, violated Ohio law relating to the charitable trust and/or solicitation activities of National Coalition and Gospel Light.

S. Each of the Liberty Parties denies that, through their acts and/or omissions, they have violated Ohio law relating to the charitable trust and/or solicitation activities of National Coalition and Gospel Light.

T. The Attorney General and the Liberty Parties wish to resolve all issues, allegations and/or claims between and among them arising out of the Charitable Investigation.

U. All parties agree that neither execution or performance of this Agreement by Gospel Light, National Coalition, Abel, Bellis, or Foster shall constitute an admission of any wrongdoing or violations of law by any of them.

2.   <u>Dissolution of National Coalition</u>.

A. On or before June 30, 2021, National Coalition shall make best efforts to complete and file all documents with, and pay any necessary fees to, the Ohio Secretary of State, the Attorney General, the Internal Revenue Service, and any other Federal or State agency necessary to formally dissolve National Coalition.  National Coalition shall timely provide copies of these documents to the Attorney General, as directed.  In no event shall dissolution and payment be completed later than August 31, 2021.

B. National Coalition and Gospel Light, jointly and separately, represent and warrant that any and all documents or records, in whatever form, currently in the care, custody or

control of National Coalition relating to the formation, operation, governance, finances and/or service to members of National Coalition and/or Gospel Light either have been or will be preserved in the care, custody and/or control of Gospel Light.

C. Assets of National Coalition suitable for distribution to and/or use by another healthcare sharing ministry shall go only to Gospel Light.

3. <u>Board Membership for Gospel Light</u>.

A. Following the Effective Date, Bellis, Foster, and Abel are prohibited from serving in any capacity on the Board of Directors of Gospel Light.

B. Within 120 days after the Effective Date, Gospel Light's Board of Directors shall appoint two new, outside and independent Board Members with expertise or experience in health care claims administration, law, finance or accounting, or business management.  Prior to appointment, Gospel Light will identify the proposed board candidates to the Attorney General, for review of the independence and qualifications by the Attorney General.  The Attorney General reserves the right to reject proposed Board candidates by providing notice of rejection to Gospel Light no later than 15 business days after receiving written notice of that individual's nomination.  For purposes of this Paragraph and the remainder of this Agreement, the term "<u>independent</u>" shall mean the absence of any pre-existing professional or familial relationship with any of the Liberty Parties (other than as Liberty HealthShare members), any current or former board members of Gospel Light or National Coalition, The Medical Cost Savings Solution, Ltd., SavNet International, LLC, Cost Sharing Solutions, LLC, any of the owners of the preceding three entities, or any other entity with common ownership to any of these three entities.

4.    <u>Senior Level Executive Reporting</u>.

    A.  Beginning no later than the Effective Date and continuing through January 24, 2022, the positions, or the future functional equivalents, of Chief Financial Officer and Chief Legal Counsel for Gospel Light, currently held by Stephen Furst and Steven Yashnik respectively, shall report directly to the Board of Directors of Gospel Light and not to the Chief Executive Officer.  On or after January 25, 2022, all terms of employment or decisions relating to employment for the positions of Chief Financial Officer and Chief Legal Counsel, or the future functional equivalents, shall be set or made by the Board of Directors of Gospel Light, but those positions may otherwise report to the Chief Executive Officer if and as the Board directs.

5.    <u>Auditing Firm and Practices</u>.

    A.  Upon the completion of Gospel Light's annual filings with the IRS and Attorney General and accounting audit for fiscal year 2020, Gospel Light shall disengage and thereafter permanently refrain from engaging its current auditing firm, Sullivan & Company, LLC, for those same services.

    B.  Subject to Paragraph 5.A, Gospel Light shall retain a new and independent auditing firm for all audit engagements, including but not limited to the annual filings with the IRS and Attorney General and accounting audit for fiscal year 2021 and thereafter.  The new auditing firm shall be selected by Gospel Light's Board of Directors, in consultation with the Chief Financial Officer, through a competitive process, soliciting requests for proposals from a minimum of three qualified accounting firms.  Prior to engaging the new auditing firm, Gospel Light will identify the proposed auditing firm to the Attorney General, which the Attorney General may reject by providing notice of

rejection to Gospel Light no later than 30 days after receiving written notice of intent to proceed with hiring.  Gospel Light shall retain the new auditing firm no later than November 1, 2021 unless the Attorney General rejects the candidate.

C.  For fiscal year 2020 and beyond, Gospel Light's IRS form 990 filings shall include the following:

   i.  Gospel Light shall not be required to include cost-containment vendor expenses on Part IX of IRS form 990.  Within Part IX, however, Gospel Light shall reference or refer the reader to Schedule O of IRS form 990.

   ii.  On Schedule O, Gospel Light shall disclose both total and net "sharepower" for the fiscal year.  The net sharepower figure shall be calculated by subtracting from the total sharepower figure all administrative expense allocations and all cost-containment vendor expenses.  The administrative expense allocations and cost containment vendor expenses shall be disclosed, separately, on Schedule O.  For the cost-containment vendor expenses, Gospel Light shall identify or describe the types of services (such as balance billing, provider disputes, case management, negotiations, preferred provider agreements, etc.) that are categorized as cost-containment vendor expenses.

D.  For fiscal year 2020 and beyond, substantially the same information described in Paragraph 5.C.ii above shall also be disclosed in Gospel Light's audited financial statements.

6.  <u>Abel Retirement and Replacement Chief Executive Officer</u>.

A.  Abel tendered her resignation to the Board of Directors of Gospel Light on January 24, 2021.  Abel's retirement date will be effective no later than January 24, 2022, and Abel

will abide by the terms set forth in the 2021 Executive Compensation and Severance/Retention Agreement.  Upon her retirement and in no event later than January 24, 2022, Abel shall not be employed by Gospel Light in any capacity.

B. Prior to the Effective Date, Gospel Light will have executed the above identified 2021 Executive Compensation and Severance/Retention Agreement, which will require Abel to, among other services and covenants, use her best efforts to stabilize and position Gospel Light for a successful transition with a new senior officer.  The senior officer will be selected by the Board of Directors of Gospel Light.  The intent is for such person to take over as the next Chief Executive Officer after Abel's departure.  The 2021 Executive Compensation and Severance/Retention package will provide compensation and benefits lasting not more than twelve months and otherwise reasonable and typical to one provided to senior management in the normal course of nonprofit employment agreements and departures.  Prior to execution, Gospel Light will allow the Attorney General to review and verify the final terms of the 2021 Executive Compensation and Severance/Retention Agreement in the Columbus, Ohio office of Roetzel & Andress.

C. For a period of twelve months following the date of her effective separation of service from Gospel Light, Abel shall not perform any work or service, either directly or indirectly, for Gospel Light not authorized by the 2021 Executive Compensation and Severance/Retention Agreement or for any third-party vendor providing services to Gospel Light.  Following this twelve-month period, Abel shall not be restricted from working for or on behalf of any third-party vendor providing services to Gospel Light. Provided, however, that if those services for the third-party vendor also involve

contractual services for Gospel Light, such services shall be subject to review and prior approval of Gospel Light's Board of Directors.

D. Within 180 days of the Effective Date, Gospel Light's Board of Directors shall direct a search for and hire a new senior officer to be trained by and take over as Chief Executive Officer for Abel upon her separation from Gospel Light.  The new senior officer must be an outside and independent candidate.  Prior to hiring, Gospel Light will identify the proposed senior officer for review of the independence and qualifications by the Attorney General, whom the Attorney General may reject by providing notice of rejection to Gospel Light no later than 15 business days after receiving written notice of intent to proceed with hiring.

E.  Notwithstanding any other provision in this Agreement, Abel may work for or with any trade association whose members include but are otherwise independent of Gospel Light.

7. <u>Bellis</u>.

A. Bellis shall not be employed by Gospel Light in any capacity following the December 31, 2022 termination date of his 2018 Executive Employment Agreement, as amended commensurate with this Agreement.

B. Effective December 31, 2022, all rights and obligations of Gospel Light and Bellis to one another under their 2018 Executive Employment Agreement shall fully and finally terminate such that, without limitation, Bellis' obligations not to compete with Gospel Light and any right to payment or benefits from Gospel Light shall cease, effective December 31, 2022.

SETTLEMENT AGREEMENT– Page **10** of 24

C. Prior to December 31, 2022, Bellis shall not perform any work, either directly or indirectly, for Gospel Light not authorized by the 2018 Executive Employment Agreement, as amended commensurate with this Agreement, or for any third-party vendor providing services to Gospel Light.  Beginning on or after December 31, 2022, Bellis shall not be restricted from working for or on behalf of any third-party vendor providing services to Gospel Light, subject to review and prior approval of Gospel Light's Board of Directors.

D. Notwithstanding any other provision in this Agreement, Bellis may work for or with any trade association whose members include but are otherwise independent of Gospel Light.

8. <u>Foster</u>.

A. Foster is not currently and following the Effective Date shall not be employed by Gospel Light in any capacity.

B. Prior to the effective date of Abel's resignation from Gospel Light, Foster shall be barred from performing any work, either directly or indirectly, for Gospel Light.  He also shall not participate in any negotiation or delivery of direct services to Gospel Light on behalf of any third-party vendor providing services to Gospel Light. Beginning after the effective date of Abel's resignation from Gospel Light, Foster shall not be restricted from working for or on behalf of any third-party vendor providing services to Gospel Light, subject to review and prior approval of Gospel Light's Board of Directors.

SETTLEMENT AGREEMENT– Page **11** of **24**

    C.  Notwithstanding any other provision in this Agreement, Foster may work for or with any trade association whose members include but are otherwise independent of Gospel Light.

9.   <u>Vendor Relationships</u>.

    A.  To the extent Gospel Light is party to any contract with The Medical Cost Savings Solution, Ltd., SavNet International, LLC, Cost Sharing Solutions, LLC, or any other vendor with common ownership to any of these entities, and that contract is set to expire on or before January 24, 2022, Gospel Light shall either let those contracts expire or agree only to extend the terms of the current contracts with minimal modifications until no later than March 31, 2022.

    B.  To the extent Gospel Light is party to any contract with The Medical Cost Savings Solution, Ltd., SavNet International, LLC, Cost Sharing Solutions, LLC, or any other vendor with common ownership to any of these entities, and that contract is set to expire after January 24, 2022, Gospel Light shall not negotiate an extension of such existing contract prior to March 31, 2022.  The competitive vendor selection process established in Paragraph 9.C below does not prohibit the parties from negotiating and entering into a new contract after March 31, 2022.

    C.  Subsequent to March 31, 2022, Gospel Light shall not renew or enter into any contract with The Medical Cost Savings Solution, Ltd., SavNet International, LLC, Cost Sharing Solutions, LLC, or any other vendor with common ownership to any of these entities, without first utilizing a competitive and objective vendor-selection process approved by the Board of Directors of Gospel Light.

10.  Continuation of Operations and Service at Gospel Light.

   A.  This Agreement is intended to sustain and continue Gospel Light's operations and charitable service to the members of Liberty HealthShare throughout the changes otherwise described and required in this Agreement.

   B.  Other than the transfer referenced in Paragraph 1.M above, Gospel Light shall not merge with or into, transfer or assign any assets to, or transfer or assign any rights or obligations regarding the members of Liberty HealthShare to, or enter into any binding agreement to do any of the preceding with, any other organization or corporation, including any other health care sharing ministry, prior to March 31, 2022, and may do so thereafter only if approved by the Board of Directors of Gospel Light.

11.  Civil Penalty, Costs and Fees.

   A.  Subject to and without waiving Paragraphs 1.S and 1.U above, National Coalition agrees to pay a civil penalty for the failure to timely register with the Charitable Law Section of the Attorney General prior to making charitable solicitations, in the amount of $30,000.00 (thirty thousand dollars and zero cents) (the "civil penalty"), provided that $10,000.00 (ten thousand dollars and zero cents) of the civil penalty will be suspended subject to, and abated upon, National Coalition and Gospel Light fully satisfying and performing all of their obligations under the Agreement.  The civil penalty shall be paid by wire transfer with receipt acknowledged, or by cashier's check or money order payable to **"Treasurer, State of Ohio"** and mailed or delivered to:

> Ohio Attorney General
> Charitable Law Section
>  Attn:  Chief Accountant
> 30 E. Broad St., 25th Floor
> Columbus, OH  43215

The civil penalty shall be paid within 15 days of the Effective Date.  Gospel Light may pay, and guarantees the payment of, the civil penalty on behalf of National Coalition.  Within two business days of receiving notice that National Coalition or Gospel Light intends to pay the civil penalty by wire transfer, the Attorney General shall provide to counsel wire transfer instructions.

B.   Subject to and without waiving Paragraphs 1.S and 1.U above, Gospel Light agrees to pay the Attorney General $20,000.00 (twenty thousand dollars and zero cents) for the reasonable costs of investigation and $50,000.00 (fifty thousand dollars and zero cents) for reasonable attorneys' fees incurred in conjunction with the Charitable Investigation (collectively, the "cost and fees amount").  The costs and fees amount shall be paid by wire transfer with receipt acknowledged, or by cashier's check or money order payable to "Treasurer, State of Ohio" and mailed or delivered to

> Ohio Attorney General
> Charitable Law Section
>   Attn:  Chief Accountant
> 30 E. Broad St., 25th Floor
> Columbus, OH  43215

The cost and fees amount shall be paid within 15 days of the Effective Date.  Within two business days of receiving notice that Gospel Light intends to pay the cost and fees amount by wire transfer, the Attorney General shall provide to counsel wire transfer instructions.

C.   Failure by National Coalition and/or Gospel Light to comply with their respective obligations under the Agreement shall entitle the Attorney General to $10,000.00 (ten thousand dollars and zero cents) in stipulated civil penalties per violation.  In the event the Attorney General believes that any obligation has not been complied with, the

Attorney General will provide written notice and a ten-day period to cure the noncompliance.  The notice required under this Paragraph may be provided to the party alleged to be in breach at the email address set forth in Paragraph 14.B below.  If the alleged breaching party is Gospel Light, such notice shall also be delivered by U.S. mail to the Chairman of the Board of Directors at the address set forth in Paragraph 1.D above.  The ten-day cure period begins once email or mail receipt is acknowledged by the alleged breaching party; provided, however, that if the Attorney General complies with the notice provisions in this Paragraph and Paragraph 14.B, then in no event shall the cure period exceed 24 days from the date notice was provided.

D.  National Coalition and Gospel Light do not control Abel, Bellis, and/or Foster, who are represented by separate counsel.  As such, to the extent Abel, Bellis, and/or Foster fails to adhere to the terms of this Agreement, National Coalition and Gospel Light shall not be held accountable for such conduct unless they directly participated in the conduct giving rise to the alleged breach.

E.  The Attorney General shall be entitled to an award of reasonable costs and fees, including attorneys' fees, incurred in successfully obtaining relief from any breach of the Agreement by any Liberty Party.

12.  <u>Ongoing Cooperation by National Coalition, Gospel Light, Abel, Bellis, and Foster</u>.

A.  The Liberty Parties shall cooperate, reasonably and promptly, with the Attorney General regarding the Charitable Investigation and any litigation arising from the Charitable Investigation.  This cooperation shall include:

i.  Fully, fairly, and truthfully disclosing and/or producing, voluntarily and without service of subpoena or investigative demand, all non-privileged information

and all non-privileged documents or other tangible evidence requested by the Attorney General concerning or relevant to whether any person is violating or conspiring to violate, or has violated or conspired to violate, the law including, without limitation, non-privileged information that falls into the following categories: (a) formation of National Coalition and/or Gospel Light; (b) operation of Gospel Light and/or National Coalition; (c) governance of Gospel Light and/or National Coalition; (d) finances of Gospel Light and/or National Coalition; (e) communications with past and present directors, trustees, officers, employees, consultants, contractors, and/or agents of Gospel Light and National Coalition; (f) business and/or contracts between and/or for the benefit of Gospel Light and/or National Coalition and service vendors, including without limitation Legacy Management, LLC, Cost Sharing Solutions LLC, The Medical Cost Savings Solution, Ltd., SavNet International LLC, and HealthShare RX (collectively, "Vendors"); (g) communications with past and present owners, members, managers, directors, trustees, officers, consultants, contractors, employees and/or agents of Vendors; (h) meetings, and actions without a meeting, of the directors and/or trustees of Gospel Light and/or National Coalition; (i) termination or separation of Gospel Light and/or National Coalition's Chief Legal Counsel Sandra Cheshire; (j) Termination or separation of Gospel Light and/or National Coalition's Chief Medical Officer John Hunt; (k) conflicts of interest, actual and/or alleged, relating to Gospel Light and/or National Coalition's formation, operation, governance, finances and/or service to members; and (l) Communications with and/or among

Druzilla Abel, Daniel J. Beers, Daniel J. Beers II, Ronald S. Beers, Thomas Fabris, Brandon Fabris, Dale Bellis, Larry Foster, and Douglas Behrens and persons acting as their agents or representatives.

ii.   For a period of not less than five years following the Effective Date, maintaining custody of, or making arrangements to have maintained, all documents and records that fall into the categories described in Paragraph 12.A.i including, for Abel, Bellis, and Foster, personal emails, text messages, or any other digital communications; and,

iii.   Attending, appearing and/or participating, voluntarily and without service of subpoena or investigative demand, at any discussions, interviews, depositions, hearings, trials or other proceedings, whether formal or informal, at which the presence of a Liberty Party is requested by the Attorney General and answering any and all inquiries regarding non-privileged information that may be put forth by the Attorney General at any proceedings, including about such Liberty Party's own acts and/or omissions and/or against such Liberty Party.   All Liberty Parties are entitled to reasonable notice of the request and may have counsel present to represent the them at these proceedings.

iv.   The cooperation required under Paragraph 12.A shall not be deemed to waive any attorney-client privilege or work product protections.   The Attorney General reserves the right to challenge any assertions of privilege or protection.

B.  Additional Cooperation by National Coalition and Gospel Light

i.   In addition to cooperation under Paragraph 12.A above, Gospel Light and National Coalition will undertake reasonable best efforts to have Gospel Light's

and/or National Coalition's current and former officers, directors and employees cooperate according to Paragraphs 12.A.i., 12.A.ii., and 12.A.iii above.

ii. No later than the Effective Date, Gospel Light and National Coalition shall produce to the Attorney General a log or logs of the documents and information withheld and/or redacted from their responses to investigative requests for records in the Charitable Investigation.  The log(s) shall provide sufficient information, without disclosing privileged information, to identify and ascertain the parties to, dates, parties to creation and/or communication, form and subject matter of such documents and information, and the asserted privilege or protection.

iii. No later than 14 days after the Effective Date, Gospel Light and/or the National Coalition will release Jim Hummer from any and all non-disclosure agreements for the limited purpose of allowing him to fully cooperate with the Attorney General regarding the Charitable Investigation and any litigation arising from the Charitable Investigation.

iv. No later than 14 days after the Effective Date, Gospel Light and/or National Coalition will release Sandy Cheshire from any and all non-disclosure agreements for the limited purpose of allowing her to fully cooperate with the Attorney General regarding the Charitable Investigation and any litigation arising from the Charitable Investigation, provided that such release(s) shall not waive any attorney-client privilege or work product protections.  The Attorney General does not object if counsel from Roetzel & Andress or other designated

counsel (at the discretion and cost of Gospel Light and/or National Coalition) is present in any interview, deposition, or testimony of Ms. Cheshire to assert reasonable objections to preserve the attorney-client privilege or attorney work product protection.  The Attorney General reserves the right to challenge any assertions of privilege or protection.

C. The parties reserve all rights under the Ohio Civil Rules and any rights afforded by the 5th Amendment to the U.S. Constitution with respect to their obligations to cooperate under this Agreement.

D. A refusal to cooperate by any Liberty Party will be considered only a breach of the Agreement by the refusing Liberty Party, subject to the rights reserved in Paragraphs 11.D, 12.B.i., and 12.C above.

13.   <u>Releases and Reservation of Rights</u>.

A. Conditioned upon and subject to full and complete material performance of their obligations under this Agreement, the Attorney General hereby fully and completely releases Abel, Bellis, and Foster from any and all claims, and causes of action of any nature or any kind, both known and unknown, arising from the Charitable Investigation for any acts and/or omissions in their capacity as Board Members and/or Officers of Gospel Light or the National Coalition.

B. Conditioned upon and subject to full and complete material performance of their obligations under this Agreement, the Attorney General hereby fully and completely releases Gospel Light and National Coalition from any and all claims, and causes of action of any nature or kind, both known and unknown, arising from the Charitable Investigation.

SETTLEMENT AGREEMENT– Page **19** of **24**

C.  Conditioned upon and subject to full and complete material performance by Gospel Light and National Coalition of their obligations under this Agreement, the Attorney General hereby fully and completely releases Darrell Beachy, Durlin Beachy, Don Brewer, Scot Burris, Joseph Gingerich, Brad Hahn, Tyler Hochstetler, Ryan Mast, William Waldron, Everett Yoder, Stephen Furst, Steve Yashnik, Michael Fairless, Robert Kintigh, Amy Hagen, Sr., Terrie Ipson, and Wes Humble (collectively, the "Released Nonparties") from any and all claims, causes of action of any nature or kind, both known and unknown, arising from the Charitable Investigation for any acts and/or omissions in their capacities as Board Members and/or Officers of Gospel Light or National Coalition.

    i.  Upon a showing by Gospel Light that it must indemnify any other individual(s) relating to or arising from the Charitable Investigation, the Attorney General will work in good faith with Gospel Light to determine whether such individual may be released on the same or similar terms and conditions as individuals are being released under this Agreement.

    ii.  Nothing in this Agreement shall be construed to prevent or limit in any way the Attorney General's ability to seek information, documents, or testimony from any of the Released Nonparties.

D.  Nothing in this Agreement shall be construed to release any of the Liberty Parties from their obligations under this Agreement.  Nothing in this Agreement shall be construed to release any of the Liberty Parties or any of the Released Nonparties from any claims or causes of action based on acts or omissions occurring after the Effective Date.

E.  Nothing in this Agreement shall be construed to release or effect in any way, and the Attorney General reserves all rights to pursue, any and all claims or causes of action the Attorney General may have against any individual or entity other than the Liberty Parties or the Released Nonparties, including claims or causes of action that may involve the acts or omissions of the Liberty Parties or the Released Nonparties.

F.  Nothing in this Agreement shall be construed to release or effect in any way, and the Attorney General reserves all rights to pursue, any and all claims or causes of action of any State agencies or sections of the Attorney General's Office other than the Charitable Law Section, including any claims or causes of action arising out of or relating to any investigation by the Consumer Protection Section of the Ohio Attorney General's Office.

14.  <u>Miscellaneous</u>.

A.  The parties shall execute and deliver such further instruments and documents and take such other actions as may reasonably be requested and required to perform their obligations under this Agreement, including obligations to cooperate.

B.  Any notice required or provided under this Agreement shall be effective when sent by as follows:

   i.  To Gospel Light c/o Daniel Hilson, Esq., Roetzel & Andress, at dhilson@ralaw.com, and Jessica Lopez, Esq., Roetzel & Andress at Jlopez@ralaw.com, and with a mail address of 222 S. Main Street, Akron, Ohio 44308-1500, with a copy via regular U.S. Mail to Gospel Light Mennonite Church Medical Aid Plan, 4845 Fulton Drive NW, Canton, Ohio 44718 Attention: Chief Legal Officer;

SETTLEMENT AGREEMENT– Page **21** of **24**

ii.  To National Coalition c/o Daniel Hilson, Esq., Roetzel & Andress, at dhilson@ralaw.com, and Jessica Lopez, Esq., Roetzel & Andress at Jlopez@ralaw.com, and with a mail address of 222 S. Main Street, Akron, Ohio 44308-1500, with a copy via regular U.S. Mail to National Coalition of Health Care Sharing Ministries, Inc., 4845 Fulton Drive NW, Canton, Ohio 44718 Attention: Chief Legal Counsel;

iii.  To Abel c/o Helen Mac Murray, Esq., Mac Murray & Shuster, at hmacmurray@mslawgroup.com and with a mail address of 6525 West Campus Oval Ste. 210, New Albany, Ohio 43054 with a copy to Druzilla Abel via email to drudyable@yahoo.com;

iv.  To Bellis c/o David Thomas, Esq., Taft, Stettinius & Hollister LLP, at dthomas@taftlaw.com, and with a mail address of 65 East State Street Ste. 1000, Columbus, Ohio 43215, with a copy to Dale Bellis via email to dalebellis123@gmail.com;

v.  To Foster c/o Helen Mac Murray, Esq., Mac Murray & Shuster, at hmacmurray@mslawgroup.com, and with a mail address of 6525 West Campus Oval Ste 210 New Albany, Ohio 43054, with a copy to Larry Foster via email to lfoster@pharmacywholesaleclub.com; and

vi.  To the Attorney General, c/o Daniel Fausey, Section Chief, Charitable Law Section at Daniel.Fausey@OhioAttorneyGeneral.gov, with a copy to Attorney General, Charitable Law Section, 30 E. Broad St., 25th Floor, Columbus, Ohio 43215, Attention:  Section Chief.

SETTLEMENT AGREEMENT– Page **22** of **24**

Any party may change its notice party and/or address by providing written notice to the Attorney General and all Liberty Parties according to this Agreement.

C.  This Agreement is entered into in the State of Ohio and will be governed under the laws of the State of Ohio.

D.  The parties acknowledge and agree that all matters relating to the enforcement and interpretation of this Agreement shall be subject to the jurisdiction of the Franklin County, Ohio Common Pleas Court.

E.  All parties acknowledge that they have been given ample opportunity to be advised by legal counsel of their own choosing as to the meaning and effect of each provision of this Agreement and that they have knowingly and voluntarily elected to enter into this Agreement.  The parties agree to sign this Agreement as their own voluntary act and deed, and each represents that such execution was not the result of any duress, coercion, or undue influence upon either of them.  The parties hereby acknowledge receipt of a copy of this Agreement before signing it and understand that each and every provision of this Agreement is contractual, legally binding, and not mere recitals.

F.  In the event that any provision of the Agreement is deemed to be invalid or unenforceable, the remaining provisions will remain intact and enforceable as stated, provided that doing so provides the same or similar consideration to the parties.

G.  This Agreement represents the entire understanding of the parties with respect to the subject matter contained herein.  The Agreement may be modified only in writing signed by all parties.

SETTLEMENT AGREEMENT– Page **23** of **24**

H. This Agreement is not intended to and shall not confer any rights upon any persons or entities other than the Attorney General, the Liberty Parties, and the Released Nonparties.

I. This Agreement may be signed in counterparts which, when taken together, will constitute a single integrated document.  Signed copies of the Agreement sent by electronic means will be considered to be the same as original signed versions.

J. It is understood and agreed that the payments described herein and the settlement and releases are the compromise of disputed claims and are not to be construed as an admission of any liability, fault, or wrongdoing on the part of the Liberty Parties, whom expressly deny liability and fault.

K. Each party has cooperated in (and in any construction to be made of this Agreement shall be deemed to have cooperated in) the drafting and the preparation of this Agreement.

L. Each individual signing below represents that he or she is authorized and directed to sign this Agreement on behalf of the representative party and further represents that he or she has the requisite authority to bind the party on behalf of whom they are signing.

**(remainder of this page intentionally left blank / signature page follows)**

SETTLEMENT AGREEMENT– Page **24** of **24**

This Agreement is being executed by the parties as of the Effective Date.

DALE BELLIS, in his personal capacity

NATIONAL COALITION OF HEALTH CARE SHARING MINISTRIES, INC.

*Durlin Beachy*

_____
Signature

_____
Representative's Signature

  Durlin Beachy-Chairman
_____
Printed name and title

DRUZILLA ABEL, in her personal capacity

_____
Signature

GOSPEL LIGHT MENNONITE CHURCH MEDICAL AID PLAN, INC.

_____
Representative's Signature

LARRY FOSTER, in his personal capacity

_____
Printed name and title

_____
Signature

DAVE YOST,
OHIO ATTORNEY GENERAL

_____
Daniel W. Fausey
Section Chief
Charitable Law Section
30 E. Broad St., 25th Fl.
Columbus, OH 43215

SETTLEMENT AGREEMENT– Page **25** of **24**

This Agreement is being executed by the parties as of the Effective Date.

DALE BELLIS, in his personal capacity

NATIONAL COALITION OF HEALTH CARE SHARING MINISTRIES, INC.

_____

Signature

_____

Representative's Signature

_____

Printed name and title

DRUZILLA ABEL, in her personal capacity

_____

Signature

GOSPEL LIGHT MENNONITE CHURCH MEDICAL AID PLAN, INC.

_____

Representative's Signature

LARRY FOSTER, in his personal capacity

_____

Printed name and title

_____

Signature

DAVE YOST,
OHIO ATTORNEY GENERAL

_____

Daniel W. Fausey
Section Chief
Charitable Law Section
30 E. Broad St., 25th Fl.
Columbus, OH 43215

**24    24**

B

B

B

SETTLEMENT AGREEMENT– Page **24** of **24**

This Agreement is being executed by the parties as of the Effective Date.

DALE BELLIS, in his personal capacity

NATIONAL COALITION OF HEALTH
CARE SHARING MINISTRIES, INC.

_____
Signature

_____
Representative's Signature

_____
Printed name and title

DRUZILLA ABEL, in her personal capacity

_____
Signature

GOSPEL LIGHT MENNONITE CHURCH
MEDICAL AID PLAN, INC.

_____
Representative's Signature

LARRY FOSTER, in his personal capacity

_____
Printed name and title

_____
Signature

DAVE YOST,
OHIO ATTORNEY GENERAL

_____
Daniel W. Fausey
Section Chief
Charitable Law Section
30 E. Broad St., 25th Fl.
Columbus, OH 43215

SETTLEMENT AGREEMENT– Page 24 of 24

This Agreement is being executed by the parties as of the Effective Date.

DALE BELLIS, in his personal capacity

_____
Signature

DRUZILLA ABEL, in her personal capacity

_____
Signature

LARRY FOSTER, in his personal capacity

_____
Signature

NATIONAL COALITION OF HEALTH CARE SHARING MINISTRIES, INC.

_____
Representative's Signature

_____
Printed name and title

GOSPEL LIGHT MENNONITE CHURCH MEDICAL AID PLAN, INC.

_____
Representative's Signature

_____
Printed name and title

DAVE YOST,
OHIO ATTORNEY GENERAL

_____
Daniel W. Fausey
Section Chief
Charitable Law Section
30 E. Broad St., 25th Fl.
Columbus, OH 43215

SETTLEMENT AGREEMENT– Page **24** of **24**

This Agreement is being executed by the parties as of the Effective Date.

DALE BELLIS, in his personal capacity

_____
Signature

DRUZILLA ABEL, in her personal capacity

_____
Signature

LARRY FOSTER, in his personal capacity

_____
Signature

NATIONAL COALITION OF HEALTH CARE SHARING MINISTRIES, INC.

_____
Representative's Signature

_____
Printed name and title

GOSPEL LIGHT MENNONITE CHURCH MEDICAL AID PLAN, INC.

_____
Representative's Signature

_____
Printed name and title

DAVE YOST,
OHIO ATTORNEY GENERAL

_____
Daniel W. Fausey
Section Chief
Charitable Law Section
30 E. Broad St., 25th Fl.
Columbus, OH 43215

SETTLEMENT AGREEMENT– Page **1** of **15**

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into effective December _1ᴳ_, 2021 (the "Effective Date") between the State of Ohio, *ex rel.*, Dave Yost, Ohio Attorney General (the "Attorney General"); and Daniel J. Beers personally ("D. Beers"), Cost Sharing Solutions LLC ("CSS"), Daniel Beers II personally ("D. Beers II"), Ronald Beers personally ("R. Beers"), Brandon Fabris personally ("B. Fabris"), The Medical Cost Savings Solution, Ltd. ("MCS"), Thomas Fabris personally ("T. Fabris"), Barat Consulting, LLC ("Barat Consulting"), and Scott Barat personally ("S. Barat") (D. Beers, CSS, D. Beers II, R. Beers, B. Fabris, MCS, T. Fabris, Barat Consulting, and S. Barat, collectively, constituting the "Vendor Parties").

**In consideration** of the mutual promises and obligations contained in this Agreement, the Attorney General and the Vendor Parties enter into this Agreement and agree as follows:

1.   Parties and Predicate.

    A. The Attorney General has authority for enforcing charitable trusts and overseeing charitable solicitations in the State of Ohio pursuant to the Ohio Charitable Organizations Act, R.C. 1716.01 *et seq.*, the Ohio Charitable Trust Act, R.C. 109.23 *et seq.*, and Ohio common law.

    B. National Coalition of Health Care Sharing Ministries, Inc. ("National Coalition") was an Ohio nonprofit corporation whose principal place of operations was 4845 Fulton Drive NW, Canton, Ohio 44718. On June 29, 2021, National Coalition filed a Certificate of Dissolution with the Ohio Secretary of State.

    C. Gospel Light Mennonite Church Medical Aid Plan, Inc. ("Gospel Light"), is a Virginia Non-Stock corporation whose principal place of operations is 4845 Fulton Drive NW, Canton, Ohio 44718.



EXHIBIT
**1.62**

# EXHIBIT C

SETTLEMENT AGREEMENT– Page **2** of **15**

D. Gospel Light has been recognized by the Centers for Medicare & Medicaid Services ("CMS") as a healthcare sharing ministry under Section 5000A(d)(2)(B)(ii) of the Affordable Care Act.

E. National Coalition and Gospel Light either are or were "charitable organizations" as that term is defined in R.C. 1716.01(A) and "charitable trusts" as that term is defined in R.C. 109.23.

F. Gospel Light has 501(c)(3) status under the Internal Revenue Code. Prior to its dissolution, National Coalition had 501(c)(3) status under the Internal Revenue Code.

G. Either individually or jointly, National Coalition and/or Gospel Light have been operating a healthcare sharing ministry beginning no later than 2014 under the name "Liberty HealthShare."

H. Members of Liberty HealthShare make "contributions" as that term is defined in R.C. 1716.01(E).

I. National Coalition and Gospel Light have been engaged in "solicitation" as that term is defined in R.C. 1716.01(K)(1).

J. D. Beers resides in Stark County, Ohio. D. Beers previously held the position of Member Development Partner for Liberty HealthShare.

K. CSS is an Ohio for-profit limited liability company formed by D. Beers II and B. Fabris and currently owned 100%, collectively, by D. Beers II, B. Fabris, and R. Beers. Since 2014, CSS has provided marketing and promotional services for Liberty HealthShare, including the operation of a call center.

L. CSS's principal place of business is 2824 Woodlawn Ave. NW, Canton, Ohio 44708. D. Beers II, B. Fabris, and R. Beers all reside in Stark County, Ohio.

SETTLEMENT AGREEMENT– Page **3** of **15**

M. MCS is an Ohio for-profit limited liability company formed and currently owned 100% by T. Fabris. Since 2015, MCS has contracted with National Coalition and/or Gospel Light to provide repricing, medical discount, bill negotiations and bill clearing house services for the benefit of Liberty HealthShare members.

N. MCS's principal place of business is 2824 Woodlawn Ave. NW, Canton, Ohio 44708. T. Fabris resides in Stark County, Ohio.

O. Barat Consulting is an Ohio for-profit limited liability company formed and currently owned 100% by S. Barat. Barat Consulting has received payments from both CSS and MCS and has made payments to D. Beers.

P. Barat Consulting's principal place of business is 608 Highland Ave., Barberton, Ohio 44203. S. Barat resides in Stark County, Ohio.

Q. R. Beers, B. Fabris, D. Beers II, and CSS have engaged in solicitation as that term is defined in R.C. 1716.01(K)(1) on behalf of and/or in relation to Liberty HealthShare. CSS continues to engage in solicitation as that term is defined in R.C. 1716.01(K)(1).

R. CSS has acted and continues to act as a "professional solicitor" as that term is defined in R.C. 1716.01(J) on behalf of and/or in relation to Liberty HealthShare.

S. Pursuant to his statutory and common law authority, and in his role as parens patriae to protect the intended beneficiaries of charitable trusts including, but not limited to, current and former members of Liberty HealthShare, the Attorney General directed that the Charitable Law Section of the Ohio Attorney General's Office investigate the acts and omissions of various individuals and entities, including the Vendor Parties, to ascertain whether, under R.C. 109.24 and common law, the property held or controlled by Gospel Light and/or National Coalition for charitable purposes has been and is being

SETTLEMENT AGREEMENT– Page **4** of **15**

properly administered in accordance with R.C. Chapter 109 and Ohio common law, and whether the requirements of R.C. Chapter 1716 regarding the conduct of charitable solicitations were satisfied relating to Liberty HealthShare (the "Charitable Investigation"). The Charitable Investigation commenced in January 2018 and encompassed any and all claims, causes of actions, legal theories, remedies at law or in equity, or other forms of relief under the authority of the Attorney General pursuant to R.C. 109.24, R.C. Chapter 1716, and under common law as it relates to the administration of charitable trusts, including, but not necessarily limited to claims to recover excess benefits or compensation from the Vendor Parties under the common law, the use or misuse of charitable funds, breaches of fiduciary duty, any claims predicated on violations of R.C. Chapter 1716, or any other claims predicated on an abuse of charitable trust under R.C. 109.24, or any alleged relationship between the Vendor Parties or their principals or agents and Liberty HealthShare, including but not limited to any conspiracy to commit any of the above-referenced acts (the "Potential Charitable Claims and Causes of Action").

T. Through the Charitable Investigation, with the initial belief that the Vendor Parties violated Ohio law, the Attorney General sought, in part, to collect monies from the Vendor Parties from the amounts they were paid by Liberty HealthShare, for the benefit of the intended charitable beneficiaries of Liberty HealthShare.

U. The Attorney General and the Vendor Parties have been engaged in good faith negotiations since April 2021 in an effort to resolve all issues, allegations and/or claims arising out of or related to the Charitable Investigation or the Potential Charitable Claims

SETTLEMENT AGREEMENT-- Page 5 of 15

and Causes of Action and now wish to finally and fully resolve these issues, allegations, and/or claims pursuant to the terms of this Agreement.

2. <u>CSS to register as a professional solicitor.</u>

    A. Within 60 days of the Effective Date, CSS shall take all steps necessary to register as a professional solicitor with the Charitable Law Section of the Ohio Attorney General's Office pursuant to R.C. 1716.07 and any rules adopted thereunder.

    B. Following the date of its initial registration pursuant to Paragraph 2.A, CSS shall comply with the requirements for and be subject to the laws applicable to professional solicitors, including as set forth in R.C. Chapter 1716 and any rules adopted thereunder.

3. <u>Cost and Fees, Payments, and Civil Penalty.</u>

    A. The Vendor Parties agree to pay the Attorney General $20,000.00 (twenty thousand dollars and zero cents) for the reasonable costs of investigation and $30,000.00 (thirty thousand dollars and zero cents) for reasonable attorneys' fees incurred in conjunction with the Charitable Investigation (collectively, the "<u>Cost and Fees Amount</u>"). The Costs and Fees Amount shall be paid by wire transfer with receipt acknowledged, or by cashier's check or money order payable to "Treasurer, State of Ohio" and delivered to:

        Ohio Attorney General
        Charitable Law Section
        Attn: Chief Accountant
        30 E. Broad St., 25th Floor
        Columbus, OH 43215

The Cost and Fees Amount shall be paid within 3 business days of the execution of this Agreement. Within two business days of receiving notice that the Vendor Parties intend to pay the Cost and Fees amount by wire transfer, the Attorney General shall provide

SETTLEMENT AGREEMENT– Page **6** of **15**

to counsel wire transfer instructions. The Attorney General shall deposit the Cost and Fees Amount into the charitable law fund established under R.C. 109.32.

B.  The Vendor Parties further agree to pay the amount of $5,850,000.00 (five million, eight hundred fifty thousand dollars and zero cents) (the "Payments"). The Payments shall be paid by wire transfer with receipt acknowledged, or by cashier's check or money order payable to "Treasurer, State of Ohio" and delivered to:

> Ohio Attorney General
> Charitable Law Section
> Attn: Chief Accountant
> 30 E. Broad St., 25th Floor
> Columbus, OH 43215

Within two business days of receiving notice that the Vendor Parties intend to pay a Payment by wire transfer, the Attorney General shall provide to counsel wire transfer instructions. The Payments shall be paid according to the following schedule:

i.  $450,000.00 (four hundred fifty thousand dollars and zero cents) shall be paid within 90 days of the Effective Date;

ii.  $540,000.00 (five hundred forty thousand dollars and zero cents) shall be paid on or before July 15, 2022;

iii.  $540,000.00 (five hundred forty thousand dollars and zero cents) shall be paid on or before January 15, 2023;

iv.  $540,000.00 (five hundred forty thousand dollars and zero cents) shall be paid on or before July 15, 2023;

v.  $540,000.00 (five hundred forty thousand dollars and zero cents) shall be paid on or before January 15, 2024;

SETTLEMENT AGREEMENT– Page 7 of **15**

   vi. $540,000.00 (five hundred forty thousand dollars and zero cents) shall be paid on or before July 15, 2024;

  vii. $540,000.00 (five hundred forty thousand dollars and zero cents) shall be paid on or before January 15, 2025;

 viii. $540,000.00 (five hundred forty thousand dollars and zero cents) shall be paid on or before July 15, 2025;

   ix. $540,000.00 (five hundred forty thousand dollars and zero cents) shall be paid on or before January 15, 2026;

   x. $540,000.00 (five hundred forty thousand dollars and zero cents) shall be paid on or before July 15, 2026; and

   xi. $540,000.00 (five hundred forty thousand dollars and zero cents) shall be paid on or before January 15, 2027.

The Payments shall be deposited into the Attorney General's R004 fund, a non-operating fund established by the General Assembly for the purpose of administering court orders and settlements on behalf of the Attorney General, and shall be accounted for separately within the R004 fund. The Payments shall be redistributed by the Attorney General, in his sole discretion, to or for the ultimate benefit of current or former members of Liberty HealthShare for the Potential Charitable Claims and Causes of Action.

C. The Vendor Parties further agree to pay a civil penalty in the amount of $600,000.00 (six hundred thousand dollars and zero cents) (the "Civil Penalty"). The Civil Penalty shall be paid by wire transfer with receipt acknowledged, or by cashier's check or money order payable to "Treasurer, State of Ohio" and delivered to:

SETTLEMENT AGREEMENT– Page **8** of **15**

Ohio Attorney General
Charitable Law Section
Attn: Chief Accountant
30 E. Broad St., 25th Floor
Columbus, OH 43215   .

Within two business days of receiving notice that the Vendor Parties intend to pay the Civil Penalty by wire transfer, the Attorney General shall provide to counsel wire transfer instructions. The Attorney General shall deposit the Civil Penalty into the charitable law fund established under R.C. 109.32. The Civil Penalty shall be paid according to the following schedule:

    i. $60,000.00 (sixty thousand dollars and zero cents) shall be paid on or before March 15, 2022;

    ii. $60,000.00 (sixty thousand dollars and zero cents) shall be paid on or before November 15, 2022;

    iii. $60,000.00 (sixty thousand dollars and zero cents) shall be paid on or before March 15, 2023;

    iv. $60,000.00 (sixty thousand dollars and zero cents) shall be paid on or before November 15, 2023;

    v. $60,000.00 (sixty thousand dollars and zero cents) shall be paid on or before March 15, 2024;

    vi. $60,000.00 (sixty thousand dollars and zero cents) shall be paid on or before November 15, 2024;

    vii. $60,000.00 (sixty thousand dollars and zero cents) shall be paid on or before March 15, 2025;

SETTLEMENT AGREEMENT– Page **9** of **15**

    viii.  $60,000.00 (sixty thousand dollars and zero cents) shall be paid on or before November 15, 2025;

    ix.  $60,000.00 (sixty thousand dollars and zero cents) shall be paid on or before March 15, 2026; and

    x.  $60,000.00 (sixty thousand dollars and zero cents) shall be paid on or before November 15, 2026.

D.  D. Beers, CSS, D. Beers II, B. Fabris, R. Beers, MCS, T. Fabris, Barat Consulting, and S. Barat agree that they are jointly and severally liable for the Cost and Fees Amount, the Payments, and the Civil Penalty.

E.  Upon written notice to the Attorney General pursuant to Paragraph 5.C, the Vendor Parties may make early lump sum payments towards any of the payment obligations in this Agreement and it shall apply to the next payment due and owing.

F.  If the Vendor Parties fail to comply with any of the payment requirements in this Agreement, then the Attorney General may certify any and/or all unpaid balances to the Ohio Attorney General's Collections Enforcement Section ("Collections") for collection. In the event of certification, the Vendor Parties agree to pay additional collection costs assessed by Collections in accordance with R.C. 131.02(A) equal to the amounts charged pursuant to R.C. 109.08 and 109.081 for the cost of certification and the use of Special Counsel for the collection of the debt. Interest shall also be charged upon certification in accordance with R.C. 131.02(D). Nothing in this paragraph shall be construed to limit the Attorney General's discretion or authority to pursue any other available remedy.

SETTLEMENT AGREEMENT– Page **10** of 15

4.    Forbearance, Releases, and Reservation of Rights.

    A.   The Attorney General shall initiate no litigation against the Vendor Parties arising from or related to the Charitable Investigation or the Potential Charitable Claims and Causes of Action so long as the Vendor Parties strictly comply with all of the payment requirements in Paragraphs 3.A, 3.B, and 3.C of this Agreement.

    B.   The Vendor Parties agree that any statute of limitations applicable to any claim or cause of action of the Attorney General's arising from or related to the Charitable Investigation or the Potential Charitable Claims and Causes of Action shall be tolled, as of the Effective Date, until July 15, 2027 or upon the date in which all payments under this Agreement have been paid in full, whichever is earlier.

    C.   Upon receipt of payment in full of the Cost and Fees Amount, the Payments, and the Civil Penalty, along with any additional amounts as set forth in Paragraph 3.F, if applicable, the Attorney General, in his role as parens patriae to protect the intended beneficiaries of charitable trusts including, but not limited to, current and former members of Liberty HealthShare, hereby agrees to fully and completely release the Vendor Parties for any and all acts or omissions from any and all claims and causes of action of any nature or any kind, both known and unknown, arising from or related to the Charitable Investigation or the Potential Charitable Claims and Causes of Actions occurring prior to the Effective Date.

    D.   Nothing in this Agreement shall be construed to release any of the Vendor Parties from their obligations under this Agreement. Nothing in this Agreement shall be construed to release any of the Vendor Parties from any claims or causes of action based on acts or omissions occurring after the Effective Date except that the Attorney General shall not

SETTLEMENT AGREEMENT– Page **11** of **15**

have a cause of action or claim related to the current compensation as outlined under the current contracts between the Vendor Parties and Liberty HealthShare.

E. Nothing in this Agreement shall be construed to release or affect in any way any rights, claims, or causes of action the Attorney General may have against any individual or entity other than the Vendor Parties arising from or related to the Charitable Investigation. Nothing in this Agreement shall be construed to prevent or limit in any way the Attorney General's ability to seek information, documents, or testimony from any of the Vendor Parties in conjunction with the Charitable Investigation or any litigation by the Attorney General arising from or related to the Charitable Investigation.

F. Except for the Potential Charitable Claims and Causes of Action, nothing in this Agreement shall be construed to release or affect in any way any rights, claims, or causes of action of any other agencies of the State of Ohio or any sections of the Attorney General's Office other than the Charitable Law Section. Nothing in this Agreement shall be construed to release or affect in any way any rights, claims, or causes of action arising out of or relating to the final judgment, entered on March 29, 2005, in the civil action captioned *Barberton Rescue Mission, et al., v. Bruce E. Hawthorn, et al.,* Case No. CV-2000-12-5496, in the Summit County Court of Common Pleas.

5. <u>Miscellaneous</u>.

A. The parties shall execute and deliver such further instruments and documents and take such other actions as may reasonably be requested and required to perform their obligations under this Agreement.

B. Attorney General agrees to apply the reporting requirements of IRC Section 6050X and related regulations, et al. regardless of the effective, binding date of this Agreement, as

SETTLEMENT AGREEMENT– Page **12** of **15**

they pertain to the reporting of amounts required for compliance with this IRC Section for application of compliance with the identification and establishment requirements of 26 U.S.C. 162(f) et seq. affording Vendor Parties the ability for payments made under paragraph 2.B. above, to claim as a federal tax deduction as enumerated above as part of this Agreement and by reporting such payments to the IRS in Box 2 of the IRS Form 1098-F.

C. Any notice required or provided under this Agreement shall be effective when sent as follows:

  i. To the Vendor Parties, c/o Laura Mills, at lmills@lawyerswithstrategy.com, with a copy to Rick Arnold, at rarnold@asalawfirm.com and Nathan Garrett, at NGarrett@gravesgarrett.com; and

  ii. To the Attorney General, c/o Daniel Fausey, Section Chief, Charitable Law Section at Daniel.Fausey@OhioAGO.gov, with a copy to Attorney General, Charitable Law Section, Attention: Section Chief, 30 E. Broad St., 25th Floor, Columbus, Ohio 43215.

Any party may change its notice party and/or contact information by providing written notice to the Attorney General and all Vendor Parties according to this Agreement.

D. This Agreement is entered into in the State of Ohio and will be governed under the laws of the State of Ohio.

E. The parties acknowledge and agree that all matters relating to the enforcement and interpretation of this Agreement shall be subject to the jurisdiction of the Franklin County, Ohio Common Pleas Court pursuant to O.R.C. 109.16.

SETTLEMENT AGREEMENT– Page **13** of **15**

F.  All parties acknowledge that they have been given ample opportunity to be advised by legal counsel of their own choosing as to the meaning and effect of each provision of this Agreement and that they have knowingly and voluntarily elected to enter into this Agreement. The parties agree to sign this Agreement as their own voluntary act and deed, and each represents that such execution was not the result of any duress, coercion, or undue influence upon either of them. The parties hereby acknowledge receipt of a copy of this Agreement before signing it and understand that each and every provision of this Agreement is contractual, legally binding, and not mere recitals.

G.  In the event that any provision of the Agreement is deemed to be invalid or unenforceable, the remaining provisions will remain intact and enforceable as stated, provided that doing so provides the same or similar consideration to the parties.

H.  This Agreement represents the entire understanding of the parties with respect to the subject matter contained herein. The Agreement may be modified only in writing signed by all parties.

I.  This Agreement may be signed in counterparts which, when taken together, will constitute a single integrated document. Signed copies of the Agreement sent by electronic means will be considered to be the same as original signed versions.

J.  Each party has cooperated in (and in any construction to be made of this Agreement shall be deemed to have cooperated in) the drafting and the preparation of this Agreement.

K.  Each individual signing below represents that he or she is authorized and directed to sign this Agreement on behalf of the representative party and further represents that he or she has the requisite authority to bind the party on behalf of whom they are signing.

SETTLEMENT AGREEMENT– Page **14** of **15**

L.  The Parties agree that the execution of this Agreement is done for the purposes of compromise, and to eliminate the burden of expense of further litigation, and does not constitute, and shall not be construed as, an admission of liability, wrongdoing, fault, judgment or concession, or as evidence with respect thereto, by any of the Vendor Parties, on account of any claims or matters and any such liability being specifically denied.

**(remainder of this page intentionally left blank / signature page follows)**

SETTLEMENT AGREEMENT– Page 15 of 15

This Agreement is being executed by the parties as of the Effective Date.

DANIEL J. BEERS, in his personal capacity

_____
Signature

COST SHARING SOLUTIONS, LLC

_____
Representative's Signature

_Daniel J Beers II   MEMBER_
Printed name and title

DANIEL BEERS II, in his personal capacity

_____
Signature

BRANDON FABRIS, in his personal capacity

_____
Signature

THE MEDICAL COST SAVINGS
SOLUTION, LTD.

_____
Representative's Signature

_Thomas A. Fabris  CEO_
Printed name and title

RONALD BEERS, in his personal capacity

_____
Signature

BARAT CONSULTING, LLC

_____
Representative's Signature

_Scott Barat_, _Member_
Printed name and title

THOMAS FABRIS, in his personal capacity

_____
Signature

SCOTT BARAT, in his personal capacity

_____
Signature

DAVE YOST,
OHIO ATTORNEY GENERAL

_____
Daniel W. Fausey
Section Chief
Charitable Law Section
30 E. Broad St., 25th Fl.
Columbus, OH 43215

NM OFFICE OF SUPERINTENDENT OF INSURANCE
**F I L E D**
02/22/2023 01:53:13 pm

<u>**BEFORE THE NEW MEXICO OFFICE OF SUPERINTENDENT OF INSURANCE**</u>

| | | |
|---|---|---|
| **IN THE MATTER OF** | ) | |
| **GOSPEL LIGHT MENNONITE** | ) | **Docket No. 2021-0085** |
| **CHURCH MEDICAL AID PLAN** | ) | |
| **D/B/A LIBERTY HEALTHSHARE** | ) | |
| Respondent. | ) | |
| _____ | ) | |

<u>**FINAL ORDER**</u>

**THIS  MATTER**

**THE SUPERINTENDENT FINDS AND CONCLUDES:**

B

EXHIBIT
**1.63**

EXHIBIT 5
Ex. 1.63, p. 1 of 8

B

B

B

**IT IS THEREFORE ORDERED that:**

B

**DONE AND ORDERED**

_____
**HON. JENNIFER A. CATECHIS**
**INTERIM SUPERINTENDENT OF INSURANCE**

## CERTIFICATE OF SERVICE

*Final Order*

_____

**Jennifer Romero, OSI Paralegal**

# Health Care Sharing Ministries Reporting to the Massachusetts Health Connector in 2020 & 2021:

A summary of information reported to the Health Connector by health arrangements provided by an established religious organization seeking minimum creditable coverage status for 2020 and 2021

**Massachusetts Health Connector**

**September 2021**





EXHIBIT 1.64   Ex. 1.64, p. 1 of 33

Resp. Appx. p. 591

# Table of Contents

Table of Contents....................................................................................................................... 2

Executive Summary .................................................................................................................. 4

1.0: Background ........................................................................................................................ 9

    1.1: Minimum Creditable Coverage (MCC) .......................................................................... 9

    1.2: MCC Regulation Amendments in 2019 ....................................................................... 10

2.0: Health Care Sharing Ministries Reporting to the Health Connector ............................... 13

3.0: Total Massachusetts HCSM Membership Reported ........................................................ 14

    3.1: Small Business Membership ....................................................................................... 16

4.0: Operations ...................................................................................................................... 18

    4.1: Location of HCSM Operation and Advertising ............................................................ 18

    4.2: Member Fees or Penalties ......................................................................................... 19

    4.3: Third-Party Vendors .................................................................................................. 21

    4.4: Provider Contracts ..................................................................................................... 23

5.0: Finances .......................................................................................................................... 25

    5.1: Administrative Fees ..................................................................................................... 29

    5.2: Rate Negotiation ........................................................................................................ 31

6.0: Conclusion ...................................................................................................................... 32

Appendix ................................................................................................................................ 33

    Abbreviations ...................................................................................................................... 33

Tables and Figures

*Tables*
Table 1: Summary of Reporting Form Responses, 2020 & 2021
Table 2: Health Care Sharing Ministries (HCSMs) that Submitted MCC Reporting Forms in 2020 and 2021
Table 3: Health Care Sharing Ministries (HCSMs) with Small Business Participation
Table 4: Location of Health Care Sharing Ministry (HCSM) Operation and Advertising
Table 5: Circumstances in which Members are Subject to Additional Fees, Sharing Requirements, or Termination
Table 6: Health Care Sharing Ministry (HCSM) Use of Third-Party Vendors
Table 7: Contracts with Health Care Providers
Table 8. Amount Paid out by HCSM for Members Health Care Costs as a Percentage of Member Contributions (Reporting Years 2020 & 2021)
Table 9. HCSM Administrative Fees (Reporting Years 2020 & 2021)
Table 10. HCSM Rate Negotiation (Reporting Years 2020 & 2021)

*Figures*
Figure 1: Total Contributions Paid by Members to HCSM, Total Medical Bills Submitted by Members for Sharing, Total Qualifying Medical Bills, and Total Amount Paid Through the HCSM for Care (Reporting Year 2020)
Figure 2: Total Contributions Paid by Members to HCSM, Total Medical Bills Submitted by Members for Sharing, Total Qualifying Medical Bills, and Total Amount Paid Through the HCSM for Care (Reporting Year 2021)
Figure 3: MCC Regulation Amendment Timeline
Figure 4: Massachusetts Health Care Sharing Ministry (HCSM) 2019 Membership Based on MCC Reporting Forms Submitted in 2020
Figure 5: Massachusetts Health Care Sharing Ministry (HCSM) 2020 Membership Based on MCC Reporting Forms Submitted in 2021
Figure 6: Total Contributions Paid by Members to HCSM, Total Medical Bills Submitted by Members for Sharing, Total Qualifying Medical Bills, and Total Amount Paid Through the HCSM for Care (Reporting Year 2020)
Figure 7: Total Contributions Paid by Members to HCSM, Total Medical Bills Submitted by Members for Sharing, Total Qualifying Medical Bills, and Total Amount Paid Through the HCSM for Care (Reporting Year 2021)

3

# Executive Summary

As part of its 2006 health care reforms, Massachusetts began requiring adults to have health insurance that meets certain standards or else face a tax penalty. The Massachusetts Health Connector's Board of Directors is responsible for setting the standards for the types of coverage that may satisfy this requirement and issued regulations in 2007 outlining what constitutes Minimum Creditable Coverage (MCC). In addition to enrolling in health insurance products, these regulations allowed an individual to satisfy their coverage requirements by participating in a health arrangement provided by an established religious organization. In 2019, the Health Connector updated its MCC regulations to set certain standards for which kinds of such health arrangements, commonly known as health care sharing ministries, or HCSMs, can be used to satisfy the MCC requirement, based on increasing reports of confusion among state residents around how these products compare to traditional health insurance.

The updated MCC regulations went into effect in January 2020. Under the amended regulations, a HCSM is deemed to provide minimum creditable coverage under 956 CMR 5.00 provided that the organization meets certain standards and attests to the Health Connector for each MCC Reporting Year that the arrangement meets those standards, specifically that it:

- is not a for-profit organization;
- does not make any direct or indirect representation that the organization has sufficient financing to meet members' anticipated financial or medical needs or that it has had a successful history of meeting members' financial or medical needs, provided that this requirement shall not apply to any financial statement that the organization is otherwise required to disclose by law;
- does not use compensated sales agents, sales tactics, or deceptive marketing practices to solicit or enroll members, including that it does not use common insurance terms, such as "health plan," "coverage," "copay," "copayment," "deductible," "premium," and "open enrollment," or refer to itself as "licensed" in advertisements, marketing material, brochures, or other materials related to the arrangement;
- does not use funds paid by members for medical needs to cover administrative costs;
- provides disclosure that the organization is not an insurance company and does not guarantee that medical bills will be paid by the organization or any other individuals; such disclosure must be made at initial contact with a prospective member, at the time of any material modification to the terms of the sharing arrangement, and in all advertising, brochures, and marketing materials;
- reports annually to the Health Connector any information about membership, operations, and finances as the Health Connector may require; and
- meets such other criteria that the Connector may deem appropriate to ensure that individuals participating in such arrangements participate only in those operating in a manner consistent with the requirements described in 956 CMR 5.03(3)(d) 1. through 6.[1]

---

[1] To date, the Health Connector has not used this provision to identify any additional criteria that HCSMs must meet.

4

A complete and timely response to the Health Connector's reporting form satisfies one of the standards necessary to be a health care sharing ministry deemed to provide MCC. The purpose of the reporting requirement is for the Health Connector, interested stakeholders, and the public to learn about the HCSMs operating in Massachusetts that would like to be deemed to provide MCC.

For the first year of required reporting, which was 2020, the Health Connector posted the reporting form on its website in May and accepted submissions through July 31 to allow for flexibility in the first year of the new requirement. For reporting year 2021 and beyond, HCSMs must submit their reporting form to the Health Connector by March 31 of that year. The Health Connector received seven MCC reporting form submissions from HCSMs in 2020 and six submissions in 2021. In 2021, two HCSMs from 2020 did not re-submit reporting forms and one new HCSM made a submission.

Table 1 summarizes key highlights from reporting form responses in 2020 and 2021, including information learned about the reporting HCSMs' membership, operations, and finances. Each MCC reporting year is based on data from the previous calendar year (CY). For example, 2020 reporting forms reflect information from CY 2019 (January 2019-December 2019) and 2021 reporting forms reflect information from CY 2020 (January 2020-December 2020).

*Table 1: Summary of Reporting Form Responses (2020 & 2021)*

| | 2020 | 2021 |
|---|---|---|
| Membership | • 7 HCSMs with at least 2,467 total MA members reported to the Health Connector.[2] <br> • Medi-Share (793), OneShare (572), and Christian Healthcare Ministries (521) had the greatest number of MA members. <br> • 3 HCSMs reported involvement with MA small businesses and their employees. | • 6 HCSMs with 2,170 total MA members reported to the Health Connector. <br> • Samaritan (669), Christian Healthcare Ministries (522), and Liberty (455) had the greatest number of MA members.[3] <br> • 2 HCSMs reported involvement with MA small businesses and their employees. |

---

[2] In 2020, some HCSMs reported membership at the household level resulting in underreported membership for 2020. In 2021, Health Connector staff changed the question about membership on the reporting form to clarify that HCSMs should report membership by individual member level data (not just household level).

[3] The change in the top 3 HCSMs with the greatest MA membership from 2020 to 2021 is due to the inconsistencies in how HCSMs reported member data in 2020 (some reported by household instead of actual members).

5

| Operations | • 6 out of the 7 HCSMs reported charging members extra fees or said they issued penalties in certain circumstances, most of which were tied to "violations of lifestyle agreements" or pre-existing conditions.<br>• 5 out of 7 HCSMs used third party vendors.<br>• All HCSMs operated in either all or nearly all states.<br>• 5 out of 7 HCSMs reported engaging in some type of provider contracting. | • 4 out of the 6 HCSMs reported charging members extra fees or said they issued penalties in certain circumstances, most of which were tied to "violations of lifestyle agreements" or pre-existing conditions.<br>• 4 out of 6 HCSMs used third party vendors.<br>• All HCSMs operated in either all or nearly all states.<br>• 4 out of 6 HCSMs reported engaging in some type of provider contracting. |
|---|---|---|
| Finances | • On average, members paid their HCSM about 1.8 times the amount that the HCSM paid out for members' health care bills.<br>• Health care costs paid for through the HCSM as a percentage of member contributions ranged from 16% to 79%.<br>• On average, about 50% of medical bills submitted by HCSM members were determined to be eligible for sharing.<br>• All HCSMs charged their members an administrative fee; however, the fee structures and amounts varied.<br>• Most HCSMs reported that individuals and/or the arrangement negotiate members' medical bills and some used a third-party for negotiations. | • On average, members paid their HCSM about 1.4 times the amount that the HCSM paid out for members' health care bills.<br>• Health care costs paid for through the HCSM as a percentage of member contributions ranged from 28% to 100%.<br>• On average, about 50% of medical bills submitted by HCSM members were determined to be eligible for sharing.<br>• All HCSMs charged their members an administrative fee; however, the fee structures and amounts varied.<br>• Most HCSMs reported that individuals and/or the arrangement negotiate members' medical bills and some used a third-party for negotiations. |

The following two charts further summarize the financial data submitted by HCSMs in 2020 and 2021. HCSMs reported information about total contributions paid by members to the HCSM, total medical bills submitted by members for sharing, total amount of medical bills that qualified for sharing, and the total amount paid through the HCSM for members' health care costs.

6

*Figure 1. Total Contributions Paid by Members to HCSM, Total Medical Bills Submitted by Members for Sharing, Total Qualifying Medical Bills, and Total Amount Paid Through the HCSM for Care (Reporting Year 2020)[4]*



*\*In 2020 and 2021, Liberty noted that the total amount submitted to the health arrangement for sharing includes "total charges submitted" which may include items such as duplicate bills and does not take into account certain factors such as deductions for discounts.*

*\*\*In 2020, Samaritan noted that shares received in one year would be for bills submitted in both the previous and current year; the "qualifying" shareable amount listed above includes provider reductions.*

---

[4] Some HCSMs were left out of Figure 1 for various reasons: Solidarity does not track state level data and does not collect data on total share amounts submitted for sharing. CMM reported <50 members making it difficult to make a comparison to other arrangements.

7

*Figure 2. Total Contributions Paid by Members to HCSM, Total Medical Bills Submitted by Members for Sharing, Total Qualifying Medical Bills, and Total Amount Paid Through the HCSM for Care (Reporting Year 2021)[5]*



*In 2020 and 2021, Liberty noted that the total amount submitted to the health arrangement for sharing includes "total charges submitted" which may include items such as duplicate bills and does not take into account certain factors such as deductions for discounts.*

**In 2020, Samaritan noted that shares received in one year would be for bills submitted in both the previous and current year; the "qualifying" shareable amount listed above includes provider reductions.*

This report on 2019 and 2020 information collected by HCSMs seeking MCC status is designed to help inform consideration of whether additional adjustments are appropriate as it relates to the evolving health care sharing ministries landscape and the state's ongoing individual mandate policy framework.

---

[5] Some HCSMs were left out of Figure 2 for various reasons: Solidarity does not track state level data and does not collect data on total share amounts submitted for sharing. Zion Health reported $0 for all fields aside from total shares contributed by the member and only has 7 total members.

8

# 1.0: Background

## 1.1: Minimum Creditable Coverage (MCC)

As part of Chapter 58 reforms, Massachusetts law requires adult residents to have health insurance that meets the state's Minimum Creditable Coverage (MCC) standards or potentially face an individual mandate penalty. MCC has a wide reach, with over 4 million Massachusetts residents subject to MCC standards. While state law defines MCC at a high level, it authorizes the Health Connector's Board of Directors to promulgate regulations further detailing creditable coverage.[6] The Health Connector first promulgated regulations on MCC in 2007 to define the minimum standards a health plan must meet for Massachusetts residents to comply with the requirement to obtain and maintain coverage under the Commonwealth's individual mandate law.

Minimum creditable coverage refers to the minimum level of benefits that adult tax filers need to carry in order to be considered insured and avoid tax penalties in Massachusetts. For most plans, MCC standards include[7]:

- Coverage for a comprehensive set of services (e.g. doctors' visits, hospital admissions, day surgery, emergency services, mental health and substance abuse, and prescription drug coverage)
- Doctor visits for preventive care, without a deductible
- A cap on annual deductibles
- For plans with up-front deductibles or co-insurance on core services, an annual maximum on out-of-pocket spending
- No caps on total benefits for a particular illness or for a single year
- No policy that covers only a fixed dollar amount per day or stay in the hospital, with the patient responsible for all other charges

Most plans sold in Massachusetts meet the MCC standards. Massachusetts-licensed health insurance companies must put an MCC-compliance notice on their plans sold in Massachusetts to indicate whether the plan meets MCC. Every year in January, insurers send Form MA 1099-HC to their enrollees to indicate whether a given insurance policy from the prior year met MCC requirements and the months in which an enrollee was covered by that policy. Taxpayers then use Form 1099-HC when filing their state income taxes. However, there are different pathways to MCC compliance. Employers, unions, plan sponsors, and insurers can apply for MCC Certification if they have a comprehensive plan that does not meet all specific MCC requirements but have a robust plan design overall. However, there are restrictions on certain deviations from MCC standards and applicants must explain the ways in which they do not meet all MCC requirements.[8] In addition, MCC regulations automatically deem some categories of coverage to provide MCC such as a plan through the U.S. Veterans Administration Health

---

[6] M.G.L. ch. 111M § 1; M.G.L. ch. 176Q § 3.

[7] Please see the most recent administrative bulletin, found at https://betterhealthconnector.com/about/policy-center/rules-regulations, regarding Minimum Creditable Coverage Regulations for all annually indexed limits

[8] MCC Certification application can be found here: https://betterhealthconnector.com/about/policy-center/rules-regulations/massachusetts-individual-mandate

9

System, TRICARE, a tribal or Indian Health Service plan, and many others.[9]

This "automatic" or "categorical" compliance pathway outlined in MCC regulations is how health arrangements provided by established religious organizations, such as HCSMs, are deemed to provide MCC. From the time that MCC regulations were first promulgated in 2007 until amendments were made in 2019, MCC regulations stated that any "health arrangement provided by established religious organizations comprised of individuals with sincerely held beliefs" is deemed to meet MCC. The regulations did not clearly define the standards that such "health arrangements" must meet prior to amendments in 2019.

## 1.2: MCC Regulation Amendments in 2019

The MCC regulations have been amended several times since their initial enactment, including updates in 2013 to reflect changes in the health insurance landscape brought by implementation of the federal Affordable Care Act (ACA). At that time, Massachusetts chose to maintain its state level individual mandate in large part to maintain the MCC standards, which in addition to providing a minimum "coverage floor" for individual mandate compliance also promote basic consumer protections for Massachusetts residents. Today, MCC standards are especially important in offering a framework for acceptable coverage in Massachusetts because, as of 2019, the federal individual mandate penalty was reduced to $0, rendering the ACA standards for creditable coverage ineffectual.

After implementation of the ACA, Health Connector staff identified several areas of the regulations that would benefit from amendment to better align with market dynamics and current Health Connector practice. Specifically, in October 2019, staff recommended opening a public comment period to receive feedback on three proposed modifications to the regulations: reinstatement of indexing to deductibles, clarification of standards used to define health arrangements provided by established religious organizations, and technical and organizational updates. After receiving, reviewing, and considering written and oral comments from stakeholders about the proposed MCC regulation amendments, Health Connector staff revised the proposed MCC regulation amendments and brought the final amendments to the Health Connector Board in December 2019. The Health Connector Board voted to approve the final version of the proposed MCC regulations on December 12, 2019 and the adopted final version of the regulations went into effect on January 1, 2020. Final MCC regulations can be viewed at: https://betterhealthconnector.com/wp-content/uploads/rules-and-regulations/956CMR5.00.pdf.

---

[9] See full list of coverage deemed to provide MCC and more information about MCC at:
https://betterhealthconnector.com/about/policy-center/rules-regulations/massachusetts-individual-mandate

10

*Figure 3: MCC Regulation Amendment Timeline*

**October 2019**
- **10/10**: Presented proposed MCC regulation amendments for Board Vote
- **10/11**: Sent out Local Government Advisory Committee Letters
- **10/30**: Public comment period opened

**November 2019**
- **11/25**: Held public hearing; public comment period closed

**December 2019**
- **12/6**: Memo to Board of Public hearing and final regulations
- **12/11**: Filed amended small business impact statement
- **12/12**: Hold Board vote on final version of proposed regulations
- **12/13**: File final regulations with Secretary of State
- **12/27**: Publication of adopted final version of proposed regulations in the CMR

**January 2020**
- **1/1**: Effective date of proposed MCC regulations

While the 2019 proposed and finalized MCC regulation amendments addressed many important issues, this report is only focused on MCC amendments impacting health arrangements provided by established religious organizations.

"Health arrangements provided by established religious organizations" that satisfy MCC have typically been "health care sharing ministries" (HCSMs), though other arrangements might also satisfy that definition. Since ACA implementation began, there has been a nationwide increase in the number of HCSMs and the number of people who join them. Estimates indicate HCSM participation has grown since passage of the ACA from fewer than 200,000 enrollees before 2010 to about 1 million today.[10]

This increased prevalence has led state regulators to be more vigilant in their review of such organizations.[11] In addition, the National Association of Insurance Commissioners and at least 15 states, including Massachusetts, issued alerts about the risks posed to consumers by HCSMs.[12] In

---

[10] Volk, J., Curran, E., Giovannelli, J. (2018). Health Care Sharing Ministries: What Are the Risks to Consumers and Insurance Markets? The Commonwealth Fund. Retrieved from: https://www.commonwealthfund.org/publications/fund-reports/2018/aug/health-care-sharing-ministries#14

[11] For example, Colorado, Connecticut, New Hampshire, Texas, and Washington have taken legal action against one health care sharing ministry, Aliera, for allegedly engaging in fraudulent activity and deceptive marketing practices; Volk, J., Giovannelli, J., Goe, C. (2020). States Take Action on Health Care Sharing Ministries, But More Could Be Done to Protect Consumers. The Commonwealth Fund. Retrieved from: https://www.commonwealthfund.org/blog/2020/states-take-action-health-care-sharing-ministries-more-could-be-done-protect-consumers

[12] Volk, J., Giovannelli, J., Goe, C. (2020). States Take Action on Health Care Sharing Ministries, But More Could Be Done to Protect Consumers. The Commonwealth Fund. Retrieved from: https://www.commonwealthfund.org/blog/2020/states-take-action-health-care-sharing-ministries-more-could-be-done-protect-consumers

June 2019, Massachusetts's Division of Insurance (DOI) advised consumers that Aliera, an organization marketing itself as a HCSM, was potentially operating illegally in the state. In August 2019, the Health Connector opened a Special Enrollment Period (SEP) available for Massachusetts residents who are or were at any point in 2019 members of an Aliera arrangement. In addition, a health care sharing ministry called Sharity Ministries Inc. (formerly known as Trinity Health Share Inc., an arrangement affiliated with Aliera) filed for Chapter 11 Bankruptcy and ceased operations in July 2021.[13]

In order to address the changing landscape of HCSMs in the U.S. and across the Commonwealth, Health Connector staff proposed to maintain language in the MCC regulations that permits certain health arrangements to meet MCC, while specifying the criteria that are used to identify a bona fide health arrangement provided by established religious organizations. Health Connector staff took this approach in order to preserve the intent of the MCC language while accounting for current market conditions.

The MCC regulation amendments approved by the Health Connector Board clarify that an individual may meet their health coverage requirements by participating in one of these "health arrangements" if the arrangement:

1) Is not-for-profit;
2) does not make any direct or indirect representation that the organization has sufficient financing to meet members' anticipated financial or medical needs or that it has had a successful history of meeting members' financial or medical needs, provided that this requirement shall not apply to any financial statement that the organization is otherwise required to disclose by law;
3) does not use compensated sales agents, sales tactics, or deceptive marketing practices to solicit or enroll members, including that it does not use common insurance terms, such as "health plan," "coverage," "copay," "copayment," "deductible," "premium," and "open enrollment," or refer to itself as "licensed" in advertisements, marketing material, brochures, or other materials related to the arrangement;
4) does not use funds paid by members for medical needs to cover administrative costs;
5) provides disclosure that the organization is not an insurance company and does not guarantee that medical bills will be paid by the organization or any other individuals; such disclosure must be made at initial contact with a prospective member, at the time of any material modification to the terms of the sharing arrangement, and in all advertising, brochures, and marketing materials;
6) reports annually to the Health Connector any information about membership, operations, and finances as the Health Connector may require; and

---

[13] Sharity (formerly Trinity Healthshare Inc.) is affiliated with Aliera. However, Aliera is not part of the bankruptcy; Mot. To Authorize the Subchapter V Trustee to Investigate the Debtor's Financial Affairs, at 2 Par. 2, In re Sharity Ministries, Inc., No. 21-11001 (JTD) (Bankr. D. Del.)

7) meets such other criteria that the Connector may deem appropriate to ensure that individuals participating in such arrangements participate only in those operating in a manner consistent with the requirements described in 956 CMR 5.03(3)(d) 1. through 6.[14]

The new reporting requirement for health arrangements that are seeking MCC status was included in the final regulations in order to clarify the extent to which these types of arrangements are active in the Commonwealth. The annual reporting form for health arrangements seeking MCC status includes questions about membership, operations, finances, as well as an attestation section for arrangements to attest that they meet all of the new standards necessary to be deemed a health arrangement that provides MCC. In addition, the reporting form requires that arrangements submit the following documents along with a completed form:

- Written disclosures that the organization make available in conformance with 956 CMR 5.03(3)(d)5
- All marketing materials or brochures
- Guidelines or other member-participant or public-facing materials that explain sharing terms & conditions
- The organization's audited financial statements (if the organization has no audited financial statements, it should provide any available unaudited financial statements)

The annual reporting form for health arrangements provided by established religious organizations seeking MCC compliance can be found on the Health Connector's website: https://www.mahealthconnector.org/minimum-creditable-coverage/health-arrangements-reporting.

This report summarizes data provided to the Health Connector by health arrangements seeking MCC status in the first two years (2020 and 2021) of the new reporting requirement.

## 2.0: Health Care Sharing Ministries Reporting to the Health Connector

A complete and timely response to the Health Connector's reporting form satisfies one of the criteria necessary to be a HCSM deemed to provide MCC.

The Health Connector posted its first health arrangement reporting form on its website in May 2020 and accepted submissions through July 31. For reporting year 2021, HCSMs were required to submit their forms by March 31, which is the annual deadline for all future reporting years.

The Health Connector received reporting form submissions from seven HCSMs in 2020 and six HCSMs in 2021. In 2020, the Health Connector received forms from Medi-Share, Christian Healthcare Ministries (CHM), Liberty, Christian Mutual Med Aid (CMM), Solidarity, OneShare, and Samaritan. In 2021, the Health Connector received submissions from Christian Healthcare Ministries (CHM), Liberty, Solidarity, OneShare, and Samaritan, as well as a submission from a new HCSM, Zion Health.

---

[14] To date, the Health Connector has not used this provision to identify any additional criteria that HCSMs must meet.

13

Forms submitted in 2020 reflect information from calendar year 2019 and forms submitted in 2021 reflect information from calendar year 2020. As noted in Table 2, some arrangements reported using different names for their religious organization and the organization's health care sharing ministry program. This report references each HCSM throughout by the health care sharing ministry program name.

*Table 2. Health Care Sharing Ministries (HCSMs) that Submitted MCC Reporting Forms in 2020 and 2021*

| Established Religious Organization | Religious Organization's Health Care Sharing Ministry Program | Years of MCC Reporting Form Submission |
|---|---|---|
| Christian Care Ministry, Inc. (CCM) | Medi-Share | 2020 |
| Christian Healthcare Ministries, Inc., dba Heartfelt Radio (CHM) | Christian Healthcare Ministries, Inc., dba Heartfelt Radio | 2020, 2021 |
| Gospel Light Mennonite Church Medical Aid Plan, Inc. dba Liberty HealthShare | Gospel Light Mennonite Church Medical Aid Plan, Inc. dba Liberty HealthShare | 2020, 2021 |
| Logos Missions, Inc. | Christian Mutual Med Aid | 2020 |
| Melita Christian Fellowship Hospital Plan, dba Solidarity HealthShare | Melita Christian Fellowship Hospital Plan, dba Solidarity HealthShare | 2020, 2021 |
| OneShare Health, LLC changed from Kingdom Healthshare Ministries, LLC on March 22, 2019 | OneShare Health, LLC changed from Kingdom Healthshare Ministries, LLC on March 22, 2019 | 2020, 2021 |
| Samaritan Ministries International | Samaritan Classic, Basic & Given | 2020, 2021 |
| Zion Health | Zion Health | 2021 |

## 3.0: Total Massachusetts HCSM Membership Reported

In reporting year 2020, some HCSMs (Samaritan and Liberty) reported membership at the household level resulting in underreported total 2019 membership. However, Health Connector staff updated

14

the question about membership on the 2021 reporting form to clarify that HCSMs should report membership by individual member level data (not just household level).

In reporting year 2020, the seven HCSMs that submitted forms to the Health Connector reported having at least 2,467 total Massachusetts members in CY 2019. Medi-Share (793), OneShare (572), and Christian Healthcare Ministries (521) reported the greatest 2019 Massachusetts membership. In reporting year 2021, the six HCSMs that submitted forms to the Health Connector reporting a total of 2,170 Massachusetts members in CY 2020. Christian Healthcare Ministries (CHM) (522), Samaritan (669), and Liberty (455) reported the greatest 2021 Massachusetts membership. Samaritan and Liberty's reported increase in Massachusetts membership from reporting year 2020 to 2021 is likely due to the more accurate membership data reported after the form was updated and not from actual enrollment growth.

Notably, in 2020, Medi-Share reported having the most Massachusetts members in 2020 (793) but did not submit a MCC reporting form to the Health Connector in 2021. Christian Mutual Med Aid (CMM) also did not submit a form in 2021. However, they reported the fewest Massachusetts members (47) in 2020. One new HCSM, Zion Health, reported to the Health Connector in 2021 and currently has the fewest total Massachusetts members (7).

*Figure 4: Massachusetts Health Care Sharing Ministry (HCSM) 2019 Membership Based on MCC Reporting Forms Submitted in 2020*



*Liberty & Samaritan reported household member data in 2020 instead of individual member level data.*

15

*Figure 5: Massachusetts Health Care Sharing Ministry (HCSM) 2020 Membership Based on MCC Reporting Forms Submitted in 2021*



## 3.1: Small Business Membership

The health arrangement reporting form asks HCSMs if any small businesses offered their health arrangement to their employees or facilitate the arrangement for their employees. In total, three HCSMs reported that small businesses in Massachusetts used their arrangements. In 2020, Medi-Share reported that while employers do not specifically offer their health arrangement, nine employers in Massachusetts with 73 total employees "facilitate" the monthly share payments for their employees. Medi-share did not submit a form in 2021. Christian Healthcare Ministries (CHM) reported that two businesses in Massachusetts with a total of four employees participated in their arrangements in 2019 and two businesses in Massachusetts with three total employees participated in their arrangements in 2020. Samaritan reported that two businesses in Massachusetts with two households participated in their health arrangement in 2019 and one business in Massachusetts with two households participated in their health arrangement in 2020. In reporting year 2020, Samaritan further noted that the households participate directly with the ministry and not through an employer offering.

All other HCSMs reported that no small businesses participated in their health arrangements and Solidarity further clarified their response by adding that "health care sharing ministries are based on individual memberships so consequently, Solidarity does not offer small business health arrangements."

*Table 3. Health Care Sharing Ministries (HCSMs) with Small Business Participation*

| HCSM | Small Business Involvement? | Reporting Year 2020 | Reporting Year 2021 |
|---|---|---|---|
| Medi-Share | Yes | Employers do not offer it, however, 9 employers in MA with a total of 73 employees facilitate the monthly share payments of their employees | N/A |
| Christian Healthcare Ministries (CHM) | Yes | 2 businesses (4 employees) | 2 businesses (3 employees) |
| Christian Mutual Med Aid (CMM) | No | Not in MA | N/A |
| Liberty | No | Liberty does not offer memberships from employers to employees | Liberty does not offer memberships from employers to employees |
| OneShare | No | No additional comments | No additional comments |
| Samaritan | Yes | 2 businesses (2 households participating) | 1 business (2 households participating) |
| Solidarity | No | "Healthcare sharing ministries are based on individual memberships so consequently, Solidarity does not offer small business health arrangements." | "Healthcare sharing ministries are based on individual memberships so consequently, Solidarity does not offer small business health arrangements." |
| Zion Health | No | N/A | No additional comments |

17

# 4.0: Operations

## 4.1: Location of HCSM Operation and Advertising

All HCSMs reporting to the Health Connector in 2020 and 2021 operated in all or nearly all 50 states. Medi-Share, Christian Healthcare Ministries, Liberty, Samaritan, Solidarity, and Zion Health reported operating and advertising in all 50 states. Christian Mutual Med Aid reported operating and advertising in 46 states in CY 2019 but did not specify which states they did not operate and advertise in. OneShare reported operating and advertising in all states except for Vermont, Maryland, and Pennsylvania in CY 2019 and noted that they ceased enrolling new members in Washington as of March 31, 2020.

*Table 4. Location of Health Care Sharing Ministry (HCSM) Operation and Advertising*

| HCSM | Location of HCSM operation and advertising | Reporting Years |
|------|---------------------------------------------|-----------------|
| Medi-Share | All 50 states | 2020 |
| Christian Healthcare Ministries (CHM) | All 50 states | 2020, 2021 |
| Christian Mutual Med Aid (CMM) | 46 states but did not identify which states they do not operate/advertise in. | 2020 |
| Liberty | All 50 states | 2020, 2021 |
| OneShare | All states aside from VT, MD, PA, & WA. (OneShare ceased enrolling new members in Washington state as of March 31, 2020). | 2020, 2021 |
| Samaritan | All 50 states | 2020, 2021 |
| Solidarity | All 50 states | 2020, 2021 |
| Zion Health | All 50 states | 2021 |

18

## 4.2: Member Fees or Penalties

The health arrangement reporting form asks HCSMs whether there were circumstances in which members/participants were subject to fees, additional sharing requirements, or termination. Most (six out of eight) HCSMs reporting to the Health Connector in 2020 and 2021 stated that there were circumstances in which members were subject to such penalties. Table 5 reviews HCSM responses to this question and the reasons why members may be subject to extra fees or termination. Out of the six HCSMs reporting fees, additional sharing requirements, or termination under certain circumstances, four HCSMs specifically reported penalties or termination for certain behavior or due to pre-existing conditions.

In 2020, Medi-share reported that second-time violations of their "lifestyle agreement" result in membership termination. Examples of lifestyle agreement violations provided by Medi-share include submission of medical bills for tobacco use or injuries due to "use of illegal drugs" or "willful disregard for personal safety." In 2020, Christian Mutual Med Aid (CMM) reported that members who submit bills that totaled over $10,000 are subject to additional fees and members have had their memberships terminated due to smoking.

In 2020 and 2021, Liberty reported that a member may no longer participate if they failed to fully disclose pre-existing condition information at the time of the application. Liberty also reported that an applicant with certain pre-existing conditions "responsive to lifestyle changes" may be accepted as a Provisional Member subject to Liberty's Sharing Guidelines and that an additional fee is charged for "health coaching" sessions. In 2020 and 2021, Solidarity reported that membership is subject to fees pursuant to their Member Sharing Guidelines which include termination for not disclosing pre-existing conditions. Specifically, a member's medical expenses may be subject to a pre-existing condition review, including, but not limited to, request for medical notes and records, hospital charts, surgical records, or other relevant medical history information. Solidarity's guidelines state that failure to fully disclose pre-existing condition information at the time of application is grounds for termination of membership.

Outside of fees or terminations related to pre-existing conditions or "lifestyle agreement" violations, HCSMs also reported application fees, enrollment fees, annual fees, late fees, and termination due to non-payment or late payment of monthly shares or other fees.

*Table 5. Circumstances in which Members are Subject to Additional Fees, Sharing Requirements, or Termination*

| HCSM | Circumstance in which members are subject to fees, additional sharing requirements, or termination | Reporting Years |
|---|---|---|

19

| Medi-Share | • Approximately 3-4 memberships are canceled per month due to second time violations of the Medi-Share "lifestyle agreement" which may include medical bills submitted for use of tobacco use, injuries due to "willful disregard for personal safety" and "use of illegal drugs".<br><br>• Late fees for delinquent share payments (go toward "Extra Blessings program", a fund to assist members with certain ineligible medical bills).<br><br>• Members canceled after 90-120 days of share non-payment in cases where payment installments cannot be agreed upon. | 2020 |
|---|---|---|
| Christian Healthcare Ministries (CHM) | None. | 2020, 2021 |
| Christian Mutual Med Aid (CMM) | Members who had medical bills total over $10,000 were subject to additional membership fees. There were members who had their membership terminated for smoking or delinquent payments for 3 months. | 2020 |
| Liberty | • First Annual Membership Dues at the time of applicant's initial enrollment that differ based on the arrangement ($125-$135 depending on Liberty Select, Share, Plus, or Complete)<br><br>• Annual membership dues of $75 due annually upon renewal.<br><br>• An applicant with certain pre-existing conditions "responsive to lifestyle changes may be accepted as a Provisional Member" subject to the Sharing Guidelines. An additional fee is charged for "health coaching" sessions.<br><br>• The member may no longer participate if they failed to fully disclose pre-existing condition information at the time of the application, or if annual membership dues or monthly share amounts are not made on time. | 2020, 2021 |
| OneShare | Initial enrollment fees. | 2020, 2021 |

| | | |
|---|---|---|
| Samaritan | $200 application fee for new members; Members of Save to Share pay a $15 annual fee; members who don't send monthly share are inactivated. | 2020, 2021 |
| Solidarity | • "Membership is subject to fees pursuant to the Member Sharing Guidelines attached."<br><br>• Guidelines include a range of provisions including termination for not disclosing pre-existing conditions: "Medical expenses incurred may be subject to a Pre-Existing Condition review, including, but not limited to, request for medical notes and records, hospital charts, surgical records, or other relevant medical history information. Failure to fully disclose Pre-Existing Condition information at the time of application is a violation of the shared trust among Members and is grounds for termination of membership". | 2020, 2021 |
| Zion Health | None. | 2021 |

## 4.3: Third-Party Vendors

The health arrangement reporting form asks the organization to list and describe the role of any third-party vendors or administrative partners that acted on behalf of the health arrangement to assist with the marketing, sales, and administration of the health arrangement. Most (five out of eight) of the HCSMs reporting to the Health Connector in 2020 and 2021 use third-party vendors or administrative partners that act on behalf of the health arrangement.

In reporting year 2020, Medi-Share reported using vendors to facilitate direct interactions with health arrangement members and prospective members. The third-party vendors performed a range of activities including advertising, social media, communications, and payment technology.

In reporting years 2020 and 2021, Liberty, OneShare, Samaritan, and Solidarity reported use of third-party vendors. Liberty reported that they facilitate the sharing of medical bills with assistance from third-party vendors, including vendors that provide marketing services, administration of discounts on medical bills, coordination with healthcare providers, administration of pharmacy discounts and services, administration of personalized health and wellness coaching for pre-existing conditions, and case management. OneShare reported using third-party vendors for storage of member data and administration, administration of sharing requests, discount programs, and telemedicine. OneShare also reported that the use of external sales partners was discontinued in Massachusetts on February 1, 2020.

21

Samaritan reported using third-party vendors to assist members in negotiating reductions in billing and help members digitally manage shares. Samaritan also stated in their submission that they understand this question to relate to the direct support of bill sharing on behalf of their members as opposed to underlying support of the overall ministry.

In 2020, Solidarity reported using third-party vendors to reprice medical bills submitted by members and for marketing and initial call center support; however, both vendors were terminated in 2019. In 2021, Solidarity reported using a new third-party vendor for repricing member medical bills.

*Table 6. Health Care Sharing Ministry (HCSM) Use of Third-Party Vendors*

| HCSM | Third-Party Vendors | Reporting Years |
|------|---------------------|-----------------|
| Medi-Share | These vendors facilitated direct interaction with members or prospective members: Path Interactive: Pay Per Click Advertising (Google, Bing), Digital Moses: Social Media Advertising On A Mission, Communications: Radio Advertising Liquid Payments- Information Technology Services. | 2020 |
| Christian Healthcare Ministries (CHM) | None | 2020, 2021 |
| Christian Mutual Med Aid (CMM) | None | 2020 |
| Liberty | LHS facilitates the sharing of medical bills and operates, in part, with the assistance from third-party vendors for some limited services to facilitate sharing. Vendors include: Cost Sharing Solutions LLC (marketing services), The Medical Cost Savings Solution Ltd. (MedCost) (provides administration of discounts on medical bills and coordination with healthcare providers), SavNet International LLC (administration of pharmacy discounts and a customer service desk), GemCare (administration of personalized health and wellness coaching for pre-existing lifestyle-based health conditions), HealthSmart Care Management Solutions, L.P (provides large case individual member medical care management as needed), HealthShare Rx was reported as a new third-party vendor in 2020 and provides pharmacy vendor services. | 2020, 2021 |

22

| OneShare | Enrollment123/Administration123 is OneShare's system for storage of all member data/administration. Loomis administrates OneShare's Member Sharing Requests. OneShare has many external partners who market programs to individuals. However, the use of external sales partners was discontinued in Massachusetts on February 1, 2020. NBI provides a suite of discount programs to OneShare members in MA. OneShare partners with Teladoc to provide telemedicine services to OneShare members in MA. | 2020, 2021 |
| Samaritan | Karis and AMPs assist some members in negotiating reductions in billings. Samaritan states that they "understand this question to relate to direct support of bill sharing on behalf of our members as opposed to underlaying support of overall ministry". Samaritan also has a new program that uses Sharable to assist some members to digitally manage their shares. | 2020, 2021 |
| Solidarity | 2020: Medical Cost Saving Solution, Inc. assisted Solidarity in repricing of member submitted medical bills (relationship terminated July 2019). Cost Sharing Solutions. Inc. assisted Solidarity in marketing and initial call center support (relationship terminated May 2019). 2021: Anasazi Medical Payment Solutions, Inc. dba Advanced Medical Pricing Solutions assists Solidarity in repricing of Member medical bills. | 2020, 2021 |
| Zion Health | None | 2021 |

## 4.4: Provider Contracts

The health arrangement reporting form asks if the HCSM directly contracted with health care providers for services received by the member. Most (five out of eight) of the HCSMs reporting to the Health Connector in 2020 and 2021 reported that they use some form of provider contracts ranging from single case agreements to contracts with provider networks.

In 2020, Medi-Share reported that they had two single case agreements in 2019 but had no direct contracts with health providers in Massachusetts. In 2020 and 2021, Christian Healthcare Ministries (CHM), Liberty, OneShare, and Solidarity reported some type of contracting with health care providers or networks.

CHM reported that they make arrangements on a case-by-case basis except for one lab that operates in multiple states and that they do not pre-approve or make contracts for specific procedures or other types of health care services. Liberty reported that they do directly contract with health care providers. OneShare reported that they do not directly contract with providers in Massachusetts; however, they do contract with a provider network to obtain network access for

23

members. Solidarity reported that they directly enter agreements with providers on behalf of members for services received.

*Table 7. Contracts with Health Care Providers*

| HCSM | Provider contracts | Reporting Years |
|------|-------------------|-----------------|
| Medi-Share | No direct contracts with health providers in MA except for 2 single case agreements in 2019. | 2020 |
| Christian Healthcare Ministries (CHM) | Arrangements are made on a case-by-case basis except for one lab that operates in multiple states. No pre-approvals or contracts for specific procedures or other health care. | 2020, 2021 |
| Christian Mutual Med Aid (CMM) | None | 2020 |
| Liberty | Yes | 2020, 2021 |
| OneShare | Does not directly contract with providers in Massachusetts, but contracts with a provider network to obtain network access for members. | 2020, 2021 |
| Samaritan | None in Massachusetts | 2020, 2021 |
| Solidarity | Solidarity directly enters into agreements on behalf of the members with providers for services received by members. | 2020, 2021 |
| Zion Health | No | 2021 |

24

## 5.0: Finances

Reporting health arrangements are required to answer a range of questions about the organization's finances over the past calendar year. Questions in the financial portion of the reporting form aim to collect information about the total amount that members pay into the HCSM, the amount of medical bills members submit for sharing regardless of whether the services are considered eligible for sharing, the amount for services or bills that qualify for sharing, and the total amount that was paid out of the HCSM for members' health care costs. The form also asks about administrative fees and whether the organization, its members, or outside entities negotiate payment rates. Specifically, HCSMs are asked to answer the following questions about their finances:

- What were the total share amounts contributed by members/participants?
- What was the total amount submitted to the health arrangement by members/participants for sharing? (This should include all submissions by members/participants, not just qualifying submissions).
- What was the total qualifying sharable amount submitted by members/participants?
- What was the total amount paid through the health arrangement for members'/participants' submitted health care costs?
- What were the arrangement's administrative fees per member? (if the administrative fee amount per member/participant changes, e.g., based on type of membership or length of membership, please detail all fees and circumstances under which they occurred).
- Does the health arrangement negotiate rates? And if so, who does the negotiating (your members, your organization, or other entities)?

On average, HCSMs reported in 2020 that members paid their HCSM about 1.8 times the amount that the HCSM paid out for members' health care bills and, on average, about 50% of medical bills submitted by HCSM members were determined to be eligible for sharing by the HCSM. Costs paid for through the HCSMs as a percentage of member contributions ranged from 16% to 79% in 2020.

25

*Figure 6: Total Contributions Paid by Members to HCSM, Total Medical Bills Submitted by Members for Sharing, Total Qualifying Medical Bills, and Total Amount Paid Through the HCSM for Care (Reporting Year 2020)[15]*



*\*In 2020 and 2021, Liberty noted that the total amount submitted to the health arrangement for sharing includes "total charges submitted" which may include items such as duplicate bills and does not take into account certain factors such as deductions for discounts.*

*\*\*In 2020, Samaritan noted that shares received in one year would be for bills submitted in both the previous and current year; the "qualifying" shareable amount listed above includes provider reductions.*

On average, HCSMs reported in 2021 that members paid their HCSM about 1.4 times the amount that the HCSM paid out for members' health care bills and that, on average, about 50% of medical bills submitted by members were determined to be eligible for sharing by the HCSM. Costs paid for through the HCSMs as a percentage of member contributions ranged from 28% to over 100% in 2021.

---

[15] Some HCSMs were left out of Figure 6 for various reasons: Solidarity does not track state level data and does not collect data on total share amounts submitted for sharing. CMM reported <50 members making it difficult to make a comparison to other arrangements.

26

Figure 7: Total Contributions Paid by Members to HCSM, Total Medical Bills Submitted by Members for Sharing, Total Qualifying Medical Bills, and Total Amount Paid Through the HCSM for Care (Reporting Year 2021)[16]



*In 2020 and 2021, Liberty noted that the total amount submitted to the health arrangement for sharing includes "total charges submitted" which may include items such as duplicate bills and does not take into account certain factors such as deductions for discounts.

**In 2020, Samaritan noted that shares received in one year would be for bills submitted in both the previous and current year; the "qualifying" shareable amount listed above includes provider reductions.

[16] Some HCSMs were left out of Figure 7 for various reasons: Solidarity does not track state level data and does not collect data on total share amounts submitted for sharing. Zion Health reported $0 for all fields aside from total shares contributed by the member and only has 7 total members.

*Table 8. Amount Paid out by HCSM for Members Health Care Costs as a Percentage of Member Contributions (Reporting Years 2020 & 2021)[17]*

| Health Care Sharing Ministry | 2020 Submissions | 2021 Submissions |
| --- | --- | --- |
| Samaritan | 64% | 89% |
| OneShare | 44% | 28% |
| Liberty | 51% | 63% |
| Christian Healthcare Ministries (CHM) | 78% | 111% |
| Medi-Share | 37% | N/A |
| Christian Mutual Med Aid (CMM) | 16% | N/A |
| Solidarity | 79% | 71% |
| Zion | N/A | Zion reported $0 paid out |

As additional context for these figures, it may be helpful to note that in the Massachusetts merged market, health insurance carriers are required to spend 88% of every premium dollar toward claims expenses (Medical Loss Ratio or MLR), this is a higher MLR standard than the level required of health insurers under the Affordable Care Act (ACA) (80% required for individual and small group, 85% required for large group). If a health insurer spends less than the required percentage of premiums on claims expenses, it is required to pay members back in the form of MLR rebates. While HCSMs are not health insurance, and the percentage of HCSM member contributions spent on member health care costs is not the same as the percentage of premiums spent on claims expenses, state and federal standards may provide helpful context for understanding the HCSM data reported.

---

[17] Solidarity's percentages are based off their national data because they do not collect state level financial data.

28

## 5.1: Administrative Fees

The health arrangement reporting form asks HCSMs about member administrative fees. In 2020 and 2021, all HCSMs reported that they charged administrative fees; however, the fee structure and fee amounts greatly varied across organizations. For example, some arrangements reported retaining a certain percentage of monthly contributions for administrative costs while some reported charging an annual fee along with a monthly fee. In addition, some arrangements had different administrative fees based on program type and member demographics, such as age. Table 9 summarizes each HCSM's administrative fee structure and amount reported in 2020 and 2021.

*Table 9. HCSM Administrative Fees (Reporting Years 2020 & 2021)*

| Health Care Sharing Ministry | Member Administrative Fee (Reporting Year 2020) | Member Administrative Fee (Reporting Year 2021) |
|---|---|---|
| Samaritan | Members send their first month's share, and 1 month each year thereafter, to the office for administrative costs. | Members of Samaritan Classic and Basic send their first 3 months' shares and 1 month each year thereafter to the office for administrative costs. Samaritan Given members have 90% of their first 3 months' shares used for administrative expenses and 20% of each month's share thereafter used for administrative expenses. |
| OneShare | Some external sales partners[18] charge and receive a monthly administration fee from members ranging from $15 to $30 per month. OneShare does not receive a specific administrative fee, but per the member guidelines, may set aside up to 40% of the monthly contribution for administrative and overhead costs and charitable contributions. | Same as 2020 with the exception of changing "external sales partners" to "external enrollment partners" |

---

[18] OneShare discontinued the use of external sales partners in Massachusetts on February 1, 2020.

29

| | | |
|---|---|---|
| Liberty | The initial two months of a member's contribution are used for administrative costs to be used at the discretion of the ministry. Beginning with the third month of the membership and following, an admin fee not to exceed 12% is assigned to admin costs from each monthly share. Annual membership dues of $75 are also utilized to defray admin costs. All admin costs are deposited into an operating bank account and not combined with member sharing funds. | Same as reporting year 2020 |
| Christian Healthcare Ministries (CHM) | CHM has no formal fee structure. In 2019, the percentage of gifts retained by the ministry for administrative expenses was approximately 5.9%. All members sign a form acknowledging and agreeing that a small portion of their gifts may be applied to the ministry's administrative expenses. The amounts deducted are reported to the membership every year. | Same explanation as reporting year 2020, except CHM reported percentage of gifts retained by the ministry for administrative expenses was approximately 5.7%. |
| Medi-Share | Approximately 15.4% | N/A |
| Christian Mutual Med Aid (CMM) | $307.70/member | N/A |
| Solidarity | One-time membership fee of $135 and monthly admin and program service fees of $24. | One-time membership fee of $135 and monthly admin fee based on program, age, and single/couple/family. Monthly admin fee ranges from $20/mo for a single person under 30 in "Solidarity Primary Program" to $72/mo for a family over 30 in "Solidarity Premier Program". |
| Zion Health | N/A | Each month, 10% of monthly contributions received are retained by Zion Health in reserve to cover actual administrative costs. |

30

## 5.2: Rate Negotiation

In 2020 and 2021, most HCSMs reported that medical bills are negotiated in some way, whether the HCSM negotiates on behalf of members, the members negotiate their own medical bills, or a third-party vendor assists with negotiating medical bills. In some cases, HCSMs reported that a combination of these negotiation activities occur.

*Table 10. HCSM Rate Negotiation (Reporting Years 2020 & 2021)*

| HCSM | 2020 & 2021 Submissions |
| --- | --- |
| Medi-Share | Medi-Share allows members to negotiate and offers an internal negotiations team as well as an option to use a vendor partner. In FY19, Medi-Share negotiated 2 cases in MA. |
| Christian Healthcare Ministries (CHM) | CHM reported that individual members may negotiate rates with individual providers for specific services. The ministry assists individual members with this from time to time. |
| Christian Mutual Med Aid (CMM) | CMM and members negotiate rates. |
| Liberty | Liberty's members engage in negotiation of their medical bills with providers. Liberty may also negotiate medical bills with providers during the pre-notification stage and with MedCost after provision of services. |
| OneShare | OneShare Health does not directly negotiate provider rates, but contracts with a provider network to obtain access for members to rates negotiated by the network. |
| Samaritan | Samaritan reported that members, the arrangement, and other entities all negotiate billed amounts. |
| Solidarity | Solidarity, members of Solidarity, Medical Cost Saving Solution, Inc. (on behalf of Solidarity through July 2019), and Anasazi Medical Payment Solutions, Inc. dba Advanced Medical Pricing Solutions (for 2020) assist in repricing of Member medical bills. |

31

| Zion Health | Zion Health members are primarily responsible to negotiate rates for services received. However, Zion Health may, in certain circumstances, negotiate costs and rates with medical providers on behalf of its members. |
| --- | --- |

## 6.0: Conclusion

In the first two years (2020 and 2021) of the new reporting requirement for health arrangements that wish to provide MCC to Massachusetts residents, the Health Connector received in-depth information about health arrangements' membership, operations, and finances, which helped to clarify the extent to which these types of arrangements are active in the Commonwealth and shed light on the activities and operations of such arrangements, whereas previously there has been minimal, if any, state collection and reporting of information on these entities' practices.

Health Connector staff made minor changes to the 2021 reporting form to improve clarity and quality of data. Health Connector staff will continue to review the reporting form to assess whether clarifications or modifications to the form would yield better data in future reporting years. This data provides new information on uptake and use of HCSMs by Massachusetts residents and will assist the Commonwealth in continuing to ensure that future policy approaches to the individual mandate and health coverage generally are based on a clear, detailed understanding of current dynamics and practices.

# Appendix

## Abbreviations

| | |
|---|---|
| ACA | Patient Protection and Affordable Care Act |
| CY | Calendar Year |
| FY | Fiscal Year |
| HCSM | Health Care Sharing Ministry |
| Health Connector | Commonwealth Health Insurance Connector Authority |
| MCC | Minimum Creditable Coverage |
| TY | Tax Year |

## 2021 Reporting Form

The annual reporting form for health arrangements provided by established religious organizations seeking MCC status can be found on the Health Connector's website: https://www.mahealthconnector.org/minimum-creditable-coverage/health-arrangements-reporting.

33

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-01386-GPG-STV

ALLIANCE OF HEALTH CARE SHARING MINISTRIES,

        Plaintiff,

v.

MICHAEL CONWAY, in his official capacity as
Commissioner of the Colorado Division of
Insurance,

        Defendant.

---

## DECLARATION OF LEILANI RUSSELL

---

I, Leilani Russell, in accordance with 28 U.S.C. § 1746 state as follows:

1.      I am the Director of Strategy, Operation and Performance at the Colorado Division of Insurance ("Division").

2.      I have been employed by the Division since January 2020.

3.      The Division is charged with supervising the business of insurance in Colorado. § 10-1-103(1), C.R.S. The Commissioner of Insurance is the head of the Division. § 10-1-104(1), C.R.S. I use the term "Division" throughout this declaration to refer generally to actions and activities pursued under the Commissioner's authority, by the Division.

4.      I am the primary Division employee responsible for administering health care sharing plans and arrangements' (Sharing Plans) reporting obligations under section 10-16-107.4, C.R.S., and its implementing regulation, Regulation 4-10-01, 3 CCR 702-4 (collectively, the Reporting Law).

5.      My declaration below references numerous documents. True and correct copies of these documents are attached as Exhibits 2.1 to 2.8 to this declaration, which is filed in support of the Commissioner's Response in Opposition to the Motion for Preliminary Injunction.

**EXHIBIT**

**2**

Ex. 2, p. 1 of 8

6.      Following the passage of HB22-1269, the Division held two stakeholder meetings before promulgating Emergency Regulation 22-E-20, 3 CCR 702-4, to begin implementation of the Sharing Plan reporting requirements in C.R.S. 10-16-107.4.

7.      The Division received public comments in support of and opposed to the proposed emergency regulation, including comments from the Alliance and their member entities.

8.      In response to comments, the Division made revisions to the proposed emergency regulation, before promulgating its final terms, to clarify terms and definitions specific to Sharing Plans, while adhering to the statutory requirements of HB 22-1269. These revisions included the following:

   a. Clarifying the applicability of emergency regulation 22-E-20 to any Sharing Plan with 1 or more Coloradans as members;

   b. Separating the definitions of administrative expenses from programmatic expenses (such as wellness programs and care navigation); and

   c. Establishing a process to notify a Sharing Plan if materials that it requested remain confidential in its submission were released in response to a Colorado Open Records Act (CORA) request.

9.      Effective April 30, 2024, the Division promulgated permanent regulations implementing 10-16-107.4, C.R.S. The Division's permanent regulation, Regulation 4-10-01, took into account feedback provided through the emergency regulation process, discussions with representatives from different Sharing Plans, two years of data collection, and comments received through multiple public comment periods via the permanent regulation process, including in the following manners:

   a. The data reporting template replaced references to "reimbursement" with "share request," at the request of commenters, including a few Sharing Plans that are members of the Alliance;

   b. Maintaining the definition of "third party" from the emergency regulation after receiving comments that proposed updates to the definition in the draft of the permanent regulation were too broad;

   c. Explicitly referencing the need to include application forms as part of the required "Copies of consumer facing and marketing materials" that Sharing Plans submit annually; and

   d. Cleaning up of the data template to fix grammatical errors, ensure terms

2

are used consistently in all data fields, and to add the option to report the amount Sharing Plans negotiate on their members behalf.

10.     The Division created a "Reporting Template" that Sharing Plans complete to comply with their disclosure obligations under the Reporting Law. The most recent version of the Reporting Template is attached as Exhibit 2.1.

11.     The Reporting Template is a multi-page Excel spreadsheet that tracks the obligations of the Reporting Law in a standardized manner. These obligations include requiring Sharing Plans to provide basic, general information regarding their operations in Colorado.

12.     The Reporting Law and Reporting Template are not targeted at religious beliefs, but rather are solely focused on Sharing Plans' general commercial operations and health care consumer protection.

13.     The Reporting Law and Reporting Template do not require Sharing Plans to disclose personal identifiable information for Sharing Plan members or employees, but rather are focused on summary data pertaining to general commercial operations and advertising.

14.     As part of Regulation 4-10-01, the Division also created a Health Care Sharing Plan or Arrangement Reporting Attestation (the "Attestation") to support Sharing Plans' requirements under the Reporting Law. The Attestation is attached as Exhibit 2.2.  The Attestation requires Sharing Plans to certify that they have submitted all information and documentation required by the Reporting Law to the Division.

15.     Specifically, in addition to the information requested by the Reporting Template, the Attestation requires Sharing Plans to certify that they submitted to the Division certain limited categories of documentation, including consumer-facing marketing materials, a corporate organizational chart, and any training materials provided to insurance brokers or third parties marketing their Sharing Plan. These materials are required to be submitted to the Division by the Reporting Law.

16.     The submission of consumer-facing advertising materials and training materials provided to insurance brokers and third parties marketing a Sharing Plan helps the Division ensure that Sharing Plans are not engaging in misleading or confusing advertising, and that Colorado consumers are aware that Sharing Plans are not traditional health insurance.

17.     Sharing Plans, including Alliance members, have utilized misleading advertising that invokes insurance-specific terms, including terms of art from the Affordable Care Act (ACA). This misleading advertising causes consumers to wrongly believe that Sharing Plans are ACA-compliant health insurance.  Examples of

3

misleading advertising by Sharing Plans includes:

    a. The use of ACA terms such as Gold, Silver and Bronze metal tiers of plans;

    b. Use of the terms "Open Enrollment" and "Medicare Open Enrollment", which are also ACA terms;

    c. Use of insurance specific terminology including the terms "coverage", "claims", "premium" , "deductible" and "catastrophic plans".

18. In fact, Colorado law specifies that insurance carriers offering ACA-compliant individual or small group health benefit plans must provide at least one level of coverage corresponding to "Bronze," "Silver," "Gold," and "Platinum" levels. *See* C.R.S. 10-16-103.4.

19. Under the Affordable Care Act and Colorado Insurance law, "Open Enrollment" occurs during a limited period of the calendar year, and allows people to switch between health insurance plans without a qualifying life event such as a change in employment. *See* C.R.S. 10-16-105.7. There is no "Open Enrollment" period for Sharing Plans, and the use of the term "Open Enrollment" by Sharing Plans is another possible source of consumer confusion leading Colorado consumers to believe that a Sharing Plan is offering traditional health insurance.

20. In addition to utilizing confusing insurance-specific terms, the Division has also observed Sharing Plans use other misleading phrasing, including variations of the claim that "100% of your medical costs are paid" or "100% of your eligible Medical Bills" will be shared when, in fact, Sharing Plans only "eligible" costs will be shared and Sharing Plans narrowly define which bills are "eligible" for sharing.

21. Prior to the enactment of the Reporting Law, the Division received numerous complaints from Colorado consumers who were not aware that Sharing Plans were not traditional health insurance with benefits guaranteed by an enforceable contract.

22. By requiring Sharing Plans to submit consumer-facing advertising materials, the Division can verify that Sharing Plans are not utilizing misleading marketing materials targeting Colorado consumers.

23. The Reporting Law is not targeted toward religious groups. Rather, it applies generally to Sharing Plans, regardless of whether they have religious or secular membership guidelines.

24. For example, Knew Health is a Sharing Plan that has made disclosures

4

under the Reporting Law since 2022.

25.     Knew Health is not religious. Rather, it is a community of "like-minded individuals who are proactive about their wellness and looking for a better way to manage healthcare costs." KNEW HEALTH, *FAQ*, https://knewhealth.com/faq/ (last visited 8/30/2024).  Knew Health "accept[s] everyone, regardless of . . . religious affiliations." KNEW HEALTH, *Home Page*, https://knewhealth.com/ (last visited 8/30/2024).

26.     Knew Health's current Member Guidelines, and its Member Guidelines that become effective October 1, 2024, both reflect that Knew Health is not religious. These guidelines are each available at https://knewhealth.com/guidelines/ (last visited 8/30/2024), and are attached as Exhibits 2.3 and 2.4.

27.     The existing Member Guidelines specify that Membership Eligibility is based upon (1) adherence to Knew Health's Principles of Membership and (2) submission of monthly contributions. Ex. 2.3, p. 11.  Knew Health's Principles of Membership, in turn, contain no commitment to any religion or religious belief. Rather, they simply state: "I believe that a community of ethical, health-conscious people can most effectively care for one another by directly sharing the costs associated with each other's health care needs. I recognize that Knew Health welcomes members of all faiths." Ex. 2.3, p. 10.

28.     Knew Health's Member Guidelines that become effective October 1, 2024 are similarly not religious. Membership Eligibility remains based upon the same two factors outlined in the existing Member Guidelines. Ex. 2.4, p. 2. And the Principles of Membership in the new Member Guidelines, in turn, again contain no commitment to any religion or religious belief. *Id.*, pp. 1-2. Rather, they simply require members to "have a shared faith in myself and members of Knew Health, as well as the strength of our Community." *Id.* at 1. Knew Health's Principles of Membership further state: "I believe that a community of ethical, health-conscious people can most effectively care for one another by directly sharing the costs associated with each other's health care Needs. I recognize that Knew Health welcomes members of all faiths." *Id.*

29.     One of my responsibilities regarding the Reporting Law includes attempting to identify and track Sharing Plans that may be required to report under the law but have not submitted annual reports to the Division.

30.     There are several non-religious Sharing Plan entities of which the Division is aware that would be subject to the Reporting Law if and when they are confirmed to have operations in Colorado.

31.     For example, HSA Secure offers Coloradans the opportunity to join a Sharing Plan that "has no religious requirements." *See* COLOHEALTH, *HSA Secure in Colorado*, https://colohealth.com/hsa-secure-in-colorado/ (last visited 8/30/2024)

(attached as Exhibit 2.5). *See also* EIN PRESSWIRE, *HSA for America Announces HSA Secure: A New Way to Save on Healthcare Costs*, https://www.fox21news.com/business/press-releases/ein-presswire/723493777/hsa-for-america-announces-hsa-secure-a-new-way-to-save-on-healthcare-costs/ (last visited 8/30/2024) (attached as Exhibit 2.6).

32.     Big Stuff Healthshare, a Utah-based Sharing Plan, is also not religious. Rather, it is designed for "[m]iddle-aged adults and families with kids," "26-year olds or newlyweds not covered by parents' insurance," "[f]reelancers, contractors, and self-employed workers," "[u]nemployed individuals," and "[e]mployees who want to save by waiving their employer's health insurance benefit." BIG STUFF HEALTHSHARE, *Home Page*, https://www.bigstuffhealthshare.com/ (last visited 8/30/2024).

33.     Big Stuff Healthshare's Foundations for Membership include only the following statement: "I agree that a community of moral, ethical and health-conscious people can most efficiently and effectively encourage and care for one another by directly sharing the costs and expenses associated with each other's health care needs." BIG STUFF HEALTHSHARE, *Foundations for Membership*, https://www.bigstuffhealthshare.com/foundations-for-membership (last visited 8/30/2024) (attached as Exhibit 2.7). The Foundations for Membership do not require members to hold any religious beliefs. *Id.*

34.     There have been three reporting cycles under the Reporting Law to date. Sharing Plans, including member organizations in the Alliance of Health Care Sharing Ministries, provided disclosures under the Reporting Law in December 2022, March 2023, and May 2024.

35.     The Reporting Law only requires Sharing Plans to submit the completed Reporting Template and associated materials once per year. There is no continuing state surveillance of Sharing Plans outside of those annual reporting obligations.

36.     The Division does not conduct any onsite investigations, surveillance, or monitoring of Sharing Plans pursuant to the Reporting Law.

37.     On behalf of the Division, I receive the various Sharing Plans' annual submissions of the Reporting Template and associated materials. I then review those submissions for completeness.

38.     To the extent submissions are incomplete, I follow up with Sharing Plans via email requesting that they correct or supplement their submissions to bring them into compliance with the requirements of the Reporting Law.

39.     The Division has not utilized its authority under the Reporting Law to fine

6

or issue cease and desist orders to any Sharing Plans for failing to report or for submissions out of compliance with the Reporting Law.

40.     Pursuant to Section 5(B)(3) of the Regulation 4-10-01, and its prior emergency regulation iterations, Sharing Plans are permitted to mark information confidential that the Sharing Plan desires to be treated with confidentiality and not disclosed publicly.

41.     To date, no claim of confidentiality asserted by any Sharing Plan pursuant to Section 5(B)(3) of the Regulation 4-10-01, has been challenged by the Commissioner.

42.     I am also the primary author of the annual Summary Report that the Commissioner publishes and posts on the Division's website pursuant to subsection 10-16-107.4(3), C.R.S.

43.     This report aggregates and summarizes information reported to the Division under the Reporting Law including membership, financial information, and use of third-parties to market and facilitate enrollment in the Sharing Plans. These reports include quotations from submissions (without identification of the submitting Sharing Plan) that illustrate key trends in the reported information.

44.     The Summary Reports published for reporting years 2021 and 2022 are attached as Exhibits 2.8 and 2.9.

45.     The Summary Report for reporting year 2023 has not yet been published.

46.     The Reporting Law has benefited Colorado by providing data and information that is included in Colorado's Annual Reports, which makes this information available to Colorado consumers. Although these Annual Reports noted that Sharing Plans' incomplete data submissions hampered some data analyses, they conveyed key facts regarding Sharing Plans' operations in Colorado, including: confirming for the first time which entities are operating in Colorado; that around 60,000 Coloradans are current members of Sharing Plans; that Coloradans contributed between $78 and $97 million annually in 2021 and 2022 to Sharing Plans; and Sharing Plans' use of insurance brokers to recruit and enroll new members.

47.     The Reporting Law clearly defines its terms governing the scope of disclosure obligations, contrary to claims from Samaritan that any such terms are "imprecise" or "nonsensical." Declaration of Rob Waldo (ECF No. 8-1) ("Waldo Decl."), at ¶ 18.

48.     Mr. Waldo claims that "there is no standard definition" of "administrative expenses." *Id.* But the regulation promulgated by the Division provides a specific

7

definition for that term:

> "'Administrative expenses' shall mean costs incurred to operate and support the functioning of the health care sharing plan or arrangement. This includes but is not limited to bank fees, staff salaries, data processing, sales, management of health care expense submissions, marketing, outreach, and enrollment efforts. This includes fees, commissions, and remuneration paid to contractors or third parties that acted on behalf of the [Sharing Plan] to facilitate administrative operations."

*See* Regulation 4-10-01, 3 CCR 702-4, § 4(A).

49.    Mr. Waldo asserts that it is unclear whether "requests for reimbursement of health care costs or services" requires disclosure of the "'sticker price' providers put on an invoice or the reduced amount they eventually accept." Waldo Decl., ¶ 18. But the instructions contained in the Reporting Template make clear:

> "This includes <u>all</u> requests for sharing of Colorado participants' health-care costs or services including any requests that were denied or approved or have not yet been denied or approved. If this amount includes duplicate charges by medical providers, discounts, participants' initial unshareable amounts, or other expenses that do not meet the HCSPAs sharing criteria additional context can be reported in the green box on the far right hand of the tab."

*See* Reporting Template, Ex. 2.1, "Definitions and Instructions" for element "K." (Emphasis in original.). In other words, this requires disclosure of the sticker price.

50.    Mr. Waldo notes that the Reporting Law requires disclosure of "reimbursement request denials," but claims there is no direction as to "whether requests that are outside of established policies or guidelines constitute a 'denial.'" But the regulation promulgated by the Division confirms that Sharing Plans should disclose the "Total number of share requests, for Colorado participants, that were denied (not shared) because they were not eligible for sharing according to the organization's guidelines." *See* Ex. ___, *Disclosure topic "P."*

I declare under penalty of perjury under the law of Colorado that the foregoing is true and correct.

Executed on August _30_, 2024.

<span style="margin-left:auto">*Leilani Russell*</span>
<span style="margin-left:auto">Leilani Russell</span>

8

## Instructions

### Instructions applicable to entire template (all tabs):

~ This template should be downloaded as an Excel file, filled out, and submitted back to the Division as an Excel file.

~ All tabs must be completed and emailed to the Division. In addition, Colorado Revised Statute 10-16-107.4 specifies other material also required to be submitted to the Division as part of data reporting.

~ Unless explicitly noted otherwise all data fields in this template are related to participants in plans or arrangements who are Colorado residents. E.g., requests for national information use the word "nationally" to denote the data should be provided at a national and not Colorado level.

~ All data filings submitted shall be considered public and shall be open to public inspection, unless the information may be considered confidential pursuant to § 24-72-204, C.R.S. **The entire filing cannot be held as confidential.** A "Confidentiality Index" shall be completed if the health care sharing plan or arrangement desires confidential treatment of any information submitted. Information identified as confidential shall be marked as such and shall be submitted separately from non-confidential material. If a CORA request is received requesting the information identified as confidential, the Division will notify the health care sharing plan or arrangement prior to sharing any information that the plan or arrangement may have identified as confidential in the confidentiality index.

~ Completed templates should be emailed to Leilani Russell (Leilani.Russell@state.co.us)

### Instructions applicable to tab "Pg.2 Plan specific information"

~ If your organization has a TIN (Tax ID number) please provide that in the designated field, otherwise leave this field blank.

~ If data elements are not applicable to your organization's plan or arrangement please note "*does not apply see note*" and explain why this data element does not apply to your organization in the "Additional context" green box

~ Products will be the organization's specific titles. E.g. Classic membership

~ Please note element "**D. The total number of employer groups in Colorado that facilitate all or some of their employee participants' monthly share contributions**" this includes monthly share contributions for the employee's family member(s) facilitated by the employer

~ Please note element "**K. Total dollar amount of health-care costs or services that were incurred by the participant and submitted by or on behalf of the participant for sharing**" This includes all requests for sharing of Colorado participants' health-care costs or services including any requests that were denied or approved or have not yet been denied or approved. If this amount includes duplicate charges by medical providers, discounts, participants' initial unshareable amounts, or other expenses that do not meet the HCSPAs sharing criteria additional context can be reported in the green box on the far right hand of the tab.

~ Please note element "**L. Total dollar amount of requests for sharing of Colorado participants' health-care costs or services that qualified for sharing excluding any amounts that the participants incurring the health-care costs or services must pay before receiving sharing amounts under the member guidelines**" this is the amount from element K minus any duplicate charges by medical providers, discounts, participants' initial unshareable amounts, or other expenses that do not meet the HCSPAs sharing criteria.

~ Please note element "**M.  For this product, the total amount of payments made to providers for Colorado participants' health-care costs or services**" is the subset of dollars from element "**L. Total dollar amount of requests for sharing of Colorado participants' health-care costs or services that qualified for sharing excluding any amounts that the participants incurring the health-care costs or services must pay before receiving sharing amounts under the member guidelines**" that were paid to providers for that product, in that reporting year. If this data element is not applicable to your organization's plan or arrangement please note "does not apply see note" and explain why this data element does not apply to your organization in the "Additional context" green box.

~ Please note element "**N. Total dollar amount of sharing requests facilitated or provided to Colorado participants for health care costs or services**" is the subset of dollars from element "**L. Total dollar amount of requests for sharing of Colorado participants' health-care costs or services that qualified for sharing excluding any amounts that the participants incurring the health-care costs or services must pay before receiving sharing amounts under the member guidelines**" that were shared with participants for the product, in the reporting year. If this data element is not applicable to your organization's plan or arrangement please note "does not apply see note" and explain why this data element does not apply to your organization in the "Additional context" green box.

### Definitions

EXHIBIT
**2.1**

Ex. 2.1, p. 1 of 6

## Definitions

~ "Administrative expenses" shall mean costs incurred to operate and support the functioning of the health care sharing plan or arrangement. This includes but is not limited to bank fees, staff salaries, data processing, sales, management of health care expense submissions, marketing, outreach, and enrollment efforts. This includes fees, commissions, and remuneration paid to contractors or third parties that acted on behalf of the HCSPA to facilitate administrative operations.

~ "CORA" shall mean the Colorado Open Records Act (§ 24-72-201, et seq, C.R.S.).

~ "Coloradans" shall mean residents of Colorado during the reporting period.

~ "Filing date" shall mean for the purposes of this regulation, the day after the HCSPR filing is received at the Division.

~ "Health care costs" or "health care expenses" shall mean any amount billed by a health care provider for health care services or related products or by a pharmacy.

~ "Health care services" means any services included in or incidental to the furnishing of medical, behavioral, mental health, or substance use disorder; dental, or optometric care; hospitalization; or nursing home care to an individual, as well as the furnishing to any person of any other services for the purpose of preventing, alleviating, curing, or healing human physical illness or injury, or behavioral, mental health, or substance use disorder. "Health-care services" includes the rendering of the services through the use of telehealth, as defined in § 10-16-123 (4)(e), C.R.S.

~ "Health care sharing plan" or "health care sharing arrangement" or "plan" or "arrangement" or "HCSPA" shall mean any organization that offers or markets products to facilitate payment or reimbursement of health-care costs or services for one (1) or more residents of Colorado. This does not include direct primary care agreements as defined in § 6-23-101, C.R.S.; consumer payment plans offered directly between a provider and patient (or patient's responsible party); businesses used to facilitate the plan's operations such as reimbursement handling, cost containment vendors, data processing; and crowdfunded sources that do not require ongoing membership fees, share requirements, or dues for the purposes of payment for and/or reimbursement of health care services.

~ "Insurance producer" or "producer", shall have the same meaning as found at § 10-2-103(6), C.R.S., with the exception that for the purposes of this regulation it does not include § 10-2-103 (6)(b), C.R.S."

~ "Program expenses" shall mean any service by the HCSPA or its contractors that, while not direct medical care, contributes to the care and overall experiences of HCSPA's participants. This includes but is not limited to coaching and wellness programs, care navigation, care coordination, medical review, quality improvement efforts, cost containment, reimbursement handling, and bill negotiations. This includes fees, commissions, and remuneration paid to contractors that acted on behalf of the HCPA to facilitate program expenses.

~ "Product(s)" means, for the purposes of this regulation, the services covered as a package under a membership plan, tier, or level.

~ "Third party" shall mean contractors that are associated with or assist the plan or arrangement in offering or enrolling Colorado residents as participants in the plan or arrangement.

| Select reporting year | | TIN | |
| --- | --- | --- | --- |

## Organizational Information

| Provide the name of your Organization: | | Provide a list of: | Web based materials |
| --- | --- | --- | --- |
| Contact person for your organization: | | Parent companies, subsidiaries, and other names that your organization has operated under at any time with the immediately preceding 5 calendar years: | Provide your Organization's website |
| Name: | | Parent Companies | |
| Email: | | Subsidiaries | Provide any additional website(s) your organization uses to communicate marketing materials including social media sites |
| Mailing address: | | Other names that your organization has operated under | |
| Telephone number: | | | |

**Please review around the d** *(partially cut off)*

### REQUIRED INFORMATION

| A. Product name (list out all products your organization offers in Colorado) | B. Number of Colorado residents that participated in this product in the reporting year (individuals) | C. Number of Coloradan HOUSEHOLDS that participated in the product in this reporting year | D. The total number of employer groups included in element D, list out how many individual Colorado participants were included (separate answers by commas) | E. For each employer group included in element D, list out how many individual Colorado participants were included (separate answers by commas) | F. Total number of participants in the product NATIONALLY? | G. Number of contracts entered into with health care service providers providing services for Colorado participants for this product. This includes contractors that provide telehealth services for participants | H. Total amount of fees, dues, shares, contributions, or other payments collected from individuals, Colorado employer groups, or others who participated in this product ($) | I. The percentage of fees, dues, shares, contributions, or other payments from Colorado participants in this product retained by the plan or arrangement for administrative expenses (%) | J. The percentage of fees, dues, contributions, or other payments from Colorado participants in this product retained by the plan or arrangement for program expenses (%) | K. Total dollar amount of health-care costs or services that were incurred by the participant and submitted by or on behalf of the participant for sharing | L. Total dollar amount of requests for sharing of health-care costs or services that qualified for sharing excluding any amounts that the participants incurring the health-care costs or services must pay before receiving sharing amounts under the member guidelines ($) | M. Total dollar amount of payments made to providers for Colorado participants' health care costs or services ($) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |

v the updated instructions tab for clarifications
ata elements on this tab and "Pg. 3 Aggregate
Information"

| N. Total dollar amount of sharing requests facilitated or provided to Colorado participants for health care costs or services ($) | O. Total number of requests by or on behalf of the Colorado participants' for sharing of healthcare costs or services incurred by the participant (Number) | P. Total number of share requests, for Colorado participants, that were denied (not shared) because they were not eligible for sharing according to the organization's guidelines (Number) | Q. Total number of appeals of denied sharing requests for Colorado participants' incurred health-care costs or services (Number) | R. Total number of appeals requests that were later approved for sharing for Colorado participants' incurred health-care costs or services (Number) | S. Percentage of total number of requests denied compared to the total number of Colorado participants share requests submitted | T. Percentage of total number of requests denied compared to the total number of appeals for sharing that were "denied" (not shared) for Colorado participants | U. Total amount of Colorado participants' health-care costs or services submitted in the reporting period that qualify for sharing pursuant to the plan/arrangement's criteria but that were not shared or paid by the last day of the reporting year, excluding any amounts that the participants incurring the health-care costs or services must pay before receiving sharing amounts under the member guidelines ($) | V. Estimated number of individual plan/arrangement participants anticipated in Colorado in the current calendar year | W. Estimated number of households plan/arrangement participants anticipated in the current calendar year | X. Estimated number of employer groups in Colorado that facilitate all or some of their employee participants' monthly share contributions in the current calendar year |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

| Y. Estimated total number of individual Colorado participants associated with the employers in element X in the current calendar year | Z. The total number of producers that are associated with or assist in offering or enrolling participants in Colorado in the product (number of **producers**) | AA. Of the number of Colorado participants in the product how many were enrolled through a producer (number of **participants**) | | Additional context you'd like to provide the Division about this product or any of the data submitted on this tab? Possibly data to include could be the total dollar amount of discounts negotiated for Colorado participants.<br><br>If any Colorado data were provided on a pro rata basis please note that here and which data elements (e.g. B, G-J, M) are based off of national numbers |
|---|---|---|---|---|
| | | | | |

**Organizational Information**

| Organizational Name | |
|---|---|

| REQUIRED INFORMATION - THIRD PARTIES | | | REQUIRED INFORMATION - Producers | REQUIRED INFORMATION - Organizational | REQUIRED INFORMATION | ADDITIONAL INFORMATION |
|---|---|---|---|---|---|---|
| Provide a list of third parties, excluding producers, that are associated with or assist the HCSPs in the following bolded areas | | | | Colorado Counties | National Information | Please describe any appeals processes that your organization's uses when a participant contests a reimbursement, requested share, or payment denial |
| (Add more rows to this table as needed) | | | | | | |
| Name of third party - provide the "doing business as" name of each applicable third-party (list out separately) | Total commission, fees, or remuneration paid in the previous calendar year for: **marketing, promoting, or enrolling participants in a HCSPA product to Colorado participants** | Total commission, fees, or remuneration paid in the previous calendar year for: **operating, managing, or administering a product offered by the HCSPA** | **Total number of producers** that are associated with or assist in offering or enrolling participants in Colorado (Aggregate value) | **Total commission, fees, or remuneration paid** in the previous calendar year to **producers** for: marketing, promoting, or enrolling Colorado participants in a plan or arrangement (Aggregate value) | List out the Colorado counties where a plan/arrangement was offered in **2023** | List out the Colorado counties where a plan/arrangement is **intended** to be offered in **2024** | List out the other states (i.e., states other than Colorado) in which your organization offered a plan or arrangement was in **2023** One row per state | |
| 1 | | | | | | | |
| 2 | | | | | | | |
| 3 | | | | | | | |
| 4 | | | | | | | |
| 5 | | | | | | | |
| 6 | | | | | | | |
| 7 | | | | | | | |
| 8 | | | | | | | |
| 9 | | | | | | | |
| 10 | | | | | | | |
| 11 | | | | | | | |
| 12 | | | | | | | |

Additional context you'd like to provide the Division about the data provided on this tab?



**COLORADO**
**Department of Regulatory Agencies**
Division of Insurance

# Health Care Sharing Plan or Arrangement Reporting Attestation

### Timeline to respond to incomplete submissions

If the Organization subject to the requirements of § 10-16-107.4, C.R.S fails to submit the information or certification required by § 10-16-107.4, C.R.S, the submission is incomplete. The Commissioner of Insurance shall make a determination of completeness no later than forty-five (45) days after the filing date of the submission. If the commissioner has not informed the Organization of any deficiencies in the submission within forty-five (45) days after receiving the submission, the submission is considered complete.

If the Commissioner determines that a person fails to comply with the requirements of § 10-16-107.4, C.R.S, the Commissioner shall: (a) notify the Organization that the submission is incomplete and enumerate in the notification each deficiency found in the person's submission; and (b) allow the Organization thirty (30) days after notice of the incomplete submission to remedy the deficiency found in the submission. If the Organization does not remedy the deficiency within the thirty-day period, the Commissioner may levy a fine not to exceed five thousand dollars ($5,000) per day. If the Organization does not remedy the deficiency or deficiencies within thirty (30) days after the initial fine is levied, the Commissioner may issue a cease-and-desist order in accordance with section § 10-3-904.5, C.R.S.

☐ By clicking here, you attest that you read the above statement and are aware of the timeline to respond to the Commissioner and the Division if this submission is deemed incomplete.

☐ By clicking here, you attest that all data required to be submitted, per § 10-16-107.4, C.R.S, have been submitted to the Division. Including submitting of: (1) supplemental, training, and marketing materials; (2) organizational chart of the HCSA with a list of officers, directors, and their roles; (3) copies of any training materials provided to a producer; (4) training materials provided to a third party; and (5) the Reporting Template.

☐ By clicking here, you, an officer of the Organization, attest that the information provided in this reporting template, to the best of your good-faith knowledge and belief, is accurate and satisfies the requirements of § 10-16-107.4, C.R.S.

_____
Digital Signature

_____
Date

_____
Print name and role within organization

_____
Email address

# MEMBER
# GUIDELINES

**At Knew Health**, we have reimagined the HealthShare model to simplify the experience of our members and make medical cost sharing more accessible. Our Member Guidelines outline who we are as an organization and how we share in the medical costs of our members.

# Contents

Our Mission -------------------------------------------------------------- 9

Membership Eligibility ------------------------------------------------- 11

  1. Commitment ------------------------------------------------------ 11

  2. Participation through Contributions ------------------------------11

  3. Qualification ----------------------------------------------------- 12

Enrollment Requirements --------------------------------------------- 12

  1. Determination of Household Membership -------------------------12

  2. Dependents ----------------------------------------------------- 12

  3. Newborns ------------------------------------------------------- 13

  4. Adoption -------------------------------------------------------- 13

  5. Grandchildren -------------------------------------------------- 13

  6. Tobacco -------------------------------------------------------- 14

2

Resp. Appx. p. 640

## Member Responsibilities ----------------------------------------------------- 14

1. Member Contributions ---------------------------------------------------- 14

2. Proper Submission of Medical Needs to Knew Health ------------------------ 14

3. Trust & Accountability --------------------------------------------------- 14

## How Needs are Shared------------------------------------------------------15

1. Determination of a Need -------------------------------------------------- 15

2. Initial Unshareable Amount (IUA) -----------------------------------------15

3. Changing your IUA ------------------------------------------------------- 15

4. Maximum Shareable Amount ------------------------------------------------16

5. Multiple Needs in a 12-Month Period --------------------------------------16

6. Insurance Companies & Government Entities --------------------------------16

7. Active Membership ------------------------------------------------------16

8. Late Fees and Interest ---------------------------------------------------16

9. Appeals

## Medical Conditions Existing Prior to Membership ----------------------------17

1. Definition: 24 Months Symptoms and Treatment Free ------------------------ 17

2. Exceptions for High Blood Pressure, High Cholesterol, and Diabetes --------------17

3. Exceptions for Other Medical Conditions ----------------------------------17

4. Pre-Existing Condition Phase-In Period ------------------------------------18

## Limitations on Sharing ------------------------------------------------------ 18

1. Abortion --------------------------------------------------------------- 18

2. ADHD, ADHS, and SPD Treatment -----------------------------------------18

3. Allergy Treatments ------------------------------------------------------ 19

4. Alternative Medical Practices --------------------------------------------19

5. Alcohol and Drug Abuse Treatments --------------------------------------19

6. Ambulance Transports --------------------------------------------------- 19

7. Audiological ------------------------------------------------------------ 19

8. Automobile Accidents ---------------------------------------------------20

9. Cataract Surgery --------------------------------------------------------20

10. Chiropractic -----------------------------------------------------------20

11. Chronic Pain Therapy ---------------------------------------------------20

3

12. Cosmetic Surgery -------------------------------------------------------20

13. Dental --------------------------------------------------------------- 20

14. Diabetic Medication & Supplies -------------------------------------- 20

15. Emergency Visits ----------------------------------------------------- 21

16. Fertility -------------------------------------------------------------21

17. Genetic Mutation ----------------------------------------------------- 21

18. Home Healthcare ----------------------------------------------------- 21

19. Hospice Care --------------------------------------------------------- 21

20. Hospitalization ------------------------------------------------------- 22

21. Hyperbaric Therapy --------------------------------------------------- 22

22. Injections ------------------------------------------------------------ 22

23. Injuries Obtained from Certain Acts ----------------------------------- 22

24. Laboratory Tests and Checkups ---------------------------------------- 22

25. Long-Term Care and Skilled Nursing -----------------------------------22

26. Medical Equipment ---------------------------------------------------22

27. Medical Supplies -----------------------------------------------------23

28. Mental Health -------------------------------------------------------- 23

29. Naturopathic ---------------------------------------------------------23

30. Newborn Care --------------------------------------------------------23

31. Nutritionists and Dieticians ------------------------------------------23

32. Occupational Therapy -------------------------------------------------23

33. Organ Transplants ----------------------------------------------------24

34. Sleep Apnea ----------------------------------------------------------24

35. Physical Therapy -----------------------------------------------------24

36. Prescriptions ---------------------------------------------------------24

37. Preventive Services --------------------------------------------------- 24

38. Speech Therapy ------------------------------------------------------24

39. Sports ---------------------------------------------------------------25

40. Sterilization --------------------------------------------------------- 25

41. Suicide and Attempted Suicide ----------------------------------------25

42. Surrogacy ----------------------------------------------------------- 25

43. Therapeutic Massage Therapy -----------------------------------------25

4

44. Tobacco Use over 50------------------------------------------------------------25

45. Vision --------------------------------------------------------------------- 26

46. Weight Reduction --------------------------------------------------------- 26

Maternity Needs ---------------------------------------------------------------26

1. General ------------------------------------------------------------------26

2. Separate Needs ----------------------------------------------------------26

3. Early Sharing Requests --------------------------------------------------26

4. Home Births ------------------------------------------------------------- 27

5. Pregnancy Prior to Membership ----------------------------------------- 27

6. Waiting Period -----------------------------------------------------------27

7. Premature Birth ---------------------------------------------------------27

Submission of Medical Needs --------------------------------------------------27

1. Submitting a Needs Request --------------------------------------------- 27

2. Required Documentation ------------------------------------------------- 28

3. Time Limit for Providing Documentation --------------------------------28

4. Meeting the IUA --------------------------------------------------------- 28

5. Negotiating Medical Bills ------------------------------------------------28

End of Life Assistance ----------------------------------------------------------- 28

Appendix A: Defined Terms ---------------------------------------------------- 29

1. Annual limit --------------------------------------------------------------29

2. Application date ----------------------------------------------------------29

3. Contribution List --------------------------------------------------------- 29

4. Date of service ----------------------------------------------------------- 29

5. Dependent -------------------------------------------------------------- 29

6. Effective Date ----------------------------------------------------------- 30

7. Eligible Need  -----------------------------------------------------------30

8. Head of household ------------------------------------------------------30

9. Household membership --------------------------------------------------30

10. Healthcare sharing ------------------------------------------------------30

11. Inactive Member--------------------------------------------------------- 30

12. Ineligible Need ----------------------------------------------------------30

5

13. Initial Unshareable Amount ----------------------------------------------------- 31

14. Licensed medical professional ------------------------------------------------31

15. Lifetime limit -------------------------------------------------------------------- 31

16. Maternity need ------------------------------------------------------------------ 31

17. Maximum shareable amount ---------------------------------------------------- 31

18. Medically necessary ------------------------------------------------------------ 31

19. Member(s) -----------------------------------------------------------------------31

20. Membership --------------------------------------------------------------------- 32

21. Membership cancellation request ---------------------------------------------32

22. Membership commitment ------------------------------------------------------- 32

23. Member responsibility amounts ------------------------------------------------ 32

24. Membership update ------------------------------------------------------------- 32

25. Membership limitation -----------------------------------------------------------32

26. Membership options -------------------------------------------------------------33

27. Membership withdrawal --------------------------------------------------------- 33

28. Monthly contributions ----------------------------------------------------------- 33

29. Needs request ------------------------------------------------------------------- 33

30. Office visit -----------------------------------------------------------------------33

31. Membership administration -----------------------------------------------------33

32. Pre-existing condition ---------------------------------------------------------- 34

33. Proration ------------------------------------------------------------------------- 34

34. Shareable amount --------------------------------------------------------------- 34

35. Explanation of benefits (EOB) -------------------------------------------------- 34

36. Usual reasonable and customary costs (URC) --------------------------------- 34

37. Unshareable amount(s) --------------------------------------------------------- 34

Appendix B: Frequently Asked Questions ---------------------------------------------35

What does Knew Health believe? ------------------------------------------------- 35

What kind of company is Knew Health? ------------------------------------------ 35

Isn't Knew Health really just another health insurance company? ---------------------- 35

6

What's the advantage of Knew Health not being a health insurance company? ----------36

Is Knew Health legal? ----------------------------------------------------------36

How are members of Knew Health affected by the federal healthcare law (including the

Affordable Care Act)? ------------------------------------------------------ 36

How does Knew Health handle medical claims? -------------------------------- 36

What procedure should I follow to request reimbursement for my medical bills when I

have a need? --------------------------------------------------------------37

How long does it take Knew Health to process a medical need? --------------------37

Can I choose my own doctors and hospitals without being penalized? -------------------37

Does Knew Health charge monthly premiums? -------------------------------- 37

Does Knew Health use deductibles and co-insurance? -------------------------------- 38

Will Knew Health share medical costs that were incurred outside of the United States? ------38

What are Knew health's membership requirements? -------------------------------- 38

Can my membership be dropped if I have very high medical needs? -------------------- 38

Can my family members participate in the sharing program? ------------------------- 38

What if my dependents do not agree to abide by the Knew Health Member Guidelines? ----- 39

Is there a lifetime or yearly maximum amount that is eligible for sharing for any one

person or family? ------------------------------------------------------------ 39

What kinds of needs do Knew Health members share? --------------------------------39

What kinds of needs do Knew Health members not share? -----------------------------39

How does Knew Health handle very large medical expenses? --------------------------39

What amounts do members share for maternity needs? ------------------------------ 40

Am I excluded from membership/reimbursement eligibility if I'm a cancer survivor? ---------40

How does Knew Health handle expenses for medical treatments that occurred overseas? ----40

What if I lose my job or change employers? Can I take my Knew Health plan with me? ------ 40

This program sounds kind of unusual; does it really work? ------------------------------ 41

What happens if Knew Health's members' needs are greater than the monthly

contributions received? --------------------------------------------------------41

How much does it cost to belong to Knew Health? --------------------------------41

Can my employer pay some, or all, of my monthly contribution amount? ------------------42

7

How is my portion of the monthly contribution collected? -------------------------------42

Are my monthly contributions higher if I, or a participating member in my family, uses tobacco products? -------------------------------------------------------------42

Are my monthly contributions a pre-tax deduction like health insurance premiums? --------42

How often can the monthly contribution amounts be changed? -------------------------42

Are my pre-existing conditions always unshareable? ---------------------------------43

Appendix C: Company FAQs ------------------------------------------------------43

Is Knew Health a group benefit? -------------------------------------------------43

Why should my company participate in Knew Health's medical cost sharing program? ------43

Does Knew Health's medical cost sharing program comply with the Affordable Care Act requirements? --------------------------------------------------------------43

What are the risks and liabilities my company may be exposed to through participation in Knew Health? --------------------------------------------------44

Can my employee's monthly contributions be collected via payroll deductions? ---------- 44

Can my company pay some or all of its employee's monthly contributions? --------------44

How do I set up my employees' witholding amounts? --------------------------------- 44

Is there any additional administration or work for my company as a result of participation? - 44

The cost savings sound great, but how will my employees be affected by Knew Health's program? ----------------------------------------------------- 45

Disclaimer ----------------------------------------------------------------- 46

Resp. Appx. p. 646

# Knew Health's Mission

Welcome. Thank you for your interest in Knew Health. Our founder, Joshua Rosenthal, believes that everyone should have access to preventative health and wellness resources. And everyone should have a safety net for when unexpected medical costs occur.

Knew Health makes healthcare simple and affordable by pairing preventative health with medical cost sharing.

We put your health first by providing access to personalized health coaching, preventive coverage, allowances for preventive medical care above and beyond conventional care, access to the highest quality supplements, complimentary lab work, and monthly seminars on health and wellness education.

And when you have a health need, we provide you with the freedom to choose the right providers for you. We give you a team dedicated to help you easily navigate the healthcare system. We make it possible to invest back into your health and wellness, and we'll have your back when unexpected medical costs happen.

The concept of medical cost sharing has evolved over decades of communities coming together in times of need and sharing burdens with one another. Knew Health has created a one-of-a-kind Community of passionate individuals that pull together to efficiently manage one another's medical costs.

Knew Health will make your life better. We will change the way you think about healthcare by making it easier to live healthier, to feel your best, to save money on healthcare costs, to receive the best quality care, and we'll help one another every step of the way. Through our intentionally different, wellness-focused healthcare solution, you can achieve your optimal wellness and have the stability of our Community at your back.

9

# Principles of Membership

Each member of Knew Health must comply with the following requirements to maintain membership with Knew Health Alliance, hereby known as Knew Health, and remain eligible to participate in the medical cost sharing program and participate in all other Knew Health services. Adherence to the Knew Health Principles of Membership minimizes medical risks, encourages good health practices, and ensures member integrity and accountability.

**All Knew Health members must attest to the following statements:**

• I believe that a community of ethical, health-conscious people can most effectively care for one another by directly sharing the costs associated with each other's health care needs. I recognize that Knew Health welcomes members of all faiths.

• I understand that Knew Health is a membership, not an insurance entity, and that Knew Health cannot guarantee payment of medical expenses.

• I agree to practice good health measures and strive for a balanced lifestyle. I agree to abstain from the use of any illicit or illegal drugs and refrain from excessive alcohol consumption, and acts which are harmful to the body. I understand that members who use tobacco will have an increased monthly contribution (per household) of $112.50.

• I am obligated to care for my family. I believe that mental, physical, emotional, or other abuse of a family member, or any other person, is morally wrong. I commit to treating my family and others with care and respect at all times.

• I agree to submit to mediation followed by subsequent binding arbitration, if needed, for any instance of a dispute with Knew Health or its affiliates.

10

Resp. Appx. p. 646

# Membership Eligibility

**Membership eligibility in Knew Health is primarily based upon two factors.**

1. Adherence to the Knew Health Principles of Membership.
2. Participation in the community by submitting monthly contributions.

After committing to these primary obligations, prospective members are eligible to enroll in the Knew Health community. Membership may begin on a date elected by the prospective member or specified by Knew Health. The first monthly contribution must be received before the membership is considered active.

## 1. Commitment

Members of Knew Health commit to abide by a set of personal standards as outlined in the Knew Health Principles of Membership. If a violation of the Principles of Membership is discovered through review of a member's submitted medical records, all cost sharing for the needs of that member will be put on hold. This hold will begin on the date in which the violation was discovered or recorded in the member's medical records. A notification of the hold and an explanation of the discovery will be issued to the member.

The member will be granted 30 days to submit documentation supporting compliance with the Principles of Membership. If the submitted documentation does not satisfactorily demonstrate compliance with the Principles of Membership, the member will automatically be withdrawn from the sharing program and membership will be revoked. In the event that membership is revoked due to a violation of the Principles of Membership, Knew Health will not return the offending member's contributions received prior to the date of withdrawal.

## 2. Participation through Contributions

To participate in the member-to-member medical cost sharing community and access Knew Health services, members must submit the monthly contribution amount associated with their level of membership.

Members have multiple options for submitting their monthly contributions. Individual members can make contributions directly to Knew Health. For members who enroll in Knew Health through their workplace , payments can be made through their employer.

All member contributions are voluntary, but the monthly contribution is required to be active and eligible for sharing. Monthly contributions must be received no later than 30 days after the billing date. If a monthly contribution is not received by the last day of the billing month, the membership will become inactive and the member will be withdrawn from the medical cost sharing community.

11

Any member that has been withdrawn may reapply, provided they meet all enrollment and eligibility requirements. Once the member reapplies and membership is reinstated by Knew Health, the member will become eligible to participate in cost sharing. All member needs and medical costs occurring after the membership is inactivated and before reinstatement will be ineligible for cost sharing, and any medical conditions existing before the date of reinstatement will be considered pre-existing. Any member whose membership has been inactivated three times will not be eligible to reapply.

## 3. Qualification

To be qualified for membership, an applicant must meet all criteria set forth in the membership guidelines and the membership enrollment form. If at any time it is discovered that a member did not submit a complete membership enrollment form, the incomplete form could result in either a retroactive membership limitation or a retroactive denial of membership.

While member health status has no effect on eligibility for membership, there are limitations on medical cost sharing for some conditions that existed prior to a member's effective date.

# Enrollment Requirements

Knew Health offers different enrollment types for individuals and families. Monthly contributions are based on the enrollment type, initial unshareable amount, and member age. This section outlines the different household memberships and who is eligible for enrollment therein.

## 1. Determination of Household Membership

There are four tiers of membership, and member contributions are calculated depending on the participating members of a household.

- Member Only: an individual member of Knew Health
- Member & Spouse: Two married members or two domestic partners
- Member & Child(ren): A member and any eligible dependent children, without membership of a spouse
- Member & Family: A member, spouse/domestic partner, and any dependent children

## 2. Dependents

An unmarried dependent may participate under a combined membership with the head of household through the age of 25. Children born into a membership due to an eligible maternity need may participate under a combined membership. Under a combined membership, the head of household is responsible for ensuring that each individual participating under the combined membership complies with membership guidelines and the Knew Health Principles of Membership.

12

Once a dependent reaches the age of 26 or marries, that dependent is no longer eligible to participate under the combined membership. A dependent who wishes to continue participating as a member with Knew Health may complete an enrollment form. Any medical needs that occur between the time when a child leaves their parent's membership and enrolls in their own membership are not shareable. If a dependent ages-out of their Knew Health membership but chooses to re-enroll at a later date, they will be subject to the limitations associated with preexisting conditions.

## 3. Newborns

Newborns whose birth is part of a shareable maternity need will automatically be enrolled in a Knew Health membership at birth. In the case of a change in household enrollment type, the monthly contribution amount will be adjusted automatically. If a member does not wish for their newborn to be added to their membership, they must notify Knew Health 30 days prior to birth.

Newborns who are not born as part of a shareable maternity need must be enrolled manually in a Knew Health membership. The newborn's membership will begin on the date of enrollment. Any genetic conditions or complications for newborns not born as part of a shareable maternity need are considered pre-existing and subject to the same limitations as defined in the section "Medical Conditions Existing Prior to Membership."

## 4. Adoption

Knew Health regards adopted children the same as biological children regarding membership. Any physical conditions of which the adoptive parents are aware prior to the legal adoption of the child are considered pre-existing conditions and are subject to the sharing limitations and phase-in period outlined in the Member Guidelines. Adopted children cannot be added to a Knew Health membership prior to birth.

## 5. Grandchildren

A grandchild (or grandchildren) may be included as part of their grandparent's membership if they meet the following criteria.

1. The grandparent has legal custody of the grandchild.
2. The grandchild lives with their grandparents at least nine months out of the year.
3. There is no other agency, person, or group responsible for the grandchild's medical needs.

13

## 6. Tobacco

Knew Health households with one or more tobacco users are required to contribute a higher monthly contribution to maintain membership. The monthly tobacco surcharge is $112.50 per household.

A household member who has used any tobacco product one or more times a month within the past year is considered a tobacco user. Tobacco products include, but are not limited to, cigarettes, cigars, chewing tobacco, snuff, vape products, and pipe tobacco. Smoked cannabis products are considered tobacco for the purposes of the tobacco surcharge.

# Member Responsibilities

All members of Knew Health share certain responsibilities to remain a part of the sharing program. Because the actions of one member can affect the entire community, each member will be held accountable for following these standards.

## 1. Member Contributions

Monthly membership contributions should be made in a timely manner. If contributions are not made within 30 days of the due date, the membership will be inactivated, and any needs will not be shareable. See "Participation through Contributions" for more information.

## 2. Proper Submission of Medical Needs to Knew Health

For Knew Health to share in a member's medical expenses, the member is responsible for submitting a complete and correct Needs Request within six months of the treatment date to Knew Health. This process is outlined in the section titled "Submission of Medical Needs."

## 3. Trust & Accountability

Knew Health community members are expected to act with honor and integrity. Members should not falsify medical needs or medical records or use deceptive practices. If a member abuses the trust of Knew Health and its members, their membership may be revoked.

14

# How Needs are Shared

This section explains how the shareable amount of a member's medical expenses will be determined.

Medical needs are submitted on a per member, per incident basis. Medical needs may be injuries or illnesses that result in medical expenses. These medical expenses may be incurred by receiving medically necessary treatment from licensed medical professionals and facilities, such as physicians, emergency rooms, and hospital facilities.

When a member has a medical expense to be shared, the member must submit original, itemized bills for the medical expense within six months of treatment. Bills submitted more than six months after the service date of treatment will not be shareable. There is no lifetime limit on the number of conditions or the total dollar amount that may be shared.

## 1. Determination of a Need

Expenses related to the same medical condition, whether expenses for a single incident or separate incidents, will be shared as one need. The related expenses will accumulate toward the total need amount.

## 2. Initial Unshareable Amount (IUA)

The initial unshareable amount, or IUA, is the amount that a member will pay before the Knew Health community shares in eligible medical expenses. The IUA is also known as your personal responsibility. Knew Health has five primary levels of personal responsibility: $500, $1,000, $1500, $2,500, and $5,000. The lower your personal responsibility (or IUA), the higher your monthly contribution will be.

All qualifying medical expenses submitted after the IUA is met are shareable with the Knew Health community at one hundred percent. There is no annual or lifetime limit. You will not need to pay the IUA for a single need again until you are symptom free for 12 months. Additionally, you will not be responsible for more than three IUAs in a rolling 12-month period.

## 3. Changing your IUA

Members may choose to change their IUA once per membership year. If an IUA is lowered, a 60-day waiting period will apply to all needs other than those resulting from an accident.

15

Resp. Appx._p. 659

## 4. Maximum Shareable Amount

There is no annual or lifetime maximum shareable amount for any member or membership household. Knew Health has a systematic way to handle large needs and has budgeted to address large needs.

## 5. Multiple Needs in a 12-Month Period

Member households that experience multiple needs will be responsible for up to three IUAs within a rolling 12-month period. After a member has paid three IUAs in a twelve-month period, any additional shareable needs of $500 or more will be shared with the Knew Health community at one hundred percent.

## 6. Insurance Companies & Government Entities

Insurance companies and government entities are primarily responsible for the payment of a member's medical expenses. Members who are eligible for benefits through either insurance or government assistance must contact the Knew Health Needs team before submitting their medical need.

## 7. Active Membership

To participate in medical cost sharing with the Knew Health community, a membership must be active. Membership is considered active when the member has paid their monthly contributions on time and is in good standing with Knew Health.

For a medical need to be shared, the membership must be active during the date(s) of service, when medical bills are received, and at the time the IUA is paid. If a membership deactivates before the determination of sharing is made, the bills will not be shared with the community. Any pre-existing condition limitations are applied based on the first date of active membership.

## 8. Late Fees and Interest

Any late payment fees or interest charges that may accrue to medical bills before the member meets their IUA are the member's responsibility—they are not shareable.

Additionally, any late payment fees or interest charges caused by a member's delay in providing necessary documentation to Knew Health are not shareable.

16

Resp. Appx_p. 654

## 9. Appeals

If a member believes that a limitation was incorrectly placed on member sharing, an appeal may be submitted. Members may submit an appeal and provide supporting medical evidence to have the membership limitation removed. All appeals are reviewed by a committee that includes at least one Knew Health board member.

To file an appeal, send the medical evidence, an explanation of why you feel that the limitation was placed unfairly, and any supporting documentation to needs@knewhealth.com.

# Medical Conditions Existing Prior to Membership

To keep membership contributions low for all members, Knew Health implements a waiting period for sharing of medical conditions that exist prior to enrollment in a Knew Health membership. This section defines medical conditions prior to membership and outlines the sharing limitations.

## 1. Definition: 24 Months Symptom and Treatment Free

Needs that arise from conditions that existed prior to membership are only shareable if the condition was regarded as cured and did not require treatment or present symptoms for 24 months prior to the effective date of membership.

Any diagnosed illness or injury for which a person has been examined, taken medication, had symptoms, or received medical treatment within 24 months prior to the effective date of membership is considered a pre-existing condition. For more information, please see the definition of pre-existing condition listed under "defined terms."

## 2. Exceptions for High Blood Pressure, High Cholesterol, and Diabetes

High blood pressure, high cholesterol, and diabetes (types 1 and 2) will not be considered preexisting conditions as long as the member has not been hospitalized for the condition in the 12 months prior to enrollment and is able to control it through medication and/or diet.

## 3. Exceptions for Other Medical Conditions

Knew Health recognizes that each member's situation is different. Knew Health reserves the right to make exceptions for certain medical conditions on a case-by-case basis. Knew Health makes decisions in service to the community as a whole.

17

Resp. Appx._p. 659

## 4. Pre-Existing Condition Phase-In Period

Pre-existing conditions have a phase-in period wherein sharing is limited. Starting from the initial enrollment date, members have a one-year waiting period before pre-existing conditions are shareable. After the first year, pre-existing needs are eligible for sharing on a limited basis, with the amount increasing each membership year. Members are never required to pay a second IUA for the same need, including pre-existing conditions.

Knew Health attempts to negotiate all medical bills received. Even if a pre-existing condition is not shareable, members may still receive discounts for their services through negotiation.

**Shareable amounts for pre-existing conditions:**

• Year One: $0 (waiting period)
• Year Two: $25,000 maximum per need
• Year Three: $50,000 maximum per need
• Year Four: $125,000 maximum per need

After year four of membership, expenses related to pre-existing conditions will remain shareable at a maximum of $125,000 in a 12-month rolling period and resetting each membership year.

# Limitations on Sharing

Member needs not associated with a prior medical condition are generally shareable. The following list reflects limitations on sharing. All shareable expenses are subject to the member's IUA.

## 1. Abortion

Expenses for the abortion of a living, unborn baby are not shareable.

## 2. ADHD, ADHS, and SPD Treatment

Expenses for prescriptions related to ADHD, ADHS, and SPD are not shareable.

18

## 3. Allergy Treatments

Allergy testing and medication is excluded from sharing. Needs that arise out of non-seasonal allergies, such as an emergency room visit for an allergic reaction, are considered shareable.

## 4. Alternative Medical Practices

Alternative medical treatments may be shared with the Knew Health community with prior written approval from Knew Health. Alternative medical treatments without written approval may not be shareable. To be considered a viable alternative to a traditional treatment plan, these treatments must be considered safe and effective. A member is also required to demonstrate the proposed value of the alternative treatment.

**What is needed for Knew Health to consider an alternative medical need?**

• Explanation of why the alternative medical need was selected
• Explanation of why the alternative medical need should be shared
• Doctor notes on current condition (Knew Health can help obtain doctor notes)
• Estimated costs (Knew Health can help obtain the estimated costs, if appropriate)

Knew Health considers alternative medical treatment plans on an individual basis and may put a cap on visits or shareable costs depending on the service.

## 5. Alcohol and Drug Abuse Treatment

Treatment for alcohol abuse, substance abuse, or chemical dependency is shareable up to $3,000 per member.

## 6. Ambulance Transports

Ambulance transports are shareable as part of a need when they are required in relation to a specific shareable illness or injury.

## 7. Audiological

Audiological needs to correct hearing loss are shareable. Expenses related to hearing aids are not shareable.

19

## 8. Automobile Accidents

Needs arising from an automobile accident are only shareable when a third party or insurance entity is not liable. If the member's medical need is being considered, or should be considered, by a third party or insurance entity, the need is not shareable until Knew Health receives documentation to reflect a lack of liability or partial payment.

## 9. Cataract Surgery

Cataract surgery is treated as a pre-existing condition and subject to a one-year waiting period before it is shareable. Each eye is considered a separate need and subject to an individual IUA.

## 10. Chiropractic

Services related to the treatment of a specific musculoskeletal injury or disease are shareable for up to 25 office visits per need for up to 120 days. All other chiropractic services will be treated as alternative medical practices and are subject to the limitations as outlined.

## 11. Chronic Pain Therapy

Services related to chronic pain therapy have the same limitations as an alternative medical practice. They are shareable as part of a related eligible need, and members must get prior approval from Knew Health for the number and type of sessions. See the limitations on injections for more information.

## 12. Cosmetic Surgery

Expenses related to cosmetic surgery are shareable only for disfiguration due to a shareable injury or illness.

## 13. Dental

Knew Health may share in dental-related expenses that are deemed medical.

## 14. Diabetic Medication & Supplies

Any medical expenses related to supplies, testing, medication, or other implements used to treat insulin-dependent diabetes (type 1) are not shareable.

20

Resp. Appx_a_658

## 15. Emergency Visits

Emergency room visits are generally shareable separately or in conjunction with an eligible medical need related to an illness, injury, or accident. The first ER visit for a medical condition is treated as a normal need. Each additional visit related to the same condition requires the member to take on a personal responsibility of $500 in addition to the member's IUA.

Members with nonemergency needs should seek out other treatment options such as doctor visits, telemedicine, urgent care clinics, or other appropriate care. Seeking proper nonemergency care reduces emergency room visits and the financial strain on the entire community.

## 16. Fertility

Expenses related to fertility evaluations and treatments are not shareable.

## 17. Genetic Mutation

Needs resulting from a genetic mutation that existed prior to membership are subject to the same limitations as other pre-existing conditions.

If the member did not receive a diagnosis, require treatment, present symptoms, or take medication for the genetic mutation in the 24 months prior to membership, needs related to the condition are considered shareable without pre-existing condition limitations.

## 18. Home Healthcare

Home healthcare expenses are shareable when related to an accident or injury and when the care has been prescribed by a licensed physician. Sharing of home healthcare expenses is limited to 30 days and $5,000.

## 19. Hospice Care

Hospice care is shareable for 90-day periods when ordered by and under the care of a licensed care professional and upon physician approval or certification of terminal illness.

21

## 20. Hospitalization

Hospitalization is shareable at a semi-private room rate. If a medical provider prescribes ICU or quarantine, those expenses are also shareable.

## 21. Hyperbaric Therapy

Inpatient or outpatient hyperbaric therapy may be shareable for the treatment of a specific illness or injury. Outpatient hyperbaric therapy is shareable for up to 35 therapy sessions.

## 22. Injections

Injections related to pain management for a shareable need are shareable up to $5,000. Hormone therapy injections related to a shareable need are shareable up to $3,000. Injections related to gender transitioning or sex reassignment therapy are not shareable.

## 23. Injuries Obtained from Certain Acts

Injuries or illnesses resulting from participation in a riot, criminal act, euthanasia, assisted suicide, or other such acts are not shareable.

## 24. Laboratory Tests and Checkups

Laboratory tests and checkups are shareable as part of an eligible need and prescribed by a licensed medical provider.

## 25. Long-Term Care and Skilled Nursing

Long-term care and skilled nursing are shareable when prescribed by a licensed medical provider for recovery from a shareable injury or illness. Sharing for these services is limited to 90 days per medical need.

## 26. Medical Equipment

Medical equipment, including durable medical equipment (DME), is shareable if it is prescribed by a licensed medical provider and if it is related to a shareable need.

Resp_Aspn_s 660

## 27. Medical Supplies

Medical supplies that directly aid in the treatment of, or recovery from, a shareable need are generally shareable for up to 120 days from the treatment start date as prescribed by a licensed medical provider. Medical supply costs must be over $100 per item to be shared. Knew Health will share the retail costs (or fair costs when applicable) and, thus, encourages members to use alternative vendors such as local pharmacies or medical supply stores.

## 28. Mental Health

Expenses related to medications or other treatment for any mental health illness or condition are not shareable. Mental health conditions may include anxiety, depression, mental illnesses, and other psychological conditions.

## 29. Naturopathic

Naturopathic care may be shareable pending written approval from Knew Health. Any expenses incurred prior to receiving written approval are not shareable.

## 30. Newborn Care

Routine care for a newborn without complications is included with an eligible maternity need.

NICU care and other complications are treated as a separate need of the baby. Expenses related to circumcision are excluded from sharing.

## 31. Nutritionists and Dieticians

Expenses related to nutritionist and dietician services are not shareable unless prescribed by a licensed medical provider. Knew Health must provide approval for nutritionist and dietician services prior to sharing.

## 32. Occupational Therapy

Occupational therapy is shareable for inpatient treatment and up to 35 outpatient sessions per need, up to $7,500.

23

## 33. Organ Transplants

Organ transplants are shareable; however, they are subject to limitations for conditions existing prior to membership.

## 34. Physical Therapy

Physical therapy is shareable for inpatient treatment and up to 35 outpatient sessions per need, up to $7,500.

## 35. Prescriptions

Prescriptions for medications related to an eligible need and that are billed by a provider are considered shareable.

Prescriptions filled at a pharmacy will be considered for sharing under the following conditions: prior approval is given by Knew Health, the prescription is related to the treatment of a shareable need, and prescription costs accumulate to $500 monthly. Sharing for these prescriptions is limited to 12 months.

Other prescription costs are generally not shareable.

## 36. Preventive Services

Preventive services are not subject to the IUA.

## 37. Sleep Apnea

Sleep apnea equipment and testing is not shareable with the Knew Health community.

## 38. Speech Therapy

Speech therapy in relation to a shareable illness, injury, or accident is shareable for 35 outpatient visits per condition, up to $3,000. Speech therapy for conditions such as speech delays or learning impairments not caused by injury or accident is not shareable.

24

Resp. Appx. p. 662

## 39. Sports

Knew Health may share medical expenses related to sporting activities.

Injuries or illnesses resulting from participation in professional sports are not shareable.

Injuries or illnesses resulting from recreational karate, jujitsu, taekwondo, or other combat sports are shareable when the member has not been paid to compete.

## 40. Sterilization

Elective sterilization, such as tubal ligation and vasectomy, is not shareable.

## 41. Suicide and Attempted Suicide

In the event of a dependent suicide, financial assistance can slightly ease the burden on our members. For this reason, Knew Health will share in expenses related to the suicide or attempted suicide of an adolescent up to age 18, up to $25,000 and after a one-year waiting period of continuous membership.

## 42. Surrogacy

Expenses related to a surrogate pregnancy, whether or not the surrogate is a member, are not shareable.

## 43. Therapeutic Massage Therapy

Expenses related to therapeutic massage are shareable if the therapy is related to an eligible need and prescribed by a licensed medical provider. Massage therapy is shareable for 25 sessions per need, up to $3,000.

## 44. Tobacco Use over 50

Medical cost sharing for the needs of tobacco users 50 years of age and older is limited to $50,000 for each of the following four disease categories:

• Stroke
• Cancer
• Heart conditions
• Chronic obstructive pulmonary disease (COPD)

25

## 45. Vision

Knew Health may share in vision-related expenses that are deemed medical.

## 46. Weight Reduction

Expenses related to weight reduction are shareable if prescribed by a licensed medical provider and approved by Knew Health—up to $3,000 per need.

# Maternity Needs

As a general rule, maternity needs are shareable and are treated like any other medical need.

## 1. General

As with any other medical need, expectant mothers pay a single IUA for all expenses related to their maternity need. Shareable expenses may be related to miscarriage, prenatal care, postnatal care, and delivery. STD screenings prescribed by a licensed practitioner as part of routine prenatal care are shareable as part of the maternity need. Maternity needs requests must be submitted within 30 days from the date the member's pregnancy is verified.

## 2. Separate Needs

Any need of the baby, whether occurring before or after birth, is separate from the mother's maternity need. Expenses for any pregnancy or birth-related complications of the mother will be shared as part of the maternity need.

## 3. Early Sharing Requests

A maternity care provider may reduce normal charges if a member prepays some or all of the bill. If this is the case, Knew Health will consider sharing the maternity need prior to delivery. To be considered for early sharing, the member must submit an estimate from the provider with the needs request form.

26

Resp. Appx. p. 664

## 4. Home Births

Home births typically incur fewer expenses. If the costs are significantly lower for a home birth than for a hospital birth and the member is under the care of a licensed care provider, Knew Health may partially waive the IUA for the maternity need.

## 5. Pregnancy Prior to Membership

Pregnancy that begins prior to membership, is not shareable. A newborn conceived prior to membership must be enrolled in Knew Health by the parents within 30 days of the child's birth.

For any pregnancy that is not shared as an eligible maternity need with Knew Health, any complications or conditions present at the time of birth are considered pre-existing and are subject to the applicable waiting periods for sharing.

## 6. Waiting Period

Pregnancy is considered a pre-existing condition if the pregnancy begins within the first 60 days of the membership.

## 7. Premature Birth

The baby's needs are fully shareable, even if the baby is born prematurely. Any services not included in a standard maternity need would be considered a separate need of the baby.

# Submission of Medical Needs

Knew Health strives to share in its members' medical needs in a timely, accurate manner. To do this, it is crucial for members to submit medical needs correctly and include all required documentation.

## 1. Submitting a Needs Request

Needs requests should be submitted through the Knew Health Member Portal. Needs requests should be submitted as soon as possible. Most non-emergency needs requests, such as surgical procedures, should be submitted prior to the date of service. For any help with this process, members may contact Knew Health directly during business hours.

27

## 2. Required Documentation

Needs requests must contain all required documentation, including but not limited to the following:

• Itemized bills
• Proof of IUA payment
• Medical records and other additional documents

## 3. Time Limit for Providing Documentation

Original, itemized bills should be submitted promptly to Knew Health along with the needs request form in order for Knew Health to process your need as soon as possible. In order to be shared, bills and needs requests must be submitted within six months of the date of service.

## 4. Meeting the IUA

Needs are only shareable with Knew Health after the member has met their IUA. Members should provide documentation to Knew Health of all payments that may contribute toward the member's IUA. The IUA must be paid within six months of the needs request submission or bills may become ineligible for sharing.

## 5. Negotiating Medical Bills

Knew Health prefers to pay providers quickly and negotiate the best rates for healthcare services. This helps Knew Health keep rates low for members.

Members should inform Knew Health about any potential cash-pay discounts and consult with the Needs team prior to signing any payment arrangements. Knew Health is happy to participate in cost negotiations for its members.

# End of Life Assistance

If a member, or a member's dependent, dies after one year of uninterrupted membership, financial assistance will be provided to the surviving family. The member community will provide assistance upon receipt of a copy of the death certificate.

Financial assistance will be provided to the surviving family as follows:

• $10,000 upon the death of a primary member
• $10,000 upon the death of a dependent spouse
• $2,500 upon the death of a dependent child

# Appendix A: Defined Terms

## 1. Annual limit

The maximum amount shared for eligible needs per participating member per year. Knew Health does not have annual or lifetime sharing limits for our members unless specifically stated in the Membership Guidelines.

## 2. Application date

The date Knew Health receives a complete membership application.

## 3. Contribution list

A list of members who are being billed by payroll deduction through a company opposed in lieu of direct billing from Knew Health.

## 4. Date of Service

The day medical services were rendered on behalf of a participating member.

## 5. Dependent

The head of household's spouse or unmarried child(ren) under the age of 26, who are the head of household's dependent by birth, legal adoption, or marriage, and who are participating under the same combined membership. Unmarried children under 26 years of age may participate in the membership as a dependent.

29

# 6. Effective date

The date a person's membership begins.

# 7. Eligible need

A medical need that qualifies for sharing via the contributions of Knew Health members.

# 8. Head of household

The oldest participating member in the household.

# 9. Household membership

One or more family members participating under the same membership.

# 10. Healthcare sharing

A membership-based, non-insurance arrangement established for the purpose of sharing legitimate healthcare expenses between members.

# 11. Inactive member

A contributor, and contributor's dependents if applicable, who has/have not submitted monthly contributions in the manner established by the Member Guidelines. An inactive member is not eligible for sharing.

# 12. Ineligible need

A need disqualified from voluntary sharing of contributions from member contributions due to a policy set forth in the Member Guidelines.

30

## 13. Initial Unshareable Amount

The specified financial amount that members are required to bear on their own prior to any amount that may be eligible for sharing.

## 14. Licensed medical professional

An individual who has successfully completed a prescribed program of study in a variety of health fields and who has obtained a license or certificate indicating his or her competence to practice in that field (MD, DO, ND, NP, PT, PA, Chiropractor etc.)

## 15. Lifetime limit

The maximum amount shared for eligible needs over the course of an individual member's lifetime of membership.

## 16. Maternity Need

A need request that must be submitted once a member becomes pregnant within 30 days of confirmation of pregnancy from a licensed medical professional.

## 17. Maximum shareable amount

The maximum dollar amount (limit) that can be shared for any one need. Certain medical needs have a maximum shareable amount as described in the Guidelines.

## 18. Medically necessary

A service, procedure, or medication necessary to restore or maintain physical function and that is provided in the most cost-effective setting consistent with the member's condition. The fact that a provider may prescribe, administer, or recommend services or care does not make it medically necessary. This applies even if it is not listed as a membership limitation, or in the Member Guidelines. To help determine medical necessity, Knew Health may request medical records and information from licensed medical professionals.

## 19. Member(s)

A person or people (or dependent thereof) who has agreed in writing to abide by the requirements of Knew Health and is thereby eligible to participate in the sharing of medical needs with other members in accordance with the Member Guidelines and membership type.

31

## 20. Membership

This term applies to the collective body of all active, participating members of Knew Health.

## 21. Membership cancellation request

A request by a member to Knew Health requesting that their membership be cancelled. The request must include the reason for cancellation and the requested month in which the cancellation of the membership is to be effective. Knew Health requires 15 day notice prior to your payment draft date. Knew Health does not prorate cancellations or gift refunds. Cancellations become effective on the last day of your monthly billing anniversary following the timely receipt by Knew Health of your membership cancellation request.

## 22. Membership commitment

The required principles and ongoing behavioral code attested to by members as required for membership.

## 23. Member responsibility amounts

Amounts needed to be paid by the member for medical costs that are not sharable with the Knew Health community.

## 24. Membership update

A communication from the member to Knew Health providing any changes to the details of their membership information (i.e. change of address, phone number, etc.) or requesting that their membership be changed. The change request or update may take up to three business days to complete. Once a representative of Knew Health approves the requested changes, the approved changes may go into effect on the monthly membership anniversary.

## 25. Membership limitation

A specified medical condition for which medical needs arising from or associated with the condition are ineligible for reimbursement from the Shared Fund. An associated condition is one that is caused directly and primarily by the medical condition that is specifically ineligible. The membership limitation will be issued during the application process and may be subject to medical record review. Membership limitations (excluding cancer) do not apply to office visits/urgent care.

32

## 26. Membership options

A variety of sharing options are available with different initial unshareable amounts and sharing limits, as selected in writing on the membership application or enrollment portal and approved by Knew Health.

## 27. Membership withdrawal

When a membership has been or will be cancelled due to the submission of a Membership Cancellation Request, a violation of the Knew Health's Principles of Membership, or non-receipt of a voluntary monthly contribution or annual membership fee for more than 10 days past the date such payment was due. Such cancellation of membership is referred to as membership withdrawal.

## 28. Monthly contributions

Monetary contributions given voluntarily and placed in the care of Knew Health by a member to maintain active membership and to be disbursed for to the eligible needs of its members in accordance with the Member Guidelines

## 29. Needs request

A request that is required to process medical needs for accidents, injuries, or medical conditions that result in medical costs. Need requests can be submitted to needs@knewhealth.com or in the Knew Health Member Portal. The needs request must be submitted to Knew Health within six (6) months of the need to be eligible for sharing.

## 30. Office visit

Sick visits, wellness visits, specialists, and urgent care are generally considered to be office visits. The medical bill must include an office visit CPT code for the need to qualify as an office visit. Qualifications for sharing eligibility include exclusion of prior medical conditions and meeting your initial unshareable amount (IUA).

## 31. Membership administration

A collaborative process of planning, evaluating, facilitating, coordinating, and advocating for options and services to meet a participating Member's Eligible Needs through available resources to promote quality, cost-effective results.

33

## 32. Pre-existing condition

Any illness or accident for which a person has been diagnosed, received medical treatment, been examined, taken medication, or had symptoms for 24 months prior to the effective date. For information on sharing for pre-existing conditions, see the section of the Member Guidelines titled "Conditions Existing Prior to Membership."

## 33. Proration

If shareable needs are ever significantly greater than shares available in any given month, Knew Health may prorate the needs amount requested for medical expenses. This involves an across the board percentage reduction of needs payments but does not necessarily mean that all member needs will not be met in that month.

## 34. Shareable amount

The amount of the need request that remains after the member's initial unshareable amount has been satisfied and falls within the guidelines for sharing within the membership.

## 35. Explanation of benefits (EOB)

Correspondence that is delivered to the participating members and their providers once medical needs have been processed, are pending, or have been rejected. The Sharing Summary will state their member responsibility amount as well as any amounts shared by the Shared Fund on the member's behalf.

## 36. Usual reasonable and customary costs (URC)

The general cost of medical services in a geographic area, as determined by Knew Health, based on what providers in the area usually charge for the same or a similar medical service.

## 37. Unshareable amount(s)

A medical expense incurred by a member that is not shareable for one or more of the following reasons: a member's violation of the Knew Health's Principles of Membership, non-current membership status, or any other condition or requirement that is excluded by the Member Guidelines.

34

# Appendix B:
# Frequently Asked Questions

## What does Knew Health believe?

Knew Health believes that its members, in concert with the medical providers of their choosing, have a natural incentive to do what is best for themselves and their families.We also believe individuals have the primary responsibility for making their own healthcare decisions. When members have financial needs due to illness that are greater than they can bear individually, the goal of the Knew Health community, in a corporate sense, is to assist members in carrying one another's burdens. The method by which Knew Health seeks to facilitate the sharing of members' medical costs is to teach and apply these principles of community and responsibility as an integral part of its sharing philosophy.

## What kind of company is Knew Health?

Knew Health, is a Delaware corporation with administrative offices in Englewood, New Jersey. Knew Health is not an insurance company. Knew Health provides the framework and administrative support for a membership program.

## Isn't Knew Health really just another health insurance company?

No. Insurance arrangements are a contract whereby one party agrees to be legally responsible for and accept another party's risk of loss in exchange for a payment—a premium. Knew Health Memberships provide an arrangement whereby members agree to share medical expenses through the act of voluntary giving. Knew Health is not licensed or registered by any insurance board or department. Knew Health does not assess applicants' health risks because neither Knew Health nor its members are assuming financial liability for any other member's risk. Unlike insurance, the focus of Knew Health is to provide an avenue for members to help each other bear their immediate healthcare expenses.

35

# What's the advantage of Knew Health not being a health insurance company?

When health care costs are paid by someone other than the person receiving care, as is typically the case when an insurance company or government entity agrees to cover such costs, the healthcare model can be undermined. Knew Health believes many of the current problems with the healthcare system are the direct result of restricting personal freedom and responsibility through dependence on third-party payers. Knew Health is designed to allow members to help one another while maintaining freedom of choice and personal responsibility.

## Is Knew Health legal?

As a corporation, Knew Health is required to abide by certain state and federal regulations. The health sharing program administered by Knew Health may be legally operated in all fifty (50) states. Currently, Knew Health is not enrolling new members in the states of Washington, New York, Illinois, Vermont, and Pennsylvania.

## How are members of Knew Health affected by the federal healthcare law (including the Affordable Care Act)?

Beginning in 2019, individuals are no longer required to obtain minimum health insurance coverage pursuant to the "individual mandate" under the Affordable Care Act and will not be penalized for failing to purchase health insurance.

## How does Knew Health handle medical Need requests?

Because there is no transfer of risk, as defined in applicable insurance rules and regulations, with respect to Knew Health, no "claim" is ever owed by a Knew Health on behalf of any member. When members incur medical expenses, they experience medical needs that may or may not be eligible for reimbursement from the Shared Fund. Knew Health members are required to submit proof of their medical expenses to Knew Health. Knew Health then evaluates each submission for eligibility or ineligibility based on the Member Guidelines. Eligible needs are designated for sharing using the funds accumulated through monthly member contributions.

36

# What procedure should I follow to request reimbursement for my medical bills when I have a need?

At or before the time a member receives medical service, the member should inform their medical providers (doctors, laboratories, clinics, hospitals, etc.) that he or she is a self-pay patient. Healthcare providers can send bills directly to Knew Health. Any proof of payment made towards their IUA (initial unshareable amount) should be submitted to Knew Health. Knew Health will review the submitted documentation for sharing with the community. Knew Health's team of medical bill negotiators may contact the providers to discuss the appropriate payment for the services that were performed and determine if negotiations are applicable for the billed amounts.

## How long does it take Knew Health to process a medical need?

Typically, eligible reimbursement is made to members, or payment is made to the providers within 5-7 days once all documentation has been received.

## Can I choose my own doctors and hospitals without being penalized?

Yes. Each member's personal freedom to select the medical providers of their choice is fundamental to Knew Health's philosophy. Knew Health endeavors to provide members with detailed and current information and recommendations to help them identify and receive treatment from the highest quality health provider(s). Accordingly, there are no out-of-network penalties or other restrictions.

## Does Knew Health charge monthly premiums?

Because Knew Health is not insurance, it does not charge premiums. Rather, Knew Health's members freely choose to assist other members with their medical expenses by contributing a predetermined amount each month; called a "share."

37

# Does Knew Health use deductibles and co-insurance?

Because Knew Health is not insurance, it does not charge premiums. Rather, Knew Health's members freely choose to assist other members with their medical expenses by contributing a predetermined amount each month; called a "share." These shares or Membership contributions make up the Shared Fund, which are then used to share in Members' eligible medical expenses. Knew Health's process differs significantly from insurance practices in this regard; to our member's advantage. Insurance deductibles are cumulative over the course of a predetermined plan period. Co-insurance is the portion of the medical expense owed by the patient. Conversely, when members incur an eligible medical expense that exceeds the initial unshareable amount, any amount above the initial unshareable amount may be eligible for sharing. On the fourth medical need in a household, the member no longer needs to pay the initial unshareable amount. If the additional medical expenses are more than $500, the remaining costs are fully shareable with the community.

# Will Knew Health share medical costs that were incurred outside of the United States?

Yes, members' eligible needs, wherever incurred, will be handled through the Knew Health sharing program.

# What are Knew Health's membership requirements?

Knew Health members must agree to the Principles of Membership and be under 65 years of age.

# Can my membership be dropped if I have very high medical needs?

Members cannot be dropped from the sharing program due to their medical needs. Neither membership nor monthly contribution is adversely impacted by the amount of medical expenses a member or their family members may have.

# Can my family members participate in the sharing program?

Spouses, domestic partners, and dependent children are welcome to participate in the sharing program.

38

## What if my dependents do not agree to abide by the Knew Health Member Guidelines?

All Members of Knew Health must agree to abide by the Knew Health membership requirements as directed by Knew Health. For children under the age of 26 who are living with their member parent or guardian, Knew Health requires that the member hold their children responsible for compliance with all requirements stated in the Member Guidelines. For example, Knew Health does not approve the sharing of medical expenses for injuries resulting from the use of illegal substances. Hence, medical expenses incurred by a member's child who is injured while he/she is under the influence of an illegal substance are generally not eligible for sharing.

## Is there a lifetime or yearly maximum amount that is eligible for sharing for any one person or family?

There are no lifetime or annual maximum amounts eligible for sharing for most medical needs. Some conditions have limits, generally calculated per need, as described in the section "Limitations on Sharing." There is no limit on the number of needs that an individual member or household may have.

## What kinds of needs do Knew Health members share?

In general, needs for illnesses or injuries resulting in visits to licensed medical providers, emergency rooms, testing facilities, or hospitals are shared on a per person, per incident basis once the member has met their personal responsibility by paying their initial unshareable amount.

## What kinds of needs do Knew Health members not share?

Needs resulting from medical conditions that existed prior to the effective date are typically not shared or are shared in a limited capacity. Each member has an IUA (initial unshareable amount) for which reimbursement from the Shared Fund will not be made.

## How does Knew Health handle very large medical expenses?

Knew Health takes steps to ensure that money is set aside for very large medical needs. A minimum of 15% of all monthly member contributions are set aside in preparation of the occurrence of very large medical expenses, i.e. those over $100,000.

39

## What amounts do members share for maternity needs?

For a pregnancy that begins at least 60 days after the start of a member's effective date, maternity needs are shared like any other need. For a pregnancy that began prior to a member's effective date or within the first 60 days of their effective date, pregnancy is treated as a pre-existing condition and not shared.

## Am I excluded from membership/reimbursement eligibility if I am a cancer survivor?

No. In fact, there are several ways in which costs related to treatment for cancer survivors could be shared:

1) The expenses for a second occurrence of cancer would only be ineligible for sharing if it "resulted from" the first episode of cancer.

2) Except for insulin-dependent diabetes, all conditions a member had prior to their effective date may be shareable according to the limitations set forth in the section "Medical Conditions Existing Prior to Membership."

## How does Knew Health handle expenses for medical treatments that occurred overseas?

Bills from medical treatments that occurred overseas must be written in or translated into English and the price converted to U.S. dollars before the need is submitted. They are then processed in the same manner as bills from medical treatment in the U.S.

## What if I lose my job or change employers? Can I take my Knew Health membership with me?

Yes, continuation of membership in Knew Health's sharing program after termination of employment is a simple process. Because membership is individually based, members can change the billing method at any time.

40

## This program sounds kind of unusual; does it really work?

The concept of medical cost sharing has been highly successful within the confines of faith based groups for more than forty (40) years. During this time period, hundreds of thousands of individuals, families, and businesses have shared hundreds of millions of dollars in medical expenses. As a result, there is a strong foundational precedent in the concept of medical cost sharing.

A community of health-conscious individuals who care for one another can successfully participate in the sharing of medical expenses in a manner that will reduce the financial burden of receiving medical care for all members. Members should note, however, that past successes by faith-based sharing groups assisting one another is no guarantee of the future success of similar programs. There is no promise or contract by Knew Health or the members to contribute toward any need any other member might have in the future.

## What happens if Knew Health's members' needs are greater than the monthly contributions received?

Knew Health keeps excess funds to share member needs in the event that needs for a month exceed the monthly contributions received. To date, all eligible needs have been shared in full without need to draw from the excess funds.

However, if the rare event occurs that all needs cannot be met for a given month, Knew Health uses a prorating method to evenly distribute the available funds among members with needs. For example, if the monthly contributions received for a given month amounts to 80% of the needs submitted for that month, each member would have 80% of their eligible expenses shared that month. The Knew Health community has not needed to prorate member needs in the past and has ample excess sharing contributions to draw from, but has these procedures in place to account for every possibility.

## How much does it cost to belong to Knew Health?

Every member provides a specific monthly contribution depending on their membership type, age, and chosen Initial Unshareable Amount. Employer contributions, if applicable, can also affect the monthly cost to the member. See the Knew Health website for current monthly contribution rates. Monthly contributions are subject to change by vote of Knew Health's board of directors.

41

# Can my employer pay some, or all, of my monthly contrbution amount?

Yes, there is no limit (other than business financial restraints) as to how much your employer can contribute towards your required monthly contribution.

# How is my portion of the monthly contribution collected?

Knew Health offers multiple payment options for members to pay their monthly contributions, including card payment and payment through payroll deductions.

# Are my monthly contributions higher if I, or a participating member in my family, uses tobacco products?

Yes. Tobacco use of any kind is clinically proven to cause serious health conditions. Due to the increased likelihood of higher medical costs associated with tobacco use, Knew Health households with one or more tobacco users are required to contribute a higher monthly contribution amount to maintain membership. Additionally, medical needs for tobacco users age 50 and older are limited to $50,000 for each of the following four disease categories: cancer, heart conditions, COPD, and stroke.

# Are my monthly contributions a pre-tax deduction like health insurance premiums?

No. The monthly contribution is a voluntary contribution towards a membership program that facilitates the sharing of member's medical bills. As such, the money members contribute to the Knew Health program is a post-tax contribution.

# How often can the monthly contribution amounts be changed?

Monthly contribution amounts can be changed twice a year, in accordance with the policies and procedures set forth in these guidelines. The monthly contribution can only change when approved by Knew Health's board of directors. To date, Knew Health has never had to increase the monthly contribution rate and does not plan to do so in the near future.

42

## Are my pre-existing conditions always unshareable?

In the first year of membership, pre-existing conditions are not shareable with the Knew Health community. Pre-existing conditions become sharable on a limited basis after one year of continuous membership, with the limit increasing to a maximum of $125,000 per need in the fourth year of membership and onward. For more information, see the section "Medical Conditions Existing Prior to Membership."

# Appendix C: Company FAQs

## Is Knew Health a group benefit?

No, Knew Health is an individual and family medical cost sharing program. We allow for a company contribution list. Employees who participate can be added or removed from the contributions list at any time and billed directly.

## Why should my company participate in Knew Health?

Participation in Knew Health's program is always voluntary, both from the company's and the employee's perspectives. Business owners choose to work with Knew Health because they value community and personal responsibility and because they want to use a cost sharing approach to ensure provision of quality healthcare for their employees. There are numerous factors that contribute to Knew Health's greater efficiencies for both companies and employees.

## Does Knew Health comply with the Affordable Care Act requirements?

Knew Health is not a substitute for insurance as defined by the Affordable Care Act and therefore does not meet the requirements by itself.

43

# What are the risks and liabilities my company may be exposed to through participation in Knew Health?

Knew Health is a voluntary program. It is not insurance. Member companies are not purchasing insurance coverage by participating in the program. By participating in the program, companies are neither promising their employees that their larger medical bills will be paid, nor are they taking on liability to pay those bills as a company. Companies can choose to contribute on behalf of their employee members.

# Can my employee's monthly contributions be collected via payroll deductions?

Yes. Knew Health allows members to join a contribution list of members who are part of a company. Employers can deduct member contributions by payroll deduction on a post-tax basis.

# Can my company pay some or all of its employee's monthly contributions?

Yes. Participating companies can contribute as much of the employee's monthly contributions as they wish. It should be recognized that this is viewed as a component of the employee's total compensation. Companies can tier their employees based on legal requirements and offer different product bundles to each tier. Talk to your legal representative about legal requirements on tiering qualifications.

# How do I set up my employees' withholding amounts?

Companies should consult with their own legal and tax advisors for more information regarding payroll and income tax implications for their specific situations.

# Is there any additional administration or work for my company as a result of participation?

The Knew Health team is glad to assist with any questions you or your staff might have regarding monthly contributions and the entire Knew Health process.

44

## The cost savings sounds great, but how will my employees be affected by Knew Health's program?

The employees of participating businesses are granted the opportunity to voluntarily join Knew Health. As such, participating employees voluntarily choose to pay the portion of the monthly contribution that is not carried by their company. Any employee can withdraw from the program at any time, but if they do, they will no longer be eligible to receive contributions towards their medical expenses in the event that they incur a medical need.

45

# Disclaimer

Knew Health is not an insurance company. Neither this publication nor membership in Knew Health are issued or offered by an insurance company. The purpose of these Member Guidelines is to help members understand and identify medical needs that qualify for potential sharing and the process by which payments are made. The Member Guidelines are not for the purpose of describing to prospective members what amounts will be reimbursed by Knew Health. While Knew Health has shared all eligible needs of its members to date, membership does not guarantee or promise that your eligible needs will be shared. Rather, membership in Knew Health merely guarantees the opportunity for members to care for one another in a time of need and present their medical needs to other members as outlined in these membership guidelines. The financial assistance Members receive will come from other members' monthly contributions and not from Knew Health.

This publication and Membership in Knew Health should never be considered a substitute for a health insurance policy. If the Membership is unable to share in all or part of a Members eligible medical Needs, each Member will remain solely financially liable for any and all unpaid medical Needs. These Guidelines do not create a legally enforceable contract between Knew Health and any of its Members. Neither these Guidelines, nor any other arrangement between Members and Knew Health create any rights for any Member as a reciprocal beneficiary, a third-party beneficiary, or otherwise. An exception to a specific provision and does not supersede or void any other provisions.  The decision by Knew Health to reimburse a Member's eligible Needs does not and shall not constitute a waiver of this provision or establish by estoppel or any other means any obligation on the part of Knew Health to reimburse a Member's eligible Needs.

Resp. Appx. p. 684

Version 22.7



# Member Guidelines

Knew Health is not an insurance company nor is the membership offered through an insurance company. Knew Health Membership does not satisfy state or federal requirements for healthcare coverage or minimum essential coverage. This is not a legally binding agreement to reimburse or indemnify you for medical expenses you incur. There is no guarantee of payment of medical expenses you incur.

KNEWHEALTH.COM |  (855) 542-0050                                VERSION 24.1  | UPDATED 10/2024

EXHIBIT
2.4

Ex. 2.4, p. 1 of 38

Resp. Appx_p. 689

## Knew Health's Mission

At Knew Health, we believe everyone should have easy access to preventive health and wellness resources. And everyone should have a safety net for when unexpected medical costs occur.

Knew Health makes healthcare simple and affordable by pairing general health and wellness with medical cost sharing.

We put your health first by providing access to personalized health coaching, routine health visits and screenings, allowances for wellness care that goes beyond the routine, access to the highest quality supplements, complimentary lab work, telehealth, and monthly seminars on health and wellness education.

And when you have a health Need, we provide you with the freedom to choose the right providers for you. We give you a team dedicated to helping you easily navigate the healthcare system and choose the highest quality care for the most fair and reasonable rates. We make it possible to invest back into your health and wellness, and we'll have your back when unexpected medical costs happen. We're also here for joyous times of pregnancy and birth, whether it's a home birth or hospital delivery.

The concept of medical cost sharing has evolved over decades of communities coming together in times of need and sharing burdens with one another. Knew Health has created a one-of-a-kind community of passionate individuals that pull together to efficiently manage one another's medical costs.

Knew Health will make your life better. We will change the way you think about healthcare by making it easier to live healthier, to feel your best, to save money on the highest quality healthcare, and we'll help one another every step of the way. Through our intentionally different, wellness-focused healthcare solution, you can achieve your optimal wellness and have the stability of our community at your back.

## Principles of Membership

Each member of Knew Health must comply with the following requirements to maintain membership and remain eligible to participate in the medical cost sharing program and participate in all other Knew Health services. Adherence to the Knew Health Principles of Membership minimizes medical risks, encourages good health practices, and ensures member integrity and accountability.

All Knew Health Members must attest to the following statements:

- I believe that a community of ethical, health-conscious people can most effectively care for one another by directly sharing the costs associated with each other's health care Needs. I recognize that Knew Health welcomes members of all faiths.

- I understand Knew Health is a membership, not an insurance entity, and that Knew Health cannot guarantee payment of medical expenses.

- I have a shared faith in myself and members of Knew Health, as well as the strength of our Community.

- I believe I have a fundamental right guaranteed by the U.S. Constitution to freely associate in the lawful exercise of common beliefs to voluntarily share health expenses with one another.



- I believe in the importance of charity and benevolence as well as the social duties of voluntariness, integrity, honesty, and personal responsibility.

- I believe that practicing good health measures and striving for a balanced lifestyle is a commitment that all Knew Health Community members should make.

- I agree to abstain from the use of ALL illegal drugs in my state of residence, as well as abstaining from using prescription medications without a prescription.

- I agree to refrain from excessive alcohol consumption, and acts which are harmful to the body.

- I agree that members who use tobacco products, including, but not limited to, cigarettes, e-cigarettes, cigars, chewing tobacco, snuff, vape products, pipe tobacco, and smoked cannabis will have an increased monthly contribution of $112.50 per individual.

- I agree to care for my family. I believe that mental, physical, emotional, or other abuse of a family member, or any other person, is morally wrong. I commit to treating my family and others with care and respect at all times.

- I agree to submit to mediation followed by subsequent binding arbitration, if needed, for any instance of a dispute with Knew Health or its affiliates.

## Membership Eligibility

Membership eligibility in Knew Health is primarily based on two factors.

1. Adherence to the Knew Health Principles of Membership.

2. Participation in the community by submitting monthly contributions.

After committing to these primary obligations, prospective members are eligible to enroll in the Knew Health Community. Membership may begin on a date elected by the prospective member or specified by Knew Health. The first monthly contribution must be received before membership is considered active.



Resp. Appx. p. 694

## 1. Commitment

Members of Knew Health commit to abide by a set of personal standards as outlined in the Knew Health Principles of Membership. If a violation of the Principles of Membership is discovered, all cost sharing for the Needs of that member will be put on hold. This hold will begin on the date in which the violation was discovered or recorded in the member's medical records. A notification of the hold and an explanation of the discovery will be issued to the member.

The member will be granted 30 days to submit documentation supporting compliance with the Principles of Membership. If the submitted documentation does not satisfactorily demonstrate compliance with the Principles of Membership, the member will automatically be withdrawn from the sharing program and membership will be revoked. In the event that membership is revoked due to a violation of the Principles of Membership, Knew Health will not return the offending member's contributions received prior to the date of withdrawal.

## 2. Participation through Contributions

To participate in the member-to-member medical cost sharing Community and access Knew Health services, members must submit the monthly contribution amount associated with their level of membership.

Members have multiple options for submitting their monthly contributions. Individual members can make contributions directly to Knew Health. For members who enroll in Knew Health through their workplace, payments can be made through their employer.

Membership in the Knew Health Community is voluntary, but the monthly contribution is required to be active and eligible for sharing. Monthly contributions must be received no later than 30 days after the billing date. If a monthly contribution is not received by the last day of the billing month, the membership will become inactive and the member will be withdrawn from the Knew Health Community.

Any member that has been withdrawn may reapply, provided they meet all enrollment and eligibility requirements. Once the member reapplies and membership is reinstated by Knew Health, the member will become eligible to participate in the Knew Health Community. All member Needs and medical costs occurring after the membership is inactivated and before reinstatement will be ineligible for sharing, and any medical conditions existing before the date of reinstatement will be considered pre-existing. Any member whose membership has been inactivated three times will not be eligible to reapply.

## 3. Qualification

To be qualified for membership, an applicant must meet all criteria set forth in the membership guidelines and the membership enrollment form. If at any time it is discovered that a member did not submit a complete and accurate membership enrollment form, the incomplete or inaccurate form could result in either a retroactive membership limitation or a retroactive denial of membership.

While member health status has no effect on eligibility for membership, there are limitations on medical cost sharing for some conditions that existed prior to a member's effective date.



# Membership Requirements

Knew Health offers different enrollment types for individuals and families. Monthly contributions are based on the enrollment type, Initial Unshareable Amount (IUA), and the age of the oldest participating member. This section outlines the different household memberships and who is eligible for enrollment therein.

## 1. Determination of Household Membership

There are four tiers of membership, and member contributions are calculated depending on the participating members of a household.

- Individual Membership: an individual member of Knew Health

- Spouse/Domestic Partner Membership: A combined membership made up of two individuals that are married or are domestic partners

- Adult & Children: A combined membership made up of an individual adult member and any eligible dependent children (see below), without membership of a spouse or domestic partner

- Family Membership: A combined membership made up of two individuals who are married or who are domestic partners, and any dependent children

## 2. Dependants

An unmarried dependent child may participate under a combined membership with the head of household through the age of 25. Children born into a membership from an eligible maternity Need may participate under a combined membership as long as they are added to the membership within 30 days of their birth. Under a combined membership, the primary member is responsible for ensuring that each individual participating under the combined membership complies with membership guidelines and the Knew Health Principles of Membership.

Once a dependent child reaches the age of 26 or marries, that child is no longer eligible to participate under the combined membership. A dependent who wishes to continue participating as a member with Knew Health may complete an enrollment form. Any medical Needs that occur between the time when a child leaves their parent's membership and enrolls in their own membership are not shareable. If a dependent ages-out of their Knew Health membership but chooses to re-enroll at a later date, they will be subject to the limitations associated with pre-existing conditions.



## 3. Newborns

Newborns whose birth is part of a shareable maternity Need will need to be added to the Knew Health membership within 30 days of the birth to be active as of their date of birth. In the case of a change in household enrollment type, the monthly contribution amount will be adjusted and accounted for at the time the newborn is added.

Newborns who are not born as part of a shareable maternity Need must be enrolled manually in a Knew Health membership, taking effect the 1st of the month following enrollment. Any genetic conditions or medical complications for newborns not born as part of a shareable maternity Need are considered pre-existing and subject to the same limitations as defined in the section "Medical Conditions Existing Prior to Membership".

## 4. Adoption

Knew Health regards adopted children the same as biological children regarding membership. Any physical conditions of which the adoptive parents are aware prior to the legal adoption of the child are considered pre-existing conditions and are subject to the sharing limitations and phase-in period outlined in the Member Guidelines. Adopted children cannot be added to a Knew Health membership prior to birth.

## 5. Grandchildren

A grandchild (or grandchildren) may be included as part of their grandparent's membership if they meet the following criteria.

1. The grandparent has legal custody of the grandchild.
2. The grandchild lives with their grandparents at least nine months out of the year.
3. There is no other agency, person, or group responsible for the grandchild's medical Needs.

## 6. Tobacco/Smoked Products

Knew Health households with one or more tobacco users are required to contribute a higher monthly contribution to maintain membership. The monthly tobacco or smoked product surcharge is $112.50 per household.

A household member who has used any tobacco or other smoked products one or more times a month within the past year is considered a tobacco user. Tobacco and smoked products include, but are not limited to, cigarettes, e-cigarettes, cigars, chewing tobacco, snuff, vape products, and pipe tobacco. Smoked cannabis products are considered tobacco for the purposes of the tobacco surcharge.

If a Member engages in tobacco/smoked product use after joining, they must contact Knew Health to have that change reflected on their membership. Please note that failure to report Tobacco/Smoked Product Use to Knew Health may result in termination of membership.



Resp. Appx. p. 697

## Member Responsibilities

All members of Knew Health share certain responsibilities to remain a part of the sharing Community. Because the actions of one member can affect the entire Community, each member will be held accountable for following these standards.

### 1. Member Contributions

Monthly membership contributions should be made in a timely manner. If contributions are not made within 30 days of the due date, the membership will be inactivated, and any Needs will not be shareable. See "Participation through Contributions " for more information.

### 2. Proper Submission of Medical Needs to Knew Health

For the Knew Health Community to share in a member's medical expenses, the member is responsible for submitting a complete and correct Need Request within six months of the treatment date to Knew Health. This process is outlined in the section titled "Submission of Medical Needs."

### 3. Trust & Accountability

Knew Health Community members are expected to act with honor and integrity. Members must not falsify medical Needs or medical records or use deceptive practices. Knew Health does not accept altered or changed medical records. If a member abuses the trust of Knew Health and its members, their membership will be revoked and may be subject to legal proceedings on behalf of the Community.

## General Wellness Sharing

The Knew Health Community proudly shares in the general wellness of our members, values the health of our community and is dedicated to their health and happiness.

For the following general wellness categories, members are not limited in their choice of licensed healthcare practitioner and general wellness is not subject to Initial Unshareable Amounts (IUAs). If general wellness visits or services result in the need for additional diagnostic testing, these future costs will be subject to a member's Initial Unshareable Amount (IUA) and a new Need. These allowances are based on a membership year *(EX: if your membership became effective on May 1st your membership Year is 05/01/XXXX through 04/30/XXXX).*



Req: Aqx_s 692

# Shareable General Wellness

- Adult annual well-visit: one visit shareable up to $250/year
- Well-woman visit: one visit shareable up to $250/year, additional $150 for a pap smear
- Well-child visits: shareable up to $250/visit+immunizations costs based on age
  - Children Aged 0-12 months: 6 visits per year
  - Children Aged 13-24 months: 3 visits per year
  - Children Aged 25-36 months: 2 visits per year
  - Children Aged 36 months-18 years: 1 visit per year
- Screening Mammogram: Shareable up to $500 starting at age 40 *(schedule as recommended by healthcare provider)**
- Screening Colonoscopy: Shareable up to $2500 starting at age 45 *(schedule as recommended by healthcare provider)**
- STD Screenings: shareable up to $150 per year
- Birth Control: IUDs (intrauterine device) shareable up to $1000 every 3 years, all other forms are shareable up to $200 per year

*The Knew Health Community will share in the cost of alternatives to routine breast cancer and colorectal cancer screenings, such as thermograms, 3-D ultrasounds, stool tests, and sigmoidoscopies. We encourage members to work with their licensed healthcare providers to confirm the optimal testing for their health Needs and cancer screenings. If a member proceeds with alternatives to mammograms or colonoscopies and requires additional testing, these costs will be subject to the member's IUA before being eligible to share. Please note that this does not extend to full body thermograms or scans. If screenings are needed before the recommended age, a note from your licensed healthcare provider will be required detailing the necessity for early screening.

Adult Immunization Allowances:

- Chickenpox (Varicella): shareable up to $185 per dose
- Diphtheria, Whooping Cough (Pertussis), and Tetanus (TDAP): shareable up to $75 per dose
- Flu (influenza): shareable up to $50 per dose
- Hepatitis A: shareable up to $105 per dose
- Hepatitis B: shareable up to $155 per dose
- Human Papillomavirus (HPV): shareable up to $295 per dose
- Measles, Mumps, and Rubella (MMR): shareable up to $115 per dose
- Meningococcal: shareable up to $225 per dose
- Pneumococcal: shareable up to $275 per dose
- Shingles: shareable up to $225 per dose
- COVID-19 Vaccine (annual): $100 per dose (annual max)
- Respiratory Syncytial Virus (RSV): $250 per dose

*This maximum shareable cost includes a $25 administrative cost for self-pay patients.*



Ex. 2.4, p. 8 of 38

Pediatric Immunization Allowances:

The Knew Health Community will share in pediatric immunization administrative fees and the cost of the vaccination, which are shareable up to 110% of the Private Sector Cost/Dose as published by the Center for Disease Control (CDC).

## General Lab Work

Lab work is an area where prices can vary drastically. To ensure that members can get fair rates on yearly lab work, Knew Health members have access to Evexia Diagnostics, whose rates run up to 90-95% lower than most other lab services. We encourage all members to use Evexia Diagnostics whenever possible.

Through Evexia Diagnostics, members have a selection of free tests, as well as individual tests, specialty kits, and panels. The lab allowance is applicable to blood work only (this does not include specialty kits).

The Knew Health Community will share up to $80 per member per year on general lab work. This allowance is based on a membership Year *(EX: if your membership became effective on May 1st, 05/01/XXXX through 04/30/XXXX).*

## Self-Care Credit (Supplemental Allowance)

Knew Health members go above and beyond routine preventive care to stay as healthy as possible. To help manage the cost of additional preventive care, each membership receives $200 per year. This is not per member. This credit is based on a membership Year *(EX: if your membership became effective on May 1st, 05/01/XXXX through 04/30/XXXX).*

Examples include:

- maintenance chiropractic
- acupuncture care
- massage therapy
- counseling/therapy (mental/behavioral health)
- gym memberships
- nutritional supplement costs
- additional lab work

This credit is in addition to routine, preventive sharing and cannot be used for expenses that would go towards your Initial Unshareable Amount for injury, illness, or pregnancy expenses.



# Direct Primary Care

Members of Knew Health can receive a 10% discount on their monthly contribution when they combine their membership with a direct primary care (DPC) membership that meets the following criteria:

- A minimum of 50% of the household is active with a direct primary care provider
- The direct primary care provider's website must clearly demonstrate that they are a direct primary care practice
- The practice cannot accept insurance payments
- Virtual direct primary care may qualify if it meets all other criteria
- The membership must include routine primary care services

Please note that this discount is in lieu of sharing costs that are included with their direct primary care (DPC) membership. For any other general wellness services that are billed separately and not included in the direct primary care (DPC) membership, these costs can still be shared under the applicable allowance, i.e. immunizations, mammograms, etc.

To provide proof of DPC participation, members must provide a statement of participation from their practitioner or proof of payment. This needs to be emailed to hello@knewhealth.com. Proof of participation must be provided to Knew Health for every month of DPC Membership.

# How Medical Needs Are Shared

This section explains how the shareable amount of a member's medical expenses will be determined.

Medical Needs are submitted on a per member, per incident basis. Medical Needs may be injuries, illnesses, or pregnancies that result in medical expenses. These medical expenses may be incurred by receiving medically necessary treatment from licensed medical professionals and facilities, such as physicians, emergency rooms, and hospital facilities.

When a member has a medical expense to be shared, the member must submit original, itemized bills for the medical expense within six months of treatment (date of service). Bills submitted more than six months after the treatment will not be shareable. There is no lifetime limit on the number of conditions or the total dollar amount that may be shared.

## 1. Determination of a Need

Expenses related to the same medical condition, whether expenses for a single incident or separate incidents, will be shared as one Need. The related expenses will accumulate toward the total Need amount.

In the event that a member suffers injury at the hand of another person/party leading that person/party to be liable or potentially liable for payment and the liable party and/or their insurer refuses to pay unless or until a legal remedy is reached, the member will be responsible to pursue such legal remedy against the liable person/party. The Knew Health Community reserves the right to not share and/or place conditions on the sharing of these Needs requests until such matter is settled or adjudicated.



## 2. Initial Unshareable Amount (IUA)

The Initial Unshareable Amount, or IUA, is the amount that a member will pay per Need before the Knew Health Community shares in eligible medical expenses. The IUA is also known as your personal responsibility. Knew Health has five primary levels of personal responsibility: $500, $1000, $1500, $2,500, and $5,000. The lower your personal responsibility (or IUA), the higher your monthly contribution will be.

Eligible medical expenses submitted after the IUA is met for a specific Need are shareable. There is no annual or lifetime limit. You will not need to pay the IUA for a single Need again until you are symptom free for 12 months. Additionally, you will not be responsible for more than three IUAs in a membership year.

## 3. Changing Your IUA

Members may choose to change their IUA once a year on their membership anniversary. If an IUA is lowered, a 60-day waiting period will apply to all new Needs other than those resulting from an accident.

## 4. Maximum Shareable Amount

While there is no lifetime maximum amount eligible for sharing for any household or membership, sharing is limited by the aggregate amount available for sharing from member contributions. In order to ensure equitable sharing among members, no single Need Request may consume more than 10% of the aggregate amount available for sharing in any calendar year. The ability to share up to 10% of the aggregate amount available for sharing in any calendar year, may only occur up to a maximum of two years.

## 5. Multiple Needs in a 12-Month Period

Member households that experience multiple Needs will be responsible for up to three IUAs within a membership year. After a member has paid three IUAs in a membership year any additional shareable Needs that exceed $500 in that membership year will have the IUA waived.

## 6. Insurance Companies & Government Entities

Insurance companies and government entities are primarily responsible for the payment of a member's medical expenses. Members who are eligible for benefits through either insurance or government assistance must contact Knew Health before submitting their medical Need. Knew Health is not intended to share in co-pays or co-insurance, but the Knew Health Community may consider bills after they have been submitted to an insurance plan or government program. Explanations of benefits must be submitted for consideration in these circumstances.



## 7. Active Membership

To participate in medical cost sharing with the Knew Health Community, a membership must be active. Membership is considered active when the member has paid their monthly contributions on time and is in good standing.

For a medical Need to be shared, the membership must be fully paid and active during the date(s) of service, when medical bills are received, and at the time the IUA is paid. If a membership deactivates before the determination of sharing is made, the bills will not be shared with the Community. Any pre-existing condition limitations are applied based on the first date of active membership.

## 8. Late Fees and Interest

Any late payment fees or interest charges that may accrue to medical bills before the member meets their IUA are the member's responsibility—they are not shareable.

Additionally, any late payment fees or interest charges caused by a member's delay in providing necessary documentation to Knew Health are not shareable.

## 9. Appeals

If a member believes that a limitation was incorrectly placed on Community sharing, an appeal may be submitted. Members may submit an appeal and provide supporting medical evidence to have the sharing determination or limitation removed. All appeals are reviewed by a committee that includes at least one Knew Health board member.

To file an appeal, send the medical evidence, an explanation of why you feel that the limitation was placed unfairly, and any supporting documentation through the Appeal Form located in the Knew Health Member Portal within 30 days of the original determination being issued.

## Medical Conditions Existing Prior to Membership

To keep membership contributions low for all members, Knew Health implements a waiting period for sharing of medical conditions that exist prior to enrollment in a Knew Health membership. This section defines medical conditions prior to membership and outlines the sharing limitations.

### 1. Definition: 24 Months Symptom and Treatment Free

Needs that arise from conditions that existed prior to membership are only shareable if the condition appears to be cured and 24 months prior to the effective date of membership have passed without symptoms, treatment, or medication (even if the cause of the symptoms are unknown or misdiagnosed).

Any medical condition that was symptomatic, suspected, diagnosed or required treatment within the 24 months prior to the effective date of membership is considered a pre-existing condition.



Resp. Appx. p. 697

## 2. Exceptions for High Blood Pressure, High Cholesterol, and Diabetes

High blood pressure, high cholesterol, and diabetes (types 1 and 2) will not be considered pre-existing conditions as long as the member has not been hospitalized for the condition in the 12 months prior to enrollment and is able to control it through medication and/or diet.

## 3. Pre-Existing Condition Phase-In Period

Pre-existing conditions have a phase-in period wherein sharing is limited. Starting from the membership effective date, members have a one-year waiting period before pre-existing conditions are shareable. After the first year, pre-existing Needs are eligible for sharing on a limited basis, with the amount increasing each membership year.

Knew Health attempts to negotiate all medical bills received. Even if a pre-existing condition is not shareable, members may still receive assistance to pursue discounts for their services through negotiation.

Shareable amounts for pre-existing conditions:

• Year One: $0 (waiting period)
• Year Two: $25,000 maximum per Need
• Year Three: $50,000 maximum per Need
• Year Four: $125,000 maximum per Need

After year four of membership, expenses related to pre-existing conditions will remain shareable at a maximum of $125,000 in a 12-month rolling period and resetting each membership year.


# Limitations On Sharing

Member Needs not associated with a prior medical condition are generally shareable. The following list reflects limitations on sharing. All shareable expenses are subject to the member's IUA.

## 1. ADHD and SPD

Maximum shareable amount of $1,000 per member per membership year.

## 2. Allergy Treatments

Allergy testing, curative treatments, and medication are shareable up to $2,500 per eligible Need and subject to pre-existing condition limitations. Needs arising from acute, non-seasonal allergies, such as an emergency room visit for an allergic reaction, are considered shareable. Each new acute episode is regarded as a new Need subject to the member's IUA. Such testing will not be shareable if ordered by alternative/functional/integrative medicine practitioners.



Ex. 2.4, p. 13 of 38

### 3. Alcohol and Drug Abuse Treatment

Treatment for alcohol abuse, substance abuse, or chemical dependency is shareable up to a lifetime maximum of $3,000 per member. The Knew Health Community does not share costs for treatments related to addictions other than for alcohol abuse, substance abuse, or chemical dependency. Injuries or illnesses that directly result from a member abusing drugs, alcohol, or other controlled substances will not be shared.

### 4. Audiological

Audiological Needs to correct hearing loss are shareable up to a lifetime maximum of $10,000 per member. Expenses related to hearing aids are not shareable.

### 5. Complications of Non-Shareable and/or Elective Surgeries/Procedures

Generally not Shareable. Exceptions exist when a true complication occurs during or immediately after the surgery/procedure that results in a member needing and receiving emergency medical attention to address an issue unrelated to the original intent of the non-shareable surgery/procedure.

*Example: while receiving cosmetic breast implants, a member has a reaction to the anesthesia, resulting in emergency medical attention.*

Complications from elective or cosmetic procedures, including dissatisfaction, regret, failure to obtain the desired results, or failure of cosmetic devices are not considered shareable complications.

### 6. Cosmetic Procedures

Generally not shareable. Exceptions exist when such procedures are necessary because of disfigurement resulting from a shareable Need. A mastectomy, reconstruction, or cosmetic procedure occurring because of a new cancer diagnosis after a membership Effective Date, is also generally eligible for sharing subject to any other applicable limitations in the Guidelines. Members undergoing a mastectomy, reconstruction, or cosmetic procedure as part of a pre-existing cancer diagnosis are subject to the Pre-Existing Sharing Limitations. Complications related to a shareable Need are generally shareable. Cosmetic reconstruction when eligible for sharing is limited to a lifetime maximum of $20,000 per member. A member undergoing bilateral breast reduction as part of a shareable Need is eligible for up to a lifetime maximum of $10,000 per member. Complications including dissatisfaction, regret, or failure to obtain the desired results are not considered shareable.

### 7. Dental

Dental procedures, such as, but not limited to, tooth extractions, cavities, crowns, and root canals, are generally not shareable when the procedure is or can be ordered/provided by a dentist, dental surgeon, oral surgeon, orthodontist, periodontist, endodontist, or other dental professional.

Tooth damage caused by a traumatic accident or injury may be considered for sharing up to a lifetime maximum of $10,000 per member. Eating, chewing, and grinding related injuries are not considered a traumatic injury.

### 8. Diabetic Medication & Supplies

Any medical expenses related to supplies, medication, or other implements used to treat or manage diabetes are not shareable.

### 9. Dialysis/End Stage Renal Disease

Dialysis and/or End Stage Renal Disease shareable up to 12 months or $90,000 per Need whichever is exceeded first.



Knew_Appx_p. 699

## 10. Dermatology

Dermatological screenings, annual visits, and checkups are not shareable. Diagnosis and therapy for normal, non-cancerous dermatologic conditions related to aging are not shareable. Diagnosis and therapy for other dermatological illnesses that exceed a member's IUA are generally shareable subject to other applicable provisions in the Member Guidelines.

## 11. Emergency Visits

Emergency room visits are generally shareable separately or in conjunction with an eligible medical Need related to an illness, injury, or accident. The first ER visit for a medical condition is treated as a normal Need. Each additional emergency room visit related to the same condition requires the member to take on a personal responsibility of $500 in addition to the member's IUA.

Members with non-emergency Needs should seek out other treatment options such as doctor visits, telemedicine, urgent care clinics, or other appropriate care. Seeking proper non-emergency care reduces emergency room visits and the financial strain on the entire Community.

## 12. Emergency Transports

Emergency transports, including but not limited to ambulance and airlifts, for life threatening emergencies are shareable as part of a Need when they are medically required in relation to a specific shareable illness or injury and/or whenever practical due to the severity, proximity and circumstances associated with a specific illness or injury, shareable up to $10,000 per Need. Ambulance transports are not shareable for convenience purposes only or for scheduled appointments.

## 13. Fertility

Expenses related to fertility evaluations and treatments are not shareable.

## 14. Genetic Mutation and Testing

Needs resulting from a genetic mutation that existed prior to membership are subject to the same limitations as other pre-existing conditions. If the member did not receive a diagnosis, require treatment, present symptoms, or take medication for the genetic mutation in the 24 months prior to membership, Needs related to the condition are considered shareable without pre-existing condition limitations. Genetic testing will only be considered for sharing if it is required for the treatment of a shareable condition, such as breast cancer.

## 15. High-Cost Therapeutics

Experimental drugs and/or therapies, such as cell therapy, gene therapy, immunotherapy, biologics, or individual new therapeutics are not eligible for sharing.

## 16. Home Healthcare

Home healthcare expenses are shareable when related to an accident or injury and when the care has been prescribed by a licensed physician. Sharing of home healthcare expenses is limited to 30 days and $5,000 per Need.



## 20. Injuries Obtained from Certain Acts

Injuries or illnesses resulting from participation in a riot, an act of war (declared or undeclared), civil insurrection, rebellion, riot, criminal acts (whether or not charged), euthanasia, assisted suicide, use of illegal substances, gross negligence or other such acts are not shareable.

## 21. Laboratory Tests, Diagnostic Imaging, and Check-Ups

Laboratory tests, diagnostic imaging, and checkups are shareable as part of an eligible Need when prescribed by a licensed medical provider.

## 22. Long-Term Care and Skilled Nursing

Long-Term care and skilled nursing are shareable when prescribed by a licensed medical provider for recovery from a shareable injury or illness. Sharing for these services is limited to 60 days or $20,000, whichever occurs first, per medical Need.

## 23. Medical Equipment

Medical equipment, including durable medical equipment, is shareable if prescribed by a licensed medical provider and related to a shareable Need up to 70% of the cost of the medical equipment up to $25,000 per Need. The equipment must be a customary or necessary part of directly treating the condition (such as oxygen tanks and devices/respirators, special shoes, orthotics, crutches, etc.). Custom braces or orthotics are shareable up to one item or pair per body part, exceeding this limit needs prior approval.

## 24. Medical Practices (Alternative)

Some alternative medical treatments may be shared with the Knew Health Community with prior written approval from Knew Health. Toxic mold therapies, chronic lyme therapies, IV infusion therapies, ozone therapies, light therapies, and platelet rich plasma/stem cell (PRP) therapies are not eligible to be shared with the Knew Health Community.

For other alternative medical treatments to be considered for approval, the treatment plan must be considered safe and effective. A member and licensed provider must be able to demonstrate the proposed value of the alternative treatment versus using current standards of care (also referred to as traditional or conventional treatment).

Approving alternative Needs will be done on an equitable basis to the current standards of care of the same condition. Alternative treatments that are more costly than the current standards of care may be capped on the amount that will be eligible for sharing. Choosing to start with alternative treatment and changing towards current standards of care may limit sharing based on what was shared for the alternative method.



Alternative treatments that need to go through the appropriate process include, but are not limited to:

- Acupuncture
- Homeopathy
- Naturopathy
- Functional and integrative medicine
- Nutritional supplements
- Detoxification
- Craniosacral therapy
- Use of diagnostics and therapeutics for Electromagnetic Hypersensitivity Syndrome, MCAS, chronic pain and other poorly characterized conditions
- Stem cell therapies (other than where proven effective)
- Non-FDA approved uses of cryotherapy and light therapy
- All diagnostics and lab tests performed on healthy people other than screening testing as recommended by the US Preventive Task Force.
- Heavily marketed diagnostics or therapeutics that lack sufficient evidence to gain FDA approval.

What is required for Knew Health to consider an alternative medical Need in place of the current standards of care?

• Explanation of why the alternative medical treatment is being selected over the current standards of care. This should include, but not be limited to, evidence of treatment efficacy for the condition substantiated by peer-reviewed medical journals.
• The treatment plan from the provider that includes notes, costs, estimated duration of care, and an explanation of treatment.

Knew Health considers alternative medical treatment plans on an individual basis and may put a cap on visits or shareable costs depending on the service. Any expenses incurred prior to receiving written approval are not shareable. If a healthcare provider cannot itemize the services being provided, we cannot share in these requests. Treatment plans have to be clearly broken down into details (services by code, number of services, any other items included with the plan, and a clear timeline). Treatment plans can only be approved for durations up to 1 month in advance.

## 25. Medical Supplies

Medical supplies that directly aid in the treatment of, or recovery from, a shareable Need are generally shareable for up to 90 days from the treatment start date as prescribed by a licensed medical provider. Medical supply costs must be over $100 per item to be shared. Knew Health will share the retail costs (or fair costs when applicable).



**26. Mental Health**

Expenses related to medications or other treatment for any mental health illness or condition are not shareable. Mental health conditions may include anxiety, depression, mental illnesses, and other psychological conditions.

**27, Motor Vehicle Accidents**

Needs arising from motor vehicle (automobile, motorcycle, motorized scooter, etc.) accidents are only shareable when a third party or insurance entity is not liable. The Need Request must be submitted in writing to Knew Health within 6 months of the accident.

The Knew Health Community will not share in motor vehicle accidents in which the member did not have the required insurance and/or liability coverage. If the member's medical Need is being considered, or should be considered, by a third party or insurance entity, the Need is not shareable until Knew Health receives documentation to reflect a lack of liability or partial payment. If the member is suing another party for damages the Knew Health Community cannot share in the resulting medical expenses.

**28. Newborn Care**

Routine care for a newborn without complications is included with an eligible maternity Need. NICU (Newborn Intensive Care Unit) care and other complications are treated as a separate Need of the newborn. NICU care and complications resulting from premature birth are shared up to $250,000 per Need or 12 months, whichever comes first. Expenses related to circumcision are excluded from sharing.

**29. Non-Medical Expenses**

Telephone calls, cots, meals for visitors, shipping costs, and other expenses not directly related to medically necessary services are not shareable.

**30. Nutritionists and Dieticians**

Expenses related to nutrition and dietician services are not shareable unless prescribed by a licensed medical provider. Knew Health must provide approval for nutritionist and dietician services prior to sharing. All Knew Health members have access to complementary health coaching and fitness resources which can assist with nutrition and diet education as a part of their membership.

**31. Organ Transplants**

Organ transplants are shareable; however, they are subject to limitations for conditions existing prior to membership and are shareable up to $100,000 per member per lifetime.

If the member is an organ donor these costs are generally not shareable.



Resp. Appx. p. 793

### 32. Prescription Medications

Prescription medications are considered shareable if they are related to the treatment of an eligible Need and prescribed or ordered by a licensed medical doctor (MD). The sharing of medications is limited to 12 months per Need, not to exceed $10,000.

Long-term maintenance medications that a member has already been taking at the time of enrollment are not eligible for sharing.

### 33. Preventive (Prophylactic) Medicine

Needs used to prevent a condition that has not yet developed or been diagnosed, are not eligible for sharing in the first 12 months of membership. These procedures include but are not limited to mastectomies, hysterectomies, and salpingectomies/salpingo-oophorectomies.

If a member demonstrates medical indication of high risk for a future diagnosis of cancer and elects to undergo preventive surgery to reduce this risk, the costs associated with this surgery are generally shareable with prior approval from Knew Health after Year 2 of membership, up to $30,000 after the IUA has been met.

### 34. Recovery Allowance

Members receive an allowance of up to $7,500 per eligible medical Need related to seek the recovery care their licensed healthcare provider recommends.

As part of the allowance, eligible expenses include:
- Chiropractic Care
- Occupational Therapy
- Physical Therapy
- Speech Therapy
- Hyperbaric Therapy

*Any alternative treatments included with this allowance must be submitted to Knew Health as an alternative medical treatment for approval.*

Knew Health will review on a case-by-case basis for Needs resulting from more severe injuries or illnesses, such as stroke, heart attack, and serious accidents, that require treatment costs beyond the allowance amount.

Therapeutic massage therapy is not shareable.

### 35. Sleep Apnea

Sleep apnea-related expenses, including appointments, testing, and equipment, are not shareable.



## 36. Sports

The Knew Health Community may share medical expenses related to sporting activities. Injuries or illnesses resulting from participation in professional sports or when the participant is paid to compete are not shareable. Hazardous sporting activities including, but not limited to, motorcycle racing, off-road vehicle competitions, hang gliding, parasailing, skydiving, drag racing, motocross racing, road racing, sporting stunts, and mixed martial arts (MMA) are not eligible for sharing.

## 37. Sterilization

Elective sterilization, such as a tubal ligation or a vasectomy, is not shareable.

## 38. Suicide and Attempted Suicide

In the event of a dependent suicide, financial assistance can slightly ease the burden on our members. For this reason, Knew Health will share in expenses related to the suicide or attempted suicide of an adolescent up to age 18, up to $25,000 and after a one-year waiting period of continuous membership.

## 39. Surgical Procedures

Prior medical review and approval is required for non-emergent surgical procedures to be eligible to share. Expert second opinions associated with the procedure are eligible to share. The Knew Health Community encourages the use of expert second opinions prior to surgical procedures and will assist in facilitating expert second opinions.

## 40. Surrogacy

Expenses related to a surrogate pregnancy, whether or not the surrogate is a member, are not shareable.

## 41. Temporomandibular Joint Dysfunction (TMJ)

TMJ-related expenses, including appointments, testing, and equipment, are shareable up to $1500 per member, per lifetime.

## 42. Tobacco or Smoked Product Use over 50

Sharing for the eligible Needs of tobacco or smoked product users 50 years of age and older is limited to $25,000 for each of the following conditions:

• Stroke
• Cancer
• Heart conditions
• Chronic obstructive pulmonary disease (COPD)
• Oral and Esophageal disease
• Gastric and Duodenal Ulcers



### 43. Vision

Shareable for expenses due to glaucoma and other medical diseases or injury of the eyes. Cataract surgery is treated as a pre-existing condition and subject to a one-year waiting period before it is shareable. Cataract surgery is generally shareable, subject to a maximum of $5,000 per eye with each eye being subject to an IUA. Vision Therapy is subject to a maximum of $3,500 per separate Need. Lasik and other refraction correction surgery, eyeglasses, and contacts are not shareable.

### 44. Weight Reduction

Expenses related to weight reduction are shareable if prescribed by a licensed medical provider and approved by Knew Health. These expenses are shareable up to $3,000 per Need. Injections and medications related to weight loss are not shareable.

### 45. Worker's Compensation

Expenses related to a work injury are not eligible for sharing.

## Maternity Needs

As a general rule, maternity Needs are shareable and are treated like any other medical Need as long as the estimated delivery date falls after the first 12 months of membership.

### 1. General

As with any other medical Need Requests, expectant mothers pay a single IUA for all expenses related to their maternity Need Request. Shareable expenses may be related to miscarriage, prenatal care, postnatal care, and delivery.

Please submit your maternity Need Request as soon as possible, but no later than 6 months from pregnancy confirmations so we can best assist you with your maternity Need Request.

### 2. Seperate Needs

Any Need of the baby, whether occurring before or after birth, is separate from the mother's maternity Need. Expenses for any pregnancy or birth-related complications of the mother will be shared as part of the maternity Need.

### 3. Early Sharing Requests

A maternity care provider may reduce normal charges if a member prepays some or all of the bill. If this is the case, Knew Health will consider sharing the maternity Need prior to delivery. To be considered for early sharing, the member must submit an estimate from the provider with the Need Request form.



Resp. Appx. p. 799

**4. Pregnancy Prior to Membership**

A pregnancy that begins prior to membership is not shareable.

For any pregnancy that is not shared as an eligible maternity Need with Knew Health, any complications or conditions present at the time of birth are considered pre-existing and are subject to the applicable waiting periods for sharing.

**5. Waiting Period**

Maternity expenses incurred prior to the member's effective date of membership are not shareable. Likewise, maternity expenses for a pregnancy with an expected delivery date in the first 12 months of membership are not shareable.

Newborns who are not born as part of a shareable maternity Need must be enrolled manually in a Knew Health membership no later than 30 days after the date of birth to be effective on the date of birth. If manually enrolled 30 days after the date of birth, the newborn's membership will begin on the 1st day of the next month. Any genetic conditions or complications for newborns not born as part of a shareable maternity Need are considered pre-existing and subject to the same limitations as defined in the section "Medical Conditions Existing Prior to Membership".

**6. Premature Birth**

Newborns born as a part of a shareable maternity Need are fully shareable, even if the baby is born prematurely. Any services not included in a standard maternity Need would be considered a separate Need of the newborn.

**7. Adding Newborn To Membership**

For a newborn to be added to a membership effective as of the date of birth, the request must be submitted to Knew Health within 30 days of the date of birth. If the request is received beyond 30 days after the date of birth, the newborn's membership will begin on the 1st day of the next month.

**What is Shareable**

Many times, maternity services are billed as a global fee or as a part of a financial agreement. This will generally include all professional obstetric or midwifery services for routine antepartum care, delivery services, and postpartum care. The Knew Health Community can share up to an additional 30% above the average local global maternity fee for a midwife, birthing center, or obstetrics clinic.

If a member prepays their global fee and switches to a new provider before the end of the pregnancy, sharing may be limited for additional global and/or other fees.



## Prenatal

- Routine office visits
- Routine lab work
- Most immunizations (such as flu shots)
- Fetal non-stress test (after 36-weeks)
- Up to three standard ultrasounds (unless an unexpected complication requires additional scans)
- STD/STI screenings prescribed by a licensed practitioner as part of routine prenatal care
- Chiropractic care shareable up to 8 sessions, whether occurring prenatal or up to 2 months post delivery
- Pelvic Floor Therapy shareable up to 2 sessions, whether occurring prenatal or up to 3 months post delivery

## Delivery

- OB/GYN labor and delivery
- Cesarean Multiple births
- Hospital labor and delivery
- Hospital room and board
- Anesthesiologist
- Legally practicing midwives
- Home births
- Birthing centers
- Charges related to unexpected complications with mother
- One in-hospital pediatrician visit, including routine immunizations, routine lab work, and routine hearing tests (these are shareable when the baby is added to the membership within 30 days of delivery and when these services occur prior to discharge from hospital)

## Postnatal

- Mother's six-week postpartum checkup with pap test
- 2-week cesarean post-op appointment
- Chiropractic care shareable up to 8 sessions, whether occurring prenatal or up to 2 months post delivery
- Pelvic Floor Therapy shareable up to 2 sessions, whether occurring prenatal or up to 3 months post delivery
- Postpartum depression care shareable up to $3500 per pregnancy



**What is Unshareable**

Prenatal

- 3D & 4D ultrasounds
- Non-prescription supplements
- Massage Therapy
- Genetic testing, including but not limited to
    - Amniocentesis Inhibin A
    - Alpha-Fetoprotein Serum (AFP)
    - NIPT testing
    - Services by companies providing genetic testing

Delivery*

- Doula services
- Birthing tubs (or other items)
- Placenta encapsulations
- Circumcision

*Other services may be ineligible as determined by Knew Health. If you have questions about a specific service, please contact Knew Health prior to receiving care.*

Postnatal

- Breast pumps
- Lactation consultant
- Mother's immunizations
- Massage Therapy
- Additional postpartum services

If you have questions about a specific service, please contact Knew Health prior to testing. All genetic testing will be the responsibility of the member.

Check-ups for the baby after delivery are not part of the maternity Need request. These would either fall under general wellness, or would be considered a separate Need Request and subject to Member Guidelines eligibility determination.

Complications of the newborn would be considered a separate Need Request and subject to eligibility determination based on the Member Guidelines.



Resp. Appx_p. 709

# IUA Payments

Like any other shareable medical expense, the IUA must be paid prior to Community sharing. The IUA must be paid within six months of the first day of service, or the maternity Need Request may become ineligible for sharing. Consideration will be given for situations where the cost of treatment has not exceeded the IUA after six months. Please contact the Needs Team in this situation. Any late payment fees or interest charges incurred because of a late IUA payment are not shareable.

Members will make payments equivalent to their IUA directly to providers for shareable services. In the event of overpayment, IUA reimbursements can be given to the member.

## Switching Providers

If a member begins their pregnancy care with one provider with a global fee and then switches to another provider later in their pregnancy, future sharing for the pregnancy may be limited up to 50%.

## Separate Need Requests

Any additional Need Requests of the baby after birth, whether the condition existed before or after birth (including congenital conditions), is separate from the mother's maternity Need Request and will require a new medical Need Request submission and IUA for each baby. Expenses for any pregnancy or birth-related complications of the mother are considered for sharing as part of the maternity Need Request.

## Premature Birth

The baby's eligible Need Requests are considered shareable as part of an eligible maternity Need, even if the baby is born prematurely. Any services not included in a standard maternity Need would be considered a separate Need for the baby and will require a new medical Need Request submission and new IUA for each baby. NICU (Newborn Intensive Care Unit) care and other complications are treated as a separate Need of the newborn. NICU care and complications resulting from premature birth are shared up to $250,000 per Need or 12 months, whichever comes first.

## In Vitro Fertilization (IVF)

Expenses related to fertility treatments are not shareable.

## Elective C-Sections

If a member elects a c-section when not medically necessary, sharing for the delivery may be limited up to 80% of the total cost.

## Miscarriage

Any expenses related to a miscarriage that are associated with an eligible maternity Need are shareable if the costs exceed your IUA.

Expenses related to a miscarriage that is not associated with an eligible maternity Need are shareable as a regular Need Request.



# Submission Of Medical Needs

Knew Health strives to share in its members' medical Needs in a timely, accurate manner. To do this, it is crucial for members to submit medical Needs correctly and include all required documentation.

## 1. Submitting a Needs Request

Members are responsible for collecting all relevant documentation and submitting that to Knew Health. Need Requests must be submitted through the Knew Health Member Portal. Need Requests should be submitted as soon as possible. Most non-emergency Need Requests, such as surgical procedures, should be submitted prior to the date of service. For any help with this process, members may contact Knew Health directly during business hours.

## 2. Required Documentation

Need Requests must contain all required documentation, including but not limited to the following:

• Itemized bills*
• Proof of IUA payment
• Medical records, Letters of Medical Necessity and other additional documents
• Treatment plans

*If a healthcare provider cannot itemize the services being provided, these costs cannot be shared with the Knew Health Community. Treatment plans have to be clearly broken down into details (services by code, number of services, any other items included with the plan, and a clear timeline). Treatment plans can only be approved for durations of up to 1 month in advance.

## 3. Time Limit for Providing Documentation

Original, itemized bills should be submitted promptly to Knew Health along with the Need Request form in order for Knew Health to process your Need as soon as possible. In order to be shared, bills and Need Requests must be submitted within six months of the date of service.

## 4. Meeting the IUA

Needs are only shareable with Knew Health after the member has met their IUA. Members should provide documentation to Knew Health of all payments that may contribute toward the member's IUA. The IUA must be paid within six months of the Need Request submission or bills may become ineligible for sharing.

## 5. Negotiating Medical Bills

The Knew Health Community prefers to share quickly and negotiate the best rates for healthcare services. This helps Knew Health keep rates low for members.

Members should inform Knew Health about any potential cash-pay discounts and consult with the Member Care Team prior to signing any payment arrangements. Knew Health is happy to participate in cost negotiations for its members.



**End of Life Assistance**

If a member, or a member's dependent, dies after one year of uninterrupted membership, financial assistance will be provided to the surviving family. The Knew Health Community will provide assistance upon receipt of a copy of the death certificate.

Financial assistance will be provided to the surviving family as follows:

- $10,000 upon the death of a primary member
- $10,000 upon the death of a dependent spouse
- $2,500 upon the death of a dependent child

## Appendix A: Defined Terms

### 1. Annual limit

While there is no lifetime maximum amount eligible for sharing for any household or membership, sharing is limited by the aggregate amount available for sharing from member contributions. In order to ensure equitable sharing among members, no single Need Request may consume more than 10% of the aggregate amount available for sharing in any calendar year. The ability to share up to 10% of the aggregate amount available for sharing in any calendar year, may only occur up to a maximum of two years.

### 2. Application date

The date Knew Health receives a complete membership application.

### 3. Contribution list

A list of members who are being billed by payroll deduction through a company opposed in lieu of direct billing from Knew Health.

### 4. Date of Service

The day medical services were rendered on behalf of a participating member.

### 5. Dependent

The head of the household's spouse, domestic partner, or unmarried children under the age of 26, who are the head of household's dependent by birth, legal adoption, or marriage, and who are participating under the same combined membership. Unmarried children under 26 years of age may participate in the membership as a dependent.

### 6. Effective date

The date a person's membership begins.

### 7. Eligible Need

A medical Need that qualifies for sharing via the contributions of Knew Health membership.

### 8. Head of household

The oldest participating member in the household, whose age determines the monthly contribution cost.

### 9. Household membership

One or more family members participating under the same membership.



## 10. Healthcare sharing or medical cost sharing

A membership-based, non-insurance arrangement established for the purpose of sharing legitimate healthcare expenses between members.

## 11. Inactive member

A contributor, and contributor's dependents if applicable, who has/have not submitted monthly contributions in the manner established by the Member Guidelines. An inactive member is not eligible for sharing.

## 12. Ineligible Need

A Need disqualified from voluntary sharing of contributions from member contributions due to a policy set forth in the Member Guidelines.

## 13. Initial Unshareable Amount (IUA)

The specified financial amount that members are required to bear on their own prior to any amount that may be eligible for sharing.

## 14. Licensed medical professional

An individual who has successfully completed a prescribed program of study in a variety of health fields and who has obtained a license indicating their competence to practice in that field (MD, DO, NP, PA, CNM). They must be listed on the National Provider Registry (NPI).

## 15. Maternity Need

A Need Request that must be submitted once a member becomes pregnant within 30 days of confirmation of pregnancy from a licensed medical professional.

## 16. Maximum shareable amount

The maximum dollar amount (limit) that can be shared for any one Need. Certain medical Needs have a maximum shareable amount or sharing limitation as described in the Guidelines.

## 17. Medically necessary

A service, procedure, or medication necessary to restore or maintain physical function and that is provided in the most cost-effective setting consistent with the member's condition. The fact that a provider may prescribe, administer, or recommend services or care does not make it medically necessary. This applies even if it is not listed as a membership limitation, or in the Member Guidelines. To help determine medical necessity, Knew Health may request medical records and information from licensed medical professionals.

## 18. Member(s)

A person or people (or dependent thereof) who has agreed in writing to abide by the requirements of Knew Health and is thereby eligible to participate in the sharing of medical Needs with other members in accordance with the Member Guidelines and membership type.



Resp. Appx. p. 719

**19. Membership**

This term applies to the collective body of all active, participating members of Knew Health.

**20. Membership Cancellation Request**

A request by a member to Knew Health requesting that their membership be canceled. The request must include the reason for cancellation and the requested month in which the cancellation of the membership is to be effective. Knew Health requires 15 day notice prior to your payment draft date. Knew Health does not prorate cancellations or gift refunds. Cancellations become effective on the last day of your monthly billing anniversary following the timely receipt by Knew Health of your membership cancellation request.

**21. Membership commitment**

The required principles and ongoing behavioral code attested to by members as required for membership.

**22. Member responsibility amounts**

Amounts needed to be paid by the member for medical costs that are not shareable with the Knew Health Community.

**23. Membership update**

A communication from the member to Knew Health providing any changes to the details of their membership information (i.e. change of address, phone number, etc.) or requesting that their membership be changed. The change request or update may take up to three business days to complete. Once a representative of Knew Health approves the requested changes, the approved changes may go into effect on the monthly membership anniversary.

**24. Membership limitation**

A specified medical condition for which medical Needs arising from or associated with the condition are ineligible for reimbursement from the Community. An associated condition is one that is caused directly and primarily by the medical condition that is specifically ineligible. The membership limitation will be issued during the application process and may be subject to medical record review.

**25. Membership options**

A variety of sharing options are available with different Initial Unshareable Amounts (IUA) and sharing limits, as selected in writing on the membership application or enrollment portal and approved by Knew Health.

**26. Membership withdrawal**

When a membership has been or will be canceled due to the submission of a Membership Cancellation Request, a violation of the Knew Health's Principles of Membership, or non-receipt of a voluntary monthly contribution or annual membership fee for more than 30 days past the date such payment was due (delinquent). Such cancellation of membership is referred to as membership withdrawal or a delinquent membership.



**27. Membership Year**

The twelve month period immediately following the effective date of membership and beginning again each anniversary of the membership effective date.

**28. Monthly contributions**

Monetary contributions are given voluntarily and placed in the care of the Knew Health Community by a member to maintain active membership and to be disbursed to the eligible Needs of its members in accordance with the Member Guidelines. Contributions are made monthly on an automatic subscription and are applied to the next month of membership. For example, when a monthly contribution is made in May, it applies to membership for the month of June.

Knew Health does not encourage or condone that monthly contributions be paid by anyone other than a participating member. Knew Health will not be able to discuss membership or payment information with anyone but the participating member without the express written permission of the participating member.

**29. Need Request**

A Request that is required to process medical Needs for accidents, injuries, or medical conditions that result in medical costs. Need Requests must be submitted via the Knew Health Member Portal. The Need Request must be submitted to Knew Health within six months of the start of the condition to be eligible for sharing and bills must be submitted within 6 months of the date of service to be eligible for sharing.

**30. Office visit**

Sick visits, wellness visits, specialists, and urgent care are generally considered to be office visits. The medical bill must include an office visit CPT code for the Need to qualify as an office visit. Qualifications for sharing eligibility include exclusion of prior medical conditions and meeting your Initial Unshareable Amount (IUA).

**31. Membership administration**

A collaborative process of planning, evaluating, facilitating, coordinating, and advocating for options and services to meet a participating member's eligible Needs through available resources to promote quality, cost-effective results.

**32. Pre-existing condition**

Any medical condition that was symptomatic, suspected, diagnosed or required treatment within the 24 months prior to the effective date of membership is considered a pre-existing condition. For information on sharing for pre-existing conditions, see the section of the Member Guidelines titled "Medical Conditions Existing Prior to Membership."



**33. Proof of Cessation for Tobacco Use**

To prove cessation of tobacco use, a member will be required to show cessation of tobacco for a 12-month period. To do this, a member is required to submit three (3) negative cotinine tests: 1) the first negative cotinine test date triggers the start of the 12-month period; 2) the second cotinine test can be submitted any time during the next 10 months; and 3) the third negative cotinine test must occur during the month preceding the 12-month anniversary of the first test. A member will also be required to submit an affidavit or acknowledgement stating the last date of tobacco use upon submitting their third negative cotinine test. Once the 12 months have passed and Knew Health has received all required tests and affidavit/acknowledgement, the member will no longer be subject to the monthly tobacco surcharge on their membership contribution. The limitations for sharing in Needs related to stroke, cancer, heart conditions, chronic obstructive pulmonary disease (COPD), oral and esophageal disease, and gastric and duodenal ulcers for members over the age of 50 are still in effect even with proof of cessation.

**34. Proration**

If shareable Needs are ever significantly greater than shares available in any given month, Knew Health may prorate the Need amount requested for medical expenses. This involves an across the board percentage reduction of Need payments but does not necessarily mean that all member Needs will not be met in that month.

**35. Shareable amount**

The amount of the Need Request that remains after the member's Initial Unshareable Amount (IUA) has been satisfied and falls within the guidelines for sharing within the membership.

**36. Explanation of Sharing (EOS)**

Correspondence that is delivered to the participating members once medical Needs have been processed, are pending, or have been rejected. The Explanation of Sharing Summary will state their member responsibility amount or IUA as well as any amounts shared by the Community on the member's behalf.

**37. Usual reasonable and customary costs (URC)**

The general cost of medical services in a geographic area, as determined by Knew Health, based on what providers in the area usually charge for the same or a similar medical service. The Knew Health Community may limit sharing based on UCR.

**38. Unshareable amount(s)**

A medical expense incurred by a member that is not shareable for one or more of the following reasons: a member's violation of the Knew Health's Principles of Membership, delinquent membership status, or any other condition or requirement that is excluded by the Member Guidelines.



# Appendix B: Frequently Asked Questions

**What does Knew Health believe?**

Knew Health believes that its members, in concert with the medical providers of their choosing, have a natural incentive to do what is best for themselves and their families. We also believe individuals have the primary responsibility for making their own healthcare decisions. When members have financial needs due to illness that are greater than they can bear individually, the goal of the Knew Health Community is to assist members in carrying one another's burdens. The method by which Knew Health seeks to facilitate the sharing of members' medical costs is to teach and apply these principles of community and responsibility as an integral part of its sharing philosophy.

**What kind of company is Knew Health?**

Knew Health is a Delaware corporation and is not an insurance company. Knew Health provides the framework and administrative support for the membership program.

**Isn't Knew Health really just another health insurance company?**

No. Insurance arrangements are a contract whereby one party agrees to be legally responsible for and accept another party's risk of loss in exchange for a payment—a premium. Knew Health memberships provide an arrangement whereby members agree to share medical expenses through the act of voluntary giving. Knew Health is not licensed or registered by any insurance board or department. Knew Health does not assess applicants' health risks because neither Knew Health nor its members are assuming financial liability for any other member's risk. Unlike insurance, the focus of Knew Health is to provide an avenue for members to help each other bear their immediate healthcare expenses.

**What's the advantage of Knew Health not being a health insurance company?**

When health care costs are paid by someone other than the person receiving care, as is typically the case when an insurance company or government entity agrees to cover such costs, the healthcare model can be undermined. Knew Health believes many of the current problems with the healthcare system are the direct result of restricting personal freedom and responsibility through dependence on third-party payers. Knew Health is designed to allow members to help one another while maintaining freedom of choice and personal responsibility.

**How are members of Knew Health affected by the federal healthcare law (including the Affordable Care Act)?**

Beginning in 2019, individuals are no longer required to obtain minimum health insurance coverage pursuant to the "individual mandate " under the Affordable Care Act and will not be penalized for failing to purchase health insurance.



**How does Knew Health handle medical Need Requests?**

Because there is no transfer of risk, as defined in applicable insurance rules and regulations, with respect to Knew Health, no "claim" is ever owed by a Knew Health on behalf of any member. When members incur medical expenses, they experience medical Needs that may or may not be eligible for reimbursement from the Community. Knew Health members are required to submit proof of their medical expenses to Knew Health. Knew Health then evaluates each submission for eligibility or ineligibility based on the Member Guidelines. Eligible Needs are designated for sharing using the funds accumulated through monthly member contributions.

**What procedure should I follow to request reimbursement for my medical bills when I have a Need?**

At or before the time a member receives medical service, the member should inform their medical providers (doctors, laboratories, clinics, hospitals, etc.) that they are a self-pay patient. Healthcare providers can send bills directly to Knew Health. Any proof of payment made towards their IUA (Initial Unshareable Amount) should be submitted to Knew Health. Knew Health will review the submitted documentation for sharing with the Community. Knew Health's Member Care Team may contact the providers to discuss the appropriate payment for the services that were performed and determine if negotiations are applicable for the billed amounts.

**How long does it take Knew Health to process a medical Need?**

Typically, eligible reimbursement is made to members within 1-2 weeks once all documentation has been received.

**Can I choose my own doctors and hospitals without being penalized?**

Yes. Each member's personal freedom to select the medical providers of their choice is fundamental to Knew Health's philosophy. Knew Health endeavors to provide members with detailed and current information and recommendations to help them identify and receive treatment from the highest quality health provider(s). Accordingly, there are no out-of-network penalties or other restrictions.

**Does Knew Health charge monthly premiums?**

Because Knew Health is not insurance, it does not charge premiums. Rather, Knew Health's members freely choose to assist other members with their medical expenses by contributing a predetermined amount each month; called a "monthly contribution".

**Does Knew Health use deductibles and coinsurance?**

Because Knew Health is not insurance, it does not charge premiums. Rather, Knew Health's members freely choose to assist other members with their medical expenses by contributing a predetermined amount each month; called a "monthly contribution". These shares or membership contributions make up the Community Fund, which are then used to share in members' eligible medical expenses. Knew Health's process differs significantly from insurance practices in this regard; to our members' advantage. Insurance deductibles are cumulative over the course of a predetermined plan period. Co-insurance is the portion of the medical expense owed by the patient. Conversely, when members incur an eligible medical expense that exceeds the Initial Unshareable Amount (IUA), any amount above the Initial Unshareable Amount may be eligible for sharing. On the fourth medical Need in a household, the member no longer needs to pay the IUA if the additional medical expenses are more than $500.



Resp. Appx. p. 718

**Will Knew Health share medical costs that were incurred outside of the United States?**

Eligible medical expenses that exceed a member's IUA that occur overseas as a result of a medical emergency are shareable. Bills from medical treatments that occurred overseas must be written in or translated into English and the price converted to U.S. dollars before the Need is submitted. They are then processed in the same manner as bills from medical treatments that occur in the U.S.

Non-emergency services that occur overseas are generally not eligible to share, regardless of cost savings.

**What constitutes a medical emergency?**

Emergency care refers to medical services provided for conditions that require immediate attention to prevent serious harm or risk to life. It typically involves sudden and acute symptoms or injuries that could lead to significant disability or death if not treated promptly. Examples include, but are not limited to, heart attacks, strokes, severe bleeding, or acute respiratory distress. Emergency care is characterized by urgent interventions to stabilize patients, manage pain, and address life-threatening conditions, often provided in emergency departments or during ambulance services. The primary goal is to prevent deterioration of the patient's condition and provide immediate relief from severe symptoms.

**What are Knew Health's membership requirements?**

Knew Health members must agree to the Principles of Membership and be under 65 years of age.

**Can my membership be dropped if I have very high medical Needs?**

Members cannot be dropped from the sharing program due to their medical Needs. Neither membership nor monthly contribution is adversely impacted by the amount of medical expenses a member or their family members may have.

**Can my family members participate in the Knew Health Community?**

Spouses, domestic partners, and dependent children are welcome to participate in the Community.

**What if my dependents do not agree to abide by the Knew Health Member Guidelines?**

All Members of Knew Health must agree to abide by the Knew Health membership requirements as directed by Knew Health. For children under the age of 26 who are living with their member parent or guardian, Knew Health requires that the member hold their children responsible for compliance with all requirements stated in the Member Guidelines. For example, Knew Health does not approve the sharing of medical expenses for injuries resulting from the use of illegal substances. Hence, medical expenses incurred by a member's child who is injured while he/she is under the influence of an illegal substance are generally not eligible for sharing.

Is there a lifetime or yearly maximum amount that is eligible for sharing for any one person or family?
There are no lifetime or annual maximum amounts eligible for sharing for most medical Needs. Some conditions have limits, generally calculated per Need, as described in the section "Limitations on Sharing." There is no limit on the number of Needs that an individual member or household may have. While there is no lifetime maximum amount eligible for sharing for any household or membership, sharing is limited by the aggregate amount available for sharing from member Contributions. In order to ensure equitable sharing among members, no single Need Request may consume more than 10% of the aggregate amount available for sharing in any calendar year. The ability to share up to 10% of the aggregate amount available for sharing in any calendar year, may only occur up to a maximum of two years.



**What kinds of Needs do Knew Health members share?**

In general, Needs for illnesses, injuries, and pregnancies resulting in visits to licensed medical providers, emergency rooms, testing facilities, or hospitals are shared on a per person, per incident basis once the member has met their personal responsibility by paying their Initial Unshareable Amount (IUA).

**What kinds of Needs do Knew Health members not share?**

Needs resulting from medical conditions that existed prior to the effective date are typically not shared or are shared in a limited capacity. Each member has an IUA (Initial Unshareable Amount) for which reimbursement from the Community Fund will not be made.

**What amounts do members share for maternity Needs?**

Pregnancies with an estimated delivery date that falls after the first 12 months of membership are shared like any other Need. For a pregnancy that began prior to a member's effective date or with an estimated delivery date that falls within the first 12 months of membership, pregnancy is treated as a pre-existing condition and not shared.

**What if I lose my job or change employers? Can I take my Knew Health membership with me?**

Yes, continuation of membership in Knew Health Community after termination of employment is a simple process. Because membership is individually based, members can change the billing method at any time.

**This program sounds kind of unusual; does it really work?**

The concept of medical cost sharing has been highly successful within the confines of faith based groups for more than forty years. During this time period, hundreds of thousands of individuals, families, and businesses have shared hundreds of millions of dollars in medical expenses. As a result, there is a strong foundational precedent in the concept of medical cost sharing.

A community of health-conscious individuals who care for one another can successfully participate in the sharing of medical expenses in a manner that will reduce the financial burden of receiving medical care for all members. Members should note, however, that past successes by faith-based sharing groups assisting one another is no guarantee of the future success of similar programs. There is no promise or contract by Knew Health or the members to contribute toward any Need any other member might have in the future.

**What happens if Knew Health's members' Needs are greater than the monthly contributions received?**

Knew Health keeps excess funds to share member Needs in the event that Needs for a month exceed the monthly contributions received. To date, all eligible Needs have been shared in full without need to draw from the excess funds.

However, if the rare event occurs that all Needs cannot be met for a given month, Knew Health uses a prorating method to evenly distribute the available funds among members with Needs. For example, if the monthly contributions received for a given month amounts to 80% of the Needs submitted for that month, each member would have 80% of their eligible expenses shared that month. The Knew Health Community has not needed to prorate member Needs in the past and has ample excess sharing contributions to draw from, but has these procedures in place to account for every possibility.



Req. Appx. p. 726

**How much does it cost to belong to Knew Health?**

Every member provides a specific monthly contribution depending on their membership type, age, and chosen Initial Unshareable Amount. Employer contributions, if applicable, can also affect the monthly cost to the member. See the Knew Health website for current monthly contribution rates. Monthly contributions are subject to change by vote of Knew Health's board of directors.

**Can my employer pay some, or all, of my monthly contribution amount?**

Yes, there is no limit (other than business financial restraints) as to how much your employer can contribute towards your required monthly contribution.

**How is my portion of the monthly contribution collected?**

Knew Health offers multiple payment options for members to pay their monthly contributions via automatic monthly subscriptions through a credit or debit card.

**Are my monthly contributions higher if I, or a participating member in my family, uses tobacco or other smoked products?**

Yes. Tobacco or smoked product use of any kind is clinically proven to cause serious health conditions. Due to the increased likelihood of higher medical costs associated with tobacco use, Knew Health households with one or more tobacco or smoked product users are required to contribute a higher monthly contribution amount to maintain membership. Additionally, medical Needs for tobacco or smoked products users aged 50 and older are limited to $25,000 for each of the following four disease categories: stroke, cancer, heart conditions, COPD, oral and esophageal disease, and gastric and duodenal ulcers.

**Are my monthly contributions a pre-tax deduction like health insurance premiums?**

No. The monthly contribution is a voluntary contribution towards a membership program that facilitates the sharing of member's medical bills. As such, the money members contribute to the Knew Health program is a post-tax contribution.

**How often can the monthly contribution amounts be changed?**

Monthly contribution amounts can be changed twice a year, in accordance with the policies and procedures set forth in these guidelines. The monthly contribution can only change when approved by Knew Health's board of directors. To date, Knew Health has never had to increase the monthly contribution rate and does not plan to do so in the near future.

**Are my pre-existing conditions always unshareable?**

In the first year of membership, pre-existing conditions are not shareable with the Knew Health Community. Pre-existing conditions become shareable on a limited basis after one year of continuous membership, with the limit increasing to a maximum of $125,000 per Need in the fourth year of membership and onward. For more information, see the section "Medical Conditions Existing Prior to Membership."



Reep_Appx_p. 721

# Appendix C: Company FAQs

**Is Knew Health a group benefit?**

No, Knew Health is an individual and family sharing Community. We allow for a company contribution list. Employees who participate can be added or removed from the contributions list at any time and billed directly.

**Why should my company participate in Knew Health?**

Participation in Knew Health's program is always voluntary, both from the company's and the employee's perspectives. Business owners choose to work with Knew Health because they value community and personal responsibility and because they want to use a community sharing approach to ensure provision of quality healthcare for their employees. There are numerous factors that contribute to Knew Health's greater efficiencies for both companies and employees.

**Does Knew Health comply with the Affordable Care Act requirements?**

Knew Health is not a substitute for insurance as defined by the Affordable Care Act and therefore does not meet the requirements by itself.

**What are the risks and liabilities my company may be exposed to through participation in Knew Health?**

Knew Health is a voluntary program. It is not insurance. Companies are not purchasing insurance coverage by participating in the program. By participating in the program, companies are neither promising their employees that their larger medical bills will be paid, nor are they taking on liability to pay those bills as a company. Companies can choose to contribute on behalf of their employee members.

**Can my employee's monthly contributions be collected via payroll deductions?**

Yes. Knew Health allows members to join a contribution list of members who are part of a company. Employers can deduct member contributions by payroll deduction on a post-tax basis.

**Can my company pay some or all of its employee's monthly contributions?**

Yes. Participating companies can contribute as much of the employee's monthly contributions as they wish. It should be recognized that this is viewed as a component of the employee's total compensation. Companies can tier their employees based on legal requirements and offer different product bundles to each tier. Talk to your legal representative about legal requirements on tiering qualifications.

**How do I set up my employees' withholding amounts?**

Companies should consult with their own legal and tax advisors for more information regarding payroll and income tax implications for their specific situations.



**Is there any additional administration or work for my company as a result of participation?**

The Knew Health team is glad to assist with any questions you or your staff might have regarding monthly contributions and the entire Knew Health process.

**The cost savings sounds great, but how will my employees be affected by the Knew Health Community?**

The employees of participating businesses are granted the opportunity to voluntarily join Knew Health. As such, participating employees voluntarily choose to pay the portion of the monthly contribution that is not carried by their company. Any employee can withdraw from the program at any time, but if they do, they will no longer be eligible to receive contributions towards their medical expenses in the event that they incur a medical Need.

---

### Disclaimer

*Knew Health is not an insurance company. Neither this publication nor membership in Knew Health are issued or offered by an insurance company. The purpose of these Member Guidelines is to help members understand and identify medical Needs that qualify for potential sharing and the process by which payments are made. The Member Guidelines are not for the purpose of describing to prospective members what amounts will be reimbursed by Knew Health. While Knew Health has shared all eligible Needs of its members to date, membership does not guarantee or promise that your eligible needs will be shared. Rather, membership in Knew Health merely guarantees the opportunity for members to care for one another in a time of need and present their medical Needs to other members as outlined in these membership guidelines. The financial assistance members receive will come from other members' monthly contributions and not from Knew Health.*

*This publication and membership in Knew Health should never be considered a substitute for a health insurance policy. If the Membership is unable to share in all or part of a member's eligible medical Needs, each member will remain solely financially liable for any and all unpaid medical Needs. These Guidelines do not create a legally enforceable contract between Knew Health and any of its members. Neither these Guidelines, nor any other arrangement between members and Knew Health create any rights for any member as a reciprocal beneficiary, a third-party beneficiary, or otherwise. An exception to a specific provision and does not supersede or void any other provisions. The decision by Knew Health to reimburse a member's eligible Needs does not and shall not constitute a waiver of this provision or establish by estoppel or any other means any obligation on the part of Knew Health to reimburse a member's eligible Needs.*



Req: Aqx_a 723



**86°**                                                                 SIGN UP

 | **EIN Presswire | Newsmatics**

---

## HSA for America Announces HSA Secure: A New Way to Save on Healthcare Costs

---

NEWS PROVIDED BY
EIN Presswire
Jun 27, 2024, 8:00 PM ET

---

*HSA for America launches HSA Secure, combining HSAs & health sharing to lower healthcare costs for individuals & families.*

USA, June 27, 2024 /EINPresswire.com/ --
HSA for America, a leading advocate for health sharing ministries, announced the launch of HSA Secure today. HSA Secure combines the benefits of health savings



www.HSAforAmerica.com

EXHIBIT
**2.6**
Ex. 2.6, p. 1 of 6

accounts (HSAs) with health sharing.

HSA Secure allows self-employed individuals and small businesses to use pre-tax dollars to pay for qualified medical expenses through an HSA. The program also offers a variety of benefits, including:

- 100% coverage for preventive care services
- Sharing costs for medical bills
- The ability to choose your own doctor

"HSA Secure is a great option for people who are looking for a more affordable way to cover their healthcare costs," said Wiley Long, President, HSA for America. "By combining HSAs with health sharing, we can help people save money on their medical bills and get the tax benefits of an HSA."

More details about HSA Secure:
- The program includes an HSA-qualified MEC (minimum essential coverage) preventive care plan.
- Members can make tax-deductible contributions to their HSA every year.
- Unused HSA funds can be rolled over yearly and invested for future use.
- Members share medical costs with other members, saving money on monthly premiums.
- Large expenses, such as hospitalization, surgery, and specialists, are paid through a medical cost-sharing program.
- The cost of HSA Secure varies depending on age, but is typically half that of traditional health insurance.

Here are eight key benefits of utilizing HSA Secure:

- Tax-Deductible HSA Contributions: Money deposited in the HSA is tax-deductible, immediately reducing annual income tax payments.

- Tax-Deferred Growth: The money deposited in the HSA grows tax-deferred, including interest earned on the account balance, allowing for more efficient savings growth over time.

- Tax-free Withdrawals: Money withdrawn from the HSA to cover medical expenses is tax-free.

- Flexibility and Control: HSA Secure gives members greater control over their healthcare spending, allowing the funds to be used for various medical expenses, including those not covered by the health sharing plan.

- Cost Savings on Premiums: HSA Secure can significantly reduce overall healthcare costs, as health sharing plans typically have lower monthly premiums compared to traditional health insurance.

- Retirement Savings: After age 65, HSA funds can be used for non-medical expenses without penalty, though they will be taxed as ordinary income. This feature makes HSA Secure a useful tool for retirement planning.

- Enhanced Savings with Health Sharing: Health sharing plans like HSA Secure enable maximum savings by offering affordable plans. When combined with the tax advantages of an HSA, these plans provide an effective way to manage healthcare expenses efficiently.

To learn more about HSA Secure, please visit HSA Secure.

About HSA for America

HSA for America provides education and resources to help people learn more about affordable healthcare options and find the right plan for them.

They focus on two main areas: health insurance plans that work alongside Health

Savings Accounts (HSAs) and alternative health sharing plans. By offering guidance through these options, HSA for America assists individuals, families, and even small businesses find cost-effective solutions for their healthcare needs.

Wiley P Long

HSA for America

+1 800-913-4509

email us here

Visit us on social media:

Facebook

X

LinkedIn

YouTube

NOTE: This content is not written by or endorsed by "KXRM", its advertisers, or Nexstar Media Inc.
*For inquiries or corrections to Press Releases, please reach out to EIN Presswire.*



News and Weather for Colorado Springs, Pueblo, and Southern Colorado

About Our Ads

EEO Report

FCC Public Information File

Nexstar CC Certification

**Get News App**





**Get Weather App**





**Stay Connected**

Privacy Policy   06/27/2024

Terms Of Use

FCC Applications

Public File Assistance Contact

Subscribe To Push Notifications

The Hill

NewsNation

BestReviews

Content Licensing

Nexstar Digital

Journalistic Integrity

Sitemap

Do Not Sell or Share My Personal Information

HSA for America Announces HSA Secure: A New Way to Save on Healthcare Costs

© 1998 - 2024 Nexstar Media Inc. | All Rights Reserved.



DPC Connection

Foundations for Membership

Member Guidelines   Sharing

Contact   Blog

Foundations for Membership

Each Member must comply with the following requirements in order to preserve its membership and be eligible to participate in the sharing program. The requirements below benefit all Members by assuring honor and integrity on the part of Members and by minimizing medical risks and ensuring proper accountability while encouraging good health practices. All Members must agree with and attest to the following statements:

- I agree that a community of moral, ethical and health-conscious people can most efficiently and effectively encourage and care for one another by directly sharing the costs and expenses associated with each other's health care needs.

- I understand that Big Stuff Health Share is a Benevolence Organization, not an insurance entity and that while Big Stuff Health Share assures that every effort will be made to have Members fulfill their monthly sharing commitment, Big Stuff Health Share, in and of itself, cannot guarantee payment of any medical expenses.

EXHIBIT
**2.7**

Ex. 2.7, p. 1 of 3

- I agree to practice good health measures and strive for a balanced lifestyle.

DPC Connection

Foundations for Membership
...om the usage of any form of illicit/illegal drugs and excessive alcohol
consumption, all of which ...  ...  ...stand that tobacco consumers have
an increased share of $50 monthly per household.

Member Guidelines    Sharing

Contact    Blog

- I believe I am obligated to care for my family and that physical, mental or emotional abuse of any kind to a family Member or anyone else is morally wrong.

- I agree to submit to mediation followed by subsequent binding arbitration, if needed, for any instance of a dispute with Big Stuff Health Share or its affiliates.

- I agree to sign and submit a membership continuation agreement each renewal year confirming my commitment to adhere to these principles.

DPC Connection

Foundations for Membership

Member Guidelines      Sharing

Contact      Blog





Member Guidelines

Foundations for Membership

Submit a Shared Need Request

Contact



# Health Care Sharing Plans and Arrangements in Colorado

Colorado House Bill 22-1269 2021 report

April 1, 2023



EXHIBIT
2.8

Ex. 2.8, p. 1 of 15

# Table of Contents

**Table of Contents**                                                          **2**

**Background**                                                                 **3**

**Overview of Data Collection Efforts**                                        **3**

**Summary of Findings**                                                        **4**

    Membership                                             4

    National HCSA Activity                                  5

    Financial Information                                   5

    Marketing Efforts and Use of Producers                  7

**Data Limitations**                                                           **7**

**Asking Questions and Submitting a Complaint**                                **7**

**Next Steps**                                                                 **8**

**Appendices**                                                                 **9**

    Appendix A: Associated Legislation, Regulation, and Division Information       9

    Appendix B: Regulatory Definitions of Terms Related to HCSA Reporting          10

    Appendix C: List of Health Care Sharing Arrangements Operating in Colorado     12

    Appendix D: Services and Pre-existing Conditions Excluded from Sharing by some HCSAs       12

    Appendix E: 2021 Enrollment per HCSA                    14

    Appendix F: Total Dollar Amounts of Colorado Members' Healthcare Costs and the Total Dollar Amount of Share Requests that were Eligible for Sharing       15

2

# Background

The Division of Insurance ("Division"), consumer assistance organizations, and lawmakers have received numerous questions and complaints about Health Care Sharing Ministries, Plans, or Arrangements ("HCSAs") operating in Colorado; however, the Division had limited visibility into the HCSAs to answer the questions raised by consumers. The 73rd Colorado General Assembly passed House Bill 22-1269 ("HB22-1269") requiring HCSAs to report data annually to the Division to better understand and collect information about the HCSAs operating in Colorado. HCSAs now report to the Division data on annual enrollment, whether they use licensed producers to enroll members, HCSA guidelines that describe what is and is not eligible for sharing, and marketing materials. These data reporting efforts will ultimately increase transparency for Colorado consumers.

In Colorado statute an HCSA is defined as, "any person not authorized to sell insurance in this state [Colorado] but that offers or intends to offer a plan or arrangement in this state [Colorado] to facilitate payment or reimbursement of [Colorado] residents' health-care costs or services.[1]" Colorado law requires all HCSAs, both religious and not, to report data to the Division annually or potentially face civil penalties and cease and desist orders. [2]

HCSAs don't offer the same protections to consumers as Affordable Care Act ("ACA") plans. There is no guarantee that HCSA members will have their healthcare costs paid for (commonly referred to as "sharing" by HCSAs). Some HCSAs include notices noting lack of guaranteed payments for health costs and how members are always personally liable for payment of their medical bills, however it is unclear if consumers have full understanding of these provisions when they enroll, and many Division complaints suggest that they may not.

# Overview of Data Collection Efforts

To implement HB22-1269 the Division drafted an Emergency Regulation, created a data reporting template and a dedicated HCSA data collection webpage[3], and held two public meetings for any interested party to provide feedback on the proposed regulation. The feedback provided by consumer advocates, HCSAs, and members of the public helped refine the final emergency regulation and data reporting template.

By December 15, 2022, nine (9) HCSAs submitted data or requested an extension. Over the following months an additional twelve (12) HCSAs were identified with sixteen (16) HCSAs in total reporting 2021 data to the Division. Division staff reviewed all submissions for completeness, followed up with each HCSA if materials or data elements were missing, and asked HCSAs questions to determine if data were reported correctly based on definitions found in the regulation and reporting template.

---

[1] § 10-16-107.4 of the Colorado Revised Statutes ("C.R.S.")
[2] Potential civil penalties and cease and desist orders are subject to the requirements of due process.
[3] Links to these items can be found in the Appendices.

3

## Summary of Findings

Of all HCSAs operating in Colorado for some portion of 2021, 16 submitted data to the Division ahead of the publication of this report and all 16 submissions were initially deemed incomplete. At the time this report was prepared, not all data elements were submitted or submitted correctly following their specific definitions (e.g., The percentages of member fees or shares retained for administrative expenses or program expenses were categorized differently across HCSAs and a few HCSAs did not follow the regulatory definition). Where data submission issues are known, the Division has presented a subset of data in this report to include only those HCSAs that reported correctly. The Division is currently working with each HCSA to finalize their 2021 submissions to ensure that data submitted are uniform across HCSAs.

### Membership

In 2021, sixteen (16) HCSAs reported a total membership of 67,876 Coloradans and 1,713,447 Americans. Colorado membership numbers represent almost 4% of national enrollment numbers. In comparison Colorado's 2020 census population is 1.7% of the national population.[4] Further, Connect for Health Colorado reported 226,680 Coloradans enrolled in a health insurance plan in the individual market through the state-based exchange in 2021, meaning HCSA enrollment was ~30% of the individual market enrollment on Colorado's state-based exchange in 2021.[5] Actual enrollment in HCSAs in Colorado is likely higher than reported here as at least 5 more HCSAs were likely offering products during 2021 based on internet searches, communications with HCSAs, and consumer complaints.



Five (5) HCSAs reported Colorado employer groups participating in sharing arrangements in 2021 but at least 3 additional HCSAs have marketing and communication materials to encourage employers to offer their HCSA products to employees and/or to pay a portion of the employees monthly required membership dues or share amounts. Of the five (5) HCSAs that reported data on employer participation, an average of 13 members per employer participated in a HSCA, for a total of 1,905 members.[6] The 1,905 members most likely includes some combination of employees and employees plus their families.

---

[4] United States Census Bureau. [Profile United States 2020 census data]. Retrieved from https://data.census.gov/profile?g=0100000US
[5] Connect for Health Colorado. [2021 Annual Report]. Retrieved from https://c4-media.s3.amazonaws.com/wp-content/uploads/2022/01/14100310/C4HC_2021AnnualReport_FINAL.pdf
[6] These statistics are from the five (5) HCSAs who reported employer group participation

4

## National HCSA Activity

At least 11 HCSAs that reported data to the Division operated in and/or advertised shared products in all 50 states in 2021. Nine (9) of the HCSAs offered products in all fifty states. Vermont, Washington, Rhode Island, Pennsylvania, Maryland and Hawaii were the states with the smallest number of HCSAs. At this time, it is unclear why some states have fewer HCSAs than others.

The following map does not include all HCSAs operating in each state as this map includes the information provided to the Division and excludes those HCSAs who did not submit data. The actual number and geographic distribution of HCSAs operating in the U.S. is most likely higher and slightly different, respectively, than what is displayed on the map. While not a comprehensive view of where HCSAs operated, this map expands on the breadth of HCSAs shared by the Massachusetts Health Connector in its 2020-2021 report.[7]



Number of HCSA operating in each state in 2021

## Financial Information

Of the 16 HCSAs that submitted data, only a subset submitted their financial information correctly. A few HCSAs did not report all of the required information for differing reasons. In this section of the report the Division has provided the subset of HCSAs that reported their financial information correctly. The Division is working with all HCSAs to submit their data correctly for 2021 and future submissions.

Fourteen (14) HCSAs submitted the total dollar amount of healthcare costs or services that were submitted for sharing totaling $361,782,968.53. In comparison, $97,393,551.95 in total fees, dues, shares, contributions, and other payments were collected from Colorado members in

---

[7] Massachusetts Health Connector [Health Connector HCSM Report 2021] Retrieved from: https://betterhealthconnector.com/wp-content/uploads/Health-Connector-HCSM-Report-2021.pdf

5



**$362M** in health care costs submitted

**$131M** shared /paid

**$97M** collected from members

2021, which equals 26.7% of members' health care costs.[8] Many of the HCSAs note that their portion of the $362 million includes duplicate charges, ineligible charges based on their sharing guidelines, discounts that they negotiated on their members' behalf, and the members' agreed upon portions of medical bills. Once those amounts were deducted, the HCSAs reported that $131,984,548.13 of members' total 2021 health care costs qualified for sharing. In total, the shares collected from Colorado members covered 74% of total eligible share requests. One of the HCSAs attributed the difference between dollars shared and dollars collected to Colorado's high healthcare costs.

Actual health care costs of Colorado members were likely different than reported as claims/share requests do not include costs for benefits excluded from sharing. Many of the HCSAs reported excluding benefits such as contraception coverage, mental health services, alcohol use disorder treatments, ADHD treatments, prescription drugs for chronic conditions, abortion with no exceptions for rape or safety of the pregnant person, and some pre-existing conditions. Many of the HCSAs also reported excluding or placing limitations on maternity care unless the pregnant person had been a member of the HCSA's highest membership tier for some previous amount of time (e.g., maternity care is covered once the pregnant person has been a member for 12 months without changing to a lower cost program).

Some of the HCSAs require, in their guidelines, that members first request providers and hospitals to reduce or write off eligible health care bills. Some HCSAs also require members to first request charity care and financial support from local governments and consumer support organizations in paying the member's health care bills. For Medicare eligible members, some of the HCSAs require that members are enrolled in Medicare parts A, B, and sometimes D and that the HCSA is used after health care costs are submitted to Medicare.

---

[8] The data provided in this paragraph include only those 14 HCSAs that correctly reported on the data elements referenced. One HCSA did not report on "Total dollar amount of health-care costs or services that were incurred by the participant and submitted by or on behalf of the participant for sharing" and another reported national data instead of the required Colorado member specific data so data from both HCSAs were excluded from the financial analysis presented.

6

## Marketing Efforts and Use of Producers

Seven HCSAs reported working with a total of 862 producers[9] to enroll 4637 members, or 35.2% of the enrollment of these seven HCSAs. The range of membership enrollment via producers in the seven HCSAs is between <1% - 100% of members enrolled via producers. HCSAs are not required to report the names, business, or license numbers of individual producers so the count of 862 producers across seven HCSAs is not a unique count of producers and likely includes double counting. Five (5) of the HCSAs noted that they do not work with producers licensed in the state of Colorado to enroll members (Emergency Regulation 22-E-20 defines "producers" for HCSA data submission purposes as those licensed to sell insurance in Colorado). However, these 5 HCSAs work with third-party organizations to enroll members. An additional four HCSAs explicitly noted they do not use external producers or third-party organizations in their enrollment efforts.

Social media was also used by HCSAs to communicate to members and to market their products. Two (2) HCSAs reported using social media in their marketing efforts but internet searches by Division staff indicated that all 16 HCSAs that reported data to the Division use social media channels to market their organizations and products.

## Data Limitations

The data submitted to the Division over the past few months are the first collection of HCSA data in Colorado. Not all HCSAs submitted data following the definitions laid out in Emergency Regulation 22-E-20 or on the reporting template. Moreover, not all HCSAs submitted all required data. The Division is working to refine and clarify the reporting requirements and will be providing HCSAs with additional information to ensure more consistent reporting in the future.

There are limits to what the Division can understand from the data reported. The Division does not collect demographic information about HCSA members (e.g., age, income, or family size) or the types of employers who offer an HCSA to their employees, or the names of producers used to enroll members into HCSAs. Even with these limitations the Division has learned valuable information and noted areas for further improvement through this first data collection period.

## Asking Questions and Submitting a Complaint

If there are questions or complaints about a HCSA, please reach out to the Division of Insurance. If you're unsure of what kind of coverage you currently have, whether it is an

---

[9] For the purposes of HB22-1269's data collection efforts and this report "Producers" are defined as a person who solicits, negotiates, effects, procures, delivers, renews, continues, or binds: Policies of insurance for risks residing, located, or to be performed in this state; membership in a prepayment plan as defined in § 10–16-2 & § 10-16-3, C.R.S.; or membership enrollment in a health-care plan as defined in §10-16-4 C.R.S.; with the exception of a public adjuster. This definition is from § 10–2-103(6), C.R.S. and Emergency Regulation 22-E-20.

7

ACA-compliant health insurance, a HCSA, or something else, you can contact the Division's Consumer Services team to find out what questions to ask.

Colorado consumers enrolled in a HCSA who are having problems getting their health care costs covered should contact the Division of Insurance's Consumer Services team. The Consumer Services team is available to answer questions or respond to complaints via phone calls and/or our consumer portal. More information about filing a complaint can be found on the Division's website, emailing DORA_Insurance@state.co.us, or calling 303-894-7490 (within the Denver Metro area) or 800-930-3745 (outside the Denver Metro area).

## Next Steps

The Division is currently in the process of data collection and follow-up with HCSAs for calendar years 2021 and 2022. When new HCSAs operating in Colorado are identified, the Division will notify these HCSAs of the requirements of the law. If there is evidence that a HCSA is operating in Colorado but is not included in this report, please contact Leilani Russell (Leilani.Russell@state.co.us).

Completion of 2021 data submissions is expected by June 2023 and early Fall of 2023 for 2022 data submissions. The Division is not anticipating updates to the 2021 report. Finalized submission materials, excluding confidential information, will be posted to the Division's website for interested parties to download. The report summarizing 2022 data will be posted to the Division's website no later than October 1, 2023. Annually, HCSA data are due to the Division on March 1st of each year with the associated report published by October 1st of the same year.

The Division continues to monitor and follow-up on questions and complaints about HCSAs. Over the coming months the Division will release the permanent regulation related to House Bill 22-1269. This process includes a draft regulation, a public hearing, and different opportunities to provide public comment about the permanent regulation. Lessons learned from the first two rounds of data collection will inform the permanent regulation. Anyone interested in participating in the regulatory process should sign up for notifications from the Division and/or check the Division's website.

8

# Appendices

## Appendix A: Associated Legislation, Regulation, and Division Information

- Colorado House Bill 22-1269
- Division of Insurance Emergency Regulation 22-E-20
- The Division's consumer complaint portal and information on how to ask a question or file a complaint
- The Division's web page dedicated to House Bill 22-1269

**2021 Reporting Template:** The annual reporting template all HCSAs are required to submit can be downloaded from the Division's website:
https://docs.google.com/spreadsheets/d/1KW_s7tv91SlP-l327ttx1_Xja2w86Ui-/edit#gid=876537254

**About the Division of Insurance:** The Colorado Division of Insurance, part of the Department of Regulatory Agencies (DORA), regulates the insurance industry and assists consumers and other stakeholders with insurance issues. Visit doi.colorado.gov for more information or call 303-894-7499 / toll free 800-930-3745.

**About DORA:** DORA is dedicated to preserving the integrity of the marketplace and is committed to promoting a fair and competitive business environment in Colorado. Consumer protection is our mission. Visit dora.colorado.gov for more information or call 303-894-7855 / toll free 800-886-7675.

9

## Appendix B: Regulatory Definitions of Terms Related to HCSA Reporting

**Administrative expenses:** shall mean costs incurred to operate and support the functioning of the health care sharing plan or arrangement. This includes but is not limited to bank fees, staff salaries, data processing, sales, and marketing efforts. This includes fees, commissions, and remuneration paid to contractors that acted on behalf of the health care sharing plan or arrangement to facilitate administrative expenses.

**Coloradans:** shall mean residents of Colorado during the reporting period.

**Health care costs or health care expenses:** shall mean any amount billed by a health care provider for health care services or related products or by a pharmacy.

**Health care provider:** means any physician, dentist, optometrist, anesthesiologist, hospital, X ray, laboratory and ambulance service, or other person who is licensed or otherwise authorized in Colorado to furnish health-care services, as defined in § 10-16-102(56) of the Colorado Revised Statutes (C.R.S.).

**Health care services**: means any services included in or incidental to the furnishing of medical, behavioral, mental health, or substance use disorder; dental, or optometric care; hospitalization; or nursing home care to an individual, as well as the furnishing to any person of any other services for the purpose of preventing, alleviating, curing, or healing human physical illness or injury, or behavioral, mental health, or substance use disorder. "Health-care services" includes the rendering of the services through the use of telehealth, as defined in § 10-16-123 (4)(e), C.R.S.

**Health Care Sharing Plan or Health Care Sharing Arrangement or "plan" or "arrangement" or "HCSA"**: shall mean any person not authorized to sell insurance in Colorado but that offers or intends to offer a plan or arrangement in Colorado to facilitate payment or reimbursement of Colorado residents' health-care costs or services. This does not include direct primary care agreements as defined in § 6-23-101, C.R.S.; consumer payment plans offered directly between a provider and patient (or patient's responsible party); businesses used to facilitate the plan's operations such as reimbursement handling, cost containment vendors, data processing; and crowdfunded sources for the purposes of paying for and/or reimbursement of health care services.

**Health Care Sharing Plan Reporting or "HCSPR"**: shall mean the report required to be filed with the Commissioner pursuant to § 10-16-107.4(1), C.R.S, as interpreted by Emergency Regulation 22-E-20.

**Health Care Sharing Plan Reporting template or "template"**: shall mean the data reporting template created and distributed by the Division for the purposes of collecting data per § 10-16-107.4, C.R.S., available on the Division's website.

**Insurance producer or "producer"**: shall have the same meaning as found at § 10-2-103(6), C.R.S., with the exception that it does not include § 10-2-103(6)(b), C.R.S.

10

**Program expenses**: shall mean any service by the HCSPA or its contractors that, while not direct medical care, contributes to the care and overall experiences of HCSPA's participants. This includes but is not limited to coaching and wellness programs, care navigation, care coordination, medical review, quality improvement efforts, cost containment, reimbursement handling, and bill negotiations. This includes fees, commissions, and remuneration paid to contractors that acted on behalf of the HCSA to facilitate program expenses.

**Product(s):** shall mean the services covered as a package under a membership plan, tier, or level.

11

Appendix C: List of Health Care Sharing Arrangements Operating in Colorado

**List of HCSAs that offered plans or arrangements in Colorado in 2021
and reported data to the Division**

Altrua Ministries
Christian Healthcare Ministries
Christian Care Ministry, dba Medi-Share
Impact Health Sharing
Jericho Share
Liberty HealthShare
Logos Missions, Inc, dba Christian Mutual Medical Assistance
netWell
OneShare
Samaritan Ministries International
Sedera Medical Cost Sharing Community
Sedera, Inc.
Share HealthCare
Solidarity
Unite Health Share Ministries, dba UHSM
Zion HealthShare

12

## Appendix D: Services and Pre-existing Conditions Excluded from Sharing by some HCSAs

**The following are health care services that are excluded from sharing across some of the organizations that reported data to the Division. This is not an exhaustive list.**

- Acupuncture
- ADHD treatments
- Contraception coverage
- Cosmetic surgery
- Dental coverage
- Diabetic medication and supplies
- Fertility/Infertility care
- Gender affirming care
- Maternity care - unless the mother has been a member for 12 months without changing to a lower cost program
- Medications used to support chronic or pre-existing health conditions
- Mental health treatment
- Routine and preventive care – including, but not limited to, all well-patient care and screening tests and procedures
- Speech therapy for learning impairments and speech delays
- Substance use disorder treatment

**The following are a list of conditions that some of the HCSAs reported as pre-existing and therefore ineligible for sharing, or had limitations on sharing based on the HCSA's specific guidelines. This is not an exhaustive list.**

- ALS
- Alzheimer's Disease
- Aneurysm
- Asthma
- Autism Spectrum Disorder
- Cancer
- Cerebral Palsy
- Congenital Conditions
- Congestive Heart Failure
- COPD
- Cystic Fibrosis
- Dementia
- Diabetes Type I and II
- Down's Syndrome
- Endometriosis
- Experimental treatments
- Heart Palpitations
- Hepatitis
- Hypertension
- HIV/AIDS
- Lupus
- Lyme's Disease
- Multiple Sclerosis
- Muscular Dystrophy
- Rheumatoid Arthritis
- Sickle-Cell Disease
- Sleep Apnea

13

Appendix E: 2021 Enrollment per HCSA

| Organization | Reported Enrollment in Colorado | Reported Enrollment Nationally |
|---|---|---|
| Altrua Ministries | 503 | 21,243 |
| Christian Care Ministry, dba Medi-Share | 19,307 | 442,234 |
| Christian Healthcare Ministries | 12,846 | 517,978 |
| Impact Health Sharing | 226 | 4,658 |
| Jericho Share | 2,264 | 37,755 |
| Liberty HealthShare | 6,605 | 131,117 |
| Logos Missions, Inc, dba Christian Mutual Medical Assistance | 231 | 21,077 |
| netWell | 17 | 210 |
| OneShare | 4,355 | 57,036 |
| Samaritan Ministries International | 13,792 | 358,918 |
| Sedera Medical Cost Sharing Community | 1,637 | 24,790 |
| Sedera, Inc. | 1,499 | 7,710 |
| Share HealthCare | 20 | 499 |
| Solidarity | 807 | 22,500 |
| Unite Health Share Ministries | 1,165 | 29,847 |
| Zion HealthShare | 1,733 | 24,909 |

14

Appendix F: Total Dollar Amounts of Members' Healthcare Costs and the Total Dollar Amount of Share Requests that were Eligible for Sharing

| Organization | Total dollar amount of health-care costs or services that were incurred by participants and submitted for sharing | Total dollar amount of requests for reimbursement/sharing that qualified for reimbursement/sharing |
|---|---|---|
| Altrua Ministries | $2,335,070.40 | $1,433,915.26 |
| Christian Care Ministry, dba Medi-Share | $86,870,271.20 | $25,961,518.21 |
| Christian Healthcare Ministries | $51,504,748.73 | $47,695,071.43 |
| Impact Health Sharing | $341,595.16 | $251,081.84 |
| Jericho Share | $328,951.44 | $22,509.22 |
| Liberty HealthShare | $58,335,818.36 | $25,910,523.00 |
| Logos Missions, Inc, dba Christian Mutual Medical Assistance | $564,236.16 | $492,588.08 |
| netWell | $90,673.37 | $15,650.46 |
| OneShare | $23,753,223.42 | $4,397,790.40 |
| Samaritan Ministries International | $37,779,700.00 | $16,663,089.00 |
| Sedera Medical Cost Sharing Community | $788,758.45 | $717,537.48 |
| Sedera, Inc. | $5,328,655.28 | $4,910,196.11 |
| Share HealthCare | $1,304.00 | $606.04 |
| Solidarity* | $92,221,825.00 | $36,426,000.00 |
| Unite Health Share Ministries | $93,759,962.56 | $3,512,471.60 |
| Zion HealthShare* | | $2,026,977.45 |

*These HCSAs data were excluded from the financial analysis presented in this report

15



# Health Care Sharing Plans and Arrangements in Colorado

Colorado House Bill 22-1269 2022 report

October 2023

EXHIBIT

**2.9**

Ex. 2.9, p. 1 of 24

# Table of Contents

| | |
|---|---|
| Table of Contents | 2 |
| Background | 3 |
| Overview of Data Collection Efforts | 3 |
| Summary of Findings | 4 |
|     Membership | 4 |
|     National HCSA Activity | 4 |
|     Financial Information | 5 |
|     Marketing Efforts and Use of Producers | 7 |
| Data Limitations | 7 |
| Questions or Concerns | 8 |
| Next Steps | 8 |
| Appendices | 9 |
|     Appendix A: Associated Legislation, Regulation, and Division Information | 9 |
|     Appendix B: Regulatory Definitions of Terms Related to HCSA Reporting | 10 |
|     Appendix C: List of Health Care Sharing Arrangements Operating in Colorado | 12 |
|     Appendix D: Services and Pre-existing Conditions Excluded from Sharing by Some HCSAs | 12 |
|     Appendix E: 2022 Enrollment Data per HCSA | 14 |
|     Appendix F: 2022 Financial Information Table 1 | 15 |
|     Appendix G: 2022 Financial Information Table 2 | 18 |
|     Appendix H: 2022 Data on Denials and Appeals | 20 |
|     Appendix I: Additional 2022 Data from the Health Care Sharing Plan Reporting Template | 22 |
|     Appendix J: Number of HCSAs Operating in each State | 24 |

## Background

The 73rd Colorado General Assembly passed House Bill 22-1269 ("HB22-1269") requiring Health Care Sharing Ministries, Plans, or Arrangements ("HCSAs") to report data annually to the Division of Insurance ("Division") to collect, and publish information about the HCSAs operating in Colorado. HCSAs report data to the Division about annual enrollment and financial data, use of licensed producers, HCSA member guidelines, and marketing materials.[1] These data reporting efforts are intended to increase transparency about HCSAs for Colorado consumers.

Emergency Regulation 22-E-20 defines a "Health care sharing plan" or "health care sharing arrangement" or "plan" or "arrangement" or "HCSPA" as, "any organization that offers or markets products to facilitate payment or reimbursement of health-care costs or services for one (1) or more residents of Colorado. This does not include direct primary care agreements as defined in § 6-23-101, C.R.S.; consumer payment plans offered directly between a provider and patient (or patient's responsible party); businesses used to facilitate the plan's operations such as reimbursement handling, cost containment vendors, data processing; and crowdfunded sources for the purposes of paying for and/or reimbursement of health care services."[2] Colorado law requires all HCSAs to report data to the Division annually.

## Overview of Data Collection Efforts

To collect data from HCSAs offering plans or arrangements in Colorado in 2022, the Division used the infrastructure implemented for the 2021 data collection efforts. This includes: Emergency Regulation 22-E-20, a data reporting template, and a dedicated HCSA data collection webpage to meet the requirements of Colorado statute.[3] The feedback provided by consumer advocates, HCSAs, and members of the public helped refine the final emergency regulation and data reporting template.

By March 1, 2023, fifteen HCSAs submitted data or requested an extension in order to fulfill reporting requirements for the 2022 calendar year. Over the following months, one additional HCSA submitted 2022 data, with sixteen HCSAs in total reporting 2022 data to the Division ahead of the drafting of this report. Division staff reviewed all submissions for completeness, followed up with each HCSA if materials or data elements were missing, and conducted specific follow up as needed.

Two HCSAs that had been included in the Division's 2021 report did not submit their 2022 data in time for inclusion in this report. These two organizations accounted for nearly 19% of the 2021 Colorado HCSA membership and nearly 28% of the total aggregate health care costs eligible for sharing, respectively. Given the potential statistical impact these missing HCSAs' data could have on comparing data from one year to the next, the Division cautions against

---

[1] For a full list of all information required to be reported to the Division annually by HCSAs see § 10-16-107.4(1), C.R.S.

[2] Emergency Regulation 22-E-20's purpose is to establish the data reporting requirements applicable to all HCSAs offering or that intend to offer plans or arrangements to facilitate payment or reimbursement of health-care costs or services for residents of Colorado.

[3] Links to these items can be found in the Appendices below.

3

comparing the summary data provided in the 2022 report to that provided in the 2021 report. No information about or data from these two HCSAs were included in this 2022 report. The Division is working with both of these HCSAs to finalize their 2022 submissions and will post their non-confidential submission materials to the Division's website but does not intend to update this report with those data.

# Summary of Findings

Sixteen HCSAs submitted data to the Division ahead of the publication of this report. The Division has identified several inconsistencies in data reporting and is working to resolve such inconsistencies for future reports. For the purposes of this report, where inconsistencies in the data are present the Division has presented a subset of data in the summary sections to include only those from HCSAs that reported in accordance with Emergency Regulation 22-E-20.

## Membership

In 2022, sixteen HCSAs reported a total membership of 58,616 Coloradans and 1,265,549 members nationally. Colorado HCSA membership numbers represent over 4% of national HCSA enrollment of these HCSAs. In comparison, Colorado's 2020 census population is 1.7% of the national population.[4] Actual enrollment in HCSAs in Colorado is likely higher than reported here as at least 2 more HCSAs were likely offering products during 2022.[5]

Five of the sixteen HCSAs reported Colorado employer groups participating in sharing arrangements in 2022 and three additional HCSAs included marketing and communication materials that encourage employers to offer their HCSA products to employees and/or to pay a portion of the employees' monthly required membership dues or share amounts. Of the five HCSAs that reported data on employer participation, the range of members participating in a HCSA per employer is 1 to 80 members, with an aggregate total of 871 members across all five HCSAs.

## National HCSA Activity

Nine of the sixteen HCSAs offered products in all fifty states, while the other seven HCSAs operated in a limited number of states.

The following map shows the number of HCSAs operating in each state out of the sixteen HCSAs that reported data to the Division. If a HCSA has active members in a state but does not accept new members in that state, they are still included in this map. Four HCSAs noted that they had active members in certain states but were no longer accepting new members in Illinois, New Mexico, New York, Pennsylvania, Vermont, and Washington. Further, the map does not include a count of all possible HCSAs operating in each state as this map is limited to only the HCSAs that submitted data to the Division and excludes those HCSAs who did not submit data

---

[4] United States Census Bureau. [Profile United States 2020 census data]. Retrieved from https://data.census.gov/profile?g=0100000US
[5] Two (2) HCSAs that had been included in the Division's 2021 report did not submit their 2022 data in time for inclusion in this report.

4

in time for the publication of the report. For the number of HCSAs operating in each state please refer to Appendix J.



## Financial Information

There is variability across the 16 HCSAs regarding the financial information submitted, making comparisons difficult. For example, some data were reported at a national level instead of the state level and some data were not reported. The Division is working with all HCSAs regarding future data submissions to ensure consistency and alignment with regulatory definitions.

HCSAs are required to report the "Total amount of fees, dues, shares, contributions, or other payments collected from individuals, Colorado employer groups, or others who participated in the [HCSA's] product." Fourteen[6] HCSAs collected $78,607,499.89 in total fees, dues, shares, contributions, and other payments from members in 2022.

HCSAs are also required to report on the dollar amount of healthcare costs submitted for their members' sharing requests, the dollar amount of those healthcare costs that are determined eligible for sharing based on their specific member guidelines, and the dollar amount paid or shared to cover healthcare expenses the HCSA determines are eligible for sharing. A total of

---

[6] One HCSA reported national data instead of the required Colorado member specific data for "Total dollar amount of health-care costs or services that were incurred by the participant and submitted by or on behalf of the participant for sharing". Another HCSA reported $0 for the "Total amount of fees, dues, shares, contributions, or other payments collected from individuals, Colorado employer groups, or others who participated in the product." Data from both these HCSAs were excluded from the financial analysis.

$180,086,114.27 in healthcare costs were submitted for sharing by members of fourteen HCSAs.[7] Many of the HCSAs note that the dollar amount of healthcare costs or services submitted for sharing includes duplicate charges, ineligible charges based on the HCSA's sharing guidelines (for example a member may receive a single itemized bill from a provider with both eligible and ineligible charges but the full bill is submitted as part of the sharing request), discounts that the HCSAs negotiated on their members' behalf, and the members' agreed-upon portions of medical bills. Once those ineligible amounts were deducted, the HCSAs reported that $70,715,150.25 of members' total 2022 health care costs were determined eligible for sharing by the HCSAs. Of the over $70 million determined by the HCSAs to be eligible for sharing $65,920,503.98 in healthcare costs or services were paid by the HCSAs by December 31, 2022.

Actual health care costs of Colorado members were likely different than the HCSAs reported as some bills/share requests do not include costs for benefits excluded from sharing. Based on the Division's review of each HCSA's member guidelines many of the HCSAs reported excluding benefits such as contraception coverage, mental health services, alcohol use disorder treatments, Attention-deficit/hyperactivity disorder treatments, prescription drugs for chronic conditions, abortion with no exceptions for rape or safety of the pregnant person, and some pre-existing conditions. Many of the HCSAs also reported excluding or placing limitations on maternity care unless the pregnant person had been a member of the HCSA's highest membership tier for some previous amount of time (e.g., maternity care is covered once the pregnant person has been a member for 12 months without changing to a lower cost program).

The guidelines of all sixteen HCSAs explicitly state that members must use or are obligated to pursue[8] other payment options available to the member before submitting a share request otherwise the member's healthcare costs are not eligible for sharing. This includes using insurance, Medicare, Medicaid, Veterans Administration, Tricare, private/public grants, crowdfunding, and any liable third party (in the event of an accident) before submitting a share request. From one HCSA's member guidelines, "If the member fails to request for and or accept sources of payment available, the amount that could have been paid through other sources is not available for sharing." Two HCSAs require or suggest that members first request providers and hospitals to reduce or write off eligible health care bills (sometimes referred to as a "self-pay" discount). Eight HCSAs also state or imply that members must first request charity care and financial support from local governments and consumer support organizations in paying the

---

[7] Two HCSAs were excluded from analyses presented in the "Financial Information" section of this report. Please see Footnote 5 for more details.

[8] An example of "obligation to pursue" other payment options is copied from one HSCAs member guidelines with the name of the HCSA removed from the quote, "it is the obligation of the member to pursue payment from any other responsible payer for such medical expenses submitted to [HCSA] for assistance. Needs do not qualify for sharing to the extent that they are discountable by the health care provider or payable by any other source, whether private, governmental, or institutional. If a governmental, insurance, religious, liable third party, fraternal organization or any other financial assistance source will pay any portion of the qualifying medical bill, that amount will offset any unshared and/or shared amounts applied to the member's needs up to the total amount of the need. If the Sharing Member refuses to accept such assistance, then that portion of the medical need also becomes ineligible for sharing."

6

member's health care bills by including language such as, "Needs do not qualify for sharing to the extent that they are discountable by the health care provider or payable by any other source, whether private, governmental, or institutional." This means that medical costs submitted for sharing by a member (and also what is later submitted to the Division through the data reporting template) are likely different from the total health care cost to provide those services.

## Marketing Efforts and Use of Producers

Eight of the sixteen HCSAs reported an association with a total of 434 producers[9] to enroll 11,041 members in these eight HCSAs. The range of Colorado membership enrollment via producers in the eight HCSAs varies from 3 members enrolled through a producer to 6,756 members enrolled through a producer. HCSAs are not required to report the names, business, or license numbers of individual producers so the count of 434 producers across eight HCSAs is not a unique count of producers and likely includes double counting.

Four of the eight HCSAs that reported an association with producers also reported on the "total commission, fees, or remuneration paid in [2022] to producers for: marketing, promoting, or enrolling Colorado participants". Producers were paid $1,865,132.64 in 2022 by the four HCSAs.

The Division noted inconsistencies in how some HCSAs reported on the use of producers to enroll members in HCSAs and on the commissions, fees, or remunerations paid to producers. Some of the HCSAs noted that they cannot know if their subcontractors or third-party administrators follow the definition of a producer or not, so they are unable to report on these required data elements. It is possible that more than the eight HCSAs noted above work with producers to enroll members and that more than four HCSAs paid producers for marketing, promoting, and enrolling members. The Division is working with all HCSAs regarding future data submissions.

Fifteen HCSAs used social media to communicate to members and to market their products. Non-confidential marketing materials submitted by each HCSA, which include examples of social media posts, will be posted in the coming months to the Division's website.

## Data Limitations

The data submitted to the Division over the past few months was the second collection of HCSA data in Colorado. Not all HCSAs submitted data following the definitions laid out in Emergency Regulation 22-E-20 or on the reporting template. Further, a few HCSAs failed to report pursuant to the required deadlines for this second data collection effort. The Division will be providing

---

[9] For the purposes of HB22-1269's data collection efforts and this report, "Insurance producer" or "producer" shall have the same meaning as found at § 10-2-103(6), C.R.S., with the exception that for the purposes of this regulation it does not include § 10-2-103(6)(b), C.R.S.  This definition is from § 10–2-103(6), C.R.S. and Emergency Regulation 22-E-20.

7

HCSAs with additional information and optional training to ensure more consistent reporting in the future.

The Division does not collect demographic information about HCSA members; the types of employers who help cover an HCSA membership for their employees; or the names of producers used to enroll members into HCSAs.

## Questions or Concerns

If you have a question about your health care sharing arrangement or health insurance coverage you can contact the Division's Consumer Services team. The Consumer Services team is available to answer questions or respond via phone and/or our consumer portal. More information about filing a complaint can be found on the Division's website, emailing DORA_Insurance@state.co.us, or calling 303-894-7490 (within the Denver Metro area) or 800-930-3745 (outside the Denver Metro area).

## Next Steps

Completion of 2022 data submissions is expected in the coming months. The Division is not anticipating updates to this 2022 report. Finalized submission materials, excluding confidential information, will be posted to the Division's website for interested parties to download. Annually, HCSA data submissions are due to the Division on March 1st of each year with the associated report published by October 1st of the same year.

If there is evidence that a HCSA is operating in Colorado but is not included in this report, please contact Leilani Russell (Leilani.Russell@state.co.us).

Anyone interested in participating in the regulatory process should sign up for notifications from the Division and/or check the Division's website.

8

# Appendices

## Appendix A: Associated Legislation, Regulation, and Division Information

- Colorado House Bill 22-1269
- Division of Insurance Emergency Regulation 22-E-20
- The Division's consumer complaint portal and information on how to ask a question or file a complaint
- The Division's web page dedicated to House Bill 22-1269

2022 Reporting Template: The annual reporting template all HCSAs are required to submit can be downloaded from the Division's website: https://docs.google.com/spreadsheets/d/1KW_s7tv91SlP-I327ttx1_Xja2w86Ui-/edit#gid=876537254

About the Division of Insurance: The Colorado Division of Insurance, part of the Department of Regulatory Agencies (DORA), regulates the insurance industry and assists consumers and other stakeholders with insurance issues. Visit doi.colorado.gov for more information or call 303-894-7499 / toll free 800-930-3745.

About DORA: DORA is dedicated to preserving the integrity of the marketplace and is committed to promoting a fair and competitive business environment in Colorado. Consumer protection is our mission. Visit dora.colorado.gov for more information or call 303-894-7855 / toll free 800-886-7675.

9

## Appendix B: Regulatory Definitions of Terms Related to HCSA Reporting

The following definitions related to Health Care Sharing Plans and Arrangements can be found on Emergency Regulation 22-E-20 and are used by the HCSAs to report to the Division.

"Administrative expenses": shall mean costs incurred to operate and support the functioning of the health care sharing plan or arrangement. This includes but is not limited to bank fees, staff salaries, data processing, sales, and marketing efforts. This includes fees, commissions, and remuneration paid to contractors that acted on behalf of the health care sharing plan or arrangement to facilitate administrative expenses.

"Coloradans": shall mean residents of Colorado during the reporting period.

"Health care costs" or "health care expenses": shall mean any amount billed by a health care provider for health care services or related products or by a pharmacy.

"Health care provider": means any physician, dentist, optometrist, anesthesiologist, hospital, X ray, laboratory and ambulance service, or other person who is licensed or otherwise authorized in Colorado to furnish health-care services, as defined in § 10-16-102(56) of the Colorado Revised Statutes (C.R.S.).

"Health care services": means any services included in or incidental to the furnishing of medical,
behavioral, mental health, or substance use disorder; dental, or optometric care; hospitalization; or nursing home care to an individual, as well as the furnishing to any person of any other services for the purpose of preventing, alleviating, curing, or healing human physical illness or injury, or behavioral, mental health, or substance use disorder. "Health-care services" includes the rendering of the services through the use of telehealth, as defined in § 10-16-123 (4)(e), C.R.S.

"Health Care Sharing Plan or Health Care Sharing Arrangement" or "plan" or "arrangement" or "HCSA": shall mean any person not authorized to sell insurance in Colorado but that offers or intends to offer a plan or arrangement in Colorado to facilitate payment or reimbursement of Colorado residents' health-care costs or services. This does not include direct primary care agreements as defined in § 6-23-101, C.R.S.; consumer payment plans offered directly between a provider and patient (or patient's responsible party); businesses used to facilitate the plan's operations such as reimbursement handling, cost containment vendors, data processing; and crowdfunded sources for the purposes of paying for and/or reimbursement of health care services.

"Health Care Sharing Plan Reporting" or "HCSPR": shall mean the report required to be filed with the Commissioner pursuant to § 10-16-107.4(1), C.R.S, as interpreted by Emergency Regulation 22-E-20.

10

"Health Care Sharing Plan Reporting template" or "template": shall mean the data reporting template created and distributed by the Division for the purposes of collecting data per § 10-16-107.4, C.R.S., available on the Division's website.

"Insurance producer" or "producer": shall have the same meaning as found at § 10-2-103(6),
C.R.S., with the exception that it does not include § 10-2-103(6)(b), C.R.S.

"Product(s)": shall mean the services covered as a package under a membership plan, tier, or level.

"Program expenses": shall mean any service by the HCSPA or its contractors that, while not direct medical care, contributes to the care and overall experiences of HCSPA's participants. This includes but is not limited to coaching and wellness programs, care navigation, care coordination, medical review, quality improvement efforts, cost containment, reimbursement handling, and bill negotiations. This includes fees, commissions, and remuneration paid to contractors that acted on behalf of the HCSA to facilitate program expenses.

11

## Appendix C: List of Health Care Sharing Arrangements Operating in Colorado

List of HCSAs that offered plans or arrangements in Colorado in 2022
and reported data to the Division

Altrua Ministries

Christian Care Ministry, dba Medi-Share

Impact Health Sharing

Jericho Share

Knew Health

Liberty HealthShare

Logos Missions, Inc, dba Christian Mutual Medical Assistance

OneShare

Samaritan Ministries International

Sedera Medical Cost Sharing Community

Sedera, Inc.

Share HealthCare

Solidarity

Unite Health Share Ministries, dba UHSM

Universal Health Fellowship

Zion HealthShare

## Appendix D: Services and Pre-existing Conditions Excluded from Sharing by Some HCSAs

For more information about exclusion or coverage of services for any particular HCSA, contact that HCSA directly and review their specific membership guidelines.

The following are health care services that are excluded from sharing across some of the organizations that reported data to the Division. This is not an exhaustive list.

- Acupuncture
- ADHD treatments
- Contraception coverage
- Cosmetic surgery
- Dental coverage
- Diabetic medication and supplies
- Fertility/Infertility care
- Gender affirming care
- Maternity care - unless the mother has been a member for 12 months without changing to a lower cost program
- Medications used to support chronic or pre-existing health conditions
- Mental health treatment
- Routine and preventive care – including, but not limited to, all well-patient care and screening tests and procedures
- Speech therapy for learning impairments and speech delays
- Substance use disorder treatment

The following are a list of conditions that some of the HCSAs reported as pre-existing and therefore ineligible for sharing, or had limitations on sharing based on the HCSA's specific guidelines. This is not an exhaustive list.

- ALS
- Alzheimer's Disease
- Aneurysm
- Asthma
- Autism Spectrum Disorder
- Cancer
- Cerebral Palsy
- Congenital Conditions
- Congestive Heart Failure
- COPD
- Cystic Fibrosis
- Dementia
- Diabetes Type I and II
- Down's Syndrome
- Endometriosis
- Experimental treatments
- Heart Palpitations
- Hepatitis
- Hypertension
- HIV/AIDS
- Lupus
- Lyme's Disease
- Multiple Sclerosis
- Muscular Dystrophy
- Rheumatoid Arthritis
- Sickle-Cell Disease
- Sleep Apnea

13

Appendix E: 2022 Enrollment Data per HCSA

| Organization | Number of Colorado members enrolled | Number of members enrolled nationally | Number of Coloradan households participating | Number of members participating through an employer | Number of Colorado members enrolled through a producer |
|---|---|---|---|---|---|
| Altrua Ministries | 722 | 28,808 | 417 | - | 350 |
| Christian Care Ministry, dba Medi-Share | 18,462 | 432,684 | 7,231 | 230 | 70 |
| Impact Health Sharing | 260 | 7,208 | 145 | - | 0 |
| Jericho Share | 6,756 | 124,991 | 4,105 | - | 6,756 |
| Knew Health | 47 | 1,879 | 32 | - | 0 |
| Liberty HealthShare | 4,610 | 82,975 | 1,768 | 7 | 0 |
| Logos Missions, Inc, dba Christian Mutual Medical Assistance | 196 | 22,467 | - | - | 0 |
| OneShare | 2,691 | 35,743 | 1,556 | - | 568 |
| Samaritan Ministries International | 14,017 | 375,608 | 3,891 | 171 | 0 |
| Sedera Medical Cost Sharing Community | 2,439 | 36,208 | 1,125 | 376 | 69 |
| Sedera, Inc. | 1,271 | 7,199 | 663 | 87 | 3 |
| Share HealthCare | 34 | 1,365 | 18 | - | 0 |
| Solidarity | 699 | 20,000 | 279 | - | 0 |
| Unite Health Share Ministries[10] | | | | | |
| Universal Health Fellowship | 612 | 4,970 | 418 | - | 612 |
| Zion HealthShare | 4,739 | 56,223 | 2,390 | - | 2,613 |

Please review the Membership and National HCSA Activity sections in this report for additional context about these data.

---

[10] Unite Health Share Ministries (UHSM) requested that data supplied on tabs 2 and 3 of the reporting template be confidential.

### Appendix F: 2022 Financial Information Table 1

For HCSAs with different percentages reported across their multiple products/programs the high and low range of percentages submitted by the HCSA are displayed in this table.

Please review the financial summary included in this report for additional context about the financial data reported to the Division.

| Organization | Total amount of fees, dues, shares, contributions, or other payments collected from individuals, Colorado employer groups, or others who participated in the product | The percentage of fees, dues, shares, contributions, or other payments from Colorado participants in this product retained by the plan or arrangement for administrative expenses | The percentage of fees, dues, contributions, or other payments from Colorado participants in this product retained by the plan or arrangement for program expenses | Total dollar amount of health-care costs or services that were incurred by participants and submitted for sharing | Total dollar amount of requests for reimbursement/ sharing that qualified for reimbursement/ sharing |
|---|---|---|---|---|---|
| Altrua Ministries[11] | $0 | 9% | 24% | $1,153,495.64 | $720,936.37 |
| Christian Care Ministry, dba Medi-Share | $26,724,888.00 | 0.4 - 2.0% | 15.1% - 25.9% | $75,932,255.00 | $23,482,794.00 |
| Impact Health Sharing | $445,763.00 | 34.69% | 16.14% | $359,166.49 | $203,593.33 |
| Jericho Share | $2,647,683.50 | 0% - 69% | 0% - 82% | $874,266.22 | $213,136.78 |
| Knew Health | $96,405.29 | 33% | 30% | $41,894.66 | $31,414.69 |
| Liberty HealthShare | $13,372,939.00 | 12% of monthly contribution is used for administrative costs to be used at the discretion of the ministry.<br><br>For new members, the initial 2 months of a members contribution, in addition to the one-time application amount of | 5% | $32,462,430.28 | $13,324,431.73 |

[11]Data from this HCSA were excluded from the financial analysis presented in this report due to inconsistencies in "Total amount of fees, dues, shares, contributions, or other payments collected from individuals, Colorado employer groups, or others who participated in the product" submitted to the Division.

15

| Organization | Total amount of fees, dues, shares, contributions, or other payments collected from individuals, Colorado employer groups, or others who participated in the product | The percentage of fees, dues, shares, contributions, or other payments from Colorado participants in this product retained by the plan or arrangement for administrative expenses | The percentage of fees, dues, contributions, or other payments from Colorado participants in this product retained by the plan or arrangement for program expenses | Total dollar amount of health-care costs or services that were incurred by participants and submitted for sharing | Total dollar amount of requests for reimbursement/ sharing that qualified for reimbursement/ sharing |
|---|---|---|---|---|---|
| | | $135 and annual renewal dues of $75 for existing members are utilized for administrative expenses. | | | |
| Logos Missions, Inc, dba Christian Mutual Medical Assistance | $206,335.00 | 0% - 9.5% | 0% - 62.85% | $227,677.84 | $214,349.64 |
| OneShare | $5,662,877.28 | 18% | 10% | $13,439,548.29 | $7,794,255.87 |
| Samaritan Ministries International | $15,820,661.00 | 1% - 3.36% | 3 - 9.58% | $38,112,529.00 | $16,196,507.00 |
| Sedera Medical Cost Sharing Community | $4,295,315.42 | New Member (first 3 months): Admin fees: 62% Member Sharing: 15% Existing member (after first 3 months): Admin: 12% Member Sharing: 65% | New Member (first 3 months): Program Fees: 23% Existing member (after first 3 months): Program Fees: 23% | $4,390,024.03 | $3,565,006.65 |
| Sedera, Inc. | $1,348,821.33 | New Member (first 3 months): Admin fees: 62% Member Sharing: 15% Existing member (after first 3 months): Admin: 12% Member Sharing: 65% | New Member (first 3 months): Program Fees: 23% Existing member (after first 3 months): Program Fees: 23% | $2,306,411.30 | $1,582,592.21 |
| Share HealthCare | $15,663.11 | 53.34% | 46.65% | $49,113.09 | $11,059.66 |

16

| Organization | Total amount of fees, dues, shares, contributions, or other payments collected from individuals, Colorado employer groups, or others who participated in the product | The percentage of fees, dues, shares, contributions, or other payments from Colorado participants in this product retained by the plan or arrangement for administrative expenses | The percentage of fees, dues, contributions, or other payments from Colorado participants in this product retained by the plan or arrangement for program expenses | Total dollar amount of health-care costs or services that were incurred by participants and submitted for sharing | Total dollar amount of requests for reimbursement/ sharing that qualified for reimbursement/ sharing |
|---|---|---|---|---|---|
| Solidarity | $1,106,939.00 | 8% | 32% | $3,431,174.13 | $1,010,839.97 |
| Unite Health Share Ministries[12,13] | | | | | |
| Universal Health Fellowship | $1,176,737.23 | 1% - 4% | 19% - 60% | $2,052,707.35 | $154,153.11 |
| Zion HealthShare | $5,686,471.73 | 3.17% | 9.28% | $6,406,916.59 | $2,931,015.61 |

[12] These HCSA's data were excluded from the financial analysis presented in this report as the HCSA reported national data instead of the required Colorado member specific data for "Total dollar amount of health-care costs or services that were incurred by the participant and submitted by or on behalf of the participant for sharing"
[13] Unite Health Share Ministries (UHSM) requested that data supplied on tabs 2 and 3 of the reporting template be confidential.

Appendix G: 2022 Financial Information Table 2

| Organization | Total dollar amount of payments made to providers for Colorado participants' health care costs and services | Total dollar amount of share requests or reimbursements made to Colorado participants for health care costs or services | Total amount of Colorado participants' health-care costs and services submitted in 2022 that qualify for reimbursement/ sharing pursuant to the HCSA's criteria but that were not paid out, shared, or reimbursed by 12/31/2022[14] |
|---|---|---|---|
| Altrua Ministries | $522,161.37 | $82,382.15 | $18,129.52 |
| Christian Care Ministry, dba Medi-Share | $22,966,249.00 | $516,543.00 | $2,115,002.00 |
| Impact Health Sharing | $79,357.73 | $59,435.67 | $10,016.67 |
| Jericho Share | $213,136.78 | | $5,769.29 |
| Knew Health | $0.00 | $21,907.39 | $7,906.35 |
| Liberty HealthShare | $5,178,331.80 | $7,080,059.00 | $594,810.88 |
| Logos Missions, Inc, dba Christian Mutual Medical Assistance | $0.00 | $54,552.44 | $2,628.70 |
| OneShare | $4,280,057.80 | $109,766.16 | $198,352.21 |
| Samaritan Ministries International | $229,546.00 | $15,593,276.00 | $2,535,388.00 |
| Sedera Medical Cost Sharing Community | $3,097,062.00 | $1,179,072.66 | $254,514.46 |
| Sedera, Inc. | $650,263.00 | $722,471.02 | $52,565.82 |
| Share HealthCare | $7,991.23 | $3,068.43 | $0.00 |
| Solidarity | $657,056.20 | $136,131.95 | _[15] |
| Unite Health Share Ministries[16] | | | |
| Universal Health Fellowship | $15,711.72 | $138,441.39 | $3,750.91 |

[14] The values reported in this column exclude any amounts that the participants incurring the health-care costs or services must pay before share requests are approved or reimbursements received under the plan or arrangement

[15] The HCSA noted that they, "are working to provide this data and will provide this in a supplemental communication." No additional data were submitted by the HCSA ahead of the publication of this report

[16] Unite Health Share Ministries (UHSM) requested that data supplied on tabs 2 and 3 of the reporting template be confidential.

18

| Organization | Total dollar amount of payments made to providers for Colorado participants' health care costs and services | Total dollar amount of share requests or reimbursements made to Colorado participants for health care costs or services | Total amount of Colorado participants' health-care costs and services submitted in 2022 that qualify for reimbursement/ sharing pursuant to the HCSA's criteria but that were not paid out, shared, or reimbursed by 12/31/2022[14] |
|---|---|---|---|
| Zion HealthShare | | $2,931,015.61 | $0.00 |

19

## Appendix H: 2022 Data on Denials and Appeals

For HCSAs with different percentages reported across their multiple products/programs the high and low range of percentages submitted by the HCSA are displayed in this table.

| Organization | Total number of requests for reimbursement that should have been eligible according to the organization's guidelines but were nonetheless "denied" (not shared) | Total number of requests for reimbursement that were "denied" (not shared) because they were not eligible for sharing according to the organization's guidelines | Total number of requests by or on behalf of the Colorado participants' for reimbursement of healthcare costs or services incurred by the participant | Total number of appeals of requests for reimbursement that were "denied" (not shared) for Colorado participants' incurred health-care costs or services | Percentage of total number of requests denied compared to the total number of Colorado participants reimbursement requests submitted | Percentage of total number of requests denied compared to the total number of appeals for reimbursement that were "denied" (not shared) for Colorado participants |
|---|---|---|---|---|---|---|
| Altrua Ministries | 0 | 435 | 2,093 | 19 | 0% - 59% | 0% - 11% |
| Christian Care Ministry, dba Medi-Share | 0 | 8,406 | 48,331 | 3 | 4.09% - 18.11% | 0% - 0.04% |
| Impact Health Sharing | 0 | 206 | 929 | 0 | 22% | 0% |
| Jericho Share | 0 | 1,248 | 3,356 | 0 | 0% - 100% | 0% |
| Knew Health | 0 | 2 | 56 | 0 | 0% - 9% | 0% |
| Liberty HealthShare | 0 | 2,907 | 20,262 | 2 | 14.35% | 0.07% |
| Logos Missions, Inc, dba Christian Mutual Medical Assistance | 0 | 22 | 142 | 0 | 0% - 17% | 0% |
| OneShare | 0 | 2,267 | 8,499 | 7 | 26.67% | 0.31% |
| Samaritan Ministries International | 0 | 920 | 17,027 | 2 | 4.98% - 8.41% | 0% - 18% |
| Sedera Medical Cost Sharing Community | 0 | 132 | 2,664 | 0 | 4% - 6% | 0% - 2% |
| Sedera, Inc. | 0 | 63 | 1,204 | 0 | 0% - 5% | 0% |
| Share HealthCare | 0 | 0 | 6 | 0 | 0% | 0% |
| Solidarity | 0 | 731 | 3,844 | 0 | 19% | "Unavailable" |

| Organization | Total number of requests for reimbursement that should have been eligible according to the organization's guidelines but were nonetheless "denied" (not shared) | Total number of requests for reimbursement that were "denied" (not shared) because they were not eligible for sharing according to the organization's guidelines | Total number of requests by or on behalf of the Colorado participants' for reimbursement of healthcare costs or services incurred by the participant | Total number of appeals of requests for reimbursement that were "denied" (not shared) for Colorado participants' incurred health-care costs or services | Percentage of total number of requests denied compared to the total number of Colorado participants reimbursement requests submitted | Percentage of total number of requests denied compared to the total number of appeals for reimbursement that were "denied" (not shared) for Colorado participants |
|---|---|---|---|---|---|---|
| Unite Health Share Ministries[17] | | | | | | |
| Universal Health Fellowship | 0 | 699 | 1,638 | 3 | 0% - 55% | 0% - 36% |
| Zion HealthShare | 0 | 47 | 661 | 5 | 5% - 9% | 10% - 12% |

---

[17] Unite Health Share Ministries (UHSM) requested that data supplied on tabs 2 and 3 of the reporting template be confidential.

Appendix I: Additional 2022 Data from the Health Care Sharing Plan Reporting Template

| Organization | The total number of employer groups in Colorado that participated in this product | Number of contracts entered into with health care service providers providing services for Colorado participants for this product | Estimated number of individual plan/arrangement participants anticipated in Colorado in 2023 | Estimated number of households plan/arrangement participants anticipated in Colorado in 2023 | Estimated number of employer groups plan/arrangement participants anticipated in Colorado in 2023 | Estimated number of employee plan/arrangement participants anticipated in Colorado in 2023 |
|---|---|---|---|---|---|---|
| Altrua Ministries | 0 | 0 | 451 | 252 | 0 | 0 |
| Christian Care Ministry, dba Medi-Share | 36 | 0 | 15,965 | 6,507 | 39 | 248 |
| Impact Health Sharing | 0 | 2 | 359 | 163 | 5 | 0 |
| Jericho Share | - | 1 | 7,505 | 4,578 | - | - |
| Knew Health | | | 60 | 44 | | |
| Liberty HealthShare | 3 | 133 | 3,524 | 1,589 | 3 | 7 |
| Logos Missions, Inc, dba Christian Mutual Medical Assistance | | | 230 | - | | |
| OneShare | | | 2,667 | 1,442 | | |
| Samaritan Ministries International | 15 | | 11,097 | 3,049 | 13 | 152 |
| Sedera Medical Cost Sharing Community | 84 | 1 | 2,012 | 928 | 69 | 311 |
| Sedera, Inc. | 1 | 1 | 1,049 | 547 | 1 | 72 |
| Share HealthCare | | | 58 | 30 | | |
| Solidarity | | | 800-1000 | 350-400 | | |
| Unite Health Share Ministries[18] | | | | | | |
| Universal Health Fellowship | | | 650 | 450 | | |

---

[18] Unite Health Share Ministries (UHSM) requested that data supplied on tabs 2 and 3 of the reporting template be confidential.

22

| Organization | The total number of employer groups in Colorado that participated in this product | Number of contracts entered into with health care service providers providing services for Colorado participants for this product | Estimated number of individual plan/arrangement participants anticipated in Colorado in 2023 | Estimated number of households plan/arrangement participants anticipated in Colorado in 2023 | Estimated number of employer groups plan/arrangement participants anticipated in Colorado in 2023 | Estimated number of employee plan/arrangement participants anticipated in Colorado in 2023 |
|---|---|---|---|---|---|---|
| Zion HealthShare | | | 5,000 | 2,600 | | |

23

Appendix J: Number of HCSAs Operating in each State

| State | Number of HCSAs Operating in 2022 | State | Number of HCSAs Operating in 2022 | State | Number of HCSAs Operating in 2022 |
|---|---|---|---|---|---|
| Alabama | 16 | Louisiana | 16 | Ohio | 15 |
| Alaska | 14 | Maine | 15 | Oklahoma | 15 |
| Arizona | 16 | Maryland | 12 | Oregon | 14 |
| Arkansas | 16 | Massachusetts | 14 | Pennsylvania | 14 |
| California | 16 | Michigan | 16 | Rhode Island | 14 |
| Colorado | 16 | Minnesota | 15 | South Carolina | 16 |
| Connecticut | 15 | Mississippi | 16 | South Dakota | 16 |
| Delaware | 16 | Missouri | 15 | Tennessee | 16 |
| Florida | 16 | Montana | 14 | Texas | 16 |
| Georgia | 16 | Nebraska | 16 | Utah | 16 |
| Hawaii | 13 | Nevada | 15 | Vermont | 11 |
| Idaho | 16 | New Hampshire | 15 | Virginia | 16 |
| Illinois | 15 | New Jersey | 14 | Washington | 12 |
| Indiana | 16 | New Mexico | 15 | West Virginia | 16 |
| Iowa | 15 | New York | 15 | Wisconsin | 16 |
| Kansas | 16 | North Carolina | 16 | Wyoming | 16 |
| Kentucky | 15 | North Dakota | 15 | | |

**ROB WALDO - August 28, 2024**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-01386-GPG-STV

ALLIANCE OF HEALTH CARE SHARING MINISTRIES

        Plaintiff,

vs.

MICHAEL CONWAY, in his official capacity as
Commissioner of the Colorado Division of Insurance,

        Defendant.

_____

VIDEOCONFERENCE AND RULE 30(b)(6) DEPOSITION OF

SAMARITAN MINISTRIES INTERNATIONAL

REPRESENTATIVE ROB WALDO

_____

        PURSUANT TO NOTICE, the above-entitled
videoconference (Zoom) deposition was taken on behalf
of the Defendant on Wednesday, August 28, 2024, at 9:01
a.m., before Jana Mackelprang, Certified Realtime
Reporter, Registered Professional Reporter, and Notary
Public.

**CALDERWOOD-MACKELPRANG, INC.**
**(303) 477-3500**

EXHIBIT
**3**
Ex. 3, p. 1 of 3

**ROB WALDO - August 28, 2024**

1  intrusiveness if it's the same vendors that you're

2  disclosing?

3      A.    We would state that Colorado DOI can go

4  look at our 990.

5      Q.    Has Samaritan ever encouraged their

6  members to contact members of Congress to remove the

7  third-party vendor disclosure requirement in the Form

8  990?

9      A.    Not to my awareness.

10      Q.    Has Samaritan ever supported legislation

11  at the U.S. Congress that would remove the requirement

12  to disclose third-party vendors in the Form 990?

13      A.    Not to my awareness.

14      Q.    Has any third party that Samaritan has

15  listed as a third-party vendor in Colorado's disclosure

16  template ceased working in a business relationship with

17  Samaritan due to its inclusion on the reporting

18  template?

19      A.    I will directly answer your question, but

20  I'd first like to provide a context.

21      Q.    Sure.

22      A.    The context, as I described before, is

23  all the hurdles that vendors have to jump through and

24  the -- of which Colorado is now adding a fourth hurdle.

25  And in that, we're only at the very early stages of

**ROB WALDO - August 28, 2024**

1   seeing the animus that the DOI has already taken

2   against healthcare sharing ministries.  So we don't yet

3   see the full effect.

4           We saw it very sequentially, as I

5   outlined before with the consumer advisory,

6   ThinkAdvisor, CBS, PBS.  And the concern, which is not

7   just a fear, but it's watching some of this unfold

8   sequentially, is that the Colorado DOI has never

9   clarified statements.  They have made warnings, and

10   then they've not corrected them, even though we've

11   tried to work with the DOI.

12           So the full extent of our vendor

13   responses to this information is not yet known.  It's

14   very early.  The context, though, in which we now find

15   ourselves and our vendors is one of animus and

16   hostility.

17           Therefore, to directly answer your

18   question, no vendor has ceased to work with us yet due

19   to the Colorado reporting.  However, we do see that we

20   are on a trajectory that has put hostility into the

21   nature of our relationship with the Colorado

22   government, and that affects our vendor relationships.

23       Q.    With all of that same context

24   incorporated, has any third-party vendor threatened to

25   cease a commercial relationship with Samaritan because

**CALDERWOOD-MACKELPRANG, INC.**
**(303) 477-3500**

Ex. 3, p. 3 of 3
Resp. Appx. p. 775

**ROB WALDO - August 28, 2024**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-01386-GPG-STV

ALLIANCE OF HEALTH CARE SHARING MINISTRIES

        Plaintiff,

vs.

MICHAEL CONWAY, in his official capacity as
Commissioner of the Colorado Division of Insurance,

        Defendant.

_____

VIDEOCONFERENCE AND RULE 30(b)(6) DEPOSITION OF

SAMARITAN MINISTRIES INTERNATIONAL

REPRESENTATIVE ROB WALDO

_____

PURSUANT TO NOTICE, the above-entitled

videoconference (Zoom) deposition was taken on behalf

of the Defendant on Wednesday, August 28, 2024, at 9:01

a.m., before Jana Mackelprang, Certified Realtime

Reporter, Registered Professional Reporter, and Notary

Public.

**CALDERWOOD-MACKELPRANG, INC.**
**(303) 477-3500**

EXHIBIT
**4**
Ex. 4, p. 1 of 2

**ROB WALDO - August 28, 2024**

1   agreed to.

2          And now what we have set up with the

3   Colorado DOI is forced disclosure.  In other words, go

4   pass those NDAs.  Go pass those contracts.  And we are

5   mandating by threat of a $5,000-a-day fine and by

6   threat of a cease and desist that you can no longer

7   operate as a charitable organization.  We're mandating

8   that.

9          So to answer your question directly, I am

10  not aware of a vendor to date that has said that they

11  will leave due to this reporting.  However, I will

12  state that it violates the spirit and nature of what

13  we've agreed to and committed to and what they've

14  agreed to and committed to.  We believe that's a breach

15  of our integrity, to no fault of our own, and it is

16  harmful to the relationship, and the ramifications of

17  that are truly yet to be seen.

18      Q.    (By Mr. Khalife) Does that mean that, to

19  date, there have not been ramifications, but you are

20  concerned about future ramifications relating to the

21  disclosure of third parties pursuant to Colorado's

22  reporting law?

23          MR. MURRAY:  Objection.  Vague and

24  ambiguous.

25          THE DEPONENT:  I'll answer your question

**ROB WALDO – August 28, 2024**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-01386-GPG-STV

ALLIANCE OF HEALTH CARE SHARING MINISTRIES

        Plaintiff,

vs.

MICHAEL CONWAY, in his official capacity as
Commissioner of the Colorado Division of Insurance,

        Defendant.

_____

VIDEOCONFERENCE AND RULE 30(b)(6) DEPOSITION OF

SAMARITAN MINISTRIES INTERNATIONAL

REPRESENTATIVE ROB WALDO

_____

        PURSUANT TO NOTICE, the above-entitled

videoconference (Zoom) deposition was taken on behalf

of the Defendant on Wednesday, August 28, 2024, at 9:01

a.m., before Jana Mackelprang, Certified Realtime

Reporter, Registered Professional Reporter, and Notary

Public.

**CALDERWOOD-MACKELPRANG, INC.**
**(303) 477-3500**

EXHIBIT
**5**

Ex. 5, p. 1 of 7

**ROB WALDO - August 28, 2024**

1  newsletter or the blog or potentially the newsletter,

2  the blog, or as standalone communications?

3       A.     We provide them in all various evidence.

4  It would be uncommon for us to only provide an

5  information to members and not on any of that and not

6  to the public.  And part of that reason is because we

7  want to be transparent about who we are.

8              And if somebody says,  Well, what is

9  Samaritan Ministries?  Is it insurance?   They can go

10 and look, and even at a cursory glance of what we

11 publish on our website, they can say,  No, this is not

12 insurance at all.  These are a bunch of people that

13 talk about Jesus a lot and how they do that in

14 healthcare.

15      Q.     Understood.  Is it fair to say that those

16 types of communications, the blog and the newsletter,

17 have been in e istence from 2018 to the present

18 continuously?

19      A.     Yes.

20      Q.     And is it true that the blog, either

21 submissions or contents, are not required to be

22 reported under Colorado's reporting law?

23      A.     To my knowledge, Colorado has a broad

24 statement related to communications and marketing

25 communications.  And we have been working to be very

**ROB WALDO - August 28, 2024**

1   clear about what Colorado means in that to the e tent

2   of the compliance burden that it will impose upon us,

3   as well as the level of intrusiveness that it signifies

4   for us.

5       Q.    Is it fair to say that Samaritan has, in

6   its past reporting years, not provided any portion of

7   the blog to Colorado pursuant to the reporting law?

8       A.    I am not aware of Samaritan providing its

9   blog to Colorado.

10       Q.    And would it also be an accurate

11   statement to say that Colorado has not requested

12   Samaritan to provide any portion of the blog as part of

13   its reporting law?

14       A.    I am not aware of Colorado requesting

15   that we report to them our blog, with the caveat we

16   worked through a couple years of this emergency

17   regulation and commenting and final regulation, and the

18   dust isn't settled on everything.  So we're going with

19   an ongoing conversation in terms of the clarity at

20   which things are finalized and whether those things are

21   in writing, versus assumptions that we could make.

22       Q.    I'm sorry to do this, but just to

23   clarify, there has never been a communication from

24   Colorado requesting production of any portion of the

25   blog?

**ROB WALDO - August 28, 2024**

 1      A.      I am not aware of a requirement or

 2  request from Colorado for our blog.  And I would state

 3  that Colorado has full access to our blog.  And so I

 4  cannot clarify whether that has been part of their

 5  request that was fulfilled indirectly versus them

 6  clarifying we are not asking for this and we will not

 7  ask for it.

 8      Q.      And in turning to the newsletter, has

 9  Samaritan ever submitted to Colorado any portion of the

10  newsletter, the Samaritan newsletter, as part of the

11  reporting law?

12      A.      To my knowledge, Samaritan has not

13  submitted its newsletter or portions of its newsletter

14  to Colorado.

15      Q.      And, similarly, you are not aware of any

16  request by Colorado for Samaritan to submit any portion

17  of the newsletter as part of the reporting law?

18      A.      I am not aware of a request from Colorado

19  that we submit our newsletter, which is publicly

20  available by Colorado DOI and has not been, in writing,

21  clearly communicated whether our assumptions about what

22  is and is not acceptable is correct -- are correct.

23      Q.      Just to clarify, Colorado has not asked

24  for the newsletter?

25      A.      To my awareness, Colorado has not asked

**CALDERWOOD-MACKELPRANG, INC.**
**(303) 477-3500**

**ROB WALDO - August 28, 2024**

1   for the newsletter, with the additional caveats that I

2   mentioned, that it is publicly available, and is

3   silence consent or approval what is clear versus what

4   is assumed?

5        Q.    Understood.  In terms of some of these

6   other communications, would there be these health and

7   nutrition communications, would those all be public

8   communications, or could there be some members-only

9   health and nutrition communications?

10       A.    To my knowledge, all of what you're

11  referencing is available to the public, with the

12  e ception that if there's some content in an email that

13  then directs them to the public site that maybe members

14  don't have access to -- or the public would not have

15  access to that email.

16       Q.    And would it be your understanding that

17  Colorado has not -- let me back up.

18            Is it your understanding that Samaritan

19  has not provided to Colorado any of these health or

20  nutrition communications under its reporting law?

21       A.    Samaritan, to my knowledge, did not

22  submit these health and nutrition communications via

23  the reporting template while they were still available,

24  to the DOI publicly at all times.

25       Q.    And the DOI never -- I'm sorry, Jana, the

**ROB WALDO - August 28, 2024**

1 Division of Insurance -- never sent a request to

2 Samaritan for these health or nutrition communications

3 from Samaritan to its members?

4       A.    I'm not aware of the DOI sending a

5 request for health and nutrition communications that we

6 send to members and that are also available to the DOI

7 on our public website at all times.

8       Q.    And regarding these communications from

9 Samaritan to its members on member rights in the public

10 sphere, can you tell us a little bit more about what's

11 an e ample of that?  How would those communications

12 occur?

13       A.    That comment I made, I referenced

14 culture.  So there might be an article related to our

15 religious view about the sanctity of human life.  And

16 we may have an article or a blog article that provides

17 Christian commentary on that.  And ...

18       Q.    Yeah, I'm sorry to cut you off, if you

19 have anything else to add.

20       A.    No, that's it.

21       Q.    And would those commentaries be likely in

22 the newsletter or the blog or potentially standalone or

23 all three?

24       A.    It can be all three.

25       Q.    Okay.  And did Samaritan provide to

**ROB WALDO - August 28, 2024**

1  Colorado any articles or commentary about rights in the

2  public sphere or Christian cultural belief in response

3  to Colorado's reporting law?

4       A.      To my knowledge, Samaritan did not

5  provide any specific articles regarding rights or the

6  Christian beliefs outside of what the DOI has had

7  access to publicly the whole time, and with the same

8  caveats of us continuing to work through the clarity of

9  this regulation and what's incumbent upon us.

10      Q.      And, similarly, the Division of Insurance

11 has never requested Samaritan provide, as part of its

12 reporting law, articles or commentaries on member

13 rights in the public sphere or Christian cultural

14 beliefs?

15      A.      To my knowledge, Colorado has not

16 specifically asked for that information.  That is

17 publicly available to the DOI.  However, with all of

18 these e amples that are provided, I think it's

19 important to note that our marketing and advertising is

20 also publicly available.  And the DOI asked for

21 publicly available advertising and marketing

22 information.

23           So the lack of specific requests on some

24 of these for publicly available information is

25 inconsistent.

**CALDERWOOD-MACKELPRANG, INC.**
**(303) 477-3500**

**ROB WALDO - August 28, 2024**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-01386-GPG-STV

ALLIANCE OF HEALTH CARE SHARING MINISTRIES

      Plaintiff,

vs.

MICHAEL CONWAY, in his official capacity as
Commissioner of the Colorado Division of Insurance,

      Defendant.

_____

VIDEOCONFERENCE AND RULE 30(b)(6) DEPOSITION OF

SAMARITAN MINISTRIES INTERNATIONAL

REPRESENTATIVE ROB WALDO

_____

      PURSUANT TO NOTICE, the above-entitled
videoconference (Zoom) deposition was taken on behalf
of the Defendant on Wednesday, August 28, 2024, at 9:01
a.m., before Jana Mackelprang, Certified Realtime
Reporter, Registered Professional Reporter, and Notary
Public.

**CALDERWOOD-MACKELPRANG, INC.**
**(303) 477-3500**

EXHIBIT
**6**

Ex. 6, p. 1 of 3

**ROB WALDO - August 28, 2024**

1  national, are we able to see who's actually viewed that

2  by state -- that I don't know -- by every channel, by

3  every advertisement, so forth.

4       Q.    And I recognize you said earlier that you

5  don't have an e act percentage of the 285 hours that it

6  took to compile and produce the marketing materials,

7  but is there a general estimate that you could give us

8  of -- you know, was it half of the 285?  Not to hold

9  you to it at all, but just to get an understanding of

10  how much of the 285 is related to the marketing

11  materials.

12       A.    This is a higher one.  I can't say that

13  it's half, but it is a higher number because of the way

14  our marketing materials and system are set up.

15       Q.    And did Samaritan make any changes to its

16  marketing materials or its marketing system in response

17  to Colorado's reporting?

18       A.    I'm not aware of discussions beyond, how

19  do we comply with this?  And the specific actions

20  they've taken, I don't know, but we made every effort,

21  until this current year, to, in good faith, to both

22  comply and work for change before the finalized

23  regulation was put out, and then we changed our

24  approach.

25       Q.    And I understand that.  I just want to

**CALDERWOOD-MACKELPRANG, INC.**
**(303) 477-3500**

**ROB WALDO - August 28, 2024**

1  verify that you guys didn't change your marketing

2  strategy or content in response to Colorado's reporting

3  law?

4       A.      Not to my awareness.  We have been very

5  consistent for 30 years in terms of why and what we

6  communicate.  And I'm not aware of us changing our

7  strategy or our content based upon Colorado.

8       Q.      Understood.  And so is it Samaritan's

9  position that the portion of the reporting law that

10  requires submission of the marketing materials is

11  unconstitutionally burdensome or invasive?

12              MR. MURRAY:  Objection.  Calls for a

13  legal conclusion.

14              THE DEPONENT:  I cannot speak legally.

15  In my role, I can say that this is one element of

16  multiple and of the whole that is intrusive and

17  burdensome.

18       Q.      (By Mr. Khalife) In talking specifically

19  about the marketing material and advertisement

20  production requirement, does Samaritan feel that this

21  requirement has somehow influenced or changed its

22  message to its membership or potential members?

23       A.      Samaritan has not changed its strategy or

24  its message.  I will add that forced disclosure of our

25  communications and our materials, as outlined in the

**CALDERWOOD-MACKELPRANG, INC.**
**(303) 477-3500**

**ROB WALDO - August 28, 2024**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-01386-GPG-STV

ALLIANCE OF HEALTH CARE SHARING MINISTRIES

        Plaintiff,

vs.

MICHAEL CONWAY, in his official capacity as
Commissioner of the Colorado Division of Insurance,

        Defendant.

_____

VIDEOCONFERENCE AND RULE 30(b)(6) DEPOSITION OF

SAMARITAN MINISTRIES INTERNATIONAL

REPRESENTATIVE ROB WALDO

_____

        PURSUANT TO NOTICE, the above-entitled
videoconference (Zoom) deposition was taken on behalf
of the Defendant on Wednesday, August 28, 2024, at 9:01
a.m., before Jana Mackelprang, Certified Realtime
Reporter, Registered Professional Reporter, and Notary
Public.

**CALDERWOOD-MACKELPRANG, INC.**
**(303) 477-3500**

EXHIBIT
**7**
Ex. 7, p. 1 of 2

**ROB WALDO - August 28, 2024**

1  the fourth hurdle is that there will be a public record

2  that's forced on us to report all these vendors to the

3  Division of Insurance that will confuse vendors in the

4  public on hurdle number one.  What is Samaritan

5  Ministries?  Oh, they're insurance, because they report

6  to the Division of Insurance.

7             We're not insurance.  We're just mandated

8  by law to do this, and we object to it.  But that

9  confuses it, so it muddies the water there.

10             And then, now their names are associated

11  publicly on a list that, according to Colorado's Open

12  Records Act, anyone can access.

13             Well, why is that a problem, some may

14  say?  If the DOI and journalists would report

15  accurately, it may not be a problem.  But they aren't

16  reporting accurately.  And they have provided

17  misleading, mischaracterizing statements that are

18  harming us.  And now vendors are publicly associated

19  with us.

20             There's some vendors that face pressure

21  related to who is considered a hate group.  I am so

22  grateful no one considers us a hate group.  And we want

23  to avoid anything that would be of that nature.  Our

24  job is to love God well, according to purpose, and to

25  love others well and to honor our sincere religious

# Exhibit BB

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

| | |
|---|---|
| ALLIANCE OF HEALTH CARE SHARING MINISTRIES,<br><br>Plaintiff – Appellant,<br><br>v.<br><br>MICHAEL CONWAY, in his official capacity as Commissioner of the Colorado Division of Insurance<br><br>Defendant – Appellee. | Case No. 25-1035 |

On Appeal from the United States District Court, District of Colorado
The Honorable Gordon P. Gallagher
District Judge

District Court Case No. 24-cv-01386-GPG-STV

PHILIP J. WEISER
Attorney General
REED W. MORGAN*
Senior Assistant Attorney General
DANNY RHEINER*
Assistant Solicitor General
PHILLIP KHALIFE*
Assistant Attorney General

Colorado Department of Law
1300 Broadway, 8th Floor
Denver, CO 80203
Telephone: 720-508-6000
Email: Reed.Morgan@coag.gov
Danny.Rheiner@coag.gov
Phillip.Khalife@coag.gov
* Counsel of Record
*Counsel for Defendant - Appellee*

## DECLARATION OF REED W. MORGAN

I, Reed Morgan, in accordance with 28 U.S.C. § 1746, state as follows:

EXHIBIT
BB

1. I am counsel in this matter for Michael Conway, in his official capacity as Commissioner of the Colorado Division of Insurance. I have personal knowledge of the matters set forth below.

2. The Commissioner has produced more than 20,000 pages of documents responsive to the Alliance of Health Care Sharing Ministries' discovery requests in this matter.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: February 18, 2025

s/ _Reed Morgan_

Reed Morgan, Senior Assistant Attorney General*
*Counsel of Record
*Counsel for Defendant – Appellee*

# Exhibit CC

**IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

| | |
|---|---|
| ALLIANCE OF HEALTH CARE SHARING MINISTRIES, <br><br> Plaintiff – Appellant, <br><br> v. <br><br> MICHAEL CONWAY, in his official capacity as Commissioner of the Colorado Division of Insurance <br><br> Defendant – Appellee. | Case No. 25-1035 |

On Appeal from the United States District Court, District of Colorado
The Honorable Gordon P. Gallagher
District Judge

District Court Case No. 24-cv-01386-GPG-STV

PHILIP J. WEISER
Attorney General
REED W. MORGAN*
Senior Assistant Attorney General
DANNY RHEINER*
Assistant Solicitor General
PHILLIP KHALIFE*
Assistant Attorney General

Colorado Department of Law
1300 Broadway, 8th Floor
Denver, CO  80203
Telephone:  720-508-6000
Email:  Reed.Morgan@coag.gov
Danny.Rheiner@coag.gov
Phillip.Khalife@coag.gov
* Counsel of Record
*Counsel for Defendant - Appellee*

## SECOND DECLARATION OF Leilani Russell

I, Leilani Russell, in accordance with 28 U.S.C. § 1746, state as follows:

1.  I am over 18 years of age, and employed by the Colorado Division of Insurance as

EXHIBIT
CC

the Director of Strategy, Operations, and Performance. I have personal knowledge of the matters set forth below.

2. Attached to this declaration are true and correct copies of the following documents in the possession of the Colorado Division of Insurance.

   a. January 11, 2023 letter from Kate Harris (Colorado Division of Insurance) to Andy Schoonover (Crowd Health) (Exhibit A).

   b. September 9, 2024 letter from Kate Harris (Colorado Division of Insurance) to Andy Schoonover (Crowd Health) (Exhibit B).

   c. Email chain involving Leilani Russell, David Deal and others, between September 12, 2024 and September 20, 2024, regarding Crowd Health. (Exhibit C).

I declare under penalty of perjury that the foregoing is true and correct.


Executed on:  February 18, 2025

<div style="text-align:right">

s/Leilani Russell
Leilani Russell, MPH
Director of Strategy, Operations, and Performance
Colorado Division of Insurance

</div>

# Exhibit A



**COLORADO**

**Department of Regulatory Agencies**

Division of Insurance

January 11, 2023

Andy Schoonover
Crowd Health
3267 Bee Caves Rd.
Ste. 107-250
Austin, TX 78746

Cogency Global Inc.
1601 Elm St Ste 4360
Dallas, TX 75201

RE: Health Care Sharing Plan and Arrangement Data Submission to the Colorado Division of Insurance

Mr. Schoonover,

This letter is to inform you that as of January 11, 2023, the Colorado Division of Insurance ("Division") has not received your organization's data submission per § 10-16-107.4, Colorado Revised Statute (C.R.S.), and Emergency Regulation 22-E-20. These submissions were due to the Division no later than December 15, 2022.

Per § 10-16-107.4, C.R.S., a person not authorized by the commissioner to offer insurance in Colorado that offers or intends to offer a plan or arrangement to facilitate payment or reimbursement of health-care costs or services for residents of Colorado, regardless of whether the person is domiciled in this state or another state, shall submit to the Commissioner the information listed in § 10-16-107.4, C.R.S., and detailed in Emergency Regulation 22-E-20.

The Division believes that Crowd Health may be operating a health care sharing arrangement as defined in § 10-16-107.4, C.R.S., and has not received from Crowd Health the data required by Emergency Regulation 22-E-20. Please let us know within five (5) business days if you believe Crowd Health is not subject to § 10-16-107.4, C.R.S. and the basis for your opinion. Otherwise, please provide the Division with the required information via email no later than Friday, January 27, 2023 by 5 PM MST to Leilani Russell (leilani.russell@state.co.us) and Sara Bencic (sara.bencic@state.co.us), which must include the following:

- Completed Health Care Sharing Plan Reporting template
- Copies of consumer facing and marketing materials, including a link to the organizational website used for marketing, used in Colorado to promote the plan or arrangement, including plan or arrangement and benefit descriptions, and other materials that explain the plan or arrangement, such as member guidelines;
- An organizational chart of the HCSA with a list of officers and directors;
- Copies of all training materials provided to a producer and third party;
- Any other required information noted in Emergency Regulation 22-E-20

Failure to comply with § 10-16-107.4, C.R.S. may subject Crowd Health to fines and a cease and desist order.

Should you have questions regarding this matter, please contact Leilani.Russell@state.co.us and Sara.Bencic@state.co.us.

**EXHIBIT A**



Sincerely,



Kate Harris
Chief Deputy Commissioner, Life and Health Policy
Colorado Division of Insurance



# Exhibit B



**COLORADO**
Department of
Regulatory Agencies
Division of Insurance

September 9, 2024

Andy Schoonover
Crowd Health
3267 Bee Caves Rd.
Ste. 107-250
Austin, TX 78746

Cogency Global Inc.
1601 Elm St Ste 4360
Dallas, TX 75201

RE: Health Care Sharing Plan and Arrangement Data Submission to the Colorado Division of Insurance

Mr. Schoonover,

This letter is to inform you that as of September 9, 2024, the Colorado Division of Insurance ("Division") has not received your organization's data submission per § 10-16-107.4, Colorado Revised Statute (C.R.S.), and Regulation 4-10-01. These submissions were due to the Division no later than May 15, 2024.

Per § 10-16-107.4, C.R.S., a person not authorized by the commissioner to offer insurance in Colorado that offers or intends to offer a plan or arrangement to facilitate payment or reimbursement of health-care costs or services for residents of Colorado, regardless of whether the person is domiciled in this state or another state, shall submit to the Commissioner the information listed in § 10-16-107.4, C.R.S., and detailed in Regulation 4-10-01.

The Division believes that Crowd Health may be operating a health care sharing arrangement as defined in § 10-16-107.4, C.R.S., and has not received from Crowd Health the data required by Regulation 4-10-01. Please let us know within five (5) business days if you believe Crowd Health is not subject to § 10-16-107.4, C.R.S. and the basis for your opinion. Otherwise, please provide the Division with the required information via email no later than **Friday, September 23, 2024 by 5 PM MST** to Leilani Russell (leilani.russell@state.co.us) and Kim Williams (kim.williams@state.co.us), which must include the following:

- Completed Health Care Sharing Plan Reporting template
- Copies of consumer facing and marketing materials, including a link to the organizational website used for marketing, used in Colorado to promote the plan or arrangement, including plan or arrangement and benefit descriptions, and other materials that explain the plan or arrangement, such as member guidelines;
- An organizational chart of the HCSA with a list of officers and directors;
- Copies of all training materials provided to a producer and third party;
- Any other required information noted in Regulation 4-10-01

Failure to comply with § 10-16-107.4, C.R.S. may subject Crowd Health to fines and a cease and desist order.

Should you have questions regarding this matter, please contact Leilani.Russell@state.co.us and kim.williams@state.co.us.

Sincerely,

Kate Harris
Chief Deputy Commissioner
Colorado Division of Insurance

**EXHIBIT**

**B**



# Exhibit C

| From: | David Deal |
|---|---|
| To: | Russell - DORA, Leilani |
| Cc: | andy@joincrowdhealth.com; kate.harris@state.co.us; phillip.kalife@coag.gov; Scott Sveslosky; Kim Williams - DORA; Gabe Young |
| Subject: | RE: Response to Healthcare Sharing Plan Inquiry to CrowdHealth, Inc. September 9, 2024 |
| Date: | Friday, September 20, 2024 8:03:45 AM |
| Attachments: | image001.png |
| | image002.png |

Leilani,

Thank you for your message. CrowdHealth intends to provide the requested data by October 21, 2024. Thank you for your consideration on the delivery timeframe. CrowdHealth would like to confirm one important item discussed during our call. Specifically, if I understood you correctly, the Division represented that "commentary" or "narrative" explanations inserted by CrowdHealth into the spreadsheet <u>would be published with the public data/report such that CrowdHealth would have the opportunity to make publicly clear that it is not a Health Care Sharing Ministry</u>. After speaking with CrowdHealth, it is CrowdHealth's belief that the commentary/narrative is not in fact kept with the data/report when published. Can you please confirm 1) that any commentary/narrative provided by CrowdHealth will be included in the public data/report, and 2) confirm that the proper place for CrowdHealth to insert that commentary/narrative is in Tab 2, cells AC18-AE18 and/or Tab 3, cells V19-26 through Z19-26?

Thank you for your assistance.

**David W. Deal** | Special Counsel
+1 415-774-3298 | direct
DDeal@sheppardmullin.com | Bio

**Sheppard**Mullin

Four Embarcadero Center, 17th Floor
San Francisco, CA 94111-4109
+1 415-434-9100 | main
www.sheppardmullin.com | LinkedIn

**From:** Russell - DORA, Leilani <leilani.russell@state.co.us>
**Sent:** Thursday, September 19, 2024 1:18 PM
**To:** David Deal <DDeal@sheppardmullin.com>
**Cc:** andy@joincrowdhealth.com; kate.harris@state.co.us; phillip.kalife@coag.gov; Scott Sveslosky <SSveslosky@sheppardmullin.com>; Kim Williams - DORA <kim.williams@state.co.us>; Gabe Young <gabe.young@coag.gov>
**Subject:** Re: Response to Healthcare Sharing Plan Inquiry to CrowdHealth, Inc. September 9, 2024

Good afternoon David,

Thank you again for taking time to meet with us today. Here are some of the pieces of information

EXHIBIT

C

you asked about.

[The regulation is here](#) with it's April 30, 2024 effective date. You can find [the hearing notice](#) here (under March 1, 2024 drop down) and you can also look for more information on the Colorado Secretary of State's eDocket platform.

Additionally, as this would be CrowdHealth's first time reporting on these data we can grant an extension of 30 days as of today to submit. The new deadline for CrowdHealth to send their full submission is **October 21, 2024.** We also offer technical assistance in filling out and submitting all documents should that be of interest or need.

We'd appreciate letting us know if CrowdHealth plans to report by the 10/21/24 extension deadline or not.

All the best,
Leilani

On Wed, Sep 18, 2024 at 2:32 PM David Deal <[DDeal@sheppardmullin.com](mailto:DDeal@sheppardmullin.com)> wrote:

> Thank you very much. It will just be me on the call.
>
>> On Sep 18, 2024, at 1:30 PM, Russell - DORA, Leilani <[leilani.russell@state.co.us](mailto:leilani.russell@state.co.us)> wrote:
>>
>> Good afternoon Mr. Deal.
>>
>> I sent out an invitation for tomorrow, 9/19, at 1pm for 30 min. Please feel free to include those from CrowdHealth or their representatives as you see fit. If this time no longer works for you I'm happy to propose some times for you to consider and adjust the invite as necessary.
>>
>> We look forward to talking with you tomorrow and all the best,
>>
>> On Tue, Sep 17, 2024 at 3:27 PM David Deal <[DDeal@sheppardmullin.com](mailto:DDeal@sheppardmullin.com)> wrote:
>>
>>> Thank you for your response.  CrowdHealth just has a couple of questions.  Would you be amenable to a brief call with me?  I am available any day this week between 9-11 or 1-2 MST.  I suspect we could work through them in 15-20 minutes.
>>>
>>> **David W. Deal** | Special Counsel
>>> +1 415-774-3298 | direct
>>> [DDeal@sheppardmullin.com](mailto:DDeal@sheppardmullin.com) | [Bio](#)

**Sheppard**Mullin

Four Embarcadero Center, 17th Floor
San Francisco, CA 94111-4109
+1 415-434-9100 | main
www.sheppardmullin.com | LinkedIn

---

**From:** Russell - DORA, Leilani <leilani.russell@state.co.us>
**Sent:** Monday, September 16, 2024 3:33 PM
**To:** David Deal <DDeal@sheppardmullin.com>
**Cc:** andy@joincrowdhealth.com; kate.harris@state.co.us; phillip.kalife@coag.gov;
Scott Sveslosky <SSveslosky@sheppardmullin.com>; Kim Williams - DORA
<kim.williams@state.co.us>; Gabe Young <gabe.young@coag.gov>
**Subject:** Re: Response to Healthcare Sharing Plan Inquiry to CrowdHealth, Inc.
September 9, 2024

Thank you for reaching out Mr. Deal,

Housekeeping: I've included my colleagues Kim Williams and Gabe Young and
removed those of my colleagues no longer working on implementation of HB22-
1269. For any communication with the Division on Health Care
sharing reporting you can include those on this email chain. Further, I've also
reattached the letter the Division sent to your client on 9/9/24. As you review this
attached letter and the Division's response to your 9/12/24 email please let Kim
and I know if you'd like to set up a call to sort through anything.

Response: Regarding CrowdHealth, Inc.'s assertion that they are not subject to the
statute, the Division disagrees. Both Colorado law and regulation 4-10-01 indicate
that CrowdHealth is subject to Colorado law. There is nothing in either law or
regulation that limits these reporting requirements to "sharing ministries" as your
letter states. Here is the definition of a sharign plan or arrangement found in
regulation 4-10-01:

> "Health care sharing plan" or "health care sharing arrangement" or "plan" or
> "arrangement" or "HCSPA" shall mean any organization that offers or markets
> products to facilitate payment or reimbursement of health-care costs or
> services for one (1) or more residents of Colorado. This does not include direct
> primary care agreements as defined in § 6-23-101, C.R.S.; consumer payment
> plans offered directly between a provider and patient (or patient's responsible
> party); businesses used to facilitate the plan's operations such as
> reimbursement handling, cost containment vendors, data processing; and
> crowdfunded sources that do not require ongoing membership fees, share
> requirements, or dues for the purposes of payment for and/or reimbursement
> of health care services.

Crowd Health charges a monthly Membership Fee as do other sharing plans or
arrangements. This is not the Case with GoFundMe.

We await your client's full submission **by Monday September 23, 2024.** If additional timeis needed to complete the submission you or your client may requet an extension and we will consider it.

All the best,


On Thu, Sep 12, 2024 at 4:47 PM David Deal <DDeal@sheppardmullin.com> wrote:

> Good afternoon, Ms. Bencic,
>
> Please find the attached letter from CrowdHealth, Inc. in response to the Division's September 9, 2024, inquiry.
>
> Regards,
>
> **David W. Deal** | Special Counsel
> +1 415-774-3298 | direct
> DDeal@sheppardmullin.com | Bio
>
> **Sheppard**Mullin
> Four Embarcadero Center, 17th Floor
> San Francisco, CA 94111-4109
> +1 415-434-9100 | main
> www.sheppardmullin.com | LinkedIn
>
> <u>Attention:</u> This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.


--
Leilani Russell, MPH
Director of Strategy, Operations, and Performance
*she/her/hers* (Learn about why my pronouns are identified)
<image001.png>
C 303.204.2873
1560 Broadway Suite 850 Denver, CO 80202
Leilani.Russell@state.co.us  I  www.DORA.colorado.gov/insurance

Please consider the environment before printing this email.

Under the Colorado Open Records Act (CORA), all messages sent by or to me on this state-owned e-mail account may be subject to public disclosure.


--

**Leilani Russell, MPH**
**Director of Strategy, Operations, and Performance**
*she/her/hers* ([Learn about why my pronouns are identified](#))



**C 303.204.2873**
**1560 Broadway Suite 850 Denver, CO 80202**
[Leilani.Russell@state.co.us](mailto:Leilani.Russell@state.co.us) I [www.DORA.colorado.gov/insurance](http://www.DORA.colorado.gov/insurance)

Please consider the environment before printing this email.

Under the Colorado Open Records Act (CORA), all messages sent by or to me on this state-owned e-mail account may be subject to public disclosure.

--

**Leilani Russell, MPH**
**Director of Strategy, Operations, and Performance**
*she/her/hers* ([Learn about why my pronouns are identified](#))



**C 303.204.2873**
**1560 Broadway Suite 850 Denver, CO 80202**
[Leilani.Russell@state.co.us](mailto:Leilani.Russell@state.co.us) I [www.DORA.colorado.gov/insurance](http://www.DORA.colorado.gov/insurance)

Please consider the environment before printing this email.

Under the Colorado Open Records Act (CORA), all messages sent by or to me on this state-owned e-mail account may be subject to public disclosure.