No. 25-1035

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

ALLIANCE OF HEALTH CARE SHARING MINISTRIES
*Plaintiff-Appellant*

v.

MICHAEL CONWAY,
in his official capacity as
Commissioner of the Colorado Division of Insurance
*Defendant-Appellee*

Appeal from the United States District Court for the District of Colorado,
No. 1:24-cv-01386-GPG-STV (Hon. Gordon Gallagher)

**APPELLANT'S OPENING BRIEF**

Michael Murray
Paul Hastings LLP
2050 M Street, NW
Washington, D.C. 20036
Tel: (202) 551-1730
Fax: (202) 551-0230
Email: michaelmurray@paulhastings.com
*Counsel for Plaintiff-Appellant*

ORAL ARGUMENT REQUESTED

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF PRIOR OR RELATED APPEALS........................... vii

INTRODUCTION ............................................................................1

JURISDICTIONAL STATEMENT .........................................................3

STATEMENT OF ISSUES .................................................................3

STATEMENT OF THE CASE................................................................4

I.     Factual Background...................................................................4

        A.    Health Care Sharing Ministries .......................................5

               1. The Historical Origin of These Religious Communities..................5

               2. The Features of Health Care Sharing Ministries .............................6

        B.    The Longstanding Treatment of Health Care Sharing Ministries Before Colorado's Regime...................................8

               1. Typical Federal and State Treatment:  As Charities.........................8

               2. Comparison to Treatment of Similar Expense Sharing Organizations.....................................................9

               3. State Enforcement Activities Regarding the Ministries.................11

        C.    Colorado's Unique Regime .........................................12

               1. Ex Ante Focus on Religious Activity and Ex Post Purported Justifications ...................................................13

               2. The Colorado Law's Extensive Requirements and Exemptions for Favored Secular Conduct .............................15

               3. Colorado's Gerrymandered Regulatory Enforcement....................17

               4. The First Amendment Burdens of the Colorado Regime...............24

II.    This Case.......................................................................25

A.    The Ministries Do Not Comply with the First Permanent Reporting
      Cycle...................................................................................................25

B.    The District Court Litigation................................................................26

SUMMARY OF ARGUMENT ................................................................................28

STANDARD OF REVIEW .....................................................................................31

ARGUMENT ..........................................................................................................32

I.    The Alliance Has Demonstrated a Likelihood of Success. ...........................33

      A.    Colorado's Regime Violates the Free Exercise Clause. ....................33

            1.  Colorado's Regime Is Not Generally Applicable. .........................34

            2.  Colorado's Regime Is Not Neutral. ...............................................43

      B.    Colorado's Regime Violates the Establishment Clause......................47

      C.    Colorado's Regime Violates the Freedom of Association..................50

      D.    Colorado's Regime Violates the Free Speech Clause.........................55

      E.    Colorado's Regime Does Not Survive Strict Scrutiny.......................58

II.   The Alliance Has Established Irreparable Harm. ..........................................59

III.  The Balance of Equities and the Public Interest Favor an Injunction Pending
      Appeal..........................................................................................................60

CONCLUSION .......................................................................................................60

STATEMENT IN SUPPORT OF ORAL ARGUMENT .......................................60

**ATTACHMENTS**

ORDER [DENYING MOTION FOR PRELIMINARY INJUNCTION]..........A001

ORDER [DENYING MOTION FOR INJUNCTION PENDING APPEAL] ...A067

**TABLE OF AUTHORITIES**

**Cases**

*303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) ....................................................13

*Am. for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021) ..................... 3, 30, 51, 54

*Arc of California v. Douglas*, 757 F.3d 975 (9th Cir. 2014) ....................................59

*Ass'n of Data Processing Serv. Organizations, Inc. v. Bd. of Governors of Fed. Res. Sys.*, 745 F.2d 677 (D.C. Cir. 1984) ............................................................38

*Awad v. Ziriax*, 670 F.3d 1111 (10th Cir. 2012) .....................................................32

*Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004) .......................................58

*Bates v. City of Little Rock*, 361 U.S. 516 (1960) ...................................................52

*Bella Health & Wellness v. Weiser*, 699 F. Supp. 3d 1189 (D. Colo. 2023) .... 36, 38

*Bethel Conserv. Mennonite Church v. Comm'r*, 746 F.2d 388 (7th Cir. 1984) ....1, 5

*Blackhawk v. Pa.*, 381 F.3d 202 (3d Cir. 2004) ......................................................41

*Bowen v. Kendrick*, 487 U.S. 589 (1988) ...............................................................50

*Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786 (2011) .................................................59

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557 (1980) .....56

*Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742 (10th Cir. 2010) ..............60

*Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*, 2 F.3d 1514 (11th Cir. 1993) ................................................................................... 47, 48, 49

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) ....................................................................... 34, 42, 43, 44

*Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212 (10th Cir. 2007) ...............................................................................................................31

*City of Boerne v. Flores*, 521 U.S. 507 (1997) .......................................................58

*Does 1-11 v. Board of Regents of Univ. of Colorado*, 100 F. 4th 1251 (10th Cir. 2024) ............................................................................ 13, 29, 32, 44, 47

*Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990) .................................................................................. 33, 34, 35

*Fulton v. Philadelphia*, 593 U.S. 522 (2021) .................................. 2, 26, 28, 29, 34, 35, 36, 38, 39, 40, 43

*Gen. Motors Corp. v. Urb. Gorilla, LLC*, 500 F.3d 1222 (10th Cir. 2007) ...........31

*Healy v. James*, 408 U.S. 169 (1972) ........................................................52

*Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013) .......... 32, 59

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171 (2012)..........................................................................................47

*Hurley v. Irish–Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995).55

*In re First Nat.*, 701 F.2d 115 (10th Cir. 1983) ........................................54

*Jimmy Swaggart Ministries v. Board of Equalization*, 493 U.S. 378 (1990)... 47, 50

*John Doe No. 1 v. Reed*, 561 U.S. 186 (2010).........................................52

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022) ........................... 33, 34, 44

*Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617 (2018) . 13, 29, 42, 43, 44, 47

*Medina v. Catholic Health Initiatives*, 877 F.3d 1213 (10th Cir. 2017)  2, 29, 48, 49

*Murdoch v. Pennsylvania*, 319 U.S. 105 (1943).........................................57

*NAACP v. Alabama*, 357 U.S. 449 (1958)..............................................52

*NAACP v. Button*, 371 U.S. 415 (1963).................................................51

*Nken v. Holder*, 556 U.S. 418 (2009) ...................................................60

*Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256 (1979).......................45

*Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205 (10th Cir. 2018) ...........32

iv

*Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243 (10th Cir. 2024).......................32

*Rentera v. New Mexico Office of the Superintendent of Insurance*, No. 23-2123, 2025 WL 635754 (Feb. 27, 2025) ........................................................46

*Roberts v. United States Jaycees*, 468 U.S. 609 (1984) ........................... 31, 51, 52

*Roberts v. Winder*, 16 F.4th 1367 (10th Cir. 2021) ................................31

*Roman Catholic Diocese of Brookyn v. Cuomo*, 141 S. Ct. 63 (2021)............ 45, 59

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) ........................................38

*Shelton v. Tucker*, 364 U.S. 479 (1960)..............................................52

*Tandon v. Newsom*, 593 U.S. 61 (2021) ...................................... 29, 40, 41, 42, 46

*Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290 (1985)...................50

*Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622 (1994) ................................. 30, 55

*Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620 (1980) ........................................................................57

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008).....................................60

*Wooley v. Maynard*, 430 U.S. 705 (1977) .............................................55

*Wyandotte Nation v. Sebelius*, 443 F.3d 1247 (10th Cir. 2006) ............................31

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985).........................56

**Statutes**

28 U.S.C. § 1292(a)(1)..............................................................3

28 U.S.C. § 1331 ......................................................................3

28 U.S.C. § 1343 ......................................................................3

28 U.S.C. § 2201 ......................................................................3

28 U.S.C. § 2202 ......................................................................3

Col. Rev. Stat. § 10-16-107.4(2)................................................16

Colo. Rev. Stat. § 10-14-401 ...................................................9

Colo. Rev. Stat. § 10-14-404 ...................................................9

Colo. Rev. Stat. § 10-14-705 ............................................. 10, 41

Colo. Rev. Stat. § 10-16-107.4(1)(a) ................................ 15, 16, 17

Colo. Rev. Stat. § 10-16-107.4(4) ..........................................16

Colo. Rev. Stat. § 10-16-107.4(5).................................... 16, 35, 36

## Other Authorities

CrowdHealth, *Member Guide*, perma.cc/DD79-SQTC ...........................................10

DPC Coalition, *About the Coalition*, perma.cc/E93Q-V9KL .................................10

Fed. R. Civ. P. 65(a) ................................................................3

Gary Varvel, *John Oliver, Jim Carrey Use Art to Mock Christians*, *IndyStar* (Mar. 20, 2018) ................................................................13

GoFundMe, *Running your fundraiser with recurring donations*, perma.cc/NT4B-3D8J ................................................................10

KFF Health News, *GoFundMe Has Become a Health Care Utility*, perma.cc/2223-B3JS ................................................................10

University of Denver, *Health & Counseling Fee (HCF)*, perma.cc/DJ2F-D32R ...10

## Regulations

Emergency Regulation 22-E-20 ...............................................17

Regulation 4-10-01, available at https://doi.colorado.gov/health-care-sharing-plans-or-arrangements ................................................ 17, 23

Updated Health Care Sharing Plan Reporting template for regulation 4-10-01 .....21

## STATEMENT OF PRIOR OR RELATED APPEALS

There are no prior or related appeals.

**INTRODUCTION**

A new Colorado law and its implementing regulation threaten to fine or ban certain religious non-profit organizations unless they report with whom they affiliate and associate in the exercise of their ministry, how they collect and distribute contributions from members, and what they communicate to current and prospective members. Colorado officials have the discretion to exempt organizations from this regime and have done so for certain secular groups. The result is that by Colorado's own calculation 85% of the organizations subject to the regime are religious, which is consistent with Colorado's enlisting of the anti-religious entertainer John Oliver to drum up support for its regime. This regime runs afoul of several First Amendment protections and renders Colorado an outlier in its approach to these types of religious non-profit organizations.

The religious non-profit organizations in this case are called health care sharing ministries. Health care sharing ministries are the latest nomenclature for the mutual aid plans established originally by Mennonites, Amish, and Anabaptists to implement their understanding of the biblical admonition to "[b]ear ye one another's burdens." *Bethel Conserv. Mennonite Church v. Comm'r*, 746 F.2d 388, 392 (7th Cir. 1984) (quoting Galatians 6:2). There are more than 100 health care sharing ministries of various religions recognized by the federal government. Although these ministries vary in details, they share the common feature that their members

1

exercise their religious beliefs to share voluntarily in each other's health burdens spiritually through prayer, emotionally through notes and letters, and financially through monetary support.

Colorado recently enacted a new law and implementing regulation that subjects health care sharing ministries to extensive, continuing, and intrusive regulation as a condition of existence in the state. Colorado singled out "ministries" alone among medical expense sharing practices for these regulations. It also authorized the Colorado insurance commissioner to, in his sole discretion, exempt favored organizations caught up in the new regime, which he has done.

This new regime runs afoul of the First Amendment in several ways. Most prominently, its empowerment of the government to issue exemptions and the exemptions already issued to comparable conduct violate the Free Exercise Clause's requirement of general applicability, for they "undermine[] [Colorado's] contention that its [law] can brook no departures." *Fulton v. Philadelphia*, 593 U.S. 522, 542 (2021). In addition, Colorado's regime "restricts practices because of their religious nature." *Id.* at 533. Colorado's also regime violates the autonomy of religious organizations to be free from "long-term, continuing monitoring" of their affairs. *Medina v. Catholic Health Initiatives*, 877 F.3d 1213, 1233 (10th Cir. 2017). Finally, it violates the rights of organizations, particularly religious organizations, not to disclose those with whom they associate and not to have their religious speech

submitted to the government. *Am. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021). These features should subject Colorado's regime to significant scrutiny, which it does not survive. Accordingly, Colorado's regime should be preliminarily enjoined.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §1331 and §1343. The Plaintiff moved for a preliminary injunction, which was denied on January 13, 2025. *See id.* §2201, §2202; Fed. R. Civ. P. 65(a). The Plaintiff timely appealed on January 27, 2025. 20.App.1015. This Court has jurisdiction to review interlocutory orders of the district courts of the United States refusing injunctions. 28 U.S.C. §1292(a)(1).

## STATEMENT OF ISSUES

1. Whether empowering government officials with discretion through multiple mechanisms to grant exemptions from a government policy restricting religious exercise triggers strict scrutiny.

2. Whether the inapplicability of a government policy restricting religious exercise to comparable conduct triggers strict scrutiny.

3. Whether government actions showing that religious exercise is not being treated neutrally trigger strict scrutiny.

4. Whether government policy requiring the disclosure of affiliates of religious organizations triggers exacting scrutiny.

5. Whether the compelled submission to the government of religious speech and the compelled submission and publication of speech regarding the internal operations of a religious organization trigger strict scrutiny.

## STATEMENT OF THE CASE

This case involves health care sharing ministries. Health care sharing ministries are religious communities that members join to live their faith by voluntarily sharing spiritually, emotionally, and financially in each other's medical burdens. There are about a million members in health care sharing ministries across the entire country. Long governed by the charitable laws applicable to the churches and parachurch organizations that they are, Colorado is the first state to single them out on religious grounds for an extensive regulatory regime that requires them to disclose their internal operations, their charitable contributions, their affiliations, and their religious speech.

## I. Factual Background

Health care sharing ministries are longstanding communities that trace their origin to religious practices hundreds of years ago. Members of these ministries bear each other's medical burdens spiritually, emotionally, and financially. Until Colorado's regime, they were regulated by the federal and state governments just

like other churches and parachurch organizations, that is, like charities, with any bad actors subject to the enforcement of those or other laws triggered by the bad conduct.

### A.    Health Care Sharing Ministries

#### 1.    The Historical Origin of These Religious Communities

The concept of health care sharing ministries is hundreds of years old among Christians.  It draws on broader Abrahamic religious traditions, including religious adherents understanding of the biblical admonition to "bear ye one another's burdens." *Bethel Conserv. Mennonite Church v. Comm'r*, 746 F.2d 388, 392 (7th Cir. 1984) (quoting Galatians 6:2).  At first, such communities were termed mutual aid plans and were established by various Christian denominations, particularly Mennonites, Amish, and Anabaptists.  The term "health care sharing ministry" is the late twentieth century nomenclature for these mutual aid plans.  Individuals and families join health care sharing ministries for the same reason that Mennonites, Amish, Anabaptists, and adherents of other religious traditions did, to share each other's health care needs. 1.App.10 (Declaration of Rob Waldo, senior official of Samaritan Ministries); 1.App.102-03 (Declaration of Katy Talento, Executive Director of the Alliance).

There are more than 100 health care sharing ministries of a variety of religions in the United States, with total membership of about one million Americans. 1.App.104.  These ministries may be formed by different religions: there currently

is a Jewish ministry, and there have been efforts to form ministries for Muslim as well as Hindu communities. 1.App.114.

Although these ministries, which are often organized as churches, vary in details, they share the common feature that their members exercise their religious beliefs to share in each other's health burdens spiritually through prayer, emotionally through fellowship and communications, and financially through monetary support. 1.App.10; 1.App.102-03. For example, Samaritan Ministries proclaims its "mission is to redeem health care by helping the Body of Christ love one another through sharing each other's health care burdens while experiencing authentic Biblical community." 1.App.10. There is no dispute in this case, nor could there be, that members join health care sharing ministries as a sincere exercise of their religious faith. *See* Dist. Dkt. 52, at 1.

### 2. The Features of Health Care Sharing Ministries

Health care sharing ministries operate just like other more familiar religious organizations such as churches and parachurch ministries. Samaritan Ministries is a good example, although the precise details of each ministry vary. Samaritan establishes criteria, including religious criteria, for membership and is organized along the lines of a congregational church. 1.App.13. Its members vote to control the governing Board. Indeed, members control by that vote a supermajority of the Board, that is, six of nine seats. Staff must be members and must affirm a statement

of faith. Staff open meetings with prayer, are invited to prayer sessions with staff chaplains, and engage in communal fasting, prayer, and worship.

Samaritan also serves as a community for association and expression. Through newsletters, websites, a virtual forum, and local events, as well as member-to-member communications, Samaritan's members exhort each other on a host of religious topics, ranging from the theological to the practical. For example, newsletters contain discussions of "missional medicine," spotlights on member couples "spreading the Gospel," and international and prison ministry issues. 1.App.116.

For its part, Samaritan's medical expense sharing operates like a monthly prayer request and special collection at a church.  In Samaritan, every month, members give to other members who have medical needs. 1.App.10 . Members pray and send their monthly share, along with notes of encouragement, directly to the member in need. *Id.* This benefits the receiver by helping to alleviate the significant spiritual, emotional, and financial burdens that health care expenses bring. *Id.* It benefits the giver by allowing them to tangibly live out their personally held beliefs through participation in the biblical call to bear one another's burdens and thus fulfill the law of Christ. *Id.*

Unlike health insurance, ministries do not guarantee reimbursement of any medical expense. Rather, they receive information about medical needs and then ask

members to send funds, notes, and prayers to those members in need, if those medical needs are consistent with their religious or ethical norms. 1.App.11-12; 1.App.101-02. Samaritan, for example, adjusts what it asks of members, depending on member needs. It also accounts for the struggles of particular members at times of their lives by reducing what it asks of them, which was a common phenomenon during the pandemic. These decisions are made in accordance with the principle that members must "carry their own load." 1.App.115 (citing Galatians 6:5).

### B. The Longstanding Treatment of Health Care Sharing Ministries Before Colorado's Regime

#### 1. Typical Federal and State Treatment: As Charities

Health care sharing ministries enjoy recognition by the federal government. The Affordable Care Act exempts members of health care sharing ministries from various of its requirements. 1.App.103. The U.S. Department of Health and Human Services has certified that at least 107 of these ministries satisfy that definition. 1.App.117. The IRS also treats ministries as tax-exempt 501(c)(3) organizations. 1.App.103.

A supermajority of states do not intrude upon the operations of health care sharing ministries. 1.App.117. Thirty-three states have enacted safe harbor laws clarifying that health care sharing ministries are exempt from the state insurance code and may operate subject only to the general legal requirements applicable to charities. *Id.* An additional four states allow health care sharing ministries to operate

exempt from the state insurance code by providing an exemption for their respective residents from those states' insurance mandates. *Id.* A few, such as New Mexico, have challenged some ministries (wrongly, and subject to litigation) as subject to the insurance code. *Id.*

## 2. Comparison to Treatment of Similar Expense Sharing Organizations

That widespread state treatment of health care sharing ministries is consistent with state regulatory treatment of several types of comparable medical expense sharing organizations and practices. States rarely if ever subject expense sharing arrangements to regulation, including direct primary care arrangements, medical discount cards, crowdfunding, student health clinics at universities (where students pay a fee for unlimited access), fraternal benefit organizations, charities that pay medical bills, or fully-insured out-of-state employer health plans with in-state enrollees. 1.App.117.

Many of these expense sharing arrangements are very similar to the medical expense sharing portion of health care sharing ministries in that they accept monthly amounts and offer help with medical expenses. One big difference, of course, is that these arrangements are secular, not religious.

Fraternal benefit societies, for example, often accept monthly amounts from members and offer to help pay for comprehensive medical care. Colo. Rev. Stat. § 10-14-401; § 10-14-404. They also are often fully or partially exempt from any

9

regulation other than charitable laws. In Colorado, for example, fraternal benefit societies composed of "grand or subordinate lodges of masons, odd fellows, or knights of Pythias" and related organizations are entirely exempt from Colorado regulation. Colo. Rev. Stat. § 10-14-705; *see* 2.App.164.

Direct primary care arrangements, similarly, are not subject to regulation. These arrangements involve employer facilitation of the payment of monthly amounts by members for comprehensive primary care. 2.App.163; DPC Coalition, *About the Coalition*, perma.cc/E93Q-V9KL; Dist. Dkt. 46, at 15-16.

Crowdfunding is similar as well. Modern crowdfunding often involves recurring payments and access to medical care, such that "the crowd" "fund[s] medical expenses" through the crowdfunder. 2.App.163; CrowdHealth, *Member Guide*, perma.cc/DD79-SQTC; GoFundMe, *Running your fundraiser with recurring donations*, perma.cc/NT4B-3D8J; KFF Health News, *GoFundMe Has Become a Health Care Utility*, perma.cc/2223-B3JS (highlighting the story of Andrea Coy, of Fort Collins, Colorado, who used GoFundMe).

Student health clinics, such as those at the University of Denver, similarly involve a "health and counseling fee" for a "wide range of services" at "no and low-cost visits" facilitated by the university. 2.App.164; University of Denver, *Health & Counseling Fee (HCF)*, perma.cc/DJ2F-D32R.

Medical discount cards, for their part, are non-insurance programs, usually membership-based, that offer access to discounts negotiated with health care providers on various health care services, such as dental care or prescription drugs. 2.App.164.

Finally, out-of-state employer health insurance plans fall in the same regulatory posture. They are not subject to in-state regulation even when they have in-state members. 2.App.164-65.

### 3. State Enforcement Activities Regarding the Ministries

When problems arise with health care sharing ministries, states can and do address them through the enforcement of longstanding laws, such as insurance codes, deceptive trade practice laws or charitable rules.

For example, numerous states, including Colorado, pursued Aliera Healthcare and its affiliates for operating unlicensed insurance organizations (that is, for pretending to be health care sharing ministries when they are not), and for committing various fraudulent acts, such as diverting funds improperly to affiliates or self-dealing. 19.App.959.

Other organizations have been pursued by federal or state authorities from time to time. For example, the federal government pursued Medical Cost Sharing for fraud in Missouri. *See* Co-founder of Medical Charity in St. Joseph Sentenced for $8 Million Fraud Scheme, U.S. Dep't of Justice (Nov. 22, 2024),

https://www.justice.gov/usao-wdmo/pr/co-founder-medical-charity-st-joseph-sentenced-8-million-fraud-scheme#:~:text=McGinnis%20and%20Reynolds%20each%20admitted,3.1%20percent%20in%20health%20care.

Plaintiff Alliance of Health Care Sharing Ministries was formed by actual health care sharing ministries, as a 501(c)(6) trade organization formed to educate the public about health care sharing ministries and to advance public policy favorable to their members. 1.App.11-12; 103. Its membership includes Samaritan Ministries International, Christian Care Ministry, OneShare Health, and Altrua HealthShare, and Liberty HealthShare (associate member)—ministries that have large, nationwide membership and that have been certified by the U.S. Department of Health and Human Services Centers for Medicare and Medicaid Services as meeting the federal definition of Health Care Sharing Ministries in the Affordable Care Act. 1.App.102-04. Such nationwide ministries, including Alliance members, have been subject to investigations from time to time under state law. Plaintiff's members, however, do not include the organizations described by the district court as subject to enforcement actions in Colorado. 19.App.958-59.

C. **Colorado's Unique Regime**

Colorado has made itself an outlier from these longstanding state practices. The legislature and the Division of Insurance ("Division") have set out to regulate Plaintiff's members due to their religiosity. From 2020 through the present day,

12

Colorado officials have repeatedly stated that they want to burden health care sharing ministries because of their religious nature.[1] They have now promulgated a regime under which, as the district court acknowledged based on Colorado's own calculations, 85% of the burdened entities are religious organizations. 19.App.965; 18.App.891.

### 1. Ex Ante Focus on Religious Activity and Ex Post Purported Justifications

Colorado has been laser-focused on the religious activity of health care sharing ministries for years. Its private statements reveal that its public gerrymandering of regulatory attention to religious organizations is no accident.

Indeed, DOI officials, including Colorado's Commissioner of Insurance himself, communicated with the John Oliver show—a nationally-known anti-religious entertainer, *see, e.g.*, Gary Varvel, *John Oliver, Jim Carrey Use Art to Mock Christians*, *IndyStar* (Mar. 20, 2018)—to support Mr. Oliver's biased critique of health care sharing ministries. *See* 21.App.1051-61 (directing DOI staff to "pull recent complaints" about HCSMs for the John Oliver show "ASAP"). No reasonable government official could understand this high-level engagement as

---

[1] This would not be the first time in recent years that Colorado officials would have exhibited animus to religious exercise. *See, e.g.*, *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617 (2018); *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023); *Does 1-11 v. Board of Regents of Univ. of Colorado*, 100 F. 4th 1251 (10th Cir. 2024).

anything other than supporting Mr. Oliver's historical attacks on religion. Colorado has many ways to publicize any legitimate concerns with health care sharing ministries: it chose one of the most well-known anti-religious entertainers in the United States.

That communication is part of a long line of religious gerrymandering conduct regarding the ministries. In 2020, the Division issued a "consumer advisory" about a "ministry" due to its "religious" beliefs. 1.App.118. Specifically, the Division stated that members of the public should be wary of a "health care sharing program or ministry," because, among other reasons "members may also be subject to religious or moral restrictions from the sharing ministry." *Id*.

