**No. 25-1035**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

_____

ALLIANCE OF HEALTH CARE SHARING MINISTRIES
*Plaintiff-Appellant*

v.

MICHAEL CONWAY,
in his official capacity as
Commissioner of the Colorado Division of Insurance
*Defendant-Appellee*

_____

Appeal from the United States District Court for the District of Colorado,
No. 1:24-cv-01386-GPG-STV (Hon. Gordon Gallagher)

_____

**APPENDIX VOL I - Pages A-1 to A-140**

Date: March 21, 2025

Michael F. Murray
Paul Hastings LLP
2050 M Street, NW
Washington, D.C. 20036
(202) 551-1730
michaelmurray@Paulhastings.Com
William E. Mahoney
Paul Hastings LLP
600 Travis Street, Fifty-Eighth Floor
Houston, Texas 77002
(713) 860-7304
williammahoney@Paulhastings.Com

*Counsel For Plaintiff Alliance of
Health Care Sharing Ministries*

| ECF NO. | *DESCRIPTION* | Appx. Page No. |
|---------|---------------|----------------|
| **Appendix Vol. I, Pages 1-140** | | |
| - | District Court Docket Sheet | A-1 |
| 8-1 | Ex. A - Declaration of Rob Waldo (May 17, 2024) | A-9 |
| 8-2 | Ex. A-1 – Samaritan Bylaws | A-19 |
| 8-3 | Ex. A-2 - Samaritan Guidelines | A-44 |
| 8-4 | Ex. A-3 - Samaritan Membership Application | A-94 |
| 8-5 | Ex. B - Declaration of Katy Talento | A-100 |
| 32 | Amended Complaint of Alliance of Health Care Sharing Ministries (July 1, 2024) | A-109 |
| **Appendix Vol. II, Pages 141-179** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1-1.6 (September 3, 2024) | A-141 |
| **Appendix Vol. III, Pages 180-223** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.7-1.22 (September 3, 2024) | A-180 |
| **Appendix Vol. IV, Pages 224-261** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.23-1.28 (September 3, 2024) | A-224 |
| **Appendix Vol. V, Pages 262-307** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.29-1.33 (September 3, 2024) | A-262 |

| | **Appendix Vol. VI, Pages 308-331** | |
|---|---|---|
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.34-1.36 (September 3, 2024) | A-308 |
| | **Appendix Vol. VII, Pages 332-350** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.43-1.54 (September 3, 2024) | A-332 |
| | **Appendix Vol. VIII, Pages 351-373** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.37-1.39 (September 3, 2024) | A-351 |
| | **Appendix Vol. IX, Pages 374-424** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.40-1.40 (September 3, 2024) | A-374 |
| | **Appendix Vol. X, Pages 425-478** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.40-1.41 (September 3, 2024) | A-425 |
| | **Appendix Vol. XI, Pages 479-541** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.41-1.42 (September 3, 2024) | A-479 |
| | **Appendix Vol. XII, Pages 542-573** | |

| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.43-1.54 (September 3, 2024) | A-542 |
|---|---|---|
| **Appendix Vol. XIII, Pages 574-612** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.54-1.59 (September 3, 2024) | A-574 |
| **Appendix Vol. XIV Pages 613-682** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.6-1.6 (September 3, 2024) | A-613 |
| **Appendix Vol. XV, Pages 683-767** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.61-1.64 (September 3, 2024) | A-683 |
| **Appendix Vol. XVI, Pages 768-816** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 2.0-2.3 (September 3, 2024) | A-768 |
| **Appendix Vol. XVII, Pages 817-867** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 2.3-2.4 (September 3, 2024) | A-817 |
| **Appendix Vol. XVIII, Pages 868-933** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 2.5-7 (September 3, 2024) | A-868 |

| | **Appendix Vol. XIX, Pages 934-1002** | |
|---|---|---|
| 52.1 | Appendix to Reply to Motion for Preliminary Injunction (September 17, 2024) | A-934 |
| 54 | Order Denying the Alliance's Motion for a Preliminary Injunction (January 13, 2025) | A-949 |
| | **Appendix Vol. XX, Pages 1003-1041** | |
| 54 | Order Denying the Alliance's Motion for a Preliminary Injunction (January 13, 2025) | A-1003 |
| 55 | Notice of Appeal as to Order on Motion for Preliminary Injunction (January 27, 2025) | A-1015 |
| 58-1 | Motion for Order to Grant Injunction Pending Appeal (January 28, 2025) | A-1017 |
| | **Appendix Vol. XXI, Pages 1042-1077** | |
| 58-1 | Motion for Order to Grant Injunction Pending Appeal (January 28, 2025) | A-1042 |
| 60 | Order Denying Motion for Injunction Pending Appeal (February 3, 2025) | A-1069 |

# U.S. District Court - District of Colorado
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: 1:24-cv-01386-GPG-STV

| | |
|---|---|
| Alliance of Health Care Sharing Ministries v. Colorado Division of Insurance et al | Date Filed: 05/16/2024 |
| | Jury Demand: Plaintiff |
| Assigned to: District Judge Gordon P Gallagher | Nature of Suit: 950 Constitutionality of State Statutes |
| Referred to: Magistrate Judge Scott T. Varholak | |
| Demand: $1,000 | Jurisdiction: Federal Question |
| Case in other court:  USCA Tenth Circuit, 25-01035 | |
| Cause: 42:1983 Civil Rights Act | |

**Plaintiff**

| | | |
|---|---|---|
| **Alliance of Health Care Sharing Ministries** | represented by | **William E. Mahoney** |
| | | Paul Hastings LLP |
| | | 600 Travis Street |
| | | 58th Floor |
| | | Houston, TX 77002 |
| | | 713-860-7304 |
| | | Email: williammahoney@paulhastings.com |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Michael F. Murray** |
| | | Paul Hastings LLP |
| | | 2050 M Street NW |
| | | Washington, DC 20036 |
| | | 202-551-1730 |
| | | Email: michaelmurray@paulhastings.com |
| | | *ATTORNEY TO BE NOTICED* |

V.

**Defendant**

| | | |
|---|---|---|
| **Colorado Division of Insurance** | represented by | **Abby L. Chestnut** |
| *TERMINATED: 07/01/2024* | | Colorado Department of Law |
| | | Ralph L. Carr Colorado Judicial Center |
| | | 1300 Broadway |
| | | Denver, CO 80203 |
| | | 720-508-6353 |
| | | Email: Abby.Chestnut@coag.gov |
| | | *TERMINATED: 09/06/2024* |
| | | |
| | | **Daniel Eric Rheiner** |
| | | Colorado Attorney General's Office |
| | | Ralph L. Carr Colorado Judicial Center |
| | | 1300 Broadway |
| | | Denver, CO 80203 |
| | | 720-508-6570 |
| | | Email: Danny.Rheiner@coag.gov |

*TERMINATED: 02/28/2025*

**Phillip Mark Khalife**
Colorado Office of the Attorney General
1300 Broadway
10th Floor
Denver, CO 80203
720-508-6000
Email: Phillip.Khalife@coag.gov
*ATTORNEY TO BE NOTICED*

**Reed W. Morgan**
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
720-508-6335
Email: reed.morgan@coag.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **Michael Conway**<br>*in his official capacity as Commissioner of*<br>*the Colorado Division of Insurance* | represented by | **Abby L. Chestnut**<br>(See above for address)<br>*TERMINATED: 09/06/2024*<br><br>**Daniel Eric Rheiner**<br>(See above for address)<br>*TERMINATED: 02/28/2025*<br><br>**Phillip Mark Khalife**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Reed W. Morgan**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 05/16/2024 | 1 | COMPLAINT against Colorado Division of Insurance, Michael Conway (Filing fee $ 405,Receipt Number ACODC-9690983)Attorney Michael F. Murray added to party Alliance of Health Care Sharing Ministries(pty:pla), filed by Alliance of Health Care Sharing Ministries. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons) (Murray, Michael) (Entered: 05/16/2024) |
| 05/16/2024 | 2 | CORPORATE DISCLOSURE STATEMENT. (Murray, Michael) (Entered: 05/16/2024) |
| 05/16/2024 | 3 | NOTICE of Entry of Appearance by Michael F. Murray on behalf of Alliance of Health Care Sharing Ministries (Murray, Michael) (Entered: 05/16/2024) |
| 05/16/2024 | 4 | Case assigned to Magistrate Judge Scott T. Varholak. Text Only Entry. (blaws) (Entered: 05/17/2024) |

| 05/17/2024 | 5 | SUMMONS issued by Clerk. (Attachments: # 1 Summons, # 2 Magistrate Judge Consent Form) (blaws) (Entered: 05/17/2024) |
|---|---|---|
| 05/17/2024 | 6 | NOTICE of Entry of Appearance by William E. Mahoney on behalf of Alliance of Health Care Sharing MinistriesAttorney William E. Mahoney added to party Alliance of Health Care Sharing Ministries(pty:pla) (Mahoney, William) (Entered: 05/17/2024) |
| 05/17/2024 | 7 | ORDER Setting Deadline for Filing Election Concerning Consent/Non-Consent to Magistrate Jurisdiction Form and Setting Scheduling Conference by Magistrate Judge Scott T. Varholak on 5/17/2024. Consent Form due **7/10/2024**. Joint Proposed Scheduling Order due **7/17/2024**. Scheduling Conference set for **7/24/2024 10:00 AM** in Courtroom A 402 before Magistrate Judge Scott T. Varholak. (schap, ) (Entered: 05/17/2024) |
| 05/17/2024 | 8 | MOTION for Preliminary Injunction by Plaintiff Alliance of Health Care Sharing Ministries. (Attachments: # 1 Ex. A - Declaration of Rob Waldo, # 2 Ex. A-1 - Samaritan Bylaws, # 3 Ex. A-2 - Samaritan Guidelines, # 4 Ex. A-3 - Samaritan Membership Application, # 5 Ex. B - Declaration of Katy Talento, # 6 Proposed Order)(Murray, Michael) (Entered: 05/17/2024) |
| 05/20/2024 | 9 | ORDER In light of the filing of 8 Plaintiffs Motion for Preliminary Injunction, the Clerk of Court is directed to reassign this matter to a District Judge. See D.C.COLO.LCivR 40.1(c)(2)(a). SO ORDERED, by Magistrate Judge Scott T. Varholak on 5/20/2024. Text Only Entry (stvlc5, ) (Entered: 05/20/2024) |
| 05/20/2024 | 10 | CASE REASSIGNED Pursuant to 9 Minute Order. Case randomly reassigned to Judge Charlotte N. Sweeney and drawn to Magistrate Judge Scott T. Varholak. All future pleadings should be designated as **24-cv-01386-CNS**. (Text Only Entry) (schap, ) (Entered: 05/20/2024) |
| 05/21/2024 | 11 | SUMMONS Returned Executed by Alliance of Health Care Sharing Ministries. Colorado Division of Insurance served on 5/20/2024, answer due 6/10/2024. (Mahoney, William) (Entered: 05/21/2024) |
| 05/21/2024 | 12 | SUMMONS Returned Executed by Alliance of Health Care Sharing Ministries. Michael Conway served on 5/20/2024, answer due 6/10/2024. (Mahoney, William) (Entered: 05/21/2024) |
| 05/21/2024 | 13 | ORDER OF RECUSAL Upon review of the file of this case, I conclude that I must recuse myself fromfurther participation in this case. Accordingly, it is ORDERED that: I recuse myself from further participation in this matter; and direct that The Clerk of the Court shall reassign this case to another District Judge. This case has been randomly reassigned to District Judge Gordon P. Gallagher and drawn to Magistrate Judge Scott T. Varholak. By Judge Charlotte N. Sweeney on 5/21/2024. (norlin, ) (Entered: 05/21/2024) |
| 05/21/2024 | 14 | ORDER REFERRING CASE to Magistrate Judge Scott T. Varholak. Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Fed. R. Civ. P. 72(a) and (b), this case is referred to the assigned United States Magistrate Judge to (1) convene a scheduling conference under Fed. R. Civ. P. 16(b) and enter a scheduling order meeting the requirements of D.C.COLO.LCivR 16.2, (2) conduct such status conferences and issue such orders necessary for compliance with the scheduling order, including amendments or modifications of the scheduling order upon a showing of good cause, (3) hear and determine pretrial matters, including discovery and other specifically-referred motions, and (4) conduct hearings, including evidentiary hearings, and submit proposed findings of fact and recommendations for rulings on dispositive motions. Court sponsored alternative dispute resolution is governed by D.C.COLO.LCivR 16.6. On the recommendation or informal request of the magistrate judge or on the request of the parties by motion, this |

| | | |
|---|---|---|
| | | court may direct the parties to engage in an early neutral evaluation, a settlement conference, or another alternative dispute resolution proceeding. By District Judge Gordon P Gallagher on 5/21/2024. Text Only Entry (schap, ) (Entered: 05/21/2024) |
| 05/22/2024 | 15 | ORDER RE STATUS CONFERENCE. Plaintiff Alliance of Health Care Sharing Ministries (Plaintiff) moved for a preliminary injunction in this matter (D. 8 ). So that the Court can expeditiously address this request for preliminary relief, it is ORDERED that Plaintiff shall effect service of (1) Plaintiff's Motion for a Preliminary Injunction (and the exhibits and proposed order associated with this document) and (2) this Order on Defendants Colorado Division of Insurance and Michael Conway **no later than Friday, May 31, 2024.** IT IS FURTHER ORDERED that the parties jointly contact the Court at gallagher_chambers@cod.uscourts.gov **no later than Friday, June 7, 2024,** to set a status conference in this matter. NOTE: This will not be a hearing on the substance of Plaintiff's motion for a preliminary injunction. The purpose of this status conference will be to discuss a briefing schedule on Plaintiff's motion, set a mutually convenient date for a preliminary injunction hearing, and discuss the logistics (including the length and location) of said preliminary injunction hearing. By District Judge Gordon P Gallagher on 5/22/2024. Text Only Entry (schap, ) (Entered: 05/22/2024) |
| 05/22/2024 | 16 | NOTICE of Entry of Appearance by Abby L. Chestnut on behalf of All Defendants Attorney Abby L. Chestnut added to party Colorado Division of Insurance(pty:dft), Attorney Abby L. Chestnut added to party Michael Conway(pty:dft) (Chestnut, Abby) (Entered: 05/22/2024) |
| 05/22/2024 | 17 | NOTICE of Entry of Appearance by Phillip Mark Khalife on behalf of All Defendants Attorney Phillip Mark Khalife added to party Colorado Division of Insurance(pty:dft), Attorney Phillip Mark Khalife added to party Michael Conway(pty:dft) (Khalife, Phillip) (Entered: 05/22/2024) |
| 05/24/2024 | 18 | NOTICE of Entry of Appearance by Reed W. Morgan on behalf of All Defendants Attorney Reed W. Morgan added to party Colorado Division of Insurance(pty:dft), Attorney Reed W. Morgan added to party Michael Conway(pty:dft) (Morgan, Reed) (Entered: 05/24/2024) |
| 05/28/2024 | 19 | NOTICE re 15 Order,,,, by Plaintiff Alliance of Health Care Sharing Ministries (Mahoney, William) (Entered: 05/28/2024) |
| 05/29/2024 | 20 | NOTICE of Entry of Appearance by Daniel Eric Rheiner on behalf of All Defendants Attorney Daniel Eric Rheiner added to party Colorado Division of Insurance(pty:dft), Attorney Daniel Eric Rheiner added to party Michael Conway(pty:dft) (Rheiner, Daniel) (Entered: 05/29/2024) |
| 06/05/2024 | 21 | Emergency MOTION to Expedite *LIMITED DISCOVERY* by Defendants Colorado Division of Insurance, Michael Conway. (Morgan, Reed) (Entered: 06/05/2024) |
| 06/05/2024 | 22 | Emergency MOTION for Extension of Time to File Response/Reply as to 8 MOTION for Preliminary Injunction by Defendants Colorado Division of Insurance, Michael Conway. (Morgan, Reed) (Entered: 06/05/2024) |
| 06/06/2024 | 23 | ORDER granting in part and denying in part 22 Defendants' Emergency Motion for an Extension of Time to File Response to Motion for Preliminary Injunction. As indicated in its May 22, 2024, Order, the Court intends to set a briefing schedule on Plaintiff's Motion for Preliminary Injunction (D. 8 ) including Defendants' response and Plaintiff's reply deadlinesafter convening a status conference. The Court therefore clarifies that that the default deadline of June 10, 2024, does not apply to Defendants' response to Plaintiff's Motion for Preliminary Injunction, that Defendants presently have no obligation to file a response, and that the Court will issue further Order(s) specifying Defendants response deadline. While an extension through August 9, 2024, may ultimately be warranted, that is |

| | | an issue the Court will resolve after receiving the parties' input at the status conference. For now, Defendants' motion is denied to the extent it seeks an Order specifying that particular response date. Separately, the Court reminds the parties that, under its practice standards, "[i]f a party files what it deems an 'emergency' motion, it must email Chambers at the time the motion is filed, with the subject line containing 'Emergency Motion' and the case name and number." GPG Civ. Practice Standard 7.1A(4). The Court also notes that it generally does not view scheduling and discovery matters as emergent, barring any truly unforeseeable circumstances, and asks that the parties carefully consider whether filings are appropriately labeled "emergency" motions before submitting them. By District Judge Gordon P Gallagher on 6/6/2024. Text Only Entry (schap, ) (Entered: 06/06/2024) |
|---|---|---|
| 06/07/2024 | 24 | ORDER : Video-Teleconference Status Conference set for 6/14/2024 at 9:15 AM in Courtroom C202 before District Judge Gordon P Gallagher. By District Judge Gordon P Gallagher on June 7, 2024. Text Only Entry (gpglc3) (Entered: 06/07/2024) |
| 06/10/2024 | 25 | Partial MOTION to Dismiss by Defendants Colorado Division of Insurance, Michael Conway. (Chestnut, Abby) (Entered: 06/10/2024) |
| 06/10/2024 | 26 | ANSWER to 1 Complaint, by Colorado Division of Insurance, Michael Conway.(Khalife, Phillip) (Entered: 06/10/2024) |
| 06/12/2024 | 27 | RESPONSE to 21 Emergency MOTION to Expedite *LIMITED DISCOVERY* . filed by Plaintiff Alliance of Health Care Sharing Ministries. (Mahoney, William) (Entered: 06/12/2024) |
| 06/14/2024 | 28 | MINUTE ENTRY for Video Status Conference proceeding held before District Judge Gordon P Gallagher on 6/14/2024 referring [D. 21] Emergency Motion to Expedite Limited Discovery to Magistrate Judge Varholak. Court Reporter: Erin Valenti. (dclem) (Entered: 06/14/2024) |
| 06/14/2024 | 29 | MEMORANDUM regarding 21 Emergency MOTION to Expedite *LIMITED DISCOVERY* filed by Michael Conway, Colorado Division of Insurance. Motion referred to Magistrate Judge Scott T. Varholak by District Judge Gordon P Gallagher on 6/14/2024. Text Only Entry (schap, ) (Entered: 06/14/2024) |
| 06/14/2024 | 30 | MINUTE ORDER This matter is before the Court on Defendants' 21 Emergency Motion for Limited Expedited Discovery. A Motion Hearing is set for 7/3/2024 at 10:30 AM in Courtroom A 402 before Magistrate Judge Scott T. Varholak. SO ORDERED, by Magistrate Judge Scott T. Varholak on 6/14/2024. Text Only Entry (stvlc5, ) (Entered: 06/14/2024) |
| 06/26/2024 | 31 | REPLY to Response to 21 Emergency MOTION to Expedite *LIMITED DISCOVERY* filed by Defendants Colorado Division of Insurance, Michael Conway. (Morgan, Reed) (Entered: 06/26/2024) |
| 07/01/2024 | 32 | AMENDED COMPLAINT against Colorado Division of Insurance, Michael Conway, filed by Alliance of Health Care Sharing Ministries.(Mahoney, William) (Entered: 07/01/2024) |
| 07/01/2024 | 33 | NOTICE re 32 Amended Complaint by Plaintiff Alliance of Health Care Sharing Ministries (Attachments: # 1 Ex. A - Redline)(Mahoney, William) (Entered: 07/01/2024) |
| 07/02/2024 | 34 | MINUTE ORDER: The matter is before the Court sua sponte. At the Motion Hearing set for 7/3/2024, the Parties shall be prepared to discuss whether the Court should appoint a special master to resolve any further discovery disputes between the parties. SO ORDERED, by Magistrate Judge Scott T. Varholak on 7/2/2024. Text Only Entry (stvlc5, ) (Entered: 07/02/2024) |

| 07/02/2024 | 35 | ORDER. In light of the lodging of an 32 amended complaint, the 25 partial motion to dismiss is now MOOT. So Ordered by District Judge Gordon P Gallagher on 7/2/2024. Text Only Entry(schap, ) (Entered: 07/02/2024) |
|---|---|---|
| 07/03/2024 | 36 | MINUTE ENTRY for Motion Hearing held before Magistrate Judge Scott T. Varholak on 7/3/2024. ORDERED: Defendants' Emergency Motion for Limited Expedited Discovery 21 is DENIED AS MOOT. Before the Scheduling Conference on July 24, 20245, the parties shall discuss whether a Special Master should be assigned to the case. FTR: A402. (morti, ) (Entered: 07/03/2024) |
| 07/08/2024 | 37 | MINUTE ORDER: Due to a conflict in the Court's calendar, the Scheduling Conference set for 7/24/2024 at 10:00 AM is VACATED and RESET for 7/29/2024 at 11:00 AM in Courtroom A 402 before Magistrate Judge Scott T. Varholak. The joint proposed scheduling order is now due 7/22/2024. SO ORDERED, by Magistrate Judge Scott T. Varholak on 7/8/2024. Text Only Entry (stvlc5, ) (Entered: 07/08/2024) |
| 07/10/2024 | 38 | CONSENT to Jurisdiction of Magistrate Judge by Plaintiff Alliance of Health Care Sharing Ministries All parties do not consent.. (Mahoney, William) (Entered: 07/10/2024) |
| 07/15/2024 | 39 | ANSWER to 32 Amended Complaint by Michael Conway.(Khalife, Phillip) (Entered: 07/15/2024) |
| 07/22/2024 | 40 | Proposed Scheduling Order by Plaintiff Alliance of Health Care Sharing Ministries. (Mahoney, William) (Entered: 07/22/2024) |
| 07/29/2024 | 41 | MINUTE ENTRY for Scheduling Conference held before Magistrate Judge Scott T. Varholak on 7/29/2024. Discovery due by 4/3/2025. The Scheduling Order is signed and entered on July 29, 2024. FTR: A402. (morti,) (Entered: 07/29/2024) |
| 07/29/2024 | 42 | SCHEDULING ORDER: by Magistrate Judge Scott T. Varholak on 7/29/2024. (morti,) (Entered: 07/29/2024) |
| 08/15/2024 | 43 | Unopposed MOTION for Leave to File Excess Pages by Defendant Michael Conway. (Attachments: # 1 Proposed Order (PDF Only) Proposed Order Granting Unopposed Motion for Leave to File Excess Pages)(Chestnut, Abby) (Entered: 08/15/2024) |
| 08/15/2024 | 44 | ORDER granting 43 Unopposed Motion for Leave to File Excess Pages. The Court hereby Orders that the Defendant Commissioner shall have leave to file a Response to Plaintiffs Motion for Preliminary Injunction inexcess of the Courts page limitspecifically 35 pages in length. By District Judge Gordon P Gallagher on August 15, 2024. Text Only Entry(gpglc3) (Entered: 08/15/2024) |
| 08/17/2024 | 45 | TRANSCRIPT of Motion Hearing held on July 3, 2024 before Magistrate Judge Varholak. Pages: 1-12. **NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (Patterson Transcription Company, ) (Entered: 08/17/2024) |
| 09/03/2024 | 46 | RESPONSE to 8 MOTION for Preliminary Injunction filed by Defendant Michael Conway. (Attachments: # 1 Appendix of Exhibits)(Morgan, Reed) (Entered: 09/03/2024) |

| 09/05/2024 | 47 | MOTION to Withdraw as Attorney *by Abby Chestnut* by Defendant Michael Conway. (Chestnut, Abby) (Entered: 09/05/2024) |
|---|---|---|
| 09/05/2024 | 48 | MEMORANDUM regarding 47 MOTION to Withdraw as Attorney *by Abby Chestnut* filed by Michael Conway. Motion referred to Magistrate Judge Scott T. Varholak by District Judge Gordon P Gallagher on 9/5/2024. Text Only Entry (schap, ) (Entered: 09/05/2024) |
| 09/06/2024 | 49 | ORDER granting 47 Motion to Withdraw. Attorney Abby Chestnut is relieved of any further representation of Defendant Michael Conway. The Clerk of Court is instructed to terminate Attorney Chestnut as counsel of record, and to remove their name from the electronic certificate of mailing. Defendant shall continue to be represented bySenior Assistant Attorney General Reed William Morgan, and Assistant Attorneys General Daniel E. Rheiner and Phillip Khalife, through the Office of the Attorney General. SO ORDERED, by Magistrate Judge Scott T. Varholak on 9/6/2024. Text Only Entry(stvlc5, ) (Entered: 09/06/2024) |
| 09/12/2024 | 50 | Unopposed MOTION for Leave to *File Excess Pages* by Plaintiff Alliance of Health Care Sharing Ministries. (Attachments: # 1 Proposed Order (PDF Only))(Mahoney, William) (Entered: 09/12/2024) |
| 09/12/2024 | 51 | ORDER granting 50 Unopposed Motion for Leave to File Excess Pages. By District Judge Gordon P Gallagher on 9/12/2024. Text Only Entry(schap, ) (Entered: 09/12/2024) |
| 09/17/2024 | 52 | REPLY to Response to 8 MOTION for Preliminary Injunction filed by Plaintiff Alliance of Health Care Sharing Ministries. (Attachments: # 1 Appendix)(Mahoney, William) (Entered: 09/17/2024) |
| 09/26/2024 | 53 | NOTICE of Supplemental Authorities re: 46 Response to Motion by Defendant Michael Conway (Morgan, Reed) (Entered: 09/26/2024) |
| 01/13/2025 | 54 | ORDER. The Court DENIES the Alliance's Motion for a Preliminary Injunction (D. 8 ). By District Judge Gordon P Gallagher on 1/13/2025. (tlove, ) (Entered: 01/13/2025) |
| 01/27/2025 | 55 | NOTICE OF APPEAL as to 54 Order on Motion for Preliminary Injunction by Plaintiff Alliance of Health Care Sharing Ministries (Filing fee $ 605, Receipt Number ACODC-10115616) (Mahoney, William) (Entered: 01/27/2025) |
| 01/27/2025 | 56 | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the 55 Notice of Appeal filed by Alliance of Health Care Sharing Ministries to the U.S. Court of Appeals. ( Retained Counsel, Fee paid,) (Attachments: # 1 Preliminary Record and Docket Sheet) (tlove, ) (Entered: 01/28/2025) |
| 01/28/2025 | 57 | USCA Case Number 25-1035 for 55 Notice of Appeal filed by Alliance of Health Care Sharing Ministries. (tlove, ) (Entered: 01/28/2025) |
| 01/28/2025 | 58 | MOTION for Order to *Grant Injunction Pending Appeal* by Plaintiff Alliance of Health Care Sharing Ministries. (Attachments: # 1 Appendix)(Mahoney, William) (Entered: 01/28/2025) |
| 02/03/2025 | 59 | TRANSCRIPT ORDER FORM re 55 Notice of Appeal *no transcript needed* by Plaintiff Alliance of Health Care Sharing Ministries (Mahoney, William) (Entered: 02/03/2025) |
| 02/03/2025 | 60 | ORDER by District Judge Gordon P Gallagher on 2/3/2025. MOTION for Order to Grant Injunction Pending Appeal by Plaintiff Alliance of Health Care Sharing Ministries re 58 is DENIED. (tlove, ) (Entered: 02/03/2025) |
| 02/04/2025 | 61 | LETTER TO USCA and all counsel certifying the record is complete as to 55 Notice of Appeal filed by Alliance of Health Care Sharing Ministries. A transcript order form was |

| | | |
|---|---|---|
| | | filed stating that a transcript is not necessary. ( Appeal No. 25-1035) Text Only Entry (tlove, ) (Entered: 02/04/2025) |
| 02/10/2025 | 62 | MOTION for Protective Order by Defendant Michael Conway. (Attachments: # 1 Proposed Order (PDF Only) Stipulated Protective Order)(Morgan, Reed) (Entered: 02/10/2025) |
| 02/10/2025 | 63 | MEMORANDUM regarding 62 MOTION for Protective Order filed by Michael Conway. Motion referred to Magistrate Judge Scott T. Varholak by District Judge Gordon P Gallagher on 02/10/2025. Text Only Entry (dclem) (Entered: 02/10/2025) |
| 02/11/2025 | 64 | ORDER granting 62 Motion for Entry of Stipulated Protective Order. The Court will enter the protective order proposed by the parties with modifications to paragraph 12 to conform to this Court's practice standards. SO ORDERED by Magistrate Judge Scott T. Varholak on 2/11/2025. Text Only Entry(stvlc5, ) (Entered: 02/11/2025) |
| 02/11/2025 | 65 | STIPULATED PROTECTIVE ORDER by Magistrate Judge Scott T. Varholak on 2/11/2025. (sphil, ) (Entered: 02/11/2025) |
| 02/28/2025 | 66 | MOTION to Withdraw as Attorney *by Daniel Rheiner* by Defendant Michael Conway. (Rheiner, Daniel) (Entered: 02/28/2025) |
| 02/28/2025 | 67 | MEMORANDUM regarding 66 MOTION to Withdraw as Attorney *by Daniel Rheiner* filed by Michael Conway. Motion referred to Magistrate Judge Scott T. Varholak by District Judge Gordon P Gallagher on 02/28/2025. Text Only Entry (dclem) (Entered: 02/28/2025) |
| 02/28/2025 | 68 | ORDER granting 66 Motion to Withdraw as Counsel. Attorney Solicitor General Daniel E. Rheiner is relieved of any further representation of Defendant. The Clerk of Court is instructed to terminate Attorney Rheiner as counsel of record, and to remove their name from the electronic certificate of mailing. Defendant shall continue to be represented by Senior Assistant Attorney General Reed William Morgan and Assistant Attorney General Phillip Khalife. SO ORDERED, by Magistrate Judge Scott T. Varholak on 2/28/25. Text Only Entry(stvlc5, ) (Entered: 02/28/2025) |

### PACER Service Center

#### Transaction Receipt

03/17/2025 09:35:33

| PACER Login: | wmahoney | Client Code: | 50874.00003 |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 1:24-cv-01386-GPG-STV |
| Billable Pages: | 8 | Cost: | 0.80 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

ALLIANCE OF HEALTH CARE
SHARING MINISTRIES,

          Plaintiffs,

v.

COLORADO DIVISION OF INSURANCE;
and MICHAEL CONWAY, in his official
capacity as Commissioner of the Colorado
Division of Insurance,

          Defendants.

Case No. 1:24-cv-01386

### DECLARATION OF ROB WALDO

I, Rob Waldo, in accordance with 28 U.S.C. § 1746 state as follows:

1. I am over eighteen years of age, of sound mind, and have never been convicted of a felony or an offense involving moral turpitude. I have personal knowledge of the matters set forth below and could competently testify as to them if called upon to do so.

2. I am the Vice President and Chief Administrative Officer of Samaritan Ministries, which is a member of the Alliance of Health Care Sharing Ministries. In my role, I have personal knowledge of significant aspect of Samaritan Ministries' operations, including the topics below.

Page **1** of **10**

DECLARATION OF ROB WALDO

3.      Attached to this declaration are true and correct copies of the following documents submitted in support of Plaintiff Alliance of Health Care Sharing Ministries' Motion for a Preliminary Injunction:

| Exhibit No. | Description |
|---|---|
| A-1 | Samaritan Ministries Bylaws |
| A-2 | Samaritan Ministries Sharing Guidelines (September 2023) |
| A-3 | Samaritan Ministries Membership Application |

4.      Samaritan Ministries is a Christian 501(c)(3) nonprofit ministry that seeks out, disciples, and serves a distinct religious body whose members share directly in one another's spiritual, emotional, and financial burdens (arising from illness and injury).

5.       Samaritan was formed in 1991 in Illinois and began a nationwide ministry in 1994. Samaritan's purpose is "to glorify God by growing and equipping disciples of Jesus Christ to love God with all their heart, soul, mind and strength, and to love and care for their neighbor as themselves." Exhibit A-1 at 4 (citing Matthew 28:18–20, among others). Samaritan's mission is "to redeem health care by helping the Body of Christ love one another through sharing each other's health care burdens while experiencing authentic Biblical community." *Id*. at 5 (citing Galatians 6:2, among others).

6.      To that end, at least every month, each member of Samaritan Ministries sends a monthly share directly to another member who has a medical need. Exhibit A-2 at 6. This act of giving benefits both the receiver and the giver. It benefits the receiver by helping to alleviate the significant spiritual, emotional, and financial burdens that health care expenses bring. It benefits the giver by allowing them to tangibly live out their personally held beliefs through participation

Page **2** of **10**

**DECLARATION OF ROB WALDO**

in the biblical call to bear one another's burdens and thus fulfill the law of Christ.  Prayer is a central component of our ministry: members pray for other members in need and often send them notes of encouragement, staff pray for members directly on the phone and throughout the day, and members often pray for the staff.

7. Health care sharing is not insurance.  Members share one another's medical expenses through voluntary giving, not because of legal obligation.  Samaritan *expressly*, *consistently*, and *persistently* disclaims any assumption of risk, promise to pay, or other customary legal incidents of insurance.  *See, e.g.*, Exhibit A-2 at ii ("Health care sharing is not insurance."), 6 ("the ministry is not an insurance company"), 10–11 ("**We are not insurance**"), 81–89 (state-specific disclaimers); Exhibit A-3 at 3 (requiring applicants to initial in five separate places that they understand that Samaritan is not an insurance company and does not sell insurance). Samaritan memberships are not insurance-like "products" or "plans," and they are not "sold" by insurance professionals.  Samaritan has never used insurance agents, brokers, producers, or any other licensed or commissioned person who sells insurance, to "market" or "sell" memberships. By choosing to be a part of this sharing community, members of Samaritan Ministries radically depart from, and reject, the health insurance regime in the United States, which is premised on entitlement, not charity, and neglects spiritual and emotional needs.

