**No. 25-1035**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

_____

ALLIANCE OF HEALTH CARE SHARING MINISTRIES
*Plaintiff-Appellant*

v.

MICHAEL CONWAY,
in his official capacity as
Commissioner of the Colorado Division of Insurance
*Defendant-Appellee*

_____

Appeal from the United States District Court for the District of Colorado,
No. 1:24-cv-01386-GPG-STV (Hon. Gordon Gallagher)

_____

**APPENDIX VOL VI - Pages A-308 - A-331**

Date: March 21, 2025

Michael F. Murray
Paul Hastings LLP
2050 M Street, NW
Washington, D.C. 20036
(202) 551-1730
michaelmurray@Paulhastings.Com
William E. Mahoney
Paul Hastings LLP
600 Travis Street, Fifty-Eighth Floor
Houston, Texas 77002
(713) 860-7304
williammahoney@Paulhastings.Com

*Counsel For Plaintiff Alliance of
Health Care Sharing Ministries*

| ECF NO. | DESCRIPTION | Appx. Page No. |
|---|---|---|
| **Appendix Vol. I, Pages 1-140** | | |
| - | District Court Docket Sheet | A-1 |
| 8-1 | Ex. A - Declaration of Rob Waldo (May 17, 2024) | A-9 |
| 8-2 | Ex. A-1 – Samaritan Bylaws | A-19 |
| 8-3 | Ex. A-2 - Samaritan Guidelines | A-44 |
| 8-4 | Ex. A-3 - Samaritan Membership Application | A-94 |
| 8-5 | Ex. B - Declaration of Katy Talento | A-100 |
| 32 | Amended Complaint of Alliance of Health Care Sharing Ministries (July 1, 2024) | A-109 |
| **Appendix Vol. II, Pages 141-179** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1-1.6 (September 3, 2024) | A-141 |
| **Appendix Vol. III, Pages 180-223** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.7-1.22 (September 3, 2024) | A-180 |
| **Appendix Vol. IV, Pages 224-261** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.23-1.28 (September 3, 2024) | A-224 |
| **Appendix Vol. V, Pages 262-307** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.29-1.33 (September 3, 2024) | A-262 |

| | | |
|---|---|---|
| **Appendix Vol. VI, Pages 308-331** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.34-1.36 (September 3, 2024) | A-308 |
| **Appendix Vol. VII, Pages 332-350** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.43-1.54 (September 3, 2024) | A-332 |
| **Appendix Vol. VIII, Pages 351-373** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.37-1.39 (September 3, 2024) | A-351 |
| **Appendix Vol. IX, Pages 374-424** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.40-1.40 (September 3, 2024) | A-374 |
| **Appendix Vol. X, Pages 425-478** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.40-1.41 (September 3, 2024) | A-425 |
| **Appendix Vol. XI, Pages 479-541** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.41-1.42 (September 3, 2024) | A-479 |
| **Appendix Vol. XII, Pages 542-573** | | |

| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.43-1.54 (September 3, 2024) | A-542 |
|---|---|---|
| **Appendix Vol. XIII, Pages 574-612** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.54-1.59 (September 3, 2024) | A-574 |
| **Appendix Vol. XIV Pages 613-682** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.6-1.6 (September 3, 2024) | A-613 |
| **Appendix Vol. XV, Pages 683-767** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.61-1.64 (September 3, 2024) | A-683 |
| **Appendix Vol. XVI, Pages 768-816** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 2.0-2.3 (September 3, 2024) | A-768 |
| **Appendix Vol. XVII, Pages 817-867** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 2.3-2.4 (September 3, 2024) | A-817 |
| **Appendix Vol. XVIII, Pages 868-933** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 2.5-7 (September 3, 2024) | A-868 |

| | **Appendix Vol. XIX, Pages 934-1002** | |
|---|---|---|
| 52.1 | Appendix to Reply to Motion for Preliminary Injunction (September 17, 2024) | A-934 |
| 54 | Order Denying the Alliance's Motion for a Preliminary Injunction (January 13, 2025) | A-949 |
| | **Appendix Vol. XX, Pages 1003-1041** | |
| 54 | Order Denying the Alliance's Motion for a Preliminary Injunction (January 13, 2025) | A-1003 |
| 55 | Notice of Appeal as to Order on Motion for Preliminary Injunction (January 27, 2025) | A-1015 |
| 58-1 | Motion for Order to Grant Injunction Pending Appeal (January 28, 2025) | A-1017 |
| | **Appendix Vol. XXI, Pages 1042-1077** | |
| 58-1 | Motion for Order to Grant Injunction Pending Appeal (January 28, 2025) | A-1042 |
| 60 | Order Denying Motion for Injunction Pending Appeal (February 3, 2025) | A-1069 |



# STATE OF CONNECTICUT
## *INSURANCE DEPARTMENT*

IN THE MATTER OF:         )

                                   )

THE ALIERA COMPANIES, Inc.   )

                                   )

           and      )     Docket No. MC 19-109

                                   )

TRINITY HEALTHSHARE, Inc.   )

                                   )

       Respondents   )

## CEASE AND DESIST ORDER

The Insurance Commissioner of the State of Connecticut (hereinafter "the Commissioner") has cause to believe that the acts, practices, transactions, and course of business engaged in by The Aliera Companies, Inc. ("Aliera") and Trinity Healthshare, Inc. ("Healthshare") may be conducted in an illegal and improper way and that irreparable harm may be caused to the citizens of the State of Connecticut. As a result the issuance of the following Cease and Desist order appears warranted:

## FINDINGS OF FACT

1.

