**No. 25-1035**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

---

ALLIANCE OF HEALTH CARE SHARING MINISTRIES
*Plaintiff-Appellant*

v.

MICHAEL CONWAY,
in his official capacity as
Commissioner of the Colorado Division of Insurance
*Defendant-Appellee*

---

Appeal from the United States District Court for the District of Colorado,
No. 1:24-cv-01386-GPG-STV (Hon. Gordon Gallagher)

---

**APPENDIX VOL VII - Pages A-332 - A-350**

Date: March 21, 2025

Michael F. Murray
Paul Hastings LLP
2050 M Street, NW
Washington, D.C. 20036
(202) 551-1730
michaelmurray@Paulhastings.Com
William E. Mahoney
Paul Hastings LLP
600 Travis Street, Fifty-Eighth Floor
Houston, Texas 77002
(713) 860-7304
williammahoney@Paulhastings.Com

*Counsel For Plaintiff Alliance of
Health Care Sharing Ministries*

| ECF NO. | DESCRIPTION | Appx. Page No. |
|---|---|---|
| **Appendix Vol. I, Pages 1-140** | | |
| - | District Court Docket Sheet | A-1 |
| 8-1 | Ex. A - Declaration of Rob Waldo (May 17, 2024) | A-9 |
| 8-2 | Ex. A-1 – Samaritan Bylaws | A-19 |
| 8-3 | Ex. A-2 - Samaritan Guidelines | A-44 |
| 8-4 | Ex. A-3 - Samaritan Membership Application | A-94 |
| 8-5 | Ex. B - Declaration of Katy Talento | A-100 |
| 32 | Amended Complaint of Alliance of Health Care Sharing Ministries (July 1, 2024) | A-109 |
| **Appendix Vol. II, Pages 141-179** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1-1.6 (September 3, 2024) | A-141 |
| **Appendix Vol. III, Pages 180-223** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.7-1.22 (September 3, 2024) | A-180 |
| **Appendix Vol. IV, Pages 224-261** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.23-1.28 (September 3, 2024) | A-224 |
| **Appendix Vol. V, Pages 262-307** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.29-1.33 (September 3, 2024) | A-262 |

| | **Appendix Vol. VI, Pages 308-331** | |
|---|---|---|
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.34-1.36 (September 3, 2024) | A-308 |
| | **Appendix Vol. VII, Pages 332-350** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.43-1.54 (September 3, 2024) | A-332 |
| | **Appendix Vol. VIII, Pages 351-373** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.37-1.39 (September 3, 2024) | A-351 |
| | **Appendix Vol. IX, Pages 374-424** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.40-1.40 (September 3, 2024) | A-374 |
| | **Appendix Vol. X, Pages 425-478** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.40-1.41 (September 3, 2024) | A-425 |
| | **Appendix Vol. XI, Pages 479-541** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.41-1.42 (September 3, 2024) | A-479 |
| | **Appendix Vol. XII, Pages 542-573** | |

| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.43-1.54 (September 3, 2024) | A-542 |
|---|---|---|
| **Appendix Vol. XIII, Pages 574-612** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.54-1.59 (September 3, 2024) | A-574 |
| **Appendix Vol. XIV Pages 613-682** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.6-1.6 (September 3, 2024) | A-613 |
| **Appendix Vol. XV, Pages 683-767** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.61-1.64 (September 3, 2024) | A-683 |
| **Appendix Vol. XVI, Pages 768-816** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 2.0-2.3 (September 3, 2024) | A-768 |
| **Appendix Vol. XVII, Pages 817-867** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 2.3-2.4 (September 3, 2024) | A-817 |
| **Appendix Vol. XVIII, Pages 868-933** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 2.5-7 (September 3, 2024) | A-868 |

| | **Appendix Vol. XIX, Pages 934-1002** | |
|---|---|---|
| 52.1 | Appendix to Reply to Motion for Preliminary Injunction (September 17, 2024) | A-934 |
| 54 | Order Denying the Alliance's Motion for a Preliminary Injunction (January 13, 2025) | A-949 |
| | **Appendix Vol. XX, Pages 1003-1041** | |
| 54 | Order Denying the Alliance's Motion for a Preliminary Injunction (January 13, 2025) | A-1003 |
| 55 | Notice of Appeal as to Order on Motion for Preliminary Injunction (January 27, 2025) | A-1015 |
| 58-1 | Motion for Order to Grant Injunction Pending Appeal (January 28, 2025) | A-1017 |
| | **Appendix Vol. XXI, Pages 1042-1077** | |
| 58-1 | Motion for Order to Grant Injunction Pending Appeal (January 28, 2025) | A-1042 |
| 60 | Order Denying Motion for Injunction Pending Appeal (February 3, 2025) | A-1069 |



