**No. 25-1035**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

---

ALLIANCE OF HEALTH CARE SHARING MINISTRIES
*Plaintiff-Appellant*

v.

MICHAEL CONWAY,
in his official capacity as
Commissioner of the Colorado Division of Insurance
*Defendant-Appellee*

---

Appeal from the United States District Court for the District of Colorado,
No. 1:24-cv-01386-GPG-STV (Hon. Gordon Gallagher)

---

**APPENDIX VOL X - Pages A-425 - A-478**

Date: March 21, 2025

Michael F. Murray
Paul Hastings LLP
2050 M Street, NW
Washington, D.C. 20036
(202) 551-1730
michaelmurray@Paulhastings.Com
William E. Mahoney
Paul Hastings LLP
600 Travis Street, Fifty-Eighth Floor
Houston, Texas 77002
(713) 860-7304
williammahoney@Paulhastings.Com

*Counsel For Plaintiff Alliance of
Health Care Sharing Ministries*

| ECF NO. | *DESCRIPTION* | Appx. Page No. |
|---|---|---|
| **Appendix Vol. I, Pages 1-140** | | |
| - | District Court Docket Sheet | A-1 |
| 8-1 | Ex. A - Declaration of Rob Waldo (May 17, 2024) | A-9 |
| 8-2 | Ex. A-1 – Samaritan Bylaws | A-19 |
| 8-3 | Ex. A-2 - Samaritan Guidelines | A-44 |
| 8-4 | Ex. A-3 - Samaritan Membership Application | A-94 |
| 8-5 | Ex. B - Declaration of Katy Talento | A-100 |
| 32 | Amended Complaint of Alliance of Health Care Sharing Ministries (July 1, 2024) | A-109 |
| **Appendix Vol. II, Pages 141-179** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1-1.6 (September 3, 2024) | A-141 |
| **Appendix Vol. III, Pages 180-223** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.7-1.22 (September 3, 2024) | A-180 |
| **Appendix Vol. IV, Pages 224-261** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.23-1.28 (September 3, 2024) | A-224 |
| **Appendix Vol. V, Pages 262-307** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.29-1.33 (September 3, 2024) | A-262 |

| | **Appendix Vol. VI, Pages 308-331** | |
|---|---|---|
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.34-1.36 (September 3, 2024) | A-308 |
| | **Appendix Vol. VII, Pages 332-350** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.43-1.54 (September 3, 2024) | A-332 |
| | **Appendix Vol. VIII, Pages 351-373** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.37-1.39 (September 3, 2024) | A-351 |
| | **Appendix Vol. IX, Pages 374-424** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.40-1.40 (September 3, 2024) | A-374 |
| | **Appendix Vol. X, Pages 425-478** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.40-1.41 (September 3, 2024) | A-425 |
| | **Appendix Vol. XI, Pages 479-541** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.41-1.42 (September 3, 2024) | A-479 |
| | **Appendix Vol. XII, Pages 542-573** | |

| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.43-1.54 (September 3, 2024) | A-542 |
|---|---|---|
| **Appendix Vol. XIII, Pages 574-612** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.54-1.59 (September 3, 2024) | A-574 |
| **Appendix Vol. XIV Pages 613-682** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.6-1.6 (September 3, 2024) | A-613 |
| **Appendix Vol. XV, Pages 683-767** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.61-1.64 (September 3, 2024) | A-683 |
| **Appendix Vol. XVI, Pages 768-816** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 2.0-2.3 (September 3, 2024) | A-768 |
| **Appendix Vol. XVII, Pages 817-867** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 2.3-2.4 (September 3, 2024) | A-817 |
| **Appendix Vol. XVIII, Pages 868-933** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 2.5-7 (September 3, 2024) | A-868 |

| | **Appendix Vol. XIX, Pages 934-1002** | |
|---|---|---|
| 52.1 | Appendix to Reply to Motion for Preliminary Injunction (September 17, 2024) | A-934 |
| 54 | Order Denying the Alliance's Motion for a Preliminary Injunction (January 13, 2025) | A-949 |
| | **Appendix Vol. XX, Pages 1003-1041** | |
| 54 | Order Denying the Alliance's Motion for a Preliminary Injunction (January 13, 2025) | A-1003 |
| 55 | Notice of Appeal as to Order on Motion for Preliminary Injunction (January 27, 2025) | A-1015 |
| 58-1 | Motion for Order to Grant Injunction Pending Appeal (January 28, 2025) | A-1017 |
| | **Appendix Vol. XXI, Pages 1042-1077** | |
| 58-1 | Motion for Order to Grant Injunction Pending Appeal (January 28, 2025) | A-1042 |
| 60 | Order Denying Motion for Injunction Pending Appeal (February 3, 2025) | A-1069 |

D. **Funding of Liabilities and Distributions**

On the Effective Date, the Liquidating Trust Assets shall be deemed transferred to the Liquidating Trust free and clear of all Claims and Interests in such Liquidating Trust Assets. The Liquidating Trustee shall administer the Liquidating Trust Assets and Distribute Liquidating Trust Assets to Beneficiaries of the Liquidating Trust in accordance with the terms and conditions of the Plan, the Plan Confirmation Order and the Liquidating Trust Agreement. In the event of any inconsistency between the terms of the Plan, the Plan Confirmation Order and Liquidating Trust Agreement regarding the Liquidating Trust, the terms of the Plan shall govern, unless expressly ordered otherwise in the Plan Confirmation Order.

E. **Release of Liens**

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to this Combined Plan and Disclosure Statement, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be deemed fully released without any further action of any party, including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code or other applicable law, provided however that any tax liens that have been asserted against the Debtor shall not be released until the underlying tax claim has been satisfied.

F. **Exemption from Securities Laws**

Under section 1145 of the Bankruptcy Code, the issuance of beneficial interests in the Liquidating Trust under the Plan shall be exempt from registration under the Securities Act of 1933, as amended, and all applicable state and local laws requiring registration of securities.

G. **Exemption from Certain Taxes and Fees**

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under the Plan may not be taxed under any law imposing a stamp tax or similar tax.

H. **Debtor's Privileges as to Certain Causes of Action**

Effective as of the Effective Date, all Privileges of the Debtor relating to the Liquidating Trust Assets shall be deemed transferred, assigned, and delivered to the Liquidating Trust, without waiver or release, and shall vest with the Liquidating Trust. The Liquidating Trustee shall hold and be the beneficiary of all such Privileges and entitled to assert such Privileges. No such Privilege shall be waived by disclosures to the Liquidating Trustee of the Debtor's documents, information, or communications subject to attorney-client privileges, work product protections, or other immunities (including those related to common interest or joint defense with third parties), or protections from disclosure held by the Debtor. The Debtor's Privileges relating to the Liquidating Trust Assets will remain subject to the rights of third parties under applicable law, including any rights arising from the common interest doctrine, the joint defense doctrine, joint attorney-client representation, or any agreement; provided, however, prior to waiving such privilege, the Liquidating Trustee shall provide such third party with any written notice to the

extent such notice is required by any joint defense or common interest agreements that might have existed at the time Debtor filed the Petition. Nothing contained herein or in the Plan Confirmation Order, nor any Professional's compliance herewith and therewith, shall constitute a breach of any Privileges of the Debtor.

## I. <u>Insurance Policies</u>

Except as otherwise specifically stated herein, nothing in this Combined Plan and Disclosure Statement, the Plan Confirmation Order, or the Liquidating Trust Agreement, alters the rights and obligations of the Debtor (and their Estate) and the Debtor's insurers (and third-party claims administrators) under the Insurance Policies or modifies the coverage or benefits provided thereunder or the terms and conditions thereof or diminishes or impairs the enforceability of the Insurance Policies. On the Effective Date, all of the Debtor's rights and their Estate's rights under any Insurance Policy to which the Debtor and/or the Debtor's Estate may be beneficiaries shall vest with the Liquidating Trust. For the avoidance of doubt, the Debtor is deemed to have assumed all of the Insurance Policies. Nothing in this provision shall be deemed to be an admission of any fact, liability or other matter whatsoever.

## J. <u>Filing of Monthly and Quarterly Reports and Payment of Statutory Fees</u>

All Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtor on the Effective Date. On and after the Effective Date, the Debtor and the Liquidation Trustee shall be jointly and severally liable to pay any and all Statutory Fees when due and payable. The Debtor shall file all monthly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. Provided that the Debtor dissolves on the Effective Date, after the Effective Date, the Liquidating Trustee shall file with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee. If, after the Effective Date, disbursements, other than those made by the Liquidating Trust, are made in any quarter, the entity making such disbursements shall report same to the Liquidating Trustee for inclusion in the appropriate separate quarterly report. The Debtor and the Liquidating Trustee shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the earliest of the Debtor's Chapter 11 Case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be required to file any Administrative Claim in the case and shall not be treated as providing any release under the Plan in connection therewith.

## K. <u>Completion of Services of Professionals</u>

On the Effective Date, the Professionals for the Debtor and the Members Committee shall be deemed to have completed their services to the Debtor's Estate and such Professionals shall be able to file final and interim applications and be paid for reasonable compensation and reimbursement of expenses related thereto allowed by the Bankruptcy Court in accordance Section V.B. above. With the advice and consent of the Liquidating Trust Committee, any of such Professionals may be retained by the Liquidating Trustee to represent the Liquidating Trust.

## L. <u>Operations of the Debtor Between the Confirmation Date and the Effective Date</u>

During the period from the Confirmation Date through and until the Effective Date, the Debtor shall continue to operate as Debtor in Possession, subject to the oversight of the Bankruptcy

Court as provided in the Bankruptcy Code, the Bankruptcy Rules, and all orders of the Bankruptcy Court that are then in full force and effect.

## XI.  PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE PLAN

### A.  Distribution Record Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtor or its agents shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Interests. The Debtor and the Liquidating Trustee shall have no obligation to recognize any ownership transfer of the Claims or Interests occurring after the Distribution Record Date.  The Debtor and the Liquidating Trustee, or any party responsible for making Distributions shall be entitled to recognize and deal for all purposes under the Plan only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

### B.  Method of Payment

Unless otherwise expressly agreed, in writing, all Cash payments to be made pursuant to the Plan shall be made by check drawn on a domestic bank or an electronic wire or ACH transfer.

### C.  Claims Objection Deadline

As to Claims that are unclassified or classified in Classes 1, 2, 5, or 6, the Debtor, Liquidating Trust, and any other party in interest to the extent permitted pursuant to this Plan or section 502(a) of the Bankruptcy Code, shall file and serve any objection no later than the Claims Objection Deadline.

As to Claims that are classified in Classes 3 or 4, after the Effective Date only the Liquidating Trust shall have standing to object to such claims and shall filed and serve any objection no later than the Claims Objection Deadline, unless otherwise provided in the Claims Resolution Procedures.

The Claims Objection Deadline may be extended by the Bankruptcy Court from time to time upon motion and notice to the Bankruptcy Rule 2002 service list and all parties holding claims as to which the objection is to be extended for cause.

### D.  No Distribution Pending Allowance

Notwithstanding any other provision of the Plan or the Liquidating Trust Agreement, no Distribution of Cash or other property shall be made with respect to any portion of a Disputed Claim unless and until all objections to such Claim are resolved by Final Order or as otherwise permitted by the Plan or the Liquidating Trust Agreement.

### E.     Reserve of Cash Distributions

On any date that Distributions are to be made under the terms of the Plan, the Debtor or Liquidating Trustee, or their respective agents, as applicable, shall reserve Cash or property equal to 100% of the Cash or property that would be distributed on such date on account of Disputed Claims as if each such Disputed Claim were an Allowed Claim, but for the pendency of a dispute with respect thereto. Such Cash or property shall be held in a separate bank account maintained by the Debtor or Liquidating Trust, as applicable, for the benefit of the Holders of all such Disputed Claims pending determination of their entitlement thereto, if any.

### F.     Distribution After Allowance

The Debtor shall make Distributions to holders of Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims, Priority Non-Tax Claims, Member Claims for Post-July 8, 2021 Payments, and Miscellaneous Secured Claims to the extent such claims are Allowed prior to the Effective Date. After the Effective Date, the Liquidating Trustee shall make such Distributions, and shall make Distributions to Holders of Allowed General Unsecured Creditors and Holders of Allowed Governmental Fines and Penalty Claims as determined in the Liquidating Trustee's discretion in accordance with the Liquidating Trust Agreement.

### G.     Delivery of Distributions

Except as provided herein, Distributions to Holders of Allowed Claims shall be made: (i) at the addresses set forth on the respective proofs of Claim Filed by such Holders; (ii) at the addresses set forth on any written notices of address changes delivered to the Claims Agent after the date of any related proof of Claim; or (iii) at the address reflected in the Schedules, or, if not reflected in the Schedules, then in other records of the Debtor, if no proof of Claim is Filed and the Liquidating Trustee or the Debtor have not received a written notice of a change of address.

If the Distribution to the Holder of any Claim is returned to the Debtor or Liquidating Trustee as undeliverable, no further Distribution shall be made to such Holder unless and until the Debtor or Liquidating Trustee, as applicable, is notified in writing of such Holder's then current address. Undeliverable Distributions shall remain in the possession of the Debtor or Liquidating Trustee until the earlier of (i) such time as a Distribution becomes deliverable, or (ii) such undeliverable Distribution becomes an Unclaimed Distribution pursuant to Section XI.I of this Combined Plan and Disclosure Statement. Undeliverable Distributions shall revert to the Liquidating Trust. The Liquidating Trustee shall not have an obligation to update or correct the contact information for recipients of undeliverable Distributions.

### H.     Fractional Dollars; *De Minimis* Distributions

Notwithstanding any other provision of the Plan to the contrary, (a) the Debtor and Liquidating Trust shall not be required to make Distributions or payments of fractions of dollars, and whenever any Distribution of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down; and (b) the Debtor and Liquidating Trust shall have no duty to make a Distribution on account of any Allowed Claim (i) if the aggregate amount of all Distributions authorized to be made on such date is less than $25,000, in which case such

Distributions shall be deferred to the next Distribution, (ii) if the amount to be distributed to a Holder on the particular Distribution date is less than $100.00, unless such Distribution constitutes the final Distribution to such Holder, or (iii) if the amount of the final Distribution to such Holder is $50.00 or less. If the Liquidating Trust or Debtor withholds any Distribution under this provision, the withheld funds shall inure to the benefit of the Liquidating Trust.

