No. 25-1035

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

ALLIANCE OF HEALTH CARE SHARING MINISTRIES
*Plaintiff-Appellant*

v.

MICHAEL CONWAY,
in his official capacity as
Commissioner of the Colorado Division of Insurance
*Defendant-Appellee*

Appeal from the United States District Court for the District of Colorado,
No. 1:24-cv-01386-GPG-STV (Hon. Gordon Gallagher)

**APPENDIX VOL XIV - Pages A-613 – A-682**

Date: March 21, 2025

Michael F. Murray
Paul Hastings LLP
2050 M Street, NW
Washington, D.C. 20036
(202) 551-1730
michaelmurray@Paulhastings.Com
William E. Mahoney
Paul Hastings LLP
600 Travis Street, Fifty-Eighth Floor
Houston, Texas 77002
(713) 860-7304
williammahoney@Paulhastings.Com

*Counsel For Plaintiff Alliance of
Health Care Sharing Ministries*

| ECF NO. | *DESCRIPTION* | Appx. Page No. |
|---|---|---|
| **Appendix Vol. I, Pages 1-140** | | |
| - | District Court Docket Sheet | A-1 |
| 8-1 | Ex. A - Declaration of Rob Waldo (May 17, 2024) | A-9 |
| 8-2 | Ex. A-1 – Samaritan Bylaws | A-19 |
| 8-3 | Ex. A-2 - Samaritan Guidelines | A-44 |
| 8-4 | Ex. A-3 - Samaritan Membership Application | A-94 |
| 8-5 | Ex. B - Declaration of Katy Talento | A-100 |
| 32 | Amended Complaint of Alliance of Health Care Sharing Ministries (July 1, 2024) | A-109 |
| **Appendix Vol. II, Pages 141-179** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1-1.6 (September 3, 2024) | A-141 |
| **Appendix Vol. III, Pages 180-223** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.7-1.22 (September 3, 2024) | A-180 |
| **Appendix Vol. IV, Pages 224-261** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.23-1.28 (September 3, 2024) | A-224 |
| **Appendix Vol. V, Pages 262-307** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.29-1.33 (September 3, 2024) | A-262 |

| | **Appendix Vol. VI, Pages 308-331** | |
|---|---|---|
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.34-1.36 (September 3, 2024) | A-308 |
| | **Appendix Vol. VII, Pages 332-350** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.43-1.54 (September 3, 2024) | A-332 |
| | **Appendix Vol. VIII, Pages 351-373** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.37-1.39 (September 3, 2024) | A-351 |
| | **Appendix Vol. IX, Pages 374-424** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.40-1.40 (September 3, 2024) | A-374 |
| | **Appendix Vol. X, Pages 425-478** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.40-1.41 (September 3, 2024) | A-425 |
| | **Appendix Vol. XI, Pages 479-541** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.41-1.42 (September 3, 2024) | A-479 |
| | **Appendix Vol. XII, Pages 542-573** | |

| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.43-1.54 (September 3, 2024) | A-542 |
|---|---|---|
| **Appendix Vol. XIII, Pages 574-612** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.54-1.59 (September 3, 2024) | A-574 |
| **Appendix Vol. XIV Pages 613-682** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.6-1.6 (September 3, 2024) | A-613 |
| **Appendix Vol. XV, Pages 683-767** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.61-1.64 (September 3, 2024) | A-683 |
| **Appendix Vol. XVI, Pages 768-816** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 2.0-2.3 (September 3, 2024) | A-768 |
| **Appendix Vol. XVII, Pages 817-867** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 2.3-2.4 (September 3, 2024) | A-817 |
| **Appendix Vol. XVIII, Pages 868-933** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 2.5-7 (September 3, 2024) | A-868 |

| | **Appendix Vol. XIX, Pages 934-1002** | |
|---|---|---|
| 52.1 | Appendix to Reply to Motion for Preliminary Injunction (September 17, 2024) | A-934 |
| 54 | Order Denying the Alliance's Motion for a Preliminary Injunction (January 13, 2025) | A-949 |
| | **Appendix Vol. XX, Pages 1003-1041** | |
| 54 | Order Denying the Alliance's Motion for a Preliminary Injunction (January 13, 2025) | A-1003 |
| 55 | Notice of Appeal as to Order on Motion for Preliminary Injunction (January 27, 2025) | A-1015 |
| 58-1 | Motion for Order to Grant Injunction Pending Appeal (January 28, 2025) | A-1017 |
| | **Appendix Vol. XXI, Pages 1042-1077** | |
| 58-1 | Motion for Order to Grant Injunction Pending Appeal (January 28, 2025) | A-1042 |
| 60 | Order Denying Motion for Injunction Pending Appeal (February 3, 2025) | A-1069 |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

ROCHELLE GLASGOW                               )
1408 Cooper Street                                   )          CASE NO: _____
Missoula, MT  59802                               )
                                                              )
WILLIAM ROOKER                                )
1391A Washington Drive                         )          JUDGE: _____
Annapolis, MD 21403                             )
                                                              )
DONNA LANDRY                                  )          **COMPLAINT WITH CLASS**
2408 Division Street, N.W.                       )          **ACTION ALLEGATIONS AND**
Olympia WA  98502                               )          **REQUEST FOR RESTITUTION,**
                                                              )          **TEMPORARY, PRELIMINARY**
BONNIE SUE MARTIN                           )          **AND PERMANENT INJUNCTIVE**
418 Cranes Roost Court                           )          **RELIEF, REMOVAL OF**
Annapolis, MD  21409                            )          **TRUSTEES, AND COSTS**
                                                              )
          Named Plaintiffs,                )
                                                              )          ***Jury Demand Endorsed Hereon***
and                                                          )
                                                              )
STATE OF OHIO, ex rel. DAVE YOST,    )
ATTORNEY GENERAL OF OHIO          )
30 E. Broad Street, 14th Floor                  )
Columbus, OH  43215                             )
                                                              )
          Nominal Plaintiff                )
                                                              )
vs.                                                          )
                                                              )
DANIEL J. BEERS                                  )
4330 Butterbridge Road                           )
North Lawrence, OH  44666                    )
                                                              )
RONALD BEERS                                   )
4330 Butterbridge Road                           )
North Lawrence, OH  44666                    )
                                                              )
DANIEL BEERS, JR.                              )
4330 Butterbridge Road                           )
North Lawrence, OH  44666                    )
                                                              )
_____   )

(Caption page continued on next page)

EXHIBIT
**1.60**

Ex. 1.60, p. 1 of 70

BENJAMIN "BENNIE" BEERS )
4502 Butterbridge Road )
North Lawrence, OH  44666 )
)
RACHEL BEERS )
11323 Braddock St NW )
Canal Fulton, OH  44614 )
)
DRUZILLA J. ABEL ("DRUDY") )
8522 Saybrook Ave., NW )
North Canton, OH  44720 )
)
PAMELA K. JOHNSON )
242 Dunn Street )
Barberton, OH  44203 )
)
THOMAS FABRIS )
4438 Point Comfort Drive )
New Franklin, OH  44319 )
)
BRANDON FABRIS )
8849 Mudbrook Street, N.W. )
Massillon, OH  44646 )
)
DOUGLAS D. BEHRENS )
P.O. Box 5157 )
Akron, OH  44334 )
)
DALE E. BELLIS )
9688 Hocking St., NW )
Massillon, OH  44643 )
)
MATT BELLIS )
18 Deep Hallow Lane )
Lancaster, PA  17603 )
)
Individual Defendants, )
)
and )
)
LIBERTY HEALTHSHARE, INC. )
4845 Fulton Drive, N.W. )
Canton, OH  44718 )
)
_____ )

(Caption page continued on next page)

*ALSO SERVE STATUTORY AGENT*:      )
                )
STEPHEN FURST          )
4455 Hills And Dales Road, N.W.  )
Canton, OH  44708       )
                )
THE MEDICAL COST SAVINGS SOLUTION, LTD )
D/B/A MEDCOST SOLUTIONS, LLC ("MCS") )
4786 Dressler Rd. NW, Ste. 101  )
Canton, OH  44718       )
                )
*ALSO SERVE STATUTORY AGENT*:      )
                )
THOMAS A. FABRIS      )
4786 Dressler Rd. NW, Ste 101   )
Canton, OH  44718       )
                )
COST SHARING SOLUTIONS, LLC ("CSS") )
2824 Woodlawn Ave.     )
Canton, OH  44708       )
                )
*ALSO SERVE STATUTORY AGENT*:      )
                )
BRANDON FABRIS       )
3465 S. Arlington Rd., Ste E119  )
Akron, OH  44312        )
                )
SAVNET INTERNATIONAL, LLC ("SAVNET") )
P.O. Box 5157         )
Fairlawn, OH  44334     )
                )
*ALSO SERVE STATUTORY AGENT*:      )
                )
THOMAS F. HASKINS, JR.   )
430 White Pond Dr., Ste 200   )
Akron, OH  44320        )
                )
      Corporate Defendants    )
                )
                )

Plaintiffs, William Rooker, Rochelle Glasgow, Donna Landry and Bonnie Martin ("Plaintiffs"), by and through the undersigned attorneys, hereby submit this Complaint (the "Complaint") seeking to remedy the Defendants' misconduct alleged herein.  Plaintiffs make the allegations within this Complaint based upon personal knowledge as to themselves and with respect to the remainder of the allegations, based upon discussions with and on the reliance of their counsel, including the pre-suit investigation conducted by counsel, which included Defendants' filings with the Ohio Secretary of State, filings in legal and governmental actions, conference calls, announcements, press releases, the Company's web site, government and regulatory investigations, and other information.

## NATURE OF THE CASE

1.     Charitable organizations play a critical role in strengthening communities throughout Ohio.  They often take on noble causes and harness the energy and commitment of donors and volunteers in support of their important missions.  Making positive contributions to society as a whole by helping lead a charitable organization carries great rewards.  But it also carries great responsibilities.  In exchange for the favorable tax arrangements granted to charities, these organizations must take care to use their resources in support of a charitable purpose. However, sometimes those efforts are thwarted by theft, fraud, and a lack of serious attention to the operations and governance of those organizations.  When charities fail to act responsibly, the entire community suffers because resources are not directed to help the individuals and causes that should be benefitting.  And other nonprofit organizations often suffer because their donors and volunteers wonder if their contributions are being used appropriately.  Consequently, the regulation of nonprofits is essential to donors, volunteers, granting agencies, the community, and

1

other nonprofits.  Charity regulations help prevent fraud, provide confidence for donors and create legal mechanisms to ensure funds are not used for personal gain.

2.      Liberty HealthShare, Inc. ("Liberty") and the affiliated entities and individuals named as Co-Defendants herein stand alone in a way no nonprofit organization in Ohio ever should: by hatching a brazenly reprehensible scheme to sell and administer illegal health insurance to Plaintiffs and thousands of other individuals across the country under the guise of bona fide, faith-based healthcare sharing ministry ("HCSM") plans exempt from governmental oversight and income taxation.  The icing on the cake?  *These plans promise to deliver all the benefits of traditional health insurance at a fraction of the cost*.

3.      At least the defendants knew right when to strike.  In the face of skyrocketing health insurance costs, more Americans looked to HCSMs as an alternative to traditional health insurance plans.  HCSM membership in general has grown from a mere 200,000 individuals ten years ago to over 1,000,000 enrolled members today.  While HCSMs purport to be anything other than health insurance plans, many, including Liberty, appear to look and operate as much like health insurance as possible.

4.      Despite HCSMs having all the trappings of health insurance in appearance and in function, there are some very important differences, primarily being that HCSMs do not have to abide by laws governing insurance products.  This means that there is nothing to stop HCSMs from denying coverage based on pre-existing conditions and treatment for conditions considered essential under the Affordable Healthcare Act ("ACA").  Furthermore, HCSMs can deny coverage for nearly anything based on "morality."[1]

---

[1]  *Health Care Sharing Ministries: Last Week Tonight with John Oliver*, HBO (Jun. 28, 2021), https://www.youtube.com/watch?v=oFetFqrVBNc (where John Oliver discusses health care issues in the U.S. and how HCSMs allegedly cheat members out of health care coverage and use

2

5.      Plaintiffs allege that, through this scheme, they and the other Class Members (defined below) were charged significant monthly insurance premiums, but that Liberty, in violation of federal and state law, refused to pay for what should have otherwise been covered medical procedures and bills, thereby reaping massive profits at Plaintiffs' and the other Class Members' expense.

6.      On John Oliver's *Health Care Sharing Ministries* episode of *Last Week Tonight*, Defendant Dale E. Bellis ("Bellis") appeared in a video segment entitled "Will my bills be paid?" stating "[w]e've had a successful history of sharing medical bills 100% for every eligible need ever submitted. . . . [s]o it doesn't depend upon a written contract where we can sue each other if someone doesn't send the share amount, it's really a contract written on our hearts."[2]  Because Liberty has the discretion to deem any need ineligible, Defendant Bellis's assertion is at best, illusory.

7.      Liberty's scheme is simple in concept.  As a registered non-profit 501(c)(3) business and self-proclaimed faith-based "cost-sharing" agent for the payment of medical expenses, Liberty portrays the illegal health insurance it sells as HCSM plans—even though Liberty and the plans plainly do not meet the requirements under federal and state law for HCSMs—in an illegal scheme devised to avoid otherwise applicable federal and state law, including limitations on the percentage of premiums that can be diverted to purposes other than the payment of benefits.  Indeed, Liberty is ostensibly one of the few non-profit businesses

---

funds to line their own pockets in a predatory fashion, mentioning Liberty and Defendant Dale Bellis specifically).

[2] *Id.*

3

nationwide that has been able to procure exemption from federal and state insurance regulations while avoiding strict oversight from insurance regulators.

