**No. 25-1035**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

_____

ALLIANCE OF HEALTH CARE SHARING MINISTRIES
*Plaintiff-Appellant*

v.

MICHAEL CONWAY,
in his official capacity as
Commissioner of the Colorado Division of Insurance
*Defendant-Appellee*

_____

Appeal from the United States District Court for the District of Colorado,
No. 1:24-cv-01386-GPG-STV (Hon. Gordon Gallagher)

_____

**APPENDIX VOL XV - Pages A-683 - A-767**

Date: March 21, 2025

Michael F. Murray
Paul Hastings LLP
2050 M Street, NW
Washington, D.C. 20036
(202) 551-1730
michaelmurray@Paulhastings.Com
William E. Mahoney
Paul Hastings LLP
600 Travis Street, Fifty-Eighth Floor
Houston, Texas 77002
(713) 860-7304
williammahoney@Paulhastings.Com

*Counsel For Plaintiff Alliance of
Health Care Sharing Ministries*

| ECF NO. | DESCRIPTION | Appx. Page No. |
|---|---|---|
| **Appendix Vol. I, Pages 1-140** | | |
| - | District Court Docket Sheet | A-1 |
| 8-1 | Ex. A - Declaration of Rob Waldo (May 17, 2024) | A-9 |
| 8-2 | Ex. A-1 – Samaritan Bylaws | A-19 |
| 8-3 | Ex. A-2 - Samaritan Guidelines | A-44 |
| 8-4 | Ex. A-3 - Samaritan Membership Application | A-94 |
| 8-5 | Ex. B - Declaration of Katy Talento | A-100 |
| 32 | Amended Complaint of Alliance of Health Care Sharing Ministries (July 1, 2024) | A-109 |
| **Appendix Vol. II, Pages 141-179** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1-1.6 (September 3, 2024) | A-141 |
| **Appendix Vol. III, Pages 180-223** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.7-1.22 (September 3, 2024) | A-180 |
| **Appendix Vol. IV, Pages 224-261** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.23-1.28 (September 3, 2024) | A-224 |
| **Appendix Vol. V, Pages 262-307** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.29-1.33 (September 3, 2024) | A-262 |

| | **Appendix Vol. VI, Pages 308-331** | |
|---|---|---|
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.34-1.36 (September 3, 2024) | A-308 |
| | **Appendix Vol. VII, Pages 332-350** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.43-1.54 (September 3, 2024) | A-332 |
| | **Appendix Vol. VIII, Pages 351-373** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.37-1.39 (September 3, 2024) | A-351 |
| | **Appendix Vol. IX, Pages 374-424** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.40-1.40 (September 3, 2024) | A-374 |
| | **Appendix Vol. X, Pages 425-478** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.40-1.41 (September 3, 2024) | A-425 |
| | **Appendix Vol. XI, Pages 479-541** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.41-1.42 (September 3, 2024) | A-479 |
| | **Appendix Vol. XII, Pages 542-573** | |

| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.43-1.54 (September 3, 2024) | A-542 |
|------|------|------|
| **Appendix Vol. XIII, Pages 574-612** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.54-1.59 (September 3, 2024) | A-574 |
| **Appendix Vol. XIV Pages 613-682** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.6-1.6 (September 3, 2024) | A-613 |
| **Appendix Vol. XV, Pages 683-767** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.61-1.64 (September 3, 2024) | A-683 |
| **Appendix Vol. XVI, Pages 768-816** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 2.0-2.3 (September 3, 2024) | A-768 |
| **Appendix Vol. XVII, Pages 817-867** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 2.3-2.4 (September 3, 2024) | A-817 |
| **Appendix Vol. XVIII, Pages 868-933** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 2.5-7 (September 3, 2024) | A-868 |

| | **Appendix Vol. XIX, Pages 934-1002** | |
|---|---|---|
| 52.1 | Appendix to Reply to Motion for Preliminary Injunction (September 17, 2024) | A-934 |
| 54 | Order Denying the Alliance's Motion for a Preliminary Injunction (January 13, 2025) | A-949 |
| | **Appendix Vol. XX, Pages 1003-1041** | |
| 54 | Order Denying the Alliance's Motion for a Preliminary Injunction (January 13, 2025) | A-1003 |
| 55 | Notice of Appeal as to Order on Motion for Preliminary Injunction (January 27, 2025) | A-1015 |
| 58-1 | Motion for Order to Grant Injunction Pending Appeal (January 28, 2025) | A-1017 |
| | **Appendix Vol. XXI, Pages 1042-1077** | |
| 58-1 | Motion for Order to Grant Injunction Pending Appeal (January 28, 2025) | A-1042 |
| 60 | Order Denying Motion for Injunction Pending Appeal (February 3, 2025) | A-1069 |

# SETTLEMENT AGREEMENT

This Settlement Agreement ("<u>Agreement</u>") is entered into effective March 15, 2021 (the "<u>Effective Date</u>") between the State of Ohio, *ex rel*., Dave Yost, Ohio Attorney General (the "<u>Attorney General</u>"), and National Coalition of Health Care Sharing Ministries, Inc. ("<u>National Coalition</u>"), Gospel Light Mennonite Church Medical Aid Plan, Inc. which does business as "Liberty HealthShare" ("<u>Gospel Light</u>"), Druzilla Abel personally ("<u>Abel</u>"), Dale Bellis personally ("<u>Bellis</u>"), and Larry Foster personally ("<u>Foster</u>") (National Coalition, Gospel Light, Abel, Bellis, and Foster, collectively, constituting the "<u>Liberty Parties</u>").

**In consideration** of the mutual promises and obligations contained in this Agreement, the Attorney General and National Coalition, Gospel Light, Abel, Bellis and Foster enter into this Agreement and agree as follows:

1.   <u>Parties and Predicate</u>.

    A.   Either individually or jointly, National Coalition and/or Gospel Light have been operating a healthcare sharing ministry beginning no later than 2014 under the name "Liberty HealthShare."

    B.   The Attorney General has authority for enforcing charitable trusts and overseeing charitable solicitations in the State of Ohio pursuant to the Ohio Charitable Organizations Act, R.C. 1716.01 *et seq*., the Ohio Charitable Trust Act, R.C. 109.23 *et seq*., and Ohio common law.

    C.   National Coalition is an Ohio nonprofit corporation whose principal place of operations is 4845 Fulton Drive NW, Canton, Ohio 44718.

    D.   Gospel Light is a Virginia Non-Stock corporation whose principal place of operations is 4845 Fulton Drive NW, Canton, Ohio 44718.

**EXHIBIT**
**1.61**

# EXHIBIT A-1

SETTLEMENT AGREEMENT– Page **2** of **24**

E.  National Coalition and Gospel Light each have 501(c)(3) status under the Internal Revenue Code.

F.  National Coalition and Gospel Light are "charitable organizations" as that term is defined in R.C. 1716.01(A) and "charitable trusts" as that term is defined in R.C. 109.23.

G.  National Coalition and Gospel Light have engaged in "solicitation" as that term is defined in R.C. 1716.01(K)(1).

H.  Pursuant to his statutory and common law authority, the Attorney General directed that the Charitable Law Section of the Ohio Attorney General's Office investigate under R.C. 109.24 whether the property held by Gospel Light and/or National Coalition for charitable, religious or educational purposes has been and is being properly administered in accordance with fiduciary principles as established by the courts and statutes of this state and whether Gospel Light and/or National Coalition have properly complied with the requirements of R.C. Chapter 1716 regarding the conduct of charitable solicitations (the "Charitable Investigation").

I.  The current board members of the National Coalition are Dale Bellis, Druzilla Abel, Durlin Beachy, and Everett Yoder.

J.  The current board members of Gospel Light are Durlin Beachy, Don Brewer, Scot Burris, Ryan Mast, and Everett Yoder.

K.  Gospel Light has been recognized by Centers for Medicare & Medicaid Services ("CMS") as a healthcare sharing ministry under Section 5000A(d)(2)(B)(ii) of the Affordable Care Act.

L.  Gospel Light registered the trade name "Liberty Healthshare" with the Ohio Secretary of State on or about June 15, 2015, with a date of first use of November 15, 2014.

M.  In December 2018, National Coalition transferred substantially all of its assets to Gospel Light for the purpose of benefiting the health care sharing ministry and the membership of Gospel Light.  National Coalition and Gospel Light represent that they were unaware of the Charitable Investigation until after the asset transfer.  Gospel Light's Board of Directors has approved returning a portion of the previously transferred assets in an amount sufficient for National Coalition to pay the civil penalty agreed to by National Coalition as part of this settlement with the Attorney General.

N.  Beginning no later than January 1, 2021, National Coalition has had no employees or ongoing operations and Liberty HealthShare is being operated exclusively by Gospel Light.

O.  Abel is the current Chief Executive Officer of Gospel Light, previously served for multiple years and simultaneously as a board member, board secretary, Chief Operating Officer of both National Coalition and Gospel Light, and was listed as a vice president of both National Coalition and Gospel Light in certain filings with the Internal Revenue Service and the Charitable Law Section of the Ohio Attorney General's Office.  She resides in Stark County, Ohio.

P.  Bellis is described as the founder of Liberty HealthShare and previously served for multiple years and simultaneously as a board member, President and Executive Director of both National Coalition and Gospel Light.  He resides in Stark County, Ohio.

Q. Foster was previously a board member and Chief Executive Officer of both National Coalition and Gospel Light.  He resides in Marion County, Indiana.

R. On the basis of the Charitable Investigation, the Attorney General believes that one or more of the Liberty Parties have, through their acts and/or omissions, violated Ohio law relating to the charitable trust and/or solicitation activities of National Coalition and Gospel Light.

S. Each of the Liberty Parties denies that, through their acts and/or omissions, they have violated Ohio law relating to the charitable trust and/or solicitation activities of National Coalition and Gospel Light.

T. The Attorney General and the Liberty Parties wish to resolve all issues, allegations and/or claims between and among them arising out of the Charitable Investigation.

U. All parties agree that neither execution or performance of this Agreement by Gospel Light, National Coalition, Abel, Bellis, or Foster shall constitute an admission of any wrongdoing or violations of law by any of them.

2. <u>Dissolution of National Coalition</u>.

A. On or before June 30, 2021, National Coalition shall make best efforts to complete and file all documents with, and pay any necessary fees to, the Ohio Secretary of State, the Attorney General, the Internal Revenue Service, and any other Federal or State agency necessary to formally dissolve National Coalition.  National Coalition shall timely provide copies of these documents to the Attorney General, as directed.  In no event shall dissolution and payment be completed later than August 31, 2021.

B. National Coalition and Gospel Light, jointly and separately, represent and warrant that any and all documents or records, in whatever form, currently in the care, custody or

control of National Coalition relating to the formation, operation, governance, finances and/or service to members of National Coalition and/or Gospel Light either have been or will be preserved in the care, custody and/or control of Gospel Light.

C.  Assets of National Coalition suitable for distribution to and/or use by another healthcare sharing ministry shall go only to Gospel Light.

3.    <u>Board Membership for Gospel Light</u>.

A.  Following the Effective Date, Bellis, Foster, and Abel are prohibited from serving in any capacity on the Board of Directors of Gospel Light.

B.  Within 120 days after the Effective Date, Gospel Light's Board of Directors shall appoint two new, outside and independent Board Members with expertise or experience in health care claims administration, law, finance or accounting, or business management.  Prior to appointment, Gospel Light will identify the proposed board candidates to the Attorney General, for review of the independence and qualifications by the Attorney General.  The Attorney General reserves the right to reject proposed Board candidates by providing notice of rejection to Gospel Light no later than 15 business days after receiving written notice of that individual's nomination.  For purposes of this Paragraph and the remainder of this Agreement, the term "<u>independent</u>" shall mean the absence of any pre-existing professional or familial relationship with any of the Liberty Parties (other than as Liberty HealthShare members), any current or former board members of Gospel Light or National Coalition, The Medical Cost Savings Solution, Ltd., SavNet International, LLC, Cost Sharing Solutions, LLC, any of the owners of the preceding three entities, or any other entity with common ownership to any of these three entities.

4.    <u>Senior Level Executive Reporting</u>.

A.  Beginning no later than the Effective Date and continuing through January 24, 2022, the positions, or the future functional equivalents, of Chief Financial Officer and Chief Legal Counsel for Gospel Light, currently held by Stephen Furst and Steven Yashnik respectively, shall report directly to the Board of Directors of Gospel Light and not to the Chief Executive Officer.  On or after January 25, 2022, all terms of employment or decisions relating to employment for the positions of Chief Financial Officer and Chief Legal Counsel, or the future functional equivalents, shall be set or made by the Board of Directors of Gospel Light, but those positions may otherwise report to the Chief Executive Officer if and as the Board directs.

5.    <u>Auditing Firm and Practices</u>.

A.  Upon the completion of Gospel Light's annual filings with the IRS and Attorney General and accounting audit for fiscal year 2020, Gospel Light shall disengage and thereafter permanently refrain from engaging its current auditing firm, Sullivan & Company, LLC, for those same services.

B.  Subject to Paragraph 5.A, Gospel Light shall retain a new and independent auditing firm for all audit engagements, including but not limited to the annual filings with the IRS and Attorney General and accounting audit for fiscal year 2021 and thereafter.  The new auditing firm shall be selected by Gospel Light's Board of Directors, in consultation with the Chief Financial Officer, through a competitive process, soliciting requests for proposals from a minimum of three qualified accounting firms.  Prior to engaging the new auditing firm, Gospel Light will identify the proposed auditing firm to the Attorney General, which the Attorney General may reject by providing notice of

Ex. 1.61, p. 6 of 29

Resp. Appx. p. 544                                   **Appx. Vol XV**
                                                              **A-688**

rejection to Gospel Light no later than 30 days after receiving written notice of intent to proceed with hiring.  Gospel Light shall retain the new auditing firm no later than November 1, 2021 unless the Attorney General rejects the candidate.

C. For fiscal year 2020 and beyond, Gospel Light's IRS form 990 filings shall include the following:

    i. Gospel Light shall not be required to include cost-containment vendor expenses on Part IX of IRS form 990.  Within Part IX, however, Gospel Light shall reference or refer the reader to Schedule O of IRS form 990.

    ii. On Schedule O, Gospel Light shall disclose both total and net "sharepower" for the fiscal year.  The net sharepower figure shall be calculated by subtracting from the total sharepower figure all administrative expense allocations and all cost-containment vendor expenses.  The administrative expense allocations and cost containment vendor expenses shall be disclosed, separately, on Schedule O.  For the cost-containment vendor expenses, Gospel Light shall identify or describe the types of services (such as balance billing, provider disputes, case management, negotiations, preferred provider agreements, etc.) that are categorized as cost-containment vendor expenses.

D. For fiscal year 2020 and beyond, substantially the same information described in Paragraph 5.C.ii above shall also be disclosed in Gospel Light's audited financial statements.

6.     <u>Abel Retirement and Replacement Chief Executive Officer</u>.

A. Abel tendered her resignation to the Board of Directors of Gospel Light on January 24, 2021.  Abel's retirement date will be effective no later than January 24, 2022, and Abel

will abide by the terms set forth in the 2021 Executive Compensation and Severance/Retention Agreement.  Upon her retirement and in no event later than January 24, 2022, Abel shall not be employed by Gospel Light in any capacity.

B. Prior to the Effective Date, Gospel Light will have executed the above identified 2021 Executive Compensation and Severance/Retention Agreement, which will require Abel to, among other services and covenants, use her best efforts to stabilize and position Gospel Light for a successful transition with a new senior officer.  The senior officer will be selected by the Board of Directors of Gospel Light.  The intent is for such person to take over as the next Chief Executive Officer after Abel's departure.  The 2021 Executive Compensation and Severance/Retention package will provide compensation and benefits lasting not more than twelve months and otherwise reasonable and typical to one provided to senior management in the normal course of nonprofit employment agreements and departures.  Prior to execution, Gospel Light will allow the Attorney General to review and verify the final terms of the 2021 Executive Compensation and Severance/Retention Agreement in the Columbus, Ohio office of Roetzel & Andress.

