No. 25-1035

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

ALLIANCE OF HEALTH CARE SHARING MINISTRIES
*Plaintiff-Appellant*

v.

MICHAEL CONWAY,
in his official capacity as
Commissioner of the Colorado Division of Insurance
*Defendant-Appellee*

Appeal from the United States District Court for the District of Colorado,
No. 1:24-cv-01386-GPG-STV (Hon. Gordon Gallagher)

**APPENDIX VOL XIX - Pages A-934 - A-1002**

Date: March 21, 2025

Michael F. Murray
Paul Hastings LLP
2050 M Street, NW
Washington, D.C. 20036
(202) 551-1730
michaelmurray@Paulhastings.Com
William E. Mahoney
Paul Hastings LLP
600 Travis Street, Fifty-Eighth Floor
Houston, Texas 77002
(713) 860-7304
williammahoney@Paulhastings.Com

*Counsel For Plaintiff Alliance of
Health Care Sharing Ministries*

| ECF NO. | *DESCRIPTION* | Appx. Page No. |
|---|---|---|
| **Appendix Vol. I, Pages 1-140** | | |
| - | District Court Docket Sheet | A-1 |
| 8-1 | Ex. A - Declaration of Rob Waldo (May 17, 2024) | A-9 |
| 8-2 | Ex. A-1 – Samaritan Bylaws | A-19 |
| 8-3 | Ex. A-2 - Samaritan Guidelines | A-44 |
| 8-4 | Ex. A-3 - Samaritan Membership Application | A-94 |
| 8-5 | Ex. B - Declaration of Katy Talento | A-100 |
| 32 | Amended Complaint of Alliance of Health Care Sharing Ministries (July 1, 2024) | A-109 |
| **Appendix Vol. II, Pages 141-179** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1-1.6 (September 3, 2024) | A-141 |
| **Appendix Vol. III, Pages 180-223** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.7-1.22 (September 3, 2024) | A-180 |
| **Appendix Vol. IV, Pages 224-261** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.23-1.28 (September 3, 2024) | A-224 |
| **Appendix Vol. V, Pages 262-307** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.29-1.33 (September 3, 2024) | A-262 |

| | **Appendix Vol. VI, Pages 308-331** | |
|---|---|---|
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.34-1.36 (September 3, 2024) | A-308 |
| | **Appendix Vol. VII, Pages 332-350** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.43-1.54 (September 3, 2024) | A-332 |
| | **Appendix Vol. VIII, Pages 351-373** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.37-1.39 (September 3, 2024) | A-351 |
| | **Appendix Vol. IX, Pages 374-424** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.40-1.40 (September 3, 2024) | A-374 |
| | **Appendix Vol. X, Pages 425-478** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.40-1.41 (September 3, 2024) | A-425 |
| | **Appendix Vol. XI, Pages 479-541** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.41-1.42 (September 3, 2024) | A-479 |
| | **Appendix Vol. XII, Pages 542-573** | |

| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.43-1.54 (September 3, 2024) | A-542 |
|---|---|---|
| **Appendix Vol. XIII, Pages 574-612** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.54-1.59 (September 3, 2024) | A-574 |
| **Appendix Vol. XIV Pages 613-682** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.6-1.6 (September 3, 2024) | A-613 |
| **Appendix Vol. XV, Pages 683-767** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.61-1.64 (September 3, 2024) | A-683 |
| **Appendix Vol. XVI, Pages 768-816** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 2.0-2.3 (September 3, 2024) | A-768 |
| **Appendix Vol. XVII, Pages 817-867** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 2.3-2.4 (September 3, 2024) | A-817 |
| **Appendix Vol. XVIII, Pages 868-933** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 2.5-7 (September 3, 2024) | A-868 |

| | **Appendix Vol. XIX, Pages 934-1002** | |
|---|---|---|
| 52.1 | Appendix to Reply to Motion for Preliminary Injunction (September 17, 2024) | A-934 |
| 54 | Order Denying the Alliance's Motion for a Preliminary Injunction (January 13, 2025) | A-949 |
| | **Appendix Vol. XX, Pages 1003-1041** | |
| 54 | Order Denying the Alliance's Motion for a Preliminary Injunction (January 13, 2025) | A-1003 |
| 55 | Notice of Appeal as to Order on Motion for Preliminary Injunction (January 27, 2025) | A-1015 |
| 58-1 | Motion for Order to Grant Injunction Pending Appeal (January 28, 2025) | A-1017 |
| | **Appendix Vol. XXI, Pages 1042-1077** | |
| 58-1 | Motion for Order to Grant Injunction Pending Appeal (January 28, 2025) | A-1042 |
| 60 | Order Denying Motion for Injunction Pending Appeal (February 3, 2025) | A-1069 |

# MOVANT'S APPENDIX

## Reply in Support of Plaintiff's
## Motion for a Preliminary Injunction

# EXHIBIT A

**ROB WALDO - August 28, 2024**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-01386-GPG-STV

ALLIANCE OF HEALTH CARE SHARING MINISTRIES

       Plaintiff,

vs.

MICHAEL CONWAY, in his official capacity as
Commissioner of the Colorado Division of Insurance,

       Defendant.

_____

VIDEOCONFERENCE AND RULE 30(b)(6) DEPOSITION OF

SAMARITAN MINISTRIES INTERNATIONAL

REPRESENTATIVE ROB WALDO

_____


       PURSUANT TO NOTICE, the above-entitled

videoconference (Zoom) deposition was taken on behalf

of the Defendant on Wednesday, August 28, 2024, at 9:01

a.m., before Jana Mackelprang, Certified Realtime

Reporter, Registered Professional Reporter, and Notary

Public.

**ROB WALDO - August 28, 2024**

1  Samaritan's position and what goes into, you know,

2  putting this template together.  So let me know if you

3  want to take a break now, otherwise we're going to go

4  through this for a little while.

5       A.      We can keep going.

6       Q.      So, in general, how many hours does

7  Samaritan -- does it take Samaritan to put together the

8  information found in this template?

9       A.      What I put in my declaration for annual

10  compilation of this information is 285 hours.  I think

11  it's really important to provide context for that

12  number.

13               In terms of context there, that does not

14  include all of the challenges that I described before

15  related to understanding the terms, working with

16  Colorado DOI to clarify the terms, to provide

17  commentary, and to then respond to the outcome of this

18  report, which was a consumer advisory warning against

19  healthcare sharing ministries, and then the media

20  reports.

21               So there's a lot of context around this,

22  that the 285 hours is insufficient in saying -- it's

23  not even included in the annual preparation here, but

24  that would be, in terms of if we are looking at

25  specific hours, and all the other things were not a

**ROB WALDO - August 28, 2024**

1  factor -- but they are -- it would be 285 hours.

2        Q.    And how many employees is that 285 hours

3  split between?

4        A.    I would say maybe 15.

5        Q.    And is everybody involved in compiling

6  the information and completing this template a

7  Samaritan employee, or did you have to hire any

8  third-party contractors specifically to complete the

9  template?

10       A.    We did not hire third-party contractors

11 to assist in completing the template.  Those that

12 prepared the template were staff.  We do have some

13 lawyers who are not considered staff that have helped.

14       Q.    Now we're just going to go through each

15 column, and I'm going to ask you some basic questions

16 about each column, and please let me know if what I ask

17 is unclear or if you can't see the column.  Please

18 interrupt me at will to clarify anything I'm asking.

19             Starting here on letter B, the number of

20 Colorado residents, are you able to see that whole

21 column, Mr. Waldo?

22       A.    I am.

23       Q.    Okay.  And who at Samaritan is

24 responsible for completing Column B?

25       A.    Column B, we have some data staff that

**ROB WALDO - August 28, 2024**

1  and how to walk that out.

2              So we'll hit on all of these different

3  areas, and financial is one component of our ministry,

4  but we don't want it to be transactional.  We want it

5  to be in a community that is caring for one another.

6       Q.    That makes sense.  And so does it --

7  would I be accurate to say that, in addition to all of

8  those, you know, different buckets of communication --

9  you talked about the newsletters and the health and

10  nutrition and the rights -- and we might dig into these

11  a little bit more -- core values, and then there might

12  be communications that are financial or sharing related

13  in nature.  And would you put another bucket of

14  communications would be marketing and advertisements to

15  try and gain new members?

16       A.    Samaritan does communicate to reach

17  others that we believe are like-minded.  And we can

18  call that marketing.  We can call that advertising.

19  And we do that.  We're very intentional about how we do

20  that.  We want to attract only those people that can

21  sign up on our statement of faith and want to

22  participate in healthcare sharing like us.

23              And, yes, we do market and advertise to

24  those that we believe may be interested in joining our

25  community.

**ROB WALDO - August 28, 2024**

1  back.  We got pulled a little bit away from the

2  reporting template and requirements of Colorado's

3  reporting law, but an aspect of the Colorado reporting

4  law that I believe Samaritan has objected to and is

5  present in your declaration is this idea of the

6  disclosure of third parties who Samaritan does business

7  with in Colorado.

8        Can you tell me a little bit about what

9  Samaritan's objections are in regard to the third

10  parties who manage or implement Samaritan's programs in

11  Colorado?

12       A.    I can.  And this one has some context,

13  and I'd be glad to dive deeper, if you have any

14  questions, but the context at high level first matters

15  to us.

16       Samaritan Ministries is not well known in

17  what we do and to the general public or to third

18  parties.  Most of the public is familiar with other

19  mechanisms for healthcare, but not healthcare sharing

20  ministries.

21       And so what we have to do, our first

22  hurdle that we have to get over with vendors or third

23  parties, is we have to explain who we are and what we

24  do as healthcare sharing ministries.  Some vendors

25  understand that fairly quickly, and some vendors don't

**ROB WALDO - August 28, 2024**

1   get it at all, but they're willing to work with us.

2                   So that's the first hurdle we have with

3   vendors.

4                   The second hurdle we have with vendors is

5   there are requirements that we put in place to protect

6   our ministry, the integrity of our ministry and what

7   we've been entrusted with.  An example of that would be

8   a nonsolicitation clause or where we do arbitration.

9   And instead of legal matters, we go to arbitration.

10                  Some vendors understand that.  Some

11  vendors don't.  Some vendors are willing to work it;

12  some aren't.  But that's hurdle number two.

13                  Then there's hurdle number three.  And

14  hurdle number three is that we have sincerely held

15  religious beliefs.  And some of those religious beliefs

16  are supported by vendors; some are not.  Some may

17  disagree with some of our membership requirements.

18  Some may say that we have requirements or beliefs that

19  violate their code of conduct.  And that becomes hurdle

20  number three.

21                  And then what happens -- we have to get

22  through all of those hurdles to be able to work with

23  vendors.  And some vendors don't make it through each

24  of those, as you might imagine.

25                  But now we're adding a fourth hurdle, and

**ROB WALDO - August 28, 2024**

1    the fourth hurdle is that there will be a public record

2    that's forced on us to report all these vendors to the

3    Division of Insurance that will confuse vendors in the

4    public on hurdle number one.  What is Samaritan

5    Ministries?  Oh, they're insurance, because they report

6    to the Division of Insurance.

7                We're not insurance.  We're just mandated

8    by law to do this, and we object to it.  But that

9    confuses it, so it muddies the water there.

10               And then, now their names are associated

11   publicly on a list that, according to Colorado's Open

12   Records Act, anyone can access.

13               Well, why is that a problem, some may

14   say?  If the DOI and journalists would report

15   accurately, it may not be a problem.  But they aren't

16   reporting accurately.  And they have provided

17   misleading, mischaracterizing statements that are

18   harming us.  And now vendors are publicly associated

19   with us.

20               There's some vendors that face pressure

21   related to who is considered a hate group.  I am so

22   grateful no one considers us a hate group.  And we want

23   to avoid anything that would be of that nature.  Our

24   job is to love God well, according to purpose, and to

25   love others well and to honor our sincere religious

**ROB WALDO - August 28, 2024**

1  beliefs.  And then we let others have their sincerely

2  held religious beliefs or no beliefs at all.

3           But there are some vendors that if they

4  get associated with certain organizations, it puts

5  pressure on them.  And there's a real concern for

6  deplatforming, for removal of services because a vendor

7  gets pressure to be associated with an organization

8  based upon their religious beliefs that we're not

9  enforcing on anyone else, except our members agreed to

10  them voluntarily.

11           And then, as well, the other negative

12  part about this is that vendors are now associated with

13  an organization that the government is saying is

14  misleading consumers.  And to quote the government's --

15  the DOI's own words, it's heartbreaking.  It's

16  frustrating.

17           There are guarantees of coverage,

18  different things that are not true about us.  And now

19  we have vendors that have the government talking about

20  us in negative ways that are misleading.  It puts a

21  whole lot of pressure upon us, and it puts pressure

22  upon our vendors that we're just trying to work well

23  with, as well as our members.

24           So the disclosure of who we affiliate and

25  associate with is not as straightforward as simply

**ROB WALDO - August 28, 2024**

1   providing a list.  We believe it is compelled speech,
2   and it then puts pressure on us and vendors that is
3   harmful and detrimental to us.
4        Q.    Thank you for the explanation, and we're
5   going to spend some time unpacking that.
6              From a high level, how does Samaritan
7   decide which vendors -- and I'm happy to use your
8   terminology for this -- how does Samaritan decide which
9   vendors to contract with in Colorado?  Is there a
10  process for that?
11       A.    From a high level, it's pretty simple.
12  We have a problem we're trying to solve.  We have a
13  need, not a medical condition, but we have a situation
14  we're trying to meet, and we look at our internal
15  resources.  We look at what's available externally, and
16  is there a way to provide -- to come to a solution that
17  is better than us doing it internally?  And that has a
18  whole range of items.
19             I do want to be clear that the one area
20  that we are very adamant about for reasons that I
21  stated generally prior in my testimony today, that we
22  don't use vendors for or third parties, is our members
23  service.  And anyone who's interacting with members on
24  the phone, because we're a faith-based organization,
25  and central to that is the care and love of Jesus

**ROB WALDO - August 28, 2024**

1   3:09 p.m.)

