**No. 25-1035**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

_____

ALLIANCE OF HEALTH CARE SHARING MINISTRIES
*Plaintiff-Appellant*

v.

MICHAEL CONWAY,
in his official capacity as
Commissioner of the Colorado Division of Insurance
*Defendant-Appellee*

_____

Appeal from the United States District Court for the District of Colorado,
No. 1:24-cv-01386-GPG-STV (Hon. Gordon Gallagher)

_____

**APPENDIX VOL XX - Pages A-1003 - A-1041**

Date: March 21, 2025

Michael F. Murray
Paul Hastings LLP
2050 M Street, NW
Washington, D.C. 20036
(202) 551-1730
michaelmurray@Paulhastings.Com
William E. Mahoney
Paul Hastings LLP
600 Travis Street, Fifty-Eighth Floor
Houston, Texas 77002
(713) 860-7304
williammahoney@Paulhastings.Com

*Counsel For Plaintiff Alliance of
Health Care Sharing Ministries*

| ECF NO. | *DESCRIPTION* | Appx. Page No. |
|---|---|---|
| **Appendix Vol. I, Pages 1-140** | | |
| - | District Court Docket Sheet | A-1 |
| 8-1 | Ex. A - Declaration of Rob Waldo (May 17, 2024) | A-9 |
| 8-2 | Ex. A-1 – Samaritan Bylaws | A-19 |
| 8-3 | Ex. A-2 - Samaritan Guidelines | A-44 |
| 8-4 | Ex. A-3 - Samaritan Membership Application | A-94 |
| 8-5 | Ex. B - Declaration of Katy Talento | A-100 |
| 32 | Amended Complaint of Alliance of Health Care Sharing Ministries (July 1, 2024) | A-109 |
| **Appendix Vol. II, Pages 141-179** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1-1.6 (September 3, 2024) | A-141 |
| **Appendix Vol. III, Pages 180-223** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.7-1.22 (September 3, 2024) | A-180 |
| **Appendix Vol. IV, Pages 224-261** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.23-1.28 (September 3, 2024) | A-224 |
| **Appendix Vol. V, Pages 262-307** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.29-1.33 (September 3, 2024) | A-262 |

| | **Appendix Vol. VI, Pages 308-331** | |
|---|---|---|
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.34-1.36 (September 3, 2024) | A-308 |
| | **Appendix Vol. VII, Pages 332-350** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.43-1.54 (September 3, 2024) | A-332 |
| | **Appendix Vol. VIII, Pages 351-373** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.37-1.39 (September 3, 2024) | A-351 |
| | **Appendix Vol. IX, Pages 374-424** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.40-1.40 (September 3, 2024) | A-374 |
| | **Appendix Vol. X, Pages 425-478** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.40-1.41 (September 3, 2024) | A-425 |
| | **Appendix Vol. XI, Pages 479-541** | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.41-1.42 (September 3, 2024) | A-479 |
| | **Appendix Vol. XII, Pages 542-573** | |

| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.43-1.54 (September 3, 2024) | A-542 |
|---|---|---|
| **Appendix Vol. XIII, Pages 574-612** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.54-1.59 (September 3, 2024) | A-574 |
| **Appendix Vol. XIV Pages 613-682** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.6-1.6 (September 3, 2024) | A-613 |
| **Appendix Vol. XV, Pages 683-767** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 1.61-1.64 (September 3, 2024) | A-683 |
| **Appendix Vol. XVI, Pages 768-816** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 2.0-2.3 (September 3, 2024) | A-768 |
| **Appendix Vol. XVII, Pages 817-867** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 2.3-2.4 (September 3, 2024) | A-817 |
| **Appendix Vol. XVIII, Pages 868-933** | | |
| 46-1 | Appendix of Exhibits to Response to Motion for Preliminary Injunction, Exhibits 2.5-7 (September 3, 2024) | A-868 |

| | **Appendix Vol. XIX, Pages 934-1002** | |
|---|---|---|
| 52.1 | Appendix to Reply to Motion for Preliminary Injunction (September 17, 2024) | A-934 |
| 54 | Order Denying the Alliance's Motion for a Preliminary Injunction (January 13, 2025) | A-949 |
| | **Appendix Vol. XX, Pages 1003-1041** | |
| 54 | Order Denying the Alliance's Motion for a Preliminary Injunction (January 13, 2025) | A-1003 |
| 55 | Notice of Appeal as to Order on Motion for Preliminary Injunction (January 27, 2025) | A-1015 |
| 58-1 | Motion for Order to Grant Injunction Pending Appeal (January 28, 2025) | A-1017 |
| | **Appendix Vol. XXI, Pages 1042-1077** | |
| 58-1 | Motion for Order to Grant Injunction Pending Appeal (January 28, 2025) | A-1042 |
| 60 | Order Denying Motion for Injunction Pending Appeal (February 3, 2025) | A-1069 |

these reasons, the Reporting Law's marketing material disclosure requirement would seem to impose a relatively light touch on speech—whatever the contents of that speech are.

The Alliance's objection is that the Reporting Law's marketing materials disclosure requirement, when applied to sharing ministries, regulates not just to commercial speech, but also fully protected religious speech. There is little in the record that reflects the substance of the Alliance's members' marketing materials. The record contains Samaritan's Guidelines for Health Care Sharing (D. 8-3), which would seem to qualify as "consumer-facing and marketing materials used . . . in promoting" Samaritan's sharing plans. These guidelines—in addition to describing the plans' coverages and mechanics—note that biblical principles are foundational to Samaritan's mission and discuss Samaritan's religiously oriented membership criteria (e.g., its requirements that members must affirm a statement of faith, regularly "attend a Biblical, Christian Church," and "[a]gree that when you have a dispute with a fellow Christian, and your fellow Christian is willing to submit that dispute to fellow believers for resolution, you are not to sue each other in the civil courts or other government agencies") (*id.* at 5, 10–11). The record also includes deposition testimony from Mr. Waldo to the effect that Samaritan tailors its marketing efforts along religious lines:

> Samaritan does communicate to reach others that we believe are like-minded. And we can call that marketing. We can call that advertising. And we do that. We're very intentional about how we do that. We want to attract only those people that can sign up on our statement of faith and want to participate in healthcare sharing like us. And, yes, we do market and advertise to those that we believe may be interested in joining our community.

(D. 52-1 at 6).  Mr. Waldo further testified that he was "not aware" of Samaritan making any changes to the substance of its marketing materials in response to the Reporting Law (D. 46-1 at 791).

Based on this limited record, it appears that—at least some of the time—sharing ministries couch their marketing efforts, or explain the transactions they propose, in religious terms.  But common sense dictates that there is also a strong commercial component to sharing ministry marketing efforts.  Sharing ministry marketing materials necessarily explain the terms of a commercial transaction.  By their nature, sharing ministries (and sharing plans more generally) involve a quid pro quo: members pay regular fees in consideration for (at least a chance of) getting their medical needs covered.  While prospective members might join sharing ministries because they feel that membership is consistent with their religious values, that does not change the fact that sharing ministries would not exist if there was no need to pool medical risks—which are essentially economic.  In this regard, sharing ministries operate in the same general commercial risk management market as traditional insurance companies.

Speech explaining the terms of a risk-sharing transaction to consumers for the purposes of persuading consumers to engage in this transaction is definitionally commercial.  *See Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 473–74 (1989) ("There is no doubt that the AFS Tupperware parties the students seek to hold propose a commercial transaction, which is the test for identifying commercial speech." (citations and internal quotation marks omitted)).  And because this speech concerns an economic transaction, it is unlike other sorts of speech that the Supreme Court has recognized as non-commercial.  *See, e.g.*, *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980) (distinguishing charitable solicitation from commercial

speech on the ground that "charitable solicitation does more than inform private economic decisions and is not primarily concerned with providing information about the characteristics and costs of goods and services"). Sharing ministries' marketing materials obviously do inform private economic decisions relating to health care coverage and do provide information about goods and services. In this way, they have a clear commercial bent.

