No. 25-1035

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

ALLIANCE OF HEALTH CARE SHARING MINISTRIES,

*Plaintiff-Appellant,*

v.

MICHAEL CONWAY, in his official capacity as Commissioner of the
Colorado Division of Insurance,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Colorado
Case No. 1:24-cv-01386-GPG-STV

## BRIEF OF TERRI BALDWIN, BRIAN FRABLE, AND
## JOY SUTTON AS AMICI CURIAE IN SUPPORT OF PLAINTIFF-
## APPELLANT AND REVERSAL

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

Rory T. Gray
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
rgray@ADFlegal.org

*Counsel for Amici Curiae*

## DISCLOSURE STATEMENT

Terri Baldwin, Brian Frable, and Joy Sutton are natural persons with no parent corporations or stockholders.

# TABLE OF CONTENTS

Disclosure Statement ..................................................................i

Table of Authorities................................................................ iii

Identity and Interest of AmicI Curiae ......................................1

Summary of the Argument ......................................................3

Argument..................................................................................4

I.     Health care sharing ministries are religious nonprofits, not commercial businesses. ...................................................4

II.    The district court's Free Exercise Clause analysis is irredeemably flawed..............................................................6

    A.     Section 10-16-107.4 isn't generally applicable. ......................6

    B.     Section 10-16-107.4 isn't neutral. ........................................11

III.   The district court's free-association assessment is wrong. ...........16

IV.    The district court's rosy view of compelled speech and reliance on commercial-speech principles is unfounded. ..............19

    A.     Section 10-16-107.4 compels speech and severely burdens First Amendment rights. .......................................19

    B.     Commercial speech rules don't apply to health care sharing ministries' annual reports. .....................................21

V.     Section 10-16-107.4 can't survive any heightened scrutiny..........24

Conclusion ..............................................................................26

Certificate of Compliance.......................................................27

Certificate of Digital Submission...........................................28

Certificate of Service ..............................................................29

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*303 Creative LLC v. Elenis,*
    600 U.S. 570 (2023) ........................................................................ 20

*Americans for Prosperity Foundation v. Bonta,*
    594 U.S. 595 (2021) ................................................... 18–19, 24–26

*Blackhawk v. Pennsylvania,*
    381 F.3d 202 (3d Cir. 2004)............................................................ 8

*Bolger v. Youngs Drug Products Corp.,*
    463 U.S. 60 (1983) ........................................................................ 22

*Boy Scouts of America v. Dale,*
    530 U.S. 640 (2000) ............................................................... 16, 18

*Carson v. Makin,*
    596 U.S. 767 (2022) ...................................................................... 14

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ...................................................... 7–9, 11–14

*Does 1-11 v. Board of Regents of University of Colorado,*
    100 F.4th 1251 (10th Cir. 2024)................................................... 26

*Employment Division v. Smith,*
    494 U.S. 872 (1990) ........................................................................ 6

*Fraternal Order of Police Newark Lodge No. 12 v. City of Newark,*
    170 F.3d 359 (3d Cir. 1999)............................................................ 8

*Fulton v. City of Philadelphia,*
    593 U.S. 522 (2021) ..................................................................... 6–9

*Harris v. Quinn,*
    573 U.S. 616 (2014) ............................................................... 21–22

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
    515 U.S. 557 (1995) ................................................................ 20, 24

*Illinois ex rel. Madigan v. Telemarketing Associates*,
    538 U.S. 600 (2003) ........................................................................ 22

*In re Primus*,
    436 U.S. 412 (1978) ........................................................................ 22

*Janus v. American Federation of State, County, & Municipal
    Employees, Council 31*,
    585 U.S. 878 (2018) ................................................................... 19–21

*Kennedy v. Bremerton School District*,
    597 U.S. 507 (2022) ........................................................ 6, 9, 11, 15

*Masterpiece Cakeshop v. Colorado Civil Rights Commission*,
    584 U.S. 617 (2018) ................................................................... 14–15

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ........................................................................ 25

*National Institute of Family & Life Advocates v. Becerra*,
    585 U.S. 755 (2018) ............................................................. 20, 23–24

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
    487 U.S. 781 (1988) ................................................................ 20, 23

*Roberts v. United States Jaycees*,
    468 U.S. 609 (1984) ........................................................................ 16

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020) .......................................................................... 12

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
    547 U.S. 47 (2006) .......................................................................... 21

*Secretary of State of Maryland v. Joseph H. Munson Co.*,
    467 U.S. 947 (1984) ........................................................................ 23

*Tandon v. Newsom*,
    593 U.S. 61 (2021) ..................................................................... 9, 11

iv

*United States v. United Foods, Inc.*,
   533 U.S. 405 (2001) ........................................................21

*Village of Schaumburg v. Citizens for a Better Environment*,
   444 U.S. 620 (1980) ........................................................23

*Watson v. Jones*,
   80 U.S. (13 Wall.) 679 (1871) .........................................15

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,
   471 U.S. 626 (1985) ...................................................19, 23

