No. 25-1035

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

ALLIANCE OF HEALTH CARE SHARING MINISTRIES,

*Plaintiff-Appellant,*

v.

MICHAEL CONWAY, in his official capacity as the Commissioner of the Colorado Division of Insurance,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Colorado
Case No. 1:24-cv-01386-GPG-STV

**BRIEF OF THE LEUKEMIA & LYMPHOMA SOCIETY, AMERICAN CANCER SOCIETY, AMERICAN CANCER SOCIETY CANCER ACTION NETWORK, AMERICAN LUNG ASSOCIATION, COLORADO CENTER ON LAW AND POLICY, COLORADO CONSUMER HEALTH INITIATIVE, COLORADO GYNECOLOGIC CANCER ALLIANCE, MUSCULAR DYSTROPHY ASSOCIATION, AND NATIONAL MULTIPLE SCLEROSIS SOCIETY IN SUPPORT OF AFFIRMANCE**

Daniel J. Vedra
Vedra Law LLC
1444 Blake Street
Denver, Colorado 80202
(303) 937-6540
dan@vedralaw.com

Beth Dombroski
Triple L Law, P.C.
24928 Genesee Trail Rd. Unit 100
Golden, CO 80401
(303) 847-0755
beth@triplellaw.com

*Counsel for Amici Curiae*

## DISCLOSURE STATEMENT

The Amici Curiae organizations on this brief are non-profit organizations that have no parent corporations.  No publicly traded corporation has any ownership interest in any of the Amici Curiae on this brief.

No party or party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief.  No person contributed money that was intended to fund preparing or submitting this brief.

# TABLE OF CONTENTS

DISCLOSURE STATEMENT .................................................................ii

TABLE OF AUTHORITIES ................................................................iv

IDENTITY AND INTEREST OF AMICI CURIAE ................................. 1

SUMMARY OF THE ARGUMENT ......................................................... 7

ARGUMENT ....................................................................................... 8

I.      INTRODUCTION.................................................................... 8

II.     ARGUMENT ......................................................................... 9

      A.    Comprehensive Health Coverage Is Critical
          To Improved Health Outcomes. ........................................... 10

      B.    Health Care Sharing Agreements Pose A
          Unique Risk To Consumers. ................................................ 11

      C.    The Reporting Law Was Enacted To
          Protect Consumers. ............................................................. 14

      D.    The Reporting Law Addresses The Risk
          To Consumers Through Transparency. ............................... 15

      E.    The Balance Of The Equities And The Public
          Interest Weigh Against An Injunction. ............................... 16

   III.    CONCLUSION .......................................................................... 19

   CERTIFICATE OF COMPLIANCE .................................................... 21

   CERTIFICATE OF DIGITAL SUBMISSION .................................... 22

   CERTIFICATE OF SERVICE ........................................................... 23

# TABLE OF AUTHORITIES

## Cases

*Davis v. Mineta*, 302 F.3d 1104 (10th Cir. 2002) ....................................17

*O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft*,
    389 F.3d 973 (10th Cir. 2004) ...................................................17-18

*RoDa Drilling Co. v. Siegal*, 552 F.3d 1203 (10th Cir. 2009) ............16-17

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) ................................................17

## Statutes

26 U.S.C. § 5000A..........................................................................................8

42 U.S.C. § 18001 ..........................................................................................8

42 U.S.C. § 18022 ........................................................................................11

C.R.S. § 10-16-107.4 ...............................................................8, 14-16, 18

## Other Authorities

Agency for Healthcare Research and Quality,
    *2021 National Healthcare Quality and Disparities Report*
    (December 2021)..................................................................................10

American Cancer Society,
    *Cancer Facts and Figures* 2025-2026 (2025) ...................................5

American Cancer Society, *Cancer Prevention & Early Detection
    Facts & Figures 2025-2026* (2025) ...................................................11

American Cancer Soc'y Cancer Action Network,
    *A National Poll: Facing Cancer in the
    Health Care System* (2017)...............................................................5

American Cancer Society Cancer Action Network,
    *Cancer Patients Need Access to Comprehensive
    Health Insurance* (January 10, 2017) ...........................................11

Anthony, et al., *Insurance Status and Distant-Stage Disease at Diagnosis Among Adolescent and Young Adult Patients with Cancer Aged 15 to 39 Years: National Cancer Data Base, 2004 Through 2010*, 120 CANCER 1212, 1214 (2014) .......... 5