For several years subsequently, a state legislator introduced a bill targeting for regulation those organizations that are a "health care sharing ministry." *Id*. The Alliance opposed that bill on numerous grounds, including that it violated the First Amendment and was unworkable. In good faith, as part of the horse trading of legislative politics, the Alliance proposed an alternative bill that would involve fewer infringements on religious liberty and would be more workable. 2.App.157. However, the original "ministry" bill became law, after the legislature sanitized references to "ministry" with "program." 1.App.119.

Notably, the Commissioner supported this "ministry" bill before internalizing any justification. The Commissioner's own personal email states that he "signed

off" on the legislation and then, subsequently, was "going to need help building the case" for it.  21.App.1063.

### 2. The Colorado Law's Extensive Requirements and Exemptions for Favored Secular Conduct

The Colorado law requires reporting of extensive and intrusive information. 19.App.950-52 (full list of requirements occupying pages of district court opinion). In particular, the statute requires reporting statistical and financial information, affiliations, and communications.

First, across over a dozen different statutory requirements, the statute requires reporting of comprehensive information regarding the number of members, the amounts contributed, requested to be shared, and shared, the amounts paid to health care providers, and the internal structure of the ministry. Colo. Rev. Stat. § 10-16-107.4(1)(a)(I)-(III), (V)-(XII), (XVI), (XIX)-(XX).  This is akin to asking a church its membership numbers, how much those members contribute, and what happens to those donations.

Second, the statute requires reporting of detailed information regarding the ministry's affiliations, including "[a]ny contracts" and "third parties," *id.* § 10-16-107.4(1)(a)(IV), (XV).  That is exactly the type of disclosure that could chill affiliations, and there is undisputed evidence in the record that it in fact chills the ministry's operations and affiliations. 1.App.11-12,13,16-17; 105-06.  As Mr.

Waldo testified, ministries face many hurdles in their operation, and disclosure of affiliates adds to those hurdles. 19.App.940-43,947-48.

Last, the statute requires submission of the ministry's speech: all member and potential member communications "promoting" the ministry, including all "descriptions and other materials" that explain the ministry's sharing programs. *Id.* § 10-16-107.4(1)(a)(XVII). It is undisputed that those materials often include religious speech. 20.App.1003-04.

These raw disclosures from the ministries are available to anyone who asks for them under a Colorado Open Records Act request, subject to certain confidentiality rules that are not comprehensive.

The statute also, significantly, empowers the Division to enforce its restrictions and to fine or prohibit the operation of ministries for violations, *id.* § 10-16-107.4(2), and to adopt implementing rules, *id.* § 10-16-107.4(4). The ministries have received Division notifications of such non-compliance.

Notably, the statute states that its provisions do not apply to "[d]irect primary care agreements," or "other consumer payment arrangements identified by the commissioner by rule." *Id.* § 10-16-107.4(5). It does not cabin the commissioner's discretion in any way.

This provision was added to allow the Commissioner to protect favored organizations. Colorado's own Deputy Commissioner exchanged emails with state

legislative staff in which they discussed how to make sure that a favored dental payment arrangement—which they described as the "good guys"—that fell within the statutory terms could be excluded through amended language and how the Commissioner had the power to exempt organizations under the statute. *See* 21.App.1043-49 (acknowledging that the then-pending Reporting Law was amended to give the DOI exemptive authority to "avoid unintentional burden on the 'good guys'" [a favored secular group]).

This summary is a concise distillation and categorization of the statute's extensive requirements. Precisely everything that the statute requires the ministries to disclose occupies three pages of the district court opinion. 19.App.950-52; *id.* § 10-16-107.4(1)(a)(I)–(XX).

### 3. Colorado's Gerrymandered Regulatory Enforcement

Shortly after the enactment of the statute, the Division promulgated emergency interim regulations. *See* Emergency Regulation 22-E-20. After accepting public comments on those regulations, including that the interim regulations imposed significant costs in excess of their benefits, the Division promulgated final regulations effective April 30, 2024. *See* Regulation 4-10-01, available at https://doi.colorado.gov/health-care-sharing-plans-or-arrangements.

The final regulations impose extensive and intrusive reporting obligations that flow from the statutory requirements but are even broader. Indeed, the final

regulations break out and expand the statutory requirements across 27 columns (A through AA) of one spreadsheet and another six columns on a second spreadsheet. Here is what the spreadsheet requires:[2]

| A. Product name<br><br>(list out all products your organization offers in Colorado) |
| --- |
| B. Number of Colorado residents that participated in this product in the reporting year (Individuals) |
| C. Number of Coloradan HOUSEHOLDS that participated in the product in this reporting year |
| D. The total number of employer groups in Colorado that facilitate all or some of their employee participants' monthly share contributions |
| E. For each employer group included in element D, list out how many individual Colorado participants were included<br><br>(separate answers by commas) |
| F. Total number of participants in the product NATIONALLY? |
| G. Number of contracts entered into with health care service providers providing services for Colorado participants for this product. This includes contractors that provide telehealth services for participants |

---

[2] All emphasis is in original. These required disclosures have been transposed vertically and are listed in a table for convenience, but they can be accessed in their native format at: docs.google.com/spreadsheets/d/1B0yM0Oyhj0gNaQk9Yds TTM4udHCVfyfcZDNKnApJWVs/

| |
|---|
| H. Total amount of fees, dues, shares, contributions, or other payments **<u>collected</u>** from individuals, Colorado employer groups, or others who participated in the product<br>($) |
| I. The percentage of fees, dues, shares, contributions, or other payments from Colorado participants in this product retained by the plan or arrangement for <u>administrative expenses</u><br>(%) |
| J. The percentage of fees, dues, contributions, or other payments from Colorado participants in this product retained by the plan or arrangement for <u>program expenses</u><br>(%) |
| K. Total dollar amount of health-care costs or services that were incurred by the participant and <u>submitted</u> by or on behalf of the participant for sharing<br>($) |
| L. Total dollar amount of requests for sharing of Colorado participants' health-care costs or services that qualified for sharing excluding any amounts that the participants incurring the health-care costs or services must pay before receiving sharing amounts under the member guidelines<br>($) |
| M. Total dollar amount of payments made to <u>providers</u> for Colorado participants' health care costs or services<br>($) |

| |
|---|
| N. Total dollar amount of sharing requests facilitated or provided to Colorado <u>participants</u> for health care costs or services<br>($) |
| O. Total number of requests by or on behalf of the Colorado participants' for sharing of healthcare costs or services incurred by the participant<br>(Number) |
| P. Total number of share requests, for Colorado participants, that were denied (not shared) because they were not eligible for sharing according to the organization's guidelines<br>(Number) |
| Q. Total number of **<u>appeals</u>** of denied sharing requests for Colorado participants' incurred health-care costs or services<br>(Number) |
| R. Total number of appeals requests that were later approved for sharing for Colorado participants' incurred health-care costs or services<br>(Number) |
| S. Percentage of total number of requests denied compared to the total number of Colorado participants share requests submitted |
| T. Percentage of total number of requests denied compared to the total number of appeals for sharing that were "denied" (not shared) for Colorado participants |
| U. Total amount of **Colorado** participants' health-care costs or services submitted in the reporting period that qualify for sharing pursuant to the plan/arrangement's criteria but that were not shared or paid by the last day |

| |
|---|
| of the reporting year, excluding any amounts that the participants incurring the health-care costs or services must pay before receiving sharing amounts under the member guidelines ($) |
| V. Estimated number of individual plan/arrangement participants anticipated in Colorado in the current calendar year |
| W. Estimated number of households plan/arrangement participants anticipated in the current calendar year |
| X. Estimated number of employer groups in Colorado that facilitate all or some of their employee participants' monthly share contributions in the current calendar year |
| Y. Estimated total number of individual Colorado participants associated with the employers in element X in the current calendar year |
| Z.  The total number of producers that are associated with or assist in offering or enrolling participants in Colorado in the product (number of **producers**) |
| AA. Of the number of Colorado participants in the product how many were enrolled through a producer (number of **participants**) |

*See* Updated Health Care Sharing Plan Reporting template for regulation 4-10-01,

Sheet 2.

But the required disclosures do not even stop there. The Division also requires

the ministries to complete the following fields:

- Parent companies, subsidiaries, and other names that your organization has operated under at any time with the immediately preceding 5 calendar years:

- Provide your Organization's website

- Provide any additional website(s) your organization uses to communicate marketing materials including social media sites

- Additional context you'd like to provide the Division about this product or any of the data submitted on this tab? Possibly data to include could be the total dollar amount of discounts negotiated for Colorado participants. If any Colorado data were provided on a pro rata basis please note that here and which data elements (e.g. B, G-J, M) are based off of national numbers

- Name of third party - provide the "doing business as" name of each applicable third-party (list out separately)

- Total commission, fees, or remuneration paid in the previous calendar year for: **marketing, promoting, or enrolling participants in a HCSPA product to Colorado participants**

- Total commission, fees, or remuneration paid in the previous calendar year for: **operating, managing, or administering a product offered by the HCSPA**

- **Total number of producers** that are associated with or assist in offering or enrolling participants in Colorado (Aggregate value)

- **Total commission, fees, or remuneration paid** in the previous calendar year **to producers** for: marketing, promoting, or enrolling Colorado participants in a plan or arrangement (Aggregate value)

- List out the Colorado counties where a plan/arrangement was offered in **2023**

- List out the Colorado counties where a plan/arrangement is **intended** to be offered in **2024**

- List out the other states (i.e., states other than Colorado) in which your organization offered a plan or arrangement was in **2023** One row per state

- Please describe any appeals processes that your organization's uses when a participant contests a reimbursement, requested share, or payment denial

*Id.* Sheet 2–3 (all emphasis in original). Although not all of these requirements are constitutionally problematic, there can be no doubt of their burden. 1.App.11-17; 101-07. The undisputed testimony is that these requirements chill ministry activities and also take hundreds of hours to complete each year for the ministries. *Id.*

Significantly, the regulation also confirms that it applies selectively. It defines "health care sharing plan" to mean "any organization that offers or markets products to facilitate payment or reimbursement of health care costs or services." Regulation 4-10-01, Section 4(G). But it immediately exempts not only the statutorily exempted "direct primary care agreements," but also "consumer payment plans offered directly between a provider and patient" and certain "crowdfunded sources." *Id.* (exempting "crowdfunded sources that do not require ongoing membership fees, share requirements, or dues for the purposes of payment for and/or reimbursement of health care services").

It appears Colorado's regime is not only selective on its face but in its enforcement. Although the ministries have received numerous deficiency notices for failing to submit precisely the information demanded by the Colorado regime, certain purportedly non-exempt crowdfunding practices received a deficiency notice only after the Alliance challenge Colorado's regime and right when Colorado filed its opposition to the Alliance's motion for a preliminary injunction. This curious timing arose even though Colorado knew about this crowdfunding practice for over eighteen months, informing them by letter of Colorado's law, and that crowdfunding practice appears to have submitted nothing at all under Colorado's regime. Dkt. 15-2, at 800-12.

### 4. The First Amendment Burdens of the Colorado Regime

The Division's first public report continued to focus on the religiosity of the ministries. 1.App.132. It focused on the ministries' policy not to facilitate payment of medical expenses inconsistent with their religious beliefs. It also provided misleading information, confounding the "sticker price" charged by medical providers with the amounts ultimately paid by the ministries' members. 1.App.132-33. This report confirms the harms of the Colorado regulatory regime.

This burden arises on top of the undisputed fact that the disclosure aspects of the Colorado regime impose additional burdens. Mr. Waldo testified that organizations are reluctant to work with his ministry because of its beliefs, that

disclosure of that affiliation will exacerbate that problem, and that organizations often do not give reasons for their refusal to deal with ministries. 19.App.940-43, 947-48.

## II. This Case

### A. The Ministries Do Not Comply with the First Permanent Reporting Cycle

In the first reporting cycle for Colorado's permanent regulation, Plaintiff's members did not submit the full suite of information required to be submitted by Colorado, instead submitting minimal, high-level information that they largely already share publicly (or would voluntarily do so). Dist. Dkt. 58.

Specifically, Plaintiff's members submitted no more than their names, the number of current and projected members of Colorado residents, households, employer groups (and affiliated individuals), the current number of national members, and the total amount of contributions collected (columns A-H and V-Y of the spreadsheet). Plaintiff's members did not submit administrative expenses, program expenses, health care costs incurred, amounts paid before sharing, amounts paid to providers, amounts of sharing requests, number of sharing requests, requests declined to share, appeals, appeals granted, percentages regarding the same, amounts qualifying for sharing, producer information, and producer enrollment figures (columns I-U and Z-AA). Plaintiff's members did not submit any information regarding third parties, producers, or county information (seven additional columns

25

on the second tab of the reporting spreadsheet). And Plaintiff's members did not submit any marketing materials.

## B.    The District Court Litigation

Plaintiff brought suit against the Colorado regime in May 2024, seeking a preliminary injunction. 19.App.949. Colorado represented to Plaintiff and the district court that it would not enforce its regime against Plaintiff's members during the pendency of Plaintiff's preliminary injunction motion (notwithstanding that Plaintiff's members had not complied).   Dist. Dkt. 21.   The district court then allowed Colorado to take discovery before filing its opposition to Plaintiff's motion for a preliminary injunction, extending the deadline for the opposition to four months after the preliminary injunction was filed. After the completion of briefing in September, the parties offered their availability for a hearing on the preliminary injunction motion. Discovery continued, and Colorado began producing documents in response to requests for production.

The district court issued its ruling denying Plaintiff's motion in January.   It began its analysis by observing (wrongly) that a preliminary injunction would disrupt a regime that has been in place "for multiple years." 19.App.966. The district court then acknowledged that under *Fulton*, which rejected a policy regarding adoption set out by the city of Philadelphia, a law is not "generally applicable" under the First Amendment when "it 'invite[s]' the government to consider the particular

reasons for a person's conduct by providing 'a mechanism for individualized exemptions,'" *Fulton*, 593 U.S. at 533, but held that *Fulton* is not applicable to exemption authority that is provided "by rule," because such authority provides for "categorical exclusions." 19.App.979. The district court also acknowledged that, under *Fulton*, a law is not generally applicable "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," 19.App.978-79 (quoting *Fulton*), but concluded that no other organization "resembles insurance" in the same way as the ministries do. The court also rejected the Alliance's neutrality claim, holding that although "upwards of 85% of the sharing plan members in Colorado are members of religiously affiliated plans," 19.App.965, and certain crowdfunding arrangements (and other similar arrangements) are not regulated, there was no "religious gerrymander." Finally, as relevant, the court accepted the Alliance's view that the Establishment Clause protects religious organization autonomy (thereby rejecting Colorado's arguments) but nonetheless held that the extensive reporting requirement regime "requires only an annual email," notwithstanding the uncontroverted evidence of the burden it imposes on ministry operations. 19.App.988.

Plaintiff filed a notice of appeal and moved in the district court for an injunction pending appeal, which was denied after the court discussed additional

evidence. 21.App.1069. This Court also denied a motion for injunction pending appeal.

## SUMMARY OF ARGUMENT

Colorado's regime should be preliminary enjoined because the Alliance satisfies all four of the factors for a preliminary injunction.

I. First, the Alliance has shown a likelihood of success with respect to several constitutional claims. Colorado's regime should be subject to significant scrutiny for each of these claims, and it does not survive such scrutiny.

A. Most prominently, Colorado's regime violates the Free Exercise Clause. Government restrictions on the free exercise of religion trigger strict scrutiny when they are not generally applicable or neutral. Colorado's regime is neither.

1. Colorado's regime is not generally applicable in two separate ways. The "creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless whether any exceptions have been given." *Fulton*, 593 U.S. at 537. That "undermines the [State's] contention that its [law] can brook no departures." *Id.* at 542. Here, Colorado not only empowers the Commissioner to grant exemptions from its regime, it also empowers the Commissioner to exercise enforcement discretion. The Commissioner has done both selectively.

In addition, a law is not generally applicable if it "treat[s] *any* comparable secular activity more favorably than religious exercise," *Tandon v. Newsom*, 593

U.S. 61, 62 (2021) (per curiam) (emphasis in original), or "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," *Fulton*, 593 U.S. at 534. Here, Colorado fails to subject and indeed explicitly exempts numerous comparable secular activities from the burdens imposed on health care sharing ministries.

2. Colorado's regime also is not neutral. Even "slight suspicion" of religious intolerance or "subtle departures from neutrality" violate the Free Exercise Clause. *Masterpiece*, 584 U.S. at 638-39. As this Court recently explained, there does not need to be "egregious language" from officials: for "if that is the bar for an inference of hostility, it will almost never be cleared." *Does 1-11 v. Board of Regents of Univ. of Colorado*, 100 F. 4th 1251, 1280 (10th Cir. 2024). Here, the record is full of more than a "slight suspicion": the Commissioner liaised with an anti-religious entertainer, focused on "ministries," criticized ministries' religious views on certain health care procedures, and crafted and implemented a regime where 85% of the burdened organizations are religious organizations.

B. Colorado's regime also violates the Establishment Clause. In *Medina v. Catholic Health Initiatives*, this Court held that regulatory schemes that require "long-term, continuing monitoring" constitute excessive entanglement with religious organizations in violation of the Establishment Clause. 877 F.3d at 1233. Here, Colorado's regime imposes just that "long-term, continuing monitoring,"

subjecting health care sharing ministries to extensive and intrusive monitoring of finances and operations. The statutory requirements number in the dozens; the regulatory requirements fill multiple spreadsheets. Together, they are akin to asking a church how it spends its collection baskets on charitable giving and then publishing the result. This claim, too, should subject Colorado's regime to strict scrutiny.

C. Colorado's regime also violates the freedom of association. It is "hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *Bonta*, 594 U.S. 606. Here, Colorado's regime compels the disclosure of those who affiliate with the ministries, which should subject it to exacting scrutiny.

D. Finally, Colorado's regime violates the Free Speech Clause. "Laws that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny" as those that forbid speech. *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994). Here, Colorado's regime requires religious organizations to submit their religious speech to the government, which also publishes their internal operations.

Colorado's regime is subject to strict scrutiny under the first three and the fifth of these constitutional claims, and exacting scrutiny for the fourth claim. Colorado's regime does not survive such scrutiny.

II. The Alliance also has established irreparable harm. It is blackletter law that constitutional violations constitute irreparable harm.

III. Finally, the balance of the equities and the public interest favor an injunction. In cases involving constitutional violations, there is no legitimate interest in continuing to enforce an unconstitutional regime, especially when Colorado paused enforcement for part of this litigation.

## STANDARD OF REVIEW

This court reviews a district court's denial of a preliminary injunction for abuse of discretion. *Gen. Motors Corp. v. Urb. Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007). In general, "[a] district court abuses its discretion when it commits an error of law or makes clearly erroneous factual findings." *Id.* (quoting *Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1252 (10th Cir. 2006)). But "[i]n a First Amendment case … [this Court] review[s] the district court's findings of fact and its conclusions of law de novo." *Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212, 1219 (10th Cir. 2007) ("We conduct our review 'without deference to the trial court.'") (citation omitted); *Roberts v. Winder*, 16 F.4th 1367, 1374 (10th Cir. 2021) ("Where activity is arguably protected by the First Amendment, the court has 'an obligation to make an independent examination of the whole record'" (citation omitted)).

**ARGUMENT**

A preliminary injunction is merited when a plaintiff shows (1) a likelihood of success on the merits, (2) irreparable harm absent relief, (3) the balance of equities weighs in its favor, and (4) the injunction is in the public interest. *Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205, 1223 (10th Cir. 2018).

"[I]n First Amendment cases, the likelihood of success on the merits will often be the determinative factor." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (en banc), *aff'd sub nom., Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). That is because "[this Court's] precedent is clear that a First Amendment violation constitutes irreparable injury," "[a] governmental interest in upholding a [law] that is likely unconstitutional does not outweigh a movant's interest in protecting his constitutional rights," and "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Pryor v. Sch. Dist. No. 1*, 99 F.4th 1243, 1254 (10th Cir. 2024); *Hobby Lobby*, 723 F.3d at 1145 (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012)).

Here, the Alliance has demonstrated likelihood of success on several constitutional claims and the remaining preliminary injunction factors are easily satisfied. *See Does 1-11*, 100 F. 4th at 1267 ("[i]f the moving party is likely to succeed on each of several theories, the party's argument for preliminary relief is stronger than if the party has only one claim that is likely to be viable").

I.      **The Alliance Has Demonstrated a Likelihood of Success.**

Plaintiff is likely to succeed on the merits because Colorado's regime violates the Free Exercise Clause, the Establishment Clause, the Freedom of Association, and the Free Speech Clause.  Specifically, the regime triggers strict or exacting scrutiny and Colorado does not satisfy those heavy burdens.

A.      **Colorado's Regime Violates the Free Exercise Clause.**

The First Amendment prohibits the government from burdening "the free exercise" of religion. "The [Free Exercise] Clause protects not only the right to harbor religious beliefs inwardly and secretly." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022). Rather, "[i]t does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'" *Id.* (quoting *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 877 (1990)).

There can be no question—and Colorado has not disputed—that Colorado's regime burdens the free exercise of religion. Consistent with their commitment to bear each others' burdens, members of ministries exercise their religious beliefs by contributing spiritually, emotionally, and financially to each others' medical expenses. *See supra* Statement I.A.

An individual or organization "may carry the burden of proving a free exercise violation in various ways." *Kennedy*, 597 U.S. at 525. In particular, government action is subject to strict scrutiny under the Free Exercise Clause when it "is not 'neutral' or 'generally applicable.'" *Id.* (citing *Smith*, 494 U.S. at 879-881).

Colorado's regime fails both of these requirements.

### 1.     Colorado's Regime Is Not Generally Applicable.

"[L]aws burdening religious practice must be of general applicability." *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 542 (1993). A law may fail general applicability in at least two ways. *Fulton*, 593 U.S. at 533-34.

a. First, a law "is not generally applicable if it invite[s] the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Id.* at 533 (alteration in original) (internal quotation marks omitted). Consequently, the "creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless whether any exceptions have been given." *Id.* at 537. That "undermines the [State's] contention that its [law] can brook no departures." *Id.*

The Supreme Court's decision in *Fulton* exemplifies this rule. There, the city of Philadelphia "stopped referring children to [Catholic Social Services] upon discovering that the agency would not certify same-sex couples to be foster parents due to its religious beliefs about marriage." 593 U.S. at 527-28. The city argued that

its decision was an application of a generally applicable policy that foster agencies such as Catholic Social Services must provide services regardless of sexual orientation. But the Court concluded that was not a generally applicable policy because it empowered the city to grant exceptions at its "sole discretion." *Id.* at 537. As the Court put it, this regime 'invite[s]' the government to decide which reasons for not complying with the policy are worthy of solicitude." *Id.* (alteration in original) (quoting *Smith*, 494 U.S. at 884).

Here, the statute contains at least two types of exemption mechanisms: rulemaking and enforcement. First and foremost, with respect to rulemaking, the statute empowers the Division to exempt "other consumer payment arrangements identified by the commissioner by rule." Colo. Rev. Stat. § 10-16-107.4(5). The statute does not cabin the Division's discretion in any way. The Division has exercised that exemptive authority in its final regulation. That is a clear violation of the principle most recently enunciated in *Fulton*. Consequently, the Colorado regime is not generally applicable and is subject to strict scrutiny, which Colorado cannot satisfy. *See infra* Part I.E.

Colorado previously has made the counterintuitive argument that Colorado's regime does not provide the authority to "exempt" but rather to "clarify" the law's scope. *See* Dist. Dkt. 46, at 11-14. Even the district court rejected that argument, which is inconsistent with the clear text of the statute. Colo. Rev. Stat. § 10-16-

107.4(5) (empowering the Division to exempt "other consumer payment arrangements identified by the commissioner by rule").

Instead, the district court sidestepped this straightforward application of *Fulton* on a ground not only that Colorado did not strongly press, but that is supported by no cited authority and contradicts the only authority to address this issue (which happens to be within the same district court). The district court held that *Fulton* is not applicable to exemption authority that is provided "by *rule*," because such authority provides for "*categorical* exclusions." 19.App.976-77. But *Fulton* does not distinguish between these situations, with good reason: the concern is whether the government can "decide which reasons for not complying with the policy are worthy of solicitude" and whether the presence of discretion "undermines the [State's] contention that its [law] can brook no departures." 593 U.S. at 537, 542. That concern is applicable regardless of whether the government exercises discretion by rule or not, and the district court's ruling to the contrary directly conflicts with *Fulton*.

That is why another case in the same district did not read *Fulton* this way. In *Bella Health & Wellness v. Weiser*, the court held *Fulton* applied when "the uniformity of [the state law]'s application was dependent on the outcome of three boards' rulemaking." 699 F. Supp. 3d 1189, 1214 (D. Colo. 2023). In that case, Colorado enacted a law empowering its medical, pharmacy, and nursing boards to

promulgate regulations on whether medication abortion reversal constituted accepted practice. The boards promulgated regulations to the effect that it is not a generally accepted practice but was not per se unaccepted and would be evaluated on a case-by-case basis. The district court held that this statute and implementing rules "contain multiple mechanisms for exceptions." *Id.* First, "at the initial stage, the uniformity of [the statute's] application was dependent on the outcome of three boards' rulemaking. The fact that the law itself included this discretionary measure 'undermines the [State's] contention that its [regulations] can brook no departures.'" *Id.* (quoting *Fulton*). The court went on to address two other mechanisms: a case-by-case process in the implementation rules and the discretion of instituting the disciplinary process. *Id.* at 1214-15. *Bella Health* confirms the applicability of *Fulton*'s concern about selectivity to rulemaking.