8. Samaritan Ministries is deeply concerned about the impact Colorado's new regulatory scheme will have on our religious liberty and our ability to freely associate with our members and third-parties, in furtherance of our ministry.

9. One problematic aspect of the Colorado scheme is the requirement that we report to the state any contracts that Samaritan Ministries has "entered into with providers."  In our direct

**DECLARATION OF ROB WALDO**

member-to-member sharing model, Samaritan members, not Samaritan Ministries as a 501(c)(3), are the persons who enter into any service agreements with a provider.  Therefore, it is unclear whether the state is requiring Samaritan Ministries to disclose all medical practitioners with whom Samaritan members receive treatment.  Such a requirement would be both a shocking disclosure of members' private medical treatment choices—not to mention a compliance burden imposed upon Samaritan Ministries (that is not reflected in calculations below).

10.     Colorado also requires reporting of any "third parties" that are involved in "operating, managing, or administering" the Samaritan Ministries sharing program.  Samaritan enters into non-disclosure agreements and legal contracts with third party vendors with the expectation of protecting the confidential nature of the business relationship.  In consideration of our moral, ethical, and legal responsibility to not disclose information when we have not been given express consent, we cannot in good conscience support this disclosure of our ministry relationships.  Also, given the nature of a confidential contracted relationship, it is our understanding that many of our affiliates wish to maintain their privacy and do not want their information shared with other entities, including the government.  The forced disclosure of this information has the potential to undermine our ability to work with our vendors partners to carry out our religious mission

11.     In addition to the affiliate disclosures, Colorado's scheme demands that we provide extensive and intrusive financial data and operational statistics that go far beyond what other regulations require.  Colorado requires us to report to the state in granular fashion statistical and financial information, our affiliations, and communications.  This information can be easily misunderstood or mischaracterized when taken out of context, as we have already witnessed in

DECLARATION OF ROB WALDO

news reports.  Additionally, Samaritan Ministries already publically makes available its IRS Form 990, publicly provides its best practices in governance, and discloses national monthly sharing financials to members.

12.    Colorado requires Samaritan Ministries to report comprehensive information regarding our number of members, including the amounts they contribute, the amount of expenditures they request to be shared, the amounts actually shared, the amounts paid to health care providers, and the internal structure of our ministry.  In this way, Colorado is effectively telling Samaritan Ministries to disclose in precise detail the contents of Samaritan Ministries collection basket and how Samaritan Ministries allocates or spends that money.

13.    However, it is even more egregious than this.  In the collection basket analogy, the church is in receipt of the donations.  In Samaritan Ministries' case, members send financial gifts for medical needs directly to other members, not to the Samaritan office.

14.    This grievous overreach of requiring Samaritan to report comprehensive member information presupposes that there already does not exist appropriate and sufficient governmental oversight for our religious non-profit and consumer protection for our members.  Nothing could be further from the truth.

15.    Health Care Sharing Ministries (HCSMs) are not insurance companies.  They are ministries.  As such, they are not subject to state insurance laws.  HCSMs operate on a completely voluntary basis and are regulated as charities in their home states under each state's charity laws by each state's attorney general and as 501(c)(3) charities by the Internal Revenue Service. Samaritan Ministries has conducted a yearly independent audit for 20 years and files an IRS Form 990 annually.  As a member-driven organization, oversight is provided by a nine-member

Page **5** of **10**

**DECLARATION OF ROB WALDO**

Board.  Six of the board members are members themselves elected by the members.  Exhibit A-2 at 25.  Additionally, the entire Samaritan Ministries membership (80,000+ households) determines through a vote whether the monthly share should be increased.  *Id.* at 26.  Finally, on the rare occasion that a member has a dispute over what our guidelines say (whether a medical need should or should not be shared), a randomly selected panel of seven to thirteen members adjudicates the appeal and the panel's decision is binding on the staff and on the member.  *Id.* at 70.  How many other organizations offer this kind of consumer protection?  In 30 years of sharing, this arbitration process has only been used four times because our members are overwhelmingly happy and satisfied.  (We have historical member retention of consistently greater than 85% and member satisfaction of well over 90%).

16.     Samaritan Ministries and its members have earned and enjoy a sterling reputation.  That is because, in addition to the above points, Samaritan Ministries is characterized by:

- Direct sharing of medical needs along with emotional, and spiritual support.  Samaritan members do not have ministry accounts, nor does Samaritan Ministries pool the shares and then distribute it to the members.

- Members pay their medical providers directly.

- Eleven months out of the year members send a check directly to another member, and the other month to the office to cover administrative expenses.  Thus, members know exactly where their money goes and how much is for administration.

Page **6** of **10**

- To my knowledge, no member of Samaritan Ministries has ever made a complaint to a Department of Insurance.

- At the time of joining and every year thereafter, adults on the membership must self-attest that they agree with our statement of Faith, are living in according to a Biblical standard, and understand how Samaritan functions, *including the fact that it is not insurance.*

- At the time of joining and every year thereafter, a church leader or a person the member is spiritually accountable to confirms that the member is adhering to Biblical standards.

- SMI has been accredited by the Healthcare Sharing Accreditation Board.   This independent Board examines dozens of critical organizational characteristics to decide whether it meets the exacting and high ethical standards of transparent HCSMs (including an accountable legal structure, sound financial management, appropriate communications with members, honest evangelization, a well-administered sharing process, etc.).

17.    From the above points, it is clear that Samaritan Ministries is structured and operates much like a congregational church.  How Samaritan Ministries allocates the voluntary contributions sent from one member to another is a matter of religious conviction and is at the core of our faith-driven approach to health care.  Just as a church's decisions about how to share proceeds from the collection basket are a matter between the church and its congregants, the

Page **7** of **10**

DECLARATION OF ROB WALDO

sharing of resources within Samaritan Ministries is a private matter between our ministry and our members.  Colorado's attempt to intrude into these decisions violates our religious autonomy.

18.     Compounding that burden, many of the terms in these reporting requirements are imprecise or nonsensical.  For example, the Colorado statute requires reporting of the percentage of revenues retained for "administrative expenses," but there is no standard definition of that term.  Similarly, the statute requires reporting of dollar amounts of "requests for reimbursement of health care costs or services," but does not specify whether those amounts should be the "sticker price" providers put on an invoice or the reduced amount they eventually accept.  The statute also requires reporting of "reimbursement request denials," but provides no definition as to whether requests that are outside of established policies or guidelines constitute a "denial."

19.     If all of this wasn't enough, Colorado additionally requires Samaritan Ministries to submit copies of all member and potential member communications "promoting" the ministry, including all "descriptions and other materials" that explain Samaritan Ministries' sharing programs.  Samaritan Ministries is already transparent with the public and members about the ministry and its operations.  The best place to learn about Samaritan Ministries and our programs is our public website: ********samaritanministries.org/.

20.     All of the above information that Samaritan Ministries must disclose is subject to public review.  Colorado officials have previously used this information to warn consumers away from health care sharing ministries like ours.  I am concerned that Colorado will use the mandated affiliate disclosures or regulatory notices or reports to either explicitly or implicitly disparage our ministry and harass or pressure those who associate with Samaritan Ministries to not participate as members or work with us.  Colorado officials' initial actions using these mandated disclosures

**DECLARATION OF ROB WALDO**

indicate Samaritan Ministries must anticipate future, similar notices that have the potential to significantly impact our ability to minister to others.

21.     As Vice President and Chief Administrative Officer at Samaritan Ministries, I have seen the requirements that Colorado imposes translate into measurable monetary harms to Samaritan Ministries and not just the significant dignitary harms to our ministry and members' constitutional rights.

22.     Samaritan Ministries has a lean staff focused above all on serving our members and facilitating the sharing of health care costs.  Complying with Colorado's extensive reporting mandates requires us to divert significant staff time and resources away from those core functions. I estimate that Samaritan Ministries staff will need to spend at least 285 hours annually gathering the required data (including copies of all member and potential member communication "promoting" our ministry), preparing the reports, verifying their accuracy, and submitting them to Colorado.  This is a substantial amount of employee time that will be diverted from away from our religious mission and the health care needs of our members.

23.     Samaritan Ministries expects to incur annual legal fees to obtain advice and counsel regarding Colorado's reporting requirements.  Because the scheme is complicated and ambiguous, Samaritan Ministries will need ongoing legal guidance to ensure we are meeting our obligations and to defend against any enforcement actions.

24.     If other states follow Colorado's lead, these costs will only snowball.

I declare under penalty of perjury that the foregoing is true and correct.

DECLARATION OF ROB WALDO

Executed on May 17, 2024.

_____
Rob Waldo
Vice President &
Chief Administrative Officer
Samaritan Ministries

**DECLARATION OF ROB WALDO**

# EXHIBIT A-1

[Samaritan Ministries Bylaws]



# CORPORATE BYLAWS

**Originally Approved December 11, 1999**

**Current Version (25) adopted 6/23/23**

# SAMARITAN MINISTRIES INTERNATIONAL
## Corporation Bylaws
## Table of Contents

**Article I:**     **Identification**         **Page 4**

Section 1:     Name
Section 2:     Office
Section 3:     Fiscal Year
Section 4:     Management
Section 5:     Funds
Section 6:     Private Property Exempt

**Article II:**     **Purpose & Mission Statements with Core Values Pages 5 - 7**

**Article III:**     **Doctrinal Positions**         **Pages 7-13**

**Article IV:**     **Members**         **Page 14**

Section 1:     Qualifications
Section 2:     Voting
Section 3:     Associate Membership
Section 4:     Application
Section 5:     Termination of Membership
Section 6:     Those in Need

**Article V:**     **Organization**         **Page 15**

Section 1:     Day-to-Day Management

**Article VI:**     **Board of Directors**         **Pages 15-21**

Section 1:     Number
Section 2:     Methods of Selection/Terms of Office
Section 3:     Duties and Qualifications of Directors
Section 4:     Board Member Absence/Deemed Resignation
Section 5:     Removal of a Director
Section 6:     Resignation\Vacancies
Section 7:     Compensation
Section 8:     Powers of Directors
Section 9:     Duties of Directors
Section 10:     Annual Meetings
Section 11:     Other Meetings
Section 12:     Quorum
Section 13:     Proxy Voting
Section 14:     Officers of the Board
Section 15:     Committees

**Article VII:**     **Order of Business**         **Page 21**

**Article VIII:  Officers of the Corporation, Ministry Cabinet**          **Pages 21-24**

    Section 1:      Officers
    Section 2:      Ministry Cabinet
    Section 3:      International President\Chief Executive Officer
    Section 4:      Executive Vice President\Chief Operating Officer
    Section 5:      Vice President of Finance/Chief Financial Officer/CFO/Treasurer
    Section 6:      Vice-Presidents
    Section 7:      Assistant Treasurer\Controller
    Section 8:      Secretary & Assistant
    Section 9       Chaplain
    Section 10.     Vacancies
    Section 11:    Legal Documents
    Section 12:    Loans to Officers
    Section 13:    Compensation

**Article IX:**    **Indemnification of Officers and Directors,**          **Page 24**

**Article X:**    **Provision for Dissolution**          **Page 24**

**Article XI:**    **Amendments**          **Page 25**

██████████████

# ARTICLE I

IDENTIFICATION

**Section 1. Name.** The name of this corporation shall be Samaritan Ministries International but may also do business under "Samaritan Ministries."

**Section 2. Office.** The principal office of this Corporation shall be in Illinois. Local branch offices may be established in other localities.

**Section 3. Fiscal Year.** The fiscal year of the Corporation shall begin on the first day of July each year and end on the last day of June in the subsequent year.

**Section 4. Management.** The supreme governing or legislative body of this Corporation shall be a Board of Directors to be duly elected by the members to the Corporation as may be provided in these bylaws. The day-to-day activity shall be carried on by an International President, who shall be assisted by the Ministry Cabinet and such other administrative personnel as he may appoint.

**Section 5. Funds.** The assets of this Corporation shall be kept upon the books thereof in one fund or in segregated funds as the Board of Directors may prescribe.

**Section 6. Private Property Exempt.** The private property of all members and Directors of this Corporation shall be exempt from the corporate liabilities.

# ARTICLE II

PURPOSE, AND MISSION STATEMENTS WITH CORE VALUES

"And Jesus came and said to them, All authority in heaven and on earth has been given to me. Go therefore and make disciples of all nations, baptizing them in the name of the Father and of the Son and of the Holy Spirit, teaching them to observe all that I have commanded you. And behold, I am with you always, to the end of the age." Matthew 28:18-20 (ESV)

### Purpose Statement *(Why we exist)*

**Our Purpose** is to glorify God by growing and equipping disciples of Jesus Christ to love God with all their heart, soul, mind and strength, and to love and care for their neighbor as themselves.

Matthew 28:18-20
Mark 12:28-30
Matthew 22:36-40

[ ██████████████ ]

### Mission Statement *(What we do)*

███████████

Our Mission is to redeem health care by helping the Body of Christ love one another through sharing each other's health care burdens while experiencing authentic Biblical community.

Galatians 6:2, Philippians 2:3-4, Romans 12:10,12,13,15, John 13:34, 35

[███████████████]

[███████████████████████]

### SMI Core Values

These six shared values define who we are and what it means to be on the Samaritan Team. This is our behavioral blueprint, our script on how we think, act, and make decisions. The strength of our culture and the accomplishment of our Mission depend on us integrating and embedding these values into everything we do: the way we hire, train and develop, evaluate performance, approach tasks and projects, relate to one another, and serve members.

Our Core Values are the anchors for *all* the work that we do. If we're to fulfill our Purpose and execute our Mission of redeeming health care, we will have all been aligned, acting the same way, with the values directing our paths. It is our hope and expectation that as we hold to and live out these Core Values, God will increasingly use Samaritan Ministries, both staff and members, to bring His Kingdom realities to this earth!

1. Jesus-Centric Life
2. Joy-Filled Community
3. Christ-Compassionate Service
4. Strategy-Focused Collaboration
5. Kingdom-Minded Stewardship
6. Ever-Growing Excellence

[████████████]

### ARTICLE III

### DOCTRINAL POSITIONS

**Section 1. Doctrinal statement.**

We believe the Bible alone is the inspired Word of God; therefore, it is the final and only source of absolute spiritual authority. *(Matthew 5:17-18; Luke 24:44-49; 2 Timothy 3:16-17, 2 Peter 1:19-21)*

We believe in the triune God of the Bible. He is one God who is revealed in three distinct Persons-God, the Father; God, the Son; and God, the Holy Spirit. *(Genesis 1:2, 1:26; Exodus 20:1-7; Isaiah 6:8; John 1:1-5, 16:13-15; Matthew 28:18-20; Acts 5:3-4; 1 Corinthians 8:4-6; 2 Corinthians 13:14; Ephesians 4:3-6)*

We believe Jesus Christ was and continues to be God in the flesh—fully God and fully man. He was born of a virgin, lived a sinless life, died on the cross to pay the penalty for our sins, was bodily resurrected on the third day, and now is seated in the heavens at the right hand of God, the Father. *(Genesis 3:15; Isaiah 7:14; Matthew 1:18-25, 20:28; John 1:14, 8:57-59, 10:24-31, 14:6-11; Luke 24:36-43; Acts 5:29-32; Romans 9:5; 1 Corinthians 15:1-8; Galatians 4:4-5; Philippians 2:5-11; Colossians 1:19-20; Hebrews 1:3-4, 4:14-16, 12:2; 1 Peter 2:21-23)*

We believe that all people are born with a sinful nature and can be saved from eternal death only by grace alone, through faith alone, trusting only in Christ's atoning death and resurrection to save us from our sins and give us eternal life. *(Genesis 2:25-3:24; Isaiah 53; John 3:16; Romans 1:16-17, 3:21-26, 5:6-12, 6:23, 7:18; 1 Corinthians 15:22; 2 Corinthians 5:17-21; Galatians 2:20-21; Ephesians 2:1-10; Colossians 2:13; 1 Peter 3:18; 1 John 4:9-10)*

We believe in the bodily resurrection to everlasting life of all those who have put their faith in Jesus Christ, and the bodily resurrection to eternal judgment of all those who have not. *(Matthew 25:31-46; Luke 16:19-31; John 11:25; Romans 1:18-2:11, 10:9-10; 1 Corinthians 15:12-28; 2 Corinthians 4:13-15; Hebrews 9:24-28; Revelation 20:11-15)*

We believe that all Human Life is sacred and created by God in His image. Human Life is of inestimable worth in all its dimensions, including pre-born babies, the aged, the physically or mentally challenged, and every other stage or ██████ condition from conception through natural death. We are therefore called to defend, protect, and value all human life. *(Genesis 1:26-27; Psalm 139; 1 Corinthians 6:19-20)* [ ██████████ ]

All we believe and do should be for the glory of God alone. *(Matthew 5:16; 1 Corinthians 10:31; 2 Corinthians 4:1-6, 5:14-15; Romans 11:33-36; Revelation 4:1-11)*

[ █████████████████████ ]

**Section 2. We Acknowledge The Authority Of Scripture In All Areas, Particularly The Historicity Of Genesis. [ ████████ ]**

    A.   The doctrinal statement in Section 1 of this Article does not exhaust the extent of our beliefs grounded in scripture. Additionally, the history of modern Christian institutions is one replete with compromise on the authority of God's word, frequently beginning with the book of Genesis. We therefore take this stand as foundational to persevering in a faithful commitment to the Great Commission.

    B.   <u>We Believe</u>:

    (a.) The 66 books of the Bible are the written Word of God. The Bible is divinely inspired and inerrant throughout. Its assertions are factually true in all the original autographs. It is the supreme authority, not only in all matters of faith and conduct, but in everything it teaches. Its authority is not limited to spiritual, religious or redemptive themes but includes its assertions in such fields as history and science.

(b.) The final guide to the interpretation of Scripture is Scripture itself. For purposes of SMI's faith, doctrine, practice, policy, and discipline, our board of directors is our determining authority on the Bible's meaning and application.

(c.) The account of origins presented in Genesis is a simple, factual presentation of actual events and therefore provides a reliable framework for scientific research into the question of the origin and history of life, mankind, the Earth and the universe.

(d.) The various original life forms (kinds), including mankind, were made by direct creative acts of God. The living descendants of any of the original kinds (apart from man) may represent more than one species today, reflecting the genetic potential within the original kind. Only limited biological changes (including mutational deterioration) have occurred naturally within each kind since Creation.

(e.) The great Flood of Genesis was an actual historic event, worldwide (global) in its extent and effect.

(f.) The special creation of Adam (the first man) and Eve (the first woman), and their subsequent fall into sin, is the basis for the necessity of salvation for mankind.

(g.) Death (both physical and spiritual) and bloodshed entered into this world subsequent to, and as a direct consequence of, man's sin.

C. The following are held by the Board of Directors to be either consistent with Scripture or implied by Scripture:

(a.) Scripture teaches a recent origin for man and the whole creation, [A span of approximately 4000 years from creation to Christ being one recognized estimate].

(b.) The days in Genesis do not correspond to geologic ages but are six (6) consecutive twenty-four (24) hour days of Creation.

(c.) The Noachian Flood was a significant geological event and much fossiliferous sediment originated at that time.

(d.) The 'gap' theory has no basis in Scripture, nor has the day-age idea (so-called 'progressive creation'), nor the Framework Hypothesis or theistic evolution.

(e.) The view, commonly used to evade the implications or the authority of Biblical teaching, that knowledge and/or truth may be divided into 'secular' and 'religious', is rejected.

(f.) By definition, no apparent, perceived or claimed evidence in any field, including history and chronology, can be valid if it contradicts the Scriptural record. Of primary importance is the fact that evidence is always subject to interpretation by fallible people who do not possess all information.

**Section 3. We Recognize and Implement the spiritual authority of God's Word through adherence to its teachings regarding marriage. [██████████████████]**

A. <u>Marriage and Sexuality</u>

We believe that God wonderfully and immutably creates each person as male or female. These two distinct, complementary genders together reflect the image and nature of God. (Gen 1:26-27) Rejection of one's biological sex is a rejection of the image of God within that person.

We believe that the term "marriage" has only one meaning and that is marriage sanctioned by God which joins one man and one woman in a single, exclusive union, as delineated in Scripture. (Gen 2:18-25)

We believe God intends sexual intimacy to only occur between a man and a woman who are married to each other. (I Cor. 6:18; 7:2-5; Heb 13:4) We believe God has commanded that no intimate sexual activity be engaged in outside of a marriage between a man and a woman.

We believe that any form of sexual immorality, such as adultery, fornication, homosexual conduct, bisexual conduct, bestiality, incest, pornography, or any attempt to change one's gender, or disagreement with one's biological gender, is sinful and offensive to God. (Matt 15:18-20)

We believe that in order to preserve the function and integrity of SMI as a parachurch ministry to the local church & the Body of Christ, and to provide a biblical role model to SMI members and the community, it is imperative that all persons employed by SMI in *any capacity*, or who serve as volunteers in a capacity representative of the ministry: should abide by and agree to this Statement on Marriage and Sexuality and conduct themselves accordingly. (Matt 5:16; Phil; 2:14-16; 1 Thess 5:22)

We believe God offers redemption and restoration to all who confess and forsake their sin, seeking His mercy and forgiveness through Jesus Christ. (Acts 3:19-21; Rom 10:9-10; 1 Cor., 6:9-11)

We believe every person must be afforded compassion, love, kindness, respect, and dignity. (Mark 12:28-31; Luke 6:31) Hateful and harassing behavior or attitudes directed toward any individual are to be repudiated and are not in accord with Scripture nor the doctrines of the church nor the policies of SMI.

B. <u>Divorce and Remarriage</u>

We believe God hates divorce and thus it is never his will that a divorce occurs, but due to the fallen nature of man divorce will occur even among the faithful. See Matt 19:6; I Cor. 7.

We believe the scripture <u>allows</u> for divorce in some situations, but that remarriage while the ex-spouse is alive and is not remarried is generally forbidden and results in adultery –

Romans 7:2-3; I Cor. 7:11; and that our culture has corrupted the church such that forbidden divorce and remarriage is rampant among believers.

We believe while we are not in a position to fully evaluate every situation in light of God's holy standard, to properly preserve the function and integrity of SMI as a parachurch ministry to the local church and body of Christ, and as a role model, it is imperative that we uphold the following standard:

A person who has gone through a divorce may not meet the spiritual qualifications to serve in leadership positions including the Board of Directors, as an officer, in the Cabinet, as a director, or outward facing representatives of SMI (as determined by the Cabinet). In cases where divorce has occurred, the Board will determine whether the person is qualified by considering whether factors like those listed below are true.

> (a) The person was divorced after their conversion; and
> (b) The person took the legal initiative to obtain the divorce; and
> (c) The divorce was obtained for grounds other than adultery or abandonment; and
> (d) The person remarried while their ex-spouse was alive, and not remarried; and
> (e) The person had not been freed by their local church to remarry.

The Board does not desire to be rigid, but to apply these considerations with gracious wisdom.

C.  Minimum Standards

Both of the above statements (Article III.3.A and Article III.3.B)  regarding sex and marriage are to be considered minimum standards for the ministry. These provisions are not to be considered any hindrance to the leadership making employment and membership decisions that are, or could be viewed as, stricter than these standards.

**Section 4. We Affirm the Biblical Created Order of Men and Woman. [▮▮▮▮▮▮▮]**

Whereas we, at Samaritan Ministries International (SMI), minister in a secular culture that denies the Creator and His created order, to the point that men and women are considered interchangeable;

Whereas God's ordained distinctives are inescapable, resulting in certain functions and roles being reserved for men or for women;

Whereas liberalism in the Church, lack of faith, and a failure to confront error has led to compromise and a lack of conviction on these issues;

Whereas we recognize our own abiding sinfulness and fallibility, and acknowledge the genuine evangelical standing of many who do not agree with all of our understanding of God's Word and our resulting convictions; and

Whereas we are moved by our desire to obey God and His Word, and our responsibility to set policy for the benefit of our members, our staff and their families, therefore, be it

*Resolved* the Board of SMI affirms and adopts the following exposition by the evangelical parachurch ministry known as the Council on Biblical Manhood and Womanhood and titled as "The Danvers Statement."

### The Danvers Statement
Rationale

We have been moved in our purpose by the following contemporary developments which we observe with deep concern:

1. The widespread uncertainty and confusion in our culture regarding the complementary differences between masculinity and femininity;

2. the tragic effects of this confusion in unraveling the fabric of marriage woven by God out of the beautiful and diverse strands of manhood and womanhood;

3. the increasing promotion given to feminist egalitarianism with accompanying distortions or neglect of the glad harmony portrayed in Scripture between the loving, humble leadership of redeemed husbands and the intelligent, willing support of that leadership by redeemed wives;

4. the widespread ambivalence regarding the values of motherhood, vocational homemaking, and the many ministries historically performed by women;

5. the growing claims of legitimacy for sexual relationships which have Biblically and historically been considered illicit or perverse, and the increase in pornographic portrayal of human sexuality;

6. the upsurge of physical and emotional abuse in the family;

7. the emergence of roles for men and women in church leadership that do not conform to Biblical teaching but backfire in the crippling of Biblically faithful witness;

8. the increasing prevalence and acceptance of hermeneutical oddities devised to reinterpret apparently plain meanings of Biblical texts;

9. the consequent threat to Biblical authority as the clarity of Scripture is jeopardized and the accessibility of its meaning to ordinary people is withdrawn into the restricted realm of technical ingenuity;

10. and behind all this the apparent accommodation of some within the church to the spirit of the age at the expense of winsome, radical Biblical authenticity which in the power of the Holy Spirit may reform rather than reflect our ailing culture.

## Affirmations

Based on our understanding of Biblical teachings, we affirm the following:

1. Both Adam and Eve were created in God's image, equal before God as persons and distinct in their manhood and womanhood (Gen 1:26-27, 2:18).

2. Distinctions in masculine and feminine roles are ordained by God as part of the created order, and should find an echo in every human heart (Gen 2:18, 21-24; 1 Cor 11:7-9; 1 Tim 2:12-14).

3. Adam's headship in marriage was established by God before the Fall, and was not a result of sin (Gen 2:16-18, 21-24, 3:1-13; 1 Cor 11:7-9).

4. The Fall introduced distortions into the relationships between men and women (Gen 3:1-7, 12, 16).

   o In the home, the husband's loving, humble headship tends to be replaced by domination or passivity; the wife's intelligent, willing submission tends to be replaced by usurpation or servility.

   o In the church, sin inclines men toward a worldly love of power or an abdication of spiritual responsibility, and inclines women to resist limitations on their roles or to neglect the use of their gifts in appropriate ministries.

5. The Old Testament, as well as the New Testament, manifests the equally high value and dignity which God attached to the roles of both men and women (Gen 1:26-27, 2:18; Gal 3:28). Both Old and New Testaments also affirm the principle of male headship in the family and in the covenant community (Gen 2:18; Eph 5:21-33; Col 3:18-19; 1 Tim 2:11-15).

6. Redemption in Christ aims at removing the distortions introduced by the curse.

   o In the family, husbands should forsake harsh or selfish leadership and grow in love and care for their wives; wives should forsake resistance to their husbands' authority and grow in willing, joyful submission to their husbands' leadership (Eph 5:21-33; Col 3:18-19; Tit 2:3-5; 1 Pet 3:1-7).

   o In the church, redemption in Christ gives men and women an equal share in the blessings of salvation; nevertheless, some* governing and teaching roles within the church are restricted to men (Gal 3:28; 1 Cor 11:2-16; 1 Tim 2:11-15).

███████████

7. In all of life Christ is the supreme authority and guide for men and women, so that no earthly submission-domestic, religious, or civil-ever implies a mandate to follow a human authority into sin (Dan 3:10-18; Acts 4:19-20, 5:27-29; 1 Pet 3:1-2).

8. In both men and women a heartfelt sense of call to ministry should never be used to set aside Biblical criteria for particular ministries (1 Tim 2:11-15, 3:1-13; Tit 1:5-9). Rather, Biblical teaching should remain the authority for testing our subjective discernment of God's will.

9. With half the world's population outside the reach of indigenous evangelism; with countless other lost people in those societies that have heard the gospel; with the stresses and miseries of sickness, malnutrition, homelessness, illiteracy, ignorance, aging, addiction, crime, incarceration, neuroses, and loneliness, no man or woman who feels a passion from God to make His grace known in word and deed need ever live without a fulfilling ministry for the glory of Christ and the good of this fallen world (1 Cor 12:7-21).

10. We are convinced that a denial or neglect of these principles will lead to increasingly destructive consequences in our families, our churches, and the culture at large.

*████████████████████████████████
█████████████████████████

## ARTICLE IV

### MEMBERS

**Section 1. Qualifications**. Membership shall be open to persons of both sexes in accordance with the rules and regulations set forth by the Board of Directors. A member must:

(a) Be a Christian living by biblical principles
(b) Attend church 3 out of 4 weeks per month
(c) Totally abstain from illegal substances, and sexual activity outside of traditional biblical marriage, one man, one woman
(d) Either abstain from alcohol or limit consumption of alcohol to moderate amounts so as to never drink to drunkenness, and
(e) Abstain from tobacco use (a rare celebratory cigar or pipe, e.g. at the birth of a baby, is an allowed exception)

The Board may adopt additional qualifications from time to time. [████████████]

Dependents of members may be included in a household membership in accord with the rules as set forth by the Board of Directors but shall have no separate voting rights.

████████████

**Section 2. Voting.** Each member household of Samaritan Ministries International shall, after a probationary period set by the Board, have one ballot weighted in the same manner as established by the Board and published in the Guidelines for Board of Director elections and any time a vote of the members is called for by the board of directors. Members shall not be entitled to cast votes on any other matter except as determined by the Board of Directors. The Board may also limit voting on a matter to only those households who will be directly affected by the outcome. [E.g. only participants in Save to Share voting on a proposed increase in the Save to Share set aside amount.]

**Section 3. Associate Membership.** The Board may establish one or more categories of Associate membership having different rights and privileges than regular members, including lesser, or no rights to cast votes on corporate matters. All such associate members must meet the minimum requirements of membership set forth in Section 1.

**Section 4. Application.** Application for membership shall be made according to the rules and restrictions fixed from time to time by the Board of Directors.

**Section 5. Termination of Membership.** Once a person or household becomes a member, their membership shall continue indefinitely until they no longer meet the requirements for membership. The Cabinet shall determine whether a membership will be terminated or suspended due to a failure to meet all membership requirements as set forth in the rules approved by the Board subject to whatever appeal process the Board adopts. [████████████████████]

**Section 6. Those in Need.** All membership fees and other financial requirements of members or applicants may be waived in full or part, based upon the individuals' inability to pay.

No one shall be denied membership participation in any need sharing ministry, whether it be spiritual, emotional, or financial, who lacks the financial means, through personal resources or biblically mandated assistance, to pay their shares or any administrative fees within the resources so provided by the Board of Directors. [███████████████████]

## ARTICLE V

### ORGANIZATION

**Section 1. Day-to-Day Management.** The day-to-day Management of Samaritan Ministries has been delegated by the Board of Directors to the International President and a governing body known as the Ministry Cabinet.

## ARTICLE VI

### BOARD OF DIRECTORS

**Section 1. Number.** The number of directors shall be nine, as provided below.

**Section 2. Methods of Selection/Terms of Office.**

A.  Six Elected by Members

1.  Terms. Six Board members shall be elected by the members to serve three-year terms, or until their successors take office. The terms shall be staggered by the Board so that two directors' terms will expire each year.

2.  Nominations

    To be considered for the election ballot, a member must first document to the administrative office that they meet the qualifications of Section 3 of this Article.

    If six or fewer members submit qualifying documentation by the nomination deadline, all qualifiers shall be listed on the election ballot. If there are more than six qualifying candidates, the nominations shall go to a nominating committee to determine which candidates to submit to the membership.

3.  Nominating Committee

    The Nominating Committee shall consist of all Directors, but not including any with an expiring term who has submitted a nomination. [█████████████]

    The Committee shall choose to be on the ballot six of the qualifying nominees which they find could best address the current needs of the ministry, unless during the course of its consideration the Committee determines that fewer than six meet the requirements of Section 3 of this Article.

4.  Setting of Dates

    The dates for receiving nominations and holding elections shall be set by the Board or the Administrative office.

5.  Voting

    Each membership household shall have two votes to cast in a non-cumulative manner. The weight of the vote of each size membership household shall be determined by the Board.

6.  Winning

    In regular elections the two candidates which receive the highest number of weighted votes shall be elected to the Board. In the event of a tie, the winner shall be determined by lot. If there is only one candidate for each position, members will be provided with

█████████

a "yes/no" ballot, and a candidate must receive a simple majority of yes over no votes of the (weighted) votes cast to be elected.

7. Qualifying to Vote

A membership household shall qualify to vote if administrative records indicate it status has not terminated before the cut-off date set prior to the election by the Board or the Administrative office.

8. Vacancies

In the event of a vacancy, to complete the term the Board may make an appointment, set a special election or leave the office vacant.

B. Election Disputes

Any dispute which arises regarding nomination or election shall be resolved by the elected Board members who are not nominees for that election.

C. Founder

Ted Pittenger shall personally, permanently fill one position on the Board and may not be removed except as required by law. The Board position shall become vacant only upon Ted's death, resignation from the Board, or removal as required by law. Thereafter, the International President shall fill one position on the Board.

D. Ted Pittenger's Appointees

1. Two Appointees.

Ted Pittenger shall fill two Board positions by appointment as long as Ted remains on the Board of Directors. The appointed directors shall serve staggered two-year terms as Ted Pittenger designates.

When Ted Pittenger is no longer a Board member, the incumbent appointees shall serve out their two-year terms and then they shall be filled for three-year terms as provided in section E.

2. Qualifications

Ted Pittenger's appointees must meet all of the qualifications of the elected Board members in section 3A. of this article except the submission of nominations (3A.5) and the financial limitation of Section 3.A7., One appointee need not meet the 2-year membership requirement (3.A.2) but must be a member when he is appointed. [█████
████████████ ]

E.  Two Board Appointees

When Ted Pittenger is no longer serving on the Board, and as the Board positions he appointed become vacant, those positions shall be filled from candidates nominated by the Ministry Cabinet and approved by the Board.