The Aliera Companies, Inc. (hereinafter "Aliera") is a foreign entity organized under the laws of Delaware and acting as an insurer and as an insurance producer in the State of Connecticut with its principal place of business at 990 Hammond Drive, Suite 700, Atlanta, GA 30328. Trinity Healthshare, Inc. (hereinafter "Trinity") is a foreign corporation organized under the laws of

www.ct.gov/cid
**P.O. Box 816 Hartford, CT 06142-0816**
**An Equal Opportunity Employer**

EXHIBIT
**1.34**

Ex. 1.34, p. 1 of 10

Resp. Appx. p. 164

**Appx. Vol VI**
**A-308**

Delaware, first incorporated on or about June 27, 2018, which represent itself as a healthcare sharing ministry within the meaning of 26 USC §5000A. Aliera and Trinity ("hereinafter collectively referred to as "Respondents") are engaging in an insurance business and acting as insurers in the State of Connecticut by providing health insurance to Connecticut residents or persons authorized to conduct business in Connecticut.

2.

Neither Aliera nor Trinity have been in operation and continuously sharing members' health care costs since at least December 1, 1999, as required by 26 USC § 5000A(d)(2)(B).

3.

Since August 14, 2018 Aliera has been licensed in Connecticut as a producer agency, license No. 2571864, with authority to sell Life, Accident & Health, Credit and Travel insurance products, but is not authorized to engage in any other insurance business or to place coverage as an insurer in the state of Connecticut. Trinity does not hold any insurance license and is not authorized to transact any insurance business in the state of Connecticut.

4.

Respondents are soliciting and/or entering into health insurance contracts with residents of Connecticut or persons authorized to do business in Connecticut whereby Respondents, upon payment of a fee, agree to provide coverage for costs the members incur when receiving medical, dental, optical, hearing, vision and chiropractic services. In addition, Respondents purport to provide coverage for

2

prescription drugs, Medicare, short term health insurance and insurance for small businesses.

5.

Aliera represents that the products marketed on behalf of Trinity are not insurance, that it administers a faith-based cost sharing program on behalf of Trinity and that it provides assistance to individuals with common religious and ethical beliefs, when in fact the Respondents do not limit the marketing of their products to individuals holding any particular religious beliefs, but enroll in their program all individuals irrespective of faith and, through their marketing representatives, simply require that members enrolling in their program agree to a series of general belief statements, such as "helping others and/or maintaining a healthy lifestyle and avoid foods, behavior, or habits that produce sickness or disease to ourselves or others", or "believe that personal rights and liberties originate from God and are bestowed on us by God", or "believe that every individual has a fundamental religious right to worship God in his or her own way."

6.

Aliera's marketing materials promote individual and family coverage that includes primary care physician visits, pharmaceuticals, basic eye and hearing exams, both in- and out-patient procedures, extended hospitalizations, urgent care needs, labs and diagnostic procedures. Plans offered by Aliera come in gold, silver and bronze, using the same metal designations as insurance plans offered under the Affordable Care Act in the Connecticut Insurance Exchange.

3

7.

Encouraging the public to apply for coverage offering "lower rates", "great coverage" and "no penalty", Aliera's website states that Aliera operates "like health insurance" by pooling members' contributions to pay the providers directly, just like a regular insurance company, albeit at a premium 50 percent lower.

8.

A guide provided by Aliera to its members represents that Aliera Healthcare, Inc., in conjunction with Trinity Healthshare, LLC, creates a full range of services and benefits, including preventive care, episodic primary care, chronic maintenance, labs & diagnostics, telemedicine, including "specialty care hospitalization, surgery and emergency room treatment". The guide represents that "Aliera Healthcare, in alliance with Trinity HealthShare, makes quality healthcare choices affordable for individuals and families". In addition, the guide includes information about the coverages available, exclusions and limitations of coverage, lifetime or per incident maximum limits and amounts of deductible for each type of service, claims adjudication process and information about the use of provider networks.

9.

The Respondents market their plans to Connecticut consumers through licensed insurance producers and collect fixed monthly payments from their members, calculated on the basis of the coverage chosen, which vary in accordance with the type of plan applied for, the level of coverage, the number of family members enrolled and the underwriting characteristics of each member.

4

10.

At the present time, the Respondents have not applied for or received an insurance license from the Commissioner authorizing the Respondents to make or propose to make, as insurers, insurance contracts or to conduct in Connecticut, as principals, any insurance business, as defined in General Statutes § 38a-271 .

11.

General Statutes § 38a-272 prohibits any person or insurer from doing, directly or indirectly, any of the acts of an insurance business, as defined in General Statutes § 38a-271, unless authorized under the general statutes. General Statutes § 38a-41 prohibits any insurer or health care center from doing any insurance business or health care business in this state, except if authorized by the Commissioner.

12.

General Statutes § 38a-8 authorizes the Commissioner to administer and enforce all provisions relating to the insurance laws of our State, including the provisions of the Unauthorized Insurers Act, General Statutes § 38a-271 *et seq.* The Commissioner can, therefore, assert jurisdiction over, issue orders and/or commence administrative proceedings against, any person that, in violation of Connecticut law, provides the types of insurance coverage offered in this state by the Respondents.

5

13.