NEW YORK STATE
DEPARTMENT OF FINANCIAL SERVICES
ONE STATE STREET
NEW YORK, NEW YORK 10004

-----------------------------------------------------------------------x

In the Matter of:                              :       No. 2020-0039-C
                                               :
The Aliera Companies, Inc.,                    :
formerly known as Aliera Healthcare, Inc.      :
                                               :
Trinity Healthshare Inc.                       :
                                               :
                        Respondents.           :
-----------------------------------------------------------------------x

## STATEMENT OF CHARGES AND NOTICE OF HEARING

TO THE ABOVE-NAMED RESPONDENT:

PLEASE TAKE NOTICE that a hearing will be held at the office of the New York State

Department of Financial Services, One State Street, New York, New York 10004, 6th Floor, on

the 2nd day of February, 2021, at 10:00 a.m., and continuing thereafter day to day as determined

by the Department, before a Hearing Officer to be appointed by the Superintendent of Financial

Services, to determine whether RESPONDENTS have committed violations of Financial

Services Law § 408 with respect to an intentional fraud or intentional misrepresentation of a

material fact in connection with a financial product or service and defined violations of New

York Insurance Law by violating Insurance Law §§1102, 2102(a)(1)(A), 2102(e)(1), 2117(a),

2122(a)(2), 2123, whether a determined violation should be found pursuant to Insurance Law

**EXHIBIT**

**1.37**

Ex. 1.37, p. 1 of 24

Article 24 with respect to unfair and deceptive acts and practices, and whether civil monetary penalties shall be imposed, injunctive relief ordered, restitution ordered, and other appropriate relief granted as a result of such violations.

## OVERVIEW

1.      For several years, Respondents have conducted an illegal insurance business in New York.  Since as early as 2016, the Aliera Companies, formerly known as Aliera Healthcare, Inc., ("Aliera"), has used associated non-profit entities purporting to be health care sharing ministries ("HCSMs"), like Trinity Healthshare Inc. ("Trinity") (together with Aliera, "Respondents"), for the purpose of evading insurance regulation, while at the same time deceptively marketing and selling obvious health insurance products.  Respondents aggressively marketed and sold their products to consumers in the health insurance marketplace, preying on people who were uninsured, and deceiving consumers into paying hundreds of dollars per month for what they were led to believe was comprehensive health coverage.  At the same time, Respondents claim that their products are "not insurance" and that Respondents have no obligation to pay out claims, misrepresenting the true nature of the products.  Respondents utilized this structure to justify routine denials of consumers' medical claims and funnel payments to Aliera, the for-profit entity.  In many cases, consumer's medical claims were left unpaid.

2.      Following enforcement action by several states' insurance regulators against Respondents in 2019, Aliera restructured to become a holding company with multiple wholly-owned subsidiaries.  Aliera restructured solely in an attempt to continue its avoidance of insurance regulation and its deceptive marketing of Trinity's health care plans as alternatives to

2

traditional health insurance for its own profit, despite knowing that the products constitute illegal insurance plans without any of the consumer protections that typically accompany regulation.

3.       The Department hereby brings an administrative proceeding against Respondents, seeking to impose civil monetary penalties, injunctive relief, and restitution with respect to Respondents' numerous violations of law, and an order determining that Respondents engaged in unfair or deceptive acts or practices.

## LEGAL FRAMEWORK & JURISDICTION

4.       The New York State Department of Financial Services (the "Department") is the insurance regulator in the State of New York.  The Superintendent of the Department ("Superintendent") bears the responsibility of ensuring the safety and soundness of New York's insurance industry and promoting the reduction and elimination of fraud, abuse, and unethical conduct with respect to insurance participants.  The Superintendent has the authority to conduct investigations, to bring enforcement proceedings, and to levy monetary penalties, restitution, and order injunctive relief against parties who have violated the relevant laws and regulations.

Intentional Fraud or Misrepresentations and Unfair and Deceptive Acts or Practices

7.       Financial Services Law Section 408 provides that the Superintendent may, after notice and hearing, levy a civil penalty for, among other things, any intentional fraud or intentional misrepresentation of a material fact with respect to a financial product or service or involving any person offering to provide or providing financial products or services.