**I.     Excess Funds**

After final Distributions have been made from the Liquidation Trust in accordance with the terms of the Plan and the Liquidating Trust Agreement, if the amount of remaining Cash in the Liquidation Trust is $30,000 or less, the Liquidating Trustee, may donate such amount to nonprofit organization(s) dedicated to serving health care and health coverage needs of uninsured individuals, according to the doctrine of *cy pres*. Should the amount of remaining Cash in the Liquidation Trust exceed $30,000, the Liquidating Trustee shall move for approval from the Bankruptcy Court for a distribution of the excess funds on a pro rata basis to all Members with Allowed Claims, as compensation for any actual or potential tort claims against the Debtor.

**J.     Unclaimed Distributions**

Any Cash or other property to be distributed under the Plan to a Beneficiary shall revert to the Liquidating Trustee if it is not claimed by the Beneficiary within three (3) months after the date of such Distribution.  If such Cash or other property is not claimed on or before such date, the Distribution made to such Beneficiary shall be deemed to be reduced to zero and such returned, undeliverable, or unclaimed Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall be returned to the Liquidation Trust. All Unclaimed Distributions shall revert to the Liquidating Trust.

**K.     Set-Off**

Except as otherwise provided herein, the Debtor or Liquidating Trustee, as applicable, retain the right to reduce any Claim by way of setoff in accordance with the Debtor's books and records.  Rights of setoff and recoupment, if any, held by any Entity or Person are preserved for the purpose of asserting such rights as a defense to any Claims or Causes of Action or Avoidance Actions of the Debtor, their Estate, or the Liquidating Trustee and regardless of whether such Entity or Person is the Holder of an Allowed Claim.

**L.     Postpetition Interest**

Except as may be expressly provided herein, interest shall not accrue on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date. No prepetition Claim shall be Allowed to the extent it is for postpetition interest or other similar charges, except to the extent permitted for Holders of Secured Claims under section 506(b) of the Bankruptcy Code.

**M.     Allocation of Distributions Between Principal and Interest**

To the extent that any Allowed Claim entitled to a Distribution under the Plan comprises indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the

principal amount (as determined for U.S. federal income tax purposes) of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid prepetition interest.

### N.     Prepayment

Except as otherwise provided herein or the Plan Confirmation Order, the Debtor and the Liquidating Trustee, as applicable, shall have the right to prepay, without penalty, all or any portion of an Allowed Claim.

## XII.   EXECUTORY CONTRACTS

### A.     Rejection of Executory Contracts and Unexpired Leases

This Plan shall constitute a motion to reject all executory contracts and unexpired leases not previously rejected pursuant to an order of the Bankruptcy Court unless otherwise set forth in the Plan Supplement, and the Debtor shall have no further obligation thereunder. Without limiting the foregoing, a schedule of the Debtor's known executory contracts and unexpired leases is attached hereto as **Exhibit C**. The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of any such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code and that the rejection thereof is in the best interest of the Debtor, their Estate and all parties in interest in the Chapter 11 Case. The foregoing information shall be included in the notice of entry of the Confirmation Order. Notwithstanding the foregoing, to the extent any Insurance Policies are deemed to be executory, the Debtor does not seek to reject the Insurance Policies through this general rejection provision.

### B.     Claims Based on Rejection of Executory Contracts or Unexpired Leases

Claims created by the rejection of executory contracts and unexpired leases pursuant to this Plan, or the expiration or termination of any executory contract or unexpired lease prior to the Effective Date, must be filed with the Bankruptcy Court and served on the Debtor no later than thirty (30) days after service of notice of entry of the Confirmation Order by the Bankruptcy Court, which notice shall set forth the deadline to file such Claims. Any Claims arising from the rejection of an executory contract or unexpired lease pursuant to Section XII.A, for which proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Debtor, its Estate, the Liquidating Trust, and their respective successors and assigns, and their respective assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims and shall be subject to the provisions of this Plan.

## XIII.   CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

The following are conditions precedent to the Effective Date that must be satisfied or waived (as provided below):

a.     The Confirmation Order, which shall be in a form satisfactory to the Debtor and Members Committee, has become a Final Order;

b.     The Confirmation Order shall be in full force and effect;

c.     The Liquidating Trust Agreement is fully executed and the Liquidating Trust is formed;

d.     All actions, agreements, instruments, or other documents necessary to implement the terms and conditions of the Plan are effected or executed and delivered; and

e.     All Liquidating Trust Assets have been transferred to and/or vested in the Liquidating Trust.

Notwithstanding the foregoing, the Debtor and Members Committee may, acting jointly, waive the occurrence of any condition precedent to the Effective Date. Any such written waiver of a condition precedent set forth in this Section may be affected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate this Plan. Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

## XIV.  EXCULPATION, INJUNCTION, AND RELATED PROVISIONS

### A.  Exculpation

For the avoidance of doubt and notwithstanding any other provision of the Plan or Plan Supplement, the Plan does not contain any releases of any party or of any Causes of Action, and except for the following paragraph, the Plan does not contain any exculpation provisions.

**Except for liability of an Exculpated Party that arises primarily and directly from any act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct, the Exculpated Parties shall neither have nor incur any liability to any Entity for any and all claims, causes of action, and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing during the Exculpation Timeframe arising, in law, at equity, whether for tort, contract, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances taking place or arising during the Exculpation Timeframe and related in any way to the Chapter 11 Case.**

**This exculpation provision only includes those claims and causes of action that the Debtor would have been legally entitled to assert against the Exculpated Parties or that any Holder of a Claim or other Entity would have been legally entitled to assert against the Exculpated Parties for or on behalf of the Debtor or the bankruptcy estate and further including those claims and causes of action that are related to the Chapter 11 Case, Liquidating Trust Agreement, or this Plan, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating,**

implementing, administering, confirming, or consummating the Plan, the Liquidating Trust Agreement, or any other contract, instrument, release or other agreement or document created or entered into in connection with this Plan or any other post-petition act taken or omitted to be taken in connection with the Chapter 11 Case, but only during the Exculpation Timeframe.

**B.** **Injunction**

Pursuant to 1141(d)(3), confirmation of this Plan does not discharge this Debtor from any debt that arose before the date of the confirmation.

Except as otherwise specifically provided in the Combined Plan and Disclosure Statement, all Persons who have held, hold, or may hold Claims against or Interests in the Debtor and any successors, assigns or representatives of such Person shall be precluded and permanently enjoined on and after the Effective Date from (a) commencing or continuing in any manner any Claim, action or other proceeding of any kind against any of the assets to be distributed under the Plan, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree, or order with respect to any of the assets to be distributed under the Plan, and (c) creating, perfecting or enforcing any encumbrance of any kind with respect to any of the assets to be distributed under the Plan. All Persons or Entities who directly or indirectly have held, hold, may hold, or seek to assert Claims that been exculpated in this Plan (the "Exculpated Claims") shall be enjoined from (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to the Exculpated Claims; (ii) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order on account of or in connection with or with respect to the Exculpated Claims; (iii) creating, perfecting, or enforcing any encumbrance of any kind on account of or in connection with or with respect to the Exculpated Claims (iv) asserting any right of subrogation on account of or in connection with or with respect to the Exculpated Claims, except to the extent that a permissible right of subrogation is asserted with respect to a timely filed proof of claim; (v) or commencing or continuing in any manner any action or other proceeding on account of or in connection with or with respect to the Exculpated Claims.

Notwithstanding any provision in this Combined Plan and Disclosure Statement or the Plan Confirmation Order to the contrary, nothing contained in this Combined Plan and Disclosure Statement, or the Confirmation Order shall:

(i) extinguish, impact, or release any right of setoff, recoupment, or subrogation of any kind: (a) held by any creditor or vendor which is asserted in a timely filed proof of claim or objection to this Combined Plan and Disclosure Statement, or pursuant to section 503(b)(1)(d) of the Bankruptcy Code or (b) that is or may be asserted as an affirmative defense or other defense to a cause of action or claim asserted by a Debtor or the Liquidating Trust against such creditor or vendor; or

(ii) affect the applicability of 26 U.S.C. § 7421(a).

**Notwithstanding anything contained in the section, the injunction referenced herein shall not apply to the prosecution of any Claim against the Aliera Companies or their predecessors, successors, and assigns, current and former shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, managers, consultants, limited partners, trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, in each case in their capacity as such, and their assets and properties, as the case may be.**

C.    <u>Termination of All Employee and Workers' Compensation Benefits</u>

Except as otherwise provided in the Liquidating Trust Agreement, all existing employee benefit plans and workers' compensation benefits not previously expired or terminated by the Debtor will be deemed terminated on or before the Effective Date.

D.    <u>Exclusions and Limitations on Liability</u>

Notwithstanding anything in this Combined Plan and Disclosure Statement to the contrary, no provision of this Combined Plan and Disclosure Statement or the Plan Confirmation Order, including, without limitation, the exculpation provision contained in Section XIV.A of this Plan, shall (a) modify, release or otherwise limit the liability of any Entity not specifically released or exculpated hereunder, including, without limitation, any Entity that is otherwise liable under theories of vicarious or other derivative liability or that is a non-Debtor third party guarantor of any obligation of the Debtor, or (b) affect the ability of the Internal Revenue Service to pursue non-Debtor to the extent allowed by non-bankruptcy law for any liabilities that are related to any federal income tax liabilities that owed by the Debtor or the Debtor's Estate.

## XV.  <u>RETENTION OF JURISDICTION</u>

After the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Debtor and this Plan as is legally permissible, including, but not limited to, jurisdiction to:

1.   allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and Professional Fee Claim and the resolution of any and all objections to the allowance or priority of Claims or Interests;

2.   grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date;

3.   resolve any matters related to the assumption, assignment or rejection of any executory contract or unexpired lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

4.   ensure that Distributions to holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

5. decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving a Debtor that may be pending on the Effective Date or instituted by the Liquidating Trust after the Effective Date, including any Liquidating Trust Causes of Action;

6. hear and determine disputes (i) arising in connection with the interpretation, implementation or enforcement of the Liquidating Trust or the Liquidating Trust Agreement or (ii) arising out of or related to the issuance of any subpoenas or requests for examination pursuant to Bankruptcy Rule 2004 issued before or after the entry of the Confirmation Order relating to the subject matter of the Liquidating Trust Causes of Action;

7. enter such orders as may be necessary or appropriate to implement, interpret, enforce or consummate the provisions of this Plan, the Confirmation Order, the Liquidating Trust Agreement and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with this Plan, Plan Supplement or the Disclosure Statement;

8. resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

9. issue and enforce injunctions and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or enforcement of this Plan, except as otherwise provided in this Plan;

10. enforce all of the provisions of this Plan;

11. enforce all Orders previously entered by the Bankruptcy Court;

12. resolve any cases, controversies, suits or disputes with respect to the exculpation, injunctions, releases, and other provisions contained in this Plan, and enter such orders as may be necessary or appropriate to implement or enforce all such exculpation, injunction, release and other provisions;

13. enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

14. resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement;

15. enter an order and/or the decree contemplated in Bankruptcy Rule 3022 concluding the Chapter 11 Case; and

16. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code, including any request made under

section 505 of the Bankruptcy Code for the expedited determination of any unpaid liability of a Debtor for any tax incurred during the administration of the Chapter 11 Case, including any tax liability arising from or relating to the transactions contemplated by the Plan, for tax periods ending after the Petition Date and through the closing of the Chapter 11 Case.

Notwithstanding anything contained herein to the contrary, the Bankruptcy Court retains jurisdiction to the fullest extent permitted by applicable law to adjudicate Liquidating Trust Causes of Action and to hear and determine disputes concerning Liquidating Trust Causes of Action and any motions to compromise or settle such Liquidating Trust Causes of Action or disputes relating thereto. Despite the foregoing, if the Liquidating Trustee on behalf of the Liquidating Trust chooses to pursue any Liquidating Trust Cause of Action in another court of competent jurisdiction, the Liquidating Trustee will have authority to bring such action in any other court of competent jurisdiction.

## XVI. **MISCELLANEOUS PROVISIONS**

### A. **Modification of Plan**

Subject to the limitations contained in this Plan: (1) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, after consulting with the Member Committee, and subject to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019(a), to amend or modify this Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129 of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Liquidating Trust may, upon order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code, and Bankruptcy Rule 3019(b).

### B. **Revocation of Plan**

The Debtor reserves the right to revoke or withdraw this Plan prior to the entry of the Confirmation Order and to file subsequent plans of liquidation. If the Debtor revokes or withdraws this Plan, or if entry of the Confirmation Order or the Effective Date does not occur within one-hundred and eighty (180) days after entry of the Confirmation Order, then: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of executory contracts or leases effected by this Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission of any sort by the Debtor or any other Entity.

### C. **Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

D.      **Governing Law**

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the state of Delaware, without giving effect to the principles of conflict of laws thereof.

E.      **Reservation of Rights**

Except as expressly set forth herein, this Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order. Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by a Debtor or any Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) any Debtor with respect to the holders of Claims or Interests or other parties-in- interest; or (2) any holder of a Claim or other party-in-interest prior to the Effective Date.

F.      **Effectuating Documents; Further Transactions**

The Liquidating Trustee or its valid designee in accordance with the Liquidating Trust Agreement shall be authorized to (1) execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan and (2) certify or attest to any of the foregoing actions.

G.      **Further Assurances**

The Debtor, the Liquidating Trust, all holders of Claims receiving Distributions hereunder and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.

H.      **Dissolution of the Debtor and Closing of the Chapter 11 Case**

Upon the Effective Date, the Debtor's officers and directors shall be deemed to have resigned their respective positions with the Debtor. From and after the Effective Date, the Debtor shall be deemed to be immediately dissolved upon the Effective Date under applicable law and shall have no corporate existence thereafter without the necessity for any other or further actions to be taken by or on behalf of the Debtor or action or formality which might otherwise be required under applicable non-bankruptcy laws. The Debtor shall be treated as having completely liquidated for state, local, and U.S. federal income tax purposes, and the Debtor shall not be required to pay any taxes or fees to cause such dissolution.