8.    Liberty's scheme has proven to be an extremely lucrative—but illegal—arrangement by which its principals have amassed millions of dollars in illegal profits.  Rather than pay the covered medical procedures and bills incurred by Plaintiffs and the other Class Members which it was required to do, Liberty funneled much of the money collected as premiums or "contributions" to itself and its principals through the affiliated for-profit entity defendants so as to further circumvent and violate federal and state law limiting the distributions, profits, and compensation paid to non-profit principals.

9.    As of the filing of this complaint, Liberty claims to serve over 80,000 households, totaling more than 230,000 individuals nationwide.  What makes Liberty stand apart from its competitors in a way no organization should, however, is its blatant, knowing violations of its fiduciary and corporate duties for its own benefit and the benefit of its principals, year-after-year, with relative ease.  On June 9, 2020, News 5 Cleveland reported nearly 170 complaints had been filed with the Ohio Attorney General and almost 800 with the Better Business Bureau ("BBB") (over 600—82%--in the last six months) with the vast majority concerning rejected claims.[3]  Until recently, HCSM members have little recourse other than filing BBB complaints in their respective states.

10.    In *LeCann et al v. The Aliera Companies, Inc.*, U.S. District Judge Amy Totenberg denied a purported HCSM provider defendant's motion to dismiss a class action complaint,

---

[3]    Walsh, J. (2020, June 8). Warning about alternative health plan, company "working" on payments.      News      5      Cleveland;      Scripps      Media,      Inc. https://www.news5cleveland.com/rebound/warning-about-alternative-health-plan-company-working-on-payments (last visited Sept. 16, 2021).

4

finding, among other things, that a HCSM provider was selling illegal and unlicensed health insurance plans.  Civil Action No. 1:20-cv-02429 (N.D. Ga. Jun. 22, 2021) (interpreting Georgia statutes that essentially duplicate the Virginia statutes at issue in this action).  Indeed, through similar actions filed throughout the U.S., the truth regarding these organizations' predation on economically vulnerable groups is finally emerging and gaining national attention.

## **JURISDICTION**

11.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiffs and the Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

12.      This Court also has jurisdiction over all causes of action asserted herein pursuant to 18 U.S.C. § 1961 et seq., 28 U.S.C. § 1331, the Class Action Fairness Act, 28 U.S.C. § 1332(d), and 28 U.S.C. § 1367.  Upon information and belief, the matter in controversy exceeds $5 million exclusive of interest and costs and this matter is a class action in which certain Class Members are citizens of states other than certain Defendants' state of residence.

13.      This Court has jurisdiction over all Defendants because each Defendant is either an individual who resides within this District or is an entity that conducts business and maintains operations in this District, and/or has sufficient minimum contacts with Ohio so as to render the exercise of jurisdiction by the Ohio courts permissible under traditional notions of fair play and substantial justice.

14.      Venue in this Court is proper pursuant to 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391. A substantial portion of the transactions and wrongs complained of herein occurred in this District, and Liberty, CSS and MCS maintain their corporate headquarters in this District.

## THE PARTIES

*Plaintiffs*

15.     Plaintiff Rochelle Glasgow ("Glasgow") is an individual residing in Missoula, Montana.  Glasgow became a Liberty member in approximately January of 2017 and terminated her membership in approximately May of 2021.  During that time, Glasgow's required monthly contribution increased from $199 ($500 deductible) to $399 ($1,000 deductible).

16.     Plaintiff William Rooker ("Rooker") is an individual residing in Annapolis, Maryland.  Rooker became a Liberty member in approximately January of 2018 and remains a member as of the filing of this complaint.  During that time, Rooker's required monthly contribution increased from $199 ($500 deductible) to $399 ($1,000 deductible).

17.     Plaintiff Donna Landry ("Landry") is an individual residing in Olympia, Washington.  Landry became a Liberty member in approximately January of 2016 and terminated her membership in approximately March of 2020.  During that time, Landry's required monthly contribution increased from $191 ($500 deductible) to $241 ($1,000 deductible).

18.     Plaintiff Bonnie Sue Martin ("Martin") is an individual residing in Annapolis, Maryland.  Martin became a Liberty member in approximately the spring of 2018 and terminated her membership in approximately July of 2020.  During that time, Martin's required monthly contribution increased from $149 ($1,000 deductible) to (the best of her recollection) $245 ($1,500 deductible).

*Corporate Defendants*

19.     Defendant Liberty HealthShare, Inc. (formerly the Mindala Family Foundation) is an Ohio registered trademark of Gospel Light Mennonite Church Medical Aid Plan, Inc. ("Gospel Light"), a Virginia non-profit corporation with its principal place of business in Ohio.

6

20.     Defendant The Medical Cost Savings Solution, Ltd. d/b/a Medcost Solutions, LLC ("MCS") is an Ohio for-profit limited company that is affiliated with Liberty.  MCS holds itself out as leading the health sharing industry in providing superior service for claim repricing, balance bill advocacy, and self-pay patient legal support.

21.     Defendant Cost Sharing Solutions, LLC ("CSS") is an Ohio for-profit limited liability company founded by Defendants Daniel J. Beers, Jr. and Brandon Fabris.  CSS manages client sales campaigns by serving as a call center sales and support hub. CSS also provides other marketing services, such as radio broadcasting, search engine marketing, etc. to Liberty.

22.     Defendant SavNet International, LLC ("SavNet") is an Ohio based for-profit limited liability company founded by Douglas Behrens, one of Liberty's founders.  SavNet holds itself out as a pharmacy and prescription discount program and was one of Liberty's service providers.  In fact, SavNet's website is http://savnet4liberty.com.  In fact, if a member wished to cancel their enrollment in SavNet, then she would need to do so "in writing, notify SavNet at P.O. Box 5157 Fairlawn, OH  44334 or by calling 1-855-58-LIBERTY (1-855-585-4237)."[4]   This phone number is actually a phone number to contact Liberty.

***Individual Defendants***

23.     Defendant Daniel J. Beers is, upon information and belief, an individual residing in the State of Ohio, County of Stark.  He is also Defendants Daniel J. Beers, Jr., Bennie Beers, Ron Beers, and Rachel Beers' father and Liberty Board of Directors (the "Board") member Drudy Abel's brother.  Because Defendant Daniel J. Beers exerted *de facto* control over Liberty's

---

[4]  *See* Disclosures. SavNet Health Savings Program. http://savnet4liberty.com/disclosures/ (last visited Sep. 22, 2021).

7

day-to-day and financial transactions, he owed Liberty, its members, Plaintiffs, and putative Class Members a fiduciary duty of care and loyalty at all relevant times.

24.     Defendant Ronald Beers is, upon information and belief, an individual residing in the State of Ohio, County of Stark.  He is Defendant Daniel J. Beers' son, brother to Defendants Daniel Beers, Jr., Bennie Beers, and Rachel Beers, and Board member Drudy Abel's nephew. Defendant Ronald Beers is also an employee of Defendant CSS, an affiliated company to Liberty. As such, he owed Liberty, its Members, Plaintiffs, and the putative Class Members a fiduciary duty of care and loyalty at all relevant times.

25.     Defendant Daniel Beers, Jr. is, upon information and belief, an individual residing in the State of Ohio, County of Stark.  He is Defendant Daniel J. Beers' son, brother to Defendants Ronald Beers, Bennie Beers and Rachel Beers, and Board member Drudy Abel's nephew. Defendant Daniel Beers, Jr. also co-owns Defendant CSS, an affiliated company to Liberty.  As such, he owed Liberty, its Members, Plaintiffs, and the putative Class Members a fiduciary duty of care and loyalty at all relevant times.

26.     Defendant Bennie Beers is, upon information and belief, an individual residing in the State of Ohio, County of Stark.  He is also Defendant Daniel J. Beers' son, brother to Defendants Ronald Beers, Daniel Beers, Jr., and Rachel Beers, and Board member Drudy Abel's nephew.

27.     Defendant Rachel Beers is, upon information and belief, an individual residing in the State of Ohio, County of Stark.  She is also Defendant Daniel J. Beers' daughter, and sister to Defendants Ronald Beers, Daniel Beers, Jr. and Bennie Beers, and Board member and CEO Drudy Abel's nephew.

28.     Defendant Druzilla ("Drudy") Abel is, upon information and belief, an individual residing in the State of Ohio, County of Stark. She is also Defendant Daniel J. Beers' sister and aunt to Defendants Ronald Beers, Daniel Beers, Jr., Bennie Beers and Rachel Beers.  Defendant Drudy Abel is a founder of Liberty was an officer and/or director of Liberty.  As such, she owed Liberty, its Members, Plaintiffs, and putative Class Members a fiduciary duty of care and loyalty at all relevant times.

29.     Defendant Pamela K. Johnson is, upon information and belief, an individual residing in the State of Ohio, County of Stark.  She is also Defendant Daniel J. Beers' sister.

30.     Defendant Thomas Fabris is, upon information and belief, an individual residing in the State of Ohio, County of Stark.  He is also Defendant Brandan Fabris' father.  Defendant Thomas Fabris owns Defendant MCS, a single member LLC that is an affiliated company to Liberty.  As such, he owed Liberty, its Members, Plaintiffs, and putative Class Members a fiduciary duty of care and loyalty at all relevant times.

31.     Defendant Brandon Fabris is, upon information and belief, an individual residing in the State of Ohio, County of Stark. He is also Defendant Thomas Fabris' son.  Defendant Brandon Fabris co-owns Defendant CSS, an affiliated company to Liberty.  As such, he owed Liberty, its members, Plaintiffs, and putative Class Members a fiduciary duty of care and loyalty at all relevant times.

32.     Defendant Douglas Behrens is, upon information and belief, an individual residing in the State of Ohio, County of Stark.  He is a former Director of LHS and Defendant Dale Bellis' former business partner.  Defendant Douglas Behrens also owns Defendant SavNet, an affiliated company to Liberty.  As such, he owed Liberty, its members, Plaintiffs, and putative Class Members a fiduciary duty of care and loyalty at all relevant times.

33.     Defendant Dale E. Bellis is, upon information and belief, an individual residing in the State of Ohio, County of Stark.  He was Liberty's CEO until discharged.  Upon information and belief, Defendant Dale Bellis has also been Defendant Daniel J. Beers, Jr.'s life-long friend.

34.     Defendant Matt Bellis is, upon information and belief, an individual residing in the State of Pennsylvania, County of Lancaster.  He was a member of the "Affiliated Enterprises" described hereinbelow at all relevant times.

## FACTUAL ALLEGATIONS

### *Background of Health Care Sharing Ministries*

35.     Health insurance has become a notable economic thorn in the side of citizens across the nation, with the average premium for an individual around $500 a month and the average premium for a family of about $1,500 per month.  These skyrocketing prices have left many individuals and families looking for ways to fit what they consider to be one of life's essential bills into their already tight budgets.  With little relief in sight, those who cannot afford or refuse to pay the high cost of health care began looking for alternatives to help protect their families against both expected and unexpected health expenses.

36.     Among those alternatives are Christian health care plans, also referred to as health care sharing ministries.  Under this type of cost-sharing plan, members—typically those of the same religious faith—make monthly payments that are used to cover the medical bills of others in the group, including themselves, their family, and other members of the health care plan.

37.     The idea behind health care cost-sharing seems to date back at least a century.  For many decades, Amish and Mennonite communities across the U.S. have pooled their money to lighten the burden of debt for individuals during hard times.  In the late 20th Century, this

10

broadened to larger communities by larger cost-sharing ministries within the practicing Christian community.

38.    Most health care sharing ministries are oriented toward practicing Christians and aligned with ideals or principles found in the Christian Bible, primarily translated to mean that believers have a responsibility to assist in meeting each other's needs.  Such ministries often cite a biblical verse in the book of Galatians, from the New Testament, as a mandate applicable to medical costs—specifically Verse 2 in Chapter 6, in which the Apostle Paul wrote, "Bear one another's burdens, and thus fulfill the law of Christ."  Some ministries view verses 44–45 in Chapter 2 of the Book of Acts, also from the New Testament, which states that early Christians "were together and had everything in common" and "gave to anyone as he had need," as the basis for their founding.

39.    A bona fide HCSM plan allows people of a similar religious faith to join together to share responsibility for medical expenses.  By joining and making voluntary contributions, HCSM members have some assurance their medical expenses will be paid for by individuals in the same faith community.

40.    Several states have tried to block health care sharing ministries on the grounds that they are selling unauthorized insurance.  For example, the State of Oklahoma contested Medi-Share in 2007 for marketing information that promoted the cost-sharing option as "insurance," but MediShare changed their approach and reopened in Oklahoma three years later.  A majority of states, however, have enacted safe harbor laws specifying that the ministries are not insurance and do not need to be regulated as such.  In addition, the U.S. Department of Health and Human Services issues exemption letters to ministries that have met the criteria to operate independently of the Affordable Care Act.

11

41.     By the time the U.S. Patient Protection and ACA was passed in 2010, 100,000 people belonged to some type of medical bill-sharing ministry.  By 2014, the number rose to 160,000.  By 2019, it surpassed 1 million people—sharing more than $670 million in medical bills annually.  Members of health care sharing ministries are exempt from the individual mandate requirement of the ACA.  As a result, members of health care sharing ministries are not required to have insurance.

42.     Approximately 30 states have safe harbor laws that distinguish healthcare ministries from health insurance organizations.  But for the statutory exemptions given bona fide, qualified HCSMs, such plans would constitute "insurance" under both federal and Virginia state law.