C. For a period of twelve months following the date of her effective separation of service from Gospel Light, Abel shall not perform any work or service, either directly or indirectly, for Gospel Light not authorized by the 2021 Executive Compensation and Severance/Retention Agreement or for any third-party vendor providing services to Gospel Light.  Following this twelve-month period, Abel shall not be restricted from working for or on behalf of any third-party vendor providing services to Gospel Light.  Provided, however, that if those services for the third-party vendor also involve

contractual services for Gospel Light, such services shall be subject to review and prior approval of Gospel Light's Board of Directors.

D.  Within 180 days of the Effective Date, Gospel Light's Board of Directors shall direct a search for and hire a new senior officer to be trained by and take over as Chief Executive Officer for Abel upon her separation from Gospel Light.  The new senior officer must be an outside and independent candidate.  Prior to hiring, Gospel Light will identify the proposed senior officer for review of the independence and qualifications by the Attorney General, whom the Attorney General may reject by providing notice of rejection to Gospel Light no later than 15 business days after receiving written notice of intent to proceed with hiring.

E.   Notwithstanding any other provision in this Agreement, Abel may work for or with any trade association whose members include but are otherwise independent of Gospel Light.

7.  <u>Bellis</u>.

A.  Bellis shall not be employed by Gospel Light in any capacity following the December 31, 2022 termination date of his 2018 Executive Employment Agreement, as amended commensurate with this Agreement.

B.  Effective December 31, 2022, all rights and obligations of Gospel Light and Bellis to one another under their 2018 Executive Employment Agreement shall fully and finally terminate such that, without limitation, Bellis' obligations not to compete with Gospel Light and any right to payment or benefits from Gospel Light shall cease, effective December 31, 2022.

SETTLEMENT AGREEMENT– Page **10** of 24

C.  Prior to December 31, 2022, Bellis shall not perform any work, either directly or indirectly, for Gospel Light not authorized by the 2018 Executive Employment Agreement, as amended commensurate with this Agreement, or for any third-party vendor providing services to Gospel Light.  Beginning on or after December 31, 2022, Bellis shall not be restricted from working for or on behalf of any third-party vendor providing services to Gospel Light, subject to review and prior approval of Gospel Light's Board of Directors.

D.  Notwithstanding any other provision in this Agreement, Bellis may work for or with any trade association whose members include but are otherwise independent of Gospel Light.

8.  <u>Foster</u>.

A.  Foster is not currently and following the Effective Date shall not be employed by Gospel Light in any capacity.

B.  Prior to the effective date of Abel's resignation from Gospel Light, Foster shall be barred from performing any work, either directly or indirectly, for Gospel Light.  He also shall not participate in any negotiation or delivery of direct services to Gospel Light on behalf of any third-party vendor providing services to Gospel Light. Beginning after the effective date of Abel's resignation from Gospel Light, Foster shall not be restricted from working for or on behalf of any third-party vendor providing services to Gospel Light, subject to review and prior approval of Gospel Light's Board of Directors.

SETTLEMENT AGREEMENT– Page **11** of **24**

    C.  Notwithstanding any other provision in this Agreement, Foster may work for or with any trade association whose members include but are otherwise independent of Gospel Light.

9.   <u>Vendor Relationships</u>.

    A.  To the extent Gospel Light is party to any contract with The Medical Cost Savings Solution, Ltd., SavNet International, LLC, Cost Sharing Solutions, LLC, or any other vendor with common ownership to any of these entities, and that contract is set to expire on or before January 24, 2022, Gospel Light shall either let those contracts expire or agree only to extend the terms of the current contracts with minimal modifications until no later than March 31, 2022.

    B.  To the extent Gospel Light is party to any contract with The Medical Cost Savings Solution, Ltd., SavNet International, LLC, Cost Sharing Solutions, LLC, or any other vendor with common ownership to any of these entities, and that contract is set to expire after January 24, 2022, Gospel Light shall not negotiate an extension of such existing contract prior to March 31, 2022.  The competitive vendor selection process established in Paragraph 9.C below does not prohibit the parties from negotiating and entering into a new contract after March 31, 2022.

    C.  Subsequent to March 31, 2022, Gospel Light shall not renew or enter into any contract with The Medical Cost Savings Solution, Ltd., SavNet International, LLC, Cost Sharing Solutions, LLC, or any other vendor with common ownership to any of these entities, without first utilizing a competitive and objective vendor-selection process approved by the Board of Directors of Gospel Light.

10.    Continuation of Operations and Service at Gospel Light.

A.  This Agreement is intended to sustain and continue Gospel Light's operations and charitable service to the members of Liberty HealthShare throughout the changes otherwise described and required in this Agreement.

B.  Other than the transfer referenced in Paragraph 1.M above, Gospel Light shall not merge with or into, transfer or assign any assets to, or transfer or assign any rights or obligations regarding the members of Liberty HealthShare to, or enter into any binding agreement to do any of the preceding with, any other organization or corporation, including any other health care sharing ministry, prior to March 31, 2022, and may do so thereafter only if approved by the Board of Directors of Gospel Light.

11.    Civil Penalty, Costs and Fees.

A.  Subject to and without waiving Paragraphs 1.S and 1.U above, National Coalition agrees to pay a civil penalty for the failure to timely register with the Charitable Law Section of the Attorney General prior to making charitable solicitations, in the amount of $30,000.00 (thirty thousand dollars and zero cents) (the "civil penalty"), provided that $10,000.00 (ten thousand dollars and zero cents) of the civil penalty will be suspended subject to, and abated upon, National Coalition and Gospel Light fully satisfying and performing all of their obligations under the Agreement.  The civil penalty shall be paid by wire transfer with receipt acknowledged, or by cashier's check or money order payable to **"Treasurer, State of Ohio"** and mailed or delivered to:

> Ohio Attorney General
> Charitable Law Section
>   Attn:  Chief Accountant
> 30 E. Broad St., 25th Floor
> Columbus, OH  43215

The civil penalty shall be paid within 15 days of the Effective Date.  Gospel Light may pay, and guarantees the payment of, the civil penalty on behalf of National Coalition. Within two business days of receiving notice that National Coalition or Gospel Light intends to pay the civil penalty by wire transfer, the Attorney General shall provide to counsel wire transfer instructions.

B.  Subject to and without waiving Paragraphs 1.S and 1.U above, Gospel Light agrees to pay the Attorney General $20,000.00 (twenty thousand dollars and zero cents) for the reasonable costs of investigation and $50,000.00 (fifty thousand dollars and zero cents) for reasonable attorneys' fees incurred in conjunction with the Charitable Investigation (collectively, the "cost and fees amount").  The costs and fees amount shall be paid by wire transfer with receipt acknowledged, or by cashier's check or money order payable to "Treasurer, State of Ohio" and mailed or delivered to

> Ohio Attorney General
> Charitable Law Section
>   Attn:  Chief Accountant
> 30 E. Broad St., 25th Floor
> Columbus, OH  43215

The cost and fees amount shall be paid within 15 days of the Effective Date.  Within two business days of receiving notice that Gospel Light intends to pay the cost and fees amount by wire transfer, the Attorney General shall provide to counsel wire transfer instructions.

C.  Failure by National Coalition and/or Gospel Light to comply with their respective obligations under the Agreement shall entitle the Attorney General to $10,000.00 (ten thousand dollars and zero cents) in stipulated civil penalties per violation.  In the event the Attorney General believes that any obligation has not been complied with, the

Attorney General will provide written notice and a ten-day period to cure the noncompliance.  The notice required under this Paragraph may be provided to the party alleged to be in breach at the email address set forth in Paragraph 14.B below.  If the alleged breaching party is Gospel Light, such notice shall also be delivered by U.S. mail to the Chairman of the Board of Directors at the address set forth in Paragraph 1.D above.  The ten-day cure period begins once email or mail receipt is acknowledged by the alleged breaching party; provided, however, that if the Attorney General complies with the notice provisions in this Paragraph and Paragraph 14.B, then in no event shall the cure period exceed 24 days from the date notice was provided.

D.  National Coalition and Gospel Light do not control Abel, Bellis, and/or Foster, who are represented by separate counsel.  As such, to the extent Abel, Bellis, and/or Foster fails to adhere to the terms of this Agreement, National Coalition and Gospel Light shall not be held accountable for such conduct unless they directly participated in the conduct giving rise to the alleged breach.

E.  The Attorney General shall be entitled to an award of reasonable costs and fees, including attorneys' fees, incurred in successfully obtaining relief from any breach of the Agreement by any Liberty Party.

12.  Ongoing Cooperation by National Coalition, Gospel Light, Abel, Bellis, and Foster.

A.  The Liberty Parties shall cooperate, reasonably and promptly, with the Attorney General regarding the Charitable Investigation and any litigation arising from the Charitable Investigation.  This cooperation shall include:

   i.  Fully, fairly, and truthfully disclosing and/or producing, voluntarily and without service of subpoena or investigative demand, all non-privileged information

and all non-privileged documents or other tangible evidence requested by the Attorney General concerning or relevant to whether any person is violating or conspiring to violate, or has violated or conspired to violate, the law including, without limitation, non-privileged information that falls into the following categories: (a) formation of National Coalition and/or Gospel Light; (b) operation of Gospel Light and/or National Coalition; (c) governance of Gospel Light and/or National Coalition; (d) finances of Gospel Light and/or National Coalition; (e) communications with past and present directors, trustees, officers, employees, consultants, contractors, and/or agents of Gospel Light and National Coalition; (f) business and/or contracts between and/or for the benefit of Gospel Light and/or National Coalition and service vendors, including without limitation Legacy Management, LLC, Cost Sharing Solutions LLC, The Medical Cost Savings Solution, Ltd., SavNet International LLC, and HealthShare RX (collectively, "Vendors"); (g) communications with past and present owners, members, managers, directors, trustees, officers, consultants, contractors, employees and/or agents of Vendors; (h) meetings, and actions without a meeting, of the directors and/or trustees of Gospel Light and/or National Coalition; (i) termination or separation of Gospel Light and/or National Coalition's Chief Legal Counsel Sandra Cheshire; (j) Termination or separation of Gospel Light and/or National Coalition's Chief Medical Officer John Hunt; (k) conflicts of interest, actual and/or alleged, relating to Gospel Light and/or National Coalition's formation, operation, governance, finances and/or service to members; and (l) Communications with and/or among

Druzilla Abel, Daniel J. Beers, Daniel J. Beers II, Ronald S. Beers, Thomas Fabris, Brandon Fabris, Dale Bellis, Larry Foster, and Douglas Behrens and persons acting as their agents or representatives.

ii.  For a period of not less than five years following the Effective Date, maintaining custody of, or making arrangements to have maintained, all documents and records that fall into the categories described in Paragraph 12.A.i including, for Abel, Bellis, and Foster, personal emails, text messages, or any other digital communications; and,

iii.  Attending, appearing and/or participating, voluntarily and without service of subpoena or investigative demand, at any discussions, interviews, depositions, hearings, trials or other proceedings, whether formal or informal, at which the presence of a Liberty Party is requested by the Attorney General and answering any and all inquiries regarding non-privileged information that may be put forth by the Attorney General at any proceedings, including about such Liberty Party's own acts and/or omissions and/or against such Liberty Party.  All Liberty Parties are entitled to reasonable notice of the request and may have counsel present to represent the them at these proceedings.

iv.  The cooperation required under Paragraph 12.A shall not be deemed to waive any attorney-client privilege or work product protections.  The Attorney General reserves the right to challenge any assertions of privilege or protection.

B.  Additional Cooperation by National Coalition and Gospel Light

i.  In addition to cooperation under Paragraph 12.A above, Gospel Light and National Coalition will undertake reasonable best efforts to have Gospel Light's

and/or National Coalition's current and former officers, directors and employees cooperate according to Paragraphs 12.A.i., 12.A.ii., and 12.A.iii above.

ii. No later than the Effective Date, Gospel Light and National Coalition shall produce to the Attorney General a log or logs of the documents and information withheld and/or redacted from their responses to investigative requests for records in the Charitable Investigation.  The log(s) shall provide sufficient information, without disclosing privileged information, to identify and ascertain the parties to, dates, parties to creation and/or communication, form and subject matter of such documents and information, and the asserted privilege or protection.

iii. No later than 14 days after the Effective Date, Gospel Light and/or the National Coalition will release Jim Hummer from any and all non-disclosure agreements for the limited purpose of allowing him to fully cooperate with the Attorney General regarding the Charitable Investigation and any litigation arising from the Charitable Investigation.

iv. No later than 14 days after the Effective Date, Gospel Light and/or National Coalition will release Sandy Cheshire from any and all non-disclosure agreements for the limited purpose of allowing her to fully cooperate with the Attorney General regarding the Charitable Investigation and any litigation arising from the Charitable Investigation, provided that such release(s) shall not waive any attorney-client privilege or work product protections.  The Attorney General does not object if counsel from Roetzel & Andress or other designated

counsel (at the discretion and cost of Gospel Light and/or National Coalition) is present in any interview, deposition, or testimony of Ms. Cheshire to assert reasonable objections to preserve the attorney-client privilege or attorney work product protection.  The Attorney General reserves the right to challenge any assertions of privilege or protection.

C. The parties reserve all rights under the Ohio Civil Rules and any rights afforded by the 5th Amendment to the U.S. Constitution with respect to their obligations to cooperate under this Agreement.

D. A refusal to cooperate by any Liberty Party will be considered only a breach of the Agreement by the refusing Liberty Party, subject to the rights reserved in Paragraphs 11.D, 12.B.i., and 12.C above.

13. <u>Releases and Reservation of Rights</u>.

A. Conditioned upon and subject to full and complete material performance of their obligations under this Agreement, the Attorney General hereby fully and completely releases Abel, Bellis, and Foster from any and all claims, and causes of action of any nature or any kind, both known and unknown, arising from the Charitable Investigation for any acts and/or omissions in their capacity as Board Members and/or Officers of Gospel Light or the National Coalition.

B. Conditioned upon and subject to full and complete material performance of their obligations under this Agreement, the Attorney General hereby fully and completely releases Gospel Light and National Coalition from any and all claims, and causes of action of any nature or kind, both known and unknown, arising from the Charitable Investigation.

C.  Conditioned upon and subject to full and complete material performance by Gospel Light and National Coalition of their obligations under this Agreement, the Attorney General hereby fully and completely releases Darrell Beachy, Durlin Beachy, Don Brewer, Scot Burris, Joseph Gingerich, Brad Hahn, Tyler Hochstetler, Ryan Mast, William Waldron, Everett Yoder, Stephen Furst, Steve Yashnik, Michael Fairless, Robert Kintigh, Amy Hagen, Sr., Terrie Ipson, and Wes Humble (collectively, the "Released Nonparties") from any and all claims, causes of action of any nature or kind, both known and unknown, arising from the Charitable Investigation for any acts and/or omissions in their capacities as Board Members and/or Officers of Gospel Light or National Coalition.

    i.  Upon a showing by Gospel Light that it must indemnify any other individual(s) relating to or arising from the Charitable Investigation, the Attorney General will work in good faith with Gospel Light to determine whether such individual may be released on the same or similar terms and conditions as individuals are being released under this Agreement.

    ii.  Nothing in this Agreement shall be construed to prevent or limit in any way the Attorney General's ability to seek information, documents, or testimony from any of the Released Nonparties.

D.  Nothing in this Agreement shall be construed to release any of the Liberty Parties from their obligations under this Agreement.  Nothing in this Agreement shall be construed to release any of the Liberty Parties or any of the Released Nonparties from any claims or causes of action based on acts or omissions occurring after the Effective Date.