2                MR. KHALIFE:  We're back on the record.

3   Mr. Waldo, I just want to say thank you very much for

4   speaking with us today.  It was an enjoyable

5   conversation, and I don't have any further questions at

6   this time.

7                THE DEPONENT:  Well, thank you, Phil.  I

8   appreciate the time today in speaking with you.

9                MR. MURRAY:  I think we may circle up for

10  a few minutes and see if we have any cross-examination

11  questions, technically I think they're called.  Maybe

12  we just take five minutes and then circle back.  Why

13  don't we make it an even 5:15 and come back.

14                (A recess was taken from 3:09 p.m. to

15  3:16 p.m.)

16                MR. MURRAY:  Let's go back on the record.

17                      EXAMINATION

18  BY MR. MURRAY:

19       Q.    Mr. Waldo, I just have a few questions

20  for you involving what Mr. Khalife was saying or asking

21  you about.

22                With respect to your advertising and

23  marketing materials, do they mention the Bible or Bible

24  verses?

25       A.    Yes, frequently.

ROB WALDO - August 28, 2024

```
 1        Q.      Do your advertising and marketing
 2  materials talk about your religious beliefs?
 3        A.      Yes, frequently.
 4        Q.      Would you consider your advertising and
 5  marketing materials your religious speech?
 6        A.      Yes.
 7        Q.      The attorney for the other side mentioned
 8  HB 1198.  Do you recall that conversation?
 9        A.      Yes.
10        Q.      And I think you used the term
11  "legislative bargain" in that conversation; is that
12  right?
13        A.      I did.
14        Q.      Was it your first choice that HB 1198
15  passed the Legislature and became law?
16        A.      No, it was a legislative bargain
17  guaranteeing the codifying of certain rights, but it
18  did diminish other rights.  So it was not our first
19  choice.
20        Q.      I believe you also mentioned earlier
21  today in a discussion with opposing counsel the concept
22  of what has and has not changed with respect to your
23  communications in response to the Colorado law and
24  regulations.
25               Do you recall that conversation?
```

**ROB WALDO - August 28, 2024**

1        A.      Yes.

2        Q.      I believe you stated that nothing has

3    changed yet.  Does that sound right to you?

4        A.      Yes, to date.

5        Q.      Might you change those communications in

6    the future?

7        A.      Yes.  We are still seeing how this

8    complaint plays out and what the government mandates

9    upon us and is upheld by law, and our response on how

10   it infringes upon our rights and what we must do to

11   speak up on behalf of that and what we must communicate

12   as our response.

13       Q.      Do you think it might affect who you will

14   communicate with as well as the content of that

15   communication?

16       A.      Yes.

17       Q.      Do you recall talking with opposing

18   counsel about vendors and the vendors' process of

19   deciding to work with you?

20       A.      I do.

21       Q.      When vendors decide to stop working with

22   you, do they always tell you why?

23       A.      No.

24       Q.      When vendors decide not to begin working

25   with you, do they always tell you why?

**ROB WALDO - August 28, 2024**

```
1        A.      No.

2               MR. MURRAY:  Those are all the questions

3   I have.  I'm not sure, Phil, if you have any follow-up

4   questions, but that would be your prerogative, not

5   mine.

6               MR. KHALIFE:  Thanks, Mike.  No, no

7   redirect.  And thank you again, Mr. Waldo and Jana.

8               THE DEPONENT:  Thank you.  I appreciate

9   the time.

10              THE COURT REPORTER:  Do you mind, before

11  we go totally off the record, if I can get what you'd

12  like to order?

13              MR. KHALIFE:  Absolutely.  I think we

14  already talked about the quick turnaround, and if we

15  could please get just the electronic copy, the four to

16  the page.

17              Do we need anything else?

18              THE COURT REPORTER:  Whether or not you

19  want scanned exhibits, digitalized.

20              MR. KHALIFE:  I think we only had the

21  three, so sure on scanned exhibits.

22              MR. MURRAY:  Yes, please, we'll do the

23  same thing that they're doing.

24              (WHEREUPON, the deposition was concluded

25  at 3:20 p.m.)
```

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Gordon P. Gallagher

Civil Action No. 24-cv-01386-GPG-STV

ALLIANCE OF HEALTH CARE
SHARING MINISTRIES,

      Plaintiff,

v.

MICHAEL CONWAY, in his official capacity
as Commissioner of the Colorado Division of Insurance,

      Defendant.

---

## ORDER

---

Before the Court is Plaintiff Alliance of Health Care Sharing Ministries' (the Alliance) Motion for a Preliminary Injunction (D. 8). The Court DENIES this motion for the following reasons.

### I. BACKGROUND

The Alliance is a 501(c)(6) trade organization representing the interests of various health care sharing ministries (D. 8-5 at 3). These ministries are 501(c)(3) organizations "whose core purpose is to facilitate the sharing of medical expenses as an exercise and expression of religious belief" (*id.* at 4). At least some of them offer health care sharing plans or arrangements to Colorado residents and are thus subject various reporting requirements under Colorado Revised Statutes § 10-16-107.4 and its implementing regulation, 3 Colo. Code Regs. § 702-4:4-10-01 (Regulation 4-

1

10-01).  This Order refers to this law and regulation collectively as the "Reporting Law."  The

Alliance challenges the constitutionality of the Reporting Law and seeks to enjoin its enforcement

(*see generally* D. 8; D. 32).

Section 10-16-107.4, enacted in 2022, generally requires "[a] person not authorized by the

[C]ommissioner [of the Colorado Division of Insurance] . . . to offer insurance in [Colorado] that

offers or intends to offer a plan or arrangement to facilitate payment or reimbursement of health-

care costs or services for residents of [Colorado]" to annually report data to Defendant

Commissioner of the Colorado Division of Insurance (the Commissioner, or Defendant).  The

required data includes:

(I)     The total number of individuals and households that participated in
        the plan or arrangement in [Colorado] in the immediately preceding
        calendar year;

(II)    The total number of employer groups that participated in the plan
        or arrangement in [Colorado] in the immediately preceding
        calendar year, specifying the total number of participating
        individuals in each participating employer group;

(III)   If the person offers a plan or arrangement in other states, the total
        number of participants in the plan or arrangement nationally;

(IV)    Any contracts the person has entered into with providers in
        [Colorado] that provide health-care services to plan or arrangement
        participants;

(V)     The total amount of fees, dues, or other payments collected by the
        person in the immediately preceding calendar year from
        individuals, employer groups, or others who participated in the plan
        or arrangement in [Colorado], specifying the percentage of fees,
        dues, or other payments retained by the person for administrative
        expenses;

(VI)    The total dollar amount of requests for reimbursement of health-
        care costs or services submitted in [Colorado] in the immediately
        preceding calendar year by participants in the plan or arrangement

2

or providers that provided health-care services to plan or arrangement participants;

(VII)    The total dollar amount of requests for reimbursement of health-care costs or services that were submitted in [Colorado] and were determined to qualify for reimbursement under the plan or arrangement in the immediately preceding calendar year;

(VIII)   The total amount of payments made to providers in [Colorado] in the immediately preceding calendar year for health-care services provided to or received by a plan or arrangement participant;

(IX)     The total amount of reimbursements made to plan or arrangement participants in [Colorado] in the immediately preceding calendar year for health-care services provided to or received by a plan or arrangement participant;

(X)      The total number of requests for reimbursement of health-care costs or services submitted in [Colorado] in the immediately preceding calendar year that were denied, expressed as a percentage of total reimbursement requests submitted in that calendar year, and the total number of reimbursement request denials that were appealed;

(XI)     The total amount of health-care expenses submitted in [Colorado] by plan or arrangement participants or providers in the immediately preceding calendar year that qualify for reimbursement pursuant to the plan or arrangement criteria but that, as of the end of that calendar year, have not been reimbursed, excluding any amounts that the plan or arrangement participants incurring the health-care costs must pay before receiving reimbursement under the plan or arrangement;

(XII)    The estimated number of plan or arrangement participants the person is anticipating in [Colorado] in the next calendar year, specifying the estimated number of individuals, households, employer groups, and employees;

(XIII)   The specific counties in [Colorado] in which the person:

(A) Offered a plan or arrangement in the immediately preceding calendar year; and

(B) Intends to offer a plan or arrangement in the next calendar year;

3

(XIV)   Other states in which the person offers a plan or arrangement;

(XV)   A list of any third parties, other than a producer, that are associated with or assist the person in offering or enrolling participants in [Colorado] in the plan or arrangement, copies of any training materials provided to a third party, and a detailed accounting of any commissions or other fees or remuneration paid to a third party in the immediately preceding calendar year for:

     (A) Marketing, promoting, or enrolling participants in a plan or arrangement offered by the person in [Colorado]; or

     (B) Operating, managing, or administering a plan or arrangement offered by the person in [Colorado];

(XVI)   The total number of producers that are associated with or assist the person in offering or enrolling participants in [Colorado] in the plan or arrangement, the total number of participants enrolled in the plan or arrangement through a producer, copies of any training materials provided to a producer, and a detailed accounting of any commissions or other fees or remuneration paid to a producer in the immediately preceding calendar year for marketing, promoting, or enrolling participants in a plan or arrangement offered by the person in [Colorado];

(XVII)   Copies of any consumer-facing and marketing materials used in [Colorado] in promoting the person's plan or arrangement, including plan or arrangement and benefit descriptions and other materials that explain the plan or arrangement;

(XVIII) The name, mailing address, e-mail address, and telephone number of an individual serving as a contact person for the person in [Colorado];

(XIX)   A list of any parent companies, subsidiaries, and other names that the person has operated under at any time within the immediately preceding five calendar years; and

(XX)   An organizational chart for the person and a list of the officers and directors of the person[.]

Colo. Rev. Stat. § 10-16-107.4(1)(a).

4

The statute carves out from these reporting requirements "[d]irect primary care agreements" and "[o]ther consumer payment arrangements identified by the [C]ommissioner by rule, including consumer payment plans offered directly by a provider to a patient or the party responsible for payment on behalf of the patient." *Id.* § 10-16-107.4(5). It also authorizes the Commissioner to "adopt rules as necessary" to implement the statute. *Id.* § 10-16-107.4(4). And it permits the Commissioner to levy fines against persons who do not remedy identified reporting deficiencies within a 30-day cure period. *Id.* § 10-16-107.4(2).

Section 10-16-107.4 further requires the Commissioner to "[p]repare a written report summarizing the information" submitted by reporting parties and to post on the Colorado Division of Insurance's (the Division) website "the report and accurate and evidence-based information about the persons who submitted information . . . , including how consumers may file complaints." *Id.* § 10-16-107.4(3).

Regulation 4-10-01, which became effective on April 30, 2024,[1] requires all "health care sharing plans and arrangements" to email the Division a filled-out reporting template,[2] along with copies of marketing materials, an organizational chart, and copies of training materials provided

---

[1] The Division enacted an interim regulation, Emergency Regulation 22-E-20, which became effective shortly after Section 10-16-107.4 became law in 2022. The interim regulation imposed reporting requirements on sharing plans similar to those the final regulation imposes. *See generally* Emergency Regulation 22-E-20, *available at* https://drive.google.com/file/d/1vbJEv9NQKpvOgY9UQ1ZwDhducFQ717nb/view; *see also id.*, Appendix A.

[2] This reporting template is a spreadsheet, with requests for information generally tracking the categories enumerated in Colorado Revised Statutes § 10-16-107.4(1)(a) (though the reporting template divides certain of the statutory categories into separate requests) (*see* D. 46-1 at 638–40). The template contains some requests for information not expressly noted in the statute, however. For instance, it asks reporting parties to identify their organizational websites (*id.* at 638). It also asks that reporting parties identify the percentage of fees, dues, contributions, or other payments from Colorado sharing plan or arrangement participants are retained for "program expenses," as opposed to "administrative expenses" (*id.*), and to describe their appeals processes and provide data on appeals outcomes (*id.* at 639, 641).

to "producer[s]" and "third part[ies]."  *See* Regulation 4-10-01(5)(A).  It defines "health care

sharing plan" and "health care sharing arrangement" to include:

> any organization that offers or markets products to facilitate payment or
> reimbursement of health-care costs or services for one (1) or more residents
> of Colorado. This does not include direct primary care agreements as
> defined in § 6-23-101, C.R.S.; consumer payment plans offered directly
> between a provider and patient (or patient's responsible party); businesses
> used to facilitate the plan's operations such as reimbursement handling, cost
> containment vendors, data processing; and crowdfunded sources that do not
> require ongoing membership fees, share requirements, or dues for the
> purposes of payment for and/or reimbursement of health care services.

Regulation 4-10-01(4)(G).    Covered entities must complete Regulation 4-10-01's reporting

requirements annually: the required reports are due "by March 1 of each year with data for the

prior calendar year."[3]  Regulation 4-10-01(5)(A)(2).

## II.  FINDINGS OF FACT[4]

### A.  Sharing arrangements proliferate after the Affordable Care Act passes.

In 2010, Congress passed the Affordable Care Act (ACA), which mandates that most

individuals obtain "minimum essential" insurance coverage for themselves and their dependents.

*See* 26 U.S.C. § 5000A(a).  But the ACA exempts members of "health care sharing ministries"

from this requirement.  *Id.* § 5000A(d)(2)(B).  After the ACA passed, membership in health care

---

[3] Emergency Regulation 22-E-20 likewise imposed a March 1 reporting deadline, except for 2021 data, which it
required covered entities to report by December 15, 2022.