The record shows that the commercial aspects of sharing plan marketing materials are Colorado's concern. As previously discussed, the Division received numerous complaints indicating that sharing plans and their agents were misleading consumers and that consumers were confused as to the limitations of sharing plans vis-à-vis traditional insurance. The Division also discovered that certain plans were impermissibly operating as unlicensed insurers. Colorado's requirement that sharing plans disclose their marketing materials relates directly to these concerns. And while there is no evidence that Colorado's disclosure requirements have *any* chilling or compelled-speech effects on *any* component of *any* sharing plan's marketing materials, the Court suspects that the only potentially viable argument along these lines is that the Reporting Law might make sharing plans more sensitive to underscoring distinctions between their offerings and traditional insurance and take greater pains to ensure they are accurately describing the coverage they provide. But these burdens would seem to fall on the clearly commercial aspects of sharing plan marketing efforts. There is no indication that they would fall on any sort of religious messaging or appeal.

Because sharing plan marketing materials are at their core commercial speech, and because the burden of the Reporting Law—if any—would seem to fall on this commercial speech, the Court concludes that the commercial speech doctrine applies here. While the Court recognizes

that some sharing plans may include religious messaging in their marketing materials, that does not change the result of its analysis.

Proposing commercial transactions in religious terms—or injecting other forms of protected speech into otherwise commercial appeals—does not necessarily remove speech in furtherance of that transaction from the ambit of the commercial speech doctrine or create an inextricable intertwinement issue.  *See Fox*, 492 U.S. at 474–75 (noting that opening sales presentations with a prayer or the Pledge of Allegiance "would [not] convert them into religious or political speech").  In *Fox*, for instance, the Supreme Court rejected a houseware sales company's arguments that gatherings it hosted, where it not only pitched its products, but also "touch[ed] on other subjects . . . such as how to be financially responsible and how to run an efficient home," inextricably intertwined pure and commercial speech.  *Id.* at 474.  In concluding that the commercial speech doctrine applied, the Supreme Court observed that the challenged policy—which generally prohibited private commercial enterprises from operating on state university campuses—did "[n]othing [to] prevent[] the speaker from conveying, or the audience from hearing, [] noncommercial messages."  *Id.*  Here too, the Reporting Law does not preclude any sharing ministry from conveying any religious message to its members or prospective members: ministries are free to say anything they want about religion or their religious values to anyone they wish.  There is no evidence that the Reporting Law burdens religious speech at all— and if it imposes any burden on speech, that burden would seem to fall on purely commercial speech.

While the Court concludes that the commercial speech doctrine applies, that does not fully resolve the question of the particular level of scrutiny the Reporting Law must survive.  As the

Court indicated, the Reporting Law is not precisely like the regulations at issue in *Central Hudson* or *Zauderer*. But on balance, the Reporting Law's requirement that reporting parties disclose their marketing materials is more like *Zauderer's* consumer disclosure requirement. If anything, it is less burdensome because it does not dictate the substance of any communication—rather, it requires reporting parties to disclose their already disseminated marketing materials to the state.

Accordingly, the Court finds that the Reporting Laws' marketing-material disclosure requirement need only survive the rational basis inquiry set forth in *Zauderer*. The marketing-material disclosure requirement easily satisfies this test. Understanding how sharing plans market themselves can guide the Division in advising consumers and acting against sharing plans that engage in misleading marketing. And the best way to understanding how sharing plans market themselves is almost certainly to look at how sharing plans actually market themselves. The marketing-material disclosure requirement thus "reasonably relate[s] to the State's interest in preventing deception of consumers." *See Zauderer*, 471 U.S. at 651.

### ii. *Internal Data Disclosures*

The Alliance also challenges the Reporting Law on the ground that its various reporting requirements aside from the marketing-related disclosure obligation "compel[] [] ministries to speak about their internal operations." The Alliance does not identify the particular disclosure requirements it finds objectionable. But the Court presumes the Alliance's objection extends to the requirements that sharing plans disclose the total amounts of fees, dues, and payments they collect; the total dollar amounts of reimbursement requests for healthcare costs or services submitted in Colorado; the total dollar amount of such requests qualifying for reimbursement; and

like data.[23]  The Alliance claims that these requirements are not entitled to deferential *Zauderer* review because *Zauderer* extends only to factual and uncontroversial disclosures and "Defendant[] . . . post[s] excerpts of the Alliance's members' speech that are misleading by omission and thereby controversial" (D. 8 at 32).  Defendant counters that the required disclosures represent commercial speech of the sort *Zauderer* contemplates, and that the Alliance's real objection is to government speech, not the disclosure requirements themselves.

In the Court's view, the commercial speech doctrine applies more cleanly to regulations applying to the Alliance's members' advertising than it does to the Reporting Law's separate data disclosure requirements.[24]  Sharing plan advertising proposes a transaction; the other sharing plan data the Reporting Law seeks, while of course related to sharing plans' commercial activity, does not.  *Cf. SEC v. AT&T, Inc.*, 626 F. Supp. 3d 703, 748–49 (S.D.N.Y. 2022) (concluding that *Zauderer* was "inapposite" in a challenge to a Securities and Exchange Commission disclosure regulation because the compelled disclosures "reache[d] [securities] issuer speech made in a wide array of contexts that d[id] not involve a proposed commercial transaction").  The compelled internal data disclosures are not commercial speech in the same way that the Alliance's members' advertising is.  And the Court construes the Alliance's challenge to these compelled internal data disclosures as different than its challenge to the advertising disclosures.  The Alliance at least seems to be arguing that the advertising disclosures exert a chilling effect on its members' speech;

---

[23] This data relates most closely to the Alliance's apparent concern that the metrics Defendant requests and publicly reports paint a misleading picture of its members' operations.

[24] Strictly speaking, the Reporting Law requires disclosures *of* advertising, not disclosures *in* advertising.  So *Zauderer* is also not a precise fit for the Alliance's challenge to the Reporting Law's marketing materials disclosure requirement either.  But to the extent that the Reporting Law's marketing materials disclosure requirement regulates speech, it regulates commercial speech.  Accordingly, the Court finds that *Zauderer* governs that particular disclosure requirement.

the Alliance's challenge to the internal data disclosures seems to be more along compelled speech lines. Both in actuality and as asserted, the internal data disclosure requirements do not operate as a regulation of commercial speech.

But while the Court is not persuaded that *Zauderer* governs here, because the Reporting Law's data disclosure requirements do not require commercial speech, that does not mean that *Zauderer* lacks any persuasive relevance. Indeed, "*Zauderer* . . . underscores that laws compelling disclosures of factual information in connection with commercial transactions may implicate only minimal First Amendment interests of the merchant, are judged under a rational basis standard, and do not implicate the traditional concerns associated with compelled speech." *Id.* at 749 (footnote omitted).

Moreover, even if the commercial speech doctrine does not apply, that does not necessarily mean that strict scrutiny applies to the Reporting Law's operations data disclosure requirements. Similar compelled disclosure arrangements are routinely upheld in other contexts. For instance, courts have concluded that required disclosures of transaction data to the Internal Revenue Service do not implicate the First Amendment. *See United States v. Sindel*, 53 F.3d 874, 877–78 (8th Cir. 1995) (rejecting the claim that required disclosure of information relating to cash transactions in excess of $10,000 violated the First Amendment's compelled speech prohibition).

And in the securities context, courts generally uphold compelled disclosure requirements under deferential rubrics. *See, e.g., Ohralik*, 436 U.S. at 456 ("Numerous examples could be cited of communications that are regulated without offending the First Amendment, such as the exchange of information about securities . . . ."); *AT&T, Inc.*, 626 F. Supp. 3d at 743 (observing that "laws and regulations mandating affirmative disclosures of information, particularly for public

issuers and other participants in the securities industry . . . . have routinely withstood First

Amendment challenges without any suggestion that strict, or even intermediate, scrutiny applied");

*SEC v. Wall St. Publ'g Inst., Inc.*, 851 F.2d 365, 373 (D.C. Cir. 1988) ("If speech employed directly

or indirectly to sell securities were totally protected, any regulation of the securities market would

be infeasible—and that result has long since been rejected.").