## **Statutes**

26 U.S.C. § 5000A.............................................................4, 14

Colo. Rev. Stat. § 10-14-705 ...............................................10

Colo. Rev. Stat. § 10-16-107.4 ................ 1, 7, 10, 12–13, 17–18

## **Other Authorities**

1 Corinthians 12:12–13, 25–27 ..............................................2

1 Corinthians 6:19–20 ...........................................................2

*Attorney General Phil Weiser shuts down fake charity for deceptive military care package fraud*, Colo. Att'y Gen. (May 16, 2024) ......13

Brandon Choe, *'Last Week Tonight': John Oliver Creates Another Fake Church To Unmask Religious Health Care Loophole*, Deadline (June 27, 2021) .............................................15

*Consumer Advisory: Division of Insurance cautions Coloradans about limited health insurance*, Colo. Dep't of Regulatory Agencies (Feb. 9, 2021)..............................................14, 17

*Consumer Advisory: Division of Insurance Cautions Coloradans on the Limitations of Health Care Sharing Programs*, Colo. Dep't of Regulatory Agencies (Dec. 11, 2020)................................1, 14, 17

Ephesians 5:3–7 .....................................................................2

*Exemption requirements – 501(c)(3) organizations*, IRS (Jan. 30, 2025) ...........................................................................4

Genesis 1:26–27.........................................................................2

*Health Care Sharing Plans or Arrangements Reporting Requirements*, Colo. Dep't of Regulatory Agencies.......................20

Hebrews 13:16 ...........................................................................2

John 13:34–35.............................................................................2

Miranda Fraraccio, *Nonprofit vs. Not-for-Profit vs. For-Profit: What's the Difference?*, U.S. Chamber of Com. (Mar. 17, 2025) ...............................................................................5

Paul Demko & Renuka Rayasam, *Why Desperate Families are Getting Religion on Health Coverage*, Politico Magazine (Feb. 4, 2018) ...................................................................23

Reed Ableson, *It Looks Like Health Insurance, but It's Not. 'Just Trust God,' Buyers Are Told*, New York Times (Jan. 2, 2020) ......23

## **Regulations**

3 Colo. Code Regs. § 702-4:4-10-01 ...........................................1, 8, 10, 20

**IDENTITY AND INTEREST OF AMICI CURIAE[1]**

Colorado has a documented history of denigrating religious health care sharing ministries as a group, characterizing them as "too good to be true" charities who "don't pay" and discriminate on "religious" grounds against "activity [they do] not agree with." *Consumer Advisory: Division of Insurance Cautions Coloradans on the Limitations of Health Care Sharing Programs*, Colo. Dep't of Regul. Agencies (Dec. 11, 2020), https://bit.ly/4kJviJa ("2020 Consumer Advisory"). This case is about Section 10-16-107.4, a Colorado law that singles out religious health care sharing ministries from other charities, targeting them for special disfavor.[2] Colo. Rev. Stat. § 10-16-107.4. Under that law, ministries must spend hundreds of hours each year detailing their structure, operations, associations, and communications for the Colorado Insurance Commissioner, who uses that information to draft and publish a biased report, which further maligns them.

Amici Terri Baldwin, Brian Frable, and Joy Sutton are individual members of religious health care sharing ministries. Ms. Baldwin is a

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than amici and their counsel made any monetary contribution intended to fund the preparation or submission of this brief. Counsel were timely notified of this brief as required by Fed. R. App. P. 29. Plaintiff-Appellant consented to the brief's filing and Defendant-Appellee "is not opposed to the filling of" this brief.

[2] This matter also concerns Colorado's implementing regulation— 3 Colo. Code Regs. § 702-4:4-10-01.

1

Colorado resident who has been a member of OneShare Health for seven years. Mr. Frable is also a Colorado resident; he has been a member of Liberty HealthShare for seven years. And Ms. Sutton is a Colorado resident and eight-year member of Liberty HealthShare. OneShare and Liberty are institutional members of Plaintiff-Appellant Alliance of Health Care Sharing Ministries. Opening.Br.12.

Amici are Christians who joined Christian health care sharing ministries to exercise their sincerely held religious beliefs. Ms. Baldwin believes that God made humans in His image (Genesis 1:26–27), the body is holy, and Christians should engage in healthy living, avoiding behaviors that harm the body (1 Corinthians 6:19–20)—a core belief of OneShare. To Mr. Frable, Liberty embodies the Bible's command that Christians walk through life in a mutually supportive community (Hebrews 13:16) characterized by love for one another (John 13:34–35). And Ms. Sutton trusts Liberty, a body of fellow believers (1 Corinthians 12:12–13, 25–27), with her personal information and financial contributions because it doesn't pay for abortions or gender-transitions that violate her religious beliefs (Ephesians 5:3–7).

Amici are concerned that Colorado's vindictive campaign against religious health care sharing ministries will extinguish charities like OneShare and Liberty, depriving Amici of membership in Christian communities that personify their beliefs and impairing their free exercise of religion. Amici file this brief to highlight egregious flaws in

the district court's analysis, which gives Colorado a blank check to single out a disfavored group of religious charities, impose extreme reporting burdens designed to defame or prosecute them, and obstruct First Amendment freedoms.