Dieguez, et al., The Cost Burden Of Blood Cancer Care, Milliman (Oct. 2018) ........................................................................ 4

Hanna, et al., *Mortality Due to Cancer Treatment Delay: Systematic Review and Meta-analysis*, 371 BMJ m4087 (Nov. 2020) ........................................................... 6

Partnership to Protect Coverage. *Under-Covered: How Insurance-Like Products Are Leaving Patients Exposed,* at 15, (Mar. 2021) ............................................................ 12

Shih, et al., *Costs Around the First Year of Diagnosis for 4 Common Cancers Among the Privately Insured*, 114 Journal of the National Cancer Institute 10 (Oct. 2022) ....... 14

Volk, et al., *Health Care Sharing Ministries: What are the Risks to Consumers and Insurance Markets?*, Commonwealth Fund Issue Brief August 2018........................ 12-13

Wilper et al., *Health Insurance And Mortality in US Adults*, 99 Am. J. Pub. Health 2289, 2292 (2009) ....................................... 6

Yabroff, et al., *Association of Medical Financial Hardship and Mortality Among Cancer Survivors in the United State*s, 114 Journal of the National Cancer Institute 6 (Jun. 13, 2022). ................................................................................ 4

Zhao, et al, *Health insurance status and cancer stage at diagnosis and survival in the United States*, CA: A Cancer J. for Clin. (2022)....................................................... 6

**IDENTITY AND INTEREST OF AMICI CURIAE**

Amici Curiae The Leukemia & Lymphoma Society, American Cancer Society, American Cancer Society Cancer Action Network, American Lung Association, Colorado Center on Law and Policy, Colorado Consumer Health Initiative, Colorado Gynecologic Cancer Alliance, Muscular Dystrophy Association, and National Multiple Sclerosis Society (collectively "Amici") are patient and consumer advocacy groups that represent millions of healthcare consumers in Colorado and across the nation who face debilitating chronic and life-threatening health conditions. Colorado's regulatory requirements concerning Health Care Sharing Agreements ("HCSA" or "HCSAs") provide essential transparency to a growing industry that is known to limit care to unsuspecting consumers.

The Leukemia & Lymphoma Society ("LLS") is the world's largest voluntary health agency dedicated to fighting blood cancer and ensuring that the more than 1.3 million blood cancer patients and survivors in the United States have access to the care they need. LLS's mission is to cure blood cancers and to improve the quality of life of patients and their families. LLS advances that mission by advocating that blood cancer patients have sustainable access to quality, affordable, coordinated healthcare, regardless of the source of their coverage.

The mission of the American Cancer Society ("ACS") is to improve the lives of people with cancer and their families through advocacy, research, and patient support, to ensure everyone has an opportunity to prevent, detect, treat, and survive cancer. ACS's extensive scientific findings have established that (1) access to preventive care is strongly linked to early detection and successful treatment of many forms of

1

cancer, and (2) inability to access such preventive screenings is a major impediment to advancing the fight against cancer. The American Cancer Society Cancer Action Network ("ACS CAN") is ACS's nonprofit, nonpartisan advocacy affiliate, making cancer a top priority for policymakers at every level of government. ACS CAN advocates for guaranteeing all Americans access to preventive care and affordable and adequate health insurance.

The American Lung Association is the nation's oldest voluntary health organization, representing millions of people with or at risk for lung disease in the United States. The Lung Association strongly supports universal access to quality and affordable healthcare. Requiring reporting for HCSAs is essential to educate the public on the difference between these plans and quality and affordable healthcare plans.

The Colorado Center on Law and Policy ("CCLP"), established in 1998, is a non-profit anti-poverty organization advancing the rights of all Coloradans. CCLP uses legislation, litigation, administrative advocacy and research to improve health and economic self-sufficiency. As relevant here, CCLP holds a particular expertise in health systems and affordability, and a core aspect of our mission is ensuring equitable access to medical services for all Coloradans.

Colorado Consumer Health Initiative ("CCHI") supports Coloradans one-on-one to navigate medical billing and health care cost issues and advance policy changes for more equitable and affordable health care. Colorado consumers have been directly impacted by the lack of protections and, prior to HB22-1269, the complete lack of transparency around HCSAs. Coloradans who have enrolled in these arrangements

are hit with large medical bills that these arrangements won't cover, and they reach out to CCHI for help. These are some of the hardest and most complicated cases to address. The transparency this law brings is vital to help consumers understand what HCSAs are and how they operate before they sign up, need to access care, and incur medical costs that they may be left on the hook to cover.