Indeed, in this very case, Colorado discussed using its exemptive rulemaking authority to selectively protect secular "good guys" (*see* 21.App.1043-49) while ensuring the ministries receive harsh treatment. In an email during the legislative process, Colorado officials encouraged legislative solutions that would empower the Commissioner to exempt from the statute's plain coverage a particular practice regarding the payment of dental expenses. Any revisionism that these "good guys" are different than the ministries only underscores that Colorado is picking and choosing whom to exempt.

37

That the district court's view is impossible to square with *Fulton* also is buttressed by the longstanding administrative law doctrine that agencies may obtain the same result in making policy through either rulemaking or adjudication. *SEC v. Chenery Corp.*, 332 U.S. 194 (1947). That is why those methods of regulation are generally subject to similar standards of review. *See Ass'n of Data Processing Serv. Organizations, Inc. v. Bd. of Governors of Fed. Res. Sys.*, 745 F.2d 677, 683 (D.C. Cir. 1984).

There also is an additional level of exemption discretion here: enforcement discretion. *Fulton* is triggered when a regime "invites the government to consider the particular reason for a person's conduct." 593 U.S. at 537. An administrative enforcement system like that in this case is just that. *Bella Health* is again instructive. There, the court observed that the state officials "have discretion throughout the disciplinary process to decide whether and how to punish a provider who engages in" medication abortion reversal and that such discretion triggered *Fulton*. 699 F. Supp. 3d at 1214-15.

Here, similarly, Colorado is empowered to decide which organizations it enforces its regime against. That discretion has come into play in at least two ways so far. First, in this case, Colorado decided not to enforce its regime against those ministries in active litigation over the regime during the pendency of preliminary injunction proceedings in the district court. Dist. Dkt. 21.

38

Second, Colorado has selectively chosen when and how to enforce its regime with respect to crowdfunding, conducting enforcement against secular entities only after denying its regime targets the ministries. In its briefing, the Alliance correctly observed that the Commissioner has exempted certain crowdfunding from its regime, and that modern crowdfunding is a secular version of health care sharing ministries in relevant part, with citation to one particular example of crowdfunding. In response, Colorado claimed that it has enforced its regime against that particular crowdfunder, including, in its own words, before this litigation commenced.

But a closer look indicates that Colorado is again picking and choosing when to enforce its regime in the very way that *Fulton* forbids. Colorado sent a letter to that crowdfunder demanding compliance with its regime in January 2023. *See* Dkt. 15-2, at 808 (letter to CrowdHealth). Eighteen months later, it apparently had received nothing from that organization. In that interim, it had sent numerous deficiency letters to ministries over purported omissions in or problems with their submissions, reminding the ministries of fines and compliance requirements and publishing critical reports. Yet Colorado sent its letter to that secular crowdfunder for failing to comply with its regime only in September 2024, after filing its opposition to the preliminary injunction motion in this case, denying selective enforcement of the regime. *See* Dkt. 15-2, at 808 (letter to CrowdHealth in September 2024). There is only one way to read this history that Colorado has

revealed: if the organization is a ministry, then Colorado will enforce its regime with detail; if the organization is secular, then Colorado may not do so.

b. Second, a law fails general applicability if it "treat[s] *any* comparable secular activity more favorably than religious exercise," *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam) (emphasis in original), or "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," *Fulton*, 593 U.S. at 534. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Tandon*, 593 U.S. at 62. A single exemption for comparable secular activity condemns government action to strict scrutiny review. *Id*.

Here, Colorado fails to subject and indeed explicitly exempts numerous comparable secular activities from the burdens imposed on health care sharing ministries. For example, Colorado law explicitly exempts direct primary care arrangements, while Colorado regulation explicitly exempts consumer payment plans and crowdfunded arrangements. That these practices are explicitly exempted necessarily means that they would be covered by the statutory language but for the explicit exemption and thus trigger "the government's asserted interests in a similar way." *See supra* Statement I.B.

In addition, Colorado does not regulate other organizations that help individuals share medical expenses, such as but not limited to masonic fraternal organizations, medical discount cards, student health clinics at universities (where students pay a fee for unlimited access), charities that pay medical bills, or fully-insured out-of-state employer health plans with Colorado enrollees. *See, e.g.*, *id.*; Colo. Rev. Stat. § 10-14-705 (exempting "Grand or subordinate lodges of masons, odd fellows, or knights of Pythias," among other fraternal organizations from regulation under the Insurance Code). All of these organizations, too, involve the same purported interest in regulatory medical expense sharing.

The district court rejected this argument by holding that none of these practices "resembles insurance" such that it creates confusion and flipping the burden onto the Alliance to prove otherwise. Yet the Supreme Court has criticized placing the burden on the plaintiff in these cases. In *Tandon*, the Court criticized the Ninth Circuit for not placing the burden on the government: "instead of requiring the State to explain why it could not safely permit at-home worshipers to gather in larger numbers while using precautions used in secular activities, the Ninth Circuit erroneously declared that such measures might not 'translate readily' to the home." 593 U.S. at 64; *see Blackhawk v. Pa.*, 381 F.3d 202, 211 (3d Cir. 2004) (placing burden on government).

*Tandon* also demonstrates that courts have treated far more disparate activities as comparable than the Alliance proposes here. *See Lukumi*, 508 U.S. at 544-45 (animal sacrifice and "improper disposal of garbage by restaurants"); *Tandon*, 539 U.S. at 62 (classifying as comparable to churches "hair salons, retail stores, personal care services, movie theaters, private suites at sporting events and concerts, and indoor restaurants").

At its core, the district court's analysis rests on the conclusion that ministries are different in the quantity of risk they purportedly pose. Even putting aside that the reason Colorado posits this consumer confusion risk—the ministries' structure—is equally applicable to other organizations, this argument, too, violates *Tandon*, which took the Ninth Circuit to task for trying to compare precise quantities of risk, as opposed to the governmental interests. In *Tandon*, the dissent tried to analyze the amount of risk for particular activities; the majority did not. That is because the government can "engineer" this quantification effort "by adjusting the dials just right—fine-tuning the level of generality up or down." *Masterpiece*, 584 U.S. at 652 (Gorsuch, J., concurring).

Colorado's purported evidence of customer confusion is a good example of this creative "engineering." Colorado's primary evidence consists of state AG and commissioner enforcement activity against organizations operating an unlicensed insurance company or in violation of other charitable laws. *See* 19.App.969-70.

Colorado casts this activity as evidence of the need to police ministries, "fine-tuning the level of generality" to ministries. But it is just as easy to move to a different level of generality and cast this evidence as about policing unlicensed insurance or charities. Colorado's remaining evidence consists of complaints about producers or networks, which are not exclusive to ministries and do not justify a focus on them, or complaints regarding religious organizations not facilitating sharing of payment of medical procedures against their religious beliefs, which are fundamentally theological and not a subject for government regulation. *See id.* In sum, Colorado's attempts to distinguish these numerous similar activities fall apart at the slightest probing.

### 2. Colorado's Regime Is Not Neutral.

The government is "obliged under the Free Exercise Clause to proceed in a manner neutral toward and tolerant of [] religious beliefs." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018). "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 593 U.S. at 533. Laws also are not neutral when they accomplish a "religious gerrymander" where "the burden of the [law], in practical terms, falls on [religious] adherents but almost no others." *Lukumi*, 508 U.S. at 535-36.

A law is also not neutral when "the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body" demonstrate animus toward religion. *Masterpiece*, 584 U.S. at 639. When "'official expressions of hostility' to religion accompany laws or policies burdening religious exercise," courts must "'set aside' such policies without further inquiry." *Kennedy*, 597 U.S. 507, 525 n.1 (2022) (quoting *Masterpiece*, 584 U.S. at 639).

Even "slight suspicion" of religious intolerance or "subtle departures from neutrality" violate the Free Exercise Clause. *Masterpiece*, 584 U.S. at 639. As this Court recently explained, there does not need to be "egregious language" from officials: for "if that is the bar for an inference of hostility, it will almost never be cleared." *Does 1-11 v. Board of Regents of Univ. of Colorado*, 100 F. 4th 1251 (10th Cir. 2024).

Rather, in assessing neutrality, courts must "survey meticulously" for "masked, as well as overt" hostility. *Lukumi*, 508 U.S. at 534. "Factors relevant to the assessment of governmental neutrality include 'the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body.'" *Masterpiece*, 584 U.S. at 639 (quoting *Lukumi*, 508 U.S. at 540). All evidence of a law's purpose is relevant to determining whether a law was "enacted 'because of,'

not merely 'in spite of,' [its] suppression of [] religious practice." *Lukumi*, 506 U.S. at 540 (quoting *Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256, 279 (1979)); *see e.g., Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2021) (per curiam) (rejecting pandemic restrictions because "statements made in connection with the challenged rules can be viewed as targeting the ultra-Orthodox [Jewish] community") (internal quotation marks omitted) (alteration in original); *Lukumi*, 508 U.S. at 541 (rejecting regulation regarding treatment of animals because of, among other reasons, hostility of members of the city council towards the religion of Santeria).

Here, Colorado's regulatory regime is not neutral with respect to religion. Indeed, the Commissioner himself conspired with the John Oliver show—a well-known anti-religious entertainer—to denigrate the ministries. *See* 21.App.1051-61**.** In addition, the Division's statements target "ministries" for their religious beliefs, the legislative history exhibits the same focus, the Division's misleading report reiterates that view, and the statutory and regulatory exemptions privilege similar secular conduct while covering conduct that the district court acknowledged is overwhelmingly (85%) religious. *See supra* Statement III. Together, these indicate

more than a "slight suspicion" that defendants have proceeded in a manner intolerant of religious beliefs.[3]

Colorado previously has argued its regime is not a gerrymander because it in theory applies to secular health care sharing plans. Yet "[i]t is no answer that a State treats some comparable secular businesses or other activities as poorly as or even less favorably than the religious exercise at issue." *Tandon*, 593 U.S. at 62. And the district court also recognized that upwards of 85% of regulated organizations are religious. 21.App.965; 18.App.891.

Colorado also has repeated the district court view that conspiring with antireligious entertainer John Oliver had an "obvious innocent explanation" of publicizing concerns about ministries, not to express disapproval of religious beliefs. 21.App.1074. But Colorado specifically chose to coordinate with Mr. Oliver when no government official could understand that such coordination would lead to anything other than another episode in his long history of intense animus towards religious adherents. This outsourcing of animus, when combined with the gerrymandering and the legislative and regulatory focus on "ministries," is more than the mere "slight suspicion" and "subtle departures from neutrality" required to

---

[3] The combination of these private and public communications reveals more intolerance than the case of *Rentera v. New Mexico Office of the Superintendent of Insurance*, No. 23-2123, 2025 WL 635754 (Feb. 27, 2025) (unpublished), which involved primarily public statements, *id.* at *7-*8.

prevail. *Masterpiece*, 584 U.S. at 638. As this Court recently explained, there does not need to be "egregious language" from officials (or, as Colorado put it once, more than "just two" documents, Dkt. 15-1, at 9): for "if that is the bar for an inference of hostility, it will almost never be cleared." *Does 1-11*, 100 F. 4th at 1251.

### B.  Colorado's Regime Violates the Establishment Clause.

"Throughout our Nation's history, religious bodies have been the preeminent example of private associations that have act[ed] as critical buffers between the individual and the power of the State." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 199 (2012) (Alito, J., concurring) (internal quotation marks omitted). "To safeguard this crucial autonomy," the courts have long acted to "protect a private sphere within which religious bodies are free to govern themselves in accordance with their own beliefs." *Id.* As the district court accepted (rejecting Colorado's contrary argument), the Establishment Clause furthers that end, prohibiting "excessive entanglement between religion and government." *Does* 1-11, at 1270. Under it, although government may impose "narrowly drawn" requirements regarding "recordkeeping and disclosure," it may not force a religious organization to subject itself to the state as ultimate arbiter of its activities. *Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*, 2 F.3d 1514, 1535 (11th Cir. 1993); *see Jimmy Swaggart Ministries v. Board of Equalization*, 493 U.S. 378, 394 (1990).

This distinction is well illustrated in *Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*. There, the city of Clearwater, Florida, promulgated an ordinance requiring that any organization that solicits funds report the name of the organization, its tax-exempt status, its purpose, the names and addresses of its officers, its other locations, any past criminal prosecutions, and, most relevant here, "[a]n estimated schedule of salaries, wages, fees, commissions, expenses and costs to be expended and paid in connection with the solicitation of funds and in connection with their disbursement, and an estimated percentage of the total projected collections which the costs of the solicitation will comprise," together with annual figures for the same. *Church of Scientology*, 2 F.3d at 1521-22. The court concluded that this ordinance excessively entangled the government with a religious organization because it essentially required a religious organization "to divulge its entire budget and all its operations on a continuing basis," and it mandated "detailed monitoring and close administrative interaction." *Id*. at 1535.

Similarly and much more recently, in *Medina v. Catholic Health Initiatives*, this Court held that regulatory schemes that require "long-term, continuing monitoring" constitute excessive entanglement with religious organizations in violation of the Establishment Clause. 877 F.3d at 1233. There, an employee argued that a church's benefit plan should be subject to ERISA and that exempting churches from ERISA coverage constituted excessive entanglement with religion. This Court

concluded that the employee's argument turned the Establishment Clause on its head: "far from entangling the government in the affairs of religious institutions, the church-plan exemption avoids the entanglement that would likely occur in its absence." *Id*. at 1234.

Here, Colorado's regime imposes the "long-term, continuing monitoring" and "detailed monitoring and close administrative interaction" condemned by *Medina* and *Church of Scientology*. The Colorado regime subjects health care sharing ministries to extensive and intrusive monitoring of finances and operations. The statutory requirements number in the dozens; the regulatory requirements fill multiple spreadsheets. *See supra* Statement I.C. Colorado requests detailed financial and operational metrics that are akin to asking a church how it spends its collection baskets on charitable giving. Even worse, Colorado exposes those internal workings of a religious organization for all the world to see. Consequently, Colorado's regime triggers strict scrutiny, which it cannot survive.

The district court's primary response to these arguments was to describe Colorado's regime as a reporting requirement and as "only requiring an annual email." 19.App.988. As an initial matter, the *Church of Scientology* case also involved a reporting regime. And the uncontroverted evidence is not only that such a reporting regime exposes religious organizations internal workings to public view

but also that the Colorado regime shapes and affects behavior in the same way as the *Church of Scientology* reporting regime. *E.g.*, 1.App.11-12.

More fundamentally, this regime cannot be characterized as just an "annual email." Indeed, the cases that the district court and Colorado cite prove as much because they are worlds away: *Bowen v. Kendrick*, 487 U.S. 589 (1988), involved religious organizations voluntarily participating in government programs, not being required to do so to operate at all, and in *Jimmy Swaggart Ministries*, 493 U.S. at 378, and *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290 (1985), the law required the religious organizations to create records for themselves, not create records and then turn them over to the government. At times, Colorado has questioned whether the sworn declaration that the law takes hundreds of hours to comply with is insufficient, and has observed that some of the required information is available publicly. *See* Dkt. 15-1. But the declaration is undisputed and, although some of the required information is already public, the vast majority of it is not.

At the end of the day, Colorado simply has no response to the undisputed fact that its regime subjects health care sharing ministries to dozens of invasive requirements and public scrutiny of their internal operations.

## C. Colorado's Regime Violates the Freedom of Association.

The Supreme Court has "'long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with

others.'" *Bonta*, 594 U.S. at 606 (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)). It is "hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *Id.* (alteration in original). In such situations, courts subject government restrictions on the freedom of association to "exacting scrutiny." *Id*. at 607.

Under "exacting scrutiny," there must be "a substantial relation" between the restriction and a "sufficiently important governmental interest." *Bonta*, 594 U.S. at 607. Not just any governmental interest is "sufficiently important." For example, "administrative convenience" is not enough. *Id.* at 615. Similarly, for a "substantial relation" to exist between the restriction and the governmental interest, that restriction must be "narrowly tailored." *Id.* at 608. That is because "First Amendment freedoms need breathing space to survive." *NAACP v. Button*, 371 U.S. 415, 433 (1963). To be "narrowly tailored," the restriction must satisfy a "means-end fit." *Id.* at 613. Required disclosure, for example, is not acceptable when enforcement mechanisms such as *ex post* investigation would suffice. *See id.* at 614.

The right to freedom of association applies in two ways of particular relevance here. First, the government can violate the freedom of association by compelling an organization to disclose the names of individuals who associate with the organization. In *Americans for Prosperity Foundation v. Bonta*, the Court held that

California's requirement that nonprofit organizations disclose the identities of their donors violated the First Amendment. *Id.* at 618. There, the California Attorney General promulgated a regulation requiring nonprofit organizations to file paperwork listing their major donors, in the interest of easing the investigatory burden of the government agency. The Supreme Court declared the regulation unconstitutional. It held that California's generalized interest in preventing wrongdoing did not justify the significant burden, including the risk of public disclosure, of collecting this information from nonprofit organizations. *See id. Bonta* is the latest in a long line of cases preventing the government from inquiring into the "internal structure or affairs of an association." *See, e.g.*, *Roberts*, 468 U.S. at 623; *NAACP v. Alabama*, 357 U.S. 449, 462 (1958); *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960); *Healy v. James*, 408 U.S. 169, 181–182 (1972).

Second, the government can violate the freedom of association by compelling an individual to disclose the names of organizations with which he associates. "[A] vital relationship [exists] between freedom to associate and privacy in one's associations." *NAACP v. Alabama*, 357 U.S. at 462. That is because compelled disclosure of individuals' associations can "subject them to threats, harassment, or reprisals from either Government officials or private parties," *John Doe No. 1 v. Reed*, 561 U.S. 186, 200 (2010)—a risk that is increasingly true in today's digital age. In *Shelton v. Tucker*, for example, the Court declared unconstitutional an

Arkansas statute requiring teachers to list the organizations to which they belonged or contributed. 364 U.S. 479 (1960). The Court held that, although the government of course enjoys the right to investigate the fitness of those who teach in its schools, that governmental interest "cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Id.* at 488.

The Colorado regime runs afoul of both of these principles. It requires the disclosure of numerous entities that associate with health care sharing ministries, including those who, in Colorado's words, "assist in marketing and enrollment" (that is, proselytization). *See supra* Statement I.C.  That disclosure has the potential to chill entities from affiliating with the ministries. Indeed, the Alliance is already aware of exactly that and submitted two sworn declarations supporting that effect. 1.App.9,100.  One deponent, a ministry official, further testified in deposition that organizations are reluctant to work with his ministry because of its beliefs, that disclosure of that affiliation will exacerbate that problem, and that organizations often do not give reasons for their refusal to deal. 19.App.940-43,947-48.

The district court rejected this argument only by imposing an impossible burden on association claims that is forbidden by the Supreme Court.  The district court held the Alliance has not shown a "risk of chilling" because it is not able to point to a "specific" vendor or other relationship torpedoed by Colorado's regime.

11.App.1000 ("If its disclosure requirements posed a bona fide risk of chilling protected association, the Court would expect that the Alliance would be able to produce more specific evidence germane to that risk.").

That is not the standard applied by the Supreme Court. In *Bonta*, the Court explicitly held that plaintiffs must show a "substantial number" of entities "will be subjected to harassment and reprisals" *only* "where the challenged regime is narrowly tailored to an important government interest." 594 U.S. at 617. Indeed, it was the *dissent* in *Bonta* that wanted that standard and criticized the *majority* for rejecting it: "Today, the Court abandons the requirement that plaintiffs demonstrate that they are chilled, much less that they are reasonably chilled. Instead, it presumes (contrary to the evidence, precedent, and common sense) that all disclosure requirements impose associational burdens." *Id.* at 629 (Sotomayor, J., dissenting).

This Court held similarly (and presciently) in *In re First Nat.*, 701 F.2d 115 (10th Cir. 1983). There, it stated that affidavits describing a "reluctance of people sympathetic [to the group] to associate with the group" upon exposure are sufficient evidence, when there is related evidence of antipathy towards a group's other known adherents. *Id.* at 116–17. In light of Mr. Waldo's testimony about organizations' antipathy towards the ministries, 19.App.940-43, 947-48, the Alliance has satisfied the required showing under governing precedents.

Once the Alliance makes that showing, Colorado cannot satisfy the required exacting scrutiny for its regime because there is no substantial relation between the disclosure requirement and a sufficiently important governmental interest. Colorado has not advanced such an interest; to the extent it relies on a general interest in consumer protection, that does not match the burdensome disclosure regime it has enacted. There is no substantial relation between a putative consumer protection rationale and the requirements, and in any event, the requirements are not narrowly tailored.

### D. Colorado's Regime Violates the Free Speech Clause.

The right to speak and the right to refrain from speaking are "complementary components of the broader concept of individual freedom of mind" protected by the First Amendment. *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (internal quotation marks omitted). "Laws that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny" as those that forbid speech. *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994). Any attempt by the government either to restrict, chill, or compel individuals to express certain views is subject to strict scrutiny. The general rule "that the speaker has the right to tailor the speech[ ] applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Hurley v. Irish–Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995).

The Colorado regime, by requiring submission of the communications of the ministries with prospective and current members, chills ministry speech and, by requiring reporting of information that Colorado posts publicly, compels the ministries to speak about their internal operations. That is inconsistent with the First Amendment's prohibition on restricting or compelling speech. Consequently, it is subject to strict scrutiny. Defendants cannot satisfy strict scrutiny for these infringements because they lack a compelling interest, and the law is not narrowly tailored.

For compelled speech, the only narrow exception to the application of strict scrutiny relates to "purely factual and uncontroversial disclosures" that are "related to the State's interest in preventing deception of consumers" by commercial speech and that are not "unduly burdensome." *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985); *see also Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980). Defendants cannot satisfy this standard because they post excerpts of Plaintiff's members' religious speech that also are misleading by omission and thereby controversial.

The district court rejected this claim with two erroneous moves. First, it concluded that the ministries' speech, although admittedly religious and soliciting funds for an IRS-recognized charity, 20.App.1004, is nonetheless "commercial speech" (and thus its required submission is not subject to strict scrutiny) because it

"inform[s] private economic decisions relating to health care coverage and do[es] provide information about goods and services." Op. 56-57. This flies in the face of the Supreme Court's clear holding in *Village of Schaumburg v. Citizens for a Better Environmentu* that "charitable solicitation does more than inform private economic decisions and is not primarily concerned with providing information about the characteristics of goods and services." 444 U.S. 620, 632 (1980).

The district court was only able to avoid *Schaumberg*'s clear holding on charitable solicitation by pointing to "Colorado's concern" that the ministries are simply "[p]roposing commercial transactions" and it is those transactions that "concern" Colorado. 20.App.1005-06. But Colorado does not get to decide whether religious speech is instead commercial any more than Pennsylvania could decide that "the sale of religious literature by itinerant evangelists" was a "commercial enterprise beyond the protection of the First Amendment." *Schaumburg*, 444 U.S. at 630 (describing *Murdoch v. Pennsylvania*, 319 U.S. 105 (1943), protection of the sale of religious literature). Religious speech does not lose its protection because the state believes it is solely or primarily commercial, or because aspects of it relating to commerce raise "concerns." That would undermine the strict scrutiny protection for religious speech.

Second, the district court rejected the Alliance's claim that requiring the submission of ministry data on internal operations and posting it publicly (in a

misleading fashion, to boot) triggers strict scrutiny. The court held that although not technically "commercial speech," Colorado's regime "does not implicate core First Amendment concerns" because the requirements are "commercial-speech adjacent" and akin to the "securities context." 20.App.1009-11. But Colorado's regime compels disclosure and then publishes (misleadingly) the internal operations *of a religious organization*, not the details of a securities trade. It is only by again wrongly accepting "Colorado's desire" to focus on aspects of ministries relating to commerce, 20.App.1011, that the application of strict scrutiny can be avoided, this time by creating a First Amendment free zone for "commercial-speech adjacent" restrictions.

### E.     Colorado's Regime Does Not Survive Strict Scrutiny.

When government action infringes free exercise and religious autonomy rights, it must survive strict scrutiny: "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). The government bears the burden, and therefore "face[s] the daunting task of establishing that the requirement was narrowly tailored to advance a compelling governmental interest." *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1294 (10th Cir. 2004). Here, the district court did not conclude (and Colorado did not argue beyond a stray sentence) that Colorado's regime could satisfy strict scrutiny. Nor could it given the lack of Colorado enforcement actions addressed by this law: Colorado simply has not

shown an "actual problem in need of solving." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (internal quotation marks omitted). And its regime is not narrowly tailored in light of its underinclusivity and the existence of other legal tools for consumer protection. *See supra* Statement I.B.