The Cabinet shall provide at least four nominees for each position to be filled.

The appointed members shall serve staggered three-year terms as set by the Board.

The appointed members must meet all the qualifications of Section 3A, except for paragraphs 5 (nomination) and 7 (financial interest).

F.  Succession\Taking Office

Board Members shall take office per their method of selection:

1.  By regular election – at the Annual meeting of the Board which may occur immediately after the last meeting of the old Board.
2.  By special election – as determined by the Board
3.  By appointment – at the meeting of their appointment.

**Section 3. Qualifications of Directors.**

A.  Ballot Qualifications **-** To qualify to be on the ballot, a person must:

1)  be at least 30 years old by the close of the nomination period;
2)  Have been a regular member for an uninterrupted two years by, and including, the close of the nomination period for that election;
3)  Have been in good standing for all periods of membership in the past five years. "Good standing" means not being on probation, or otherwise having any privileges suspended for failure to meet member responsibilities;
4)  Not be chronically late in sending shares or the annual administrative fee and continuation form. Chronic lateness means four or more administrative reminders were necessary in any 12-month period in the past 5 years prior to the close of the nomination period for that election;
5)  Submit a written personal nomination detailing why he wants to serve on the Board along with a second to the nomination by someone from another SMI member household;
6)  Meets the qualifications for an elder as set forth in 1 Timothy 3, with a written verification from among his local church's leadership. The SMI Board may by Unanimous vote of those present determine independently that the Member's reputation outside the church is such that his service on the Board might bring the ministry into disrepute, so as to preclude him from being on the ballot;

7) Have no financial or employment interest in Samaritan Ministries International by the close of the nomination period for that election;

8) Sign a statement that he is in agreement with all the doctrinal positions in Article III, and meets the Divorce and Remarriage standard for Board Members; and

9) Submit:

(a) a statement from a pastor or elder of his church affirming that the church's statement of faith/doctrinal statement or positions are consistent with the doctrinal positions of Article III of these bylaws; or if there is an inconsistency, an explanation from the potential candidate for the inconsistency; and

(b) a copy of his church's statement of faith/doctrinal statement or positions.

10. Authorize and cooperate with a thorough background check (the extent of which will match the background check required of an officer of SMI) and be subject to a background check at each reelection. Any matters of concern revealed in a background check will be reviewed by the Board Nominating Committee which at their discretion may be grounds for disqualification. (█████████████)

B. <u>Prior Removal Disqualification</u> - A Director who has been removed under Section 5 is never again eligible to serve on the board.

C. <u>Continuing Qualifications</u> - To continue to hold office, a person must:

1. Remain a regular member in good standing, See Section 3 A(3) above.

2. Have no financial or employment interest in Samaritan Ministries International except as allowed by the Bylaws.

3. Annually sign a statement that he is in agreement with all the doctrinal statements in Article III.

4. Meet the Divorce and Remarriage standard of Article III for Directors.

**Section 4. Board Member Absence/Deemed Resignation.** If a Director fails to attend three Board Meetings in a row, or more than one-half of the Board Meetings held in any twelve-month period, that Director will be deemed to have resigned and his position shall be deemed to have become vacant for the remainder of his term or until the vacancy is filled pursuant to Article VI, Section 2.A of these Bylaws. At the discretion of the Board Chairman, imposition of this rule may be waived and absences excused due to extenuating circumstances. The minutes should note any excused absences.

**Section 5. Removal of a Director.**

A. <u>The grounds for removing a Director are</u>:

1. No longer meeting the qualifications of a board member, including if a Director develops a financial interest in SMI prohibited by Section 3(A)(7) during his term;

2. Breach of his fiduciary duty toward SMI;

3. Disfellowship or other discipline by his local church for actions incompatible with being a member of the SMI board;

4. Gross sin bringing the ministry into disrepute.

B. Procedure

A Board member may be removed as follows:

1. By vote of a majority of board members then serving, or by the written request of 100 member households, procedures for the removal of a board member will be initiated with the issue of whether grounds for removal exist to be determined by Christian arbitration through Peacemaker Ministries, Institute for Christian Conciliation. See www.HisPeace.org. If the arbitration finds grounds for removal exist, and the parties are not reconciled, the board member may then be removed by majority vote of the board; or

2. If the board votes unanimously (not counting the member at issue) that grounds exist to remove a board member, or by the request of 200 of the member households, then that board member will be subject to a special recall election and shall be removed from office if two-thirds of those member household voting, by weighted vote, vote for removal. A Board member subjected to recall shall have a reasonable opportunity to present his position to the members either with the recall ballot or in the newsletter mailed at least two weeks prior to the ballot.

**Section 6. Resignation\Vacancies.** A Director may resign at any time by filing his written resignation with the Chairman.  Article VI-. Section 2.A.8 shall then control.

**Section 7. Compensation.**  All directors shall serve without pay except that a director who is also an employee of the Corporation shall be compensated as the Board of Directors determines. The Board may, from time to time, make regulations providing for the payment of traveling expenses and other expenses incurred by directors in attending board meetings or otherwise performing their duties.

**Section 8. Powers of Directors.** The corporate power of this Corporation shall be vested in the Board of Directors as a body, who shall have the management and control of the business of the corporation. They shall employ such agents, representatives and persons as they may deem advisable. No individual Board member nor committee shall have any authority to act for the corporation except as delegated by the full Board within the constraints of the law.

**Section 9. Duties of Directors.**

The foundational duties of all Board Members are the "duty of care" and the "duty of loyalty."

A. <u>Duty of Care</u>.

The "duty of care" consists of, but is not limited to:

1. Determine mission and purposes
2. Establishing and reviewing board policies governing the Corporation and its operations.
3. Employing on behalf of the Corporation a President/CEO and defining the duties and responsibilities of the CEO in a written job description.
4. Support and evaluate the CEO
5. Ensure effective planning
6. Monitor and strengthen programs and services
7. Ensure adequate financial resources
8. Protect assets and provide financial oversight
9. Establish procedures for selection of a competent board
10. Ensure legal and ethical integrity
11. Enhance the organization's public standing
12. Attend Board meetings and actively participate.

B. <u>Duty of Loyalty</u>.

The "duty of loyalty" consists of always acting in the best interest of the organization and not your own, or some other person's or entity's, interest.

**Section 10. Annual Meetings.** The date of the regular annual meeting of the Board of Directors shall normally be between the first day December and the last day of March of the subsequent year, the exact date and hour to be designated by the Chairman of the Board and the International President. The annual meeting of the Board of Directors shall be at the home office or at such other place, or by telephone, satellite or video conferencing as the Chairman of the Board and the International President may specify.

**Section 11. Other Meetings.** Other meetings of the Board of Directors may be held upon the call of the International President, Chairman, or Vice Chairman at any time or place and by telephone, satellite, or video conferencing upon 10-day notice specifying the general purpose of the meeting; given to each director either personally, by mail or by telegram, except for a meeting to discuss and approve a pro-rata situation which shall require a 24 hour notice

**Section 12. Quorum.** At any meeting of the Board of Directors, the presence of a majority of the then serving members of the Board which must include at least 50% of the then serving elected members, shall constitute a quorum for the transaction of any business.

In the event of the necessity to take emergency action when vacancies or illness on the board make the quorum requirement impossible to meet, a meeting of all members currently serving and physically able to participate shall constitute a quorum. Absent members shall be immediately notified of any action taken, and the action taken must be ratified at the next meeting of the Board, and if not so ratified shall be nullified to the extent possible.

**Section 13. Proxy Voting.** Proxy voting shall not be allowed by Directors.

**Section 14. Officers of the Board.** The directors shall elect at each annual meeting a Chairman of the Board, a Vice Chairman of the Board, and such other officers of the Board as it determines, and all of whom shall have such duties as are assigned by the Board of Directors.

**Section 15. Committees.** The Board of Directors may, from time to time, appoint such standing and special committees as may be deemed necessary and advisable.

## ARTICLE VII

ORDER OF BUSINESS

The Chairman of the Board shall set the agenda of each scheduled and called meeting.
The meetings of the Board of Directors shall be conducted according to "Robert's Rules of Order".

## ARTICLE VIII

OFFICERS OF THE CORPORATION, THE MINISTRY* CABINET

**Section 1. Officers**

A.  <u>Selection.</u> At the Annual Meeting of the Board of Directors, the Board shall appoint the officers of the Corporation including those which make up the Ministry Cabinet and it shall function according to the policies and directives set forth by the Board of Directors. The Board of Directors may from time to time create other offices with designation of duties and shall appoint persons to fill such offices.

B.  <u>Qualifications.</u> Due to the spiritual nature of our purpose and the theological foundations upon which this ministry stands (See Article III), of necessity the leaders of this ministry must be mature in their Christian walk and meet Biblical standards for leadership. This, both to represent the ministry to the members and general public, and to teach the same to the staff in

word and deed. Therefore, to be an officer in this ministry, the person must meet the Biblical requirements for the office of deacon (I Tim. 3:8--13) and be in agreement with SMI's Doctrinal Statement and positions as reflected in Article III.

[                                                          ]

**Section 2. Ministry Cabinet.**

A.  <u>Composition</u>: The following officers, the International President, Executive Vice President, Vice President of Finance and such other Vice Presidents as the Board appoints from time to time, shall form a Ministry Cabinet to carry on the necessary business between meetings of the Board. The Ministry Cabinet shall be responsible for all matters coming to it between meetings of the Board of Directors, except for those matters which the Board of Directors or Illinois law shall specifically reserve to the Board of Directors for final action.

B.  <u>Quorum</u>: The quorum necessary for the Ministry Cabinet to take action is:

   A.  If the International President is present, a majority of the persons then serving in the Ministry Cabinet; or

   B.  If the International President is not present, then all other persons then serving in the Ministry Cabinet.

**Section 3. International President\Chief Executive Officer.** The International President shall 1) Attend to the executive business of the Corporation, 2) Have charge of the general welfare of the Corporation under the Board of Directors, 3) Be in charge of the office of the Corporation, and 4) Shall be responsible for all operating activities. He shall have such additional duties as the Board of Directors may designate for such office.

**Section 4.  Executive Vice President\Chief Operating Officer.** The Executive Vice President shall function temporarily in the place of the International President, as necessary because of the absence, sickness or death of the International President, until the return of the International President or a replacement is designated by the Board of Directors.  He has oversight of those responsible for the day-to-day operation of the Corporation. He shall also perform such other duties as shall from time to time be assigned to him by the President or Board of Directors.

**Section 5. Vice President of Finance/Chief Financial Officer/CFO/Treasurer.** The CFO shall be the legal custodian of all notes, securities and other valuables which may from time to time come into the possession of the Corporation and shall immediately deposit same in some reliable bank or other depository designated by the Board of Directors. The CFO, with the advice and consent of the International President, shall: 1) Maintain adequate capital structure to assure the effectual operation of the corporation; 2) Invest deposits or excess funds within guidelines and policies approved by the Board of Directors; 3) Arrange for special credit as necessary; and 4) Serve as the corporate Treasurer. He shall have such other duties as the Board of Directors may designate.

██████████

**Section 6. Vice Presidents**. Such other Vice Presidents may be appointed by the Board from time to time as it deems necessary, with such titles and responsibilities as are included in the appointing resolution, or which the President or Executive Vice President later assigns.

The President may name such other Vice-Presidents as he deems advisable who are not corporate officers. [███████████████]

**Section 7. Assistant Treasurer\Controller**. The Assistant Treasurer shall have such duties as are delegated to him by the CFO. In the event of a vacancy in the CFO's office, he will serve as the acting CFO until one is appointed.

**Section 8. Secretary & Assistant**

   A.  Secretary. The Secretary shall have custody of the official records of the Corporation. He shall keep the official minute records of all the meetings of the Board of Directors and its committees, have custody of the corporate seal and shall perform such other duties as the Board of Directors may from time to time determine. He shall give the required notice of annual and special meetings of the Board of Directors with the advice and consent of the Chairman of the Board and the International President. The duties of the Secretary may be performed by one or more assistant Secretaries appointed by the Board of Directors.

   B.  Assistant Secretary. The Assistant Secretary shall have such duties as are delegated to him by the Secretary. In the event of a vacancy in the Secretary's office, he will serve as the acting Secretary until one is appointed.

**Section 9. Chaplain.** The duties of the Chaplain are to provide spiritual leadership and instruction to the staff and members of the Corporation. This may, but is not limited to, include conducting Bible Studies and prayer sessions with the staff, so they in turn can minister spiritually to the members, and writing articles of spiritual instruction for the Newsletter. The Chaplain may be designated by the Board to report to the International President or the Chairman of the Board.

**Section 10. Vacancies.** All vacancies of officers, other than the International President, may be filled by appointment of the Ministry Cabinet, and such appointment shall be effective until the next regular or special meeting of the Board of Directors. A vacancy in the office of International President will be filled only by the Board of Directors.

**Section 11. Legal Documents.** Except for transactions with a value less than $100,000, all contracts, leases, commercial paper and other instruments in writing and legal documents including bonds, deeds and mortgages, the assignment and endorsement of stocks, bonds or other securities registered in the name of the Corporation shall be signed by at least two of either the International President, the Executive Vice President, or the Chief Financial Officer.

All checks, drafts, notes and orders for the payment of money shall be signed by those officers or employees of the Corporation as the Ministry Cabinet may from time to time designate, except for amounts over $100,000 must be signed by the International President, Executive Vice President or the Chief Financial Officer.

**Section 12. Loans to Officers.** No loan of money or property or any advance on account of services to be performed in the future shall be made to any officer or director of the corporation except for travel advances under such conditions which the Board of directors may determine.

**Section 13. Compensation.**

A. <u>Determination</u>. The compensation of the International President and any employees who serve as directors, shall be set by the Board of Directors. The compensation of the officers shall be reported to the Board at the summer meeting.

B. <u>Member of the Board</u>. If an employee is a member of the Board of Directors when his compensation is being considered, he may only be present to answer questions and otherwise must recuse himself from the meeting and not be present during debate and voting on the compensation or on any transfer of property from the corporation.

C. <u>Amount and Manner</u>. The compensation shall be approved in both amount and manner to be in compliance with Internal Revenue Code Regulation Section 53.4958-6(C) so as to be presumed reasonable.

## ARTICLE IX

INDEMNIFICATION OF OFFICERS AND DIRECTORS

**Section 1. Mandatory Indemnification.**

The Corporation shall indemnify any person made a party, or is threatened to be made a party to any threatened, pending or completed claim, action, suit or proceeding (civil, criminal or administrative) by reason of the fact that he is or was an Officer, or Director of the Corporation or of any corporation (for profit or not for profit), partnership, association, trust, foundation, or other organization or entity where he served at the request of the Corporation to the full extent permitted by the Illinois Not For Profit Corporation Act and Illinois common law, whichever is greater, as in effect at the time of adoption of this bylaw, or as amended from time to time, whichever is greater. The foregoing right of indemnification shall not be deemed exclusive of any other rights to which a person seeking indemnification may be entitled under any bylaw, agreement, vote of members or disinterested directors, or otherwise.

**Section 2. Mandatory Advance Payments.**

Expenses (including attorney's fees) incurred by a former or current officer or director for any matter potentially required to be indemnified under Paragraph A shall be paid by the Corporation in advance of the final disposition of such matter upon receipt of an undertaking by or on behalf of such officer or director to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the Corporation as authorized in this Article IX.

Confidential: Do Not Distribute

██████████████

# ARTICLE X

### PROVISION FOR DISSOLUTION

In the event the Corporation should be dissolved, the assets shall be given to:

    First, pay creditors

    Second, pay any outstanding needs of current subscribers

    Third, any remaining assets will be given to any not-for-profit organization selected by the Board of Directors that meets the requirements of Article 4 of the Articles of Incorporation.

# ARTICLE XI

### AMENDMENTS

These bylaws may be amended, repealed or added to at any regular meeting (or at any special meeting of the Board of Directors called for that purpose) by an affirmative vote of 80% of the directors voting but no amendment, repeal or addition shall be considered unless notice of the proposed amendment, repeal or addition is submitted to the members of the Board of Directors at least 30 days prior to the date of such meeting, or all members of the Board then holding office waive the 30 day notice requirement.

Certified by SMI Secretary,

ROB WALDO _____      7/26/23 _____

**PRINTED NAME**         **SIGNATURE**         **DATE**

**APPROVALS**

| TITLE | NAME | DATE |
| --- | --- | --- |
| General Counsel | Brian Heller | 7/16/23 |
| Chairman of the Board | Jim Taggart | 7/26/23 |

# EXHIBIT A-2

[Samaritan Ministries Sharing Guidelines
(September 2023)]



# Guidelines for Health Care Sharing

in Samaritan™ **Classic** and **Basic**

SEPTEMBER 2023

**Samaritan™**
M I N I S T R I E S



Guidelines for
Health Care Sharing

in Samaritan™ **Classic** and **Basic**

SEPTEMBER, 2023

# Contents

**Introduction**     4    Foundational Principles
                     6    Overview

**Membership**      14    I. Requirements
                    17    II. Family Defined
                    19    III. Responsibilities
                    25    IV. Member Involvement
                    27    V. Additional Giving
                    29    VI. Amounts That Members Share

**Needs**           35    VII. Pre-Existing Conditions
                    39    VIII. Need Sharing
                    40    A. Physical Conditions
                    43    B. Sharing Limits
                    55    C. Motor Vehicle Injuries
                    56    D. Non-Qualifying Items
                    59    IX. Maternity & Newborn Care
                    64    X. Submitting Medical Needs
                    69    XI. Advisory Opinions & Binding Decisions
                    69    XII. Reconciling Disagreements
                    71    XIII. Amending Guidelines
                    72    XIV. Switching Membership Levels

**Save to Share™**  76    I. Participation
**Guidelines**      77    II. Need Sharing
                    80    III. Amendments & Mediation

                    81    State Legal Notices
                    90    Index

**Guidelines for Health Care Sharing in Samaritan Classic and Basic**
Copyright © 2023 Samaritan Ministries International. Members and potential members may download, print, and share these Guidelines with their friends, church leaders, and medical service providers. All other rights are reserved.

These Guidelines are accurate as of September 2023. To access the most recent version of the Guidelines, please visit **samaritanministries.org/guidelines.**

**Contact us:**

**info@samaritanministries.org**

**1(877)764-2426**
Mon, Tue, Wed, and Fri: 8:00am–5:00pm CST
Thur: 9:30am–5:00pm CST

Samaritan Ministries
PO BOX 3618
Peoria, IL 61612

Samaritan Ministries International (SMI) is recognized by the IRS as a 501(c)(3) charity that administers a health care sharing ministry. The ministry enables Christians to help one another with medical needs without using health insurance. Health care sharing is not insurance. Members share one another's medical expenses through voluntary giving, not because of legal obligation.

## We believe the following Biblical principles are basic to the life of every believer; therefore foundational to our health care sharing ministry:

### Jesus Christ is our Provider for every need.
As the Creator of all things, He is the only One with all the resources necessary to meet every need that occurs in His creation.

### Our needs are more than physical.
Human beings are more than just a collection of cells, and we have needs that go beyond the physical body. Our members come together to meet the financial, physical, and spiritual aspects of each medical need.

### God has made us stewards of His resources.
As a first line of defense, members of the Body of Christ are responsible to use the resources they've been given by God to care for themselves, their family, and others.

### Our local Christian church offers us support.
We seek to support and supplement the local Body, not replace it. We depend on local Christian church leaders to provide accountability for the Samaritan members under their care.

### Mankind is the crown of His Creation.
Because we bear the image of God, we are to respect all human life at all stages of development. Therefore, we live according to Biblical principles in all aspects of our lives by treating our bodies as temples of the Holy Spirit.

# Foundational Principles

## HOW IT WORKS



**A medical need arises**
There are no network restrictions. Choose the doctor, hospital and pharmacy that works best for you and your family.



**The need is shared**
Medical bills are sent to Samaritan Ministries, and we notify members to pray and send money for your shareable bills.



**Your bills get paid**
The money received is used to pay your medical bills and you enjoy encouraging messages from other members.

# Overview

Every month, members of Samaritan Ministries give to other members who have medical needs. Members pray and send their monthly share, along with notes of encouragement, directly to the member in need. This allows members to minister to all aspects of the need: spiritual, emotional, physical, and financial.

Samaritan Ministries International (*SMI*) is a not-for-profit health care sharing ministry that enables Christians to help one another with medical needs without using health insurance. Because the ministry is not an insurance company, some of the terminology and processes are different than what you may be used to.

SMI members do not pay "premiums," and money is not collected by SMI to "cover" members' medical expenses. Instead, members send their monthly shares directly to other members with medical needs. Share notifications are sent out monthly, and they inform the members who they'll be sharing with that month, and what the need was for. Once members receive their share notification, they send their designated share amount, as well as a note of encouragement directly to the member with the need.

Eleven months a year, members share directly with each other. On the 12th month, members send their shares to the Samaritan Ministries office. The shares the office receives are used to support the ministry's administrative services.

Medical needs below the initial unshareable amount of $400 for Samaritan Classic and $1,500 for Samaritan Basic are not shared. Needs that exceed the initial unshareable amount are shareable up to the maximum shareable amount of $250,000 for Samaritan Classic and $236,500 for Samaritan Basic. The amount above the maximum shareable amount may be shared for members enrolled in Save to Share™.

Needs that do not qualify according to the Guidelines cannot be shared as

**Appx. Vol I**
**A-49**

part of the monthly share notification. However, we can make these unqualified needs known to the membership as a Special Prayer Need, and other members are free to make donations towards the unqualified need.

SMI is governed by a nine member Board of Directors, all of whom are SMI members. Six of the Board members are elected by the membership. Each Board member's term is for three years. None of the elected Board members have a financial or employment interest in SMI. No Board members receive financial compensation for their service as Board members, except for reimbursement of expenses incurred attending the meetings. The Board has three regularly scheduled meetings each year and additional special meetings as needed.

## Introduction to Membership Levels

**Samaritan Classic**
MONTHLY SHARE

| | |
|---|---|
| 1 Person.............................. | $303 |
| 2 Person.............................. | $591 |
| 3–7 Person.......................... | $634 |
| 8+ Person............................ | $771 |
| Individual ≤ Age 29............. | $182 |
| Widowed/Divorced & Children...... | $462 |

**Samaritan Basic**
MONTHLY SHARE

| | ≤ 29 years old | 30–44 years old | 45–59 years old | 60+ years old |
|---|---|---|---|---|
| 1 Person...... | $105 | $132 | $153 | $175 |
| 2 Person...... | $218 | $261 | $304 | $349 |
| 3+ Person.... | $275 | $327 | $383 | $437 |

### Switching Membership Levels

Please read *Section XIV* carefully about the implications of switching levels. Switching to Basic will result in all bills subsequently received by SMI to be

shared under the Basic Guidelines. In switching to Classic from Basic you may totally lose the ability to share some needs.

*Summarized below is a brief introduction of the key differences between member-ship levels. Please read the full Guidelines for a complete explanation of sharing.*

### Sharing Percentage
**Basic •  90%**          **Classic •  100%**

The amount of qualifying bills above the initial unshareable amount will be shared at 100% in Samaritan Classic, and at 90% in Samaritan Basic, absent any prorating. (*Section VI.A.7*)

### Initial Unshareable Amount
**Basic •  $1,500**          **Classic •  $400**

The initial amount per medical condition that members do not share in Basic is $1,500, compared to $400 in Classic. The initial unshareable amount can be adjusted down for discounts received in Basic only. (*Section VI.A.4*)

A medical condition does not qualify for any sharing until the total bills exceed the initial unshareable amount (*not counting discounts*).

### Maternity Limit
**Basic •  $5,000**          **Classic •  $250,000**

Maternity needs in Samaritan Basic have a $5,000 sharing limit. The maximum 10% co-share amount of $13,500 also applies to prevent these needs from becoming too great a burden. (*Section IX.A.8*)

Maternity needs in Samaritan Classic have a $250,000 maximum shareable amount.

A multi-person membership (*or its equivalent*) is required for maternity sharing. (*Section IX.A.1*)

## Maximum Shareable Amount

**Basic** • **$236,500**      **Classic** • **$250,000**

The most that can be shared for a given need is $250,000 in Samaritan Classic. For Samaritan Basic the amount is $236,500 ($250,000 minus the *$13,500 maximum co-share*). (*Section VI.A.6*) To share in needs above these amounts, see the Save to Share program Guidelines.

## We are not insurance.

**Health Insurance** is a contract where one party agrees to be legally responsible for and accept another party's risk of loss, in exchange for a payment called a premium.

**Health care sharing** is an arrangement where members share one another's medical expenses through voluntary giving, not because of legal obligation.

We are not licensed or registered by any insurance board or department, since we are not practicing the business of insurance. We do not assess applicants' health risks, because neither the ministry nor the members are assuming financial liability for any other member's risk. There is no deadline or cutoff date to sign up for SMI; you can join anytime. There is no "policy term" ... your membership continues as long as you meet your responsibilities.

### No Premiums

Insurance companies collect premiums that they keep until the money is needed for claims. Samaritan Ministries is not an insurance company, so we have no premiums. Members of Samaritan Ministries retain possession of their money until it is needed. Eleven months each year they send their assigned share, not to the ministry, but directly to another member who has a qualified medical need.

### No Claims

Because Samaritan Ministries is not an insurance company, there is no transfer of risk. This means that when a member receives medical care,

there is no "claim" that is owed. There is simply a medical need. Samaritan members send proof of their medical expenses to the Samaritan Ministries office (*or they can submit the need online via their Samaritan Dashboard*), where the need will be evaluated according to the Guidelines. Then the qualified needs are shared among the members. Again, this giving is voluntary and does not involve any legal obligation (*claim*) on the ministry or the other members.

### Initial Unshareable Amount

In a sharing ministry, each member is always responsible for all of their own medical expenses. A medical need below the initial unshareable amount of $400 for Samaritan Classic or $1,500 for Samaritan Basic is not shared by the members. When needs exceed the initial unshareable amount, those amounts are shareable up to $250,000 for Samaritan Classic and $236,500 for Samaritan Basic. Sharing of needs continues past the maximum shareable amount if a member is enrolled in Save to Share.

### Operational Costs

One month each year every Samaritan household sends their monthly share amount to the Samaritan office. In addition, new members send a start-up administrative fee along with their first month's share to the office. The start-up administrative fee is non-refundable. In their first year, new members may also be asked to send their second and occasional third month's shares to the office, depending on administrative needs. Unique services provided to the members may be paid for by other means as determined by the Board of Directors. An audit of ministry finances is conducted by an independent, outside auditing firm each year to verify integrity in how administrative money is handled.

### Balancing Needs and Shares

If all needs cannot be met, we use a prorating method to evenly distribute the burden. For example, if there is only enough share money for 97% of the needs submitted for a particular month, 97% of each need would be shared for that month. We can also overlap needs from two months so that there is enough money for all the needs. See *Section VI.D* "Balancing Needs and Shares/Proration."

## Is this legal?

Samaritan Ministries is not restricted from operating in any of the 50 United States, U.S. territories, or any foreign country, and has no legal barriers of which we are aware. Samaritan Ministries International is recognized by the IRS as a 501(c)(3) charity. If your state requires all residents to have health insurance during the year or be exempt from the requirement, consult samaritanministries.org/tax for instructions on how to file your exemption. Health care sharing also satisfies the mandates of the federal Affordable Care Act. For years 2018 and prior, members are to complete the IRS created Form 8965 which indicates what portion of the year they were a member of a health care sharing ministry.

## Health Care / Doctor Visits as a Cash-Pay Patient

Members deal directly with the providers of their choice, as "cash-pay" patients. There are no "preferred providers" or required networks, therefore, no "out of network" penalties. Members are free to work with their providers to determine the best treatments for their families.

## Sharing Large Needs

For each medical need, the maximum shareable amount for members participating in Samaritan Classic is $250,000. For members participating in Samaritan Basic, the maximum shareable amount is $236,500. The need has to meet the Guidelines before it can be shared. SMI members are also eligible to participate in another sharing ministry, Save to Share, where needs exceeding the maximum shareable amount may be shared. (*See Save to Share Guidelines.*) Massachusetts' members are required to participate in Save to Share. There is no limit on the number of needs that an individual member or household may have, and neither your membership nor monthly share amount is affected by the amount of medical expenses you have.

## Receiving Shares

The sharing turnaround time is normally within two to three months from receipt of your medical bills and required information. If your Need Processing Form is correct and complete, and there are no ongoing financial negotiations with providers, your need will be shared at the beginning of the second month after we receive your need. See page 67.

SMI will provide you with a checklist (*via postal mail and in your Samaritan Dashboard*) so that you can keep track of the members assigned to send to your need. If someone on your list has stopped sharing and will not be sending to you, that amount will be reassigned the following month to a member who is sharing. You must be current in your sharing responsibilities and other member requirements to have a need shared by the membership.

## Medical Care Outside the U.S.

Whether you're on vacation or a missions trip, bills from medical treatments occurring overseas can be shared. They must be written or translated into English and the price converted to U.S. dollars. They are handled the same as bills from treatment in the U.S. in all other respects.

# I. Requirements

To become a member you must meet all the requirements of this section and submit an application, including a church leader verification. As long as you continue to meet these requirements and fulfill all membership responsibilities, your membership will continue.

We believe the following membership requirements benefit all members by being Scriptural, and also by minimizing medical risks and costs, ensuring proper accountability, and encouraging good health practices. SMI retains the discretion to remove from membership any member whose behavior violates Biblical standards such that they may bring the ministry into disrepute.

A. Be a professing Christian living by Biblical principles. Every adult on the membership must affirm the following member Statement of Faith:

**I believe in the triune God of the Bible. He is one God Who is revealed in three distinct Persons—God the Father, God the Son, and God the Holy Spirit.**
GEN 1:26 | LUKE 1:35, 3:21–22 | 2 COR 13:14 | MATT 28:18–20

**I believe Jesus Christ was God in the flesh and continues to be such even after His resurrection—fully God and fully man. He was born of a virgin, lived a sinless life, died on the cross to pay the penalty for our sins, was bodily resurrected on the third day, and now is seated in the heavens at the right hand of God the Father.**
ISA 7:14, 9:6 | MATT 1:22–23, 26:64 | MARK 16:19 | LUKE 24:38–40 | JOHN 1:1–2, 1:14, 1:29, 2:18–21, 5:18, 8:46 | ACTS 2:32–33 | 1 COR 15:3–4, 15:20–21 | 2 COR 5:21 | COL 1:15–20, 2:9 | HEB 1:1–4, 4:14–15, 7:26, 9:11–14, 10:10–12 | 1 PETER 2:22–24 | 1 JOHN 3:5

**I believe that all people have sinned and fallen short of God's glory and can be saved from eternal death only through faith in Jesus Christ, Whose atoning death and resurrection secures for us eternal life.**
JER 17:9 | JOHN 3:3, 14:6, 20:30–31 | ROM 3:9–11, 3:23, 5:12–21, 10:8–13 | EPH 2:8–9

B. As a community of Christians helping other Christians with their medical bills, every adult on a membership must attend a Biblical, Christian church regularly (at least three out of four weeks per month that your health or weather permits). If it is not possible for you to regularly attend a Biblical, Christian church, please submit a letter giving the details. HEB 10:25 *Fellowships, churches, temples, wards, and denominations that fall outside of Biblical, Christian faith—such as the Church of Scientology, Unitarian, Jehovah's Witnesses, and The Church of Jesus Christ of Latter-day Saints— do not qualify for the church attendance requirement.*

C. Believe you are to bear one another's burdens. GAL 6:2 | PHIL 2:4

D. Agree to: not abuse any legal or prescribed substance, abstain totally from illegal drugs and recreational use of marijuana, and abstain from tobacco use (a rare celebratory cigar or pipe, e.g. when a baby is born, is allowed). ROM 13:1 | 1 COR 6:12

E. Limit consumption of alcohol to moderate amounts and never drink to drunkenness, or cause another brother or sister in Christ to stumble. EPH 5:18

F. Abstain from any sexual activity outside of traditional Biblical marriage as designed by God between one biological man and one biological woman, which precludes rejecting one's biological sex in any manner. GEN 1:27, 2:24 | MATT 19:5 | 1 COR 6:18

G. Agree to practice good health measures in accordance with the principle that your body is the temple of the Holy Spirit. 1 COR 6:19–20

H. Keep your membership active by promptly sending your monthly assigned share to all regular needs assigned to you in your monthly newsletter mailing or eShare notification. A notice will be given to members who are late in sending shares, and they will lose eligibility to have their own needs shared until the issue has been corrected. If financial need is the cause of these problems, assistance may be available through the Sponsorship Program (*Section VC*). LUKE 16:10

Appx. Vol I
A-53

I. Agree that when you have a dispute with a fellow Christian, and your fellow Christian is willing to submit that dispute to fellow believers for resolution, you are not to sue each other in the civil courts or other government agencies. (*Section XII*). A person initiating a legal proceeding against SMI to become a member would disqualify himself from membership. 1 COR 6:1–8

J. Sign and send in your Membership Continuation Form each year, confirming that you are still meeting the above requirements. PROV 10:9

K. Have someone to whom you are accountable (pastor, elder, church official, small group leader, accountability partner, etc.) sign a statement confirming that you meet the above requirements. HEB 13:17

L. You will be required to agree to these requirements when you apply for membership and provide background information including your date of birth. Annually, you will need to reconfirm that you still meet these requirements.

If at any time you no longer meet all of these membership requirements, you must notify SMI immediately, and your membership and all privileges will be suspended unless otherwise indicated.

Your health status has no effect on your eligibility for membership.

However, there are limitations on the sharing of needs for some conditions that existed before membership. Other needs in which members share have specific requirements. For a detailed explanation of the types of needs that are shared or not shared by the members, see the shareable needs Guidelines (*Sections VI–IX*).

To be eligible to have a need shared, a member must be meeting all of the requirements of membership including being current with all shares, and the need must not be caused by conduct inconsistent with membership requirements.