General Statutes § 38a-17 authorizes the Commissioner to order any insurer to discontinue any illegal or improper method of doing business if, in the opinion of the Commissioner, such insurer is in fact doing business in an illegal or improper way.

14.

General Statutes §§ 38a-481 and 38a-513 provide that no individual health insurance policy or group health insurance policy, respectively, shall be delivered or issued for delivery in this state until a copy of the form thereof and of the classification of risks and the premium rates have been filed with, and approved by, the Commissioner.

15.

The Respondents have never filed copies of the forms relating to the health insurance plans they offer in Connecticut or the premium rates applicable to the risk classification of the contracts they offer to the public.

16.

General Statutes § 38a-1 defines the term "insurance" as "any agreement to pay a sum of money, provide services or any other thing of value on the happening of a particular event or contingency or to provide indemnity for loss in respect to a specified subject by specified perils in return for a consideration. In any contract of insurance, an insured shall have an interest which is subject to a risk of loss through destruction or impairment of that interest, which risk is assumed by the insurer and such assumption shall be part of a general scheme to distribute losses among a large

6

group of persons bearing similar risks in return for a ratable contribution or other consideration."

17.

 The products marketed by the Respondents include an agreement to pay a sum of money, provide services or any other thing of value on the happening of a particular event or contingency, i.e. sickness or injury, or to provide indemnity for loss in respect to a specified subject by specified perils - indemnify their members for costs incurred for medical expenses - in return for a consideration. As it relates to the contracts issued by the Respondents, members have an interest which is subject to a risk of loss through destruction or impairment of that interest, which risk is assumed by the Respondents as part of a general scheme to distribute losses among a large group of persons bearing similar risks in return for a ratable contribution or other consideration by each member.

## CONCLUSIONS OF LAW

1.

The facts set forth in paragraphs 1 through 17 of the Findings of Fact herein show that the Respondents are subject to the jurisdiction of the Commissioner and are subject to all appropriate provisions of the Connecticut Insurance Code pursuant to General Statutes § 38a-271 *et seq.* Said facts further show that the Respondents have been acting, and are currently acting, as insurers and/or transacting the business of insurance in Connecticut without a subsisting certificate of authority in violation of General Statutes § 38a-272 and § 38a-41.

7

2.

The facts set forth in paragraphs 1 through 17 of the Findings of Fact herein show that the Respondents are acting as insurers in Connecticut by providing health insurance without first obtaining a certificate of authority from the Commissioner, in violation of General Statutes § 38a-41, and without having filed such health insurance products with the Commissioner and having obtained the Commissioner's approval prior to marketing such products, in violation of General Statutes §§ 38a-481 and 38a-513.

3.

The facts set forth in paragraphs 1 through 17 of the Findings of Fact herein constitute grounds for the Commissioner to issue an order directing the Respondents to immediately discontinue engaging in an insurance business in Connecticut whereby they provide Life, Accident & Health insurance or any other kind of insurance to Connecticut residents or persons authorized to do business in Connecticut.

4.

The facts set forth in paragraphs 1 through 17 of the Findings of Fact herein constitute grounds, pursuant to General Statutes § 38a-278, for the Commissioner to subject the Respondents to a monetary penalty of up to $50,000.00 for each and every act of violation of the Connecticut Insurance Statutes or any pertinent Rules and Regulations of the Connecticut Insurance Department, which amount may be increased by $2,500.00 for the first offense and by an additional $2,500.00 for each month during which any violation continued.

8

5.

The facts set forth in paragraphs 1 through 17 of the Findings of Fact herein give the Commissioner reasonable cause to believe that the Respondents have violated, are violating, and will continue to violate the insurance laws of Connecticut. The aforesaid facts also show that the Respondents have not committed merely technical violations, but have violated a basic tenet of public policy by transacting insurance in this State without a subsisting certificate of authority in violation of General Statutes §§ 38a-41 and 38a-272.

6.

The facts set forth in paragraphs 1 through 17 of the Findings of Fact herein give the Commissioner reasonable cause to believe that the probability of such continued violations constitutes a situation of imminent peril to the public welfare, and that the situation therefore imperatively requires immediate action.

7.

The facts set forth in paragraphs 1 through 17 of the Findings of Fact herein give the Commissioner reasonable cause to believe that the Respondents have violated Sections 38a-481 and 38a-513 of the Connecticut General Statutes by failing to file the rates and forms for the health insurance policies marketed in Connecticut and by failing to obtain prior approval from the Commissioner prior to marketing their insurance contracts in this state.

Pursuant to General Statutes § 38a-17, IT IS THEREFORE ORDERED by the Insurance Commissioner:

9

That the Respondents IMMEDIATELY CEASE AND DESIST from acting as insurers with respect to subjects of insurance resident, located or to be performed in this state, transacting an insurance business in Connecticut, or otherwise violating in any way the insurance laws of the State of Connecticut, except for payment on existing contracts of insurance or other obligations for business placed in our state, which payments are to be made for each claim without regard to any condition, exclusion or limitation contained in the contracts sold or any other defense.

IT IS FURTHER ORDERED:

That any and all licensed producers and any other representatives of the Respondents IMMEDIATELY CEASE AND DESIST from representing insurers that are not authorized to transact insurance in this state or assisting any person in the transaction of an insurance business in Connecticut without a proper license, or otherwise violating in any way the insurance laws of Connecticut, except for facilitating the payment of claims on existing contracts or other obligations for business placed in our state.