8.       "Financial product or service" includes, among other things, any financial product or service provided by a person regulated by the Superintendent under the New York Insurance Law, including health insurance products.

3

9.      Further, Article 24 of the New York Insurance Law prohibits any unfair and deceptive acts or practices in the insurance business in New York.

10.      Section 2430 of the New York Insurance Law provides that "[n]o person shall engage in this state in any trade practice constituting a defined violation or a determined violation as defined herein."  The term "defined violation" is defined in New York Insurance Law § 2402(b) to mean the commission by a person of an act prohibited by a series of enumerated statutes.  Each of the violations of the New York Insurance Law described as licensing requirements below is so enumerated.  Pursuant to Section 2402(c), the term "determined violation" means "any unfair method of competition or any unfair or deceptive act or practice, which is not a defined violation but is determined by the superintendent pursuant to section two thousand four hundred five of this article to be such method, act or practice."

11.      Section 2405(a) authorizes the Superintendent to bring a statement of charges and initiate a hearing "[w]henever the superintendent has reason to believe that a person has committed or is committing a defined violation or has been or is engaging in any method of competition, or any act or practice, which could become a determined violation" and that a proceeding is in the public interest.

<u>New York's Licensing Requirements for All Insurance Business</u>

12.      Pursuant to New York Insurance Law §1102(a), no person, firm, association, or corporation may conduct insurance business in New York State unless authorized by a license issued by the Department or otherwise exempt from licensing pursuant to the Insurance Law.

13.      New York Insurance Law §1101(b)(1) defines the "doing of an insurance business" in relevant part as engaging in any of the following acts:

> Making, or proposing to make, as insurer, any insurance contract, including either issuance or delivery of a policy or contract of insurance to a resident of this state or

4

to any firm, association, or corporation authorized to do business herein, or solicitation of applications for any such policies or contracts;

Collecting any premium, membership fee, assessment or other consideration for a policy or contract of insurance;

Doing any kind of business, including a reinsurance business, specifically recognized as constituting the doing of an insurance business within the meaning of the Insurance Law;

Doing or proposing to do any business in substance equivalent to any of the foregoing in a manner designed to evade the provisions of the Insurance Law.

14.     Section 1101(a) of the New York Insurance Law defines an insurance contract to

be:

any agreement or other transaction whereby one party, the "insurer," is obligated to confer benefit of pecuniary value upon another party, the "insured" . . . dependent upon the happening of a fortuitous event in which the insured or beneficiary has, or is expected to have at the time of such happening, a material interest which will be adversely affected by the happening of such event,

<u>New York's Licensing Requirements for Insurance Producers</u>

15.     New York Insurance Law § 2102(a)(1)(A) further provides that no person, firm,

association or corporation may act as an insurance producer in New York State unless authorized

to do so by a license issued by the Department.

16.     With certain exceptions not relevant here, an "insurance producer" is defined in

Insurance Law § 2101(k) as "an insurance agent, title insurance agent, insurance broker,

reinsurance intermediary, excess lines broker, or any other person required to be licensed under

the laws of this state to sell, solicit or negotiate insurance."

17.     In addition to the general requirement that an insurance producer be licensed, the

law also prohibits any person who is required to be licensed by the Department and is not so

licensed from accepting any commission, service fee, brokerage or other valuable consideration

for selling, soliciting or negotiating insurance in New York pursuant to Insurance Law §
2102(e)(1).

18.     Moreover, acting as an agent of an unauthorized insurer, acting as an insurance
broker in the solicitation, negotiation or effectuation of any insurance contract on behalf of an
unauthorized insurer, and in any way or manner aiding an unauthorized insurer in effecting an
insurance contract constitutes a violation of New York Insurance Law § 2117(a).

19.     Insurance Law § 2122(a)(2) further provides that no insurance producer or other
person, shall, by any advertisement or public announcement in this state, call attention to any
unauthorized insurer or insurers.

20.     New York Insurance Law § 2102(g) provides that any person, firm, association or
corporation who or that violates any provision of § 2101 shall be subject to a penalty not to
exceed 500 dollars for each transaction.

21.     Any person or entity that violates New York Insurance Law § 2117 is, in addition
to any other penalty provided by law, subject to a penalty of 500 dollars for each transaction,
pursuant to New York Insurance Law § 2117(g).