The Liquidating Trustee shall file a motion closing the Chapter 11 Case after the Liquidating Trust Assets are fully administered or as soon as reasonably permissible.

## I.     Dissolution of the Members Committee

Upon the occurrence of the Effective Date, the Members Committee shall dissolve automatically, whereupon its members, professionals, and agents shall be released from any duties and responsibilities in the Chapter 11 Case and under the Bankruptcy Code, except with respect to (i) obligations arising under confidentiality agreements, which shall remain in full force and effect, (ii) prosecuting applications for payment of fees and reimbursement of expenses of Professionals, or Members Committee members, or attending to any other issues related to applications for payment of fees and reimbursement of expenses of Professionals, and (iii) prosecuting or participating in any appeal of the Plan Confirmation Order or any request for reconsideration thereof.

## J.     Service of Documents

Any pleading, notice or other document required by this Plan to be served on or delivered to the Debtor, Members Committee or Liquidating Trustee shall be sent by first class U.S. mail, postage prepaid to:

| To the Debtor: | Sharity Ministries Inc.<br>P.O. Box 250069<br>Atlanta, GA 30325<br><br>With a copy to:<br><br>Baker & Hostetler LLP<br>Attn: Jorian L. Rose<br>45 Rockefeller Plaza<br>New York, New York 10111<br><br>And<br><br>Baker & Hostetler LLP<br>Attn: Andrew V. Layden<br>SunTrust Center, Suite 2300<br>200 South Orange Avenue<br>Orlando, FL  32801-3432 |
| --- | --- |
| To the Member Committee: | Sirianni Youtz Spoonemore Hamburger<br>Attn: Eleanor Hamburger<br>3101 Western Avenue, Suite 350<br>Seattle, Washington 98121 |

{1325.002-W0066336.}                    57

Resp. Appx, p. 293                    Appx. Vol X
A-437

Ex. 1.40, p. 64 of 87

K.    **Filing of Additional Documents**

On or before the Effective Date, the Debtor may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

## XVII.  RISKS AND OTHER CONSIDERATIONS

A.    **Bankruptcy Considerations**

Although the Plan Proponent believes that this Combined Plan and Disclosure Statement will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will confirm the Plan as proposed.  Moreover, there can be no assurance that modifications of this Combined Plan and Disclosure Statement will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

In addition, the occurrence of the Effective Date is conditioned on the satisfaction (or waiver) of the conditions precedent specified herein, and there can be no assurance that such conditions will be satisfied or waived.  In the event such conditions precedent have not been satisfied or waived (to the extent possible hereunder) within forty five (45) days after the Plan Confirmation Date, which period may be extended by the Plan Proponent and the Members Committee, then the Plan Confirmation Order may be vacated, no Distributions will be made pursuant to the Plan, and the Debtor and all Holders of Claims and Interests will be restored to the status quo ante as of the day immediately preceding the Plan Confirmation Date as though the Plan Confirmation Date had never occurred.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Plan Proponent believes that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because each Class of Claims and Interests encompass Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

While the Plan Proponent believes that there are sufficient Liquidating Trust Assets to make Distributions to Liquidating Trust Beneficiaries, there can be no assurance that the Liquidating Trust Assets will be sufficient to pay all Liquidating Trust Operational Expenses or make Distributions to the Liquidating Trust Beneficiaries.

B.    **No Duty to Update Disclosures**

The Plan Proponent has no duty to update the information contained in this Combined Plan and Disclosure Statement as of the date hereof, unless otherwise specified herein, or unless the Plan Proponent is required to do so pursuant to an Order of the Bankruptcy Court.  Delivery of this Combined Plan and Disclosure Statement after the date hereof does not imply that the information contained herein has remained unchanged.

C.      **Alternatives to Confirmation and Consummation of the Plan**

1.      **Alternate Plan**

If the Plan is not confirmed, the Debtor or any other party in interest (if, pursuant to section 1121 of the Bankruptcy Code, the Debtor have not Filed a plan within the time period prescribed under the Bankruptcy Code) could attempt to formulate and propose a different plan.  Such a plan likely would result in additional costs, including, among other things, additional professional fees or potential asserted substantial contribution claims, all of which would likely constitute Administrative Expense Claims (subject to allowance).  The Plan Proponent believes that the Plan, which is the result of extensive negotiations among the Debtor and the Members Committee, provides for an orderly and efficient liquidation of the Debtor's remaining assets and enables creditors to realize the best return under the circumstances.

2.      **Chapter 7 Liquidation or Dismissal**

If a plan pursuant to Chapter 11 is not confirmed by the Bankruptcy Court, the Chapter 11 Case could (if the Debtor consents) be converted to a liquidation case under Chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed, pursuant to applicable provisions of Chapter 7 of the Bankruptcy Code, to liquidate the assets of the Debtor for distribution in accordance with the priorities established by the Bankruptcy Code.  The Plan Proponent believes that liquidation under Chapter 7 of the Bankruptcy Code of the Debtor's remaining assets would result in a substantial reduction in the value to be realized by holders of Claims as compared to Distributions contemplated under the Plan.  This is so because a Chapter 7 liquidation would require the appointment of a trustee, unfamiliar with the debtor's business operations, issues relevant to the Debtor's membership, and the events that transpired during the Chapter 11 Case, and which would require substantial additional expenses (including the costs associated with the Trustee's retention of attorneys and other professionals) and would delay the orderly liquidation of the Estate Assets, thereby lowering recoveries to holders of Claims. Consequently, the Debtor believes that confirmation of the Plan will provide a substantially greater return to holders of Claims than would liquidation under Chapter 7 of the Bankruptcy Code.  A copy of the Plan Proponent's liquidation analysis is attached to this Plan as **Exhibit B**.

D.      **Certain Federal Tax Consequences**

**THE FOLLOWING DISCUSSION SUMMARIZES CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN TO THE DEBTOR AND TO CERTAIN HOLDERS OF ALLOWED CLAIMS. THIS SUMMARY DOES NOT ADDRESS THE FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS WHO ARE UNIMPAIRED, DEEMED TO HAVE REJECTED THE PLAN IN ACCORDANCE WITH THE PROVISIONS OF SECTION 1126(G) OF THE BANKRUPTCY CODE, OR HOLDERS WHOSE CLAIMS ARE ENTITLED TO PAYMENT IN FULL IN CASH.**

This summary is based on the IRC, existing and proposed Treasury Regulations, judicial decisions, and published administrative rules and pronouncements of the IRS as in effect on the

{1325.002-W0066336.}                              59

Resp. Appx. p. 295                                                                    Ex. 1.40, p. 66 of 87

Appx. Vol X
A-439

date hereof, all of which are subject to change, possibly on a retroactive basis. Any such change could significantly affect the U.S. federal income tax consequences described below.

The Debtor has not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the Plan. This discussion does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (*e.g.*, foreign taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, states or their subdivisions or integral parts, other governmental entities, holders that are, or hold Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax or the "Medicare" tax on unearned income, persons who use the accrual method of accounting and report income on an "applicable financial statement," and persons holding Claims that are part of a straddle, hedging, constructive sale, or conversion transaction). In addition, this discussion does not address U.S. federal taxes other than income taxes, nor does it address the Foreign Account Tax Compliance Act. Creditors who are non-U.S. Holders should consult their own tax advisors with respect to the tax consequences of the Plan applicable to them.

The following discussion generally assumes that the Plan will be treated as a plan of liquidation of the Debtor for U.S. federal income tax purposes, and that all Distributions to holders of Claims will be taxed accordingly.

**ACCORDINGLY, THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR FOR ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN.**

　　3.　　**Consequences To The Debtor**

　　　　　　(a)　　Cancellation of Debt Income. In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("**CODI**") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of CODI, in general, is the excess of (1) the adjusted issue price of the indebtedness satisfied, over (2) the fair market value of any consideration given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a taxpayer is not required to include CODI in gross income (a) if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case (the "**Bankruptcy Exception**"), or (b), to the extent that the taxpayer is insolvent immediately before the discharge (the "**Insolvency Exception**"). Instead, as a consequence of such exclusion, a taxpayer-debtor

must reduce its tax attributes by the amount of CODI that it excluded from gross income. In general, tax attributes will be reduced in the following order: (a) net operating losses ("**NOLs**"); (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits. Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.

(b)     <u>Transfer of Assets to Liquidating Trust</u>. The Debtor's transfer of assets to the Liquidating Trust may result in the recognition of gain or loss by the Debtor, depending in part on the value of such assets on the date of such transfer to the Liquidating Trust relative to the Debtor's adjusted tax basis in such assets.

### 4.     Consequences to Holders of Allowed General Unsecured Claims

Pursuant to the Plan, each holder of an Allowed General Unsecured Claim will receive, in full and final satisfaction of its applicable claim, its Pro Rata Share of the Beneficial Interests. As discussed below (see Section 5—"Tax Treatment of the Liquidating Trust and Holders of Liquidating Trust Interests"), each holder of an Allowed General Unsecured Claim that receives a Liquidating Trust Interest will be treated for U.S. federal income tax purposes as directly receiving, and as a direct owner of, an undivided interest in the Liquidating Trust Assets consistent with its economic rights in the trust.

(a)     <u>Realization and Recognition of Gain or Loss</u>. In general, a holder of an Allowed General Unsecured Claim will recognize gain or loss with respect to its Allowed General Unsecured Claim in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value of its undivided interest in the Liquidating Trust Assets consistent with its economic rights in the trust received in respect of its Claim (other than any consideration attributable to a Claim for accrued but unpaid interest or OID) and (ii) the adjusted tax basis of the Claim exchanged therefor (other than any tax basis attributable to accrued but unpaid interest or accrued OID previously included in the holder's taxable income). Pursuant to the Plan, the Liquidating Trust will in good faith value the assets transferred to the Liquidating Trust, and all parties to the Liquidating Trust (including holders of Allowed General Unsecured Claims receiving Liquidating Trust Interests) must consistently use such valuation for all U.S. federal income tax purposes. As discussed below, the amount of Cash or other property received in respect of an Allowed General Unsecured Claim for accrued but unpaid interest will be taxed as ordinary income, except to the extent previously included in income by a holder under its method of accounting. See Section D.4 below—"Distributions in Respect of Accrued Interest or OID."

In the event of the subsequent disallowance of any Disputed General Unsecured Claim or the reallocation of undeliverable distributions, it is possible that a holder of a previously Allowed Claim may receive additional distributions in respect of its Claim. Accordingly, it is possible that the recognition of any loss realized by a holder with respect to an Allowed General Unsecured Claim may be deferred until all General Unsecured Claims are Allowed or Disallowed. Alternatively, it is possible that a holder will have additional gain in respect of any additional distributions received. See also Section D.5—"Tax Treatment of the Liquidating Trust and

Holders of Liquidating Trust Interests – Tax Reporting for Assets Allocable to Disputed Claims," below.

After the Effective Date, a holder's share of any collections received on the assets of the Liquidating Trust (other than as a result of the subsequent disallowance of Disputed Claims or the reallocation of undeliverable distributions) should not be included, for U.S. federal income tax purposes, in the holder's amount realized in respect of its Allowed Claim but should be separately treated as amounts realized in respect of such holder's ownership interest in the underlying assets of the Liquidating Trust.

If gain or loss is recognized, such gain or loss may be long-term capital gain or loss if the Allowed General Unsecured Claim disposed of is a capital asset in the hands of the holder and has been held for more than one year. Each holder of an Allowed General Unsecured Claim should consult its tax advisor to determine whether gain or loss recognized by such holder will be long-term capital gain or loss and the specific tax effect thereof on such holder. The character of any gain or loss depends on, among other things, the origin of the holder's Allowed General Unsecured Claim, when the holder receives payment in respect of such Allowed General Unsecured Claim, whether the holder reports income using the accrual or cash method of tax accounting, whether the holder acquired its Allowed General Unsecured Claim at a discount, whether the holder has taken a bad debt deduction with respect to such Allowed General Unsecured Claim, and/or whether (as intended and herein assumed) the Plan implements the Liquidating of the Debtor for U.S. federal income tax purposes.

A holder's aggregate tax basis in its undivided interest in the Liquidating Trust Assets will equal the fair market value of such interest increased by its share of the Debtor's liabilities to which such assets remain subject upon transfer to the Liquidating Trust, and a holder's holding period generally will begin the day following establishment of the Liquidating Trust

## 5.    Distributions in Respect of Accrued Interest or OID

In general, to the extent any amount received (whether stock, Cash, or other property) by a holder of a debt instrument is received in satisfaction of accrued interest or OID accrued during its holding period, such amount will be taxable to the holder as ordinary interest income (if not previously included in the holder's gross income under the holder's normal method of accounting). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest or OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled, in the case of a tax-free exchange, that a holder could not claim an ordinary deduction with respect to any accrued OID. It is unclear whether the same result would obtain in the case of a taxable transaction.

Pursuant to Article XI.L., except as otherwise required by law (as reasonably determined by the Liquidating Trustee), distributions with respect to an Allowed Claim will be allocated first to the principal portion of such Allowed Claim (as determined for U.S. federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any. However, there is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes. You are urged to consult your own tax advisor regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest (including OID)

and the character of any loss claimed with respect to accrued but unpaid interest (including OID) previously included in gross income for U.S. federal income tax purposes.

### 6. Tax Treatment of the Liquidating Trust and Holders of Liquidating Trust Interests

(a) <u>Classification of the Liquidating Trust</u>. The Liquidating Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes (other than in respect of any portion of the Liquidating Trust Assets allocable to, or retained on account of, Disputed Claims, as discussed below). In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (*i.e.*, a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Liquidating Trust will be structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45 all parties (including, without limitation, the Debtor, the Liquidating Trustee, the Liquidating Trust Oversight Committee, and holders of Liquidating Trust Interests) shall treat the transfer of Liquidating Trust Assets to the Liquidating Trust as (1) a transfer of the Liquidating Trust Assets (subject to any obligations relating to those assets) directly to holders of Liquidating Trust Interests (other than to the extent Liquidating Trust Assets are allocable to Disputed Claims), followed by (2) the transfer by such beneficiaries to the Liquidating Trust of Liquidating Trust Assets in exchange for Liquidating Trust Interests. Accordingly, except in the event of contrary definitive guidance, holders of Liquidating Trust Interests shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of Liquidating Trust Assets (other than such Liquidating Trust Assets as are allocable to Disputed Claims). While the following discussion assumes that the Liquidating Trust would be so treated for U.S. federal income tax purposes, no ruling will be requested from the IRS concerning the tax status of the Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust as a grantor trust. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Liquidating Trust and the holders of Claims could vary from those discussed herein.