43.     In order for members to be exempt from the tax penalties outlined in the ACA, 26 U.S.C.A. § 5000A(d)(2)(B)(ii), ministries must meet the following qualifications:

(I) is described in section 501(c)(3) and is exempt from taxation under section 501(a),

(II) members of which share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs and without regard to the State in which a member resides or is employed,

(III) members of which retain membership even after they develop a medical condition,

(IV) which (or a predecessor of which) has been in existence at all times since December 31, 1999, and medical expenses of its members have been shared continuously and without interruption since at least December 31, 1999, and

(V) which conducts an annual audit which is performed by an independent certified public accounting firm in accordance with generally accepted accounting principles and which is made available to the public upon request.

12

44.    Qualified organizations are exempt from various federal and state insurance regulations, such as regulations requiring the provision of minimal essential coverage[5] and regulations limiting the percentage of member premiums that can be diverted to purposes other than payment for medical costs and activities to improve health care quality.[6]

45.    Qualified organizations are also eligible to receive tax-deductible contributions in accordance with Internal Revenue Code section 170.  To qualify, (i) the organization must not be organized or operated for the benefit of private interests, and (ii) no part of a section 501(c)(3) organization's net earnings may inure to the benefit of any private shareholder or individual.  Most germane to this action are the twin prohibitions against (i) knowingly purchasing services from service providers affiliated with the organization and (ii) paying above market rates for their services.  If the organization engages in an excess benefit transaction with a person having substantial influence over the organization, an excise tax may also be imposed on the person and any organization managers agreeing to the transaction.  Finally, to assist the IRS's oversight of charitable activities, the organization must file an annual information return containing certain disclosures.

---

[5]  26 U.S.C. § 5000A(d)(2)(B)(i)-(ii) (explaining that individuals who are members of health care sharing ministries, as defined by the subsection B(ii), are not "applicable individuals" required to maintain minimum essential coverage under the ACA).

[6]  Under the ACA, the medical loss ratio dictates that, for health insurance issuers offering coverage in the "large group market," 85% of premiums collected must go towards (1) reimbursement for clinical services provided to enrollees; (2) activities that improve health care quality; and (3) on all other non-claims costs, including an explanation of the nature of such costs, and excluding Federal and State taxes and licensing or regulatory fees. 42 U.S.C. § 300gg-18(b)(1)(A)(i).  For health insurance issuers in the "small group market," 80% of premiums collected must go towards these expenses. § 300gg-18(b)(1)(A)(ii).  Liberty falls into the "large group market" category.

13

*Liberty HealthShare's History and Internal Governance*

46.    In March 1995, Defendant Daniel J. Beers formed and incorporated Benevolent Health Systems, LTD ("BHS"), which was part of an early health care sharing ministry. [7]  BHS was owned and operated by Defendant Daniel J. Beers and Jeffrey A. Beers.  BHS purportedly engaged in a process known as "needs reduction" in which BHS's employees called medical service providers to request reductions or discounts on medical bills on the grounds that BHS's member was an uninsured Christian and was paid pursuant to contact with BHS.

47.    Defendant Daniel J. Beers was also employed by Barberton Rescue Mission in its Christian Brotherhood Newsletter Division until August 2000, when his employment was terminated by the Board of Trustees.  However, Defendant Daniel J. Beers continued participating in BRM's operations post termination.

48.    On December 11, 2000, the  Attorney General of Ohio filed a Verified Complaint and Request for Restitution, Temporary, Preliminary and Permanent Injunctive Relief, Removal of Trustees, and Civil Penalties and Costs against Defendants Daniel J. Beers, Ronald Beers, and Pamela K. Johnson, among others, including BHS, alleging breach of fiduciary duty involving self-dealing, diversion of funds and property to themselves through others, and usurpation of corporate opportunities, conversion, civil fraud, solicitation fraud, and unjust enrichment. [8]  As a

---

[7]    *See* Ohio Secretary of State, Benevolent Health Systems, Ltd. Business Details, https://businesssearch.ohiosos.gov?=businessDetails/901142 (last visited Sept. 23, 2021); Benevolent Health Systems Ltd. Certificate of Incorporation, Secretary of State of Ohio, https://bizimage.ohiosos.gov/api/image/pdf/5111_1324 (last visited Sept. 23, 2021)..

[8]  A copy of the 2000 Ohio Attorney General Complaint is attached hereto as **Exhibit A**.  After an extensive trial in 2004, Defendants were found liable for virtually all charges.  Despite damage awards totaling $14,357,347, no money has been collected from any defendant except $5,000 from Thomas Hawthorn.  In response to a 2016 garnishment order, Liberty HealthShare swore it is holding none of Daniel J. Beers' assets.  A March 2020 docket entry renews the judgment liens.

14

result, the defendants were found liable for virtually all charges in 2004 and were ordered to pay $14,357,347 in damages.

49.    Upon information and belief, at all times relevant to this Complaint, Defendant Daniel J. Beers has exercised and continues to exercise control of Liberty through his immediate family members and closest friends.

50.    In 2012, Defendants Douglas D. Behrens, Drudy Abel, and Dale E. Bellis formed and incorporated Liberty HealthShare Council, Inc. ("LHC"), a non-profit corporation in Ohio, to purportedly establish a comprehensive system of family oriented medical cost-sharing services nationally and internationally; the making of contributions and distributions to benefit those without the ability to pay health care expenses; and to establish and maintain medical clinics serving those without or with insufficient health care insurance coverage. [9]

51.    Defendants planned to reap significant illegal profits by misusing the laws regarding HCSMs to avoid federal and state insurance laws (including those laws that regulate and limit the percentage of funds that an insurer collects that may be kept for the insurer's own purposes), and to offer to consumers like Plaintiffs and the Class Members what was in fact illegal insurance, similar to the BHS scheme, but on a much larger scale.

52.    In 2013, LHC and Christian Financial Death Benefit ("CFDA") merged into the Mindala Family Foundation and changed its name to Liberty.

53.    Also in 2014, Liberty merged with Gospel Light, a Virginia-based non-profit, and Gospel Light began operating as Liberty.  In its December 5, 2014 Foreign Nonprofit Corporation

---

[9]     *See* Ohio Secretary of State , Liberty HealthShare Council, Inc.,https://businesssearch.ohiosos.gov?=businessDetails/2115887 (last visited Sept. 23, 2021)..

Application for License, Liberty stated its corporate purpose was "sharing members [sic] health care expenses."

54.     Liberty holds itself out as a HCSM and commented generally about HCSMs in its 2019 Verification of Registration with the Ohio Attorney General's Office, stating:

> GOSPEL LIGHT MENNONITE CHURCH MEDICAL AID PLAN, INC., DBA LIBERTY HEALTHSHARE, IS A NOT-FOR-PROFIT HEALTH CARE SHARING MINISTRY. IN GENERAL, A HEALTH CARE SHARING MINISTRY IS A TAX-EXEMPT ORGANIZATION WHOSE MEMBERS SHARE A COMMON SET OF ETHICAL OR RELIGIOUS BELIEFS AND SHARE MEDICAL EXPENSES IN ACCORDANCE WITH THOSE BELIEFS, EVEN AFTER A MEMBER DEVELOPS A MEDICAL CONDITION. PARTICIPANTS SHARE IN THE MEDICAL, HOSPICE, AND BURIAL COSTS OF OTHERS WHO HAVE JOINED TOGETHER TO AID EACH OTHER.

55.     Liberty's web site claims that it is:

> [A] healthcare sharing ministry of Gospel Light Mennonite Church Medical Aid Plan, Inc. [] a religious nonprofit, 501(c)(3) organization led by a five-member Board of Directors who meet on at least a quarterly basis, or more frequently as needed. The Board of Liberty HealthShare was formed when three sharing ministries unified in 2014: Christian Financial Death Assistance, Gospel Light Mennonite Church Medical Aid Plan, Inc., and Calvary Healthcare Sharing Ministry, Inc. Along with two other Directors, a member of each sharing ministry serves on the Board in rotating terms of three years. A strict Conflict of Interest policy exists for Board enforcement.

56.     Liberty's Board of Directors currently include Scot Burris, Everett Yoder, Durlin Beachy, Don Brewer, Ryan Mast, and Robert Klinestiver, M.D.   Former directors include Defendant Dale E. Bellis, Larry Foster, and Defendant Douglas Behrens.  Defendant Drudy Abel is Liberty's CEO and Steven Furst is Liberty's Chief Financial Officer. [10]  Each of these individuals

---

[10]     *See   Leading   Healthcare   Sharing   Programs*,   Liberty   HealthShare. https://www.libertyhealthshare.org/about-us (last visited Sep. 22, 2021).

16

owe or owed fiduciary duties of care and loyalty to Liberty, its members, Plaintiffs, and putative Class Members at all relevant times.

57.     Despite merging with several other organizations through the course of its existence, neither Liberty or any of the predecessor organizations it merged with has been in existence at all times since December 31, 1999, nor have the medical expenses of its members been shared continuously and without interruption since then.  For this reason and the other reasons listed herein, Liberty does not meet the legal requirements to be an HCSM.

***Liberty's Creation, Marketing, Sales, and Administration of a Sham HCSM***

58.     Despite holding itself out as an HCSM, Liberty is actually an unlicensed insurer because it fails to meet federal and state requirements for the exception.

59.     VA Code Ann. § 38.2-100 defines "[i]nsurance" as:

[T]he business of transferring risk by contract wherein a person, for a consideration, undertakes (i) to indemnify another person, (ii) to pay or provide a specified or ascertainable amount of money, or (iii) to provide a benefit or service upon the occurrence of a determinable risk contingency. Without limiting the foregoing, "insurance" shall include (i) each of the classifications of insurance set forth in Article 2 (§ 38.2-101 et seq.) of this chapter and (ii) the issuance of group and individual contracts, certificates, or evidences of coverage by any health services plan as provided for in Chapter 42 (§ 38.2-4200 et seq.), health maintenance organization as provided for in Chapter 43 (§ 38.2-4300 et seq.), legal services organization or legal services plan as provided for in Chapter 44 (§ 38.2-4400 et seq.), dental or optometric services plan as provided for in Chapter 45 (§ 38.2-4500 et seq.), and dental plan organization as provided for in Chapter 61 (§ 38.2-6100 et seq.)…

60.     VA Code Ann. § 38.2-6300 defines a "health care sharing ministry" as "a health care cost sharing arrangement among individuals of the same religion based on their sincerely held religious beliefs, which arrangement is administered by a non-profit organization that has been granted an exemption from federal income taxation pursuant to § 501(c)(3) of the Internal Revenue Code of 1986" and that:

17

    a.        Limits its membership to individuals who are of a similar faith;

    b.        Acts as an organizational clearinghouse for information about members who have financial or medical needs and matches them with members with the present ability to assist those with financial or medical needs, all in accordance with the organization's criteria;

    c.        Provides for the financial or medical needs of a member through payments directly from one member to another. The requirements of this subdivision [] may be satisfied by a trust established solely for the benefit of members, which trust is audited annually by an independent auditing firm;

    d.        Provides amounts that members/subscribers may contribute with (i) no assumption of risk or promise to pay among the members and (ii) no assumption of risk or promise to pay by the organization to the members;

    e.        Provides written monthly statements to all members that list the total dollar amount of qualified needs submitted to the organization by members for their contribution; and

    f.        Provides in substance a certain written disclaimer on or accompanying all promotional documents distributed by or on behalf of the organization, including applications and guideline materials.

61.    As set forth in more detail below, Liberty does not qualify as an HCSM under federal law or Virginia laws because, among other things, it has not existed since December 31, 1999, and it has no legitimate predecessor entity it could rely on to satisfy that requirement.

62.     None of the Defendant corporations nor the other organizations it merged with were incorporated before December 31, 1999, and many of the individual Defendants named herein were then involved in the BHS health sharing scandal.

63.     Liberty's membership application ("Application") and Sharing Guidelines (attached hereto as **Exhibit A**) contain generic Christian-flavored statements that proclaim, for example:

> We share each other's medical expenses not as matter of convenience or cost savings, but because we are compelled by God and conscience to do so. Sharing such burdens is part of our religious, ethical and moral code. It is our biblical obligation to help our fellow man when in need. We are our brother's keeper! It is our spiritual duty to God and our ethical responsibility to ourselves and the other members of our cost-sharing ministry to care for our bodies and maintain our health.

64.     The form statement of beliefs that are advertised to consumers and that members agree to when they join Defendants' plans are even more generic and secular:

**Statement of Shared Beliefs**

At the core of what we do, and how we relate to and engage with one another as a community of people, is a set of common beliefs.

1.     We believe that our personal rights and liberties originate from God and are bestowed on us by God, and are not concessions granted to us by governments or men.

2.     We believe every individual has a fundamental religious right to worship the God of the Bible in his or her own way.

3.     We believe it is our biblical and ethical obligation to assist our fellow man when they are in need according to our available resources and opportunity.

4.     We believe it is our spiritual duty to God and our ethical duty to others to maintain a healthy lifestyle and avoid foods, behaviors or habits that produce sickness or disease to others or ourselves.

5.     We believe it is our fundamental right of conscience to direct our own healthcare, in consultation with physicians, family or other valued advisors, free from government dictates, restraints and oversight.

65.     Upon information and belief, membership is not actually faith restricted and no process exists to actually verify applicants' or members' sincerely and shared religious beliefs.  In contrast, Liberty claims on its web site to "use state-of-the-art technology to verify medical information and to ensure that funds contributed to members are used exclusively to pay shared medical expenses."

66.     At all relevant times, Liberty designed, marketed, and sold the pseudo-purported HCSM plans at issue in this case to Plaintiffs and the Class Members using affiliated companies that did not in fact qualify as HCSMs under federal or state law.

67.     Liberty and its affiliated entities sold plans to thousands of members who paid a monthly fee to Defendant to participate in Defendant's illegal HCSM plans.

68.     Liberty's Sharing Guidelines (i.e., the operative contract) clearly outline a plan to indemnify members or pay certain amounts upon determinable contingencies and distribute losses among Liberty's members, and therefore meet the definition of insurance under applicable law.