E.  Nothing in this Agreement shall be construed to release or effect in any way, and the Attorney General reserves all rights to pursue, any and all claims or causes of action the Attorney General may have against any individual or entity other than the Liberty Parties or the Released Nonparties, including claims or causes of action that may involve the acts or omissions of the Liberty Parties or the Released Nonparties.

F.  Nothing in this Agreement shall be construed to release or effect in any way, and the Attorney General reserves all rights to pursue, any and all claims or causes of action of any State agencies or sections of the Attorney General's Office other than the Charitable Law Section, including any claims or causes of action arising out of or relating to any investigation by the Consumer Protection Section of the Ohio Attorney General's Office.

14.   <u>Miscellaneous</u>.

A.  The parties shall execute and deliver such further instruments and documents and take such other actions as may reasonably be requested and required to perform their obligations under this Agreement, including obligations to cooperate.

B.  Any notice required or provided under this Agreement shall be effective when sent by as follows:

   i.  To Gospel Light c/o Daniel Hilson, Esq., Roetzel & Andress, at dhilson@ralaw.com, and Jessica Lopez, Esq., Roetzel & Andress at Jlopez@ralaw.com, and with a mail address of 222 S. Main Street, Akron, Ohio 44308-1500, with a copy via regular U.S. Mail to Gospel Light Mennonite Church Medical Aid Plan, 4845 Fulton Drive NW, Canton, Ohio 44718 Attention: Chief Legal Officer;

ii.  To National Coalition c/o Daniel Hilson, Esq., Roetzel & Andress, at dhilson@ralaw.com, and Jessica Lopez, Esq., Roetzel & Andress at Jlopez@ralaw.com, and with a mail address of 222 S. Main Street, Akron, Ohio 44308-1500, with a copy via regular U.S. Mail to National Coalition of Health Care Sharing Ministries, Inc., 4845 Fulton Drive NW, Canton, Ohio 44718 Attention: Chief Legal Counsel;

iii.  To Abel c/o Helen Mac Murray, Esq., Mac Murray & Shuster, at hmacmurray@mslawgroup.com and with a mail address of 6525 West Campus Oval Ste. 210, New Albany, Ohio 43054 with a copy to Druzilla Abel via email to drudyable@yahoo.com;

iv.  To Bellis c/o David Thomas, Esq., Taft, Stettinius & Hollister LLP, at dthomas@taftlaw.com, and with a mail address of 65 East State Street Ste. 1000, Columbus, Ohio 43215, with a copy to Dale Bellis via email to dalebellis123@gmail.com;

v.  To Foster c/o Helen Mac Murray, Esq., Mac Murray & Shuster, at hmacmurray@mslawgroup.com, and with a mail address of 6525 West Campus Oval Ste 210 New Albany, Ohio 43054, with a copy to Larry Foster via email to lfoster@pharmacywholesaleclub.com; and

vi.  To the Attorney General, c/o Daniel Fausey, Section Chief, Charitable Law Section at Daniel.Fausey@OhioAttorneyGeneral.gov, with a copy to Attorney General, Charitable Law Section, 30 E. Broad St., 25th Floor, Columbus, Ohio 43215, Attention:  Section Chief.

SETTLEMENT AGREEMENT– Page **22** of **24**

Any party may change its notice party and/or address by providing written notice to the Attorney General and all Liberty Parties according to this Agreement.

C. This Agreement is entered into in the State of Ohio and will be governed under the laws of the State of Ohio.

D. The parties acknowledge and agree that all matters relating to the enforcement and interpretation of this Agreement shall be subject to the jurisdiction of the Franklin County, Ohio Common Pleas Court.

E. All parties acknowledge that they have been given ample opportunity to be advised by legal counsel of their own choosing as to the meaning and effect of each provision of this Agreement and that they have knowingly and voluntarily elected to enter into this Agreement.  The parties agree to sign this Agreement as their own voluntary act and deed, and each represents that such execution was not the result of any duress, coercion, or undue influence upon either of them.  The parties hereby acknowledge receipt of a copy of this Agreement before signing it and understand that each and every provision of this Agreement is contractual, legally binding, and not mere recitals.

F. In the event that any provision of the Agreement is deemed to be invalid or unenforceable, the remaining provisions will remain intact and enforceable as stated, provided that doing so provides the same or similar consideration to the parties.

G. This Agreement represents the entire understanding of the parties with respect to the subject matter contained herein.  The Agreement may be modified only in writing signed by all parties.

SETTLEMENT AGREEMENT– Page **23** of **24**

H.  This Agreement is not intended to and shall not confer any rights upon any persons or entities other than the Attorney General, the Liberty Parties, and the Released Nonparties.

I.  This Agreement may be signed in counterparts which, when taken together, will constitute a single integrated document.  Signed copies of the Agreement sent by electronic means will be considered to be the same as original signed versions.

J.  It is understood and agreed that the payments described herein and the settlement and releases are the compromise of disputed claims and are not to be construed as an admission of any liability, fault, or wrongdoing on the part of the Liberty Parties, whom expressly deny liability and fault.

K.  Each party has cooperated in (and in any construction to be made of this Agreement shall be deemed to have cooperated in) the drafting and the preparation of this Agreement.

L.  Each individual signing below represents that he or she is authorized and directed to sign this Agreement on behalf of the representative party and further represents that he or she has the requisite authority to bind the party on behalf of whom they are signing.

**(remainder of this page intentionally left blank / signature page follows)**

SETTLEMENT AGREEMENT– Page **24** of **24**

This Agreement is being executed by the parties as of the Effective Date.

DALE BELLIS, in his personal capacity

NATIONAL COALITION OF HEALTH CARE SHARING MINISTRIES, INC.

*Durlin Beachy*

_____
Signature

_____
Representative's Signature

Durlin Beachy-Chairman
_____
Printed name and title

DRUZILLA ABEL, in her personal capacity

_____
Signature

GOSPEL LIGHT MENNONITE CHURCH MEDICAL AID PLAN, INC.

_____
Representative's Signature

LARRY FOSTER, in his personal capacity

_____
Printed name and title

_____
Signature

DAVE YOST,
OHIO ATTORNEY GENERAL

_____
Daniel W. Fausey
Section Chief
Charitable Law Section
30 E. Broad St., 25th Fl.
Columbus, OH 43215

SETTLEMENT AGREEMENT– Page **25** of **24**

This Agreement is being executed by the parties as of the Effective Date.

DALE BELLIS, in his personal capacity

NATIONAL COALITION OF HEALTH CARE SHARING MINISTRIES, INC.

_____
Signature

_____
Representative's Signature

_____
Printed name and title

DRUZILLA ABEL, in her personal capacity

_____
Signature

GOSPEL LIGHT MENNONITE CHURCH MEDICAL AID PLAN, INC.

_____
Representative's Signature

LARRY FOSTER, in his personal capacity

Scot Barrus, Chairman
_____
Printed name and title

_____
Signature

DAVE YOST,
OHIO ATTORNEY GENERAL

_____
Daniel W. Fausey
Section Chief
Charitable Law Section
30 E. Broad St., 25th Fl.
Columbus, OH 43215

SETTLEMENT AGREEMENT– Page **24** of 24

This Agreement is being executed by the parties as of the Effective Date.

DALE BELLIS, in his personal
capacity

NATIONAL COALITION OF HEALTH CARE
SHARING MINISTRIES, INC.

_____
Signature

_____
Representative's Signature

_____
Printed name and title

DRUZILLA ABEL, in her personal
capacity

_____
Signature

GOSPEL LIGHT MENNONITE CHURCH
MEDICAL AID PLAN, INC.

_____
Representative's Signature

LARRY FOSTER, in his personal
capacity

_____
Printed name and title

_____
Signature

DAVE YOST,
OHIO ATTORNEY GENERAL

_____
Daniel W. Fausey
Section Chief
Charitable Law Section
30 E. Broad St., 25th Fl.
Columbus, OH 43215

SETTLEMENT AGREEMENT– Page **24** of **24**

This Agreement is being executed by the parties as of the Effective Date.

DALE BELLIS, in his personal capacity

*[signature: Dale Bellis]*

_____
Signature

DRUZILLA ABEL, in her personal capacity

_____
Signature

LARRY FOSTER, in his personal capacity

_____
Signature

NATIONAL COALITION OF HEALTH CARE SHARING MINISTRIES, INC.

_____
Representative's Signature

_____
Printed name and title

GOSPEL LIGHT MENNONITE CHURCH MEDICAL AID PLAN, INC.

_____
Representative's Signature

_____
Printed name and title

DAVE YOST,
OHIO ATTORNEY GENERAL

_____
Daniel W. Fausey
Section Chief
Charitable Law Section
30 E. Broad St., 25th Fl.
Columbus, OH 43215

SETTLEMENT AGREEMENT– Page 24 of 24

This Agreement is being executed by the parties as of the Effective Date.

DALE BELLIS, in his personal capacity

_____
Signature

NATIONAL COALITION OF HEALTH
CARE SHARING MINISTRIES, INC.

_____
Representative's Signature

_____
Printed name and title

DRUZILLA ABEL, in her personal capacity

_____
Signature

GOSPEL LIGHT MENNONITE CHURCH
MEDICAL AID PLAN, INC.

_____
Representative's Signature

_____
Printed name and title

LARRY FOSTER, in his personal capacity

_____
Signature

DAVE YOST,
OHIO ATTORNEY GENERAL

_____
Daniel W. Fausey
Section Chief
Charitable Law Section
30 E. Broad St., 25th Fl.
Columbus, OH 43215

SETTLEMENT AGREEMENT– Page **24** of **24**

This Agreement is being executed by the parties as of the Effective Date.

DALE BELLIS, in his personal capacity

NATIONAL COALITION OF HEALTH CARE SHARING MINISTRIES, INC.

_____
Signature

_____
Representative's Signature

DRUZILLA ABEL, in her personal capacity

_____
Printed name and title

_____
Signature

GOSPEL LIGHT MENNONITE CHURCH MEDICAL AID PLAN, INC.

_____
Representative's Signature

LARRY FOSTER, in his personal capacity

_____
Printed name and title

_____
Signature

DAVE YOST,
OHIO ATTORNEY GENERAL

_____

**Daniel W. Fausey**
**Section Chief**
**Charitable Law Section**
30 E. Broad St., 25th Fl.
Columbus, OH 43215

Ex. 1.61, p. 29 of 29

SETTLEMENT AGREEMENT– Page 1 of 15

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into effective December 1$\mathcal{C}$, 2021 (the "Effective Date") between the State of Ohio, *ex rel.*, Dave Yost, Ohio Attorney General (the "Attorney General"); and Daniel J. Beers personally ("D. Beers"), Cost Sharing Solutions LLC ("CSS"), Daniel Beers II personally ("D. Beers II"), Ronald Beers personally ("R. Beers"), Brandon Fabris personally ("B. Fabris"), The Medical Cost Savings Solution, Ltd. ("MCS"), Thomas Fabris personally ("T. Fabris"), Barat Consulting, LLC ("Barat Consulting"), and Scott Barat personally ("S. Barat") (D. Beers, CSS, D. Beers II, R. Beers, B. Fabris, MCS, T. Fabris, Barat Consulting, and S. Barat, collectively, constituting the "Vendor Parties").

**In consideration** of the mutual promises and obligations contained in this Agreement, the Attorney General and the Vendor Parties enter into this Agreement and agree as follows:

1.  Parties and Predicate.

    A.  The Attorney General has authority for enforcing charitable trusts and overseeing charitable solicitations in the State of Ohio pursuant to the Ohio Charitable Organizations Act, R.C. 1716.01 *et seq.*, the Ohio Charitable Trust Act, R.C. 109.23 *et seq.*, and Ohio common law.

    B.  National Coalition of Health Care Sharing Ministries, Inc. ("National Coalition") was an Ohio nonprofit corporation whose principal place of operations was 4845 Fulton Drive NW, Canton, Ohio 44718. On June 29, 2021, National Coalition filed a Certificate of Dissolution with the Ohio Secretary of State.

    C.  Gospel Light Mennonite Church Medical Aid Plan, Inc. ("Gospel Light"), is a Virginia Non-Stock corporation whose principal place of operations is 4845 Fulton Drive NW, Canton, Ohio 44718.

**EXHIBIT**
**1.62**

# EXHIBIT C

SETTLEMENT AGREEMENT– Page **2** of **15**

D.  Gospel Light has been recognized by the Centers for Medicare & Medicaid Services ("CMS") as a healthcare sharing ministry under Section 5000A(d)(2)(B)(ii) of the Affordable Care Act.

E.  National Coalition and Gospel Light either are or were "charitable organizations" as that term is defined in R.C. 1716.01(A) and "charitable trusts" as that term is defined in R.C. 109.23.

F.  Gospel Light has 501(c)(3) status under the Internal Revenue Code. Prior to its dissolution, National Coalition had 501(c)(3) status under the Internal Revenue Code.

G.  Either individually or jointly, National Coalition and/or Gospel Light have been operating a healthcare sharing ministry beginning no later than 2014 under the name "Liberty HealthShare."

H.  Members of Liberty HealthShare make "contributions" as that term is defined in R.C. 1716.01(E).

I.  National Coalition and Gospel Light have been engaged in "solicitation" as that term is defined in R.C. 1716.01(K)(1).

J.  D. Beers resides in Stark County, Ohio. D. Beers previously held the position of Member Development Partner for Liberty HealthShare.

K.  CSS is an Ohio for-profit limited liability company formed by D. Beers II and B. Fabris and currently owned 100%, collectively, by D. Beers II, B. Fabris, and R. Beers. Since 2014, CSS has provided marketing and promotional services for Liberty HealthShare, including the operation of a call center.

L.  CSS's principal place of business is 2824 Woodlawn Ave. NW, Canton, Ohio 44708. D. Beers II, B. Fabris, and R. Beers all reside in Stark County, Ohio.

SETTLEMENT AGREEMENT– Page 3 of 15

M.  MCS is an Ohio for-profit limited liability company formed and currently owned 100% by T. Fabris. Since 2015, MCS has contracted with National Coalition and/or Gospel Light to provide repricing, medical discount, bill negotiations and bill clearing house services for the benefit of Liberty HealthShare members.

N.  MCS's principal place of business is 2824 Woodlawn Ave. NW, Canton, Ohio 44708. T. Fabris resides in Stark County, Ohio.

O.  Barat Consulting is an Ohio for-profit limited liability company formed and currently owned 100% by S. Barat. Barat Consulting has received payments from both CSS and MCS and has made payments to D. Beers.

P.  Barat Consulting's principal place of business is 608 Highland Ave., Barberton, Ohio 44203. S. Barat resides in Stark County, Ohio.

Q.  R. Beers, B. Fabris, D. Beers II, and CSS have engaged in solicitation as that term is defined in R.C. 1716.01(K)(1) on behalf of and/or in relation to Liberty HealthShare. CSS continues to engage in solicitation as that term is defined in R.C. 1716.01(K)(1).

R.  CSS has acted and continues to act as a "professional solicitor" as that term is defined in R.C. 1716.01(J) on behalf of and/or in relation to Liberty HealthShare.

S.  Pursuant to his statutory and common law authority, and in his role as parens patriae to protect the intended beneficiaries of charitable trusts including, but not limited to, current and former members of Liberty HealthShare, the Attorney General directed that the Charitable Law Section of the Ohio Attorney General's Office investigate the acts and omissions of various individuals and entities, including the Vendor Parties, to ascertain whether, under R.C. 109.24 and common law, the property held or controlled by Gospel Light and/or National Coalition for charitable purposes has been and is being

SETTLEMENT AGREEMENT– Page **4** of **15**

properly administered in accordance with R.C. Chapter 109 and Ohio common law, and whether the requirements of R.C. Chapter 1716 regarding the conduct of charitable solicitations were satisfied relating to Liberty HealthShare (the "Charitable Investigation"). The Charitable Investigation commenced in January 2018 and encompassed any and all claims, causes of actions, legal theories, remedies at law or in equity, or other forms of relief under the authority of the Attorney General pursuant to R.C. 109.24, R.C. Chapter 1716, and under common law as it relates to the administration of charitable trusts, including, but not necessarily limited to claims to recover excess benefits or compensation from the Vendor Parties under the common law, the use or misuse of charitable funds, breaches of fiduciary duty, any claims predicated on violations of R.C. Chapter 1716, or any other claims predicated on an abuse of charitable trust under R.C. 109.24, or any alleged relationship between the Vendor Parties or their principals or agents and Liberty HealthShare, including but not limited to any conspiracy to commit any of the above-referenced acts (the "Potential Charitable Claims and Causes of Action").