[4] Unless otherwise noted, the Court draws the operative facts from the parties' briefing on the Alliance's motion for a
preliminary injunction and the exhibits supporting this briefing.  In view of the parties' submissions, the Court
determined that neither an evidentiary hearing nor oral argument would materially assist it in resolving this matter and
that this matter could be decided on the papers. *See Northglenn Gunther Toody's, LLC v. HQ8-10410-10450 Melody
Lane LLC*, 702 F. App'x 702, 705 (10th Cir. 2017) (recognizing that "neither Fed. R. Civ. P. 65(a) nor this circuit's
precedent require the district court to hold an evidentiary hearing or oral argument before deciding a motion for a
preliminary injunction").

sharing ministries increased significantly, likely because these plans generally require members to make lower monthly payments than traditional insurers do (*see* D. 46-1 at 7).

Health care sharing ministries are not as heavily regulated as traditional insurers under federal and Colorado law.  For instance, traditional ACA-governed insurance plans must spend at least 80% of premiums paying claims or on other activities improving health care quality (or otherwise issue rebates).  42 U.S.C. § 300gg-18(b)(1)(A).  And they must cover, among other things, pre-existing conditions, pregnancy care, treatment for substance use disorders, and mental health care, where plans offered by health care sharing ministries are exempt from these requirements.  *See* 42 U.S.C. § 300gg-3(a) (prohibiting insurers from excluding coverage for pre-existing conditions); 42 U.S.C. § 300gg–6 (requiring insurers to provide coverage consistent with the health benefits package enumerated in 42 U.S.C. § 18022); 42 U.S.C. § 18022 (enumerating areas of required coverage).  Colorado imposes similar requirements on traditional, ACA-compliant insurers.  *See* Colo. Rev. Stat. § 10-16-104 (enumerating areas of mandatory coverage); Colo. Rev. Stat. § 10-16-118 (prohibiting certain insurers from denying coverage for pre-existing conditions).  Moreover, Colorado subjects traditional insurers to extensive rate-filing regulations.  *See id.* § 10-16-107 (requiring insurers to submit expected rate increases to the Commissioner and obligating the Commissioner to adopt rules establishing required benefits ratios for health insurance plans).  And it requires traditional health insurers to participate in the Colorado Life and Health Insurance Protection Association (which essentially pools member resources to cover claims for coverage against insolvent insurers).[5]  *See id.* §§ 10-20-101–120.

---

[5] Colorado imposes other requirements on traditional insurers, too.  *See, e.g.*, Colo. Rev. Stat. §§ 10-3-101, 10-3-108 (requiring insurers—before offering any plan in Colorado—to submit their governing documents to the Commissioner); Colo. Rev. Stat. § 10-3-105 (generally obligating insurers to obtain a certificate of authority from the Commissioner before transacting any insurance business in Colorado); Colo. Rev. Stat. § 10-3-109 (requiring

**B. Consumers and others raise concerns about sharing plan practices.**

Starting in roughly 2018, the Division, through consumer complaints, other state regulators, the National Association of Insurance Commissioners, and sharing plan marketing materials—purportedly became aware that health care sharing plans posed unique risks to consumers (D. 46-1 at 7–8).[6]  Among the concerns relayed to the Division were: (1) that sharing plans offered substantial incentives to insurance brokers, who were aggressively marketing sharing plans to consumers; (2) that sharing plan marketing materials and communications were misleading consumers into believing that these plans were providing comprehensive insurance benefits at lower prices than traditional plans; and (3) that sharing plans were chronically rejecting or delaying payment on claims their members understood to be reimbursable (*id.* at 8).

Examples of consumer complaints the Division received include:

- A September 2018 complaint alleging that a sharing plan denied a consumer coverage for a hospital stay relating to potential stroke or blood clot symptoms on the basis that the consumer's illness was "not life-threatening" (*id.* at 10, 46–47).

- An October 2018 complaint alleging that a consumer had received advanced approval for a procedure from Liberty HealthShare, which subsequently refused to cover the costs, causing the consumer to face collections proceedings (*id.* at 10, 48).

- A February 2019 complaint alleging that a consumer had signed up for a sharing plan with the understanding that it would cover surgery for a pre-existing condition, but then was denied coverage (*id.* at 9, 33).

- An August 2019 complaint alleging that Alliance member Aliera had denied a consumer coverage for roughly $50,000 in hospital bills (which the consumer had incurred after

---

insurance companies operating in Colorado to file a report with the Commissioner that includes "a detailed statement of assets and liabilities, the amount and character of the business transacted, and moneys received and expended during the year, and any further details of expenditures, and such other information . . . as the [C]ommissioner deems necessary").

[6] The Court uses the term "sharing plans" to refer generally to benefits plans offered by health care sharing ministries and all other entities subject to the reporting requirements in Colorado Revised Statutes § 10-16-107.4 and the Division's implementing regulations.

suffering a broken neck and brain injury in a domestic violence incident) on the ground that the consumer's injuries were "self-inflicted in contradiction to elements of a healthy and spiritual lifestyle as enumerated in the Aliera Master Guidelines" (*id.* at 10, 50, 53).

- A September 2019 complaint alleging that Alliance member Aliera initially denied coverage for a hospital visit relating to potential blood clots on the ground that the consumer's condition was not "life threatening," and then reversed its decision on appeal (but still did not promptly provide coverage) (*id.* at 10, 56).

- A November 2019 complaint alleging that a consumer had purchased a sharing plan based on the mistaken understanding that it was insurance, and then was denied coverage on the basis of a pre-existing condition (*id.* at 10, 58).

- An April 2020 complaint alleging that a sharing plan (which the consumer mistakenly believed to be insurance) had refused to reimburse hospital bills relating to a knee injury (*id.* at 11, 60–61).

- A December 2020 complaint alleging that a sharing plan falsely claimed that it had paid medical bills relating to a cardiac arrest, and then stonewalled the consumer when the consumer attempted to follow up (*id.* at 11, 63).

- An April 2021 complaint alleging that a sharing plan denied coverage for a procedure on the basis that it related to a pre-existing condition, and continued to deny coverage even after receiving a letter from the consumer's physician explaining that the condition was not pre-existing (*id.* at 11, 69).

- A June 2021 complaint alleging a sharing plan was non-responsive to a consumer and a hospital where she received care, and had failed to reimburse the consumer for over $10,000 in medical bills the consumer incurred in August 2020 (*id.* at 11, 72).

- A July 2021 complaint alleging claims-handling delays (*id.* at 11, 74).

- An August 2021 complaint alleging that a broker had misled a consumer into believing that the consumer was purchasing an insurance policy (when in fact the consumer was purchasing a membership in a sharing ministry), and that the consumer had difficulty cancelling automatic payments (*id.* at 9, 36).

- A November 2021 complaint alleging that a consumer was misled into believing that he or she was purchasing a 70/30 individual health plan (as opposed to membership in a sharing plan or ministry), when the consumer was in fact purchasing membership in a sharing ministry (*id.* at 9, 38).

- A November 2021 complaint alleging that a sharing plan changed its membership rules in order to avoid reimbursing members for expenses incurred in the two-month period leading up to plan cancellation (but during the term of the plan) (*id.* at 11, 76).

- A January 2022 complaint alleging the complainant's elderly mother was "scammed" by a representative of sharing company Altrua Healthshare when she attempted to purchase a "regular insurance plan," but was instead sold a plan "that did not cover mental healthcare or other kinds of care that standard, actual insurance plans are required to provide" (*id.* at 9, 40).

- An August 2022 complaint alleging that a representative of a sharing plan had represented to a consumer that the plan provided comprehensive coverage (excepting only coverage for pregnancies and mental illness), and that the consumer had realized that this representation was false after receiving explanation of benefits paperwork after a doctor's visit (*id.* at 9–10, 44).

Moreover, various healthcare providers complained to the Division that they were experiencing difficulty securing payment from sharing plans (*id.* at 8). For instance, in April 2019, Primary Care Partners suggested that the Division issue "a notification to individuals in the State of Colorado that providers [were] having issues with non-payment or late payment" from sharing plans and that consumers would ultimately have to foot the bill (*id.* at 8, 29). Primary Care Partners also asserted that it was "having a difficult time" getting Alliance member Liberty HealthShare (Liberty) to engage with it "with respect to claims issues/problems" (*id.* at 29). Similarly, in August 2019, Children's Hospital Colorado—expressly naming members of the Alliance including Liberty, Christian Care Ministry/Medi-Share, Samaritan Ministries, Altrua Healthshare, and OneShare Health (OneShare)—informed the Division that it was observing "a growing number of issues regarding unpaid claims" from sharing entities (*id.* at 8, 26).

### C. The Division and regulatory authorities elsewhere crack down on sharing plans.

The Commissioner issued cease and desist orders to two entities involved in the sale of sharing plan memberships—Trinity Healthshare (Trinity) and Aliera Healthcare (Aliera)—in 2019

(*id.* at 11).  These orders alleged that Trinity was operating as an unlicensed insurer, and that Aliera was marketing, administering, and managing Trinity's products in Colorado (*id.*).    Trinity ultimately agreed to cease doing business with Colorado residents (*id.* at 12), and Aliera agreed that it would "not provide any services or contract with any unauthorized insurers or unauthorized insurance products, including . . . Health Care Sharing Ministries . . . unless and until HCSMS are permitted to be marketed in Colorado either by statute, or through an administrative or judicial determination . . . ." (*id.* at 97).

Regulators in other states took action against these companies too (*id.* at 12).  These regulators alleged—among other things—that Trinity and Aliera committed only between 8% and 35% of the fees they collected to paying member claims, used insurance terms like "deductible," "premium," and "comprehensive coverage" when marketing their products to consumers, falsely presented themselves as sharing ministries within the meaning of the ACA, and improperly diverted member funds to pay corporate officers and affiliates (*id.* at 12–13).

Aliera and a successor entity to Trinity both eventually entered Chapter 11 Bankruptcy proceedings (*id.* at 13).  The Division's understanding is that only between 1-5% of the over $600,000,000 in outstanding member claims against Aliera and 0-10% of the over $300,000,000 in outstanding member claims against Trinity's successor entity will ever be paid (*id.*).  Further, between 2016 and 2018, Aliera entered into an agreement with Alliance member OneShare, whereby Aliera committed to administering some of OneShare's sharing plans (*id.*).  Aliera's bankruptcy prevented payment of some OneShare customers' claims (*id.*).

Though the Division apparently only initiated enforcement proceedings against Trinity and Aliera before the Colorado legislature enacted Section 10-16-107.4 in 2022, it was aware that

11

regulators in other states were taking enforcement actions and/or initiating litigation against other sharing plans, including Alliance member Liberty, which operates in Colorado (*id.* at 8, 14–15). Specifically, after opening an investigation into Liberty in January 2018, the Ohio Attorney General filed a suit against Liberty generally alleging that Liberty was diverting member funds to corporate officers and affiliated entities, rather than paying valid member claims (*id.* at 15). And at least California, North Dakota, Washington, and New Mexico regulators have initiated enforcement actions against Liberty and/or other sharing plans (*id.* at 14–16).

In December 2020, the Division issued an advisory warning Colorado consumers about the limitations common to sharing plans (*id.* at 14). This advisory stated:

> As open enrollment for individual plans (meaning not from an employer) continues, the Colorado Division of Insurance (DOI), part of the Department of Regulatory Agencies (DORA), is again alerting consumers about the risks of Health Care Sharing Programs or Ministries.
>
> On the surface, such programs may look like complete, Affordable Care Act (ACA) insurance. Low monthly payments, which the programs may refer to as "premiums," may entice people to join, thinking they're getting full health insurance coverage at a bargain. Such programs may even mimic the look and feel of ACA-compliant health insurance, using terms like "bronze, silver and gold tiers." But these sharing programs or ministries often do not offer the same comprehensive benefits as ACA plans, and do not meet the ACA consumer protection standards.
>
> Problems occur when members get medical care and then these programs don't pay, leaving the member with the doctor and hospital bills. The member is surprised as they thought they had full insurance coverage, but come to find out all that these programs don't cover.

(*Id.* at 421). The advisory further observed that sharing plans "typically have restrictions or exclusions on pre-existing conditions"; that "[m]embers may also be subject to religious or moral restrictions . . . , which may leave members responsible for the full costs of health care that results from an activity that the ministry [offering the plan] does not agree with"; that sharing plans often

12

"do not provide mental health coverage treatment or substance use disorder treatment"; and that these features distinguish sharing plans from ACA-compliant plans (*id.* at 421–22).

Officials in other states—including Alabama, Louisiana, Maryland, Massachusetts, Nebraska, Rhode Island, Vermont, West Virginia, and California—have issued similar warnings (*id.* at 14).

### D. Colorado's legislature decides to regulate sharing plans.

Section 10-16-107.4 represents just the latest in a series of the Colorado legislature's efforts to regulate sharing plans. These efforts began in 2020, with House Bill 20-1008 (HB20-1008). That bill would have required persons offering, operating, managing, or administering "health care cost-sharing arrangements" to annually report various data—including annual audited financial statements—to the Commissioner. *See* HB 20-1008. It defined "health care cost-sharing arrangement" as:

>  (I)    A health care sharing ministry, as defined in 26 U.S.C. sec. 5000A(d)(2)(B); or
>
>  (II)   A medical cost-sharing community or other arrangement or entity through which members of the community or arrangement contribute money on a regular basis, at levels established by the community or arrangement, that may be used to share, cover, or otherwise defray the medical costs of members of the community or arrangement.

(*Id.*). This bill failed to pass, as did House Bill 21-1135 (HB21-1135), a substantially similar bill introduced in 2021.