Deferential treatment of disclosure obligations in the securities context is appropriate for

several reasons.  First, such disclosure obligations do not constitute "a veiled attempt to 'suppress

unpopular ideas or information or manipulate the public debate through coercion rather than

persuasion.'"  *Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1108 (D.C. Cir. 2011) (quoting

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994)).  Second, securities disclosure

requirements do not generally implicate political speech, restrict speech, or implicate expressions

of opinions or points of view, and instead generally concern themselves with strictly factual

information.  *AT&T, Inc.*, 626 F. Supp. 3d at 750 (drawing on these considerations in concluding

that strict scrutiny did not apply to Regulation Fair Disclosure).  Third, securities regulations

operate in an area that has been historically and extensively regulated by the government.  *Wall St.

Pub. Inst., Inc.*, 851 F.2d at 372 (noting that regulations incidentally burdening free speech are

commonly upheld when those regulations appear in the context of an "extensively regulate[d] []

field of economic activity").  These same general considerations underpin the commercial speech

doctrine.  *Ohralik*, 436 U.S. at 455–56 (distinguishing commercial from other speech on the basis

that commercial speech "occurs in an area traditionally subject to government regulation");

*Zauderer*, 471 U.S. at 651 (noting that the "interests at stake" in commercial-speech-related cases

are "not of the same order" as those present in other First Amendment cases, because commercial-

speech-related regulations do not "'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein'") (quoting *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)).

While the Reporting Law's internal data disclosure requirements might not compel or regulate commercial speech as that term is used in Supreme Court caselaw, and while they are not securities regulations, they are similar to compelled disclosure requirements subject to the commercial speech doctrine and compelled disclosure requirements within the securities regulation regime. Like speech subject to the commercial speech doctrine and speech compelled by securities regulations, the speech the Reporting Law's internal data disclosure requirements compel does not implicate core First Amendment concerns.

The Reporting Law requires sharing plans to disclose high-level data about their business operations. This data is commercial-speech adjacent, as it relates to and sheds lights on the transactions that sharing plans facilitate. And the Reporting Law's data disclosure requirements serve the same general concerns as commercial speech and securities regulations—they are calculated to prevent consumer and marketplace confusion. Moreover, the Reporting Law's data disclosure requirements do not operate to suppress any ideas, do not involve political speech, do not restrict speech, and do not require expressions of opinions or points of view. They simply require factual disclosures about sharing plan businesses operations. Finally, though states have not so far traditionally and heavily regulated the sharing plan market (likely because of this market's relatively recent emergence), there is a longstanding tradition of states extensively regulating the conventional insurance market (and for the same general consumer protection reasons that underpin Colorado's desire to regulate the sharing plan market). In short, the

Reporting Law's data disclosure requirements lack "any hallmark indicative of an occasion to apply strict scrutiny." *AT&T, Inc.*, 626 F. Supp. 3d at 750. They are similar to the sorts of laws that courts evaluate under more deferential standards.

As to which more deferential standard applies, the Court finds that rational basis scrutiny is most appropriate.[25] The Reporting Law's internal data disclosure requirements—to the extent they implicate speech—compel rather than restrict it. They therefore "trench much more narrowly" on First Amendment interests than speech restrictions. *Zauderer*, 471 U.S. at 651. They are also similar to the sorts of laws approved in *Zauderer* in that they require disclosure of uncontroversial factual matters for the purpose of informing consumer decisionmaking.[26] The data Colorado seeks on sharing plan claims-payment practices is certainly germane to its legitimate consumer protection concerns. The Reporting Law's internal data disclosure requirements thus easily clear rational basis scrutiny.

In sum, the Alliance has not demonstrated that it is likely to succeed on the merits of its free-speech-based challenge to any aspect of the Reporting Law. Rational basis scrutiny applies

---

[25] Even if the Court did not find that the Reporting Law's data-disclosure requirements were analogous to commercial speech and securities regulations, it would not necessarily follow that these requirements would be subject to strict scrutiny. *See, e.g.*, *Am. Target Advert., Inc. v. Giani*, 199 F.3d 1241, 1247–48 (10th Cir. 2000) (concluding that a Utah law imposing registration and disclosure requirements on professional solicitors was content neutral, and upholding the law after determining it satisfied the requirements of intermediate scrutiny). Here, the Reporting Law's data-disclosure requirements are content-neutral, because there is no indication that Colorado adopted them "because of disagreement" with any particular message, or to "suppress the expression of unpopular views." *See id.* (quoting *Turner Broad. Sys., Inc.*, 512 U.S. at 642; and then quoting *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–48, (1986)). Accordingly, the highest level of scrutiny the Court would apply in response to the Alliance's free speech challenge is intermediate scrutiny. And the Court would find that the Reporting Law's data disclosure requirements meet intermediate scrutiny. The required disclosures enable Colorado to understand sharing plan practices (and ultimately assist consumers in making informed healthcare decisions). Colorado has a substantial interest in protecting its consumers, and Colorado's requirement that sharing plans produce data shedding light on their payment practices is narrowly drawn to that interest.

[26] The Alliance's argument that the metrics its members must report are controversial because of the spin that others' speech can put on them is unpersuasive. The fact that a speaker might not like what others say about their speech does not render any data the speaker reports controversial.

to both the Reporting Law's marketing materials disclosure requirements and its business-operations data disclosure requirements.  And both components of the Reporting Law satisfy rational basis scrutiny's requirements.

### B.  Irreparable Harm, Balance of Hardships, and Public Interest Considerations

"[I]n First Amendment cases, the likelihood of success on the merits will often be the determinative factor."  *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (quoting *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012)).  If Colorado's Reporting Law violated the Alliance's members' First Amendment rights, that constitutional violation would unquestionably work irreparable harm upon them, and it would be in the public interest to enjoin Colorado from enforcing the Reporting Law.  *See id.* (explaining the relevance of constitutional violations to preliminary injunction analyses); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").  Conversely, if Colorado's Reporting Law does not violate the Alliance's members' First Amendment rights, the Alliance lacks any hook for demonstrating irreparable harm, and the public interest would dictate that Colorado be permitted to enforce its valid laws in furtherance of the interests the legislature intended them to serve.

Here, the Alliance has not demonstrated that it is likely to succeed on the merits of any of its claims.  Given the apparently low likelihood that the Reporting Law is violating any of the Alliance's members' First Amendment rights, the Court concludes that the irreparable harm and balance of hardships/public interest factors weigh in Defendant's favor.

**IV. CONCLUSION**

Because the Alliance has not shown that any of the preliminary injunction factors weigh in its favor (and in particular has failed to make a strong showing as to its likelihood of success on the merits of any of its claims), the Court DENIES the Alliance's Motion for a Preliminary Injunction (D. 8).

DATED January 13, 2025.

BY THE COURT:

_____
Gordon P. Gallagher
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| ALLIANCE OF HEALTH CARE SHARING MINISTRIES, | |
| Plaintiff, | |
| v. | Case No. 1:24-CV-01386-GPG-STV |
| MICHAEL CONWAY, in his official capacity as Commissioner of the Colorado Division of Insurance, | |
| Defendant. | |

## <u>NOTICE OF APPEAL</u>

Please take notice that under 28 U.S.C. § 1292(a)(1), Plaintiff hereby appeals to the United States Court of Appeals for the Tenth Circuit this Court's January 13, 2025 Order (D. 54) denying Plaintiff's Motion for a Preliminary Injunction (D. 8), as well as any associated orders.

Dated: January 27, 2025

Respectfully submitted,

*/s/ Michael F. Murray*

Michael F. Murray
PAUL HASTINGS LLP
2050 M Street, NW
Washington, D.C. 20036
(202) 551-1730
michaelmurray@paulhastings.com
William E. Mahoney
PAUL HASTINGS LLP
600 Travis Street, Fifty-Eighth Floor
Houston, Texas 77002
(713) 860-7304
williammahoney@paulhastings.com
*COUNSEL FOR PLAINTIFF ALLIANCE OF HEALTH CARE SHARING MINISTRIES*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 27, 2025 I filed the foregoing document via the

Court's electronic case filing system, which will serve such filing on all counsel of record.