## SUMMARY OF THE ARGUMENT

Health care sharing ministries are religious nonprofits, not commercial businesses. The district court erred in treating these ministries as commercial insurance carriers subject to the Affordable Care Act and other insurance regulations, which federal law forbids. The district court also got the free-exercise analysis wrong; Section 10-16-107.4 is not generally applicable and is not neutral for multiple reasons. Regarding free association, the district court overcomplicated matters and missed the serious burdens the law imposes on health care sharing ministries' internal affairs and provider partnerships, threatening these ministries' continued vitality. And on free speech, the district court minimized the severe harm posed by Section 10-16-107.4's compulsion of speech and relied on commercial-speech rules that don't apply here. As Section 10-16-107.4 can't withstand any form of heightened scrutiny, the district court abused its discretion in failing to grant an injunction.

# ARGUMENT

## I.    Health care sharing ministries are religious nonprofits, not commercial businesses.

The district court painted religious health care sharing ministries as commercial businesses in all but name. Op.6–7, 55–58, 63–64. That's factually and legally wrong. Health care sharing ministries are "religious non-profit organizations." Opening.Br.1. Under federal law, they must: (1) qualify for 501(c)(3) tax-exempt status; (2) have members who share a common set of religious or moral beliefs and share medical expenses among members in keeping with those beliefs, without reference to where members work or reside; (3) retain members who develop a medical condition; (4) exist, or have a predecessor in existence, since December 31, 1999; and (5) conduct annual audits performed by an independent and reputable CPA firm, and provide those audits to the public upon request. 26 U.S.C. § 5000A(d)(2)(B)(ii).

Public-charity status isn't a mere label, it's a matter of substance. Health care sharing ministries have satisfied the IRS that they're "organized and operated exclusively for exempt purposes set forth in section 501(c)(3)," not "for the benefit of private interests," and their "net earnings [don't] inure to the benefit of any private shareholder or individual." *Exemption requirements – 501(c)(3) organizations*, IRS (Jan. 30, 2025), https://bit.ly/4hNnPpT. Ministries' "success is measured by [their] impact and effectiveness in achieving [their] mission and the

number of people" benefitted by their work. Miranda Fraraccio, *Nonprofit vs. Not-for-Profit vs. For-Profit: What's the Difference?*, U.S. Chamber of Com. (Mar. 17, 2025), https://bit.ly/4iL43fo (quotation omitted). And any net profits ministries realize are "usually … reinvest[ed] … into the organization's mission." *Id.* (quotation omitted).

By contrast, commercial businesses "exist[ ] to earn a profit" for their "owners, shareholders, or private investors," a classic private interest. *Id.* (quotation omitted). Commercial businesses "evaluate success based on financial performance and growth." *Id.* (quotation omitted). And businesses "can disperse earnings among the owners, shareholders, and employees or spend them however they choose." *Id.*

The upshot is that health care sharing ministries are the polar opposite of commercial businesses. As public charities, their relationship with the government is fundamentally different. That doesn't mean health care sharing ministries are immune from government oversight or responsibility for their illegal conduct. But it does mean that the state must treat them like public charities—which they are—and not like commercial businesses—which they aren't. It also means that special rules for health care sharing ministries that don't apply to other charities are inherently suspect.

## II.    The district court's Free Exercise Clause analysis is irredeemably flawed.

The district court held that Section 10-16-107.4 complies with the Free Exercise Clause because it is generally applicable and neutral under *Employment Division v. Smith*, 494 U.S. 872 (1990). Op.20–32. But the court's analysis is irredeemably flawed. Categorical exclusions are worse, not better, than tailored exemptions—all of which defeat general applicability. *Contra* Op.29. Other exempt non-insurance means of paying for healthcare costs similarly implicate the state interests underlying Section 10-16-107.4 *Contra* Op.29–31. And health care sharing ministries may establish a lack of neutrality without showing barefaced hostility toward their religious practices. *Contra* Op.26.

### A.    Section 10-16-107.4 isn't generally applicable.

For a law to be generally applicable, the state must "appl[y] [it] in an evenhanded, across-the-board way." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527 (2022). A clear-cut way for the government to flunk this requirement is by creating "a formal mechanism for granting exceptions" that "invites the government to decide which reasons for not complying with the [law] are worthy of solicitude," regardless of "whether any exceptions have been given" in practice. *Fulton v. City of Phila.*, 593 U.S. 522, 537 (2021) (cleaned up). Section 10-16-107.4 creates such a mechanism by instituting onerous reporting require-ments that Colorado "is prepared to impose upon [health care sharing

6

ministries] but not upon" others, *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 545 (1993) (cleaned up), the "precise evil … the requirement of general applicability is designed to prevent," *id.* at 546.

On its face, Section 10-16-107.4 "does not apply to … [o]ther consumer payment arrangements *identified by the commissioner by rule*, including," but not limited to, "consumer payment plans offered directly by a provider to a patient or" responsible party. Colo. Rev. Stat. § 10-16-107.4(5)(b) (emphasis added). The district court recognized that this presented a general applicability problem. But it didn't subject the law to strict scrutiny. Instead, the court carved out a novel exception for laws that delegate "broad" authority to "public official[s]" authorized "to create *categorical* exclusions for *types* of arrangements that do not implicate [a law's] underlying policy objectives and concerns." Op.29.