Colorado Gynecologic Cancer Alliance ("CGCA") serves all those diagnosed with gynecologic cancer in Colorado, including ovarian, uterine and cervical cancers. CGCA's mission is to provide both emotional and financial support while creating a welcoming and empowering community where survivors can meet others who must walk the same path. Our financial support includes insurance optimization and insurance advocacy.

The Muscular Dystrophy Association ("MDA") is the preeminent voluntary health organization in the United States for people living with muscular dystrophy, ALS, and over 300 other neuromuscular conditions. For 75 years, MDA has led the way in accelerating research, advancing care, and advocating support and inclusion of families living with neuromuscular disease. MDA's mission is to empower the people we serve to live longer, more independent lives.

The National Multiple Sclerosis Society (the "Society") mobilizes people and resources so that the nearly one million people affected by multiple sclerosis ("MS") can live their best lives while the Society works to stop MS in its tracks, restore what has been lost and end MS forever.

Treatment of cancer of all types is extremely stressful due to its intensity, duration, and the physical and emotional toll it takes on patients and their families. Chemotherapy, radiation, and stem cell

transplants can cause severe side effects like fatigue, nausea, pain, and a weakened immune system, leaving patients vulnerable to infections. The uncertainty of outcomes, frequent hospital visits, and long periods of isolation further heighten anxiety and depression. Financial burdens and disruptions to daily life, work, and relationships add to the overwhelming strain, making cancer treatment not only a medical challenge but a deeply personal and emotional ordeal.

The cost to treat these diseases without health insurance can be prohibitive for most Americans. The average cost associated with leukemia treatment was $200,000 for chronic leukemia and $800,000 for acute leukemia.[1] Among cancer survivors aged 18-65, twenty-nine percent reported financial hardships within the past 12 months.[2] Chronic diseases like muscular dystrophy, ALS, and MS are no different. All require a lifetime of expensive care.

One obstacle to minimizing stress is substandard or inadequate health insurance. A patient may only learn about the quality of the patient's health insurance after diagnosis. Cancer diagnoses are unexpected. The American Cancer Society estimates that in 2025 there will be over 2 million new cancer diagnosis in the U.S., and more than 618,000 will die from the disease, which is the equivalent of 1,700 deaths

---

[1] Dieguez, et al., *The Cost Burden Of Blood Cancer Care*, Milliman (Oct. 2018), https://www.lls.org/sites/default/files/Milliman%20study%20cost%20burden%20of%20blood%20cancer%20care.pdf.

[2] Yabroff, et al., *Association of Medical Financial Hardship and Mortality Among Cancer Survivors in the United States*, 114 Journal of the National Cancer Institute Issue 6, 863 (Jun. 13, 2022).

per day.[3]  40 out of 100 men and 39 out of 100 women will face a cancer diagnosis in their lifetime.[4]

A cancer diagnosis cannot be predicted and can happen at any time. It is at this moment that a cancer patient's healthcare coverage is put to the test.  Learning that one's health insurance plan lacks basic coverages that the patient expected to exist can contribute to increased stress at a critical point of treating cancer and contribute to poor outcomes.

The increased risks associated with inadequate health insurance stem from a variety of factors.  For cancer patients, early detection and treatment are key. But an American Cancer Society Cancer Action Network poll conducted before passage of the ACA found that thirty-four percent of individuals under the age of sixty-five with cancer or a history of cancer had delayed care because of cost in the preceding twelve months.[5]   Another study observed that uninsured females are twice as likely as insured females, and uninsured males are one and a half times as likely as insured males, to be diagnosed with cancer that has already metastasized.[6]  Research  from the American Cancer Society shows that

---

[3] American Cancer Society, *Cancer Facts and Figures 2025*, at 1 (2025) https://www.cancer.org/content/dam/cancer-org/research/cancer-facts-and-statistics/annual-cancer-facts-and-figures/2025/2025-cancer-facts-and-figures-acs.pdf

[4] *Id.* at 1.

[5] American Cancer Soc'y Cancer Action Network, *A National Poll: Facing Cancer in the Health Care System* at 17 (2017), https://www.fightcancer.org/sites/default/files/National%20Documents/ACS_CANPolling_Report_7.27.10.pdf.