## II. The Alliance Has Established Irreparable Harm.

It is blackletter law that a First Amendment violation or the imposition of compliance costs is irreparable harm. *See Hobby Lobby Stores v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013). Plaintiffs and its members will suffer both injuries. The unconstitutional burden and compliance costs are recurring, like the weekly worship restrictions in *Roman Catholic Diocese of Brooklyn v. Cuomo*, where the Supreme Court held there was "irreparable harm" even when there had been some compliance. 592 U.S. 14, 19 (2020). And the uncontroverted record is that Plaintiff's members spend about 200 hours in attempting to comply with Colorado's regime. 1.App.107.

Colorado previously has argued that there is no irreparable harm due to the timing of this lawsuit, suggesting that that the Alliance delayed too long. But there is not any unjustifiable delay: Plaintiff brought suit within weeks of the permanent regulation and in any event "courts are loath to withhold relief solely on that ground," and even more so "in the context of ongoing, worsening injuries." *Arc of California v. Douglas*, 757 F.3d 975, 990-91 (9th Cir. 2014).

III. **The Balance of Equities and the Public Interest Favor an Injunction Pending Appeal.**

A party seeking an injunction must demonstrate "that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, the government "does not have an interest in enforcing a law that is likely" invalid. *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010).

In addition, the government does not have an interest in enforcing a law that it has voluntarily agreed not to enforce. Colorado represented that it would not enforce its regime against Plaintiff's members during the pending of preliminary injunction proceedings. *See supra* Statement III. It cannot now declare that the public interest requires immediate enforcement of its regime.

## CONCLUSION

This Court should reverse the district court's denial of a preliminary injunction.

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Counsel believes that oral argument may be helpful to the Court in light of the importance and complexity of the issues this First Amendment case presents.

Respectfully submitted,

*/s/ **Michael F. Murray***
Michael Murray
Paul Hastings LLP
2050 M Street, NW
Washington, D.C. 20036
Tel: (202) 551-1730
Fax: (202) 551-0230
Email: michaelmurray@paulhastings.com

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B).

1.   This brief is 12,913 words excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

2.   This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman type, which complies with Fed. R. App. P. 32(a)(5) and (6).

*/s/ Michael F. Murray*
Michael Murray
Paul Hastings LLP
2050 M Street, NW
Washington, D.C. 20036
Tel: (202) 551-1730
Fax: (202) 551-0230
Email: michaelmurray@paulhastings.com

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program and according to the program are free of viruses.

*/s/ Michael F. Murray*
Michael Murray
Paul Hastings LLP
2050 M Street, NW
Washington, D.C. 20036
Tel: (202) 551-1730
Fax: (202) 551-0230
Email: michaelmurray@paulhastings.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of March 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Michael F. Murray*
Michael Murray
 Paul Hastings LLP
2050 M Street, NW
Washington, D.C. 20036
Tel: (202) 551-1730
Fax: (202) 551-0230
Email: michaelmurray@paulhastings.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Gordon P. Gallagher

Civil Action No. 24-cv-01386-GPG-STV

ALLIANCE OF HEALTH CARE
SHARING MINISTRIES,

      Plaintiff,

v.

MICHAEL CONWAY, in his official capacity
as Commissioner of the Colorado Division of Insurance,

      Defendant.

---

**ORDER**

---

Before the Court is Plaintiff Alliance of Health Care Sharing Ministries' (the Alliance) Motion for a Preliminary Injunction (D. 8). The Court DENIES this motion for the following reasons.

## I. BACKGROUND

The Alliance is a 501(c)(6) trade organization representing the interests of various health care sharing ministries (D. 8-5 at 3). These ministries are 501(c)(3) organizations "whose core purpose is to facilitate the sharing of medical expenses as an exercise and expression of religious belief" (*id.* at 4). At least some of them offer health care sharing plans or arrangements to Colorado residents and are thus subject various reporting requirements under Colorado Revised Statutes § 10-16-107.4 and its implementing regulation, 3 Colo. Code Regs. § 702-4:4-10-01 (Regulation 4-

1

10-01).  This Order refers to this law and regulation collectively as the "Reporting Law."  The

Alliance challenges the constitutionality of the Reporting Law and seeks to enjoin its enforcement

(*see generally* D. 8; D. 32).

Section 10-16-107.4, enacted in 2022, generally requires "[a] person not authorized by the

[C]ommissioner [of the Colorado Division of Insurance] . . . to offer insurance in [Colorado] that

offers or intends to offer a plan or arrangement to facilitate payment or reimbursement of health-

care costs or services for residents of [Colorado]" to annually report data to Defendant

Commissioner of the Colorado Division of Insurance (the Commissioner, or Defendant).  The

required data includes:

(I)     The total number of individuals and households that participated in
        the plan or arrangement in [Colorado] in the immediately preceding
        calendar year;

(II)    The total number of employer groups that participated in the plan
        or arrangement in [Colorado] in the immediately preceding
        calendar year, specifying the total number of participating
        individuals in each participating employer group;

(III)   If the person offers a plan or arrangement in other states, the total
        number of participants in the plan or arrangement nationally;

(IV)    Any contracts the person has entered into with providers in
        [Colorado] that provide health-care services to plan or arrangement
        participants;

(V)     The total amount of fees, dues, or other payments collected by the
        person in the immediately preceding calendar year from
        individuals, employer groups, or others who participated in the plan
        or arrangement in [Colorado], specifying the percentage of fees,
        dues, or other payments retained by the person for administrative
        expenses;

(VI)    The total dollar amount of requests for reimbursement of health-
        care costs or services submitted in [Colorado] in the immediately
        preceding calendar year by participants in the plan or arrangement

2

A002

or providers that provided health-care services to plan or arrangement participants;

(VII)    The total dollar amount of requests for reimbursement of health-care costs or services that were submitted in [Colorado] and were determined to qualify for reimbursement under the plan or arrangement in the immediately preceding calendar year;

(VIII)    The total amount of payments made to providers in [Colorado] in the immediately preceding calendar year for health-care services provided to or received by a plan or arrangement participant;

(IX)    The total amount of reimbursements made to plan or arrangement participants in [Colorado] in the immediately preceding calendar year for health-care services provided to or received by a plan or arrangement participant;

(X)    The total number of requests for reimbursement of health-care costs or services submitted in [Colorado] in the immediately preceding calendar year that were denied, expressed as a percentage of total reimbursement requests submitted in that calendar year, and the total number of reimbursement request denials that were appealed;

(XI)    The total amount of health-care expenses submitted in [Colorado] by plan or arrangement participants or providers in the immediately preceding calendar year that qualify for reimbursement pursuant to the plan or arrangement criteria but that, as of the end of that calendar year, have not been reimbursed, excluding any amounts that the plan or arrangement participants incurring the health-care costs must pay before receiving reimbursement under the plan or arrangement;

(XII)    The estimated number of plan or arrangement participants the person is anticipating in [Colorado] in the next calendar year, specifying the estimated number of individuals, households, employer groups, and employees;

(XIII)    The specific counties in [Colorado] in which the person:

(A) Offered a plan or arrangement in the immediately preceding calendar year; and

(B) Intends to offer a plan or arrangement in the next calendar year;

(XIV)   Other states in which the person offers a plan or arrangement;

(XV)    A list of any third parties, other than a producer, that are associated
        with or assist the person in offering or enrolling participants in
        [Colorado] in the plan or arrangement, copies of any training
        materials provided to a third party, and a detailed accounting of any
        commissions or other fees or remuneration paid to a third party in
        the immediately preceding calendar year for:

        (A) Marketing, promoting, or enrolling participants in a plan or
            arrangement offered by the person in [Colorado]; or

        (B) Operating, managing, or administering a plan or arrangement
            offered by the person in [Colorado];

(XVI)   The total number of producers that are associated with or assist the
        person in offering or enrolling participants in [Colorado] in the plan
        or arrangement, the total number of participants enrolled in the plan
        or arrangement through a producer, copies of any training materials
        provided to a producer, and a detailed accounting of any
        commissions or other fees or remuneration paid to a producer in the
        immediately preceding calendar year for marketing, promoting, or
        enrolling participants in a plan or arrangement offered by the person
        in [Colorado];

(XVII)  Copies of any consumer-facing and marketing materials used in
        [Colorado] in promoting the person's plan or arrangement,
        including plan or arrangement and benefit descriptions and other
        materials that explain the plan or arrangement;

(XVIII) The name, mailing address, e-mail address, and telephone number
        of an individual serving as a contact person for the person in
        [Colorado];

(XIX)   A list of any parent companies, subsidiaries, and other names that
        the person has operated under at any time within the immediately
        preceding five calendar years; and

(XX)    An organizational chart for the person and a list of the officers and
        directors of the person[.]

Colo. Rev. Stat. § 10-16-107.4(1)(a).

A004

The statute carves out from these reporting requirements "[d]irect primary care agreements" and "[o]ther consumer payment arrangements identified by the [C]ommissioner by rule, including consumer payment plans offered directly by a provider to a patient or the party responsible for payment on behalf of the patient."  *Id.* § 10-16-107.4(5).  It also authorizes the Commissioner to "adopt rules as necessary" to implement the statute.  *Id.* § 10-16-107.4(4).  And it permits the Commissioner to levy fines against persons who do not remedy identified reporting deficiencies within a 30-day cure period.  *Id.* § 10-16-107.4(2).

Section 10-16-107.4 further requires the Commissioner to "[p]repare a written report summarizing the information" submitted by reporting parties and to post on the Colorado Division of Insurance's (the Division) website "the report and accurate and evidence-based information about the persons who submitted information . . . , including how consumers may file complaints." *Id.* § 10-16-107.4(3).

Regulation 4-10-01, which became effective on April 30, 2024,[1] requires all "health care sharing plans and arrangements" to email the Division a filled-out reporting template,[2] along with copies of marketing materials, an organizational chart, and copies of training materials provided

---

[1] The Division enacted an interim regulation, Emergency Regulation 22-E-20, which became effective shortly after Section 10-16-107.4 became law in 2022.  The interim regulation imposed reporting requirements on sharing plans similar to those the final regulation imposes.  *See generally* Emergency Regulation 22-E-20, *available at* https://drive.google.com/file/d/1vbJEv9NQKpvOgY9UQlZwDhducFQ717nb/view; *see also id.*, Appendix A.

[2] This reporting template is a spreadsheet, with requests for information generally tracking the categories enumerated in Colorado Revised Statutes § 10-16-107.4(1)(a) (though the reporting template divides certain of the statutory categories into separate requests) (*see* D. 46-1 at 638–40).  The template contains some requests for information not expressly noted in the statute, however.  For instance, it asks reporting parties to identify their organizational websites (*id.* at 638).  It also asks that reporting parties identify the percentage of fees, dues, contributions, or other payments from Colorado sharing plan or arrangement participants are retained for "program expenses," as opposed to "administrative expenses" (*id.*), and to describe their appeals processes and provide data on appeals outcomes (*id.* at 639, 641).

5

to "producer[s]" and "third part[ies]."  *See* Regulation 4-10-01(5)(A).  It defines "health care

sharing plan" and "health care sharing arrangement" to include:

> any organization that offers or markets products to facilitate payment or
> reimbursement of health-care costs or services for one (1) or more residents
> of Colorado. This does not include direct primary care agreements as
> defined in § 6-23-101, C.R.S.; consumer payment plans offered directly
> between a provider and patient (or patient's responsible party); businesses
> used to facilitate the plan's operations such as reimbursement handling, cost
> containment vendors, data processing; and crowdfunded sources that do not
> require ongoing membership fees, share requirements, or dues for the
> purposes of payment for and/or reimbursement of health care services.

Regulation 4-10-01(4)(G).  Covered entities must complete Regulation 4-10-01's reporting

requirements annually: the required reports are due "by March 1 of each year with data for the

prior calendar year."[3]  Regulation 4-10-01(5)(A)(2).

## II.  FINDINGS OF FACT[4]

### A.  Sharing arrangements proliferate after the Affordable Care Act passes.

In 2010, Congress passed the Affordable Care Act (ACA), which mandates that most

individuals obtain "minimum essential" insurance coverage for themselves and their dependents.

*See* 26 U.S.C. § 5000A(a).  But the ACA exempts members of "health care sharing ministries"

from this requirement.  *Id.* § 5000A(d)(2)(B).  After the ACA passed, membership in health care

---

[3] Emergency Regulation 22-E-20 likewise imposed a March 1 reporting deadline, except for 2021 data, which it required covered entities to report by December 15, 2022.

[4] Unless otherwise noted, the Court draws the operative facts from the parties' briefing on the Alliance's motion for a preliminary injunction and the exhibits supporting this briefing.  In view of the parties' submissions, the Court determined that neither an evidentiary hearing nor oral argument would materially assist it in resolving this matter and that this matter could be decided on the papers.  *See Northglenn Gunther Toody's, LLC v. HQ8-10410-10450 Melody Lane LLC*, 702 F. App'x 702, 705 (10th Cir. 2017) (recognizing that "neither Fed. R. Civ. P. 65(a) nor this circuit's precedent require the district court to hold an evidentiary hearing or oral argument before deciding a motion for a preliminary injunction").

sharing ministries increased significantly, likely because these plans generally require members to make lower monthly payments than traditional insurers do (*see* D. 46-1 at 7).

Health care sharing ministries are not as heavily regulated as traditional insurers under federal and Colorado law.  For instance, traditional ACA-governed insurance plans must spend at least 80% of premiums paying claims or on other activities improving health care quality (or otherwise issue rebates).  42 U.S.C. § 300gg-18(b)(1)(A).  And they must cover, among other things, pre-existing conditions, pregnancy care, treatment for substance use disorders, and mental health care, where plans offered by health care sharing ministries are exempt from these requirements.  *See* 42 U.S.C. § 300gg-3(a) (prohibiting insurers from excluding coverage for pre-existing conditions); 42 U.S.C. § 300gg–6 (requiring insurers to provide coverage consistent with the health benefits package enumerated in 42 U.S.C. § 18022); 42 U.S.C. § 18022 (enumerating areas of required coverage).  Colorado imposes similar requirements on traditional, ACA-compliant insurers.  *See* Colo. Rev. Stat. § 10-16-104 (enumerating areas of mandatory coverage); Colo. Rev. Stat. § 10-16-118 (prohibiting certain insurers from denying coverage for pre-existing conditions).  Moreover, Colorado subjects traditional insurers to extensive rate-filing regulations.  *See id.* § 10-16-107 (requiring insurers to submit expected rate increases to the Commissioner and obligating the Commissioner to adopt rules establishing required benefits ratios for health insurance plans).  And it requires traditional health insurers to participate in the Colorado Life and Health Insurance Protection Association (which essentially pools member resources to cover claims for coverage against insolvent insurers).[5]  *See id.* §§ 10-20-101–120.

---

[5] Colorado imposes other requirements on traditional insurers, too.  *See, e.g.*, Colo. Rev. Stat. §§ 10-3-101, 10-3-108 (requiring insurers—before offering any plan in Colorado—to submit their governing documents to the Commissioner); Colo. Rev. Stat. § 10-3-105 (generally obligating insurers to obtain a certificate of authority from the Commissioner before transacting any insurance business in Colorado); Colo. Rev. Stat. § 10-3-109 (requiring

**B. Consumers and others raise concerns about sharing plan practices.**

Starting in roughly 2018, the Division, through consumer complaints, other state regulators, the National Association of Insurance Commissioners, and sharing plan marketing materials—purportedly became aware that health care sharing plans posed unique risks to consumers (D. 46-1 at 7–8).[6] Among the concerns relayed to the Division were: (1) that sharing plans offered substantial incentives to insurance brokers, who were aggressively marketing sharing plans to consumers; (2) that sharing plan marketing materials and communications were misleading consumers into believing that these plans were providing comprehensive insurance benefits at lower prices than traditional plans; and (3) that sharing plans were chronically rejecting or delaying payment on claims their members understood to be reimbursable (*id.* at 8).

Examples of consumer complaints the Division received include:

- A September 2018 complaint alleging that a sharing plan denied a consumer coverage for a hospital stay relating to potential stroke or blood clot symptoms on the basis that the consumer's illness was "not life-threatening" (*id.* at 10, 46–47).

- An October 2018 complaint alleging that a consumer had received advanced approval for a procedure from Liberty HealthShare, which subsequently refused to cover the costs, causing the consumer to face collections proceedings (*id.* at 10, 48).

- A February 2019 complaint alleging that a consumer had signed up for a sharing plan with the understanding that it would cover surgery for a pre-existing condition, but then was denied coverage (*id.* at 9, 33).

- An August 2019 complaint alleging that Alliance member Aliera had denied a consumer coverage for roughly $50,000 in hospital bills (which the consumer had incurred after

---

insurance companies operating in Colorado to file a report with the Commissioner that includes "a detailed statement of assets and liabilities, the amount and character of the business transacted, and moneys received and expended during the year, and any further details of expenditures, and such other information . . . as the [C]ommissioner deems necessary").

[6] The Court uses the term "sharing plans" to refer generally to benefits plans offered by health care sharing ministries and all other entities subject to the reporting requirements in Colorado Revised Statutes § 10-16-107.4 and the Division's implementing regulations.

suffering a broken neck and brain injury in a domestic violence incident) on the ground that the consumer's injuries were "self-inflicted in contradiction to elements of a healthy and spiritual lifestyle as enumerated in the Aliera Master Guidelines" (*id.* at 10, 50, 53).

- A September 2019 complaint alleging that Alliance member Aliera initially denied coverage for a hospital visit relating to potential blood clots on the ground that the consumer's condition was not "life threatening," and then reversed its decision on appeal (but still did not promptly provide coverage) (*id.* at 10, 56).

- A November 2019 complaint alleging that a consumer had purchased a sharing plan based on the mistaken understanding that it was insurance, and then was denied coverage on the basis of a pre-existing condition (*id.* at 10, 58).

- An April 2020 complaint alleging that a sharing plan (which the consumer mistakenly believed to be insurance) had refused to reimburse hospital bills relating to a knee injury (*id.* at 11, 60–61).

- A December 2020 complaint alleging that a sharing plan falsely claimed that it had paid medical bills relating to a cardiac arrest, and then stonewalled the consumer when the consumer attempted to follow up (*id.* at 11, 63).

- An April 2021 complaint alleging that a sharing plan denied coverage for a procedure on the basis that it related to a pre-existing condition, and continued to deny coverage even after receiving a letter from the consumer's physician explaining that the condition was not pre-existing (*id.* at 11, 69).

- A June 2021 complaint alleging a sharing plan was non-responsive to a consumer and a hospital where she received care, and had failed to reimburse the consumer for over $10,000 in medical bills the consumer incurred in August 2020 (*id.* at 11, 72).

- A July 2021 complaint alleging claims-handling delays (*id.* at 11, 74).

- An August 2021 complaint alleging that a broker had misled a consumer into believing that the consumer was purchasing an insurance policy (when in fact the consumer was purchasing a membership in a sharing ministry), and that the consumer had difficulty cancelling automatic payments (*id.* at 9, 36).

- A November 2021 complaint alleging that a consumer was misled into believing that he or she was purchasing a 70/30 individual health plan (as opposed to membership in a sharing plan or ministry), when the consumer was in fact purchasing membership in a sharing ministry (*id.* at 9, 38).

- A November 2021 complaint alleging that a sharing plan changed its membership rules in order to avoid reimbursing members for expenses incurred in the two-month period leading up to plan cancellation (but during the term of the plan) (*id.* at 11, 76).

- A January 2022 complaint alleging the complainant's elderly mother was "scammed" by a representative of sharing company Altrua Healthshare when she attempted to purchase a "regular insurance plan," but was instead sold a plan "that did not cover mental healthcare or other kinds of care that standard, actual insurance plans are required to provide" (*id.* at 9, 40).

- An August 2022 complaint alleging that a representative of a sharing plan had represented to a consumer that the plan provided comprehensive coverage (excepting only coverage for pregnancies and mental illness), and that the consumer had realized that this representation was false after receiving explanation of benefits paperwork after a doctor's visit (*id.* at 9–10, 44).

Moreover, various healthcare providers complained to the Division that they were experiencing difficulty securing payment from sharing plans (*id.* at 8).  For instance, in April 2019, Primary Care Partners suggested that the Division issue "a notification to individuals in the State of Colorado that providers [were] having issues with non-payment or late payment" from sharing plans and that consumers would ultimately have to foot the bill (*id.* at 8, 29).  Primary Care Partners also asserted that it was "having a difficult time" getting Alliance member Liberty HealthShare (Liberty) to engage with it "with respect to claims issues/problems" (*id.* at 29).  Similarly, in August 2019, Children's Hospital Colorado—expressly naming members of the Alliance including Liberty, Christian Care Ministry/Medi-Share, Samaritan Ministries, Altrua Healthshare, and OneShare Health (OneShare)—informed the Division that it was observing "a growing number of issues regarding unpaid claims" from sharing entities (*id.* at 8, 26).

### C.  The Division and regulatory authorities elsewhere crack down on sharing plans.

The Commissioner issued cease and desist orders to two entities involved in the sale of sharing plan memberships—Trinity Healthshare (Trinity) and Aliera Healthcare (Aliera)—in 2019

10

A010

(*id.* at 11). These orders alleged that Trinity was operating as an unlicensed insurer, and that Aliera was marketing, administering, and managing Trinity's products in Colorado (*id.*). Trinity ultimately agreed to cease doing business with Colorado residents (*id.* at 12), and Aliera agreed that it would "not provide any services or contract with any unauthorized insurers or unauthorized insurance products, including . . . Health Care Sharing Ministries . . . unless and until HCSMS are permitted to be marketed in Colorado either by statute, or through an administrative or judicial determination . . . ." (*id.* at 97).

Regulators in other states took action against these companies too (*id.* at 12). These regulators alleged—among other things—that Trinity and Aliera committed only between 8% and 35% of the fees they collected to paying member claims, used insurance terms like "deductible," "premium," and "comprehensive coverage" when marketing their products to consumers, falsely presented themselves as sharing ministries within the meaning of the ACA, and improperly diverted member funds to pay corporate officers and affiliates (*id.* at 12–13).

Aliera and a successor entity to Trinity both eventually entered Chapter 11 Bankruptcy proceedings (*id.* at 13). The Division's understanding is that only between 1-5% of the over $600,000,000 in outstanding member claims against Aliera and 0-10% of the over $300,000,000 in outstanding member claims against Trinity's successor entity will ever be paid (*id.*). Further, between 2016 and 2018, Aliera entered into an agreement with Alliance member OneShare, whereby Aliera committed to administering some of OneShare's sharing plans (*id.*). Aliera's bankruptcy prevented payment of some OneShare customers' claims (*id.*).

Though the Division apparently only initiated enforcement proceedings against Trinity and Aliera before the Colorado legislature enacted Section 10-16-107.4 in 2022, it was aware that

regulators in other states were taking enforcement actions and/or initiating litigation against other

sharing plans, including Alliance member Liberty, which operates in Colorado (*id.* at 8, 14–15).

Specifically, after opening an investigation into Liberty in January 2018, the Ohio Attorney

General filed a suit against Liberty generally alleging that Liberty was diverting member funds to

corporate officers and affiliated entities, rather than paying valid member claims (*id.* at 15).  And

at least California, North Dakota, Washington, and New Mexico regulators have initiated

enforcement actions against Liberty and/or other sharing plans (*id.* at 14–16).

In December 2020, the Division issued an advisory warning Colorado consumers about the

limitations common to sharing plans (*id.* at 14).  This advisory stated:

> As open enrollment for individual plans (meaning not from an employer)
> continues, the Colorado Division of Insurance (DOI), part of the
> Department of Regulatory Agencies (DORA), is again alerting consumers
> about the risks of Health Care Sharing Programs or Ministries.
>
> On the surface, such programs may look like complete, Affordable Care Act
> (ACA) insurance. Low monthly payments, which the programs may refer
> to as "premiums," may entice people to join, thinking they're getting full
> health insurance coverage at a bargain. Such programs may even mimic the
> look and feel of ACA-compliant health insurance, using terms like "bronze,
> silver and gold tiers." But these sharing programs or ministries often do not
> offer the same comprehensive benefits as ACA plans, and do not meet the
> ACA consumer protection standards.
>
> Problems occur when members get medical care and then these programs
> don't pay, leaving the member with the doctor and hospital bills. The
> member is surprised as they thought they had full insurance coverage, but
> come to find out all that these programs don't cover.

(*Id.* at 421).  The advisory further observed that sharing plans "typically have restrictions or

exclusions on pre-existing conditions"; that "[m]embers may also be subject to religious or moral

restrictions . . . , which may leave members responsible for the full costs of health care that results

from an activity that the ministry [offering the plan] does not agree with"; that sharing plans often

12

A012

"do not provide mental health coverage treatment or substance use disorder treatment"; and that these features distinguish sharing plans from ACA-compliant plans (*id.* at 421–22).

Officials in other states—including Alabama, Louisiana, Maryland, Massachusetts, Nebraska, Rhode Island, Vermont, West Virginia, and California—have issued similar warnings (*id.* at 14).