**Appx. Vol I
A-54**

# II. Family Defined

A membership in Samaritan Ministries is limited to members of the same nuclear family. Nuclear family includes only husband, wife, and children, but can include grandchildren in the circumstances described in *II.F.* There are five primary sizes of participation for an SMI membership—one person; two persons (*two members of the same nuclear family*); three to seven person family; eight or more person family; and single parent with one or more children (*widowed, divorced, or legally separated*).

Any unmarried children age 17 and under, and unmarried children age 18 and over who meet the requirements of paragraph A, may be included as a child in a family membership. Their medical needs may be submitted for sharing if they meet the member requirements in *Section I* and are listed on the Membership Application/Continuation Form. Children 18 and over must verify that they meet the member requirements by signing an application form.

## A. Adult Children (*Age 18 and Over*)

Your single children from age 18 up to and including age 25 may be on your membership if they are living at home (*which includes while away at school full time*).

However, an 18 year old and over may not be on a membership with a sibling when no parent is active on the membership. Whenever that occurs, the older child will be split off to his own membership.

Single children age 26 and over may be on your membership if they are still living in your home and have an annual adjusted gross income (AGI) for federal tax purposes of less than 80 times the Samaritan Classic one-person membership monthly share.

***Example:*** *For the current Samaritan Classic one-person monthly share of $303, the AGI limit is $303 x 80, or $24,240.*
***Note:*** *This income exception will not be available after November 2020, and*

*children age 26 and over must split to their own membership by November 15, 2020. If the adult child turns age 26 without creating his own membership, he will be inactivated from Samaritan Ministries membership as of December 1, 2020. For more information about splitting off an existing membership, see Section XIV.D.*

If your child has a disability, there is administrative leeway for your child to remain on your family membership even after turning age 26. Contact your Member Services team before that date if you wish to apply for this status.

### B.  Marriage

When your children are married, they must have their own membership even if they qualify as your dependent, or are under age 26. The spouse will not be a part of the new membership until they submit an application.

### C.  Thirty Day Transition Allowance

1. **Children who become ineligible to be on their parents' membership**—as described in items *A* and *B*, will have a 30–day grace period to obtain their own membership after which they will no longer be considered part of their parents' membership. It is the child's obligation to be aware when he is responsible for his own membership.

2. **Gap Time**—Any incidents which occur from the time a child leaves his parents' membership to the date he begins his own, will not be shared.

### D.  Newborn

A newborn, whose addition to the membership will increase the monthly share amount, will be included within the membership retroactive to the date of birth, as long as at least one parent was a member as of the baby's birth and you notify SMI to add him to the membership no later than 30 days after the birth; otherwise, the effective membership date will be no earlier than the date of notification to SMI. SMI should be notified as soon as possible to add subsequent newborn children to the membership. Please be aware that there are specific Guidelines addressing sharing needs for a newborn (*Section IX*).

### E.  Adoption

Adopted, unmarried children are considered members of the family the same as biological children.

### F.  Grandchildren

Grandchildren may be included as part of their grandparents' membership if they meet all of the following criteria:

1. They live permanently with their grandparents (*their residence*), and
2. The grandparents have legal custody, or the grandchild is the child of a minor, and
3. They meet the eligibility Guidelines for children, and
4. They have no other agency, person, or group responsible for their medical bills.

### G.  Splitting Off a Membership

A child or spouse splitting off an existing membership will begin at the same level as the existing membership, but may immediately switch to a different level subject to the switching Guidelines in *Section XIV*.

## III. Responsibilities

Please familiarize yourself with the following duties so we can minister to each other more efficiently and effectively. Your faithful participation directly ministers to other members.

### A.  Check Your Mail

Each member should faithfully check the mail (*or email if you have chosen that option*) for the newsletter mailing or eShare notification, and promptly call the office to request the newsletter and your monthly share assignment if you have not received them by the 10th of the month.

**Appx. Vol I
A-55**

## B. New Members

To begin a membership, each new member sends a start-up administrative fee to the SMI office, along with their share for the first month. The start-up administrative fee is currently $200, and is non-refundable. New members will also normally be assigned to send their shares for the second and occasional third months to the office, although some may be directed to send to a member to maintain basic amounts of share money for needs.

## C. Sending Shares

After the first two or three months of membership, the next nine or ten months you will send your share to a member in need. Then, in your second year as a member, one month you will send your share to the office, and eleven months you will send your monthly share to another member with a medical need. Eleven months of shares to a member, and one to the office, will then continue as long as you remain a member.

A portion of members' monthly shares may be converted to administrative fees for expenses Samaritan incurs to facilitate sharing. These fees, when applicable, do not increase your monthly share amount. Members will be informed of the amount prior to any fees taking effect and on their monthly share assignment.

The assignment sheet in each month's email or newsletter mailing will tell where the monthly share should be sent. If your share check does not have your individual name on it, please make sure your name is on the memo line or other location so proper credit will be given to you. The share must be sent in U.S. currency.

## D. Monthly Share Amount (as of September 2023)

The amount you send each month depends on the membership level that you choose: Samaritan Classic or Samaritan Basic.

1. **Samaritan Classic**—See the Samaritan Classic monthly share chart for respective sharing amounts. Members must be from the same nuclear family.

---

**Samaritan Classic**
MONTHLY SHARE

| | |
|---|---|
| 1 Person* | $303 |
| 2 Person | $591 |
| 3–7 Person | $634 |
| 8+ Person | $771 |
| Individual ≤ Age 29 | $182 |
| Widowed/Divorced & Children | $462 |

*Note: To share maternity needs in either Samaritan Classic or Samaritan Basic, a membership of two or more people (or its equivalent) is required. See Section IX.A.1.*

If you need financial assistance with your share amount, see *Section V.C.* "Sponsorship."

2. **Samaritan Basic**—Your monthly share amount is based on the number of people in your family who are participating in the membership, and the oldest person of that group, as shown in the chart below. Members must be from the same nuclear family.

---

**Samaritan Basic**
MONTHLY SHARE

| | ≤29 years old | 30–44 years old | 45–59 years old | 60+ years old |
|---|---|---|---|---|
| 1 Person* | $105 | $132 | $153 | $175 |
| 2 Person | $218 | $261 | $304 | $349 |
| 3+ Person | $275 | $327 | $383 | $437 |

*Note: To share maternity needs in either Samaritan Classic or Samaritan Basic, a membership of two or more people (or its equivalent) is required. See Section IX.A.1.*

## E. Overseas Members

Must have a stateside contact through which to send monthly shares and to receive shares sent to help with a need in a timely manner. The Member Services department can waive the need for a contact, if the member demonstrates that requirements are met by other means.

## F. Sending Notes

Along with your monthly share, send a note of encouragement to the member with the medical need to which you are assigned. Also pray for this member and for other members listed in the Prayer Guide.

## G. Respect the Privacy of Other Members

Members share deeply personal prayer requests and detailed health information with one another to allow for specific prayer. While it is expected this information may be shared with family and prayer partners, please be sensitive: Do not post names or details on social media, blogs, or websites without permission, or in any other way misuse the information.

## H. Misuse of Trust and Accountability

At all times act with integrity and avoid the appearance of evil. Members presenting a falsified need, using deceptive practices, or participating in another member's misuse of trust will be dropped from membership.

When a need is submitted requesting other members share financially to relieve the burden of a medical expense, the member submitting the need is committing that those medical expenses will be paid immediately, if not already paid, to the extent of the sharing received unless a different arrangement has been made through the administrative office.

Members submitting needs further commit to work with SMI staff and partners to determine if the bills are shareable, to seek fair and reasonable prices from providers (see *Sections X.E and X.F*), and to document amounts paid to providers.

If a member receives more share money than the amount of his financial need, as a result of discounts or other changes, he will be directed to forward any extra share money to another member with a need or to the administrative office to assist with the cost of negotiating reductions in SMI members' medical bills.

When an issue of possible misuse of trust by a member arises (*whether or not still active or currently a member*), the administrative office may seek

the assistance of the member's Christian church and provide it with the necessary information to address the issue and hold the member accountable. The member may request resolution of the question through the mediation and arbitration provisions of *Section XII* of the Guidelines.

## I. Ending Membership

If you wish to end your membership, SMI must have received notice from you no later than the 15th day of the month that you want to be the last month in which you share, so that a member with a need will not be relying on receiving your share. (*E.g., if you want your last sharing month to be February, you must notify SMI by February 15.*) After the 15th of the month, SMI will be preparing share notifications to send the following month, counting on the share you have pledged to help meet the needs of our brothers and sisters.

## J. Modifying Membership Size

If you are continuing your membership but removing from the membership a spouse, or otherwise lowering the level of household participation, SMI must have received notice from you no later than the 15th day of the month that you want to be the last month in which you share the higher amount, so that a member with a need will not be relying on receiving the higher share amount. (*E.g., If you want your monthly share to be modified after February, you must notify SMI by February 15.*)

Additionally, if a spouse is being removed from the membership, the notice is not effective until written approval of the change signed by the removed spouse is received by SMI. See *Section XIV* regarding switching membership levels: Basic/Classic.

## K. Restarting a Membership After 30 Days

1. **And a Need has Occurred**—If you have a need occur (*whether new or related to a prior need*) after the date that your membership has ended, and you seek to restart your membership more than 30 days after the membership ended:

a. It will be treated as a new membership so all existing health conditions will be subject to the pre-existing conditions sharing limits discussed in *Section VII*, and

b. You may be required to pay a start-up fee, which is non-refundable.

**2. And No Need has Occurred**—If you seek to restart your membership and no need has occurred since your membership ended:

a. If you notify Member Services within 60 days after the membership ended and you catch up on any missed shares, your membership will be treated as if it never ended.

b. If you notify Member Services more than 60 days after your membership ended, it will be treated as a new membership, so all existing health conditions will be subject to the pre-existing conditions sharing limits discussed in *Section VII*, and you may be required to pay a start-up fee, which is non-refundable.

**L. Restarting a Membership After One Year**

If you seek to restart a membership more than a year after it ended, it will be treated as a brand new membership requiring a new application and start-up fee, and subject to the pre-existing health conditions sharing limits of *Section VII* as if you had never been a member. The start-up administrative fee is non-refundable.

# IV. Member Involvement

## A. Nominations and Elections

From SMI's inception, members have participated in determining how the ministry functions. Members continue to participate in important decisions by voting. Each membership receives one ballot, which counts as one vote for Board of Directors elections or any proposed share increases.

**1. For Board Members**—The SMI Board consists of nine members of SMI. Six Board members are elected by the membership to staggered three-year terms. (*Vacancies in these positions may be filled by Board appointment.*) Members nominate candidates and vote by mail. Elections are announced in the newsletter and held each fall. The qualifications for Board members are available upon request. Samaritan Ministries founder, Ted Pittenger, is a permanent Board member and will appoint the other two Board members.

If the elected positions are contested, the two candidates receiving the most votes are elected. A candidate only receiving a plurality will be the winner unless the Board determines that a runoff should occur between the highest candidates. If there is only one candidate for each position, members will be provided with a "Yes/No" ballot, and each candidate must receive a simple majority of the votes cast to be elected.

**To be eligible for Board membership, nominees must agree with the Bylaws doctrinal statements, including the following Board member Statement of Faith:**

- *I believe the Bible alone is the inspired Word of God; therefore it is the final and only source of absolute spiritual authority.*

- *I believe in the triune God of the Bible. He is one God Who is revealed in three distinct Persons—God the Father, God the Son, and God the Holy Spirit.*

- *I believe Jesus Christ was God in the flesh, and continues to be such*

even after His resurrection—fully God and fully man. He was born of a virgin, lived a sinless life, died on the cross to pay the penalty for our sins, was bodily resurrected on the third day, and now is seated in the heavens at the right hand of God the Father.

- *I believe that all people are born with a sinful nature and can be saved from eternal death only by grace alone, through faith alone, trusting only in Christ's atoning death and resurrection to save us from our sins and give us eternal life.*

- *I believe in the bodily resurrection of all who have put their faith in Jesus Christ, and the bodily resurrection to judgment of all who have not.*

- *All I believe and do should be for the glory of God alone.*

2. **For Share Increases**—All proposed share increases for Classic or Basic will be submitted to the membership of that program for their approval. The share increase will not be implemented if more than 50% of the households in that program vote against the proposed share increase.

3. **For Advisory Input on Other Issues**—The Board may seek an advisory vote of the members on any issue, e.g. whether to make changes in the Guidelines concerning what medical needs should be shared.

### B. Communicating With Each Other

At SMI we believe all members of the Body of Christ should give input for the mutual edification of the whole body. We encourage members to communicate with staff about all issues of health care. Your input can help us be more aware of ways to improve the ministry. You may know about new and effective medical treatments. You may know of ways to negotiate discounts or use alternate treatments to keep costs down. You may know of specific medical, spiritual, or financial needs. You may know of ways the staff can better serve our members and encourage a spirit of community. Input offered in a spirit of love is highly valued, and we welcome it. Our staff and members should always communicate with these scriptural admonitions in mind: "But the fruit of the Spirit is ... kindness ... gentleness" *GAL 5:22-23* and, "Let your speech always be gracious ..." *COL 4:6 (ESV)*

### C. Membership Level Requirement

All the persons in a membership must share at the same membership level, all either being in Samaritan Basic or all in Samaritan Classic.

# V. Additional Giving

Although we practice good stewardship by adhering to our Guidelines and limiting needs we share to what members have agreed upon, we also strongly encourage giving above and beyond what is required. This can be done through Special Prayer Needs, extra giving in proration months, the Sponsorship Program, and bequests. Because SMI is an IRS recognized 501(c)(3) tax-exempt charity, any of these gifts can be tax-deductible if given directly to SMI's Member Assistance Fund.

### A. Special Prayer Needs

Needs that do not meet the Guidelines may be eligible to be shared as Special Prayer Needs that members may give to in addition to their regular monthly share. SMI reserves the right to decide which needs will or will not be shared as Special Prayer Needs. Requests for needs to be submitted as Special Prayer Needs will be evaluated on such criteria as the extent of the financial burden, the availability of assistance from other sources, the degree to which the need was avoidable, and the amount of other pending requests.

Before submitting a Special Prayer Need, consider your financial resources, what reductions you have requested from providers, and what assistance is available from your family and local Christian church. Remember that the SMI membership will be giving beyond their monthly shares to lighten your burden. For questions concerning Special Prayer Needs call 877-764-2426 to speak to your Member Services team.

The $1,500 initial unshareable amount (*Section VI.A.4*) and the unshared amount due to the 90% sharing percentage (*VI.A.7.a*) in Samaritan Basic are not eligible for Special Prayer Needs.

All other unshared bills of a Samaritan Basic participant are eligible as a Special Prayer Need on the same basis as Samaritan Classic participants.

**B. Proration Months**

In months where a proration occurs, most members who had a shareable need that month will only have the prorated amount shared, which may still leave a significant burden on some families. In such cases the monthly assignment sheet will show you the extra amount you, and the other members assigned that need, would have to send so that the member's need would be fully met. All members are asked to prayerfully consider giving out of their surplus, beyond their minimum monthly share, to minimize the effect of the proration.

You may give extra directly to the member assigned to you, or if you want to be able to receive a federal tax deduction for your gift, send it to the office designated for the member assistance fund.

**C. Sponsorship**

Even though members work to keep the monthly share amounts as low as possible, there are still circumstances when an applicant or current member may not be able to pay the entire amount. Because we are committed to the central role of the family and the local Christian church in all of life, including health care, application for help through Sponsorship will require that these other avenues of assistance be explored first, so they have the first opportunity to receive the blessing of giving. For more information about how to apply for Sponsorship, please call us toll-free at 877-764-2426.

**D. Bequests**

When preparing your will or other estate planning, your estate can make a tax-deductible gift to assist your fellow believers with health care burdens, or designate for other ministries of SMI, like the Special Needs Adoptions fund and Disaster Relief. SMI can be identified as …

**Samaritan Ministries International • Peoria, IL • FEIN 37-1295601**

# VI. Amounts That Members Share

This section explains how the shareable amount of a member's medical expenses will be determined. There is no calendar year or lifetime limit on the number of conditions or the total dollar amount of different needs that may be shared. Itemized bills you want shared must be submitted within one year of treatment. Bills submitted more than a year after treatment will not ordinarily be shared.

**A. Sharing Amounts**

Medical needs are submitted on a per person per incident basis for illnesses or injuries resulting in visits to licensed medical professionals, emergency rooms, or hospitals (*inpatient and outpatient*).

1. **Need Defined**—Bills related to the same condition, including those for separate incidents, (*e.g. separate treatments or episodes of symptoms*) will be shared as one need and accumulate towards the $250,000 maximum amount shared in Samaritan Classic/$236,500 in Samaritan Basic. If at least 12 months pass without any symptoms, medication, or other treatment for the condition that originally created the need (*or related subsequent conditions*), and the condition thereafter recurs, it will be treated as a new need. Tests or a doctor's statement may be required to verify the lapse of symptoms, medication, or other treatment.

2. **Multiple, Simultaneous Needs**—If more than one shareable condition is treated during the same time period, the member may submit separate needs for each condition. Each need must be submitted with a separate Need Processing Form, whether submitting the need via postal mail or online via your Samaritan Dashboard. The initial unshareable amount will apply to each need.

3. **Minimum Amount to be a Shareable Need**—Needs of $400 or less for Samaritan Classic, and $1,500 or less for Samaritan Basic, are not considered burdens that should be borne by other members. **(Note:** *The $400 amount for Samaritan Classic took effect for needs started as of September 1, 2020.)* If a need of this size is a burden that the member cannot bear alone, help can be sought from family, friends, or local Christian church. For participants in Samaritan Classic it can be submitted as a Special Prayer Need.

4. **Initial Unshareable Amount**—When a need is greater than $400 in Samaritan Classic, or $1,500 in Samaritan Basic, only the portion of the need that exceeds those amounts will be shareable. See paragraph 5. (**Note:** *The $400 amount for Samaritan Classic took effect for needs started as of September 1, 2020.)* Due to current technical limitations, an amount less than $25 that is otherwise shareable may not be shared.

5. **Effect of Discounts**—

a. **For Samaritan Basic**—Payments by insurers and other organizations, and reductions by health care providers will be applied first, dollar for dollar, to the initial unshareable amount ($1,500) and any applicable proration of each need. Discounts do not affect the 90% sharing percentage of Samaritan Basic for need amounts over $1,500.

b. **For Samaritan Classic**—Effective for all needs started on or after September 1, 2020, payments by insurers and other organizations, and reductions by health care providers will not reduce the initial unshareable amount ($400) or any applicable proration of each need. Reductions and third-party payments will still apply toward the initial unshareable amount and proration for any need started prior to September 1, 2020.

6. **Maximum Amount**—The maximum amount shared for each need is $236,500 for Samaritan Basic and $250,000 for Samaritan Classic. *(If you desire to participate in need sharing for amounts greater than $236,500/$250,000, see the Save to Share program Guidelines. Massachusetts' members are required to participate in Save to Share.)*

There is no lifetime maximum sharing amount for any person or household membership.

7. **Special Guidelines for Participants in Samaritan Basic**—

a. **90% Sharing Percentage**—Needs for participants in Samaritan Basic are shared at 90% of the need amount that is over the $1,500 initial unshareable amount.

b. **Maximum 10% Co-share Amount**—The maximum amount unshareable due to the 90% sharing is $13,500.

c. **Maximum Shareable Amount**—Paragraphs **a** & **b** together make $236,500 the maximum amount shared in Samaritan Basic.

*Example: Member has a total of qualifying bills for a need in the amount of $252,000, with no discounts and shared in a month with no prorating.*

*The first $1,500 is not shared due to the initial unshareable amount, leaving $250,500 in qualified bills.*

*The $500 is over the $250,000 maximum bill amount considered, and is not shared unless the member is part of Samaritan Basic/Save to Share.*

*90% sharing of $250,000 makes $225,000 shareable. This would result in $25,000 not shareable, but because the maximum 10% co-share amount due to the 90% sharing is $13,500, then an additional $11,500 ($25,000 − $13,500) is added to the $225,000 making $236,500 eligible to share.*

**B.  Payments from Others**

**1. Others Obligated to Pay**—

a. **Insurance Type Arrangements**—Bills must be submitted to insurance, Medicare, Worker's Compensation, and any other payer who may be responsible, before submitting them to Samaritan Ministries. Members must receive notice of payment or rejection, and submit documentation thereof, before Samaritan Ministries will

consider sharing the need. Any amount paid by insurance, Medicare, Worker's Compensation, or any other responsible or liable party will not be shared. If a bill is shared and later reimbursed by a third party, or liability is released as part of a settlement, the reimbursed amount must be sent on to meet other members' needs, even if the amount of medical expense compensation is not specified in the settlement.

b. **Pursuing Legal Remedy**—If a member suffers an injury and a probable liable party or his insurance refuses to pay unless legal remedies are pursued, the member must pursue his legal remedies unless he demonstrates that doing so would violate his Biblically-based conviction against initiating a lawsuit. Conditions may be placed on sharing needs related to such injuries before the matter is settled. Amounts that are received in settlement, to the extent they fairly represent compensation for shared medical expenses, must be sent on to meet other members' needs.

2. **Other Available Assistance**—Seeking assistance from government aid programs is never required by SMI and is contrary to our understanding of God's desire for His people. However, if a non-governmental, secular, religious, or fraternal organization is willing to pay any portion of a qualifying medical bill and the member refuses to accept this payment, the member has then chosen not to have that portion of the bill shared, unless the member demonstrates that accepting the assistance would violate his Biblical conviction. Funds raised by crowdfunding for shareable medical expenses must be reported to SMI and will be applied to reduce the shareable amount.

3. **Health Reimbursement Arrangement (HRA), Flexible Spending Account (FSA), and Health Savings Account (HSA)**—A member who has the right to a reimbursement from an HRA, FSA, or HSA for a shareable medical expense is not required to pay the bill with his HRA, FSA, or HSA although he should consider whether this resource should be used to lessen the burden that the other members will bear. If HRA, FSA, or HSA money is used to pay the expense, then that expense may still be submitted to be shared.

*Note: There may be income tax consequences from using reimbursements from an HRA, FSA, or HSA to pay for an expense for which you also received share amounts. Please consult your tax advisor.*

4. **Other Health Care Sharing Organizations**—If a member simultaneously participates in another health care sharing ministry, he may not seek shares/payments from multiple ministries in excess of his shareable bills, for to do so is to obtain assistance beyond his burden.

**C. Discounts**

Discounts given by any health care provider should be listed in the Discounts column on the Bill List and will not be shared. However, in Samaritan Basic only, discounts do reduce the initial unshareable amount (see VI.A.5) and the amount subject to prorating (see VI.D.2).

**D. Balancing Needs and Shares/Proration**

The amount of a need that is shared may be affected by the amount of other members' needs. Each month there is a fixed amount of committed shares available from members to be sent out to meet needs. However, the needs of members fluctuate, and in any one month may be greater, or less, than the shares available. Needs take varying amounts of time to process to be ready for sharing, and there is never an exact match between the amount of shares available for a month and the needs that have been received. Many times the mismatch between needs and shares is remedied by overlapping needs received in two months, but occasionally the discrepancy is too large for this simple adjustment. The handling of large fluctuations is described below:

1. **When Shares are Greater Than Needs**—If the shares available for a particular month are greater than the needs to be shared, and all of the unshared prorated needs from the previous month are also met, needs for the following month may be shared or the share amounts assigned to the members may be reduced for the month.

2. **When Needs are Greater Than Shares/Prorating**—It is our goal that all qualifying needs presented by the members will be shared. However, in the event that the shareable needs are significantly

greater than the shares available for that particular month, we may use a prorating contingency plan. For example, if $1,000,000 in total needs are to be shared in a given month, but only $900,000 in shares are available, we will take the percentage of shares as compared to needs—900,000/1,000,000 = 90%—and apply that percentage to each need. Thus, we will share 90% of the normal shareable amount of each need presented for that particular month. If you have a need for which $1,000 would normally be shared, $900 would actually be shared that month. If you participate in Samaritan Basic, the 90% proration would first be applied, leaving $900 (*assuming no offsetting discounts*), and then multiply that amount times the 90% sharing percentage (*$900 x 90%*) making $810 the amount shared. We will ask members to pray that God will provide for the unshared portion of these needs in the following month. Members will also be encouraged to give more than their normal monthly share to help make up the shortfall. See Section V.B.

If in the month following the prorating we find that the shareable needs are less than the shares available, we will consider carrying over the unshared portion of prorated needs from the previous month. Once a deficit has run and one month has passed, we will not usually carry over the unshared needs to subsequent months. However, we will consider sharing prorated needs that are an excessive burden to a member as a Special Prayer Need. See Section V.A. In Samaritan Basic only, if medical providers have given you discounts on your bills, the discounts will be applied first to the initial $1,500 unshareable amount, and then to the amount that is prorated, reducing or eliminating the impact of prorating on your need.

**Special Prorating Guidelines for Participants in Samaritan Classic—**

a. **Maximum Prorated Amount**—Effective for all needs started on or after September 1, 2020, a need will not be prorated more than $2,500. A member would need to have a total of $83,500 in bills (*after discounts*) prorated at 3% to reach the maximum prorated amount. Bills submitted on the same need in non-prorated months would not contribute to this total since those bills are not prorated. If proration

occurs for multiple months, the Board may increase the maximum prorated amount as needed.

*Example: A need of $150,000 receiving a $50,000 discount leaves a total amount of $100,000 in shareable bills. If the entire $100,000 is prorated at a standard amount of 3%, it would result in a prorated amount of $3,000 ($100,000 x .03). Thus, the need would be prorated the maximum amount of $2,500 instead of $3,000, and Samaritan would share $97,500 in shareable bills.*

3. **Samaritan Basic/Samaritan Classic/Future Programs**—The balancing of needs and shares calculations may be done by sharing across two or more programs or by keeping them separate, as allowed by the SMI Board of Directors.

E. **Time Limit for Submitting Documentation**

The sooner that bills are submitted to SMI usually means the larger the reduction in price that can be obtained from the provider through negotiations. When there are a number of bills related to treating the same incident, it is helpful for them to be submitted together if they all can be obtained within a 30-day period. With this in mind, itemized bills should be submitted to the Samaritan office as soon as possible (*either by mail using the Need Processing Form or online via your Samaritan Dashboard*). Ordinarily, bills submitted more than one year after the service was provided will not be shared.

# VII. Pre-Existing Conditions

Expenses for any medical service/treatment provided during your membership which meets these Guidelines are shareable while you are a member in good standing except as explained below or as otherwise agreed prior to membership.

If you ever switch membership levels from Samaritan Classic to Samaritan Basic, see Section XIV for an explanation of how your membership start date

will change for purposes of determining whether a condition is pre-existing.

## A. Conditions Cured & 12 Months Symptom and Treatment Free

Needs that result from a condition that existed prior to membership (known or producing observable symptoms) are only shareable if the condition appears to be cured, and 12 months have passed without any symptoms (whether or not benign), treatment, or medication (even if the cause of the symptoms is unknown or misdiagnosed). Tests or a doctor's statement may be required to verify the lapse of symptoms, treatment, and medication.

*Exception: For genetic disorders, hereditary diseases, cases of related cancers, and for heart conditions, the symptom/treatment-free period is five years.*

*Please note: New needs are not considered as "resulting from a condition that existed before membership" unless the prior condition actually caused the new need. Be aware that even though a condition may appear at one time to have been cured, there could be a subsequent relapse or complication which is a result of the original condition. SMI may require that the member provide a written opinion from a physician that the current need was not caused by the prior condition. Even though a need may not be shared because it resulted from a condition existing before membership, it may still qualify to be shared among our members as a Special Prayer Need. See Section V.A.*

## B. Conditions Stabilized and Five Years Symptom Free

A condition will not be considered as existing before membership, even though it may be known that it is not "cured," if all these are documented by the member to be true for at least five years at the time your membership began, or sometime thereafter:

1. The condition had not been treated nor was future treatment prescribed/planned;

2. The condition had not produced harmful symptoms (*only benign symptoms*); and

3. The condition had not deteriorated.

New members are strongly encouraged to have the condition evaluated by their physician at the time of becoming a member to document that it has not deteriorated since the previous evaluation, or to establish a baseline. The statement described in *Section VII.D* will be required at the time bills are submitted for a need related to such a condition.

## C. Exceptions for Diabetes, High Blood Pressure, and Cholesterol Level

1. **Diabetes**—Needs resulting from Type 1 diabetes that existed prior to a membership will not be shared even though the member went 12 months without symptoms, treatment, or medication.

2. **Diabetes Explained**—By Type 1 diabetes (*also called juvenile onset diabetes*), we mean that condition where the body produces insufficient insulin. Type 2 diabetes (*also called "non-insulin dependent diabetes"*), the condition where your body is insulin resistant, and gestational diabetes, are subject to a 12-month symptom and treatment-free limitation. The condition commonly referred to as "pre-diabetes" will not be considered a condition existing before membership.

**For Type 2 diabetes, you will have met the 12-month limitation if:**

a. at least 12 months have passed without any symptoms, treatment, or medication; and

b. in the month before and the month after the 12-month period (*and anytime you are tested in-between*) your Hemoglobin A1C test level is 7 percent or below. Documentation of these test results must be provided to the office.

3. **High Blood Pressure Exception**—High blood pressure will not be considered a "condition existing prior to membership" even if you have not gone 12 months symptom-free, as long as you have not been treated at a hospital for high blood pressure in the past five years, and you are able to control the condition through medication or diet. Medication for treatment as a chronic condition will not be shared.

**4. Elevated Cholesterol**—Is not by itself considered a pre-existing condition, nor the mere fact that a person is taking a prescribed statin drug. However, if the prescription is for diagnosed arteriosclerosis for a particular location (e.g. heart, carotid artery), that condition would be pre-existing as to that location.

## D. Verification for Certain Conditions

For some of the conditions listed in Section VIII, a statement signed by both the member and the doctor must be submitted, verifying that the condition did not exist prior to membership, or that the member went at least 12 months (up to five years for some conditions) without symptoms, treatment, and medication subsequent to the last time the condition occurred before becoming a member.

## E. Dropping and Rejoining

A condition that developed while a person is a member, will be considered a condition existing before membership if the person ends his membership, and later rejoins, unless:

**1.** the condition meets the cured/symptoms/treatment criteria of Section VII.A;

**2.** this membership was in good standing when ended, and the person was at all times while not a member either:

  **a.** insured under a required employer group insurance plan with creditable coverage (if available, the member may be required to purchase COBRA coverage to deal with ongoing treatment); or

  **b.** a member of another health care sharing ministry with a reciprocal arrangement.

(Conditions that developed while a person was not a member will still be governed by the limitations of Sections VII.A, B, and C.); or

**3.** other provisions were made in writing at the time the membership ended.

## F. Adoption

Any physical condition of which the adopting parents had reason to be aware that the adopted child had prior to the adopting parents being legally responsible for the child's expenses, or prior to his effective date within his parents' membership, will be considered a "condition that existed before membership." However, routine maternity needs may be shared as provided in Section IX.A.6 and needs related to genetic disorders and hereditary diseases may be shared as provided in Section VIII.A.

# VIII. Need Sharing

We share expenses you incur for providing medical care to your your membership household, within the Guidelines approved by the members or the Board of Directors (including the dollar and time limits of Sections VI and VII).

Every effort continues to be made to write the Guidelines to be simple and understandable. It is staff's goal to find some way to share your medical bills within the constraints of what you as members have agreed through the Guidelines. If there is disagreement on the issue of shareability, there are multiple layers of appeals within staff, and ultimately the matter can be decided by a panel of members. See Section XII.A.

The approved Guidelines place some limitations on the types of physical maladies and medical services for which we share needs, and limit the sharing of expenses incurred due to injuries from certain listed causes. We do not require that treatments be approved by the American Medical Association, and welcome nutritional treatment approaches within the limits described in Section VIII.

This section is designed to allow you to quickly check the physical condition (Part A), and the medical services needed (Part B), to confirm whether or not a particular medical expense is shareable. There are special provisions for injuries from motor vehicle accidents (Part C), and a few services and charges that are not shared (Part D). Please call your Member Services team

if you have any questions regarding the application of these Guidelines. Also, see *Section XI* regarding advisory opinions and binding decisions.

## A. Physical Conditions

Expenses for all types of physical conditions are generally shareable—subject to the treatment limitations of *Part B*—and with special provisions for some conditions as explained below:

1. **Asthma**—Shareable. During the first three years of membership, the statement described in *Section VII.D* may be required.

2. **Back Problems**—Shareable. During the first five years of membership, the statement described in *Section VII.D* may be required.

3. **Bunions**—Shareable. During the first three years of membership, the statement described in *Section VII.D* may be required.

4. **Cancer**—Shareable, but there may be a limitation if it is related to cancer of a type you had prior to becoming a member (*see Section VII.A*). During the first five years of membership, the statement described in *Section VII.D* may be required.

5. **Carpal Tunnel Syndrome**—Shareable. During the first three years of membership, the statement described in *Section VII.D* may be required.

6. **Complications from Maternity**—Bills for complications to the mother are considered part of the maternity need. See *Sections IX.A.3* and *IX.C* for details.

7. **Complications Following Non-Shareable Medical Procedures**—If complications arise from a medical procedure that is not shareable (*e.g. a routine colonoscopy and most cosmetic surgery—see Section VIII.B*), expenses for treating the complications are shareable unless the procedure that was the cause was not shareable due to moral reasons (*e.g. Abortion—see Section VIII.D.1*), or the complication itself is not

shareable (*e.g. a routine dental problem arising from the treatment of a routine dental problem*).

8. **Dental Conditions**—Dental services are not shared, except when required due to an eligible accident or as a necessary accessory to treating another non-dental condition, such as an eligible genetic disorder (*see Section VIII.A.11*). The following accidents are considered ineligible: the breaking or injury of natural teeth caused by dental care, when eating, or by ineligible motor vehicle accidents (*see Section VIII.C.2*).

Eligible dental needs are subject to the respective initial unshareable amounts of $400 for Samaritan Classic, and $1,500 for Samaritan Basic with the 90% sharing percentage.

9. **Diabetes**—Shareable, unless it is related to diabetes you had prior to becoming a member and it does not come within the exception described in *Section VII.C.2*. During the first five years of membership, the statement described in *Section VII.D* may be required. Sharing of the cost of prescriptions for medication or supplements to treat diabetes is subject to a 120-day supply limit.