SO ORDERED this 2nd day of December, 2019.


_____
Andrew N. Mais
Insurance Commissioner

10

STATE OF MICHIGAN
DEPARTMENT OF INSURANCE AND FINANCIAL SERVICES

**Before the Director of the Department of Insurance and Financial Services**

In the matter of:

**Aliera Companies (formerly known as Aliera Healthcare)**     **Enforcement Case No. 21-16507**
Unlicensed

**Sharity Ministries, Inc. (formerly known as Trinity Healthshare, Inc.)**
Unlicensed

**Ensurian Agency,**
Unlicensed,

                    Respondents.
_____/

**Issued and entered
on August 11, 2021
by Anita G. Fox
Director**

## ORDER TO CEASE AND DESIST WITH STATEMENT OF FINDINGS
## AND NOTICE OF OPPORTUNITY FOR HEARING

Pursuant to Section 251 of the Michigan Insurance Code (Code), MCL 500.251, and after reviewing evidence of the conduct described in the attached Statement of Findings, and

**WHEREAS,** the Director of the Department of Insurance and Financial Services finds that immediate action is necessary and appropriate in the public interest for the protection of the public health, safety, and welfare, and consistent with the purposes fairly intended by public policy and provisions of the Code,

**IT IS THEREFORE ORDERED THAT:**

1.      Respondents shall immediately **CEASE AND DESIST** from all activities in violation of the Code as described in the Statement of Findings.

2.      A copy of this Order shall be immediately served upon Respondents and shall be effective upon the date of service.

3.      Respondents will have 30 calendar days after the service of this Order to contest it by requesting a hearing. Within 10 calendar days after receiving the request, the hearing process shall commence. This Order shall remain in effect until further order of the Director. Any request for a hearing should be addressed to the Department of Insurance and

EXHIBIT
**1.35**

Order to Cease and Desist
Enforcement Case No. 21-16507
Page 2 of 2

Financial Services, Attention: Randle Swinson, Hearings Coordinator, P.O. Box 30220, Lansing, MI 48909-7720 or faxed to 517-284-8843.

4.  Any such hearing held shall address the following issues:

    a.   The facts set forth in the Statement of Findings.

    b.   The continuation of the Order to Cease and Desist.

    c.   Restitution to be paid by the Respondent.

5.  If a hearing is requested, an administrative law judge from the Michigan Office of Administrative Hearings and Rules shall preside over any such hearing.

6.  The Director retains jurisdiction of the matters contained herein and the authority to issue such further Orders as shall be deemed just, necessary, and appropriate.

7.  Pursuant to Section 251(6) of the Code, MCL 500.251(6), a person who violates or otherwise fails to comply with an Order to Cease and Desist is subject to one or more of the following:

    a.   Payment of a civil fine of not more than $1,000 for each violation not to exceed an aggregate civil fine of $30,000. However, if the person knew or reasonably should have known the conduct was in violation of the cease and desist order, the person shall be subject to a civil fine of not more than $25,000 for each violation not to exceed an aggregate civil fine of $250,000.

    b.   Suspension or revocation of the person's license or certificate of authority.

    c.   Complete restitution, in the form, amount, and within the period determined by the Director, to all persons in Michigan damaged by the violation or failure to comply.

Anita G. Fox
Director

STATE OF MICHIGAN
DEPARTMENT OF INSURANCE AND FINANCIAL SERVICES

**Before the Director of the Department of Insurance and Financial Services**

In the matter of:

**Aliera Companies (formerly known as Aliera Healthcare)**          **Enforcement Case No. 21-16507**
Unlicensed

**Sharity Ministries, Inc. (formerly known as Trinity Healthshare, Inc.)**
Unlicensed

**Ensurian Agency,**
Unlicensed,

                    Respondents.
_____/

## STATEMENT OF FINDINGS

1.    Pursuant to Section 251(1) of the Code, MCL 500.251(1), the Director is empowered to issue a cease and desist order upon finding any of the following:

>          (a) A person is conducting transactions of insurance for which a certificate of authority is required by this act without having obtained a certificate of authority.

>          (b) A person is acting as an insurance agent, solicitor, adjuster, or counselor without a license as required by this act.

>          (c) A person is engaged in an act or practice in the business of insurance for which authority from or notification to the commissioner is required by this act and the person has not received authority or given notification.

>          (d) A person authorized to engage in the business of insurance under this act is engaged in conduct that presents an immediate danger to public health, safety, or welfare. MCL 500.251(1).

2.    Under Section 1201a(1) of the Code, it is a violation for a person to sell, solicit, or negotiate insurance in this state for any line of insurance without first obtaining a license or qualification for that line. MCL 500.1201a(1).

>    a.    "Negotiate" means the act of conferring directly with or offering advice directly to a purchaser or prospective purchaser of a particular contract of insurance concerning any of the substantive benefits, terms, or conditions of the contract, provided that the person engaged

Ex. 1.35, p. 3 of 9

Resp. Appx. p. 176          **Appx. Vol VI
A-320**

Statement of Findings
Enforcement Case No. 21-16507
Page 2 of 7

in that act either sells insurance or obtains insurance from insurers for purchasers. MCL 500.1201(m).

b.   "Sell" means to exchange a contract of insurance by any means, for money or its equivalent, on behalf of an insurance company. MCL 500.1201(n).

c.   "Solicit" means attempting to sell insurance or asking or urging a person to apply for a particular kind of insurance from a particular company. MCL 500.1201(o).