## FACTUAL ALLEGATIONS

### I.    Background

22.     Aliera is a foreign, for-profit corporation organized under the laws of Delaware.
Aliera was incorporated in December 2015 by Timothy Moses and Shelley Steele under the
name Aliera Healthcare, Inc.[1]  During the early days of the company, Aliera partnered with
Anabaptist Healthshare ("Anabaptist"), a non-profit corporation that was based in Virginia,

---

[1]     Timothy Moses was convicted of federal securities fraud and perjury in 2005 in connection with a
prior business that he owned.  He was sentenced to over six years in prison and ordered to pay $1.65 in
restitution to the company's shareholders.

6

which operated as an alleged HCSM limited to members of the Gospel Light Mennonite Church of the Anabaptist faith.  An HSCM, as defined by 26 U.S.C § 5000A, is an entity narrowly defined by federal law in 2010 for the limited purpose of providing an exemption to the individual mandate under the Affordable Care Act.  HCSMs operate as a form of a medical cost sharing arrangement historically utilized by religious communities in which members make voluntary payments to a shared pool for the purpose of paying other members' health care costs. To qualify as a health care sharing ministry under federal law, among other things, an entity must have been in operation continuously since at least December 31, 1999.  Some states have insurance licensing exemptions for HSCMs.

23.      New York does not exempt HSCMs from New York insurance licensing requirements.

24.      As a result of the partnership between Aliera and Anabaptist, a non-profit entity known as Unity Healthshare was formed, for the purpose of enrolling members on a nationwide basis and expanding the HCSM.  Between 2016 and 2018, Aliera partnered with Unity Healthshare to expand and offer health care plans to members nationwide in various states, including New York.  During the summer of 2018, the relationship between Aliera and the leaders of the Anabaptist ministry deteriorated after the Anabaptist ministry uncovered serious accounting irregularities:  Moses had written authorized checks to himself from Unity Healthshare funds.

25.      As a result of that dispute, Aliera caused a new non-profit corporation, Trinity, to be created.  The Chief Executive Officer of Trinity was a former Aliera employee with close ties to the Moses family.  At the time that it was created, Trinity had no members enrolled in its products.

26.     Notably, the creation of these new entities and nationwide expansion should have disqualified Trinity as an exempted HCSM under federal law because it had not been in continuous operation since prior to December 31, 1999.  (As noted above, New York law does not exempt HCSMs from licensing requirements.)  Aliera, as evidenced by its relationship with Trinity, represented that Trinity was an HCSM so that Aliera could continue to evade other states' and federal regulation while conducting an illegal insurance business.[2]

27.     In addition to installing a former Aliera employee as the CEO of Trinity, Aliera extended its control over all aspects of Trinity's business, reducing Trinity to shell company controlled by Aliera.  Soon after Trinity's incorporation, Aliera and Trinity entered into an agreement (the "2018 Management Agreement") wherein Aliera was named the administrator, exclusive marketer, and program manager for Trinity, effectively controlling all aspects of Trinity's business.  Pursuant to that agreement, any new members who enrolled with Trinity were deemed to be Aliera consumers.  Aliera retained the exclusive right to develop, market, and sell Trinity's plans, and was responsible for setting plan pricing and medical expense eligibility.  Aliera's responsibilities also included managing third-party administrators responsible for the processing of medical claims forms.  In addition, Aliera was designated as solely responsible for developing and marketing the plans and contracted to perform all aspects of customer billing.  The agreement also delegated all of Trinity's financial accounting functions to Aliera.  The 2018 Management Agreement directed that enrollment fees from Trinity members would first be paid directly into an *Aliera* bank account, and only subsequently transferred to a Trinity bank account (to which Aliera was a signatory), for the actual payment of members' medical costs (to the

---

[2]     Whether or not the entities constitute HCSMs for the purposes of exemption from federal law with respect to the (no longer enforced) penalties for the ACA's individual mandate has no bearing on whether or not the entity is exempt from New York's insurance licensing laws, and is raised here only to underscore the extent of the deceptive tactics utilized by Aliera to avoid regulatory oversight.

8

extent those claims were paid at all).  In sum, the operation of the entire agreement allowed Aliera to utilize Trinity as a shell entity to conduct an unregulated insurance business for its own profit.

28.     In controlling Trinity pursuant to the 2018 Management Agreement, Aliera retained an unacceptably high proportion of consumer premiums.  In one example of the health plans offered, rather than holding the funds for payment of medical claims, Aliera bypassed Trinity's authority and outright retained at least 65% of those premiums and a significant portion of reimbursements from the remaining fees, leaving approximately 16% in reserve for medical benefits for members.  For another plan, only 9.8% of collected fees were allocated to reimburse members' medical expenses, with the remaining fees earmarked mostly for alleged administrative costs and commissions.  By contrast, the Affordable Care Act requires that insurers spend at least 80% of premium dollars on medical benefits for members.  In sum, only a small fraction of premiums were available to reimburse medical expenses, resulting in unpaid claims for consumers who were led to believe that they had purchased reliable health care coverage.