(b) <u>General Tax Reporting by the Liquidating Trust and holders of Liquidating Trust Interests</u>. For all U.S. federal income tax purposes, all parties must treat the Liquidating Trust as a grantor trust of which the holders of Liquidating Trust Interests are the owners and grantors, and treat the holders of Liquidating Trust Interests, as the direct owners of an undivided interest in the Liquidating Trust Assets (other than any assets allocable to Disputed Claims), consistent with their economic interests therein. The Liquidating Trustee will file tax returns for the Liquidating Trust treating the Liquidating Trust as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a). The Liquidating Trustee also shall annually send to each holder of a Liquidating Trust Interest a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes.

Allocations of taxable income of the Liquidating Trust (other than taxable income allocable to any assets allocable to, or retained on account of, Disputed Claims, if such income is otherwise taxable at the Liquidated Trust) among the holders of Liquidating Trust Interests will be determined by reference to the manner in which an amount of Cash equal to such taxable income

would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, and, if applicable, other than assets allocable to Disputed Claims) to the holders of Liquidating Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets for purposes of allocating taxable income and loss shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

As soon as reasonably practicable after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Liquidating Trust shall make a good faith valuation of the Liquidating Trust Assets. All parties to the Liquidating Trust (including, without limitation, the Debtor, the Liquidating Trustee, and holders of Liquidating Trust Interests) must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Taxable income or loss allocated to a holder of Liquidating Trust Interests should be treated as income or loss with respect to such holder's undivided interest in the Liquidating Trust Assets, and not as income or loss with respect to its prior Allowed General Unsecured Claim. The character of any income and the character and ability to use any loss will depend on the particular situation of the holders of Liquidating Trust Interests.

The U.S. federal income tax obligations of a holder with respect to its Liquidating Trust Interest are not dependent on the Liquidating Trust distributing any Cash or other proceeds. Thus, a holder may incur a U.S. federal income tax liability with respect to its allocable share of the Liquidating Trust's income even if the Liquidating Trust does not make a concurrent distribution to the holder. In general, other than in respect of Cash retained on account of Disputed Claims and distributions resulting from undeliverable distributions (the subsequent distribution of which still relates to a holder's Allowed General Unsecured Claim), a distribution of Cash by the Liquidating Trust will not be separately taxable to a holder of Liquidating Trust Interests since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the Liquidating Trust). Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of Cash originally retained by the Liquidating Trust on account of Disputed Claims.

The Liquidating Trustee will comply with all applicable governmental withholding requirements. Thus, in the case of any holders of Liquidating Trust Interests that are not U.S. persons, the Liquidating Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate). As indicated above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S.

holders; accordingly, such holders should consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including owning an interest in the Liquidating Trust.

(c)     Tax Reporting for Assets Allocable to Disputed Claims. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trustee of an IRS private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee (A) may elect to treat any Liquidating Trust Assets allocable to, or retained on account of, Disputed Claims (i.e., a Disputed Claim Reserve) as a "disputed ownership fund" governed by Treasury Regulations Section 1.468B-9, if applicable, and (B) to the extent permitted by applicable law, will report consistently for state and local income tax purposes.  Accordingly, if a "disputed ownership fund" election is made with respect to a Disputed Claim Reserve, such reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the Liquidating Trust Assets (including any gain recognized upon the disposition of such assets).  All distributions from such reserves (which distributions will be net of the expenses, including taxes, relating to the retention or disposition of such assets) will be treated as received by holders in respect of their Claims as if distributed by the Debtor.  All parties (including, without limitation, the Debtor, the Liquidating Trustee and the holders of Liquidating Trust Interests) will be required to report for tax purposes consistently with the foregoing. A Disputed Claim Reserve will be responsible for payment, out of the assets of the Disputed Claim Reserve, of any taxes imposed on the Disputed Claim Reserve or its assets.  In the event, and to the extent, any Cash in the Disputed Claim Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such reserve (including any income that may arise upon the distribution of the assets in such reserve), assets of the Disputed Claim Reserve may be sold to pay such taxes.

## 7.     Withholding on Distributions and Information Reporting

All distributions to holders of Allowed General Unsecured Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding.  Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%).  Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. Holders of Allowed General Unsecured Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

In addition, a holder of an Allowed General Unsecured Claim or a holder of Liquidating Trust Interests that is a not a U.S. person may be subject to up to 30% withholding, depending on, among other things, the particular type of income and whether the type of income is subject to a

Ex. 1.40, p. 72 of 87

Resp. Appx. p. 301                     **Appx. Vol X
A-445**

lower treaty rate. As to certain Claims, it is possible that withholding may be required with respect to Distributions by the Debtor even if no withholding would have been required if payment was made prior to the Chapter 11 Cases. A non-U.S. holder may also be subject to other adverse consequences in connection with the implementation of the Plan. As discussed above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. holders. Non-U.S. holders are urged to consult their tax advisors regarding potential withholding on Distributions by the Debtor or payments from the Liquidating Trust.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the holder's tax returns.

## XVIII. **RECOMMENDATION AND CONCLUSION**

The Plan Proponent strongly believes that the Plan is in the best interests of the Estates and urges the Holders of Impaired Claims entitled to vote to accept the Plan and to evidence such acceptance by properly voting and timely returning their Ballots.

Dated: November 29, 2021  
Wilmington, Delaware

SHARITY MINISTRIES, INC.

By: _/s/ Neil Luria_____  
Name: Neil Luria  
Title: Chief Restructuring Officer

# **EXHIBIT A**

## <u>MEMBER SUMMARY</u>

Sharity Ministries, Inc. ("Sharity") has filed for bankruptcy in the Bankruptcy Court in Delaware. Sharity was originally named "Trinity Healthshare, Inc." ("Trinity") but its name was changed to Sharity. Sharity and Trinity are the same company.

You are getting these papers because you are listed as a current or former member of Sharity or Trinity.

For purposes of the bankruptcy, you will be treated as having a claim for the greater of all monthly payments you made or medical claims you submitted but which were not paid, according to Sharity's records. You do not need to do anything to have a claim for this amount. As described below, you have the right to correct the amount shown by filing an additional claim. If you already filed a proof of claim in the bankruptcy, your claim will be the amount you listed in the proof of claim, unless it is objected to.

This summary provides information on the "Plan" for handling the claims against Sharity and how your claim will be treated if the Bankruptcy Court approves the "Plan."

**Please read this summary of the Plan and the process for approving it.**

**STEPS TO CONFIRMATION OF THE PLAN:**

- Sharity's Combined Disclosure Statement and Chapter 11 Plan of Liquidation (the "Plan") was filed with the Bankruptcy Court and has been provided to Members along with a ballot for Members to accept or reject the Plan.

- Members may vote on whether to accept or reject the Plan.   YOUR VOTE IS IMPORTANT.  Please submit your vote by November 22, 2021, at 5:00 p.m. prevailing Eastern Time.

- The Bankruptcy Court will hold a hearing after the vote to determine whether to approve or reject the Plan or to make changes to it.

- If the Plan is confirmed by the Bankruptcy Court, Sharity will be liquidated and its assets will be transferred to a special "Liquidating Trust" set up to pursue claims on behalf of Members against any person or entity responsible for their losses.  The Liquidating Trust will be controlled by a Liquidating Trustee with oversight by a Liquidating Trust Committee made up of Members and operated for the benefit of Members.  The Liquidating Trust Committee will most likely be the people who make up the current Members Committee, which is five Sharity Members selected by the U.S. Trustee to represent the interests of Members in this bankruptcy.  There will also be a governmental representative who will act on behalf of state governments.

- Your claim for compensation is already submitted and the amount is provided on your ballot. The amount is either the total unpaid medical expenses submitted in claims to

Sharity or the total monthly payments you made, whichever is greater. The amount was calculated based on Sharity's records which may not be accurate. If you already filed a proof of claim in the bankruptcy, your claim will be the amount you listed in the proof of claim.

- **You have until January 4, 2022 to submit additional claims for compensation or to dispute your claim information.  You can find instructions on how to submit an additional claim or other information at** www.bmcgroup.com/sharity.

- You may submit an additional claim even if you do not vote on the Plan or voted to reject the Plan.

- If the Plan is not confirmed by the Bankruptcy Court, another plan must be confirmed or there must be another resolution of Sharity's chapter 11 case before any payments can be made. It is also possible that if the Plan is not confirmed by the Bankruptcy Court, the case will be converted to a liquidation under Chapter 7 of the Bankruptcy Code and run by a court-appointed trustee, or it could be dismissed.  Members would not have the opportunity to vote on a plan if either of those things happens.

**YOUR VOTE COUNTS:** You have the right to vote to accept or reject the Plan if you were or are a member of Sharity (previously known as Trinity). **Ballots must be RECEIVED by November 22, 2021, at 5:00 p.m. prevailing Eastern Time,** in order to be counted.

**HOW TO VOTE:** You can vote by submitting an electronic ballot or by mailing your ballot. You should have received a ballot with instructions on how you can vote. The ballot will contain information regarding the amount of your specific claim for compensation. If you did not receive a ballot or if you have any questions regarding the Plan or voting, please contact the Debtor's Solicitation Agent, BMC Group, via one of the following methods:

> BMC Group Inc.
> Telephone: 1-888-909-0100
> Website:  www.bmcgroup.com/sharity
> Email: sharity@bmcgroup.com

**LIQUIDATING TRUST:** The Plan creates a Trust for the benefit of Members to hold all of the assets (money and legal claims) held by Sharity.  The Trust is expected to start with approximately $1 million plus Sharity's possible lawsuits against third parties, including the Aliera Companies, its related companies and its insiders.  The Trust will be able to bring lawsuits to recover money. Any money recovered will be for the benefit of Members.

**TIMING:** The hearing to approve the Plan will be held on December 2, 2021 at 1:00 p.m. prevailing Eastern Time.

**CLAIMS:** The deadline for filing additional claims for compensation is January 4, 2022.  You may file a claim at this website:  www.bmcgroup.com/sharity.

If you made a monthly payment to Sharity after July 8, 2021, and the Plan is approved by the Court, the Liquidating Trustee will refund those claims within 30 days after the Plan becomes effective.

If you file any other claim, such as a claim for uncovered medical expenses, or a refund of monthly payments on or before July 8, 2021, then the Liquidating Trustee will process and pay those claims according to the Plan only if and when enough money is recovered through the lawsuits to pay the claims. The amount and timing of any such payment is not known, and depends on whether the Liquidating Trustee is successful in pursuing the legal claims of Sharity for the Members' benefit.

**PLEASE VOTE.**

## FREQUENTLY ASKED QUESTIONS FOR MEMBERS

**1.      Do I need to file a claim to receive compensation under the Plan?**

No, your claim for compensation is already submitted and the amount is provided on your ballot. You can also go to www.bmcgroup.com/sharity and follow the instructions to see your claim. The amount of your claim is the greater of the total unpaid medical expenses submitted in claims to Sharity or the total monthly payments you made, unless you filed a proof of claim, in which case the amount of your claim is what you listed in the proof of claim. If you think the claim information on the website is incorrect and wish to dispute it or wish to file an additional claim for compensation you must file a claim by **January 4, 2022**. You can find instructions on how to submit an additional claim and other information at www.bmcgroup.com/sharity.

**2.      Under the Plan, how will my claims be paid?**

The Plan will establish a trust fund to pay member claims. This trust fund is called the Liquidating Trust.

Members that made monthly payments to Sharity after July 8, 2021 will be paid 100% of the amount you paid after that date within 30 days of the Plan becoming effective.

Other claims will not be paid until there is enough money recovered from lawsuits that the Liquidating Trust will file.

**3.      Does the Bankruptcy Court need to approve Sharity's Plan?**

Yes. The Bankruptcy Court will decide whether to approve the Plan at a hearing on December 2, 2021.

**4.      Do members get to vote on whether the Bankruptcy Court should approve or not approve the Plan?**

Yes, all members may vote on whether they accept or reject the Plan based upon their claims. Members will be divided into two Classes for voting purposes, called Class 3 and Class 4 under the Plan. Class 3 is made up of all Sharity Members who submitted a monthly payment after July 8, 2021, the date Sharity filed for bankruptcy. Class 4 is made up of all other claims by Member and claims of other unsecured creditors.

**5.      Do I vote twice if I have two claims, one in Class 3 and one in Class 4?**

Yes, Members who have two claims, one in Class 3 and one in Class 4, may cast a ballot to accept or reject the Plan in each class.

**6.      How do I vote?**

You may submit your ballot online or by mail, as provided in the instructions.

**7.      How many Classes must vote in favor of the Plan for the Plan to be Confirmed?**

At least one Class must vote to accept the plan in order for it to be approved.  For a Class to accept the Plan, at least 50% of the claims voted and 66 and 2/3% of the amounts voted in that Class must vote to accept the Plan.

**8.      If no Class accepts the Plan, can the Bankruptcy Court still approve the Plan?**

No, if no Classes vote to accept the Plan, a new Plan would have to be submitted or the case would not proceed in Chapter 11 bankruptcy.

**9.      If the Plan is Approved, Who will run the Liquidating Trust?**

The Liquidating Trust will be run by an individual known as a Liquidating Trustee. The Members Committee will identify a Liquidating Trustee, which will be posted on the BMC website as part of a "Plan Supplement" by November 8, 2021.  If those parties cannot agree on a Liquidating Trustee, the Bankruptcy Court will appoint one at or shortly after the confirmation hearing.