69.     The Sharing Guidelines detail the coverage available for: preventative care, primary care, chronic maintenance, labs and diagnostics, telemedicine, prescription drug programs, urgent care, specialty care, hospitalization, surgery, emergency room visits, and more.

70.     In its sales and marketing materials, Defendants concealed from Plaintiffs and the Class that Defendants' plans did not qualify as HCSM plans under federal law (including the ACA) or state law because Liberty was created after December 31, 1999, and had no qualifying predecessor entity, and for other reasons.  See 26 U.S.C. § 5000A(d)(2)(B)(IV) (To be an HCSM the entity must have "been in existence at all times since December 31, 1999, and medical expenses of its members have been shared continuously and without interruption since at least December 31, 1999.").

20

71.     Defendants falsely and misleadingly represented that Liberty was offering Plaintiffs and the Class memberships in an HCSM—including doing so in its Application, Sharing Guidelines, web sites, and in other marketing and advertising materials—when, in reality, Liberty did not qualify as a HCSM under federal or state law, as Defendants knew.

72.     Liberty cannot qualify as an HCSM under the ACA because:

a.     Liberty and its predecessors were formed after December 31, 1999, and members have not shared medical expenses "continuously and without interruption since December 31, 1999." Upon information and belief, Liberty has never been recognized as an HCSM by any federal or state governmental agency. Liberty has no valid predecessor entities whose experience it can rely on.

b.     Membership in Liberty's plans is not "faith based," and members share no common sectarian beliefs. Instead, Liberty allows any individual to be a member regardless of their faith or any connection to a faith community. In other words, Liberty's plans are available to members of any faith or no faith at all, and its members subscribing to a purported set of vague beliefs is a pro forma administrative step.

c.     Liberty's members do not play a role in determining benefit guidelines (such as through a vote or election of representatives); determining procedures for allocating benefits; determining which medical expenses will be covered; or determining who gets paid benefits and when. Instead, Liberty alone develops membership guidelines; determines which medical expenses get covered; and retains total discretion to determine which claims will be paid, without member input. While Liberty holds itself out as an organization that facilitates the sharing of health care costs, in reality, Liberty, like a

21

traditional insurer, is the sole and final arbiter of the plans and benefit claims, and its members play no material role in managing the plans.

73.     Neither Liberty nor its related entities and affiliated enterprises actually facilitate the transfer of funds between members as contemplated by legally constituted HCSMs.  Instead, members make payments directly to Defendants, and Defendants in turn assume full risk and make payments to members from a pool of money.  As with traditional insurance, members pay monthly premiums under the window dressing of "Suggested Monthly Shares" for different levels of coverage under Liberty's Complete, Plus, and Share health care plans.

74.     Members pay Liberty a certain amount every month in order to maintain membership and coverage.  When signing up for a Liberty plan, a member must submit an application and provide a medical history, as with the typical insurance underwriting process. Sharing Guidelines at 6.  If a member does not submit a complete or accurate medical history, she can be denied, or can be "retroactively" denied membership.  *Id*. at 5.

75.     Certain care, however, is not covered until a member has met her "Annual Unshared Amount" ("AUA"), which operates like a typical health insurance deductible.   The Sharing Guidelines define the AUA as:

> The amount of medical expense eligible for sharing must exceed an annual accumulative amount assigned for each single, couple or family membership. The annual amount shall be calculated upon each member's Enrollment Activation Date until his or her next annual renewal date or program level change. All eligible medical expenses that exceed the applicable AUA shall then be subject to the program limits per incident selected by the member.

.

76.     The Annual Unshared Amount for each program level, must be paid by the member before medical costs are eligible for sharing, with exceptions such as "reasonable charges" for annual preventative wellness visits and related lab work after the first two months of membership.

22

77.     As with traditional medical insurance, there are three tiers of coverage available to Liberty members: Liberty Complete, Liberty Plus, and Liberty Share.  As of October 1, 2020, the monthly "Sharing Amounts" paid by Liberty Complete members were $399 ("Single" coverage), $499 ("Couple" coverage), and $675 ("Family" coverage); Liberty Plus members pay $374 (Single), $474 (Couple), and $624 (Family); and Liberty Share members pay $349 (Single); $449 (Couple); and $599 (Family).[11]   This type of tiered coverage is emblematic of typical health insurance.

78.     Moreover, members' contributions/premiums are not voluntary, and Liberty's claim that "sharing" is "voluntary" is a bald misrepresentation.  If members do not pay, their membership is suspended due to non-payment and only reactivated if the missed payments and annual renewal dues are repaid.  If a member has been suspended for more than two months, the member must reapply as a new member.  Suspended members cannot receive payment for their medical expenses from other members, and "[s]haring needs occurring after a Sharing Member's suspension date are not eligible for sharing, even after membership is reactivated."   Sharing Guidelines at 8.

79.     The Sharing Guidelines, in a section entitled "Submit Dues and Suggested Monthly Shares," state that:

> Each month a Sharing Member is assigned a specific need in which to share. By submission of the suggested Monthly Share Amount, the member instructs Liberty HealthShare to assign his/her contribution as prescribed in these Guidelines, which set forth the conditions upon which Sharing Member medical expenses will be shared. By participation in the Program, the Sharing Member both accepts those conditions as enforceable and binding within the program for the assigning of

---

[11]   On September 30, 2021, Liberty announced to its members that it "created three new sharing programs: Liberty Unite, Liberty Connect, and Liberty Essential," effective December 1, 2021, requiring members to select from one of the new programs based on the members' annual renewal date.

23

his/her contribution and designates Liberty HealthShare as the final authority for the interpretation of these Guidelines.

80.     Coverage is conditioned on timely payment and providing a truthful accounting of one's medical history.  In exchange for accurately filling out the application and payment of monthly fees, a Liberty member remains eligible to have her expenses paid by Liberty upon certain determinable contingencies.  This process clearly shifts the risk of payment for medical expenses from the individual member to the pool of sub-accounts from which her expenses will be paid.

81.     As such, regardless of how Liberty defines itself, Liberty's Sharing Guidelines constitute insurance, not legitimate HCSM plans, where members receive payments from members of the same faith community where they do not have the ability to pay contributions or pay for those medical expenses.

82.     Liberty has regularly accepted and enrolled members in its purported HCSM plans regardless of any faith-based affiliation.  In practice, Defendant enrolls "all comers."

83.     Contrary to Liberty's repeated representations in its promotional materials, Application, Sharing Guidelines, and on its website that it does not offer insurance, that is in substance what is being offered, even though the insurance so offered is illegal.

84.     Liberty frequently includes statements disavowing that the plans are insurance solely to support the false assertion that the plans are legitimate HCSM plans.

85.     Liberty uses other contrivances to create the trappings of an HCSM, but they are shams that are for appearance and do not meet the substantive requirements of a legally constituted and operated HCSM.

86.     For example, Defendants use a "ShareBox" to create the false impression that it operates the plans to allow for the kind of medical cost sharing that is part of a true HCSM, but in

fact the plans are operated like insurance, not an HCSM, and the so-called ShareBox is mere window dressing in its actual operation.

87.     Liberty's plans have been and are marketed, sold, and administered as "health care plans," a term that by law connotes an insurance plan, and as a "[a] bold alternative to expensive healthcare."  *See.* VA Code Ann. § 38.2-100.

88.     Liberty's plans resemble insurance in every material respect, other than providing the promised coverage.  Because Liberty is not a legal HCSM, and due to the nature of the benefits offered, its plans are not exempt from the ACA, and the plans constitute insurance under applicable federal laws and VA Code Ann. § 38.2-100 et seq.

89.     Liberty's plans involve an application process that is materially indistinguishable from the process of applying for insurance (including completing medical history), participation in "Healthtrac" to achieve certain weight loss and fitness goals for the goals of reducing health care costs, an underwriting process to determine each member's health risk levels ("green," "yellow," and "red"), the assumption of risk by Liberty for costs associated with members' healthcare needs, and the carving out from coverage of certain preexisting conditions and other needs.

90.     While Defendants offer members insurance, they do so as an illegal insurer and have not been authorized or certified to sell or issue the insurance it offers to members, including Plaintiffs.  Defendants failed to disclose these material facts to Plaintiffs and the proposed Class.

91.     The Individual Defendants, along with their long-time business partners, contrived, formed, and operated Liberty and its affiliated enterprises as a means to obtain exorbitant illegal payments and profits in a similar fashion to the BHS scheme, and they misused and continue to misuse Liberty to cause consumers like Plaintiffs and Class Members to pay thousands or tens of

thousands of dollars in premiums each year that were and are then funneled to Liberty and its principals.  Defendants misrepresented the plans' true and illegitimate purpose and operation in this material regard, among others.

92.     Plaintiffs and the Class relied upon Defendants' material misrepresentations that the plans being offered were legitimate and legal HCSMs that would provide medical coverage, rather than the illegal and fraudulent contrivance they actually were, the true purpose of which was to circumvent state and federal insurance laws in a scheme to funnel money collected as premiums or "contributions" to Defendants and the individuals who controlled Defendants.

93.     Plaintiffs and the Class relied upon Defendants' material misrepresentations that the plans being offered were legitimate and legal HCSMs that would provide medical coverage, rather than the illegal and fraudulent contrivance they actually were, the true purpose of which was to circumvent state and federal insurance laws in a scheme to funnel money collected as premiums or "contributions" to Defendants and the individuals who controlled Defendants.

94.     Defendants' misrepresentations go to the entire legitimacy, nature, legality, and even existence of the plans sold and operated by Defendants.  The pervasive nature, extent, and character of Defendants' misrepresentations precluded any customer or potential customer from making a knowing and informed consent or agreement to participate in the illegal insurance plans sold by Defendants that are at issue here.

95.     Defendants knew, or at a minimum should have known, that its pseudo-HCSM plans did not qualify as HCSM plans, but Defendants nevertheless continued to represent its plans as qualifying HCSM plans and have continued to charge and take significant payments from Plaintiffs and the Class.  Defendant have done so as part of its illegal scheme to avoid federal and state insurance regulations.

96.     The actions of Defendant complained of herein were taken willfully, maliciously, in bad faith, and with the specific intent to cause harm to Plaintiffs and the Class, and Defendants' actions have in fact caused the intended harm to Plaintiffs and the Class.

***Liberty's Sham Dispute Resolution Procedures***

97.     In furtherance of Liberty's scheme to illegally divert to Defendants and its owners the premiums it collected, Liberty has regularly and routinely delayed and denied payment on claims that are covered by the plans.

98.     Liberty's Sharing Guidelines describe its dispute resolution and appeal system as follows:

> Liberty HealthShare is a voluntary association of like-minded people who come together to assist each other by sharing medical expenses. Such a sharing and caring association does not lend itself well to the mentality of legally enforceable rights. However, it is recognized that differences of opinion will occur, and that a methodology for resolving disputes must be available. Therefore, by becoming a Sharing Member of Liberty HealthShare, you agree that any dispute you have with or against Liberty HealthShare will be settled using the following steps of action, and only as a course of last resort.

> If a determination is made, with which the Sharing Member disagrees and believes there is a logically defensible reason why the initial determination is wrong, then the Sharing Member may file an appeal.  The appeal letter must be sent via email to appeals@libertyhealthshare.org, or by mail to Liberty HealthShare, Appeals Department, 4845 Fulton Dr. NW, Canton, Ohio 44718.  The letter must contain the case or bill number along with the reason for the appeal.  **Appeals will be accepted from Sharing Members only; appeals will not be accepted from providers. Sharing Members cannot appeal the guidelines, balance bills nor matters relating to enrollment.**

> A. ***First Level Appeal*** Most differences of opinion can be resolved simply by calling Liberty HealthShare. If this option of an informal call does not resolve the dispute, an Appeals Utilization Review Nurse will review the appeal letter and all supporting documentation, and contact the member within 10 working days via phone or email with the determination. The appeal letter must contain the case or bill number along with the reason for the appeal (what and why the Sharing Member is appealing).

27

B. **_Second Level Appeal_** If the Sharing Member is unsatisfied with the determination of the Appeals Utilization Review Nurse, then the Sharing Member may request a second level appeal. The appeal must be in writing, must contain the case or bill number, and state the elements of the dispute and the relevant facts. Importantly, the appeal should address all of the following:

> 1. What information does Liberty HealthShare have that is either incomplete or incorrect?
>
> 2. How do you believe Liberty HealthShare has misinterpreted the information already on hand?
>
> 3. What provision in the LHS Guidelines do you believe Liberty HealthShare applied incorrectly?

Within 30 days, the Appeals Nurse Manager and the Director of Medical Services will review the appeal, and the aggrieved party will be contacted via phone or email with the determination.

C. **_Third Level & Final Appeal_** Should the matter still stay unresolved, then the aggrieved party may request a third and final appeal. The appeal will be submitted to three or more randomly chosen Sharing Members, in good standing and chosen by Liberty HealthShare, who shall agree to review the matter and shall constitute an External Resolution Committee. Within 30 days, the External Resolution Committee shall render their determination and appealing member will be notified.

D. **_Mediation and Arbitration_** If the aggrieved Sharing Member disagrees with the conclusion of the Final Appeal Panel, then the matter shall be settled by mediation and, if necessary, legally binding arbitration in accordance with the Rules of Procedure for Christian Conciliation of the Institute for Christian Conciliation, a division of Peacemaker Ministries. Judgment upon an arbitration decision may be entered in any court otherwise having jurisdiction.

Sharing Members agree and understand that these methods shall be the sole remedy for any controversy or claim arising out of the Sharing Guidelines and expressly waive their right to file a lawsuit in any civil court **_against one another_** for such disputes, except to enforce an arbitration decision. **_Any such arbitration shall be held in Fredericksburg, Virginia subject to the laws of the Commonwealth of Virginia_**.