T. Through the Charitable Investigation, with the initial belief that the Vendor Parties violated Ohio law, the Attorney General sought, in part, to collect monies from the Vendor Parties from the amounts they were paid by Liberty HealthShare, for the benefit of the intended charitable beneficiaries of Liberty HealthShare.

U. The Attorney General and the Vendor Parties have been engaged in good faith negotiations since April 2021 in an effort to resolve all issues, allegations and/or claims arising out of or related to the Charitable Investigation or the Potential Charitable Claims

SETTLEMENT AGREEMENT-- Page **5** of **15**

and Causes of Action and now wish to finally and fully resolve these issues, allegations, and/or claims pursuant to the terms of this Agreement.

2.   <u>CSS to register as a professional solicitor.</u>

    A. Within 60 days of the Effective Date, CSS shall take all steps necessary to register as a professional solicitor with the Charitable Law Section of the Ohio Attorney General's Office pursuant to R.C. 1716.07 and any rules adopted thereunder.

    B. Following the date of its initial registration pursuant to Paragraph 2.A, CSS shall comply with the requirements for and be subject to the laws applicable to professional solicitors, including as set forth in R.C. Chapter 1716 and any rules adopted thereunder.

3.   <u>Cost and Fees, Payments, and Civil Penalty.</u>

    A. The Vendor Parties agree to pay the Attorney General $20,000.00 (twenty thousand dollars and zero cents) for the reasonable costs of investigation and $30,000.00 (thirty thousand dollars and zero cents) for reasonable attorneys' fees incurred in conjunction with the Charitable Investigation (collectively, the "<u>Cost and Fees Amount</u>"). The Costs and Fees Amount shall be paid by wire transfer with receipt acknowledged, or by cashier's check or money order payable to "Treasurer, State of Ohio" and delivered to:

        Ohio Attorney General
        Charitable Law Section
        Attn: Chief Accountant
        30 E. Broad St., 25th Floor
        Columbus, OH 43215

The Cost and Fees Amount shall be paid within 3 business days of the execution of this Agreement. Within two business days of receiving notice that the Vendor Parties intend to pay the Cost and Fees amount by wire transfer, the Attorney General shall provide

SETTLEMENT AGREEMENT– Page **6** of **15**

to counsel wire transfer instructions. The Attorney General shall deposit the Cost and Fees Amount into the charitable law fund established under R.C. 109.32.

B.  The Vendor Parties further agree to pay the amount of $5,850,000.00 (five million, eight hundred fifty thousand dollars and zero cents) (the "Payments"). The Payments shall be paid by wire transfer with receipt acknowledged, or by cashier's check or money order payable to "Treasurer, State of Ohio" and delivered to:

> Ohio Attorney General
> Charitable Law Section
> Attn: Chief Accountant
> 30 E. Broad St., 25th Floor
> Columbus, OH 43215

Within two business days of receiving notice that the Vendor Parties intend to pay a Payment by wire transfer, the Attorney General shall provide to counsel wire transfer instructions. The Payments shall be paid according to the following schedule:

   i.  $450,000.00 (four hundred fifty thousand dollars and zero cents) shall be paid within 90 days of the Effective Date;

   ii.  $540,000.00 (five hundred forty thousand dollars and zero cents) shall be paid on or before July 15, 2022;

   iii.  $540,000.00 (five hundred forty thousand dollars and zero cents) shall be paid on or before January 15, 2023;

   iv.  $540,000.00 (five hundred forty thousand dollars and zero cents) shall be paid on or before July 15, 2023;

   v.  $540,000.00 (five hundred forty thousand dollars and zero cents) shall be paid on or before January 15, 2024;

SETTLEMENT AGREEMENT– Page **7** of **15**

    vi.  $540,000.00 (five hundred forty thousand dollars and zero cents) shall be paid on or before July 15, 2024;

    vii.  $540,000.00 (five hundred forty thousand dollars and zero cents) shall be paid on or before January 15, 2025;

    viii.  $540,000.00 (five hundred forty thousand dollars and zero cents) shall be paid on or before July 15, 2025;

    ix.  $540,000.00 (five hundred forty thousand dollars and zero cents) shall be paid on or before January 15, 2026;

    x.  $540,000.00 (five hundred forty thousand dollars and zero cents) shall be paid on or before July 15, 2026; and

    xi.  $540,000.00 (five hundred forty thousand dollars and zero cents) shall be paid on or before January 15, 2027.

The Payments shall be deposited into the Attorney General's R004 fund, a non-operating fund established by the General Assembly for the purpose of administering court orders and settlements on behalf of the Attorney General, and shall be accounted for separately within the R004 fund. The Payments shall be redistributed by the Attorney General, in his sole discretion, to or for the ultimate benefit of current or former members of Liberty HealthShare for the Potential Charitable Claims and Causes of Action.

C. The Vendor Parties further agree to pay a civil penalty in the amount of $600,000.00 (six hundred thousand dollars and zero cents) (the "Civil Penalty"). The Civil Penalty shall be paid by wire transfer with receipt acknowledged, or by cashier's check or money order payable to "Treasurer, State of Ohio" and delivered to:

SETTLEMENT AGREEMENT– Page **8** of **15**

Ohio Attorney General
Charitable Law Section
Attn: Chief Accountant
30 E. Broad St., 25th Floor
Columbus, OH 43215     .

Within two business days of receiving notice that the Vendor Parties intend to pay the Civil Penalty by wire transfer, the Attorney General shall provide to counsel wire transfer instructions. The Attorney General shall deposit the Civil Penalty into the charitable law fund established under R.C. 109.32. The Civil Penalty shall be paid according to the following schedule:

    i.   $60,000.00 (sixty thousand dollars and zero cents) shall be paid on or before March 15, 2022;

    ii.   $60,000.00 (sixty thousand dollars and zero cents) shall be paid on or before November 15, 2022;

    iii.   $60,000.00 (sixty thousand dollars and zero cents) shall be paid on or before March 15, 2023;

    iv.   $60,000.00 (sixty thousand dollars and zero cents) shall be paid on or before November 15, 2023;

    v.   $60,000.00 (sixty thousand dollars and zero cents) shall be paid on or before March 15, 2024;

    vi.   $60,000.00 (sixty thousand dollars and zero cents) shall be paid on or before November 15, 2024;

    vii.   $60,000.00 (sixty thousand dollars and zero cents) shall be paid on or before March 15, 2025;

SETTLEMENT AGREEMENT– Page **9** of **15**

  viii. $60,000.00 (sixty thousand dollars and zero cents) shall be paid on or before November 15, 2025;

  ix. $60,000.00 (sixty thousand dollars and zero cents) shall be paid on or before March 15, 2026; and

  x. $60,000.00 (sixty thousand dollars and zero cents) shall be paid on or before November 15, 2026.

D. D. Beers, CSS, D. Beers II, B. Fabris, R. Beers, MCS, T. Fabris, Barat Consulting, and S. Barat agree that they are jointly and severally liable for the Cost and Fees Amount, the Payments, and the Civil Penalty.

E. Upon written notice to the Attorney General pursuant to Paragraph 5.C, the Vendor Parties may make early lump sum payments towards any of the payment obligations in this Agreement and it shall apply to the next payment due and owing.

F. If the Vendor Parties fail to comply with any of the payment requirements in this Agreement, then the Attorney General may certify any and/or all unpaid balances to the Ohio Attorney General's Collections Enforcement Section ("Collections") for collection. In the event of certification, the Vendor Parties agree to pay additional collection costs assessed by Collections in accordance with R.C. 131.02(A) equal to the amounts charged pursuant to R.C. 109.08 and 109.081 for the cost of certification and the use of Special Counsel for the collection of the debt. Interest shall also be charged upon certification in accordance with R.C. 131.02(D). Nothing in this paragraph shall be construed to limit the Attorney General's discretion or authority to pursue any other available remedy.

SETTLEMENT AGREEMENT– Page 10 of 15

4.    Forbearance, Releases, and Reservation of Rights.

    A.  The Attorney General shall initiate no litigation against the Vendor Parties arising from or related to the Charitable Investigation or the Potential Charitable Claims and Causes of Action so long as the Vendor Parties strictly comply with all of the payment requirements in Paragraphs 3.A, 3.B, and 3.C of this Agreement.

    B.  The Vendor Parties agree that any statute of limitations applicable to any claim or cause of action of the Attorney General's arising from or related to the Charitable Investigation or the Potential Charitable Claims and Causes of Action shall be tolled, as of the Effective Date, until July 15, 2027 or upon the date in which all payments under this Agreement have been paid in full, whichever is earlier.

    C.  Upon receipt of payment in full of the Cost and Fees Amount, the Payments, and the Civil Penalty, along with any additional amounts as set forth in Paragraph 3.F, if applicable, the Attorney General, in his role as parens patriae to protect the intended beneficiaries of charitable trusts including, but not limited to, current and former members of Liberty HealthShare, hereby agrees to fully and completely release the Vendor Parties for any and all acts or omissions from any and all claims and causes of action of any nature or any kind, both known and unknown, arising from or related to the Charitable Investigation or the Potential Charitable Claims and Causes of Actions occurring prior to the Effective Date.

    D.  Nothing in this Agreement shall be construed to release any of the Vendor Parties from their obligations under this Agreement. Nothing in this Agreement shall be construed to release any of the Vendor Parties from any claims or causes of action based on acts or omissions occurring after the Effective Date except that the Attorney General shall not

SETTLEMENT AGREEMENT– Page 11 of 15

have a cause of action or claim related to the current compensation as outlined under the current contracts between the Vendor Parties and Liberty HealthShare.

E. Nothing in this Agreement shall be construed to release or affect in any way any rights, claims, or causes of action the Attorney General may have against any individual or entity other than the Vendor Parties arising from or related to the Charitable Investigation. Nothing in this Agreement shall be construed to prevent or limit in any way the Attorney General's ability to seek information, documents, or testimony from any of the Vendor Parties in conjunction with the Charitable Investigation or any litigation by the Attorney General arising from or related to the Charitable Investigation.

F. Except for the Potential Charitable Claims and Causes of Action, nothing in this Agreement shall be construed to release or affect in any way any rights, claims, or causes of action of any other agencies of the State of Ohio or any sections of the Attorney General's Office other than the Charitable Law Section. Nothing in this Agreement shall be construed to release or affect in any way any rights, claims, or causes of action arising out of or relating to the final judgment, entered on March 29, 2005, in the civil action captioned *Barberton Rescue Mission, et al., v. Bruce E. Hawthorn, et al.,* Case No. CV-2000-12-5496, in the Summit County Court of Common Pleas.

5.   Miscellaneous.

A. The parties shall execute and deliver such further instruments and documents and take such other actions as may reasonably be requested and required to perform their obligations under this Agreement.

B. Attorney General agrees to apply the reporting requirements of IRC Section 6050X and related regulations, et al. regardless of the effective, binding date of this Agreement, as

SETTLEMENT AGREEMENT– Page **12** of **15**

they pertain to the reporting of amounts required for compliance with this IRC Section for application of compliance with the identification and establishment requirements of 26 U.S.C. 162(f) et seq. affording Vendor Parties the ability for payments made under paragraph 2.B. above, to claim as a federal tax deduction as enumerated above as part of this Agreement and by reporting such payments to the IRS in Box 2 of the IRS Form 1098-F.

C.  Any notice required or provided under this Agreement shall be effective when sent as follows:

    i.  To the Vendor Parties, c/o Laura Mills, at lmills@lawyerswithstrategy.com, with a copy to Rick Arnold, at rarnold@asalawfirm.com and Nathan Garrett, at NGarrett@gravesgarrett.com; and

    ii.  To the Attorney General, c/o Daniel Fausey, Section Chief, Charitable Law Section at Daniel.Fausey@OhioAGO.gov, with a copy to Attorney General, Charitable Law Section, Attention: Section Chief, 30 E. Broad St., 25th Floor, Columbus, Ohio 43215.

Any party may change its notice party and/or contact information by providing written notice to the Attorney General and all Vendor Parties according to this Agreement.

D.  This Agreement is entered into in the State of Ohio and will be governed under the laws of the State of Ohio.

E.  The parties acknowledge and agree that all matters relating to the enforcement and interpretation of this Agreement shall be subject to the jurisdiction of the Franklin County, Ohio Common Pleas Court pursuant to O.R.C. 109.16.

SETTLEMENT AGREEMENT– Page **13** of **15**

F.  All parties acknowledge that they have been given ample opportunity to be advised by legal counsel of their own choosing as to the meaning and effect of each provision of this Agreement and that they have knowingly and voluntarily elected to enter into this Agreement. The parties agree to sign this Agreement as their own voluntary act and deed, and each represents that such execution was not the result of any duress, coercion, or undue influence upon either of them. The parties hereby acknowledge receipt of a copy of this Agreement before signing it and understand that each and every provision of this Agreement is contractual, legally binding, and not mere recitals.

G.  In the event that any provision of the Agreement is deemed to be invalid or unenforceable, the remaining provisions will remain intact and enforceable as stated, provided that doing so provides the same or similar consideration to the parties.

H.  This Agreement represents the entire understanding of the parties with respect to the subject matter contained herein. The Agreement may be modified only in writing signed by all parties.

I.  This Agreement may be signed in counterparts which, when taken together, will constitute a single integrated document. Signed copies of the Agreement sent by electronic means will be considered to be the same as original signed versions.

J.  Each party has cooperated in (and in any construction to be made of this Agreement shall be deemed to have cooperated in) the drafting and the preparation of this Agreement.

K.  Each individual signing below represents that he or she is authorized and directed to sign this Agreement on behalf of the representative party and further represents that he or she has the requisite authority to bind the party on behalf of whom they are signing.

SETTLEMENT AGREEMENT– Page 14 of 15

L.  The Parties agree that the execution of this Agreement is done for the purposes of compromise, and to eliminate the burden of expense of further litigation, and does not constitute, and shall not be construed as, an admission of liability, wrongdoing, fault, judgment or concession, or as evidence with respect thereto, by any of the Vendor Parties, on account of any claims or matters and any such liability being specifically denied.

**(remainder of this page intentionally left blank / signature page follows)**

SETTLEMENT AGREEMENT– Page **15** of **15**

This Agreement is being executed by the parties as of the Effective Date.

DANIEL J. BEERS, in his personal capacity

Signature

COST SHARING SOLUTIONS, LLC

Representative's Signature

Daniel J Beers II MEMBER
Printed name and title

DANIEL BEERS II, in his personal capacity

Signature

BRANDON FABRIS, in his personal capacity

Signature

THE MEDICAL COST SAVINGS SOLUTION, LTD.