In 2022, legislators introduced two competing bills directed at regulating sharing plans: House Bill 22-1198 (HB22-1198) and House Bill 22-1269 (HB22-1269). HB22-1198, which the Alliance testified in support of (*see* D. 46-1 at 17), would have expressly exempted sharing plans from state insurance laws, but would also have imposed various disclosure requirements on sharing

plans, *see* HB22-1198.  For instance, it would have compelled sharing plans to notify applicants

that they do not provide insurance, do not guarantee payment of medical bills, and may exclude

from coverage more claims than traditional ACA-governed insurance plans.  *See id.*  It would have

also obligated sharing plans to obtain written affirmations from plan applicants indicating that the

applicants received and understood the above notice and received and had an opportunity to review

materials describing the plans' terms and conditions.  *See id.*  HB 22-1198 would also have

required sharing plans to disclose various high-level plan financial data—including contribution

amounts, the amount of reimbursed medical expenses, and the amount of claimed medical

expenses—as well as information on related-party transactions to their members (or optionally, to

the broader public on a publicly accessible website).  *See id.*  And it would have required sharing

plans to publicly disclose their annual audits and other basic plan information, like the name of the

organization offering the plan, contact information for the plan, and copies of plan documents.  *See

id.*  The Colorado Attorney General would have been responsible for enforcing compliance with

HB22-1198's requirements.  *See id.*  But HB 22-1198 did not pass.

The Division supported the competing bill, HB22-1269, which passed and became codified

at Section 10-16-107.4 (D. 46-1 at 17).[7]  Debra Judy, a Deputy Commissioner with the Division,

testified as to the scale of sharing plan membership in Colorado, and explained that HB22-1269

would enable the Division to more fully understood the sharing plan market and help consumers

navigate coverage questions (*id.* at 18–19).  Various religiously affiliated persons and entities also

testified in support of HB22-1269.  For instance, Christian Healthcare Sharing Ministries

representative Keith Hopkinson testified that HB22-1269 would help keep consumers informed

---

[7] For HB22-1269's general terms, see Section I, *supra*.

14

and imposed only relatively limited disclosure requirements (*id.* at 19). Peter Severseen, representing Lutheran Advocacy Ministry, similarly testified that HB22-1269 struck an appropriate balance between protecting religious association and safeguarding consumers (*id.*). HB22-1269's House of Representatives sponsor, Representative Susan Lontine, explained the bill to the House Committee on Health and Insurance in the following terms:

> Health care sharing arrangements . . . are programs where individual members with shared values pay monthly into a pool designed to help cover other members' medical expenses. These programs have minimal oversight and there is no guarantee they will actually pay for anyone's medical expenses. House Bill 22-1269 requires health care cost sharing arrangements to submit some basic, routine information to the Division of Insurance about how they operate and DOI will share this information publicly. This is a comprehensive data reporting bill designed to discourage misconduct and promote a necessary level of transparency to protect consumers. It will not impact the way these arrangements operate beyond requiring HCSAs to submit an annual data report. Currently very little information is known about these arrangements. That's why we're running a data reporting bill: to best understand how HCSAs are affecting consumers. We simply want to shed light on how many of these programs there are in Colorado, how these programs do business, how many Coloradans are paying into them, and how much of their health care costs get paid. The Division of Insurance will share this information publicly. This will help the DOI and the public learn about the impact these programs have on the cost of health insurance and health care in our state, make sure the programs can provide coverage to their members, and help the programs keep their advertising honest and clear. These programs may work for some people, particularly those for whom health sharing aligns with their deeply held religious beliefs. More concerning, however, are people who are signing up because they see these arrangements as a cheaper alternative to health insurance, without recognizing the financial risk they are taking on. As the cost of health care and coverage continue to rise out of the reach of many consumers these arrangements may look increasingly attractive but people need to know why they are priced lower and how they may impact them long-term. Both current members and individuals considering these options alike should be aware of what members are paying for, how contributions are being used, and what protections they may or may not have when using these programs. And that is why I'm bringing the bill.

(*Id.* at 18).

**E.  The Commissioner and Division implement the Reporting Law.**

After Colorado's legislature passed HB22-1269, the Division promulgated an interim regulation, Emergency Regulation 22-E-20, to implement it.  This regulation required sharing plans to fill out and annually file a reporting template, with the initial reports (consisting of 2021 data) due December 15, 2022, and subsequent reports due on March 1 of each successive year. This template was substantially similar to the template associated with the final regulation, Regulation 4-10-01, which became effective on April 30, 2024.  *Compare* Emergency Regulation 22-E-20, Appendix A, *with* D. 46-1 at 638–40.

Persons offering sharing plans in Colorado—including members of the Alliance's—have submitted disclosures to the Division under Section 10-16-107.4 and its implementing regulations on at least three occasions: in December 2022, March 2023, and March 2024 (D. 46-1 at 633). Both the emergency and final regulations permit reporting parties to request confidential treatment of information submitted with their filings.  *See* Emergency Regulation 22-E-20; Regulation 4-10-01.  As of the time of briefing, the Division has not challenged any claim of confidentiality asserted under the regulations' procedures (D. 46-1 at 634).  The Division has produced summary reports reflecting the 2021, 2022, and 2023 data it received under the regulations.  *See id.* at 738–76; COLO. DIV. INSUR., HEALTH CARE SHARING PLANS AND ARRANGEMENTS IN COLORADO (2024), https://drive.google.com/drive/folders/1xPJMWwDtjSKl1P91TROoRmOWfCIb6wCo (the 2023 Report).

These reports indicate that not all of the reporting parties are religiously affiliated. Defendant specifically identifies the sharing organization Knew Health as an offeror of one such secular sharing plan in Colorado (D. 46-1 at 631–32).  But ministries have a much larger market

16

share than secular groups: the Alliance reads the Division's first two reports as suggesting that upwards of 85% of sharing plan members are members of religiously oriented sharing plans (*see* D. 52 at 12–13). And many of the reporting parties identify themselves as ministries (*see, e.g.*, D. 46-1 at 749 (listing the entities that reported 2021 data to the Division)).[8]

### F. The Alliance files suit.

The Alliance filed the instant lawsuit against the Commissioner and the Division on May 16, 2024, alleging that the Reporting Law violates the Free Exercise, Establishment, and Free Speech Clauses of the First Amendment, and abridges its members' First Amendment freedom of association (*see generally* D. 1).[9] The following day, the Alliance filed its motion for a preliminary injunction (D. 8).

### III.  LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule" and should be "granted only in cases where the necessity for it is clearly established." *U.S. ex rel. Citizen Band Potawatomi Indian Tribe of Oklahoma v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888–89 (10th Cir. 1989) (citations and internal quotation marks omitted). "The purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance." *Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1267 (10th Cir. 2005). To prevail on a motion for a preliminary injunction, the movant must prove: (1) a substantial likelihood of prevailing on the merits; (2) irreparable injury unless the injunction is

---

[8] The words "ministry" or "ministries" appear in the names of five of the sixteen entities that filed reports with the Division reflecting 2021 data (*see* D. 46-1 at 749). Several of the other entities' names also include terms invoking religion (e.g., "Zion" and "Jericho") (*see id.*). These trends persist in Division's 2022 and 2023 data reports. *See id.* at 764 (four out of sixteen entities representing themselves as ministries); 2023 Report at 11 (five out of seventeen).

[9] The Alliance has since amended its complaint, and the Division is no longer a party to this suit (*see* D. 32).

issued; (3) that the threatened injury (without the injunction) outweighs the harm that the preliminary injunction may cause the opposing party; and (4) that the injunction will not adversely affect the public interest. *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (citation and internal quotation marks omitted). "An injunction can issue only if each factor is established." *Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1277 (10th Cir. 2022) (citation omitted). The final two preliminary injunction factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Because a preliminary injunction is an extraordinary remedy, the plaintiff's right to relief must be clear and unequivocal. *Schrier*, 427 F.3d at 1258 (citation omitted). Moreover, the Tenth Circuit specifically disfavors injunctions that will (1) alter the status quo, (2) mandate an affirmative act by the defendant, or (3) afford the movant all the relief that it could recover at the conclusion of a full trial on the merits. *Id*. at 1259. To obtain an injunction falling into one of these disfavored categories, the plaintiff must make a "strong showing" that the likelihood-of-success-on-the-merits and balance-of-harms factors tip in its favor. *Chiles v. Salazar*, 116 F.4th 1178, 1199–1200 (10th Cir. 2024); *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 976 (10th Cir. 2004).

## IV.  ANALYSIS

The Alliance's requested preliminary injunction—which seeks to disrupt a statutory and regulatory regime that has been in effect and that the Alliance's members have complied with for multiple years—is the sort of status-quo-altering injunction the Tenth Circuit disfavors.  The

18

Alliance does not dispute that its requested injunction would disturb the status quo.[10]  Accordingly,

the Alliance must make a strong showing that it is likely to succeed on the merits of its claims and

that the balance of hardships weighs in its favor.  The Alliance cannot meet this heightened burden.

### A.  Likelihood of Success

The Alliance has not made a showing—strong or otherwise—that it is likely to succeed on

the merits of any of its claims.  First, the Alliance has not demonstrated that the Reporting Law is

not neutral or generally applicable, or that it is not rationally related to a legitimate government

interest.  Accordingly, the Alliance has not shown that it is likely to succeed on the merits of its

free exercise claim.  Second, generally applicable administrative and recordkeeping regulations

like the Reporting Law do not violate the Establishment Clause.  The Alliance is therefore unlikely

to succeed on the merits of its Establishment Clause claim.  Third, the Alliance has not shown that

the Reporting Law's requirement that the Alliance's members disclose certain third-party vendors

poses any risk of chilling the Alliance's members' First Amendment associational rights.  Thus,

the Alliance's challenge to the Reporting Law on freedom-of-association grounds is unlikely to

succeed.  Fourth and finally, the Alliance has not shown that the Reporting Law—in compelling

the Alliance's members divulge their marketing materials and to report factually accurate

operations data—violates the Alliance's members' free speech rights.  The Alliance therefore has

not shown that it is likely to succeed on the merits of its free speech claim.

---

[10] Defendant specifically contends that "[t]he Alliance cannot satisfy its heavy burden to disrupt the Reporting Law's status quo with an injunction" (D. 46 at 37), and notes that the Alliance's members have submitted disclosures under the Reporting Law "on three occasions over two years before filing this suit" (*id.* at 4).  The Alliance does not respond to Defendant's argument that a heightened standard of review applies, for instance, by arguing that regulatory landscape was in flux before the Division promulgated Regulation 4-10-01, such that the Division's emergency regulation did not represent the status quo (*see generally* D. 52).

### 1. Free Exercise Clause

The Free Exercise Clause in the First Amendment to the United States Constitution provides that "Congress shall make no law . . . prohibiting the free exercise" of religion.  U.S. Const. amend. I.  Through the Fourteenth Amendment, this protection likewise applies against state laws and policies.  *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022) (recognizing that the First Amendment's free-exercise protections are incorporated into the Fourteenth Amendment).  But not every law that burdens religion is unconstitutional—or even presumptively so.  Indeed, "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021) (citing *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 878–82 (1990)).  Rather, neutral and generally applicable laws need only bear a rational relationship to a legitimate government end.  *United States v. Hardman*, 297 F.3d 1116, 1126 (10th Cir. 2002).

On the record currently before the Court, the Alliance has not met its burden of showing that the Reporting Law is not neutral or is not generally applicable.[11]  And the Reporting Law easily clears the minimal level of scrutiny that applies to neutral and generally applicable laws.

### i. Neutrality

"Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature."  *Fulton*, 593 U.S. at 533.  Along the

---

[11] The party seeking a preliminary injunction predicated on a free exercise challenge bears the burden of demonstrating that the challenged law or policy is not neutral or generally applicable.  *Chiles v. Salazar*, 116 F.4th 1178, 1222 (10th Cir. 2024); *see also Kennedy*, 597 U.S. at 525 (noting that "a plaintiff may carry the burden of proving a free exercise violation . . . by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable'").

same lines, a law is not neutral if it is "specifically directed at . . . religious practice." *Kennedy*,

597 U.S. at 526 (quoting *Smith*, 494 U.S. at 878).  Facially discriminatory laws—i.e., laws that

"refer[] to a religious practice without a secular meaning discernable from the language or

context"—fall into this camp. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S.

520, 533 (1993).  So too do laws that otherwise target religious exercise as their "object." *Kennedy*,

597 U.S. at 526 (quoting *Lukumi*, 508 U.S. at 533).  Impermissible targeting may be inferred where

"the effect of a law in its real operation" is to effect a "religious gerrymander." *Lukumi*, 508 U.S.

at 535.  Importantly, however, a law or policy's disparate impact on religious adherents does not

necessarily compel a finding of targeting.  *See id.* ("To be sure, adverse impact will not always

lead to a finding of impermissible targeting.  For example, a social harm may have been a

legitimate concern of government for reasons quite apart from discrimination.").  Targeting may

also be inferred when "the historical background of the decision under challenge, the specific series

of events leading to the enactment or official policy in question, and the legislative or

administrative history, including contemporaneous statements made by members of the

decisionmaking body" speak to discriminatory intent.  *Id.* at 540; *see also Masterpiece Cakeshop

v. Colorado C.R. Comm'n*, 584 U.S. 617, 639 (2018) (applying these factors); *Chiles*, 116 F.4th at

1223 (same).

      The Reporting Law does not facially discriminate against religious practices.  And the

Alliance does not contend that it does.  Instead, the Alliance argues that the Reporting Law operates

as a religious gerrymander and that the circumstances surrounding the enactment of the Reporting

Law bespeak government hostility towards the religious practices of its members.

The Court does not find these arguments persuasive.  First, as Defendant observes, Section the Reporting Law's requirements apply not only to sharing ministries, but also to secular entities that offer or intend to offer sharing plans or arrangements in Colorado.  To be sure, ministries have a strong presence in Colorado's sharing plan market: according to the Alliance, upwards of 85% of the sharing plan members in Colorado are members of religiously affiliated plans.  And a cursory review of the Division's annual reports indicates that many of the reporting parties describe themselves as ministries.  Under the circumstances of this case, however, the Court cannot say that any disparate impact the Reporting Law may have on religious adherents reflects impermissible targeting and is not just some incidental result of Colorado's legitimate efforts to regulate a social harm.  *Cf. Lukumi*, 508 U.S. at 535 (characterizing disparate impact as non-dispositive).