/s/ ***William E. Mahoney***
William E. Mahoney

# <u>Movant Alliance of Health Care Sharing Ministries' Appendix</u>

## Motion for Injunction Pending Appeal

## January 28, 2025

**ALLIANCE OF HEALTH CARE SHARING MINISTRIES**

**vs**

**MICHAEL CONWAY, COMMISSIONER OF INSURANCE**

Index of Exhibits to Motion for Injunction Pending Appeal

| Ex. | Name |
|-----|------|
| A | Health Care Sharing Plans and Arrangements in Colorado, 2023 Report |
| B | [DOI_014673–014679] |
| C | [DOI_001171–001181] |
| D | [DOI_000821–000826] |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

# EXHIBIT A



# Health Care Sharing Plans and Arrangements in Colorado

Colorado House Bill 22-1269 2023 report

October 2024

# Table of Contents

| | |
|---|---|
| **Table of Contents** | **2** |
| **Background** | **3** |
| **Overview of Data Collection Efforts** | **3** |
| **Summary of Findings** | **4** |
| Membership | 4 |
| Table 1. 2023 Enrollment Data per HCSA | 4 |
| Financial Information | 6 |
| Marketing Efforts and Use of Producers | 7 |
| **Data Limitations** | **8** |
| **Questions or Concerns** | **8** |
| **Next Steps** | **8** |
| **Appendices** | **9** |
| Appendix A: Associated Legislation, Regulation, and Division Information | 9 |
| Appendix B: Regulatory Definitions of Terms Related to HCSA Reporting | 9 |
| Appendix C: List of Health Care Sharing Arrangements Operating in Colorado | 11 |
| Appendix D: Services and Pre-existing Conditions Excluded from Sharing by Some HCSAs | 11 |
| Appendix E: 2023 Financial Information Table 1 | 13 |
| Appendix F: 2023 Financial Information Table 2 | 15 |
| Appendix G: 2023 Data on share request denials and appeals | 17 |
| Appendix H: Additional 2023 Data from the Health Care Sharing Plan Reporting Template | 20 |
| Appendix I: Number of HCSAs Operating in each State | 22 |

# Background

The 73rd Colorado General Assembly passed House Bill 22-1269 ("HB22-1269") requiring Health Care Sharing Ministries, Plans, or Arrangements ("HCSAs") to report data annually to the Division of Insurance ("Division") and "for the Commissioner [of Insurance] to prepare a written report summarizing the information submitted" about the HCSAs operating in Colorado. HCSAs report data to the Division about annual enrollment and financial data, use of licensed producers, HCSA member guidelines, and marketing materials.[1] These data reporting efforts are intended to increase transparency about HCSAs for Colorado consumers.

Regulation 4-10-01 defines a "Health care sharing plan" or "health care sharing arrangement" or "plan" or "arrangement" or "HCSPA" as, "any organization that offers or markets products to facilitate payment or reimbursement of health-care costs or services for one (1) or more residents of Colorado. This does not include direct primary care agreements as defined in § 6-23-101, C.R.S.; consumer payment plans offered directly between a provider and patient (or patient's responsible party); businesses used to facilitate the plan's operations such as reimbursement handling, cost containment vendors, data processing; and crowdfunded sources that do not require ongoing membership fees, share requirements, or dues for the purposes of payment for and/or reimbursement of health care services."[2] Colorado law requires all HCSAs to report data to the Division annually.

# Overview of Data Collection Efforts

To collect data from HCSAs offering plans or arrangements in Colorado in 2023, the Division used the infrastructure implemented for previous years' data collection efforts and released regulation 4-10-01. This included two years of data collection under Emergency Regulation 22-E-20, two public meetings ahead of the adoption of Emergency Regulation 22-E-20, discussions with representatives from different Sharing Plans, two public comment periods to respond to draft forms of regulation 4-10-01, updates to the data reporting template, and a dedicated HCSA data collection webpage to meet the requirements of Colorado statute.[3] The two previous years of data collection efforts and feedback provided by consumer advocates, HCSAs, and members of the public helped refine updates to the regulation and data reporting template. Additionally, the Division offered HCSAs one-on-one office hours to answer questions and help clarify the reporting requirements. One HCSA reached out to the Division with questions ahead of the submission deadline.

By May 31, 2024, seventeen HCSAs submitted data for the 2023 calendar year. Division staff reviewed all submissions for completeness; followed up with each HCSA if materials were missing or data elements did not appear to follow Section 10-16-107.4 CRS and regulation 4-10-01.

---

[1] For a full list of all information required to be reported to the Division annually by HCSAs see § 10-16-107.4(1), Colorado Revised Statutes ("C.R.S").
[2] Regulation 4-10-01 establishes the data reporting requirements applicable to all HCSAs offering or that intend to offer plans or arrangements to facilitate payment or reimbursement of health-care costs or services for residents of Colorado.
[3] Links to these items can be found in the Appendices below.

3

Five HCSAs reported a subset of required values for 2023[4]. Given the potential statistical impact these missing data could have on comparing financial data from one year to the next, the Division cautions against comparing the summary financial data provided in this report to previous years' reports. All seventeen HCSAs reported enrollment data for 2023.

## Summary of Findings

Seventeen HCSAs submitted data to the Division ahead of the publication of this report. For the purposes of this report, where inconsistencies in the data are present, the Division has presented a subset of data in the summary sections to include only those from HCSAs that reported in accordance with Regulation 4-10-01 and noted this in the footnotes.

HCSAs do not have uniform sharing or business practices and where some data points required by law are not applicable to a specific HCSA and the HCSA has communicated that distinction in their reporting template "N/A" is used in this report to note that distinction. Where data were missing from a submission "-" is used.

### Membership

Presented in Table 1 is a summary of enrollment related data for each HCSA in 2023.

### Table 1. 2023 Enrollment Data per HCSA

| Organization | Number of Colorado members enrolled | Number of members enrolled nationally | Number of Coloradan households participating | Number of Colorado members participating through an employer | Number of Colorado members enrolled through a producer |
|---|---|---|---|---|---|
| Altrua Ministries | 264 | 11,564 | 145 | 0 | 0 |
| Christian Care Ministry, dba Medi-Share | 17,127 | 408,793 | 6,518 | 216 | 0 |
| Christian Healthcare Ministries | 13,593 | 476,828 | 5,824 | 294 | 0 |
| Impact Health Sharing | 360 | 14,588 | 210 | N/A | 360 |
| Jericho Share | 2,587 | 12,864 | 1,681 | - | 2,587 |
| Knew Health | 162 | 2,902 | 86 | 2 | 0 |
| Liberty HealthShare | 2,911 | 60,858 | 1,362 | 6 | - |

---

[4] Due to ongoing litigation relating to HCSA entities and regarding the reporting requirements, the Division will not comment on individual HCSA submissions for the 2024 reporting cycle.

4

| Organization | Number of Colorado members enrolled | Number of members enrolled nationally | Number of Coloradan households participating | Number of Colorado members participating through an employer | Number of Colorado members enrolled through a producer |
|---|---|---|---|---|---|
| Logos Missions, Inc, dba Christian Mutual Medical Assistance | 174 | 17,821 | N/A | 0 | 0 |
| OneShare | 2,116 | 28,423 | 1,098 | 0 | 0 |
| Samaritan Ministries International | 12,828 | 349,408 | 3,510 | 187 | - |
| Sedera Medical Cost Sharing Community | 2,562 | 35,447 | 1,171 | 344 | 1564 |
| Sedera, Inc. | 716 | 3,807 | 361 | 66 | 706 |
| Share HealthCare | 53 | 618 | 26 | 0 | 0 |
| Solidarity | 551 | 19,429 | 210 | N/A | 0 |
| Unite Health Share Ministries[5] | Redacted | Redacted | Redacted | Redacted | Redacted |
| Universal Health Fellowship | 758 | 10,079 | 542 | N/A | 758 |
| Zion HealthShare | 4,700 | 51,185 | 2,488 | 0 | 0 |

In 2023, seventeen HCSAs reported a total membership of 62,461 Coloradans and 1,521,668 members nationally. Colorado HCSA membership numbers represent slightly over 4% of national HCSA enrollment of these HCSAs. In comparison, Colorado's 2020 census population is 1.7% of the national population.[6] Actual enrollment in HCSAs in Colorado is likely different than reported here as other HCSAs could be operating in Colorado but have not reported data to the Division.