The rub is that granting the Colorado Insurance Commissioner boundless discretion to create categorical exceptions for secular reasons "invites the government to decide which reasons for not complying with the [law] are worthy of solicitude." *Fulton*, 593 U.S. at 537 (cleaned up). "If anything, this concern is only *further implicated* when the government does not merely create a mechanism for individualized exemptions, but instead, actually creates a categorical exemption for [groups for secular reasons] but not for [groups for religious reasons]." *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359,

7

365 (3d Cir. 1999) (Alito, J.) (emphasis added); *accord Blackhawk v. Pennsylvania*, 381 F.3d 202, 210–11 (3d Cir. 2004) (Alito, J.).

In this case, the Commissioner enjoys "broad legislative delegation" to say that Section 10-16-107.4's unstated "policy objectives" categorically require health care sharing ministries—but practically no one else—to comply. Op.29. Such a statute isn't generally applicable. The Commissioner necessarily evaluates "the particular justification for" applying Section 10-16-107.4 to some groups and not others. *Lukumi*, 508 U.S. at 537. "But the [State] may not refuse to extend that exemption system to cases of religious hardship without compelling reason." *Fulton*, 593 U.S. at 535 (cleaned up).

This problem is not hypothetical. The Commissioner has already used his unbounded authority to gerrymander the definition of a "[h]ealth care sharing plan" or "health care sharing arrangement" via regulation. 3 Colo. Code Regs. § 702-4:4-10-01, § 4(G). Those terms—and the statute's reach—now *exclude* secular "crowdfunded sources that do not require ongoing membership fees, share requirements, or dues for the purposes of payment for and/or reimbursement of health care services." *Id.* Consequently, Section 10-16-107.4 applies to health care sharing ministries—who are overwhelming religious—and little else. Opening.Br.13. So Colorado "devalues religious reasons" for an exception and "single[s] out" the ministries' "religious practice … for

8

discriminatory treatment." *Lukumi*, 508 U.S. at 537–38. That means strict scrutiny applies. *Kennedy*, 597 U.S. at 526.

Yet Section 10-16-107.4's general applicability problem doesn't end there. Laws aren't generally applicable if they "prohibit[ ] religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 534. The extent makes no difference: laws that "treat *any* comparable secular activity more favorably than religious exercise" flounder. *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam). Comparability is "judged against the asserted government interest that justifies the regulation at issue." *Id.* at 62. So courts look to "the risks various activities pose" to the government's interest, "not the reasons why people" engage in those activities. *Id.*

Here, the government's interest in enforcing Section 10-16-107.4 is unclear. Colorado raised six in this Court: (1) knowing the number of people who don't have health insurance, (2) knowing which non-insurance entities operate in Colorado and the extent of their operations, (3) monitoring non-insurance entities' financial health and corporate structure, (4) monitoring non-insurance entities' activities to ensure they're not engaged in the business of insurance, (5) monitoring non-insurance entities' marketing to ensure they're not presented as insurance; and (6) informing the public about the limits of non-insurance entities' services. Opp.Mot.Injunction.Pending.Appeal.6–7.

Taking Colorado's argument at face value, the government's interest in enforcing Section 10-16-107.4 is gaining ready information about non-insurance entities to monitor their scope and impact, as well as ensuring they're not violating insurance or consumer-protection laws and informing the public about their services' limits. But *none* of these interests are exclusive to health care sharing ministries. They apply equally to *all entities* offering non-insurance means to pay medical bills.

Consider direct primary care agreements, which Section 10-16-107.4(4)(a) exempts; most crowdfunded sources, which 3 Colo. Code Regs. § 702-4:4-10-01, § 4(G) exempts; and fraternal organizations, which Colo. Rev. Stat. § 10-14-705 exempts from state insurance law and the Commissioner's oversight. All three offer non-insurance "plan[s] or arrangement[s] to facilitate payment or reimbursement of health-care costs." Colo. Rev. Stat. § 10-16-107.4(1). Otherwise, Colorado wouldn't need to exempt them from Section 10-16-107.4. Colorado's interest in ready information about non-insurance entities' scope and impact applies equally to them; yet they're not burdened by Section 10-16-107.4's exhaustive reporting requirements.

Nor can Colorado deny the possibility that some direct primary care agreement and crowdfunding providers will go off the rails and violate insurance or consumer-protection laws. Similarly, fraternal organizations may mislead people about medical payments and violate consumer protection laws, even if they're not subject to the insurance

10

variety. Colorado's interest in their legal compliance is identical. Nonetheless, Colorado targets only health care sharing ministries for reporting and oversight, leaving other non-insurance entities alone.

Last, due to their relative novelty, any non-insurance means of paying for healthcare costs is likely to confuse segments of the public. But Colorado doesn't collect extensive information about direct primary care agreement and crowdfunding providers or fraternal organizations, or write annual reports painting them in a negative light and broadcast their services' limits, directing interested persons to traditional insurance providers instead. Colorado reserves those special burdens and censure for health care sharing ministries.