[6] Anthony, et al., *Insurance Status and Distant-Stage Disease at Diagnosis Among Adolescent and Young Adult Patients with Cancer Aged 15 to 39 Years: National Cancer Data Base, 2004 Through 2010*, 120 CANCER 1212, 1214 (2014).

uninsured Americans are less likely to get screened for cancer and thus are more likely to have their cancer diagnosed at an advanced stage when survival is less likely and the cost of care more expensive.[7]  Studies show that uninsured patients had substantially higher risks of presenting with late-stage cancers at diagnosis, especially for screen-detectable cancers and cancers with early signs and symptoms, for which access to care is critical for early diagnosis.[8]  Cancer patients who experience financial hardship have a higher adjusted mortality risk.

Unsurprisingly, health outcomes drastically improve when individuals have access to healthcare due to comprehensive and robust health insurance.  A study found that approximately forty-five thousand deaths annually could be attributed to the lack of health insurance among working-age Americans.[9]  These uninsured individuals had a forty percent higher risk of death than their privately insured counterparts.[10]

Amici are uniquely aware of the need for patients and consumers to have access to comprehensive, quality, and affordable healthcare, as the patients amici represent face costly care needs. Americans at any time can be unexpectedly diagnosed with life-threatening diseases such as cancer, which require immediate and costly treatment that can be

---

[7] Zhao, et al, *Health insurance status and cancer stage at diagnosis and survival in the United States*, CA: A Cancer J. for Clin., (2022) available at https://doi.org/10.3322/caac.21732

[8] Hanna, et al., *Mortality Due to Cancer Treatment Delay: Systematic Review and Meta-analysis*, 371 BMJ m4087 at 5, (Nov. 2020) https://www.bmj.com/content/371/bmj.m4087.

[9] Wilper et al., *Health Insurance And Mortality in US Adults*, 99 Am. J. Pub. Health 2289, 2292 (2009).

[10] *Id.*

financially devastating.  In addition, chronic care patients have consistent and continuous care needs that can be equally as costly, especially if those conditions worsen from involuntarily delayed care.  It is imperative that consumers have transparency as to what health plans cover when seeking cost-effective coverage for themselves and their families.

Amici are invested in ensuring that consumers and patients have the care they need when they need it.  Amici supported the passage of Colorado's HCSA reporting law because it provides transparency that ultimately protects consumers.  Amici believe that any delay in reporting will harm Coloradans seeking to purchase health coverage for themselves and their families.

## SUMMARY OF THE ARGUMENT

The District Court correctly denied a motion to preliminarily enjoin Colorado's HCSA reporting law.  Comprehensive healthcare coverage is critical to positive outcomes in the treatment of cancer and other chronic and acute illnesses.  HCSAs pose a risk to consumers obtaining comprehensive healthcare coverage because they can be designed and marketed similar to traditional heath insurance but lack the minimum protections guaranteed by regulated insurance plans.  The Reporting Law at issue in this case was enacted to protect consumers by promoting transparency and permitting consumers to assess and compare HCSAs on a basic level.  The balance of equities favored denying the injunction because the public's interest in obtaining transparent information about HCSAs outweighed the alleged irreparable harm that the Appellant purported to experience.  For these reasons, Amici ask the Court to affirm the denial of the motion for preliminary injunction.

**ARGUMENT**

## I.   INTRODUCTION

In Colorado, HCSAs are predominantly established by health care sharing ministries ("**HCSM**"). An HCSM is a non-profit organization of individuals with a common ethical or religious belief and who agree to share medical expenses among members in accordance with those beliefs. 26 U.S.C. § 5000A(d)(2)(B)(ii). Members of an HCSM are exempt from the minimum essential health coverage requirements of the Affordable Care Act, 42 U.S.C. § 18001 *et seq.* ("**ACA**"). In response to deceptive marketing practices that confused consumers into believing that they were purchasing health insurance, states across the country have stepped in to address misleading advertising of HCSAs that has caused significant consumer harm. In Colorado, aggressive marketing of such agreements has led to a host of consumer complaints. (App. Vol. III at A-180-232). To address this documented consumer harm, the State of Colorado acted to bring transparency to the public regarding these agreements through Colorado House Bill 22-1269, codified at C.R.S. § 10-16-107.4, *et seq.* (hereinafter, the "**Reporting Law**").