### D. Colorado's legislature decides to regulate sharing plans.

Section 10-16-107.4 represents just the latest in a series of the Colorado legislature's efforts to regulate sharing plans. These efforts began in 2020, with House Bill 20-1008 (HB20-1008). That bill would have required persons offering, operating, managing, or administering "health care cost-sharing arrangements" to annually report various data—including annual audited financial statements—to the Commissioner. *See* HB 20-1008. It defined "health care cost-sharing arrangement" as:

> (I)    A health care sharing ministry, as defined in 26 U.S.C. sec. 5000A(d)(2)(B); or
>
> (II)   A medical cost-sharing community or other arrangement or entity through which members of the community or arrangement contribute money on a regular basis, at levels established by the community or arrangement, that may be used to share, cover, or otherwise defray the medical costs of members of the community or arrangement.

(*Id.*). This bill failed to pass, as did House Bill 21-1135 (HB21-1135), a substantially similar bill introduced in 2021.

In 2022, legislators introduced two competing bills directed at regulating sharing plans: House Bill 22-1198 (HB22-1198) and House Bill 22-1269 (HB22-1269). HB22-1198, which the Alliance testified in support of (*see* D. 46-1 at 17), would have expressly exempted sharing plans from state insurance laws, but would also have imposed various disclosure requirements on sharing

plans, *see* HB22-1198. For instance, it would have compelled sharing plans to notify applicants that they do not provide insurance, do not guarantee payment of medical bills, and may exclude from coverage more claims than traditional ACA-governed insurance plans. *See id.* It would have also obligated sharing plans to obtain written affirmations from plan applicants indicating that the applicants received and understood the above notice and received and had an opportunity to review materials describing the plans' terms and conditions. *See id.* HB 22-1198 would also have required sharing plans to disclose various high-level plan financial data—including contribution amounts, the amount of reimbursed medical expenses, and the amount of claimed medical expenses—as well as information on related-party transactions to their members (or optionally, to the broader public on a publicly accessible website). *See id.* And it would have required sharing plans to publicly disclose their annual audits and other basic plan information, like the name of the organization offering the plan, contact information for the plan, and copies of plan documents. *See id.* The Colorado Attorney General would have been responsible for enforcing compliance with HB22-1198's requirements. *See id.* But HB 22-1198 did not pass.

The Division supported the competing bill, HB22-1269, which passed and became codified at Section 10-16-107.4 (D. 46-1 at 17).[7] Debra Judy, a Deputy Commissioner with the Division, testified as to the scale of sharing plan membership in Colorado, and explained that HB22-1269 would enable the Division to more fully understood the sharing plan market and help consumers navigate coverage questions (*id.* at 18–19). Various religiously affiliated persons and entities also testified in support of HB22-1269. For instance, Christian Healthcare Sharing Ministries representative Keith Hopkinson testified that HB22-1269 would help keep consumers informed

---

[7] For HB22-1269's general terms, see Section I, *supra*.

A014

and imposed only relatively limited disclosure requirements (*id.* at 19).    Peter Severseen, representing Lutheran Advocacy Ministry, similarly testified that HB22-1269 struck an appropriate balance between protecting religious association and safeguarding consumers (*id.*). HB22-1269's House of Representatives sponsor, Representative Susan Lontine, explained the bill to the House Committee on Health and Insurance in the following terms:

> Health care sharing arrangements . . . are programs where individual members with shared values pay monthly into a pool designed to help cover other members' medical expenses. These programs have minimal oversight and there is no guarantee they will actually pay for anyone's medical expenses. House Bill 22-1269 requires health care cost sharing arrangements to submit some basic, routine information to the Division of Insurance about how they operate and DOI will share this information publicly. This is a comprehensive data reporting bill designed to discourage misconduct and promote a necessary level of transparency to protect consumers. It will not impact the way these arrangements operate beyond requiring HCSAs to submit an annual data report. Currently very little information is known about these arrangements. That's why we're running a data reporting bill: to best understand how HCSAs are affecting consumers. We simply want to shed light on how many of these programs there are in Colorado, how these programs do business, how many Coloradans are paying into them, and how much of their health care costs get paid. The Division of Insurance will share this information publicly. This will help the DOI and the public learn about the impact these programs have on the cost of health insurance and health care in our state, make sure the programs can provide coverage to their members, and help the programs keep their advertising honest and clear. These programs may work for some people, particularly those for whom health sharing aligns with their deeply held religious beliefs. More concerning, however, are people who are signing up because they see these arrangements as a cheaper alternative to health insurance, without recognizing the financial risk they are taking on. As the cost of health care and coverage continue to rise out of the reach of many consumers these arrangements may look increasingly attractive but people need to know why they are priced lower and how they may impact them long-term. Both current members and individuals considering these options alike should be aware of what members are paying for, how contributions are being used, and what protections they may or may not have when using these programs. And that is why I'm bringing the bill.

(*Id.* at 18).

15

A015

**E.  The Commissioner and Division implement the Reporting Law.**

After Colorado's legislature passed HB22-1269, the Division promulgated an interim regulation, Emergency Regulation 22-E-20, to implement it.  This regulation required sharing plans to fill out and annually file a reporting template, with the initial reports (consisting of 2021 data) due December 15, 2022, and subsequent reports due on March 1 of each successive year.  This template was substantially similar to the template associated with the final regulation, Regulation 4-10-01, which became effective on April 30, 2024.  *Compare* Emergency Regulation 22-E-20, Appendix A, *with* D. 46-1 at 638–40.

Persons offering sharing plans in Colorado—including members of the Alliance's—have submitted disclosures to the Division under Section 10-16-107.4 and its implementing regulations on at least three occasions: in December 2022, March 2023, and March 2024 (D. 46-1 at 633).  Both the emergency and final regulations permit reporting parties to request confidential treatment of information submitted with their filings.  *See* Emergency Regulation 22-E-20; Regulation 4-10-01.  As of the time of briefing, the Division has not challenged any claim of confidentiality asserted under the regulations' procedures (D. 46-1 at 634).  The Division has produced summary reports reflecting the 2021, 2022, and 2023 data it received under the regulations.  *See id.* at 738–76; COLO. DIV. INSUR., HEALTH CARE SHARING PLANS AND ARRANGEMENTS IN COLORADO (2024), https://drive.google.com/drive/folders/1xPJMWwDtjSKl1P91TROoRmOWfCIb6wCo (the 2023 Report).

These reports indicate that not all of the reporting parties are religiously affiliated.  Defendant specifically identifies the sharing organization Knew Health as an offeror of one such secular sharing plan in Colorado (D. 46-1 at 631–32).  But ministries have a much larger market

16

share than secular groups: the Alliance reads the Division's first two reports as suggesting that

upwards of 85% of sharing plan members are members of religiously oriented sharing plans (*see*

D. 52 at 12–13). And many of the reporting parties identify themselves as ministries (*see, e.g.*, D.

46-1 at 749 (listing the entities that reported 2021 data to the Division)).[8]

### F. The Alliance files suit.

The Alliance filed the instant lawsuit against the Commissioner and the Division on May

16, 2024, alleging that the Reporting Law violates the Free Exercise, Establishment, and Free

Speech Clauses of the First Amendment, and abridges its members' First Amendment freedom of

association (*see generally* D. 1).[9] The following day, the Alliance filed its motion for a preliminary

injunction (D. 8).

### III. LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule"

and should be "granted only in cases where the necessity for it is clearly established." *U.S. ex rel.*

*Citizen Band Potawatomi Indian Tribe of Oklahoma v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d

886, 888–89 (10th Cir. 1989) (citations and internal quotation marks omitted). "The purpose of a

preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury

that will surely result without their issuance." *Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1267 (10th

Cir. 2005). To prevail on a motion for a preliminary injunction, the movant must prove: (1) a

substantial likelihood of prevailing on the merits; (2) irreparable injury unless the injunction is

---

[8] The words "ministry" or "ministries" appear in the names of five of the sixteen entities that filed reports with the Division reflecting 2021 data (*see* D. 46-1 at 749). Several of the other entities' names also include terms invoking religion (e.g., "Zion" and "Jericho") (*see id.*). These trends persist in Division's 2022 and 2023 data reports. *See id.* at 764 (four out of sixteen entities representing themselves as ministries); 2023 Report at 11 (five out of seventeen).

[9] The Alliance has since amended its complaint, and the Division is no longer a party to this suit (*see* D. 32).

issued; (3) that the threatened injury (without the injunction) outweighs the harm that the preliminary injunction may cause the opposing party; and (4) that the injunction will not adversely affect the public interest. *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (citation and internal quotation marks omitted). "An injunction can issue only if each factor is established." *Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1277 (10th Cir. 2022) (citation omitted). The final two preliminary injunction factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Because a preliminary injunction is an extraordinary remedy, the plaintiff's right to relief must be clear and unequivocal. *Schrier*, 427 F.3d at 1258 (citation omitted). Moreover, the Tenth Circuit specifically disfavors injunctions that will (1) alter the status quo, (2) mandate an affirmative act by the defendant, or (3) afford the movant all the relief that it could recover at the conclusion of a full trial on the merits. *Id*. at 1259. To obtain an injunction falling into one of these disfavored categories, the plaintiff must make a "strong showing" that the likelihood-of-success-on-the-merits and balance-of-harms factors tip in its favor. *Chiles v. Salazar*, 116 F.4th 1178, 1199–1200 (10th Cir. 2024); *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 976 (10th Cir. 2004).

## IV.  ANALYSIS

The Alliance's requested preliminary injunction—which seeks to disrupt a statutory and regulatory regime that has been in effect and that the Alliance's members have complied with for multiple years—is the sort of status-quo-altering injunction the Tenth Circuit disfavors. The

Alliance does not dispute that its requested injunction would disturb the status quo.[10]  Accordingly, the Alliance must make a strong showing that it is likely to succeed on the merits of its claims and that the balance of hardships weighs in its favor.  The Alliance cannot meet this heightened burden.

## A.  Likelihood of Success

The Alliance has not made a showing—strong or otherwise—that it is likely to succeed on the merits of any of its claims.  First, the Alliance has not demonstrated that the Reporting Law is not neutral or generally applicable, or that it is not rationally related to a legitimate government interest.  Accordingly, the Alliance has not shown that it is likely to succeed on the merits of its free exercise claim.  Second, generally applicable administrative and recordkeeping regulations like the Reporting Law do not violate the Establishment Clause.  The Alliance is therefore unlikely to succeed on the merits of its Establishment Clause claim.  Third, the Alliance has not shown that the Reporting Law's requirement that the Alliance's members disclose certain third-party vendors poses any risk of chilling the Alliance's members' First Amendment associational rights.  Thus, the Alliance's challenge to the Reporting Law on freedom-of-association grounds is unlikely to succeed.  Fourth and finally, the Alliance has not shown that the Reporting Law—in compelling the Alliance's members divulge their marketing materials and to report factually accurate operations data—violates the Alliance's members' free speech rights.  The Alliance therefore has not shown that it is likely to succeed on the merits of its free speech claim.

---

[10] Defendant specifically contends that "[t]he Alliance cannot satisfy its heavy burden to disrupt the Reporting Law's status quo with an injunction" (D. 46 at 37), and notes that the Alliance's members have submitted disclosures under the Reporting Law "on three occasions over two years before filing this suit" (*id.* at 4).  The Alliance does not respond to Defendant's argument that a heightened standard of review applies, for instance, by arguing that regulatory landscape was in flux before the Division promulgated Regulation 4-10-01, such that the Division's emergency regulation did not represent the status quo (*see generally* D. 52).

### 1.  Free Exercise Clause

The Free Exercise Clause in the First Amendment to the United States Constitution provides that "Congress shall make no law . . . prohibiting the free exercise" of religion.  U.S. Const. amend. I.  Through the Fourteenth Amendment, this protection likewise applies against state laws and policies.  *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022) (recognizing that the First Amendment's free-exercise protections are incorporated into the Fourteenth Amendment).  But not every law that burdens religion is unconstitutional—or even presumptively so.  Indeed, "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021) (citing *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 878–82 (1990)).  Rather, neutral and generally applicable laws need only bear a rational relationship to a legitimate government end.  *United States v. Hardman*, 297 F.3d 1116, 1126 (10th Cir. 2002).

On the record currently before the Court, the Alliance has not met its burden of showing that the Reporting Law is not neutral or is not generally applicable.[11]  And the Reporting Law easily clears the minimal level of scrutiny that applies to neutral and generally applicable laws.

### i.  Neutrality

"Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature."  *Fulton*, 593 U.S. at 533.  Along the

---

[11] The party seeking a preliminary injunction predicated on a free exercise challenge bears the burden of demonstrating that the challenged law or policy is not neutral or generally applicable.  *Chiles v. Salazar*, 116 F.4th 1178, 1222 (10th Cir. 2024); *see also Kennedy*, 597 U.S. at 525 (noting that "a plaintiff may carry the burden of proving a free exercise violation . . . by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable'").

A020

same lines, a law is not neutral if it is "specifically directed at . . . religious practice." *Kennedy*,
597 U.S. at 526 (quoting *Smith*, 494 U.S. at 878). Facially discriminatory laws—i.e., laws that
"refer[] to a religious practice without a secular meaning discernable from the language or
context"—fall into this camp. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S.
520, 533 (1993). So too do laws that otherwise target religious exercise as their "object." *Kennedy*,
597 U.S. at 526 (quoting *Lukumi*, 508 U.S. at 533). Impermissible targeting may be inferred where
"the effect of a law in its real operation" is to effect a "religious gerrymander." *Lukumi*, 508 U.S.
at 535. Importantly, however, a law or policy's disparate impact on religious adherents does not
necessarily compel a finding of targeting. *See id.* ("To be sure, adverse impact will not always
lead to a finding of impermissible targeting. For example, a social harm may have been a
legitimate concern of government for reasons quite apart from discrimination."). Targeting may
also be inferred when "the historical background of the decision under challenge, the specific series
of events leading to the enactment or official policy in question, and the legislative or
administrative history, including contemporaneous statements made by members of the
decisionmaking body" speak to discriminatory intent. *Id.* at 540; *see also Masterpiece Cakeshop
v. Colorado C.R. Comm'n*, 584 U.S. 617, 639 (2018) (applying these factors); *Chiles*, 116 F.4th at
1223 (same).

The Reporting Law does not facially discriminate against religious practices. And the
Alliance does not contend that it does. Instead, the Alliance argues that the Reporting Law operates
as a religious gerrymander and that the circumstances surrounding the enactment of the Reporting
Law bespeak government hostility towards the religious practices of its members.

The Court does not find these arguments persuasive. First, as Defendant observes, Section the Reporting Law's requirements apply not only to sharing ministries, but also to secular entities that offer or intend to offer sharing plans or arrangements in Colorado. To be sure, ministries have a strong presence in Colorado's sharing plan market: according to the Alliance, upwards of 85% of the sharing plan members in Colorado are members of religiously affiliated plans. And a cursory review of the Division's annual reports indicates that many of the reporting parties describe themselves as ministries. Under the circumstances of this case, however, the Court cannot say that any disparate impact the Reporting Law may have on religious adherents reflects impermissible targeting and is not just some incidental result of Colorado's legitimate efforts to regulate a social harm. *Cf. Lukumi*, 508 U.S. at 535 (characterizing disparate impact as non-dispositive).

Maybe Colorado does take umbrage to the religious beliefs and practices of sharing ministries. But there is no evidence of that. Based on the record currently before the Court, it appears far more likely that the disproportionate impact of the Reporting Law on religious entities is a byproduct of these entities' dominance of the sharing plan market—a market that seems to have largely been created by the relative flexibility ministries and their members are afforded under the ACA. Simply because many religious entities are active in a market does not mean that Colorado cannot permissibly regulate that market in response to documented abusive practices.[12]

---

[12] A contrary result would be inconsistent with *Smith* and its progeny. In *Smith* the United States Supreme Court upheld an Oregon law generally proscribing peyote possession (and related denials of unemployment benefits on peyote-use grounds) after concluding Oregon's policy was neutral and generally applicable. 494 U.S. at 874–76, 879. In so holding, the Court analogized to its racial-discrimination jurisprudence, which stands for the proposition that "neutral laws that have the *effect* of disproportionately disadvantaging a particular [] group" do not demand special scrutiny. *Id.* at 886 n.3. One might suspect that the effects of a law criminalizing peyote possession would fall disproportionately on persons using peyote for religious purposes—but that does not mean a law generally proscribing peyote possession is presumptively invalid. By the same token, the reporting regime at issue here, despite falling

*See Tingley v. Ferguson*, 47 F.4th 1055, 1087 (9th Cir. 2022) ("[T]hat a particular group, motivated by religion, may be more likely to engage in the proscribed conduct does not amount to a free exercise violation." (citation and internal quotation mark omitted)).

Second, contrary to the Alliance's arguments, the context in which Colorado adopted the Reporting Law does not indicate that Defendant or any other persons involved with the enacting and implementing the Reporting Law are impermissibly targeting religious adherents.  In support of its context-of-enactment argument, the Alliance observes that the Division's December 2020 consumer advisory explicitly mentioned ministries, as did earlier versions of the bill that was ultimately codified at Section 10-16-107.4; that the Division's reporting of data collected pursuant to the Reporting Law is misleading; and that the Reporting Law exempts secular arrangements purportedly comparable to those sharing ministries offer.

The isolated references to ministries in the Division's consumer advisory and in earlier bills regarding sharing plans do not suggest that Colorado or its regulatory officials sought to impose reporting requirements on sharing plans *because of* the religious nature of sharing ministries.  Neither the Division's consumer advisory nor the earlier-introduced bills mentioned ministries exclusively.  Rather, the advisory referred to both "Health Care Sharing Programs" and "Ministries."  And the bills referred to both "health care sharing ministr[ies], as defined in 26 U.S.C. sec. 500A(d)(2)(B)" and "medical cost-sharing communit[ies] or other arrangement[s] or

---

disproportionately on religious adherents, is not necessarily unconstitutional.  Moreover, *Smith's* core proposition is that "an individual's religious beliefs [do not] excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate."  *Id.* at 878–79.  Here, the Alliance does not contend that health care sharing is an exclusively religious practice or that Colorado cannot regulate health care sharing as a general matter.  Rather, the thrust of the Alliance's free exercise challenge is that ministries' beliefs should exempt them from complying with Colorado's reporting regime.  The Alliance's challenge and supporting arguments run afoul of *Smith's* underlying principles.

entit[ies] through which members . . . contribute money on a regular basis . . . that may be used to share, cover, or otherwise defray the medical costs of members . . . ."

As previously discussed, many of the entities that sell membership in sharing plans in Colorado are ministries, and a majority (and perhaps even a vast majority) of sharing plan members are affiliated with ministries. Given ministries' market dominance, it is unsurprising that efforts to regulate the sharing plan market might make reference to ministries.

Moreover, though the consumer advisory and bills reference ministries, they express no normative views on the religious beliefs or practices of these ministries. The record shows that the advisory post-dates various complaints the Division received to the effect that consumers (including purchasers of sharing plans from ministries) believed they were purchasing comprehensive insurance plans when they were not in fact purchasing insurance. The advisory is consistent with these complaints and is limited to statements of uncontested fact. To the extent it mentions religion, the advisory merely notes that members of sharing plans may be "subject to religious or moral restrictions from sharing ministries," which can inform coverage decisions (D. 46-1 at 422). Nobody disputes that this is factually accurate, or that coverage restrictions are a relevant consumer consideration in selecting a health plan. The advisory's factually correct statements about sharing-plan risks do not constitute commentary on the merits of the religious practices or beliefs of the ministries that offer some of the sharing plans or speak to any government animus towards religion.

The Court also does not find that the way the Division reports out the data it collects under the Reporting Law supports an inference that the Reporting Law is grounded in animus towards the religious beliefs and practices of sharing ministries. The Alliance claims that the Division's

24

A024

reporting is misleading because it compares the "sticker" price of health care costs submitted to sharing plans against the amounts sharing plans pay or reimburse, when this price is often negotiated downwards. According to the Alliance, the upshot is that the Division's reporting makes it appear that sharing plans cover a lower proportion of their members' ultimate costs than they actually do. The Alliance's briefing and pleadings on this issue are somewhat underdeveloped. If the Division's reporting is indeed misleading, the Court has no way of determining *how* misleading it is (e.g., the Alliance offers no information about the scope of the discounts sharing plans generally negotiate with providers or the extent to which "sticker" costs differ from "actual" costs). It is not clear to the Court that the amount sharing plans pay, in comparison to the amount sharing plan members claim, is not a useful metric for consumers selecting among sharing plans and conventional insurance plans. Even assuming the statistics the Division publicly reports imply that the sharing plans are paying a smaller share of "real" member costs than they actually do, this ex post reporting issue is extremely weak evidence that the object of the Reporting Law was or is to target religious entities for their practices and beliefs.

Finally, the Court rejects the Alliance's argument that the Reporting Law privileges secular conduct comparable to the religious conduct of some sharing plans through exemptions in Section 10-16-107.4, Regulation 4-10-01, and other Colorado laws. As discussed at greater length in Section IV(A)(1)(ii), *infra*, the Court does not find that the purportedly more secular sorts of arrangements exempt from the Reporting Law are meaningfully comparable to the regulated arrangements. The fact that Colorado exempts practices like crowdfunding efforts from the

A025

Reporting Law does not show that the Reporting Law is intolerant of religion or regulates sharing

plans *because* some are religious.[13]

All told, the Alliance's evidence that the Reporting Law is not neutral presents a far weaker

case than the evidence other courts have relied on in sustaining free exercise challenges.  *See, e.g.*,

*Masterpiece Cakeshop*, 584 U.S. at 635 (noting a comparison public officials drew between the

plaintiff's invocation of religious beliefs and defenses of slavery and the holocaust); *Lukumi*, 508

U.S. at 534–35 (relying on a recital in a government resolution stating that members of the public

had "expressed their concern that certain religions may propose to engage in practices which are

inconsistent with public morals, peace or safety"); *Bella Health & Wellness v. Weiser*, 699 F. Supp.

3d 1189, 1215 (D. Colo. 2023) (relying on statutory text commenting on the *values* and *beliefs* of

religious entities).  Of course, a plaintiff does not *always* need express legislative or government

statements to substantiate a free exercise challenge.  *See Lukumi*, 508 U.S. at 534 (recognizing that

"[t]he Free Exercise Clause protects against governmental hostility which is masked, as well as

overt").  But such evidence would put the Alliance's preliminary injunction request on much

stronger footing.  The evidence the Alliance has adduced at the preliminary injunction stage does

not strongly or clearly and unequivocally show that the Reporting Law is not neutral.

To the contrary, Section 10-16-107.4's legislative history and the circumstances

surrounding the Reporting Law's enactment reflect that Colorado's legislature and regulators

imposed the Reporting Law to address legitimate consumer protection concerns—not to target

religious exercise.  The Colorado legislature enacted Section 10-16-107.4 after the Division

---

[13] The Court is also unpersuaded that there is a meaningful religious-secular divide between sharing plans and all of the arrangements the Alliance casts as "secular."  For instance, crowdfunding and charitable efforts to pay for medical care are often religiously motivated.  Meanwhile, some sharing plans are secular.

received many consumer complaints concerning sharing plan practices. Multiple consumers complained to the Division that sharing plans (or brokers and agents marketing these plans) misled them into believing they were purchasing comprehensive insurance plans (as opposed to membership in sharing plans), that they otherwise misunderstood the scope of their benefits as sharing plan members, and that sharing plans were engaging in questionable claims-processing practices. The record also shows that providers similarly complained to the Division about sharing plan practices, and that sharing plans faced enforcement actions in Colorado and other states, not for their religious activities, but for violating state law or otherwise mistreating consumers.

Section 10-16-107.4's legislative history aligns with the concerns expressed by consumers, providers, and regulators in Colorado and other states. As Representative Lontine, HB22-1269's sponsor put it, the "minimal oversight" and lack of any "guarantee that [sharing plans] will actually pay for anyone's medical expenses" necessitated passage of a consumer protection law (D. 46-1 at 18). In her view, the Reporting Law's object is to "promote a necessary level of transparency to protect consumers" and not to "impact the way these [sharing] arrangements operate beyond requiring [them] to submit an annual data report" (*id.*). Testimony the legislature heard in favor of the Reporting Law also speaks to its intended purpose and effects. Debra Judy, a Deputy Commissioner for the Division, testified that the Reporting Law would enable the Division to more fully understand the health sharing market and assist consumers in addressing coverage questions (*id.* at 18–19). Keith Hopkinson, representing Christian Healthcare Sharing Ministries, testified that the bill would help keep consumers informed. Peter Severseen, representing Lutheran Advocacy Ministry, similarly testified that the proposed legislation appropriately balance protecting religious belief with consumer safeguards (*id.* at 19).

27

A027

The Alliance has not shown that the Reporting Law targets religious exercise as its object or imposes reporting requirements on sharing plans *because of* the religious nature of some of the entities that market them. The Alliance has not therefore shown that the Reporting Law lacks neutrality.

### ii. General Applicability

A law may not be generally applicable for one of two reasons. First, "[a] law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Fulton*, 593 U.S. at 533 (quoting *Smith*, 494 U.S. at 884). Second, a law is not generally applicable "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* at 534. For purposes of this second test, "whether two activities are comparable . . . must be judged against the asserted government interest that justifies the regulation at issue" and "the risks [the] various activities pose." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021).