10. **Foot Disorder and Bunions**—Shareable. During the first three years of membership, the statement described in *Section VII.D* may be required.

11. **Genetic Disorders**—Shareable when at least one of these is true:

   a. Neither the condition nor a symptom of the condition was discovered until after membership had begun;

   b. The condition has not required treatment or produced harmful symptoms, and has not deteriorated for at least five years;

   c. The condition exists in a person who has been included in a membership from birth, and the mother was included in a membership prior to the pregnancy; or

   d. If the condition exists in a person who was adopted, the person has been included in a membership since the adoption, and the

adopting parents were unaware of the condition at the time the adoption was finalized.

12. **Heart Conditions**—Shareable unless related to a heart condition you had prior to becoming a member, and it does not come within the exceptions described in Section VII. During the first five years of membership, the statement described in Section VII.D may be required.

13. **Hemorrhoids**—Shareable. During the first three years of membership, the statement described in Section VII.D may be required.

14. **Hereditary Diseases**—Shareable under the same conditions as Genetic Disorders.

15. **Hernia**—Shareable. During the first three years of membership, the statement described in Section VII.D may be required.

16. **High Blood Pressure**—As long as you have not been treated in a hospital for high blood pressure in the past five years, and you have been able to control this condition through medication or diet, an incident that begins after your membership begins is shareable. It also qualifies for one 120-day period for sharing of prescription expenses (see Section VIII.B.28), as long as you were not previously on medication. Medication thereafter for treating a chronic condition is not shareable. See Section VII.C.3.

17. **Pregnancy/Maternity**—See Section IX for the special provisions.

18. **Prostate Conditions**—Shareable. During the first three years of membership, the statement described in Section VII.D may be required.

19. **Sexually Transmitted Diseases (STDs)**—HIV, AIDS, or other STDs contracted due to the actions of others (e.g. *blood transfusions or medical procedures*) will be shared. We do not share needs for sexually transmitted diseases, including the HIV virus and/or AIDS, when contracted by consensual sex outside of marriage, or through

irresponsible behavior such as sharing hypodermic needles for legal or illegal drugs. It is the member's responsibility to explain how the disease was contracted.

20. **Sleep Apnea**—Shareable. During the first three years of membership, the statement described in Section VII.D may be required.

21. **Temporomandibular Joint Dysfunction (*TMJ*)**—Shareable. During the first three years of membership, the statement described in Section VII.D may be required.

## B. Sharing Limits

Visits to licensed medical professionals, emergency rooms, hospitals, testing facilities, and outpatient surgery for lawfully-prescribed treatments by a licensed medical professional for injuries and illnesses are generally shareable. "Licensed medical professional" may include for example: osteopaths, naturopaths, chiropractors, and various credentialed levels of nurses, for which we will generally share the expense for what they may lawfully diagnose and/or treat under the license of their jurisdiction. Such lawfully-prescribed treatments will be shared if provided by one licensed or certified to provide that treatment within the limits of these Guidelines. Treatments provided by non-medical personnel, e.g. acupuncture and massage, must be lawfully prescribed by a licensed medical professional and documentation of the prescription may be required. A "Doctor of Acupuncture" or "Doctor of Oriental Medicine" is not considered a "licensed medical professional" for these purposes. Expenses for services rendered in any part of the world are shareable as long as the documentation meets the requirements of Section X.M. There are special rules and limitations for some services, and some services are not shareable as explained in this Section B:

1. **Alternative Medical Practices (or non-conventional treatments)**— An "alternative medical practice" or "treatment" is a treatment proposed by a member for a condition diagnosed by a licensed medical professional, but not prescribed by the member's provider. The member must present the request in writing, describing in detail the proposed treatment, the length of time envisioned for the treat-

ment, their source of information about the treatment, and why it is not being prescribed by their provider. Alternative treatments may be shared with prior written approval from Samaritan Ministries. Approval is based upon factors such as the less invasive nature of the proposed treatment, demonstration that such treatment will prevent more costly conventional treatments, consistency of the treatment with what a licensed medical professional would prescribe for illness or injury, and the member's acceptance of appropriate preconditions for sharing the expenses.

2. **Ambulance**—See "Medical Transportation" (*Section VIII.B.20*).

3. **Audiological**—Surgery to correct hearing issues due to illness, accident, or congenital disorder is shareable. Hearing aids or any related examination or fitting, are not shareable unless for hearing loss caused by accident or disease (*e.g. not shareable if due to aging or extended exposure to loud noise*). Cochlear implants (*and the related consultation and therapy*), prosthetic inner ear stimulators, and similar implanted devices are shareable if a physician has provided written verification that the hearing loss cannot be addressed by non-surgical means.

4. **Biofeedback Therapy**—Will be shared if lawfully prescribed by a licensed medical professional for treatment of a disease, injury, or physical condition, but not if strictly for a mental disorder. Documentation of the prescription may be required and it is subject to the global therapy session limit (*Section VIII.B.37*).

5. **Chiropractic**—Services are shareable, including ancillary items, such as prescribed nutritional supplements for up to 120 days and X-rays. Each office visit where adjustments, manipulations, or other therapy occurs counts towards one of the 40 total therapy-type visits allowed for any one need (*Section VIII.B.37*). To be shareable, billings for each treatment must indicate the condition being treated. Maintenance treatments are not shareable.

6. **Colonoscopy**—A colonoscopy is shareable when prescribed due to symptoms for a condition not evident prior to your membership, or when it results in the discovery of a shareable condition. Regular tests and checkups (*Section VIII.B.36*) are not shareable.

7. **Concierge Medicine**—See "Direct Primary Care" (*Section VIII.B.10*).

8. **Cosmetic Surgery**—Cosmetic surgery for disfiguration caused by amputation, disease (*excluding acne*), accident, and breast reconstruction following a mastectomy is shareable. All other elective cosmetic surgery done primarily for non-health reasons, including breast reduction or enhancement operations, is not shareable. See *Section VIII.A.11* for cosmetic surgery related to a genetic disorder.

9. **Dental**—See "Dental Problems" (*Section VIII.A.8*).

10. **Direct Primary Care**—Both "Direct Primary Care" and "Concierge Medicine" are methods by which consumers pay a regular fee, usually monthly, to secure more favorable access to a primary care physician. That monthly fee for a member's household is shareable, within the limit for tests and checkups (*Section VIII.B.36*), as part of a shareable need, up to $100 for any month in which, in regards to that need, the physician is consulted, makes a referral, or charges for services.

11. **Fertility**—Fertility treatment or testing is not shareable. However, medical expenses for an embryo adoption and implantation by a married couple will be eligible for sharing as a Special Prayer Need.

12. **Homeopathic**—Homeopathic prescriptions and treatments will be shared as long as within the allowed practice of a licensed provider.

*Note: While many licensed providers use homeopathic methods, no U.S. state licenses homeopaths as such. So treatment from an unlicensed person who has a private certification as a homeopath is only shareable as an Alternative treatment. See Section VIII.B.1.*

13. **Hormone, Infusion, and Intravenous Therapy**—Shareable if prescribed to treat a specific condition, and a treatment plan signed by the provider is submitted. There may be a limitation placed on the number of sessions, and maintenance treatments are not shareable.

14. **Hospice Care**—Hospice care services will be shared for 90 days upon prescription by a physician or certification that the person is terminally ill. Additional 90-day periods will be shared with a renewed prescription/certification subject to the per-need dollar maximum.

15. **Hyperbaric Therapy**—Shareable if prescribed for treatment of a specific injury or illness. Outpatient sessions will be included in the 40 total outpatient therapy sessions allowed for any particular need. See *Section VIII.B.37.*

16. **Massage (Therapeutic)**—Therapeutic massage sessions are shareable if lawfully prescribed by a licensed medical professional to treat a specific medical condition. Outpatient massage sessions will count toward the 40 total of all therapy-type sessions limit for any one need. See *Section VIII.B.37.* To be shareable, billings for each treatment must indicate the condition being treated. Maintenance treatments are not shareable.

17. **Medical Equipment—Rental/Purchase**—Medical equipment is shareable if it is both necessary to treat a shareable condition, and if it assists with a therapy eligible for sharing (*Section VIII.B.37*), or it assists the member to perform normal life functions inhibited by an eligible condition within the following limits:

a. **Shareable Up to 10 Times the Monthly Samaritan Classic 3-7 Person Share Amount**—Currently $6,340 ($634 x 10), for any one need in both Samaritan Basic (*subject to the 90% sharing percentage*) and Samaritan Classic, if a documented prescription is provided.

1) **Rentals**—After one month, the additional rental cost of an item is shareable only by providing the cost of purchasing the item.

2) **Maximum for an Item**—Any one item costing over three times the monthly Samaritan Classic 3-7 person share amount, currently $1,902 ($634 x 3) for both Samaritan Basic and Samaritan Classic, requires written pre-approval and sharing may be subject to conditions including limits on the amount shared. The purchase price of an item will be the maximum total amount shareable for that item whether rented or purchased.

3) **Equipment Not Shared**—Indoor/outdoor exercise or gym equipment, home improvements to residences (*anything that attaches to the dwelling*), vehicles, or computers, iPads, and software.

4) **Additional Amounts**—An additional amount over $6,340 may be shared if pre-approved in writing and substantial savings over other treatment options are demonstrated for that item, whether rented or purchased.

b. **Maintenance/Repair/Replacement**—

1) The cost of maintaining, repairing, or replacing equipment is not shareable.

2) Any one item costing over three times the monthly Samaritan Classic 3-7 person share amount, currently $1,902 ($634 x 3) for both Samaritan Basic and Samaritan Classic, requires written pre-approval and sharing may be subject to conditions including limits on the amount shared.

c. **Sharing of Supplies for Equipment**—Is subject to the 120-day Guideline limit for medical supplies. See *Section VIII.B.18.*

18. **Medical Supplies**—Medical supplies related to treating a qualifying medical condition are shareable for the customary cost of 120 days of treatment. All supplies provided during inpatient hospital stays and as a part of outpatient treatment by a medical provider will be

shareable. Subsequent sharing for maintenance of the same condition will occur only when there is a new need. See *Section VI.A.1*. Medical supplies that are intended to provide a direct medicinal effect treating a specific condition (*e.g. creams, oral mixtures, ointments, essential oils, regardless of method of ingestion or application, etc.*) require the recommendation or prescription of a licensed medical provider, including appropriate dosages.

19. **Medical Tourism**—SMI encourages its members to consider using distant providers when there are substantial savings. See the SMI website for more information. See "Travel Expenses" (*Section VIII.B.39*) for more details.

20. **Medical Transportation**—Medical transportation, including ambulance services and life flights to hospitals, is shareable in emergency situations or when prescribed by your health care provider for transport for admission to another medical facility. Transportation for appointments is not shared.

21. **Naturopathic**—Naturopathic adjustments, manipulations, and similar treatments are subject to the same 40 office visits limit as other therapy (see *Section VIII.B.37*). Other treatments lawfully provided by a licensed Doctor of Naturopathy that meet all other requirements will be shareable.

22. **Newborn Care**—See the Maternity and Newborn Guidelines (*Section IX*).

23. **Nutritionists**—Services of nutritionists, dietary consultants or herbalists, and nutritional products are not eligible for sharing unless they are licensed or certified to provide the service, and the service is prescribed by a licensed medical professional or, if the member is hospitalized, prescribed by a member of the hospital staff. Prescribed nutritional supplements are shareable for the customary cost of a 120-day supply, not including inpatient hospital stays. The Guidelines for "Alternative Medical Practices" may also apply in some cases (*Section*

VIII.B.1). See also "Supplements" and the special provisions for treating cancer (*Section VIII.B.35*).

*Exceptions: The cost of prescriptions of nutritional products for maintenance treatments of chronic or recurring conditions (e.g. diabetes, eczema, blood pressure control) is not eligible for sharing beyond a one-time, 120-day period. Subsequent sharing for nutritional products for the same condition will occur only when there is a new need. See Section VI.A.1.*

The cost of nutritional education and educational materials is not shareable.

24. **Optical**—Expenses related to cataracts, glaucoma, and other diseases or injury (*including cornea replacement due to disease or injury*) are shareable. Vision therapy is shareable, and outpatient therapy will be included in the 40 total outpatient therapy sessions allowed for any particular need. See *Section VIII.B.37*.

Routine and corrective optometric services, exams, or tests, including eyeglasses, contacts, eye refraction, LASIK surgery, cornea replacement, surgery, or other services when done primarily for corrective or cosmetic reasons unrelated to disease or injury are not shareable.

25. **Organ Transplants**—The costs to the member recipient of a routine (*not experimental*) organ transplant (*including costs of the donor*) are shareable, and are subject to the limitations for conditions that existed prior to membership (*Section VII.A and B*). The costs of a member donating a transplant is shareable only if the recipient is a member.

26. **Osteopathic**—Adjustments and manipulations, etc., are subject to the same 40 office visits limit as other therapy (see *Section VIII.B.37*). Other treatments that a licensed osteopath lawfully prescribes and that meet all other requirements will be shareable.

27. **Physical Therapy**—Shareable for injury or illness-related physical therapy received while you are in the hospital and for up to 40 sessions for outpatient therapy. Outpatient sessions will be included in the 40 total outpatient therapy sessions allowed for any particular need. See *Section VIII.B.37*.

28. **Prescriptions**—We share up to a 120-day supply of any prescription for medication related to a qualifying medical condition purchased within 120 days of the date of the first prescription purchased for a need. Direct treatments for cancer, e.g. chemotherapy and drugs that treat the pain and side effects (*but not maintenance or preventative*), anti-rejection drugs, and sublingual immunotherapy (*a curative treatment for allergies*) are not subject to this limitation. All medication, prescribed or not, administered during inpatient hospital stays will be shareable.

*Note: We do not share the cost of prescriptions for maintenance of chronic or recurring conditions (e.g. diabetes, eczema, blood pressure control) beyond a one-time, 120-day supply (Subsequent sharing of a prescription for maintenance of the same condition will occur only when there is a new need. (See Section VI.A.1.) We do not share expenses for psychotropic medications for chemical imbalances unless they are verified by laboratory tests.*

29. **Prosthetics and Orthotics**—Prosthetics are artificial devices that "replace or augment a missing or impaired part of the body." An orthotic is a support or brace for weak or ineffective joints or muscles. The initial costs of prosthetics and orthotics are generally shareable.

a. **Certain Prosthetics Limited**—Prosthetics for hair, teeth, and breasts are generally not shareable with certain exceptions for accidents and disease (see *Section VIII.A.8 "Dental Problems"* regarding teeth, and *Section VIII.B.8 "Cosmetic Surgery"* regarding breasts).

b. **Replacements and Maintenance Limitations**—

1) **Implanted**—Expenses for replacements and maintenance of prosthetics and orthotics that are surgically implanted are generally shareable. During the first five years of membership, the statement described in *Section VII.D* may be required if the device was implanted prior to membership, to document that the problem with the device was not pre-existing.

2) **Not Implanted**—To the extent that a prosthetic or orthotic is not implanted (*i.e. it can be maintained externally without surgery or other intrusion into the body*), costs of maintenance or replacement are not shareable unless it is for a condition that did not exist before membership and:

a) the expense is due to a change in the physical condition of the member; or

b) it is damaged in an accident. A failure during normal use is not an accident.

3) **Teeth**—Maintenance and replacement for implanted teeth will be shared under the same Guidelines as natural teeth. See *Section VIII.A.8*.

4) **Heart-Related Devices**—If the device is being used due to a heart condition which existed prior to membership, replacement and maintenance will be shareable after a five-year, maintenance-free period if there was no indication (*besides the lapse of time*) at the time of joining that replacement might be necessary in the next 12 months. The five-year period can run both before and after joining.

30. **Psychiatric Care**—Inpatient psychiatric care due to involuntary commitment, and psychiatric treatment for changes in the brain due to injury or physical illness are shareable up to $50,000 per condition (*as a part of the $250,000 need limit if not in Save to Share*). Psychotropic medication to treat chemical imbalances not demonstrable by lab tests is not shareable except for the situations described above. No other type of psychiatric care or services is shareable.

31. **Psychological Services**—Psychological services including psychophysiology are not shareable.

32. **Sexual Dysfunction**—Treatments for sexual dysfunction are not shareable unless due to injury or disease.

33. **Speech Therapy**—Therapy needs for treatment of speech problems related to an illness or accident (e.g. stroke) are shareable and subject to the 40 outpatient therapy session limit per need, but developmental related speech therapy is not shareable. See Section VIII.B.37.

34. **Sterilization**—Elective sterilization such as tubal ligation and vasectomy, or the reversal of the same, is not shareable. But, reversals may be shareable as Special Prayer Needs. See Section V.A. Procedures that result in sterilization are shareable if the reason for them is to treat a medical condition.

35. **Supplements (i.e. products taken orally that contain a dietary ingredient)**—We normally share up to a 120–day supply of any nutritional supplement recommended or prescribed by a licensed medical professional, to treat a specific injury or illness, purchased within 120 days of the date of the first such supplement purchased for a need. A Supplement Treatment Plan form completed by a licensed medical professional must be submitted. The form can be obtained from the Member Services department.

The 120-day supply limitation for supplements does not apply for the term of a pregnancy, nor when prescribed or recommended as a treatment (whether primary or secondary) for a diagnosed and continuing cancer condition; however, an updated Supplement Treatment Plan may be required periodically. Once the cancer is in remission, the 120–day supply limit will begin to apply.

a. Food products will not be shared. Products used to replace or replicate portions of an individual's diet will not be shared (e.g. meal replacement shakes, protein powders, food bars, and vitamin/infused drinks, teas, herbs, etc.).

b. Orally ingested essential oils are classified as "medical supplies," per Section VIII.B.18.

36. **Tests and Checkups**—Tests are shareable only when prescribed by a licensed provider because of symptoms that are evident for a condition that was not evident prior to becoming a member. Follow-up tests or checkups are not shareable more than one year after an illness or injury is: (1) stabilized after treatment, (2) in maintenance, or (3) in remission or is cured.

37. **Therapy/Chiropractic**—

a. For a therapy to be shared it must be an eligible treatment that is lawfully prescribed by a licensed medical professional (see Section VIII.B Intro) for a specific eligible condition:

1) **It must be a physical condition being treated**—not a psycho-logical, emotional, or spiritual condition. Examples of conditions we don't share for: Attention Deficit Disorder, Attention Deficit Hyperactivity Disorder, Sensory Processing Disorder, Post Traumatic Stress Disorder, and cognitive developmental issues.

2) **It must be a physical treatment**—not a psychological treatment. It can be physical by any of the below:

   a) **Direct physical manipulation**—e.g. chiropractic/naturopathic/ osteopathic adjustments, physical & occupational therapy;

   b) **Indirect physical manipulation**—an outside agent's stimuli prompts self-manipulation—e.g. speech therapy (non-developmental), biofeedback (non-psychological);

   c) **A physical agent (matter or energy) impacts the body**—e.g. radiation, oxygen, ultrasound, or heat.

**b. Limits on Visits**

**1) We share—**

a) **Inpatient**—all eligible therapy sessions administered as part of receiving inpatient care (e.g. while admitted to a hospital, or a long-term care hospital. Therapy at an inpatient rehab center is shareable for up to 45 days.) Inpatient services do not count toward the 40-session outpatient therapy limit;

b) **Outpatient**—potentially up to 40 sessions of eligible outpatient therapy of all kinds combined for any one need. However, sessions prior to reaching the 40-session limit are no longer shareable:

i) when they become maintenance, or

ii) after one year unless a treatment plan allowing such treatments has previously been submitted and approved.

2) A single visit to an outpatient health care provider will only be counted as one therapy session, even if multiple types of therapy are provided during that single visit.

3) The 40-session limit does not apply to outpatient therapy that is a direct treatment for cancer or treats the pain or side effects of chemo/radiation.

**c. Misc. Requirements and Limitations**

**1) Not Eligible for Sharing—**

a) Therapy that is simply maintenance, preventive, or to improve wellness/performance where no harmful symptoms are present for which the therapy is prescribed to improve;

b) Remote therapy where the patient and the source of therapy

are not in the same location. Services such as telemedicine consultation and prescriptions are eligible for sharing.

38. **Transplants**—See "Organ Transplants" (*Section VIII.B.25*).

39. **Travel Expenses**—Travel expenses (*transportation, meals, and lodging*) are not normally shared (*Section VIII.D.23*). However, where it can be demonstrated that a substantial savings in medical expenses resulted from the travel, reasonable expenses will be shared.

40. **Visiting Nurses**—We will share up to 45 days of prescribed visiting nursing care after you are released from a hospital. The days need not be consecutive.

**C.  Motor Vehicle Injuries**

Most needs for motor vehicle related injuries are shared. A "motor vehicle" is any vehicle with an engine/motor used for transportation, work, or recreation. Bills must be submitted to any responsible or liable party before they will be considered for sharing. See *Section VI.B.1* "Others Obligated to Pay."

1. **Shareable.** Needs from injuries in a motor vehicle accident where the member is not an operator or passenger (*in, on, or being pulled by the vehicle*), but a pedestrian, bicyclist, bystander, etc., is shareable for the amount of the need that is not the responsibility of any insurance or liable party.

2. **Shareable with Requirements.** Needs from injuries in an accident where the member is an operator or passenger (*in, on, or being pulled by the vehicle*) of on-road or off-road motor vehicles such as snowmobiles, go-karts, off-road motorcycles, ATVs, tractors, farm implements, construction equipment, golf carts, personal moving devices, motorized watercraft of all kinds, and all aircraft, will be shareable for the amount of the need that is not the responsibility of any insurance or liable party, and if **all** of the following conditions are met. The operator and any rider:

a. were riding or operating the vehicle off a public road; or were riding or operating the vehicle on a public road of which the vehicle was of a type allowed on the public road, and

b. were insured as required by law (*and if not insured, then only those expenses greater than the legally required medical coverage shall be shareable*), and

c. were not operating the vehicle recklessly, or under the influence of alcohol or any illegal substance as defined by the applicable law.

## D. Non-Qualifying Items

SMI is committed to honoring Jesus Christ in all our ways, spiritual and practical. Therefore, some of the medical practices that are listed below are not shareable because they are contrary to Scripture, even though prescribed by a licensed medical professional. Additionally, other items are not shared for various practical reasons.

Because the Guidelines cannot list all possible treatments that violate Biblical principles, SMI retains the discretion to not share such treatments, whether or not doctor prescribed, even though not listed below.

1. **Abortion**—Expenses for abortion of a living, unborn baby will not be shareable.

2. **Abuse of Drugs or Alcohol**—Injuries that result from a member abusing drugs or alcohol will not be shareable.

3. **Accidents to Teeth While Eating**—The breaking or injury of natural teeth by accident when eating is not shareable.

4. **ADD, ADHD, and SPD**—Psychotropic medication to treat chemical imbalances not demonstrable by lab tests, for Attention Deficit Disorder, Attention Deficit Hyperactivity Disorder, Sensory Processing Disorder, and similar disorders is not shareable.

5. **Aging "Reversals"**—Treatments and devices for the normal, natural slow decline in bodily functions are usually not shareable as these are items

for which members can normally budget, e.g. eyeglasses, hearing aids, dentures, sexual aids. (*When the item is a burden beyond budgeting, it may qualify as a Special Prayer Need.*) When there is a loss of function due to disease or injury, generally the treatment will be shareable subject to all other Guideline limitations.

6. **Armed Conflict**—Injuries or illness resulting from a member's active participation as a combatant in an armed conflict, but not including acting in self-defense or in defense of hearth or home, are not shareable.

7. **Contraceptives**—Items prescribed or used primarily for contraception are not shareable.

8. **Donations of Tissues and Organs**—Not shareable unless to be used for another SMI member. Complications from the donation would be shareable, but only if not the responsibility of the donee or the providers involved.

9. **Euthanasia**—Expenses for intentionally terminating a human life are not shareable.

10. **Infertility Expenses**—Bills for prescriptions, tests, treatment, in vitro fertilization, or other procedures primarily to address infertility are not shareable. However, medical expenses for an embryo adoption and implantation by a married couple will be eligible for sharing as a Special Prayer Need.

11. **Injuries from Certain Acts**—Injuries or illness from participation in a riot, criminal act, assisted suicide, or euthanasia will not be shareable.

12. **Interest/Late Charges**—Costs incurred for late payment or interest charges from any care provider are not shareable. Interest or finance charges from a credit card or lending institution that a member borrows from to pay medical bills are also not shareable unless it results in a substantial savings for early payment (30+%), and is limited to three months.

13. **Long-Term Care**—Nursing home and other long-term care is not shareable. Separately-charged, non-routine medical services while in long-term care are shareable.

14. **Membership Requirements Violated**—Needs arising from conduct inconsistent with the membership requirements, or occurring when a member is not meeting the membership requirements, are not shareable.

15. **Non-Medical Expenses**—Phone calls, cots and/or meals for visitors, and other expenses not directly related to provided medical services are normally not shareable.

16. **Prophylactic Surgery**—Removal of healthy organs (*such as due to increased risk of disease due to gene mutations*) is generally not shareable.

17. **Purchasing Supplies/Supplements from Relatives**—Purchases of supplements, supplies, etc., from a member's family will not be shared unless it is verified that it is being provided at cost.

18. **Routine, Maintenance, Stabilized, Preventive, and Wellness Care**—Costs that members commonly share (*bear for one another*) are unexpected burdens related to medical conditions. Treatments classified as "routine, maintenance, preventive, wellness," or for a stabilized condition, are usually medical costs that should be anticipated and budgeted as part of the load for an individual to carry. For these reasons such costs are generally not shared; however, if these still present a burden, they may be eligible as a Special Prayer Need (*Section V.A*).

19. **Service Animals**—None of the costs of service animals are shareable.

20. **Sex Reassignment**—Procedures known as sex reassignment, gender reassignment, transmasculine procedures, transfeminine procedures, or other related procedures, including genitoplasty, are not shareable.

21. **Sterilization**—Procedures for sterilization, and not primarily to treat a medical condition, are not shareable.

22. **Surrogacy**—Expenses related to a surrogate pregnancy, whether or not the surrogate is a member, are not shareable.

23. **Travel Expenses**—Travel expenses and lodging expenses are normally not shareable. Reasonable travel, transportation, meals, and lodging will be considered shareable if a substantial savings will result (*Section VIII.B.39*).

24. **Weight Reduction**—Weight reduction programs, diet centers, and clinics are not shareable. Staples in the stomach, balloons inserted in the stomach, jaw wiring, or any other surgical procedures done primarily for weight reduction are not shareable.

# IX. Maternity & Newborn Care

Maternity needs are shared when the doctor's estimated due date is 300 days or more after the date the mother's membership began. In general, maternity needs include bills for prenatal care, delivery, postnatal care, and miscarriage, and are treated like any other medical expense.

There are specific Guidelines for types of maternity needs that are shareable in Samaritan Basic and Samaritan Classic (*Section A*) and the initial unshared amount (*Section B*). Expenses related to pregnancies and complications of birth of the mother and child with an ineligible due date may only be shared as a Special Prayer Need (*Section C*).

**A. Maternity Needs That Are Shareable**

1. **One-Person Memberships: No Maternity Sharing (Two-Person Membership Required)**—Maternity needs for one-person memberships of women under age 45 when they become pregnant, for both

Samaritan Basic and Samaritan Classic, are not eligible for sharing except as Special Prayer Needs. This includes post-birth needs of the mother related to complications of birth. For a maternity expense to be shareable, the membership will need to be at a multi-person size (*or at an equivalent monthly share amount when multi-person is not possible or practical*) at least 300 days prior to the physician-calculated due date. (*One family member participating in Classic and another participating in Basic does not constitute a two-person membership eligible to share maternity needs. Likewise, a one-person membership provided in connection with an employer or other group organization does not constitute "a multi-person size or equivalent."*)

2. **General Rule**—Shareable maternity needs include bills for prenatal care, delivery, postnatal care, miscarriage, and congenital conditions. Shareable services include those of doulas (*up to $500*), midwives, doctors, nurse practitioners, and other licensed medical professionals. There are special criteria for sharing needs of the child from genetic disorders and hereditary diseases. See *Section VIII.A.*

3. **Separate Needs**—Bills for all pregnancy and birth-related complications of the mother will be shared as a part of the maternity need. Any pre-birth need of the child/children and routine postnatal care of the child, including no more than one routine outpatient doctor visit, will be part of the mother's maternity need. A post-birth need of the child beyond routine natal care will be considered the child's need separate from the mother's maternity need.

4. **Multiple Birth Needs**—When there are complications (*anything beyond routine natal care*) from, or as a part of, a multi-child pregnancy, the expenses for each child will be considered a separate need.

*Exception: If a multi-child pregnancy is the result of the use of fertility drugs, in vitro fertilization, or other artificial means, all pregnancy and birth-related complications of the children will be treated as one need.*

5. **Ectopic Pregnancies**—

a. **Expenses Shared**—Procedures related to a ruptured fallopian tube (*including post-operative recovery of the mother, follow-up care, and treatment of any complications*), and, where an ectopic pregnancy is diagnosed before a rupture, all pre-operative tests and consultations and expenses related to keeping the mother under medical care while determining what care should be offered for the mother and child.

b. **Expenses Not Shared**—Procedures directly related to the termination of a living, unborn child and/or removal of the living, unborn child from the mother due to an ectopic pregnancy are not shared (*e.g. methotrexate, salpingectomy, salpingostomy*), unless the removal of the child from its ectopic location was for the primary purpose of saving the life of the child or improving the health of the child.

6. **Adopted Child**—Medical expenses of the birth mother and an adopted child, for which the adopting parents (*both a husband and wife*) became liable while members and which are not from a "condition existing before membership" (see *Section II.E*), are shareable the same as other maternity needs (*e.g. two-person membership required*). The shareable amount will be reduced by any credit which the member is entitled under the federal adoption income tax credit due solely to those medical expenses. However, if the parents had reason to know of a physical condition which the adopted child had prior to the adopting parents being legally responsible for the child's expenses, or prior to his effective date within his parents' membership, it will be considered a "condition that existed before membership" under *Section VII.*

7. **Early Maternity Sharing**—If a maternity care provider will reduce the normal charges if a member prepays some or all of the bill, we will consider sharing prior to the birth the cost of some of the services to the mother, e.g. hospital or birthing center, physician or midwife, and a doula (*up to $500*), but not services for the baby or other services for the mom such as blood and lab work, ultrasounds, chiropractic, anesthesia, massage, or progesterone. The member must request an estimate from the provider and submit it with the Need Processing

Form, whether submitting the need via postal mail or online via your Samaritan Dashboard. If the resulting bills are less than the prepaid amount, the member must contact Member Services who will advise where to send the surplus.

**8. Maximum Maternity Shareable Amount Under Samaritan Basic**—The qualified bills submitted for a maternity need (defined in paragraphs A.2 & 3) for mothers participating in Samaritan Basic are shared according to the following guidelines:

- *$1,500 initial unshareable amount (may be offset by discounts)*
- *10% co-share (90% sharing percentage)*
- *$5,000 initial maternity sharing limit*

After $5,000 has been shared on the maternity need under the rules above, nothing more is shared on the need until the sum of the co-share plus the unshared amount over the $5,000 initial maternity sharing limit reaches the $13,500 maximum co-share.

Once the maximum co-share amount of $13,500 is reached, the remaining qualified bills are shared up to the $236,500 maximum shareable amount.

***Example 1: A mother's maternity need with qualifying bills of $4,500 with no discounts.*** *$1,500 is the initial unshareable amount and the remaining $3,000 is adjusted by the 90% sharing percentage, which leaves $2,700 shareable.*

***Example 2: A mother's maternity need with qualifying bills of $9,000 with no discounts.*** *$1,500 is not shared due to the initial unshareable amount and the remaining $7,500 is adjusted by the 90% sharing percentage, which leaves $6,750. The $6,750 exceeds the initial maximum shareable amount of $5,000, which leaves $5,000 shareable. Since the total unshared amount of $4,000 is less than $13,500, the initial maternity sharing limit still applies.*

***Example 3: A mother's maternity need with qualifying bills of $45,000 less $10,000 in discounts.*** *There are more qualifying bill amounts to share after the initial shared $5,000 and the unshared $13,500 max co-share. In this case, the $10,000 discounts and $13,500 max co-share are subtracted from the total qualifying bills, which leaves $21,500 shareable.*

***Example 4: A mother's maternity need with qualifying bills of $300,000 less $20,000 in discounts.*** *The $236,500 maximum shareable amount is shared. The $30,000 difference between the $250,000 Save to Share threshold and the $280,000 amount needed can also be shared if the membership participates in Save to Share.*

**B.  Initial Unshareable Amount/Proration**

1. **Standard Initial Amount**—Like any other need, only the portion of a maternity need that exceeds $400 for Samaritan Classic and $1,500 for Samaritan Basic is shareable. See Section VI.A.3 and 4.

2. **Home Births**—Effective for all needs started on or after September 1, 2020, home births in Samaritan Basic only have the $1,500 initial unshareable amount waived and are not subject to prorating (see *Section VI.D*) because they reduce overall maternity costs.

3. **After Cesarean**—Effective for all needs started on or after September 1, 2020, the $1,500 initial unshareable amount in Samaritan Basic only is waived for a vaginal birth after cesarean (VBAC).

**C.  Maternity Needs for Those With Ineligible Due Dates**
Expenses related to pregnancies and complications of birth of the mother (and child's postnatal expenses when related directly to a genetic disorder or hereditary disease, unless otherwise referenced in *Section VIII.A.11*) where the physician-calculated due date is less than 300 days after membership began—may only be shared as a Special Prayer Need (*Section V.A*).

# X. Submitting Medical Needs

Qualified expenses will be shared for all who are included in a household membership (see *Section II*) who meet the membership requirements (see *Section I*) when the expense occurs. For the person's need to be shared, the household must be current with the annual membership continuation verification and all shares, through the time he was a member, even if he is no longer a member when the need is shared.

**To submit your medical needs, please follow these instructions:**

**A. First**

Verify that your medical need meets the shareable needs Guidelines (*Sections VI–IX*). If you would like a Need Processing packet mailed to you, call Samaritan Ministries toll-free at 877-764-2426 and you will be directed to your Member Services team. Read the instructions in the Need Processing packet mailed to you and follow them carefully.