3.   The definitions of an eligible entity and health care sharing ministry are set forth in MCL 550.1853 as follows:

(a) "Eligible entity" means a faith-based, nonprofit entity that maintains tax-exempt status under section 501(c) of the internal revenue code, 26 USC 501.

(b) "Health care sharing ministry" or "ministry" means a program established by an eligible entity for the sharing of finances and health care in compliance with this act.

4.   Pursuant to MCL 550.1865, "[a]n eligible entity may establish and operate a health care sharing ministry under this act. An eligible entity that establishes and operates a health care sharing ministry in compliance with this act is not engaged in the business of insurance in this state and the entity and ministry are not subject to the insurance laws of this state."

5.   Pursuant to MCL 550.1867, in order to be considered a health care sharing ministry under Michigan law, the ministry must meet all of the following requirements:

(a) Limit participation in the ministry to individuals who are of a similar faith.

(b) Provide that the ministry act as a facilitator by matching its participants who have financial or medical needs with participants who have the ability to assist in meeting those needs according to criteria established for the ministry by the eligible entity.

(c) Provide for the financial or medical needs of a participant through voluntary contributions by its participants.

(d) Provide amounts that participants may contribute with no assumption of risk or promise to pay among its participants.

(e) Provide financial assistance to participants who have financial or medical needs with no assumption of risk or promise to pay by the ministry to its participants.

(f) Provide a monthly written statement to its participants that lists the total dollar amount of qualified financial or medical needs that were submitted to the ministry, as well as the amount actually published or assigned to participants for their contribution.

Statement of Findings
Enforcement Case No. 21-16507
Page 3 of 7

(g) Provide, in substantially similar form and language, the following written disclaimer on or accompanying all applications and guideline materials distributed by or on behalf of the ministry:

"Notice: The [insert name of eligible entity] that operates this health care sharing ministry is not an insurance company and the financial assistance provided through the ministry is not insurance and is not provided through an insurance company. Whether any participant in the ministry chooses to assist another participant who has financial or medical needs is totally voluntary. A participant will not be compelled by law to contribute toward the financial or medical needs of another participant. This document is not a contract of insurance or a promise to pay for the financial or medical needs of a participant by the ministry. A participant who receives assistance from the ministry for his or her financial or medical needs remains personally responsible for the payment of all of his or her medical bills and other obligations incurred in meeting his or her financial or medical needs.".

6. Respondent Aliera Companies (Aliera) was originally incorporated in Delaware in 2015 and is a for-profit business without religious affiliation. Aliera has created several subsidiary companies, through which it markets and sells memberships in what it purports to be health care sharing plans operated by a health care sharing ministry. These heath care sharing plans are marketed and sold throughout most of the U.S., including Michigan.

7. Respondent Sharity Ministries (Sharity) purports to be a health care sharing ministry (HCSM) created by an eligible entity as defined by MCL 550.1853. Sharity was formed on June 27, 2018, and, on or about August 13, 2018, it entered into a management agreement with Aliera whereby it agreed that Aliera would receive approximately 84% of Sharity members' sharing contributions. The management agreement was signed by Sharity's then Chairman, Mr. William Thead, who was also employed by Aliera at or about the time that the agreement was executed. Although Sharity is purportedly a separate entity from Aliera, it was formed for the primary purpose of allowing Aliera to essentially operate as an unlicensed insurer and avoid both state and federal regulation by claiming that Sharity, which it maintained significant control over, was an HCSM and therefore exempt from state and federal insurance laws.

8. Respondent Ensurian Agency is a subsidiary of Respondent Aliera that was created to market and facilitate the sale of health care sharing plans offered by Respondent Sharity.

9. Aliera, Sharity, and Ensurian are collectively referred to herein as Respondents.

10. DIFS staff received information about possible unlicensed activity by Respondents. A review of DIFS' records revealed that none of the Respondents are licensed under the Code. As a result, DIFS initiated an investigation into Respondents' activities and discovered the following facts:

a. Respondents are currently marketing and selling memberships to Michigan residents to Respondent Sharity—a purported HCSM. These memberships provide a mechanism for members to seek reimbursement of certain medical expenses by submitting what Respondents refer to as "share requests" to Respondents who in turn refer requests that meet plan guidelines on a monthly basis to members for reimbursement. All members must

Statement of Findings
Enforcement Case No. 21-16507
Page 4 of 7

pay a mandatory monthly sharing contribution to maintain membership and their payment of this fee constitutes an opt-in for the monthly sharing request.

b. Respondents offer three membership plans: Sharity Basic, Sharity Secure, and Sharity Spectrum. These plans are equivalent to the various tiers of health care coverage that are commonly provided as options by health care insurers that require escalating premiums the more coverage that is selected. In order to participate in any of Respondent's membership plans, consumers are required to pay an initial membership fee and monthly fees thereafter. Although Respondents refer to these mandatory monthly payments as sharing contributions, they are for all practical purposes premiums. As with coverage provided by health care insurers, Respondents' member guides outline escalating sharing contributions based on whether, basic, catastrophic, or comprehensive coverage is sought by the member.