29.     Beginning on or around May 2019, several states brought regulatory actions against Respondents alleging that Aliera, and therefore Trinity, were not operating an HCSM as defined by federal or state law (in those states that create exemptions for HCSMs) and scrutinizing the above-described arrangements.  Shortly after Respondents became the subject of these other states' regulatory actions, on or around July 22, 2019, Aliera Healthcare Inc., changed its name to the Aliera Companies, Inc. and became a holding company for multiple wholly-owned subsidiaries, including USA Benefits & Administrators LLC, ("USA Benefits"), Ensurian, LLC ("Ensurian"), Advevo, LLC ("Advevo"), and Tactic Edge Solutions, LLC

9

("Tactic Edge Solutions").  Following Aliera's restructuring, Trinity entered into separate

agreements with each of Aliera's wholly owned subsidiaries for many of the same

administration, marketing, and other services that were provided to Trinity pursuant to the 2018

Management Agreement, although relinquishing its exclusive control over Trinity's bank

accounts.

30.     Although the restructuring appeared to be a response to the regulatory scrutiny,

Aliera entities continue to exercise control over the operations of Trinity, albeit in a different

form.  For example, the fee structure of these agreements continues to allow that Aliera retain a

significant portion of Trinity's member fees.  Pursuant to these agreements, Trinity pays each of

the above described Aliera subsidiaries a monthly rate based on a schedule of Trinity's products.

In addition, Trinity also pays additional monthly fees and reimbursement of various expenses,

such that a similar percentage of member fees are paid back to Aliera or its affiliates, consistent

with the financial arrangement under the 2018 Management Agreement.  Currently, all of

Trinity's products are offered exclusively through Ensurian, an Aliera subsidiary.  Trinity's 2020

offerings have many of the same features as the products offered through Aliera prior to Aliera's

restructuring; many have the same name entirely or have simply been re-branded as Trinity

products.  In sum, Aliera's restructuring was a half-baked attempt to disguise Aliera's control

over Trinity and Aliera's financial benefit therefrom.

II.      **Respondents' Product Offerings Constitute Insurance**

31.     Despite claiming otherwise, Respondents enter into insurance contracts with

consumers via Trinity's plan offerings, and their products therefore qualify as insurance under

New York law.  Additionally, Respondents have engaged in the substantive equivalent of

conducting an insurance business in a manner designed to evade regulation, in violation of New York law.

32.     For years, Aliera, through Trinity and its predecessor Unity Healthshare, has offered to New York consumers health care plans that promise to cover members' medical expenses in exchange for a mandatory fixed monthly payment.  The offer of the health care plan by Respondents and the acceptance of that plan via the application and payment on behalf of the consumer constitutes an enforceable insurance contract.

33.     Such contract is further evidenced by the Respondents' enrollment process: Trinity provides potential members with plan guides that includes categories of reimbursable claims; a signed member application constitutes an agreement that the member will abide by guidelines to participate in the plan; the member is accepted into the health care plan after signing the application and making payment.  Furthermore, the member guides make clear that the offered health care plans purport to pay money – *i.e.*, a benefit of pecuniary value – to cover certain health care costs that are incurred by members.  For example, Trinity's 2020 Member Guide explains to the consumer what happens with respect to a primary care visit: "Present your member ID to the front office personnel when you arrive at your PCP's office.  The provider's staff will contact the program to verify your eligibility status.  If you have not activated your membership or if your monthly contributions are not current, the services will automatically be deemed ineligible for sharing."  In other words, the consumer can expect that, as long as monthly contributions are current, payment will be made for the visit to the primary care physician.  Thus, in exchange for a consumer's monthly payment and agreement to abide by the terms of the membership application and guidelines, Respondents have entered into a legally enforceable insurance contract with each member.

11

34.     Moreover, each of the plans qualifies as the substantive equivalent of conducting an insurance business.  As described above, Respondents' program is structured to function precisely like traditional health insurance and, as set forth in Section III below, is marketed as such.  These health care plans have the same attributes found in traditional health insurance plans that are subject to the jurisdiction, regulation, and authority of the Department.