**10.     What claims will be paid from the Liquidating Trust?**

All valid, approved Claims (called "allowed claims" in the Bankruptcy Code) filed by Members, including claims for uncovered medical expenses, refunds of monthly payments, and all amounts paid to Sharity after July 8, 2021, will be paid from the Liquidating Trust. Those claims are categorized in Classes 3 and 4 in the Plan.

Member claims in Class 3 are only for monthly payments made to Sharity after July 8, 2021, for which the member will receive a full payment of the amount you paid after that date within 30 days after the Plan becomes effective.

Member claims in Class 4 will be paid if, and when, there is a recovery (money) from lawsuits brought by the Liquidating Trustee. There is no guarantee that money will become available to pay Claims in Class 4, however, and if money does become available, there is no way of knowing how much it will be or how much the Members will actually receive.  It is most likely that Members will receive only a percentage of their claims, although the size of the percentage will also be unknown until everything is collected and the Liquidating Trust figures how much there is in Claims and how much money there is to pay them after deducting the expense of conducting the process.

**11.     What is my Unpaid Medical Claims Amount?**

Sharity has a database of all Unpaid Medical Claims.  Members can use this database to establish their claim.  Members should follow the instructions in their ballot to see what Sharity calculated the Unpaid Medical Claims to be for that Member. If you disagree with the calculation of your Unpaid Medical Claim or wish to file a claim against Sharity for other medical expenses or some other reason, you should submit a proof of claim by following the instructions on BMC's website (www.bmcgroup.com/sharity) **by no later than January 4, 2022.**

12.    **How will the Liquidating Trust be funded**?

The Liquidating Trust will be funded initially with what is expected to be approximately $1 million in cash on the official date that the Plan is approved. The Liquidating Trust will also own the right to bring lawsuits on behalf of Sharity. The Trust will receive any money obtained from the lawsuits, and use that money to pay Members' Claims.

13.    **What does the Liquidating Trustee do?**

The Liquidating Trustee will run the Liquidating Trust. This means the Liquidating Trustee, with help from legal and financial professionals, will determine the amount of Members' claims, pay them, manage the money in the Liquidating Trust and make sure that all members are treated fairly.

The Liquidating Trustee will be overseen by the Liquidating Trust Committee, which will be made up of five Members of Sharity selected by the U.S. Trustee to represent the Members' interests and a governmental representative.

14.    **What if I have more questions?**

If you have any questions regarding the Plan or voting, please contact Sharity's Solicitation Agent, BMC Group, via one of the following methods. Additional information will also be posted to Sharity's website, SharityMinistries.org.

BMC Group Inc.
Telephone: 1-888-909-0100
Website:  www.bmcgroup.com/sharity
Email: sharity@bmcgroup.com

If you have general questions about the Sharity Bankruptcy, you may contact the lawyers for the Members Committee:

Sirianni Youtz Spoonemore Hamburger PLLC
Mehri & Skalet
Website:  http://www.symslaw.com/
Email: Sharitymemberscommittee@sylaw.com

15.    **How Do I Obtain Health Insurance?**

If you or your family need health coverage, please visit https://www.healthcare.gov/marketplace-in-your-state/ to find information regarding affordable, comprehensive health coverage available in your state. Open enrollment begins on November 1st. Open enrollment periods may close soon, and vary depending on your state, so it is important to review the information and seek coverage promptly.

# **EXHIBIT B**

Ex. 1.40, p. 81 of 87

**Sharity Ministries**
**Liquidation Analysis**
($ in Thousands)

*For Discussion Purposes Only*
*Subject to Ongoing Review and Material Revision*

| | Notes | Estimated Balance | Realization Percentage Low | Realization Percentage High | Liquidation Value Low | Liquidation Value High | Realization Percentage Low | Realization Percentage High | Liquidation Value Low | Liquidation Value High |
|---|---|---|---|---|---|---|---|---|---|---|
| **Liquidation Analysis - Chapter 7 Liquidation Compared to Chapter 11 Plan of Liquidation** | | | | | | | | | | |
| *Amounts in $000s* | | | **Chapter 7 Liquidation** | | | | **Chapter 11 Plan of Liquidation** | | | |
| **Table I: Assets Available For Distribution** | | | | | | | | | | |
| Estimated Cash and Cash Equivalents - Operating Account | a | $ 841 | 100% | 100% | $ 841 | $ 841 | 100% | 100% | $ 841 | $ 841 |
| Estimated Cash and Cash Equivalents - Monies Received on Post-Petition Member Contributions | b | $ 1,174 | 100% | 100% | $ 1,174 | $ 1,174 | 100% | 100% | 1,174 | 1,174 |
| Estimated Cash and Cash Equivalents - Monies Residing in Sharebox Funding Account | c | $ 779 | 100% | 100% | 779 | 779 | 100% | 100% | 779 | 779 |
| Cash Deposits | d | 331 | 0% | 0% | - | - | 10% | 100% | 33 | 331 |
| Due from Aliera | e | 23,654 | 10% | 100% | 2,365 | 23,654 | 10% | 100% | 2,365 | 23,654 |
| Licenses; Intangibles; Other Assets | f | - | NA | NA | - | - | NA | NA | - | - |
| **Total Assets and Net Proceeds Available For Distribution** | | **$ 26,779** | **19%** | **99%** | **$ 5,159** | **$ 26,448** | **19%** | **100%** | **$ 5,192** | **$ 26,779** |
| **Table II: Estimated Wind Down Expenses** | | | | | | | | | | |
| Wind Down Expenses | g | | | | $ 450 | $ 450 | | | $ - | $ - |
| Chapter 7 Trustee Professional Fees | h | | | | 800 | 300 | | | - | - |
| Chapter 11 Liquidating Trust Professional Fees | h | | | | - | - | | | 800 | 300 |
| Chapter 7 Trustee Fees (3% of Proceeds) | i | | | | 155 | 793 | | | - | - |
| **Total Wind Down Expenses** | | | | | **$ 1,405** | **$ 1,543** | | | **$ 800** | **$ 300** |
| **Net Proceeds Available After Wind Down Expenses** | | | | | **$ 3,754** | **$ 24,904** | | | **$ 4,392** | **$ 26,479** |

| | Notes | Preliminary Balance | Recovery Percentage Low | Recovery Percentage High | Recovery Value Low | Recovery Value High | Recovery Percentage Low | Recovery Percentage High | Recovery Value Low | Recovery Value High |
|---|---|---|---|---|---|---|---|---|---|---|
| **Table III: Estimated Creditor Recoveries** | | | | | | | | | | |
| Class 1: Miscellaneous Secured Claims (Unimpaired) | | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| Class 2: Priority Non-Tax Claims (Unimpaired) | | NA | NA | NA | NA | NA | NA | NA | NA | NA |
| Class 3: Member Claims for Post-July 8, 2021 Monthly Payments (Impaired) | | 1,174 | 100.00% | 100.00% | $ 1,174 | $ 1,174 | 100.00% | 100.00% | $ 1,174 | $ 1,174 |
| Class 4: Members Claims and General Unsecured Claims (Impaired) | j | TBD | TBD | TBD | 2,581 | 23,731 | TBD | TBD | 3,219 | 25,305 |
| Class 5: Governmental Fines and Penalty Claims (Impaired) | j | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Class 6: Section 510(c) Claims (Fully Extinguished and Discharged) | | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD | TBD |

*Notes:*

a  Estimated operating cash balance tested at the effective date subject to continued updating and refinement; assumes professional fee retainers of Baker Hostetler and SOLIC Capital Advisors are applied. Does not include segregated funds currently held in separate bank accounts at Regions Banks. Includes wind-down expenses for professional fees.

b  Cash reserve balance for refunds to members who made monthly contributions subsequent to the filing date.

c  Static cash reserve balance for bank account that was used for funding share requests.

d  Estimated cash deposits held by attorneys outside of Baker Hostetler and includes other prepaid amounts, primarily a MedWatch advanced payment amount of $316k.

e  Represents monies due from Aliera Companies and its affiliates to the estate; subject to ongoing analysis to determine amounts Due from Aliera.  Estimate is hypothetical for illustrative purposes only using the reported unaudited balance sheet from the general ledger provided by the Aliera Companies as of 12/31/2020. Includes estimated TSYS credit card processor withholdings. These amounts do not include the value of any claims from causes of action or claims against Aliera outside of current amounts owing by Aliera.

f  No value assigned in the financial statements to the estate's intangible assets (domain names, mailing lists, trademark, etc.). Estimated at de minimus value for purpose of analysis.

g  Incremental wind-down costs for liquidation approximated at an incremental 12 weeks applying application of CRO services at 75% of current run-rate (shown as $37.5k per week). Base wind-down expenses for CRO services are already reflected as a deduct in the cash balance per footnote (a) above.

h  Estimate.

i  Chapter 7 Trustee Commission is calculated in accordance with 11 U.S.C. section 326(a).

j  Claims amounts uncertain in light of the General Bar Date extended to January 4, 2022. Recoveries are before any contingency fees due to counsel representing the Chapter 7 Trustee or the Liquidating Trustee.

Appx. Vol X
A-455

Case 21-11001-TMH    Doc 315-1    Filed 11/29/21    Page 83 of 87

# <u>EXHIBIT C</u>

Ex. 1.40, p. 83 of 87

**EXECUTORY CONTRACTS AND UNEXPIRED LEASE**

| CONTRACT/LEASE COUNTERPARTY | COUNTERPARTY ADDRESS | CONTRACT/LEASE DESCRIPTION | STATUS |
|---|---|---|---|
| A. Joseph Guarino III | A. Joseph Guarino III 4917 Farm Valley Dr. Woodstock, GA 30188 | Employment Agreement | Rejected by 2nd Rejection Order [D.I. 182, 9/7/21] |
| Adevo LLC | Adevo LLC 990 Hammond Drive, Suite 700 Atlanta, GA 30328 | Marketing and Brand Development Services Agreement | Rejected by 1st Rejection Order [D.I. 161, 8/19/21] |
| Base Commerce, LLC (Fresno First Bank) | Fresno State Bank 7690 N. Palm Avenue, Suite 101 Fresno, CA 93711  – and –  Base Commerce 5055 E. Washington Street, Suite 300 Phoenix, AZ 85034 | Processing of credit card transactions and other ancillary transaction services | Rejected by 2nd Rejection Order [D.I. 182, 9/7/21] |
| Centivo T Holdings, LLC | Centivo T. Holdings, LLC C/O Centivo Corporation 307 Cayuga Road, Suite 170 Buffalo, NY 14225  – and –  Lowenstein Sandler, LLP 1251 6th Ave., 17th Floor New York, NY 10020 Attn: Anthony Pergola | Master Services Agreement | Rejected by 3rd Rejection Order [D.I. 227, 10/4/21] |

| CONTRACT/LEASE COUNTERPARTY | COUNTERPARTY ADDRESS | CONTRACT/LEASE DESCRIPTION | STATUS |
|---|---|---|---|
| Corporation Service Corporation | Corporation Service Corporation 251 Little Falls Drive Wilmington, DE 19808 | Registered Agent Services Contract | |
| Enrollment123, Inc. *dba* Administration123 | Enrollment 123, Inc. C/O Adminstration123 668 N. Coast Hwy #167 Laguna Beach, CA 92651 Attn: Joe Siedel | Services Agreement | Rejected by 3rd Rejection Order [D.I. 227, 10/4/21] |
| Ensurian Agency, LLC | Ensurian Agency, LLC 990 Hammond Drive, Suite 700 Atlanta, GA 30328 | Managing National General Wholesaler Agreement | Rejected by 1st Rejection Order [D.I. 161, 8/19/21] |
| Faith Driven Life Church | Faith Driven Life Church/New Horizons Church of God in Christ c/o Oliver J. Haney III 2822 Randall St. East Point, GA 30344 | Charitable Contribution Agreement | Rejected by 2nd Rejection Order [D.I. 182, 9/7/21] |
| Forestall CPA's | Forestall CPA's 5328 Lanier Island Parkway, Suite 201 Buford, GA 30518-9056 | Engagement Letter | |
| Gibbons, P.C. | Gibbons, P.C. One Gateway Center Newark, NJ 07102-6310 Attn: Kevin G. Walsh, Esq. | Legal Services Engagement Letter | |
| Global Processing Partners, LLC | Global Processing Partners, LLC 389 Highway 21, Suite 402b Madisonville, LA 70447 | Processing of ACH transactions and checks | Rejected by 2nd Rejection Order [D.I. 182, 9/7/21] |

| CONTRACT/LEASE COUNTERPARTY | COUNTERPARTY ADDRESS | CONTRACT/LEASE DESCRIPTION | STATUS |
|---|---|---|---|
| Howard S. Russell | Howard S. Russell H.S. Russell Family Ministries, Inc. 16163 Galehouse Road Doylestown, OH 44230 | Consultant Services Agreement | |
| Husch Blackwell | Husch Blackwell 901 St. Louis Street, Suite 1800 Springfield, MO 65806 Attn: Ginger K. Gooch, Esq. | Legal Services Engagement Letter | |
| Joy C. Spriggs | Joy C. Spriggs 8473 SE Pine Circle Hobe Sound, FL 33455 | Employment Agreement | |
| McBrayer PLLC | McBrayer PLLC 201 East Main Street, Suite 900 Lexington, KY 40507 Attn: Jon A. Woodall, Esq. | Legal Services Engagement Letter | |
| MedWatch, LLC | MedWatch, LLC 400 Colonial Center Parkway Suite 320 Lake Mary, FL 32746 Attn: Sally-Ann Polson | Medical Management Services Agreement | Rejected by 3rd Rejection Order [D.I. 227, 10/4/21] |
| McLane Middleton | McLane Middleton 900 Elm Street, 10th Floor Manchester, NH 03101 Attn: Michael A. Delaney, Esq. | Legal Services Engagement Letter | |
| Michael A. LeBrun | Michael A. LeBrun Midaire, LLC 1930 Rand Ridge Ct., Suite B Marietta, GA 30062 | Consultant Services Agreement | |

| CONTRACT/LEASE COUNTERPARTY | COUNTERPARTY ADDRESS | CONTRACT/LEASE DESCRIPTION | STATUS |
|---|---|---|---|
| Office Evolution | Office Evolution<br>821 Atlanta Street<br>Roswell, GA 30075 | Lease of Office space | Rejected by 2nd Rejection Order [D.I. 182, 9/7/21] |
| Stage2Accounting, Inc. | Stage2Accounting, Inc.<br>661 Wellington Drive<br>Winder, GA 30680 | Independent Contractor Agreement | |
| Tactic Edge Solutions, LLC | Tactic Edge Solutions, LLC<br>990 Hammond Drive, Suite 700<br>Atlanta, GA 30328 | Ancillary Services Agreement | Rejected by 1st Rejection Order [D.I. 161, 8/19/21] |
| Tactic Edge Solutions, LLC | Tactic Edge Solutions, LLC<br>990 Hammond Drive, Suite 700<br>Atlanta, GA 30328 | IT Platform Services Agreement | Rejected by 1st Rejection Order [D.I. 161, 8/19/21] |
| Three Digital Advertising | Three Digital Advertising<br>550 Pharr Road, Suite 900<br>Atlanta, GA 30305 | Advertising Contract | |
| USA Benefits & Administrators, LLC | USA Benefits & Administrators, LLC<br>990 Hammond Drive, Suite 700<br>Atlanta, GA 30328 | Administration Services Agreement | Rejected by 1st Rejection Order [D.I. 161, 8/19/21] |
| Vonage Business Inc. | Vonage Business<br>PO Box 392415<br>Pittsburgh, PA 15251-9415<br><br>– and –<br><br>Vonage Legal Dept.<br>Vonage Business<br>23 Main Street<br>Holmdel, NJ 07733 | Service Agreement | |