Liberty HealthShare shall pay the fees of the arbitrator in full and all other expenses of the arbitration; provided that each party shall pay for and bear the cost of its own transportation, accommodations, experts, evidence and legal counsel and provided further that the aggrieved Sharing Member shall reimburse the full cost of arbitration should the arbitrator determine in favor of Liberty HealthShare and not the aggrieved Sharing Member. **_The aggrieved Sharing Member agrees to be legally bound by the Arbitrator's decision_**. The Rules of Procedure for Christian

28

Conciliation of the Institute for Christian Conciliation, a division of Peacemaker Ministries, will be the sole and exclusive procedure for resolving any dispute between individual members and Liberty HealthShare when disputes cannot be otherwise settled.

(Emphasis added).

99.    In accordance with the Sharing Guidelines, Defendants imposeed a dispute resolution procedure that required any member who disagreed with a determination regarding a payment of a claim to utilize a three-step internal dispute resolution procedure that violates the ACA, among other laws.  The ACA require that any internal claim appeal process have no more than two levels of internal appeals, among other things.  *See* 45 C.F.R. § 147.136.

100.   When members' claims remain unpaid after the appeal process, they were then required to participate in mediation, which was then to be followed by mandatory arbitration that is binding on the member, but by its terms is not binding on Liberty.

101.   Liberty's Sharing Guidelines mediation and arbitration provision is ambiguous and should be construed against Liberty.  Liberty demands of members that its mediation and arbitration provision is the "sole remedy for any controversy or claim arising out of the Sharing Guidelines and expressly waive their right to file a lawsuit in any civil court *against one another*." No express waiver of rights is stated to exist against Liberty.

102.   Besides being illegal under state and federal law, Defendants did not design the aforementioned dispute resolution process and eventual arbitration as a *bona fide* means to settle disputes but instead designed and misused the process as a means to delay and deny covered claims, force members to accept unreasonable settlements for covered claims, force members to incur costs that would make it impossible or impractical to recover claims, deny legally required recourse to the court system, allow Liberty's owners to illegally funnel members' contributions not their own pockets, unreasonably extend the time for payment of those claims that were

29

eventually paid, and saddle members with substantial medical costs that should have been covered under the plans.

103.    Upon information and belief, most claims that have been subject to the sham dispute resolution process involved covered claims but were wrongly delayed or denied by Liberty in its capacity as administrator.  Defendants intentionally designed the purported dispute resolution procedures and arbitration provisions as a mechanism to further Defendants' scheme to avoid paying covered claims.

104.    For the foregoing reasons, among others, and because the mechanism provided by Liberty to resolve claim disputes was illegal and designed and used to facilitate denial of covered claims, in each and every instance in which Liberty has delayed or denied honoring and paying a claim, that action of Liberty is illegal and ultra vires and Defendants are estopped from denying the claim.  By law and equity, Liberty must honor and pay all such claims that have been submitted for payment when the illegal claim procedure was effective.

### Liberty's Related Entities and Affiliated Enterprises

105.    Despite Liberty's designation as a nonprofit corporation, it conducted business through related entities and affiliated for-profit enterprises in a scheme to surreptitiously funnel profits to Defendants.

106.    These organizations are either constructs of board members or family members of board members that have not been properly disclosed, charge Liberty unreasonably and unnecessarily over-market pricing for services, and significantly erode the amount of money available for "sharing" to Liberty's members.

30

107.    Despite this, Liberty claims on its web site that "[o]ur Board of Directors is the final authority that oversees the entire organization.   Our Board Members are independent, non-compensated decision makers who follow a strict conflict of interest policy."

108.    In November 2014, CSS was formed by Defendant Brandon Fabris.  CSS is an Ohio for-profit LLC.  Defendant Daniel Beers, Jr. secures a majority interest in CSS and is a non-voting member. CSS is a contractual service provider to Liberty that holds itself out as conducting "[m]arketing, call center operations, and technology consulting on behalf of HealthCare [sic] Sharing Ministries," and as such is an affiliated company to Liberty and necessarily intertwined with its operations.   According to Liberty's 2017 Form 990, CSS was Liberty's highest paid independent contractor with compensation totaling $17,859,288, nearly seven times the amount of the next highest paid independent contractor for professional services.  CSS and Liberty recently shared the $250,000 cost to be lead sponsors of CPAC 2020, the Conservative Political Action Conference.

109.    In 2015 Defendant Thomas Fabris, father of Defendant Brendan Fabris, formed Defendant MCS.  MCS is a single member for-profit Ohio LLC and affiliated company to Liberty. MCS holds itself out as leading the health sharing industry in providing superior service for claim repricing, balance bill advocacy, and self-pay patient legal support.  MCS's listed and registered address, 4786 Dressler Rd. NW, Suite 101, Canton, OH 44718, is a mailbox at a UPS Store franchise location.

110.    With respect to Liberty's 2018 audited financial disclosure:

The Organization has contracted with a related entity, The National Coalition of Health Care Sharing Ministries, Inc. to provide selective supportive services. Those costs totaled $58,723,816 for the 2018 calendar year. The two organizations are related because their boards of directors have common members. The National Coalition of Health Care Sharing Ministries, Inc. reported on its 2018 audited financial statements that about 26% of their expenses were used for management

31

and general purposes and about 74% of their expenses were used for direct program purposes.

111.    With respect to Liberty's Form 990 for 2019, Defendant Drudy Abel, Liberty's

CEO at the time, disclosed the following family relationships in Schedule L:

> Cheryl Foster (Spouse), Administrative Services, Matthew Bellis (Son), Administrative Services, Pamela Johnson (Sister), Administrative Services, Druzilla B Heim (Daughter), Administrative Services and Emily Braucher-Abel (In-Law), Administrative Services.

112.    Contrary to the foregoing disclosures, Defendant Drudy Abel answered "No" to the

following questions in Part IV (Checklist of Required Schedules) of Liberty's Form 990 for 2019:

> 25b. Is the organization aware that it engaged in an excess benefit transaction with a disqualified person in a prior year, and that the transaction has not been reported on any of the organization's prior Forms 990 or 990-EZ?

> 28. Was the organization a party to a business transaction with one of the following parties (see Schedule L, Part IV instructions for applicable filing thresholds, conditions, and exceptions):

> a. A current or former officer, director, trustee, key employee, creator or founder, or substantial contributor?

> b. A family member of any individual described in line 28a?

> c. A 35% controlled entity of one or more individuals and/or organizations described in lines 28a or 28b?

> 34. Was the organization related to any tax-exempt or taxable entity?

> 35a. Did the organization have a controlled entity within the meaning of section 512(b)(13)?

113.    Also, in contrast to the foregoing disclosures in Liberty's Form 990 for 2019,

Defendant Drudy Abel answered "No" to the following questions in Part VI, Section A (Governing

Body and Management):

> 2. Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee?

3. Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors or trustees, or key employees to a management company or other person?

5. Did the organization become aware during the year of a significant diversion of the organization's assets?

7b. Are any governance decisions of the organization reserved to (or subject to approval by) members, stockholders, or persons other than the governing body?

114.     Despite answering in the negative in Section A, Defendant Drudy Abel answered

"Yes" to the following questions in Section B (Policies):

12b. Were officers, directors, or trustees, and key employees required to disclose annually interests that could give rise to conflicts?

12c. Did the organization regularly and consistently monitor and enforce compliance with the policy? If "Yes," describe in Schedule O how this was done.

The only statement in Schedule O is: "The Directors monitor and maintain the conflict of interest

policy."

***Defendants' Self-Dealing Activities were Concealed from Members and Liberty***

115.     Liberty's arrangements with related entities and affiliated enterprises were not

arm's length transactions as they should have been, but part of a larger self-dealing scheme that

diverted member funds from Liberty and lined the pockets of its founders in a way totally contrary

to its mission as a purported nonprofit HCSM and charitable organization.

116.     Liberty claims that "with the exception of an administrative fee, money designated

by members for cost sharing is never owned or invested by Liberty HealthShare" "and we track

the exchange to be certain that those funds are used only to pay shared needs" on its web site.

117.     In a section of the Sharing Guidelines entitled "Administrative Costs," Liberty

states that in addition to collecting the first two months of membership fees, it imposes:

[A]n administrative fee not to exceed 12% is assigned to each Monthly Share Amount regardless of family size beginning the third month of membership and

33

following. A single, couple or family membership all contribute up to 12% from their Monthly Share Amount for administration. In addition, the membership enrollment dues and annual renewal dues are utilized by Liberty HealthShare to defray administrative costs. These amounts calculate together to formulate an administrative overhead. Administrative costs and their assessments to the members may be revised at any time by majority vote of the Board of Directors of Liberty HealthShare. Notice of any such change will be given to the members in a timely manner.

118.    In fact, members paid fees additional to the administrative fee, which included portions of the initial membership fee diverted to MCS and additional fees going to CSS, meaning that Liberty members ended up having less sharing power than they were led to believe.

119.    As Liberty began to grow rapidly, its sharing power began to decline because it was paying out more expenses than it was collecting in premiums or membership dues.  When the Individual Defendants realized that their entire scheme was in trouble, third party consultants were hired to find a way to stem the financial bleeding.  Up until that point, Liberty had been able to bring in enough new members to subsidize payments to existing members.

120.    As a result of their investigations and communications with each other, third party consultants for Liberty and employees not party to the self-dealing scheme began noticing something was not quite right at Liberty.  Despite alarm bells sounding, the Beers family Defendants chose to enrich their family and protect their scheme.

121.    On January 13, 2017, Jim Hummer of Hummer Health Management, an independent consultant, prepared a presentation for Liberty.  The presentation described how the affiliated enterprises were draining member funds available for sharing in an unsustainable fashion.  It was soon apparent that Liberty's affiliated enterprises' costs were running out of control because the relationships were established as a matter of convenience, lack of due diligence, and as part of Liberty's overall scheme to funnel profits from members' pooled funds to the Individual Defendants. In fact, there was **never any bid process to ensure that Liberty paid market prices for**

34

*business services expenses*. Instead, vendor selection was subject to Defendant Dan Beers's approval and control without any due diligence.  For example, MCS, CSS, and SavNet were all businesses that Defendant Dan Beers exercised command, control, and/or material influence.  As a result, Liberty's sharing power was significantly impaired and the for-profit business service providers owned or controlled by Defendant Dan Beers raked in cash.

122.    In addition to Mr. Hummer's independent report, Liberty's then CEO, Sandy Cheshire, also produced a report critical of Liberty and its affiliated enterprises, which included diagrams showing Liberty's relationships to its affiliated enterprises and related operations.  Sandy Cheshire was previously Liberty's Chief Legal Officer and attorney before a meteoric ascent to the CEO position, and as a result, was in the position to understand the scheme, the roles and relationships between each participant, the flow of cash and control, and the illegality therefor.

123.    When Sandy Cheshire completed her report sometime in or around August 2017, Defendant Dan Beers discovered that Sandy Cheshire would produce the report at the next Liberty Board of Directors meeting.  At the Board meeting the next day, Sandy Cheshire was blocked from entering the meeting and immediately terminated.

124.    Subsequently, Sandy Cheshire retained an attorney, and with the threat of going public, Defendant Dan Beers and Liberty paid Sandy Cheshire a substantial sum of money in conjunction with a non-disclosure agreement to quash any chance of the report seeing the light of day.

125.    Around the same time in 2017, John Hunt, Liberty's Chief Medical Officer, also began uncovering the scheme.  Through his interactions with Sandy Cheshire, third party consultants, and in the course of his employment, Mr. Hunt became aware of the scheme, but was powerless to correct the ongoing wrongs perpetuated by the Defendants.  As a result, Mr. Hunt

35

tendered his resignation rather than take part in the scheme and filed a complaint about Liberty's practices with the Ohio Attorney General.

126.    In fact, both Sandy Cheshire and John Hunt were contacted and interviewed by the Ohio Attorney General in connection with its continuing investigation of Liberty's practices.

127.    The foregoing observations, recommendations, and concerns were all swept under the rug by Liberty in an effort to continue the scheme, and those that spoke up were swiftly terminated or otherwise silenced.  Liberty's members would remain unaware of Defendants' self-dealing scheme as a result.

## **DEFENDANTS' VIOLATIONS OF LAW**

128.    Defendants sold inherently unfair and deceptive health care plans to members and failed to provide them with the coverage the purchasers believed they would receive.  Defendants claimed the health care plans were not "insurance" in order to avoid both oversight by the state insurance commissioner and the minimum requirements mandated by the Patient Protection and the Affordable Care Act ("ACA").  At the same time, Defendants created the health care plans to appear like health insurance that would actually provide meaningful coverage for the purchasers' health care needs.

129.    When Congress passed the ACA in 2010, the ACA required all individuals to be covered by health insurance or pay a penalty.[12]  Congress allowed for a handful of exceptions to that requirement, set out in 26 U.S.C. § 5000A.  One of those exceptions was for members of

---

[12]  In 2018, Congress lowered this penalty to $0.  On June 17, 2021, the U.S. Supreme Court rejected a challenge to the ACA on standing grounds after finding that "[w]ith the penalty zeroed out, the IRS can no longer seek a penalty from those who fail to comply."  *California v. Texas*, 141 S. Ct. 2104, 2114 (2021).

36

existing HCSMs.  In order to qualify as an HCSM under the ACA, an entity must meet rigid requirements, including: (1) it must be recognized as a 501(c)(3) tax exempt organization; (2) its members must "share a common set of ethical or religious beliefs and share medical expenses among members according to those beliefs"; and (3) it must have "been in existence at all times since December 31, 1999, and medical expenses of its members [must] have been shared continuously and without interruption since at least December 31, 1999."   26 U.S.C. §5000A(d)(2)(B)(ii).  At no time has Liberty ever met the definition of an HCSM.