Representative's Signature

Thomas A. Fabris CEO
Printed name and title

RONALD BEERS, in his personal capacity

Signature

BARAT CONSULTING, LLC

Representative's Signature

Scott Barat , Member
Printed name and title

THOMAS FABRIS, in his personal capacity

Signature

DAVE YOST,
OHIO ATTORNEY GENERAL

SCOTT BARAT, in his personal capacity

Signature

Daniel W. Fausey
Section Chief
Charitable Law Section
30 E. Broad St., 25th Fl.
Columbus, OH 43215

NMOSC ICERT - SUPERINTENDENT OF INSURANCE
**F I L E D**
02/22/2023 01:53:13 pm

## BEFORE THE NEW MEXICO OFFICE OF SUPERINTENDENT OF INSURANCE

IN THE MATTER OF )
GOSPEL LIGHT MENNONITE )     Docket No. 2021-0085
CHURCH MEDICAL AID PLAN )
D/B/A LIBERTY HEALTHSHARE )
    Respondent. )
_____ )

## FINAL ORDER

    **THIS MATTER** comes before the Interim New Mexico Superintendent of Insurance ("Superintendent") upon receipt of the Hearing Officer's Recommended Decision and Order Setting Deadline for Exceptions filed to the docket in this proceeding on January 20, 2023 and Liberty Healthshare's Exceptions to Hearing Officer's Recommended Decision filed in this proceeding on February 3, 2023. Having considered the record, the Hearing Officer's Recommended Decision and Respondent's Exceptions, and being fully informed in the premises,

    **THE SUPERINTENDENT FINDS AND CONCLUDES:**

    1. The Superintendent has jurisdiction over the subject matter and the parties;

    2. The Superintendent initiated this proceeding by issuing an Order to Cease and Desist and Order to Show Cause ("Initial Order") directed to Respondent on November 23, 2021;

    3. The Superintendent originally appointed Richard B. Word as the Hearing Officer to preside over this matter. Upon Hearing Officer Word's recusal due to his pending retirement, the Superintendent appointed R. Alfred Walker as the Hearing Officer to preside over this matter. The Hearing Officers conducted evidentiary hearings. The parties submitted written arguments and requested findings of fact and conclusions of law;

    4. After considering the record, Hearing Officer R. Alfred Walker issued a Recommended Decision on January 20, 2023;



EXHIBIT 5
Ex. 1.63, p. 1 of 8

5.   Respondent filed Exceptions to the Recommended Decision on February 3, 2023;

6.   The Superintendent rules on the Exceptions as follows:

   a.      Exception 1: Burden of Proof. Overruled. No party requested a finding of fact or conclusion of law relating to burden of proof. Upon review of the record, the Superintendent determines that Petitioner met its burden of proving the allegations of the Initial Order by a preponderance of the evidence;

   b.      Exception 2: Standard of Proof. Overruled. No party requested a finding of fact or conclusion of law relating to the standard of proof. Upon review of the record, the Superintendent determines that Petitioner met its burden of proving the allegations of the Initial Order by a preponderance of the evidence;

   c.      Exception 3: Hearing Officer's Findings of Fact 7 and 8. Overruled. Respondent describes the Hearing Officer's findings as "accurate" but appears to challenge the conclusion reached from the facts. The conclusion is that a contract was formed, and the facts support that conclusion. Respondent does not cite to any part of the record to challenge the findings, and these findings are supported by substantial evidence.

   d.      Exception 4: Hearing Officer's Finding of Fact 10. Overruled. The Superintendent need not concern herself with the application of the parole evidence rule in New Mexico or under what circumstances a written contract may be modified orally or by course of performance. The question addressed was whether a contract was formed, and performance by Respondent is evidence of the formation of a contract not the interpretation of the contract. This finding is supported by substantial evidence.

   e.      Exception 5: Hearing Officer's Finding of Fact 11. Overruled. Again, Respondent does not seem to challenge the finding as inaccurate but challenges the conclusion this fact

supports. The conclusion is that a contract was formed, and the fact supports that conclusion. Respondent does not cite to any part of the record to challenge the finding, and this finding is supported by substantial evidence.

f.      Exception 6: Hearing Officer's Finding of Fact 14. Overruled. Again, Respondent attacks the conclusion which this fact supports. The conclusion is that Respondent is an entity that reimburses any costs of health care services and is therefore a health insurance carrier. Respondent does not cite to any part of the record to challenge the finding, and this finding is supported by substantial evidence.

g.      Exception 7: Hearing Officer's Finding of Fact 15. Overruled. Respondent relies on dictionary definitions of "coverage." Respondent ignores the evidence in the record that its own members described the Gospel Light Plan as providing coverage for or covering various medical costs. Respondent does not cite to any part of the record to challenge the finding, and this finding is supported by substantial evidence.

h.      Exception 8: Hearing Officer's Finding of Fact 17. Overruled. Finding of Fact 17 is not contradicted by Finding of Fact 9. Finding of Fact 9 supports the conclusion that a contract was formed, because despite the disclaimer of any obligation, Respondent's performance of the obligation provided the mutuality of obligation for the formation of the contract. The performance of the obligation is the payment or reimbursement of loss. This finding is supported by substantial evidence.

i.      Exception 9: Hearing Officer's Conclusion of Law 1. Overruled. Respondent did not propose findings of fact or conclusions of law on the issues of subject matter jurisdiction or personal jurisdiction. The Hearing Officer's findings of fact are supported by substantial evidence,

and his conclusions of subject matter jurisdiction and personal jurisdiction are supported by those findings and by the law.

j.      Exception 10: Hearing Officer's Conclusion of Law 3. Overruled. The Hearing Officer's findings of fact are supported by substantial evidence, and his Conclusion of Law 3 is supported by those findings and by the law.

k.      Exception 11: Hearing Officer's Conclusion of Law 4. Overruled. Even though the Hearing Officer did not make a finding specifically describing the Gospel Light Plan as a contract for a health benefits plan, the Hearing Officer found that the Gospel Light Plan is a contract. Finding of Fact 11 and Conclusion of Law 2. The Hearing Officer also found that Respondent provides coverage in this state for health benefits. Finding of Fact 15. The Hearing Officer's findings of fact are supported by substantial evidence, and his Conclusion of Law 4 is supported by those findings and by the law.

l.      Exception 12: Hearing Officer's Conclusion of Law 5. Overruled. Respondent engages in the same circular reasoning that it accuses the Hearing Officer of engaging in. Respondent says that it cannot be a health insurance carrier because only a health insurance carrier can offer health benefits, and it cannot offer health benefits because it is not a health insurance carrier. The Hearing Officer is correct that the Legislature intended the Insurance Code to regulate both health benefits and anyone who offers health benefits. The Hearing Officer's findings of fact on these issues are supported by substantial evidence, and his Conclusion of Law 5 is supported by those findings and by the law.

m.      Exception 13: Hearing Officer's Conclusion of Law 6.  Overruled. The Hearing Officer's findings of fact are supported by substantial evidence, and his Conclusion of Law 6 is supported by those findings and by the law.

n.      Exception 14: Hearing Officer's Conclusion of Law 7. Overruled. As noted above, the Hearing Officer made findings that the Gospel Light Plan was a contract to provide health benefits. Respondent argues that the Hearing Officer did not make a finding that the contract was one of insurance. However, the Hearing Officer found that Respondent undertakes to pay or indemnify its members as to loss from certain specified contingencies or perils, or to pay or grant a specified amount or determinable benefit in connection with ascertainable risk contingencies. Finding of Fact 17. That language comes from the statutory definition of insurance. Since the question of what constitutes insurance is a question of law, it was appropriate for the Hearing Officer to describe the contract as one of insurance in his conclusions, rather than in his findings. Respondent reiterates its arguments about why the Gospel Light Plan is not insurance, but the Hearing Officer's findings of fact are supported by substantial evidence, and his Conclusion of Law 7 is supported by those findings and by the law.

o.      Exception 15: Hearing Officer's Conclusion of Law 8. Overruled. The Hearing Officer's findings of fact are supported by substantial evidence, and his Conclusion of Law 8 is supported by those findings and by the law.

p.      Exception 16: Hearing Officer's Conclusion of Law 9. Overruled. The Hearing Officer's findings of fact are supported by substantial evidence, and his Conclusion of Law 9 is supported by those findings and by the law.

q.      Exception 17: Hearing Officer's Conclusion of Law 10. Overruled. Respondent reiterates its arguments about why the New Mexico Insurance Code is an unconstitutional burden on its and its members free exercise rights, but the Hearing Officer's findings of fact are supported by substantial evidence, and his Conclusion of Law 10 is supported by those findings and by the law.

r.      Exception 18: Hearing Officer's Conclusion of Law 11. Overruled. Respondent reiterates its arguments about why the Superintendent's public statements are evidence of religious animus and bias against Respondent. Respondent also asserts that is was error for the Hearing Officer to quash Respondent's subpoena of the Superintendent, which prevented Respondent from creating a record of animus and bias. However, without evidence of animus and bias in the record, it was appropriate for the Hearing Officer to prevent the disqualification of the Superintendent as the final decisionmaker, which would have occurred if the Superintendent were called as a witness, in order for Respondent to attempt to get the Superintendent to say something disqualifying. The Hearing Officer's findings of fact are supported by substantial evidence, and his Conclusion of Law 11 is supported by those findings and by the law.

s.      Exception 19: Hearing Officer's Conclusion of Law 12 and Recommended Decision B. Overruled. The Hearing Officer's findings of fact are supported by substantial evidence, and his Conclusion of Law 12 and Recommended Decision B are supported by those findings and by the law.

t.      Exception 19: Hearing Officer's Conclusion of Law 13 and Recommended Decision C. Overruled. The Hearing Officer's findings of fact are supported by substantial evidence, and his Conclusion of Law 13 and Recommended Decision C are supported by those findings and by the law; and

7.   The Hearing Officer's Recommended Decision is supported by substantial evidence in the record and is legally sound; and

**IT IS THEREFORE ORDERED that:**

A.  Liberty Healthshare's Exceptions to the Recommended Decision are overruled.

B.  The Hearing Officer's Findings of Fact, Conclusions of Law, and Recommendations are adopted as the Superintendent's own;

C.  Respondent shall cease and desist from soliciting, offering to sell, selling, collecting membership fees or monthly share amounts, or servicing HSCMS in New Mexico until Respondent complies with the requirements of the New Mexico Insurance Code;

D.  Under law, respondent could be fined up to $20,000 per violation under to NMSA 1978, Section 59A-1-18, Respondent is hereby fined five thousand dollars ($5,000) for each of its 502 violations of the New Mexico Insurance Code, for a total fine of two million five hundred ten thousand dollars ($2,510,000);

E.  Respondent has the right to appeal this Final Order to district court pursuant to NMSA 1978, Section 39-3-1.1 (1999) and Rule 1-074 NMRA;

F.  This Order is effective immediately;

G.  Copies of this Order shall be sent to all persons listed as service recipients on OSI's eDocket; and

H.  This docket is hereby closed.

**DONE AND ORDERED** under the Seal of the Office of Superintendent of Insurance at Santa Fe, New Mexico this 22nd day of February, 2023.

_____
**HON. JENNIFER A. CATECHIS**
**INTERIM SUPERINTENDENT OF INSURANCE**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 22nd day of February, 2023, I caused the foregoing *Final Order* to be filed through the OSI's eDocket online filing system, which caused all persons entitled to notice in this case to be served electronically.

_Jennifer Romero_

**Jennifer Romero, OSI Paralegal**

# Health Care Sharing Ministries Reporting to the Massachusetts Health Connector in 2020 & 2021:

A summary of information reported to the Health Connector by health arrangements provided by an established religious organization seeking minimum creditable coverage status for 2020 and 2021

**Massachusetts Health Connector**

**September 2021**





Resp. Appx, p. 591

Appx. Vol XV
A-735

EXHIBIT
**1.64**

Ex. 1.64, p. 1 of 33

# Table of Contents

Table of Contents...................................................................................................... 2

Executive Summary ................................................................................................. 4

1.0: Background ....................................................................................................... 9

    1.1: Minimum Creditable Coverage (MCC) ....................................................... 9

    1.2: MCC Regulation Amendments in 2019 ................................................... 10

2.0: Health Care Sharing Ministries Reporting to the Health Connector ............... 13

3.0: Total Massachusetts HCSM Membership Reported ........................................ 14

    3.1: Small Business Membership ................................................................... 16

4.0: Operations ..................................................................................................... 18

    4.1: Location of HCSM Operation and Advertising ......................................... 18

    4.2: Member Fees or Penalties ...................................................................... 19

    4.3: Third-Party Vendors .............................................................................. 21

    4.4: Provider Contracts ................................................................................ 23

5.0: Finances ........................................................................................................ 25

    5.1: Administrative Fees ............................................................................... 29

    5.2: Rate Negotiation ................................................................................... 31

6.0: Conclusion .................................................................................................... 32

Appendix .............................................................................................................. 33

    Abbreviations ................................................................................................ 33

Tables and Figures

*Tables*

Table 1: Summary of Reporting Form Responses, 2020 & 2021
Table 2: Health Care Sharing Ministries (HCSMs) that Submitted MCC Reporting Forms in 2020 and 2021
Table 3: Health Care Sharing Ministries (HCSMs) with Small Business Participation
Table 4: Location of Health Care Sharing Ministry (HCSM) Operation and Advertising
Table 5: Circumstances in which Members are Subject to Additional Fees, Sharing Requirements, or Termination
Table 6: Health Care Sharing Ministry (HCSM) Use of Third-Party Vendors
Table 7: Contracts with Health Care Providers
Table 8. Amount Paid out by HCSM for Members Health Care Costs as a Percentage of Member Contributions (Reporting Years 2020 & 2021)
Table 9. HCSM Administrative Fees (Reporting Years 2020 & 2021)
Table 10. HCSM Rate Negotiation (Reporting Years 2020 & 2021)

*Figures*

Figure 1: Total Contributions Paid by Members to HCSM, Total Medical Bills Submitted by Members for Sharing, Total Qualifying Medical Bills, and Total Amount Paid Through the HCSM for Care (Reporting Year 2020)
Figure 2: Total Contributions Paid by Members to HCSM, Total Medical Bills Submitted by Members for Sharing, Total Qualifying Medical Bills, and Total Amount Paid Through the HCSM for Care (Reporting Year 2021)
Figure 3: MCC Regulation Amendment Timeline
Figure 4: Massachusetts Health Care Sharing Ministry (HCSM) 2019 Membership Based on MCC Reporting Forms Submitted in 2020
Figure 5: Massachusetts Health Care Sharing Ministry (HCSM) 2020 Membership Based on MCC Reporting Forms Submitted in 2021
Figure 6: Total Contributions Paid by Members to HCSM, Total Medical Bills Submitted by Members for Sharing, Total Qualifying Medical Bills, and Total Amount Paid Through the HCSM for Care (Reporting Year 2020)
Figure 7: Total Contributions Paid by Members to HCSM, Total Medical Bills Submitted by Members for Sharing, Total Qualifying Medical Bills, and Total Amount Paid Through the HCSM for Care (Reporting Year 2021)

3

## Executive Summary

As part of its 2006 health care reforms, Massachusetts began requiring adults to have health insurance that meets certain standards or else face a tax penalty. The Massachusetts Health Connector's Board of Directors is responsible for setting the standards for the types of coverage that may satisfy this requirement and issued regulations in 2007 outlining what constitutes Minimum Creditable Coverage (MCC). In addition to enrolling in health insurance products, these regulations allowed an individual to satisfy their coverage requirements by participating in a health arrangement provided by an established religious organization. In 2019, the Health Connector updated its MCC regulations to set certain standards for which kinds of such health arrangements, commonly known as health care sharing ministries, or HCSMs, can be used to satisfy the MCC requirement, based on increasing reports of confusion among state residents around how these products compare to traditional health insurance.