Maybe Colorado does take umbrage to the religious beliefs and practices of sharing ministries.  But there is no evidence of that.  Based on the record currently before the Court, it appears far more likely that the disproportionate impact of the Reporting Law on religious entities is a byproduct of these entities' dominance of the sharing plan market—a market that seems to have largely been created by the relative flexibility ministries and their members are afforded under the ACA.  Simply because many religious entities are active in a market does not mean that Colorado cannot permissibly regulate that market in response to documented abusive practices.[12]

---

[12] A contrary result would be inconsistent with *Smith* and its progeny.  In *Smith* the United States Supreme Court upheld an Oregon law generally proscribing peyote possession (and related denials of unemployment benefits on peyote-use grounds) after concluding Oregon's policy was neutral and generally applicable.  494 U.S. at 874–76, 879. In so holding, the Court analogized to its racial-discrimination jurisprudence, which stands for the proposition that "neutral laws that have the *effect* of disproportionately disadvantaging a particular [] group" do not demand special scrutiny.  *Id.* at 886 n.3.  One might suspect that the effects of a law criminalizing peyote possession would fall disproportionately on persons using peyote for religious purposes—but that does not mean a law generally proscribing peyote possession is presumptively invalid.  By the same token, the reporting regime at issue here, despite falling

*See Tingley v. Ferguson*, 47 F.4th 1055, 1087 (9th Cir. 2022) ("[T]hat a particular group, motivated by religion, may be more likely to engage in the proscribed conduct does not amount to a free exercise violation." (citation and internal quotation mark omitted)).

Second, contrary to the Alliance's arguments, the context in which Colorado adopted the Reporting Law does not indicate that Defendant or any other persons involved with the enacting and implementing the Reporting Law are impermissibly targeting religious adherents. In support of its context-of-enactment argument, the Alliance observes that the Division's December 2020 consumer advisory explicitly mentioned ministries, as did earlier versions of the bill that was ultimately codified at Section 10-16-107.4; that the Division's reporting of data collected pursuant to the Reporting Law is misleading; and that the Reporting Law exempts secular arrangements purportedly comparable to those sharing ministries offer.

The isolated references to ministries in the Division's consumer advisory and in earlier bills regarding sharing plans do not suggest that Colorado or its regulatory officials sought to impose reporting requirements on sharing plans *because of* the religious nature of sharing ministries. Neither the Division's consumer advisory nor the earlier-introduced bills mentioned ministries exclusively. Rather, the advisory referred to both "Health Care Sharing Programs" and "Ministries." And the bills referred to both "health care sharing ministr[ies], as defined in 26 U.S.C. sec. 500A(d)(2)(B)" and "medical cost-sharing communit[ies] or other arrangement[s] or

---

disproportionately on religious adherents, is not necessarily unconstitutional. Moreover, *Smith's* core proposition is that "an individual's religious beliefs [do not] excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." *Id.* at 878–79. Here, the Alliance does not contend that health care sharing is an exclusively religious practice or that Colorado cannot regulate health care sharing as a general matter. Rather, the thrust of the Alliance's free exercise challenge is that ministries' beliefs should exempt them from complying with Colorado's reporting regime. The Alliance's challenge and supporting arguments run afoul of *Smith's* underlying principles.

entit[ies] through which members . . . contribute money on a regular basis . . . that may be used to share, cover, or otherwise defray the medical costs of members . . . ."

As previously discussed, many of the entities that sell membership in sharing plans in Colorado are ministries, and a majority (and perhaps even a vast majority) of sharing plan members are affiliated with ministries. Given ministries' market dominance, it is unsurprising that efforts to regulate the sharing plan market might make reference to ministries.

Moreover, though the consumer advisory and bills reference ministries, they express no normative views on the religious beliefs or practices of these ministries. The record shows that the advisory post-dates various complaints the Division received to the effect that consumers (including purchasers of sharing plans from ministries) believed they were purchasing comprehensive insurance plans when they were not in fact purchasing insurance. The advisory is consistent with these complaints and is limited to statements of uncontested fact. To the extent it mentions religion, the advisory merely notes that members of sharing plans may be "subject to religious or moral restrictions from sharing ministries," which can inform coverage decisions (D. 46-1 at 422). Nobody disputes that this is factually accurate, or that coverage restrictions are a relevant consumer consideration in selecting a health plan. The advisory's factually correct statements about sharing-plan risks do not constitute commentary on the merits of the religious practices or beliefs of the ministries that offer some of the sharing plans or speak to any government animus towards religion.

The Court also does not find that the way the Division reports out the data it collects under the Reporting Law supports an inference that the Reporting Law is grounded in animus towards the religious beliefs and practices of sharing ministries. The Alliance claims that the Division's

24

reporting is misleading because it compares the "sticker" price of health care costs submitted to sharing plans against the amounts sharing plans pay or reimburse, when this price is often negotiated downwards. According to the Alliance, the upshot is that the Division's reporting makes it appear that sharing plans cover a lower proportion of their members' ultimate costs than they actually do. The Alliance's briefing and pleadings on this issue are somewhat underdeveloped. If the Division's reporting is indeed misleading, the Court has no way of determining *how* misleading it is (e.g., the Alliance offers no information about the scope of the discounts sharing plans generally negotiate with providers or the extent to which "sticker" costs differ from "actual" costs). It is not clear to the Court that the amount sharing plans pay, in comparison to the amount sharing plan members claim, is not a useful metric for consumers selecting among sharing plans and conventional insurance plans. Even assuming the statistics the Division publicly reports imply that the sharing plans are paying a smaller share of "real" member costs than they actually do, this ex post reporting issue is extremely weak evidence that the object of the Reporting Law was or is to target religious entities for their practices and beliefs.

Finally, the Court rejects the Alliance's argument that the Reporting Law privileges secular conduct comparable to the religious conduct of some sharing plans through exemptions in Section 10-16-107.4, Regulation 4-10-01, and other Colorado laws. As discussed at greater length in Section IV(A)(1)(ii), *infra*, the Court does not find that the purportedly more secular sorts of arrangements exempt from the Reporting Law are meaningfully comparable to the regulated arrangements. The fact that Colorado exempts practices like crowdfunding efforts from the

Appx. Vol. XIX
A-973

Reporting Law does not show that the Reporting Law is intolerant of religion or regulates sharing plans *because* some are religious.[13]

All told, the Alliance's evidence that the Reporting Law is not neutral presents a far weaker case than the evidence other courts have relied on in sustaining free exercise challenges. *See, e.g.*, *Masterpiece Cakeshop*, 584 U.S. at 635 (noting a comparison public officials drew between the plaintiff's invocation of religious beliefs and defenses of slavery and the holocaust); *Lukumi*, 508 U.S. at 534–35 (relying on a recital in a government resolution stating that members of the public had "expressed their concern that certain religions may propose to engage in practices which are inconsistent with public morals, peace or safety"); *Bella Health & Wellness v. Weiser*, 699 F. Supp. 3d 1189, 1215 (D. Colo. 2023) (relying on statutory text commenting on the *values* and *beliefs* of religious entities). Of course, a plaintiff does not *always* need express legislative or government statements to substantiate a free exercise challenge. *See Lukumi*, 508 U.S. at 534 (recognizing that "[t]he Free Exercise Clause protects against governmental hostility which is masked, as well as overt"). But such evidence would put the Alliance's preliminary injunction request on much stronger footing. The evidence the Alliance has adduced at the preliminary injunction stage does not strongly or clearly and unequivocally show that the Reporting Law is not neutral.

To the contrary, Section 10-16-107.4's legislative history and the circumstances surrounding the Reporting Law's enactment reflect that Colorado's legislature and regulators imposed the Reporting Law to address legitimate consumer protection concerns—not to target religious exercise. The Colorado legislature enacted Section 10-16-107.4 after the Division

---

[13] The Court is also unpersuaded that there is a meaningful religious-secular divide between sharing plans and all of the arrangements the Alliance casts as "secular." For instance, crowdfunding and charitable efforts to pay for medical care are often religiously motivated. Meanwhile, some sharing plans are secular.

received many consumer complaints concerning sharing plan practices. Multiple consumers complained to the Division that sharing plans (or brokers and agents marketing these plans) misled them into believing they were purchasing comprehensive insurance plans (as opposed to membership in sharing plans), that they otherwise misunderstood the scope of their benefits as sharing plan members, and that sharing plans were engaging in questionable claims-processing practices. The record also shows that providers similarly complained to the Division about sharing plan practices, and that sharing plans faced enforcement actions in Colorado and other states, not for their religious activities, but for violating state law or otherwise mistreating consumers.

Section 10-16-107.4's legislative history aligns with the concerns expressed by consumers, providers, and regulators in Colorado and other states. As Representative Lontine, HB22-1269's sponsor put it, the "minimal oversight" and lack of any "guarantee that [sharing plans] will actually pay for anyone's medical expenses" necessitated passage of a consumer protection law (D. 46-1 at 18). In her view, the Reporting Law's object is to "promote a necessary level of transparency to protect consumers" and not to "impact the way these [sharing] arrangements operate beyond requiring [them] to submit an annual data report" (*id.*). Testimony the legislature heard in favor of the Reporting Law also speaks to its intended purpose and effects. Debra Judy, a Deputy Commissioner for the Division, testified that the Reporting Law would enable the Division to more fully understand the health sharing market and assist consumers in addressing coverage questions (*id.* at 18–19). Keith Hopkinson, representing Christian Healthcare Sharing Ministries, testified that the bill would help keep consumers informed. Peter Severseen, representing Lutheran Advocacy Ministry, similarly testified that the proposed legislation appropriately balance protecting religious belief with consumer safeguards (*id.* at 19).

27

The Alliance has not shown that the Reporting Law targets religious exercise as its object or imposes reporting requirements on sharing plans *because of* the religious nature of some of the entities that market them. The Alliance has not therefore shown that the Reporting Law lacks neutrality.

### ii. General Applicability

A law may not be generally applicable for one of two reasons. First, "[a] law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Fulton*, 593 U.S. at 533 (quoting *Smith*, 494 U.S. at 884). Second, a law is not generally applicable "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* at 534. For purposes of this second test, "whether two activities are comparable . . . must be judged against the asserted government interest that justifies the regulation at issue" and "the risks [the] various activities pose." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021).

The Alliance contends that the Reporting Law fails both tests. According to the Alliance, Section 10-16-107.4 creates a mechanism for the Commissioner to craft individualized exemptions because it permits the Commissioner to exclude from this statute's reporting requirements "[o]ther consumer payment arrangements identified by the [C]ommissioner by rule, including consumer payment plans offered directly by a provider to a patient or the party responsible for payment on behalf of the patient." *See* Colo. Rev. Stat. § 10-16-107.4(5)(b). The problem with this argument is that Section 10-16-107.4 delegates to the Commissioner the authority to act by *rule*, not the authority to issue *individualized* exemptions of the type that *Fulton* contemplates.

The government contract at issue in *Fulton* dictated that a "[p]rovider [of foster care placement services] shall not reject a child or family including, but not limited to, . . . prospective foster or adoptive parents, for Services based upon . . . their . . . sexual orientation . . . unless an exception is granted by the Commissioner [of Philadelphia's Department of Human Services] or the Commissioner's designee, in his/her sole discretion."  593 U.S. at 535.  Similarly, *Sherbert v. Verner*, a case on which *Fulton's* discussion of general applicability relied, involved a statute that denied unemployment benefits to claimants who "failed, without good cause . . . to accept available suitable work."  374 U.S. 398, 401 (1963).  In *Fulton*, the Supreme Court described both these "sole discretion" and "good cause" standards as constitutionally problematic because they invited officials to consider the particular reasons for an individual person's conduct when distributing exemptions from otherwise generally applicable policies.  593 U.S. at 533–34, 537.

In contrast to the standards at issue in *Fulton* and *Sherbert,* Section 10-16-107.4 simply delegates rulemaking authority to a public official—that is, it permits a public official to create *categorical* exclusions for *types* of arrangements that do not implicate Section 10-16-107.4's underlying policy objectives and concerns.  It does not authorize the Commissioner to exempt individual persons from complying with the Reporting Law or invite the Commissioner to consider whether individual persons' beliefs are worthy (or unworthy) of solicitude.  While Section 10-16-107.4 broadly delegates legislative powers to the Commissioner, not every broad legislative delegation runs afoul of the Free Exercise Clause.

The Alliance also asserts that the Reporting Law is not generally applicable because it permits secular conduct that undermines the Reporting Law's policy objectives in a similar way to the religious conduct it allegedly infringes upon.  The Alliance specifically identifies (1) direct

primary care arrangements, (2) crowdfunding entities, (3) consumer payment plans, (4) medical discount plans, (5) student health clinics at universities, (6) charities, (7) fraternal organizations, and (8) fully insured out-of-state employer health plans as purportedly comparable secular arrangements that are exempted from complying with the Reporting Law (through exemptions enumerated in Section 10-17-107.4, Regulation 4-10-01, and other Colorado laws). But there is no evidence that any of these arrangements pose the same or similar risks to those the Reporting Law seeks to mitigate.

The complaints the Division received before Colorado enacted the Reporting Law illustrate that consumers were confused by sharing plans' offerings—on several occasions, consumers mistook these plans for traditional, comprehensive insurance plans. There is no evidence that any of the excepted arrangements pose similar consumer confusion risks.

It is unlikely that they would. For instance, direct primary care arrangements—in contrast to sharing plans—look nothing like insurance. They involve arrangements directly between consumers and healthcare providers, and do not involve third parties aggregating funds or facilitating the flow of funds to pay or reimburse health care expenses. Further, there is no indication that direct primary care arrangements hold themselves out as offering insurance-like benefits, as sharing plans sometimes do.