Seven of the seventeen HCSAs reported Colorado employer groups participating in sharing arrangements in 2023. Of the seven HCSAs that reported data on employer participation, the range of members participating in a HCSA per employer is 1 to 65 members, with an aggregate total of 1,115 members across all seven HCSAs.

---

[5] Unite Health Share Ministries (UHSM) requested that data supplied on tabs 2 and 3 of the reporting template, and therefore what would be displayed on this table, be confidential. Where "Redacted" is displayed the data were submitted to the Division but redacted from the report.
[6] United States Census Bureau. [Profile United States 2020 census data]. Retrieved from https://data.census.gov/profile?g=0100000US

5

## Financial Information

Twelve HCSAs reported the required financial information to the Division. However, one of the HCSAs requested that their financial information be kept confidential, and they are excluded from the summary analysis presented in this section.

HCSAs are required to report the "Total amount of fees, dues, shares, contributions, or other payments collected from individuals, Colorado employer groups, or others who participated in the [HCSA's] product." The eleven HCSAs collected $39,474,869 in total fees, dues, shares, contributions, and other payments from members in 2023.

HCSAs are also required to report on the dollar amount of healthcare costs submitted for their members' sharing requests, the dollar amount of those healthcare costs that are determined eligible for sharing based on their specific member guidelines, and the dollar amount paid or shared to cover healthcare expenses the HCSA determines are eligible for sharing. A total of $96,207,407 in healthcare costs were submitted for sharing by members of the eleven HCSAs. Many of the HCSAs note that the dollar amount of healthcare costs or services submitted for sharing includes duplicate charges, ineligible charges based on the HCSA's sharing guidelines (for example a member may receive a single itemized bill from a provider with both eligible and ineligible charges but the full bill is submitted as part of the sharing request), discounts that the HCSAs negotiated on their members' behalf, and the members' agreed-upon portions of medical bills. Once those amounts ineligible for sharing were deducted, the eleven HCSAs reported that $58,590,086 of members' total 2023 health care costs were determined eligible for sharing. Of the $58,590,086 determined by the HCSAs to be eligible for sharing $34,291,846 in healthcare costs or services were paid by the HCSAs by December 31, 2023.

Actual health care costs of Colorado members were likely different than the HCSAs reported as some bills/share requests do not include costs for benefits excluded from sharing and were not submitted by the member. Nor do the amounts submitted to the Division include the amounts members need to pay before being eligible for sharing. This is sometimes referred to as an "Annual Unshared Amount" and the amount varies within a HCSAs offered products and across HCSAs.

The guidelines of twelve[7] HCSAs explicitly state that members must use or are obligated to pursue[8] other payment options available to the member before submitting a share request otherwise the member's healthcare costs are not eligible for sharing. This includes using insurance, Medicare, Medicaid, Veterans Administration, Tricare, private/public grants, crowdfunding, and any liable third party (in the event of an accident) before submitting a share

---

[7] Five HCSAs did not submit their member guidelines as required

[8] An example of "obligation to pursue" other payment options is copied from one HSCA's member guidelines with the name of the HCSA removed from the quote, "it is your [the member's] obligation to pursue payment from any other responsible payer before submitting such medical expenses to [HCSA] for assistance. If a governmental, insurance, or religious program; liable third party; fraternal organization; or any other financial assistance source will pay any portion of the qualifying medical bill, that amount will offset any unshared and/or shared amounts applied to the member's needs up to the total amount of the need. If the Sharing Member refuses to accept such assistance, then that portion of the medical need also becomes ineligible for sharing."

6

request. From one HCSA's member guidelines, "Failure to disclose coverage with an insurance, third-party administrator, or government assistance plan may result in ineligibility for sharing. This includes, but is not limited to, any form of coverage through a non-member spouse, family member, employer, or government entity." One HCSA requires or suggests that members first request providers and hospitals to reduce or write off eligible health care bills (sometimes referred to as a "self-pay" discount).

Five HCSAs also state or suggest that members must first request charity care and financial support from local governments and consumer support organizations in paying the member's health care bills by including language such as, "Needs do not qualify for sharing to the extent that they are discountable by the health care provider or payable by any other source, whether private, governmental, or institutional." This means that medical costs submitted for sharing by a member (and what is later submitted to the Division through the data reporting template) are likely different from the total health care cost to provide those services.

## Marketing Efforts and Use of Producers

Five HCSAs reported that 262 producers enrolled 6,442 members in these five HCSAs. The range of Colorado membership enrolled via producers varies from 1 member enrolled through a producer for one HCSA to 1,151 members enrolled through a producer for another HCSA. HCSAs are not required to report the names, business, or license numbers of individual producers so the count of 262 producers across this subset of HCSAs is not a unique count of producers and likely includes double counting.

Four of the five HCSAs that reported an association with producers also reported on the "total commission, fees, or remuneration paid in [2023] to producers for: marketing, promoting, or enrolling Colorado participants". The fifth HCSA included their producer payment information with one of the other HCSAs that reported on this value. Producers were paid a total of $100,580 in 2023 by the four HCSAs. The Division noted inconsistencies in how some HCSAs reported on the use of producers to enroll members in HCSAs and on the commissions, fees, or remunerations paid to producers. Some of the HCSAs commented that they cannot know if their subcontractors or third-party administrators follow the definition of a producer or not, so they are unable to report on these required data elements. Additionally, five HCSAs did not submit data on marketing or use of producers. It is possible that more than the five HCSAs noted above work with producers to enroll members and that more than the four HCSAs noted above paid producers for marketing, promoting, and enrolling members.

Six HCSAs paid third parties $892,039 for "marketing, promoting, or enrolling participants in a plan or arrangement to Colorado participants" and four HCSAs paid third parties $4,896,482 for "operating, managing, or administering a plan or arrangement offered by the [HCSA]."

Sixteen HCSAs used social media to communicate to members and to market their products. Non-confidential marketing materials submitted by each HCSA, which include examples of social media posts, will be posted in the coming months to the Division's website.

7

## Data Limitations

Information provided by each HCSA includes an attestation that the annual submission is the "best of your good-faith knowledge and belief, is accurate and satisfies the requirements of § 10-16-107.4, C.R.S." and must be signed by an officer of the HCSA. The Division has checked each submission for completeness but is limited in its ability to independently verify all or some parts of each submission. The Division intentionally does not, and will not, collect information on individual HCSA members, employers, or producers.

Five HCSAs reported a subset of required values for 2023[9].

The Division does not collect demographic information about HCSA members; the types of employers who help cover an HCSA membership for their employees; or the names of producers used to enroll members into HCSAs.

HCSA members can switch HCSAs mid-year and would be double counted in this situation without a way to be deduplicated from the data submitted to the Division and used in this report. Therefore, the values for these data points in this report may not be a unique count.

## Questions or Concerns

If you have a question about your health care sharing arrangement or health insurance coverage you can contact the Division's Consumer Services team. The Consumer Services team is available to answer questions or respond via phone and/or our consumer portal. Information about filing a complaint can be found on the Division's website, emailing DORA_Insurance@state.co.us, or calling 303-894-7490 (within the Denver Metro area) or 800-930-3745 (outside the Denver Metro area).