So Colorado exempts from Section 10-16-107.4 "secular conduct that undermines the government's asserted interests in a similar way." *Kennedy*, 597 U.S. at 526. "It is no answer that [Colorado] treats" a few secular health care sharing organizations just "as poorly." *Tandon*, 593 U.S. at 62. Colorado "treats some comparable secular activities more favorably than … religious exercise," which defeats general applicability, *id.* at 63, and "trigger[s] strict scrutiny" *Kennedy*, 597 U.S. at 526.

## B.    Section 10-16-107.4 isn't neutral.

There are "many ways" to demonstrate that a law's "object … is the suppression of … religious conduct." *Lukumi*, 508 U.S. at 533. Particularly "strong evidence" is "the effect of a law in its real

operation," which may show "an impermissible attempt to target [people of faith] and their religious practices." *Id.* at 535. Another marker is proportionality: a law that imposes "gratuitous [burdens] on religious conduct" was likely designed "to suppress [that] conduct." *Id.* at 538 (cleaned up). Laws also lack neutrality when related "statements … can be viewed as targeting [a religious] community." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 16–17 (2020) (per curiam).

This case represents the perfect storm of non-neutrality: real-world targeting, disproportionality, and religious hostility. First, it's obvious—and everyone agrees—that Section 10-16-107.4 applies to health care sharing ministries and practically no one else. So "almost the only conduct subject to [the law] is the religious exercise of [health care sharing ministry] members." *Lukumi*, 508 U.S. at 535. That's the natural result of exempting direct primary care agreements and granting the Commissioner freewheeling authority to exempt crowd-funding and other non-insurance plans or arrangements to pay health care costs. Colo. Rev. Stat. § 10-16-107.4(1) & (5). Here, as in *Lukumi*, Colorado's "narrow" regulation of non-insurance entities, combined with a "pattern of exemptions," establishes a religious "gerrymander." 508 U.S. at 537. The big picture leads to one conclusion: religious health care sharing ministries were "the exclusive legislative concern." *Id.* at 536; *accord* Opening.Br.13–17, 23–24, 37–41, 45–46.

Second, Section 10-16-107.4 burdens health care sharing ministries' religious practices "much more … than is necessary in order to achieve the legitimate ends [Colorado] asserted in [its] defense." *Lukumi*, 508 U.S. at 542. Colorado knows how to properly regulate charities. When a particular group engages in deceptive or otherwise illegal practices, the Colorado Attorney General files suit under the Colorado Charitable Solicitations Act or the Colorado Consumer Protection Act. *E.g.*, *Attorney General Phil Weiser shuts down fake charity for deceptive military care package fraud*, Colo. Att'y Gen. (May 16, 2024), https://bit.ly/41UBo0N. Colorado never required a dragnet of extensive reporting requirements for all—or a subset of—public charities that sweeps in law abiders and law breakers alike.

The district court said that Section 10-16-107.4 combats a unique possibility of public confusion between health care sharing ministries and insurance companies. Op.30–31, 63. But the law does surprisingly little to combat confusion; it merely requires the Commissioner to post a lengthy annual report on health care sharing ministries on his website that no one is likely to read. Colo. Rev. Stat. § 10-16-107.4(3). None of the exhaustive details the Commissioner must include in the report are particularly relevant to potential confusion. And the Commissioner is perfectly able to broadcast the difference between health care sharing ministries and insurance companies without them. *E.g.*, *Consumer Advisory: Division of Insurance cautions Coloradans about limited*

13

*health insurance*, Colo. Dep't of Regul. Agencies (Feb. 9, 2021), https://bit.ly/4bUqYTl ("2021 Consumer Advisory"). In short, Section 10-16-107.4 is the sort of "gratuitous" burden or massive overkill that reflects hostility to religion. *Lukumi*, 508 U.S. at 538.

Last, Colorado's crusade against health care sharing ministries reflects "a negative normative evaluation of" their religious beliefs and practice. *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 639 (2018) (cleaned up). Colorado blames these ministries for *not* being something their religion disallows—"complete, Affordable Care Act (ACA) insurance" providers. 2020 Consumer Advisory. That health care sharing ministries have religious values and requirements—*i.e.*, "religious or moral restrictions"—is a feature, not a bug. *Id*. Federal law *requires* these ministries to have members who share a common set of religious beliefs and share medical expenses among members in keeping with those beliefs. 26 U.S.C. § 5000A(d)(2)(B)(ii).

It manifests hostility toward religion for Colorado to say health care sharing ministries should abandon their religious identity and beliefs to become like secular insurers and "meet the ACA consumer protection standards." 2020 Consumer Advisory; *cf. Carson v. Makin*, 596 U.S. 767, 787 (2022) ("[T]he Free Exercise Clause forbids discrimination on the basis of religious status."). These ministries are private religious associations—like churches—whose members share their beliefs and agree with their religious practices. Opening.Br.5–8; *cf.*

14

*Watson v. Jones*, 80 U.S. (13 Wall.) 679, 728–29 (1871) (religious organizations' right to "organize" and "govern[ ]" themselves "is unquestioned"). Colorado "has no role in deciding *or even suggesting* whether the religious ground for" these private associations' internal rules or practices "is legitimate or illegitimate." *Masterpiece Cakeshop*, 584 U.S. at 639 (emphasis added). By treating health care sharing ministries like insurance businesses, not religious associations, Colorado "impose[d] regulations that are hostile to [their] religious beliefs" and passed "judgment upon or presuppose[d] the illegitimacy of [their] religious beliefs and practices." *Id.* at 638.