The Reporting Law addresses the complaints that consumers and providers have made to the Division of Insurance ("**DOI**") about HCSAs. (Id.). The majority of these complaints concern HCSAs denying coverage, refusing payment to providers, and misleading consumers over the nature of an HCSM. (Id.). The Reporting Law requires a person offering an HCSA to report basic, high-level information about the operation of the sharing agreement to the Colorado Division of Insurance (the "**Division**"). That information is summarized and released to the public on the Division's website. The report provides critical information about

the HCSA, such as whether the HCSA is paying claims or has established a relationship with care providers so that Coloradans are able to make the best choice for their family's health needs.   No other resource summarizes and provides this critically important information, like how much the HCSA spends on administrative expenses; how much the HCSA spends on claims; and the amount of claims the HCSA has denied. C.R.S. § 10-16-107.4(1)(a).

Two years after the act became law, the Alliance of Health Care Sharing Ministries (the "**Appellant**") sued the Commissioner for the Division, claiming that the Reporting Law violates the Free Exercise Clause, the Establishment Clause, the Freedom of Association, and the Free Speech Clause.  Also two years after the act became law, the Appellant sought a preliminary injunction enjoining the enforcement of the Reporting Law on the grounds, among others, that it would suffer irreparable harm if this two-year-old law was not immediately struck down as unconstitutional.  After the Appellant's motion for preliminary injunction was denied, it appealed.

## II.    ARGUMENT

Comprehensive healthcare coverage is critical to health outcomes. Recognizing that sharing plans pose a unique risk to patients and consumers, Colorado's attempt to regulate health care sharing plans via the Reporting Law was intended to protect patients and consumers. The law addresses the risks to consumers, and the balance of the equities and public interest weigh against an injunction.

///

///

///

### A.    Comprehensive Health Coverage Is Critical To Improved Health Outcomes.

Amici are acutely aware of the established fact that comprehensive health coverage improves outcomes, and poor coverage leads to poor outcomes. When consumers have insurance that provides comprehensive coverage of services, they can access the healthcare system, and in a timely manner when faced with an emergent illness. The importance of access is not confined to that initial point of contact for an emergent issue. Access allows patients to develop an ongoing relationship with their providers, who become familiar with their health history. This relationship then provides a point of access to the healthcare system when emergent needs arise.[11]

Further, having comprehensive healthcare allows healthcare professionals to conduct diagnostic testing, make referrals for critical specialty care, timely schedule procedures, and manage chronic conditions. This leads to "statistically significant and clinically relevant improvements." [12] Additionally, comprehensive coverage improves medication adherence. Moreover, patients with comprehensive coverage have more regular communication with their providers, with whom they have developed relationships. [13] This improves management of conditions, which ultimately lowers costs and leads to better outcomes.

Comprehensive coverage for ACA-mandated essential health benefits means that consumers can be routinely screened for certain cancers. Screening for cancer reduces cancer mortality for breast,

---

[11] Agency for Healthcare Research and Quality, *2021 National Healthcare Quality and Disparities Report (*Dec. 2021).

[12] *Id.*

[13] *Id.* at A3

cervical, colorectal, lung, and prostate by detecting cancers early. Screening can also prevent cervical and colorectal cancer by identifying and treating precancerous lesions.[14]  Consequently, early detection is crucial for improved outcomes.  But those improved outcomes require a patient to have an entry point to the healthcare system.  Without access to comprehensive coverage, a patient may find themselves having to delay care or forgo care altogether because of the costs, potentially leading to preventable deaths.[15]

### B.   Health Care Sharing Agreements Pose A Unique Risk To Consumers.

HCSAs may not provide comprehensive coverage.  A participant in an HCSA is exempt from the minimum coverage requirement of the ACA, and the healthcare cost sharing of HCSAs is exempt from the essential health benefit requirements of the ACA.  Those essential health benefits include emergency services, hospitalization, prescription drugs, laboratory services, preventive and wellness services, and chronic disease management.  42 U.S.C. § 18022(b)(1).  Because nothing requires an HCSA to provide these essential health benefits, any advertising or marketing that suggests, overtly or by implication, that an HCSA is health insurance could mislead consumers to mistakenly choose an

---

[14] American Cancer Society, *Cancer Prevention & Early Detection Facts & Figures 2025-2026*, at 46 (2025), available at https://www.cancer.org/content/dam/cancer-org/research/cancer-facts-and-statistics/cancer-prevention-and-early-detection-facts-and-figures/2025-cped-files/cped-cff-2025-2026.pdf

[15] American Cancer Society Cancer Action Network, *Cancer Patients Need Access to Comprehensive Health Insurance* (January 10, 2017) https://www.fightcancer.org/sites/default/files/Comprehensive%20Health%20Coverage%20Factsheet%2001-05-17.pdf

HCSA, believing the HCSA provides the same coverage as ACA-compliant health insurance.  And the consequence of being misled is not just monetary—the consequences are life or death.