The Alliance contends that the Reporting Law fails both tests. According to the Alliance, Section 10-16-107.4 creates a mechanism for the Commissioner to craft individualized exemptions because it permits the Commissioner to exclude from this statute's reporting requirements "[o]ther consumer payment arrangements identified by the [C]ommissioner by rule, including consumer payment plans offered directly by a provider to a patient or the party responsible for payment on behalf of the patient." *See* Colo. Rev. Stat. § 10-16-107.4(5)(b). The problem with this argument is that Section 10-16-107.4 delegates to the Commissioner the authority to act by *rule*, not the authority to issue *individualized* exemptions of the type that *Fulton* contemplates.

28

A028

The government contract at issue in *Fulton* dictated that a "[p]rovider [of foster care placement services] shall not reject a child or family including, but not limited to, . . . prospective foster or adoptive parents, for Services based upon . . . their . . . sexual orientation . . . unless an exception is granted by the Commissioner [of Philadelphia's Department of Human Services] or the Commissioner's designee, in his/her sole discretion."  593 U.S. at 535.  Similarly, *Sherbert v. Verner*, a case on which *Fulton's* discussion of general applicability relied, involved a statute that denied unemployment benefits to claimants who "failed, without good cause . . . to accept available suitable work."  374 U.S. 398, 401 (1963).  In *Fulton*, the Supreme Court described both these "sole discretion" and "good cause" standards as constitutionally problematic because they invited officials to consider the particular reasons for an individual person's conduct when distributing exemptions from otherwise generally applicable policies.  593 U.S. at 533–34, 537.

In contrast to the standards at issue in *Fulton* and *Sherbert,* Section 10-16-107.4 simply delegates rulemaking authority to a public official—that is, it permits a public official to create *categorical* exclusions for *types* of arrangements that do not implicate Section 10-16-107.4's underlying policy objectives and concerns.  It does not authorize the Commissioner to exempt individual persons from complying with the Reporting Law or invite the Commissioner to consider whether individual persons' beliefs are worthy (or unworthy) of solicitude.  While Section 10-16-107.4 broadly delegates legislative powers to the Commissioner, not every broad legislative delegation runs afoul of the Free Exercise Clause.

The Alliance also asserts that the Reporting Law is not generally applicable because it permits secular conduct that undermines the Reporting Law's policy objectives in a similar way to the religious conduct it allegedly infringes upon.  The Alliance specifically identifies (1) direct

29

A029

primary care arrangements, (2) crowdfunding entities, (3) consumer payment plans, (4) medical discount plans, (5) student health clinics at universities, (6) charities, (7) fraternal organizations, and (8) fully insured out-of-state employer health plans as purportedly comparable secular arrangements that are exempted from complying with the Reporting Law (through exemptions enumerated in Section 10-17-107.4, Regulation 4-10-01, and other Colorado laws). But there is no evidence that any of these arrangements pose the same or similar risks to those the Reporting Law seeks to mitigate.

The complaints the Division received before Colorado enacted the Reporting Law illustrate that consumers were confused by sharing plans' offerings—on several occasions, consumers mistook these plans for traditional, comprehensive insurance plans. There is no evidence that any of the excepted arrangements pose similar consumer confusion risks.

It is unlikely that they would. For instance, direct primary care arrangements—in contrast to sharing plans—look nothing like insurance. They involve arrangements directly between consumers and healthcare providers, and do not involve third parties aggregating funds or facilitating the flow of funds to pay or reimburse health care expenses. Further, there is no indication that direct primary care arrangements hold themselves out as offering insurance-like benefits, as sharing plans sometimes do.

Crowdfunding arrangements likewise would not seem to create similar consumer confusion risks to the ones sharing plans do. Indeed, a consumer raising money on GoFundMe to fund a surgery would not likely mistake GoFundMe for insurance in the same way that a

A030

consumer—told by an insurance agent that they were purchasing insurance—might mistake a sharing plan for an insurance.[14]

Consumer payment plans—like direct primary care arrangements—involve direct relationships between consumers and providers, and do not involve third-party intermediaries like insurance companies or sharing plans. Again, there would seem to be little risk that a consumer entering into a payment plan with a provider would think they were purchasing insurance. Similarly, medical discount plans do not involve third parties facilitating reimbursement or payment of health care expenses: the consumer remains the responsible and ultimate payor. Nor is there any evidence that medical discount plans hold themselves out as offering insurance-like benefits. Given these features, it is unlikely that anybody entering into a medical discount plan would think they were buying insurance.

Student health clinics at universities, charities, and fraternal organizations also do not generally hold themselves out as offering comprehensive insurance coverage and lack the basic features that would cause consumers to mistake them for insurance.

Of the exempted arrangements the Alliance identifies, only foreign employer health plans really resemble insurance (because they are). But these plans do not pose similar risks to consumers as sharing plans. As Defendant observes, these plans are regulated by insurance officials in the states in which they are headquartered.

---

[14] The risk of consumer confusion specific to sharing plans is evident even without misleading marketing. For instance, though the Guidelines for Health Sharing applying to members of Samaritan Ministries—one of the Alliance's constituents—explain that Samaritan Ministries does not offer insurance, the package of benefits that Samaritan Ministries offers closely resembles insurance. Samaritan Ministries members pay monthly "shares"— similar to premiums—and submit "needs"—similar to claims—which are covered subject to comprehensive coverage guidelines and caps that vary with the specific Samaritan Ministries plan the member signs on for (*see generally* D. 8-3).

Because the Alliance has not shown that the Reporting Law either provides a mechanism for individualized exemptions or prohibits religious conduct while permitting secular conduct that undermines the Reporting Law's objectives in similar ways, the Alliance has not shown that the Reporting Law is not generally applicable.

### iii.  Rational Basis Review

Given that the Alliance has not shown that the Reporting Law is not neutral or is not generally applicable, the Court finds that the Reporting Law is subject only to rational basis review. *See Hardman*, 297 F.3d at 1126 (observing that neutral and generally applicable laws are subject only to rational basis review); *Chiles*, 116 F.4th at 1225 ("Because, on the record before us, we find Ms. Chiles has failed to show the MCTL lacks neutrality and general applicability, the district court did not abuse its discretion in finding the MCTL is subject to rational basis review.").

The Reporting Law clears rational basis review.  The parties do not dispute that consumer protection is a legitimate government interest.  (And the Alliance would be hard pressed to argue otherwise given its support for HB 22-1198, a bill competing with HB 22-1269 that would have imposed auditing and reporting requirements on sharing plans.)  Moreover, the Court finds that the Reporting Law's requirements are rationally related to consumer protection.  The Reporting Law generally seeks information concerning the size, scope, payment practices, and marketing efforts of sharing plans.  The Court agrees with Defendant that this information would be helpful in identifying, understanding, assessing, and addressing the risks sharing plans pose to consumers.

### 2.  Establishment Clause

The Establishment Clause of the First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion."  U.S. Const.

32

A032

amend. I.  This provision applies to the states through the Fourteenth Amendment.  *See Everson v. Bd. of Ed. of Ewing*, 330 U.S. 1, 15 (1947) (addressing the incorporation of the Establishment Clause into the Fourteenth Amendment).  The United States Supreme Court has instructed that "the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'"  *Kennedy*, 597 U.S. at 535 (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)).  This historical-practices-and-understandings standard replaced the test enumerated in *Lemon v. Kurtzman*, 403 U.S. 602 (1971).  *Id.* at 534 (observing that the Supreme Court had "long ago abandoned *Lemon*").  Under *Lemon*, a law did not pass Establishment Clause muster if it: (1) lacked a secular legislative purpose, (2) lacked a principal or primary effect that neither advanced nor inhibited religion, or (3) fostered an excessive entanglement with religion.  *Lemon*, 403 U.S. at 612–13.  Ultimately, the *Lemon* test "also came to involve estimations about whether a 'reasonable observer' would consider the government's challenged action an 'endorsement' of religion."[15]  *Kennedy*, 597 U.S. at 534.

The Alliance —citing *Lemon's* entanglement prong—contends that the Reporting Law is invalid because it involves long-term, continuing monitoring of religious organizations and thereby fosters excessive government entanglement with those entities.  Defendant responds that the Supreme Court has abrogated *Lemon*; that even assuming *Lemon's* entanglement test were still good law, generally applicable administrative and recordkeeping regulations do not create excessive entanglement; and that generally applicable administrative and recordkeeping regulations do not constitute an establishment under the historical-practices-and-understandings test.

---

[15] In *Kennedy*, the Supreme Court expressly disavowed this endorsement test too.  *See* 597 U.S. at 534.

In abandoning *Lemon*, the Supreme Court did not issue state actors a blank check to begin entangling themselves in the affairs of religious institutions.  The Court has little doubt that laws that do foster an excessive entanglement between government and religion are inconsistent with the historical practices and understandings that inform the meaning of the Establishment Clause. In short, entanglement is still a relevant consideration in Establishment Clause analyses.  *See, e.g., Shurtleff v. City of Bos.*, 596 U.S. 243, 286 (2022) (Gorsuch, J., concurring) (listing "government [] control over the doctrine and personnel of the established church" among the characteristics of founding-era establishments); *Does 1-11 v. Bd. of Regents of Univ. of Colorado*, 100 F.4th 1251, 1270 (10th Cir. 2024) (relying on the Establishment Clause's "prohibition of excessive entanglement between religion and government" post-*Kennedy*); *Hilsenrath ex rel. C.H. v. Sch. Dist. of the Chathams*, 698 F. Supp. 3d 752, 763 n.15 (D.N.J. 2023) (observing that even though *Kennedy* clarifies that the *Lemon* test no longer applies, "[t]hat is not to say that the considerations underlying the *Lemon* test have become irrelevant").

At the same time, however, *Kennedy* does not draw into doubt the various Supreme Court precedents validating the constitutionality of generally applicable administrative and recordkeeping regulations.  *See, e.g., Jimmy Swaggart Ministries v. Bd. of Equalization of California*, 493 U.S. 378, 395 (1990) ("[G]enerally applicable administrative and recordkeeping regulations may be imposed on religious organization without running afoul of the Establishment Clause."); *Hernandez v. Commissioner*, 490 U.S. 680, 696–97 (1989) ("[R]outine regulatory interaction which involves no inquiries into religious doctrine, no delegation of state power to a religious body, and no detailed monitoring and close administrative contact between secular and religious bodies, does not of itself violate the nonentanglement command." (citations and internal

quotation marks omitted)); *Tony and Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290,

305–306, (1985) (observing that administrative and recordkeeping regulations—even ones that are

comparatively "burdensome in terms of paperwork"—may be sustained if not intrusive into

religious affairs).

Such generally applicable administrative and recordkeeping laws lack the characteristics

of founding era establishments.  As Justice Gorsuch explained in his *Shurtleff* concurrence:

> Beyond a formal declaration that a religious denomination was in fact the
> established church, it seems that founding-era religious establishments
> often bore certain other telling traits. First, the government exerted control
> over the doctrine and personnel of the established church. Second, the
> government mandated attendance in the established church and punished
> people for failing to participate. Third, the government punished dissenting
> churches and individuals for their religious exercise. Fourth, the
> government restricted political participation by dissenters. Fifth, the
> government provided financial support for the established church, often in
> a way that preferred the established denomination over other churches. And
> sixth, the government used the established church to carry out certain civil
> functions, often by giving the established church a monopoly over a specific
> function. Most of these hallmarks reflect forms of "coerc[ion]" regarding
> "religion or its exercise."

596 U.S. at 285–86 (Gorsuch, J., concurring) (citations omitted).  Moreover, the Alliance does not

argue that generally applicable administrative and recordkeeping laws are inconsistent with the

historical practices and understandings surrounding the Establishment Clause.

In sum, the core legal propositions on which the parties rely remain valid post-*Kennedy*:

laws that excessively entangle government and religious entities violate the Establishment Clause,

while laws that merely impose generally applicable administrative and recordkeeping

requirements (along the lines of those at issue in *Jimmy Swaggart Ministries*, *Hernandez*, and *Tony

and Susan Alamo Foundation*) do not.  The question this case presents is what category the

Reporting Law falls into.

In an attempt to show that the Reporting Law falls into the former category, the Alliance cites to *Aguilar v. Felton*, 473 U.S. 402 (1985), *Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*, 2 F.3d 1514 (11th Cir. 1993), and *Medina v. Catholic Health Initiatives*, 877 F.3d 1213 (10th Cir. 2017). But the Reporting Law is not like the policies and laws at issue in these cases. It is more like the policies and laws in *Jimmy Swaggart Ministries, Hernandez*, and *Tony and Susan Alamo Foundation*. While it may "requir[e] [] religious institutions to disclose [] information" about transactions that they carry out, the "administrative inquiries" the Reporting Law contemplates "'bear no resemblance to the kind of government surveillance the [Supreme] Court has previously held to pose an intolerable risk of government entanglement with religion.'" *Hernandez*, 490 U.S. at 698 (quoting *Tony and Susan Alamo Foundation*, 471 U.S. at 305).

*Aguilar* involved a state program that placed public school teachers at parochial schools, and corresponding state efforts to monitor and restrict those teachers' activities (including at least monthly unannounced visits from program field personnel, other visits by program coordinators, directives to the instructors to avoid involvement with religious activities, bars to religious materials in instructor classrooms, and directives to the parochial school administrators to clear the classrooms used by public school personnel of religious symbols). 473 U.S. at 406–07. The Court observed that the program's use of public school teachers created a sort of Catch-22: because it would violate the Establishment Clause for these teachers to convey a religious message, "ongoing inspection [was] required to ensure the absence of a religious message." *Id.* at 412. But this constitutionally required monitoring would itself violate the Establishment Clause by creating too high a degree of entanglement between government and religious institutions. *Id.* at 413. As the Court explained, "the detailed monitoring and close administrative contact required to maintain

36

A036

[the] program c[ould] only produce a kind of continuing day-to-day relationship which the policy of [the Establishment Clause] seeks to minimize" and "[t]he picture of state inspectors prowling the halls of parochial schools and auditing classroom instruction surely raises more than an imagined specter of governmental secularization of a creed." *Id.* at 414 (citations and internal quotations omitted).

The Reporting Law requires a far lower degree of contact between state officials and the religious institutions: representatives for sharing ministries (as well as representatives for secular sharing plans) must annually send the Division an email attaching a spreadsheet of basic business information along with marketing materials and training materials disseminated to third parties. This falls far short of the "continuing day-to-day relationship" and "detailed monitoring and close administrative contact" the *Aguilar* Court held violated the Establishment Clause. It is also worth noting that the Supreme Court later reversed its *Aguilar* decision: in *Agostini v. Felton*, 521 U.S. 203, 233 (1997), the Supreme Court held that the exact same program that was at issue in *Aguilar* did "not result in an 'excessive' entanglement that advances or inhibits religion."

*Church of Scientology* also involved a far more invasive (and less narrowly drawn) monitoring and reporting program than the one at issue here. In that case, the City of Clearwater enacted an ordinance generally requiring charitable organizations—including religious institutions like the Church of Scientology—soliciting funds within the City of Clearwater to register annually with the city. 2 F.3d at 1521. To obtain this registration, charitable organizations had to file a registration form with the city clerk. *Id.* This registration form required charities to disclose various categories of information, including, among other things, "an estimated schedule of salaries, wages, fees, commissions, expenses and costs to be expended and paid in connection with

the solicitation of funds and in connection with their disbursement, and an estimated percentage of the total projected collections which the costs of the solicitation will comprise." *Id.* at 1522. At the end of each annual registration period, registrants were further required to file a retrospective statement identifying "the full amount of money and property collected"; "a complete list of any and all expenses incurred in procuring those funds . . . broken down into salaries, wages, fees, commissions, advertising and all other expenses"; "the bank, if any, where the proceeds of those solicitations of funds were placed"; and the "actual or proposed utilization in approximate amounts of the said proceeds." *Id.* Organizations omitting information from the registration form or retrospective reports were also required to prepare a sworn "private statement" containing the otherwise required information, and maintain supporting records validating the private statements, which, upon the request of an organization member, the organization was required to disclose (along with the private statement). *Id.* at 1522–23. Noncompliance with these requirements could result in criminal penalties. *Id.* at 1523.

In holding that the City of Clearwater's reporting requirements collectively fostered excessive entanglement between the city and religious organizations like the Church of Scientology, the Eleventh Circuit relied on the Supreme Court's (now disavowed) *Aguilar* entanglement analysis. *Id.* at 1536. And it ultimately concluded that the City of Clearwater's ordinance ran afoul of the Establishment Clause because the ordinance mandated

> a "detailed monitoring and close administrative interaction" by empowering the city clerk to review in detail the disclosure of proposed spending for the coming year and to assess disclosure of all such activities over the preceding year, by mandating public access to a detailed accounting of church expenditures, by opening the books and records to members of

organizations employing the private statement and by involving criminal
courts in enforcing these provisions.[16]

*Id.* at 1535–36.    These requirements collectively compelled religious and other charitable
organizations to "divulge [their] entire budget[s] and all [their] operations on a continuing basis."
*Id.* at 1535.

The Reporting Law does not require such comprehensive and invasive disclosures.  While
the entities subject to Reporting Law must generally disclose the total amount of fees received
from plan participants, the amount retained for administrative expenses, the total amount of
reimbursements made to plan or arrangement participants, and compensation and remuneration
paid to producers and other third parties engaged in marketing and administering the plans or
arrangements, these disclosure obligations do not "require a church to divulge its entire budget and
all its operations" like the ordinance in *Church of Scientology* did.  Instead, they are narrowly
drawn to Colorado's consumer protection concerns (and concomitant needs to understand sharing
plan marketing practices and to verify that sharing plans are not retaining an excessive share of
member payments, as opposed to paying member claims).

Finally, the Alliance—relying on dicta from the Tenth Circuit's decision in *Medina v.
Catholic Health Initiatives*—compares the Reporting Law to a hypothetical version of the
Employee Retirement Income Security Act (ERISA) that did not exempt "church plans."  *Medina*
involved an Establishment Clause challenge to ERISA's church plan exemption.  877 F.3d at 1214.
In concluding that this exemption did not violate the Establishment Clause, the Tenth Circuit

---

[16] The Eleventh Circuit also held that there were fact issues as to whether the City of Clearwater enacted its ordinance
to discriminate against the Church of Scientology, pointing to statements from public officials (including statements
comparing the Church of Scientology to a cancer).  *Church of Scientology Flag Serv. Org., Inc.*, 2 F.3d at 1531–33.
That subtext is not present in this case.

postulated that a version of ERISA *not* including this exemption would violate the Establishment

Clause by fostering excessive entanglement between government and religion:

> Complying with ERISA's fiduciary rules is no simple matter. A Catholic church, or entity associated with one, might want to invest its plan assets in service of certain social goals. But that could run afoul of ERISA, which requires diversification of plan assets, 29 U.S.C. § 1104(a)(1)(C), and that plan assets be held for the exclusive purpose of providing benefits and defraying reasonable plan expenses. 29 U.S.C. § 1103(c). There would, moreover, be pervasive monitoring to determine whether the church or church-associated entity was complying with ERISA.

*Id.* at 1233. But the Reporting Law—which again requires only an annual email reporting high-

level and basic business information—does not pose the same risk of entanglement that verifying

a religious entity's compliance with fiduciary and other obligations under ERISA would. The

Reporting Law does not delve into sharing plans' purposes, goals, and objectives—it simply seeks

data germane to documented consumer protection concerns.

The Reporting Law imposes generally applicable administrative and recordkeeping that do

not entail detailed monitoring or close administrative contact between Colorado authorities and

the ministries subject to the Reporting Law. The Alliance is therefore unlikely to show that the

Reporting Law fosters a risk of excessive entanglement and violates the Establishment Clause on

that basis. The Alliance has not made a strong showing that it is likely to succeed on the merits of

its Establishment Clause claim.

### 3. *Freedom of Association*

The First Amendment freedoms "to speak, to worship, and to petition the government for

the redress of grievances could not be vigorously protected from interference by the State unless a

correlative freedom to engage in group effort toward those ends were not also guaranteed."

*Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). Thus, though the First Amendment does not

A040

explicitly mention such associational rights, the Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Id.* The Supreme Court has sometimes referred to the associational freedom derived from the First Amendment as a right of "expressive association."[17] *See id.* at 618; *see also Salvation Army v. Dep't of Cmty. Affs. of State of N.J.*, 919 F.2d 183, 198 (3d Cir. 1990) (discussing the Supreme Court's efforts to categorize associational rights and observing that collective religious exercise falls into the "expressive association" category).

Because expressive associational rights derive from the First Amendment, "there is no constitutional right to associate for a purpose that is not protected by the First Amendment." *Salvation Army*, 919 F.2d at 199 (citing *City of Dallas v. Stanglin*, 490 U.S. 19 (1989)). Moreover, "the right of expressive association has different contours depending upon the activity in which a group is engaged" and the specific First Amendment protection on which a plaintiff grounds its expressive association claim. *Id.*

When religious organizations (such as the Alliance's constituents) assert expressive association claims, two First Amendment protections may be implicated. First, religious organizations may invoke the right to free exercise, "which may include actions that are not covered by the free speech clause." *Id.* Second, they may rely on the right to express ideas, "which is protected by the free speech clause" irrespective of the religious nature of such ideas. *Id.*

---

[17] The Supreme Court has used this nomenclature to distinguish First Amendment associational rights from the right to "enter into and maintain certain intimate human relationships"—i.e., the right to intimate association. *Roberts*, 468 U.S. at 617–18. The Alliance's freedom-of-association claim depends on the premise that Defendant violated its members' First Amendment associational rights, and not any right to intimate association.

### i. Association for Religious Purposes

Neutral and generally applicable laws are presumptively valid against groups claiming expressive associational rights under the Free Exercise Clause, just as they are valid against individuals asserting individual free exercise rights under the same provision. Any other approach would produce the "anomalous" result of privileging corporate over individual religious exercise. *Id.*

Here, the Court has already held that the Alliance has failed to demonstrate that the Reporting Law is anything other than neutral and generally applicable. Thus, to the extent that the Alliance's freedom-of-association claim is grounded on the Free Exercise Clause, the Alliance has failed to show a strong likelihood of success on the merits for the same general reasons as it failed to establish a likelihood of success on the merits of its freestanding free exercise claim.

### ii. Association for Free Speech Purposes

The Court considered whether the Alliance has any sort of expressive association claim predicated on the Free Exercise Clause because the Alliance raised a freestanding free exercise claim and because the Alliance's constituents are not disputed to be religious organizations acting on their genuinely held religious beliefs. But the thrust of the Alliance's freedom-of-association challenge seems to be that various of the Reporting Law's disclosure requirements create a risk of chilling the relationships among its members and the third-party vendors and service providers they work with, and by extension the ability of the Alliance's members' to spread their religious messages (*see* D. 8 at 29–30 (citing various cases addressing association for purposes of engaging in political and other kinds of speech)). In particular, the Alliance challenges the Reporting Law's requirement that persons offering or intending to offer sharing plans or arrangements to produce

A042

"[a] list of any third parties, other than a producer, that are associated with or assist the person in offering or enrolling participants . . . in the plan or arrangement."[18]  *See* Colo. Rev. Stat. § 10-16-107.4(1)(a)(XV).  Though the Alliance's briefing and pleadings are not entirely clear as to what components of the Reporting Law it challenges on freedom-of-association grounds, it also appears that the Alliance may be contesting the Reporting Law's requirement that reporting parties provide information respecting contracts they have entered into with healthcare providers.  *See id.* § 10-16-107.4(1)(a)(IV).  The Alliance challenges these provisions both facially and as applied.

The Alliance relies on the Supreme Court's decision in *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021) for the proposition that compelled disclosure requirements trigger exacting scrutiny—i.e., an inquiry into whether the challenged disclosure requirement is substantially related to a sufficiently important government interest.  But the Court does not read *Americans for Prosperity Foundation* to automatically apply exacting scrutiny to all so-called compelled disclosure requirements—just the ones that create "[t]he risk of a chilling effect on association."  *Id.* at 618.  Nor does the Court read this case to displace the framework the Supreme Court's precedents establish for freedom-of-association claims generally.

Not all compelled disclosure requirements are equally situated.  One might describe a municipal law requiring applicants for building permits to identify the contractors they intend to use as a "compelled disclosure requirement."  Or consider a state law requiring the persons forming a limited liability companies to disclose their identities when they file articles of organization with the state.  It seems that these sorts of laws would not chill First Amendment freedoms as a general

---

[18] Pursuant to the relevant statutory definition, a producer is "a person licensed by the division who solicits, negotiates, effects, procures, delivers, renews, continues, services, or binds health benefit plans and is licensed to conduct these activities in Colorado."  Colo. Rev. Stat. § 10-16-102(55).

matter, even though they could apply to entities engaged in expressive conduct falling within the First Amendment's protections.  It strikes the Court as unlikely that the Supreme Court intended to pull these sorts of laws into the exacting scrutiny dragnet simply because they could be described as "compelled disclosure" laws.