**B. Online**

If you prefer to submit your bills online instead, you can use your Samaritan Dashboard. Go to your Dashboard apps, click the Needs app, and then follow the online instructions.

**C. Itemized Bill**

Along with your Need Processing Form, you must submit itemized bills to Samaritan Ministries. Ask your health care provider to itemize all bills, and make copies to keep for your own records. If you are submitting your need online, you will need to have electronic versions of your itemized bills, to upload them when prompted. An itemized bill will contain the following information:

1. Name, address, and phone number of the provider
2. Name of the patient
3. Date(s) of services provided
4. Cost

5. Description of the services or item
6. Account number if available

The most common need processing delays are caused by bills that do not provide specific and complete information about the services you received. Bills that merely give amounts or codes may not be accepted. Overbilling and errors are common in health care, and detailed bills allow you and Samaritan Ministries to verify that you are being billed correctly.

**D. Read the "Common Questions"**

This sheet is included in the Need Processing packet mailed to you. Seek reductions on your bills, using as a guide the "Suggestions for Negotiating Reductions" section and the Healthcare Bluebook available on your Samaritan Dashboard. Reductions may decrease the $1,500 initial unshareable amount in Samaritan Basic. Additionally, reductions help reduce the burden for all members.

**E. Obtaining Fair Price**

One of the reasons that the monthly share is kept low is the substantial reductions from original billings that members and our negotiators are able to obtain.

*Please note: Almost no one pays a hospital's "list price," which is the price that is printed on the bill given to you. Hospitals' "list prices" are three to five times what they expect most people to pay. Therefore, you may be able to obtain a cash-pay discount of as much as 75% off the "list price." Physicians and other non-hospital services typically give cash-pay discounts of 20–40%. Thus, we encourage members to seek discounts even on small bills, but depending on the situation, often our negotiators are able to save even more. Your provider may also offer a prompt-payment discount if you are able to pay your bill within a certain time frame. Be sure to notify the Member Services department of any prompt-pay deadlines.*

**F. Cooperation Required**

When you submit bills, you are committing to cooperate with Samaritan Ministries staff and partners to determine if the bills are shareable, to seek

*The sharing turnaround time is normally within two to three months from receipt of your medical bills and required information:*



**MONTH 1**

**You send us your bills**
The process starts when we get your bills online or by mail.



**MONTH 2**

**We process your bills**
We do our part to review and assign medical needs.




**MONTH 3**

**You receive shares**
Funds from other members should arrive by the end of this month.

**Have additional bills later?**
Submit new bills at any time to begin the process again for those bills.

---

fair and reasonable prices from medical providers, and to document amounts you have paid to providers. You will be required to sign a medical release so that Samaritan Ministries or its partners can obtain records and communicate with your providers. Failing to submit a signed medical release, revoking a medical release, or declining to work with Samaritan staff and partners to obtain a fair price will prevent the sharing of your need.

In order to steward the shares of fellow Christians, Samaritan Ministries assists members to manage and control the costs of their health care. We are committed to protecting members from unfair and unreasonable charges. Samaritan reserves the right, on behalf of its members, to determine what charges or parts of a charge are unfair or unreasonable based on techniques, criteria, and standards adopted by Samaritan Ministries. Samaritan will limit the sharing of charges determined to be unfair or unreasonable and will advocate on behalf of sharing members against any health care provider demanding payment of unfair charges. This Guideline empowers Samaritan members to refuse to pay excessive charges, while also committing Samaritan to contend for fair prices on members' behalf. Samaritan Ministries and its partners will work with members and their providers to reach a resolution on excessive charges through negotiation and, if necessary, protect members through legal action. Samaritan will not leave an open bill dispute unresolved.

**G.  "Bill List"**

List the amounts you have been billed. Also list any payments by other agencies and discounts from the health care provider. These reductions will not be shared. Total the columns on the "Bill List" and number your bills according to the list.

**H.  Member Questionnaire**

The person with the medical need should complete this section. **Exception:** If the patient is a minor, parents may complete the Member Questionnaire. Your need will not be shared without it.

**I.  Explain the Need**

Include a letter or note explaining the incident so we can better understand

your need. Describe how we may pray for you or give praise for how God is already working in the situation. A short summary of your condition will be included in the Prayer Guide and in the assignment sheet sent to the members who will be sharing with you.

### J. Send to SMI

Mail your need information to Samaritan Ministries in the need envelope provided (or *submit it online via your Samaritan Dashboard*). Members correctly submitting needs are generally receiving gifts from other members within two to three months after receipt of the bills by SMI, helping you to pay the medical bills in a timely fashion.

### K. Payment Plan

If you have not arranged a payment plan with the provider, you should pay something on the bill monthly, even if it is only $10, so the provider knows you are not forgetting your responsibility.

### L. More Bills

If additional bills for the same need arrive after you have submitted your need, call for an Add-on Form designated for your need, to submit the additional bills (*or submit them online via your Samaritan Dashboard*).

### M. Overseas Bills

If you are treated for an illness or medical condition in another country, the entire itemized billing statement must be written or translated in English, and the cost must be converted to U.S. dollars.

### N. Time Limit for Submitting Documentation

The sooner that bills are submitted to SMI usually means the larger the reduction in price that can be obtained from the provider through negotiations. When there are a number of bills related to treating the same incident, it is helpful for them to be submitted together if they all can be obtained within a 30-day period. With this in mind, itemized bills should be submitted to the Samaritan office as soon as possible (*either by mail using the Need Processing Form or online via your Samaritan Dashboard*). Ordinarily, bills submitted more than one year after the service was provided will not be shared.

**Appx. Vol I
A-80**

# XI. Advisory Opinions & Binding Decisions

Although Samaritan Ministries staff are trained to be forthright in phone conversations, routine responses to emails and oral opinions offered by the staff do not constitute binding decisions. Members who call to inform us of their circumstances in order to discover if a treatment qualifies for sharing will be given an opinion—not a binding decision. Inquiries by members in writing explaining circumstances and medical procedures involved and specifically seeking a binding, written ruling from SMI Leadership will be answered in writing and will explicitly indicate if it is a decision that will bind SMI. The routine submission of bills to SMI followed by SMI's standard "Need Status Update" will not be considered such an inquiry or binding ruling.

# XII. Reconciling Disagreements

Samaritan Ministries is a community of Christians—and its members, as followers of Christ, believe that the Bible commands them to make every effort to live at peace and to resolve disputes with each other in private or within the Christian church (see *MATT 18:15–20; 1 COR 6:1–8*). SMI does not understand these Scriptures to prohibit believers from cooperating with governmental authorities when a crime has been committed by another professing believer (*ROM 13:1–7*). A member who chooses to violate this command of Scripture and his covenant with his SMI brethren and takes a dispute to court, destroys our fellowship and has chosen to be as if he had never been a Samaritan Ministries member, and to not have his needs shared with the membership.

Therefore, in becoming a member or reaffirming your membership, you agree that any civil claim or dispute you have with or against SMI, its employees, directors, members, and associate members, that is related to SMI and its ministries in any way, shall be settled by Biblically-based mediation and, if

necessary, legally binding arbitration. And SMI agrees similarly with respect to any civil matter SMI might have against you. The procedure to be used depends upon the nature of the issue as explained in *Sections XII.A* and *XII.B*.

**A. Questions Regarding Whether a Need is Shareable**

Nearly all needs can be determined to be shareable or not shareable according to the Guidelines. In matters where the Guidelines may not provide absolute clarity, Samaritan Ministries can usually determine whether the need should be shared according to procedure and precedent. If Samaritan Ministries cannot determine whether the need is shareable, or if you believe we are mis-interpreting the Guidelines or your circumstances, upon your written request explaining why you believe the bills in question are shareable under the Guidelines, the need will be submitted to a panel of 7 to 13 randomly chosen members who will review the need to determine whether it is shareable. The panel's decision will be binding on both SMI and the member. Your written request must be postmarked, or received by SMI, no later than 90 days after you received the staff's response to your last internal appeal.

**B. Resolution of All Other Issues**

Membership requirement issues related to your payment of shares or your integrity (*with respect to the submission and payment of medical bills*) may be appealed to the Institute for Christian Conciliation as explained below. All other questions regarding whether you meet membership requirements may be appealed to the Board of Directors who make the final, non-appeal-able decision.

Any other issue shall be settled in accordance with the Rules of Procedure for Christian Conciliation™ of the Institute for Christian Conciliation. (*Complete text of the Rules is available at ICCpeace.com or by contacting ICC Peace at info@iccpeace.com*). However, if both SMI and you agree, the dispute may be submitted to a randomly selected panel of members instead. In all events, you will have available the same relief as a court could grant. SMI will pay all of the arbitrator's fees and costs unless the arbitration determines there was no reasonable basis for your complaint, in which case you will be responsible for the fees and costs.

**C. You and SMI Agree Not to Go to Court**

You understand that these methods shall be the sole remedy for any civil con-troversy or claim arising out of your relationship with SMI and expressly waive your right to file a lawsuit in any civil court against SMI, its employees, members, associate members, and directors, for such disputes, except to enforce an arbitration decision obtained under *Sections XII.A or XII.B*. This also includes any determinations as to whether the matter in dispute comes within this arbitra-tion agreement or can be required to be arbitrated. If an arbitration decision has been made and anyone is failing to follow that decision, then in order to enforce the arbitration award under either *Sections XII.A or XII.B*, the decision may be entered only in the Circuit Court of Peoria County, Illinois. Resolving disputes within the Body of Christ is always the command of Scripture and in the interest of all our members (*MATT 18:15–20; 1 COR 6*). Therefore, even if SMI or a member participates to some extent in a court proceeding regarding a matter in dispute, this participation will not be forfeiting the ability to later demand that the dispute be resolved by these arbitration procedures.

**D. Applicable Law**

For all civil matters of procedure and substance regarding any dispute or claim that comes within these mediation/arbitration requirements, the laws of the State of Illinois, and if applicable of the United States, shall govern.

# XIII. Amending Guidelines

**A. Procedures**

These Guidelines may be amended by the Samaritan Ministries Board of Directors. The Board has the option of first taking an advisory vote of the members.

**B. Effective Date**

Amendments to the Guidelines will go into effect as soon as administra-tively practical or as designated by the Board. If you have a need which began before the change was adopted, the sharing of bills related to that need will be determined by the Guidelines as they existed on the date the bills were

incurred. However, bills related to a member's need that would have been shareable under the Guidelines in effect when a need began, will remain shareable regardless of subsequent Guideline changes.

## C. Notice of Amendments

Members will be notified of changes to the Guidelines in the monthly newsletter, through postings on the ministry website, or by provision of updated Guidelines booklets when they are notified that their Membership Continuation Form is coming due.

# XIV. Switching Membership Levels

If you choose to switch your membership level, all needs will be "archived," meaning you would no longer be able to add more bills to that need number after switching, no matter the date of service. Once your membership level is switched, your new monthly share will be effective for the next monthly share assigned.

*Example: If your membership level is switched on August 28, your new monthly share will be effective for the October share. The September share was already assigned at your previous monthly share rate.*

Review points *A* and *B* below for details on how each switch in levels would affect your membership.

## A. Switching from Samaritan Classic to Samaritan Basic

Any bills received at the SMI office after the day of the switch will be shared under the Samaritan Basic Guidelines, even though the need was started under the Samaritan Classic Guidelines. If a bill is received after the switch date for a need that started under Samaritan Classic, a new need will have to be started with a new Need Processing Form. Such a bill cannot be submitted with a Need Add-on Form.

Appx. Vol I
A-82

## B. Switching from Samaritan Basic to Samaritan Classic

Bills received at the SMI office after the date of the switch will be shared under the Samaritan Classic Guidelines only if the related need meets the requirements of *Section VIII* for not being pre-existing in relation to the date of the switch. In other words, all the needs of all the persons in the switching membership are treated like they became members on the day of the switch.

That means that any condition/injury occurring prior to the switch date, even if it occurred while the person was a Samaritan member participating in either membership level, is now pre-existing until it meets the new time/symptoms/treatment requirements in relation to the switching date. A new Special Prayer Need could be opened to request assistance for medical bills related to pre-existing conditions. (See Section V.A.)

*Example 1: Member joined Samaritan January 1, 2017, participating in Samaritan Basic and on March 1, 2017, he develops cancer. All treatments ended June 30, 2017, and there were no further treatments or symptoms. On July 1, 2020, he switches to Samaritan Classic. In July, 2021, the same cancer reoccurs. The need would be considered pre-existing and only shareable as a Special Prayer Need because the condition has not gone five years treatment and symptom free. (See Section VII.A.)*

*Example 2: Same facts as Example 1 except on January 1, 2021, the member switched back to Samaritan Basic. When the cancer reoccurs in July 1, 2021, it is still pre-existing because the member's start date in relation to need is still July 1, 2020, when he switched to Samaritan Classic, and the five year symptom/treatment-free requirement for cancer still applies.*

## C. Switching Fee

There is a non-refundable fee of $100 for each time a membership switches levels.

## D. Splitting Off an Existing Membership

A child or spouse splitting off an existing membership will begin at the same level as the existing membership, but may immediately switch to a different level subject to the switching Guidelines in *Section XIV*. If a change in member-

# Save to Share™

**The members of Samaritan Ministries share in needs up to $250,000.**

**For those who want to help bear burdens that exceed $250,000, there is Save to Share.**



---

ship level is made at or after the split, the same results and fee as described in paragraphs A–C apply.

**E.  Multiple Switches**

There is no limit on the number of switches, but the following special rules apply:

1. **60 days**—A switch may be "reversed" within 60 days as if it did not occur as long as no new needs or bills occurred during that time. You must contact our office directly.

2. **30 days**—If a new need or bills occur after a switch, the switch may only be "reversed" if done within 30 days of the switch. You must contact our office directly.

3. **Switching Fee**—Is never refundable and will be charged for every switch, but will not be charged again for a "reversal."

# I. Participation

**The following Guidelines apply only to Save to Share and not general membership:**

**A.** Only members of SMI are eligible to participate.

**B.** An active SMI membership allows you to participate in Save to Share at the same level of membership (one person, two-person family, three or more person family, or single-parent family).

**C.** In addition to the annual administrative share, each participating household must set aside funds that will be dedicated for use in the program. As of September 2023, the current **annual** household amount required to be set aside is $133 for one person, $266 for a two-person membership and single-parent family, and $399 for a three or more person family.

**Voting**—Set-aside amounts can only be raised by a vote of participants with a 60% majority of the votes cast required for approval.

**D.** Any unused funds remaining at the end of a year's participation are to be held for future needs if the household continues participation, and the household will be asked to set aside an additional full year's amount for the new year. (A household will not be asked to add any amount that brings the total set aside to more than three times the current annual set-aside amount.)

**E.** An annual administrative share (currently $15) will be required from each participating household. This share is separate from the set-aside amount and is paid to SMI.

**F.** The funds set aside are the property of the member and will be used at the member's voluntary discretion. If the member ceases participation in the program, unused funds will remain the property of the member.

**G.** **Financial Difficulties**—If your financial situation changes and you believe you will not be able to continue participation, please contact your Member Services team immediately so that future Save to Share needs will not be assigned to you.

# II. Need Sharing

**A.** All of the responsibilities of Samaritan members and the requirements for submitting needs as set forth in the "Membership" and "Needs" Guidelines (*Sections I–XIV*) apply similarly to participants except when the Save to Share Guidelines specifically provide otherwise.

**B.** Only needs eligible for sharing in the "Membership" and "Needs" Guidelines will be qualified to be shared in Save to Share. Also, for needs from a condition that occurred while an SMI member, but before participating in Save to Share, to be shareable, the condition must meet the same type of symptom and treatment free/time elapse, etc. requirements while a Save to Share member, as are found in Section VII "Pre-Existing Conditions" and Section IX.C "Maternity Needs for Those With Ineligible Due Dates" (e.g, for the pregnancy of a member joining Save to Share fewer than 300 days before the estimated due date, the child's postnatal expenses when related directly to a genetic disorder or hereditary disease—unless otherwise referenced in *Section VIII.A.11*—would not be shareable under Save to Share).

It is also necessary to again qualify for the pre-existing exceptions of *Section VII*, for a condition which developed while a person participated in Save to Share, if the person later dropped out of Save to Share and then rejoined.

**C.** Save to Share needs will only be shared in months when there is a qualified need to share.

**D.** New SMI members who join Save to Share at the same time will not

be asked to share in Save to Share needs until they begin sharing with regular needs.

E. When a member who participates in Save to Share has a shareable need that is more than $250,000, the amount of that need that exceeds $250,000 will be eligible for sharing with other Save to Share participants. It will only be the amount of the need over $250,000 that is shared even though the ministry may not have shared all of the first $250,000 of the need due to proration or the initial unshareable amount.

Although participants in Samaritan Basic have a maximum shareable amount of $236,500, that amount is based on $250,000 of eligible bills (*plus the $1,500 initial unshareable amount*). Therefore, participants in Samaritan Basic/Save to Share are eligible for sharing in Save to Share after the $236,500 Samaritan Basic sharing maximum is reached.

Large needs frequently are the result of the reality that most health care providers charge patients without insurance substantially more than insured patients. Therefore, Save to Share needs are not shared until satisfactory negotiations with providers toward reductions in bills have occurred.

F. In order to have a Save to Share need shared, a participant must have the appropriate amount set aside, must have given to all Save to Share needs that have been assigned to him, must be current in sharing with all other SMI needs assigned to him, and must be a member in good standing of SMI. A participant who does not send his share after two notices may be removed from participation and, once removed, will not be eligible for reinstatement.

G. Needs that qualify for sharing will be divided among participating households in proportion to the amounts set aside by participants by year.

***Example:*** *If a participant has a shareable need of $450,000 after negotiations and adjusting for the initial unshareable amount and discounts,*

*the first $250,000 would be shared according to the "Needs" Guidelines (including the co-share and implementation of the pro rata provision if necessary). The remaining $200,000 would be shared in Save to Share.*

*If the total amount set aside by participants for the current year is $20,000,000, then each household would be asked to share 1% ($200,000/$20,000,000) of their current year set-aside amount balance.*

*So a two-person membership which had not yet shared in Save to Share for the current year would be asked to send $266 x .01 = $2.66 in addition to their regular share.*

H. If the amount of one need qualifying for sharing in Save to Share exceeds half of the funds for the current year held by the participants when the need is shared, only half of these funds will be assigned for sharing. Funds held from the previous years would then be assigned to the remaining unmet portion of the need, up to half of these funds.

***Example:*** *There is a need amounting to $3,000,000 (after the first $250,000 was shared under the "Needs" Guidelines).*

*There is $4,000,000 available in the current year set-aside amount. Only $2,000,000 of the $3,000,000 need will be allocated to the current year to stay within the half limitation mentioned above ($2,000,000/$4,000,000 = 50%).*

*If the previous years' set-aside balance is $3,000,000, then those Save to Share members with previous years' set-aside amounts will be asked to share one-third of that balance ($1,000,000/$3,000,000) with the second Save to Share need to help with the remaining $1,000,000.*

If at any time there are multiple Save to Share needs in process, and the order in which they are shared could affect the maximum amount shared for a particular need, then the need given priority for calculating the shareable amount will be the need for which the properly completed form (and all required documentation) first arrived.

# State Legal Notices

**Alabama Code Title 22-6A-2**
Notice: The organization facilitating the sharing of medical expenses is not an insurance company, and neither its guidelines nor plan of operation is an insurance policy. Whether anyone chooses to assist you with your medical bills will be totally voluntary because no other participant will be compelled by law to contribute toward your medical bills. As such, participation in the organization or a subscription to any of its documents should never be considered to be insurance. Regardless of whether you receive any payment for medical expenses or whether this organization continues to operate, you are always personally responsible for the payment of your own medical bills.

**Alaska Statute 21.05.021(k)**
Notice: The organization coordinating the sharing of medical expenses is not an insurance company, and neither its guidelines nor plan of operation is an insurance policy. Whether anyone chooses to assist you with your medical bills will be totally voluntary because no other participant will be compelled by law to contribute toward your medical bills. Participation in the organization or a subscription to any of its documents should never be considered to be insurance. Regardless of whether you receive a payment for medical expenses or whether this organization continues to operate, you are always personally responsible for the payment of your own medical bills.

**Arizona Statute 20-122**
Notice: The organization facilitating the sharing of medical expenses is not an insurance company and the ministry's guidelines and plan of operation are not an insurance policy. Whether anyone chooses to assist you with your medical bills will be completely voluntary because participants are not compelled by law to contribute toward your medical bills. Therefore, participation in the ministry or a subscription to any of its documents should not be considered to be insurance. Regardless of whether you receive any payment for medical expenses or whether this ministry continues to operate, you

---

I.  Giving to Save to Share needs is done through the monthly newsletter mailing or eShare notification. The shareable amount of the need is determined and then divided proportionally among all Save to Share memberships according to the size of their membership (i.e. one person, two-person family, three or more person family, and single-parent family). The correct Save to Share amount is then added to the regular share amount for each of these Save to Share households.

The Save to Share gifts are added to the total amount of share money available, and then enough of this larger amount is assigned to selected Save to Share members to be given to the Save to Share need(s). The other Save to Share members are directed to send their entire amounts (*including the Save to Share amount*) to regular needs. In this way the members with Save to Share needs receive the amount they should receive, but instead of being inundated with a large number of small gifts coming from every Save to Share member, they receive a more manageable number of larger gifts.

# III. Amendments & Mediation

A.  These Guidelines may be amended by the Samaritan Ministries Board of Directors. The Board has the option of taking an advisory vote of the Save to Share participants.

B.  If a member disagrees with a determination made by the Samaritan Ministries staff regarding a need, they may ask for the matter to be submitted to a panel of 7 to 13 randomly chosen Save to Share participants.

C.  Any disputes remaining after this resolution process will be handled using the mediation/arbitration procedures specified in *Section XII.B* and C.

are always personally responsible for the payment of your own medical bills.

## Arkansas Code 23-60-104.2

Notice: The organization facilitating the sharing of medical expenses is not an insurance company and neither its guidelines nor plan of operation is an insurance policy. If anyone chooses to assist you with your medical bills, it will be totally voluntary because participants are not compelled by law to contribute toward your medical bills. Participation in the organization or a subscription to any of its documents should never be considered to be insurance. Regardless of whether you receive a payment for medical expenses or if this organization continues to operate, you are always personally responsible for the payment of your own medical bills.

## Florida Statute 624.1265

Samaritan Ministries International is not an insurance company, and membership is not offered through an insurance company. Samaritan Ministries International is not subject to the regulatory requirements or consumer protections of the Florida Insurance Code.

## Georgia Statute 33-1-20

Notice: The organization facilitating the sharing of medical expenses is not an insurance company, and neither its guidelines nor plan of operation is an insurance policy. Whether anyone chooses to assist you with your medical bills will be totally voluntary because no other participant will be compelled by law to contribute toward your medical bills. As such, participation in the organization or a subscription to any of its documents should never be considered to be insurance. Regardless of whether you receive any payment for medical expenses or whether this organization continues to operate, you are always personally responsible for the payment of your own medical bills.

## Idaho Statute 41-121

Notice: The organization facilitating the sharing of medical expenses is not an insurance company, and neither its guidelines nor plan of operation is an insurance policy. Whether anyone chooses to assist you with your medical bills will be totally voluntary because no other participant will be

compelled by law to contribute toward your medical bills. As such, participation in the organization or a subscription to any of its documents should never be considered to be insurance. Regardless of whether you receive any payment for medical expenses or whether this organization continues to operate, you are always personally responsible for the payment of your own medical bills.

## Illinois Statute 215-5/4-Class 1-b

Notice: The organization facilitating the sharing of medical expenses is not an insurance company, and neither its guidelines nor plan of operation constitute or create an insurance policy. Any assistance you receive with your medical bills will be totally voluntary. As such, participation in the organization or a subscription to any of its documents should never be considered to be insurance. Whether or not you receive any payments for medical expenses and whether or not this organization continues to operate, you are always personally responsible for the payment of your own medical bills.

## Indiana Code 27-1-2.1

Notice: The organization facilitating the sharing of medical expenses is not an insurance company, and neither its guidelines nor its plan of operation is an insurance policy. Any assistance you receive with your medical bills will be totally voluntary. Neither the organization nor any other participant can be compelled by law to contribute toward your medical bills. As such, participation in the organization or a subscription to any of its documents should never be considered to be insurance. Whether or not you receive any payments for medical expenses and whether or not this organization continues to operate, you are always personally responsible for the payment of your own medical bills.

## Kentucky Revised Statute 304.1-120 (7)

Notice: Under Kentucky law, the religious organization facilitating the sharing of medical expenses is not an insurance company, and its guidelines, plan of operation, or any other document of the religious organization do not constitute or create an insurance policy. Participation in the religious organization or a subscription to any of its documents shall not be considered insurance. Any assistance you receive with your

medical bills will be totally voluntary. Neither the organization or any participant shall be compelled by law to contribute toward your medical bills. Whether or not you receive any payments for medical expenses, and whether or not this organization continues to operate, you shall be personally responsible for the payment of your medical bills.

**Louisiana Revised Statute Title 22–318,319**
Notice: The ministry facilitating the sharing of medical expenses is not an insurance company. Neither the guidelines nor the plan of operation of the ministry constitutes an insurance policy. Financial assistance for the payment of medical expenses is strictly voluntary. Participation in the ministry or a subscription to any publication issued by the ministry shall not be considered as enrollment in any health insurance plan or as a waiver of your responsibility to pay your medical expenses.

**Maine Revised Statute Title 24–A, §704, sub–§3**
Notice: The organization facilitating the sharing of medical expenses is not an insurance company and neither its guidelines nor plan of operation is an insurance policy. Whether anyone chooses to assist you with your medical bills will be totally voluntary because no other participant will be compelled by law to contribute toward your medical bills. Participation in the organization or a subscription to any of its documents should never be considered to be insurance. Regardless of whether you receive payment for medical expenses or whether this organization continues to operate, you are always personally responsible for the payment of your own medical bills.

**Maryland Article 48, Section 1-202(4)**
Notice: This publication is not issued by an insurance company nor is it offered through an insurance company. It does not guarantee or promise that your medical bills will be published or assigned to others for payment. No other subscriber will be compelled to contribute toward the cost of your medical bills. Therefore, this publication should never be considered a substitute for an insurance policy. This activity is not regulated by the State Insurance Administration, and your liabilities are not covered by the Life and Health Guaranty Fund. Whether or not you receive any payments for medical expenses and

whether or not this entity continues to operate, you are always liable for any unpaid bills.

**Massachusetts**
The organization coordinating the sharing of medical expenses is not an insurance company, and neither its guidelines nor plan of operation is an insurance policy. Whether anyone chooses to assist you with your medical bills will be totally voluntary because no other participant will be compelled by law to contribute toward your medical bills. Due to the public policy implications of Massachusetts' mandatory insurance requirement (which operates independent of the Affordable Care Act), all Massachusetts members of SMI must be participants in the Save to Share program for sharing medical expenses above $250,000.

**Michigan Section 550.1867**
Notice: Samaritan Ministries International that operates this health care sharing ministry is not an insurance company and the financial assistance provided through the ministry is not insurance and is not provided through an insurance company. Whether any participant in the ministry chooses to assist another participant who has financial or medical needs is totally voluntary. A participant will not be compelled by law to contribute toward the financial or medical needs of another participant. This document is not a contract of insurance or a promise to pay for the financial or medical needs of a participant by the ministry. A participant who receives assistance from the ministry for his or her financial or medical needs remains personally responsible for the payment of all of his or her medical bills and other obligations incurred in meeting his or her financial or medical needs.

**Mississippi Title 83-77-1**
Notice: The organization facilitating the sharing of medical expenses is not an insurance company, and neither its guidelines nor plan of operation is an insurance policy. Whether anyone chooses to assist you with your medical bills will be totally voluntary because no other participant will be compelled by law to contribute toward your medical bills. As such, participation in the organization or a subscription to any of its documents should never be considered to be insurance.

Regardless of whether you receive any payment of medical expenses or whether this organization continues to operate, you are always personally responsible for the payment of your own medical bills.

**Missouri Section 376.1750**

Notice: This publication is not an insurance company nor is it offered through an insurance company. Whether any-one chooses to assist you with your medical bills will be totally voluntary, as no other subscriber or member will be compelled to contribute toward your medical bills. As such, this publication should never be considered to be insurance. Whether you receive any payments for medical expenses and whether or not this publication continues to operate, you are always personally responsible for the payment of your own medical bills.

**Montana Revised Statute Chapter Sections 33-1-102 and 33-1-201**

Notice: The health care sharing ministry facilitating the sharing of medical expenses is not an insurance company and does not use insurance agents or pay commissions to insurance agents. The health care sharing ministry's guidelines and plan of operation are not an insurance policy. Without health care insurance, there is no guarantee that you, a fellow member, or any other person who is a party to the health care sharing ministry agreement will be protected in the event of illness or emergency. Regardless of whether you receive any payment for medical expenses or whether the health care sharing ministry terminates, withdraws from the faith-based agreement, or continues to operate, you are always personally responsible for the payment of your own medical bills. If your participation in the health care sharing ministry ends, state law may subject you to a waiting period before you are able to apply for health insurance coverage.

**Nebraska Revised Statute Chapter 44-311**

IMPORTANT NOTICE. This organization is not an insurance company, and its product should never be considered insur-ance. If you join this organization instead of purchasing health insurance, you will be considered uninsured. By the terms of this agreement, whether anyone chooses to assist you

with your medical bills as a participant of this organization will be totally voluntary, and neither the organization nor any participant can be compelled by law to contribute toward your medical bills. Regardless of whether you receive payment for medical expenses or whether this organization continues to operate, you are always personally responsible for the payment of your own medical bills. This organization is not regulated by the Nebraska Department of Insurance. You should review this organization's guidelines carefully to be sure you understand any limitations that may affect your personal medical and financial needs.

**New Hampshire Section 126-V:1**

IMPORTANT NOTICE: This organization is not an insurance company, and its product should never be considered insurance. If you join this organization instead of purchasing health insurance, you will be considered uninsured. By the terms of this agreement, whether anyone chooses to assist you with your medical bills as a participant of this organization will be totally voluntary, and neither the organization nor any participant can be compelled by law to contribute toward your medical bills. Regardless of whether you receive payment for medical expenses or whether this organization continues to operate, you are always personally responsible for the payment of your own medical bills. This organization is not regulated by the New Hampshire Insurance Department. You should review this organization's guidelines carefully to be sure you understand any limitations that may affect your personal medical and financial needs.

**North Carolina Statute 58-49-12**

Notice: The organization facilitating the sharing of medical expenses is not an insurance company and neither its guide-lines nor its plan of operation is an insurance policy. Whether anyone chooses to assist you with your medical bills will be voluntary. No other participant will be compelled by law to contribute toward your medical bills. As such, participation in the organization or a subscription to any of its documents should never be considered to be insurance. Regardless of whether you receive any payment for medical expenses or whether this organization continues to operate, you are always personally liable for the payment of your own medical bills.

**Pennsylvania 40 Penn. Statute Section 23(b)**

Notice: This publication is not an insurance company nor is it offered through an insurance company. This publication does not guarantee or promise that your medical bills will be published or assigned to others for payment. Whether anyone chooses to pay your medical bills will be totally voluntary. As such, this publication should never be considered a substitute for insurance. Whether you receive any payments for medical expenses and whether or not this publication continues to operate, you are always liable for any unpaid bills.

**South Dakota Statute Title 58-1-3.3**

Notice: The organization facilitating the sharing of medical expenses is not an insurance company, and neither its guidelines nor plan of operation is an insurance policy. Whether anyone chooses to assist you with your medical bills will be totally voluntary because no other participant will be compelled by law to contribute toward your medical bills. As such, participation in the organization or a subscription to any of its documents should never be considered to be insurance. Regardless of whether you receive any payments for medical expenses or whether this organization continues to operate, you are always personally responsible for the payment of your own medical bills.

**Texas Code Title 8, K, 1681.001**

Notice: This health care sharing ministry facilitates the sharing of medical expenses and is not an insurance company, and neither its guidelines nor its plan of operation is an insurance policy. Whether anyone chooses to assist you with your medical bills will be totally voluntary because no other participant will be compelled by law to contribute toward your medical bills. As such, participation in the ministry or a subscription to any of its documents should never be considered to be insurance. Regardless of whether you receive any payment for medical expenses or whether this ministry continues to operate, you are always personally responsible for the payment of your own medical bills. Complaints concerning this health care sharing ministry may be reported to the office of the Texas attorney general.

**Virginia Code 38.2-6300-6301**

Notice: This publication is not insurance, and is not offered through an insurance company. Whether anyone chooses to assist you with your medical bills will be totally voluntary, as no other member will be compelled by law to contribute toward your medical bills. As such, this publication should never be considered to be insurance. Whether you receive any payments for medical expenses and whether or not this publication continues to operate, you are always personally responsible for the payment of your own medical bills.

**Wisconsin Statute 600.01 (1) (b) (9)**

ATTENTION: This publication is not issued by an insurance company, nor is it offered through an insurance company. This publication does not guarantee or promise that your medical bills will be published or assigned to others for payment. Whether anyone chooses to pay your medical bills is entirely voluntary. This publication should never be considered a substitute for an insurance policy. Whether or not you receive any payments for medical expenses, and whether or not this publication continues to operate, you are responsible for the payment of your own medical bills.

**Wyoming 26.1.104 (a)(vi)(C)**

Notice: The organization facilitating the sharing of medical expenses is not an insurance company, and neither its guidelines nor plan of operation is an insurance policy. Any assistance with your medical bills is completely voluntary. No other participant is compelled by law or otherwise to contribute toward your medical bills. Participation in the organization or a subscription to any of its documents shall not be considered to be health insurance and is not subject to the regulatory requirements or consumer protections of the Wyoming insurance code. You are personally responsible for payment of your medical bills regardless of any financial sharing you may receive from the organization for medical expenses. You are also responsible for payment of your medical bills if the organization ceases to exist or ceases to facilitate the sharing of medical expenses.