c. Respondents have created an electronic "ShareBox Portal" by which they send out monthly messages to members outlining the share requests that are being made that month and asking whether the member wishes to opt in or out of sharing. There is no indication that the members make any individualized determinations on monthly share requests and Respondents' member guides render it clear that participation in the healthcare sharing ministry constitutes an "opt-in" for sharing. Thus, the practical effect of the notification of share requests is not to give the members any real choice on whether to assist fellow members but instead simply a choice on whether to remain a member of the ministry. Similar to an insurance policy in which there is no coverage without payment of the required monthly premium, there is no ability to make a share request or participate in the sharing ministry without the payment of a monthly sharing contribution.

d. As part of the enrollment process, applicants are asked to provide a detailed medical history so that Respondents are able to identify preexisting conditions, many of which are excluded from share requests, other than on a hardship basis which requires additional assessments on members. Respondent's member guides state that "[t]o be fair and equitable and not overburden the membership community, restrictions and limitations are applied to conditions occurring prior to membership, known as pre-existing conditions." Exclusion of preexisting conditions from coverage was a common feature of many health insurance plans prior to the passage of the Affordable Care Act (ACA).

e. For all of the membership plans, the percentage of health care costs that are eligible for share requests is dependent upon whether the costs were incurred at what is commonly referred to in the insurance industry as "in-network providers," but which Respondent refers to as "recognized provider groups." For example, under the Sharity Secure Plan, hospital costs incurred at a recognized provider group are eligible for a 100% reimbursement share request while hospital costs incurred at a non-recognized provider group are eligible for a 60% reimbursement share request.

f. Similar to healthcare coverage offered by insurance providers, for all of Respondents' membership plans, the membership costs vary based upon the ages of the applicants. For example, under the Sharity Spectrum plan, the cost of a membership plan for members aged 18-29 is $315.00/month while the same plan for members aged 60 and over is $715.00/month.

Statement of Findings
Enforcement Case No. 21-16507
Page 5 of 7

g.   Although Respondents state that the cost-sharing among members is based on voluntary contributions, they also informed DIFS that members "remain active participants in the HCSM programs and may submit their medical expenses for sharing as long as they adhere to the Statement of Beliefs and submit monthly voluntary gifts to share in other members' medical expenses." Under this plan, if a member does not "voluntarily" pay the monthly membership fee, their membership is rendered inactive, and they cannot participate in the ministry.

h.   Similar to health insurance, all of Respondents' plans require a deductible to be met before any payments or share requests can be made. Respondents refer to this deductible as a Member Share Responsibility Amount (MSRA). For example, under the Sharity Spectrum plan, members must meet a $3000 MSRA for each medical expense before any portion of the medical expense can be submitted as a sharing request.

i.   Similar to most health insurance plans prior to the passage of the ACA, Respondents' plans include a lifetime cap on the amount of reimbursement that can be received through sharing requests. For example, under the Sharity Spectrum Plan, there is a $600,000 lifetime maximum reimbursement limit.

j.   Respondents actively solicit and sell the membership plans described above in the State of Michigan.

11.   Based on the facts set forth above, Respondents are engaged in the unlicensed practice of insurance. At its heart, the business of insurance involves the transfer of risk whereby one party undertakes to indemnify another against loss in the event that a specified contingency occurs. The individual or entity purchasing insurance makes a payment to the insurer that essentially transfers the risk that a costly contingency will occur to the insurer by transferring the responsibility to pay for the costs associated with the contingency to the insurer. The indemnity agreement between parties almost always contains several hallmark characteristics—the payment of premiums, coverage limits, and deductibles. The amount of premium is usually determined in part by a business risk profile of the applicant as determined by the insurer.

12.   Here, Respondents are accepting a transfer of risks from its members. They are receiving monthly premiums in the form of mandatory monthly sharing contributions. They have agreed to submit sharing requests to its members should certain contingencies occur. All members of the ministry are required to make monthly sharing contributions in order to remain active. Thus, a promise to submit a share request to ministry members is essentially a promise that the ministry will pay according to the terms of the membership plan.

13.   Moreover, increasing the rates based upon the members' age and the exclusion of preexisting conditions is indicative that Respondents are creating a business risk profile of its members and adjusting premiums/sharing contributions accordingly. Other indications that Respondents have merely re-labeled its actions as non-insurance in order to avoid the state and federal laws and regulations that are associated with the business of insurance are its tiered membership plans that provide more or less coverage dependent upon the amount of premium/sharing contributions that the member is willing to pay. Differing prices based on whether in network providers are used and

Statement of Findings
Enforcement Case No. 21-16507
Page 6 of 7

the imposition of deductibles/member share responsibility amounts described above are also characteristics of health insurance.

14. Respondents have done little more than relabel their actions by using different terminology than is typically used in the insurance industry, but it is the actions themselves, not the labels applied to those actions, that determine whether Respondents are engaged in the business of insurance. Based on the factors described above, Respondents' actions are properly labeled as insurance and they have failed to obtain the proper licensure and/or certificates of authority to engage in such business in the state of Michigan.

15. Respondents' attempts to avoid application of state and federal laws and regulations by labeling themselves as an HCSM are likewise without merit. Pursuant to MCL 550.1867, in order to qualify as an HCSM, the ministry must "act as a facilitator by matching its participants who have financial or medical needs with participants who have the ability to assist in meeting those needs according to criteria established for the ministry by the eligible entity." Here, the ministry's utilization of membership plans does not operate to match participants with needs to those who have the ability to assist in meeting those needs. As indicated above, the monthly sharing contributions are mandatory in order to participate in the ministry and the ability of a member to assist is not a factor. Indeed, if a member does not have "the ability to assist," and thus does not pay their monthly contribution, they will no longer be a member of the ministry and will lose the ability to submit share requests.