35.     For example, each member is responsible for reaching his "member share responsibility amount" before cost sharing is available, a feature commonly referred to as a deductible by licensed health insurers.  The mandatory fixed monthly payment is tantamount to a premium required by licensed health insurers.  Trinity's current health plans are offered in "tiers" with varying costs based on level of coverage, and includes a schedule of "consult fees," readily identifiable as a co-payment under licensed plans.  Likewise, members can utilize services from a network of providers and, as with a New York licensed health insurer, an Aliera subsidiary processes the medical claims on behalf of Trinity members.  For all of these reasons, and as set forth below, Respondents have engaged in an illegal insurance business in New York.

**III.    Respondents Utilize Misrepresentations and Deceptive Tactics to Evade Regulation**

36.     Respondents know that insurance products are subject to the jurisdiction, oversight and regulation of the Department pursuant to the laws set forth above.  Thus, Respondents deceptively litter marketing materials with disclaimers, stating, for example, that Trinity "does not guarantee payment of claims." In doing so, Respondents have sought to disqualify their products as insurance, thereby misrepresenting the true nature of these products.

37.     Nevertheless, while misrepresenting the true nature of these products, Respondents aggressively advertise in the national and New York insurance marketplaces that these products are "affordable alternatives for health care" that provide comprehensive coverage,

12

targeting consumers who are uninsured.  Every aspect of Respondents' marketing, notwithstanding their false disclaimers, leads consumers to believe that they have purchased legitimate, comprehensive health insurance coverage.  For example, Respondents market their programs as providing "access to a wide range of medical services" that are eligible for payment, including telemedicine, discount prescription drugs, and access to labs and diagnostics.  The various plans offered by Respondents are outlined in Trinity's marketing materials as for "individual and family" and range on a continuum of "Basic Care," "Interim Care," "Supplemental (Dental and Vision)," "Everyday" care, and "Catastrophic."  Members are issued membership cards, and Trinity maintains a network of providers and provides a search function on its website for participating providers for consumers to search.

38.     Respondents also aggressively advertise their products through licensed insurance brokers calling New York consumers, and on the internet in the health insurance marketplace.  In 2018, Aliera published a promotional video on YouTube that encouraged the viewer to consider Aliera as a substitute for traditional medical insurance.[3]  Additionally, Aliera's website previously marketed Trinity's products as "Quality Healthcare Sharing Plans at an Affordable Price."  Currently, Ensurian's website advertises "Innovative Health Care Solutions for Every Need and Budget," states that "the power of choice is in your hands," and solicits consumers to seek a quote to "compare affordable health care plans of your choice."  Trinity's website states that "Trinity wanted to alleviate the burden of expensive health care cost by offering an affordable option," emphasizing the affordability of its plans for consumers.  And, as recently as April 2020, Aliera admitted to utilizing New York licensed insurance brokers, who marketed and sold Respondents' products by calling New York consumers.  All of the above described tactics

---

[3] That video has since been removed from YouTube, presumably after state regulators in Washington raised concerns about it in 2019.

misled consumers into believing that they were purchasing a comprehensive health insurance plan pursuant to which qualifying medical claims were obligated to be paid.  In many instances, though, members claims were left unpaid, and Respondents repeatedly frustrated, delayed, and denied claims while relying on Trinity's dubious HCSM status and bogus disclaimers to avoid its legally mandated obligations.

## IV.   Consumers Have Been Harmed By Respondents' Deceptive Tactics

39.     As set forth above, since 2016, Aliera has utilized its shell entities, including Trinity, for the purpose of conducting an unregulated health insurance business for its own profit. From 2016 to the present, the total number of New York residents who have enrolled in Aliera's products is 40,843.  As of January 2020, Aliera had 6,347 New Yorkers enrolled in Aliera products (approximately 4,000 of whom are also currently enrolled in Trinity products).  Trinity currently has 5,605 New York residents enrolled its products.

40.     Numerous consumers' claims have gone unpaid.  The Department has received complaints from consumers dating back to at least 2018.  The consumers' complaints relate to a variety of medical procedures that were delayed or ultimately denied, leaving the consumer with the bills or without medical care.  Aliera entities routinely stall and delay payment of claims, providing conflicting and shifting justifications to consumers in denying claims.  Consumers have expressed that, based on how the plans were marketed to them, they believed that they had purchased legitimate health insurance coverage, and that their medical claims would be covered. By way of example:

- During the winter of 2019, Consumer A, who was current on all monthly payments to Aliera, reported that her treatments for a recent diagnosis of leukemia had been denied.  Consumer A returned from an emergency admission to the hospital to thousands of dollars in unpaid medical bills that Aliera refused to cover.  When Consumer A attempted to resolve the claim, she was told by Aliera that her claim was denied due to a "pre-existing condition."  Consumer A is not aware that she

14

had any such "pre-existing condition," and she never received any clarification or detail from Aliera in that regard, despite repeated requests for clarification.  The claim remains outstanding.