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | CHAPTER 11 |
| | ) | |
| THE ALIERA COMPANIES INC. | ) | CASE NO. 21-11548 (TMH) |
| d/b/a Aliera Healthcare, Inc., et al., | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| | ) | |
| | ) | |
| | ) | |

---

## MODIFIED COMBINED FIRST AMENDED DISCLOSURE STATEMENT AND PLAN OF LIQUIDATION FILED JOINTLY BY THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

---

**SCROGGINS & WILLIAMSON, P.C.**

**J. Robert Williamson**
**Georgia Bar No. 765214**
**Ashley Reynolds Ray**
**Georgia Bar No. 601559**
**4401 Northside Parkway**
**Suite 450**
**Atlanta, GA 30327**
**(404) 893-3880**

- and –

**MONZACK MERSKY AND BROWDER, P.A.**

**Rachel B. Mersky**
**Del. Bar No. 2049**
**1201 Orange Street, Suite 400**
**Wilmington, DE 19801**
**T: (302) 656-8162**
**F: (302) 656-2769**
**E: rmersky@monlaw.com**

**Counsel for the Debtors**

**Dated:  August 14, 2023**

**GREENBERG TRAURIG, LLP**

**Dennis A. Meloro**
**Del. Bar No. 4435**
**222 Delaware Avenue, Suite 1600**
**Wilmington, DE 19801**
**T: (302) 661-7000**
**E: melorod@gtlaw.com**

- and -

**John D. Elrod**
**Georgia Bar No. 246604**
**3333 Piedmont Road, NE, Suite 2500**
**Atlanta, GA 30305**
**T: (678) 553-2259**
**F: (678) 553-2269**
**E: elrodj@gtlaw.com**

**Counsel for the Official Committee of Unsecured Creditors**

EXHIBIT
1.41

SECTION 1.   DEFINITIONS AND INTERPRETATION ............................................................ 2

    1.1   Definitions ...................................................................................................................2

SECTION 2.   BACKGROUND AND DISCLOSURES ............................................................. 2

    2.1   The Debtors' Business and Corporate Structure .........................................................2
    2.2   Events Precipitating the Debtors' Chapter 11 Filing ..................................................4
    2.3   The Chapter 11 Cases .................................................................................................5
    2.4   Significant Events During Chapter 11 ........................................................................6
    2.5   Certain Federal Income Tax Consequences ...............................................................7
    2.6   Alternate Plan .............................................................................................................8
    2.7   Best Interests Test and Liquidation Analysis .............................................................8

SECTION 3.   TREATMENT OF ADMINISTRATIVE CLAIMS, PRIORITY TAX
              CLAIMS, U.S. TRUSTEE FEES, AND PROFESSIONAL FEES ...................... 9

    3.1   Administrative Claims .................................................................................................9
    3.2   Administrative Claims Bar Date ..................................................................................9
    3.3   Priority Tax Claims ...................................................................................................10
    3.4   U.S. Trustee Fees ......................................................................................................10

SECTION 4.   SUMMARY OF TREATMENT OF CLAIMS AND ESTIMATED
              RECOVERIES ....................................................................................................... 10

SECTION 5.   CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
              INTERESTS ........................................................................................................... 13

    5.1   Classification and Specification of Treatment of Claims .......................................13
    5.2   Classes of Claims ......................................................................................................13

SECTION 6.   ACCEPTANCE OR REJECTION OF THE PLAN ........................................... 15

    6.1   Impaired Classes Vote ..............................................................................................15
    6.2   Presumed Acceptance of this Plan ............................................................................15
    6.3   Presumed Rejection of this Plan ...............................................................................15
    6.4   Voting Classes ...........................................................................................................15
    6.5   Nonconsensual Confirmation ....................................................................................15

SECTION 7.   CONFIRMATION AND VOTING PROCEDURES ........................................... 15

    7.1   Confirmation Hearing ...............................................................................................15
    7.2   Procedure for Objections ..........................................................................................16
    7.3   Requirements for Confirmation ................................................................................16
    7.4   Classification of Claims and Equity Interests ..........................................................16
    7.5   Impaired Claims or Equity Interests .........................................................................17
    7.6   Eligibility to Vote on the Plan ..................................................................................17
    7.7   Solicitation Notice ....................................................................................................17

7.8    Procedure and Voting Deadline .............................................................................17
7.9    Acceptance of the Plan..........................................................................................19

SECTION 8.    MEANS FOR IMPLEMENTATION OF PLAN ................................................. 19

8.1    Funding for this Plan.............................................................................................19
8.2    Formation of the Trust ..........................................................................................19
8.3    Appointment of Liquidating Trustee; Deemed Resignation of Directors
       and Officers..........................................................................................................19
8.4    Vesting of Assets ..................................................................................................20
8.5    Corporate Action...................................................................................................20
8.6    Continuing Existence ............................................................................................20
8.7    Substantive Consolidation of Debtors for Plan Purposes ....................................21
8.8    Distributions to Classes 3 and 4 Pursuant to Unsecured Creditor
       Settlement .............................................................................................................21
8.9    Causes of Action ...................................................................................................22
8.10   Privileges as to Certain Causes of Action............................................................23
8.11   Agreements, Instruments, and Documents ...........................................................24
8.12   Closing of the Debtors' Chapter 11 Cases............................................................24
8.13   Corporate Dissolution ..........................................................................................24
8.14   Effective Date Events ...........................................................................................25

SECTION 9.    PROVISIONS REGARDING LIQUIDATING TRUSTEE................................ 25

9.1    General Powers and Duties of the Liquidating Trustee ........................................25
9.2    Compensation of Liquidating Trustee and its Professionals.................................26
9.3    No Agency Relationship .......................................................................................26
9.4    Reporting...............................................................................................................26
9.5    Resignation, Death or Removal of Liquidating Trustee .......................................27

SECTION 10.   EXECUTORY CONTRACTS ............................................................................... 27

10.1   Rejection of Contracts and Unexpired Leases .....................................................27
10.2   Insurance Contracts...............................................................................................27
10.3   Compensation and Benefit Programs....................................................................27
10.4   Reservation of Rights as to Executory Contracts ................................................27

SECTION 11.   DISTRIBUTION PROVISIONS ........................................................................... 28

11.1   No Distributions on Account of Claims That Have Not Become Allowed
       Claims ...................................................................................................................28
11.2   Reserves for Claims That Have Not Been Allowed .............................................28
11.3   Distribution of Plan Consideration ......................................................................28
11.4   Unclaimed Cash....................................................................................................28
11.5   Unnegotiated Distribution Checks........................................................................29
11.6   Fractional Dollars..................................................................................................29
11.7   Distribution Dates .................................................................................................29
11.8   Bankruptcy Code Sections 509 and 510 ..............................................................29

11.9 Distributions to be Applied First to Administrative and Priority Claims .............29
11.10 Estimation of Claims.................................................................................30
11.11 Chapter 5 Provisions.................................................................................30
11.12 Third-Party Agreements............................................................................30
11.13 Objections to Claims.................................................................................30
11.14 Settlement of Causes of Action and Disputed Claims ................................31
11.15 Setoffs ....................................................................................................31
11.16 Distribution Cap.......................................................................................31
11.17 De Minimis Distributions ...........................................................................31
11.18 Withholding Taxes....................................................................................31
11.19 Distribution Record Date...........................................................................32

SECTION 12. CONDITIONS PRECEDENT ......................................................... 32

12.1 Conditions to Confirmation .........................................................................32
12.2 Conditions to Effective Date........................................................................32
12.3 Nonfulfillment of Conditions........................................................................32
12.4 Waiver of Conditions to Confirmation and Effective Date ...............................32

SECTION 13. EFFECTS OF PLAN CONFIRMATION............................................. 33

13.1 Interest on Claims, Fees, Costs, Charges....................................................33
13.2 Exculpation ...............................................................................................33
13.3 Injunction ..................................................................................................33
13.4 Post-Effective Date Effect of Evidences of Claims.........................................33
13.5 Surrender of Instruments and Release of Liens .............................................34
13.6 Term of Stays.............................................................................................34
13.7 No Discharge .............................................................................................34
13.8 Retention of Jurisdiction..............................................................................34
13.9 Failure of the Court to Exercise Jurisdiction ..................................................35

SECTION 14. MISCELLANEOUS PROVISIONS.................................................... 35

14.1 Exemption from Transfer Taxes ...................................................................35
14.2 Modification of Plan ....................................................................................36
14.3 Revocation of this Plan ...............................................................................36
14.4 Preservation and Application of Insurance.....................................................36
14.5 Successors and Assigns, Binding Effect........................................................36
14.6 Computation of Time...................................................................................37
14.7 Notices .....................................................................................................37
14.8 Severability ...............................................................................................37
14.9 Designated Notice......................................................................................37
14.10 Validity and Enforceability.........................................................................37
14.11 Plan Supplement ......................................................................................38
14.12 Controlling Documents...............................................................................38
14.13 Reservation of Rights................................................................................38
14.14 Substantial Consummation ........................................................................38

14.15   Governing Law ..............................................................................................38

## NOTICE

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT EXCEPT AS EXPRESSLY INDICATED HEREIN.  THIS COMBINED PLAN AND DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION AND BELIEF.  NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT ON THE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS.  CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED.  THE DELIVERY OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED DISCLOSURE STATEMENT AND COMBINED PLAN AND DISCLOSURE STATEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.

# INTRODUCTION

The Aliera Companies, Inc. d/b/a Aliera Healthcare, Inc. ("**Aliera**"), together with four wholly owned subsidiaries[1], debtors and debtors-in-possession in the above-styled Chapter 11 cases (collectively, the "**Debtors**") and the Official Committee of Unsecured Creditors (the "**Committee,**" together with the Debtors, the "**Plan Proponents**"), hereby propose jointly a plan of liquidation (as may be amended or supplemented, the "**Plan**") which is embodied within the following Combined Disclosure Statement and Plan of Liquidation (the "**Combined Plan and Disclosure Statement**"), pursuant to sections 1125 and 1129 of the Bankruptcy Code, for the resolution of outstanding Claims against the Debtors and their estates pursuant to chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Ad Hoc Committee of Members has reviewed the Proposed Plan and supports it.

The Plan constitutes a liquidating chapter 11 plan for the Debtors.  The Plan provides for the Debtors' assets already liquidated or to be liquidated over time and for the proceeds to be distributed to Holders of Allowed Claims in accordance with the terms of the Plan.  Except as otherwise provided by order of the Bankruptcy Court, Distributions will occur on the Effective Date or as soon thereafter as is practicable and at various intervals thereafter.  The Plan provides for the establishment of the Trust which shall, as provided for in the Plan and the Trust Agreement, be the means to effect such liquidation and Distributions.

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in Section 14.2 of the Combined Plan and Disclosure Statement, the Plan Proponents expressly reserve the right to alter, amend or modify the Combined Plan and Disclosure Statement, one or more times, before its substantial consummation, including as disclosed more fully in Section 14.2 of this Combined Plan and Disclosure Statement.

All Holders of Claims against the Debtors are encouraged to read this Combined Plan and Disclosure Statement and other Plan Documents in their entirety as soon as possible.  The Plan Documents, once Filed, shall be available for review on the claims and noticing agent's website at https://dm.epiq11.com/case/aliera/info, in the office of the clerk of the Bankruptcy Court, or online through the Court's ECF system, www.deb.uscourts.gov.  Holders of Claims or Equity Interests may also obtain a copy of the Plan Documents by contacting counsel for the Debtors or the Committee by a written request sent to the above address.  Each of the Plan Documents is an integral part of this Plan and is hereby incorporated by reference and made a part of this Plan.

---

[1] The jointly administered Debtors in these chapter 11 cases along with the last four digits of their federal tax identification number include: The Aliera Companies Inc. (9555) (Case No. 21-11548 and 22-10125), Advevo LLC (6736) (Case No. 22-10124), Ensurian Agency LLC (3244) (Case No. 22-10123), Tactic Edge Solutions LLC (2923) (Case No. 22-10122) and USA Benefits & Administrators LLC (5803) (Case No. 22-10121).

## SECTION 1. DEFINITIONS AND INTERPRETATION

### 1.1    Definitions.

Capitalized terms used in this Plan and not otherwise defined in this Plan or in the Bankruptcy Code have the meanings specified in the attached **Exhibit 1**.