130.    As set forth herein, Defendants engaged in a fraudulent scheme during the Class Period in violation of federal and/or state law by self-dealing through undisclosed conflicts to enrich themselves to the detriment of Plaintiffs and putative Class Members.  Defendants used and conspired with Liberty to establish supra-market rates for medical cost-sharing through affiliated companies run by family members and other close relations.  Specifically, they engaged in self-dealing and conflicts of interest to extract improper, unfair, usurious, unwarranted, supra-market, and unreasonable fees from Plaintiffs and putative Class Members that substantially profited Defendants while financially harming and diminishing Plaintiffs' and putative Class Members' benefits.  Defendants' wrongful acts, omissions and prohibited transactions include (without limitation) the following:

a.    Defendants, individually and jointly, allowed and continue to allow Defendant Daniel J. Beers and the other Individual Defendants to exert concealed (yet real and material) authority over Liberty's day-to-day and financial decision-making power regarding its cost-sharing operations—similar to the actions and scheme undertaken taken by Daniel J. Beers that led to his civil and criminal liability to BHS and Barberton Rescue Mission in 2004;

37

b.      Defendants concealed and failed to disclose to the public the active and material power and influence Defendant Daniel J. Beers and the Individual Defendants exert over all Defendants and their operations, resulting in substantial financial benefits to Defendant Daniel J. Beers and other Defendants to the detriment of Plaintiffs and putative Class Members;

c.      Defendants openly encouraged—but concealed from the public—material conflicts of interest with certain service providers controlled by family members and other close relations that inflated Defendants' financial benefit to the detriment of Plaintiffs and putative Class Members; and

d.      Through self-dealing and concealing conflicts of interests, Defendants were able to create, maintain, and charge supra-market and usurious premium rates to members, resulting in a financial enrichment to Defendants at Plaintiffs' and putative Class Members' expense.

131.    Plaintiffs bring this action, in part, to put an end to Defendants' scheme and to recover the improper, unwarranted, usurious, and unreasonable fees charged to Plaintiff and all Class Members.  Separately, Plaintiffs seek declaratory and injunctive relief to remove the entire Liberty Board of Directors and to replace them with new directors that are truly independent and loyal to the interests of Liberty and its members.

## PIERCING THE CORPORATE VEIL

132.    The alter-ego corporate forms of the Defendants CSS and MCS are a sham and should be disregarded because their corporate forms are a mere shell, instrumentality, and a conduit used as an unfair device to achieve an inequitable result, and adherence to the fiction of the separate existence of the corporations would sanction a fraud or promote an injustice.

38

133.    The corporate fiction has been utilized and promoted by these Defendant alter-ego corporations as a sham to perpetrate a fraud for the direct personal benefit of the Individual Defendants.

134.    Each Individual Defendant organized, operated, and maintained all of its wholly owned subsidiaries, as described herein, as mere shells, instrumentalities, and conduits.  There was such unity between the Individual Defendant and her alter-ego corporate entit(ies) that the individuality or separateness of the alter-ego corporations never existed or ceased to exist because of the unity of the interest and ownership.

135.    Each of the Defendant corporations described as an "alter-ego" herein was owned, managed, and/or operated as the alter ego of an Individual Defendant and is each the alter ego for the other with respect to the execution and performance of the Scheme and enterprise that is central to the claims of Plaintiffs and the Class.

136.    The following facts regarding the operations of Defendants CSS, MCS, and SavNet support disregarding the corporate fiction: (1) corporate formalities for all of these Defendants were ignored and were not observed; (2) property was not kept separate and apart between the parent corporations and the wholly owned subsidiary corporations; (3) direct deposits were made into bank accounts of the alter-ego corporations, which were controlled by the Individual Defendant and deposited into the Individual Defendant's accounts; (4) the Individual Defendant at all times maintained 100% financial interest in her corporations and maintained control over the subsidiary corporations on an operational basis by appointing all officers, directors, and top management and supervisory employees of each subsidiary corporation; (5) the corporations are and were used or established for the business purposes of the Individual Defendant, and are or were the means by which the Individual Defendant conducted her business; (6) the corporations'

39

operations, functions, and facilities were not reasonably capitalized in light of the nature and risk of the ostensible business of the corporations; (7) the capital and credit line used to fund and operate the corporations' operations, function, and facilities were solely that of the Individual Defendant; and (8) the payment of salaries and wages to the workers of the corporations and operations were made from the bank accounts and funds of the Individual Defendant.

137.    Plaintiffs further allege that at all relevant times, the Individual Defendant(s) and the Defendant corporations, as applicable, have operated as a single business enterprise to achieve a common business purpose.  The Individual Defendants and any wholly owned corporations were not operated as separate and individual entities, but rather they integrated and commingled their resources to achieve a common business purpose and conducted their operations such that: (1) the corporations were used or established for the business purposes of the Individual Defendant, and were the means by which Individual Defendant conducted all her business; (2) a single and common board of directors and the same members existed between the Individual Defendant and alter-ego corporations; (3) the same centralized and consolidated account and financial reporting was used by both the Individual Defendant and the alter-ego corporations for both internal and external purposes, such as for filing all required reports with the U.S. Department of the Treasury and Internal Revenue Service; and (4) the Individual Defendants paid the wages of all officers, directors, employees, agents, and representatives of the alter-ego corporations.

138.    The Individual Defendants have intentionally operated all alter-ego corporations in a manner that left the alter-ego corporations without assets sufficient to satisfy the claims of Plaintiffs and the Class, by taking complete control and possession of the alter-ego corporations' revenues and receivables as soon as they were received or accrued.  All monies received as proceeds pursuant to and in performance of contracts by the alter-ego corporations were

40

maintained and received by the Defendant alter-ego corporations to fund Individual Defendant operations and were not maintained at the corporate level.

## **CLASS ACTION ALLEGATIONS**

139.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

140.    ***Definition of Class:*** Pursuant to Fed. R. Civ. P. 23, Plaintiffs bring this action on behalf of themselves, and all persons similarly situated.  The proposed class is defined as "all current and former participants in Liberty plans from 2013 forward who have made periodic payments to Liberty to participate in plans presented as HCSMs."  The Class (or "Class Members") shall further consist of two Sub-Classes:

a.      *Current Liberty HealthShare Members*– individuals who became members of Liberty during the Class Period who still maintain their membership as of the filing of this Complaint. ("Injunctive Relief Sub-Class");

b.      *Former Liberty HealthShare Members*—individuals who became members of Liberty HealthShare during the Class Period who are no longer members as of the filing of this Complaint. ("Damages Sub-Class").

141.    Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest or are a parent or subsidiary of, or any entity that is controlled by a Defendant, and any of Defendants' officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors, and assigns.  Also excluded are those persons who timely and validly request exclusion from the Class.

142.    Plaintiffs reserve the right to amend the foregoing Class and Sub-Class definitions if discovery and further investigation reveal the Class or Sub-Classes should be modified.

143.     ***Size of the Class and Numerosity***: While the exact number of Class Members is presently unknown to Plaintiffs, Class Membership is ascertainable based upon the records maintained by Defendants.  At this time, Plaintiffs, upon information and belief, contend that the Class includes hundreds of thousands of Members.

144.     ***Class Representative and Adequacy***: Plaintiffs have and will continue to fairly and adequately protect the interests of putative Class Members and have retained counsel competent and experienced in class actions and consumer law.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

145.     ***Typicality***: Plaintiffs' claims are typical of the claims of the Class Members as all Class Members are similarly affected by the Defendants' respective wrongful conduct in violation of the laws complained of herein.  Defendants have acted on grounds generally applicable to the proposed class, rendering declaratory and injunctive relief appropriate respecting the Class. Certification is therefore proper under Fed. R. Civ. P. 23(b)(2).

146.     ***Common Questions of Fact and Law***: Common questions of law and fact exists as to all Class Members and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class, and without limitation, are:

a.     Whether Liberty's plans were HCSM plans;

b.     Whether Liberty's plans were illegal insurance plans;

c.     Whether Liberty's plans were falsely represented to not be insurance;

d.     Whether Defendants violated federal or state law by offering and selling its plans to Plaintiffs and the Class or by administering the plans;

42

e.      Whether Defendants knew that the plans it sold to Plaintiffs and the Class members were not HCSM plans;

f.      Whether Defendants knew that the plans it sold to Plaintiffs and the Class members constituted insurance;

g.      Whether Plaintiffs and Class members have been damaged, and if so, are eligible for and entitled to compensatory and punitive damages;

h.      Whether Liberty's uniform policy of conditioning membership on making monthly payments qualifies for protection as a "contribution" as well as valid consideration for its standard membership contract;

i.      The nature, scope, and operations of Defendants' wrongful policies;

j.      Whether Defendants were agents, each of the other, operating, acting, and otherwise conducting and comporting themselves at the direction, with express or implied consent, for the benefit and in the name of one other, within the terms and limits and to the extent, whether express or implied, of the agency relationship that existed between them, for the purposes of undertaking and accomplishing those actions complained of herein;

k.      Whether Plaintiffs and the Class were third-party beneficiaries of contracts between Defendants and entities facilitating Defendants' fraudulent scheme;

l.      Whether Defendants' association furnished a vehicle for the commission of two or more predicate acts;

m.      Whether Defendants' enterprise was engaged in, or its activities affected, interstate commerce pursuant to 18 U.S.C. § 1962;

n.      Whether Defendants have engaged in mail and/or wire fraud;

43

o.      Whether Defendants participated in and controlled the conduct and affairs of a common enterprise through a pattern of racketeering activity;

p.      Whether Defendants' Enterprise(s) is an enterprise within the meaning of 18 U.S.C. § 1961(4);

q.      Whether Defendants' corporations, limited liability companies, limited partnerships, other corporate entities and partnerships, as applicable, constitute enterprises for the purposes 18 U.S.C. § 1961(4);

r.      Whether Defendants conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs, for the purposes of 18 U.S.C. § 1962(c);

s.      Whether Defendants have used or invested income from their racketeering activities to establish or operate their Enterprise in violation of 18 U.S.C. § 1962(a);

t.      Whether Defendants conducted or participated in the affairs of their Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c);

u.      Whether Defendants' overt and/or predicate acts in furtherance of their violations of 18 U.S.C. ¶¶ 1962(a) and (c) proximately caused injury to the Plaintiffs and Class Members;

v.      Whether Defendants had a policy and practice of fraudulently charging persons supra-market rates;

w.      Whether MCS, CSS, and SavNet are Liberty's alter egos;

x.      Whether Defendants' conduct inflated the amounts that Plaintiffs and the Class Members paid for medical cost-sharing by more than they would owe if Defendants acted lawfully;

y.      Whether Defendants engaged in self-dealing;

44

z.    Whether Defendants engaged in prohibited transactions;

aa.    Whether Defendants breached contractual obligations to Plaintiffs and Class Members;

bb.    Alternatively, whether Defendants were unjustly enriched;

cc.    The nature and extent of damages and other remedies owed to Class Members by virtue of Defendants' conduct; and

dd.    Whether this Honorable Court can enter declaratory and injunctive relief, or other equitable relief.

147.    ***Questions of Law and Fact Common to the Class Predominate Over Individual Issues:*** The claims of the individual class members are more efficiently adjudicated on a class-wide basis.  Any interest that individual members of the class may have in individually controlling the prosecution of separate actions is outweighed by the efficiency of the class action mechanism. Upon information and belief, no class action suit is presently filed or pending against Defendants for the relief requested in this action.  Issues as to Defendants' conduct in applying standard marketing, sales and administration practices towards all members of the class predominate over questions, if any, unique to members of the class.  Certification is therefore additionally proper under Fed. R. Civ. P. 23(b)(3).

148.    ***Superiority of Class Action:*** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class Members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and

45

equitable handling of all Class Members' claims in a single forum.  The conduct of this action as a class action conserves the resources of the parties and of the judicial system and protects the rights of the Class Members.  There will be no difficulty in the management of this action as a class action.  The prosecution of separate actions by class members against Defendants would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct.   Certification is therefore proper under Fed. R. Civ. P. 23(b)(1).

149.   *Venue:* This action can be most efficiently prosecuted as a class action in this jurisdiction, where Defendants do business and reside.

150.   *Class Counsel:* Named Plaintiffs have retained experienced and competent class counsel.

151.   Defendants are each subject to the claims of Plaintiffs and the Class by virtue of their conspiracy, partnership, joint enterprise, agreement, and/or aiding and abetting.

152.   Plaintiffs cannot be certain of the form and manner of a proposed notice to Class Members until the Class is finally defined and discovery is completed regarding the identity of class members.  Plaintiffs anticipate, however, that notice by mail or email will be given to Class members who can be identified specifically.  In addition, notice may be published in appropriate publications, on the Internet, in press releases, and in similar communications in a way that is targeted to reach class members.  The cost of notice, after class certification, trial, or settlement before trial, should be borne by Defendant.

153.   Plaintiffs reserve the right to modify or amend the definition of the proposed Class at any time before the Class is certified before the Court.

## CAUSES OF ACTION

### COUNT I

**(Breach of Contract and Covenant of Good Faith and Fair Dealing
as to Defendant Liberty)**

154.    Plaintiffs re-allege and incorporate the preceding allegations as if set forth fully herein.

155.    All contracts include a duty to comply with the applicable rules of law.  Good faith is an element of every contract pertaining to sharing of healthcare expenses.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

156.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

157.    Under its Sharing Guidelines, Liberty impliedly promises to administer the plan in accordance with principles of good faith and fair dealing.

158.    The transactions between Defendants and the Class members (which include Plaintiffs) created certain enforceable rights and duties regarding the handling and payment of members' claims and the allocation of members' premium payments or "contributions."