The updated MCC regulations went into effect in January 2020. Under the amended regulations, a HCSM is deemed to provide minimum creditable coverage under 956 CMR 5.00 provided that the organization meets certain standards and attests to the Health Connector for each MCC Reporting Year that the arrangement meets those standards, specifically that it:

- is not a for-profit organization;
- does not make any direct or indirect representation that the organization has sufficient financing to meet members' anticipated financial or medical needs or that it has had a successful history of meeting members' financial or medical needs, provided that this requirement shall not apply to any financial statement that the organization is otherwise required to disclose by law;
- does not use compensated sales agents, sales tactics, or deceptive marketing practices to solicit or enroll members, including that it does not use common insurance terms, such as "health plan," "coverage," "copay," "copayment," "deductible," "premium," and "open enrollment," or refer to itself as "licensed" in advertisements, marketing material, brochures, or other materials related to the arrangement;
- does not use funds paid by members for medical needs to cover administrative costs;
- provides disclosure that the organization is not an insurance company and does not guarantee that medical bills will be paid by the organization or any other individuals; such disclosure must be made at initial contact with a prospective member, at the time of any material modification to the terms of the sharing arrangement, and in all advertising, brochures, and marketing materials;
- reports annually to the Health Connector any information about membership, operations, and finances as the Health Connector may require; and
- meets such other criteria that the Connector may deem appropriate to ensure that individuals participating in such arrangements participate only in those operating in a manner consistent with the requirements described in 956 CMR 5.03(3)(d) 1. through 6.[1]

---

[1] To date, the Health Connector has not used this provision to identify any additional criteria that HCSMs must meet.

4

A complete and timely response to the Health Connector's reporting form satisfies one of the standards necessary to be a health care sharing ministry deemed to provide MCC. The purpose of the reporting requirement is for the Health Connector, interested stakeholders, and the public to learn about the HCSMs operating in Massachusetts that would like to be deemed to provide MCC.

For the first year of required reporting, which was 2020, the Health Connector posted the reporting form on its website in May and accepted submissions through July 31 to allow for flexibility in the first year of the new requirement. For reporting year 2021 and beyond, HCSMs must submit their reporting form to the Health Connector by March 31 of that year. The Health Connector received seven MCC reporting form submissions from HCSMs in 2020 and six submissions in 2021. In 2021, two HCSMs from 2020 did not re-submit reporting forms and one new HCSM made a submission.

Table 1 summarizes key highlights from reporting form responses in 2020 and 2021, including information learned about the reporting HCSMs' membership, operations, and finances. Each MCC reporting year is based on data from the previous calendar year (CY). For example, 2020 reporting forms reflect information from CY 2019 (January 2019-December 2019) and 2021 reporting forms reflect information from CY 2020 (January 2020-December 2020).

*Table 1: Summary of Reporting Form Responses (2020 & 2021)*

| | 2020 | 2021 |
|---|---|---|
| Membership | <ul><li>7 HCSMs with at least 2,467 total MA members reported to the Health Connector.[2]</li><li>Medi-Share (793), OneShare (572), and Christian Healthcare Ministries (521) had the greatest number of MA members.</li><li>3 HCSMs reported involvement with MA small businesses and their employees.</li></ul> | <ul><li>6 HCSMs with 2,170 total MA members reported to the Health Connector.</li><li>Samaritan (669), Christian Healthcare Ministries (522), and Liberty (455) had the greatest number of MA members.[3]</li><li>2 HCSMs reported involvement with MA small businesses and their employees.</li></ul> |

---

[2] In 2020, some HCSMs reported membership at the household level resulting in underreported membership for 2020. In 2021, Health Connector staff changed the question about membership on the reporting form to clarify that HCSMs should report membership by individual member level data (not just household level).

[3] The change in the top 3 HCSMs with the greatest MA membership from 2020 to 2021 is due to the inconsistencies in how HCSMs reported member data in 2020 (some reported by household instead of actual members).

5

| | | |
|---|---|---|
| Operations | • 6 out of the 7 HCSMs reported charging members extra fees or said they issued penalties in certain circumstances, most of which were tied to "violations of lifestyle agreements" or pre-existing conditions.<br>• 5 out of 7 HCSMs used third party vendors.<br>• All HCSMs operated in either all or nearly all states.<br>• 5 out of 7 HCSMs reported engaging in some type of provider contracting. | • 4 out of the 6 HCSMs reported charging members extra fees or said they issued penalties in certain circumstances, most of which were tied to "violations of lifestyle agreements" or pre-existing conditions.<br>• 4 out of 6 HCSMs used third party vendors.<br>• All HCSMs operated in either all or nearly all states.<br>• 4 out of 6 HCSMs reported engaging in some type of provider contracting. |
| Finances | • On average, members paid their HCSM about 1.8 times the amount that the HCSM paid out for members' health care bills.<br>• Health care costs paid for through the HCSM as a percentage of member contributions ranged from 16% to 79%.<br>• On average, about 50% of medical bills submitted by HCSM members were determined to be eligible for sharing.<br>• All HCSMs charged their members an administrative fee; however, the fee structures and amounts varied.<br>• Most HCSMs reported that individuals and/or the arrangement negotiate members' medical bills and some used a third-party for negotiations. | • On average, members paid their HCSM about 1.4 times the amount that the HCSM paid out for members' health care bills.<br>• Health care costs paid for through the HCSM as a percentage of member contributions ranged from 28% to 100%.<br>• On average, about 50% of medical bills submitted by HCSM members were determined to be eligible for sharing.<br>• All HCSMs charged their members an administrative fee; however, the fee structures and amounts varied.<br>• Most HCSMs reported that individuals and/or the arrangement negotiate members' medical bills and some used a third-party for negotiations. |

The following two charts further summarize the financial data submitted by HCSMs in 2020 and 2021. HCSMs reported information about total contributions paid by members to the HCSM, total medical bills submitted by members for sharing, total amount of medical bills that qualified for sharing, and the total amount paid through the HCSM for members' health care costs.

6

*Figure 1. Total Contributions Paid by Members to HCSM, Total Medical Bills Submitted by Members for Sharing, Total Qualifying Medical Bills, and Total Amount Paid Through the HCSM for Care (Reporting Year 2020)[4]*



*In 2020 and 2021, Liberty noted that the total amount submitted to the health arrangement for sharing includes "total charges submitted" which may include items such as duplicate bills and does not take into account certain factors such as deductions for discounts.

**In 2020, Samaritan noted that shares received in one year would be for bills submitted in both the previous and current year; the "qualifying" shareable amount listed above includes provider reductions.

---

[4] Some HCSMs were left out of Figure 1 for various reasons: Solidarity does not track state level data and does not collect data on total share amounts submitted for sharing. CMM reported <50 members making it difficult to make a comparison to other arrangements.

7

*Figure 2. Total Contributions Paid by Members to HCSM, Total Medical Bills Submitted by Members for Sharing, Total Qualifying Medical Bills, and Total Amount Paid Through the HCSM for Care (Reporting Year 2021)[5]*



*In 2020 and 2021, Liberty noted that the total amount submitted to the health arrangement for sharing includes "total charges submitted" which may include items such as duplicate bills and does not take into account certain factors such as deductions for discounts.*
**In 2020, Samaritan noted that shares received in one year would be for bills submitted in both the previous and current year; the "qualifying" shareable amount listed above includes provider reductions.*

This report on 2019 and 2020 information collected by HCSMs seeking MCC status is designed to help inform consideration of whether additional adjustments are appropriate as it relates to the evolving health care sharing ministries landscape and the state's ongoing individual mandate policy framework.

---

[5] Some HCSMs were left out of Figure 2 for various reasons: Solidarity does not track state level data and does not collect data on total share amounts submitted for sharing. Zion Health reported $0 for all fields aside from total shares contributed by the member and only has 7 total members.

8

# 1.0: Background

## 1.1: Minimum Creditable Coverage (MCC)

As part of Chapter 58 reforms, Massachusetts law requires adult residents to have health insurance that meets the state's Minimum Creditable Coverage (MCC) standards or potentially face an individual mandate penalty. MCC has a wide reach, with over 4 million Massachusetts residents subject to MCC standards. While state law defines MCC at a high level, it authorizes the Health Connector's Board of Directors to promulgate regulations further detailing creditable coverage.[6] The Health Connector first promulgated regulations on MCC in 2007 to define the minimum standards a health plan must meet for Massachusetts residents to comply with the requirement to obtain and maintain coverage under the Commonwealth's individual mandate law.

Minimum creditable coverage refers to the minimum level of benefits that adult tax filers need to carry in order to be considered insured and avoid tax penalties in Massachusetts. For most plans, MCC standards include[7]:

- Coverage for a comprehensive set of services (e.g. doctors' visits, hospital admissions, day surgery, emergency services, mental health and substance abuse, and prescription drug coverage)
- Doctor visits for preventive care, without a deductible
- A cap on annual deductibles
- For plans with up-front deductibles or co-insurance on core services, an annual maximum on out-of-pocket spending
- No caps on total benefits for a particular illness or for a single year
- No policy that covers only a fixed dollar amount per day or stay in the hospital, with the patient responsible for all other charges

Most plans sold in Massachusetts meet the MCC standards. Massachusetts-licensed health insurance companies must put an MCC-compliance notice on their plans sold in Massachusetts to indicate whether the plan meets MCC. Every year in January, insurers send Form MA 1099-HC to their enrollees to indicate whether a given insurance policy from the prior year met MCC requirements and the months in which an enrollee was covered by that policy. Taxpayers then use Form 1099-HC when filing their state income taxes. However, there are different pathways to MCC compliance. Employers, unions, plan sponsors, and insurers can apply for MCC Certification if they have a comprehensive plan that does not meet all specific MCC requirements but have a robust plan design overall. However, there are restrictions on certain deviations from MCC standards and applicants must explain the ways in which they do not meet all MCC requirements.[8] In addition, MCC regulations automatically deem some categories of coverage to provide MCC such as a plan through the U.S. Veterans Administration Health

---

[6] M.G.L. ch. 111M § 1; M.G.L. ch. 176Q § 3.

[7] Please see the most recent administrative bulletin, found at https://betterhealthconnector.com/about/policy-center/rules-regulations, regarding Minimum Creditable Coverage Regulations for all annually indexed limits

[8] MCC Certification application can be found here: https://betterhealthconnector.com/about/policy-center/rules-regulations/massachusetts-individual-mandate

9

System, TRICARE, a tribal or Indian Health Service plan, and many others.[9]

This "automatic" or "categorical" compliance pathway outlined in MCC regulations is how health arrangements provided by established religious organizations, such as HCSMs, are deemed to provide MCC. From the time that MCC regulations were first promulgated in 2007 until amendments were made in 2019, MCC regulations stated that any "health arrangement provided by established religious organizations comprised of individuals with sincerely held beliefs" is deemed to meet MCC. The regulations did not clearly define the standards that such "health arrangements" must meet prior to amendments in 2019.

## 1.2: MCC Regulation Amendments in 2019

The MCC regulations have been amended several times since their initial enactment, including updates in 2013 to reflect changes in the health insurance landscape brought by implementation of the federal Affordable Care Act (ACA). At that time, Massachusetts chose to maintain its state level individual mandate in large part to maintain the MCC standards, which in addition to providing a minimum "coverage floor" for individual mandate compliance also promote basic consumer protections for Massachusetts residents. Today, MCC standards are especially important in offering a framework for acceptable coverage in Massachusetts because, as of 2019, the federal individual mandate penalty was reduced to $0, rendering the ACA standards for creditable coverage ineffectual.

After implementation of the ACA, Health Connector staff identified several areas of the regulations that would benefit from amendment to better align with market dynamics and current Health Connector practice. Specifically, in October 2019, staff recommended opening a public comment period to receive feedback on three proposed modifications to the regulations: reinstatement of indexing to deductibles, clarification of standards used to define health arrangements provided by established religious organizations, and technical and organizational updates. After receiving, reviewing, and considering written and oral comments from stakeholders about the proposed MCC regulation amendments, Health Connector staff revised the proposed MCC regulation amendments and brought the final amendments to the Health Connector Board in December 2019. The Health Connector Board voted to approve the final version of the proposed MCC regulations on December 12, 2019 and the adopted final version of the regulations went into effect on January 1, 2020. Final MCC regulations can be viewed at: https://betterhealthconnector.com/wp-content/uploads/rules-and-regulations/956CMR5.00.pdf.

---

[9] See full list of coverage deemed to provide MCC and more information about MCC at: https://betterhealthconnector.com/about/policy-center/rules-regulations/massachusetts-individual-mandate

10

*Figure 3: MCC Regulation Amendment Timeline*

**October 2019**
- **10/10**: Presented proposed MCC regulation amendments for Board Vote
- **10/11**: Sent out Local Government Advisory Committee Letters
- **10/30**: Public comment period opened

**November 2019**
- **11/25**: Held public hearing; public comment period closed

**December 2019**
- **12/6**: Memo to Board of Public hearing and final regulations
- **12/11**: Filed amended small business impact statement
- **12/12**: Hold Board vote on final version of proposed regulations
- **12/13**: File final regulations with Secretary of State
- **12/27**: Publication of adopted final version of proposed regulations in the CMR

**January 2020**
- **1/1**: Effective date of proposed MCC regulations

While the 2019 proposed and finalized MCC regulation amendments addressed many important issues, this report is only focused on MCC amendments impacting health arrangements provided by established religious organizations.

"Health arrangements provided by established religious organizations" that satisfy MCC have typically been "health care sharing ministries" (HCSMs), though other arrangements might also satisfy that definition. Since ACA implementation began, there has been a nationwide increase in the number of HCSMs and the number of people who join them. Estimates indicate HCSM participation has grown since passage of the ACA from fewer than 200,000 enrollees before 2010 to about 1 million today.[10]

This increased prevalence has led state regulators to be more vigilant in their review of such organizations.[11] In addition, the National Association of Insurance Commissioners and at least 15 states, including Massachusetts, issued alerts about the risks posed to consumers by HCSMs.[12] In

---

[10] Volk, J., Curran, E., Giovannelli, J. (2018). Health Care Sharing Ministries: What Are the Risks to Consumers and Insurance Markets? The Commonwealth Fund. Retrieved from: https://www.commonwealthfund.org/publications/fund-reports/2018/aug/health-care-sharing-ministries#14

[11] For example, Colorado, Connecticut, New Hampshire, Texas, and Washington have taken legal action against one health care sharing ministry, Aliera, for allegedly engaging in fraudulent activity and deceptive marketing practices; Volk, J., Giovannelli, J., Goe, C. (2020). States Take Action on Health Care Sharing Ministries, But More Could Be Done to Protect Consumers. The Commonwealth Fund. Retrieved from: https://www.commonwealthfund.org/blog/2020/states-take-action-health-care-sharing-ministries-more-could-be-done-protect-consumers

[12] Volk, J., Giovannelli, J., Goe, C. (2020). States Take Action on Health Care Sharing Ministries, But More Could Be Done to Protect Consumers. The Commonwealth Fund. Retrieved from: https://www.commonwealthfund.org/blog/2020/states-take-action-health-care-sharing-ministries-more-could-be-done-protect-consumers

11

June 2019, Massachusetts's Division of Insurance (DOI) advised consumers that Aliera, an organization marketing itself as a HCSM, was potentially operating illegally in the state. In August 2019, the Health Connector opened a Special Enrollment Period (SEP) available for Massachusetts residents who are or were at any point in 2019 members of an Aliera arrangement. In addition, a health care sharing ministry called Sharity Ministries Inc. (formerly known as Trinity Health Share Inc., an arrangement affiliated with Aliera) filed for Chapter 11 Bankruptcy and ceased operations in July 2021.[13]

In order to address the changing landscape of HCSMs in the U.S. and across the Commonwealth, Health Connector staff proposed to maintain language in the MCC regulations that permits certain health arrangements to meet MCC, while specifying the criteria that are used to identify a bona fide health arrangement provided by established religious organizations. Health Connector staff took this approach in order to preserve the intent of the MCC language while accounting for current market conditions.