Crowdfunding arrangements likewise would not seem to create similar consumer confusion risks to the ones sharing plans do. Indeed, a consumer raising money on GoFundMe to fund a surgery would not likely mistake GoFundMe for insurance in the same way that a

30

consumer—told by an insurance agent that they were purchasing insurance—might mistake a sharing plan for an insurance.[14]

Consumer payment plans—like direct primary care arrangements—involve direct relationships between consumers and providers, and do not involve third-party intermediaries like insurance companies or sharing plans. Again, there would seem to be little risk that a consumer entering into a payment plan with a provider would think they were purchasing insurance. Similarly, medical discount plans do not involve third parties facilitating reimbursement or payment of health care expenses: the consumer remains the responsible and ultimate payor. Nor is there any evidence that medical discount plans hold themselves out as offering insurance-like benefits. Given these features, it is unlikely that anybody entering into a medical discount plan would think they were buying insurance.

Student health clinics at universities, charities, and fraternal organizations also do not generally hold themselves out as offering comprehensive insurance coverage and lack the basic features that would cause consumers to mistake them for insurance.

Of the exempted arrangements the Alliance identifies, only foreign employer health plans really resemble insurance (because they are). But these plans do not pose similar risks to consumers as sharing plans. As Defendant observes, these plans are regulated by insurance officials in the states in which they are headquartered.

---

[14] The risk of consumer confusion specific to sharing plans is evident even without misleading marketing. For instance, though the Guidelines for Health Sharing applying to members of Samaritan Ministries—one of the Alliance's constituents—explain that Samaritan Ministries does not offer insurance, the package of benefits that Samaritan Ministries offers closely resembles insurance. Samaritan Ministries members pay monthly "shares"—similar to premiums—and submit "needs"—similar to claims—which are covered subject to comprehensive coverage guidelines and caps that vary with the specific Samaritan Ministries plan the member signs on for (*see generally* D. 8-3).

Because the Alliance has not shown that the Reporting Law either provides a mechanism for individualized exemptions or prohibits religious conduct while permitting secular conduct that undermines the Reporting Law's objectives in similar ways, the Alliance has not shown that the Reporting Law is not generally applicable.

### iii. Rational Basis Review

Given that the Alliance has not shown that the Reporting Law is not neutral or is not generally applicable, the Court finds that the Reporting Law is subject only to rational basis review. *See Hardman*, 297 F.3d at 1126 (observing that neutral and generally applicable laws are subject only to rational basis review); *Chiles*, 116 F.4th at 1225 ("Because, on the record before us, we find Ms. Chiles has failed to show the MCTL lacks neutrality and general applicability, the district court did not abuse its discretion in finding the MCTL is subject to rational basis review.").

The Reporting Law clears rational basis review. The parties do not dispute that consumer protection is a legitimate government interest. (And the Alliance would be hard pressed to argue otherwise given its support for HB 22-1198, a bill competing with HB 22-1269 that would have imposed auditing and reporting requirements on sharing plans.) Moreover, the Court finds that the Reporting Law's requirements are rationally related to consumer protection. The Reporting Law generally seeks information concerning the size, scope, payment practices, and marketing efforts of sharing plans. The Court agrees with Defendant that this information would be helpful in identifying, understanding, assessing, and addressing the risks sharing plans pose to consumers.

### 2. Establishment Clause

The Establishment Clause of the First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion." U.S. Const.

amend. I.  This provision applies to the states through the Fourteenth Amendment.  *See Everson v. Bd. of Ed. of Ewing*, 330 U.S. 1, 15 (1947) (addressing the incorporation of the Establishment Clause into the Fourteenth Amendment).  The United States Supreme Court has instructed that "the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'"  *Kennedy*, 597 U.S. at 535 (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)).  This historical-practices-and-understandings standard replaced the test enumerated in *Lemon v. Kurtzman*, 403 U.S. 602 (1971).  *Id.* at 534 (observing that the Supreme Court had "long ago abandoned *Lemon*").  Under *Lemon*, a law did not pass Establishment Clause muster if it: (1) lacked a secular legislative purpose, (2) lacked a principal or primary effect that neither advanced nor inhibited religion, or (3) fostered an excessive entanglement with religion.  *Lemon*, 403 U.S. at 612–13.  Ultimately, the *Lemon* test "also came to involve estimations about whether a 'reasonable observer' would consider the government's challenged action an 'endorsement' of religion."[15]  *Kennedy*, 597 U.S. at 534.

The Alliance —citing *Lemon's* entanglement prong—contends that the Reporting Law is invalid because it involves long-term, continuing monitoring of religious organizations and thereby fosters excessive government entanglement with those entities.  Defendant responds that the Supreme Court has abrogated *Lemon*; that even assuming *Lemon*'s entanglement test were still good law, generally applicable administrative and recordkeeping regulations do not create excessive entanglement; and that generally applicable administrative and recordkeeping regulations do not constitute an establishment under the historical-practices-and-understandings test.

---

[15] In *Kennedy*, the Supreme Court expressly disavowed this endorsement test too.  *See* 597 U.S. at 534.

In abandoning *Lemon*, the Supreme Court did not issue state actors a blank check to begin entangling themselves in the affairs of religious institutions. The Court has little doubt that laws that do foster an excessive entanglement between government and religion are inconsistent with the historical practices and understandings that inform the meaning of the Establishment Clause. In short, entanglement is still a relevant consideration in Establishment Clause analyses. *See, e.g., Shurtleff v. City of Bos.*, 596 U.S. 243, 286 (2022) (Gorsuch, J., concurring) (listing "government [] control over the doctrine and personnel of the established church" among the characteristics of founding-era establishments); *Does 1-11 v. Bd. of Regents of Univ. of Colorado*, 100 F.4th 1251, 1270 (10th Cir. 2024) (relying on the Establishment Clause's "prohibition of excessive entanglement between religion and government" post-*Kennedy*); *Hilsenrath ex rel. C.H. v. Sch. Dist. of the Chathams*, 698 F. Supp. 3d 752, 763 n.15 (D.N.J. 2023) (observing that even though *Kennedy* clarifies that the *Lemon* test no longer applies, "[t]hat is not to say that the considerations underlying the *Lemon* test have become irrelevant").

At the same time, however, *Kennedy* does not draw into doubt the various Supreme Court precedents validating the constitutionality of generally applicable administrative and recordkeeping regulations. *See, e.g., Jimmy Swaggart Ministries v. Bd. of Equalization of California*, 493 U.S. 378, 395 (1990) ("[G]enerally applicable administrative and recordkeeping regulations may be imposed on religious organization without running afoul of the Establishment Clause."); *Hernandez v. Commissioner*, 490 U.S. 680, 696–97 (1989) ("[R]outine regulatory interaction which involves no inquiries into religious doctrine, no delegation of state power to a religious body, and no detailed monitoring and close administrative contact between secular and religious bodies, does not of itself violate the nonentanglement command." (citations and internal

34

quotation marks omitted)); *Tony and Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290,

305–306, (1985) (observing that administrative and recordkeeping regulations—even ones that are

comparatively "burdensome in terms of paperwork"—may be sustained if not intrusive into

religious affairs).

Such generally applicable administrative and recordkeeping laws lack the characteristics

of founding era establishments.  As Justice Gorsuch explained in his *Shurtleff* concurrence:

> Beyond a formal declaration that a religious denomination was in fact the
> established church, it seems that founding-era religious establishments
> often bore certain other telling traits. First, the government exerted control
> over the doctrine and personnel of the established church. Second, the
> government mandated attendance in the established church and punished
> people for failing to participate. Third, the government punished dissenting
> churches and individuals for their religious exercise. Fourth, the
> government restricted political participation by dissenters. Fifth, the
> government provided financial support for the established church, often in
> a way that preferred the established denomination over other churches. And
> sixth, the government used the established church to carry out certain civil
> functions, often by giving the established church a monopoly over a specific
> function. Most of these hallmarks reflect forms of "coerc[ion]" regarding
> "religion or its exercise."

596 U.S. at 285–86 (Gorsuch, J., concurring) (citations omitted).  Moreover, the Alliance does not

argue that generally applicable administrative and recordkeeping laws are inconsistent with the

historical practices and understandings surrounding the Establishment Clause.

In sum, the core legal propositions on which the parties rely remain valid post-*Kennedy*:

laws that excessively entangle government and religious entities violate the Establishment Clause,

while laws that merely impose generally applicable administrative and recordkeeping

requirements (along the lines of those at issue in *Jimmy Swaggart Ministries*, *Hernandez*, and *Tony

and Susan Alamo Foundation*) do not.  The question this case presents is what category the

Reporting Law falls into.

In an attempt to show that the Reporting Law falls into the former category, the Alliance cites to *Aguilar v. Felton*, 473 U.S. 402 (1985), *Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*, 2 F.3d 1514 (11th Cir. 1993), and *Medina v. Catholic Health Initiatives*, 877 F.3d 1213 (10th Cir. 2017). But the Reporting Law is not like the policies and laws at issue in these cases. It is more like the policies and laws in *Jimmy Swaggart Ministries, Hernandez*, and *Tony and Susan Alamo Foundation*. While it may "requir[e] [] religious institutions to disclose [] information" about transactions that they carry out, the "administrative inquiries" the Reporting Law contemplates "'bear no resemblance to the kind of government surveillance the [Supreme] Court has previously held to pose an intolerable risk of government entanglement with religion.'" *Hernandez*, 490 U.S. at 698 (quoting *Tony and Susan Alamo Foundation*, 471 U.S. at 305).

*Aguilar* involved a state program that placed public school teachers at parochial schools, and corresponding state efforts to monitor and restrict those teachers' activities (including at least monthly unannounced visits from program field personnel, other visits by program coordinators, directives to the instructors to avoid involvement with religious activities, bars to religious materials in instructor classrooms, and directives to the parochial school administrators to clear the classrooms used by public school personnel of religious symbols). 473 U.S. at 406–07. The Court observed that the program's use of public school teachers created a sort of Catch-22: because it would violate the Establishment Clause for these teachers to convey a religious message, "ongoing inspection [was] required to ensure the absence of a religious message." *Id.* at 412. But this constitutionally required monitoring would itself violate the Establishment Clause by creating too high a degree of entanglement between government and religious institutions. *Id.* at 413. As the Court explained, "the detailed monitoring and close administrative contact required to maintain

36

[the] program c[ould] only produce a kind of continuing day-to-day relationship which the policy of [the Establishment Clause] seeks to minimize" and "[t]he picture of state inspectors prowling the halls of parochial schools and auditing classroom instruction surely raises more than an imagined specter of governmental secularization of a creed." *Id.* at 414 (citations and internal quotations omitted).

The Reporting Law requires a far lower degree of contact between state officials and the religious institutions: representatives for sharing ministries (as well as representatives for secular sharing plans) must annually send the Division an email attaching a spreadsheet of basic business information along with marketing materials and training materials disseminated to third parties. This falls far short of the "continuing day-to-day relationship" and "detailed monitoring and close administrative contact" the *Aguilar* Court held violated the Establishment Clause. It is also worth noting that the Supreme Court later reversed its *Aguilar* decision: in *Agostini v. Felton*, 521 U.S. 203, 233 (1997), the Supreme Court held that the exact same program that was at issue in *Aguilar* did "not result in an 'excessive' entanglement that advances or inhibits religion."

*Church of Scientology* also involved a far more invasive (and less narrowly drawn) monitoring and reporting program than the one at issue here. In that case, the City of Clearwater enacted an ordinance generally requiring charitable organizations—including religious institutions like the Church of Scientology—soliciting funds within the City of Clearwater to register annually with the city. 2 F.3d at 1521. To obtain this registration, charitable organizations had to file a registration form with the city clerk. *Id.* This registration form required charities to disclose various categories of information, including, among other things, "an estimated schedule of salaries, wages, fees, commissions, expenses and costs to be expended and paid in connection with

37

the solicitation of funds and in connection with their disbursement, and an estimated percentage of the total projected collections which the costs of the solicitation will comprise." *Id.* at 1522. At the end of each annual registration period, registrants were further required to file a retrospective statement identifying "the full amount of money and property collected"; "a complete list of any and all expenses incurred in procuring those funds . . . broken down into salaries, wages, fees, commissions, advertising and all other expenses"; "the bank, if any, where the proceeds of those solicitations of funds were placed"; and the "actual or proposed utilization in approximate amounts of the said proceeds." *Id.* Organizations omitting information from the registration form or retrospective reports were also required to prepare a sworn "private statement" containing the otherwise required information, and maintain supporting records validating the private statements, which, upon the request of an organization member, the organization was required to disclose (along with the private statement). *Id.* at 1522–23. Noncompliance with these requirements could result in criminal penalties. *Id.* at 1523.

In holding that the City of Clearwater's reporting requirements collectively fostered excessive entanglement between the city and religious organizations like the Church of Scientology, the Eleventh Circuit relied on the Supreme Court's (now disavowed) *Aguilar* entanglement analysis. *Id.* at 1536. And it ultimately concluded that the City of Clearwater's ordinance ran afoul of the Establishment Clause because the ordinance mandated

> a "detailed monitoring and close administrative interaction" by empowering the city clerk to review in detail the disclosure of proposed spending for the coming year and to assess disclosure of all such activities over the preceding year, by mandating public access to a detailed accounting of church expenditures, by opening the books and records to members of

organizations employing the private statement and by involving criminal
courts in enforcing these provisions.[16]

*Id.* at 1535–36.    These requirements collectively compelled religious and other charitable
organizations to "divulge [their] entire budget[s] and all [their] operations on a continuing basis."
*Id.* at 1535.