## Next Steps

Review of 2023 data submissions is expected in the coming months. If evidence is later discovered proving an HCSA was operating in Colorado during the reporting period, and did not submit data to the Division, the Division may initiate enforcement actions against non-reporting HCSAs. The Division is not anticipating updates to this 2023 report. Finalized submission materials, excluding confidential information, will be posted to the Division's website for interested parties to download. Annually, HCSA data submissions are due to the Division on March 1st of each year with the associated report published by October 1st of the same year.

If there is evidence that a HCSA is operating in Colorado but is not included in this report, please contact Leilani Russell (Leilani.Russell@state.co.us).

---

[9]Due to ongoing litigation relating to HCSA entities and regarding the reporting requirements, the Division will not comment on individual HCSA submissions for the 2024 reporting cycle.

8

# Appendices

## Appendix A: Associated Legislation, Regulation, and Division Information

- Colorado House Bill 22-1269
- Division of Insurance Emergency Regulation 22-E-20
- Division of Insurance Regulation 4-10-01, including an attestation
- The Division's consumer complaint portal and information on how to ask a question or file a complaint
- The Division's web page dedicated to House Bill 22-1269

**2023 Reporting Template:** The annual reporting template all HCSAs submit to the Division can be downloaded from the Division's website:
https://docs.google.com/spreadsheets/d/1B0yM0Oyhj0gNaQk9YDsTTM4udHCVfyfcZDNKnApJWVs

**About the Division of Insurance:** The Colorado Division of Insurance, part of the Department of Regulatory Agencies (DORA), regulates the insurance industry and assists consumers and other stakeholders with insurance issues. Visit doi.colorado.gov for more information or call 303-894-7499 / toll free 800-930-3745.

**About DORA:** DORA is dedicated to preserving the integrity of the marketplace and is committed to promoting a fair and competitive business environment in Colorado. Consumer protection is our mission. Visit dora.colorado.gov for more information or call 303-894-7855 / toll free 800-886-7675.

## Appendix B: Regulatory Definitions of Terms Related to HCSA Reporting

The following definitions related to Health Care Sharing Plans and Arrangements can be found on Regulation 4-10-01 and are used by the HCSAs to report to the Division.

**"Administrative expenses"** shall mean costs incurred to operate and support the functioning of the health care sharing plan or arrangement. This includes but is not limited to bank fees, staff salaries, data processing, sales, management of health care expense submissions, marketing, outreach, and enrollment efforts. This includes fees, commissions, and remuneration paid to contractors or third parties that acted on behalf of the HCSPA to facilitate administrative operations.

**"CORA"** shall mean the Colorado Open Records Act (§ 24-72-201, et seq, C.R.S.).

**"Coloradans"** shall mean residents of Colorado during the reporting period.

**"Filing date"** shall mean for the purposes of this regulation, the day after the HCSPR filing is received at the Division.

9

**"Health care costs" or "health care expenses"** shall mean any amount billed by a health care provider for health care services or related products or by a pharmacy.

**"Health care provider"** shall have the same meaning as found at § 10-16-102(56), C.R.S. "Health care provider" includes telehealth and direct primary care providers for the purposes of this regulation.

**"Health care services"** means any services included in or incidental to the furnishing of medical, behavioral, mental health, or substance use disorder; dental, or optometric care; hospitalization; or nursing home care to an individual, as well as the furnishing to any person of any other services for the purpose of preventing, alleviating, curing, or healing human physical illness or injury, or behavioral, mental health, or substance use disorder. "Health-care services" includes the rendering of the services through the use of telehealth, as defined in § 10-16-123 (4)(e), C.R.S.

**"Health care sharing plan" or "health care sharing arrangement" or "plan" or "arrangement" or "HCSPA"** shall mean any organization that offers or markets products to facilitate payment or reimbursement of health-care costs or services for one (1) or more residents of Colorado. This does not include direct primary care agreements as defined in § 6-23-101, C.R.S.; consumer payment plans offered directly between a provider and patient (or patient's responsible party); businesses used to facilitate the plan's operations such as reimbursement handling, cost containment vendors, data processing; and crowdfunded sources that do not require ongoing membership fees, share requirements, or dues for the purposes of payment for and/or reimbursement of health care services.

**"Health Care Sharing Report" or "HCSR"** shall mean the report required to be filed with the Commissioner pursuant to § 10-16-107.4(1), C.R.S.

**"Health Care Sharing Plan or Arrangement Reporting template" or "template"** shall mean the data reporting template created and distributed by the Division for the purposes of collecting data per § 10-16-107.4, C.R.S.

**"Insurance producer" or "producer"** shall have the same meaning as found at § 10-2-103(6), C.R.S., with the exception that for the purposes of this regulation it does not include § 10-2-103(6)(b), C.R.S."

**"Product(s)"** means, for the purposes of this regulation, the services covered as a package under a membership plan, tier, or level.

**"Program expenses"** shall mean any service by the HCSPA or its contractors that, while not direct medical care, contributes to the care and overall experiences of HCSPA's participants. This includes but is not limited to coaching and wellness programs, care navigation, care coordination, medical review, quality improvement efforts, cost containment, reimbursement handling, and bill negotiations. This includes fees, commissions, and remuneration paid to contractors that acted on behalf of the HCPA to facilitate program expenses.

10

**"Third party"** shall mean contractors that are associated with or assist the plan or arrangement in offering or enrolling Colorado residents as participants in the plan or arrangement.

## Appendix C: List of Health Care Sharing Arrangements Operating in Colorado

**List of HCSAs that offered plans or arrangements in Colorado in 2023 and reported data to the Division**

Altrua Ministries
Christian Care Ministry, dba Medi-Share
Christian Healthcare Ministries
Impact Health Sharing
Jericho Share
Knew Health
Liberty HealthShare
Logos Missions, Inc, dba Christian Mutual Medical Assistance
OneShare
Samaritan Ministries International
Sedera Medical Cost Sharing Community
Sedera, Inc.
Share HealthCare
Solidarity
Unite Health Share Ministries, dba UHSM
Universal Health Fellowship
Zion HealthShare

## Appendix D: Services and Pre-existing Conditions Excluded from Sharing by Some HCSAs

For more information about exclusion or coverage of services for any particular HCSA review the specific membership guidelines from the HCSA.

**The following are health care services that are excluded from sharing across some of the organizations that reported data to the Division. This is not an exhaustive list.**

- Acupuncture
- ADHD treatments
- Contraception coverage
- Cosmetic surgery
- Dental coverage
- Diabetic medication and supplies
- Eye care
- Fertility/Infertility care
- Gender affirming care
- Maternity care - unless the mother has been a member for 12 months without changing to a lower cost program
- Medications used to support chronic or pre-existing health conditions
- Mental health treatment
- Routine and preventive care – including, but not limited to, all well-patient care and screening tests and procedures
- Substance use disorder treatment
- Vaccinations and/or Immunizations
- Weight Management treatment or procedures

**The following are a list of conditions that some of the HCSAs reported as pre-existing and therefore ineligible for sharing, or had limitations on sharing based on the HCSA's specific guidelines. This is not an exhaustive list.**

- ALS
- Alzheimer's Disease
- Aneurysm
- Asthma
- Autism Spectrum Disorder
- Cancer
- Cerebral Palsy
- Congenital Conditions
- Congestive Heart Failure
- COPD
- Cystic Fibrosis
- Dementia
- Diabetes Type I and II
- Down's Syndrome
- Endometriosis
- Experimental treatments
- Heart Palpitations
- Hepatitis
- Hypertension
- HIV/AIDS
- Lupus
- Lyme's Disease
- Multiple Sclerosis
- Muscular Dystrophy
- Rheumatoid Arthritis
- Sickle-Cell Disease
- Sleep Apnea

## Appendix E: 2023 Financial Information Table 1

For HCSAs with different percentages reported across their multiple products/programs the high and low range of the reported values are displayed in this table.