Colorado also teamed up with John Oliver—best known for creating a fake church and mocking religion—to ridicule health care sharing ministries as "hypocritical organizations" that "exploit morality clauses to deny coverage to queer people, the obese or even people who smoke or drink." Brandon Choe, *'Last Week Tonight': John Oliver Creates Another Fake Church To Unmask Religious Health Care Loophole*, Deadline (June 27, 2021); *accord* Opening.Br.13–14, 45–46. This evidence together yields more than a "slight suspicion" that Section 10-16-107.4 "stem[s] from animosity to religion or distrust of its practices." *Masterpiece Cakeshop*, 584 U.S. at 638–39. So the law must be "set aside … without further inquiry," *Kennedy*, 597 U.S. at 525 n.1.

15

## III.   The district court's free-association assessment is wrong.

The district court rightly took health care ministries' free-association claim seriously. But the court's assessment of that claim is wrong. Op.50–55. Implicit in the First Amendment is the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, *religious*, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) (emphasis added). At their core, health care sharing ministries "engage in … expression." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). These ministries communicate a particular vision of what religious communities should look like and how fellow believers should behave—both individually and collectively in relation to one another. Opening.Br.5–8. Because health care sharing ministries "instill [religious] values … both expressly and by example," they are protected expressive associations. *Dale*, 530 U.S. at 649–50.

Unlawful burdens on free association "may take many forms." *Id.* at 648. One type is "intrusion into the internal structure or affairs of an association," such as pressuring a "group to accept members it does not desire." *Roberts*, 468 U.S. at 623. Another sort is "attempt[ing] to require disclosure of" members—or other private information—that threatens the association's continued viability. *Id.* at 622–23. This case involves both.

Colorado maligns health care sharing ministries because they are *religious* associations that limit membership to coreligionists, expect

16

members to live a conforming lifestyle, and refuse to facilitate payment for medical expenses stemming from conduct that violates their religious beliefs. *E.g.*, 2021 Consumer Advisory (denigrating "health insurance-like products that DO NOT meet the requirements of the ACA and offer extremely limited coverage" like "health care sharing ministries" who "[l]imit[ ] or [provide] no coverage for mental health / behavioral health treatment"); 2020 Consumer Advisory (criticizing health "sharing programs or ministries often do not offer the same comprehensive benefits as ACA plans," "do not meet the ACA consumer protection standards," and impose "religious or moral restrictions").

Section 10-16-107.4's reporting requirements are designed to help ferret out medical expenses that health care sharing ministries refuse to facilitate payment for as *expressions of their shared religious beliefs*— giving Colorado ammunition to dox them. Colo. Rev. Stat. § 10-16-107.4(1)(a)(X) & (XVII). And the law's report-generating and online-publication provisions deploy this information to paint health care sharing ministries in a negative light, pressuring them to *drop the shared religious beliefs—i.e.*, coreligionist and lifestyle requirements, and corresponding coverage limits—they were created to personify and express. Colo. Rev. Stat. § 10-16-107.4(3). So the statute pressures religious health care sharing ministries to be like ACA-compliant insurance carriers and "accept members where such acceptance would

derogate from … [their] expressive message," *Dale*, 530 U.S. at 661, which triggers strict scrutiny, *id.* at 648.

Moreover, "compelled disclosure of affiliation" violates "freedom of association." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (quotations omitted). Section 10-16-107.4(1)(a)(IV) requires health care sharing ministries to disclose their private "contracts" with any "providers" in Colorado that offer "health-care services to plan or arrangement participants." The Commissioner's "written report," published online, must detail these private arrangements. Colo. Rev. Stat. § 10-16-107.4(3)(a). Colorado has no legitimate grounds for broadcasting information about health care sharing ministries' partners on the internet. The data's only apparent use is doxing providers who associate with these ministries, which critics paint as hypocritical religious bigots. *Supra* p.15. And that "chill[s]—even if indirectly"— religious health care sharing ministries' ability to associate with health care providers, who are susceptible to public smear campaigns. *Ams. for Prosperity,* 594 U.S. at 609.

The district court said it's not evident that any provider would refuse to associate with a health care sharing ministry due to Section 10-16-107.4's disclosure requirements. Op.50–52. That's irrelevant: "Exacting scrutiny is triggered by state action which *may* have the effect of curtailing the freedom to associate, and by the *possible* deterrent effect of disclosure." *Ams. for Prosperity*, 594 U.S. at 616

18

(cleaned up). Because Section 10-6-107.4 is a "broad and sweeping state inquir[y] into … protected" association that "discourage[s] citizens from exercising rights protected by the Constitution," at a minimum, exacting scrutiny applies to the law's provider-contract disclosure provision. *Id.* at 610–11 (cleaned up).