HCSAs have employed aggressive and deceptive marketing tactics that confuse consumers looking for inexpensive health coverage.  HCSA features closely resemble ACA-compliant health plans: they have monthly premiums, deductibles, and copayments; defined benefits; and some have provider networks.[16]  Many HCSAs use tiered cost levels similar to those of the ACA market plans, such as gold, silver, and bronze.[17]  These plans may also pay brokers to market the plans, and do so during open enrollment, claiming that these plans are low-cost alternatives to regular insurance.[18]  These tactics lure unsuspecting consumers, especially low-income individuals and families, into purchasing coverage under an HCSA that lacks the minimum requirements and guarantees of regulated insurance.

The problem for consumers is that these plans simply do not provide the same coverage as ACA-compliant plans.  Benefits are much more limited than ACA-compliant plans and contain exclusions for pre-existing conditions.  They may also lack coverage for behavioral health services, including prescriptions for common psychiatric medications,

---

[16] Volk, et al., *Health Care Sharing Ministries: What are the Risks to Consumers and Insurance Markets?* Commonwealth Fund Issue Brief August 2018,
https://www.commonwealthfund.org/sites/default/files/2018-08/Volk_hlt_care_sharing_ministries.pdf.

[17] *Id.* at 3

[18] Partnership to Protect Coverage. *Under-Covered: How Insurance-Like Products Are Leaving Patients Exposed,* at 15 (Mar. 2021).

and payment is never guaranteed.[19]  Further, as the Division noted in October 2024, many HCSAs require members to disclose and to use other insurance first, such as Medicaid, Medicare, or TriCare.  (App. Vol. XVIII at A-898).  Some HCSAs require members to negotiate provider bills before seeking reimbursement from the HCSA.  (App. Vol. XV at A-740).  All suffer from the same problem: there is no guarantee of payment.  (App. Vol. XII at A-556).

This means that patients with life-threatening diagnoses must spend time trying to figure out how their bills will be paid when they should be focusing on treatment.  Worrying about how to pay can lead to substantially delayed care, when timely care is vital to prevent disease proliferation.  Disease proliferation extends and increases the cost of care while jeopardizing outcomes.

HCSAs pose an additional risk to consumers with the potential to raise overall costs for those relying on ACA-compliant plans.  Because these plans are aggressively marketed as low-cost coverage that allows the consumer to meet the same needs covered by traditional health insurance, an increase in membership in these plans may draw healthy individuals out of other forms of comprehensive coverage such as traditional health insurance.  In order to have a healthy risk pool, issuers rely on a large risk pool of both healthy individuals and those with more healthcare needs to keep insurance costs low.  If healthy people leave the risk pool, leaving it dense with those who have more healthcare needs, the cost of insurance will increase because there are not enough low-cost individuals left in the pool to spread insurance risk.

---

[19] *Id.* at 14-15.

### C.    The Reporting Law Was Enacted To Protect Consumers.

The proliferation of HCSAs in Colorado has led to a host of complaints to the Division from providers and consumers alike. (App. Vol. III at A-180-232).  Complaints from providers allege unpaid claims and payment delays. (Id.).  Complaints from consumers allege being misled by brokers as to the nature of HCSAs, creating the mistaken belief that an HCSA is an ACA-compliant plan.  Consumers also complained that payment denials left them with huge, unforeseen provider bills.  For a patient, such confusion and payment refusals could be devastating.

A cost study published in the Journal of the National Cancer Institute revealed that the average cost of cancer is well over $100,000.00.[20]  The study pointed to the alarming increase in the cost of cancer care, coupled with the increase in out-of-pocket costs for those with ACA-compliant plans.[21]  Such increases are leading to financial toxicity for even those with fully ACA-compliant insurance plans.  For those who face payment refusals after relying on HCSAs, more of the cost is shifted to the consumer.  Facing the full cost of care, patients delay in seeking care or forego treatment altogether.