And *Americans for Prosperity Foundation's* language confirms the Supreme Court didn't. That decision stressed that it was limited to its own facts.  *See Americans for Prosperity Found.*, 594 U.S. at 617 (noting "[t]he gravity of the privacy concerns *in this context*," i.e., in the compelled-disclosure-of-charitable-donors context (emphasis added)).  Nothing in *Americans for Prosperity Foundation* suggests that there is a per se chilling risk when a law compels entities to disclose third-party commercial affiliates, a fundamentally different type of association than the relationship between charities and their donors.  *Cf. Roberts*, 468 U.S. at 634–37 (O'Connor, J., concurring) (observing that "there is only minimal constitutional protection of the freedom of commercial association" and that even entities that engage in a large amount of expressive conduct lack immunity from laws bearing on their commercial associations).  Moreover, under *Americans for Prosperity Foundation*, a law's chilling effect factors into the exacting scrutiny test.  Indeed, "[t]o withstand [exacting] scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights."  *Americans for Prosperity Found.*, 594 U.S. at 607 (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)).  If a law poses no chilling risk, it follows that no sort of special scrutiny is required.

Establishing that a challenged disclosure law poses a risk of chilling First Amendment associational freedoms is a threshold requirement for asserting a First Amendment associational claim.  *See id.* at 618; *cf. In re Motor Fuel Temperature Sales Pracs. Litig.*, 641 F.3d 470, 488 (10th

Cir. 2011) (requiring an entity asserting a First Amendment associational privilege to make a prima

facie showing that the privilege applies). Before applying a First Amendment test, the Court

necessarily must determine whether the First Amendment even applies in the first instance. And

that depends on whether the plaintiff has a protected First Amendment associational interest, and

whether the challenged law implicates that interest. As the United States Court of Appeals for the

Sixth Circuit—drawing on Supreme Court precedent—explained:

> The Supreme Court's precedent has led us to consider three things when
> confronted with an expressive-association claim. *See Hamilton Cnty. Educ.*
> *Ass'n v. Hamilton Cnty. Bd. of Educ.*, 822 F.3d 831, 840 (6th Cir. 2016);
> *Miller v. City of Cincinnati*, 622 F.3d 524, 538 (6th Cir. 2010). First: Does
> the First Amendment apply to the group because it engages in speech? *See*
> [*Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000)]. Second: If the group
> engages in speech, does a law "significantly burden" its ability to express
> its message? *See id.* at 653, 120 S.Ct. 2446; *Roberts*, 468 U.S. at 622–23,
> 104 S.Ct. 3244. Third: If this burden exists, can the government satisfy the
> scrutiny that applies? For some burdens, the Court has applied strict
> scrutiny. *See Dale*, 530 U.S. at 648, 120 S.Ct. 2446; *Roberts*, 468 U.S. at
> 623, 104 S.Ct. 3244. For others, it has applied its less rigorous "exacting
> scrutiny" test. *Ams. for Prosperity Found.*, 141 S. Ct. at 2383 (plurality
> opinion) (quoting [*Buckley v. Valeo*, 424 U.S. 1, 64 (1976)]); *cf. id.* at 2391–
> 92 (Alito, J., concurring in part and concurring in the judgment). And for
> the ballot-access burdens that we have discussed, it has applied the
> *Anderson-Burdick* balancing test. *See* [*Washington State Grange v.*
> *Washington State Republican Party*, 552 U.S. 442, 451–52 (2008)].

*Lichtenstein v. Hargett*, 83 F.4th 575, 602 (6th Cir. 2023).

Launching into an exacting scrutiny analysis before determining a First Amendment

associational interest was even in play would put the cart before the horse. And doing so would

be inconsistent with the Supreme Court's general approach to analyzing constitutional claims. In

the Second Amendment context, for instance, the plaintiff bears an initial burden of showing that

the Second Amendment's text covers the conduct the challenged law or policy regulates. *See New*

*York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022). It is only then that the burden

shifts to the government to show that its law or policy "is consistent with this Nation's historical tradition of firearm regulation." *Id.* It wouldn't make sense to have it any other way—it would be absurd to require the government to prove its law or policy was consistent with historical arms regulation when its law or policy does not even implicate the right to bear arms. The same is true here. If the Alliance cannot show that the Reporting Law risks chilling its members' expressive rights (or, for purposes of its facial challenge, creates a broad-based chilling risk), there is no basis for holding the government to an exacting scrutiny standard.

The Court finds the Sixth Circuit's framework for analyzing expressive associational claims persuasive. Defendant does not dispute that the Alliance's member ministries—in furtherance of their genuinely held religious beliefs—disseminate religious messages. These messages qualify as protected First Amendment speech, and the Alliance's member ministries are entitled to associate for purposes of engaging in this speech. The Court therefore finds that the Alliance clears the first step of the *Lichtenstein* analysis.

Where the Alliance stumbles is the second step of analysis, which focuses on the burden the government law or policy imposes on a plaintiff's protected associational rights. Consistent with *Americans for Prosperity Foundation*, however, the Court would rephrase this inquiry in terms of "risks of a chilling effect" or burdens rather than actual chilling effects or burdens.

Though *Americans for Prosperity Foundation* clarifies that it is "[t]he risk of a chilling effect on association" that "trigger[s]" First Amendment protection, 594 U.S. at 618, it does not clearly specify what a freedom-of-association plaintiff must do to make this showing in each and every procedural posture. In *Americans for Prosperity Foundation*, which concerned an appeal after a trial on the merits, the Supreme Court noted record evidence that the petitioners and their

supporters had been subjected to bomb threats, protests, stalking, and physical violence. *Id.* at 617. It also relied on the briefing of *amici* "span[ning] the ideological spectrum" in concluding that "[t]he deterrent effect feared" by charitable organizations subject to California's donor-disclosure law was "real and pervasive." *Id.* In the discovery context, meanwhile, courts have held that an entity challenging discovery on the basis of a First Amendment associational privilege must make a prima facie showing of the privilege's applicability, *see In re Motor Fuel Temperature Sales Pracs. Litig.*, 641 F.3d at 488, which showing is not made through "minimal and equivocal" evidence of a chilling risk, *id.* at 490.

Here, the Alliance must make a strong showing as to its likelihood of success on the merits to receive a preliminary injunction. While *Americans for Prosperity Foundation* and litigation discovery cases are not entirely on point, the Court finds that they strongly suggest a freedom-of-association plaintiff may not clear its preliminary injunction burden by vaguely averring to subjective and undeveloped fears of a chilling risk. At a minimum, the Alliance must explain how the Reporting Law's requirement that its members disclose certain of their commercial affiliates creates a real risk of chilling its members'—or, for purposes of its facial challenge, others'—expressive activities, and the objective facts on which that belief is grounded.

In some contexts, a risk of chilling or otherwise burdening associational rights might be obvious:

> A government can burden the right to associate in a "number" of ways. *Ams. for Prosperity Found.*, 141 S. Ct. at 2382 (quoting *Roberts*, 468 U.S. at 622, 104 S.Ct. 3244). It might compel a group (say, the Boy Scouts) to accept members with whom the group does not want to associate (say, openly gay individuals) because the group believes that this membership will dilute its message (say, disapproval of non-heterosexual conduct). *See Dale*, 530 U.S. at 653, 120 S.Ct. 2446. The government also might compel a group (say, the NAACP) to disclose its list of members to a hostile audience (say, the

47

> segregated south) and so deter individuals from joining the group out of fear
> of harassment. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449,
> 461–63, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Or the government might
> discriminate against a group (say, the Students for a Democratic Society) by
> refusing to give it a generally available benefit (say, access to a college's
> facilities) that groups generally use to air their points of view. *See Healy v.
> James*, 408 U.S. 169, 181, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972). Or it might
> prohibit a group (say, the NAACP) from soliciting individuals (prospective
> clients) to associate with the group's lawyers for litigation purposes. *See
> NAACP v. Button*, 371 U.S. 415, 429–37, 83 S.Ct. 328, 9 L.Ed.2d 405
> (1963); *see also NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 911–12,
> 924–26, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982).

*Lichtenstein*, 83 F.4th at 602. Or, as in *Americans for Prosperity Foundation*, a risk of chilling

might be inferred based on a documented pattern connecting disclosures to harassment and

intimidation. *See* 594 U.S. at 616–17 (noting the petitioners' evidence that "they and their

supporters have been subjected to bomb threats, protests, stalking, and physical violence" in

concluding that a California donor-disclosure law created an unnecessary risk of chilling

association).

    In this case, the Alliance challenges an industry-specific disclosure law that requires

industry members to disclose third parties that are involved with offering or enrolling participants

in their products. This disclosure regime is quite different from a disclosure law obligating the

NAACP to disclose its members' identities against the backdrop of the Jim Crow South—which

could and did subject members to reprisals, and thus created a risk of chilling association with the

NAACP. And it is not the same as the disclosure regime in *Americans for Prosperity Foundation*,

which broadly required California charities to disclose their major donors, some of whom were

threatened based on disclosure of their donations to arguably controversial causes. 594 U.S. at

602, 604, 616–17. The disclosure regime at issue in this case does not present any obvious risk of

chilling third-party vendors from associating with the Alliance's members for purposes of

disseminating the Alliance's members' messages or present any obvious risk of preventing the Alliance's members from getting their messages out. The Court will not assume that any such risks exist,[19] absent evidence from the Alliance showing the presence of a chilling threat.

But the Alliance has not shown that the Reporting Law creates a risk of chilling its members' expressive rights. The Alliance filed two declarations in support of its preliminary injunction motion—one from Rob Waldo, Vice President and Chief Administrative Officer of Alliance member Samaritan Ministries (Samaritan) (D. 8-1), and the other from Katy Talento, Executive Director of the Alliance (D. 8-5). It also filed excerpts from Mr. Waldo's deposition (D. 52-1). None of this evidence shows that the Reporting Law creates a risk of chilling its members' expressive conduct.[20]

In his declaration, Mr. Waldo indicates that one of the reasons Samaritan finds the Reporting Law troubling is that its members, rather than Samaritan itself, contract with providers for services, and that the Reporting Law may require Samaritan to disclose its members' contracts

---

[19] The Court is particularly reluctant to presume the sort of disclosure arrangement at issue in this case creates some sort of chilling risk when the Supreme Court—in cases the Alliance cites—has suggested that disclosure requirements bearing on professional fundraisers working on charities (in contrast to caps affecting charity spending on fundraising) are constitutional. *See Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 967 n.16 (1984) ("[C]oncerns about unscrupulous professional fundraisers, like concerns about fraudulent charities, can and are accommodated directly, through disclosure and registration requirements and penalties for fraudulent conduct.").

[20] The Alliance quotes *In re First Nat. Bank, Englewood, Colo.*, 701 F.2d 115, 116 (10th Cir. 1983) for the proposition that affidavits describing the "'reluctance of people sympathetic [to the group] to associate with the group' upon exposure are sufficient evidence" to make out a freedom-of-association claim (D. 52 at 17). But the Alliance leaves out a key part of this quotation: "Affidavits submitted to the district court *describe harassment and intimidation of petitioners' known members*, and the resulting reluctance of people sympathetic to the goals of [the group] to associate with the group for fear of reprisals." *In re First Nat. Bank*, 701 F.3d at 116–17 (emphasis added). In *In re First National Bank*, the entities asserting a First Amendment associational privilege thus pointed to objective facts demonstrating the existence of a chilling risk. They did not simply rely on vague averments (not backed up any factual support) that they or their members felt some subjective chilling risk. That is essentially the missing piece here. The Alliance relies on declarations concluding that the Reporting Law creates a chilling risk, but these conclusions rest on scant objective supporting evidence. If the Alliance had produced evidence that over the three cycles the Reporting Law has been in effect, its members and their vendors had faced harassment and intimidation (or anything approaching harassment and intimidation) its preliminary injunction request would be on much stronger footing.

with these providers to the state (thereby compromising its members' medical privacy) (*see* D. 8-1 at 3–4). The Alliance does not connect this concern to its members' (or anyone else's) expressive activity. The Court assumes that the Alliance's theory here is that the Reporting Law makes it more difficult for Samaritan to reach prospective members with its message, because these prospective members might be worried that if they join Samaritan, their confidential healthcare choices might be disclosed to the state. Ultimately, this purported concern is speculative and appears to depend on a straw man reading of the Reporting Law.

Section 10-16-107.4 facially requires disclosure of "[a]ny contracts the person [i.e., the reporting party] has entered into with providers" in Colorado. The reporting template associated with Regulation 4-10-01, meanwhile, does not require disclosure of any actual contracts—it merely asks reporting parties to identify how many contracts they have entered into with providers for Colorado plan participants. *See* D. 46-1 at 638. On its face, the Reporting Law therefore cannot be read to seek individual plan members' contracts with their providers.

Mr. Waldo's declaration also indicates that Samaritan's contractual relationships with at least some of its "third party vendors" are subject to non-disclosure agreements and that it is Samaritan's "understanding that many of [its] affiliates wish to maintain their privacy," such that "[t]he forced disclosure of [Samaritan's vendor relationships] has the potential to undermine [Samaritan's] ability to work with [its] vendor[] partners to carry out [its] religious mission" (D. 8-1 at 4). And during his deposition, Mr. Waldo indicated that if Colorado and journalists would report accurately on the activities of sharing plans, it might not be a problem for Samaritan to disclose its vendors, but because of this allegedly misleading reporting, vendors might be reluctant to associate with Samaritan:

A050

> And then, now [vendors'] names are associated publicly on a list that, according to Colorado's Open Records Act, anyone can access. Well, why is that a problem, some may say? If the DOI and journalists would report accurately, it may not be a problem. But they aren't reporting accurately. And they have provided misleading, mischaracterizing statements that are harming us. And now vendors are publicly associated with us.

(D. 52-1 at 9). Mr. Waldo also explained that "[t]here's some vendors that face pressure related to who is considered a hate group," and that while Samaritan is not considered a hate group, other organizations that offer sharing plans may be, and so vendors might be reluctant to associate with those organizations if their affiliations are made public (*id.* at 9–10).

Again, the Alliance does not draw a clear connection between the unspecified vendor relationships Mr. Waldo discusses and Samaritan's (or any other organization's) ability to engage in expressive conduct. Moreover, the concerns Mr. Waldo's declaration and deposition testimony raise are vague, speculative, and conclusory.[21]

Ms. Talento's declaration has the same issues. According to Ms. Talento, "[m]any Alliance ministry affiliates wish to maintain the privacy of their business or religious affiliations and do not want their information shared with the government," so "[t]he forced disclosure of this information undermines Alliance ministry members' abilities to work with their partners to carry out their religious missions" (D. 8-5 at 6). Like Mr. Waldo's statements, this description of the Reporting Law's threats to the Alliance's members' ability to spread their religious message is vague. Unlike Mr. Waldo, Ms. Talento indicates that she is "already aware of some affiliates expressing reluctance to continue working with health care sharing ministries because of Colorado's

---

[21] Mr. Waldo's speculative concerns about vendor behavior are also significantly undercut by his admission that "no vendor has ceased to work with [Samaritan] yet due to the Colorado reporting [law]" (D. 46-1 at 779).

regulations" (*id.*).  But this statement is still vague and does not demonstrate that there is a risk that sharing ministries will somehow be impaired in disseminating their religious messages. Moreover, the Court notes that Colorado's reporting regime has been in place for three reporting cycles.  If its disclosure requirements posed a bona fide risk of chilling protected association, the Court would expect that the Alliance would be able to produce more specific evidence germane to that risk.[22]  Ultimately, the Alliance's expressed concerns about chilling appear to be entirely subjective and lacking in factual support.

Because the Alliance has not shown that the Reporting Law actually threatens to affect its members' expressive activities, the Alliance has not proven a substantial likelihood of prevailing on the merits of its freedom-of-association claim.

### 4. Free Speech Clause

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'"  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting U.S. Const. amend. I).  It protects "both the right to speak freely and the right to refrain from speaking at all."  *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).

But the First Amendment does not protect all speech equally.  Indeed, the Constitution affords commercial speech—that is, "expression related solely to the economic interests of the

---

[22] During his deposition, Mr. Waldo explained that Samaritan's vendors do not always tell Samaritan why they stop working with Samaritan, and that potential vendors do not always explain why they decline to work with Samaritan in the first place (*see* D. 52-1 at 14–15).  This testimony does not establish that vendors or potential vendors that ceased doing business or declined to do business with the Alliance's members would not or could not cite the Reporting Law as a reason for those decisions if in fact they perceived the Reporting Law as an issue.  The fact that none of the Alliances members have evidently reported losing out on any vendor relationships strongly suggests that the Reporting Law does not create any real chilling risk.  At best, Mr. Waldo's testimony is an attempt to explain away the Alliance's lack of evidence.  But ultimately, explaining away the absence of evidence is not the same thing as evidence, and this explanation does not make for a strong showing that the Alliance is likely to succeed on the merits of its freedom-of-association claim.

speaker and its audience," or speech "proposing a commercial transaction"—"lesser protection"
than it does "other constitutionally guaranteed expression." *Cent. Hudson Gas & Elec. Corp. v.
Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561–63 (1980).  Laws regulating commercial
speech are not subject to strict scrutiny.  Instead, laws *restricting* commercial speech generally
need only survive intermediate scrutiny.  *United States v. Wenger*, 292 F. Supp. 2d 1296, 1303 (D.
Utah 2003); *see also Cent. Hudson Gas & Elec. Corp*, 447 U.S. at 564–65 (explaining the
framework applying to efforts to regulate commercial speech that is neither misleading nor related
to unlawful activity).  Meanwhile, laws that *compel* commercial speech (e.g., in the form of
consumer-protection oriented disclosures in advertisements) need only "reasonably relate[] to the
State's interest in preventing deception of consumers," at least so long as such compelled speech
is "purely factual and uncontroversial." *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of
Ohio*, 471 U.S. 626, 651 (1985).  This lower standard for compelled commercial speech recognizes
that laws that compel speech "trench much more narrowly" on First Amendment interests than do
laws that restrict speech.  *Id.*

Applying the commercial speech doctrine requires distinguishing commercial from other
speech.  Courts have routinely referred to this analysis as a "commonsense" test.  *See, e.g.*, *Rubin
v. Coors Brewing Co.*, 514 U.S. 476, 482 (1995); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447,
455 (1978).  But the lines between commercial and fully protected speech are not always clear.
*See City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 419 (1993) (observing "the
difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category").
When commercial and "otherwise fully protected speech" are "inextricably intertwined,"
commercial speech does not "retain[] its commercial character." *Riley v. Nat'l Fed'n of the Blind*

A053

*of N. Carolina, Inc.*, 487 U.S. 781, 796 (1988). Rather, the court must simply apply the applicable test for fully protected expression (generally some form of heightened scrutiny). *Id.* Ultimately, a court's "lodestars in deciding what level of scrutiny to apply" are "the nature of the speech taken as a whole and the effect of the [challenged law or regulation] thereon." *Id.*

Here, the Alliance contends that the Reporting Law violates its members' free speech rights in two ways: first, by requiring that reporting parties produce "[c]opies of any consumer-facing and marketing materials used in [Colorado] in promoting the [reporting party's] plan or arrangement, including plan or arrangement benefit descriptions and other materials that explain the plan or arrangement," Colo. Rev. Stat. §10-16-107.4(1)(a)(XVII); and second, by requiring reporting parties to produce various internal operations data.

### i. Marketing Materials Disclosures

The Reporting Law functions differently from the sorts of laws at issue in *Central Hudson* and *Zauderer*. Unlike the regulatory order at issue in *Central Hudson*, which banned certain categories of advertising, *see* 447 U.S. at 558–60, the Reporting Law does not facially restrict speech. And unlike the regulation at issue in *Zauderer*, which required attorneys advertising contingent-fee arrangements to disclose in their advertising their clients' potential liability for certain costs, *see* 471 U.S. at 652, the Reporting Law does not compel reporting parties to convey any particular message or include any particular information in their advertising. Rather, the Reporting Law requires reporting parties to turn over to the state marketing materials that they have already disseminated to some portion of the consuming public. In other words, the Reporting Law does not require anyone to say anything new—just to say what they have already said. For

these reasons, the Reporting Law's marketing material disclosure requirement would seem to impose a relatively light touch on speech—whatever the contents of that speech are.

The Alliance's objection is that the Reporting Law's marketing materials disclosure requirement, when applied to sharing ministries, regulates not just to commercial speech, but also fully protected religious speech. There is little in the record that reflects the substance of the Alliance's members' marketing materials. The record contains Samaritan's Guidelines for Health Care Sharing (D. 8-3), which would seem to qualify as "consumer-facing and marketing materials used . . . in promoting" Samaritan's sharing plans. These guidelines—in addition to describing the plans' coverages and mechanics—note that biblical principles are foundational to Samaritan's mission and discuss Samaritan's religiously oriented membership criteria (e.g., its requirements that members must affirm a statement of faith, regularly "attend a Biblical, Christian Church," and "[a]gree that when you have a dispute with a fellow Christian, and your fellow Christian is willing to submit that dispute to fellow believers for resolution, you are not to sue each other in the civil courts or other government agencies") (*id.* at 5, 10–11). The record also includes deposition testimony from Mr. Waldo to the effect that Samaritan tailors its marketing efforts along religious lines:

> Samaritan does communicate to reach others that we believe are like-minded. And we can call that marketing. We can call that advertising. And we do that. We're very intentional about how we do that. We want to attract only those people that can sign up on our statement of faith and want to participate in healthcare sharing like us. And, yes, we do market and advertise to those that we believe may be interested in joining our community.

(D. 52-1 at 6).  Mr. Waldo further testified that he was "not aware" of Samaritan making any changes to the substance of its marketing materials in response to the Reporting Law (D. 46-1 at 791).

Based on this limited record, it appears that—at least some of the time—sharing ministries couch their marketing efforts, or explain the transactions they propose, in religious terms.  But common sense dictates that there is also a strong commercial component to sharing ministry marketing efforts.  Sharing ministry marketing materials necessarily explain the terms of a commercial transaction.  By their nature, sharing ministries (and sharing plans more generally) involve a quid pro quo: members pay regular fees in consideration for (at least a chance of) getting their medical needs covered.  While prospective members might join sharing ministries because they feel that membership is consistent with their religious values, that does not change the fact that sharing ministries would not exist if there was no need to pool medical risks—which are essentially economic.  In this regard, sharing ministries operate in the same general commercial risk management market as traditional insurance companies.

Speech explaining the terms of a risk-sharing transaction to consumers for the purposes of persuading consumers to engage in this transaction is definitionally commercial.  *See Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 473–74 (1989) ("There is no doubt that the AFS Tupperware parties the students seek to hold propose a commercial transaction, which is the test for identifying commercial speech." (citations and internal quotation marks omitted)).  And because this speech concerns an economic transaction, it is unlike other sorts of speech that the Supreme Court has recognized as non-commercial.  *See, e.g.*, *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980) (distinguishing charitable solicitation from commercial

A056

speech on the ground that "charitable solicitation does more than inform private economic decisions and is not primarily concerned with providing information about the characteristics and costs of goods and services"). Sharing ministries' marketing materials obviously do inform private economic decisions relating to health care coverage and do provide information about goods and services. In this way, they have a clear commercial bent.

The record shows that the commercial aspects of sharing plan marketing materials are Colorado's concern. As previously discussed, the Division received numerous complaints indicating that sharing plans and their agents were misleading consumers and that consumers were confused as to the limitations of sharing plans vis-à-vis traditional insurance. The Division also discovered that certain plans were impermissibly operating as unlicensed insurers. Colorado's requirement that sharing plans disclose their marketing materials relates directly to these concerns. And while there is no evidence that Colorado's disclosure requirements have *any* chilling or compelled-speech effects on *any* component of *any* sharing plan's marketing materials, the Court suspects that the only potentially viable argument along these lines is that the Reporting Law might make sharing plans more sensitive to underscoring distinctions between their offerings and traditional insurance and take greater pains to ensure they are accurately describing the coverage they provide. But these burdens would seem to fall on the clearly commercial aspects of sharing plan marketing efforts. There is no indication that they would fall on any sort of religious messaging or appeal.

Because sharing plan marketing materials are at their core commercial speech, and because the burden of the Reporting Law—if any—would seem to fall on this commercial speech, the Court concludes that the commercial speech doctrine applies here. While the Court recognizes

57

A057

that some sharing plans may include religious messaging in their marketing materials, that does not change the result of its analysis.

Proposing commercial transactions in religious terms—or injecting other forms of protected speech into otherwise commercial appeals—does not necessarily remove speech in furtherance of that transaction from the ambit of the commercial speech doctrine or create an inextricable intertwinement issue. *See Fox*, 492 U.S. at 474–75 (noting that opening sales presentations with a prayer or the Pledge of Allegiance "would [not] convert them into religious or political speech"). In *Fox*, for instance, the Supreme Court rejected a houseware sales company's arguments that gatherings it hosted, where it not only pitched its products, but also "touch[ed] on other subjects . . . such as how to be financially responsible and how to run an efficient home," inextricably intertwined pure and commercial speech. *Id.* at 474. In concluding that the commercial speech doctrine applied, the Supreme Court observed that the challenged policy—which generally prohibited private commercial enterprises from operating on state university campuses—did "[n]othing [to] prevent[] the speaker from conveying, or the audience from hearing, [] noncommercial messages." *Id.* Here too, the Reporting Law does not preclude any sharing ministry from conveying any religious message to its members or prospective members: ministries are free to say anything they want about religion or their religious values to anyone they wish. There is no evidence that the Reporting Law burdens religious speech at all—and if it imposes any burden on speech, that burden would seem to fall on purely commercial speech.