# Notes

# Index

| | |
|---|---|
| Adoption | II.E, VII.F, IX.A.6 |
| Advance Decisions | XI |
| Appeals | XII |
| Cooperation Required | X.F |
| Discounts on Bills | VI.A.5, VI.C, VI.D.2 |
| Equipment | VIII.B.17 |
| Family Membership (Defined) | II |
| "Incident" (Defined) | VI.A.1 |
| Maternity | IX |
| Medical Tourism/Travel Expenses | VIII.B.19 & 39, VIII.D.23 |
| Mental Illness | VIII.B.30 & 31 |
| Need (Defined) | VI.A.1 |
| Orthotics | VIII.B.29 |
| Pre-Existing Conditions | VII, IX.C |
| Pre-Payment/Early Sharing | IX.A.7 |
| Psychotropic Medication | VIII.B.30 |
| Samaritan Basic & Samaritan Classic | Pages 8–10, III.D, VI, IX, XIV |
| Share Amounts | Pages 8–10, III.D |
| Supplements/Vitamins | VIII.B.5, 23, & 35 |
| Supplies | VIII.B.18 |
| Surplus Shares | III.H |
| Switching Membership Levels | XIV |
| Travel Expenses | VIII.B.39, VIII.D.23 |
| Vaccinations | VIII.D.18 |

Notes



**samaritanministries.org**

**phone**
**877-764-2426**
MON, TUE, WED, AND FRI:  8:00 A.M. – 5:00 P.M. CST
THUR:  9:30 A.M. – 5:00 P.M. CST

**email**
**info@samaritanministries.org**

# EXHIBIT A-3

[Samaritan Ministries Membership
Application]



| | | | | |
|---|---|---|---|---|
| Start | M / Y | A | Y | N |
| Paid | $ | Adults | # | UNITS |
| Check # | | Children | # | |
| Due | $ | MemKey | | |
| | Sent | | Received | |



# Membership Application

## 1 General Membership Information

Need help completing this form? Call us toll-free at 1-877-764-2426.

**Please print clearly with blue or black ink.**

**Name** — First / Middle / Last

**Birth date** — Month / Day / Year  **Male/Female** — M / F

**Organization** — If applicable

**Address**

**City** — **State** — **Zip**

**Email**

**Cell phone** — **Home phone**

**Work phone**

**Occupation**

### How did you learn about this ministry?
Give specific names if possible and please check all that apply.

- ☐ Friend/referral (somebody told me):
- ☐ Magazine:
- ☐ Internet:
- ☐ Conference:
- ☐ Radio program/network:
- ☐ I'm a member splitting off my parent's current Samaritan membership:
  - Parent's Name / Membership #
- ☐ I was previously a Samaritan member
- ☐ Other:

## Family Members In Your Household

- Please list spouse even if he/she is not joining
- Include dependents 25 years old and under, or those 26 and over who meet basic income requirements (see Guidelines Section II.A, B, & C).
- Include last name if different than member above
- Please use an additional sheet of paper if necessary

| | First | Middle | Last | Male/Female | Birth date | Include in Membership? |
|---|---|---|---|---|---|---|
| **Spouse** | First | Middle | Last | M / F | M / D / Y | Y / N |
| **Child #1** | First | Middle | Last | M / F | M / D / Y | Y / N |
| **Child #2** | First | Middle | Last | M / F | M / D / Y | Y / N |
| **Child #3** | First | Middle | Last | M / F | M / D / Y | Y / N |
| **Child #4** | First | Middle | Last | M / F | M / D / Y | Y / N |
| **Child #5** | First | Middle | Last | M / F | M / D / Y | Y / N |
| **Child #6** | First | Middle | Last | M / F | M / D / Y | Y / N |

## 2 Family Health History

Please list the medical history of anyone you are adding to membership. Provide a list of all tests, treatments, and symptoms (even if not diagnosed or treated) that have occurred during the last 12 months, as well as a complete health history for genetic defects, hereditary diseases, diabetes, heart conditions, and cancer. **Sharing medical expenses for some conditions existing prior to membership may be limited, but eligibility for membership is not affected by these or any health conditions. (Please use an additional sheet of paper if necessary.)**

| Family member | Illness or injury | Date of treatment | Outcome of treatment |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

**Appx. Vol I**
**A-95**





# 3 Newsletter Membership Agreement

**Please read and initial the following statements.**

### Membership Requirements

*Applicant's Initials / Spouse's Initials*

**1.** I have access to the current Samaritan Ministries Guidelines, have read them, and agree to abide by them. (The Guidelines can be accessed at samaritanministries.org.)

**2.** I have read and do affirm the member Statement of Faith (Section I.A).

**3.** I agree to abide by the membership requirements listed in Sections I and II of the Guidelines, including:

**a.** I attend Biblical, Christian church services at least three weeks each month (except for illness, travel, etc.).

**b.** I abstain from the use of tobacco and illegal drugs.

**c.** I abstain from any sexual activity outside of traditional Biblical marriage.

**d1.** I abstain completely from the use of alcoholic beverages (wine used for communion is an approved exception).

– or –

**d2.** I use alcoholic beverages in careful moderation—never drinking to drunkenness (Ephesians 5:18).

**4.** I affirm that everyone age 18 and over included in this membership meets the requirements listed in Sections I and II of the Guidelines. (Leave blank if not applicable.)

### Ministry Understandings

**5.** I understand that Samaritan Ministries is not an insurance company, does not provide insurance, and is not regulated or approved by a department of insurance in any state. A monthly mailing/email provides information to enable me to pray for specific medical needs, send notes of encouragement, and directly share financially in another member's need.

**6.** I understand that Samaritan Ministries has no obligation to pay any medical bill of mine or my family.

**7.** I understand that any monthly shares I receive will come directly from fellow members, not from Samaritan Ministries. Information I may have regarding past giving by Samaritan members does not guarantee any future giving.

**8.** I agree that the responsibility for paying medical bills remains mine whether or not I receive financial help from other members.

**9.** I understand that the heads of household on the membership (whether or not active) will have access to all information on the membership (as will any other individual with whom I share my online membership login credentials). This includes the medical information of the spouse and all dependents on the membership, regardless of their age.

### Sharing Practices

**10.** I understand that the purpose of Samaritan's financial sharing is to bear one another's medical burdens. Leaving medical bills unpaid or otherwise using members' monthly shares for another purpose would be a violation of their trust, making me ineligible to have additional needs shared and ineligible to continue membership. I authorize Samaritan to hold me accountable with my Christian church (as reported to SMI or where I am currently attending) for any such violation even if I am no longer a Samaritan member.

### Sharing Practices (cont.)

*Applicant's Initials / Spouse's Initials*

**11.** I understand that 11 months of the time I will be asked to send a monthly share directly to a member with a need. I understand that I must send to all assigned needs and be current in sharing with members and the office, to be eligible to have my own needs shared.

**12.** I understand that one month each year my monthly share will be sent as an administrative fee to the Samaritan Ministries' office, to be used at the discretion of Samaritan Ministries to perform all ministry functions, including presenting this ministry to others who are not members, and for such other purposes as determined by the Board of Directors. This share will not be used to reimburse shareable medical expenses, nor is it a "premium" for any agreement by Samaritan Ministries to reimburse me for medical expenses.

**13.** If I decide to discontinue my membership, I agree to send notification in writing to Samaritan Ministries before the 15th of the month preceding the month in which I wish to stop sharing, and to continue sending to assigned needs until my cancellation is acknowledged.

**14.** I understand that if I should end my membership and later rejoin, the provisions for having my needs shared will be the same as starting a new membership, without regard to any previous membership time.

**15.** Conditions existing before membership: I understand that any health condition (diagnosed or not) that my household members have experienced (symptoms or treatment) prior to the membership will not be eligible for sharing as a regular need until 12 months elapse without any symptoms, treatment, or medication (Section VII). The requirement for recurrence of a related cancer or a heart condition is five years without symptoms, treatment, or medication. The need may be presented as a Special Prayer Need (Section V.A).

**16.** Exceptions: I understand that any need resulting from Type I diabetes that existed before my membership will not be shared as a regular need (but may qualify as a Special Prayer Need), even if it has not recurred prior to the membership or has been declared cured (Section II.B).

**17.** I have read and understand the specific limits on what can be shared for a maternity need (Section IX).

### Conflict Resolution

**18.** I agree that neither I nor Samaritan Ministries have any legal power to force anyone to give to me for any need. Members give to other members voluntarily as an expression of obedience to their Christian faith, and it would be contrary to my Christian beliefs for any governmental authority to construe giving by members to be a contractual obligation.

**19.** I agree that believers should settle their disputes within the Body of believers, and not take one another to civil courts, unless they refuse to submit to the Body (1 Corinthians 6:1-8). I agree as a condition of membership, to submit any dispute or claim against Samaritan Ministries, its members, staff, officers, or directors, to Christian arbitration under the laws of Illinois and the United States—or the Board of Directors where applicable—as provided in Section XII of the Guidelines, and give up any right to sue in civil court.

**I have initialed each of the above statements and sign here indicating my agreement. (Required from each participating adult.)**

Applicant's signature _____ Date _____

Spouse's signature _____ Date _____

**Please specify when you want to start your membership:**

☐ On the date it is received at Samaritan Ministries' office.   – or –   ☐ on   *Month* / *Day* / *Year*



## 4 — To Share in Needs That Exceed $250,000

### *Save to Share*™ Membership Agreement

**Only those desiring to participate in *Save to Share*™ should complete this section.**
(Please read and initial the following statements.)

Applicant's Initials / Spouse's Initials

**1.** I understand that participation in *Save to Share*™ requires participation in Samaritan Classic or Samaritan Basic, and adherence to the Guidelines. I understand that a decision to discontinue that participation will at the same time terminate my participation in *Save to Share*™.

**2.** I have access to the current *Save to Share*™ Guidelines, have read them, and agree to abide by them. (The *Save to Share*™ Guidelines can be accessed at samaritanministries.org.)

**3.** I understand that if I should end participation in the *Save to Share*™ program for any reason and later reapply, the provisions for having my needs shared will be as though I had never participated previously (i.e. pre-existing conditions, etc.).

Applicant's Initials / Spouse's Initials

**4.** I understand that *Save to Share*™ is part of Samaritan Ministries and is not an insurance company, but a sharing ministry. The same understandings and limitations I have agreed to regarding Samaritan Classic or Samaritan Basic also apply to *Save to Share*™ except that *Save to Share*™ shares that portion of a *Save to Share*™ member's need that exceeds the $250,000 maximum shareable amount (up to the available amounts under the Guidelines).

**5.** I understand and agree that it is my responsibility to set aside the agreed upon amount of money to be ready to share in the need(s) assigned to me (see *Save to Share*™ Guidelines). Failure to share in a need assigned to me will result in dismissal from *Save to Share*™ with no possibility of reinstatement.

**I have initialed each of the above statements and sign here indicating my agreement. (Required from each participating adult.)**

Applicant's signature _____ Date _____

Spouse's signature _____ Date _____

## 5 — Required Church Information

As a community of Christians helping other Christians with their medical bills, every adult on the membership must affirm the member Statement of Faith (Guidelines—Section I.A) and attend a Biblical, Christian church regularly.

Fellowships, churches, temples, wards, and denominations that fall outside of Biblical, Christian faith—such as the Church of Scientology, Unitarian, Jehovah's Witnesses, and The Church of Jesus Christ of Latter-day Saints—do not qualify for the church attendance membership requirement.

**I/We attend** _Church name_

**Denomination** _____

**Church address** _____

**Church phone** _____

**City** _____ **State** ____ **Zip** _____

**Church email** _____

The pastor of your Christian church, a church officer (if you are the pastor), or some other person to whom you are accountable (if you are in a Christian mission church or church planting effort) must complete the Church Leader Verification section below.

### Church Leader Verification

☐ **Pastor**   ☐ **Church Officer**   ☐ **Person to whom you are accountable**

(If someone to whom you are accountable is providing verification, please describe the relationship below.)

**To the best of your knowledge, does the member(s) listed in Section One:**

Yes / No

☐ ☐ Participate in the Christian church or fellowship you attend?

☐ ☐ Attend Christian services at least three weeks each month (except for illness, travel, etc.)?

☐ ☐ Abstain from the use of tobacco and illegal drugs?

☐ ☐ Abstain from consumption of alcohol or consume alcohol only in careful moderation?

☐ ☐ Abstain from any sexual activity outside of traditional Biblical marriage?

**Leader's name** _Please print_

**(Must not be yourself or another member of your immediate household.)**

**Phone** _____  ☐ Home  ☐ Cell  ☐ Office

**Leader's signature** X _____

**Date** _Month_ / _Day_ / _Year_

# 6 Membership Fee Calculator

*Need help completing this form? Call us toll-free at 1-877-764-2426.*

**I want to join the following ministries:** *(check all that apply and indicate totals)*

✓ **Main Newsletter Ministry** ............................................... **Start-up Administrative Fee** (non-refundable) → **$ 200.00**

**Samaritan Classic\* Monthly Share** [1]

■ **Regular**

☐ **One person - $263** per month [2] (age 30 or older)

☐ **Two persons - $511** per month

☐ **Three to seven person** family - **$596** per month

☐ **Eight or more person** family - **$682** per month

☐ **Widowed or divorced** with children - **$408** per month

**First month's Regular share** [1] → +

— OR —

■ **Young Adult** (age 29 or younger)

☐ **One person - $177** per month [2]

> **\*If you are interested in the Samaritan Basic sharing option, you must sign up online. Go to samaritanministries.org/cost for information on Samaritan Basic, or call 1-877-764-2426.**

— OR —

[1] Share amounts can only be increased by a vote of the members. See Section IV.A.2 of the Guidelines.

[2] To share maternity needs, a minimum of two people are required to be on the membership (or be at an equivalent monthly share amount).

**First month's Young Adult share** → +

☐ **Save to Share™** ............................................... **$15 Annual Administrative Fee** → +

(Optional ministry for needs that exceed $250,000—see Section 4)

Include only the *Save to Share™* annual administrative fee of **$15** in your payment. **You should not send your Save to Share™ set-aside funds to Samaritan Ministries.**

**Total Fee(s) + First Month's Share    $** *Total*

Please send your payment for applicable administrative fees plus the first month's share, along with this completed application form to: **Samaritan Ministries, PO Box 3618, Peoria, IL 61612-3618**

20220701

# 7 Important Notices

**A** This ministry is not operated by an insurance company nor is it offered through an insurance company. Samaritan Ministries and its members assume no responsibility for your medical bills. Whether you receive any share money to help you with your medical needs will depend on the voluntary giving of your fellow members as an expression of Christian love, but no matter how much money you receive, you always remain solely responsible for payment of your own medical bills.

**B** Samaritan Ministries retains the absolute discretion to accept, reject, or qualify your membership. You should not assume that your application has been accepted until you have received a written confirmation from Samaritan Ministries. (However, your membership will not be refused based on your age, health, or family size.)

# 8 Household Information

To be used only by Samaritan Ministries to better serve our members.

**Marital Status**

☐ Married
☐ Widowed
☐ Divorced
☐ Separated
☐ Never Married
☐ Remarried

**Highest Level of Education Completed**

Applicant  Spouse

☐ ☐ High School
☐ ☐ Some College
☐ ☐ 2-Year Degree
☐ ☐ Master's Degree
☐ ☐ Doctorate/Professional Degree
☐ ☐ Specialized Certification (please specify)

Applicant  Spouse

☐ ☐ 4-Year Degree

**Household Income**

☐ Below $15,000
☐ $15,000 - $24,999
☐ $25,000 - $49,999
☐ $50,000 - $74,999
☐ $75,000 - $99,999
☐ $100,000 and over

Strictly confidential. For internal, office use only. Will not be sold or disclosed to outside parties.

☐ I would prefer not to participate.

# Basic Addendum

**Please print clearly with blue or black ink.**
Please contact us if you have any questions at 1.877.764.2426.


**Samaritan** MINISTRIES™

---

**OFFICE USE ONLY**   MemName [                    ]   MemKey [                    ]

---

**1** SAMARITAN BASIC MEMBERSHIP AGREEMENTS

**All participating adults must read and initial the following statements.**
Membership will not be refused based on age, health, or family size, but Samaritan Ministries retains the right to accept, reject, or qualify your membership. Membership isn't active until you've received a written confirmation from Samaritan Ministries.

## Samaritan BASIC Agreements

☐ I understand that I am signing up for membership in Samaritan Ministries at the Basic participation level, not the Classic participation level.

☐ I have read and understand the sharing limits and costs of participating in Samaritan Basic, and that they will apply to any medical needs of eligible members of my household.

☐ I understand that my membership level does not alter or reduce the membership requirements.

☐ I understand that the amount shared for a qualifying medical need in Samaritan Basic will usually be less than it would be at the Classic membership level.

---

**Please specify when you want to start your membership:** On the date it is received at Samaritan Ministries' office. ☐ —OR— ON [ MM/DD/YYYY ]

**I have initialed each of the above statements and sign here indicating my agreement. (Required from each participating adult.)**

APPLICANT'S NAME                                  DATE   SPOUSE'S NAME                                  DATE
*Please Print*                                            *Please Print*

*Signature*                                               *Signature*

---

**2** BASIC SHARE COST INFORMATION

**All monthly membership costs are based on age and household size.**
Share amounts can only be increased by a vote of the members. See Section IV.A.2 of the Guidelines.
To share maternity needs, a minimum of two people are required to be on the membership.

## Samaritan BASIC    Monthly Share    Age of oldest member

| Membership Size | ≤ 29 | 30-44 | 45-59 | 60+ |
|---|---|---|---|---|
| 1 Person | $99 | $126 | $147 | $168 |
| 2 Person | $209 | $251 | $293 | $337 |
| 3+ Person | $263 | $314 | $368 | $421 |

20220701

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

ALLIANCE OF HEALTH CARE
SHARING MINISTRIES,

                Plaintiffs,

v.

COLORADO DIVISION OF INSURANCE;
and MICHAEL CONWAY, in his official
capacity as Commissioner of the Colorado
Division of Insurance,

                Defendants.

Case No. 1:24-cv-01386

<u>**DECLARATION OF KATY TALENTO**</u>

I, Katy Talento, in accordance with 28 U.S.C. § 1746 state as follows:

1.      I am over eighteen years of age, of sound mind, and have never been convicted of a felony or an offense involving moral turpitude. I have personal knowledge of the matters set forth below and could competently testify as to them if called upon to do so.

2.      I am the Executive Director of the Alliance of Health Care Sharing Ministries. In my role, I manage the activities of the Alliance, coordinate with Alliance members, and make recommendations to the Board of Directors of the Alliance.

3.      The purpose of this declaration is to explain what a health care sharing ministry is, what the Alliance is, and to discuss the effects of a new law and implementing regulation by the State of Colorado that pertains to health care sharing ministries.

## I.   What is a health care sharing ministry?

4.   Health care sharing ministries allow faith-centered people to come together as a community to share each other's medical expenses.  Every month, members contribute a set amount toward the medical expenses of other members or directly to the overhead needs of the ministry.  Each ministry does this differently; some ministries have an online sharing technology system to approve the sharing of funds, while others send individual checks to members.  When members go to the doctor, hospital, or otherwise incur a medical cost, they later submit an itemized bill to their community, through their ministry.  After the ministry reviews the bill to ensure that all expenses meet the ministry's guidelines, the ministry assigns another member or members to share in the expense, facilitating the payment from such assignees to the member who submitted the expense or to the health care provider.

5.   Health care sharing ministries *are not* insurance.  Health care sharing ministries are non-profit, 501(c)(3) values-based organizations that operate on a completely different model than insurance.  Health care sharing ministries do not indemnify their members, and there is no guarantee that a member's health care costs will be paid.  Instead, health care sharing ministries are communities of individuals with strong religious ties who faithfully come together to share eligible health care costs, as described in each ministry's sharing guidelines.  Health care sharing ministries enable faith-based communities to support one another and decide which health care costs they will share—instead of the secular health care offerings by government, corporate employers, or insurance company executives.  Each ministry is transparent about what costs are shared. This information is available to the public, and member ministries of the Alliance share this information with their prospective members before they join the ministry.

6.      Around one million Americans are members of a health care sharing ministry because health care sharing ministries align with their religious convictions to support their brothers and sisters.  Health care sharing ministries also offer principled, high-quality care at a price that is often more affordable than what is offered by large insurance companies or the hyper-regulated federal exchanges.  Further, health care sharing ministries share more than just health expenses: they additionally offer spiritual support to members through prayer and fellowship.

7.      Health care sharing ministries that I represent welcome any like-minded individuals who share their religious beliefs and want to join their ministry to share health care expenses.  Each health care sharing ministry has a statement of beliefs that everyone in the ministry agrees to uphold.  That statement of beliefs ensures that the ministry maintains an identity rooted in shared faith and values.  New members must expressly acknowledge that they (1) adhere to the ministry's statement of faith, (2) will abide by its requirements of members, and (3) understand what types of expenses are shared and what types of expenses will not be shared.

## II.     What is the Alliance of Health Care Sharing Ministries?

8.       The Alliance is a 501(c)(6) trade organization formed to represent the common interests of health care sharing ministries.  The Alliance's members include the majority of the health care sharing ministries that have large, nationwide membership and that have been certified by the U.S. Department of Health and Human Services Centers for Medicare and Medicaid Services as meeting the federal definition of "health care sharing ministry" under the Affordable Care Act.  The Alliance's members include Samaritan Ministries.

9.      The standards that the Alliance's members agree to uphold are posted on our website.  *See* Alliance of Health Care Sharing Ministry Standards for Partner and Affiliate Member

Organizations (promulgated April 2020), https://ahcsm.org/about-us/ministry-standards/. In summary, we require our members to be 501(c)(3) organizations whose core purpose is to facilitate the sharing of medical expenses as an exercise and expression of religious beliefs. We require our member ministries to follow corporate governance best practices, be fiscally responsible, and be transparent with their members.

10.    As to the operation of their ministries, all Alliance members adhere to the following practices, which are consistent with what I explained above:

6. Health Care Sharing Ministry Practices.

The organization shall operate a health care sharing ministry that:
1. Facilitates the voluntary payment of certain medical expenses incurred by its members through payments by other members, all in accordance with methods and criteria adopted by the organization or its members;

2. Establishes regular payment amounts for its members;

3. Provides no assumption of risk or promise to pay among the members or by the organization;

4. Accepts as members only individuals and families who share a common set of religious beliefs held by the organization and who, as an exercise and expression of such beliefs, desire to share voluntarily in paying certain medical expenses incurred by the members;

5. Provides monthly to all members the total dollar amount of member medical expenses for which the organization in the prior month facilitated payment according to the organization's criteria;

6. Provides on or accompanying all applications and guideline materials distributed by or on behalf of the organization the following statements (in substance):

    i. The health care sharing ministry is not an insurance company nor is it offered through an insurance company.

    ii. Whether anyone chooses to assist a member with the member's medical bills will be totally voluntary, as neither the ministry nor any other member will be compelled by law to contribute toward such member's medical bills.

    iii. The health care sharing ministry should never be considered to be insurance.

    iv. Whether a member receives any payments for medical expenses and whether or not the health care sharing ministry continues to operate, the member is always personally responsible for the payment of the member's own medical bills.

**III.    How Colorado's new regime harms the Alliance and its members.**

11.    As Executive Director of the Alliance of Health Care Sharing Ministries, I have worked closely with Alliance members to learn how Colorado's new regime will affect member ministries.  I believe the Colorado regime will cause them substantial and irreparable harm.

12.    Colorado's regime demands that Alliance members provide the state with extensive and intrusive financial data and operational statistics that go far beyond what other regulations require.  The Colorado regime requires Alliance members to report to the state their statistical and financial information, affiliations, and communications.   This information can be easily misunderstood or mischaracterized when taken out of context.

13.    The Colorado regime requires Alliance members to report comprehensive information regarding their number of members, including the amounts they contribute, the amount of expenditures they request to be shared, the amounts actually shared, the amounts paid to health care providers, and the internal structure of their ministries.  In this way, Colorado effectively tells Alliance member ministries to disclose in precise detail the contents of their collection baskets and how member ministries allocate or spend that money.

14.    How Alliance members allocate the voluntary contributions they receive is a matter of religious conviction and is at the core of their faith-driven approach to health care.  Just as a church's decisions about how to share proceeds from the collection basket are a matter between the church and its congregants, the sharing of resources within a health care sharing ministry is a matter between the ministry and its members that is governed by religious principles.  Colorado's intrusion into those decisions violates the religious autonomy of Alliance members.

15.     Compounding that burden, many of the terms in Colorado's reporting requirements are imprecise or nonsensical.  For example, the statute requires reporting of the percentage of revenues retained for "administrative expenses," but there is no standard definition of that term in the statute.    Similarly,  the  statute  requires  reporting  of  dollar  amounts  of  "requests  for reimbursement of health care costs or services," but does not specify whether those amounts should be the "sticker price" providers put on an invoice or the reduced amount they eventually accept. The statute also requires reporting of "reimbursement request denials," but provides no definition as to whether requests that are outside of publicly posted sharing guidelines constitute a "denial."

16.     Another  problematic  aspect  of  the  Colorado  regime  is  the  requirement  that ministries report to the state any contracts that they have "entered into with providers," another undefined term.  By its plain language, this means that Alliance member ministries are required to disclose all medical practitioners with whom they do business.  Colorado also requires reporting of any "third parties" that are involved in "operating, managing, or administering" the member ministry's sharing program.  Many Alliance ministry affiliates wish to maintain the privacy of their business or religious affiliations and do not want their information shared with the government. The forced disclosure of this information undermines Alliance ministry members' abilities to work with their partners to carry out their religious missions.  I am already aware of some affiliates expressing  reluctance  to  continue  working  with  health  care  sharing  ministries  because  of Colorado's regulations.

17.     If  all  of  this  weren't  enough,  Colorado  further  requires  health  care  sharing ministries to submit copies of all member and potential member communications "promoting" the ministry,  including  all  "descriptions  and  other  materials"  that  explain  the  ministry's  sharing

programs.  In this way, Colorado effectively tells Alliance member ministries to disclose in precise detail the how they evangelize.

18.     All of the above information that Alliance members must disclose is subject to public review.    Colorado officials have previously used this information to warn potential members away from health care sharing ministries.  I am concerned that Colorado will use the mandated affiliate disclosures to disparage or harass the Alliance and its members or pressure me or members of Alliance member ministries to not participate in a health care sharing ministry.  This will significantly impact the ability of all members of Alliance member ministries to practice their religious call to share the burdens of each other's health care costs.

19.     Through my role as Executive Director at the Alliance, I have seen how all of the above requirements translate into measurable monetary harms to our member health care sharing ministries, in addition to the irreparable dignitary harms the regime causes them to suffer.

20.     The Colorado statute and regulations cause member ministries to divert staff time and funds away from the core purpose of the ministries—sharing in members' health care expenses—and towards compliance with the statute and regulations.  I estimate that the average member ministry will need to devote 200 hours of time annually distributed across multiple employees to comply with the Colorado statute and regulations.  This includes employee time to train employees on the regime, gather the required data, prepare reports, verify their accuracy, ensure legal compliance, and submit the reports and other materials to Colorado.

21.     This is a substantial amount of employee time that will be diverted from the core missions of Alliance member ministries.  The equivalent blended hourly rate paid to all the various professionals at all five Alliance member ministries who will have to work to comply with the

Colorado statute and regulations is difficult to determine, but in any instance it is substantial.  For example, the cost of 200 hours of employee labor at a $30 per hour rate is $6,000.  The cost at a $50 per hour rate is $10,000.  The cost at a $70 per hour rate is $14,000.  Whatever is the proper total must then be multiplied by all member ministries.

22.     Therefore, I *very conservatively* estimate that complying with Colorado's regime will cost Alliance members in total over $30,000 in direct costs and 1000 hours of lost staff time every year.  For nonprofit ministries, this represents a substantial amount of money and time that will be diverted away from their religious missions and the health care needs of their members.

23.     Further, I can state with greater specificity the costs that the Alliance itself has incurred in responding to Colorado's statute and regulations and informing our members of the same.  I estimate the Alliance has spent over one thousand employee hours for a total cost of over $100,000.  The Alliance has also spent hundreds of thousands of dollars on legal expenses related to the Colorado statute and regulations, including commenting on proposed regulations.  The Alliance will be forced to continue incurring many of these onerous expenses if the Colorado regime is permitted to take effect. If other states are permitted to follow Colorado's lead, all of the above costs to member health care sharing ministries and the Alliance itself will only snowball.

24.     Preliminarily enjoining the State of Colorado's health care sharing ministry law and regulations before members are forced to begin incurring the substantial costs described above would temporarily remedy their harms.  Declaring the State of Colorado's health care sharing ministry law and regulations unconstitutional under the Constitution of the United States and the Constitution of the State of Colorado and permanently enjoining the State of Colorado from enforcing them would remedy the harms discussed above on a more lasting basis.

To the best of my knowledge, information, and belief, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 17, 2024.

_____

Katy Talento
Executive Director
Alliance of Health Care Sharing Ministries

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

ALLIANCE OF HEALTH CARE
SHARING MINISTRIES,

             Plaintiff,

v.

MICHAEL CONWAY, in his official
capacity as Commissioner of Insurance,

             Defendant.

Case No. 1:24-CV-01386-GPG-STV

## FIRST AMENDED COMPLAINT

Plaintiff Alliance of Health Care Sharing Ministries brings this action for declaratory and equitable relief against Defendant Michael Conway, in his official capacity as Commissioner of Insurance. Plaintiff challenges a new Colorado law and implementing regulation that target religious organizations that help their members exercise the religious belief that they should contribute voluntarily to each other's financial, spiritual, and emotional medical needs. In addition to singling out these religious organizations for special adverse treatment, the new law and regulation subject them to unwarranted long-term, continuing monitoring that would entangle the government excessively with religion and undermine the proper autonomy of all religious organizations. Colorado's regime runs afoul of the First Amendment and sets Colorado apart as an outlier in the nation in its approach to these decades-old organizations.

## INTRODUCTION

1.      A new Colorado law and implementing regulation targets religious organizations that help their members exercise the religious belief that they should contribute to each other's medical needs.  Colorado subjects these long-established religious organizations, called health care sharing ministries, to extensive and intrusive reporting requirements regarding (1) those with whom they affiliate and associate, (2) their communications to current and prospective members of the ministry, and (3) their operational, statistical, and financial information, including which members they assist and how they staff their ministry.  These requirements are akin to subjecting a church to comprehensive inquiry and monitoring as to who its congregants are, how it evangelizes, and how it distributes from its collection basket for religious programs for its own members.

2.      Colorado is an outlier with respect to its new law and regulation.  Health care sharing ministries as organized today have existed for decades, and the Christian concept of sharing health care expenses dates to the earliest days of Christianity and draws upon Abrahamic traditions.  No other state has attempted to subject these indisputably religious organizations to anything remotely similar to the Colorado regime as a condition of merely existing within that particular state.  Nor does Colorado subject similar medical expense sharing organizations or activities to similar reporting and disclosure requirements.

3.      Colorado's unique, misguided approach violates the Constitution in several ways.  Significantly, it violates the Free Exercise rights of ministries to be free from laws

that target religious exercise, that do not treat comparable secular activities similarly to religious activities, and that provide state officials unbridled discretion to exempt their favored organizations.  The Supreme Court recently explained that each of those types of laws violate the Constitution: a government acts unlawfully when it "restricts practices because of their religious nature," "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," or provides a "mechanism for individualized exemptions" in an official's "sole discretion." *Fulton v. Philadelphia*, 593 U.S. 522, 533–35 (2021).

4.      Just as significantly, Colorado's regime violates the autonomy of religious organizations to be free from unwarranted state entanglement in their affairs and from forced disclosure (and thereby potential chilling) of their affiliates and associates.  As the Tenth Circuit recently explained, regulatory schemes that require "long-term, continuing monitoring" of religious organizations constitute excessive entanglement with religion in violation of the Establishment Clause's protection of religious autonomy.  *Medina v. Catholic Health Initiatives*, 877 F.3d 1213, 1233 (10th Cir. 2017).  And of course it is beyond dispute the First Amendment protects the rights of organizations, particularly religious organizations, not to disclose those with whom they associate.  *Am. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021).

5.      Colorado may enforce this new regime with crushing fines.  Without immediate relief, health care sharing ministries are thus forced to choose between their constitutional rights and severe financial penalties.  The Constitution protects them from that choice.

**PARTIES**

6.      Plaintiff Alliance of Health Care Sharing Ministries is a 501(c)(6) trade organization formed to represent the common interests of health care sharing ministry organizations that are facilitating the sharing of health care needs (financial, emotional, and spiritual) by individuals and families.  The Alliance engages with federal and state regulators, as well as other stakeholders, regarding health care sharing ministries.  Its mission includes protecting the liberty of its member ministries to practice their religious convictions in health care, informing legislators and regulators regarding ministries, and helping ministries navigate legislative and regulatory environments.  The Alliance's members include the majority of the health care sharing ministries that have large, nationwide membership and that have been certified by the U.S. Department of Health and Human Services Centers for Medicare and Medicaid Services as meeting the federal definition of "health care sharing ministry" under the Affordable Care Act.  The Alliance's members include Samaritan Ministries.

7.      Plaintiff has associational standing to bring this suit on behalf of its members who are adversely affected by the challenged statute and regulations. Those members would have standing to sue in their own right, the interests at issue are germane to the Alliance's mission, and the participation of an individual member is not required.

8.      Plaintiff has member ministries who have members in Colorado that participate in the ministries' health care sharing programs and incur medical expenses in Colorado that are shared among ministries' members.  These ministries are required to comply with the Colorado statute and regulation in order to operate in Colorado.  These

ministries not only will face intrusive and extensive burdens on their religious beliefs from the operation of the Colorado statute and regulation, but also significant compliance costs for compiling and producing the required information.  These harms are directly traceable to the statute and regulations, which are unique among U.S. jurisdictions, and would be remedied by an order enjoining the statute and regulation from taking effect.

9.     Defendant Michael Conway, sued in in his official capacity, is the Commissioner of Insurance.  Commissioner Conway oversees the Colorado Division of Insurance ("Division"), a state agency responsible for administering the Colorado statute targeting health care sharing ministries.  The Commissioner also promulgated regulations implementing that statute.