16. Respondents also fail to meet the requirements of MCL 550.1867(d) which states that ministries must "[p]rovide amounts that participants may contribute with no assumption of risk or promise to pay among its participants." Here too, the mandatory nature of membership sharing contributions renders Respondents' compliance impossible. Because failure to pay a monthly sharing contribution results in the removal of the member from the ministry, the practical effect is that all members have agreed to pay the share requests. There is no discretion—indeed, the member guides state that participation in the ministry constitutes an opt-in to sharing. Thus, if you are a member, you are promising to pay the share requests.

17. Additionally, Respondents fail to meet the requirements of MCL 550.1867(e) which provides that ministries must "[p]rovide financial assistance to participants who have financial or medical needs with no assumption of risk or promise to pay by the ministry to its participants." Once again, the mandatory nature of the sharing contributions renders it impossible for the Respondents to comply. Those participants who have financial or medical needs that render them incapable of providing a monthly sharing contribution are no longer members and can receive no assistance from the ministry. Likewise, because all participants in the ministry are considered to have opted into monthly sharing, all members have essentially promised to pay share requests in accordance with the ministry guidelines.

18. Based on their failure to comply with the requirements of MCL 550.1867 set forth above, Respondents are not operating as a healthcare sharing ministry, but instead are merely claiming the HCSM exemption from state regulation in order to engage in the business of insurance without complying with the statutory and regulatory requirements that an insurer must meet to receive a certificate of authority and/or license to operate in the state of Michigan.

Statement of Findings
Enforcement Case No. 21-16507
Page 7 of 7

19.     By engaging in a concerted action to enroll Michigan residents in the membership plans described above, Respondents have acted as an insurer without the required certificate of authority, in violation of Section 402 of the Code, MCL 500.402.

20.     By engaging in a concerted action to solicit and sell the membership plans described above, Respondents have acted as unlicensed insurance producers in violation of Section 1201a(1) of the Code, MCL 500.1201a(1).

21.     By violating Chapter 12 of the Code in the manner described above, Respondents are subject to sanctions under Section 1244 of the Code, MCL 500.1244, which may include civil fines of up to $50,000.00 and restitution. By violating Section 402 of the Code in the manner described above, Respondent is subject to sanctions under Section 150 of the Code, MCL 500.150, which may include civil fines of up to $50,000.00.

ORDER NO. E20-31

STATE OF NEW JERSEY
DEPARTMENT OF BANKING AND INSURANCE

IN THE MATTER OF:

_____

| | |
|---|---|
| ALIERA HEALTHCARE, INC. (License No. 1647593), doing business as The Aliera Companies, Inc., JESSICA BUDDINGTON (License No. 1676980), ALEXANDER CARDONA (License No. 1631866), ENSURIAN AGENCY, LLC (License No. 3000658229), JON HATCHER (License No. 3000654413), And TRINITY HEALTHSHARE, INC., | ) ) ) ) ) ) ) ) ) ) ) |
| Respondents. | ) |

**ORDER TO CEASE AND DESIST**

_____

TO:    The Aliera Companies, Inc.
        Attn: Chase Moses, President
        990 Hammond Drive
        Suite 700
        Atlanta, GA 30328

        Jessica Buddington
        The Aliera Companies, Inc.
        990 Hammond Drive
        Suite 700
        Atlanta, GA 30328

        Alexander Cardona
        The Aliera Companies, Inc.
        990 Hammond Drive
        Suite 700
        Atlanta, GA 30328

        Ensurian Agency, LLC
        Attn: Jon Hatcher, President
        913 N. Market Street
        Suite 200
        Wilmington, DE 19801
        Jon Hatcher, President

**EXHIBIT**
**1.36**
Ex. 1.36, p. 1 of 5

Ensurian Agency, LLC
913 N. Market Street
Suite 200
Wilmington, DE 19801

Trinity Healthshare, Inc.
Attn: Joseph Guarino, III, President
5901-B Peachtree Dunwoody Road
Suite C160
Atlanta, GA 30328

THIS MATTER, having been opened by the Commissioner of Banking and Insurance ("Commissioner"), State of New Jersey, upon information that Aliera Healthcare, Inc., doing business as The Aliera Companies, Inc. ("Aliera"), Jessica Buddington ("Buddington"), Alexander Cardona ("Cardona"), Ensurian Agency, LLC ("Ensurian"), Jon Hatcher ("Hatcher"), and Trinity Healthshare, Inc. ("Trinity") (collectively referred to as "Respondents"), may have violated various provisions of the insurance laws of the state of New Jersey; and

WHEREAS, Order to Show Cause No. E20-31 was issued against Respondents on December 23, 2020; and

WHEREAS, Respondents are subject to the provisions of the New Jersey Insurance Producer Licensing Act of 2001, N.J.S.A. 17:22A-26 to -48 ("Producer Act"), and the regulations promulgated thereunder, N.J.A.C. 11:16-1.1 to -7.10, the Producer Licensing regulations, N.J.A.C. 11:17-1.1 to -2.17, the regulations governing Insurance Producer Standards of Conduct, N.J.A.C. 11:17A-1.1 to 11:17D-2.8, and the general penalty provision of N.J.S.A. 17:33-2; and

WHEREAS, pursuant to N.J.S.A. 17:22A-40(d), the Commissioner shall retain the authority to enforce the provisions of and impose any penalty or remedy authorized by the Producer Act and Title 17 of the Revised Statutes or Title 17B of the New Jersey Statutes against any person who is under investigation for or charged with a violation of the Producer Act or Title