• During the spring of 2019, Consumer B reported that she enrolled in an Aliera product through a licensed insurance broker after googling the phrase, "affordable health insurance in NY."  Despite representations by the broker that her current physicians would accept the plan, none of her physicians accepted the plan.  Even after she was provided a list of approved physicians by Aliera, she learned that none of those physicians accepted the plan.  Consumer B cancelled her membership but was only refunded for three of the seven months of premiums paid.  Consumer B reported that she was told by the representative who sold her the plan that it was insurance; otherwise she would not have purchased it.

• During the summer of 2019, Consumer C reported that he was denied coverage for surgery for nerve damage in his hand, despite having made all his monthly payments.  When the consumer contacted Aliera regarding his coverage, Aliera stalled, delayed, and refused to respond, frustrating the consumer's efforts to resolve the issue.  Consumer C was eventually told by Aliera that his surgery would not be covered due to his "tobacco use."  Consumer C has since cancelled his policy with Aliera.  To date, he has not had surgery for the issue with his hand.

• During the fall of 2019, Consumer D reported that Aliera had denied claims for routine lab work.  When she followed up with Aliera, Consumer D received varying and conflicting explanations from its representatives.  Consumer D also reported that Aliera had denied coverage for a colonoscopy, even where she had received prior authorization from Aliera for the procedure. Again, Aliera delayed and frustrated her attempts to resolve the claim, providing conflicting information.

• During the fall of 2019, Consumer E reported that when enrolling with Aliera, the consumer was provided with information stating that his current doctor was "in network."  Following a visit to his doctor, Aliera refused to pay.  Again, Aliera frustrated attempts by Consumer E to resolve the claim by providing conflicting information and insufficient justifications for the denial, including asserting that they did not cover "specialists."  Aliera also denied lab work and prescription claims for Consumer E, yet failed to refund the consumer's payment when the consumer requested cancellation.

• During the fall and winter of 2019, Consumer F reported that he purchased an Aliera plan after being told by an insurance broker that the plan would cover "all medical bills."  Consumer F subsequently became aware that Aliera was not covering his bills and providers would not accept the plan.  After the consumer cancelled his membership, Aliera froze all his medical claims and refused to pay any medical bills incurred during the time that he was a paid member.

- At end of 2019, Hospital A reported that Aliera refused to cover an emergency admission for a patient's delivery, despite having previously advised that payment would be approved. When Hospital A followed up over a period of several months, Aliera deferred and delayed, claiming that they had never received the patient's medical records, which Hospital A had sent to Aliera on two prior occasions.

- During winter of 2020, a provider reported that Aliera denied a claim for a patient's breast cancer treatment leaving an unpaid bill of $14,712.50.

- During spring of 2020, Consumer G reported that, despite never missing a monthly payment, her bill for routine lab work was denied, leaving Consumer G responsible for approximately $1,600 in medical bills, which she was unable to pay. When Consumer G called to resolve her dispute, Aliera representatives repeatedly delayed and offered conflicting explanations for the denial. Ultimately, her claim was paid, but only after Consumer G informed Aliera that she was reporting the company to regulatory agencies. Consumer G also reported that, at the time she signed up for the Aliera plan, despite Aliera's disclaimers, she was led to believe that the plan constituted comprehensive but affordable health coverage. As a result of Aliera's failure to timely pay out her claim, Consumer G's credit has been harmed.

- In the spring of 2020, Hospital B reported that Aliera refused to pay a $10,000+ claim for a patient. The hospital reported that Aliera has been "impossible" to deal with, and repeatedly frustrated attempts by the hospital to get the claim paid.

- In the fall of 2020, Consumer H reported that Trinity refused to pay out claims from routine visits to her physician. When Consumer H called multiple times over a period of several months to resolve the claims, she received different excuses for the denial, including that her physician was not "in network" (even though she had confirmed that her physician was covered prior to purchasing the plan) and that Trinity had not received the claim from the physician. After several months of failed attempts to resolve the claim, Consumer H cancelled her Trinity plan.