#### 1.1.1    Rules of Construction.

Unless otherwise specified, all Section or Exhibit references in this Plan are to the respective section in, or exhibit to, this Plan, as the same may be amended, waived, or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein. The rules of construction contained in Bankruptcy Code Section 102 shall apply to this Plan. The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. Unless otherwise provided, (i) any reference in this Plan to an existing document, Exhibit or Schedule means such document, Exhibit or Schedule as it may have been amended, restated, revised, supplemented or otherwise modified, and (ii) any reference in this Plan to a document being in a particular form or on particular terms means that such document will be substantially in such form or on such terms. If a time or date is specified for any payments or other distribution under this Plan, it shall mean on or as soon as reasonably practicable thereafter. Each term includes the singular and plural form of the term regardless of how the term is stated and each stated pronoun is gender neutral.

## SECTION 2. BACKGROUND AND DISCLOSURES

THE FOLLOWING STATEMENTS ARE MADE FOR INFORMATIONAL PURPOSES ONLY. THE PLAN PROPONENTS, FOR THEMSELVES AND FOR THE LIQUIDATING TRUSTEE, RESERVE ALL RIGHTS REGARDING THE ACCURACY OF THE STATEMENTS BELOW. NOTHING HEREIN IS AN ADMISSION OF ANY FACT BY ANY PARTY.

### 2.1    The Debtors' Business and Corporate Structure.

Aliera was a health care organization marketing health care solutions to customers that were located in various states. Prior to 2016, Aliera (through a predecessor) developed and sold closed network capitated Direct Primary Care Medical Home ("***DPCMH***") health programs. Those programs, which focused on preventative and primary care, claimed to lower members' costs for primary care, wellness, and preventive medicine. They came to include a variety of services, such as telemedicine, PCP, urgent care, labs and discount pharmacy. Those offerings did not include comprehensive coverage, however, and, in Fall 2016, Aliera determined that it should work with a nonprofit Health Care Sharing Ministry ("***HCSM***") to offer a more comprehensive suite of products to members and potential members.

Aliera approached Anabaptist Healthshare ("***AHS***") about developing a business relationship. AHS was an existing non-profit 501(c)(3) ministry. AHS sold an HCSM product, in which members of similar religious/faith beliefs are asked to share in the health care costs of its members. Aliera proposed combining its DPCMH product with a new HCSM product in order to

2

provide a comprehensive offering.  The new HCSM product would be offered through a wholly owned subsidiary of AHS, Unity HealthShare, LLC ("*Unity*").  In February 2017, Unity and Aliera signed an agreement authorizing Aliera to sell the combined DPCMH and HCSM product and administer the plans (the "*Unity Agreement*").  Aliera was granted an exclusive license to market and sell the Unity products.

After forming a contractual relationship with Unity, Aliera began marketing and selling the combined DPCMH/HCSM products.  However, significant disputes arose between Unity and Aliera, including disagreement over how monthly member payments were to be allocated under the Unity Agreement.  When the parties were unable to resolve the dispute through mediation, Unity terminated the agreement, and in August 2018, Aliera filed a complaint against Unity in the Superior Court of Fulton County, Georgia.  Counterclaims were asserted by Unity, and the court entered a preliminary injunction against Aliera and appointed a receiver.  Eventually, the parties entered into a settlement agreement and the lawsuit was dismissed.

In June 2018, Aliera and/or its principals created Trinity Healthshare, Inc. (n/k/a Sharity Ministries, LLC) ("*Trinity*" or "*Sharity*"), as a nonprofit healthcare sharing ministry.  Aliera established a contractual relationship with Sharity, effective August 13, 2018.  Aliera's agreement with Sharity  authorized Aliera to begin marketing and selling Sharity HCSM products to former Aliera/Unity members and potential members.

Additionally, Aliera decided to reorganize and restructure its business lines.  Aliera's reorganization was completed by July 1, 2019.  It changed its name to The Aliera Companies, Inc, which became a holding and management company with four wholly owned subsidiaries (collectively, the "*Aliera Companies*"), each with its own distinct business service operation, as shown below.

A.     **The Aliera Companies, Inc.** – A holding and management company provided human resources, payroll, training, compliance and accounting services for its four subsidiaries, Advevo LLC ("*Advevo"*), Ensurian Agency LLC ("*Ensurian*"), Tactic Edge Solutions LLC ("*Tactic Edge*"), and USA Benefits & Administrators LLC ("*USA Benefits*").

B.     **Advevo** – was a marketing and fulfillment company.  Advevo created and implemented marketing strategies, conducted extensive market research to increase sales for companies, sought to build relationships with target audiences, increased overall exposure by extending reach to potential customers likely to be interested in the product or service being offered, and satisfied monthly fulfillment needs.  Advevo used strategy and design to simplify and solve communication issues.  Advevo targeted three areas of marketing concentration, Digital Marketing, Market Communications, and Market Strategy.

C.     **USA Benefits & Administrators** – was a third-party administration organization, licensed in New Mexico and had planned to be licensed nationwide to adjudicate insurance claims and administer certain aspects of employee benefit plans.  It also customized adjudication of healthcare sharing ministries' unique health share requests.

D.     **Tactic Edge** – was a full-service provider of managed IT services, core IT platforms, and Business Process Outsourcing (BPO) for brokers, agencies, and call centers.  With

3

Tactic Edge, clients had a full end-to-end platform and service to manage their members' life cycle from enrollment and billing to administration, operations and customer service.

E.   **Ensurian** – was a licensed sales/brokerage company that served the needs of individuals, families, and small businesses through various means, including intent to sell insurance and non-insurance products directly to individuals and small employers. Ensurian was poised to become a leading technology enabled, licensed national brokerage firm that gave individuals opportunity to compare, purchase, and enroll in a large and diverse offering of health, supplemental, and other insurance or non-insurance products, but began losing its presence because of all the negative media and regulatory investigations, as discussed below. Product offerings include Health Care Sharing Ministry (HCSM) medical sharing plans, supplemental plans, and fully insured insurance portfolios in the individual market, including products such as dental, vision, accident, critical illness, cancer and other income protection products. With the rise of consumer-driven healthcare, these products provided consumers with important coverage to protect their health and financial well-being.

Following the reorganization, on or about January 1, 2020, all four of the Aliera Companies entered into separate vendor agreements with Sharity that superseded the original agreement between Aliera and Sharity. Under these new contracts, Sharity retained certain of the Aliera Companies to perform all of the same tasks under the original Aliera/Sharity contract, among other things, provide (i) administrative services, (ii) information technology related services, (iii) marketing, brand development, and sale services, and (iv) regulatory and compliance services.

## 2.2   Events Precipitating the Debtors' Chapter 11 Filing.

During 2018-2021, various governmental units conducted investigations resulting in cease and desist orders against Aliera and Sharity based on allegations that the Aliera/Sharity health plans were unauthorized health insurance. At the same time, private parties filed individual and class action lawsuits against Aliera and Sharity alleging that the health plans were illegal health insurance and failed to comply with state and federal consumer protections, and that they failed to pay the medical benefits promised by the health plans. Ultimately, more than twenty state insurance departments issued orders against the Aliera Companies and/or Sharity requiring them to cease and desist from offering health care sharing programs and withdraw from the health coverage markets in those states.

Additionally, two of the class action lawsuits obtained judgments against Aliera: *Jackson et al., v. The Aliera Companies, Inc.; Aliera Healthcare Inc.; Trinity Healthshare Inc.,* No. 2:19-cv-1281 (J. Rothstein, W.D. Wash.) (the "***Jackson Suit***") and *Albina et al. v. The Aliera Companies, Inc.; Trinity Healthshare Inc.; OneShare Health LLC,* No. 5:20-cv-496-JMH (J. Hood, C.D. Ky.) (the "***Albina Suit***"). Both judgments were entered by default following the withdrawal of Aliera's counsel in those lawsuits after Aliera was unable to continue paying counsel to defend it. In the Jackson Suit, an order was entered on October 6, 2021, granting counsel for Aliera's motion to withdraw and granting Aliera 15 days to retain substitute counsel. Aliera was unable to retain substitute counsel; thereafter, on November 12, 2021, an order was entered striking Aliera's Answer and entering Default Judgment against Aliera. Similarly, in the Albina Suit an order was entered on October 4, 2021, granting a motion to withdraw filed by Aliera's counsel.

4

That order gave Aliera 30 days to retain replacement counsel, which it was unable to do. Subsequently, a Default Judgment was entered against Aliera on November 17, 2021.

With declining membership levels and revenues, Sharity filed a voluntary petition for relief under Chapter 11 on July 8, 2021, in the United States Bankruptcy Court for the District of Delaware, Case No. 21-11001-JTD (the "**Sharity Case**"). Sharity ceased making payments to Aliera and sought to reject its contracts with the Aliera Companies. This resulted in a significant reduction in the Debtors' cash flow and eventually forced the Debtors to cease operations on or before the first week of October.

By the time of their shutdown, the Debtors were left with very little funds on hand. In an effort to wind down and liquidate their assets for the benefit of creditors in an expeditious and cost-effective manner, the Debtors elected to file in Georgia a statutory Assignment for Benefit of Creditors (the "**ABC**"). That ABC proceeding was filed on or about October 11, 2021. As part of the ABC process, assets of the Debtors were assigned to Asset Recovery Associates Aliera, LLC ("**ARAA**") as the "Assignee" charged with liquidating the Debtors remaining assets and distributing the funds to creditors with valid claims. Katie S. Goodman, an experienced professional fiduciary, is the principal of ARAA.

On or about November 24, 2021, the official committee of unsecured creditors appointed in the Sharity Case (the "**Sharity Committee**") filed an adversary complaint against the Debtors in the Delaware bankruptcy court (Adv. Proc. No. 21-51291-JTD). In its Complaint, the Sharity Committee, *inter alia*, asserts claims for conversion, unjust enrichment, and seeks to avoid and recover alleged fraudulent and preferential transfers. The complaint seeks damages against the Debtors, jointly and severally, in the amount of $574,736,117. The adversary proceeding was automatically stayed as a result of the Debtors' bankruptcy filings and remains pending. Under Sharity's confirmed liquidating plan, the Sharity Trustee was appointed to oversee a liquidating trust established to hold assets of Sharity's bankruptcy estate. The Sharity Trustee has filed one or more proofs of claim in the Debtors' Chapter 11 Cases asserting the same claims which are the subject of the adversary proceeding. Those claims would be settled under this Plan.

### 2.3    The Chapter 11 Cases.

On December 3, 2021, an involuntary petition for relief (the "**Involuntary Petition**") under Chapter 11 of the Bankruptcy Code was filed against Aliera in the United States Bankruptcy Court for the District of Delaware (the "**Delaware Court**") by Class Representatives in the *Jackson* and *Albina* lawsuits who had obtained final judgments. On December 21, 2021, a voluntary Chapter 11 petition was filed in the United States Bankruptcy Court for the Northern District of Georgia (the "**Georgia Court**") by Aliera, as well as by each of the other Debtors.

On or about December 21, 2021, the following motions were filed with the Delaware Court (collectively, the "**Venue Motions**") *Motion to Transfer Venue Pursuant to 28 U.S.C. § 1412 and Fed. R. Bankr. P. 1014* [Dkt. No. 17] filed by Aliera and the *Petitioning Creditors' Motion to Transfer Venue of the Later-Filed Voluntary Bankruptcy Cases of the Aliera Companies Inc. and Its Four Affiliates* [Dkt. No. 18]. On December 29, 2021, Aliera filed a *Motion to Dismiss Involuntary Petition* [Dkt. No. 21] (the "**Motion to Dismiss**"). On January 25, 2022, the Delaware Court entered an Order on the Venue Motions transferring venue of the voluntary cases filed by

5

the Debtors in the Georgia Court to the Delaware Court. Subsequently, Aliera withdrew its Motion to Dismiss and consented to entry of an order for relief under Chapter 11 in connection with the Involuntary Petition. On February 16, 2022, an Order was entered by the Delaware Court consolidating the two Aliera cases, with Case No. 21-11548-JTD being the surviving case, and ordering that the cases be jointly administered [Dkt. No. 75].

No trustee or examiner has been appointed in these Chapter 11 Cases. No request has been made for the appointment of a trustee or examiner. The Committee was appointed on February 21, 2022.

The Debtors each filed their Schedules on April 29, 2022. These Schedules provide information concerning each Debtor's financial condition on or about the Petition Date. These documents are available from the Office of the Clerk of the U.S. Bankruptcy Court for the District of Delaware and are online at https://ecf.deb.uscourts.gov (please note that a PACER account is required to view and download documents), or free of charge at https://dm.epiq11.com/case/aliera/info.

An initial Section 341 meeting of creditors for each Debtor was held on March 14, 2022. Those meetings were continued to and concluded on May 17, 2022.

### 2.4    Significant Events During Chapter 11

A number of substantive applications and motions have been filed, orders entered, and/or other actions taken over the course of these Chapter 11 Cases, which are summarized below:

- ***Retention of Chief Liquidation Officer***. On March 1, 2022, the Court entered an Order [Dkt. No. 112] approving the Debtors' retention of GGG Partners, LLC, to provide the services of Katie S. Goodman as Chief Liquidation Officer of the Debtors. Since her appointment, Ms. Goodman has been primarily responsible for overseeing the managing the Debtors performance of its administrative and other obligations through the Chapter 11 process.

- ***Retention of Debtor Professionals***. On March 14, 2022, the Court entered Orders [Dkt. Nos. 133 & 134] authorizing the Debtors to retain the law firms of Scroggins & Williamson, P.C. and Monzack Mersky and Browder, PA. as Chapter 11 counsel for the Debtors. On April 25, 2022, the Court entered an Order [Dkt. No. 187] authorizing the Debtors' retention of SeatonHill Partners, LP, as financial advisors to the Debtors.

- ***Retention of Committee Professionals***. On April 14, 2022, the Court entered an Order [Dkt. No. 174] authorizing the Committee to retain the law firm of Greenberg Traurig, LLP. On July 20, 2022, the Court entered an Order [Dkt. No. 290] authorizing the Committee's retention of B. Riley Advisor Services, as financial advisors to the Committee.

- ***Bar Date Motion***. Pursuant to the *Motion of Debtors For Entry of Order Pursuant to Bankruptcy Code Sections 105(a), 501, 502, 503, and 1111(a), Bankruptcy Rules 2002 and 3003(C)(3), and Local Rules 1009-2 and 2002-1(e) (I) Establishing Bar Dates For*

6

*Filing Claims Against the Debtors and (II) Approving Form And Manner Of Notice Thereof* [Dkt. No. 222], the Court entered an Order on July 20, 2022 [Dkt. No. 292], which, among other things, established August 30, 2022 as the general bar date for filing proofs of claims.