47

159.    Liberty breached its contractual duties by directing those payments to its own personal profits and that of its principals and by refusing to pay or delaying payment of medical expenses that should have been covered, all of which are actions in bad faith by Defendants.

160.    Defendants further breached the implied covenant of good faith and fair dealing pursuant to contract by taking members' payments and using them for personal profits and that of its principals, by refusing to pay medical expenses that should have been covered, and by misrepresenting the nature of the products being sold to members which were not HCSMs but were in fact unlawful contracts of insurance.

161.    Defendants' breaches of contract, including its breaches of the implied covenant of good faith and fair dealing, have caused Plaintiffs and the Class members to suffer damages in an amount to be proven at trial.

## COUNT II

### (Money Had and Received as to All Defendants)

162.    Plaintiffs re-allege and incorporate the allegations asserted in paragraphs 1 through 153 of this Complaint as if set forth fully herein.

163.    This claim is brought in the alternative to breach of contract in the event the Court finds the Liberty's Sharing Guidelines contract illegal or otherwise unenforceable.

164.    Plaintiffs and Class members paid Liberty for purported HCSM plans covering them and their families.

165.    Defendants have no right to receive or retain any of such payments.

166.    Defendants and their principals used the payments from Plaintiffs and Class members for their own purposes and profits and to pay for the administrative costs of running their

business, but not for providing the actual services that were advertised (*e.g.*, coverage for medical bills), as required by law.

167.    Plaintiffs and Class Members made their payments to obtain coverage for medical expenses through what were falsely purported to be legal and proper HCSM plans, but in reality, the plans in questions were not HCSM plans, and as a result, Defendants had no right to receive or retain any of those payments.

168.    The plans Defendants sold and in which it enrolled Plaintiffs and the Class were illegal insurance contracts that Defendant had no right or permission to sell under federal or state law.

169.    It would be unjust and improper to allow Defendants to retain the money Plaintiffs and Class members directly conferred to Defendants, and Defendants should not, in equity and good conscience, be permitted to keep the funds that Plaintiffs and the Class members paid to Defendants.

170.    The payments made by Plaintiffs and the Class members to Defendants justly belong to Plaintiffs and the Class and should be returned to them.

171.    The payments made to Defendants constitute monies had and received that Plaintiffs and the Class are entitled to recover from Defendants, together with interest, punitive damages, and the costs of litigation, including attorneys' fees.

## <u>COUNT III</u>

### **(Unjust Enrichment as to Defendant Liberty)**

172.    Plaintiffs re-allege and incorporate the preceding allegations in paragraphs 1 through 153 of this Complaint as if set forth fully herein.

49

173.     This claim is brought in the alternative to breach of contract in the event the Court finds Liberty's Sharing Guidelines contract illegal or otherwise unenforceable.

174.     Plaintiffs and the Class members paid Liberty each month for Defendants' purported HCSM plans covering themselves and their families.

175.     Liberty retained Plaintiffs' and Class members' payments, and Plaintiffs and the Class members conferred a direct benefit on Defendants.

176.     Defendants and their principals used the payments from Plaintiffs and the Class members for their own purposes and profits and to pay for the administrative and marketing costs of running the business, but not for the provision of actual services that were advertised (*e.g.*, coverage for medical bills), as required by law.

177.     Plaintiffs and the Class members made their payments as purported "voluntary" "contributions" for what they believed was an HCSM plan, but in reality, Defendants and its affiliated enterprises were not HCSMs, nor were the plans in question HCSM plans.

178.     Rather than apply payments from Plaintiffs and the Class members to pay for participants' covered medical expenses, the covered medical claims of other Class members, or improving the quality of health care, Defendants kept to themselves a substantial amount of the contributions by Plaintiffs and the Class members primarily as profit despite Liberty's organization as a non-profit charitable organization.

179.     Defendants would be unjustly enriched if they were allowed to retain the money Plaintiffs and the Class members have paid to Defendants, and Defendants should not in equity and good conscience be permitted to keep the funds that Plaintiffs and the Class members paid to Defendants.

50

180.     Defendants' inequitable conduct caused Plaintiffs and the Class members to pay to Defendants thousands of dollar or tens of thousands of dollars annually, payments to which Defendants were not legally permitted to receive or retain.

181.     The failure to compensate Plaintiffs and the Class members for the extensive benefits conferred upon Defendants renders the transactions between Plaintiffs and the Class members with Defendants unjust.

182.     There being no enforceable contractual provision that expressly controls the subject matter of the instant claims, equity requires that Defendants pay restitution of the amounts paid by Plaintiffs and the Class members unjustly retained by Defendants, plus interest, punitive damages, and the costs of litigation including attorneys' fees.

## <u>COUNT IV</u>

**(Violations of 18 U.S.C. § 1962(c) Against Defendants Liberty, CSS, MCS, and SavNet)**

183.     Plaintiffs re-allege and incorporate the preceding allegations in paragraphs 1 through 153 of this Complaint as if set forth fully herein.

184.     This claim for relief arises under 18 U.S.C. § 1964(a) of RICO and seeks relief from Defendants Liberty, CSS, MCS, and SavNet for their activities described herein constituting violations of 18 U.S.C. § 1962(c).

185.     All of the conduct herein alleged was committed by Defendants willfully, knowingly, maliciously and with reckless disregard of the rights of Plaintiffs and the Class.

186.     All of the conduct herein alleged was committed by Defendants willfully, knowingly, maliciously and with reckless disregard of the rights of Plaintiffs and the Class.

187.     At all material times, the Defendants named herein controlled and/or conducted the enterprise described herein which engaged in substantial interstate and foreign commerce, and

51

transacted business in the State of Ohio (whether or not they are registered to do so). The transactions complained of herein negatively impacted interstate and foreign commerce by the use of the instrumentalities of such commerce for illegal purposes.

188.     At all material times, in connection with the activities giving rise to this action, the Defendants named herein willfully and knowingly conspired with each other, as well as others known and unknown to Plaintiffs and the Class, to engage in various activities set forth herein and aided and abetted one another in these activities, all as proscribed and prohibited by 18 U.S.C. § 1962(c).

189.     At all times relevant hereto, Plaintiffs, the members of the Class, and Defendants were and are "persons" within the meaning of 18 U.S.C § 1961 (3).

190.     The Defendants named herein together constituted a loose or informal association of distinct entities.

191.     Each Corporate Defendant is sufficiently independent of the informal association-in-fact that orchestrated the Scheme.

192.     Each Corporate Defendant is sufficiently distinct from the associated-in-fact criminal enterprise such that each Corporate Defendant is liable as its own "person" pursuant to RICO laws.  Despite mutual connection to the Beers family and some overlapping ownership, each entity is separate and distinct from one another.  Liberty is incorporated in Virginia, CSS is incorporated in Ohio, and MCS is incorporated in Ohio.

193.     Each is also a separate ongoing business with a separate customer base. Each is free to act independently and advance its own interests contrary to those of the other corporations.

194.     Each and every Individual Defendant and Corporate Defendant engaged in a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5) by committing and/or

52

conspiring to commit or aiding and abetting in the Scheme by each one's participation in at least two such acts of racketeering activity, as described above, with all such acts having occurred since 2013, in furtherance of the Scheme.  In fact, the RICO Defendants actually committed hundreds of predicate acts.

195.    Each one of these underlying predicate acts amounts to, or otherwise constitutes a threat of continuing racketeering activity, as racketeering is defined by federal RICO law.

196.    The RICO Defendants together perpetuated a criminal enterprise from at least 2013 until the present that has injured the Plaintiffs and many thousands of other members of the Class.

197.    The fact that Daniel Beers has a long and storied past of defrauding people, as described above, indicates that these fraudulent activities threaten repetition in the future.  But Daniel Beers could not have acted alone.  Defendants together operated a clandestine, informal organization consisting of natural persons and corporations which the natural persons formed, on an as-needed basis, to effectuate their Scheme.

198.    Each of the acts of racketeering activity of the Defendants named herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had the same or substantially similar results and impact upon similarly situated victims.

199.    The multiple acts of racketeering activity committed and/or conspired to or aided and abetted by the RICO Defendants all were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).

200.    Defendants Liberty, CSS, MCS, and SavNet engaged in a pattern of racketeering activity through their operation and management of an association-in-fact enterprise with each

53

other.  In essence, these Defendants associated for the purpose of making money from repeated criminal activity.  The objectives and purposes of the enterprise included, but were not limited to, enriching its members through the funds of Plaintiffs and the Class, funds which were stolen, unlawfully converted, or taken from Plaintiffs and the Class, and then distributed to the members of the enterprise after the funds crossed state boundaries.  Each member knew the funds had been stolen, unlawfully converted, or taken from Plaintiffs and the Class through fraud.

201.    Defendants Liberty, CSS, MCS, and SavNet transmitted and accepted funds through a pattern of interstate wire transfers while knowing the funds were be obtained by fraud in order to encourage and/or effectuate the repeated and continued transmission and acceptance of further funds known to be obtained by fraud in furtherance of the conspiracy.  These Defendants managed, operated, and agreed to participate in a RICO enterprise and conspiracy.  In furtherance thereof, each of these Defendants engaged in a pattern of predicate acts during the Relevant Time Period.  This conduct and other circumstantial evidence demonstrate their agreement to deprive Plaintiffs and the Class of their funds through fraud.

202.    Defendants operated and constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4).  The enterprise is an ongoing organization, which engages in, and whose activities affect, interstate commerce and transacts business in the State of Ohio (regardless of whether they are registered to do so).  While Defendants named herein participated in the enterprise and were a part of the enterprise, these Defendants also had an existence separate and distinct from the enterprise.

203.    Defendants named herein maintained an interest in and control of the enterprise and also conducted or participated in the conduct of the enterprise's affairs through a pattern of

54

racketeering activity. These Defendants' control of and participation in the enterprise was necessary for the successful operation of Defendants' scheme.

204.    The enterprise described in this Complaint was the means by which the Defendants named herein carried out their illegal scheme and provided the necessary cover with which Defendants were able to conceal their scheme.

205.    The enterprise had an ascertainable structure separate and apart from the pattern of racketeering activities in which the Defendants named herein engaged.

206.    These Defendants' close interpersonal relationships, their common interest in profiting from funds obtained by fraud, and the longevity of their affairs together permitted them to participate in the affairs of an enterprise through their predicate acts throughout the Relevant Time Period, as discussed further below.

207.    The Defendants named herein engaged in one or more acts of mail fraud as a predicate act for the purposes of 18 U.S.C. § 1962(c); 18 U.S.C. § 1961(1); and 18 U.S.C. § 1341, by knowingly and willfully devising the Scheme to defraud the Class, or for obtaining money or property by means of false pretenses, representations or promises; and by using the United States Postal Service to mail, or by causing to be mailed, promotional materials, account statements, and other written materials containing misrepresentations for the purpose of executing the Scheme to defraud Plaintiffs and the Class, on numerous occasions from 2013 through the present.

208.    Specifically, Defendants falsely and misleadingly represented that Liberty was offering Plaintiffs and the Class memberships in an HCSM—including doing so in its Application, Sharing Guidelines, web sites, and in other marketing and advertising materials—when, in reality, Liberty did not qualify as a HCSM under federal or state law, as Defendants knew.

55

209.    Defendants also omitted from its Application, Sharing Guidelines, web sites, and in other marketing and advertising materials that Liberty's arrangements with related entities and affiliated enterprises were not arm's length transactions as they should have been, but part of a larger self-dealing scheme that diverted member funds from Liberty and lined the pockets of its founders in a way totally contrary to its mission as a purported nonprofit HCSM and charitable organization.

210.    In furtherance of the Scheme to defraud, the Defendants named herein continued to send misleading information to Plaintiffs to keep Plaintiffs from discovering the misrepresentations and to discourage Plaintiffs from pursuing their legal rights.  These statements misled Plaintiffs and the Class into believing that they were investing in a valid HCSM plan and that the funds of Plaintiffs and the Class would be used to pay legitimate claims and necessary expenses.  As a result of these fraudulent representations, Defendants gained the funds of Plaintiffs and the Class.

211.    Defendants named herein also engaged in one or more acts of wire fraud as a predicate act for the purposes of 18 U.S.C. § 1962(c); 18 U.S.C. § 1961(1); and 18 U.S.C. § 1343, by knowingly and willfully devising and intending to devise a Scheme and artifice to defraud others of money and property, by means of materially false and fraudulent pretenses, representations, and promises, as more fully described herein, by knowingly and willfully devising and intending to devise a Scheme and artifice to defraud others, of money and property, by means of materially false and fraudulent pretenses, representations, and promises, as described herein, and by perpetuating the fraud by means of interstate transfers of monies.  Defendants, for the purpose of executing and attempting to execute the Scheme, did cause to be transmitted in

56

interstate commerce, by means of a wire communication, certain signs, signals and sounds, that is, transfers of monies from accounts in various states, in violation of 18 U.S.C. § 1343.

212.    Furthermore, and in violation of 18 U.S.C. § 2314, Defendants repeatedly transmitted funds in excess of $5,000 across state lines, knowing the same to have been stolen or obtained by his fraud, on numerous occasions throughout the Relevant Time Period, in order to pay those employed by and associated with the enterprise.  These funds were transferred, after being stolen and having crossed a state boundary, through wire transfers in furtherance of the objective of the enterprise of depriving Plaintiffs and the Class of their funds.

213.    Defendants' RICO violations and Scheme resulted in inflated "Sharing Amounts" and therefore lower payments to satisfy Liberty members' medical claims.

## COUNT V

### (Conversion)

214.    Plaintiffs re-allege and incorporate the preceding allegations in paragraphs 1 through 153 of this Complaint as if set forth fully herein.