The MCC regulation amendments approved by the Health Connector Board clarify that an individual may meet their health coverage requirements by participating in one of these "health arrangements" if the arrangement:

1) Is not-for-profit;
2) does not make any direct or indirect representation that the organization has sufficient financing to meet members' anticipated financial or medical needs or that it has had a successful history of meeting members' financial or medical needs, provided that this requirement shall not apply to any financial statement that the organization is otherwise required to disclose by law;
3) does not use compensated sales agents, sales tactics, or deceptive marketing practices to solicit or enroll members, including that it does not use common insurance terms, such as "health plan," "coverage," "copay," "copayment," "deductible," "premium," and "open enrollment," or refer to itself as "licensed" in advertisements, marketing material, brochures, or other materials related to the arrangement;
4) does not use funds paid by members for medical needs to cover administrative costs;
5) provides disclosure that the organization is not an insurance company and does not guarantee that medical bills will be paid by the organization or any other individuals; such disclosure must be made at initial contact with a prospective member, at the time of any material modification to the terms of the sharing arrangement, and in all advertising, brochures, and marketing materials;
6) reports annually to the Health Connector any information about membership, operations, and finances as the Health Connector may require; and

---

[13] Sharity (formerly Trinity Healthshare Inc.) is affiliated with Aliera. However, Aliera is not part of the bankruptcy; Mot. To Authorize the Subchapter V Trustee to Investigate the Debtor's Financial Affairs, at 2 Par. 2, In re Sharity Ministries, Inc., No. 21-11001 (JTD) (Bankr. D. Del.)

12

7)  meets such other criteria that the Connector may deem appropriate to ensure that individuals participating in such arrangements participate only in those operating in a manner consistent with the requirements described in 956 CMR 5.03(3)(d) 1. through 6.[14]

The new reporting requirement for health arrangements that are seeking MCC status was included in the final regulations in order to clarify the extent to which these types of arrangements are active in the Commonwealth. The annual reporting form for health arrangements seeking MCC status includes questions about membership, operations, finances, as well as an attestation section for arrangements to attest that they meet all of the new standards necessary to be deemed a health arrangement that provides MCC. In addition, the reporting form requires that arrangements submit the following documents along with a completed form:

- Written disclosures that the organization make available in conformance with 956 CMR 5.03(3)(d)5
- All marketing materials or brochures
- Guidelines or other member-participant or public-facing materials that explain sharing terms & conditions
- The organization's audited financial statements (if the organization has no audited financial statements, it should provide any available unaudited financial statements)

The annual reporting form for health arrangements provided by established religious organizations seeking MCC compliance can be found on the Health Connector's website: https://www.mahealthconnector.org/minimum-creditable-coverage/health-arrangements-reporting.

This report summarizes data provided to the Health Connector by health arrangements seeking MCC status in the first two years (2020 and 2021) of the new reporting requirement.

## 2.0: Health Care Sharing Ministries Reporting to the Health Connector

A complete and timely response to the Health Connector's reporting form satisfies one of the criteria necessary to be a HCSM deemed to provide MCC.

The Health Connector posted its first health arrangement reporting form on its website in May 2020 and accepted submissions through July 31. For reporting year 2021, HCSMs were required to submit their forms by March 31, which is the annual deadline for all future reporting years.

The Health Connector received reporting form submissions from seven HCSMs in 2020 and six HCSMs in 2021. In 2020, the Health Connector received forms from Medi-Share, Christian Healthcare Ministries (CHM), Liberty, Christian Mutual Med Aid (CMM), Solidarity, OneShare, and Samaritan. In 2021, the Health Connector received submissions from Christian Healthcare Ministries (CHM), Liberty, Solidarity, OneShare, and Samaritan, as well as a submission from a new HCSM, Zion Health.

---

[14] To date, the Health Connector has not used this provision to identify any additional criteria that HCSMs must meet.

13

Forms submitted in 2020 reflect information from calendar year 2019 and forms submitted in 2021 reflect information from calendar year 2020. As noted in Table 2, some arrangements reported using different names for their religious organization and the organization's health care sharing ministry program. This report references each HCSM throughout by the health care sharing ministry program name.

*Table 2. Health Care Sharing Ministries (HCSMs) that Submitted MCC Reporting Forms in 2020 and 2021*

| Established Religious Organization | Religious Organization's Health Care Sharing Ministry Program | Years of MCC Reporting Form Submission |
|---|---|---|
| Christian Care Ministry, Inc. (CCM) | Medi-Share | 2020 |
| Christian Healthcare Ministries, Inc., dba Heartfelt Radio (CHM) | Christian Healthcare Ministries, Inc., dba Heartfelt Radio | 2020, 2021 |
| Gospel Light Mennonite Church Medical Aid Plan, Inc. dba Liberty HealthShare | Gospel Light Mennonite Church Medical Aid Plan, Inc. dba Liberty HealthShare | 2020, 2021 |
| Logos Missions, Inc. | Christian Mutual Med Aid | 2020 |
| Melita Christian Fellowship Hospital Plan, dba Solidarity HealthShare | Melita Christian Fellowship Hospital Plan, dba Solidarity HealthShare | 2020, 2021 |
| OneShare Health, LLC changed from Kingdom Healthshare Ministries, LLC on March 22, 2019 | OneShare Health, LLC changed from Kingdom Healthshare Ministries, LLC on March 22, 2019 | 2020, 2021 |
| Samaritan Ministries International | Samaritan Classic, Basic & Given | 2020, 2021 |
| Zion Health | Zion Health | 2021 |

## 3.0: Total Massachusetts HCSM Membership Reported

In reporting year 2020, some HCSMs (Samaritan and Liberty) reported membership at the household level resulting in underreported total 2019 membership. However, Health Connector staff updated

14

the question about membership on the 2021 reporting form to clarify that HCSMs should report membership by individual member level data (not just household level).

In reporting year 2020, the seven HCSMs that submitted forms to the Health Connector reported having at least 2,467 total Massachusetts members in CY 2019. Medi-Share (793), OneShare (572), and Christian Healthcare Ministries (521) reported the greatest 2019 Massachusetts membership. In reporting year 2021, the six HCSMs that submitted forms to the Health Connector reporting a total of 2,170 Massachusetts members in CY 2020. Christian Healthcare Ministries (CHM) (522), Samaritan (669), and Liberty (455) reported the greatest 2021 Massachusetts membership. Samaritan and Liberty's reported increase in Massachusetts membership from reporting year 2020 to 2021 is likely due to the more accurate membership data reported after the form was updated and not from actual enrollment growth.

Notably, in 2020, Medi-Share reported having the most Massachusetts members in 2020 (793) but did not submit a MCC reporting form to the Health Connector in 2021. Christian Mutual Med Aid (CMM) also did not submit a form in 2021. However, they reported the fewest Massachusetts members (47) in 2020. One new HCSM, Zion Health, reported to the Health Connector in 2021 and currently has the fewest total Massachusetts members (7).

*Figure 4: Massachusetts Health Care Sharing Ministry (HCSM) 2019 Membership Based on MCC Reporting Forms Submitted in 2020*



*Liberty & Samaritan reported household member data in 2020 instead of individual member level data.*

*Figure 5: Massachusetts Health Care Sharing Ministry (HCSM) 2020 Membership Based on MCC Reporting Forms Submitted in 2021*



## 3.1: Small Business Membership

The health arrangement reporting form asks HCSMs if any small businesses offered their health arrangement to their employees or facilitate the arrangement for their employees. In total, three HCSMs reported that small businesses in Massachusetts used their arrangements. In 2020, Medi-Share reported that while employers do not specifically offer their health arrangement, nine employers in Massachusetts with 73 total employees "facilitate" the monthly share payments for their employees. Medi-share did not submit a form in 2021. Christian Healthcare Ministries (CHM) reported that two businesses in Massachusetts with a total of four employees participated in their arrangements in 2019 and two businesses in Massachusetts with three total employees participated in their arrangements in 2020. Samaritan reported that two businesses in Massachusetts with two households participated in their health arrangement in 2019 and one business in Massachusetts with two households participated in their health arrangement in 2020. In reporting year 2020, Samaritan further noted that the households participate directly with the ministry and not through an employer offering.

All other HCSMs reported that no small businesses participated in their health arrangements and Solidarity further clarified their response by adding that "health care sharing ministries are based on individual memberships so consequently, Solidarity does not offer small business health arrangements."

16

**Table 3. Health Care Sharing Ministries (HCSMs) with Small Business Participation**

| HCSM | Small Business Involvement? | Reporting Year 2020 | Reporting Year 2021 |
|------|------|------|------|
| Medi-Share | Yes | Employers do not offer it, however, 9 employers in MA with a total of 73 employees facilitate the monthly share payments of their employees | N/A |
| Christian Healthcare Ministries (CHM) | Yes | 2 businesses (4 employees) | 2 businesses (3 employees) |
| Christian Mutual Med Aid (CMM) | No | Not in MA | N/A |
| Liberty | No | Liberty does not offer memberships from employers to employees | Liberty does not offer memberships from employers to employees |
| OneShare | No | No additional comments | No additional comments |
| Samaritan | Yes | 2 businesses (2 households participating) | 1 business (2 households participating) |
| Solidarity | No | "Healthcare sharing ministries are based on individual memberships so consequently, Solidarity does not offer small business health arrangements." | "Healthcare sharing ministries are based on individual memberships so consequently, Solidarity does not offer small business health arrangements." |
| Zion Health | No | N/A | No additional comments |

17

# 4.0: Operations

## 4.1: Location of HCSM Operation and Advertising

All HCSMs reporting to the Health Connector in 2020 and 2021 operated in all or nearly all 50 states. Medi-Share, Christian Healthcare Ministries, Liberty, Samaritan, Solidarity, and Zion Health reported operating and advertising in all 50 states. Christian Mutual Med Aid reported operating and advertising in 46 states in CY 2019 but did not specify which states they did not operate and advertise in. OneShare reported operating and advertising in all states except for Vermont, Maryland, and Pennsylvania in CY 2019 and noted that they ceased enrolling new members in Washington as of March 31, 2020.

*Table 4. Location of Health Care Sharing Ministry (HCSM) Operation and Advertising*

| HCSM | Location of HCSM operation and advertising | Reporting Years |
|---|---|---|
| Medi-Share | All 50 states | 2020 |
| Christian Healthcare Ministries (CHM) | All 50 states | 2020, 2021 |
| Christian Mutual Med Aid (CMM) | 46 states but did not identify which states they do not operate/advertise in. | 2020 |
| Liberty | All 50 states | 2020, 2021 |
| OneShare | All states aside from VT, MD, PA, & WA. (OneShare ceased enrolling new members in Washington state as of March 31, 2020). | 2020, 2021 |
| Samaritan | All 50 states | 2020, 2021 |
| Solidarity | All 50 states | 2020, 2021 |
| Zion Health | All 50 states | 2021 |

18

## 4.2: Member Fees or Penalties

The health arrangement reporting form asks HCSMs whether there were circumstances in which members/participants were subject to fees, additional sharing requirements, or termination. Most (six out of eight) HCSMs reporting to the Health Connector in 2020 and 2021 stated that there were circumstances in which members were subject to such penalties. Table 5 reviews HCSM responses to this question and the reasons why members may be subject to extra fees or termination. Out of the six HCSMs reporting fees, additional sharing requirements, or termination under certain circumstances, four HCSMs specifically reported penalties or termination for certain behavior or due to pre-existing conditions.

In 2020, Medi-share reported that second-time violations of their "lifestyle agreement" result in membership termination. Examples of lifestyle agreement violations provided by Medi-share include submission of medical bills for tobacco use or injuries due to "use of illegal drugs" or "willful disregard for personal safety." In 2020, Christian Mutual Med Aid (CMM) reported that members who submit bills that totaled over $10,000 are subject to additional fees and members have had their memberships terminated due to smoking.

In 2020 and 2021, Liberty reported that a member may no longer participate if they failed to fully disclose pre-existing condition information at the time of the application. Liberty also reported that an applicant with certain pre-existing conditions "responsive to lifestyle changes" may be accepted as a Provisional Member subject to Liberty's Sharing Guidelines and that an additional fee is charged for "health coaching" sessions. In 2020 and 2021, Solidarity reported that membership is subject to fees pursuant to their Member Sharing Guidelines which include termination for not disclosing pre-existing conditions. Specifically, a member's medical expenses may be subject to a pre-existing condition review, including, but not limited to, request for medical notes and records, hospital charts, surgical records, or other relevant medical history information. Solidarity's guidelines state that failure to fully disclose pre-existing condition information at the time of application is grounds for termination of membership.

Outside of fees or terminations related to pre-existing conditions or "lifestyle agreement" violations, HCSMs also reported application fees, enrollment fees, annual fees, late fees, and termination due to non-payment or late payment of monthly shares or other fees.

*Table 5. Circumstances in which Members are Subject to Additional Fees, Sharing Requirements, or Termination*

| HCSM | Circumstance in which members are subject to fees, additional sharing requirements, or termination | Reporting Years |
|---|---|---|

19

| | | |
|---|---|---|
| Medi-Share | • Approximately 3-4 memberships are canceled per month due to second time violations of the Medi-Share "lifestyle agreement" which may include medical bills submitted for use of tobacco use, injuries due to "willful disregard for personal safety" and "use of illegal drugs". <br><br> • Late fees for delinquent share payments (go toward "Extra Blessings program", a fund to assist members with certain ineligible medical bills). <br><br> • Members canceled after 90-120 days of share non-payment in cases where payment installments cannot be agreed upon. | 2020 |
| Christian Healthcare Ministries (CHM) | None. | 2020, 2021 |
| Christian Mutual Med Aid (CMM) | Members who had medical bills total over $10,000 were subject to additional membership fees. There were members who had their membership terminated for smoking or delinquent payments for 3 months. | 2020 |
| Liberty | • First Annual Membership Dues at the time of applicant's initial enrollment that differ based on the arrangement ($125-$135 depending on Liberty Select, Share, Plus, or Complete) <br><br> • Annual membership dues of $75 due annually upon renewal. <br><br> • An applicant with certain pre-existing conditions "responsive to lifestyle changes may be accepted as a Provisional Member" subject to the Sharing Guidelines. An additional fee is charged for "health coaching" sessions. <br><br> • The member may no longer participate if they failed to fully disclose pre-existing condition information at the time of the application, or if annual membership dues or monthly share amounts are not made on time. | 2020, 2021 |
| OneShare | Initial enrollment fees. | 2020, 2021 |

20

| Samaritan | $200 application fee for new members; Members of Save to Share pay a $15 annual fee; members who don't send monthly share are inactivated. | 2020, 2021 |
|---|---|---|
| Solidarity | • "Membership is subject to fees pursuant to the Member Sharing Guidelines attached."<br><br>• Guidelines include a range of provisions including termination for not disclosing pre-existing conditions: "Medical expenses incurred may be subject to a Pre-Existing Condition review, including, but not limited to, request for medical notes and records, hospital charts, surgical records, or other relevant medical history information. Failure to fully disclose Pre-Existing Condition information at the time of application is a violation of the shared trust among Members and is grounds for termination of membership". | 2020, 2021 |
| Zion Health | None. | 2021 |

## 4.3: Third-Party Vendors

The health arrangement reporting form asks the organization to list and describe the role of any third-party vendors or administrative partners that acted on behalf of the health arrangement to assist with the marketing, sales, and administration of the health arrangement. Most (five out of eight) of the HCSMs reporting to the Health Connector in 2020 and 2021 use third-party vendors or administrative partners that act on behalf of the health arrangement.

In reporting year 2020, Medi-Share reported using vendors to facilitate direct interactions with health arrangement members and prospective members. The third-party vendors performed a range of activities including advertising, social media, communications, and payment technology.

In reporting years 2020 and 2021, Liberty, OneShare, Samaritan, and Solidarity reported use of third-party vendors. Liberty reported that they facilitate the sharing of medical bills with assistance from third-party vendors, including vendors that provide marketing services, administration of discounts on medical bills, coordination with healthcare providers, administration of pharmacy discounts and services, administration of personalized health and wellness coaching for pre-existing conditions, and case management. OneShare reported using third-party vendors for storage of member data and administration, administration of sharing requests, discount programs, and telemedicine. OneShare also reported that the use of external sales partners was discontinued in Massachusetts on February 1, 2020.