The Reporting Law does not require such comprehensive and invasive disclosures.  While
the entities subject to Reporting Law must generally disclose the total amount of fees received
from plan participants, the amount retained for administrative expenses, the total amount of
reimbursements made to plan or arrangement participants, and compensation and remuneration
paid to producers and other third parties engaged in marketing and administering the plans or
arrangements, these disclosure obligations do not "require a church to divulge its entire budget and
all its operations" like the ordinance in *Church of Scientology* did.  Instead, they are narrowly
drawn to Colorado's consumer protection concerns (and concomitant needs to understand sharing
plan marketing practices and to verify that sharing plans are not retaining an excessive share of
member payments, as opposed to paying member claims).

Finally, the Alliance—relying on dicta from the Tenth Circuit's decision in *Medina v.
Catholic Health Initiatives*—compares the Reporting Law to a hypothetical version of the
Employee Retirement Income Security Act (ERISA) that did not exempt "church plans."  *Medina*
involved an Establishment Clause challenge to ERISA's church plan exemption.  877 F.3d at 1214.
In concluding that this exemption did not violate the Establishment Clause, the Tenth Circuit

_____

[16] The Eleventh Circuit also held that there were fact issues as to whether the City of Clearwater enacted its ordinance
to discriminate against the Church of Scientology, pointing to statements from public officials (including statements
comparing the Church of Scientology to a cancer).  *Church of Scientology Flag Serv. Org., Inc.*, 2 F.3d at 1531–33.
That subtext is not present in this case.

postulated that a version of ERISA *not* including this exemption would violate the Establishment

Clause by fostering excessive entanglement between government and religion:

> Complying with ERISA's fiduciary rules is no simple matter. A Catholic church, or entity associated with one, might want to invest its plan assets in service of certain social goals. But that could run afoul of ERISA, which requires diversification of plan assets, 29 U.S.C. § 1104(a)(1)(C), and that plan assets be held for the exclusive purpose of providing benefits and defraying reasonable plan expenses. 29 U.S.C. § 1103(c). There would, moreover, be pervasive monitoring to determine whether the church or church-associated entity was complying with ERISA.

*Id.* at 1233.  But the Reporting Law—which again requires only an annual email reporting high-

level and basic business information—does not pose the same risk of entanglement that verifying

a religious entity's compliance with fiduciary and other obligations under ERISA would.  The

Reporting Law does not delve into sharing plans' purposes, goals, and objectives—it simply seeks

data germane to documented consumer protection concerns.

The Reporting Law imposes generally applicable administrative and recordkeeping that do

not entail detailed monitoring or close administrative contact between Colorado authorities and

the ministries subject to the Reporting Law.  The Alliance is therefore unlikely to show that the

Reporting Law fosters a risk of excessive entanglement and violates the Establishment Clause on

that basis.  The Alliance has not made a strong showing that it is likely to succeed on the merits of

its Establishment Clause claim.

### 3.  *Freedom of Association*

The First Amendment freedoms "to speak, to worship, and to petition the government for

the redress of grievances could not be vigorously protected from interference by the State unless a

correlative freedom to engage in group effort toward those ends were not also guaranteed."

*Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).  Thus, though the First Amendment does not

40

explicitly mention such associational rights, the Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Id.* The Supreme Court has sometimes referred to the associational freedom derived from the First Amendment as a right of "expressive association."[17] *See id.* at 618; *see also Salvation Army v. Dep't of Cmty. Affs. of State of N.J.*, 919 F.2d 183, 198 (3d Cir. 1990) (discussing the Supreme Court's efforts to categorize associational rights and observing that collective religious exercise falls into the "expressive association" category).

Because expressive associational rights derive from the First Amendment, "there is no constitutional right to associate for a purpose that is not protected by the First Amendment." *Salvation Army*, 919 F.2d at 199 (citing *City of Dallas v. Stanglin*, 490 U.S. 19 (1989)). Moreover, "the right of expressive association has different contours depending upon the activity in which a group is engaged" and the specific First Amendment protection on which a plaintiff grounds its expressive association claim. *Id.*

When religious organizations (such as the Alliance's constituents) assert expressive association claims, two First Amendment protections may be implicated. First, religious organizations may invoke the right to free exercise, "which may include actions that are not covered by the free speech clause." *Id.* Second, they may rely on the right to express ideas, "which is protected by the free speech clause" irrespective of the religious nature of such ideas. *Id.*

---

[17] The Supreme Court has used this nomenclature to distinguish First Amendment associational rights from the right to "enter into and maintain certain intimate human relationships"—i.e., the right to intimate association. *Roberts*, 468 U.S. at 617–18. The Alliance's freedom-of-association claim depends on the premise that Defendant violated its members' First Amendment associational rights, and not any right to intimate association.

### i.  Association for Religious Purposes

Neutral and generally applicable laws are presumptively valid against groups claiming expressive associational rights under the Free Exercise Clause, just as they are valid against individuals asserting individual free exercise rights under the same provision.  Any other approach would produce the "anomalous" result of privileging corporate over individual religious exercise. *Id.*

Here, the Court has already held that the Alliance has failed to demonstrate that the Reporting Law is anything other than neutral and generally applicable.  Thus, to the extent that the Alliance's freedom-of-association claim is grounded on the Free Exercise Clause, the Alliance has failed to show a strong likelihood of success on the merits for the same general reasons as it failed to establish a likelihood of success on the merits of its freestanding free exercise claim.

### ii.  Association for Free Speech Purposes

The Court considered whether the Alliance has any sort of expressive association claim predicated on the Free Exercise Clause because the Alliance raised a freestanding free exercise claim and because the Alliance's constituents are not disputed to be religious organizations acting on their genuinely held religious beliefs.  But the thrust of the Alliance's freedom-of-association challenge seems to be that various of the Reporting Law's disclosure requirements create a risk of chilling the relationships among its members and the third-party vendors and service providers they work with, and by extension the ability of the Alliance's members' to spread their religious messages (*see* D. 8 at 29–30 (citing various cases addressing association for purposes of engaging in political and other kinds of speech)).  In particular, the Alliance challenges the Reporting Law's requirement that persons offering or intending to offer sharing plans or arrangements to produce

"[a] list of any third parties, other than a producer, that are associated with or assist the person in offering or enrolling participants . . . in the plan or arrangement."[18]  *See* Colo. Rev. Stat. § 10-16-107.4(1)(a)(XV).  Though the Alliance's briefing and pleadings are not entirely clear as to what components of the Reporting Law it challenges on freedom-of-association grounds, it also appears that the Alliance may be contesting the Reporting Law's requirement that reporting parties provide information respecting contracts they have entered into with healthcare providers.  *See id.* § 10-16-107.4(1)(a)(IV).  The Alliance challenges these provisions both facially and as applied.

The Alliance relies on the Supreme Court's decision in *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021) for the proposition that compelled disclosure requirements trigger exacting scrutiny—i.e., an inquiry into whether the challenged disclosure requirement is substantially related to a sufficiently important government interest.  But the Court does not read *Americans for Prosperity Foundation* to automatically apply exacting scrutiny to all so-called compelled disclosure requirements—just the ones that create "[t]he risk of a chilling effect on association."  *Id.* at 618.  Nor does the Court read this case to displace the framework the Supreme Court's precedents establish for freedom-of-association claims generally.

Not all compelled disclosure requirements are equally situated.  One might describe a municipal law requiring applicants for building permits to identify the contractors they intend to use as a "compelled disclosure requirement."  Or consider a state law requiring the persons forming a limited liability companies to disclose their identities when they file articles of organization with the state.  It seems that these sorts of laws would not chill First Amendment freedoms as a general

---

[18] Pursuant to the relevant statutory definition, a producer is "a person licensed by the division who solicits, negotiates, effects, procures, delivers, renews, continues, services, or binds health benefit plans and is licensed to conduct these activities in Colorado."  Colo. Rev. Stat. § 10-16-102(55).

matter, even though they could apply to entities engaged in expressive conduct falling within the First Amendment's protections. It strikes the Court as unlikely that the Supreme Court intended to pull these sorts of laws into the exacting scrutiny dragnet simply because they could be described as "compelled disclosure" laws.

And *Americans for Prosperity Foundation's* language confirms the Supreme Court didn't. That decision stressed that it was limited to its own facts. *See Americans for Prosperity Found.*, 594 U.S. at 617 (noting "[t]he gravity of the privacy concerns *in this context*," i.e., in the compelled-disclosure-of-charitable-donors context (emphasis added)). Nothing in *Americans for Prosperity Foundation* suggests that there is a per se chilling risk when a law compels entities to disclose third-party commercial affiliates, a fundamentally different type of association than the relationship between charities and their donors. *Cf. Roberts*, 468 U.S. at 634–37 (O'Connor, J., concurring) (observing that "there is only minimal constitutional protection of the freedom of commercial association" and that even entities that engage in a large amount of expressive conduct lack immunity from laws bearing on their commercial associations). Moreover, under *Americans for Prosperity Foundation*, a law's chilling effect factors into the exacting scrutiny test. Indeed, "[t]o withstand [exacting] scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Americans for Prosperity Found.*, 594 U.S. at 607 (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)). If a law poses no chilling risk, it follows that no sort of special scrutiny is required.

Establishing that a challenged disclosure law poses a risk of chilling First Amendment associational freedoms is a threshold requirement for asserting a First Amendment associational claim. *See id.* at 618; *cf. In re Motor Fuel Temperature Sales Pracs. Litig.*, 641 F.3d 470, 488 (10th

Cir. 2011) (requiring an entity asserting a First Amendment associational privilege to make a prima

facie showing that the privilege applies). Before applying a First Amendment test, the Court

necessarily must determine whether the First Amendment even applies in the first instance. And

that depends on whether the plaintiff has a protected First Amendment associational interest, and

whether the challenged law implicates that interest. As the United States Court of Appeals for the

Sixth Circuit—drawing on Supreme Court precedent—explained:

> The Supreme Court's precedent has led us to consider three things when
> confronted with an expressive-association claim. *See Hamilton Cnty. Educ.
> Ass'n v. Hamilton Cnty. Bd. of Educ.*, 822 F.3d 831, 840 (6th Cir. 2016);
> *Miller v. City of Cincinnati*, 622 F.3d 524, 538 (6th Cir. 2010). First: Does
> the First Amendment apply to the group because it engages in speech? *See*
> [*Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000)]. Second: If the group
> engages in speech, does a law "significantly burden" its ability to express
> its message? *See id.* at 653, 120 S.Ct. 2446; *Roberts*, 468 U.S. at 622–23,
> 104 S.Ct. 3244. Third: If this burden exists, can the government satisfy the
> scrutiny that applies? For some burdens, the Court has applied strict
> scrutiny. *See Dale*, 530 U.S. at 648, 120 S.Ct. 2446; *Roberts*, 468 U.S. at
> 623, 104 S.Ct. 3244. For others, it has applied its less rigorous "exacting
> scrutiny" test. *Ams. for Prosperity Found.*, 141 S. Ct. at 2383 (plurality
> opinion) (quoting [*Buckley v. Valeo*, 424 U.S. 1, 64 (1976)]); *cf. id.* at 2391–
> 92 (Alito, J., concurring in part and concurring in the judgment). And for
> the ballot-access burdens that we have discussed, it has applied the
> *Anderson-Burdick* balancing test. *See* [*Washington State Grange v.
> Washington State Republican Party*, 552 U.S. 442, 451–52 (2008)].

*Lichtenstein v. Hargett*, 83 F.4th 575, 602 (6th Cir. 2023).

Launching into an exacting scrutiny analysis before determining a First Amendment

associational interest was even in play would put the cart before the horse. And doing so would

be inconsistent with the Supreme Court's general approach to analyzing constitutional claims. In

the Second Amendment context, for instance, the plaintiff bears an initial burden of showing that

the Second Amendment's text covers the conduct the challenged law or policy regulates. *See New*

*York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022). It is only then that the burden

shifts to the government to show that its law or policy "is consistent with this Nation's historical tradition of firearm regulation." *Id.* It wouldn't make sense to have it any other way—it would be absurd to require the government to prove its law or policy was consistent with historical arms regulation when its law or policy does not even implicate the right to bear arms. The same is true here. If the Alliance cannot show that the Reporting Law risks chilling its members' expressive rights (or, for purposes of its facial challenge, creates a broad-based chilling risk), there is no basis for holding the government to an exacting scrutiny standard.

The Court finds the Sixth Circuit's framework for analyzing expressive associational claims persuasive. Defendant does not dispute that the Alliance's member ministries—in furtherance of their genuinely held religious beliefs—disseminate religious messages. These messages qualify as protected First Amendment speech, and the Alliance's member ministries are entitled to associate for purposes of engaging in this speech. The Court therefore finds that the Alliance clears the first step of the *Lichtenstein* analysis.

Where the Alliance stumbles is the second step of analysis, which focuses on the burden the government law or policy imposes on a plaintiff's protected associational rights. Consistent with *Americans for Prosperity Foundation*, however, the Court would rephrase this inquiry in terms of "risks of a chilling effect" or burdens rather than actual chilling effects or burdens.

Though *Americans for Prosperity Foundation* clarifies that it is "[t]he risk of a chilling effect on association" that "trigger[s]" First Amendment protection, 594 U.S. at 618, it does not clearly specify what a freedom-of-association plaintiff must do to make this showing in each and every procedural posture. In *Americans for Prosperity Foundation*, which concerned an appeal after a trial on the merits, the Supreme Court noted record evidence that the petitioners and their

46

supporters had been subjected to bomb threats, protests, stalking, and physical violence. *Id.* at

617. It also relied on the briefing of *amici* "span[ning] the ideological spectrum" in concluding

that "[t]he deterrent effect feared" by charitable organizations subject to California's donor-

disclosure law was "real and pervasive." *Id.* In the discovery context, meanwhile, courts have

held that an entity challenging discovery on the basis of a First Amendment associational privilege

must make a prima facie showing of the privilege's applicability, *see In re Motor Fuel Temperature*

*Sales Pracs. Litig.*, 641 F.3d at 488, which showing is not made through "minimal and equivocal"

evidence of a chilling risk, *id.* at 490.