Please review the data limitations section included in this report for additional context about the financial data reported to the Division.

| Organization | Total amount of fees, dues, shares, contributions, or other payments collected from individuals, Colorado employer groups, or others who participated in the product | The percentage of fees, dues, shares, contributions, or other payments from Colorado participants in this product retained by the plan or arrangement for **administrative expenses** | The percentage of fees, dues, contributions, or other payments from Colorado participants in this product retained by the plan or arrangement for **program expenses** | Total dollar amount of health-care costs or services that were incurred by the participant and submitted by or on behalf of the participant for sharing | Total dollar amount of requests for sharing of Colorado participants' health-care costs or services **that qualified for sharing** excluding any amounts that the participants incurring the health-care costs or services must pay before receiving sharing amounts under the member guidelines |
|---|---|---|---|---|---|
| Altrua Ministries[10] | $835,931.28 | - | - | - | - |
| Christian Care Ministry, dba Medi-Share[11] | $27,706,631.00 | - | - | - | - |
| Christian Healthcare Ministries | $22,276,198.01 | 4.80% | 5.60% | $55,763,555.94 | $46,056,456.71 |
| Impact Health Sharing | $511,485.00 | 34.70% | 14.60% | $1,116,220.00 | $177,337.53 |
| Jericho Share | $1,219,599.95 | 0%-82% | 0%-82% | $1,079,940.20 | $80,843.46 |
| Knew Health | $306,938.94 | 33% | 20% | $200,827.89 | $98,530.56 |

---

[10] Data from these HCSAs were excluded from the financial analysis presented in this report due to inconsistencies or missing data. Where data were missing from a submission " - " is used.
[11] Ibid

| Organization | Total amount of fees, dues, shares, contributions, or other payments collected from individuals, Colorado employer groups, or others who participated in the product | The percentage of fees, dues, shares, contributions, or other payments from Colorado participants in this product retained by the plan or arrangement for **administrative expenses** | The percentage of fees, dues, shares, contributions, or other payments from Colorado participants in this product retained by the plan or arrangement for **program expenses** | Total dollar amount of health-care costs or services that were incurred by the participant and submitted by or on behalf of the participant for sharing | Total dollar amount of requests for sharing of Colorado participants' health-care costs or services **that qualified for sharing** excluding any amounts that the participants incurring the health-care costs or services must pay before receiving sharing amounts under the member guidelines |
|---|---|---|---|---|---|
| Liberty HealthShare[12] | $9,563,957.00 | - | - | - | - |
| Logos Missions, Inc, dba Christian Mutual Medical Assistance | $199,300.00 | 10.00% | 22.00% | $128,393.20 | $64,905.36 |
| OneShare[13] | $4,275,772.68 | - | - | - | - |
| Samaritan Ministries International[14] | $16,012,373.00 | - | - | - | - |
| Sedera Medical Cost Sharing Community | $5,916,748.45 | First three months: 62%; after that: 12% | 23% | $6,904,090.50 | $5,455,787.61 |
| Sedera, Inc. | $1,523,542.20 | First three months: 62%; after that: 12% | 23% | $1,053,231.50 | $803,148.60 |
| Share HealthCare | $54,297.00 | 33.6% - 38.4% | 62.2% - 66.4% | $778.85 | $266.00 |
| Solidarity | $825,220.00 | 8% | 32% | $3,033,948.59 | $547,717.95 |

[12] Data from these HCSAs were excluded from the financial analysis presented in this report due to inconsistencies or missing data. Where data were missing from a submission " - " is used.
[13] Ibid
[14] Ibid

14

| Organization | Total amount of fees, dues, shares, contributions, or other payments collected from individuals, Colorado employer groups, or others who participated in the product | The percentage of fees, dues, shares, contributions, or other payments from Colorado participants in this product retained by the plan or arrangement for **administrative expenses** | The percentage of fees, dues, contributions, or other payments from Colorado participants in this product retained by the plan or arrangement for **program expenses** | Total dollar amount of health-care costs or services that were incurred by the participant and submitted by or on behalf of the participant for sharing | Total dollar amount of requests for sharing of Colorado participants' health-care costs or services **that qualified for sharing** excluding any amounts that the participants incurring the health-care costs or services must pay before receiving sharing amounts under the member guidelines |
|---|---|---|---|---|---|
| Unite Health Share Ministries[15] | Redacted | Redacted | Redacted | Redacted | Redacted |
| Universal Health Fellowship | $1,652,026.00 | 36% - 50% | 34% - 60% | $2,012,926.35 | $167,719.53 |
| Zion HealthShare | $4,989,513.17 | 13.40% | 3.20% | $24,913,494.41 | $5,137,373.18 |

---

[15] Unite Health Share Ministries (UHSM) requested that data supplied on tabs 2 and 3 of the reporting template, and therefore what would be displayed on this table, be confidential.

## Appendix F: 2023 Financial Information Table 2

| Organization | Total dollar amount of payments made **to providers** for Colorado participants' health care costs and services | Total dollar amount of health-care costs or services that were incurred **by the participant** and submitted by or on behalf of the participant for sharing | Total amount of Colorado participants' health-care costs and services submitted in 2023 that qualify for sharing pursuant to the plan/arrangement's criteria but that were not shared or paid by 12/31/2023, excluding any amounts that the participants incurring the health-care costs or services must pay before receiving sharing amounts under the member guidelines[16] | Total number of requests by or on behalf of the Colorado participants' for sharing of healthcare costs or services incurred by the participant |
|---|---|---|---|---|
| Altrua Ministries[17] | - | - | - | - |
| Christian Care Ministry, dba Medi-Share[18] | - | - | - | - |
| Christian Healthcare Ministries | $5,013,145.76 | $16,752,703.49 | $11,573.42 | 17,188 |
| Impact Health Sharing | $148,457.56 | $28,879.97 | $0.00 | 863 |
| Jericho Share | $80,843.46 | $0.00 | $57,226.13 | 1,724 |
| Knew Health | $0.00 | $98,530.56 | $1,570.56 | 71 |
| Liberty HealthShare[19] | - | - | - | - |
| Logos Missions, Inc, dba Christian Mutual Medical Assistance | $8,983.92 | $48,288.89 | $7,632.55 | 262 |

[16] The values reported in this column exclude any amounts that the participants incurring the health-care costs or services must pay before share requests are approved under the plan or arrangement

[17] Data from these HCSAs were excluded from the financial analysis presented in this report due to inconsistencies or missing data. Where data were missing from a submission " - " is used.

[18] Ibid

[19] Ibid

| Organization | Total dollar amount of payments made **to providers** for Colorado participants' health care costs and services | Total dollar amount of health-care costs or services that were incurred **by the participant** and submitted by or on behalf of the participant for sharing | Total amount of Colorado participants' health-care costs and services submitted in 2023 that qualify for sharing pursuant to the plan/arrangement's criteria but that were not shared or paid by 12/31/2023, excluding any amounts that the participants incurring the health-care costs or services must pay before receiving sharing amounts under the member guidelines[16] | Total number of requests by or on behalf of the Colorado participants' for sharing of healthcare costs or services incurred by the participant |
|---|---|---|---|---|
| OneShare[20] | - | - | - | - |
| Samaritan Ministries International[21] | - | - | - | - |
| Sedera Medical Cost Sharing Community | $4,613,502.51 | $842,285.10 | $714,919.60 | 3,374 |
| Sedera, Inc. | $678,527.10 | $124,621.50 | $0.00 | 324 |
| Share HealthCare | $0.00 | $266.00 | $0.00 | 2 |
| Solidarity | $440,173.93 | $107,544.02 | - | 2,806 |
| Unite Health Share Ministries[22] | Redacted | Redacted | Redacted | Redacted |
| Universal Health Fellowship | $150,947.58 | $16,771.95 | $6,850.75 | 1,837 |
| Zion HealthShare | $4,167,983.89 | $969,389.29 | $31.00 | 2,501 |

---

[20] Ibid
[21] Ibid
[22] Unite Health Share Ministries (UHSM) requested that data supplied on tabs 2 and 3 of the reporting template, and therefore what would be displayed on this table, be confidential. Their data is excluded from the financial analysis presented in this report.