## IV. The district court's rosy view of compelled speech and reliance on commercial-speech principles is unfounded.

The district court's free-speech analysis suffers from two basic flaws. Compelled speech is a red-level threat to First Amendment interests, not a low-level burden. And the speech of religious charities like health care sharing ministries isn't "commercial" in any sense.

### A. Section 10-16-107.4 compels speech and severely burdens First Amendment rights.

The district court regarded compelled-speech mandates as relatively minor burdens on First Amendment rights. *E.g.*, Op.53, 64 (citing *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985)). Yet the Supreme Court has rejected any such notion. Speech-compulsion measures "are at least as threatening" as laws that "restrict[ ] … what can be said." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018). Indeed, with compelled speech "*additional damage* is done" because "individuals are coerced into betraying their convictions," which "is always demeaning." *Id.* at 893 (emphasis added). So the government may not "force …

19

[speakers] to include other ideas with [their] own speech,"*303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023), or even "statements of fact [they] would rather avoid," *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995). Nor may government compel speakers "to *subsidize* the speech of other[s]." *Janus*, 585 U.S. at 893.

Section 10-16-107.4(1)(a) requires health care sharing ministries to generate speech they "would not otherwise make" in the form of annual spreadsheet reports detailing their structure, operations, associations, and communications—the content of which is set by the government. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988); *accord* 3 Colo. Code Regs. § 702-4:4-10-01, § 5(A); *Health Care Sharing Plans or Arrangements Reporting Requirements*, Colo. Dep't of Regul. Agencies, https://bit.ly/4hGPadc. Because the statute requires these ministries "to speak a particular message" about themselves, the law "alter[s] the content of their speech," is "content-based," and thus "presumptively unconstitutional" unless Colorado satisfies strict scrutiny. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) ("*NIFLA*") (cleaned up).

In addition, Section 10-16-107.4(3) requires the Colorado Insurance Commissioner to use health care sharing ministries' compelled speech, which expends hundreds of hours of employee time, to craft an annual report—or message—about these ministries that the ministries oppose as false or misleading. Opening.Br.23, 59. Colorado does so to

transfer the financial burden of producing the raw materials for the report from the Commissioner's staff to the ministries' employees. And this implicates the ministries' free-speech rights by requiring them to, in effect, "subsidize speech with which they" disagree. *Janus*, 585 U.S. at 907; *cf. United States v. United Foods, Inc.*, 533 U.S. 405, 415 (2001) ("We have not upheld compelled subsidies for speech in the context of a program where the principal object is speech itself."). *But see Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 61 n.4 (2006) (citizens generally lack a "First Amendment right not to fund government speech" (quotation omitted)).

## B.    Commercial speech rules don't apply to health care sharing ministries' annual reports.

The district court primarily rejected health care sharing ministries' free-speech claims because it held that commercial speech rules apply. Op.52–64. That conclusion is wrong for four reasons. First, this lawsuit concerns *compelled* speech in the form of annual reports that Colorado requires health care sharing ministries to create and submit to the Insurance Commissioner detailing their structure, operations, associations, and communications. *Accord Harris v. Quinn*, 573 U.S. 616, 648 (2014) (examining "the speech compelled *in this case*") (emphasis added). These ministries aren't selling themselves to Colorado; in fact, they don't want to speak to Colorado at all. So it's clear that health care sharing ministries' compulsory reports don't

merely "propose a commercial transaction," which is the Supreme Court's "defin[ition]" of commercial speech. *Id.* (quotation omitted).

Second, commercial speech is absent here because health care sharing ministries are religious associations, not commercial businesses. In this noncommercial context, speech that might otherwise constitute advertisements are actually "modes of expression and association protected by the First and Fourteenth Amendments," which Colorado may not "regulate … as improper solicitation of [insurance] business."[3] *In re Primus*, 436 U.S. 412, 423 (1978) (quotation omitted). Indeed, these public charities' actions are "undertaken to express personal [religious] beliefs and to advance [their] … [religious] objectives …, rather than to derive financial gain." *Id.* at 422. Because their speech falls "within the generous zone of First Amendment protection reserved for associational freedoms," commercial speech rules don't apply. *Id.* at 431.

Third, the district court ignored a long line of cases establishing that "[t]he First Amendment protects the right to engage in charitable solicitation," *Illinois ex rel. Madigan v. Telemarketing Assocs.*, 538 U.S. 600, 611 (2003), and "that charitable solicitations involve a variety of speech interests" that place them outside the realm of "purely

---

[3] *Accord Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) ("[T]hat these pamphlets are conceded to be advertisements clearly does not compel the conclusion that they are commercial speech.").

commercial speech," *Riley*, 487 U.S. at 788 (quotations omitted). *Accord Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 960–61 (1984); *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 629 (1980). Because Section 10-16-107.4 regulates charities' expression "with the heavy hand that [the Colorado Insurance Commissioner's] unbridled discretion allows," the law "affects the speech of the … [religious] causes with which [health care sharing ministries] are associated. *Riley*, 487 U.S. at 801 n.13. So these ministries' expression is, at a minimum, "inextricably intertwined with otherwise fully protected speech" on religious matters. *Id.* at 796.