Colorado's law is a reporting law that attempts to protect consumers through transparency.  The law requires certain disclosures to be made by HCSAs to the Division.  This includes reporting such basic, generic information as the number of Coloradans enrolled in such plans;

---

[20] Shih, et al., *Costs Around the First Year of Diagnosis for 4 Common Cancers Among the Privately Insured*, 114 Journal of the National Cancer Institute 10, at 1392-99 (Oct. 2022) available at https://doi.org/10.1093/jnci/djac141.
[21] *Id.*

the value of claims submitted by members that are approved, denied, and approved but not paid; marketing materials; and third-party contracts, including providers and brokers.  C.R.S. § 10-16-107.4.  These disclosures will then be analyzed and made available publicly on the Division's website.  *Id.*

Making this information available to the public allows consumers to review arrangements under consideration for purchase and determine whether the HCSA is likely to meet the consumer's healthcare needs. This information gives consumers an idea of how much HCSAs actually pay out in claims, so they can assess risk and their healthcare needs.  For example, if a plan exhibits a high ratio of administrative expense coupled with high claim denials, a consumer may opt for another plan or other form of coverage.  The law also helps the state monitor how many consumers may be at financial risk from membership in an HCSA. Ultimately, the law does not directly prevent financial toxicity but provides consumers with a set of tools to assess the unique risks these plans pose.

### D.    The Reporting Law Addresses The Risk To Consumers Through Transparency.

The Reporting Law seeks to improve health outcomes by promoting informed choice by consumers at the time the consumer purchases healthcare coverage.  As it pertains to consumers, the Reporting Law does two things.  First, the Reporting Law requires HCSAs to report basic information concerning the operation of a health care cost-sharing plan to the Commissioner.  C.R.S. § 10-16-107.4(1)(a).  This includes general demographic information about the plan, the amounts collected to fund the plan, and the amounts paid out on the plan.  *Id.*  This also includes

information about whether the plan has arrangements with care providers and the amounts that the plan has paid relative to the amounts requested to be paid.  *Id.*  And the Reporting Law requires an HCSA to provide a copy of its consumer-facing marketing materials to the Division.  *Id.*

Second, the Reporting Law requires the Commissioner to prepare a report summarizing the information submitted by HCSAs and publish the report on the Division's website.  C.R.S. § 10-16-107.4(3).  This report, derived from information sworn by the HCSA to be accurate under C.R.S. § 10-16-107.4(1)(b), must be accurate and evidence-based.  C.R.S. § 10-16-107.4(3)(b).

In sum, the Reporting Law requires that HCSAs provide basic information about the financial and logistical operation of a plan.  That information is reviewed and reported to healthcare consumers for their use in deciding whether to enroll in an HCSA, which HCSA to enroll in, or whether another type of health-care coverage, such as health insurance, is more appropriate for the consumer.  Without this information, healthcare consumers left to make decisions on critically important issues informed only by the advertisements of HCSAs.

## E.    The Balance Of The Equities And The Public Interest Weigh Against An Injunction.

The District Court correctly determined that the Appellant had not met its burden of establishing the balance of equities weighed in its favor.  A "preliminary injunction is [intended] to preserve the pre-trial status quo . . . ."  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009).  "To obtain a preliminary injunction, the moving party must demonstrate" among other things, "that the balance of equities tips in the

movant's favor; and (4) that the injunction is in the public interest." *Id.*
"A preliminary injunction is an extraordinary remedy never awarded as
of right.  In each case, courts must balance the competing claims of injury
and consider the effect of granting or withholding the requested relief,
paying particular regard to the public consequences." *Winter v. NRDC,
Inc.*, 555 U.S. 7, 9 (2008).