While the Court concludes that the commercial speech doctrine applies, that does not fully resolve the question of the particular level of scrutiny the Reporting Law must survive. As the

58

A058

Court indicated, the Reporting Law is not precisely like the regulations at issue in *Central Hudson* or *Zauderer*. But on balance, the Reporting Law's requirement that reporting parties disclose their marketing materials is more like *Zauderer's* consumer disclosure requirement. If anything, it is less burdensome because it does not dictate the substance of any communication—rather, it requires reporting parties to disclose their already disseminated marketing materials to the state.

Accordingly, the Court finds that the Reporting Laws' marketing-material disclosure requirement need only survive the rational basis inquiry set forth in *Zauderer*. The marketing-material disclosure requirement easily satisfies this test. Understanding how sharing plans market themselves can guide the Division in advising consumers and acting against sharing plans that engage in misleading marketing. And the best way to understanding how sharing plans market themselves is almost certainly to look at how sharing plans actually market themselves. The marketing-material disclosure requirement thus "reasonably relate[s] to the State's interest in preventing deception of consumers." *See Zauderer*, 471 U.S. at 651.

### ii. Internal Data Disclosures

The Alliance also challenges the Reporting Law on the ground that its various reporting requirements aside from the marketing-related disclosure obligation "compel[] [] ministries to speak about their internal operations." The Alliance does not identify the particular disclosure requirements it finds objectionable. But the Court presumes the Alliance's objection extends to the requirements that sharing plans disclose the total amounts of fees, dues, and payments they collect; the total dollar amounts of reimbursement requests for healthcare costs or services submitted in Colorado; the total dollar amount of such requests qualifying for reimbursement; and

like data.[23]  The Alliance claims that these requirements are not entitled to deferential *Zauderer* review because *Zauderer* extends only to factual and uncontroversial disclosures and "Defendant[] . . . post[s] excerpts of the Alliance's members' speech that are misleading by omission and thereby controversial" (D. 8 at 32).  Defendant counters that the required disclosures represent commercial speech of the sort *Zauderer* contemplates, and that the Alliance's real objection is to government speech, not the disclosure requirements themselves.

In the Court's view, the commercial speech doctrine applies more cleanly to regulations applying to the Alliance's members' advertising than it does to the Reporting Law's separate data disclosure requirements.[24]  Sharing plan advertising proposes a transaction; the other sharing plan data the Reporting Law seeks, while of course related to sharing plans' commercial activity, does not.  *Cf. SEC v. AT&T, Inc.*, 626 F. Supp. 3d 703, 748–49 (S.D.N.Y. 2022) (concluding that *Zauderer* was "inapposite" in a challenge to a Securities and Exchange Commission disclosure regulation because the compelled disclosures "reache[d] [securities] issuer speech made in a wide array of contexts that d[id] not involve a proposed commercial transaction").  The compelled internal data disclosures are not commercial speech in the same way that the Alliance's members' advertising is.  And the Court construes the Alliance's challenge to these compelled internal data disclosures as different than its challenge to the advertising disclosures.  The Alliance at least seems to be arguing that the advertising disclosures exert a chilling effect on its members' speech;

---

[23] This data relates most closely to the Alliance's apparent concern that the metrics Defendant requests and publicly reports paint a misleading picture of its members' operations.

[24] Strictly speaking, the Reporting Law requires disclosures *of* advertising, not disclosures *in* advertising.  So *Zauderer* is also not a precise fit for the Alliance's challenge to the Reporting Law's marketing materials disclosure requirement either.  But to the extent that the Reporting Law's marketing materials disclosure requirement regulates speech, it regulates commercial speech.  Accordingly, the Court finds that *Zauderer* governs that particular disclosure requirement.

the Alliance's challenge to the internal data disclosures seems to be more along compelled speech lines. Both in actuality and as asserted, the internal data disclosure requirements do not operate as a regulation of commercial speech.

But while the Court is not persuaded that *Zauderer* governs here, because the Reporting Law's data disclosure requirements do not require commercial speech, that does not mean that *Zauderer* lacks any persuasive relevance. Indeed, "*Zauderer* . . . underscores that laws compelling disclosures of factual information in connection with commercial transactions may implicate only minimal First Amendment interests of the merchant, are judged under a rational basis standard, and do not implicate the traditional concerns associated with compelled speech." *Id.* at 749 (footnote omitted).

Moreover, even if the commercial speech doctrine does not apply, that does not necessarily mean that strict scrutiny applies to the Reporting Law's operations data disclosure requirements. Similar compelled disclosure arrangements are routinely upheld in other contexts. For instance, courts have concluded that required disclosures of transaction data to the Internal Revenue Service do not implicate the First Amendment. *See United States v. Sindel*, 53 F.3d 874, 877–78 (8th Cir. 1995) (rejecting the claim that required disclosure of information relating to cash transactions in excess of $10,000 violated the First Amendment's compelled speech prohibition).

And in the securities context, courts generally uphold compelled disclosure requirements under deferential rubrics. *See, e.g., Ohralik*, 436 U.S. at 456 ("Numerous examples could be cited of communications that are regulated without offending the First Amendment, such as the exchange of information about securities . . . ."); *AT&T, Inc.*, 626 F. Supp. 3d at 743 (observing that "laws and regulations mandating affirmative disclosures of information, particularly for public

issuers and other participants in the securities industry . . . . have routinely withstood First

Amendment challenges without any suggestion that strict, or even intermediate, scrutiny applied");

*SEC v. Wall St. Publ'g Inst., Inc.*, 851 F.2d 365, 373 (D.C. Cir. 1988) ("If speech employed directly

or indirectly to sell securities were totally protected, any regulation of the securities market would

be infeasible—and that result has long since been rejected.").

Deferential treatment of disclosure obligations in the securities context is appropriate for

several reasons. First, such disclosure obligations do not constitute "a veiled attempt to 'suppress

unpopular ideas or information or manipulate the public debate through coercion rather than

persuasion.'" *Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1108 (D.C. Cir. 2011) (quoting

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994)). Second, securities disclosure

requirements do not generally implicate political speech, restrict speech, or implicate expressions

of opinions or points of view, and instead generally concern themselves with strictly factual

information. *AT&T, Inc.*, 626 F. Supp. 3d at 750 (drawing on these considerations in concluding

that strict scrutiny did not apply to Regulation Fair Disclosure). Third, securities regulations

operate in an area that has been historically and extensively regulated by the government. *Wall St.

Pub. Inst., Inc.*, 851 F.2d at 372 (noting that regulations incidentally burdening free speech are

commonly upheld when those regulations appear in the context of an "extensively regulate[d] []

field of economic activity"). These same general considerations underpin the commercial speech

doctrine. *Ohralik*, 436 U.S. at 455–56 (distinguishing commercial from other speech on the basis

that commercial speech "occurs in an area traditionally subject to government regulation");

*Zauderer*, 471 U.S. at 651 (noting that the "interests at stake" in commercial-speech-related cases

are "not of the same order" as those present in other First Amendment cases, because commercial-

speech-related regulations do not "'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein'") (quoting *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)).

While the Reporting Law's internal data disclosure requirements might not compel or regulate commercial speech as that term is used in Supreme Court caselaw, and while they are not securities regulations, they are similar to compelled disclosure requirements subject to the commercial speech doctrine and compelled disclosure requirements within the securities regulation regime. Like speech subject to the commercial speech doctrine and speech compelled by securities regulations, the speech the Reporting Law's internal data disclosure requirements compel does not implicate core First Amendment concerns.

The Reporting Law requires sharing plans to disclose high-level data about their business operations. This data is commercial-speech adjacent, as it relates to and sheds lights on the transactions that sharing plans facilitate. And the Reporting Law's data disclosure requirements serve the same general concerns as commercial speech and securities regulations—they are calculated to prevent consumer and marketplace confusion. Moreover, the Reporting Law's data disclosure requirements do not operate to suppress any ideas, do not involve political speech, do not restrict speech, and do not require expressions of opinions or points of view. They simply require factual disclosures about sharing plan businesses operations. Finally, though states have not so far traditionally and heavily regulated the sharing plan market (likely because of this market's relatively recent emergence), there is a longstanding tradition of states extensively regulating the conventional insurance market (and for the same general consumer protection reasons that underpin Colorado's desire to regulate the sharing plan market). In short, the

Reporting Law's data disclosure requirements lack "any hallmark indicative of an occasion to apply strict scrutiny." *AT&T, Inc.*, 626 F. Supp. 3d at 750. They are similar to the sorts of laws that courts evaluate under more deferential standards.

As to which more deferential standard applies, the Court finds that rational basis scrutiny is most appropriate.[25] The Reporting Law's internal data disclosure requirements—to the extent they implicate speech—compel rather than restrict it. They therefore "trench much more narrowly" on First Amendment interests than speech restrictions. *Zauderer*, 471 U.S. at 651. They are also similar to the sorts of laws approved in *Zauderer* in that they require disclosure of uncontroversial factual matters for the purpose of informing consumer decisionmaking.[26] The data Colorado seeks on sharing plan claims-payment practices is certainly germane to its legitimate consumer protection concerns. The Reporting Law's internal data disclosure requirements thus easily clear rational basis scrutiny.

In sum, the Alliance has not demonstrated that it is likely to succeed on the merits of its free-speech-based challenge to any aspect of the Reporting Law. Rational basis scrutiny applies

---

[25] Even if the Court did not find that the Reporting Law's data-disclosure requirements were analogous to commercial speech and securities regulations, it would not necessarily follow that these requirements would be subject to strict scrutiny. *See, e.g., Am. Target Advert., Inc. v. Giani*, 199 F.3d 1241, 1247–48 (10th Cir. 2000) (concluding that a Utah law imposing registration and disclosure requirements on professional solicitors was content neutral, and upholding the law after determining it satisfied the requirements of intermediate scrutiny). Here, the Reporting Law's data-disclosure requirements are content-neutral, because there is no indication that Colorado adopted them "because of disagreement" with any particular message, or to "suppress the expression of unpopular views." *See id.* (quoting *Turner Broad. Sys., Inc.*, 512 U.S. at 642; and then quoting *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–48, (1986)). Accordingly, the highest level of scrutiny the Court would apply in response to the Alliance's free speech challenge is intermediate scrutiny. And the Court would find that the Reporting Law's data disclosure requirements meet intermediate scrutiny. The required disclosures enable Colorado to understand sharing plan practices (and ultimately assist consumers in making informed healthcare decisions). Colorado has a substantial interest in protecting its consumers, and Colorado's requirement that sharing plans produce data shedding light on their payment practices is narrowly drawn to that interest.

[26] The Alliance's argument that the metrics its members must report are controversial because of the spin that others' speech can put on them is unpersuasive. The fact that a speaker might not like what others say about their speech does not render any data the speaker reports controversial.

to both the Reporting Law's marketing materials disclosure requirements and its business-operations data disclosure requirements.  And both components of the Reporting Law satisfy rational basis scrutiny's requirements.

### B.  Irreparable Harm, Balance of Hardships, and Public Interest Considerations

"[I]n First Amendment cases, the likelihood of success on the merits will often be the determinative factor."  *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (quoting *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012)).  If Colorado's Reporting Law violated the Alliance's members' First Amendment rights, that constitutional violation would unquestionably work irreparable harm upon them, and it would be in the public interest to enjoin Colorado from enforcing the Reporting Law.  *See id.* (explaining the relevance of constitutional violations to preliminary injunction analyses); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").  Conversely, if Colorado's Reporting Law does not violate the Alliance's members' First Amendment rights, the Alliance lacks any hook for demonstrating irreparable harm, and the public interest would dictate that Colorado be permitted to enforce its valid laws in furtherance of the interests the legislature intended them to serve.

Here, the Alliance has not demonstrated that it is likely to succeed on the merits of any of its claims.  Given the apparently low likelihood that the Reporting Law is violating any of the Alliance's members' First Amendment rights, the Court concludes that the irreparable harm and balance of hardships/public interest factors weigh in Defendant's favor.

## IV. CONCLUSION

Because the Alliance has not shown that any of the preliminary injunction factors weigh in its favor (and in particular has failed to make a strong showing as to its likelihood of success on the merits of any of its claims), the Court DENIES the Alliance's Motion for a Preliminary Injunction (D. 8).

DATED January 13, 2025.

BY THE COURT:

_____
Gordon P. Gallagher
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Gordon P. Gallagher

Civil Action No. 24-cv-01386-GPG-STV

ALLIANCE OF HEALTH CARE
SHARING MINISTRIES,

     Plaintiff,

v.

MICHAEL CONWAY, in his official capacity
as Commissioner of the Colorado Division of Insurance,

     Defendant.

---

## ORDER

---

Before the Court is Plaintiff Alliance of Health Care Sharing Ministries' (the Alliance) Motion for Injunction Pending Appeal (D. 58). For the following reasons, this motion is DENIED.

## I. BACKGROUND

On May 17, 2024, the Alliance filed a motion for a preliminary injunction, asking the Court to enjoin the enforcement of Colorado Revised Statutes § 10-16-107.4 and its implementing regulation, 3 Colo. Code Regs. § 702-4:4-10-01 (*see* D. 8). This statute and regulation (collectively, the Reporting Law) generally obligate entities that offer or intend to offer health care sharing plans or arrangements to Colorado residents to report various information to Defendant

1

A067

Michael Conway, Commissioner of the Colorado Division of Insurance (Defendant, or the Commissioner).[1]

On January 13, 2025, the Court denied the Alliance's motion, concluding that the Alliance had not shown that it was likely to succeed on the merits of any of its claims (*see* D. 54). On January 27, 2025, the Alliance filed a notice of appeal (D. 55). In its instant motion, filed on January 28, 2025, the Alliance asks that the Court "enjoin Defendant's enforcement of [the Reporting Law] pending appeal," or, alternatively, that the Court "enter an administrative stay for at least ten days to give Plaintiffs an opportunity to seek emergency relief from the Tenth Circuit" (D. 58).[2]

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 62(d), "[w]hile an appeal is pending from an interlocutory order . . . that . . . refuses . . . an injunction, the court may . . . grant an injunction on terms for bond or other terms that secure the opposing party's rights." In deciding a motion for an injunction pending appeal, the Court considers four factors: (1) whether the movant has made a strong showing that it is likely to prevail on the merits of its appeal; (2) whether the movant will be irreparably injured if the injunction is not granted; (3) whether granting the injunction will substantially harm the opposing parties; and (4) where the public interest lies. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *Bradford v. U.S. Dep't of Lab.*, No. 21-CV-03283-PAB-STV, 2022 WL 266805, at *1 (D. Colo. Jan. 28, 2022). These factors substantially overlap with the factors that

---

[1] Further background on the Reporting Law and the facts of this case may be found in the Court's Order denying the Alliance's preliminary injunction motion (*see* D. 54 at 1–17).

[2] The Commissioner has not responded to this motion. But the Court exercises its prerogative to proceed without the benefit of a response, *see* D.C.COLO.LCivR 7.1(d), in part so that the Alliance may more promptly seek emergency relief from the Tenth Circuit—should it choose to seek such relief.

govern preliminary injunction requests. *Nken v. Holder*, 556 U.S. 418, 434 (2009); *see also Hobby Lobby Stores, Inc. v. Sebelius*, No. 12-6294, 2012 WL 6930302, at *1 (10th Cir. Dec. 20, 2012) (observing that ruling on a motion for injunction pending appeal involves the "same inquiry" as a preliminary injunction analysis).

### III.  ANALYSIS

Relying on *McClendon v. City of Albuquerque*, 79 F.3d 1014, 1020 (10th Cir. 1996), the Alliance argues that "if a party 'can meet the other requirements for a stay pending appeal, they will be deemed to have satisfied the likelihood of success on appeal element if they show questions going to the merits so serious, substantial, difficult and doubtful, as to make the issues ripe for litigation and deserving of more deliberate investigation'" (D. 58 at 5–6).  In the Alliance's view, this is one such "case [that] presents substantial legal questions that warrant an injunction pending appeal" (*id.* at 7).

The Court does not disagree that this case presents important legal questions requiring an involved analysis.  But—as at least one judicial officer in this District has observed—the Tenth Circuit has backed away from the "substantial question" test the Alliance advances.  *See Bradford*, 2022 WL 266805, at *2–3 (observing that "*McClendon* . . . [is] no longer followed" and rejecting the movants' attempt to "rely[] on the outdated substantial question test").  Accordingly, the Alliance must still make a strong showing that it is likely to succeed on the merits of its appeal, regardless of how the other factors relevant to a request for an injunction pending appeal resolve.

The Alliance has not done this.  Instead, the Alliance argues that the Court's January 13, 2025 Order "resolves several novel legal issues" and that "discovery in this case continues to undermine Colorado's arguments" (D. 58 at 7–8). But the Court does not find that the Alliance's

positions "equate to a 'strong showing' that [it is] likely to succeed on the merits of [its] appeal."
*Bradford*, 2022 WL 266805, at *3.

### A.  Novel Legal Questions

According to the Alliance, the "Court's opinion resolves the legal question of how to apply *Fulton's* application of strict scrutiny to regulations that authorize exemptions at officials' discretion to situations where that discretion is implemented by way of rulemaking" and addresses "the novel legal question of how to apply the Establishment Clause to regulations that intrude on the affairs of a religious organization" (D. 58 at 7).

To the Alliance's first point, it is the Alliance that is asking to apply *Fulton* in a novel way. As the Court's January 13, 2025 Order observed, *Fulton's* concern is not exemptive authority generally, but the exercise of *individualized* exemptive authority—it applies by its terms to laws that provide "a mechanism for individualized exemptions" (D. 54 at 28 (quoting *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021)).  It is possible that the Tenth Circuit could construe *Fulton* to apply to laws that confer broader rulemaking authority on state agencies (as opposed to laws that authorize state officials to make individualized determinations).  But "[t]he sheer possibility of a reversal—a possibility that exists in every appeal—is insufficient for the Court to find an injunction . . . is necessary here."  *Delux Pub. Charter, LLC v. Cnty. of Westchester*, No. 22-CV-01930 (PMH), 2024 WL 3744167, at *3 (S.D.N.Y. July 25, 2024).

The Alliance's second point regarding this case's novelty fares no better.  How the Establishment Clause applies to regulations that intrude on the affairs of a religious organization is not a "novel legal question."  There is a longstanding and well-established body of caselaw that confirms that generally applicable administrative and recordkeeping regulations may be imposed

4

on religious entities without violating the Establishment Clause (*see* D. 54 at 35 (explaining that "*Kennedy* [*v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022)] does not draw into doubt the various Supreme Court precedents validating the constitutionality of generally applicable administrative and recordkeeping regulations" and citing cases)). In the Court's view, the Reporting Law falls under the umbrella of this authority. Again, the Tenth Circuit may disagree, but that possibility does not mean that the Alliance has made a strong showing that it is likely to succeed on the merits of its appeal.

### B. New Evidence

The Alliance's arguments concerning evidence obtained through discovery—even assuming that they inform the Alliance's prospects of success on appeal—are unpersuasive.[3] The Alliance first points to email correspondence including Colorado insurance officials and state legislative staff addressing questions about whether the Reporting Law would apply to a charitable entity (*see* D. 58 at 8; D. 58-1 at 26–33). The Alliance reads this email chain as discussing how the Reporting Law's delegation of rulemaking authority to the Commissioner would be used to exempt a particular favored entity. But the Court reads this correspondence as reflecting a more general intent not to subject charitable organizations to the Reporting Law, because they do not

---

[3] The Alliance's motion at various points appears to attack the Court's January 13, 2025 Order on the basis that the Court denied the Alliance's preliminary injunction request without a hearing (*see, e.g.*, D. 58 at 9 (stating that the evidence the Alliance has obtained in discovery, "which would have been presented at an evidentiary hearing, further confirms this case presents substantial questions on the merits")). The Court notes that the record it ruled on included around one thousand pages of evidence, including various declarations, deposition testimony, and reports; that the Alliance had multiple years pre-suit to marshal evidence in support of its constitutional claims; and that the Court agreed to an extended briefing schedule (under which the Alliance filed its reply brief in September 2024). And—as the Alliance concedes—this case largely turns on issues of law. Moreover, the Alliance never moved for leave to supplement the preliminary injunction record, nor did it move for reconsideration of the Court's order denying its preliminary injunction request on the basis of any evidence it obtained in discovery. Nor does the Alliance indicate when it received the evidence in discovery. In any event, for the reasons explained below, the Court does not find the Alliance's new evidence persuasive.

pose the same consumer risks as the health sharing plans Colorado intended to regulate. The email chain actually nicely illustrates how the Reporting Law's drafters intended its rules-based exemptive approach to function in practice. That is, it shows that the Reporting Law's drafters wanted to give the Commissioner the flexibility to exempt entire *categories* of payment arrangements that do not pose the same consumer risks as the health sharing plans the Reporting Law is intended to regulate, not that the Reporting Law's drafters wanted to give the Commissioner the ability to provide waivers to individual entities whose values he happens to approve of.

The Alliance also points to emails documenting the Colorado Division of Insurance's (the Division) efforts to provide source materials to a producer of John Oliver's television show for a story on health care sharing ministries (*see* D. 58 at 8–9; D. 58-1 at 34–45). According to the Alliance, this collaboration reflects the Division's animus towards the religious practices of health care sharing ministries because "[n]o reasonable government official could understand this high-level engagement [with the producer] as anything other than supporting Mr. Oliver's historical attacks on religion" (D. 58 at 9). But there is an obvious innocent explanation for why the Division might engage with someone like Mr. Oliver. With all due respect to the Division, Mr. Oliver likely has a significantly greater popular following. It strikes the Court that the likely reason the Division worked with Mr. Oliver was so that it could use his platform to advise consumers of health sharing plans' documented risks, not so that they could express their disapproval of the religious beliefs and religious practices of sharing ministries.

Finally, the Alliance points to an email from the Commissioner explaining that he was "signed off on [the Reporting Law] going to bill paper," but was "going to need help building the case for the disclosure requirements" (*see* D. 58 at 9; D. 58-1 at 47–52). According to the Alliance,

6

A072

this language confirms that the Commissioner's justification for the Reporting Law is a post-hoc invention. But the Alliance takes the Commissioner's statement out of context. The email reads, in full:

> I've signed off on this going to bill paper. I'm going to need help building the case for the disclosure requirements either through our consumer complaints and/or through stories in the press. Dayle, please talk to Vince regarding consumers being mislead or confused about the terms of a sharing ministry. If anyone has any other thoughts about ways to support the disclosure requirement please talk with me. Thank you.

(D. 58-1 at 47).

This is hardly an admission that the Commissioner supported the Reporting Law for no reason—rather, it indicates the Commissioner's awareness that the Division had received consumer complaints speaking to consumer confusion concerns. The thrust of this email seems to be about building public support for a bill the Commissioner believed necessary, not a request for help inventing some justification that did not exist in the first instance.

In sum, the Alliance's new evidence does not move the needle. It does not change the Court's view that a preliminary injunction is not appropriate. And—even assuming that it could be relevant to the Alliance's likelihood of success on the merits of its appeal—the Court does not find that the Alliance's new evidence means the Alliance has made a "strong showing" of its likelihood of success on appeal.

## IV. CONCLUSION

Because the Alliance has not made a strong showing that it is likely to prevail on the merits of its appeal, the Court declines to consider the other factors in the injunction-pending-appeal analysis. *See Bradford*, 2022 WL 266805, at *4 ("Because plaintiffs have failed to show a strong likelihood that they will succeed on the merits of their appeal, the Court need not consider the

A073

other factors for a stay or injunction pending appeal."). The Alliance's request for a stay pending appeal is DENIED.

The Alliance's alternative request that the Court "enter an administrative stay for at least ten days to give Plaintiffs an opportunity to seek emergency relief from the Tenth Circuit" is likewise DENIED. As an initial matter, there is nothing to stay. The Order the Alliance is challenging on appeal denies a request to preliminarily enjoin the Reporting Law—a "stay" of that Order would have no effect. In substance, then, the Alliance seems to be asking that the Court preliminarily enjoin the Reporting Law for at least ten days. But it is not clear to the Court that it has any authority to issue a preliminary injunction pending appeal without reference to the factors discussed above, including the Alliance's likelihood of success on the merits of its appeal. The Court thus views the Alliance's request for an administrative stay as duplicative of its request for an injunction pending appeal. And it denies this request for the same reasons.

The Court also observes that an injunction of significantly longer than ten days would be necessary to have any real-world effect. The Reporting Law imposes a reporting deadline of March 1 (and grants reporting parties 30 days to cure any deficiencies the Commissioner identifies in their reporting). Under these circumstances, it is not clear to the Court how a ten-day injunction would help the Alliance—even if the Alliance's concern is that the Commissioner will ask its members to provide information they declined to provide in the previous reporting cycle. (The Alliance may of course seek emergency relief from the Tenth Circuit under Federal Rule of Appellate Procedure 8(a)(2), advising the Tenth Circuit of its members' actual or potential reporting deadlines.)

A074

A075

DATED February 3, 2025.

BY THE COURT:

Gordon P. Gallagher
United States District Judge