## JURISDICTION AND VENUE

10.     This action arises under the Constitution and the laws of the United States. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

11.     The Court has authority to issue the declaratory and injunctive relief sought under 28 U.S.C. §§ 2201 and 2202.

12.     Venue lies in this district under 28 U.S.C. § 1391(b)(1) and (2).

## FACTUAL ALLEGATIONS

### I.     Health Care Sharing Ministries

#### A.     Origin and Overview

13.     Although the term "health care sharing ministry" ("HCSM") developed in the 20th century, the concept of health care sharing ministries is hundreds of years old among Christians, drawing on Abrahamic traditions.  Health care sharing ministries are the latest

nomenclature for the mutual aid plans established by various Christian denominations, particularly Mennonites, Amish, and Anabaptists, to implement their understanding of the biblical admonition to "[b]ear ye one another's burdens." *Bethel Conserv. Mennonite Church v. Comm'r*, 746 F.2d 388, 392 (7th Cir. 1984) (quoting Galatians 6:2).

14.     This type of ministry is common among Christian traditions.  There are more than 100 health care sharing ministries in the United States, with total membership of about one million members.  There also is a Jewish health care sharing ministry, and there have been efforts to establish a health care sharing ministry for followers of Islam.

15.     Although these ministries vary in details, they share the common feature that their members exercise their religious beliefs to share in each other's health burdens spiritually through prayer, emotionally through fellowship and communications, and financially through monetary support.

### B.     Health Care Sharing Ministries in Practice

16.     Samaritan Ministries exemplifies this reality.  Samaritan was formed in 1991 in Illinois and began a nationwide ministry in 1994.  Samaritan declares that its "purpose is to glorify God by growing and equipping disciples of Jesus Christ to love God with all their heart, soul, mind and strength, and to love and care for their neighbor as themselves."  Bylaws (citing Matthew 28:18–20, among others).  Its "mission is to redeem health care by helping the Body of Christ love one another through sharing each other's health care burdens while experiencing authentic Biblical community."  *Id*. (citing Galatians 6:2, among others).

17.     To that end, "every month, members of Samaritan Ministries give to other members who have medical needs.  Members pray and send their monthly share, along with notes of encouragement, directly to the member in need.  This allows members to minister to all aspects of the need: spiritual, emotional, physical, and financial."   But Samaritan does not guarantee reimbursement of any medical expense; rather, it receives information about medical needs and then asks fellow members to send funds, notes, and prayers those members in need, as long as those medical needs are consistent with Samaritan's ethical norms.  It adjusts what it asks of members, depending on member needs.  It also accounts for the struggles of particular members at times of their lives by reducing what it asks of them, which was a common phenomenon during the pandemic.  These decisions are made in accordance with the principle that members must "carry their own load."  *Id.* (citing Galatians 6:5).

18.     To become a member of Samaritan, one must "be a Christian living by biblical principles" as certified by a local church leader.   Members also must affirm Samaritan's statement of faith, which contains numerous doctrinal positions, and attend church services at least three weeks per month.  And they must agree to resolve disputes amongst members, consistent with biblical principles.   *See* Application (citing 1 Corinthians 6:1-8).

19.     Samaritan is governed along the lines of a congregational church.   Its members vote to control the governing Board.  Indeed, members control by that vote a supermajority of the Board, that is, six of nine seats.  The Board votes on all significant matters, including, importantly, changes in requested sharing amounts.

20.     Samaritan's internal operations also closely resemble that of a church.  Staff must be members and must affirm a statement of faith.  Staff open meetings with prayer, are invited to prayer sessions with staff chaplains, and engage in communal fasting, prayer, and worship.

21.     Samaritan also serves as a community for association and expression. Through newsletters, websites, a virtual forum, and local events, as well as member-to-member communications, Samaritan's members exhort each other on a host of religious topics, ranging from the theological to the practical.  For example, newsletters contain discussions of "missional medicine," spotlights on member couples "spreading the Gospel," and international and prison ministry issues.

22.     Numerous other ministries function as religious organizations in a similar way as Samaritan.   For example, Medi-Share members agree to "live by biblical standards," that "believers are to bear one another's burdens," and "attend and actively support a fellowship of believers regularly."  Medi-Share Guidelines (citing, among others, Matthew 2:19).  OneShare Health, similarly, declares that its "Mission as a Health Care Sharing Ministry is to help Christians share each other's medical expenses by providing affordable sharing programs which align with their beliefs. With origins in the Anabaptist faith and a chaplain on staff, we welcome and unite those who agree with our core biblical principles and Statement of Beliefs relating to life, health, and caring for others." OneShare Health, Who We Are (May 8, 2024).  Liberty HealthShare's Sharing Guidelines require that its members "acknowledge that Jesus Christ is [their] Salvation," "Demonstrate the Fruits of the Spirit," "Honor the biblical teaching to 'share one another's

burdens,'" and "Participate regularly in worship and prayer."  Liberty HealthShare 2023 Sharing Guidelines.

### C.    Historical Interaction with Governments

23.    Ministries like Samaritan, Medi-Share, OneShare Health, and Liberty HealthShare enjoy recognition by the federal government.  The Affordable Care Act exempts members of health care sharing ministries from various of its requirements.  The U.S. Department of Health and Human Services has certified that at least 107 of these ministries satisfy that definition.  The IRS also treats ministries as tax-exempt 501(c)(3) organizations and several file paperwork regarding that status.

24.    A supermajority of states do not intrude upon the operations of health care sharing ministries.  Thirty-three states have enacted safe harbor laws clarifying that health care sharing ministries are exempt from the state insurance code and may operate subject only to the general legal requirements applicable to charities.  An additional four states allow health care sharing ministries to operate exempt from the state insurance code by providing an exemption for their respective residents from those states' insurance mandates.  A few states, such as New Mexico, have challenged some ministries (wrongly, and subject to litigation) as constituting insurance subject to the insurance code.

25.    That widespread state treatment of health care sharing ministries is consistent with state regulatory treatment of similar medical expense sharing organizations and practices.  States rarely if ever subject similar expense sharing arrangements to regulation, such as but not limited to, direct primary care arrangements, medical discount cards, crowdfunding, student health clinics at universities (where

students pay a fee for unlimited access), charities that pay medical bills, or fully-insured out-of-state employer health plans with in-state enrollees.

## II.      Colorado's Outlier Approach

26.     Colorado, however, has taken a different approach, motivated by bias against health care sharing ministries, which renders it unique in the entire nation.  That is, Colorado has set out to regulate health care sharing ministries, in contrast to similar health financing arrangements, because they are health care sharing ministries and maintain certain religious beliefs.

### A.      Colorado's Singular Focus on Health Care Sharing Ministries

27.     Colorado first evidenced its singular focus on the religious aspects of health care sharing ministries in a "consumer advisory" on December 11, 2020.  *See* Consumer Advisory: Division of Insurance Cautions Coloradans on the Limitations of Health Care Sharing Programs (Dec. 11, 2020), https://perma.cc/FRJ9-A3CS.

28.      In the "consumer advisory," the Division stated that members of the public should be wary of a "health care sharing program or ministry," because, among other reasons "members may also be subject to religious or moral restrictions from the sharing ministry."  *Id.*

29.     Colorado also evidenced its singular focus on health care sharing ministries in the legislative process.   For several years both before and after the Division's "consumer advisory" warning about the "religious or moral" elements of a "ministry," a state legislator introduced a bill targeting for regulation all entities constituting a "health care sharing ministry."  *See, e.g.*, House Bill 20-1008; House Bill 21-1135.

30.     Several years later, and notwithstanding separate public comments regarding the focus of the bill sponsor on health care sharing ministries, the legislature attempted to sanitize those efforts by removing all references to a "ministry," but retaining the same essential regulatory scheme.   House Bill 22-1269; *see* Hannah Metzger, Colorado Bill Aims to Create Reporting Requirements for Health Care Sharing Ministries, Colorado Politics (Mar. 11, 2022), https://perma.cc/A4K4-4Q8F (recognizing the similarities between House Bill 22-1269 and prior bills).

31.     That bill, after some revisions, became law on June 8, 2022.  Laws 2022, Ch. 444 (H.B. 22-1269) (June 8, 2022) (codified at Colo. Rev. Stat. § 10-16-107.4).

**B.      Colorado's Health Care Sharing Ministries Law:  Intrusive and Extensive Regulation with Unbridled Discretion**

32.     The Colorado statute imposes extensive and intrusive reporting requirements on health care sharing ministries in order to exist in Colorado.  The statute requires reporting of several types of information:  statistical and financial, affiliations, and communications.

33.     First, the statute requires reporting of mounds of statistical and financial information.  Across over a dozen different statutory requirements, the statute requires reporting of comprehensive information regarding the number of members in the ministry, the amounts contributed to each other, the amounts requested to be shared, and actually shared, the amounts members of the ministry pay to health care providers, and the internal structure of the ministry.  Colo. Rev. Stat. § 10-16-107.4(1)(a)(I)–(III), (V)–(XII), (XVI), (XIX)–(XX).  The reporting requirements provide a detailed picture of the ministry's finances.  To put it another way, the reporting requirements ask the ministries how much

their members are contributing to each other.  This is akin to asking a church in a painstakingly detailed fashion about its collection basket and how it spends that money.

34.     Compounding that burden, many of the terms in these reporting requirements are imprecise or nonsensical.  For example, the statute requires reporting of the percentage of revenues retained for "administrative expenses," but there is no standard definition of that term in the statute.  Similarly, the statute requires reporting of dollar amounts of "requests for reimbursement of health care costs or services," but does not specify whether those amounts should be the "sticker price" providers put on an invoice or the reduced amount they eventually accept.  The statute also requires reporting of "reimbursement request denials," but provides no definition as to whether requests that are outside of ministry guidelines constitute a "denial."

35.     Second, the statute requires reporting of detailed information regarding the ministry's affiliations.  It requires reporting of "any contracts the [ministry] has entered into with providers," that is, all medical practitioners with which it may do business.  *Id.* § 10-16-107.4(1)(a)(IV).  It also requires reporting of "any third parties that are associated with or assist" the ministry "in offering or enrolling participants" in the ministry" and a "detailed accounting" of amounts "paid to a third party" for "operating, managing, or administering a plan or arrangement."  *Id.* § 10-16-107.4(1)(a)(XV). This is akin to asking a church about how it performs its charitable endeavors, how it evangelizes, and who it associates with in doing so.

36.     Finally, the statute requires submission of the ministry's speech.  It asks for "any" member and potential member communications "promoting" the ministry, including

all "descriptions and other materials" that explain the ministry's sharing programs.  *Id.* § 10-16-107.4(1)(a)(XVII).  This is akin to asking a church about the speech it uses to evangelize and recruit new adherents or explain its doctrines.

37.     This summary is a concise distillation and categorization of the statute's extensive requirements.   Here is precisely everything that the statute requires the ministries to disclose:

> (I) The total number of individuals and households that participated in the plan or arrangement in this state in the immediately preceding calendar year;
>
> (II) The total number of employer groups that participated in the plan or arrangement in this state in the immediately preceding calendar year, specifying the total number of participating individuals in each participating employer group;
>
> (III) If the person offers a plan or arrangement in other states, the total number of participants in the plan or arrangement nationally;
>
> (IV) Any contracts the person has entered into with providers in this state that provide health-care services to plan or arrangement participants;
>
> (V) The total amount of fees, dues, or other payments collected by the person in the immediately preceding calendar year from individuals, employer groups, or others who participated in the plan or arrangement in this state, specifying the percentage of fees, dues, or other payments retained by the person for administrative expenses;
>
> (VI) The total dollar amount of requests for reimbursement of health-care costs or services submitted in this state in the immediately preceding calendar year by participants in the plan or arrangement or providers that provided health-care services to plan or arrangement participants;

(VII) The total dollar amount of requests for reimbursement of health-care costs or services that were submitted in this state and were determined to qualify for reimbursement under the plan or arrangement in the immediately preceding calendar year;

(VIII) The total amount of payments made to providers in this state in the immediately preceding calendar year for health-care services provided to or received by a plan or arrangement participant;

(IX) The total amount of reimbursements made to plan or arrangement participants in this state in the immediately preceding calendar year for health-care services provided to or received by a plan or arrangement participant;

(X) The total number of requests for reimbursement of health-care costs or services submitted in this state in the immediately preceding calendar year that were denied, expressed as a percentage of total reimbursement requests submitted in that calendar year, and the total number of reimbursement request denials that were appealed;

(XI) The total amount of health-care expenses submitted in this state by plan or arrangement participants or providers in the immediately preceding calendar year that qualify for reimbursement pursuant to the plan or arrangement criteria but that, as of the end of that calendar year, have not been reimbursed, excluding any amounts that the plan or arrangement participants incurring the health-care costs must pay before receiving reimbursement under the plan or arrangement;

(XII) The estimated number of plan or arrangement participants the person is anticipating in this state in the next calendar year, specifying the estimated number of individuals, households, employer groups, and employees;

(XIII) The specific counties in this state in which the person:

(A) Offered a plan or arrangement in the immediately preceding calendar year; and

(B) Intends to offer a plan or arrangement in the next calendar year;

(XIV) Other states in which the person offers a plan or arrangement;

(XV) A list of any third parties, other than a producer, that are associated with or assist the person in offering or enrolling participants in this state in the plan or arrangement, copies of any training materials provided to a third party, and a detailed accounting of any commissions or other fees or remuneration paid to a third party in the immediately preceding calendar year for:

(A) Marketing, promoting, or enrolling participants in a plan or arrangement offered by the person in this state; or

(B) Operating, managing, or administering a plan or arrangement offered by the person in this state;

(XVI) The total number of producers that are associated with or assist the person in offering or enrolling participants in this state in the plan or arrangement, the total number of participants enrolled in the plan or arrangement through a producer, copies of any training materials provided to a producer, and a detailed accounting of any commissions or other fees or remuneration paid to a producer in the immediately preceding calendar year for marketing, promoting, or enrolling participants in a plan or arrangement offered by the person in this state;

(XVII) Copies of any consumer-facing and marketing materials used in this state in promoting the person's plan or arrangement, including plan or arrangement and benefit descriptions and other materials that explain the plan or arrangement;

(XVIII) The name, mailing address, e-mail address, and telephone number of an individual serving as a contact person for the person in this state;

> (XIX) A list of any parent companies, subsidiaries, and other names that the person has operated under at any time within the immediately preceding five calendar years; and
>
> (XX) An organizational chart for the person and a list of the officers and directors of the person[.]

Colo. Rev. Stat. § 10-16-107.4(1)(a)(I)–(XX).

38.     All of the reported information is subject to public review.  Indeed, the Commissioner is required by statute to prepare a written report summarizing the reported information and publish on its website underlying information, subject to the requirement that it be "accurate and evidence-based." *Id*. § 10-16-107.4(3).  And the raw disclosures from the ministries are available to anyone who asks for them under a Colorado Open Records Act request.

39.     The statute also, significantly, empowers the Commissioner to enforce its restrictions and to fine or prohibit the operation of ministries for violations.  *Id*. § 10-16-107.4(2).  Those fines can amount to five thousand dollars a day even for merely incomplete submissions, leading to the potential for fines over technical, non-substantive violations.

40.     The statute, finally, empowers the Commissioner to adopt implementing rules.  *Id*. § 10-16-107.4(4).

41.     The statute is selective in its application to similar activities.  It explicitly states that its provisions do not apply to "direct primary care agreements."  (It, of course, does not enumerate comprehensively the numerous other activities that are similar to the activities of health care sharing ministries but that it does not cover.)  The statute also

explicitly states that its provisions do not apply to "other consumer payment arrangements identified by the commissioner by rule." *Id.* § 10-16-107.4(5). That provision provides unbridled discretion to the Commissioner to exempt organizations along the lines of the ministries.

### C.   Colorado's Implementing Regulations

42.     Shortly after the enactment of the statute, the Commissioner promulgated emergency interim regulations. *See* Emergency Regulation 22-E-20. After accepting public comments on those regulations, including that the interim regulations imposed significant costs in excess of their benefits, the Commissioner promulgated final regulations effective April 30, 2024. *See* Regulation 4-10-01, available at https://doi.colorado.gov/health-care-sharing-plans-or-arrangements.

43.     The final regulations impose extensive and intrusive reporting obligations that flow from the statutory requirements. The regulation defines several key terms. For example, it clarifies that "third party" means "contractors that are associated with or assist the plan or arrangement in offering or enrolling Colorado residents as participants" in the ministry. *Id.* Section 4(M). That is, ministries must report any entity that helps share medical expenses. The regulation also clarifies that "administrative expenses" includes "staff salaries," "marketing, outreach, and enrollment efforts." *Id.* Section 4(A). That is, ministries must report how much they spend on ministers and religious communications and outreach to new members.

44.     Significantly, the regulation also confirms that it applies selectively. It defines "health care sharing plan" to mean "any organization that offers or markets

products to facilitate payment or reimbursement of health care costs or services." *Id.* Section 4(G).     But it immediately exempts not only the statutorily exempted "direct primary care agreements," but also "consumer payment plans offered directly between a provider and patient" and "crowdfunded sources." *Id.* Section 4(G).

45.     The regulatory burden imposed by the statute and regulations is not only extensive and intrusive, but also costly.   Health care sharing ministries must spend significant resources compiling state-specific information, which they do not generally collect or assemble, particularly at this level of detail.  Member ministries must divert staff time and funds away from the core purpose of the ministries—sharing in members' health care expenses—and towards compliance with the statute and regulations.  This includes employee time to train employees on the regime, gather the required data, prepare reports, verify their accuracy, ensure legal compliance, and submit the reports and other materials to Colorado.

46.     The final regulation requires the ministries to compile, diligence, and then submit to the Division a spreadsheet with the following information:[1]

| A. Product name |
| --- |
| (list out all products your organization offers in Colorado) |
| B. Number of Colorado residents that participated in this product in the reporting year (Individuals) |

---

[1] All emphasis is in original.  These required disclosures have been transposed vertically and are listed in a table for convenience, but they can be accessed in their native format at: docs.google.com/spreadsheets/d/1B0yM0Oyhj0gNaQk9YDsTTM4udHCVfyfcZDNKnApJWVs/

| |
|---|
| C. Number of Coloradan HOUSEHOLDS that participated in the product in this reporting year |
| D. The total number of employer groups in Colorado that facilitate all or some of their employee participants' monthly share contributions |
| E. For each employer group included in element D, list out how many individual Colorado participants were included<br><br>(separate answers by commas) |
| F. Total number of participants in the product NATIONALLY? |
| G. Number of contracts entered into with health care service providers providing services for Colorado participants for this product. This includes contractors that provide telehealth services for participants |
| H. Total amount of fees, dues, shares, contributions, or other payments **collected** from individuals, Colorado employer groups, or others who participated in the product<br>($) |
| I. The percentage of fees, dues, shares, contributions, or other payments from Colorado participants in this product retained by the plan or arrangement for <u>administrative expenses</u><br>(%) |
| J. The percentage of fees, dues, contributions, or other payments from Colorado participants in this product retained by the plan or arrangement for <u>program expenses</u><br>(%) |
| K. Total dollar amount of health-care costs or services that were incurred by the participant and <u>submitted</u> by or on behalf of the participant for sharing<br>($) |

| |
|---|
| L. Total dollar amount of requests for sharing of Colorado participants' health-care costs or services that qualified for sharing excluding any amounts that the participants incurring the health-care costs or services must pay before receiving sharing amounts under the member guidelines ($) |
| M.  Total dollar amount of payments made to <u>providers</u> for Colorado participants' health care costs or services ($) |
| N. Total dollar amount of sharing requests facilitated or provided to Colorado <u>participants</u> for health care costs or services ($) |
| O. Total number of requests by or on behalf of the Colorado participants' for sharing of healthcare costs or services incurred by the participant (Number) |
| P. Total number of share requests, for Colorado participants, that were denied (not shared) because they were not eligible for sharing according to the organization's guidelines (Number) |
| Q. Total number of **<u>appeals</u>** of denied sharing requests for Colorado participants' incurred health-care costs or services (Number) |
| R. Total number of  appeals requests that were later approved for sharing for Colorado participants' incurred health-care costs or services (Number) |
| S. Percentage of total number of requests denied compared to the total number of Colorado participants share requests submitted |

| T. Percentage of total number of requests denied compared to the total number of appeals for sharing that were "denied" (not shared) for Colorado participants |
|---|
| U. Total amount of **Colorado** participants' health-care costs or services submitted in the reporting period that qualify for sharing pursuant to the plan/arrangement's criteria but that were not shared or paid by the last day of the reporting year, excluding any amounts that the participants incurring the health-care costs or services must pay before receiving sharing amounts under the member guidelines<br>($) |
| V. Estimated number of individual plan/arrangement participants anticipated in Colorado in  the current calendar year |
| W. Estimated number of households plan/arrangement participants anticipated in the current calendar year |
| X. Estimated number of employer groups in Colorado that facilitate all or some of their employee participants' monthly share contributions in the current calendar year |
| Y. Estimated total number of individual Colorado participants associated with the employers in element X in the current calendar year |
| Z.  The total number of producers that are associated with or assist in offering or enrolling participants in Colorado in the product<br>(number of **producers**) |
| AA. Of the number of Colorado participants in the product how many were enrolled through a producer<br>(number of **participants**) |

Updated Health Care Sharing Plan Reporting template for regulation 4-10-01, Sheet 2.

47.     But the required disclosures do not stop there.  The Commissioner also requires the ministries to complete the following fields:

- Parent companies, subsidiaries, and other names that your organization has operated under at any time with the immediately preceding 5 calendar years:

- Provide your Organization's website

- Provide any additional website(s) your organization uses to communicate marketing materials including social media sites

- Additional context you'd like to provide the Division about this product or any of the data submitted on this tab? Possibly [sic] data to include could be the total dollar amount of discounts negotiated for Colorado participants. If any Colorado data were provided on a pro rata basis please note that here and which data elements (e.g. B, G-J, M) are based off of national numbers

- Name of third party - provide the "doing business as" name of each applicable third-party (list out separately)

- Total commission, fees, or remuneration paid in the previous calendar year for: **marketing, promoting, or enrolling participants in a HCSPA product to Colorado participants**

- Total commission, fees, or remuneration paid in the previous calendar year for: **operating, managing, or administering a product offered by the HCSPA**

- **Total number of producers** that are associated with or assist in offering or enrolling participants in Colorado (Aggregate value)

- **Total commission, fees, or remuneration paid** in the previous calendar year **to producers** for: marketing, promoting, or enrolling Colorado participants in a plan or arrangement (Aggregate value)

- List out the Colorado counties where a plan/arrangement was offered in **2023**

- List out the Colorado counties where a plan/arrangement is **intended** to be offered in **2024**

- List out the other states (i.e., states other than Colorado) in which your organization offered a plan or arrangement was in **2023** One row per state
- Please describe any appeals processes that your organization's uses when a participant contests a reimbursement, requested share, or payment denial

*Id.* Sheet 2–3 (all emphasis in original). Although not all of these requirements are constitutionally problematic, there can be no doubt of their burden.

### D.    Colorado's Report

48.    The harms of this regulatory regime are confirmed and exacerbated by the Commissioner's first public report. Contrary to the statutory requirement that it produce an accurate report, the Commissioner reported *wildly misleading* information. *See* Colorado Division of Insurance, Health Care Sharing Plans and Arrangements in Colorado (Apr. 1, 2023).

49.    The report purports to state the aggregate dollar amount of health care costs submitted and to compare that number to the amount paid, thereby suggesting that the ministries fail to facilitate their members sharing medical expenses with one-another. But the aggregate dollar amount of health care costs submitted consists primarily of the "sticker price" that providers charge (and which other health care entities involved in financing medical bills, such as insurance companies or even cash-pay patients, almost never pay).

50.    This error was replicated in news coverage of Colorado's report, without any correction by Colorado. *See* Allison Bell, Think Adviser

https://www.thinkadvisor.com/2023/05/16/what-colorado-data-tells-us-about-the-wild-west-of-health-care-cost-sharing-ministries/.

51.     The Commissioner's report, like its initial consumer advisory, also focused on the ministries' policy not to facilitate payment of medical expenses inconsistent with their religious beliefs.

52.     The Division spoke publicly about this report to CBS News, expressing "concern[]" that "1 in 4 Coloradans purchasing health care coverage on their own" choose health care sharing ministries, as opposed to an ACA-based plan.  *See* Markian Hawryluk, At Least 1.7 Million Americans Use Health Care Sharing Plans, Despite Lack of Protections, CBS News (June 13, 2023), https://perma.cc/L2GA-PJR7.  (That statistic also is likely incorrect, because Colorado asks for the number of members in particular HCSMs but does not ask for, and has not undertaken, any effort to de-duplicate members who participate in multiple programs for a particular HCSM.)

53.     A few months later, Commissioner Conway reiterated his "very vocal" concerns with health care sharing ministries and in particular his concern that health care sharing ministries do not facilitate the sharing of all the medical expenses that are required to be covered by an Affordable Care Act insurance plan.  Of course, the reason the ministries decline to facilitate the sharing of certain expenses is because those expenses are incurred for reasons that violate their religious beliefs.

## CLAIMS FOR RELIEF

### COUNT I
### 42 U.S.C. § 1983
### Violation of U.S. Const. Amend. I: Free Exercise Clause
### Not Generally Applicable

54.     This count incorporates all preceding paragraphs by reference.

55.     "[L]aws burdening religious practice must be of general applicability."
*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993).  A
law may fail general applicability in at least two ways.  *Fulton*, 593 U.S. at 533–34.

56.     First, a law fails general applicability if it "treat[s] *any* comparable secular
activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62
(2021) (per curiam).  "[W]hether two activities are comparable for purposes of the Free
Exercise Clause must be judged against the asserted government interest that justifies
the regulation at issue."  *Id.*  The comparability analysis "is concerned with the risks
various activities pose," not the "reasons why" people engage in those activities.  *Id*.

57.     Plaintiff's members exercise their religious beliefs through sharing medical
expenses.  Health care sharing ministries exist because their members believe that their
religion commands them to bear each other's burdens.

58.     Colorado has not asserted in its legislation a specific interest in regulating
health care sharing ministries.  To the extent that interest consists of the Commissioner's
and Division's general concern in consumer protection with respect to the sharing and
payment of medical expenses, *see* https://doi.colorado.gov/, there are numerous
comparable activities that Colorado does not regulate, including but not limited to direct
primary care arrangements, medical discount cards, crowdfunding, student health clinics

at universities (where students pay a fee for unlimited access), charities that pay medical bills, or fully-insured out-of-state employer health plans with Colorado enrollees.

59.     Second, a law "is not generally applicable if it invite[s] the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 593 U.S. at 533 (alteration in original) (internal quotation marks omitted).  As the Supreme Court explained, "[t]he creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless whether any exceptions have been given, because it 'invite[s]' the government to decide which reasons for not complying with the policy are worthy of solicitude." *Id.* (alteration in original).

60.     Here, the statute empowers the Commissioner to exempt "other consumer payment arrangements identified by the commissioner by rule."  Colo. Rev. Stat. § 10-16-107.4(5).  The Commissioner has exercised that exemptive authority in its final regulation.

61.     Colorado's regulatory regime thus triggers strict scrutiny.  Colorado has no compelling interest in its regulatory regime, nor has it selected the least restrictive means to further any government interest.  Health care sharing ministries are already regulated in Colorado by the Attorney General, who has jurisdiction over all charities and other non-insurance entities and whose office is tasked with balancing constitutional religious liberty, free speech, and free association interests with consumer protection interests.

62.     Plaintiff's members have suffered and will suffer irreparable harm absent injunctive and declaratory relief against Defendant, his agents and employees, and all those acting in concert with him.

**COUNT II**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I: Free Exercise Clause**
**Not Neutral**

63.     This count incorporates all preceding paragraphs by reference.

64.     The government is "obliged under the Free Exercise Clause to proceed in a manner neutral toward and tolerant of [] religious beliefs." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018).

65.      "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 593 U.S. at 533.  Laws are not neutral when they accomplish a "religious gerrymander." *Lukumi*, 508 U.S. at 535.  A religious gerrymander occurs when "the burden of the [law], in practical terms, falls on [religious] adherents but almost no others."  *Id.* at 536.  A law is also not neutral when "the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body" demonstrate animus toward religion.  *Masterpiece*, 584 U.S. at 639.  When "'official expressions of hostility' to religion accompany laws or policies burdening religious exercise," courts must "'set aside' such policies without further inquiry." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 n.1 (2022) (quoting *Masterpiece*, 584 U.S. at 639).

66.     Colorado's regulatory regime is not neutral with respect to religion.  The Division's statements, the legislative history, the exemptions for similar secular conduct, and the manner of implementing the statute indicate that Defendant has proceeded in a manner intolerant of religious beliefs.  The regulatory regime thus "violate[s] the State's

duty under the First Amendment not to base laws or regulations on hostility to a religion or religious viewpoint." *Masterpiece*, 584 U.S. at 638.

67.     Although strict scrutiny is not applicable to a non-neutral law, Defendant could not satisfy strict scrutiny in any event because the State lacks a compelling interest and the law is not narrowly tailored.

68.     Plaintiff's members have suffered and will suffer irreparable harm absent injunctive and declaratory relief against Defendant, his agents and employees, and all those acting in concert with him.

**COUNT III**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I: Establishment Clause**
**Religious Autonomy**

69.     This count incorporates all preceding paragraphs by reference.

70.     The government may not subject religious organizations to "long-term, continuing monitoring" without satisfying strict scrutiny. *Medina*, 877 F.3d at 1233. That is because the First Amendment protects against the government excessively entangling itself with religious organizations. *Id.* In order to function, religious organizations must have breathing space consistent with their autonomy. *See id.* That means that the government may not subject their finances and operations to "pervasive monitoring." *Id.*

71.     The Colorado regime subjects health care sharing ministries to extensive and intrusive monitoring of finances and operations. It requests detailed financial and operational metrics that are akin to asking a church how it spends funds from its collection baskets on charitable giving.

72.     Colorado's regulatory regime thus triggers strict scrutiny.  Colorado has no compelling interest in its regulatory regime, nor has it selected the least restrictive means to further any government interest.

73.     Plaintiff's members have suffered and will suffer irreparable harm absent injunctive and declaratory relief against Defendant, his agents and employees, and all those acting in concert with him.

## COUNT IV
## 42 U.S.C. § 1983
## Violation of U.S. Const. Amend. I: Free Association
## Compelled Disclosure of Affiliation

74.     This count incorporates all preceding paragraphs by reference.

75.     The Supreme Court has "'long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others.'"  *Bonta*, 594 U.S. at 606 (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)).   "Protected association furthers 'a wide variety of political, social, economic, educational, religious, and cultural ends,' and 'is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority.'"  *Id.* (quoting *Roberts*, 468 U.S. at 622).  It is "hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action."   *Id.* (alteration in original).   Such disclosures are subject to "exacting scrutiny."  *Id.* at 607.

76.     The Colorado regime requires the disclosure of numerous entities that associate with health care sharing ministries.  That disclosure has the potential to chill entities from affiliating with the ministries.

77.     Colorado cannot satisfy exacting scrutiny, because there is no substantial relation between the disclosure requirement and a sufficiently important governmental interest.  Colorado has not advanced such an interest; to the extent it relies on a general interest in consumer protection, that does not match the burdensome disclosure regime it has enacted.   There is no substantial relation between that interest and the requirements.  In any event, the requirements are not narrowly tailored.

78.     Plaintiff's members have suffered and will suffer irreparable harm absent injunctive and declaratory relief against Defendant, his agents and employees, and all those acting in concert with him.

**COUNT V**
**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I: Free Speech Clause**
**Compelled Speech**

79.     This count incorporates all preceding paragraphs by reference.

80.     "The right to speak and the right to refrain from speaking are complementary components of the broader concept of individual freedom of mind" protected by the First Amendment.   *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (internal quotation marks omitted). Any attempt by the government either to restrict speech or compel individuals to express certain views is subject to strict scrutiny.  The general rule "that the speaker has the right to tailor the speech[ ] applies not only to expressions of value, opinion, or

endorsement, but equally to statements of fact the speaker would rather avoid." *Hurley v. Irish–Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995).

81.    The Colorado regime, by requiring reporting of information that Colorado posts publicly, compels the ministries to speak about their internal operations. In addition, by requiring submission of ministry communications, it chills protected speech.

82.    Defendant cannot satisfy strict or exacting scrutiny for these speech restrictions or this compelled speech because the State lacks a compelling interest and the law is not narrowly tailored.

83.    Plaintiff's members have suffered and will suffer irreparable harm absent injunctive and declaratory relief against Defendant, his agents and employees, and all those acting in concert with him.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

a.    Declare that Colorado's health care sharing ministry law and regulation violate the Free Exercise Clause of the First Amendment to the United States Constitution because they are not neutral or generally applicable;

b.    Declare that Colorado's health care sharing ministry law and regulation violate the Establishment Clause of the First Amendment to the United States Constitution by intruding on the autonomy of religious organizations;

c.    Declare that Colorado's health care sharing ministry law and regulation violate the Free Association Clause of the First Amendment to the United States Constitution by compelling identification of affiliates and associates;

d.   Declare that Colorado's health care sharing ministry law and regulation violate the Free Speech Clause of the First Amendment to the United States Constitution by restricting, chilling, and compelling speech;

e.   Declare that Colorado's health care sharing ministry law and regulation are unconstitutional on their face and as applied to Plaintiff and its current and future members;

f.   Issue a preliminary injunction and permanent injunction prohibiting Defendant, his agents and employees, and all those acting in concert with him, from enforcing Colorado's health care sharing ministry law and regulation against Plaintiff, its current and future members, and all those acting in concert with Plaintiff;

g.   Award Plaintiff reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

h.   Award such other relief as the Court may deem equitable, just, and proper.

Plaintiff demands a trial by jury of all issues so triable.

Dated:   July 1, 2024                    Respectfully submitted,

/s/ *Michael F. Murray*
Michael F. Murray
Paul Hastings LLP
2050 M Street, NW
Washington, D.C. 20036
(202) 551-1730
michaelmurray@paulhastings.com

William E. Mahoney
Paul Hastings LLP
600 Travis Street
Fifty-Eighth Floor
Houston, Texas 77002
(713) 860-7304
williammahoney@paulhastings.com