17 of the Revised Statutes or Title 17B of the New Jersey Statutes even if the person's license has been surrendered or has lapsed by operation of law; and

WHEREAS, under N.J.S.A. 17:1-15(j), the Commissioner may order any person violating any provision of Title 17 of the Revised Statutes or Title 17B of the New Jersey Statutes to cease and desist from engaging in such conduct; and

## ORDER TO CEASE AND DESIST

IT APPEARING, that Trinity does not qualify as a Health Care Sharing Ministry ("HCSM") under 26 U.S.C. § 5000A(d)(2)(B); and

IT FURTHER APPEARING, that Trinity does not possess a certificate of authority issued by the Commissioner to act as an insurer in New Jersey; and

IT FURTHER APPEARING, that Trinity has been operating, and continues to operate, as an unauthorized insurer in New Jersey, in violation of N.J.S.A. 17B:17-13(a); and

IT FURTHER APPEARING, that Aliera does not possess a certificate of authority issued by the Commissioner to act as an insurer in New Jersey; and

IT FURTHER APPEARING, that Aliera has been operating, and continues to operate, as an unauthorized insurer in New Jersey, in violation of N.J.S.A. 17B:17-13(a); and

IT FURTHER APPEARING, that  Respondents have engaged in the transaction of the business of insurance, as defined at N.J.S.A. 17B:17-13(b), with respect to Trinity healthcare plans ("Trinity Plans") developed, marketed, solicited and sold to New Jersey consumers, in violation of N.J.S.A. 17B:17-13(b); and

IF FURTHER APPEARING, that Respondents, on their own and through others, marketed, solicited and sold, and continue to market, solicit and sell, the Trinity Plans to New Jersey consumers, falsely representing Trinity to be a qualified HCSM that excepts its members from compliance with the "minimum essential coverage" required under N.J.S.A. 54A:11-3; and

IT FURTHER APPEARING, that Respondents' actions in marketing, soliciting and selling the Trinity Plans to New Jersey consumers subjected, and continue to subject, those unsuspecting consumers to liability for a penalty tax under N.J.S.A. 54A:11-3(b), contrary to Respondents' representations; and

IT FURTHER APPEARING, that Respondents' actions in marketing, soliciting and selling the Trinity Plans to New Jersey consumers are an unfair or deceptive act or practice in the business of life insurance, health insurance and annuities in violation of N.J.S.A. 17B:30-3; and

IT FURTHER APPEARING, that Respondents' actions in marketing, soliciting and selling the Trinity Plans to New Jersey consumers constitute the making, publishing, disseminating, circulating, or placing before the public, directly or indirectly, advertisements, announcements or statements containing assertions, representations or statements with respect to the business of insurance that are untrue, deceptive or misleading, and are unfair or deceptive acts or practices in the business of life insurance, health insurance and annuities in violation of N.J.S.A. 17B:30-4; and

NOW, THEREFORE, IT IS on this 23rd day of December 2020;

ORDERED, that Respondents, and their officers, directors, trustees, employees, agents and affiliates, IMMEDIATELY CEASE AND DESIST from the solicitation, negotiation, or sale of any and all HCSM products in the state of New Jersey; and

IT IS FURTHER ORDERED, that Respondents, and their officers, directors, trustees, employees, agents and affiliates, IMMEDIATELY CEASE AND DESIST from writing any new HCSM coverage or renewing any HCSM coverage for New Jersey insurance consumers; and

IT IS FURTHER ORDERED, that Respondents, and their officers, directors, trustees, employees, agents and affiliates, IMMEDIATELY CEASE AND DESIST from acting as insurers with respect to subjects of insurance resident, located or to be performed in this state, transacting

Page 4 of 5

any insurance business in New Jersey, engaging in or transacting the unauthorized business of insurance in New Jersey,  or otherwise violating in any way the insurance laws of the State of New Jersey, pursuant to N.J.S.A. 17B:17-13(a), N.J.S.A. 17B:17-13(b), N.J.S.A. 17B:30B-3 and -4, and N.J.S.A. 17:1-15(j); and

IT IS FURTHER ORDERED, that Respondents shall within ten days of the date of this Order to Cease and Desist provide the Commissioner with a list of all New Jersey residents currently covered by Trinity Plans, including name, mailing address, email address and telephone number; and

IT IS FURTHER ORDERED, that this Order to Cease and Desist shall remain in effect subject to the further order of the Commissioner; and

IT IS FURTHER ORDERED, that Respondents have the right to move to vacate this Order to Cease and Desist. Any motion to vacate this Order to Cease and Desist must be in writing and filed with the Commissioner within twenty (20) days of service of this Order to Cease and Desist by delivery to the Office of Regulatory Affairs, Department of Banking and Insurance, 20 West State Street, P.O. Box 325, Trenton, New Jersey 08625, with a copy to be sent to Virgil Dowtin, Chief of Investigations, Department of Banking and Insurance, State of New Jersey, 20 West State Street, P.O. Box 329, Trenton, New Jersey 08625. A copy of the motion shall also be sent to Deputy Attorney General Jeffrey S. Posta, Banking and Insurance Section, 25 Market Street, P.O. Box 117, Trenton, New Jersey 08625-0117.

_____
Marlene Caride
Commissioner

Page 5 of 5