These complaints are in addition to several others submitted to the Department, and over one hundred complaints submitted directly to Respondents. They demonstrate a pattern and practice by Respondents of routinely denying or delaying payments of members' legitimate medical claims, and frustrating consumers' attempts to resolve their claims. The repeated failure to pay out medical claims of its members comports with the substantial amount of fees retained by Aliera for its own profit, rather than held in reserve by Trinity for the actual payment of members' medical claims.

16

SPECIFICATION OF CHARGES

CHARGE I
RESPONDENTS VIOLATED NEW YORK FINANCIAL SERVICES LAW §408

41.     Petitioner realleges and incorporates by reference the assertions contained in paragraphs 1-40 above as if set forth fully herein.

42.     On multiple occasions from approximately 2016 through the present, in connection with the advertising, marketing, or offering of Respondents' products, Respondents intentionally misrepresented the nature of such products for the purpose of avoiding regulation and oversight.

43.     In fact, Respondents' products constitute insurance or the substantive equivalent of insurance and are subject to the jurisdiction and regulatory oversight of the Department.

44.     At the same time as misrepresenting the true nature of its products, Respondents aggressively marketed their products in the health insurance marketplace, representing to consumers, directly or by implication, that their products would provide consumers with meaningful health care coverage, or an equivalent to traditional health insurance, leaving consumers with the understanding that medical costs would be paid.

45.     Respondents did so for the purpose of collecting payments from consumers for their products for their own profits.

46.     In many cases, Respondents in fact avoided the payment of members' medical claims, delaying or denying member claims for dubious or insufficient reasons and frustrating consumer attempts to resolve their claims, thereby harming consumers.

47.     Accordingly, Respondents committed intentional fraud and/or made intentional misrepresentations of material facts with respect to a financial product or service and are thus liable to pay a civil penalty of up to five thousand dollars ($5,000) per offense.

17

CHARGE II
RESPONDENTS ENGAGED IN UNFAIR AND DECEPTIVE ACTS AND PRACTICES WARRANTING THE FINDING OF A DETERMINED VIOLATION

48.     Petitioner realleges and incorporates by reference the assertions contained in paragraphs 1-40 above as if set forth fully herein.

49.     On multiple occasions from approximately 2016 through the present, in connection with the advertising, marketing, or offering of its products, Respondents intentionally misrepresented the nature of Respondents' products, with the intention of avoiding regulation and oversight.

50.     In fact, Respondents' offerings constitute insurance or the substantive equivalent and are subject to the jurisdiction and regulatory oversight of the Department.

51.     At the same as misrepresenting the true nature of its products, Respondents aggressively marketed its products in the health insurance marketplace, representing to consumers, directly or by implication, that its products would provide consumers with meaningful health care coverage, or an equivalent to traditional health insurance, leaving consumers with the understanding that medical costs would be paid.

52.     Respondents did so for the purpose of collecting payments from consumers for their products for their own profits.

53.     In many cases, Respondents in fact avoided the payment of members' medical claims, delaying or denying member claims for dubious or insufficient reasons and frustrating consumer attempts to resolve their claims, harming the consumer.

54.     Accordingly, Respondents engaged in unfair and deceptive acts and practices warranting the finding of a determined violation.

18

## CHARGE III
### RESPONDENTS VIOLATED NEW YORK INSURANCE LAW § 1102(a)

55.    Petitioner realleges and incorporates by reference the assertions contained in paragraphs 1-40 above as if set forth fully herein.

56.    On multiple occasions from approximately 2016 through the present, Respondents engaged in the unauthorized business of insurance in New York by participating in offering, administering, and facilitating of insurance products to consumers, including in New York.  At no time did Respondents hold a license to engage in the transaction of insurance from the Department.

57.    Respondents' products offer health care coverage to its members for a fixed monthly payment and, in exchange, Respondents are obligated to pay out members' incurred medical costs, and as such, its plans constitute insurance contracts.

58.    Respondents are not exempt from the Department's licensing requirements.  New York's licensing laws are subject to very limited exemptions not applicable here, and further encompass any entity doing any business "in substance equivalent" to an insurance business in a manner that is designed to evade the law.

59.    Accordingly, Respondents have engaged in the unauthorized business of insurance in New York and are liable to pay a civil monetary penalty of up to one thousand dollars ($1,000) for the first violation and two thousand five hundred dollars ($2,500) for each subsequent violation.

## CHARGE IV
### ALIERA VIOLATED NEW YORK INSURANCE LAW § 2102(a)(1)(a)

60.    Petitioner realleges and incorporates by reference the assertions contained in paragraphs 1-40 above as if set forth fully herein.

19