- ***Adversary Proceeding Against Burdette Atlanta and Shelley Steele***.  On July 22, 2022, the Committee filed its *Motion Of Official Committee Of Unsecured Creditors For An Order Authorizing The Committee To Pursue Certain Claims On Behalf Of The Debtors' Estates Against Insiders* [Dkt. No. 303] (the "***Standing Motion***").   The Standing Motion was granted by Order entered on July 27, 2022 [Dkt. No. 316]. Thereafter, on July 27, 2022, the Committee filed a Complaint initiating Adversary Proceeding No. 22-50400  against Burdette Atlanta, LLC, and Aliera's CEO, Shelley Steele.  In the Adversary Proceeding, the Committee, *inter alia*, seeks to recover certain alleged fraudulent transfers amounts owed on loans from Aliera to Steele.   The adversary proceeding is currently pending and has not been resolved.

- ***Settlement with ROC III Fairlead Embassy Row Owner, LLC.***  On August 15, 2022, the Court entered an Order [Dkt. No. 332] approving a settlement between Aliera and one of its landlords, ROC III Fairlead Embassy Row Owner, LLC, which, *inter alia*, authorized the landlord to take possession of certain personal property of Aliera located at the leased premises in return for a credit against the landlord's claims under the lease.

- ***Ongoing Litigation and Investigations by the Committee and Certain Governmental Entities.***  During the Chapter 11 Cases the Debtors and their professionals have been required to spend a substantial amount of time responding to subpoenas and/or requests for information from the Committee and its professionals, as well as various governmental entities investigating Aliera and/or certain former officers and employees.  Additionally, separate lawsuits were filed post-petition against one or more of the Debtors by The State of California and the U.S. Department of Labor seeking injunctive and/or restitutionary relief.  The plaintiffs in those actions contend that the actions come within the "police and regulatory power" exception to the automatic stay under 11 U.S.C. § 362(b)(4).  As a result, Aliera has been required to appear through counsel in such actions to protect the interests of the Debtors' Estates.

### 2.5    Certain Federal Income Tax Consequences.

The confirmation and execution of the Plan may have tax consequences to Holders of Claims and Equity Interests.  The Plan Proponents do not offer an opinion as to any federal, state, local, or other tax consequences to Holders of Claims and Equity Interests as a result of the confirmation of the Plan.  All Holders of Claims and Equity Interests are urged to consult their own tax advisors with respect to the federal, state, local, and foreign tax consequences of the Plan. This Plan is not intended, and should not be construed, as legal or tax advice to any Creditor, Equity Interest Holder, or other party in interest.

### 2.6    Alternate Plan.

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different plan. However, the additional costs, which may constitute Administrative Claims may be so significant that one or more parties in interest could request that the Chapter 11 Cases be converted to chapter 7. Accordingly, the Plan Proponents believe that the Plan enables creditors to realize the best return under the circumstances.

The Plan incorporates the Unsecured Creditor Settlement negotiated by and among the Debtors, the Committee, the Sharity Trustee, and Unity Class Representatives, on behalf of the Unity Members, described more particularly below in <u>Section 8.8</u> of the Plan. It is contemplated that the Unsecured Settlement shall be approved in connection with the Confirmation of the Plan. Among other things, it provides for distributions from the Trust to Holders of Class 3 Unsecured Trade Claims and Class 4 Unsecured Medical Claims under the Plan pursuant to a distribution waterfall negotiated by the parties. The Unsecured Creditor Settlement fixes and allows the Class 4 Unsecured Medical Claims, comprised of the Sharity Trust Claim and the Unity Member Class Claim, in a total amount of $660,667,598. The total amount of Allowed Unsecured Trade Claims in Class 3 under the Plan is not fixed, but the Plan Proponents estimate these will range from $10,000,000 to $15,000,000. The proposed waterfall distribution provides that the first $2,500,000 in Available Cash will be distributed to Class 3, and the next $6,000,000 in Available Cash will be distributed to Class 4. Available Cash after that will be distributed pursuant to negotiated percentages as described in Section 8.8.

Because the total Allowed Unsecured Medical Claims is significantly larger than the projected total amount of Allowed Unsecured Trade Claims, it is likely that the percentage recovery by the underlying Class 4 claimants represented by the Sharity Trust and Unity Class Representatives will be less than the recovery to the Unsecured Trade claimants. However, the Plan Proponents, with the support by the Sharity Trust and the Unity Class Representatives, believe the proposed distribution scheme to be effectuated under the Unsecured Creditors Settlement is fair and equitable to both classes of Unsecured Creditors for several reasons. First, absent the settlement it is likely that a significant portion of the Trust Assets would be consumed with litigating issues related to determining liability and damages in connection with the pending Sharity Adversary Proceeding and an objection to the Unity Class POC and opposing the Unity Class Certification Motion. In contrast, there would be few or no grounds to dispute liability or the amount of most of the Unsecured Trade Claims filed in these Chapter 11 Cases, since they are primarily contractual in nature. The Unsecured Creditor Settlement resolves a number of highly contested Claim allowance issues and allows the Liquidating Trustee to focus its attention on maximizing the value of Trust Assets.

### 2.7    Best Interests Test and Liquidation Analysis.

As described above, section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Claim or Equity Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. The Debtors estates currently have approximately $5,000,000 in cash on hand generated primarily from income tax refunds received during the Chapter 11 Cases. The Debtors' other remaining assets consist

8

primarily of Causes of Action and Claims, including, without limitation, Claims against (a) former insiders and entities owned or controlled by them, (b) persons and entities with whom the Debtors had contracts and/or did business, and (c) professionals who performed pre-petition services for the Debtors.

The value of any distributions if the Debtors' Chapter 11 Cases were converted to a case under Chapter 7 of the Bankruptcy Code would be less than the value of Distributions under the Plan. This is due in large part to the fact that conversion of the Chapter 11 Cases to chapter 7 cases would require the appointment of a chapter 7 trustee, and in turn, such chapter 7 trustee's likely retention of new professionals. The "learning curve" that the trustee and new professionals would be faced with comes at a significant cost to the Estates and with a significant delay compared to the time of distributions under the Plan (and prosecution of Causes of Action). Worse still, a chapter 7 trustee would be entitled to significant fees relating to the distributions of the already monetized assets made to creditors. Accordingly, a portion of the cash currently available for Distribution to Holders of Claims would instead be paid to the chapter 7 trustee.

As a result, the Plan Proponents believe that the Estates would have fewer funds to be distributed in a hypothetical chapter 7 liquidation than they would if this Plan is confirmed, and therefore Holders of Claims in all Impaired Classes will recover less than in the hypothetical chapter 7 cases. Accordingly, the Plan Proponents believe that the "best interests" test of Bankruptcy Code Section 1129 is satisfied.

Attached hereto as **Exhibit 2** is a Liquidation Analysis showing the projected return under the proposed Plan versus a projected return under a hypothetical distribution under Chapter 7.

**SECTION 3.   TREATMENT OF ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, U.S. TRUSTEE FEES, AND PROFESSIONAL FEES**

**3.1     Administrative Claims**.

In accordance with Bankruptcy Code Section 1123(a)(1), Administrative Claims have not been classified and are treated as described in this **Section 3**. Except as otherwise provided in this Plan, each Person holding an Allowed Administrative Claim shall receive Cash equal to the unpaid portion of such Allowed Administrative Claim as soon as practicable after the later of: (a) the Effective Date; (b) the date on which such Person becomes the Holder of such an Allowed Administrative Claim; or (c) the date or dates when that Claim is payable by its terms, consistent with past practice. To the greatest extent possible, Allowed Administrative Claims shall be paid from Existing Debtor-Held Funds.

**3.2     Administrative Claims Bar Date**.

Requests for payment of Administrative Claims (other than Fee Claims and claims for tax liabilities arising after the Petition Date) must be filed and served on the Debtors no later than the first Business Day that is thirty (30) days after service of notice of the Effective Date (the "***Administrative Claims Bar Date***"), which notice shall set forth the Administrative Claims Bar Date. Holders of Administrative Claims (other than Fee Claims) that do not file requests for the allowance and payment thereof on or before the Administrative Claims Bar Date shall forever be barred from asserting such Administrative Claims against the Debtors, their Estates or the Trust,

9

absent Bankruptcy Court order to the contrary.  Objections to each such Claims may be filed in accordance with the Bankruptcy Rules.  The Court shall determine whether all such Administrative Claims should be Allowed Claims.  Administrative Claims for tax liabilities shall be paid by the Debtors in the ordinary course of business.

### 3.3     Priority Tax Claims.

In accordance with Bankruptcy Code Section 1123(a)(1), Priority Tax Claims have not been classified and are treated as described in this **<u>Section 3</u>**.  Each Person holding an Allowed Priority Tax Claim shall receive, as determined by the Trustee in his sole discretion:  (a) payment in Cash in full on the later of the Effective Date or the date such Claim becomes an Allowed Claim; or (b) Cash over a period not exceeding five (5) years after the date of assessment of such Claim, with interest at a rate consistent with Bankruptcy Code Section 511, in periodic payments, having the value of such Claim as of the Effective Date.  No Claim for or demand for any penalty relating to any Priority Tax Claim other than a penalty of the type specified in Bankruptcy Code Section 507(a)(8)(G) shall be Allowed, and the Holder of an Allowed Priority Tax Claim shall not assess or attempt to collect a penalty from the Estates or any of the Assets other than a penalty of the type specified in Bankruptcy Code section 507(a)(8)(G).  To the greatest extent possible, Allowed Priority Tax Claims shall be paid from Assets available for payment of Priority Tax Claims.

### 3.4     U.S. Trustee Fees.

All U.S. Trustee Fees due and payable prior to the Effective Date shall be paid by the Debtors on the Effective Date.  After the Effective Date, all U.S. Trustee Fees shall be paid when due and payable by the Liquidating Trustee on behalf of the Consolidated Estate.  The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR.  After the Effective Date, the Liquidating Trustee shall file with the Bankruptcy Court on behalf of the Consolidated Estate separate UST Form 11-PCR reports when they become due. The Liquidating Trust shall remain obligated to pay U.S. Trustee Fees to the Office of the U.S. Trustee on behalf of the Consolidated Estate until the Chapter 11 Cases are closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.  The U.S. Trustee shall not be required to file any Administrative Claim in the case, and shall not be treated as providing any release under the Plan.

### SECTION 4.  SUMMARY OF TREATMENT OF CLAIMS AND ESTIMATED RECOVERIES

The following chart provides a summary of treatment of each Class of Claims (other than Administrative and Priority Tax Claims) and an estimate of the recoveries of each class.  The treatment provided in this chart is for information purposes only and is qualified in its entirety by Section 5 of this Combined Plan and Disclosure Statement.

| Class | Estimated Allowed Claims | Treatment | Estimated Recovery to Holders of Allowed Claims[2] |
|---|---|---|---|
| Administrative Claims | $800,000 | Will receive payment in full for any unpaid Allowed Claims as soon as practicable after the later of: (a) the Effective Date; (b) the date on which such Claim is Allowed; or (c) the date or dates when that Claim is payable by its terms, consistent with past practice. | 100% |
| Class 1 – Other Secured Claims | $0.00 | Will receive either (a) the net proceeds, if any, of the sale or other disposition of the Assets in which such other Secured Claim has a lien, on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Claim becomes Allowed; or (b) if still in the Debtors' possession or control, the return of the property subject to the senior, perfected, non-avoidable, and indefeasible lien or security interest securing such Holder's Allowed Secured Claim. | 100% |
| Class 2 – Unsecured Priority Claims | $0.00 | Will receive payment in full on the later of (a) the Effective Date; or (b) the date on which such Person becomes the Holder of such an Allowed Unsecured Priority Claim. | 100% |

---

[2] The estimated percentage recovery is based upon, among other things, an estimate of the Allowed Claims in the Chapter 11 Cases. The actual amount of the Allowed Claims may be greater or lower than estimated. Thus, the actual recoveries may be higher or lower than projected depending upon, among other things, the amounts and priorities of Claims that are actually Allowed by the Bankruptcy Court.

11

| Class | Estimated Allowed Claims | Treatment | Estimated Recovery to Holders of Allowed Claims[2] |
|---|---|---|---|
| Class 3 – Unsecured Trade Claims | $10,000,000 to $15,000,000 | Will receive a *pro rata* share of UTC Cash available after payment of or reserve for Allowed Claims on the later of:  (a) the date or dates determined by the Liquidating Trustee, to the extent there is Cash available for distribution in the judgment of the Liquidating Trustee, having due regard for the anticipated and actual expenses, and the likelihood and timing, of the process of liquidating or disposing of the Assets; and (b) the date on which such Claim becomes Allowed. | 15 – 35% |
| Class 4 – Unsecured Medical Claims | $660,667,598 | Will receive a *pro rata* share of UMC Cash available after payment of or reserve for Allowed Claims on the later of:  (a) the date or dates determined by the Liquidating Trustee, to the extent there is Cash available for distribution in the judgment of the Liquidating Trustee, having due regard for the anticipated and actual expenses, and the likelihood and timing, of the process of liquidating or disposing of the Assets; and (b) the date on which such Claim becomes Allowed. | 1 - 5% |
| Class 5 – Subordinated Governmental Claims | Exceeds $225,000,000 | Will be subordinated and will not receive payment until Allowed Claims in Classes 3 and 4 have been paid in full | 0% |
| Class 6 – Insider Claims | $2,298,479 | Will receive no distributions. | N/A |
| Class 7 – Equity Interests | | Will receive no distributions and retain no equity interests. | N/A |

Approximately 235 proofs of claim have been filed in the Chapter 11 Cases.   The Debtors estimate that their non-priority, Unsecured Claims, in the aggregate, will total (a) approximately $10,000,000 to $15,000,000, in Class 3, and (b) $660,667,598, in Class 4.   The Debtors and

Resp. Appx, p. 334                                    Ex. 1.41, p. 18 of 57

Appx. Vol X
A-478