215.    Plaintiffs and Class members paid thousands of dollars in monthly premiums to Liberty to obtain coverage for themselves and their families.  Plaintiffs and Class members paid these monthly "contributions" to Defendants to participate in a purported HCSM plan offered by Defendants and to pay for medical expenses and the medical expenses of other Class members and to pay for the reasonable administration costs of the plans.

216.    Defendants had and do have a duty to maintain and preserve Plaintiffs' and Class members' contributions for their proper and legally permitted purposes – covering Plaintiffs' and Class Members' medical expenses, and to prevent their diminishment through wrongful acts.

217.    Liberty has, and without legal right, exercised dominion and control over Plaintiffs' and Class members' "contributions" (i.e. premiums) paid by Plaintiffs and Class members that were intended to cover Plaintiffs' and the Class members' medical expenses and has wrongfully and without authority taken for itself, its principals, and certain third parties a significant portion of those contributions as administrative costs and profits, rather than using the contributions for the intended and rightful purpose, all in hostility to the rights of Plaintiffs and Class members.

218.    The funds that Plaintiffs and the Class members paid to Defendants constitute specific and identifiable funds earmarked for a specific purpose.

219.    Defendants continue to wrongfully and unlawfully retain these funds without the authorization of Plaintiffs or Class members, and Defendants intend to permanently deprive Plaintiffs and Class members of their contributions for Defendants' own profit rather than applying those payments to Plaintiffs' and Class members' benefits claims or refunding the excess premiums received.

220.    As a direct and proximate result of that wrongful conversion, Plaintiffs and the Class members have suffered and continue to suffer damages.

221.    Defendants have converted for their own use the periodic payments made by Plaintiffs and the Class at an amount to be determined at trial, including special, general, and punitive damages, interest, and the cost of litigation, including attorneys' fees.

## COUNT VI

### (Breach of Fiduciary Duty as to Liberty)

222.    Plaintiffs re-allege and incorporate the preceding allegations in paragraphs 1 through 153 of this Complaint as if set forth fully herein.

58

223.    The transactions and facts governing the relationship between Defendants on the one hand and Plaintiffs and the Class members on the other give rise to a fiduciary or confidential relationship between the parties, such that Defendant owed a heightened a duty of the utmost good faith to Plaintiffs and the Class members.

224.    Plaintiffs and Class members placed an enormous amount of trust in Defendants, parties of vastly superior power and bargaining position; provided Defendants with many millions of dollars of payments annually for plans offered by Liberty, and empowered Defendants to allocate those funds to cover members' medical expenses, administer the plans, and make crucial healthcare decisions.

225.    Defendants invited and accepted their power, responsibility, position of trust, and member contributions, and in turn, Plaintiffs and Class members weakened their ability to make their own healthcare choices while reasonably assuming that Defendants would place member interests above the individual interests of Defendants and its owners and the interests of other third parties.

226.    Defendants retained substantial discretion with respect to the use and allocation of Plaintiffs' and the Class members' money and the control of Plaintiffs' and the Class members' healthcare, both in the initial determination of any claim and in the appeals process that would be prohibited if Defendant called these plans what they were (i.e., insurance contracts).

227.    In addition to the discretion Liberty arrogated to itself, Defendants purported to protect and facilitate the faith-based and community structure of the plans offered by Liberty, and by doing so, elevated its relationship with Plaintiffs and Class members above a simple commercial relationship.

59

228.     Defendants further elicited trust and reliance from Plaintiffs and the Class members by misrepresenting that Liberty met the requirements of an HCSM, and that it had been continuously operating a sharing ministry since December 1999, almost twelve years before Liberty was even created.

229.     As a fiduciary, Defendants were required to place member interests, including Plaintiffs' interests, above its own. Defendants were required to exercise its position of trust with due care and good faith; provide members with all material information and act honestly in all respects; and avoid conflict of interests and avoid favoring another's interests over the interests of its members.

230.     In violation of those duties, Defendants squandered, stole and diverted significant assets composed of its members' contributions to Liberty's owners, de facto owner Daniel J. Beers, to his family, and to other third parties, all without Plaintiffs' or the Class members' knowledge, consent, or authorization.

231.     Defendants had a fiduciary obligation to primarily use member contributions to cover claims and pay reasonable administration costs of the business. Instead, Defendants failed to protect and favor members' interests and allowed its owners and other third parties to line their pockets while members were left with millions of dollars in covered but unreimbursed medical expenses.

232.     Defendants violated its duty of candor to members despite its superior knowledge and proprietary knowledge, skill, and position of trust, and despite knowing that it was in a position that requires the utmost good faith.

233.     Defendants made materially false and misleading representations and failed to provide material information that members and potential members would need to know to make

an informed choice about joining or continuing to participate in Liberty's plans, including: that Liberty was formed by—or at the direction—of Daniel J. Beers (found liable for fraud, among other things, by the Attorney General of Ohio); that it was not authorized to sell HCSM plans, was misleading consumers, and was engaged in fraudulent advertising and misrepresentations.

234.    Plaintiffs and the Class suffered damages as a proximate result of Defendant's fiduciary breaches.

235.    Plaintiffs and Class members each paid monthly hundreds or thousands of dollars and incurred millions of dollars in covered but unreimbursed medical expenses based upon Defendants' breaches and its materially false and misleading information to members.

236.    Defendants failed to provide members and potential members with material information they would need to know to determine whether to enter or remain in the plans; and Defendants failed to protect member contributions by misappropriating the funds.

237.    Many Class members' medical bills, including Plaintiffs', are outstanding, meaning Plaintiffs and Class members are and will be subjected to collection efforts and enforcement actions.

238.    By reason of the foregoing, Plaintiffs and the members of the Class are entitled to recover from Defendants all damages and costs permitted by law, including actual, nominal, general, and punitive damages and their costs and attorneys' fees.

## COUNT VII

### (Intentional, or Alternatively, Negligent Misrepresentation as to Liberty)

239.    Plaintiffs re-allege and incorporate the preceding allegations in paragraphs 1 through 153 of this Complaint as if set forth fully herein.

61

240.    Defendant—in its promotional and membership materials, including on its websites, in membership identification cards (the equivalent of an insurance card), and in every Sharing Guideline published during the class period—made materially false and misleading representations and failed to disclose material statements that Defendant had a duty to disclose to Plaintiffs and Class members, including those described below.

241.    For example, Defendant falsely and misleadingly represented that:

a.    Liberty is a legitimate HCSM, when it was and it not is legitimate.

b.    The plans offered by Defendant were not insurance, when the plans were actually illegal insurance contracts.

c.    Monthly payments would go to covering members' medical expenses when, in fact, significant portions of payments were being converted by Defendant and its principals for uses other than paying members' medical expenses.

d.    There was a permissible, legitimate, fair and meaningful claim dispute resolution procedure when, in fact, the dispute resolution procedures were illegal and were designed and used by Defendants to facilitate Defendants' wrongful denial of covered claims.

242.    Defendants had a duty to disclose the foregoing information based on its superior and proprietary knowledge and based on the special relationship, privity, and fiduciary duty Defendants shared with members, including Plaintiffs and the Class.

243.    Defendants made the foregoing false and misleading representations and omissions recklessly or with actual knowledge of their falsity.

244.    In the alternative, Defendants made the false and misleading representations negligently, as Defendants lacked any ground—much less a reasonable ground—to believe that

62

Liberty's plans were legitimate HCSM plans.  Moreover, the plans offered by Liberty were insurance under federal law and state law.  Defendants were not authorized as an insurer by federal or state law to sell or issue the plans offered by Liberty.

245.    Defendants had a duty to not act negligently and to impart accurate information to Plaintiffs and other Class members due to their relationship with Plaintiffs and Class members and their superior knowledge of the facts and circumstances underlying the issuance of the plans and Defendants' interactions with courts, regulatory bodies, and attorneys general.

246.    Defendants made the foregoing misrepresentations and failed to provide accurate and complete material information to induce Plaintiffs and Class members to purchase the plans offered by Liberty and to continue paying periodic fees that Defendants then diverted to its owners, including Liberty's de facto owner, Defendant Daniel J. Beers.

247.    Plaintiffs and the Class justifiably and reasonably relied on the materially false and misleading representations contained in Liberty's promotional materials, membership materials, and websites, or otherwise acted without the aforementioned material information which Defendants had a duty to disclose.

248.    Plaintiffs and Class members purchased and maintained Liberty's plans and paid periodic premiums reasonably believing that Liberty's plans were legal and legitimate HCSM plans, rather than shams designed to avoid federal and state insurance laws and permit Defendants to loot the plans; that the premiums would be used by Defendants to fund medical expenses; and that Defendants would pay medical expenses.

249.    As a proximate result of Defendants' materially false and misleading misrepresentations and material omissions, Plaintiffs and the Class suffered damages, including many millions of dollars in payments, as well as unreimbursed medical expenses.

63

250.    Many Class members' medical bills, including Plaintiffs, are outstanding, meaning Plaintiffs and Class members are subjected to harassment, collection efforts, and potential enforcement actions.

251.    By reason of the foregoing, Plaintiffs and the members of the Class are entitled to recover from Defendants all damages and costs permitted by law, including actual, nominal, general, and punitive damages, costs, and attorneys' fees.

## COUNT VIII

### (Accounting as to Defendant Liberty)

252.    Plaintiffs re-allege and incorporate the preceding allegations in paragraphs 1 through 153 of this Complaint as if set forth fully herein.

253.    Plaintiffs and putative Class Members are entitled to a full accounting and disclosure from Defendants of all administrative expenses and other payments to persons and entities from 2013 to the present.

254.    Plaintiffs and putative Class Members seek a Court Order requiring Defendants to produce said accounting according to law and for the public's benefit.

255.    Plaintiffs and putative Class Members also seek disgorgement of any excessive and/or unnecessary expenses or other payments issued by Defendants that are and/were to the detriment of Plaintiffs and putative Class Members.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that this Honorable Court Order the following relief from Defendants jointly and/or severally:

a.    ORDER certification of the Class and Sub-Classes defined in Plaintiffs' complaint;

64

b.      APPOINT all Plaintiffs Representatives of the Class;

c.      APPOINT Rooker Representative of the Injunctive Relief Sub-Class;

d.      APPOINT Glasgow, Martin and Landry Representatives of the Damages Sub-Class;

e.      APPOINT Johnson Fistel LLP lead counsel for the Class and George Cochran local counsel;

f.      DECLARE that Defendants' unauthorized health insurance plans were and are illegal contracts;

g.      ISSUE an immediate, preliminary and permanent injunction enjoining Defendants (and their officers, partners, agents, servants, representatives, salespeople, employees, successors or assigns, under the names they presently use or any other names, through any corporate or other device, and those in active concert and participation with the Defendants, directly or indirectly) from engaging in the acts and practices of which Plaintiffs complain;

h.      IMPOSE a constructive trust over the value of Liberty's assets and business opportunities that were usurped by Defendants;

i.      ORDER the removal of Individual Defendants as trustees of Liberty, and, as to those Individual Defendants who are employees of Liberty;

j.      ORDER that the Individual Defendants are prohibited from selling or transferring assets of Liberty, entering into contracts on its behalf, acting as signatory on any financial checking, savings or other financial accounts of Liberty, or deciding issues of compensation to themselves, each other or any member of their families;

65

k.      FIND Defendants liable on all counts applicable to each Defendant and Liberty's CEOs or directors personally liable upon finding Liberty an unauthorized and insolvent insurer pursuant to VA Code Ann. § 38.2-215;

l.      AWARD Plaintiffs and putative Class Members compensatory damages in excess of $25,000 for Defendants' unlawful conduct as set forth herein (including, without limitation, breach of contract and breach of fiduciary duties owed to current and former Liberty Members);

m.     DECLARE the Individual Defendants who are trustees and/or employees of the corporate Defendants liable in punitive damages for their civil fraud perpetrated against Plaintiffs and putative Class Members;

n.      ORDER disgorgement and restitution so that Defendants reimburse Plaintiffs and putative Class Members for funds unjustly retained or converted;

o.      ORDER (i) rescission of the unauthorized health insurance plans and restitution of all premiums received from members of the proposed class, including interest; or, at the option of any class member (ii) reform the unauthorized health insurance plans to comply with the minimum mandatory benefits required under the relevant state insurance code and federal law, and permit class members to resubmit claims for medical services, costs and other expenses that would have been covered;

p.      GRANT Plaintiffs the costs of bringing this action, including a reasonable sum for investigative fees and a reasonable sum for attorneys' fees as allowed by law;

q.      AWARD prejudgment and post-judgment interest to Plaintiffs and the Class, and any other relief this Court deems proper.

66

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury as to all claims so triable.


Respectfully Submitted,

DATED: October 21, 2021                    **LAW OFFICE OF GEORGE W. COCHRAN**


                                           */s/ George W. Cochran*
                                           GEORGE W. COCHRAN (0031691)

                                           1981 Crossfield Circle
                                           Kent, Ohio 44240
                                           Telephone: (330) 607-2187
                                           Facsimile: (330) 230-6136
                                           lawchrist@gmail.com

                                           **JOHNSON FISTEL, LLP**

                                           MICHAEL I. FISTEL, JR.
                                           WILLIAM W. STONE
                                           OLIVER S. TUM SUDEN
                                           40 Powder Springs Street
                                           Marietta, GA 30064
                                           Telephone: (470) 632-6000
                                           Facsimile: (770) 200-3101
                                           MichaelF@johnsonfistel.com
                                           WilliamS@johnsonfistel.com
                                           OliverT@johnsonfistel.com

                                           CHASE M. STERN
                                           655 West Broadway. Suite 1400
                                           San Diego, CA 92101
                                           Telephone: 619.230.0063
                                           Facsimile: 619.255.1856
                                           ChaseS@johnsonfistel.com

                                           ***Counsel to Plaintiffs***

67