21

Samaritan reported using third-party vendors to assist members in negotiating reductions in billing and help members digitally manage shares. Samaritan also stated in their submission that they understand this question to relate to the direct support of bill sharing on behalf of their members as opposed to underlying support of the overall ministry.

In 2020, Solidarity reported using third-party vendors to reprice medical bills submitted by members and for marketing and initial call center support; however, both vendors were terminated in 2019. In 2021, Solidarity reported using a new third-party vendor for repricing member medical bills.

*Table 6. Health Care Sharing Ministry (HCSM) Use of Third-Party Vendors*

| HCSM | Third-Party Vendors | Reporting Years |
|------|---------------------|-----------------|
| Medi-Share | These vendors facilitated direct interaction with members or prospective members: Path Interactive: Pay Per Click Advertising (Google, Bing), Digital Moses: Social Media Advertising On A Mission, Communications: Radio Advertising Liquid Payments- Information Technology Services. | 2020 |
| Christian Healthcare Ministries (CHM) | None | 2020, 2021 |
| Christian Mutual Med Aid (CMM) | None | 2020 |
| Liberty | LHS facilitates the sharing of medical bills and operates, in part, with the assistance from third-party vendors for some limited services to facilitate sharing. Vendors include: Cost Sharing Solutions LLC (marketing services), The Medical Cost Savings Solution Ltd. (MedCost) (provides administration of discounts on medical bills and coordination with healthcare providers), SavNet International LLC (administration of pharmacy discounts and a customer service desk), GemCare (administration of personalized health and wellness coaching for pre-existing lifestyle-based health conditions), HealthSmart Care Management Solutions, L.P (provides large case individual member medical care management as needed), HealthShare Rx was reported as a new third-party vendor in 2020 and provides pharmacy vendor services. | 2020, 2021 |

22

| OneShare | Enrollment123/Administration123 is OneShare's system for storage of all member data/administration. Loomis administrates OneShare's Member Sharing Requests. OneShare has many external partners who market programs to individuals. However, the use of external sales partners was discontinued in Massachusetts on February 1, 2020. NBI provides a suite of discount programs to OneShare members in MA. OneShare partners with Teladoc to provide telemedicine services to OneShare members in MA. | 2020, 2021 |
| Samaritan | Karis and AMPs assist some members in negotiating reductions in billings. Samaritan states that they "understand this question to relate to direct support of bill sharing on behalf of our members as opposed to underlaying support of overall ministry". Samaritan also has a new program that uses Sharable to assist some members to digitally manage their shares. | 2020, 2021 |
| Solidarity | 2020: Medical Cost Saving Solution, Inc. assisted Solidarity in repricing of member submitted medical bills (relationship terminated July 2019). Cost Sharing Solutions. Inc. assisted Solidarity in marketing and initial call center support (relationship terminated May 2019).<br><br>2021: Anasazi Medical Payment Solutions, Inc. dba Advanced Medical Pricing Solutions assists Solidarity in repricing of Member medical bills. | 2020, 2021 |
| Zion Health | None | 2021 |

## 4.4: Provider Contracts

The health arrangement reporting form asks if the HCSM directly contracted with health care providers for services received by the member. Most (five out of eight) of the HCSMs reporting to the Health Connector in 2020 and 2021 reported that they use some form of provider contracts ranging from single case agreements to contracts with provider networks.

In 2020, Medi-Share reported that they had two single case agreements in 2019 but had no direct contracts with health providers in Massachusetts. In 2020 and 2021, Christian Healthcare Ministries (CHM), Liberty, OneShare, and Solidarity reported some type of contracting with health care providers or networks.

CHM reported that they make arrangements on a case-by-case basis except for one lab that operates in multiple states and that they do not pre-approve or make contracts for specific procedures or other types of health care services. Liberty reported that they do directly contract with health care providers. OneShare reported that they do not directly contract with providers in Massachusetts; however, they do contract with a provider network to obtain network access for

23

members. Solidarity reported that they directly enter agreements with providers on behalf of members for services received.

*Table 7. Contracts with Health Care Providers*

| HCSM | Provider contracts | Reporting Years |
|------|--------------------|-----------------|
| Medi-Share | No direct contracts with health providers in MA except for 2 single case agreements in 2019. | 2020 |
| Christian Healthcare Ministries (CHM) | Arrangements are made on a case-by-case basis except for one lab that operates in multiple states. No pre-approvals or contracts for specific procedures or other health care. | 2020, 2021 |
| Christian Mutual Med Aid (CMM) | None | 2020 |
| Liberty | Yes | 2020, 2021 |
| OneShare | Does not directly contract with providers in Massachusetts, but contracts with a provider network to obtain network access for members. | 2020, 2021 |
| Samaritan | None in Massachusetts | 2020, 2021 |
| Solidarity | Solidarity directly enters into agreements on behalf of the members with providers for services received by members. | 2020, 2021 |
| Zion Health | No | 2021 |

24

## 5.0: Finances

Reporting health arrangements are required to answer a range of questions about the organization's finances over the past calendar year. Questions in the financial portion of the reporting form aim to collect information about the total amount that members pay into the HCSM, the amount of medical bills members submit for sharing regardless of whether the services are considered eligible for sharing, the amount for services or bills that qualify for sharing, and the total amount that was paid out of the HCSM for members' health care costs. The form also asks about administrative fees and whether the organization, its members, or outside entities negotiate payment rates. Specifically, HCSMs are asked to answer the following questions about their finances:

- What were the total share amounts contributed by members/participants?
- What was the total amount submitted to the health arrangement by members/participants for sharing? (This should include all submissions by members/participants, not just qualifying submissions).
- What was the total qualifying sharable amount submitted by members/participants?
- What was the total amount paid through the health arrangement for members'/participants' submitted health care costs?
- What were the arrangement's administrative fees per member? (if the administrative fee amount per member/participant changes, e.g., based on type of membership or length of membership, please detail all fees and circumstances under which they occurred).
- Does the health arrangement negotiate rates? And if so, who does the negotiating (your members, your organization, or other entities)?

On average, HCSMs reported in 2020 that members paid their HCSM about 1.8 times the amount that the HCSM paid out for members' health care bills and, on average, about 50% of medical bills submitted by HCSM members were determined to be eligible for sharing by the HCSM. Costs paid for through the HCSMs as a percentage of member contributions ranged from 16% to 79% in 2020.

25

*Figure 6: Total Contributions Paid by Members to HCSM, Total Medical Bills Submitted by Members for Sharing, Total Qualifying Medical Bills, and Total Amount Paid Through the HCSM for Care (Reporting Year 2020)[15]*



*\*In 2020 and 2021, Liberty noted that the total amount submitted to the health arrangement for sharing includes "total charges submitted" which may include items such as duplicate bills and does not take into account certain factors such as deductions for discounts.*

*\*\*In 2020, Samaritan noted that shares received in one year would be for bills submitted in both the previous and current year; the "qualifying" shareable amount listed above includes provider reductions.*

On average, HCSMs reported in 2021 that members paid their HCSM about 1.4 times the amount that the HCSM paid out for members' health care bills and that, on average, about 50% of medical bills submitted by members were determined to be eligible for sharing by the HCSM. Costs paid for through the HCSMs as a percentage of member contributions ranged from 28% to over 100% in 2021.

---

[15] Some HCSMs were left out of Figure 6 for various reasons: Solidarity does not track state level data and does not collect data on total share amounts submitted for sharing. CMM reported <50 members making it difficult to make a comparison to other arrangements.

26

Figure 7: Total Contributions Paid by Members to HCSM, Total Medical Bills Submitted by Members for Sharing, Total Qualifying Medical Bills, and Total Amount Paid Through the HCSM for Care (Reporting Year 2021)[16]



*In 2020 and 2021, Liberty noted that the total amount submitted to the health arrangement for sharing includes "total charges submitted" which may include items such as duplicate bills and does not take into account certain factors such as deductions for discounts.

**In 2020, Samaritan noted that shares received in one year would be for bills submitted in both the previous and current year; the "qualifying" shareable amount listed above includes provider reductions.

---

[16] Some HCSMs were left out of Figure 7 for various reasons: Solidarity does not track state level data and does not collect data on total share amounts submitted for sharing. Zion Health reported $0 for all fields aside from total shares contributed by the member and only has 7 total members.

*Table 8. Amount Paid out by HCSM for Members Health Care Costs as a Percentage of Member Contributions (Reporting Years 2020 & 2021)[17]*

| Health Care Sharing Ministry | 2020 Submissions | 2021 Submissions |
|---|---|---|
| Samaritan | 64% | 89% |
| OneShare | 44% | 28% |
| Liberty | 51% | 63% |
| Christian Healthcare Ministries (CHM) | 78% | 111% |
| Medi-Share | 37% | N/A |
| Christian Mutual Med Aid (CMM) | 16% | N/A |
| Solidarity | 79% | 71% |
| Zion | N/A | Zion reported $0 paid out |

As additional context for these figures, it may be helpful to note that in the Massachusetts merged market, health insurance carriers are required to spend 88% of every premium dollar toward claims expenses (Medical Loss Ratio or MLR), this is a higher MLR standard than the level required of health insurers under the Affordable Care Act (ACA) (80% required for individual and small group, 85% required for large group). If a health insurer spends less than the required percentage of premiums on claims expenses, it is required to pay members back in the form of MLR rebates. While HCSMs are not health insurance, and the percentage of HCSM member contributions spent on member health care costs is not the same as the percentage of premiums spent on claims expenses, state and federal standards may provide helpful context for understanding the HCSM data reported.

---

[17] Solidarity's percentages are based off their national data because they do not collect state level financial data.

28

## 5.1: Administrative Fees

The health arrangement reporting form asks HCSMs about member administrative fees. In 2020 and 2021, all HCSMs reported that they charged administrative fees; however, the fee structure and fee amounts greatly varied across organizations. For example, some arrangements reported retaining a certain percentage of monthly contributions for administrative costs while some reported charging an annual fee along with a monthly fee. In addition, some arrangements had different administrative fees based on program type and member demographics, such as age. Table 9 summarizes each HCSM's administrative fee structure and amount reported in 2020 and 2021.

*Table 9. HCSM Administrative Fees (Reporting Years 2020 & 2021)*

| Health Care Sharing Ministry | Member Administrative Fee (Reporting Year 2020) | Member Administrative Fee (Reporting Year 2021) |
|---|---|---|
| Samaritan | Members send their first month's share, and 1 month each year thereafter, to the office for administrative costs. | Members of Samaritan Classic and Basic send their first 3 months' shares and 1 month each year thereafter to the office for administrative costs. Samaritan Given members have 90% of their first 3 months' shares used for administrative expenses and 20% of each month's share thereafter used for administrative expenses. |
| OneShare | Some external sales partners[18] charge and receive a monthly administration fee from members ranging from $15 to $30 per month. OneShare does not receive a specific administrative fee, but per the member guidelines, may set aside up to 40% of the monthly contribution for administrative and overhead costs and charitable contributions. | Same as 2020 with the exception of changing "external sales partners" to "external enrollment partners" |

---

[18] OneShare discontinued the use of external sales partners in Massachusetts on February 1, 2020.

29

Ex. 1.64, p. 29 of 33

Resp. Appx, p. 619         Appx. Vol XV
A-763

| | | |
|---|---|---|
| Liberty | The initial two months of a member's contribution are used for administrative costs to be used at the discretion of the ministry. Beginning with the third month of the membership and following, an admin fee not to exceed 12% is assigned to admin costs from each monthly share. Annual membership dues of $75 are also utilized to defray admin costs. All admin costs are deposited into an operating bank account and not combined with member sharing funds. | Same as reporting year 2020 |
| Christian Healthcare Ministries (CHM) | CHM has no formal fee structure. In 2019, the percentage of gifts retained by the ministry for administrative expenses was approximately 5.9%. All members sign a form acknowledging and agreeing that a small portion of their gifts may be applied to the ministry's administrative expenses. The amounts deducted are reported to the membership every year. | Same explanation as reporting year 2020, except CHM reported percentage of gifts retained by the ministry for administrative expenses was approximately 5.7%. |
| Medi-Share | Approximately 15.4% | N/A |
| Christian Mutual Med Aid (CMM) | $307.70/member | N/A |
| Solidarity | One-time membership fee of $135 and monthly admin and program service fees of $24. | One-time membership fee of $135 and monthly admin fee based on program, age, and single/couple/family. Monthly admin fee ranges from $20/mo for a single person under 30 in "Solidarity Primary Program" to $72/mo for a family over 30 in "Solidarity Premier Program". |
| Zion Health | N/A | Each month, 10% of monthly contributions received are retained by Zion Health in reserve to cover actual administrative costs. |

30

## 5.2: Rate Negotiation

In 2020 and 2021, most HCSMs reported that medical bills are negotiated in some way, whether the HCSM negotiates on behalf of members, the members negotiate their own medical bills, or a third-party vendor assists with negotiating medical bills. In some cases, HCSMs reported that a combination of these negotiation activities occur.

*Table 10. HCSM Rate Negotiation (Reporting Years 2020 & 2021)*

| HCSM | 2020 & 2021 Submissions |
|---|---|
| Medi-Share | Medi-Share allows members to negotiate and offers an internal negotiations team as well as an option to use a vendor partner. In FY19, Medi-Share negotiated 2 cases in MA. |
| Christian Healthcare Ministries (CHM) | CHM reported that individual members may negotiate rates with individual providers for specific services. The ministry assists individual members with this from time to time. |
| Christian Mutual Med Aid (CMM) | CMM and members negotiate rates. |
| Liberty | Liberty's members engage in negotiation of their medical bills with providers. Liberty may also negotiate medical bills with providers during the pre-notification stage and with MedCost after provision of services. |
| OneShare | OneShare Health does not directly negotiate provider rates, but contracts with a provider network to obtain access for members to rates negotiated by the network. |
| Samaritan | Samaritan reported that members, the arrangement, and other entities all negotiate billed amounts. |
| Solidarity | Solidarity, members of Solidarity, Medical Cost Saving Solution, Inc. (on behalf of Solidarity through July 2019), and Anasazi Medical Payment Solutions, Inc. dba Advanced Medical Pricing Solutions (for 2020) assist in repricing of Member medical bills. |

31

| Zion Health | Zion Health members are primarily responsible to negotiate rates for services received. However, Zion Health may, in certain circumstances, negotiate costs and rates with medical providers on behalf of its members. |
|---|---|

# 6.0: Conclusion

In the first two years (2020 and 2021) of the new reporting requirement for health arrangements that wish to provide MCC to Massachusetts residents, the Health Connector received in-depth information about health arrangements' membership, operations, and finances, which helped to clarify the extent to which these types of arrangements are active in the Commonwealth and shed light on the activities and operations of such arrangements, whereas previously there has been minimal, if any, state collection and reporting of information on these entities' practices.

Health Connector staff made minor changes to the 2021 reporting form to improve clarity and quality of data. Health Connector staff will continue to review the reporting form to assess whether clarifications or modifications to the form would yield better data in future reporting years. This data provides new information on uptake and use of HCSMs by Massachusetts residents and will assist the Commonwealth in continuing to ensure that future policy approaches to the individual mandate and health coverage generally are based on a clear, detailed understanding of current dynamics and practices.

32

# Appendix

## Abbreviations

ACA .................................................... Patient Protection and Affordable Care Act
CY ...................................................... Calendar Year
FY ...................................................... Fiscal Year
HCSM.................................................. Health Care Sharing Ministry
Health Connector ........................... Commonwealth Health Insurance Connector Authority
MCC ................................................... Minimum Creditable Coverage
TY ...................................................... Tax Year

## 2021 Reporting Form

The annual reporting form for health arrangements provided by established religious organizations seeking MCC status can be found on the Health Connector's website: https://www.mahealthconnector.org/minimum-creditable-coverage/health-arrangements-reporting.

33