Here, the Alliance must make a strong showing as to its likelihood of success on the merits

to receive a preliminary injunction. While *Americans for Prosperity Foundation* and litigation

discovery cases are not entirely on point, the Court finds that they strongly suggest a freedom-of-

association plaintiff may not clear its preliminary injunction burden by vaguely averring to

subjective and undeveloped fears of a chilling risk. At a minimum, the Alliance must explain how

the Reporting Law's requirement that its members disclose certain of their commercial affiliates

creates a real risk of chilling its members'—or, for purposes of its facial challenge, others'—

expressive activities, and the objective facts on which that belief is grounded.

In some contexts, a risk of chilling or otherwise burdening associational rights might be

obvious:

> A government can burden the right to associate in a "number" of ways. *Ams.*
> *for Prosperity Found.*, 141 S. Ct. at 2382 (quoting *Roberts*, 468 U.S. at 622,
> 104 S.Ct. 3244). It might compel a group (say, the Boy Scouts) to accept
> members with whom the group does not want to associate (say, openly gay
> individuals) because the group believes that this membership will dilute its
> message (say, disapproval of non-heterosexual conduct). *See Dale*, 530 U.S.
> at 653, 120 S.Ct. 2446. The government also might compel a group (say,
> the NAACP) to disclose its list of members to a hostile audience (say, the

> segregated south) and so deter individuals from joining the group out of fear of harassment. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 461–63, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Or the government might discriminate against a group (say, the Students for a Democratic Society) by refusing to give it a generally available benefit (say, access to a college's facilities) that groups generally use to air their points of view. *See Healy v. James*, 408 U.S. 169, 181, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972). Or it might prohibit a group (say, the NAACP) from soliciting individuals (prospective clients) to associate with the group's lawyers for litigation purposes. *See NAACP v. Button*, 371 U.S. 415, 429–37, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *see also NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 911–12, 924–26, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982).

*Lichtenstein*, 83 F.4th at 602. Or, as in *Americans for Prosperity Foundation*, a risk of chilling might be inferred based on a documented pattern connecting disclosures to harassment and intimidation. *See* 594 U.S. at 616–17 (noting the petitioners' evidence that "they and their supporters have been subjected to bomb threats, protests, stalking, and physical violence" in concluding that a California donor-disclosure law created an unnecessary risk of chilling association).

In this case, the Alliance challenges an industry-specific disclosure law that requires industry members to disclose third parties that are involved with offering or enrolling participants in their products. This disclosure regime is quite different from a disclosure law obligating the NAACP to disclose its members' identities against the backdrop of the Jim Crow South—which could and did subject members to reprisals, and thus created a risk of chilling association with the NAACP. And it is not the same as the disclosure regime in *Americans for Prosperity Foundation*, which broadly required California charities to disclose their major donors, some of whom were threatened based on disclosure of their donations to arguably controversial causes. 594 U.S. at 602, 604, 616–17. The disclosure regime at issue in this case does not present any obvious risk of chilling third-party vendors from associating with the Alliance's members for purposes of

disseminating the Alliance's members' messages or present any obvious risk of preventing the Alliance's members from getting their messages out. The Court will not assume that any such risks exist,[19] absent evidence from the Alliance showing the presence of a chilling threat.

But the Alliance has not shown that the Reporting Law creates a risk of chilling its members' expressive rights. The Alliance filed two declarations in support of its preliminary injunction motion—one from Rob Waldo, Vice President and Chief Administrative Officer of Alliance member Samaritan Ministries (Samaritan) (D. 8-1), and the other from Katy Talento, Executive Director of the Alliance (D. 8-5). It also filed excerpts from Mr. Waldo's deposition (D. 52-1). None of this evidence shows that the Reporting Law creates a risk of chilling its members' expressive conduct.[20]

In his declaration, Mr. Waldo indicates that one of the reasons Samaritan finds the Reporting Law troubling is that its members, rather than Samaritan itself, contract with providers for services, and that the Reporting Law may require Samaritan to disclose its members' contracts

---

[19] The Court is particularly reluctant to presume the sort of disclosure arrangement at issue in this case creates some sort of chilling risk when the Supreme Court—in cases the Alliance cites—has suggested that disclosure requirements bearing on professional fundraisers working on charities (in contrast to caps affecting charity spending on fundraising) are constitutional. *See Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 967 n.16 (1984) ("[C]oncerns about unscrupulous professional fundraisers, like concerns about fraudulent charities, can and are accommodated directly, through disclosure and registration requirements and penalties for fraudulent conduct.").

[20] The Alliance quotes *In re First Nat. Bank, Englewood, Colo.*, 701 F.2d 115, 116 (10th Cir. 1983) for the proposition that affidavits describing the "'reluctance of people sympathetic [to the group] to associate with the group' upon exposure are sufficient evidence" to make out a freedom-of-association claim (D. 52 at 17). But the Alliance leaves out a key part of this quotation: "Affidavits submitted to the district court *describe harassment and intimidation of petitioners' known members*, and the resulting reluctance of people sympathetic to the goals of [the group] to associate with the group for fear of reprisals." *In re First Nat. Bank*, 701 F.3d at 116–17 (emphasis added). In *In re First National Bank*, the entities asserting a First Amendment associational privilege thus pointed to objective facts demonstrating the existence of a chilling risk. They did not simply rely on vague averments (not backed up any factual support) that they or their members felt some subjective chilling risk. That is essentially the missing piece here. The Alliance relies on declarations concluding that the Reporting Law creates a chilling risk, but these conclusions rest on scant objective supporting evidence. If the Alliance had produced evidence that over the three cycles the Reporting Law has been in effect, its members and their vendors had faced harassment and intimidation (or anything approaching harassment and intimidation) its preliminary injunction request would be on much stronger footing.

with these providers to the state (thereby compromising its members' medical privacy) (*see* D. 8-1 at 3–4). The Alliance does not connect this concern to its members' (or anyone else's) expressive activity. The Court assumes that the Alliance's theory here is that the Reporting Law makes it more difficult for Samaritan to reach prospective members with its message, because these prospective members might be worried that if they join Samaritan, their confidential healthcare choices might be disclosed to the state. Ultimately, this purported concern is speculative and appears to depend on a straw man reading of the Reporting Law.

Section 10-16-107.4 facially requires disclosure of "[a]ny contracts the person [i.e., the reporting party] has entered into with providers" in Colorado. The reporting template associated with Regulation 4-10-01, meanwhile, does not require disclosure of any actual contracts—it merely asks reporting parties to identify how many contracts they have entered into with providers for Colorado plan participants. *See* D. 46-1 at 638. On its face, the Reporting Law therefore cannot be read to seek individual plan members' contracts with their providers.

Mr. Waldo's declaration also indicates that Samaritan's contractual relationships with at least some of its "third party vendors" are subject to non-disclosure agreements and that it is Samaritan's "understanding that many of [its] affiliates wish to maintain their privacy," such that "[t]he forced disclosure of [Samaritan's vendor relationships] has the potential to undermine [Samaritan's] ability to work with [its] vendor[] partners to carry out [its] religious mission" (D. 8-1 at 4). And during his deposition, Mr. Waldo indicated that if Colorado and journalists would report accurately on the activities of sharing plans, it might not be a problem for Samaritan to disclose its vendors, but because of this allegedly misleading reporting, vendors might be reluctant to associate with Samaritan:

> And then, now [vendors'] names are associated publicly on a list that, according to Colorado's Open Records Act, anyone can access. Well, why is that a problem, some may say? If the DOI and journalists would report accurately, it may not be a problem. But they aren't reporting accurately. And they have provided misleading, mischaracterizing statements that are harming us. And now vendors are publicly associated with us.

(D. 52-1 at 9). Mr. Waldo also explained that "[t]here's some vendors that face pressure related to who is considered a hate group," and that while Samaritan is not considered a hate group, other organizations that offer sharing plans may be, and so vendors might be reluctant to associate with those organizations if their affiliations are made public (*id.* at 9–10).

Again, the Alliance does not draw a clear connection between the unspecified vendor relationships Mr. Waldo discusses and Samaritan's (or any other organization's) ability to engage in expressive conduct. Moreover, the concerns Mr. Waldo's declaration and deposition testimony raise are vague, speculative, and conclusory.[21]

Ms. Talento's declaration has the same issues. According to Ms. Talento, "[m]any Alliance ministry affiliates wish to maintain the privacy of their business or religious affiliations and do not want their information shared with the government," so "[t]he forced disclosure of this information undermines Alliance ministry members' abilities to work with their partners to carry out their religious missions" (D. 8-5 at 6). Like Mr. Waldo's statements, this description of the Reporting Law's threats to the Alliance's members' ability to spread their religious message is vague. Unlike Mr. Waldo, Ms. Talento indicates that she is "already aware of some affiliates expressing reluctance to continue working with health care sharing ministries because of Colorado's

---

[21] Mr. Waldo's speculative concerns about vendor behavior are also significantly undercut by his admission that "no vendor has ceased to work with [Samaritan] yet due to the Colorado reporting [law]" (D. 46-1 at 779).

regulations" (*id.*).  But this statement is still vague and does not demonstrate that there is a risk that sharing ministries will somehow be impaired in disseminating their religious messages. Moreover, the Court notes that Colorado's reporting regime has been in place for three reporting cycles.  If its disclosure requirements posed a bona fide risk of chilling protected association, the Court would expect that the Alliance would be able to produce more specific evidence germane to that risk.[22]  Ultimately, the Alliance's expressed concerns about chilling appear to be entirely subjective and lacking in factual support.

Because the Alliance has not shown that the Reporting Law actually threatens to affect its members' expressive activities, the Alliance has not proven a substantial likelihood of prevailing on the merits of its freedom-of-association claim.

### 4. Free Speech Clause

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'"  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting U.S. Const. amend. I).  It protects "both the right to speak freely and the right to refrain from speaking at all."  *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).

But the First Amendment does not protect all speech equally.  Indeed, the Constitution affords commercial speech—that is, "expression related solely to the economic interests of the

---

[22] During his deposition, Mr. Waldo explained that Samaritan's vendors do not always tell Samaritan why they stop working with Samaritan, and that potential vendors do not always explain why they decline to work with Samaritan in the first place (*see* D. 52-1 at 14–15).  This testimony does not establish that vendors or potential vendors that ceased doing business or declined to do business with the Alliance's members would not or could not cite the Reporting Law as a reason for those decisions if in fact they perceived the Reporting Law as an issue.  The fact that none of the Alliances members have evidently reported losing out on any vendor relationships strongly suggests that the Reporting Law does not create any real chilling risk.  At best, Mr. Waldo's testimony is an attempt to explain away the Alliance's lack of evidence.  But ultimately, explaining away the absence of evidence is not the same thing as evidence, and this explanation does not make for a strong showing that the Alliance is likely to succeed on the merits of its freedom-of-association claim.

speaker and its audience," or speech "proposing a commercial transaction"—"lesser protection" than it does "other constitutionally guaranteed expression." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561–63 (1980).  Laws regulating commercial speech are not subject to strict scrutiny.  Instead, laws *restricting* commercial speech generally need only survive intermediate scrutiny.  *United States v. Wenger*, 292 F. Supp. 2d 1296, 1303 (D. Utah 2003); *see also Cent. Hudson Gas & Elec. Corp*, 447 U.S. at 564–65 (explaining the framework applying to efforts to regulate commercial speech that is neither misleading nor related to unlawful activity).  Meanwhile, laws that *compel* commercial speech (e.g., in the form of consumer-protection oriented disclosures in advertisements) need only "reasonably relate[] to the State's interest in preventing deception of consumers," at least so long as such compelled speech is "purely factual and uncontroversial." *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 651 (1985).  This lower standard for compelled commercial speech recognizes that laws that compel speech "trench much more narrowly" on First Amendment interests than do laws that restrict speech.  *Id.*

Applying the commercial speech doctrine requires distinguishing commercial from other speech.  Courts have routinely referred to this analysis as a "commonsense" test.  *See, e.g.*, *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 482 (1995); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455 (1978).  But the lines between commercial and fully protected speech are not always clear. *See City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 419 (1993) (observing "the difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category"). When commercial and "otherwise fully protected speech" are "inextricably intertwined," commercial speech does not "retain[] its commercial character." *Riley v. Nat'l Fed'n of the Blind*

*of N. Carolina, Inc.*, 487 U.S. 781, 796 (1988).  Rather, the court must simply apply the applicable test for fully protected expression (generally some form of heightened scrutiny).  *Id.*  Ultimately, a court's "lodestars in deciding what level of scrutiny to apply" are "the nature of the speech taken as a whole and the effect of the [challenged law or regulation] thereon."  *Id.*

Here, the Alliance contends that the Reporting Law violates its members' free speech rights in two ways: first, by requiring that reporting parties produce "[c]opies of any consumer-facing and marketing materials used in [Colorado] in promoting the [reporting party's] plan or arrangement, including plan or arrangement benefit descriptions and other materials that explain the plan or arrangement," Colo. Rev. Stat. §10-16-107.4(1)(a)(XVII); and second, by requiring reporting parties to produce various internal operations data.

### i.  Marketing Materials Disclosures

The Reporting Law functions differently from the sorts of laws at issue in *Central Hudson* and *Zauderer*.  Unlike the regulatory order at issue in *Central Hudson*, which banned certain categories of advertising, *see* 447 U.S. at 558–60, the Reporting Law does not facially restrict speech.  And unlike the regulation at issue in *Zauderer*, which required attorneys advertising contingent-fee arrangements to disclose in their advertising their clients' potential liability for certain costs, *see* 471 U.S. at 652, the Reporting Law does not compel reporting parties to convey any particular message or include any particular information in their advertising.  Rather, the Reporting Law requires reporting parties to turn over to the state marketing materials that they have already disseminated to some portion of the consuming public.  In other words, the Reporting Law does not require anyone to say anything new—just to say what they have already said.  For