## Appendix G: 2023 Data on share request denials and appeals

For HCSAs with different percentages reported across their multiple products/programs the high and low range of the reported values are displayed in this table.

Where a HCSA has not supplied data to the Division, " - " is used.

Where a HCSA has indicated that a required data element is not applicable, "N/A" is used.

| Organization | Total number of share requests, for Colorado participants, that were denied (not shared) because they were not eligible for sharing according to the organization's guidelines | Total number of appeals of denied sharing requests for Colorado participants' incurred health-care costs or services | Total number of appeals requests that were later approved for sharing for Colorado participants' incurred health-care costs or services | Percentage of total number of requests denied compared to the total number of Colorado participants share requests submitted | Percentage of total number of requests denied compared to the total number of appeals for sharing that were "denied" (not shared) for Colorado participants |
|---|---|---|---|---|---|
| Altrua Ministries[23] | - | - | - | - | - |
| Christian Care Ministry, dba Medi-Share[24] | - | - | - | - | - |
| Christian Healthcare Ministries | 4,585 | 5 | 1 | 0.27% | 0% |
| Impact Health Sharing | 88 | 0 | 0 | 10.20% | 0% |
| Jericho Share | 47 | 4 | - | 0% - 17.00% | 0% - 33.00% |
| Knew Health | 0 | 0 | 0 | N/A | N/A |
| Liberty HealthShare[25] | - | - | - | - | - |

[23] Data from these HCSAs were excluded from the financial analysis presented in this report due to inconsistencies or missing data. Where data were missing from a submission " - " is used.
[24] Ibid.
[25] Ibid.

| Organization | Total number of share requests, for Colorado participants, that were denied (not shared) because they were not eligible for sharing according to the organization's guidelines | Total number of appeals of denied sharing requests for Colorado participants' incurred health-care costs or services | Total number of appeals requests that were later approved for sharing for Colorado participants' incurred health-care costs or services | Percentage of total number of requests denied compared to the total number of Colorado participants share requests submitted | Percentage of total number of requests denied compared to the total number of appeals for sharing that were "denied" (not shared) for Colorado participants |
|---|---|---|---|---|---|
| Logos Missions, Inc, dba Christian Mutual Medical Assistance | 19 | 0 | 0 | 0% - 8.00% | 0% |
| OneShare[26] | - | - | - | - | - |
| Samaritan Ministries International[27] | - | - | - | - | - |
| Sedera Medical Cost Sharing Community | 271 | 2 | 2 | 7.60% - 8.20% | 0% |
| Sedera, Inc. | 22 | 0 | 0 | 0% - 6.80% | 0% |
| Share HealthCare | 1 | 0 | 0 | 50.00% | 0% |
| Solidarity | 695 | - | - | 24.00% | - |
| Unite Health Share Ministries[28] | Redacted | Redacted | Redacted | Redacted | Redacted |
| Universal Health Fellowship | 307 | 16 | 4 | 16.20% | 5.20% |
| Zion HealthShare | 196 | 23 | 10 | 5.80% - 9.00% | 7.00% - 14.00% |

---

[26] Data from these HCSAs were excluded from the financial analysis presented in this report due to inconsistencies or missing data. Where data were missing from a submission " - " is used.

[27] Ibid.

[28] UHSM requested that data supplied on tabs 2 and 3 of the reporting template be confidential.

19

## Appendix H: Additional 2023 Data from the Health Care Sharing Plan Reporting Template

Where a HCSA has not supplied data to the Division, " - " is used.

Where a HCSA has indicated that a required data element is not applicable, "N/A" is used.

| Organization | The total number of employer groups in Colorado that participated in this product | Number of contracts entered into with health care service providers providing services for Colorado participants for this product | Estimated number of individual plan/arrangement participants anticipated in Colorado in 2024 | Estimated number of households plan/arrangement participants anticipated in Colorado in 2024 | Estimated number of employer groups plan/arrangement participants anticipated in Colorado in 2024 | Estimated number of individual Colorado participants associated with the employers in in 2024 |
|---|---|---|---|---|---|---|
| Altrua Ministries | 0 | - | 264 | 141 | 0 | 0 |
| Christian Care Ministry, dba Medi-Share | 34 | - | 12,951 | 4,934 | - | - |
| Christian Healthcare Ministries | 24 | 13 | 10,382 | 4,806 | 24 | 289 |
| Impact Health Sharing | 0 | 0 | 410 | 18,000 | 0 | 0 |
| Jericho Share | 0 | 1 | 2,750 | 1,801 | - | - |
| Knew Health | 1 | 0 | 375 | 200 | 1 | 2 |
| Liberty HealthShare | 2 | 11 | 1,350 | 2,807 | 3 | 6 |
| Logos Missions, Inc, dba Christian Mutual Medical Assistance | 0 | 0 | 230 | N/A | 0 | 0 |
| OneShare | - | - | 2,116 | 1,098 | 0 | 0 |

| Organization | The total number of employer groups in Colorado that participated in this product | Number of contracts entered into with health care service providers providing services for Colorado participants for this product | Estimated number of individual plan/arrangement participants anticipated in Colorado in 2024 | Estimated number of households plan/arrangement participants anticipated in Colorado in 2024 | Estimated number of employer groups plan/arrangement participants anticipated in Colorado in 2024 | Estimated number of individual Colorado participants associated with the employers in in 2024 |
|---|---|---|---|---|---|---|
| Samaritan Ministries International | 17 | 0 | 11,320 | 3,033 | 15 | 183 |
| Sedera Medical Cost Sharing Community | 345 | 1 | 2,114 | 966 | 66 | 285 |
| Sedera, Inc. | 1 | 1 | 595 | 547 | 1 | 72 |
| Share HealthCare | 0 | 0 | 70 | 35 | 5 | 2 |
| Solidarity | N/A | N/A | 675 | 300 | 0 | 0 |
| Unite Health Share Ministries[29] | Redacted | Redacted | Redacted | Redacted | Redacted | Redacted |
| Universal Health Fellowship | N/A | 0 | 834 | 596 | N/A | N/A |
| Zion HealthShare | 0 | 1 | 5,267 | 2,802 | 0 | 0 |

---

[29] UHSM requested that data supplied on tabs 2 and 3 of the reporting template be confidential.

## Appendix I: Number of HCSAs Operating in each State[30]

| State | Number of HCSAs Operating in 2023 | State | Number of HCSAs Operating in 2023 | State | Number of HCSAs Operating in 2023 |
|---|---|---|---|---|---|
| Alabama | 11 | Louisiana | 11 | Ohio | 10 |
| Alaska | 8 | Maine | 10 | Oklahoma | 10 |
| Arizona | 11 | Maryland | 8 | Oregon | 10 |
| Arkansas | 11 | Massachusetts | 9 | Pennsylvania | 8 |
| California | 11 | Michigan | 11 | Rhode Island | 10 |
| Colorado | 11 | Minnesota | 10 | South Carolina | 11 |
| Connecticut | 9 | Mississippi | 11 | South Dakota | 11 |
| Delaware | 11 | Missouri | 10 | Tennessee | 11 |
| Florida | 11 | Montana | 9 | Texas | 11 |
| Georgia | 11 | Nebraska | 11 | Utah | 11 |
| Hawaii | 8 | Nevada | 10 | Vermont | 7 |
| Idaho | 11 | New Hampshire | 10 | Virginia | 11 |
| Illinois | 9 | New Jersey | 10 | Washington | 7 |
| Indiana | 11 | New Mexico | 10 | West Virginia | 10 |
| Iowa | 9 | New York | 9 | Wisconsin | 11 |
| Kansas | 11 | North Carolina | 11 | Wyoming | 11 |
| Kentucky | 10 | North Dakota | 10 | | |

---

[30] Information from six HCSAs are not included in this table. One HCSA asked for their data submitted on the template to remain confidential and five did not submit these data following regulation 4-10-01. Due to ongoing litigation relating to HCSA entities and regarding the reporting requirements, the Division will not comment on individual HCSA submissions for the 2024 reporting cycle.