Finally, the district court leaned heavily on *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626 (1985). But "[t]he *Zauderer* standard does not apply here," as the fine-grained reports that Section 10-16-107.4 compels are "obviously … not limited to purely factual and uncontroversial information about the terms under which services will be available." *NIFLA*, 585 U.S. at 768 (cleaned up). Those reports concern the scope, inner workings, and partnerships of religious health care sharing ministries, which are "anything but … 'uncontroversial' topic[s]." *Id.* at 769; *accord* Reed Ableson, *It Looks Like Health Insurance, but It's Not. 'Just Trust God,' Buyers Are Told*, N.Y. Times (Jan. 2, 2020), https://bit.ly/4c5qZE8; Paul Demko & Renuka Rayasam, *Why Desperate Families are Getting Religion on Health Coverage*, Politico Magazine (Feb. 4, 2018), https://politi.co/4iV3sb7.

23

Plus, the Insurance Commissioner isn't a prospective member, so any "purely factual" information that Section 10-16-107.4 requires these ministries to send him is outside the "commercial advertising" arena—the *only context* where *Zauderer* applies. *Hurley*, 515 U.S. at 573 (quotations omitted).

What's more, *Zauderer* doesn't sanction boundless disclosures of even purely factual and uncontroversial information. Compelled disclosures of this type can't be "unjustified or unduly burdensome." *NIFLA*, 585 U.S. at 768 (quotation omitted). Section 10-16-107.4's disclosures are both. Colorado doesn't need a prophylactic dragnet requiring *all* health care sharing ministries—law-abiding and law-breaking groups alike—to report their activities. And these annual reports' enormous detail—covering ministries' structure, operations, associations, and communications—is clearly excessive.

## V.  **Section 10-16-107.4 can't survive any heightened scrutiny.**

The district court's ruling should be reversed because Section 10-16-107.4 can't survive any type of heightened scrutiny—strict scrutiny, exacting scrutiny, or otherwise. Colorado "has an important interest in preventing wrongdoing by charitable organizations." *Ams. for Prosperity*, 594 U.S. at 612. But the Insurance Commissioner has a limited role in that regard; he enjoys no general oversight over charities and merely enforces insurance and consumer-protection laws. Plus,

there's "a dramatic mismatch … between the interest[s] that [the Commissioner] seeks to promote and the disclosure regime that [Colorado] has implemented in service of that end." *Id.*

Colorado "is not free to enforce *any* disclosure regime that furthers its interests. [The state] must instead demonstrate its need for universal production [by health care sharing ministries] in light of any less intrusive alternatives." *Id.* at 613. Here, the Commissioner has "multiple alternative mechanisms" for obtaining information about a particular health care sharing ministry "after initiating an investigation." *Id.* at 614. But Colorado didn't try any "alternatives to the current disclosure requirement." *Id.* at 613. The state merely "cast[ ] a dragnet for sensitive … information from" health care sharing ministries writ large—whether they are law-abiding or not. *Id.* at 614.

Accordingly, Section 10-16-107.4 flunks "narrow tailoring," which requires the government to "demonstrate that alternative measures that burden substantially less [First Amendment activity] would fail to achieve [its] interests." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014). Colorado's "up-front collection" of copious information about health care sharing ministries' structure, operations, associations, and communications "is particularly dubious given that" *very few* States "impose such a requirement." *Ams. for Prosperity*, 594 U.S. at 614.

In sum, the Colorado Insurance Commissioner's desire for "administrative convenience does not remotely reflect the seriousness of

25

the actual burden" Section 10-16-107.4 imposes on health care sharing ministries' free-exercise, free-association, and free-speech rights. *Id.* at 615 (cleaned up). Health care sharing ministries are therefore likely to prevail under the First Amendment, and the other injunction factors favor them. *Does 1-11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251, 1274–75 (10th Cir. 2024). "Accordingly, the district court abused its discretion by failing to grant … a preliminary injunction." *Id.* at 1279.

## CONCLUSION

This Court should reverse and remand with instructions for the district court to enter a preliminary injunction enjoining Section 10-16-107.4's enforcement.

Dated: March 25, 2025

Respectfully submitted,

*s/Rory T. Gray*

| | |
|---|---|
| John J. Bursch | Rory T. Gray |
| ALLIANCE DEFENDING FREEDOM | ALLIANCE DEFENDING FREEDOM |
| 440 First Street NW, Suite 600 | 1000 Hurricane Shoals Rd. NE |
| Washington, DC 20001 | Suite D-1100 |
| (616) 450-4235 | Lawrenceville, GA 30043 |
| jbursch@ADFlegal.org | (770) 339-0774 |
| | rgray@ADFlegal.org |

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because this brief contains 5,551 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: March 25, 2025

<u>*s/Rory T. Gray*</u>
Rory T. Gray
*Counsel for Amici Curiae*

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Cortex XDR, Agent version 7.8.1, and according to the program are free of viruses.

*s/Rory T. Gray*
Rory T. Gray
*Counsel for Amici Curiae*

28

## CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

*s/Rory T. Gray*
Rory T. Gray
*Counsel for Amici Curiae*