The balance of equities factor is addressed by balancing the
irreparable harm to the moving party against the harm caused by
granting the injunction, including the public consequences.  *Davis v.
Mineta*, 302 F.3d 1104, 1116 (10th Cir. 2002) ("We must next balance the
irreparable harms we have identified against the harm to defendants if
the preliminary injunction is granted.").   When considering the balance
of harms, "[t]he status quo is also relevant to the credibility of the parties'
claims of irreparable harm." *O Centro Espirita Beneficente Uniao do
Vegetal v. Ashcroft*, 389 F.3d 973, 1017 (10th Cir. 2004).  "It is difficult to
measure irreparable harm, and either party's willingness to put up with
a situation in the past can serve as an indication that the party's injury
is not as serious as alleged, or that the party has implicitly consented to
the supposed injury." *Id.*

Against this Court's observation in *O Centro* that delay in seeking
injunctive relief undermines a claim of irreparable harm, Appellant
waited over 23 months after the Reporting Law became effective to file
suit.  Despite waiting until 2024 to challenge a law passed in 2022,
Appellant describes the Reporting Law as "recently enacted" and "new".
(Br. at 2).  Appellant's argument on this point is that it waited until the
regulations implementing the law were finalized, despite these
regulations   mirroring   the   Reporting   Law's   statutory   reporting

requirements.   (Br. at 59).  This argument rings hollow and reflects that any harm to Appellant or its members is "not as serious as alleged . . . ." *O Centro*, *supra*.

By contrast, the harm to the public is great.  Without the Reporting Law, the healthcare consuming public does not have access to the critically important information required to be reported to the Division and published on the Division's website.  For example, the Reporting Law requires plans to disclose "[a]ny contract the person has entered into with providers in this state that provide health-care services to plan or arrangement participants . . . ."  C.R.S. § 10-16-107.4(1)(a)(IV).  This information allows a potential consumer to discern which plans are merely collecting contributions towards plan expenses from those plans that have negotiated contracts with care providers to establish a network of reliable and affordable care.  Additionally, the Reporting Law permits consumers to compare the administrative cost ratios among plans.  C.R.S. § 10-16-107.4(1)(a)(V).  This information permits potential consumers to assess which plans are expensive to operate and likely to retain less of the participant's contributions for paying health-care related expenses.  Similarly, the Reporting Law requires plans to disclose the total amount of requests for reimbursement of health-care costs, the total amount that were determined to qualify for reimbursement or were denied; and the total amount of payments made for healthcare costs or services and the total denied.  C.R.S. § 10-16-107.4(1)(a)(VI-X).  This information allows a potential consumer to understand the amount of healthcare costs that are submitted to the plan and actually paid (or denied).

The foregoing examples illustrate the Reporting Law's intended benefits.  Without the Reporting Law, there is no required disclosure of

this basic information that allows consumers to understand how a plan functions. And without the Reporting Law, consumers cannot compare plans against each other or basic health insurance. Instead, a consumer's only option is to request information from the HCSA and await a response. The public's interest is best served by requiring this disclosure and allowing the public to make informed decisions concerning their healthcare choices.

## III.  CONCLUSION

The marketplace for healthcare coverage is difficult to navigate and consumers are punished for poor choices. The Colorado General Assembly acted to ameliorate consumer harm by requiring all HCSAs to report basic information about the advertising and operation of a plan to the Division. This reporting provides the consumer with basic information that allows the consumer to make a meaningful choice.

After this law had existed for nearly two years, the Appellant challenged it as unconstitutional on myriad grounds and sought preliminary injunctive relief. After concluding that the Appellant had failed to show a strong likelihood of success on the merits, the Appellant faced a heightened burden to show that the balance of equities weighed in its favor. The public's interest in accurate information about healthcare coverage outweighed any irreparable harm to the Appellant, and Appellant failed to meet this burden.

For these reasons, Amici respectfully request that the Court affirm the District Court's denial of the motion for preliminary injunction.

DATED:  May 14, 2025

19

Respectfully submitted,

/s/ Daniel J. Vedra
Daniel J. Vedra
Vedra Law LLC
1444 Blake Street
Denver, Colorado 80202
(303) 937-6540
Dan@vedralaw.com

Beth Dombroski
Triple L Law, P.C.
24928 Genesee Trail Rd.
Unit 100
Golden, CO 80401
(303) 847-0755
beth@triplellaw.com
Attorneys for Amici Curiea

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because this brief contains 4,492 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Microsoft Word using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: May 14, 2025

/s/ Daniel J. Vedra
Daniel J. Vedra
Counsel for Amici Curiae

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing: (1) all required privacy redactions have been made per 10th Cir. R. 25.5; (2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents; (3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, McAfee Antivirus, and according to the program are free of viruses.

Dated: May 14, 2025

/s/ Daniel J. Vedra
Daniel J. Vedra
Counsel for Amici Curiae

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

Dated: May 14, 2025

/s/ Daniel J. Vedra
Daniel J. Vedra
Counsel for Amici Curiae